## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PNGI CHARLES TOWN GAMING, LLC,  :
                                        :

           Petitioner           :
                                          :

v.                                     :     Civil Action No. ___3:14-cv-2__ (Groh)
                                          :

TINA MAWING AND THE CHARLES     :
TOWN HORSEMEN'S BENEVOLENT   :
PROTECTIVE ASSOCIATION,        :
                                          :

           Respondents         :

## PETITIONER CHARLES TOWN GAMING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO VACATE ARBITRATION AWARD

## I.    INTRODUCTION

        Petitioner PNGI Charles Town Gaming, LLC ("PNGI" or the "Track") moves pursuant to 9 U.S.C. § 10 (2002) to vacate an arbitration award improperly entered against it by arbitrators that lacked the power to enter such an award because the parties agreed to an arbitration before three arbitrators, but the arbitrator appointed by PNGI became gravely ill and passed away without ever participating in the deliberations and decision-making that went into the purported award.  The remaining two arbitrators, one of whom had repeatedly demonstrated gross bias against PNGI throughout the arbitration, rendered the award without the PNGI-appointed arbitrator in direct violation of the parties' arbitration agreement.

        This arbitration arose from a dispute under a contract between PNGI and Respondent The Charles Town Horsemen's Benevolent Protective Association (the "HBPA") to which Respondent Tina Mawing ("Ms. Mawing") was a third party beneficiary.  The arbitration clause required that such disputes be arbitrated before a panel of three arbitrators; one each selected by the parties and the third selected by the party-appointed arbitrators.

1

The cards were stacked against PNGI almost from the start of this arbitration. Unbeknownst to PNGI, Respondents interviewed their arbitration pick before officially appointing him.  Perhaps it was the call itself or maybe it was the content of that call, but something gave Arbitrator Karlin the impression that he was being hired as an advocate for Respondents rather than a neutral arbitrator because nothing about his conduct in this case could be classified as neutral.  Instead, Arbitrator Karlin's advocacy ranged from *sua sponte* adding claims to the case on Respondents' behalf in order to ensure an award of attorneys' fees to the caustic cross-examination of  PNGI witnesses and attempts to impeach their credibility.

PNGI, on the hand, did not engage is such improper *ex parte* communications with Arbitrator William Wycoff before selecting him from the list provided by the American Arbitration Association.  If it had, perhaps PNGI would have learned that Arbitrator Wycoff was suffering from Acute Myeloid Leukemia and could have made an informed decision about whether or not to proceed with Arbitrator Wycoff as an arbitrator in his condition.  But Arbitrator Wycoff's condition was concealed from PNGI, and PNGI did not learn about it until after Arbitrator Wycoff passed away on October 21, 2013, just 14 days after the purported arbitration award had been issued.  Upon further investigation, PNGI learned from a review of Arbitrator Wycoff's time records that **he had not participated in this arbitration after June 26, 2013, including no participation in reviewing the post-arbitration filings submitted by the parties on July 31 and August 30, 2013 or the issuance of the purported award on October 7, 2013.**

Seizing on the opportunity to further help "his client," Arbitrator Karlin along with Arbitrator James Carney proceeded to deliberate and render an award without the input of PNGI's selected arbitrator, Arbitrator Wycoff, in direct violation of the parties' agreement to

2

arbitrate before a panel of three arbitrators.  The award that was rendered however, is admittedly not final and definite because, according to Arbitrators Karlin and Carney, the closed record upon which they deliberated without Arbitrator Wycoff did not contain sufficient evidence from which they could award either damages or attorneys' fees to Ms. Mawing.  Their solution was an attempt to reopen the record to allow supplementation, but such action is expressly prohibited by the rules governing the arbitration, which rules PNGI and the Respondents expressly agreed would govern the arbitration.

The Federal Arbitration Act provides that an arbitration award must be vacated when there is, among other things, a showing of partiality by an arbitrator, when arbitrators exceed their power, or when the arbitrators so imperfectly executed the award that a mutual, final, and definite award upon the subject matter submitted was not made.  This case demonstrates a perfect storm of all three problems with the purported arbitration award and it must be vacated.

## II.       THE COURT'S JURISDICTION

PNGI is a limited liability company.  For jurisdictional purposes, PNGI is a citizen of the states in which its members reside.  *General Technology Applications, Inc. v. EXRO LTDA,* 388 F.3d 114, 120 (4th Cir. 2004) (holding that a limited liability company is assigned the citizenship of its members).  The sole member of PNGI is CRC Holdings, Inc. ("CRC"), a Florida corporation with its principal place of business in Pennsylvania. Accordingly, for purposes of determining diversity of citizenship, PNGI is either a citizen of Florida or of Pennsylvania, but not West Virginia.  Respondent HBPA is an unincorporated association organized under the laws of West Virginia with its principal place of business in West Virginia.  Respondent Mawing resides in Jefferson County, West Virginia and is a citizen

thereof..  Because Petitioner and Respondents are citizens of different states and the amount Ms.

Mawing sought in the underlying arbitration exceeds $75,000, this Court is vested with subject

matter jurisdiction.

## III.   FACTUAL BACKGROUND

### A.   The Parties and Their Relationship.

PNGI operates a licensed racetrack located in Charles Town, West Virginia.  [Ex. 2 at C-

19, at ¶ 6; Ex. 2 at C-18, at ¶ 6].[1]  Ms. Mawing is a licensed horse trainer who trains horses that

she enters to race at various tracks, including PNGI's racetrack in Charles Town (the "Track").

[Ex. 2 at C-19, at ¶ 1; Ex. 2 at C-18, at ¶ 1].  The HBPA is a non-profit association made up of

owners and trainers of thoroughbred horses that race at the Track.  [Ex. 2 at C-18, at ¶ 2; Ex. 2 at

C-18, at ¶ 2].  Ms. Mawing is a member of the HBPA and serves on the organization's board.

[Ex. 1, at 44:5 – 45:1; Ex. 2 at C-19, at ¶ 1; Ex. 2 at C-18, at ¶ 1].

PNGI and the HBPA are parties to an agreement dated December 21, 2004 (the "HBPA

Agreement") which memorializes the parties' respective obligations to each other with regard to

thoroughbred racing at the Track.  [Ex. 2 at C-1].

Under the HBPA Agreement, the Track provides 1,148 horse stalls at the Track free of

charge to HBPA members.  The HBPA Agreement addresses general parameters for applying for

and allocating those stalls.  [Ex. 2 at C-1, at ¶ 11, Ex. 1 at 502:22 – 503:3]. The Track agreed that

it would not "discriminate in the allocation of stalls by reason of HBPA membership or activity

or condone its representatives or employees discriminating in the allocation of stalls."  [*Id.* at

¶ 11(B)].  Outside of this sole limitation, however, the Track is given absolute discretion in the

---

[1] The record from the arbitration hearing, including the Trial Transcript, Claimant's Exhibits and Respondents Exhibits is attached hereto as Exhibits 1, 2, and 3 respectively.

allocation of its stalls.  [*Id.* at ¶ 11; "Subject to this limitation, the allocation of stalls shall be in the discretion of Charles Town Races."  [*Id.* at ¶ 11(B)].

The Track created a stall allocation committee to administer the task of allocating its limited supply of free stalls.  The committee is made of six individuals who are employees of the Track.  [Ex. 1 at 423:13 – 425:10; 505:12 – 507:6].  The Track always receives more requests for stalls than it can accommodate.  [*Id.* at 446:1 – 9].  Because the Track cannot provide free stalls to every applicant, the committee looks at a number of non-exhaustive factors that it considers in evaluating the applications.  [Ex. 1 at 512:21 – 513:17].  These factors include, but are not limited to, objective statistics such as the number of starts per stall, winning percentage, and recent earnings.  [*Id.*]  The committee also looks to subjective factors such as following the barn rules and keeping the trainer's area clean.  [*Id.* at 513:11 – 17].  Whether a trainer is a member of the HBPA or serves on its board is not a factor in the stall allocation process.  [*Id.* at 513:18 – 22].

After reviewing Ms. Mawing's stall application for the September 1, 2008 through December 31, 2008 term, the committee determined not to allocate Ms. Mawing any free stalls for that term.  [Ex. 2 at C-39].  Ms. Mawing's reduction in stalls came as a direct result of her failure to follow barn rules, her less than remarkable racing statistics, and soon after her baseless and slanderous allegation to the Governor of West Virginia that the Track intentionally and deliberately tried to injure animals on the property.  [Ex. 1 at 883:5 – 13].

This denial of free stalls had no impact whatsoever on Ms. Mawing's occupational permit issued by the West Virginia Racing Commission and has not prevented Ms. Mawing from racing horses at the Track or any other track in West Virginia.  [Ex. 3 at R-25].  Ms. Mawing, like many other trainers, now stables the horses she trains at an off-site location.

5

## B.   The Arbitration Clause.

The HBPA Agreement provides for disputes between the parties arising out of the

HBPA Agreement be determined by arbitration:

> Arbitration. In the event there is a disagreement between the parties as to
> whether any party has complied with the terms or conditions in this
> Agreement, then Charles Town Races and the HBPA shall each choose an
> Arbitrator and the two Arbitrators shall choose a third Arbitrator. The
> Board of Arbitrators shall decide the issues involved and each party agrees
> to be bound by the decision of the arbitration panel.

[Ex. 2 at C-1].

## C.   Despite The Arbitration Agreement, Mawing Initiated This Action With A State Court Lawsuit.

On September 11, 2008, just days after Mawing learned that she would no longer

be offered the use of free stalls on PNGI's property, she filed an action in the Circuit Court of

Jefferson County on behalf of herself and 25 other horsemen seeking a preliminary injunction

that would permit her to remain in the free stalls.  However, during the preliminary injunction

hearing it was discovered that most of those 25 additional Plaintiffs not only did not want any

part of the lawsuit, but did not even know they had been named as plaintiffs.  [See Ex. 3,  R-70].

The injunction was denied and within a year, the only remaining plaintiffs in the case were

Mawing and the HBPA.

The claims asserted by Mawing included breach of the non-discrimination clause

in the HBPA Agreement and violation of various state statutes and state constitutional right to

due process.  The HBPA asserted no claims and was a party in name only.

Following some limited discovery, PNGI moved for summary judgment of

Respondents' claims.  In response, Respondents claimed for the first time that Mawing's claim

arose, in part, under 28 U.S.C. §1983.  PNGI then immediately moved the case to the United

States District Court for the Northern District of West Virginia on the basis of federal question

jurisdiction.  After some additional discovery and another motion for summary judgment, the District Court determined that the entire matter was governed by the arbitration clause in the HBPA Agreement and ordered that the case be sent to arbitration.  PNGI unsuccessfully appealed that decision to the United States Court of Appeals for the Fourth Circuit.

**D.   The Selection of Arbitrators.**

On January 10, 2012, nine months after the Fourth Circuit issued its decision, Respondents initiated an action before the AAA.  Immediately following the filing of the arbitration, the parties affirmatively agreed to be bound by the AAA's Commercial Arbitration Rules.  [See January 31, 2012 email exchange is attached hereto as Ex. 4].   As set forth above, pursuant to the arbitration clause, each party was to select an arbitrator and then those arbitrators selected a third to act as the chair of the panel.  PNGI's selected arbitrator was William Wycoff, an attorney with the law firm of Thorpe Reed in Pittsburgh, Pennsylvania.  After Respondents' initial arbitrator pick was rejected because he had previously sued PNGI on a number of occasions, Respondents selected Allan Karlin, a West Virginia attorney from Morgantown, West Virginia. Notably, prior to his selection, counsel for Respondents had an *ex-parte* telephone call with Arbitrator Karlin, a fact that PNGI learned only after the arbitration had ended.  James Carney, an attorney from Pittsburgh was ultimately selected as the panel chair by Arbitrators Karlin and Wycoff.

**E.   The Arbitration Hearing And The Setting Of Deadlines.**

The arbitration hearing was held in Martinsburg, West Virginia from June 10- 12, 2013.  On June 12, 2013, the final day of testimony in this arbitration, the parties and the Panel reached an agreement concerning the closing of the arbitration record and deadline for the Panel to issue its award.  Specifically, the parties and the Panel agreed that the parties would simultaneously file post-trial submissions on July 31, 2013, responses would be due August 31,

7

2013 and the Panel had an award deadline of September 30, 2013. [Ex. 1 at 957-961]. Notably, the discussion on the record makes clear that the Panel was well aware of their award deadline and specifically scheduled the closing of the record to accommodate Arbitrator Wycoff's August vacation plans so that the it would not cut into the 30-day time period for issuing an award.

On September 25, 2013, AAA informed the parties that the Panel had "closed the case" on September 1, 2013, but was requesting an extension to issue "the award" on or before October 15, 2013. [See September 25, 2013 email exchange attached hereto as Ex. 5]. The parties agreed to the brief extension of the award deadline. [*Id*]. The Panel issued the award on October 7, 2013.

### F.   The October 7 Award.

On October 11, 2013, AAA forwarded to the parties what purported to be the award of the panel dated October 7, 2013 (the "October 7 Award"). The October 7 Award purports to contain electronic, not actual, signatures of the three panel members. [The October 7 Award is attached hereto as Ex. 6].

The October 7 Award rejected every single one of Respondents' claims except for breach of the no discrimination provision in the HBPA Agreement concerning the allocation of stalls. In support of that finding, the Panel granted Mawing injunctive relief and awarded her up to nine stalls indefinitely into the future.

The arbitrators next purported to award Mawing damages, but as the arbitrators conceded, the record before it did not contain enough information from which they could compute a damage award. Issue 12 in the October 7 Award provides that any damages awarded to Mawing must be "reduced to take into account those stall allocation periods in which [Mawing] requested fewer than nine stalls and to take into account her reimbursement of stall

rent by Mr. Wratchford and Mr. Barr for the periods in which she and Mr. Mawing testified she was being paid by them." However, because the record contains insufficient information for the arbitrators to make any sort of damage calculation, they then went on to direct "**the parties** to determine the damages due based on the records of the stall allotment committee and the Mawings' testimony with respect to her receipt of payment (reimbursement) for stall rent." (emphasis added).[2]

Finally, as discussed in more detail below, the arbitrators purported to award Mawing attorneys' fees, the support for which again was not in the closed record and required submission of additional evidence.

### G. Arbitrator Karlin Demonstrates Bias Throughout The Arbitration.

From the very first *ex-parte* phone call Respondents' counsel had with Arbitrator Karlin on July 31, 2012[3] until the issuance of the October 7 Award, it has been clear that Arbitrator Karlin was biased against PNGI and would go to great lengths to make sure that it would not only lose this arbitration but would be made to pay Respondents' attorneys' fees at all costs- even if it meant feeding never before raised theories of liability to Respondents.

Arbitrator Karlin's first outward demonstration of bias occurred during the argument on the motion for summary judgment. During the argument, Arbitrator Karlin *sua sponte* injected a brand new claim into the case that had never before been raised or even contemplated by the Respondents: a claim pursuant to W. Va. Code § 61-5-27(c), a criminal statute.  Arbitrator Karlin, acting as an advocate and not a neutral, argued that the statute applied here even though in five years it had never been part of this case.  Both parties were caught off

---

[2] Respondents' counsel conceded the same problem with the record when he attempted to calculate damages.  In an October 22, 2013 email, Mr. Hammer conceded that he was unable to find anything in the record showing the amount of stall rent paid by Mr. Barr even though at least two witnesses testified such rent was paid.  [See Hammer email attached hereto as Ex. 7].

[3] The time record for David Hammer, Esq. showing the *ex parte* call is attached hereto as Ex. 8.

guard by the injection of this new claim into the case and neither side could speak intelligently about it during the argument.  Accordingly, Mr. Karlin requested that the parties submit written memoranda the following day discussing the relevance of this new claim.  [See May 30, 2013 email from Arbitrator Karlin to the parties, attached hereto as Ex. 9].

Upon review of the statute, it became clear why Arbitrator Karlin was fighting so hard for the inclusion of this new claim: if successful, Mawing could be awarded her attorneys' fees. PNGI objected to Arbitrator Karlin's efforts to *sua sponte* amend Respondents' claim to include this new statute, but that objection was rejected by the arbitrators and the new claim was added to the case just days before the start of the arbitration hearing.

Arbitrator Karlin's next act as advocate for Respondents occurred during the hearing itself.  On the third day of the hearing, two executives associated with PNGI testified – Albert Britton, the General Manager of the Track and John Finamore, the Vice President of Operations for PNGI's ultimate parent company, Penn National Gaming, Inc.. As Mr. Karlin's time records indicate, he did his homework for this testimony and came prepared to cross-examine each witness.  [See Arbitrator Karlin's 6/11/13 time record showing review of depositions, attached hereto as Ex. 10].

The hearing transcripts demonstrate that Arbitrator Karlin's questions did not go simply to fact gathering.  Rather they were designed to harass, embarrass and attempt to impeach the credibility and integrity of the witnesses for the benefit of Respondents.  For example, during Arbitrator Karlin's extensive cross examination of Mr. Finamore, he badgered Mr. Finamore for failing to take notes of a conversation that had occurred almost five years before his testimony and was incredulous that Mr. Finamore, who is responsible for overseeing not only PNGI, but eight other gaming properties and all of Penn National's racing operations around the country,

10

would not keep records of a conversation that might one day become the subject of litigation. [Ex. 1 at 734-748].

Mr. Karlin's behavior concerning Mr. Britton was even worse.  Indeed, he was so eager to cross examine Mr. Britton that he did not even wait for Ms. Mawing's counsel to finish his cross examination and instead Arbitrator Karlin jumped right in to help Mr. Hammer out. [Ex. 1 at 841-843].  Of course, that did not stop Arbitrator Karlin from engaging in his own full blown cross examination once Mr. Hammer was finished and that examination went on for more than 15 pages in the transcript.  [Ex. 1 at 861-878].  During this interrogation, Arbitrator Karlin attempted to impeach Mr. Britton with prior deposition testimony by taking a single deposition answer out of context that differed from a prior answer given during the same deposition all in an effort to challenge Mr. Britton's credibility.  We now know that the reason for Arbitrator Karlin's stilted attack was so that he could create yet another way in which he could lobby the other arbitrators to award attorneys' fees to respondents.

In their post-arbitration filings, Respondents raised for the first time a claim for attorneys' fees under West Virginia' common law in a throw away single sentence in the last paragraph of their conclusions of law.  [Respondents' post-arbitration filings are attached hereto as Ex. 11].  Fortunately for Respondents, they had Arbitrator Karlin on their side to do the leg work for them on this issue.  According to his time records, Arbitrator Karlin spent more than an hour and a half researching the attorneys' fee issue in the days leading up to the drafting of the October 7 Award.  [See Ex. 10].

Not surprisingly based on the record, when the October 7 Award was issued, the arbitrators rejected each and every claim pursued by Respondents that would have awarded Ms. Mawing statutory attorneys' fees (including the new statute Arbitrator Karlin added to the case

just days before the hearing); but permitted Respondents to file a fee petition on the basis of the purported common law right to attorneys' fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  Notably, the October 7 Award contains a lengthy discussion with several case citations (none of which appear in Respondents' filings but are no doubt the result of Arbitrator Karlin's hour and half of research in order to assist his team) about West Virginia's common law right to attorneys' fees and concludes that based on Arbitrator Karlin's targeted and misleading cross-examination of Mr. Britton, PNGI acted in bad faith, vexatiously, wantonly and oppressively and it should be responsible for Ms. Mawing's attorneys' fees.

### H.   Arbitrator Wycoff's Untimely Death.

On October 24, 2013, the parties were informed by AAA that Arbitrator Wycoff, the arbitrator selected by PNGI, had passed away, leaving a void on the arbitration panel. According to his obituary, Mr. Wycoff died on October 21, 2013 of Acute Myeloid Leukemia. His passing from this aggressive cancer occurred just 14 days after the October 7 Award was entered in this arbitration.

Given the unfortunate condition that Mr. Wycoff must have been in during the last few weeks and maybe even months of his life, PNGI was concerned that Mr. Wycoff was physically and mentally incapable of meaningfully participating in the deliberations and decision making leading up to the entry of the October 7 Award.  PNGI was also concerned about whether Mr. Wycoff was suffering from this terrible disease at the time of the hearing in June (just over four months prior to his death) in light of the fact that both PNGI's counsel and client representative observed Mr. Wycoff sleeping during witness testimony at the arbitration hearing.

12

Based on these concerns, PNGI requested that AAA provide it with the time records showing Mr. Wycoff's participation in this case following the arbitration hearing in June. [See PNGI's October 29, 2013 letter to AAA, attached hereto as Ex. 12]. When the AAA finally produced those records, PNGI was disappointed (but not surprised) to learn that Mr. Wycoff's time entries end on June 26, 2013, two weeks after the hearing ended but before any of the parties had submitted any post-hearing filings and long before any of the so-called deliberations by Arbitrators Karlin and Carney concerning the decision to be reached in this arbitration. [Arbitrator Wycoff's time records along with AAA's confirmation that they constitute all the records submitted are attached as Ex. 13]. Indeed because the October 7 Award contains only s/ electronic signatures, and because there are no pertinent time records, there is no indication that Mr. Wycoff even so much as read the October 7 Award that purports to bear his name.

## IV.    ARGUMENT

Under the Federal Arbitration Act, a district court may make an order vacating an award upon the application of any party to the arbitration (1) where there was evident partiality or corruption in the arbitrators, or either of them or (2) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a)(2) and (4).[4] Here, both grounds exist for vacating the October 7 Award.

### A.    Arbitrators Carney And Karlin Exceeded Their Powers By Issuing An Award Without The Participation And Input Of Arbitrator Wycoff.

A federal court can vacate an arbitration award in a case "[w]here the arbitrators exceeded their powers." 9 U.S.C. § 10(d). The power and authority of the arbitrators in an arbitration proceeding is dependent on the provisions of the arbitration agreement under which

---

[4] West Virginia Code § 55-10-1 provides the same grounds for vacating an arbitration award as the Federal Arbitration Act.

the arbitrators are appointed. *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830 (11th Cir. 1991). Here, Arbitrators Karlin and Carney exceeded their power by issuing an award in which Arbitrator Wycoff did not participate on account of his illness in direct violation of the parties' arbitration agreement requiring an arbitration before a panel of **three** arbitrators.

The parties' obligation to arbitrate this dispute arises from the HBPA Agreement, which provides that in the event arbitration is necessary, the parties will each select an arbitrator and then those arbitrators will select a third arbitrator. AAA Rule R-13 provides that when the parties' agreement sets forth a method for selecting arbitrators, the method "shall" be followed. Thus, the parties expressly agreed and contracted that any arbitration in this case would be heard and decided by **three** arbitrators.

Here, as Arbitrator Wycoff's time records confirm, his terminal illness prevented him from participating in this arbitration after June 26, 2013, which means that he did not participate in the issuance of the October 7 Award that purports to include his name, but does not contain his signature. When Arbitrators Carney and Karlin elected to proceed with deliberations and decision-making in the absence of Mr. Wycoff, they exceeded their powers because the parties' agreement provided for a decision by three arbitrators, not two.

The Eleventh Circuit decision in *Szuts* is instructive. Like here, the arbitration agreement in *Szuts* required arbitrations to be decided by a three-person panel. 931 F.2d. at 832. When one arbitrator was disqualified and removed from the panel, the remaining two arbitrators rendered a decision in favor of the claimant and respondent sought to have the decision vacated. Significantly, the Eleventh Circuit noted that the parties' arbitration provision requiring three arbitrators meant that all three arbitrators "participate in the arbitration by hearing all the evidence presented by the parties; by hearing the arguments presented by the parties; and by

14

participating in the consultation and deliberation among the arbitrators on the decision of the controversy." *Id.* at 831.  Finding that the remaining two arbitrators violated the provisions of the arbitration agreement by rendering a decision with less than three arbitrators, the Court vacated the award and remanded for a new arbitration proceeding before a panel of three new arbitrators. *Id.* at 832.

Likewise, in *CIA De Navegacion OMSIL, S.A. v. Hugo Neu Corp.*, 359 F. Supp. 898 (S.D.N.Y. 1973), the court refused to allow an arbitration to proceed following the death of an arbitrator when the parties agreement required a three person panel.  After the hearing had concluded, but before a decision could be made, the arbitrator appointed by the respondent died. *Id.* at 899.  Petitioners sought to have a third arbitrator appointed to simply pick up where the deceased arbitrator left off; the respondent sought a new arbitration with a new panel.  *Id.*  In concluding that a new arbitration and new panel was warranted the court concluded that the parties having bargained for the right to appoint their own arbitrator are entitled to "[w]hatever advantages there were or might have been" in that arbitrator's participation in the deliberations and decision making, which advantages were irretrievably lost upon the death of the arbitrator. *Id* The court further noted:

> The two remaining arbitrators, "petitioner's" and the neutral, have worked together and been exposed to each other's influence.  The results of that may have been good, bad, or nil for respondent.  But respondent is unable (as is the court) to know and is unwilling to risk the unknown.  It is not fair or fitting to impose the risk, which respondent never agreed to accept by judicial command.

*Id.*

The parties' obligation to arbitrate this matter was governed by the arbitration clause in the HBPA Agreement, which required a three-person arbitration panel to include an arbitrator appointed by PNGI.  PNGI was denied the benefit of its bargain when its appointed

15

arbitration, Arbitrator Wycoff, became ill and incapable of participating in the deliberation and

decision-making following the arbitration hearing.  Rather than alert the parties to the

circumstances, Arbitrators Karlin and Carney proceeded to render an award in the absence of

Arbitrator Wycoff.  Such actions by Arbitrators Karlin and Carney, particularly in light of

Arbitrator Karlin's gross bias against PNGI, was beyond the power granted to them by the

parties' agreement, and the October 7 Award must be vacated.

Thru decision by Arbitrators Karlin and Carney to render a decision without the

input of PNGI-appointed arbitrator, Arbitrator Wycoff, goes beyond just a breach of the

arbitration clause, and instead implicates manifest prejudice that defeats the purpose of

arbitration.  PNGI received no benefit, however minimal, from the arbitrator it appointed, who

worked with and developed camaraderie with the other arbitrators when it came time to

deliberate and reach a decision.  Instead, whatever good-will and thoughtfulness Arbitrator

Wycoff had to contribute was absent and the true neutral, Arbitrator Carney, heard nothing but

the anti-PNGI sentiment from Arbitrator Karlin. This is patently unfair to PNGI.

### B. The October 7 Award Is Not A Final, Definite Award Upon The Subject Matter Submitted Because The Arbitrators Were Unable To Determine Damages And Fees Based On The Closed Record Before It.

It is the general rule with regard to the confirmability of arbitration awards that in

order to be "final" and "definite," the award must both resolve all the issues submitted to

arbitration, and determine each issue fully so that no further litigation is necessary to finalize the

obligations of the parties under the award.  *Puerto Rico Maritime Shipping Authority v. Star*

*Lines, Ltd.*, 454 F. Supp. 368 (S.D.N.Y. 1978).  "An award that fails to lay any one issue to rest

is contrary to the general principles of arbitration law … and is not 'final' within the meaning of

the Federal Arbitration Act." *Id.*  In this case, Arbitrators Carney and Karlin conceded in the

16

October 7 Award that they could not render a final and definite award on the record before it, which record was closed, and attempted to exceed their authority by attempting to open the record in order to take additional evidence.

According to the October 7 Award, the arbitrators determined that Mawing was entitled to damages for breach of contract, but failed to calculate the amount purportedly due. [Ex. 6]. The arbitrators conceded that the reason they could not make a calculation was because the record did not contain sufficient evidence from which to determine certain deductions required to be made. [*Id*]. Incredibly, the arbitrators "ordered" that the parties attempt to reach an agreement on the deductions, and if no such agreement can be reached, the parties were to return to the arbitrators for further hearing. [*Id*].

Arbitrators Karlin and Carney also made a determination that based on this common law theory first raised after the arbitration hearing, Mawing was entitled to an award of attorneys' fees. However, they were likewise unable to award those fees because Mawing did not present any evidence of such fees during the arbitration hearing. [*Id*]. Despite PNGI raising this issue in its post-arbitration filings, Mawing continued to make no effort to supplement the record with that information while the record remained open. [See PNGI's post-arbitration filings attached hereto as Ex. 14]. Instead, the October 7 Award, again confirming that the arbitrators could not render a final and definite award, provided for Mawing to submit a fee petition within 20 days after the entry of the purported award.

Having failed to issue a final and definitive award before October 15, 2013, the deadline agreed to by the parties for the issuance of such award, the remaining two arbitrators were left with no authority to require supplementation of the record or issue further awards under

the AAA Commercial Arbitration Rules (the "Arbitration Rules"), which rules the parties

expressly agreed would bind them.  [Ex. 4].

   Under the Arbitration Rules, the arbitration hearing in this case is closed and no

further award can be issued.  Pursuant to Arbitration Rule R-39(b),[5] when documents and/or

briefs are to be filed after the hearing (as contemplated in R-35), the hearing shall be closed as of

the final date set by the arbitrators for the receipt of such documents and briefs.  In this case, that

date was August 31, 2013, and the closing of the record was confirmed by Ms. Cook's email.

[Ex. 5].  Accordingly, pursuant to R-45 and the agreement reached by the parties and the Panel

on the final day of testimony, the Panel was required to issue its final award on or before

September 30, 2013.  That deadline was extended by agreement of the parties to October 15,

2013 (the "Award Deadline").

   Although the October 7, 2013 Award purported to reserve to the Panel the right to

enter an award of damages, attorneys' fees and the apportionment of costs, the Arbitration Rules

concerning the closing and reopening of hearings (R-39 and R-40) and the confirmation from the

AAA that the case was closed as of September 1, 2013 defeat these efforts by the Panel.  The

Panel conceded in the October 7, 2013 Award that it was unable to enter a definite award on

either damages or attorneys' fees on the record before it, and instead requested that the parties

submit further evidence and argument on those issues after the Award Deadline.  However,

under R-39, as described above, the hearing is closed and under R-40 it cannot be reopened.  R-

40 provides:

>  The hearing may be reopened on the arbitrator's initiative, or by the direction of
> the arbitrator upon application of a party, at any time before the award is made. If
> reopening the hearing would prevent the making of the award within the specific
> time agreed to by the parties in the arbitration agreement, the matter may not be

---

[5] A copy of the relevant Arbitration Rules is attached hereto as Ex. 15].

> reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (14 calendar days if the case is governed by the Expedited Procedures).

[Ex. 15].

Here, while the arbitrators may have desired to reopen the hearing in its October 7, 2013 Award, because it provided for the taking of evidence over a more than 40 day period that would prevent the making of an award by the Award Deadline, the arbitrators were first required to obtain the agreement of the parties for the extension.  PNGI was not asked and did not consent to such an extension.  As such, based on the Arbitration Rules, the arbitrators have no authority to issue any additional awards and the failure of the October 7 Award to lay all issues to rest means it is not definite or final and must be vacated.  *See Avamer Associates, L.P. v. 57 St. Associates, LP.,* 881 N.Y.S.2d 361, 2009 WL 530984 (N.Y.Sup.Ct. 2009) (vacating modification to award that was not timely requested under AAA rules).

The significance of the time limitations in the Arbitration Rules are no more apparent than in a case such as this where PNGI no longer has the benefit of the arbitrator it selected and, more importantly, who sat through the presentation of the evidence.  To side step the timing requirements of the Arbitration Rules, even if PNGI were to now appoint a third arbitrator, would be prejudicial and wholly unfair to PNGI.

Plainly, the deadline for the issuance of an award in this matter was October 15, 2013.  Even if they had the power to do so at the time, Arbitrators Carney and Karlin failed to issue an award that was final and definite by that date.  Because the October 7 Award leaves undecided the determination of damages and attorneys' fees, it must be vacated pursuant to 9 U.S.C. §10(a)(4).

**C.   The Award Must Be Vacated Due To Karlin's Overwhelming Bias.**

When a claim of partiality is made, the court is under an obligation to scan the record to see if it demonstrates "evident partiality" on the part of the arbitrators.  *Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967); *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17 (2d Cir. 1962).  The West Virginia Supreme Court has pronounced that the behavior engaged in by Arbitrator Karlin is the essence of bias and warrants that the award be vacated.  *Wheeling Gas Co. v. The City of Wheeling*, 5 W. Va. 448 (W.Va. 1872).

"It is common practice for the submission to provide that the plaintiff and defendant shall each appoint an arbitrator.  The arbitrators so selected are not to consider themselves the agents or advocates of the party who appoints them.  When once nominated, they are to perform the duty of deciding impartially between the parties and they will be looked upon *as acting corruptly if they act as agents,* or take instructions from either side."  *Id.* at 451 (emphasis in original); s*ee also Holodnak v. AVCO Corp.*, 381 F. Supp. 191 (D. Conn. 1974) (vacating arbitration award when the record revealed that the arbitrator showed not only partiality but open hostility toward the plaintiff through questioning); *partially overruled on other grounds* 514 F.2d 285 (2d Cir. 1975).

Beginning with his first *ex parte* call with Respondents' counsel before he was even appointed to the panel and continuing to the issuance of the October 7 Award without the benefit of Mr. Wycoff's input, Arbitrator Karlin has demonstrated that he saw his role here as advocate for Respondents and not as an impartial neutral.  The record amply shows that Arbitrator Karlin went to great lengths to find a way by which Ms. Mawing could be awarded attorneys' fees, including suggesting new causes of action to Respondents on the eve of the

20

arbitration hearing never before contemplated in this case and researching grounds for awarding fees under the common law.  Arbitrator Karlin's behavior grossly crossed the line when he undertook a caustic cross-examination of two PNGI executives aimed not at gathering facts, but at harassing and embarrassing the witnesses for Respondents' benefit.

Arbitrator Karlin's distain for PNGI coupled with Mr. Wycoff's inability to meaningfully participate in the deliberations and decision-making here created sever prejudice to PNGI leaving no alternative but to vacate the award.

## V.      CONCLUSION

From almost the very start, PNGI did not stand a chance in this arbitration.  It was prejudiced by Respondents' selection and *ex parte* discussions with an arbitrator that would later act as an advocate for Respondents rather than a neutral; it was prejudiced when it was kept in the dark about Arbitrator Wycoff's terminal illness and inability to participate in this case after the hearing but before a decision could be made; it was prejudiced when the remaining two arbitrators elected to render an award in direct violation of the parties' arbitration agreement; and it continues to be prejudiced by the remaining two arbitrators' efforts to open the record and take additional evidence in an attempt to finalize an award they were unable to finalize by the requisite deadline.  Under these circumstances, there can be no other conclusion but that the October 7 Award must be vacate and the case remanded to the AAA for the start of a new arbitration with an entirely new panel.

Dated: January 6, 2014                    By:/s/ Brian M. Peterson

    Brian M. Peterson
    Bowles Rice LLP
    W.V. Bar No. 7770
    Post Office Drawer 1419
    Martinsburg, West Virginia 25402-1419
    Telephone: (304) 264-4223
    Facsimile: (304) 267-3822

    Of Counsel

    Stacey A. Scrivani
    Stevens & Lee, P.C.
    W.V. No. 11593
    111 North Sixth St.
    Reading, PA 19603
    Telephone: (610)478-2086
    Facsimile: (610)988-0812

SL1 1277806v2 005982.00037