# EXHIBIT 1

Page 1

1   AMERICAN ARBITRATION ASSOCIATION
2
3   CHARLES TOWN HORSEMAN'S  :
    BENEVOLENT AND PROTECTIVE :
4   ASSOCIATION, INC., and   :
    TINA MAWING,          : NO. 55-196-Y-00015-12
5        Claimants  :
              :
6   PNGI CHARLES TOWN GAMING, :
    LLC,              :
7        Respondent  :
8
9           * * *
10      ARBITRATION HEARING - VOLUME I
11   BEFORE:  JAMES T. CARNEY, ESQUIRE
12        WILLIAM M. WYCOFF, ESQUIRE
13        ALLAN N. KARLIN, ESQUIRE
14      Monday, June 10, 2013
15        10:54 a.m.
16           * * *
17
18      Holiday Inn
19      301 Foxcroft Avenue
20      Martinsburg, West Virginia 25401
21
22      Whereupon, the above-entitled matter
23   came on for hearing and the proceedings were as
24   follows:

Page 2

1   APPEARANCES:
2
3         On behalf of the Claimant:
4      DAVID M. HAMMER, Esquire
5   Hammer, Ferretti & Schiavoni, 408 West King
6   Street, Martinsburg, West Virginia 25401
7      Telephone:  (304) 264-8505
8      Fax: (304) 264-8506
9      E-mail:  dhammer@hfslawyers.com
10
11         On behalf of the Claimant:
12      HARRY P. WADDELL, Esquire
13   Waddell Law Offices, 300 West Martin Street,
14   Martinsburg, West Virginia 25401
15      Telephone:  (304) 263-4988
16      Fax:  (304) 262-2498
17      E-mail:  hwad50@aol.cmo
18
19
20
21
22
23
24

Page 3

1   APPEARANCES (Cont.):
2
3         On behalf of the Respondent:
4      JOSEPH E. WOLFSON, Esquire
5   Stevens & Lee, 620 Freedom Business Center, Suite
6   200, King of Prussia, Pennsylvania 19406
7      Telephone:  (610) 205-6000
8      Fax:  (610) 337-4374
9      E-mail:  jwo@stevenslee.com
10
11         On behalf of the Respondent:
12      STACEY A. SCRIVANI, Esquire
13   Stevens & Lee, 111 North Sixth Street, Reading,
14   Pennsylvania 19603-0679
15      Telephone:  (610) 478-2086
16      Fax:  (610) 988-0812
17      E-mail:  sasc@stevenslee.com
18
19   ALSO PRESENT:
20      Tina Malgarini Mawing
21      Raymond J. Funkhouser
22      Erich Zimny
23
24

Page 4

1            I N D E X
2   WITNESS                    PAGE
3   Tina Malgarini Mawing
4      Direct Examination by Mr. Waddell.........38
5      Cross-Examination by Mr. Wolfson.........209
6      Redirect Examination by Mr. Waddell......295
7
8
9         E X H I B I T S
10           IDEN MARKED ENTERED
11   Claimant's Exhibit No. 1......123.....--....123
12   Claimant's Exhibit No. 4......123....--....123
13   Claimant's Exhibit No. 6......144.....--.....--
14   Claimant's Exhibit No. 7......233.....--.....--
15   Claimant's Exhibit No. 11.....157.....--.....--
16   Claimant's Exhibit No. 12.....166.....--.....--
17   Claimant's Exhibit No. 13......55.....--.....--
18   Claimant's Exhibit No. 27.....150.....--.....--
19   Claimant's Exhibit No. 28.....190.....--.....--
20   Claimant's Exhibit No. 39.....123.....--.....123
21   Claimant's Exhibit No. 40A....138....138......--
22   Claimant's Exhibit No. 40B....138....138......--
23   Claimant's Exhibit No. 40C....138....138......--
24   Claimant's Exhibit No. 40D....138....138......--

Page 5

```
 1        E X H I B I T S  (Cont.)
 2           IDEN MARKED ENTERED
 3  Claimant's Exhibit No. 40E.....--.....--......--
 4  Claimant's Exhibit No. 40F....138....138......--
 5  Claimant's Exhibit No. 41.....298....298......--
 6  Respondent's Exhibit No. 2....219.....--......--
 7  Respondent's Exhibit No. 15...191.....--......--
 8  Respondent's Exhibit No. 25...283.....--......--
 9  Respondent's Exhibit No. 28...217.....--......--
10  Respondent's Exhibit No. 34...192.....--......--
11  Respondent's Exhibit No. 35...267.....--......--
12  Respondent's Exhibit No. 36...270.....--......--
13  Respondent's Exhibit No. 69...277.....--......--
14  Respondent's Exhibit No. 69B..277.....--......--
15  Respondent's Exhibit No. 69C..252.....--......--
16
17     (Note:  Claimant's Exhibit No. 4 an
18  objection is raised to being admitted for the
19  truth of the matter.)
20
21     (Claimant Exhibit 40E was retained by
22  Attorney Wolfson)
23
24
```

Page 6

```
 1            *  *  *
 2        P R O C E E D I N G S
 3          ARBITRATOR CARNEY:  Shall we
 4  get started?
 5          MR. WOLFSON:  All set.
 6          MR. HAMMER:  We're ready.
 7          ARBITRATOR CARNEY:  Go ahead.
 8  Everybody turn off your phones.  I always forget
 9  to do mine, but I have to remind everybody of it.
10          MR. HAMMER:  Do you want the
11  claimant to begin?
12          ARBITRATOR WYCOFF:  Can we
13  have everybody for the record put in appearances
14  first, please?
15          MR. HAMMER:  Here on behalf
16  of the claimant, Tina Mawing, David Hammer and
17  Harry Waddell.
18          MR. WOLFSON:  On behalf of
19  the respondent Penn National Gaming, Charles Town
20  Gaming, Joe Wolfson from Stevens & Lee.
21          MS. SCRIVANI:  Stacey
22  Scrivani from Steven and Lee.
23          MR. WOLFSON:  And our client
24  has a representative here this morning.
```

Page 7

```
 1      Will you introduce yourself, please?
 2          MR. ZIMNY:  Erich Zimny.
 3          ARBITRATOR KARLIN:  How do
 4  you spell that last name?
 5          MR. ZIMNY:  Z I, M as in
 6  Mary, N as in Nancy, Y.
 7          MR. WOLFSON:  Erich is with
 8  an H.
 9          MR. ZIMNY:  With an H.
10          MR. HAMMER:  The first issue
11  I would like to take up this morning is the issue
12  of the HBPA's participation.
13          From the outset they've been involved
14  in this case.  We've already had discussion about
15  the motion that the HBPA had made to be treated
16  as a nominal party on the basis that we did not
17  want to be subjected to extensive discovery that
18  was served on the HBPA.
19          This panel ruled that we had to
20  produce a corporate representative from the HBPA,
21  the president, which we did for deposition.  And
22  that we also had to produce discovery.
23          We would ask that for purposes -- for
24  the purpose of obtaining relief on the issue of
```

Page 8

```
 1  whether the stall license agreement, which
 2  purports on its face to supersede the HBPA
 3  contract from 2004, we would ask permission to
 4  participate to make that argument and get a
 5  ruling from this panel as requested in the second
 6  amended complaint on the issue of whether that
 7  stall license agreement is a violation of the
 8  contract itself.
 9          We think that's a straight question
10  of law, that no facts of discovery is necessary.
11  But that's our position and we have produced all
12  the discovery we're obligated to produce.
13          MR. WOLFSON:  If I may.
14          Very simply, what they're asking to
15  do now is ask for relief now that was off the
16  table throughout the discovery of this matter.
17  If we had known that we would be litigating in
18  subject to a claim for relief relating to the
19  contract, we would have had to take much broader
20  discovery from the HBPA.  Because if we step
21  back, what they're really alleging is that the
22  HBPA as itself and all its members are somehow
23  harmed and are really seeking injunctive relief.
24          So, we would have wanted to know how
```

1  it is that anyone has possibly had an injury or
2  the HBPA broadly has had a broad injury as a
3  result of this clause.
4        Because if there is any individual
5  injury, we certainly have the ability for
6  individuals.
7        Somehow this is much broader.  We
8  would have wanted to test that, find out what the
9  possible injury is, how it arises to irreparable
10  harm.  We are completely handicapped here.  We
11  have really no idea what their arguments are
12  going to be or what possible evidence there is
13  relating to this clause in the contract that
14  they're now seeking to have an Order that it's
15  void.  We would have wanted to find that out, we
16  would have been entitled to find that out.
17        And the discovery that they're
18  referring to that we did take was specifically
19  limited.  And we made that argument to you at the
20  time they were seeking the Protective Order.  And
21  they said they're a nominal party, they shouldn't
22  have to do any discovery at all, because they
23  have no claims whatsoever in this case.  All we
24  did was seek discovery related to Miss Mawing.

1        So, based on that, we at no time had
2  any understanding that the HBPA was anything
3  other than a nominal party that they said they
4  were that was not seeking relief as they said
5  they were not.
6        Now to come in and handicap us,
7  hamstring us, as a result of not being able to
8  pursue any discovery and find out how there is
9  this harm on behalf of the HBPA as a whole, is
10  really prejudicial at this point.  And we
11  strenuously object.
12        ARBITRATOR CARNEY:  Okay.
13        Well, the Panel will take your
14  arguments and issue under advisement and we will
15  discuss it and rule on it as promptly as possible
16  so that we don't interfere with the presentation
17  of the case.
18        ARBITRATOR WYCOFF:  Does this
19  issue relate in any way to any of the individual
20  claims that Miss Mawing has and has to be decided
21  for any of those claims?
22        MR. HAMMER:  No, it does not.
23        ARBITRATOR WYCOFF:  Okay,
24  thank you.

1        MR. WADDELL:  Gentlemen, I
2  think there was another issue that was raised in
3  your ruling in this case.  And that was
4  the -- whether the 1st Amendment retaliation
5  claim was properly before the Panel.
6        I had submitted an e-mail on Saturday
7  or Sunday, I think, to you on that issue and
8  included a copy of the notice of removal that was
9  filed by the respondent in this case when they
10  removed the case to federal court.
11        And also then the Order of the
12  federal court judge compelling arbitration and
13  referred to portions of both of those documents.
14  The one document, the notice of removal, clearly
15  indicates that the basis for the removal includes
16  claims that are contending that the claimant has
17  presented under Amendments 1 and 14 of the United
18  States Constitution.
19        So, it clearly -- they clearly
20  contemplated at the time of removal from state
21  court to federal court that we were pursuing a
22  Federal 42 USC-1983 claim based on both the 1st
23  Amendment and the 14th Amendment.
24        Then I'll also refer you to the Order

1  entered by Judge Bailey, the federal judge,
2  compelling arbitration and his discussion of the
3  procedural history.
4        He also, likewise, indicates
5  that -- let me find the portion I want to refer
6  to.  It's on Page 3 dealing with the denial of
7  due process and retaliation from testimony in a
8  legal proceeding and from complaints about using
9  poison, he specifically addresses those claims
10  and indicates that they were the basis for the
11  removal to federal court.
12        And then finally, referring to the
13  last page of the Order, it's clear that he
14  ordered that the entire claim, the entire claims
15  be submitted to arbitration.
16        That, in fact, was appealed by the
17  respondent to the Fourth Circuit and the claimant
18  prevailed on that, the judge's Order was upheld.
19        So I think the 1st Amendment claim is
20  clearly properly before this Panel.
21        ARBITRATOR CARNEY:  Mr.
22  Wolfson.
23        MR. WOLFSON:  If I may.
24        It really isn't a question I would

Page 13

1  submit of whether the 1st Amendment claim, it's a
2  very narrow question, whether the specific
3  statute should be added to this case.
4         There are a couple of things that I
5  think we need to understand and think about
6  before the Panel rules on that.
7         First is whether it's a futile
8  motion.  Because to add a claim prior to trial,
9  if it's a futile claim, it can't be added, it
10  shouldn't be added.
11        And really if we take a step back,
12  all the evidence before the Panel so far
13  demonstrates that, one, my client had no idea she
14  testified at the time of the hearing.  And in
15  fact, at the next allocation, stall allocation
16  committee meeting, she went from seven to nine
17  stalls.  So we certainly didn't retaliate against
18  her at the time of the hearing or the next stall
19  allocation committee meeting.
20        Then what they allege is after we
21  found out she had a meeting with the Governor
22  that we retaliated against, she lost her stalls.
23        And the evidence before the Panel is
24  very simple.  My client had no idea she

Page 14

1  testified.  My client was not a party to that.
2  Let's be clear what they're talking about.  For
3  purposes of adding this new statute as a claim,
4  they're contending that because she testified on
5  behalf of Mr. Funkhouser at a hearing regarding
6  his license, we retaliated.
7         My client was not a party to that
8  hearing.  My client's representatives had no
9  idea, and there is no evidence we ever knew until
10  the time of this.  So it's futile.
11        Second, however, addressing whether
12  in fact it should be added, I would submit to the
13  Panel that we've litigated this case heavily,
14  strenuously in some ways, for a number of years.
15  And on the eve of the hearing to add a completely
16  new statute to which we potentially would have
17  certain defenses, have the ability to investigate
18  that, have the ability to present issues to the
19  Panel arising simply from that statute as a
20  matter of law, we're again -- we've again been
21  handicapped.  And that is prejudicial to us in
22  both accounts.  One, it's a futile effort.  And
23  secondly, the issue of prejudice.
24        Now it speaks -- all along what

Page 15

1  they've said is retaliation for asserting her 1st
2  Amendment Rights.  And they always bunch those
3  together with the Governor.  Because as you
4  heard, it was the claim of the rat poisoning,
5  retaliated for using, expressing her 1st
6  Amendment Rights where a state actor -- and of
7  course now they changed that as well, and I'll
8  talk about that.
9         But that is how we've been prejudiced
10  here.  One, it's futile.  And second, the
11  prejudice arising adding a new claim, a new
12  statute and trying to re jigger how the claims
13  are asserted.
14        ARBITRATOR CARNEY:  Well,
15  I'm not sure you're addressing specifically what
16  Mr. Hammer was addressing.  And Mr. Hammer was
17  talking, I thought, about the Section 1983 claim.
18  And under that claim it's both a violation of
19  14th Amendment and 1st Amendment.
20        MR. WOLFSON:  That's right.
21  I agree they did.  But this is, as I understand
22  it, that new statute that was raised in the oral
23  argument.
24        ARBITRATOR CARNEY:  Your

Page 16

1  point is --
2         MR. HAMMER:  I haven't argued
3  that yet.
4         MR. WOLFSON:  Oh, I
5  misunderstood.  I thought that's what he was
6  referring to.
7         ARBITRATOR CARNEY:  That's
8  why I'm saying, their argument at this point was
9  just that the 1st Amendment claim, a part of 1983
10  claim, has always been in the --
11        MR. WOLFSON:  And we don't
12  dispute that at this point.  And that was just my
13  argument of futility.  I misunderstood.  I
14  thought you were arguing them both at the same
15  time.  My mistake.  And I apologize for my
16  misunderstanding.
17        ARBITRATOR CARNEY:  That's
18  fine, no problem.  I just wanted to get it
19  straightened out.
20        MR. WOLFSON:  Thank you, I
21  apologize.
22        ARBITRATOR CARNEY:  Because I
23  expect they're going to raise the issue that you
24  have spoken to in a little bit.

1       Am I right in assuming that --

2               MR. WADDELL:  Yes, that

3   was the next item that I was going to raise,

4   Mr. Carney.

5       And that is I move to amend the

6   second amended complaint to add a cause of action

7   for retaliation under the Statute 61 -- let me

8   find it.  I want to get the right number.

9   61-5-27(f), I think is the correct citation to

10  it.  And that's the --

11              ARBITRATOR WYCOFF:  Is that

12  the West Virginia Code?

13              MR. WADDELL:  Yes, it is,

14  West Virginia Code.  It's a cause of action for

15  an individual who is retaliated against by

16  testifying in a public proceeding.

17      And in this case we'd like to move,

18  to assert that explicitly that cause of action to

19  conform to the evidence that's already in this

20  case.

21      We don't believe there is any

22  prejudice.  I think the law is pretty well

23  established both in the federal courts in West

24  Virginia and state courts that amendments are

1   freely -- pleadings are freely admitted unless

2   there can be a showing of prejudice by the

3   defendant.

4       And I think in this case since this

5   cause of action simply is adding a legal claim

6   and changes the facts and the evidence not one

7   wit as far as I can see, I don't see where the

8   prejudice exists in allowing us to do that in

9   this case.

10      The same evidence that we'll be

11  presenting in regard to the retaliation claim

12  under the 1st Amendment and the retaliation under

13  the contract.  It's the same evidence we would be

14  presenting with regard to this cause of action.

15              ARBITRATOR CARNEY:  Mr.

16  Wolfson, why don't you respond to that with a

17  focus on the prejudice aspect?

18              MR. WOLFSON:  Sure.

19      As to that, where the prejudice

20  arises is really in some way the history of the

21  litigation.  Because the claimant's claims in

22  this case, with all due respect to my offense

23  counsel here, they've really in some ways been,

24  like, nailing Jello to a wall to be blunt.

1       The claims have adjusted and changed,

2   if not weekly certainly monthly.  And, in fact,

3   just this morning we have a new calculation of

4   damages that we'll talk about later.  But that's

5   another example of how things changed.

6       And where the prejudice has arisen to

7   us is that the case started out as a retaliation

8   case principally.  And again, they did mention

9   the Forest Park, I don't dispute that.  But it

10  principally related because we were a state actor

11  they made certain allegations of the Governor.

12      And then as it changed and it focused

13  on the Governor indirectly and influencing us.

14  And then this issue of retaliation solely because

15  of Forest Park, I would submit the claim never

16  really was asserted as retaliation solely because

17  of Forest Park, which is why their claim had such

18  problems because it went from seven stalls to

19  nine stalls after the Forest Park, and it wasn't

20  until much later until after the Governor Manchin

21  meeting.

22      So it's really the focus of the case

23  and the way the case was litigated in actuality.

24  That's the prejudice to us.  Because it's changed

1   the nature of how now we're going back in time to

2   address this whole issue of what happened at

3   Forest Park, who was aware of it, what happened

4   to Miss Mawing immediately thereafter.  Which

5   was, as I said, going from seven stalls to nine

6   stalls.  And it wasn't until much later that she

7   went down to five as a result of the barn stall

8   issue that I think you've heard about.  And there

9   was no claim asserted then as well.  It wasn't

10  until the August of '08 allegation shortly after

11  the Governor Manchin meeting.

12      So the harm to us is how the case has

13  been prepared.  And then on the eve of trial it

14  is completely re jiggered how we're presenting

15  the case.  That's the harm that occurs.

16              ARBITRATOR CARNEY:  Again,

17  the Panel will consider this and I'll probably

18  rule promptly on it, again, for the same reason,

19  we don't want to ambush anybody in terms of what

20  we're trying to decide.

21              ARBITRATOR WYCOFF:  Can I ask

22  a question?

23      On futility, is that a question of

24  law or is that a question of fact?  Do we really

1  have to hear the facts to determine whether it's
2  futile or not?
3          MR. WOLFSON:  I would submit
4  it's a question of law based upon the facts as
5  presented so far by the claimants.  That's why
6  it's one of the elements that a court routinely
7  reviews.
8          Because in order to amend before
9  trial, whether you're in federal court or state
10 court, West Virginia, Pennsylvania, wherever we
11 are, one of the issues is amendments are freely
12 granted unless futility is shown, unless they're
13 futile.  That is an element.  They have to be
14 able to show it's not futile.
15         So, therefore, just knowing what you
16 already know, and they don't dispute that, there
17 are no factual disputes.  She testified, we were
18 not a party.  It was a state hearing regarding
19 Mr. Funkhouser's license.
20         There is no evidence, our people knew
21 immediately thereafter, shortly thereafter, I
22 should say, her stall allocation went from seven
23 to nine in the meeting.  She had five stalls
24 taken away because of this horse and different

1  barns which you'll hear about.  There was no
2  allegation at that time.
3          Then she went from five to zero at
4  the August allocation.  The evidence is clear,
5  the people who made that allocation decision, and
6  even the superiors, had no idea she testified.
7  And it was related solely to what they learned
8  from Governor Manchin's chief of staff and
9  Governor Manchin at the meeting shortly before
10 the allocation committee meeting.  That is
11 the --
12         ARBITRATOR KARLIN:  I just
13 have one question.
14         I'm not unsympathetic to arguments of
15 prejudice, having been there many times myself.
16 But the piece I don't understand is what evidence
17 do you see that they would put on on the statute
18 retaliation claim that they wouldn't otherwise
19 put on in this case?
20         And the reason I ask that is that, at
21 least my understanding, and perhaps I'm wrong, is
22 that an issue, rightly or wrongly, futilely or
23 not futilely, there was an allegation that this
24 hearing somehow was part of the reason for the

1  retaliation, at least as far as I remember being
2  involved as an -- on this Panel in this case.
3  So I guess I'm asking two questions.  One, am I
4  wrong about my recollection that the hearing was
5  raised as a basis for retaliation early on.
6          And two, if I'm not wrong about that,
7  what would this statutory claim require in
8  additional evidence that would not otherwise be
9  expected to be put on anyway?
10         Is that clear, are my questions
11 clear?
12         MR. WOLFSON:  Absolutely.
13 And no, I'm not disputing it was raised.  But we
14 attacked their claims on the basis of the 1983
15 and how those claims were being asserted.
16         And then what happened throughout
17 this case, both in damages and the claims, and
18 I'm going to talk about this in my opening, is
19 their claims morphed.  The emphasis of their
20 claims seriously morphed.  So much so that with
21 respect to the 1983 claim, it basically abandoned
22 that earlier claim and it then became that
23 Governor Manchin indirectly or directly
24 influenced, and that's how the State act, and we

1  basically conspired by Governor Manchin.
2          So we were attacking their claims and
3  addressing their claims as stated.  And frankly,
4  we saw them start to bob and weave so that the
5  claims and the emphasis were very different.  And
6  we addressed and our case was predicated on what
7  they were asserting.
8          ARBITRATOR KARLIN:  But I'm
9  asking a different question here.
10         MR. WOLFSON:  I'm sorry if
11 I --
12         ARBITRATOR KARLIN:  I
13 understand what you're arguing there.  But, I
14 guess, unless -- if we were not to rule -- I
15 mean, you're asking us essentially to rule that
16 the hearing is out of the case, that somehow
17 they've abandoned the hearing argument, the
18 retaliation for the hearing argument, at least it
19 sounds to me that way.
20         If you're not arguing that and they
21 are -- you do anticipate that they will go
22 forward with the presentation of evidence and
23 your defense on the issue of whether or not the
24 hearing, retaliation for the hearing

1  participation was a motive, if that's true, then
2  how does adding the statute as a potential claim
3  or theory supporting that, how does that add new
4  evidence to the case or prejudice you by
5  defenses?
6        That's what I'm missing.
7        MR. WOLFSON:  Well, the issue
8  there is, it's both on the futility side, and
9  they can try to introduce whatever they want, but
10 I would submit that based on what we know and
11 what they're not disputing it's futile.
12       Now, to address the second question,
13 how were we prejudiced by the defense issue.
14       ARBITRATOR KARLIN:  Well,
15 what different evidence would there be?
16       MR. WOLFSON:  Here's what I
17 would -- well, part of it is our entire discovery
18 I suggest might have been different, very well
19 could have been different.  Because we would have
20 focused on this statute, taken discovery
21 specifically related to try to discover the
22 defenses under the statute that we just didn't
23 have the opportunity to do, as being added late
24 to the game.

1        ARBITRATOR KARLIN:  So I
2  understand that piece.
3        But then you don't foresee any
4  different evidence that they would produce under
5  the statutory claim as opposed to the complaint
6  prior to the statutory claim?
7        MR. WOLFSON:  I don't believe
8  so.  I don't believe so, no.  And I'm not trying
9  to --
10       ARBITRATOR KARLIN:  I
11 understand.
12       MR. WOLFSON:  That's right.
13 And I want to be candid.  No, I don't foresee
14 that being any different in general.
15       What hurt us was the opportunity to
16 focus on that and defend against it and
17 investigate it more thoroughly as opposed to
18 having it issued on the day before, so to speak.
19 You know, obviously I'm exaggerating a little bit
20 on that one.
21       MR. WADDELL:  Can I respond
22 to one point raised?
23       ARBITRATOR CARNEY:  Okay,
24 let's move forward.

1        MR. WADDELL:  Well, the point
2  raised that we keep changing our theory.  Well,
3  the Panel may recall that we didn't even know
4  that the Governor called the senior vice
5  president of PNG until they disclosed that in May
6  of this -- this year.  Or April, possibly April,
7  but I think it was May.  So that was new evidence
8  to us.
9        And of course it changed the picture
10 of the case because it suggested a whole new
11 method of retaliation.
12       The only -- main moving target in
13 this case has been PNG's, first of all, saying
14 they don't have to explain why they did what they
15 did to her.  And then coming up with different
16 stories every time you take the deposition of a
17 different witness.  The final one was this
18 Mr. Finamore, the senior vice president, who came
19 up with a new reason why they did what they did.
20       So in part, we've changed our focus
21 in this case based on new evidence that we keep
22 getting.
23       MR. WOLFSON:  I'm happy to
24 respond, I don't know that it's necessary,

1  because the evidence will show and the witnesses'
2  testimony will be what it is.
3        ARBITRATOR CARNEY:  Okay.
4        Are we done with argument, can we
5  proceed with the witness?
6        MR. WADDELL:  We're ready.
7        ARBITRATOR CARNEY:  Do you
8  want opening statements?
9        MR. WADDELL:  The claimant
10 doesn't have any desire to make an opening
11 statement.  I think the Panel is aware of what
12 the case is about.
13       MR. WOLFSON:  Well, I
14 prepared one.  I've actually given part of it.
15 The only thing I'm going to just state in
16 addition to what I've said already is you're
17 going to hear one issue that I do think needs an
18 introduction, because it hasn't been part of the
19 discussion so far.  Because we have been focused,
20 as you know, during the hearings with the Panel,
21 on their claims and the defenses.
22 But there is one other aspect you need to
23 understand going into the case, and that relates
24 to the discretion that my client has in awarding

1  stalls.
2           Because what you've heard only is the
3  argument over the discrimination.  And we agree.
4  If my client were to discriminate on the stall
5  allocation process on the basis of the claimant's
6  HBPA activity, we would be liable.  We admit
7  that.  We're not allowed to do that.  That's in
8  the contract, that was negotiated between the
9  parties and it's absolutely the case.
10          But the other sentence in that
11 contract that doesn't get the, or hasn't gotten
12 the emphasis, because it wasn't really relevant
13 to the matters we were discussing during the
14 Panel's conference calls with us, was the next
15 sentence in that agreement.  Which reads, and I'm
16 going to quote, subject to this limitation the
17 allocation of stalls shall be in the discretion
18 of Charles Town Races.  Meaning that -- putting
19 aside this one issue, we're entitled to use our
20 discretion.
21          And the other thing they agreed is
22 that we're entitled to use our business interest,
23 because that's what we are, we're a business.
24          So we're entitled to use our business

1  interests, our discretion to do what's best for
2  our business as long as we don't allocate on the
3  basis of discriminating because of HBPA activity.
4           The reason that's important, you're
5  also going to hear a second point you haven't
6  heard anything about.  Is that the prior
7  stall -- excuse me, the prior HBPA and Penn
8  National Gaming contracts, actually had a
9  provision that was stronger for them.  That
10 required we couldn't take away stalls without
11 just cause and due process.
12          So the contract was actually changed
13 and a good protection for them was taken away so
14 that we could in fact use our discretion and
15 follow our business interests.
16          And what this case then comes about
17 to is whether we were simply pursuing our
18 business interest and using our discretion when
19 we didn't allocate stalls to Miss Mawing as
20 opposed to discriminating against the HBPA
21 activity.
22          Now what I'm going to suggest to you
23 is it comes down to a very simple question, is
24 when she went as a member of the board pursuing

1  HBPA activity with a number of other board
2  members to speak with Governor Manchin at a
3  hearing in early August '08, to have a discussion
4  with Governor Manchin and his chief of staff, who
5  you'll hear from, Larry Puccio, were getting
6  involved because the parties were at an impasse
7  over the then current contract negotiations.  It
8  was a bitter set of negotiations.  They were at
9  an impasse.  And the Governor got involved
10 because of tax revenue was at stake.  He wanted
11 to get these parties together, get them going,
12 let everything get going back together.  He was
13 trying to mediate.
14          And at that meeting Miss Mawing went
15 as part of this delegation to speak to the
16 Governor.
17          And then what you're going to hear is
18 that, you know, she piped up and said, Well, in
19 addition to all of that, you should know that
20 blah, blah, blah, blah, they poisoned my goat,
21 poisoned my horse and shed wire across the row,
22 the shed row, to decapitate horses.
23          Now there is confirmation of that
24 allegation.  She may deny it, but we know it was

1  said because Larry Puccio is going to testify and
2  tell you it was said.
3           And more importantly, I would
4  suggest to you, is the former executive director,
5  Mr. Hale, who isn't going to testify because he
6  is no longer with them and he's not appearing,
7  but we have his deposition introduced, he
8  remembers someone saying that at that hearing.
9  Now, he doesn't point the finger at Miss Mawing,
10 but he confirms it was said.
11          So we have two people saying it was
12 said, Mr. Puccio saying it was her.
13          Then after that the Governor called
14 my client and said hey, what are you doing?  Are
15 you really doing this kind of stuff?
16          And they even admit that if those
17 allegations were made, they'd be despicable.  I
18 think it was in one of their e-mail to you where
19 they acknowledge that.
20          So based on that Mr. Finamore speaks
21 to Mr. Britton, who was part of the allocation
22 committee.  He has that in the back of his head.
23 He then asks about her stats, and they don't
24 allocate to her.

Page 33

1    That's what this case comes down to
2  her.  Is whether in using their discretion they
3  can say someone who's going to just talk about
4  her own personal gripes and say these horrible
5  things about what kind of bad people they are,
6  they can't take that into consideration in their
7  discretion.  That's what this case really comes
8  down to.
9    Now, the other thing you've heard
10  also, and I'm not going to waste a lot of time
11  now, this whole Forest Park issue, that's the
12  testimony regarding Mr. Funkhouser, I've beaten
13  that to death, I'm not going to go through that
14  again.
15    But the last thing I do want to
16  mention is the damage issue, because that really
17  is serious.  In fact, as I mentioned, even this
18  morning, just this morning, we got the latest
19  version of their damages.  This really has been
20  nailing Jello to a wall.  And we'll address that
21  more thoroughly.  The Panel has the party's
22  position on spoliation issue.
23    But we really have been prejudiced.
24  And this morning just demonstrates it.  Because

Page 34

1  we have a calculation this morning based on a
2  number of stalls, based on a number of rent per
3  stall that frankly is now different than Miss
4  Mawing and her husband testified to previously.
5    And that's where we've really been
6  hamstrung is trying to get to the bottom of their
7  damages, and what the stalls are, which horses
8  are going to be in, which horses were out, which
9  horses -- because you'll see that, even the years
10  when she was getting more and more horses,
11  allocations, she would have more horses on the
12  application than she got stalls for.  So who was
13  being stalled where, and what was being stalled,
14  when was being stalled?  And then even what the
15  reimbursement was.
16    At first you may recall they claim no
17  reimbursement whatsoever.  We then got some
18  invoices that showed reimbursement.  Then their
19  story was, well, we got reimbursement when we go
20  into rent -- got into daily rate for the horses
21  from $50 to $40.  Then we got more invoices and
22  saw that some trainers were paying $40 without
23  paying stall rent.  Then we heard from one
24  trainer that he was paying $50 knowing that

Page 35

1  included stall rent.
2    So it's really just been a mush for
3  us, and that's been a problem.
4    With all that being said, I'm hopeful
5  you'll never get to the damage issue because my
6  confidence is you'll find for the respondent on
7  the claims.
8    Thank you.
9    ARBITRATOR CARNEY:  Mr.
10  Waddell, Mr. Hammer, feel free to respond if you
11  want, but you don't have to.
12    MR. WADDELL:  I have no
13  desire to respond, I would just like to put a
14  witness on.
15    ARBITRATOR WYCOFF:  Can I ask
16  first, could each side tell us approximately how
17  many witnesses they're planning on presenting at
18  the hearing?
19    And then my second question is, are
20  you going to submit to us depositions that we
21  will need to read after the hearing is over?
22    MR. WADDELL:  First question
23  is, we intend to put on Tina Mawing this morning
24  first.  Then we intend to play the video

Page 36

1  deposition of Mr. Finamore that we took just
2  recently.  Then we intend to put on, depending
3  on how much time is left today, the testimony of
4  Mr. Funkhouser who is the HBPA president.
5    Is there anyone else?
6    Then we'll anticipate the following
7  day we'll be putting on testimony of Mr. Yetsook
8  and Mr. Elliott.
9    Well, we have depositions of many of
10  these witnesses, the track's witnesses.  Now, if
11  they're putting them on we'll defer using those.
12  If they don't put them on then we'll submit those
13  depositions.
14    I anticipate we will be submitting
15  the deposition of Randy Wehrman because he is no
16  longer available to testify for either party.
17  I think that's it.
18    ARBITRATOR WYCOFF:  Thank
19  you.
20    MS. SCRIVANI:  It is our
21  intent to call four witnesses, Mr. Zimny,
22  Mr. Finamore, Al Britton, Dickie Moore.  And we
23  will also be submitting the deposition
24  transcript, or portions thereof, of Lenny Hale,

Page 37

1  who is the former executive director of the HBPA.
2  And I believe Mr. Rideout, I think we've agreed
3  to do him by deposition as well.
4          MR. WOLFSON:  Then we also
5  just reserve -- up until just a moment ago, we
6  had expected Miss Mawing's husband, Anthony
7  Mawing, to testify.  And I think you heard about
8  him, he is the individual that did a lot of the
9  accounting, it seems.  He may or may not testify.
10 So we reserve the right to either request that he
11 appear, introduce transcript.
12         The only other thing I'll raise is
13 Mr. Finamore will be testifying.  So whether we
14 need the video of his deposition from whenever it
15 was, I leave that to counsel and the Panel,
16 because he will be testifying.
17         ARBITRATOR WYCOFF:  He is an
18 officer of the party?
19         MR. WOLFSON:  Yes, of our
20 client.
21         ARBITRATOR WYCOFF:  So the
22 deposition can be used for any purpose.
23         MR. WOLFSON:  I wasn't
24 arguing it was inadmissible.  No, no.  It as just

Page 38

1  a question of trying to move things along.  That
2  was all.  I apologize.
3          And Mr. Puccio, I apologize, and we
4  also will, as I mentioned previously, and my
5  colleague --
6          MS. SCRIVANI:  Forgot.
7          MR. WOLFSON:  Forgot.
8  Mr. Puccio will be testifying as well, Governor
9  Manchin's former chief of staff.
10         ARBITRATOR CARNEY:  Allan, do
11 you have any questions?
12         ARBITRATOR KARLIN:  No, I
13 have no questions.
14         ARBITRATOR CARNEY:  Let's go
15 ahead and call the first witness.
16         MR. WADDELL:  Calling Tina
17 Mawing.
18         ARBITRATOR CARNEY:  Will the
19 court reporter swear her in?
20         COURT REPORTER:  Yes.
21             * * *
22     TINA MALGARINI MAWING
23 being first duly sworn, was examined and
24 testifies as follows:

Page 39

1              * * *
2          ARBITRATOR CARNEY:  For
3  counsel's understanding, we're going to run until
4  about 1:00 before we take a lunch break, if
5  that's okay.
6          MR. WADDELL:  Yes.
7          I'm going to hand you these exhibits
8  in case you need to refer to them.
9              * * *
10         (Whereupon, a discussion was
11 held off the record.)
12             * * *
13         MR. WADDELL:  Does it matter
14 whether I sit or stand?
15         ARBITRATOR CARNEY:  Wherever
16 is convenient.
17             * * *
18    D I R E C T   E X A M I N A T I O N
19 BY MR. WADDELL:
20 Q.      State your name for the record,
21 please.
22 A.      Tina Malgarini Mawing.
23 Q.      You're married; is that correct?
24 A.      Correct.

Page 40

1  Q.      Your husband's name?
2  A.      Anthony Mawing.
3  Q.      What is your occupation?
4  A.      I'm a horse trainer and a registered
5  nurse.
6  Q.      What is your husband's occupation?
7  A.      He's a jockey.
8  Q.      How long have you been involved in
9  training horses?
10 A.      Since 1984, I believe, as a trainer.
11 I've been on the racetrack since I was 20 years
12 old.
13 Q.      How long has your husband, Anthony,
14 been a jockey?
15 A.      Probably 22 years.  That's the only
16 profession he's ever had.
17 Q.      Have you ran horses -- trained horses
18 since your husband ran horses at other racetracks
19 besides Charles Town?
20 A.      Yes.  My husband is South African, he
21 has raced in several countries.  I, myself, have
22 raced in probably eight or nine states, probably
23 over 20 racetracks.
24 Q.      When did you first come to Charles

**Page 41**

1 **Town?**
2 A.     2000.
3 **Q.     What was your reason for coming here?**
4 A.     Well, we had a young -- our son was
5 young at the time, I think he was a year or two
6 years old and this is the only racetrack in the
7 country that actually goes year round.
8     So before we had to move quite a bit,
9 we'd go on a circuit or we'd stay home for part
10 of the year.  We just wanted somewhere where we
11 could race year round.
12 **Q.     So, when did you begin training**
13 **horses, then, in this area?**
14 A.     2000.  I came with one horse.  I
15 brought one horse with me from California when I
16 came.
17 **Q.     In connection with training that one**
18 **horse, did you apply for a stall with the**
19 **racetrack at that time?**
20 A.     I did.  I received a stall.
21 **Q.     And over the years, did you continue**
22 **with your training of horses at Charles Town?**
23 A.     I did.
24 **Q.     And how did your business progress?**

**Page 42**

1 A.     I would acquire more horses, I would
2 acquire clients, I would go in and ask for more
3 stalls, I always got stalls.  I was never denied
4 stalls and I was never cut back from stalls.
5 **Q.     Until, I guess, the first time you**
6 **would have been cut back in stalls would have**
7 **been in 20 --**
8 A.     8.
9 **Q.     -- 08?**
10     So from 2000, when you began, until
11 2008 you continued to grow your business; is that
12 correct?
13 A.     That's correct.
14 **Q.     Continued to increase the horses that**
15 **you were training?**
16 A.     Yes.
17 **Q.     And you continued to apply for stalls**
18 **at the racetrack?**
19 A.     I did.
20 **Q.     Now, you're currently a full time**
21 **registered nurse?**
22 A.     I am now.
23 **Q.     When did you become a full time**
24 **registered nurse?**

**Page 43**

1 A.     About approximately two years ago.
2 **Q.     Where do you work?**
3 A.     Jefferson Hospital.
4 **Q.     Had you worked there on a part time**
5 **basis before you came full time?**
6 A.     I did, I was per diem before that.
7 **Q.     When did that -- when did you start**
8 **working as a per diem nurse at the Jefferson**
9 **Hospital?**
10 A.     At Jefferson approximately June of
11 2008.
12 **Q.     Now, how many -- what is your current**
13 **job with Jefferson?**
14 A.     I am the assistant manager of the
15 intensive care unit.
16 **Q.     How many hours do you work at that**
17 **occupation?**
18 A.     It's salary, so approximately --
19 minimum of 36 and it can go up from there.
20 **Q.     And you're also continuing your full**
21 **time business as a trainer --**
22 A.     I am.
23 **Q.     -- at the same time?**
24 A.     I am.

**Page 44**

1 **Q.     How do you juggle the time to manage**
2 **that?**
3 A.     I don't sleep.
4 **Q.     Well --**
5 A.     I go from -- my husband assumes a lot
6 of the duties.  And I go from the hospital to the
7 track.
8 **Q.     Well, what hours do you work at the**
9 **hospital?**
10 A.     I work four days a week at the
11 hospital and I work from 7:00 until 4:00.  One
12 day I work a 12-hour shift so that I can have an
13 additional day off.  So I have one weekday off
14 and then the weekends off.
15 **Q.     What hours are you engaged in your**
16 **training activities at the track?**
17 A.     Well, my days off.  And then at
18 night, racing is at night.  So I go back at night
19 and do the racing part of it.
20 **Q.     How many horses do you currently**
21 **train?**
22 A.     Right now we have approximately six,
23 but it -- it goes up and down as horses get hurt
24 or as horses get fit and ready to run.  It's

Page 45

1  never static, it's constantly changing.
2  **Q.      So it's a moving target?**
3  A.      It is, it is.  But I usually maintain
4  a minimum of ten horses in training.
5  **Q.      You're also, in addition to being a**
6  **trainer at the track, you're also -- you hold a**
7  **position with the Horseman's Benevolent and**
8  **Protective Association?**
9  A.      Yes, I do.  It's my third term.
10  **Q.      How long is a term?**
11  A.      Three years.
12  **Q.      When you say a term, you're a board**
13  **member?**
14  A.      I'm an elected board member.
15  **Q.      So you've been an elected board**
16  **member of the HBPA since what year?**
17  A.      I believe 2007, maybe 2006.  You'd
18  have to do the math.
19  **Q.      Okay.**
20  A.      But I -- this is my third consecutive
21  term.
22  **Q.      And you've been a member of the HBPA**
23  **for how long?**
24  A.      Since 2000 since I ran my first horse

Page 46

1  here.
2              ARBITRATOR WYCOFF:  May I ask
3  a question?
4              MR. WADDELL:  Yes.
5              ARBITRATOR WYCOFF:  Do you
6  have to be a member of the association in order
7  to run horses there?
8              THE WITNESS:  I don't believe
9  you do.
10              ARBITRATOR WYCOFF:  Thank
11  you.
12  BY MR. WADDELL:
13  **Q.      How many board members are there**
14  **approximately?**
15  A.      Ten.  And I believe three alternates.
16  **Q.      Are they all trainers?**
17  A.      Some are trainers.  You can run -- I
18  believe five are trainers and five are owners.
19  I'm the only woman trainer on the board.
20  **Q.      Who is currently the president of the**
21  **HBPA?**
22  A.      Randy Funkhouser.
23  **Q.      In 2008 was he the president at that**
24  **time?**

Page 47

1  A.      He was.
2  **Q.      I think, if I'm not mistaken, there**
3  **was a time period when he was no longer president**
4  **and then he came back, am I correct?**
5  A.      That's correct.  In the second term,
6  I'm not sure of the exact year, Ken Lowe --
7              COURT REPORTER:  I'm sorry.
8              THE WITNESS:  Ken Lowe.  Won
9  the election and he was president.
10  BY MR. WADDELL:
11  **Q.      Do you know what year that was off**
12  **the top of your head?**
13  A.      No, I'd be guessing.  2010, maybe.
14  **Q.      Do you know when --**
15  A.      2009.
16  **Q.      Do you know when Mr. Funkhouser was**
17  **re-elected?**
18  A.      He was just re-elected this last
19  fall.
20  **Q.      Do you recall an incident or**
21  **situation where Mr. Funkhouser was suspended, his**
22  **occupational permit was suspended indefinitely by**
23  **the Racing Commission?**
24  A.      Yes.

Page 48

1  **Q.      Do you recall --**
2  A.      2007.
3  **Q.      -- when that occurred?**
4  A.      2007.
5  **Q.      Around October?**
6  A.      The actual race was the 4th of July
7  handicap.  And then the, I believe the hearing
8  was sometime in the fall.
9  **Q.      Are you familiar with the**
10  **circumstances of that suspension, the reasons?**
11  A.      Very much so.  I'm not sure exactly
12  what the allegations were against him, I just
13  know they took his permit and I don't think there
14  is any statute that says they could take his
15  permit, so...
16  **Q.      You testified?**
17  A.      I did.
18  **Q.      You had personal knowledge that was**
19  **of value in this hearing?**
20  A.      I did.  And my role as a board
21  member, one of the participants in the race came
22  to me because of some questionable circumstances
23  about a horse that was entered and how the horse
24  got entered.  They came to me.  And so ultimately

1 it wound up going to Randy and Randy raised the
2 issues.
3 **Q.      And that's what led to the -- his**
4 **raising an issue about a horse, another horse**
5 **that was running in a race, is what led to this**
6 **issue we're talking about?**
7          MR. WOLFSON:  I just want to
8 object because I think we have to be careful how
9 this testimony is raised and received.  Because
10 what we're talking about now is multiple layers
11 of hearsay.  Because ultimately the Panel is
12 aware -- and I don't think there is any dispute,
13 I just want to be clear.  The allegations were
14 made to the State Commission that took action and
15 then it came back.  So people made allegations to
16 a commission that somehow got to Mr. Funkhouser
17 that then came down the line.
18          So the witness is testifying based on
19 multiple layers of hearsay.  And I'm just
20 suggesting that it's relevant for purposes of
21 what she understood, but all of this should not
22 be accepted or offered for the truth of the
23 matter.  Because whether it is true or not
24 frankly doesn't matter.

1          MR. WADDELL:  I think she has
2 personal knowledge of what she is testifying to.
3          MR. WOLFSON:  Well, she just
4 said she wasn't sure what the allegations were
5 and how they got there or what they said
6 specifically.  And that's exactly my point.
7          MR. WADDELL:  I understand
8 your --
9          ARBITRATOR CARNEY:  Well,
10 she's already said that she doesn't know.  So
11 we're going to take that -- take her word for
12 that and recognize that she is not speaking from
13 firsthand knowledge.
14          MR. WADDELL:  Okay.
15 BY MR. WADDELL:
16 **Q.      Tina, you were called to testify on**
17 **whose behalf?**
18 A.      Mr. Funkhouser's.
19 **Q.      What was your testimony at this**
20 **hearing, what did you testify to?**
21 A.      My testimony essentially was that a
22 horseman came to me, again, in my role as a board
23 member.  I did not have a horse in the race, so
24 really I had no dog in the fight.  Came to me and

1 they were concerned at what they thought was a
2 horse bypassing all the normal procedures,
3 actually rules, as far as nominating the horse,
4 those types of things.  And suddenly on entry
5 day, the horse's name appears.
6          Never in my 30 years as being a
7 trainer have I seen that happen.  It's just not
8 done.  No matter what excuse you may have for not
9 getting your nomination in on time, it's kind of
10 too bad, so sad.
11          But this horse seemed to have
12 bypassed all of those things and made it into the
13 race.
14 **Q.      That was part of your testimony at**
15 **the hearing?**
16 A.      That was my testimony.
17          And then, of course, what I did from
18 there.  Who I contacted and...
19 **Q.      Tell me what you did testify to.**
20 A.      I contacted Mr. Yetsook, because
21 he was actually right there in my barn and
22 Mr. Yetsook had a horse in the race.
23          I said, do you know anything about
24 this?  A trainer who has -- a trainer who has a

1 horse in this race, Miss Patty Burns, she has a
2 horse in this race and she is concerned about how
3 this horse wound up in the race.  It doesn't seem
4 right.
5          So he said, I was questioning that
6 myself, I'll give Randy a call.
7 **Q.      Now Mr. Yetsook, you indicated, he**
8 **had a horse, he was training a horse that was in**
9 **this race as well?**
10 A.      He was.
11 **Q.      And he was the trainer at that time**
12 **for --**
13 A.      Confucius Say.  That was the horse in
14 the race and that was also Mr. Funkhouser's
15 horse.  O'Sullivan Farms.
16 **Q.      So that's the connection with going**
17 **to Mr. Funkhouser?**
18 A.      Correct.  And I would have gone to
19 him anyway, he's the president, that would have
20 been the next logical step.
21 **Q.      Were you acting as a board member**
22 **in conveying this complaint of a member to**
23 **Mr. Yetsook and Mr. Funkhouser?**
24 A.      Absolutely.  I had no horse in the

Page 53

1 race.
2 **Q.        Did you testify to anything else**
3 **during this hearing?**
4 A.        That was pretty much it, it was short
5 and sweet.
6 **Q.        Now, that was in -- I believe --**
7 A.        October 2007.
8 **Q.        -- October 2007?  Okay.**
9 **      Now, I want to switch subjects with**
10 **you for a moment.**
11 **      Are you familiar with the agreement**
12 **between the HBPA and the racetrack?**
13 A.        I am.  The contract?
14 **Q.        The contract.**
15 A.        Yes.
16 **Q.        Are you familiar -- there is a**
17 **current -- the current contract was entered**
18 **into -- do you know when that was entered into?**
19 A.        2009.  That sounds about right.
20 **Q.        Before that there was a contract that**
21 **had been entered into in 2004, I believe.  Is**
22 **that your --**
23 A.        It might have been, but I believe
24 there were a couple of rollovers of that

Page 54

1 contract.
2 **Q.        I'm going to direct your attention if**
3 **I could to -- if you look at the Exhibit 1.**
4       ARBITRATOR WYCOFF:  The red
5 book?
6       MR. WADDELL:  Red book.  Yes,
7 the red book.
8 BY MR. WADDELL:
9 **Q.        Do you have that?**
10 A.        I do.
11 **Q.        Tina, before the current agreement**
12 **between the horsemen, HBPA, is this the agreement**
13 **that was in effect beginning in December of 2004**
14 **it looks like?**
15 A.        That looks familiar, yes.
16 **Q.        Are you familiar with this agreement?**
17 A.        I am.
18 **Q.        How are you familiar with the**
19 **agreement?**
20 A.        This was the agreement that was in
21 effect my first term on the board.
22 **Q.        Are you familiar with the obligation**
23 **at that time as far as providing stalls, the**
24 **track providing stalls to horsemen at the track?**

Page 55

1 A.        Without finding the exact page, I
2 believe the agreement is 1,148 stalls, that they
3 are to provide.
4 **Q.        Let me see if I can find it.**
5 **It's page --**
6       MR. WADDELL:  What is that,
7 Dave, 13?
8       MR. HAMMER:  13.
9 BY MR. WADDELL:
10 **Q.        You see where it says that the**
11 **Charles Town Races should make available, and**
12 **that's a minimum, of 1,148 stalls free of charge**
13 **to the horsemen at each race meeting?**
14 A.        Yes.
15 **Q.        Do you see where it says, it is**
16 **recognized by both parties that effective stall**
17 **utilization is important to Charles Town Races**
18 **management and an equitable allocation is**
19 **essential to the livelihood of the horsemen?**
20 A.        Absolutely, yes.
21 **Q.        Is that true?**
22 A.        That is absolutely true.
23 **Q.        What is true about that?**
24 A.        If you don't have that stall space

Page 56

1 you have to ship in from another location and you
2 have to pay stall rent somewhere else.  So those
3 stalls are a premium.
4 **Q.        Do you see where it says, Under**
5 **Paragraph B, Charles Town Races shall not**
6 **discriminate in the allocation of stalls by**
7 **reason of HBPA membership or activity or condone**
8 **its representatives or employees discriminating**
9 **in the allocation of stalls.**
10 **      Do you see that?**
11 A.        I see that.
12 **Q.        Now, these are provisions that are**
13 **bargained for between the HBPA and the track; is**
14 **that correct?**
15 A.        That's correct.
16 **Q.        Again, you say that stalls are**
17 **essential to you and to the other horsemen.**
18 **      Can you explain the difficulty that**
19 **you have as a trainer if you don't have stalls**
20 **available at the track itself?**
21 A.        Oh, my gosh.
22       You have to ship in from remote
23 locations.  It has to be reasonable enough that
24 you can get the horses in every day to train.

1        So you're limited in the amount --
2    there are only set training hours.  And those can
3    vary from 6:30 in the morning until 10:30,
4    depending on the time of year.  So you only have
5    that set amount of time that you can come in and
6    exercise your horses.
7        So if I was a trainer at the track
8    and I had nine stalls, I could easily in that
9    time period send horses back and forth to the
10   track and get them in.
11       Being stabled at a remote location, I
12   have to load them in a horse trailer, haul them
13   in.  All the, if you want to say drama, with
14   getting them on the trailer, getting them off the
15   trailer.  The inherent dangers of loading and
16   unloading.  Going down the highway with them,
17   anything can happen en route.  Getting them
18   there.  Getting them exercised and cooled out
19   probably maximum, well, I know maximum I can do
20   personally is two horses a day.  And then you
21   have to pay for the stalls.
22       So wherever you are you have the cost
23   of shipping in and out, you have the cost of the
24   stalls.  It's a huge disadvantage.

1    Q.    That's why these stalls are in
2    demand?
3    A.        Absolutely.  They're in demand.  And
4    they're essential to our livelihood.
5    Q.    Now, is the -- providing stalls by
6    tracks, is that the standard practice in your
7    experience?
8    A.        Absolutely, everywhere I've ever
9    been.
10   Q.    This isn't unique to Charles Town?
11   A.        Not at all.  It's an industry
12   standard.
13   Q.    What was your understanding working
14   as a trainer at the track with the criteria to be
15   used in deciding whether you would be allocated
16   stalls or not, or did you have an understanding?
17   A.        Based both on my knowledge of having
18   trained at other racetracks, what I know to be
19   the industry standard and what I experienced
20   firsthand being at Charles Town, meeting with the
21   different racing secretaries, Mr. Lamp, Mr. Jimmy
22   Hammond.
23       I mean, we start with, I'll get ahead
24   of myself probably, a stall application.  That is

1    a very detailed record of what your horses are so
2    the racing secretary and the race office knows
3    what kind of horses you have.  Because there are
4    all different kinds of races.  So they know what
5    kinds of horses you have.  Whether those horses
6    will fit in that category.
7        Then they look at other aspects.  If
8    you're utilizing your stalls, you're making an
9    adequate number of starts -- I don't know if I'm
10   getting ahead of myself here.
11   Q.    No, that's fine.  Go ahead.
12   A.        Making an adequate number of starts,
13   the quality of horses that you have, if you have
14   a balanced stable.
15       And then assuming someone like myself
16   who was there for eight years when we're freezing
17   time at 2008, they know what of kind person I am.
18   They know, did I keep my barn area clean, were my
19   horses well cared for, did my horses look good,
20   did I have something positive to contribute to
21   horse racing at Charles Town.
22       And then, you know, they would just
23   roll it over.  Which they probably do for 99
24   percent of the stall applications.

1        If you follow those criteria, you are
2    pretty much guaranteed to have stalls.
3        ARBITRATOR CARNEY:  But did
4    you -- would you apply for a stall for a
5    particular horse?
6        In other words, if you had six horses
7    you were training, would you apply for six
8    stalls?
9        THE WITNESS:  Yes, sir.  And
10   part of the reason for that is because your
11   horses are constantly changing.  Again, this is
12   on a continuum.  You maybe have a horse get
13   injured, so you're going to replace it with
14   another horse.  Or you have two year olds, you
15   know, young horses that are now coming into
16   training.
17       So it never just -- unfortunately,
18   the stall application is kind of like a snapshot
19   in time.  It may not be a true representation of
20   what your stable is.  But at least it gives the
21   racing secretary an idea of what kind of horses
22   you do have.
23       ARBITRATOR CARNEY:  You said
24   that you apply for a stall for Horse A and may

Page 61

1  actually end up using it for Horse B.
2      THE WITNESS:  Absolutely.
3  And that is more often than not.
4      ARBITRATOR WYCOFF:  Can we
5  take a two-minute break?
6      * * *
7      (Brief break)
8      * * *
9      ARBITRATOR KARLIN:  Can I ask
10  a question here?
11      MR. WADDELL:  Yes.
12      ARBITRATOR KARLIN:  Miss
13  Mawing, there was one thing I didn't quite
14  understand.  You were describing I think what you
15  understood to be the, in practice the criteria
16  that you believe were used in terms of
17  allocation.
18      THE WITNESS:  Yes, sir.
19      ARBITRATOR KARLIN:  It wasn't
20  totally clear to me, what did you base that on?
21      THE WITNESS:  Well, I based
22  it on the stall application itself, because it's
23  a very detailed record of what horses you have or
24  potentially have, a couple of, maybe, two year

Page 62

1  olds that you just started in training.  So I
2  based it on that.
3      I based it on the industry standard,
4  my experiences is over 30 years.  And my personal
5  conversations with the racing secretaries as far
6  as what their expectations of me were.
7      ARBITRATOR KARLIN:  Are you
8  going to -- I don't know if you're going to
9  follow up on that.
10      MR. WADDELL:  I will in a
11  little bit.
12      ARBITRATOR KARLIN:  Okay.
13  BY MR. WADDELL:
14  Q.    First of all, let's be clear on which
15  racing secretaries you derive these
16  understandings from.  Which racing secretaries
17  did you talk to about their expectations?
18  A.    I spoke with Mr. Hammond, he was the
19  first racing secretary when I started racing
20  there.  Followed by Mr. Lamp, Doug Lamp.  Then
21  ultimately Mr. Wehrman, who would never return my
22  phone calls.
23  Q.    So he didn't give you any
24  understanding of what his -- how he allocated the

Page 63

1  stalls then?
2  A.    All I got from Mr. Wehrman was a call
3  to my work apologizing for not allocating stalls
4  to me.
5      ARBITRATOR WYCOFF:  How do
6  you spell that name?
7      THE WITNESS:  W E H R M A N.
8      ARBITRATOR WYCOFF:  Thank
9  you.
10  BY MR. WADDELL:
11  Q.    So the order -- of the racing
12  secretaries, either it with Hammond, Lamp and
13  then there was a -- I believe a gap?
14  A.    There was.  Mr. Lamp resigned.  And
15  then there was interim racing secretary, I
16  believe Mr. Moore and then Mr. Elliott, I believe
17  at some period of time.  It was -- yeah, it was
18  hard to keep up.  I think there may have even
19  been a couple of assistant racing secretaries who
20  filled in for a month or two.  So it was a mess.
21  Q.    Mr. Moore is Dickie Moore?
22  A.    Correct.
23  Q.    Known as Dickie Moore around the
24  track?

Page 64

1  A.    That's how he is known, yes.
2  Q.    I believe he is going to be a
3  witness, so we'll hear from him in this case as
4  far as I know.  Yeah.
5      Then Mr. Elliott will also be
6  testifying?
7  A.    Yes.
8  Q.    All right.
9      Now, the -- you mentioned starts per
10  stall.  Can you explain that in a little bit more
11  detail what's expected in that regard?
12  A.    Well, they expect -- it doesn't have
13  to be a specific horse, it just has to be a
14  number of starts.  So therefore, if you have one
15  stall, I'll make it simple, it used to be in
16  writing, now it's just a rule, I don't know that
17  it's a written rule.  I don't know if it's ever
18  been a written rule at any track I've been to.
19      But the idea is, you come there, you
20  enter your horses in races, you make your races
21  go.  So they expect a certain amount of
22  productivity out of you.  So the arbitrary number
23  has been anywhere from six to eight since I've
24  been at Charles Town.

Page 65

1  **Q.**     **Per stall?**
2  A.     Per stall.
3  **Q.**     **Per, what, year?**
4  A.     Per year.
5      So if you have one stall when they
6  look at your starts at the end of the year they
7  better see at least six starts. At least six
8  times you've run a horse. Not any specific
9  horse, it's just you have to run at least six
10 horses.
11 **Q.**     **Now, you mentioned, I think you**
12 **mentioned, type of horse or quality of horse.**
13 **Are those the same thing or different things?**
14 A.     They're basically the same thing.
15 Quality of horse would be, do you have cheap
16 horses. They ride different kinds of races. Do
17 you need me to get into the specifics --
18 **Q.**     **Yeah, I'm going to demonstrate with**
19 **this exhibit here in a minute.**
20     **But why don't you first of all, in**
21 **general, tell me what you mean by type or quality**
22 **of horses?**
23 A.     Quality horses would be, do you have
24 a cheap horse that competes at a cheaper level.

Page 66

1  Do you have a nicer horse that might compete at a
2  state's level. The idea, a trainer shoots for
3  trying to have a balanced stable. Something in
4  each category or close to it so you can fill the
5  maximum amount of races for the track.
6  **Q.**     **The track wants horses to fill the**
7  **races?**
8  A.     Absolutely.
9  **Q.**     **Then they have different types of**
10 **races?**
11 A.     They have different types of races
12 and of course --
13 **Q.**     **That require different types of**
14 **horses?**
15 A.     Right. Even from male to female.
16 There are strictly races for males and boys and
17 there are strictly races for girls.
18 **Q.**     **Does the track ever come to trainers**
19 **and say in this race we need to fill**
20 **out -- what's the term? The --**
21 A.     Fill the card or fill the race.
22 **Q.**     **Fill the card.**
23 A.     Every single day.
24 **Q.**     **All right.**

Page 67

1      **Now, if we look at this, and this is**
2  **Respondent's 5, this is in the respondent's**
3  **exhibit book if the Panel wants to refer to it.**
4      MR. WOLFSON: Ours are the
5  white books.
6      MR. HAMMER: Just for
7  everyone's knowledge, the other place -- this
8  list of chronological stall history, you'll find
9  it at Claimant's 39. So you'll see this whole
10 list of documents sequentially in order because
11 Exhibit 39 is the Claimant's. So you'll see from
12 2006 forward.
13     MR. WOLFSON: Do you
14 have -- can you give me a copy because you
15 didn't --
16     MR. HAMMER: It's in your
17 binder.
18     MR. WOLFSON: Oh, it's in
19 here. Great.
20     MR. HAMMER: It should be at
21 39.
22     ARBITRATOR WYCOFF: 35?
23     MR. HAMMER: 39.
24     MR. WADDELL: That will start

Page 68

1  with 2006?
2      MR. HAMMER: That starts with
3  2006.
4  BY MR. WADDELL:
5  **Q.**     **Can you read that?**
6  A.     I can.
7      MR. WOLFSON: Could I have
8  just a moment. Because -- could I just talk with
9  counsel for one second about this? Because this
10 again is the one we just got this morning.
11     MR. HAMMER: There is nothing
12 new about it, this is consolidated from yours and
13 mine, there is not a new document.
14     MR. WOLFSON: I just want
15 to --
16     MR. WADDELL: Just tell him
17 what...
18     MR. HAMMER: What they are is
19 I took -- I'll show you, I took the document that
20 you had produced, that we had produced and put
21 them in chronological order. So that's all you
22 see --
23     MR. WOLFSON: That's not just
24 the applications, right?

1          MR. HAMMER:  No, it's the
2  stall history chronological.  So 2006 when it
3  starts --
4          MR. WOLFSON:  So it's letters
5  and --
6          MR. HAMMER:  Letters and
7  applications.  It's in sequence.
8          MR. HAMMER:  I'm not
9  raising -- I just wanted to make sure I knew what
10  was there.
11          MR. HAMMER:  That's exactly
12  what it is.
13          MR. WOLFSON:  There was also
14  a new --
15          MR. HAMMER:  It includes
16  those three that I sent last night.
17          MR. WOLFSON:  So the new ones
18  we got --
19          MR. HAMMER:  They're in
20  there, too.
21          MR. WOLFSON:  So the new ones
22  that we got last night are in here with the
23  others?
24          MR. HAMMER:  Chronologically.

1          MR. WOLFSON:  Got it.
2  I'm sorry.  There was some new stuff in there, I
3  just wanted to make sure I knew what was there.
4  BY MR. WADDELL:
5  Q.        Miss Mawing, first of all, can
6  you -- we're looking at -- it's Exhibit -- I'm
7  going to refer to it as Exhibit Respondent's 5,
8  because it has Respondent's 5 as well.
9          MR. HAMMER:  39.
10  BY MR. WADDELL:
11  Q.        Or Exhibit 39, can you
12  identify -- wait a minute.
13          MR. HAMMER:  You want the
14  stall license?
15          MR. WADDELL:  Yeah, that's
16  what I want.
17  BY MR. WADDELL:
18  Q.        Can you identify what that document
19  is?
20  A.        That's a stall application.
21  Q.        Now, it's a two-page document
22  normally, correct?
23  A.        Correct.
24  Q.        We're looking at the first page.

1  Do you recognize this as your application for
2  stalls for the time period January 1 through June
3  30th of 2008?
4  A.        It is.
5  Q.        So you've listed 13 horses you're
6  asking for stalls for?
7  A.        Correct.
8  Q.        Now, on this application you have to
9  list the sex and age of the horse?
10  A.        That's right.
11  Q.        Then what's the next category in
12  the --
13  A.        That's whether or not a horse is a
14  maiden.  That means has it won a race yet.
15  Q.        Now, are there races at Charles Town
16  that are all maiden, called maiden races?
17  A.        They are.  Your eligibility is if
18  you've not won a race yet.  But again, there may
19  be other eligibility staked on.  You may have to
20  be a specific age, so maybe three year old
21  maidens or three year old maiden fillies.
22  Q.        The track would need a particular
23  horse that would fit that category in order to
24  have them in that race?

1  A.        Absolutely, in order to get ten of
2  them to run in a race, they would -- it
3  would -- they need a broad amount of horses.
4  Q.        Okay.
5          Then the claim -- here's the one I
6  really want to talk to you about, the column
7  called claiming price.  Because we're talking
8  there about the types of horses or races that are
9  involved, correct?
10  A.        Correct.
11  Q.        For instance, can you tell us under
12  the first horse where it says claiming price and
13  has ALW, what does that mean?
14  A.        That's allowance.
15  Q.        What does that mean?
16  A.        So I'm going to break it down.
17  A $5,000 horse, a $10,000 horse, a horse that has
18  a price tag on it means that anybody can claim or
19  buy the horse out of that race.  The --
20  Q.        Okay -- I didn't mean to interrupt
21  you.
22  A.        No, no, no.
23  Q.        I just want to point out, where
24  you've got $5,000, $10,000, those columns where

1  the $5,000 and $10,000 appear, those are claiming
2  races?
3  A.        Those are claiming races.  Basic way
4  to kind of assess the value of the horse.
5  Q.        Now, what's -- put categories --
6  categorize for me, if you will, the type of horse
7  from bad horse or -- not that great of horse to
8  good horse and how does that fit under this
9  column?
10  A.        So $5,000 is the bottom, that's the
11  lowest claiming price.  So that would be viewed
12  as the cheapest horse on the track.
13        The allowance horses are the better
14  caliber horses, they can't be claimed, the
15  competition is much tougher and they're much
16  nicer.  The track constantly put out them from
17  the time I've been there, try to get as nice of
18  horses as you can, have the -- and then they kind
19  of talked on both sides.  Because they'd say,
20  have a balance stable but try to have really nice
21  horses, too.
22        So I think I accomplished that.  I've
23  had several allowance horses and I had some
24  claiming horses.  That year I didn't.

1        But I also had stakes horses in the
2  past, too, which Kentucky Derby is a stake race.
3  That is the highest tier of this.
4  Q.        Charles Town has stakes races?
5  A.        They do.  I've won several stake
6  races at Charles Town.
7  Q.        But that's the highest caliber of
8  horse?
9  A.        Yes.
10  Q.        You don't happen to have one on this
11  particular application?
12  A.        I do not on this one.
13  Q.        What's the long short, LS, what is
14  that?
15  A.        That is whether they run long, which
16  would be six and a half furlongs to a mile, mile
17  and a sixteenth.  Versus short would be four and
18  a half.
19        So again, they're looking at the
20  distances, because, again, they want you to meet
21  set criteria of what horses they're going to
22  accept.
23  Q.        And where it says L then a dash, or a
24  slash, and then S, what does that mean?

1  A.        I have horses that can run either
2  way.
3  Q.        All right, so if it's an L that means
4  they run long, if it's an S they run short, and
5  if it's an LS they run either way?
6  A.        Correct.
7  Q.        Then I think the next one is pretty
8  self-explanatory.  It's the last time the horse
9  raced; is that correct?
10  A.        That's correct.
11  Q.        The track it raced on?
12  A.        Right.
13  Q.        Is there a benefit to Charles Town to
14  having trainers who race more of their horses
15  there, as opposed to at other tracks?
16  A.        Absolutely.  Because you're trying to
17  fill races.  The optimum would be nine races a
18  day with ten horses maximum they can race filling
19  all nine races with ten horses in each race.
20  That's the goal management, try to get the
21  betting public interested with the bigger fields.
22  That's always the push.
23  Q.        Okay.
24        Then I'm not going to get into the

1  details on this now, I think we might later, but
2  the next column is who owns the horse.
3  A.        Correct.
4  Q.        So is the practice, if you're -- if
5  you want stalls then you fill out one of these
6  applications?
7  A.        Every six months.
8  Q.        It wasn't always six months, was it?
9  A.        No.  It used to be a year.  And this
10  is the only place I've ever raced where it's
11  every six months.
12        ARBITRATOR WYCOFF:  Can I ask
13  a naive question?  I know nothing about horse
14  racing.
15        Can a horse race on consecutive days
16  or if you race a horse do you have to let it rest
17  for how long?
18        Just explain that a little bit.  That
19  is only my interest.
20        THE WITNESS:  You'll know a
21  lot by the end of this.
22        Horses usually -- I personally will
23  run them once a month.  I think that's plenty.
24        ARBITRATOR WYCOFF:  Once a

1   month?
2        THE WITNESS:  So you can see
3   why you need a broad amount of horses, a diverse
4   amount of horses to keep the races full.
5   Trainers will run them as often as every two
6   weeks, but you're not going to have a horse for
7   very long, they'll be subject to injuries the
8   more often you run them.
9        And sometimes you're forced to.  If
10  there are only -- two weeks later there is a race
11  and then there's not another one for two months,
12  you may be forced to go in that race because
13  that's how you generate your income.
14       So ideally once a month, the most I
15  would ever run a horse is every two weeks.
16       ARBITRATOR KARLIN:  Can I get
17  some enlightening, too?
18       What do you mean by a claiming price?
19       THE WITNESS:  Claiming price
20  means anybody can buy that horse for that
21  designated price.  So if you have $5,000 and I
22  ran Bama, for $5,000 in the third race at Charles
23  Town you can take your $5,000 and go buy that
24  horse.

1        ARBITRATOR KARLIN:  How often
2   does that happen?
3        THE WITNESS:  Every day, they
4   have lots of claiming races.
5        Here is the rationale behind it.  If
6   you run your horse for $5,000, somebody can take
7   your horse.  But you also hook easier
8   competition.  So you weigh out the risk benefit.
9        So you -- people may not claim your
10  horse, they may be leery.  They may have run a
11  really bad race, then they ran a good race.  Now
12  it's in for a claiming price.  Huh, they're
13  wondering why it's now so cheap.
14       So they may sit there and watch and
15  they may what they say steal a race.  Because you
16  may win a race and nobody claims the horse.  That
17  happens often.
18       ARBITRATOR KARLIN:  Is there
19  an MSW or am I mis --
20       THE WITNESS:  Yes.  Maiden
21  special weight.  And that's the equivalent of a
22  horse that's never won.  But you perceive it at
23  that point if it's running in an allowance
24  caliber.  It's a special kind of allowance race.

1   It's an allowance race for horses that have never
2   won.
3        ARBITRATOR KARLIN:  Thank
4   you.
5        ARBITRATOR CARNEY:  I have
6   one more question.
7        You have 13 horses listed here.  Now,
8   how many stalls would you realistically expect to
9   get?
10  A.       I would hope for 13, but I gradually
11  over the years got one or two.  And if I had a
12  surplus of horses, I would stable across the
13  street.  They have private barns across the
14  street.  So that was my usual, as I flexed up, I
15  would rent across the street.
16       Of course, that's a cost of doing
17  business, I didn't pass that cost on to my
18  client.  And then you could just walk over.
19       So again, it's a little more time
20  consuming, but nothing like loading them in a
21  trailer and hauling them, you know, half an hour.
22  BY MR. WADDELL:
23  Q.       In fact, with regard to this
24  particular application if February -- and I don't

1   think the decision was made until February?
2   A.    For -- which decision?
3   Q.    Allowing you --
4   A.    Right, correct.
5   Q.    And you were given nine horses?
6   A.    Nine stalls.
7   Q.    Nine stalls.
8   A.    Yes.
9   Q.    Claiming -- on these claiming races,
10  every horse that -- the track runs it as a $5,000
11  claiming race, is that how it's run?
12  A.    Yes.
13  Q.    So every horse that enters that has
14  to -- their owner has to realize that if anybody
15  else wants to buy that horse for $5,000 they can
16  do it, correct?
17  A.    That's correct.
18  Q.    That's why it keeps the quality of
19  the horse low in that race?
20  A.    Right.
21  Q.    The competitive nature of the race?
22  A.    It is.
23  Q.    Then $10,000 it would be a little
24  bit -- you'd get a little bit better quality

1   horse?
2   A.        Correct.
3   Q.        $10,000 stake claiming race?
4   A.        $10,000 horse, correct.  But that
5   does not stop you from taking your horse that you
6   value at $10,000 and running it in the $5,000
7   race.  You have a pretty darn good chance of
8   winning it because the competition is easier.
9   But you have a darn good chance someone will buy
10  it for $5,000.
11  Q.        What about -- there's been some talk
12  in this case about win percentages or things like
13  that.  Was that something that came up in your
14  discussion with the racing secretaries when you
15  were discussing what they wanted to see at
16  Charles Town?
17  A.        They never specifically, I have never
18  heard the criteria of winning percentages.  But
19  it all goes back to quality of horses.  You know,
20  are you consistent in -- I mean, they don't want
21  trainers whose horses are every single horse is
22  going to run dead last.  They like to see
23  trainers who maintain a consistent percentage.
24  They don't look at -- their own program doesn't

1   list win percent.  Their own program that they
2   put out for the betting public lists percent of
3   horses in the money.  When we say in the money,
4   that is first, second or third.
5   Q.        Win, place or show?
6   A.        That's right.
7   Q.        Why don't we actually go through your
8   history on this stall allocation.
9   If you could -- this is Exhibit 39, this is the
10  first page in that exhibit.
11            Do you recognize this -- can you read
12  it, first of all?
13  A.        Yes.
14  Q.        Do you recognize it?
15  A.        That's -- yeah.
16  Q.        Can you tell us what it is?
17  A.        That's your stall allocation official
18  notification.
19  Q.        So on December 21st of 2006 you were
20  notified that you've been allocated seven stalls
21  for 2007; is that correct?
22  A.        That's correct.
23  Q.        Okay.
24  A.        By Mr. Lamp.

1   Q.        Was that for all of 2007?
2   A.        I can't recall if we had gone to the
3   six months by then or not.  I'm going to say for
4   six months.
5   Q.        Is there anything on there that would
6   indicate whether it's for a year or for six
7   months?
8   A.        No, absolutely not.
9   Q.        So you simply just don't recall?
10  A.        I simply don't recall, I'm sorry.
11  Q.        Doug Lamp, as indicated by the
12  signature, Doug Lamp was the racing secretary at
13  that point?
14  A.        Yes.
15  Q.        Let's go to the next one.
16            This is dated February 7th, 2008.  Do
17  you see that?
18  A.        I see that.
19  Q.        And do you recognize the exhibit?
20  A.        Yes.
21  Q.        Can you tell me what it is for the
22  record?
23  A.        Again, that's another notification of
24  stalls.  And that's from Dickie Moore who was

1   not, who was the interim racing secretary.
2   Q.        Would that indicate to you between
3   the last one we just looked at and this one that
4   Doug Lamp had, he left at that point as racing
5   secretary?
6   A.        Yes, he resigned.
7   Q.        And Dickie Moore was filling in as
8   the interim racing secretary?
9   A.        Yes.
10  Q.        He was actually the general --
11  A.        He wore a lot of hats.
12  Q.        Yeah, general manager, or general
13  director of racing, or something?
14  A.        General manager, interim racing
15  secretary.  I don't know what all he did.  A lot.
16  Q.        He allocated you nine stalls February
17  7th, 2008?
18  A.        He did.
19  Q.        And that was for what time period?
20  A.        That was for March 1st through August
21  31st.
22  Q.        So it says right on this one it's for
23  a six month period commencing March 1, 2008
24  through August 31st, 2008; is that correct?

63c8bf88-9918-4cd5-8f34-92041e5909f6

## Page 85

1  A.      Yes, that's what I see.
2  Q.      Let's go to the next one.  Okay.
3      This is the stall application you
4  filled out, correct, for that -- for the period
5  January 1 through June 30th of 2008?
6  A.      Correct.
7  Q.      So the last one we just looked at
8  would have been the allocation you received --
9  A.      The nine stalls based on that
10 application.
11 Q.      Okay.
12      So this is the one we actually were
13 just talking about a moment ago where you had 13
14 horses and you got nine stalls?
15 A.      Correct.
16 Q.      Let's go to the next one.
17      Just for a minute, for the record,
18 this is just the back page of that application.
19 These applications are two sided or --
20 A.      They're two-sided.  I couldn't tell
21 you what any of that is, though.
22 Q.      Let's take a look at something, it
23 may come up later in this case.  Focus down on
24 the bottom portion.

## Page 86

1      Do you see the sentence where it
2  says, in the event of a conflict between the
3  terms of this agreement and any agreement between
4  Charles Town Races and Slots and the Horseman's
5  Benevolent & Protection Association the -- I
6  don't know if we have everything on there --
7      ARBITRATOR WYCOFF:  Could you
8  point that out exactly on there where it is?
9      MR. WADDELL:  Yes, I will.
10 It begins right -- this, three up.  Right here.
11 In the event of a conflict.
12      ARBITRATOR WYCOFF:  Thank
13 you.
14 BY MR. WADDELL:
15 Q.      It says, in the event of any conflict
16 and the terms of this agreement shall govern and
17 control.  This agreement represents the entire
18 agreement between the parties and supersedes all
19 prior agreements and understandings.
20      Do you see that?
21 A.      I saw that.
22 Q.      Were you required to sign this form
23 in order to submit a stall allocation?
24 A.      I actually refused to sign the form.

## Page 87

1  And they said that they would not even consider
2  my application unsigned.
3      I actually wrote underneath my name
4  signed it, I think something silly, signed under
5  duress or something.  And they gave me my
6  application back and said they refused to accept
7  it like that.
8  Q.      For which -- do you know which
9  application?
10      MR. WOLFSON:  I object to the
11 testimony.  Now we're getting into that issue.  I
12 just want to point out, again, that, you know, in
13 light of what we talked about earlier in the
14 contract about the discretion, if we're going to
15 go here, we may have to get into issues of
16 drafting history and which supersedes discretion
17 as opposed to this, how does this fit in with the
18 discretion.  And we're going to -- I just submit
19 to the Panel, it is again an issue of where we
20 may be going where we --
21      ARBITRATOR CARNEY:  We can
22 rule on that issue at lunchtime.  And I think,
23 Mr. Waddell, you're just taking the witness
24 through the process of operating, you're

## Page 88

1  not -- are you going to go further on this
2  particular issue?
3      MR. WADDELL:  Not with this
4  witness, no.
5      ARBITRATOR CARNEY:  That's
6  fine.
7  BY MR. WADDELL:
8  Q.      This is still Exhibit 39, part of
9  Exhibit 39.
10 Do you recognize this particular exhibit?
11 A.      It's the same exhibit.  I mean, it's
12 the same information, I'm sorry.
13      It's a stall allocation letter, it's
14 official notification.  I'm not sure why they did
15 it twice.
16 Q.      Take a look at it closer, because
17 I --
18 A.      Oh, I'm sorry, I apologize.  That's
19 the reduction letter.  That's where they took
20 four stalls from me.
21 Q.      You were given 9 stalls in
22 February --
23 A.      Right.
24 Q.      -- of 2008, correct?

Page 89

1  A.      Correct.
2  Q.      **This is a letter now you're receiving**
3  **about two months later, April 25th of 2008?**
4  A.      Right.
5  Q.      **And it's --**
6  A.      It was not during an allocation
7  period.
8  Q.      **It's signed by, again, Richard Moore?**
9  A.      Correct.
10 Q.      **And here he has the title general**
11 **manager of racing, that's what I was searching**
12 **for earlier, general manager of racing?**
13 A.      Right.
14 Q.      **He's telling you that the nine stalls**
15 **they gave you in February are being reduced by**
16 **four stalls?**
17 A.      That's right.
18 Q.      **When you got this -- how did you get**
19 **this notification?**
20 A.      I believe it was hand delivered by
21 the stall superintendent who was Mike Elliott.
22 Q.      **What did you do once you received**
23 **this notification?**
24 A.      At that time the issue was

Page 90

1  surrounding my having been supposedly in other
2  people's stalls without permission.  Myself,
3  George Yetsook, I believe Mr. Wilt, several
4  people -- I know myself and George Yetsook went
5  up and spoke to Randy Wehrman, the new racing
6  secretary.  So it was right around that same
7  period of time.  And Mr. Zimny was present for
8  that meeting.  It will explain the circumstances
9  of how both Mr. Lamp had given permission and Mr
10 Moore was aware of the circumstances.
11 Q.      **Okay.**
12 **Let me back you up for a second.**
13 **So you had a meeting with whom?**
14 A.      Eric Zimny and Randy Wehrman, myself,
15 Lenny Hale, George Yetsook.
16 Q.      **Why was Lenny Hale and George Yetsook**
17 **at this meeting if this involved you?**
18 A.      Because the whole reason that they
19 gave for reducing my number of stalls was they
20 said that I was borrowing stalls.  Which had been
21 a common practice.  Everybody did it, every track
22 I've been to they did it.  As long as you gave
23 the racing office proper notification, which I
24 did.  So I didn't make it too awfully hard for

Page 91

1  them to find me because I notified them exactly
2  whose stalls I was in.
3  Q.      **Let me back you up for a minute.**
4  **Whose stalls did you have horses in?**
5  A.      I had one in Mr. Yetsook's, I had two
6  in Mr. Butts', Mr. Richard Butts, and I had one
7  in Ronnie Wilts.
8  Q.      **So you had four horses in stalls that**
9  **belonged to other trainers?**
10 A.      That's correct.
11 Q.      **And these were -- were these trainers**
12 **also in the same barn you were in?**
13 A.      They were all in Barn 14.
14 Q.      **Had you had any discussion with them**
15 **about doing this?**
16 A.      Absolutely.  We had permission.  We
17 called, we got permission, both of us.  Myself
18 and Mr. Yetsook went to Mr. Lamp together to ask
19 for permission.
20 Q.      **At this time was there any rule,**
21 **published or written rule, that required you to**
22 **get written permission to do this?**
23 A.      No, absolutely not.
24 Q.      **Is --**

Page 92

1  A.      They --
2  Q.      **Go ahead.**
3  A.      The idea is to keep the stalls full.
4  So you have the maximum amount of horses so you
5  can fill races.  It was not an uncommon practice
6  for people to share stalls.  You just had to, for
7  the whole bio security thing, you had to notify,
8  you know, the stall superintendent, the stall
9  man, the racing secretary, someone had to have
10 knowledge of where your horses were at all times.
11 And we always maintained that practice.
12 Q.      **Now, you mentioned you wanted to keep**
13 **the stalls full.  If you're a trainer, why would**
14 **you have an empty stall in the first place?**
15 A.      Horses get injured, horses need to be
16 turned out.  You may have -- if I only have nine
17 stalls and I have a client that I have five
18 horses for and we have a falling out or he just
19 wants to move his horses to Maryland and compete
20 there, I may have five, suddenly five open stalls
21 that need to be filled.  And that's not uncommon.
22 Q.      **Let's say you don't have five horses**
23 **that you can immediately put in those stalls,**
24 **then what do you do?**

Page 93

1  A.       Well, again, this whole stall sharing
2  was, you know, was a very good thing because you
3  saw my application, I had 13 horses.  With
4  getting help from other members, other trainers
5  in my barn, I was able to keep those horses in
6  training and participate in races.
7  Q.       There was a benefit to them as well,
8  correct?
9  A.       Absolutely.  Because the rule is, if
10 you have an empty stall for more than, I don't
11 know what it is now because I'm not on the
12 racetrack, but I believe it's more than ten days,
13 they come and take it away from you.
14 Q.       So if you're a trainer with an empty
15 stall, you want to get a horse in there?
16 A.       Absolutely.
17 Q.       Now, you -- you said you had
18 permission for each horse that you had in a
19 different stall that didn't, wasn't assigned to
20 you, correct?
21 A.       Absolutely.
22 Q.       You had permission from whom?
23 A.       Initially -- I mean, again, it kind
24 of runs together because I've done this under

Page 94

1  Mr. Lamp, we've traded stalls, we've loaned
2  stalls, we've borrowed stalls, we've done this
3  under Mr. Lamp, Mr. Moore was aware of it,
4  Mr. Hammond, it was a common practice.
5        So we had, for those particular
6  stalls I had permission from Mr. Lamp initially
7  and then Mr. Moore.  We -- when he took over the
8  interim, we apprised him of the situation.
9  Q.       Tell me about Mr. Butts, do you know
10 why he had empty stalls?
11 A.       Actually he had, initially, I
12 believe, four empty stalls.  He made a phone
13 call -- well, I'll back up.
14       He told me that he had called --
15       MR. WOLFSON:  I'm going to
16 object to testimony or, from Mr., about what
17 Mr. Butts said.
18       MR. WADDELL:  I'm not trying
19 to elicit testimony about what he said.
20 BY MR. WADDELL:
21 Q.       I just asked you, do you know why he
22 had empty stalls?
23       MR. WOLFSON:  Because he told
24 her.

Page 95

1        MR. WADDELL:  That is not
2  necessarily inadmissible just for that fact.
3        ARBITRATOR CARNEY:  What's
4  the purpose of finding out why he had stalls?
5  I mean the witness testified there are empty
6  stalls.  Why is it relevant why there are empty
7  stalls?
8        MR. WADDELL:  I don't
9  have -- I mean, it's not a big issue with me, I
10 don't have to get into it.
11       ARBITRATOR CARNEY:  We will
12 admit this for the truth of the matter asserted,
13 we'll hear it for her, why she proceeded the way
14 she did.
15 BY MR. WOLFSON:
16 Q.       How old is Mr. Butts?
17 A.       I think he's 90.
18 Q.       Was he trying to --
19 A.       Scale down his operation, yes.
20 He initially had four empties.  Part of the
21 reason, I personally believe part of the reason I
22 went from seven to nine is because he and Dickie
23 Moore are good friends and he asked Mr. Moore if
24 I could have two more stalls.  He didn't want

Page 96

1  anybody else in the barn.
2        In that particular shed row, as they
3  say, that section of stalls, so there is four
4  sections of stalls, front and back, a breezeway,
5  front and back.
6        In that section of stalls it was just
7  myself and Mr. Butts.  Giving someone else just
8  two stalls would have brought another trainer
9  into the barn, you know.
10 Q.       What is the disadvantage of having
11 another trainer come into the barn?
12 A.       It's just, you know, you're kind of
13 like a family, it's having one more roommate in
14 the house.  It's worrying about more people
15 coming and going.  You try to maintain some sort
16 of barn security.  So it's one more person coming
17 and going, it's more equipment in the shed row,
18 more feed, you know, just more space taken up by
19 a third person.
20 Q.       So do you explain that you have
21 approval to Mr. Zimny sitting here --
22 A.       Absolutely.
23 Q.       Who was the other gentleman you were
24 meeting with?

63c8bf88-9918-4cd5-8f34-92041e5909f6

1  A.        Mr. Wehrman.
2  Q.        Explained that you had approval?
3  A.        Yes.
4  Q.        So what was the response?
5  A.        The response was, if we could get
6  Mr. Lamp to corroborate that, that that had been
7  a practice, that we got permission from him, then
8  that would be no problem.  They made it sound
9  like, okay, we'll fix this.  Just, you know, we
10 need to know that that's actually what happened.
11 Then when we contacted Mr. Lamp and he was
12 willing to corroborate this, the answer I got
13 was, well, he is a disgruntled employee, he'll
14 say anything.  That was the end of it.  They
15 didn't take my calls after that.
16 Q.        All right.
17           So long and short of it is, you lost
18 four stalls?
19 A.        Yes.
20 Q.        Even though you had approval?
21 A.        Correct.
22 Q.        Let's go to the next one.
23           This is, again, Exhibit 39 for the
24 Claimant.  And I guess it's part 2 for the

1  Respondent.
2           Do you recognize this document?
3  A.        Yes.  Another stall application for
4  September through December of 2008.
5  Q.        So you're on a six month time frame,
6  it looks like?
7  A.        Yes.
8  Q.        You had gotten -- in February you got
9  nine stalls and in April you got four stalls
10 taken away, so now you've got -- you've actually
11 got five stalls?
12 A.        Right.
13 Q.        And you're applying for nine stalls?
14 A.        Right.
15 Q.        For the period, the latter six months
16 of 2008?
17 A.        Right.
18 Q.        I see you have STK, Up To Mischief.
19 Is that a stake horse?
20 A.        At that point yes.
21 Q.        That is the top of the line horses?
22 A.        Right.
23 Q.        Why is no under -- the claiming under
24 She's a Hot Honey and Key Prospect, why no?

1  A.        If you'll see under last start
2  there's a slash, that means they haven't run yet.
3  I believe they were -- does it have the age
4  there?  I believe these were two year old horses
5  that have not run yet.
6           So it really, you're only speculating
7  what their value is.  You hope to start all of
8  them in that upper category of allowance.  You're
9  going to base that on their works, and their
10 performance, and what they show you in the
11 morning.  And then you decide where to run them.
12           ARBITRATOR KARLIN:  Can I get
13 some clarification.
14           You said this was for the last six
15 months, but it says September 1st to December
16 31st.  Up in the upper --
17           THE WITNESS:  It does,
18 doesn't it?
19           MR. WADDELL:  You're right.
20 BY MR. WADDELL:
21 Q.        I know why, it's because when you got
22 it in February they -- they changed the timing on
23 it.
24 A.        Right.

1  Q.        So you got reduced in the latter half
2  of 2008, you're only looking at four months,
3  September, October --
4           MR. WOLFSON:  The allocation
5  of the previous period was for the period March
6  through August 31.  They were making it up to the
7  end of the year to got back on a six month
8  calendar.
9           MR. WADDELL:  Thanks.
10           MR. WOLFSON:  Sure.
11 BY MR. WADDELL:
12 Q.        Did you get your allocation of
13 13 -- or, no, for nine, I'm sorry.
14           Did you get an allocation based on
15 your request for nine stalls?
16 A.        No, I got five stalls.
17 Q.        You had five stalls.
18 A.        Right, they rolled it over.  So I
19 only got five stalls.
20 Q.        That's news to me.
21 A.        They didn't take them until September
22 12th of 2008.
23           Oh -- I'm sorry, my apologies.  I got
24 the dates mixed up.  September 12th is when we

63c8bf88-9918-4cd5-8f34-92041e5909f6

Page 101

1  went to court for the injunction.  That's when
2  they took them.
3       So, no, I got zero stalls to answer
4  your question.
5  **Q.        Okay, good.  I'm glad we --**
6  A.        Sorry.
7  **Q.        So is this the notice you got telling**
8  **you were going to get no stalls?**
9  A.        That's right, I had 14 days to
10 vacate.
11 **Q.        It was signed by Randy Wehrman at**
12 **this point?**
13 A.        Right.
14 **Q.        At this point he has now become the**
15 **racing secretary?**
16 A.        He is the racing secretary.
17 **Q.        The date is important, it's August**
18 **29, 2008?**
19 A.        Right.
20 **Q.        This was -- do you recall that this**
21 **was about ten days after your meeting with the**
22 **Governor of West Virginia?**
23 A.        Yes, it is.
24            ARBITRATOR WYCOFF:

Page 102

1  Mr. Waddell, again, for us novices, could you
2  have the witness explain exactly what is a racing
3  secretary?  Who employed by, role, all of that.
4            MR. WADDELL:  Sure.
5            ARBITRATOR WYCOFF:  I know it
6  was in the argument the other day, but I'm not
7  real clear on.
8  BY MR. WADDELL:
9  **Q.        Can you tell us what a racing**
10 **secretary is?**
11 A.        To the best of my ability.
12 **Q.        Okay.**
13 A.        A racing secretary is a state racing
14 official.  He is an employee of Penn Gaming, but
15 he is a state racing official.  His job is to
16 look at all of the horses that are stabled on the
17 grounds.  Part of his job is to allocate stalls
18 based on those horses, based on the applications.
19 He writes a racing, it's called Racing Condition
20 Book.  So each month it goes month by month and
21 day by day.  So each racing day.  And there are
22 five racing days right now.
23       He'll put out probably 14 or 15
24 different types of races.  But the good thing is

Page 103

1  you know a month in advance so you can plan.
2            ARBITRATOR WYCOFF:  What is
3  the book's name?
4            THE WITNESS:  The Condition
5  Book.
6            ARBITRATOR WYCOFF:  What is
7  it?
8            THE WITNESS:  That lists the
9  races for each day that you can run in, that you
10 can enter your horse in.
11 BY MR. WADDELL:
12 **Q.        Now, the Condition Book on these**
13 **races, it designates the type, like two year old**
14 **maidens that have -- I don't know, whatever.**
15 A.        Right.
16 **Q.        Those are the conditions on that**
17 **particular race?**
18 A.        Correct.  And he writes about, I
19 think, 14 or 15, sometimes he even writes some
20 extras if he is short on horses.  Or if he can't
21 get enough to make nine races go, he might write
22 what's called extras, he might even write extra
23 races.
24       So he writes all these races and puts

Page 104

1  them in a book.  So you may go to June 10th and
2  there will be all these races listed.  The first
3  race may say $5,000 maiden, three year old
4  fillies.  Then there is an index.  So you can
5  look up in advance if you have that specific
6  horse what days there might be a race that you
7  can run in.
8  **Q.        Now, also, and I don't expect you to**
9  **get into this, but by regulation, racing**
10 **regulation, the racing secretary has specific**
11 **responsibilities and duties and that's a matter**
12 **of record?**
13            MR. WOLFSON:  I object.
14 You're asking the witness to testify about what
15 the regulations are.
16            MR. WADDELL:  I'm just trying
17 to clarify.
18       Are you agreed there are regulations
19 that the racing secretary is allotted
20 responsibility --
21            MR. WOLFSON:  I mean, it is
22 what it is.
23            ARBITRATOR CARNEY:  You can
24 ask the witness what her experience is --

1           MR. WADDELL: I'm just
2 trying -- the gentleman had a question about --
3           MR. WOLFSON: I understand
4 that.
5           ARBITRATOR CARNEY: You can
6 ask her what her experience is in terms of what
7 the racing secretary does.
8           MR. WADDELL: I'm finished
9 with that, okay.
10 BY MR. WADDELL:
11 **Q.      So you get this notice. I mean, are**
12 **you surprised?**
13 A.      Absolutely. I was shocked. I've
14 never, ever even been cut a single stall in my
15 entire 30 years of training.
16 **Q.      What do you do about it?**
17 A.      That's when we initially had the
18 meeting with Mr. Zimny, Mr. Wehrman, Lenny Hale,
19 myself and George Yetsook.
20 **Q.      I thought that was when you --**
21 A.      Sorry, sorry, I'm getting confused.
22 That's when I contacted -- I went to the board,
23 discussed it with the board. And with the
24 board's support we had Mr. Hammer file an

1 injunction.
2 **Q.      So you initiated legal action?**
3 A.      Right.
4 **Q.      Let me back you up for a minute.**
5 **I'm moving back to an exhibit we**
6 **already looked at. I just want to establish, on**
7 **April 25th you get this letter, and this is**
8 **cutting your stalls by --**
9 A.      Four.
10 **Q.      Four. Okay.**
11 **Do you recall a meeting of the HBPA**
12 **board of directors on April 29th, 2008?**
13 A.      Is that when Mr. Schneider was
14 present?
15 **Q.      Yes.**
16 A.      Yes.
17           ARBITRATOR KARLIN: This is
18 what, Claimant's 4?
19           MR. WADDELL: This is
20 Claimant's 4, yes.
21 BY MR. WADDELL:
22 **Q.      Do you recognize these minutes, can**
23 **you see this?**
24 A.      Yes.

1 **Q.      You can refer to it in the book.**
2 A.      This is probably better, thank you.
3           ARBITRATOR KARLIN: I seem to
4 be missing -- oh, no, I'm in the wrong book,
5 sorry about that.
6 BY MR. HAMMER:
7 **Q.      Do you recognize the document?**
8 A.      Yes, I do.
9 **Q.      What is it?**
10 A.      Charles Town Board of Directors
11 Minutes for April 29th, 2008.
12 **Q.      It has a list of attendees at the**
13 **meeting which would include yourself?**
14 A.      Correct.
15 **Q.      Let me direct you -- at this meeting,**
16 **did you raise concerns about what you felt was**
17 **being targeted by the track?**
18           MR. WOLFSON: Objection.
19 There has been no testimony at all by the witness
20 that she felt she was being targeted by the track
21 at this time.
22           MR. WADDELL: Let me withdraw
23 that question.
24           MR. WOLFSON: And I also

1 object to any conversations between the witness
2 and other members of the other party here. That
3 is clearly hearsay.
4           ARBITRATOR WYCOFF: When you
5 say the other party, who are you talking about?
6           MR. WOLFSON: HBPA.
7           ARBITRATOR WYCOFF: Pardon?
8           MR. WOLFSON: This is the
9 HBPA Board Meeting. So if he's about to have her
10 testify what she's discussed with other members
11 of the HBPA Board, that's hearsay.
12           MR. WADDELL: It's a matter
13 of record and it's your exhibit. You have the
14 same exhibit.
15           MR. WOLFSON: That doesn't
16 mean we intend to introduce it for the record for
17 what was said at the meeting. It's for
18 cross-examination purposes that we're alerting
19 you what we have available.
20           MR. WADDELL: Well, you asked
21 if we wanted joint exhibits and that was one we
22 said we would --
23           MR. WOLFSON: Absolutely, for
24 use of the hearing. We agree.

Page 109

1    ARBITRATOR WYCOFF:  Is
2  anything here an admission by a party?
3    MR. WOLFSON:  No, we were not
4  present at that.
5    MR. WADDELL:  I just want to
6  establish -- no, it's not an admission by a
7  party.  This is a meeting of the HBPA.  I
8  want -- what I'm trying to establish through
9  this, the minutes in here and this witness, is
10  she had concerns at this point that she was
11  already --
12    ARBITRATOR CARNEY:  She can
13  testify as to what she said at the meeting and
14  what concerns she expressed.
15    MR. WOLFSON:  That's right.
16  What's related by others in here is hearsay and
17  that's why I'm objecting.
18  BY MR. WADDELL:
19  **Q.    What concerns did you have at this**
20  **time that you expressed at this meeting?**
21  A.    My concerns were that the reduction
22  in my number of stalls were motivated by
23  something other than a practice that we had done
24  from day one every day.  For that suddenly to

Page 110

1  become an issue, you know, I really strongly felt
2  it was motivated by other factors.  And that was
3  my testifying for Randy Funkhouser.
4  And this was bore out by the fact that three
5  trainers testified for Randy Funkhouser --
6    MR. WOLFSON:  Objection.  Now
7  we're getting into hearsay, what others said,
8  what others did, what happened to them.
9    MR. WADDELL:  She knows what
10  happened, she knows this, she was present at the
11  hearing.  This isn't hearsay.
12    MR. WOLFSON:  No, she's about
13  to testify what other trainers received, what
14  other communications were received by other
15  trainers.  That is clearly hearsay.
16    MR. WADDELL:  I don't think
17  she was about to do that.
18    THE WITNESS:  No.
19    ARBITRATOR CARNEY:  She can
20  testify as to what she said, she can testify as
21  to what she knew, not based on what people told
22  her at a meeting.
23    MR. WOLFSON:  Exactly.
24  Exactly.

Page 111

1  BY MR. WADDELL:
2  **Q.    Your concerns were based on what,**
3  **again?**
4  A.    That they were targeting trainers
5  that testified for Randy Funkhouser because,
6  quote, unquote, from Mr. Schneider present --
7    MR. WOLFSON:  Objection.
8  BY MR. WADDELL:
9  **Q.    He's raised an objection to that.**
10  **And I agree with him.**
11  A.    Okay, I'm sorry.
12  **Q.    We're not getting into that.**
13  **It's in the minutes --**
14  A.    Okay.
15  **Q.    but we're not getting into it.**
16  **But you --**
17    ARBITRATOR CARNEY:  Just say
18  what you said at the meeting.
19    THE WITNESS:  What I said.
20  I have concerns that I am being targeted because
21  of my association with Mr. Funkhouser for
22  testifying at his trial.
23    ARBITRATOR CARNEY:  Now, if
24  her state of mind is relevant and impacted by

Page 112

1  what somebody else said, we can hear that for
2  impact on her motivation.
3    MR. WADDELL:  Well, it's in
4  the minutes what she was referring to.  And it
5  did -- that's what her state of mind was based on
6  was what had been told to her by someone else.
7  Whether it's true or not, that's what was told to
8  her.
9    MR. WOLFSON:  I just want to
10  be clear.  If we're talking about action that
11  happened months later -- because no action was
12  taken until September after the August -- no
13  allocation.  No action was taken at this time.
14  So that's --
15    ARBITRATOR WYCOFF:  But she
16  brought an injunction, didn't she?
17    MR. WOLFSON:  Months later,
18  not at this time.
19    ARBITRATOR WYCOFF:  If
20  something -- my point is, if something was said
21  at this meeting that was part of her state of
22  mind, why she decided to bring the injunction,
23  that is relevant and admissible.
24    MR. WOLFSON:  I don't

Page 113

1  necessarily dispute that depending on how it
2  comes up at that time.  But we are offering at
3  this time for a different purpose when it first
4  came up.  That's all --
5          ARBITRATOR WYCOFF:  This is
6  the problem with being an old trial lawyer, I
7  can't shut up.  I'm sorry.
8          ARBITRATOR KARLIN:  I'm glad
9  you said that, because I've been restraining
10 myself immensely.
11         MR. WADDELL:  All I'm
12 trying -- I mean, it's up to you.  All I'm
13 trying -- she had a reason why she felt she was
14 being targeted.  It's in the minutes.
15         THE WITNESS:  Yes.
16         ARBITRATOR CARNEY:  And she's
17 explained it, she said she told the people at the
18 meeting why she thought she said -- if I
19 understand her testimony.  One, she is being
20 discriminated against because she lost four
21 stalls and she explained why she believes she was
22 being discriminated.  She testified because of
23 Mr. Funkhouser, so...
24 BY MR. WADDELL:

Page 114

1  Q.     I'm going to move on.
2          Oh, is this what you said in the
3  minutes, is this the reason you gave?  Was this
4  your state of mind at the time why you thought
5  you were being targeted?
6  A.     That was my state of mind.
7          Can I elaborate?
8  Q.     Please do.
9  A.     Can I say anything Mr. Schneider said
10 to me, directly to me.
11         MR. WOLFSON:  My objection
12 stands.
13         ARBITRATOR KARLIN:  I think
14 that we're all experienced attorneys here and
15 that we can -- honestly, that we can separate out
16 whether something is for the truth of the matter
17 asserted or something for someone's state of
18 mind.
19         I think we understand that
20 distinction and we'll honor it.
21         MR. WOLFSON:  I don't dispute
22 that.  I just want it to be clear that it can't
23 be offered for the truth.  That was my point.
24         ARBITRATOR KARLIN:  I

Page 115

1  understand that.
2          ARBITRATOR CARNEY:  We all
3  agree to that.
4  BY MR. WADDELL:
5  Q.     Tell us what your actual discussions
6  were with Mr. Schneider that led you to this
7  concern that you might be being targeted?
8  A.     Mr. Schneider came to me and said
9  after Patty Burns had lost all of her stalls, one
10 of the other people testified for Mr. Funkhouser,
11 he said, losing your four stalls was a warning,
12 you're on the hit list, anybody that supports
13 Funkhouser is on the hit list.
14 Q.     That's what he said to you directly?
15 A.     That's what he said to me.
16 Q.     Is that what you were alluding to
17 when you -- in the minutes here?
18 A.     Yes.
19 Q.     In August of 2008 were you in
20 violation of any racing rule or regulation?
21 A.     No, never.
22 Q.     Were you in violation of any track
23 rule?
24 A.     No, never.  Never been in violation

Page 116

1  of any rules that I know of.
2  Q.     Have the quality of your horses
3  changed in any way?
4  A.     Nothing.  No, exceeded my number of
5  starts.
6  Q.     Can you think of any legitimate
7  criteria used by the track that you weren't
8  meeting when you applied for these stalls in
9  August of 2008?
10 A.     None.
11 Q.     Did anybody -- any management people
12 at the track give you any explanations for why
13 they were taking all of your stalls?
14 A.     Mr. Finamore's is the first
15 explanation I've ever heard, and that was a
16 couple weeks ago.
17 Q.     Before that, back --
18 A.     No.
19 Q.     at the time this occurred?
20 A.     No.  They wouldn't -- no.  They
21 wouldn't give me an explanation, they never did.
22 They wouldn't talk to me.  They wouldn't return
23 my calls.
24 Q.     Is this the letter -- do you

Page 117

1  recognize this exhibit?
2  A.      Yes.
3          MR. WOLFSON:  I'm sorry,
4  which one is this now?
5          MR. HAMMER:  This is Exhibit
6  39, September 12th, 2008.
7          THE WITNESS:  My notice to
8  vacate, basically.
9          ARBITRATOR WYCOFF:  It says
10 Moore 6.
11 BY MR. WADDELL:
12 Q.      First you got the letter from the
13 racing secretary telling you you have no stalls
14 allocated, correct?
15 A.      Right.
16 Q.      This is a follow up letter you get on
17 September 12th by Mr. Moore?
18 A.      That is my letter to vacate, yes.
19 Q.      Did you vacate?
20 A.      Absolutely, within the time frame,
21 yes.
22 Q.      So you weren't -- you weren't
23 refusing to vacate stalls or anything of that
24 nature?

Page 118

1  A.      No, we followed the injunction, but I
2  was out by the specified time.
3  Q.      Where did you -- when you removed the
4  horses from those stalls, where did you place
5  them?
6  A.      Oh, my gosh, it was a mess.
7          A couple across the street, stalls
8  were hard to come by.  A couple at a nearby farm.
9  I still had my farm at the time before it was
10 foreclosed on, I had a couple at my farm.  And
11 then I have some property at my house and I had
12 some of the horses at my house.
13         So I was spread out in four different
14 locations.
15 Q.      For a while?
16 A.      For a while.  Quite a while.
17 Q.      Let's move on to the next one,
18 exhibit.
19         Did you continue to submit
20 applications for stalls after 2008?
21 A.      Well, they never gave me a reason
22 that they took my stalls, so I just kept
23 applying.
24 Q.      Do you recognize this exhibit?

Page 119

1  A.      Yes, I do.
2  Q.      This appears to be a stall
3  application for the period January 1 through June
4  30th of 2009, correct?
5  A.      Yes.
6  Q.      You have requested ten, stalls for
7  ten horses?
8  A.      Correct.
9  Q.      Did you get a response to this?
10 A.      I believe I did.
11 Q.      Let's see if we got one.
12         Is this the response you received
13 from the track?
14 A.      That's -- yes, it is.
15 Q.      This appears to be dated December
16 17th, 2009 signed by Mr. Wehrman, racing
17 secretary saying they reviewed your application
18 and they're exercising their discretion and are
19 unable to allocate any stalls for this period
20 in -- it says 2010.
21         So that's not the 2009 one.
22         MR. WOLFSON:  It's from
23 December 2009, the letter, December 2009.
24 Starting January 2010.

Page 120

1          MR. WADDELL:  You're right.
2  I'm sorry, my mistake.
3  BY MR. WADDELL:
4  Q.      Let's go on to the next one.
5          Did you make an application for the
6  second half of 2009, July 1 through December
7  31st?
8  A.      I did.
9  Q.      Is that the application?
10 A.      Yes.
11 Q.      If we could look at -- you requested
12 15 stalls --
13 A.      Yes.
14 Q.      -- in this application?
15 A.      Yes.
16 Q.      Did you receive any stalls?
17 A.      No.  And it's safe to say I never got
18 stalls.
19 Q.      You've never gotten any stalls
20 since --
21 A.      2008.
22 Q.      -- 2008 when all your stalls were
23 taken; is that correct?
24 A.      That's correct.  And every

Page 121

1  application period I have applied for stalls.
2  Q.     Let's see the ones we do have.
3  This is a -- what's this exhibit?
4              MR. HAMMER: 39.
5  BY MR. WADDELL:
6  Q.     But I'm asking you, what is it?
7  A.     I believe that was for the second
8  half of 2009.
9              ARBITRATOR KARLIN: Can I
10 ask, is there a factual dispute between the
11 parties as to whether she applied for every
12 available, twice a year, for every year since she
13 was first not allocated stalls and in every case
14 she's been denied application, she has been
15 denied any stalls?
16             MR. WOLFSON: She has not
17 been allocated any stalls, she applied each time.
18 And it's never been in dispute.  That's right.
19             MR. WADDELL: As long as
20 we're agreed on that there is no need to go
21 through these.  I'll go through these later for a
22 different purpose.
23             THE WITNESS: Okay.
24             ARBITRATOR CARNEY: Would

Page 122

1  this be a good time to take a lunch break?
2              MR. WADDELL: I think it
3  would be an excellent time.
4              ARBITRATOR CARNEY: Let me
5  just ask one question, any objection to the
6  admission of Claimant's Exhibit No. 1 which is
7  the Collective Bargaining Agreement and
8  Claimant's Exhibit 39.
9              ARBITRATOR WYCOFF: Rules are
10 a little bit more relaxed in arbitration, but if
11 one of the sides shows an exhibit that we see and
12 then talked about and there is no objection,
13 should we assume that it's admitted?
14             MR. WOLFSON: Well, there may
15 be exhibits used for reasons other than
16 admitting.
17       For instance, the board minutes.  I
18 had marked for cross examination purpose, I never
19 intended those to be admitted, so --
20             ARBITRATOR WYCOFF: But she
21 is a member of the board and it could be
22 established a foundation hasn't been.  So are you
23 objecting to their being admitted as substantive
24 evidence?

Page 123

1              MR. WOLFSON: As -- yes,
2  because to the extent it reflects hearsay, it can
3  only be admitted for specific purposes.  It can't
4  be admitted for necessarily the truth of the
5  matter, it could be admitted for what was said.
6  So that's why I just want to be clear when we
7  admit it that there may be conditional or
8  qualified admissions.
9              ARBITRATOR KARLIN: That was
10 Claimant's 4?
11             MR. WOLFSON: I don't
12 remember.  It was whatever the board minutes
13 were, yes.
14             ARBITRATOR WYCOFF: But
15 rather than coming back to that tomorrow I think
16 as the exhibits are gone over, we should get it
17 clarified whether it's being admitted, or
18 conditional, or whatever.
19             MR. WOLFSON: That's fine, we
20 should do it at the time.
21             ARBITRATOR KARLIN: So C-1,
22 C-4 and C-39 are admitted subject to your
23 making the point that some of those may be
24 admitted not for the truth of the matter

Page 124

1  inserted?
2              MR. WOLFSON: Exactly.
3              ARBITRATOR CARNEY: C-4, you
4  have no objection?
5              MR. WOLFSON: I don't have an
6  objection to it being admitted, I object to it
7  being admitted for the truth of the matter.
8              ARBITRATOR CARNEY: But you
9  have no objection, period, to C-1 and C-39?
10             MR. WOLFSON: That's right.
11             ARBITRATOR CARNEY: Would an
12 hour do everybody or should we take longer?
13             MR. HAMMER: Hour is fine for
14 us.
15             * * *
16             (Brief break)
17             * * *
18             ARBITRATOR CARNEY: There are
19 two matters pending before the Panel.  The first
20 involved a question of whether the Horseman's
21 Association can come forward at this point and
22 present a claim that historically
23 meant -- violates the collective bargaining
24 agreement.

Page 125

1    Now, that's not a claim that Miss
2  Mawing is making or can make on her own behalf
3  because she's not been damaged by the provisions
4  in the stall agreement.
5    While we had the Association in on
6  the first conference call on this case
7  represented by separate counsel, at that point
8  the Association said that it's taking only a
9  nominal role in the case, being a nominal
10  participant.
11    Accordingly, we do not believe that
12  the claim can be amended at this point in time to
13  permit the Association to bring a claim with
14  respect to the like violation of a CBA by stall
15  agreement.
16    Now, that's ruling without prejudice
17  to any future litigation but simply saying that
18  this is not something that we could consider
19  here.
20    The second issue is a question of
21  whether Miss Mawing can amend her claim to
22  include a claim for violation of the West
23  Virginia statute we've all been talking about.
24  That's a claim we're going to defer ruling on

Page 126

1  until the close of the plaintiff's case because I
2  think at that point the respondent would be in a
3  position to argue whatever prejudice they may
4  have by letting the claim be amended.
5    So certainly from that standpoint
6  nothing in this ruling prohibits the claimant
7  from putting on evidence with respect to that
8  claim. While maybe the same evidence that it has
9  in other claim. But we'll defer for final
10  argument and ruling on it until the close of the
11  claimant, the plaintiff's case.
12    So with that, why don't we go back to
13  the direct examination of Miss Mawing.
14    MR. HAMMER: There was the
15  1st Amendment issue as well.
16    ARBITRATOR CARNEY: Well, I
17  understand Mr. Wolfson, he conceded that the 1st
18  Amendment issue is properly indicated. So we
19  understand that the claimant, 1983 claim, refers
20  to both rights under the 1st Amendment as well as
21  rights under the 14th Amendment.
22    MR. HAMMER: Okay.
23  BY MR. WADDELL:
24  Q.    Miss Mawing, now that we're back from

Page 127

1  lunch I would like to focus you on another aspect
2  of this case. And that is the issue of the whole
3  topic of making complaints and discovering
4  poison, some sort of rat poison at the track.
5    Do you understand what I'm talking
6  about?
7  A.    Yes.
8  Q.    Can you tell me when that first
9  became an issue for you?
10  A.    I believe it was right around early
11  June 2008.
12  Q.    How did it become an issue?
13  A.    I came in one morning and there were
14  dead rats everywhere. And I don't mean just one
15  or two, I mean 12, 15, 18, a huge amount of rats
16  laying dead, mostly in my shed row. And we had
17  had a rat problem, so it didn't surprise me,
18  maybe, that the track had taken some action
19  because that is part of our contract.
20  Q.    When you say it's part of your
21  contract, you're referring to the agreement, the
22  agreement between the HBPA and the track Exhibit
23  1, Claimant's 1 in this case?
24  A.    Correct. There is some wording that

Page 128

1  speaks -- there it is, rodent and pest control
2  and eradication. That is something the track has
3  to maintain.
4  Q.    So the track has a responsibility to
5  exercise rodent, and pest control, and
6  eradication?
7  A.    Yes.
8  Q.    You don't dispute that?
9  A.    No, not at all.
10  Q.    So you discover a lot of rats dead in
11  the barn area?
12  A.    Yes.
13  Q.    Anything else then that occurs that
14  raises your, heightens your concern?
15  A.    At that point, no. No. And it was
16  maybe a few days later, a week later, that I had
17  a horse that became ill. And the horse just --
18  it looked initially like it had neurological
19  problems. The vets came -- several vets came by,
20  everybody took their shot at diagnosing it, we
21  ran tests on everything possible. Because it was
22  a very nice horse, it was an allowance horse, it
23  was an expensive horse.
24    So they did the standard supportive

Page 129

1 care, they hung IVs. Then they started testing
2 for West Nile, Leis (phonetic) Nile, salmonella.
3 I don't believe there is a test for botulism, but
4 I know that eventually we treated the horse with
5 two doses of antitoxin for botulism. So we were
6 just basically shot gunning what we were doing
7 with the horse.
8 Q.      Did you have the horse removed from
9 the barn area?
10 A.      When the horse didn't get any better
11 after two or three -- two to three days, we sent
12 it to an equine hospital. Because, again, it was
13 a very nice horse. So it went to equine hospital
14 and it expired about two days after that.
15 Q.      So the horse expired?
16 A.      Correct.
17 Q.      Did you take any action at that time
18 with regard to any concern about the poison?
19 A.      Not at that point.
20 The horse died. And then it was within a day or
21 two after the horse died that we continued to
22 have rats dying. It wasn't as significant
23 probably as that first day. But we continued to
24 have rats dying. And I was actually sitting on a

Page 130

1 bale of straw in the shed row and watched a rat
2 coming down the shed row and it's staggering, it
3 has like ataxia, where the front end and the back
4 end are discoordinated. Which interesting enough
5 was the exact same symptom my horse first
6 exhibited.
7         So I thought, what are the chances?
8 I know there's been a significant amount of
9 poison put down, or thought there were, to kill
10 all these rats. I mean, it was obviously a huge
11 dosing. Could the horse have gotten into it?
12 So that was my first thought where I made this
13 connect.
14 Q.      Did you take any action based upon
15 that connection?
16 A.      Yes. I went to -- I kind of worked
17 my way up the food chain. I went to our state
18 racing official, who is Mr. Wright. That was my
19 first stop.
20 Q.      Is that Danny Wright?
21 A.      Yes. And I said to Mr. Wright, this
22 is my concern, you know, I'm -- I have a concern
23 that maybe my horse was exposed to poison.
24 Because we've run all these tests and we never

Page 131

1 did figure out what the reason was this horse
2 died. Never ran a fever. Didn't appear to -- so
3 me being a nurse, the blood counts didn't show an
4 elevated white count, absolutely nothing that
5 would signify a disease process of any kind.
6 So I said, do you think there is any possibility?
7 He said, Hang on, let me call the track
8 superintendant, and that is Doug Bowlin, let me
9 ask Mr. Bowlin.
10 Q.      You were present during this
11 conversation?
12 A.      Yes, I was sitting right there with
13 Mr. Wright.
14         So he talked to Mr. Bowlin. And I
15 only heard Mr. Wright's end of the conversation.
16 And Mr. Wright hung up and said, Mr. Bowlin said
17 you don't have a rat problem. We don't have one
18 here at Charles Town.
19         I said, Well, then you have a bigger
20 problem, because there's a lot of dead rats.
21 Then there must be something else, because there
22 is a lot of dead rats here. So, yes, we do have
23 a rat problem.
24         And so he said, well, he also said

Page 132

1 they don't put down --
2         MR. WOLFSON: Mr. Wright is
3 not an employee, so this is clearly hearsay from
4 Mr. Wright. I mean, for background. But at some
5 point we're getting where it's inadmissible.
6         MR. WADDELL: He is
7 designated -- he is a steward and he is a racing
8 official at the track. I can concede your point
9 that he isn't an employee. And I don't really
10 care what he has to say, okay. So we'll
11 not -- I'm just tying to establish who she talked
12 to about the problem.
13 BY MR. WADDELL:
14 Q.      So what did you do --
15         ARBITRATOR CARNEY: State of
16 mind.
17         MR. WOLFSON: That's fine.
18 BY MR. WADDELL:
19 Q.      What did you do next?
20 A.      That was the end of it.
21 Q.      Well, you must have done something.
22 A.      Well, at that point when Mr. Wright
23 told me there is no -- A, there is no poison, so
24 that was the end of it as far as I was concerned,

Page 133

1  I took him at his word.
2  **Q.        What occurred next that caused it to**
3  **be a continuing issue?**
4  A.        A few days after that I got a phone
5  call from one of the employees of Mr. Butts in
6  the same shed room, and my groom arrived shortly
7  after, said you need to come right away, there is
8  something wrong where your goat.
9  **Q.        Did you go check your goat?**
10 A.        Immediately.  I was actually en
11 route.
12        And when I got there, the goat was
13 dying, it was laying on its side, it was dying.
14 It had, you can see from pictures, it's a very
15 healthy goat who had never been sick, we've never
16 had a problem with him.  He was laying there
17 dying.
18        And he had red foam coming out of his
19 mouth and nose.  Which being a nurse I recognize
20 as a sign of poisoning, it's called flash
21 pulmonary edema.  We get a lot of overdose
22 patients, unfortunately, and that is something I
23 know to be associated with poisoning.  So, again,
24 I made that connect.

Page 134

1  **Q.        What did you do when you discovered**
2  **your goat was dying?**
3  A.        Well, at that point -- the goat died
4  shortly thereafter.  We loaded the goat in the
5  truck.  I took the goat to Frederick, Maryland,
6  and had a necropsy done on him.
7  **Q.        Now, at some point in time, did you**
8  **discover poison in your barn area?**
9  A.        Yes.  Yes.  So now my brain is really
10 reeling, I'm trying to put this all together.
11 And most diseases, if it was a disease, they
12 don't cross species like that.  It's not going to
13 make the goat sick and the horse sick.
14        So I started looking for other
15 causes.  And I said, listen, this goat is
16 symptomatic of poisoning, has anybody seen any
17 poison, has anybody know how the rats died?  And
18 that's when I was informed --
19 **Q.        By whom, before you --**
20 A.        My groom.
21 **Q.        Whose deposition has been taken in**
22 **this case and I think has testified to this**
23 **conversation.**
24        MR. WOLFSON:  Let's see what

Page 135

1  she says, but...
2  BY MR. WADDELL:
3  **Q.        What did your groom inform you?**
4        MR. WOLFSON:  Objection,
5  hearsay.  Introduce the groom's testimony.
6        ARBITRATOR CARNEY:  Who does
7  the groom work for?
8        MR. WOLFSON:  Her.
9        ARBITRATOR CARNEY:  It's your
10 groom?
11        THE WITNESS:  Yes, sir.
12        ARBITRATOR CARNEY:  Again,
13 it --
14        MR. WOLFSON:  Are they
15 offering it for the truth or the state of mind?
16        ARBITRATOR CARNEY:  We won't
17 admit it for the truth of the matter asserted,
18 but it will show her state of mind and trying to
19 investigate it.
20        MR. WADDELL:  We'll be -- if
21 we're not offering it, they'll be offering it,
22 one of us is going to be offering his testimony
23 by deposition, I believe.
24        MR. WOLFSON:  The only reason

Page 136

1  for my objection, I'm not trying to be an
2  obstructionist, I just want it to be clear as to
3  what the evidence is being offered for.  Because
4  it makes a difference as we move forward and with
5  respect to the defenses we're going to be putting
6  on.
7        ARBITRATOR KARLIN:  I do
8  think though, and I don't want to discourage you
9  from making your point, but I do think we fully
10 understand and appreciate -- and are sensitive to
11 the issue you're raising.
12        MR. WOLFSON:  If I can simply
13 have an objection for that basis, and I'll raise
14 it quickly, not to disrupt, the comment as being
15 offered not for the truth but for the state of
16 mind, that's fine too.
17        Because I understand this is an
18 arbitration.  But there will be a difference in
19 the matter for which it's received by the Panel
20 as we move forward.
21        ARBITRATOR KARLIN:  I think
22 the Panel appreciates that.
23        MR. WOLFSON:  Great.
24        ARBITRATOR KARLIN:  I'm not

Page 137

1  trying to stop you from reminding us, I just want
2  to assure you that we do understand that.
3          MR. WOLFSON: That's great.
4  I appreciate that, thank you.
5          MR. WADDELL: Okay.
6          MR. WOLFSON: Sure.
7  BY MR. WADDELL:
8  Q.      Your groom comes to you or you come
9  to your groom, which -- how does this work?
10 A.      I asked my groom.
11 Q.      Okay.
12 A.      I asked the other employees of
13 Mr. Butts, I asked several people --
14 Q.      I want to focus on your groom.
15 A.      Have you seen anybody putting poison
16 down?
17         He said, yeah, he comes early in the
18 morning, brings a bucket and a scoop and he puts
19 it everywhere.
20 Q.      What do you do once you hear that
21 information?
22 A.      We immediately start looking around.
23 Now, my only experience with rat poison is in the
24 pellet form in the bait block, in bait houses.

Page 138

1  Initially, obviously, I'm not looking for a
2  powder.  But once we actually started looking and
3  paying attention, we could see it everywhere.  In
4  front of the stalls, in front of my feed box,
5  underneath things.
6          ARBITRATOR WYCOFF:  What
7  exactly did you see?
8          THE WITNESS:  It's a powder.
9  It's a tan, white to tan-colored powder.
10 BY MR. WADDELL:
11 Q.      Why don't we take a look at the
12 photographs.
13 A.      Okay.
14 Q.      These have been marked Exhibit 40A,
15 B, C, D, E, F, I believe.
16         * * *
17         (Whereupon, Claimant's Exhibit Nos.
18 40A, 40B, 40C, 40D, 40F marked for the purpose of
19 identification.)
20         * * *
21 BY MR. WADDELL:
22 Q.      Let's just go through these quickly.
23         The first small photograph, that's
24 just a. --

Page 139

1  A.      Happy goat.
2  Q.      Happy goat, happy horse, right?
3          ARBITRATOR WYCOFF:  Has
4  respondent's counsel seen those?
5          MR. WOLFSON:  We have.
6          MR. WADDELL:  They have.
7          ARBITRATOR WYCOFF:  Do you
8  mind, then, if she stepped over here in front of
9  us so we can see the pictures?
10         ARBITRATOR KARLIN:  These are
11 not in the exhibit book?
12         MR. WADDELL:  They're bad
13 copies.
14         ARBITRATOR CARNEY:  That was
15 a very healthy goat.
16 BY MR. WADDELL:
17 Q.      That's the goat and the horse that
18 we're referring to in this case?
19 A.      No, this horse did not die.
20 Q.      That's a different horse?
21 A.      Yes.
22         MR. WOLFSON:  Just so
23 everyone knows, these have been marked as 40, but
24 in the books, the red books, the photographs, the

Page 140

1  black and white copies are Exhibit 9.
2          MR. HAMMER:  We're going to
3  submit the originals.
4          MR. WOLFSON:  Yeah, I just
5  wanted to note -- they're the same photos, just
6  copies, right.
7          MR. WADDELL:  No, they aren't
8  all the same.  We marked these as --
9          MR. WOLFSON:  Let me ask the
10 question, do we have copies of those?  Can you
11 make sure I have copies of those?
12         MR. WADDELL:  I thought you
13 did.
14         MR. WOLFSON:  Fine.  I saw
15 them before we began, I just don't have copies.
16 That's fine.
17         MR. WADDELL:  If you want to
18 come over here and --
19         MR. WOLFSON:  No, that's
20 fine.  Let's keep going.  I can get the copies
21 later.
22 BY MR. WADDELL:
23 Q.      I want you to show the arbitrators
24 what each of these photographs -- first of all,

1  who took these photographs?
2  A.        A friend of mine.
3  Q.        Is this your barn area?
4  A.        Yes.  These are my specific stalls,
5  my shed row.
6  Q.        Okay.
7          I want, so that the arbitrators can
8  see, hold it up and point to each one and tell
9  the arbitrators what the -- what the photograph
10 is depicting?
11 A.        Okay, this particular one is just
12 showing that it is my stall area, he thought he
13 would -- or reference it by showing that this is
14 my stall area with my name.
15         Here is the dead rat.  And here is
16 another dead rat (indicating).  But you can see,
17 this is the actual poison.  And this is all in my
18 immediate area.
19         You can't see very well in this
20 photograph, I apologize, but because you see the
21 poison is that color, it's very hard to see on
22 the straw.  But that is what he was trying to
23 capture in that picture.  Again, more poison.
24         This one you can see it on the straw.

1  And the straw is in the horse's stalls.
2  Same thing, poison.
3          Here is poison here in front of one
4  of the mats.  The significance is this is my feed
5  box, this is where all my feed is stored.
6  And there is another picture of the feed box,
7  that's what this is right here.  This is a feed
8  box here and this is the ground.  So the poison
9  was put right in front of my feed box.
10         Again, this is just more pictures of
11 rats and poison.
12         I think that -- that is a duplicate.
13             MR. WOLFSON:  Can I have that
14 one?
15             THE WITNESS:  Then
16 this -- what I think we were trying to show is
17 that these mats are in front of the stalls.  So
18 when you've got poison here and here, and we
19 don't know because normally the straw covers
20 these mats, the mats are to cushion the horse's
21 feet.  So when we started digging around the
22 horse's straw, we found more poison.
23         So we don't know where all it was
24 placed, but obviously in direct contact with the

1  animals.  And, of course, there's the goat.  And
2  obviously it wasn't starved to death.  You can
3  see in this one picture, you can actually see the
4  red foam, or you can see the red blood out his
5  nose and his mouth.
6          This last one I apologize, it's a
7  little bit blurry.  But, again, we were just
8  trying to document that there was poison there in
9  my immediate area.
10             ARBITRATOR KARLIN:  Mr.
11 Waddell, is there going to be testimony on how
12 she knows it's poison?
13             MR. WADDELL:  Good question.
14 I don't know that we can positively identify it
15 as poison.
16             THE WITNESS:  Other than the
17 invoice.
18             MR. WADDELL:  There will be
19 circumstantial evidence.
20             ARBITRATOR KARLIN:  Okay.
21 BY MR. WADDELL:
22 Q.        So you find the poison and what do
23 you do?
24 A.        After the goat died and I took him to

1  get a necropsy.  I went and saw Mr. Wright
2  again -- well, I was given a document about two
3  days after the goat died.
4  Q.        By whom?
5  A.        By one of the secretaries in the
6  office.
7  Q.        What office?
8  A.        HBPA office.
9  Q.        What document was this?
10 A.        It was a receipt from Ehrlich
11 Exterminators for the spreading of poison, Rozol
12 tracking powder specifically, in specifically
13 Barn 14, my barn.
14 Q.        That would be C-6 in the claimant's
15 list of exhibits.
16         Do you see the -- is that, looking at
17 the screen there, Tina, is that the document
18 you're referring to?
19 A.        That's what I was given, yes.
20 Q.        Can you read that well enough from
21 where you're sitting?
22 A.        I think so, yeah.
23 Q.        Have you heard of Ehrlich before?
24 A.        Not before this, no.

Page 145

1  Q.      It looks like -- I'm referring now to
2  the document where it says servicing office, it
3  looks like Ehrlich.  And an address in
4  Hagerstown, Maryland.
5          Do you see that?
6  A.      Yes.
7  Q.      Lists the client as being PNG Charles
8  Town Gaming, L.L.C.?
9  A.      Yes.
10  Q.      Can you read where the service
11  location is?
12  A.      Horse barns, PNGI Charles Town horse
13  barns.  Up in the right hand corner.
14  Q.      Can you see where it says work
15  started?
16  A.      Yes.
17  Q.      Does it indicate when the work
18  started?
19  A.      There we go 6/3 at 11:56.
20  Q.      So June 3rd --
21  A.      2008.
22  Q.      Then it says 10:57, I think, work
23  started.  Do you see that?
24  A.      I see it now, yes.

Page 146

1  Q.      Do you see where it says work
2  finished?
3  A.      Yes, 11:45.
4  Q.      Same date?
5  A.      Right.
6  Q.      Under service -- do you see where it
7  has a service order?  Service order details for
8  visit.
9  A.      Yes.
10  Q.      Do you see the service type?
11  A.      Rodent maintenance service.
12  Q.      If we look under device pesticide
13  applications, do you see that block?
14  A.      Yes.
15  Q.      Does it indicate a pesticide?
16  A.      Yes.
17  Q.      What's the pesticide?
18  A.      Rozol tracking powder.
19  Q.      Then if we move down to the bottom of
20  the exhibit.  See where it has Barn 14 written
21  in?
22  A.      Yes.
23  Q.      Is that where your --
24  A.      That's my barn.

Page 147

1  Q.      -- stalls are located?
2  A.      Yes.
3  Q.      What --
4          MR. WOLFSON:  Are you
5  referring to the handwritten notation or the --
6          MR. WADDELL:  I was referring
7  to the printed notation at the bottom, barn No.
8  14.
9          MR. WOLFSON:  Okay.
10  BY MR. WADDELL:
11  Q.      I'm moving on from that exhibit.
12  So you get this from the HBPA's office?
13  A.      Correct.
14  Q.      And then what do you do?
15  A.      I went back to Mr. Wright immediately
16  and I said, you told me you don't put poison
17  down.  He said, I'll look into it, I'll call
18  Mr. Moore.
19  Q.      Did you ever get a response back from
20  Mr. Wright?
21  A.      No.
22  Q.      Did you ever talk to Mr. Moore,
23  Dickie Moore, about this, Richard Moore?
24  A.      No, I tried to make several phone

Page 148

1  calls to him and he would never return my calls.
2  Q.      So you never spoke to him at all
3  about the poison?
4  A.      Not at that point in time.  But later
5  on I waited for him to come down to the parking
6  lot.  And again, explained to him what was going
7  on.  And that this was serious, my role as a
8  board member, my role as a barn captain, the
9  health issue for humans and animals.
10  Q.      So you had a conversation with him in
11  the parking lot of the track?
12  A.      Correct.
13  Q.      In as much detail as you can, what
14  exactly did you say and what did he say to you?
15  A.      I explained to him that I had reason
16  to believe that I had a horse and a goat die from
17  poison.  That I had done some research on the
18  actual poison they used, that it was unsafe to
19  use around animals and it was particularly unsafe
20  to use in the form that they were using it in,
21  which was a powder.  And that I'm there as their
22  representative, I'm their barn captain, this is
23  my responsibility, I'm there as a member of the
24  HBPA, that's my responsibility.  You know, you

1 need to look into this, I think it's a serious

2 issue.

3 Q.    You said two things. You mentioned as

4 **a member of the HBPA you're concerned about this,**

5 **correct?**

6 A.    Absolutely.

7 Q.    **You mentioned as a barn captain**

8 **you're concerned.  What is a barn captain?**

9 A.    A barn captain is someone who is

10 chosen by management.  It's a representative for

11 each barn.  And your job there is to, again, make

12 sure that there is no issues in the barn, that

13 not only do the people take care of their

14 animals, keep their work area clean, follow the

15 rules, but that there is no health or safety

16 issues going on.  And I was chosen by the track

17 to do that.

18 Q.    **This is track management that chose**

19 **you to be the barn captain?**

20 A.    Yes.

21 Q.    **You mentioned you did -- you said you**

22 **talked to Mr. Moore and you said you did some**

23 **research.**

24       **What research did you do?**

1 A.    I went to the hospital.

2 Q.    **Where you work?**

3 A.    Where I work.  I went to the hospital

4 and I -- we have a database, or database, that I

5 could look up the Material Safety Data Sheet on

6 this, or data sheet, on this particular poison,

7 the Rozol tracking powder.  So that's where I got

8 my information from.  And I realized it is very

9 dangerous to use around animals.

10 Q.    **I'm going to show you Exhibit C-27.**

11 A.    Okay.

12       MR. WOLFSON:  We'll object on

13 the basis, again, as hearsay, to the truth of the

14 matter asserted.  The witness can certainly use

15 this for what she knew, what she -- her state of

16 mind and what she did.  But we object for being

17 offered as the truth.

18 BY MR. WADDELL:

19 Q.    This is the first page of a --

20       ARBITRATOR KARLIN:  Can I ask

21 one question on that?

22       Is there -- is there any objection --

23 is there any question as to the authenticity of

24 this as the Material Data Safety Sheet?

1       MR. WOLFSON:  The only

2 question is whether this -- there may be an issue

3 as to which formulation of Rozol was used.  So

4 that's why we can't agree that this is for the

5 formulation as used.

6       ARBITRATOR KARLIN:  Okay.

7       MR. WOLFSON:  Because in

8 addition, again, we go back to the Ehrlich sheet,

9 it also talks about a percentage dissolution of

10 the Rozol and what that will mean in terms of the

11 actual application.

12       That's why we can't necessarily agree

13 this applies to what she saw if that was in fact

14 poison.

15       ARBITRATOR KARLIN:

16 Understood.

17       MR. WADDELL:  Okay.

18 BY MR. WADDELL:

19 Q.    **Now, we've got here a document, this**

20 **document right here we're looking at, called**

21 **Rozol Pellets, is this what you downloaded off**

22 **the internet?**

23 A.    I believe so.  But I believe I also

24 had one that was a powder as well.  It comes in

1 various forms.  Same chemical, just different...

2 Q.    **I know there is a powder and I know**

3 **there are pellets.**

4 A.    Yes.

5 Q.    **We're looking at pellets right now?**

6 A.    Right, right.  Yes, then that -- I

7 probably downloaded that one.

8       ARBITRATOR CARNEY:  We

9 understand your objection.  This may not be what

10 was used.

11       MR. WOLFSON:  It appears it

12 isn't, which is the basis of my objection.  We

13 have no objection to her testifying what she did

14 as a result of this, what her state of mind was.

15       MR. WADDELL:  We're just

16 trying to establish what she downloaded --

17       MR. WOLFSON:  I understand.

18       MR. WADDELL:  -- what she had

19 available to her.

20       MR. WOLFSON:  I understand.

21       MR. WADDELL:  Not contending

22 it's exactly the same formulation.

23       MR. WOLFSON:  I understand.

24       ARBITRATOR KARLIN:  What

Page 153

1  exhibit number?
2         MR. WADDELL:  This is Exhibit
3  27.
4         ARBITRATOR KARLIN:  I
5  misheard.
6         THE WITNESS:  It has the same
7  active ingredient.
8  BY MR. WADDELL:
9  Q.      You read this, right?
10 A.      Yes.
11 Q.      So let's look at, under
12 precautionary, where it says caution.
13 This is the block, precautionary statements,
14 Tina.
15 A.      Yes.
16 Q.      This is something you read when you
17 downloaded this information?
18 A.      Yes.
19 Q.      Did the caution cause you concern?
20 A.      Absolutely.
21 Q.      Why was that?
22 A.      Keep away from humans, domestic
23 animals and pets.  Keep away from feed or
24 foodstuffs.  May be harmful or fatal if swallowed

Page 154

1  or absorbed through the skin.
2         Now it's a powder, it's summer, fans
3  are in front of every stall, it's blowing
4  everywhere.
5         It says through the skin -- absorbed
6  through the skin because this material may reduce
7  the clotting ability of blood and cause bleeding.
8  Product should be handled with gloves, et cetera,
9  et cetera.
10 Q.      If we could move to directions for
11 use.  Did you read the section where it says
12 important?
13 A.      Do not expose to children, pets or
14 other non target animals to rodenticides.
15 Do you want me to continue?
16 Q.      No.
17         Did you read that?
18 A.      Yes.
19 Q.      Down here, did you read the section
20 on use restrictions?
21         We're going to blow it up for you.
22         Did you read this section?
23 A.      Yes.
24 Q.      Did that cause you some concern?

Page 155

1  A.      Yes.
2  Q.      Why?
3  A.      Do not place bait in areas where
4  there is a possibility of contaminating food or
5  surfaces that come in direct contact with food.
6  Q.      Now, it mentions Norway Rats, do you
7  know what a Norway Rat is?
8  A.      It's a big one.
9  Q.      You have big ones at the barn?
10 A.      We have ones you can throw saddles
11 on.
12 Q.      When you talk about talking to Dickie
13 Moore and after you had done some research, that
14 was the research that you did?
15 A.      That was the research I did.
16 Q.      What was Mr. Moore's response when
17 you raised this concern with him?
18 A.      I'll look into it.
19 Q.      Did he, in fact, ever get back in
20 touch with you about anything?
21 A.      He did not.  In fact, we cleaned up
22 the rats, we being myself, my groom, my husband,
23 we cleaned up the rats, we cleaned up the poison,
24 we removed everything.  We didn't get any support

Page 156

1  from management whatsoever.
2  Q.      As I understand your testimony so far
3  you talked to the steward, Danny Wright.
4  A.      Yes.
5  Q.      You talked to Dickie Moore?
6  A.      Yes.
7  Q.      Did you contact anyone else about
8  this issue?
9  A.      I didn't contact anyone else but the
10 state vet came by.  He just walked into the shed
11 row, I think the day after this happened.  And he
12 saw -- well, he observed the rats, that some of
13 them were still there.  The poison.  I kept
14 expecting some sort of full investigation.  And
15 he looked, and he said, okay, I'll look into
16 this.  Don't say anything.
17 Q.      Did he ever get back to you?
18 A.      No.
19 Q.      Did you talk to anyone else, or
20 contact anyone else?
21 A.      Well, after several days went by and
22 nothing was being done, I was informed that that
23 morning the Ehrlich Exterminators were again
24 there.

Page 157

1 And so at that point I just picked up
2 the phone, I tried to call Dickie Moore a couple
3 more times and he would never return my calls.
4 So at that point I picked up the phone, called
5 the Department of Agriculture. I was, I guess,
6 frustrated because I thought this is a serious
7 issue and nobody is taking it seriously.
8 Q.      After you called the Department of
9 Agriculture, then what did you do?
10 A.      Filed a report. Filed an official
11 form, an official report with the Department of
12 Agriculture.
13 Q.      C-11 will be exhibit...
14 Can you take a look at that, Tina, is
15 that the form you filed with the Department of
16 Agriculture?
17 A.      Yes.
18 Q.      It looks like, under date it's July
19 16, 2008?
20 A.      Yes.
21 Q.      You're the one making the complaint?
22 A.      Yes.
23 Q.      It's a complaint?
24 A.      It's a complaint.

Page 158

1 Q.      So what is the purpose of this
2 document?
3 A.      It's a request for investigation, I
4 believe.
5 Q.      Okay.
6 A.      It's opening an investigative case.
7 Q.      So you're asking for an inspection to
8 determine compliance with the West Virginia
9 Pesticide Law, is that --
10 A.      Yes.
11 Q.      -- what this is about?
12 A.      Yes.
13 Q.      Okay.
14 Now I'd like to move on to a meeting
15 that you and some other HBPA Board members had
16 with the Governor.
17 Do you recall a meeting with the
18 Governor on August 18, 2008?
19 A.      Yes.
20 Q.      How did you come about being a part
21 of the group that went to visit with the
22 Governor?
23 A.      I believe -- I was invited but -- I
24 believe by Mr. Funkhouser or Mr. Hale, our

Page 159

1 executive director, or both.
2 Q.      Were you aware of what the purpose of
3 the meeting was to be?
4 A.      The purpose of the meeting, we were
5 in a time period where a referendum for table
6 games was coming up. We were also in a period of
7 time where we were renegotiating our contract. I
8 was part of that committee that was reviewing and
9 we hadn't gotten to the negotiation point yet,
10 but where we were reviewing and kind of tweaking
11 our contract.
12 Q.      So you were on a committee appointed
13 to be actually reviewing the contract itself?
14 A.      Right.
15 Q.      You weren't necessarily negotiating?
16 A.      It hadn't moved to that phase yet.
17 Q.      So where did the meeting take place?
18 A.      The Governor's office in Charleston.
19 Q.      Who do you personally recall being
20 present at this meeting?
21 A.      The Governor; his aide, I believe his
22 name is Pitrolo; Mr. Puccio, the other aide or
23 whatever his title was; Lenny Hale, our executive
24 assistant, or executive director, I'm sorry;

Page 160

1 Randy Funkhouser; myself; Kim Martin, counsel for
2 the HBPA; Trish Sanderson, another board member;
3 and Mr. Shotwell.
4 Q.      And Mr. Shotwell was a board member
5 as well?
6 A.      Yes.
7 Q.      Did you bring copies of the
8 photographs of your barn area that we had entered
9 into evidence today? I assume it's entered into
10 evidence based on what we discussed earlier.
11 Those photographs that we've had marked and then
12 talked about, you showed them to the Panel.
13 Did you bring those with you?
14 A.      Yes.
15 Q.      Why?
16 A.      I was asked to bring those by Kim
17 Martin, our counsel, our HBPA counsel.
18 Q.      How long was the meeting?
19 A.      Less than an hour.
20 Q.      It took place where, in his office?
21 A.      In his office.
22 Q.      Can you describe the meeting in
23 general terms of what was being discussed, what
24 the Governor was saying, what the members of the

1 **board that were there were discussing?**
2 A.      Well, when we walked in, he was
3 pretty much to the point. We need to get this
4 done. What are the issues here? We need to get
5 this done. Which I assume to mean the contract
6 and the table games, because they were linked,
7 they were tied together.
8 **Q.      How were they tied together?**
9 A.      Well, they were both issues at the
10 same time. I'll retract that to some degree.
11 **Q.      Okay.**
12 **When in this meeting did the topic of**
13 **the dead horse and the dead goat come up?**
14 A.      Probably about halfway to three
15 quarters of the way into the meeting.
16          And we were discussing various
17 issues, concerns that we had as horsemen, track
18 safety, our high breakdown rate. We have a lot
19 of horses with that, I think at one point the
20 highest in the country. A number of horses that
21 breakdown, a number of injuries to jockeys. All
22 these horsemen issues and how they continue to
23 fall on deaf ears. We just don't get any kind of
24 dialogue with the track on a regular and

1 consistent basis about our concerns.
2          At which point Mr. Martin said, here
3 is a good opportunity, here is a good example
4 right here. Miss Mawing, why don't you tell them
5 about your experience.
6 **Q.      That's what prompted you to discuss**
7 **this issue with the Governor?**
8 A.      Yes.
9 **Q.      Tell me to the best of your**
10 **recollection as much detail as you can remember**
11 **exactly what you said to the Governor?**
12 A.      I said to the Governor that I had a
13 strong belief that poison had been spread in my
14 barn that resulted in the death of my horse and
15 my goat. And that I expressed concerns as a
16 board member, I expressed concerns as a barn
17 captain, I expressed concerns, period, that they
18 needed to investigate this and make sure this
19 doesn't happen to anybody else. This was
20 horrific. And they didn't even give me a
21 courtesy of a return phone call.
22 **Q.      That's what you said to the Governor?**
23 A.      Yes.
24 **Q.      In other words, you're saying you**

1 **reported it to track management?**
2 A.      Yes, I went up the food chain.
3 **Q.      What was -- is that all you said or**
4 **did you say anything else that you can recall**
5 **sitting here today?**
6 A.      That was basically it. I was to the
7 point -- I think that his question, the
8 answer -- my answer was answering his question of
9 why is this -- there this discord. Why can't you
10 all get along?
11 **Q.      Did you show the Governor the**
12 **pictures that you brought with you of the horse**
13 **and the goat?**
14 A.      Yes.
15 **Q.      What was the Governor's response?**
16 A.      I don't know, really, I can't
17 remember his response. Probably, you know, well,
18 my gosh.
19 **Q.      Was there any further discussion**
20 **about that, the issue of the horse, the goat and**
21 **the pesticide or poison at that time?**
22 A.      No.
23 **Q.      The meeting continued?**
24 A.      Yes.

1 **Q.      At any time did you tell the Governor**
2 **that you believed that the track deliberately**
3 **poisoned your horse?**
4 A.      Absolutely not, I never believed
5 that.
6 **Q.      At any point did you tell the**
7 **Governor or anyone in that room that you believed**
8 **the track deliberately poisoned your goat?**
9 A.      No, never believed that.
10 **Q.      You were in the deposition, sat**
11 **through the deposition of Mr. Finamore that was**
12 **taken in this case?**
13 A.      Yes.
14 **Q.      So you heard him relay what he says**
15 **he was told by the Governor regarding the**
16 **comments you made at this meeting?**
17 A.      Yes.
18 **Q.      Did you hear the comment about,**
19 **something about a trip wire used to slice a**
20 **horse's neck?**
21 A.      I heard that, yes. That's the first
22 I heard of it.
23 **Q.      Do you have any idea what that is**
24 **referring to?**

Page 165

1  A.        I don't know what a trip wire is.  I
2  have no idea what he is talking about.  I was in
3  that meeting.  The whole thing, I never left.
4  Never heard any comment about a trip wire.
5  **Q.        You certainly never made any comment**
6  **about a trip wire?**
7  A.        Absolutely not.
8  **Q.        You never made any complaints to**
9  **anybody at the track about a trip wire?**
10 A.        No.
11 **Q.        Have you ever heard, even a rumor**
12 **around the track, of something having to do with**
13 **trip wires somehow being placed to injure horses?**
14 A.        Never.
15 **Q.        Let's -- I want to talk now, I want**
16 **to get into your damages portion of your claim.**
17 A.        Okay.
18 **Q.        If we could go back to.**
19           ARBITRATOR WYCOFF:  If you're
20 switching subjects, can we have a break?
21           * * *
22           (Brief break)
23           * * *
24 BY MR. WADDELL:

Page 166

1  **Q.        Tina, at some point did you obtain**
2  **any statement from your groom, Phillip Rideout,**
3  **and submit that to the Department of Agriculture?**
4  A.        Yes.
5  **Q.        If we could see 12.**
6           **C-12 would be the exhibit.**
7           MR. WOLFSON:  My objection to
8  the document stands as well, not for the truth of
9  the matter, it's something that was submitted --
10 this is someone else who works for her whose
11 statement allegedly --
12           ARBITRATOR WYCOFF:  Was his
13 deposition taken?
14           MR. WOLFSON:  Yes.
15           ARBITRATOR CARNEY:  He's
16 going to testify.
17           MR. WOLFSON:  I understand
18 that, yes.
19           ARBITRATOR CARNEY:  Since he
20 is going to testify --
21           MR. WOLFSON:  Assuming he
22 does, yes.
23           MR. WADDELL:  Okay.
24 BY MR. WADDELL:

Page 167

1  **Q.        Tina, do you recognize C-12?**
2  A.        Yes, it's one of the documents that
3  the Department of Agriculture gave me to try
4  to -- if I had any further evidence regarding the
5  case.
6  **Q.        Now, who wrote this statement?**
7  A.        Phillip Rideout wrote the statement
8  on a piece of notebook paper and then I wrote it
9  on the official form.
10 **Q.        Is that, in fact, his signature at**
11 **the bottom of the statement?**
12 A.        It is, followed by my initials.
13 **Q.        He did review this and sign this**
14 **statement?**
15 A.        He did.  He reread it right in front
16 of me and then he signed it.
17 **Q.        Is that date when this statement was**
18 **signed it?**
19 A.        Yes.
20 **Q.        August 19, 2008?**
21 A.        Yes.
22 **Q.        Now I'm going to move onto this issue**
23 **for damages from stalls.**
24 **        If we could go to, this is Exhibit 39**

Page 168

1  and it's Respondent's 5.
2  **        We've seen this document before,**
3  **Tina.  This is your stall application that you**
4  **submitted for the time period January 1 through**
5  **June 30th, 2008, correct?**
6  A.        Correct.
7  **Q.        Sorry.  Wrong exhibit.**
8  **        This is the stall allocation 2008,**
9  **September 1 through December 31st, correct?**
10 A.        Correct.
11 **Q.        You asked for stalls for nine horses,**
12 **correct?**
13 A.        Correct.
14 **Q.        You got no stalls?**
15 A.        No.
16 **Q.        Let's take each horse.**
17 **        First horse, Up To Mischief.  That**
18 **was your own -- who is the owner of that horse?**
19 A.        My father.  Myself, now.  We're
20 partners on it now.
21 **Q.        Did you ever charge yourself or your**
22 **father for stalling this horse outside of the**
23 **track?**
24 A.        No.

Page 169

1  Q.      The next horse is Octavio owned by
2  whom?
3  A.      Krista Dehnert.
4  Q.      Who is Krista Dehnert?
5  A.      My daughter.
6  Q.      Did you ever charge your daughter
7  stall rental?
8  A.      No.
9  Q.      Queen's English is the next horse,
10 who owns that?
11 A.      Me.
12 Q.      You didn't charge yourself, did you?
13 A.      No.
14 Q.      Savanna Dawn, owned by?
15 A.      Williamson.  I don't remember if
16 Garvis or Betty.  But they are husband and wife.
17 And no.
18 Q.      You did not charge them at any time
19 any stall charge for stalling their horse off the
20 track?
21 A.      Stall rent, no.
22 Q.      Stall rent, yeah.
23 There are two horses there, Savanna and then --
24 what's the other one?  Veva --

Page 170

1  A.      Veva E.
2  Q.      Veva E.  They're both owned by the
3  same couple?
4  A.      Correct.
5  Q.      Natural Grump?
6  A.      No.
7  Q.      Who is the owner?
8  A.      Sara Kopecki, Black Horse Tavern,
9  Todd Harding.  They're a couple.
10 Q.      Todd Harding is an owner of a horse?
11 A.      Yes.
12 Q.      Kopecki is his partner or --
13 A.      Correct.
14 Q.      What's the next -- did you charge
15 either of them stall rent --
16 A.      No.
17 Q.      -- for this horse?
18 A.      No.
19 Q.      When I say stall rent, I'm referring
20 specifically to these horses?
21 A.      Correct.  No, I never did.
22 Q.      Arsiero.  Is that the name?
23 A.      My horse.
24 Q.      We can just assume you didn't charge

Page 171

1  yourself, correct?
2  A.      Correct.
3  Q.      She's a Hot Honey.  Who owned this
4  horse?
5  A.      Peter Axmaker and myself.
6  Q.      And yourself?
7  A.      Yes.
8  Q.      How about Key Prospect?
9  A.      Same.
10 Q.      So you're co-owners?
11 A.      Co-owners.
12 Q.      Was there any charge for stall rent
13 to Mr. Axmaker?
14 A.      No.
15 Q.      Let's switch to 2009.
16 This would be your stall application
17 for 2009, January 1 through June 30 of 2009,
18 correct?
19 A.      Correct.
20 Q.      Can you see the horses' names?
21 A.      I can.
22 Q.      You didn't -- obviously you applied
23 for ten stalls, you got no stalls?
24 A.      Right.

Page 172

1  Q.      So you have to stall these horses
2  somewhere?
3  A.      Right.
4  Q.      First horse is what?
5  A.      David Wratchford, Merrymonthofmay.
6  Q.      Wratchford is the owner?
7  A.      Yes.
8  Q.      Is he the only person that was ever
9  charged stall rent to your knowledge?
10 A.      Yes, yes.
11 Q.      That we've seen on any of these lists
12 here?
13 A.      Correct.
14 Q.      Queen's English --
15 A.      My horse.
16 Q.      -- that's yours.
17 Up To Mischief, again, that's you and
18 someone else?
19 A.      My father.
20 Q.      Okay.
21 Octavio is your daughter's?
22 A.      Correct.
23 Q.      Arsiero, you?
24 A.      Uh-huh.

Page 173

1  **Q.      Jenny's Vow is Wratchford?**
2  A.      Yes.
3  **Q.      You charged stall rent?**
4  A.      Yes.
5  **Q.      Veva E, G. Williamson?**
6  A.      Yes.
7  **Q.      What does the G stand for?**
8  A.      Garvis.
9  **Q.      Did you charge him stall rent?**
10 A.      No.
11 **Q.      She's a Hot Honey, again, is you and**
12 **Axmaker?**
13 A.      Right.
14 **Q.      Key Prospect is you and Axmaker?**
15 A.      Yes.
16 **Q.      Did you charge Axmaker stall rent?**
17 A.      No.
18 **Q.      Savannah Dawn is G. Williamson?**
19 A.      Yes.
20 **Q.      Did you charge him stall rent for**
21 **this horse?**
22 A.      No.
23 **Q.      We're now looking at your stall**
24 **application for July 1 to December 31st, 2009.**

Page 174

1  A.      I'm going to have to look at it in
2  here, because I can't see.
3  **Q.      Can you see it now?**
4  A.      Yeah, I think I can.  That's better.
5  **Q.      That shows all the horses.**
6  **Let's look at these horses again.  Veva E is?**
7  A.      Garvis Williamson.
8  **Q.      Did you charge him at this time for**
9  **stall rent?**
10 A.      No.
11        ARBITRATOR KARLIN:  Can I
12 just ask why the owner's names aren't on this
13 one?
14 BY MR. WADDELL:
15 **Q.      Yeah, I asked you that question many**
16 **times.**
17 A.      I don't know.  I have no idea.
18 **Q.      You did fill this out and did sign it**
19 **and submit it?**
20 A.      Signature on the back?
21 **Q.      Yeah.**
22 A.      I don't know.
23 **Q.      But you recognize who the owners of**
24 **these horses are?**

Page 175

1  A.      Absolutely.  I don't even -- there is
2  one new one on there.  Yeah, I don't think
3  that...
4  **Q.      Queen's English is yours, I think?**
5  A.      Correct.
6  **Q.      Merrymonthofmay?**
7  A.      Wratchford.
8  **Q.      Did you charge stall rent?**
9  A.      Yes.
10 **Q.      West Hampshire Way?**
11 A.      Hampshire Syndicate.
12 **Q.      Did you charge stall rent?**
13 A.      No.
14 **Q.      Margaret's Rust?**
15 A.      Ruby.
16 **Q.      Margaret's Ruby.  Whose horse?**
17 A.      It was either Tom Lynn or myself.  I
18 don't know.  I eventually took the horse over
19 because he didn't pay his bill.
20 **Q.      What was the gentleman's name?**
21 A.      Tom Lynn.
22 **Q.      Tom Lynn?**
23 A.      Correct.
24 **Q.      Did you ever charge him stall rent?**

Page 176

1  A.      No.
2        ARBITRATOR WYCOFF:  Excuse
3  me, I think there was an ambiguous answer that
4  she answered yes to something, I'm not
5  sure -- with Merrymonthofmay.
6        Did you charge stall rent?
7        THE WITNESS:  Yes.
8        ARBITRATOR WYCOFF:  You did?
9        THE WITNESS:  Yes, sir.
10       ARBITRATOR WYCOFF:  That's
11 the one you said yes and I wasn't sure.
12 BY MR. WADDELL:
13 **Q.      Yes, that's the Wratchford horse?**
14 A.      Yes.
15       ARBITRATOR WYCOFF:  Thank
16 you.
17 BY MR. WADDELL:
18 **Q.      Where are we?  Key Prospect is yours?**
19 A.      And Axmaker.
20 **Q.      Did you charge stall rent to Axmaker?**
21 A.      No.
22 **Q.      She's a Hot Honey is?**
23 A.      Myself and Axmaker.
24 **Q.      You didn't charge him stall rent?**

Page 177

1  A.     No.
2  Q.     **Jenny's Vow?**
3  A.     Wratchford, yes.
4  Q.     **You did charge him stall rent?**
5  A.     Yes.
6  Q.     **Savanna Dawn?**
7  A.     Williamson, Garvis Williamson.
8  Q.     **Did you charge him stall rent?**
9  A.     No..
10        Yes Oui Si.
11 Q.     **Yes Oui Si, that's your horse?**
12 A.     Yes.
13 Q.     **Smoken Bobbe?**
14 A.     Garvis Williamson.
15 Q.     **Did you charge him stall rent for the**
16 **horse?**
17 A.     No.
18 Q.     **Another Oreo.**
19 A.     My horse.
20 Q.     **Prince --**
21 A.     Afleet.
22 Q.     **-- Afleet.  Whose horse?**
23 A.     Bobby Smith.
24 Q.     **Bobby Smith?**

Page 178

1  A.     Yes.
2  Q.     **Did you charge him stall rent?**
3  A.     No.
4  Q.     **Up To Mischief, your --**
5  A.     My horse.
6  Q.     **And Arsiero is your --**
7  A.     My horse.
8  Q.     **Your horse?**
9  A.     Just mine.
10        ARBITRATOR CARNEY:  Make sure
11 we have it right.
12        Which horses did you charge stall
13 rent for?
14        THE WITNESS:  The only horses
15 I charged stall rent for was Mr. Wratchford,
16 Jenny's Vow and Merrymonthofmay.
17        ARBITRATOR WYCOFF:  Did you
18 name these horses or did they come with the
19 names?
20        THE WITNESS:  Both.  Both.
21 The ones I bred and raised I named, or my family
22 does.
23 BY MR. WADDELL:
24 Q.     **So first of all, every six months**

Page 179

1  **you're submitting an application, correct?**
2  A.     Correct.
3  Q.     **Now, we don't have an application for**
4  **January through, whatever the date it was for**
5  **that, July for 2010.  We asked you to produce**
6  **that if you had it.**
7  A.     Correct.
8  Q.     **Could you find it?**
9  A.     No.
10 Q.     **I think we asked the track, see if**
11 **they could find it and they couldn't find it**
12 **either.**
13 A.     Right.  I don't think they could find
14 any, if I'm correct.
15        MR. WOLFSON:  Objection, we
16 know that's wrong.
17        MR. WADDELL:  We know it's
18 wrong?
19        MR. WOLFSON:  Yeah, let's
20 strike that, let's strike that comment.
21        MR. WADDELL:  I don't think I
22 made an misstatement if there is a question about
23 that.  We did ask if you had any stall
24 applications for 2010.

Page 180

1         MR. WOLFSON:  The comment
2  they didn't have any, that's what I --
3         MR. HAMMER:  Her comment?
4         MR. WOLFSON:  Her comment.
5         THE WITNESS:  I apologize, I
6  went to try to get them from the management and
7  they wouldn't give them to me.
8         MR. WADDELL:  I agree with
9  you.
10        MR. WOLFSON:  Let's just not
11 get into that.
12        MR. WADDELL:  We're not
13 trying to.
14        MR. WOLFSON:  Okay.
15 BY MR. WADDELL:
16 Q.     **I just want to establish that we**
17 **don't -- we've got one missing.**
18 A.     That's right.
19 Q.     **So we don't know -- do you know what**
20 **horses you had on that application by any chance?**
21 A.     I think that's pretty consistent.
22 West Hampshire Way, Another Oreo, Queen's
23 English, Up To Mischief, Yes Oui Si, She's a Hot
24 Honey, probably still had Key Prospect, Savanna

Page 181

1   Dawn, Arsiero, Margaret's Ruby.
2   Q.        Is that your best recollection?
3   A.        That's my best recollection.
4   Q.        We talked about -- for this
5   one -- well, let me talk about the one you would
6   have submitted in January of 2010.  If it was any
7   horse owned by Wratchford you would have charged
8   stall rent; is that correct?
9   A.        Yes.  And I no longer had any horses
10  for Mr. Wratchford.
11  Q.        By this point?
12  A.        Correct.
13  Q.        Here we've got West Hampshire Way,
14  that's owned by?
15  A.        Hampshire Sydicate, Hampshire
16  Alliance, they're a racing syndicate.
17  Q.        Did you charge them stall rent for
18  stalling this horse?
19  A.        No.
20  Q.        Another Oreo is yours.  Queen's
21  English is yours.  Up To Mischief is yours.  Yes
22  Oui Si is yours.  She's a Hot Honey is yours.
23  Did you charge yourself stall rent?
24  A.        No, I did not.

Page 182

1   Q.        Savanna Dawn is G. Williamson?
2   A.        Yes.
3   Q.        Did you charge Mr. Williamson stall
4   rent?
5   A.        No.
6   Q.        Arsiero, yours.  Margaret's Ruby
7   yours?
8   A.        Yes.
9   Q.        We have a stall application for
10  January through June 30th, 2011 which you
11  submitted, correct?
12  A.        Yes.
13  Q.        If we look at the horses on that
14  application, the first, Queen's English, Another
15  Oreo, Margaret's Ruby, Up To Mischief and
16  Arsiero?
17  A.        Arsiero.
18  Q.        Arsiero.  Those are all your horses?
19  A.        Yes.
20  Q.        Actually, one says you and G.
21  Williamson?
22  A.        Yes.
23  Q.        That's Another Oreo?
24  A.        And Cathedral Peak.

Page 183

1   Q.        Pardon me?
2   A.        And Cathedral Peak, No. 6.
3   Q.        Okay, I hadn't gotten there yet.
4   A.        Okay.
5   Q.        So both you and Mr. Williamson were
6   co-owning Cathedral Peak and Another Oreo?
7   A.        Right.
8   Q.        Obviously you didn't charge yourself,
9   did you charge Mr. Williamson any stall rent?
10  A.        No.
11  Q.        Lucky --
12  A.        Lips.
13  Q.        -- Lips Louie is yours?
14  A.        Yes.
15  Q.        And Yes Oui Si you've got now listed
16  as Malgarini --
17  A.        Magarini.
18  Q.        Malgarini and Coogan?
19  A.        Yes.
20  Q.        Who is Malgarini?
21  A.        My mother.
22  Q.        Who is Coogan?
23  A.        My son.
24  Q.        Did you charge them stall rent?

Page 184

1   A.        No.
2   Q.        Looking at July 1 through December
3   31st, 2011, your application.  You submitted this
4   to the track, attempted to get stalls, correct?
5   A.        Correct.
6   Q.        Another Oreo, your horse?
7   A.        Yes.
8   Q.        At this point?
9   A.        Yes.
10  Q.        Yes Oui Si, you and your mother and
11  your --
12  A.        Son.
13  Q.        -- son?
14            West Hampshire Way is --
15  A.        Mine.
16  Q.        Now yours?
17  A.        Yes.
18  Q.        Queen's English is yours?
19  A.        Yes.
20  Q.        Lucky Lips is yours?
21  A.        Yes.
22  Q.        John --
23  A.        John's Glory.
24  Q.        John's Glory is yours?

Page 185

1  A.       Yes.
2  Q.       Cathedral Peak is co-owned by you and
3  G. Williamson?
4  A.       Yes.
5  Q.       You did not charge Mr. Williamson
6  anything for stall rent --
7  A.       No.
8  Q.       -- on that horse and you did not
9  charge stall rent to anybody for any of the rest
10 of the horses on this?
11 A.       No.
12 Q.       Okay.
13          We asked you to produce a stall
14 application for 2012, January through July of
15 2012, and you weren't able to find it?
16 A.       No.
17 Q.       Do you know what horses -- did you
18 submit an application for that time period?
19 A.       Yes.  I didn't miss one.
20 Q.       Do you know what horses were on that
21 application?
22 A.       Can you raise that up, please?
23 All of those except, perhaps, Ghost of Halo.
24 Q.       Ghost of Halo?

Page 186

1  A.       Correct.
2  Q.       So you believe all those other horses
3  were on that application?
4  A.       Yes.
5  Q.       The first six horses -- well, Another
6  Oreo is your horse?
7  A.       Right.
8  Q.       Yes Oui Si is your mother and your
9  son?
10 A.       Yes.
11 Q.       Up To Mischief is yours?
12 A.       Yes.
13 Q.       Did you charge any of those, anybody
14 there stall rent for those horses?
15 A.       No.
16 Q.       Smoken --
17 A.       Smoken Bobbe.
18 Q.       Smoken Bobbe is G. Williamson?
19 A.       Yes.
20 Q.       Did you charge him stall rent?
21 A.       No.
22 Q.       Cathedral Peak is yours?
23 A.       Yes.
24 Q.       Lucky Lips is yours?

Page 187

1  A.       Yes.
2  Q.       Hale Bop?
3  A.       Yes.
4  Q.       Is your mother --
5  A.       Father.
6  Q.       Father and --
7  A.       Me.
8  Q.       You.
9          John's Glory is your father and you?
10 A.       Yes.
11 Q.       Nick's Monster is someone named Norma
12 Rodney?
13 A.       Yes.
14 Q.       Did you charge Norma Rodney stall
15 rent for Nick's Monster?
16 A.       No.
17 Q.       Ghost of Halo is you?
18 A.       Yes.
19 Q.       Queen's English is you?
20 A.       Yes.
21 Q.       This is the stall application which
22 you submitted for January 1 through June 30th of
23 2013; is that correct?
24 A.       Yes.

Page 188

1  Q.       First horse, Another Oreo, is yours.
2  Yes Oui Si is your father or your mother?
3  A.       My mother.
4  Q.       Mother and your son?
5  A.       Yes.
6  Q.       Cathedral Peak is you and G.
7  Williamson?
8  A.       Yes.
9  Q.       Did you charge him for stall rent?
10 A.       No.
11 Q.       Smoken Bobbe is Williamson?
12 A.       Right.
13 Q.       Did you charge him for stall rent?
14 A.       No.
15 Q.       Ephesians Time is owned by whom?
16 A.       Ralph Havens.
17 Q.       Did you charge Mr. Havens stall rent
18 for Ephesians Time?
19 A.       No.
20 Q.       Nick's Monster is yours?
21 A.       Yes.
22 Q.       Up To Mischief is listed as who, you
23 and  ?
24 A.       Myself and my father.

63c8bf88-9918-4cd5-8f34-92041e5909f6

Page 189

1  Q.        Magdalene --
2  A.        Rose.
3  Q.        -- Rose is Mr. Haven's?
4  A.        Correct.
5  Q.        Did you charge him stall rent for
6  Magdalene Rose?
7  A.        No.
8  Q.        Lucky Lips Louie is yours, and your
9  son, and your mother?
10  A.        Yes.
11  Q.        Is that right?
12  A.        Yes.
13  Q.        Gideon Gin is whose?
14  A.        Ralph Havens'.
15  Q.        Hagens?
16  A.        Havens, H A V E N S.
17  Q.        Same gentleman as the other two
18  horses?
19  A.        Yes.
20  Q.        Did you charge him for stall rent for
21  that horse?
22  A.        No.
23  Q.        Ghost of Halo is yours?
24  A.        Right.

Page 190

1  Q.        Have you submitted an application for
2  this year?
3  A.        Not yet.
4  Q.        For the second half of this year?
5  A.        It's due the 15th.
6  Q.        So you haven't submitted one?
7  A.        Not yet.
8  Q.        We don't have this blown up, so
9  you're going to have to refer to your -- it's
10  going to be C-28 in the Claimant's.
11  A.        Okay.
12        ARBITRATOR KARLIN:  I'm
13  sorry, what number was that?
14        MR. WADDELL:  C-28.
15  BY MR. WADDELL:
16  Q.        Tina, do you recognize this exhibit?
17  A.        Yes.
18  Q.        What is it?
19  A.        This is a -- this is my attempt to
20  make some sense out of a lot of numbers.  This is
21  something that I compiled to try to simplify what
22  I paid in stall rent, vanning, et cetera, barn
23  help.
24  Q.        For instance, if we look at 2008, you

Page 191

1  list stall rent was $17,116.
2        How did you arrive at that --
3        MR. WOLFSON:  Hold on one
4  second.  Can I have a...
5        At the beginning of Mr. Mawing's
6  deposition you folks stipulated that the top was
7  no longer operative and you were supplementing
8  that with a different calculation.
9        MR. HAMMER:  I thought this
10  was the supplemented one.
11        MS. SCRIVANI:  No.  That was
12  not the agreement you and I reached at Tony's
13  deposition that day.
14        MR. WOLFSON:  This is the
15  same as R-15.  Look at it.  I'll show you the
16  stipulation.
17        MR. WADDELL:  Can we take a
18  short break to sort this out?
19        *  *  *
20        (Brief break)
21        *  *  *
22        ARBITRATOR CARNEY:  Exhibit
23  34.
24  BY MR. WADDELL:

Page 192

1  Q.        Exhibit 34, Respondent's 34.
2  Tina do you have Respondent's, R-34, in front of
3  you?
4  A.        Yes.
5  Q.        Can you tell us what it is?
6  A.        This is a list that I compiled of all
7  the dates, check numbers.  And then I categorized
8  them under who the payment was made to.
9  Q.        Trying to make some sense out of your
10  bill?
11  A.        Yeah, when we were going through
12  check, by check, by check, by check, I thought
13  this was the more expeditious way to organize it.
14  Q.        All right.
15        Now, let's try and go through this as
16  quickly as we can.
17        John Walker is who?
18  A.        He was someone who was feeding the
19  horses at the farm that we were stabled at.  So
20  normally when you're at the track, normally
21  Phillip, who's worked for me for six years, he
22  lives five minutes from the track.  He would walk
23  over and feed at night.  I had to pay somebody to
24  feet at the farm because it was too far away for

Page 193

1  Phillip to travel.
2  **Q.        So that is what these charges are**
3  **for?**
4  A.        Yes.
5  **Q.        Are these based on check numbers here**
6  **that, or checks that you wrote?**
7  A.        Yes.
8  **Q.        Rhonda Plymale?**
9  A.        Plymale.
10 **Q.        Plymale.**
11 A.        These checks were for -- she was the
12 one that had to drive the grooms to work because
13 we were stabled a considerable distance from the
14 track.
15 **Q.        When you were at the tracks, the**
16 **horses stalled at the track, how did the**
17 **grooms --**
18 A.        They lived five minutes away, walking
19 distance.  None of my grooms drove.  I don't know
20 why, but none of them knew how to drive, or ever
21 desired to drive.
22 **Q.        Or had a license, or --**
23 A.        Or had a license.  I wasn't going to
24 fire them because they couldn't drive.

Page 194

1  **Q.        So these are all checks written to**
2  **her for transporting --**
3  A.        Transporting, yes.
4  **Q.        -- grooms to the farm where you had**
5  **the horses stalled?**
6  A.        Yes.  And sometimes she'd do extra
7  things.  Feed, or something once in a while,
8  or -- you know, at night, she would go back and
9  feed for us if John couldn't or...
10         But the bulk of this is all her
11 transporting the grooms.
12 **Q.        Rory Coogan, second page?**
13 A.        Again, just feeding at night.  He
14 would go out there and feed at night for us.
15 **Q.        Who is Rory Coogan?**
16 A.        My son.
17 **Q.        Your son?**
18 A.        Yes.
19 **Q.        You paid him for this?**
20 A.        Yes.  I'd have to pay somebody else.
21 **Q.        Robert Furr?**
22 A.        That is the Hagy Farm.  He passed
23 away and Miss Hagy bought it.  So that's the
24 board on that farm?

Page 195

1  **Q.        What are the checks for?**
2  A.        Stall rent.
3  **Q.        Stall rent.**
4         **Edwin Tobin?**
5  A.        That is Media Farm.  Mr. -- the
6  person who didn't -- who has Media Farm didn't
7  have any open stalls.  But this person had some
8  open stalls and he just sublet me the stalls.
9  **Q.        Are these three checks then for stall**
10 **rent?**
11 A.        Stall rent directly to him.  I just
12 sublet stalls from him at Media Farm.
13 **Q.        Jackie Erler?**
14 A.        Same thing, stall rent, sublet a
15 stall.
16 **Q.        Where were her stalls located?**
17 A.        At that time these stalls were at
18 Mountaineer.
19 **Q.        Where?**
20 A.        Mountaineer.
21 **Q.        Mountaineer Racetrack?**
22 A.        Correct.
23 **Q.        So these shouldn't be on here?**
24 A.        No.

Page 196

1         ARBITRATOR WYCOFF:  Which
2  ones?
3         MR. WADDELL:  Jackie Erler,
4  the two checks to Jackie Erler.  That's a
5  mistake.
6         THE WITNESS:  Yeah.
7  BY MR. WADDELL:
8  **Q.        The Hagy Farms stall rent?**
9  A.        Yes.  Formerly The Furr Farm.
10 **Q.        That's currently where you're**
11 **stalling horses?**
12 A.        Yes.
13 **Q.        These checks are all for stall rent?**
14 A.        Yes.
15 **Q.        Then we have O'Sullivan Farms stall**
16 **rent?**
17 A.        Correct.
18 **Q.        O'Sullivan Farms is the -- well,**
19 **strike that.**
20         **How many stalls do you have at**
21 **O'Sullivan Farms?**
22 A.        Two.  I've had anywhere from two to
23 four over the last five years.
24 **Q.        O'Sullivan Farms is owned by**

Page 197

1  **Mr. Funkhouser?**
2  A.      Yes.
3  **Q.      Why do you have two stalls there?**
4  A.      I have one horse that won't trailer
5  at all and another horse -- well, I have two
6  horses that won't trailer.  One will attempt it
7  but one absolutely won't.  And the other horse is
8  one that I swim.  So it's just a two minute walk.
9  **Q.      Where are the stalls that**
10 **Mr. Funkhouser has that you're using, where are**
11 **they located?**
12 A.      Directly across the street from the
13 track, so you can walk over.
14 **Q.      So you can just walk your horse over?**
15 A.      Right.
16 **Q.      These are -- so the reason you have**
17 **two from him is you have two horses who won't**
18 **abide, or trailering is what you're saying?**
19 A.      That's correct.
20 **Q.      So all these checks are for stall**
21 **rent for those two horses?**
22 A.      Yes.
23 **Q.      Now, we've got Media Farms stall rent**
24 **Earl Fellinger, what is this about?**

Page 198

1  A.      Earl Fellinger is the stall, I mean,
2  is the farm manager.  Initially I wrote checks
3  out to him.  And then Louise Hobson is the actual
4  owner of the property.  And at some point they
5  just requested that I make the checks directly to
6  her instead of the farm manager.
7  **Q.      Well, it looks like -- can you**
8  **explain to me why the amounts that you're paying**
9  **to Louise Hobson are so much higher than the**
10 **checks that you're writing to Earl Fellinger?**
11 A.      Well, I know some of the checks, the
12 ones to Earl Fellinger, were partial payments.  I
13 know they worked with us and they took payments.
14 But I'd have to look at the exact check.
15 **Q.      Are you certain these are for stall**
16 **rent?**
17 A.      Yes.  It's all Media Farm.
18 **Q.      And all the checks written to Louise**
19 **Hobson are for stall rent?**
20 A.      Yes.
21 **Q.      Judy Adams, who is that?**
22 A.      Oh, stall rent.  That's for the
23 lady across the street before I rented from
24 Mr. Funkhouser, when I -- immediately -- you see

Page 199

1  the date, September of '08?
2  **Q.      Yes.**
3  A.      I said I was scattered in four
4  different places.  She loaned -- she loaned.  She
5  rented me a couple of stalls.
6  **Q.      How about NorMar Farm/B. Godfrey?**
7  A.      Same thing.
8          She is in Maryland, but when all my
9  horses were displaced she had a swimming pool
10 there and a training track on her property, even
11 though she is in Northern Maryland.  But at least
12 I could keep some of the horses fit.  When I was
13 only able to bring two in a day, if I had to put
14 them somewhere, at least I could put them
15 somewhere where they could have some level of
16 fitness.
17 **Q.      So you were able to do some training**
18 **there at her farm?**
19 A.      Yes.  She has a swimming pool on her
20 property, so...
21 **Q.      Were all these checks that were**
22 **written to her for stall rent?**
23 A.      Yes.
24          ARBITRATOR WYCOFF:  What is

Page 200

1  the significance of a swimming pool?
2          THE WITNESS:  Just like
3  humans, you can get a higher level of fitness if
4  you can swim versus there is no other option.
5          ARBITRATOR WYCOFF:  For the
6  horses?
7          THE WITNESS:  Yes, you can
8  put them in the water and swim them.
9  BY MR. WADDELL:
10 **Q.      Is this a regular swimming pool for**
11 **humans  ?**
12 A.      It's not.
13 **Q.      or is it designed especially for**
14 **horses?**
15 A.      Designed especially for horses.
16          MR. HAMMER:  No high dive.
17          THE WITNESS:  Yeah.  No water
18 wings.
19 BY MR. WADDELL:
20 **Q.      I didn't think you would put a horse**
21 **in a regular swimming pool, but...**
22 A.      Yes.
23 **Q.      My level of knowledge about horses is**
24 **not much higher than anybody else's is.**

Page 201

1 **Taylor Mountain Farm, it looks like it's crossed**
2 **off?**
3 A.        No.  Because I investigated it, and
4 it was a board bill rather than a stall rent,
5 so...
6 **Q.        Barbara Shade?**
7 A.        I'm looking at the date.  That was a
8 sublet across the street.
9 **Q.        Sublet, you mean a stall across from**
10 **the track --**
11 A.        Right.
12 **Q.        -- that you sublet?**
13 A.        That I sublet from someone.
14 **Q.        So was this for stall rent, this $100**
15 **check?**
16 A.        Yes.  And it may have only been for a
17 week or ten days.
18 **Q.        Now, there is a -- right underneath**
19 **that there is something that says vanning.**
20 A.        Yes.
21 **Q.        What is that meant to indicate?**
22 A.        Well, initially before I bought a
23 truck and trailer I had to pay people to haul my
24 horses back and forth, I didn't have any other

Page 202

1 way to do it.
2 **Q.        You had to get your horses from**
3 **wherever they were to the track for training and**
4 **for racing, I presume?**
5 A.        Correct.
6 **Q.        So you had to hire someone with vans**
7 **to do the vanning?**
8 A.        Yes, which is extremely difficult,
9 because most of them are horseman, so they're
10 training the same hours I'm training.  So they
11 don't want to leave their own training operation
12 to come and haul me.  So I was kind of at their
13 mercy, whatever they wanted to charge me.
14 **Q.        You've got Allison Allen, Tony**
15 **Stehr --**
16 A.        I don't know.
17 **Q.        Joe --**
18 A.        Stehr, Stehr.
19 **Q.        Tim Collins?**
20 A.        Yes.
21 **Q.        Jim Starkey?**
22 A.        Yes.
23 **Q.        Mark Shanley, Sammy Harder, Wayne**
24 **Potts and Jamie Wilhelm?**

Page 203

1 A.        Yes.
2 **Q.        Greg Viands, Kim Engle, Bob Birch,**
3 **Kelly Conaway.**
4 **First of all, are all the people I**
5 **mentioned so far, were they people you paid to do**
6 **vanning?**
7 A.        This is all vanning.
8 **Q.        So all these checks to those**
9 **individuals were for vanning?**
10 A.        Yes.
11 **Q.        To transport horses from wherever you**
12 **had them stalled to the track?**
13 A.        Yes.
14 **Q.        Then cash --**
15         ARBITRATOR CARNEY:  Back from
16 track, too?
17         THE WITNESS:  I'm sorry?
18         ARBITRATOR CARNEY:  And back
19 from the track, too?
20         THE WITNESS:  Yes, they would
21 charge me round trip, yes.
22 BY MR. WADDELL:
23 **Q.        What's this entry cash for vanning,**
24 **D. Hussey?**

Page 204

1 A.        He would only take cash.
2 **Q.        I don't see any cash here --**
3 A.        I thought there was one in line
4 there.
5         Oh, I know what it is.  The check
6 says cash.  When I was actually looking at the
7 check, I would cash it for cash, so I put cash on
8 it.  And then on the memo I would put vanning for
9 Dave Hussey.
10 **Q.        So you got paid by check, it was made**
11 **out to cash, but you had a notation who it was**
12 **for?**
13 A.        Correct.
14 **Q.        Then Huffman, was he vanning as well?**
15 A.        He was vanning.
16 **Q.        Mitchell Snow?**
17 A.        Yes.
18 **Q.        Tapp Horse Transportation?**
19 A.        Yes.  That was -- pick a horse up
20 from NorMar and back.
21 **Q.        That's the horse, that farm in**
22 **Maryland?**
23 A.        Northern Maryland, yes.
24 **Q.        The rest of these people, Munzer,**

Page 205

1  **Porter Horse Transport, Joe Virts, Tim Porter**
2  **Frier (phonetic), Michael Robertson, Charlotte**
3  **VanPelt, A. Luras and Mary Pollack.**
4  **        Were the checks depicted on here that**
5  **were written to them all for vanning?**
6  A.        Yes.
7  **Q.        As well as Mike Williams horse**
8  **trailer?**
9  A.        No, that's the purchase of the horse
10  trailer.
11  **Q.        There are two checks, is that for one**
12  **horse trailer?**
13  A.        Yes.  One horse trailer but we had to
14  split up the payments.
15  **Q.        That was around the beginning of 2010**
16  **it looks like?**
17  A.        Yes.
18  **Q.        What was the reason for purchasing**
19  **the horse trailer?**
20  A.        Try to eliminate some of the money
21  that we were paying out for transportation.
22  **Q.        Then after you got the horse trailer,**
23  **who was -- who was transporting your horses,**
24  **using this horse trailer?**

Page 206

1  A.        My husband or myself.
2  **Q.        You weren't having to pay someone?**
3  A.        No.
4          But I think the horse trailer
5  predated the truck.  So the horse trailer
6  probably sat there for a while before we were
7  able to buy a truck.
8  **Q.        Vital Recovery Services, what is**
9  **that?**
10  A.        Oh, that's just for paying for to get
11  my vehicle back that was repossessed.
12  **Q.        You had a vehicle repossessed?**
13  A.        Yes.
14  **Q.        How do you relate that to --**
15  A.        I don't know, it's on here.
16  **Q.        So we'll withdraw that.**
17  A.        Yeah, we can.  We were...
18  **Q.        How about the Maryland Department of**
19  **Agriculture, $85, goat?**
20  A.        That was the necropsy for the goat.
21  I just listed everything.
22  **Q.        You were trying to be thorough,**
23  **right?**
24  A.        I was.  I didn't know what was

Page 207

1  relevant and what wasn't.
2  **Q.        So you're not submitting a claim for**
3  **the goat, correct?**
4  A.        Correct.
5  **Q.        Correct, you're not?**
6  A.        Correct, no.
7          MR. WOLFSON:  The answer is
8  no?
9          THE WITNESS:  The answer is
10  no.
11  BY MR. WADDELL:
12  **Q.        Doctor -- is this related to the**
13  **horse?**
14  A.        This is related to -- yeah, the rest
15  of it is the horse.  So we can -- from then on
16  down.
17  **Q.        We can stop after the horse trailer?**
18  A.        We can.
19          ARBITRATOR KARLIN:  I'm
20  confused.  When did the truck come?
21          When did -- do we know when we moved
22  from paying people to van to handling it
23  yourself?
24          THE WITNESS:  Actually, I

Page 208

1  have a bill of sale for the truck, so I can get
2  that for you.
3  BY MR. WADDELL:
4  **Q.        Well, when?**
5          MR. WOLFSON:  I'm going to
6  object if I may.  We specifically asked for this,
7  we never saw it.
8          MR. WADDELL:  I'm just
9  responding to the request, that's all.
10          ARBITRATOR WYCOFF:  Are you
11  saying you never saw the checks?
12          MR. WOLFSON:  The bill of
13  sale.
14          ARBITRATOR WYCOFF:  The bill
15  of sale that she is talking about now?
16          MR. WOLFSON:  Yes.
17          ARBITRATOR WYCOFF:  But you
18  did see the checks?
19          MR. WOLFSON:  Yes, I'll get
20  to that.  We'll talk about those.
21  BY MR. WADDELL:
22  **Q.        So you don't have the bill of sale.**
23  **Do you know when you bought -- when did you buy**
24  **this -- are you talking about the horse trailer?**

Page 209

1  A.      Trailer or truck?
2  **Q.      Truck.  Where is the --**
3              ARBITRATOR KARLIN:  I'm
4  sorry, I didn't mean to mess this up, but I
5  thought I understood that the vanning didn't stop
6  immediately after the purchase of the trailer
7  because they didn't yet have a truck.  So
8  they -- excuse me, so vanning would have
9  continued sometime after the purchase of the
10 trailer until such time as the purchase of the
11 truck.  I was just asking for clarification.
12             MR. WADDELL:  Yeah, I -- I
13 don't know where -- I'm sorry, I don't know the
14 answer.
15 BY MR. WADDELL:
16 **Q.      Do you know the answer to that**
17 **question?**
18 A.      No.  Approximately -- actually,
19 approximately March of 2011.
20 **Q.      Is when you purchased the truck?**
21 A.      Correct.
22 **Q.      That's when you started using the**
23 **horse trailer?**
24 A.      Yes.

Page 210

1              MR. WADDELL:  Tina, I have no
2  further questions for you at this time.
3              THE WITNESS:  Thank you.
4              MR. WOLFSON:  If I may.
5              * * *
6        C R O S S - E X A M I N A T I O N
7  BY MR. WOLFSON:
8  **Q.      Good afternoon, Miss Mawing.**
9  A.      Good afternoon.
10 **Q.      We just went through, and I'm going**
11 **to come back to it, but that exhibit -- can you**
12 **keep that in front of you?  Oh, you closed it.**
13 A.      Sure.  What number was that?
14 **Q.      I think it was 34.**
15 A.      Okay.
16 **Q.      Tell me when you're there, Ma'am.**
17 A.      It's okay, you can go ahead.  Okay.
18 **Q.      We went through and you listed by,**
19 **for instance, on the first couple of pages, if**
20 **you go to, I guess, the third page, that's where**
21 **you have beginning for stall rent, right?**
22 A.      Yes.
23 **Q.      Let's just look at October 1, '08 for**
24 **a second, very top there for Mr. Furr?**

Page 211

1  A.      Yes.
2  **Q.      How many stalls did you rent that**
3  **month, do you know?**
4  A.      I rented --
5  **Q.      All together.**
6  A.      I believe eight.
7  **Q.      Okay.**
8          **Is that -- did you rent all of those**
9  **just from Mr. Furr or did you rent some from**
10 **others, those eight stalls you're talking about?**
11 A.      Those are all from Mr. Furr.
12 **Q.      So in October 1 of '08 you rented a**
13 **total of eight stalls?**
14 A.      To my best recollection.
15 **Q.      Okay.**
16 A.      It wasn't -- yeah, to my best
17 recollection.
18 **Q.      All right.**
19         **There were some months when you were**
20 **renting more than ten stalls, right?**
21 A.      Yes.
22 **Q.      That would be included in these**
23 **checks we're looking at here, too, right?**
24 A.      Right.

Page 212

1  **Q.      So which months did you rent more**
2  **than nine stalls, for example?**
3  A.      I would need some time to go back and
4  look at it.
5  **Q.      So by looking at this we can't tell**
6  **which months this would include stall rent for**
7  **the numbers of stalls you'd have to rent even if**
8  **you had the nine at Charles Town, right?**
9  A.      I don't understand your point.
10 **Q.      Let's back up.**
11         **Whether you understand my point or**
12 **not, can you answer my question?**
13 A.      I can't answer if I don't understand
14 it.
15 **Q.      Let me ask it this way:  Your claim**
16 **in this case is that you should have gotten nine**
17 **stalls from Charles Town, right?**
18 A.      Correct.
19 **Q.      But there were some month that you**
20 **were renting more than nine stalls, right?**
21 A.      Right, correct.
22 **Q.      The total amount -- let's say for**
23 **argument sake, just picking out of the air, in**
24 **August of 2011 you had to rent 12 stalls?**

Page 213

1   A.      Correct.
2   **Q.      Okay?**
3   A.      Uh-huh.
4   **Q.      What we see on this sheet is the**
5   **payment for all 12 stalls, right?**
6   A.      Correct.
7   **Q.      So in October of that month, for**
8   **instance, those months when you had to rent more**
9   **than nine stalls --**
10  A.      Yes.
11  **Q.      -- what's the amount that you'd be**
12  **taking off because you would had have to pay that**
13  **anyway?**
14  A.      You would take the amount of money
15  per stall, which is approximately $275.  And
16  anything in excess of that would be the
17  additional money.
18  **Q.      Didn't you originally tell us it was**
19  **$250 per stall?**
20  A.      It depends on the place we were at.
21  **Q.      So it's not one number fits all,**
22  **right?**
23  A.      Whatever that particular person
24  chooses to pay, you are at their mercy.  There

Page 214

1   are only a couple farms within 30 miles of the
2   racetrack.
3   **Q.      So the average of $275 doesn't really**
4   **work, does it?**
5   A.      I --
6   **Q.      You don't know?**
7   A.      Yes, it does, because some people
8   charge $300 per stall.
9   **Q.      What have you done to calculate what**
10  **the average is?**
11  **Have you gone through here and**
12  **calculated?**
13  A.      All I did was list what I've paid for
14  stall rent.
15  **Q.      That's not my question, ma'am.**
16  **Have you calculated the average you paid for a**
17  **stall?**
18  A.      Per stall, no.
19  **Q.      All right.**
20  **We'll come back to that in a second.**
21  **You told us earlier you now have six**
22  **stalls, right?**
23  **I'm sorry, I apologize, I misspoke.**
24  **You told us earlier at the very**

Page 215

1   **beginning of your deposition that now you're**
2   **training six horses?**
3   A.      Yes.
4   **Q.      For how long has it only been six**
5   **horses?**
6   A.      I have six horses in training
7   running, not six horses in training, six horses
8   running.  That's different.
9   **Q.      How many horses are you training?**
10  A.      Ten.
11  **Q.      Now, if the horses aren't running,**
12  **you don't stall them at the track, do you,**
13  **because you only stall --**
14  A.      Of course you do.
15  **Q.      So wouldn't that decrease the number**
16  **of starts per stall?**
17  A.      Absolutely, which is why they pick
18  that number of six and not 12.
19  **Q.      So currently you're only running six**
20  **horses?**
21  A.      Yes.
22  **Q.      So that's the amount that you're**
23  **seeking reimbursement for here, those six for the**
24  **current amount of time?**

Page 216

1   A.      No, I'm seeking a minimum of the nine
2   stalls I lost.
3   **Q.      But if you weren't -- if you weren't**
4   **running the horses, you stalled them at the**
5   **track?**
6   A.      Do you think that you go right into
7   the track and run?
8   There are months and months of
9   preparation and training that goes into getting a
10  horse fit to run.  And part of that is getting
11  them in the stalls in a racing environment where
12  you teach them to be competitive, you teach them
13  how to break out of a starting gate.  All those
14  things go into it.  You don't just bring a horse
15  into the barn, barn area, and run them the next
16  day.  It's a process.
17  And that's why they only build six
18  starts per stall.  Is because they're
19  anticipating that even if you ran, as I spoke
20  earlier, if you run one horse a month out of
21  the -- if you average one race a month, that's 12
22  starts.  But that's not what Penn Gaming is
23  asking for.  They're only asking for six.
24  Because they anticipate that some of those stalls

Page 217

1   are going to be used for the training process.
2   **Q.        Ma'am, let me ask you to look back**
3   **now at the contract which was Exhibit -- well,**
4   **you have the claimant's book in front of**
5   **you -- no, that is the respondent's book you have**
6   **in front of you.  To make it easy, go to**
7   **Respondent's 28.**
8   A.      Red book?
9   **Q.        No, no.  Keep the white book.  R-28.**
10          * * *
11          (Whereupon, a discussion was
12  held off the record.)
13          * * *
14          ARBITRATOR CARNEY:  Which
15  exhibit number is this?
16          MR. WOLFSON:  This is -- it's
17  the contract.  Previously we used Claimant's
18  Exhibit 1, another copy is R-28, I'm just using
19  this one because I think everybody has the white
20  book in front of you.
21          I'm going to direct the Panel's
22  attention to Page 13.
23  BY MR. WOLFSON:
24  **Q.        It's the same page we looked at**

Page 218

1   before, ma'am.
2           Are you ready, do you have that
3   ma'am?
4   A.      Yes, I do.
5   **Q.        That's okay.**
6           Earlier Mr. Waddell asked you about
7   **Subparagraph A and asked you about equitable**
8   **allocations essential to the livelihood of the**
9   **horsemen, right?**
10  A.      Correct.
11  **Q.        In there also, you read this earlier,**
12  **that effective stall utilization is important to**
13  **Charles Town Races management, do you recall**
14  **that?**
15  A.      Sure, absolutely.
16  **Q.        You understand that to be the case?**
17  A.      Sure, absolutely.
18  **Q.        Because the track wants to make sure**
19  **that the horses that are being stalled on the**
20  **grounds are going to fill the book as you**
21  **explained, right?**
22  A.      Absolutely.
23  **Q.        And will get people interested, have**
24  **full races, good horses, quality horses, people**

Page 219

1   **come and race, right?**
2   A.      Right.
3   **Q.        Let me ask you to turn now back to**
4   **R-2.**
5           **Tell me when you're there.**
6   A.      Stall application?
7   **Q.        Yes, that's right.**
8           **This is a stall application that you**
9   **filled out for the period September 1, 2008**
10  **through December 31, 2008, right?**
11  A.      Correct.
12  **Q.        This is just a different copy of what**
13  **we looked at earlier.**
14  A.      Right.
15  **Q.        This was for the period in which you**
16  **were advised you didn't receive a stall**
17  **allocation?**
18  A.      Right.
19  **Q.        Okay.**
20          **Just so we're talking about the same**
21  **thing, I just want to make sure we're there.**
22          **Ma'am, let me ask you to turn to the**
23  **second page.  And that's your signature, right?**
24  A.      Right.

Page 220

1   **Q.        Let me ask you to go to Paragraph**
2   **No. 9.**
3   A.      Item 9?
4   **Q.        Yes, please, ma'am.**
5           **And could you read that out loud for**
6   **us, the first two sentences.**
7   A.      Horsemen are allotted stalls with the
8   understanding their horses are ready to run.  All
9   horses must be in physical condition that would
10  permit them to race within 50 or 60 days of the
11  date of arrival.
12          That's reasonable.
13  **Q.        Now, when we were talking a few**
14  **minutes ago about effective stall utilization**
15  **being important to the track, you explained to**
16  **the Panel a little earlier today about some of**
17  **the parameters that you understood the track**
18  **would use in allocating stalls.**
19  A.      Yes.
20  **Q.        You mentioned starts per stall would**
21  **be one issue?**
22  A.      Yes.
23  **Q.        Right?**
24  A.      Yes.

Page 221

1  Q.        They wanted a balanced stable, right?
2  A.        Yes.
3  Q.        They wanted quality horses and
4  different types of horses of quality within
5  different categories, right?
6  A.        Yes.
7  Q.        And you also said that one of the
8  issues that the track, you understood to be
9  looking at, was how the horsemen kept their stall
10  area, for example, right?
11  A.        Correct.
12  Q.        Whether it's a clean area?
13  A.        Right.
14  Q.        And whether the -- in that regard,
15  also, where the horsemen will follow the rules of
16  the barns, right?
17  A.        Yes.
18  Q.        So they want people that are going to
19  do things the right way, keep the stalls correct
20  and abide by the rules governing the stalls,
21  right?
22  A.        Right.
23  Q.        You also said that one of the things
24  this all leads up to is to positively contribute

Page 222

1  to the racing at Charles Town and to Charles
2  Town's business, right?
3  A.        Absolutely.
4  Q.        Because you understand that it's
5  important for Charles Town to have these stalls
6  utilized in a way that ultimately will advance
7  its business, right?
8  A.        Correct.
9  Q.        Now, let me turn -- let me take a
10  step back and just make sure, again, leading up
11  to -- we talked earlier, you talked earlier with
12  Mr. Waddell about the progression you got up to
13  nine stalls, right?
14  A.        Right.
15  Q.        And when you testified at the Forest
16  Park hearing on behalf of Mr. Funkhouser, you had
17  seven stalls, right?
18  A.        I believe so, yes.
19  Q.        Then it was after you testified that
20  your allocation went up to nine?
21  A.        Correct.
22  Q.        Then in April of '08 was when the
23  four stalls were taken away.  And we looked at
24  the letter.  And that had to do with having

Page 223

1  stall -- your horses being in Mr. Yetsook's,
2  Mr. Butts' and Mr. Wilt's stalls, right?
3  A.        Yes.
4  Q.        Now, Mr. Butts, to your knowledge,
5  also lost stalls at that time, didn't he?
6  A.        He did not.
7          Mr. Butts voluntarily gave up those
8  stalls.
9  Q.        Those stalls were after the horses
10  were found in his stalls.
11  A.        No.
12  Q.        The stalls were taken away, weren't
13  they?
14  A.        They were not.  They were not taken
15  away from him.  Mr. Butts, I already testified,
16  wanted to downsize.
17  Q.        And Wilt, he lost stalls at that
18  time?
19  A.        He did not.  Mr. Wilt got more
20  stalls.
21  Q.        Mr. Butts, to your knowledge, did he
22  testify at the Funkhouser Forest Park hearing?
23  A.        No.
24  Q.        Now, ma'am, aren't you, isn't it a

Page 224

1  fact you're aware that if there are empty stalls,
2  if a trainer doesn't put horses in the stalls the
3  trainer will lose the stalls?
4  A.        That's a fact.
5  Q.        You understand the reason the track
6  does that is because empty stalls don't advance
7  its purpose, as you described earlier, of having
8  horses training to get in the book to advance the
9  business purposes and advance the racing, right?
10  A.        Right, that's why the sharing of
11  stalls worked so well.
12  Q.        Well, you're aware, also, that the
13  track is, I think as you put it, I forgot how you
14  phrased it, the track keeps track of which horses
15  are on track because of concern of disease and
16  other problems?
17  A.        Absolutely.
18  Q.        Bio security, I think is the term?
19  A.        That's the term.
20  Q.        And I'll give my colleague here
21  credit for reminding me.
22          And that's because if just any horse
23  can come on track, health issues could I arise,
24  right?

Page 225

1  A.      It's very well regulated.  They check
2  tattoos, you have to get permission to come in
3  at the gate, it's --
4  Q.      One of the issues, for example, is
5  something called equine herpes?
6  A.      Correct.
7  Q.      Which is a horrible thing for a track
8  to have, would you agree with that?
9  A.      I would agree.
10  Q.      I mean, it could shut down the truck,
11  it could shut down the racing, right, an outbreak
12  of equine herpes?
13  A.      I've been fortunate never to have
14  that experience, so I don't know, I've never been
15  in a track that even had an outbreak, so I...
16  Q.      Isn't it true, ma'am, that at the
17  time of the April '08 period, when your horses
18  were found in the different stalls, that was
19  because the track had a concern about equine
20  herpes and did a stall audit, do you remember
21  that?
22  A.      That was the story I was told.
23  Q.      By the track, right?
24  A.      Not by the track at all.  I was never

Page 226

1  given a reason.
2  Q.      Ma'am, you weren't the only person to
3  lose stalls at the time of this inspection that
4  occurred, isn't that right?
5  A.      Correct, Mr. Yetsook lost his stall.
6  Q.      And others did as well, right?
7  A.      Not to my knowledge.
8  Q.      Okay.
9          Did you ever ask other horsemen to
10  learn?
11  A.      No.
12  Q.      No?
13  A.      I'm certain, it's a small community,
14  I would have heard about it.
15  Q.      So if, in fact, other horsemen lost
16  stalls at that time you're absolutely certain you
17  would know it?
18  A.      I'm not absolutely certain, no.
19  Q.      Okay.
20  A.      There's a good chance.
21  Q.      Now, there was some testimony earlier
22  today about a board meeting and after you lost
23  your four stalls in April of '08?
24  A.      Yes.

Page 227

1  Q.      You talked about some things that
2  were said based on your understanding, what you
3  did.
4          Now, would you agree with me, ma'am,
5  that at that time there was a schism within the
6  board.
7  A.      Schism?
8  Q.      Yeah.  What I mean is there were
9  factions within the board?
10  A.      I think that's the beauty of the
11  board.  You don't agree on everything all time.
12  People bring different perspectives to the board.
13  But a schism, no, I wouldn't characterize it as
14  that.
15  Q.      Well, wouldn't you agree with me,
16  ma'am, that there was a faction that wasn't
17  particularly happy with Mr. Funkhouser's
18  leadership at the time, Mr. Lowe, Mr. Schneider,
19  Mr. Stahlin, those people?
20  A.      I think it's fair to say Mr. Lowe,
21  because he was seeking the presidency.  And
22  probably Mr. Schneider, yes, sir.
23          ARBITRATOR WYCOFF:  When you
24  said the time, you're referring to --

Page 228

1          MR. WOLFSON:  The meeting at
2  which she raised in April of '08.
3          ARBITRATOR WYCOFF:  April of
4  '08?
5          MR. WOLFSON:  Yes.  For which
6  the minutes were introduced, the time of that
7  meeting.
8          THE WITNESS:  I had no issue
9  with Mr. Lowe or Mr. Schneider, though.
10  BY MR. WOLFSON:
11  Q.      Now, I want to talk for a few minutes
12  about the poison issue, okay?
13  A.      Okay.
14  Q.      Who else, to your knowledge, had
15  animals die as a result of that poison?
16          ARBITRATOR KARLIN:  Had what?
17  I'm sorry, I didn't hear you.
18  BY MR. WOLFSON:
19  Q.      Who else had animals die as a result
20  of the poisoning incident?
21  A.      I was informed by my veterinarian
22  that in that same time period two other goats
23  died.  I don't know.  Who knows -- who would
24  think that a horse dying, who would ever make the

Page 229

1  link? Horses die. I mean, it's unfortunate. So
2  they may never have made that connection.
3  **Q.        But no one else ever told you, just**
4  **what your knowledge is, that they suspected they**
5  **lost animals also because of poisoning, right?**
6  A.        The goats, yes.
7  **Q.        Other than the --**
8  A.        The two, yes.
9  **Q.        The vet told you that?**
10  A.        Right.
11  **Q.        Now, let's sort of talk about the**
12  **timing for a second.**
13            In the red binder I'm going to turn
14  **to Claimant's Exhibit 6, please.**
15                ARBITRATOR CARNEY:  16?
16                MR. WOLFSON:  6, I'm sorry.
17                THE WITNESS:  Okay.
18  BY MR. WOLFSON:
19  **Q.        I believe you identified this as the**
20  **invoice provided to you from Ehrlich for the**
21  **laying of the poison that ultimately led to the**
22  **your -- that you believe led to the death of your**
23  **goat and horse --**
24  A.        Correct.

Page 230

1  **Q.        -- right?**
2  A.        Yes.
3  **Q.        The horse died first?**
4  A.        Yes.
5  **Q.        I just want to make sure I get the**
6  **timing.**
7  A.        Yes.
8  **Q.        So this is for an application of**
9  **poison, rat poison, on June 3rd of '08, right?**
10  A.        Right.
11  **Q.        Now, let's go down to the bottom left**
12  **corner, if you would.**
13  A.        Yes.
14  **Q.        It's written Barn 14, that**
15  **handwriting, do you recognize that?**
16  A.        Yes.
17  **Q.        Whose handwriting is that?**
18  A.        Mine.
19  **Q.        So you added that when you got this?**
20  A.        I did. I just put attention to it.
21  **Q.        I understand.**
22  A.        But it's circled, Barn 14 is circled.
23  **Q.        Ma'am, I'm not -- I just want to make**
24  **sure the Panel understands how it got there,**

Page 231

1  that's all.
2  A.        Okay.
3  **Q.        It lists the barns for which the**
4  **poison was applied as 6, 7, 11 and 14, right?**
5  A.        Yes.
6  **Q.        So it wasn't just your barn where the**
7  **poison was applied?**
8  A.        No.
9  **Q.        Also, this list, if you go back up to**
10  **mice, pesticide applications, about three, sort**
11  **of, categories up in capital letters.**
12  A.        Uh-huh, yes.
13  **Q.        Do you see that?**
14  A.        Yes.
15  **Q.        Earlier you talked about, and this**
16  **lists the pesticide as Rozol Tracking Powder,**
17  **correct?**
18  A.        Correct.
19  **Q.        You discussed with the Panel some**
20  **information you downloaded for pellets, right?**
21  A.        Right.
22  **Q.        You didn't see pellets on site, you**
23  **saw powder on site?**
24  A.        Powder on site.

Page 232

1  **Q.        Now, this also talks about the**
2  **quantity of two ounces, do you see that?**
3  A.        Yes.
4  **Q.        With a concentration of .2 percent,**
5  **do you see that?**
6  A.        Yes.
7  **Q.        Did you ever do any research to try**
8  **to determine what the percentage or what that**
9  **means, the concentration, how it works?**
10  A.        Well, I kind of stopped at the part
11  that I read where it said --
12  **Q.        A simple question, ma'am --**
13  A.        -- not to be used around animals.
14  **Q.        Ma'am, my simple question is --**
15  A.        That was enough for me. I didn't
16  need a quantitative amount. That was enough for
17  me.
18  **Q.        Ma'am, my simple question is:  In the**
19  **exhibit we pulled out regarding the pellets, did**
20  **you do any research into the powder and the**
21  **concentration percentage listed here?**
22  A.        I did research into the powder
23  itself, but I didn't do research into the
24  concentration.

Page 233

1 **Q.**       Now, if we turn to C-7, the next
2 **page.  The next exhibit.**
3            **First of all, what is R E A C H?**
4 A.       That's an equine hospital.
5 **Q.**       **This is -- this lists the patient as**
6 **Marigot Bay, right?**
7 A.       Yes.
8 **Q.**       **That was the horse that died?**
9 A.       Yes.
10 **Q.**       **The horse, it looks like, went in on**
11 **June 19th, right?**
12 A.       Yes.
13 **Q.**       **Then if we go to the second to last**
14 **page of this exhibit, it looks like the horse**
15 **died on June 23rd.**
16            **Do you see that?  That page**
17 **(indicating).**
18 A.       This one (indicating)?
19 **Q.**       **Yes.  I can show you what I'm**
20 **referring to.**
21 A.       Yes.
22 **Q.**       **It lists a hospitalization and post**
23 **mortem.**
24 A.       Yes.

Page 234

1 **Q.**       So the horse died on June 23rd,
2 **approximately 20 days after the application that**
3 **you're referring to in the prior, right?**
4 A.       Yes.
5 **Q.**       **Then it was sometime after that that**
6 **the goat died, right?**
7 A.       Within days.
8 **Q.**       **Right, okay.**
9 **Now, did you ever have the feed bag tested?**
10 A.       There would be no reason for me to
11 have --
12 **Q.**       **Ma'am, my question is very simple.**
13            **Did you have the feed bag tested?**
14 A.       No, because the feed bags are sealed
15 prior to us using them.  We use them -- open them
16 and use them immediately.  So, no.
17 **Q.**       **Did you ever test -- what's the**
18 **trough called where the feed goes in for the**
19 **horse?**
20 A.       The feed tub.
21 **Q.**       **The feed tub.**
22            **Did you ever test the food or the**
23 **feed in the feed tub after the horse and goat**
24 **died?**

Page 235

1 A.       No, no.
2 **Q.**       **Is it sort of normal for the goat and**
3 **horse to eat out of the same feed tub?**
4 A.       Not at all.  The goat can't reach the
5 feed tub, it's up here (indicating).
6 **Q.**       **Did you ever test the goat's feed to**
7 **see if the goat's feed was poisoned?**
8 A.       The goat eats off the ground.
9 **Q.**       **So the food that the horse ate wasn't**
10 **tested?**
11 A.       No.
12 **Q.**       **You didn't -- did you ever test**
13 **the -- well, what does the goat eat, the hay, the**
14 **straw?**
15 A.       The goat eats the straw and he eats
16 the grain the horse drops.  He is an opportunist.
17 **Q.**       **Did you ever have any of that dropped**
18 **straw, grain and the straw from the shed tested?**
19 A.       Huh-uh.
20 **Q.**       **The concentration to see if that**
21 **could kill it?**
22 A.       No.  I -- no, I wasn't -- my
23 participation ended with filing the complaint
24 with the Department of Agriculture.  My hope

Page 236

1 being they would pursue this.
2 **Q.**       **Then you never heard back from them**
3 **after their investigation?**
4 A.       No.
5 **Q.**       **I think you also said you filed**
6 **something with -- it was just the Department of**
7 **Agriculture -- that was the pesticide report,**
8 **right?**
9 A.       Right.
10 **Q.**       **Now, at the meeting with the Governor**
11 **when you raised the issue of the dead horse and**
12 **goat -- and you didn't accuse the track of**
13 **deliberately poisoning, right?**
14 A.       Absolutely not.
15 **Q.**       **I think what you said is you just had**
16 **a strong belief that the poison in the barn led**
17 **to the death of your horse and goat, right?**
18 A.       Absolutely.
19 **Q.**       **Did you provide the Governor with**
20 **any -- you did a necropsy on the goat, right?**
21 A.       Yes.
22 **Q.**       **Did you ever provide that to the**
23 **Governor?**
24 A.       I may have.

Page 237

1  Q.      The results?
2  A.      To be honest I don't remember.  We
3  have photographs and the report, yes.
4  Q.      Did anyone else at that meeting talk
5  about animals being poisoned other than you?
6  A.      No, just me.
7  Q.      Did anyone say they had heard of
8  other animals being poisoned or dying of poison?
9  A.      Not that I can recall.
10 Q.      Now, I believe you said that the
11 first time you ever -- well, let me ask you this.
12 I think you attended Mr. Hale's deposition in
13 this case, didn't you?
14 A.      I did not.
15 Q.      Okay.
16         Did you ever read Mr. Hale's
17 deposition?
18 A.      I did not.
19 Q.      Let me take a step back and go
20 through a different issue now.
21         With respect to your applications, it
22 was your practice, was it not, ma'am, to list
23 more horses on the stall application than you
24 even expected to get stalls for?

Page 238

1  A.      That was everyone's practice.
2  Because you list young horses because -- you're
3  trying to let the track know what potential
4  horses you have to fill races.
5  Q.      And you're also hoping to get as many
6  possible stalls as you can, right?
7  A.      Probably.
8  Q.      Sure.
9  A.      But you do that with viable
10 candidates.  I don't manufacture horses or make
11 up names.
12 Q.      Ma'am, ma'am, I'm not accusing you of
13 making up names or manufacturing -- let's back
14 up.
15 A.      Okay.
16 Q.      If you're training, let's say, 15
17 horses, when you have -- at the time you had,
18 let's say, five stalls.  Let me back up.
19 You're first given one stall at the track, a
20 stall or two?
21 A.      Right.
22 Q.      Then I think it increased to four or
23 five?
24 A.      Somewhere along the way, yes.

Page 239

1  Q.      Right.
2          Then up to seven, then up to nine?
3  A.      Right.
4  Q.      At the time you were -- you had four
5  or five, you were training in excess of, I think,
6  12 horses at that time?
7  A.      I don't recall.
8  Q.      But you would have listed all 15 or
9  even 20 horses, even if you only had four or five
10 stalls, to let the track know what you had and
11 also to try to get as many as stalls as you could
12 have?
13 A.      Absolutely.
14 Q.      With the expectation that you're
15 going to have to pay some stall rent somewhere if
16 you don't get all the stalls, right?
17 A.      That's reasonable, yes.
18 Q.      Now, with respect to the exhibit you
19 were going through, which was back to the big
20 binder, I'm sorry.  I can help you with that.
21 A.      No, I'm fine.
22 Q.      I'll make it easier for you.
23         ARBITRATOR WYCOFF:  Which
24 number?

Page 240

1          THE WITNESS:  34.
2          MR. WOLFSON:  34.
3  BY MR. WOLFSON:
4  Q.      Now, this was created -- by the way,
5  was it you or your husband that did this?
6  A.      Me.
7  Q.      This was based on a review of checks?
8  A.      Correct.
9  Q.      Based on that review of checks you
10 then listed and broke it down into these
11 categories by these people, right?
12 A.      Right.
13 Q.      Now, ma'am, would you agree with me
14 that your husband did far more of the accounting
15 and check writing for the training operation than
16 you did?
17 A.      More so, yes.
18 Q.      And he was also the one that was more
19 responsible for issuing the invoices than you
20 were; isn't that right?
21 A.      Sometimes.
22 Q.      Well, certainly, just on a month by
23 month basis, most of the invoices were sent out
24 by him, prepared, handwritten and sent out by

Page 241

1  him, right?
2  A.      Both of us.
3  Q.      You wouldn't agree with me that more
4  than half were sent by him?
5  A.      It depends on what time period you're
6  looking at.
7  Q.      From the time of April '08 until the
8  present.
9  A.      No.  I would say for the first couple
10 of years I did most of it until I became a full
11 time employee at the hospital.
12 Q.      Then he started doing it?
13 A.      He did more of it, yes.  It's
14 something we would sit down and do together, too.
15 Q.      Now, ma'am, let me turn you back to
16 R-15, which was the original, and I'm not
17 questioning about the cover, just to get us
18 there.  It has the -- you have it?
19        Tell me when you're there, ma'am.
20 A.      We're getting there.
21 Q.      Take your time.
22 A.      Okay.
23 Q.      R-15.  That's that first page that
24 there was some confusion earlier, the originally

Page 242

1  prepared summary of damages.  Then the top half
2  was withdrawn.
3  A.      Right.
4  Q.      But let me go back now a few pages.
5  And you'll see that part of this exhibit includes
6  checks.
7         Keep going.
8  A.      Same --
9  Q.      Same exhibit.  Go back about five
10 pages.
11 A.      Okay.
12        I'm in the checks, is there a
13 specific one?
14 Q.      Go to the first page, for example.
15 This will be easier.
16        ARBITRATOR KARLIN:  I'm lost.
17 We're on 15?
18        MR. WOLFSON:  Yes.  It's
19 right after the tax return.
20        ARBITRATOR KARLIN:  Okay.
21        THE WITNESS:  Okay.
22 BY MR. WOLFSON:
23 Q.      There is a tax return and then we get
24 to the beginning of the copies of the checks.

Page 243

1  And then it goes on for many pages.
2  A.      Uh-huh.
3  Q.      I just want to make sure we identify.
4  Let's go to the very first two checks at the very
5  top, 7824 and 9104.
6  A.      Okay.
7  Q.      The signature on those checks is
8  whose?
9  A.      My husband.
10 Q.      And if we go down on that same page
11 the left column second one from the bottom,
12 that's your signature?
13 A.      Correct.
14 Q.      So that way we can just see the two
15 signatures who signed them.
16        And these are what you used for
17 purposes of preparing R-34, right?
18 A.      Right.
19 Q.      Now, let's go back to R-34, I'm
20 sorry.  I'm trying to give everyone a workout
21 here, since we're inside all day.  Rhonda
22 Plymale, do you see those entries on the first
23 page?
24 A.      Yes.

Page 244

1  Q.      She also did laundry, right?
2  A.      She did until we went to the farm.
3  And there was a washing machine at the farm.
4  Q.      When did you go to the farm?
5  A.      2008.
6  Q.      After --
7  A.      September 2008.
8  Q.      So, in September of 2008 that's when
9  she stopped doing laundry?
10 A.      She -- there are a couple on here
11 that are for $120.  It makes me question whether
12 she did a couple horse blankets or something.
13 But for the most part, these are all
14 transportation costs.
15 Q.      When you say for the most part, which
16 ones are not?
17 A.      I would say there is one for $140, I
18 would say probably $20 of that is for a horse
19 blanket.
20 Q.      How about the $290, how much of that
21 is for laundry?
22 A.      $290.  Which one are you looking at?
23 Q.      Check No. 7264 November 1, '08?
24 A.      That one is -- no -- because we were

Page 245

1    at the farm with the washing machine. It was
2    probably for transportation and feeding.
3    **Q.      When you said the $120, you're**
4    **referring to the July of '09 up at the top, up**
5    **towards the top? The first two --**
6    A.      No, I said $140.
7    **Q.      $140. Oh, that one?**
8    A.      Yes.
9    **Q.      So in August of '09 that may include**
10   **some --**
11   A.      Maximum, maximum I ever paid her for
12   laundry was $20.
13   **Q.      But as you sit here now, can you**
14   **identify which of these checks would include**
15   **laundry?**
16   A.      I -- she at a minimum was paid $75 a
17   week for transporting.
18   **Q.      Okay.**
19        **Now, when you had more than nine**
20   **horses under -- well, you only had nine stalls**
21   **for what period of time?**
22   A.      Nine stalls at the track?
23   **Q.      At the track, yeah.**
24        **From, I think it was February to**

Page 246

1    **April of '08?**
2    A.      Yes. It seemed like it was a longer
3    period than that. It might have been January.
4    **Q.      We saw the letter, we can go back if**
5    **you want --**
6    A.      But you can receive a stall
7    allotment, you can receive additional stalls, it
8    doesn't have to be at that designated point in
9    time. You can go up and ask the racing secretary
10   for additional stalls, and if they're available
11   you'll get them.
12   **Q.      Ma'am, you can do a lot of things. I**
13   **understand that. I'm just focusing on what**
14   **happened.**
15   A.      My recollection is I had nine stalls
16   for a lot longer than just a couple of months.
17   **Q.      Well, was it before your allocation**
18   **of seven to nine stalls?**
19   A.      I'm not understanding the question.
20        If I only had seven I would have gone
21   up subsequently and asked for two more.
22   Especially in that time period when Mr. Butts was
23   trying to downsize.
24   **Q.      So this would have been the period**

Page 247

1    **between the fall of '07 and, let's say, early**
2    **'08, right, that's what you're talking about**
3    **here?**
4    A.      I couldn't pinpoint the time period.
5    **Q.      Well, let's go back, then.**
6        **You got seven stalls in '07 and got**
7    **an allocation of nine in early '08, right?**
8    A.      Do you have that written down?
9    **Q.      Ma'am, I can show you your testimony,**
10   **I can show you -- if you go to R-39 -- C-39 in**
11   **the red binder.**
12   A.      C-39.
13   **Q.      In the red binder, I'm sorry.**
14   A.      Okay.
15   **Q.      No, the red binder, ma'am, I**
16   **apologize.**
17        **This is what you went through with**
18   **Mr. Waddell.**
19   A.      C-39?
20   **Q.      Yes, ma'am.**
21   A.      It must be in another book. I don't
22   have a 39 in this book.
23        MR. HAMMER: You guys have
24   the 39.

Page 248

1        MR. WOLFSON: What did you
2    use for her then?
3        MR. HAMMER: It was on
4    screen. I can put it up if you want.
5        MR. WOLFSON: That would be
6    quicker. Thanks, I appreciate it.
7        MR. HAMMER: Which one do you
8    want?
9        MR. WOLFSON: Let's start
10   with 39, the first page.
11   BY MR. WOLFSON:
12   **Q.      Okay. That's from December 21, '06**
13   **allocating you seven stalls, right?**
14        MR. HAMMER: That's the first
15   page.
16        THE WITNESS: Seven stalls
17   for 2007, correct.
18   BY MR. WOLFSON:
19   **Q.      So you had seven stalls in 2007.**
20        **Let's go to the next page.**
21        **February 7, 2008 you were allocated**
22   **nine stalls?**
23   A.      Correct.
24   **Q.      Is it your testimony that you had**

63c8bf88-9918-4cd5-8f34-92041e5909f6

Page 249

1 granted to you or agreed to provide to you more
2 than the seven before you got this allocation in
3 February of '08?
4 A.      It's possible.  Just if I had an
5 agreement with the racing secretary.
6 Q.      Ma'am, I understand anything is
7 possible.  I'm simply asking your best
8 recollection.
9 A.      To my best recollection, I don't
10 know.
11 Q.      Okay.
12         Now, let's now talk about the seven
13 stalls you had as of January of '08, okay?
14 A.      Okay.
15 Q.      Would the horses you had beyond the
16 seven, you were trailering those back and forth,
17 right?
18 A.      No.  I wasn't.
19 Q.      You were only keeping at the track
20 those horses that were racing at the track?
21 A.      Or across the street where I walked
22 them over.
23 Q.      Okay.
24         After the four stalls were taken

Page 250

1 away --
2 A.      Right.
3 Q.      -- did you have vanning expenses
4 then?
5 A.      No.
6 Q.      What did you do then?
7 A.      I was across the street.
8 Q.      Okay.
9         So the vanning expenses that we're
10 looking at, those are from the stalls you were
11 renting that weren't across the street, right?
12 A.      Right.
13 Q.      How many horses, stalls, did you have
14 across the street in each of the months of, let's
15 say, '08, after you lost all your stalls?
16 A.      I don't know the exact number.
17 Depending on the availability.  I was at one
18 point in four different locations.  Vanning from
19 four different places.
20 Q.      How many stalls do you have across
21 the street right now?
22 A.      Two.  Zero now.
23 Q.      How about a year ago?
24 A.      Probably two.

Page 251

1 Q.      And the year before that?
2 A.      It waxed and waned, sometimes I had
3 zero.  The most I ever had was two.
4 Q.      Okay.
5 A.      Many, many months I had none.
6         ARBITRATOR CARNEY:  When you
7 talk about stalls across the street, are you
8 referring to a facility which is located across
9 the street from the track which you could rent
10 stalls?
11         THE WITNESS:  Correct.  But
12 there is a limited amount of barns.  There is
13 only a handful of barns.  And so they're at a
14 premium.
15         So if you have some availability, if
16 you have ten horses and there are only two stalls
17 available over there, it's an issue.  It's more
18 easy to get just one or two.  And then that's
19 directly accessible to the track.  So you can
20 just walk over and track your horse.
21         ARBITRATOR CARNEY:  You don't
22 have to van those horses?
23         THE WITNESS:  You don't have
24 to van.

Page 252

1 BY MR. WOLFSON:
2 Q.      Ma'am, now let me ask you, in that
3 same white exhibit, would you turn to 69?
4 A.      Mine only goes up to 53.
5 Q.      Our mistake.
6         69-C, okay?
7 A.      Okay.
8         MR. WOLFSON:  David, this was
9 the summary -- just by way of background, I'll
10 explain it, okay?
11         MR. HAMMER:  Yeah.
12         MR. WOLFSON:  Thanks.
13 BY MR. WOLFSON:
14 Q.      Ma'am, I'm showing you what has been
15 marked as Exhibit 69-C.  And I was just telling,
16 speaking with your counsel, this is a summary
17 that we prepared from the canceled checks you
18 gave us in part, in R-15.  And then that second
19 batch that we got, which are R-33 if you want to
20 look at those, it's just a batch of checks.
21 These are all the checks.
22 A.      Okay.
23 Q.      Okay?
24 A.      Uh-huh.

Page 253

1  **Q.        This is something that we gave to**
2  **your counsel.**
3  **        And what this shows, ma'am, is -- and**
4  **if you look at the stall rent, we combined**
5  **everything you had in stall rent per month for a**
6  **total.**
7  A.        Yes.
8  **Q.        Then we used an average of $250,**
9  **because I think you agreed, both you and your**
10 **husband testified to that amount in your**
11 **depositions?**
12 A.        I don't remember testifying to $250.
13 **Q.        Do you remember your husband telling**
14 **us $250 at his deposition?**
15 A.        I don't recall that.
16 **Q.        Let me see if I can refresh your**
17 **recollection.**
18 **        I apologize.  You know what, let me**
19 **come back to this later.  I don't want to waste**
20 **the time now.**
21 **        But on the average of $250 we have**
22 **listed here the number of horses that were**
23 **stalled per month, do you see that?**
24 **Just the column, that's what it says.**

Page 254

1  A.        I see.
2  **Q.        I'm just giving you some background**
3  **questions.**
4  A.        Sure.
5  **Q.        We ended it in January of '13 because**
6  **that's the last time we got checks.**
7  A.        Okay.
8  **Q.        Did you keep the checks after January**
9  **of 2013?**
10 A.        Of course.
11 **Q.        Okay.**
12 **        Now, there was also, as you recall in**
13 **this litigation, some issue with invoices, do you**
14 **recall that?**
15 A.        Yes.
16 **Q.        You didn't keep the invoices for all**
17 **the trainers that you were training horses for**
18 **during this time, did you?**
19 A.        Not for the entire five years, no.
20 **Q.        In fact, the way we ended up getting**
21 **there, if you recall, ma'am, was that it came up**
22 **in your deposition, your husband's deposition,**
23 **right?**
24 A.        Yes.

Page 255

1  **Q.        And originally we were told that you**
2  **didn't charge stall rent at all, do you remember**
3  **that?**
4  A.        That was my understanding.  That's
5  what I testified to, that's not what my husband
6  testified to.
7  **Q.        So that's my point.**
8  **        You testified that originally you**
9  **didn't charge stall rent at all, right?**
10 A.        That's right.  Because I wasn't aware
11 of Mr. Wratchford.
12 **Q.        But do you recall your husband**
13 **originally testifying that you didn't charge for**
14 **Mr. Wratchford either?**
15 A.        I believe he said he did.  The
16 question was, did you charge for anyone?
17        MR. WOLFSON:  Are you calling
18 Mr. Mawing?
19        MR. HAMMER:  Depends what
20 happens.
21        MR. WADDELL:  We're not
22 intending to.
23        ARBITRATOR WYCOFF:  Is his
24 deposition an exhibit?

Page 256

1        MR. WOLFSON:  Would there be
2  any dispute of introducing her husband's
3  transcripts?  You won't object to those, will
4  you?
5        MR. WADDELL:  We have an
6  understanding that if witnesses aren't called we
7  can use the transcript.
8        MR. WOLFSON:  Fine.
9        I'll withdraw and use the relevant
10 portions of her husband's testimony.  I can save
11 some time that way.
12        ARBITRATOR KARLIN:  Can I get
13 some clarification while we're doing this?
14        MR. WOLFSON:  Yes, of course.
15        ARBITRATOR KARLIN:  You may
16 have said this and I apologize, but sometimes in
17 the later afternoon things move too quickly for
18 my brain.
19        On your chart, looking at 69-C, you
20 have the number of horses per month.  It wasn't
21 totally clear to me where that came from.
22        MR. WOLFSON:  I apologize if
23 I wasn't clear.
24        ARBITRATOR KARLIN:  Well, it

Page 257

1  may have been me, I'm not blaming you at all.
2            MR. WOLFSON:  We got there by
3  taking the amount of stall rent charged during
4  the month and dividing that by $250.
5            ARBITRATOR KARLIN:  Got it.
6            ARBITRATOR CARNEY:  Back to
7  the origin of the $250 figure.
8            MR. WOLFSON:  That's what I
9  was getting to, because that is what the husband
10  testified.  And rather than waste time now, I'll
11  just introduce it.  That's what we were told at
12  the time.
13            ARBITRATOR CARNEY:  She
14  testified that she didn't do any calculation --
15            MR. WOLFSON:  That's right.
16  That's right.
17            THE WITNESS:  I also don't
18  know which farm he is referring to in the $250.
19  We've rented at several different places, as you
20  can see.
21  BY MR. WOLFSON:
22  Q.        In that case, let's go back to R-34
23  for a second.
24  A.        Which book?  This one.

Page 258

1  Q.        I'm sorry, the other white folder.
2  I'm going to make you go back and forth.  Here
3  you go.
4  A.        Thank you.  Okay.
5  Q.        Now, ma'am, let's go back to R-34.
6  And I want to go to the pages beginning with
7  stall rent, which as I understand your testimony
8  begins with the third page.
9  A.        No, it begins with Robert Furr, that
10  is where the stall rent begins.
11  Q.        Yes, that's the third page of the
12  exhibit.
13  A.        Okay, it doesn't say stall rent.  The
14  third page says stall rent, that's why I was
15  confused.  Thank you.
16  Q.        I'm not trying to trick you, ma'am,
17  I'm just trying to get us to the same place.
18  A.        It's easy to trick me at this point
19  in the afternoon.
20        All right, go ahead.
21  Q.        So the third page with Robert Furr.
22  A.        Okay.
23  Q.        What was the amount paid to Mr. Furr
24  per month?

Page 259

1  A.        You're looking at it.
2  Q.        I'm sorry, what was the average per
3  stall, what was the amount per stall paid to him
4  per month?
5  A.        I would have to calculate, I would
6  have to match it against my horses and see how
7  much.
8  Q.        Well, how would you go about doing
9  that now if you don't have the invoices and you
10  don't know which horses you were training each
11  month?
12  A.        I know what horses I was training.
13  Q.        Which records would you look at?
14  A.        Training charts.
15  Q.        What training charts?
16  A.        Training chart is just a diary that I
17  keep.
18  Q.        Is there any reason you didn't
19  produce that to us?
20  A.        It wasn't relevant.
21  Q.        Is that your determination, it wasn't
22  relevant?
23  A.        No.
24  Q.        So you could look and you could

Page 260

1  determine each month how many horses you were
2  training?
3  A.        Not with accuracy, but...
4  Q.        Not with accuracy.  What does that
5  mean?
6  A.        That means it's just my handwritten
7  notes.
8            ARBITRATOR CARNEY:  That
9  would tell us for each person who was doing,
10  renting stall to you with horses --
11            THE WITNESS:  No, no.  It's
12  just my own horses.
13  BY MR. WOLFSON:
14  Q.        Just your own horses?
15  A.        Correct.
16  Q.        Let's back up then.  Let me ask my
17  question again.
18        How do we determine each month how
19  many horses you were training and how many stalls
20  you were renting every month?
21  A.        Based on the amount of the stall
22  rent.
23  Q.        So, as you sit here, you don't
24  necessarily know what the stall rent was for each

Page 261

1  of the people, each of the places each month,
2  right?
3  A.      Not with 100 percent accuracy,
4  no. I'd have to look back over my figures.
5  Because each place charged something different.
6  Mr. Tobin might charge $150 for the month. Media
7  Farm would charge $275. Mrs. Hagy charges $300 a
8  stall.
9  Q.      What records would you look at?
10  A.      And the most difficult part is
11  sometimes they would prorate it. So if I would
12  take a horse out three weeks into it, they might
13  give me credit for that last week.
14  Q.      So, ma'am, how could we determine
15  with specificity? How would you go about
16  determining with specificity --
17  A.      Based on the amount of money that I
18  wrote the checks out for. So whatever amount
19  that I wrote the check out for that month, that
20  was the stall rent.
21  Q.      Ma'am, that's not my question.
22  A.      And I --
23  Q.      Let me back up. I apologize. And
24  it's getting late, I could be terribly -- I

Page 262

1  apologize, really. Let me back up.
2          I'm trying to find out for each one
3  of the places where you rented stalls what you
4  were charged each month for the stalls, per stall
5  each month.
6  A.      It varied.
7  Q.      I understand that.
8          That's what I'm trying to get to. How
9  do we know per stall per month what you were
10  charged?
11          Can we do it by looking at this?
12  A.      Probably if I had a little bit of
13  time.
14  Q.      What do you mean "probably," how
15  would you do it?
16  A.      I mean, Mrs. Hagy is easy. It's a
17  flat fee, it's --
18  Q.      What's that?
19  A.      It's ten stalls, the Hagy farm. I
20  have to rent the minimum.
21          Now, on the other one --
22  Q.      Let's back up before you move on.
23          Let's talk about Hagy. You have to
24  rent a minimum of ten stalls?

Page 263

1  A.      Correct.
2  Q.      That is whether you have seven or six
3  horses, you have to rent ten?
4  A.      Correct.
5  Q.      So that's not, even Mrs. Hagy doesn't
6  tell us how many stalls you needed for each
7  month, right?
8  A.      I have to -- that's the -- I have to
9  rent the ten stalls. I fill all ten stalls.
10  Q.      That's because you choose to
11  go -- when you say -- if you're training seven
12  horses how do you fill all ten?
13  A.      I have enough horses to fill them, I
14  have young horses that I'm prepping as well.
15  Q.      So that we know is $300 per stall,
16  Mrs. Hagy?
17  A.      Correct.
18  Q.      Do you sublet any of those?
19  A.      No. They're empty right now.
20  Q.      How about Mr. Furr, how much per
21  stall per month?
22  A.      Again, at that time I believe it was
23  $275. And each month it would vary. The
24  arrangement with Mr. Furr was that was based on

Page 264

1  how many horses there were at the end of the
2  month. And again, he would give us partial
3  credit.
4  Q.      So on a per-month basis can you tell
5  me what --
6  A.      Anywhere from $250 to $300.
7  Q.      But you can't say with certainty, as
8  you sit here?
9  A.      I would have to do the breakdown on
10  each horse.
11  Q.      How would you do the breakdown?
12  That's my question.
13  A.      I would do it on a month-by-month
14  basis.
15  Q.      How would you find out what horses
16  you had in that month?
17  A.      Mr. Furr and I would sit down, or
18  Mr. Furr and my husband would sit down at the end
19  of the month and say, You had X amount of horses,
20  this one left on the --
21  Q.      Fair enough.
22          I understand now where we're
23  disconnecting.
24          I'm saying right now. Right now, as

Page 265

1  you sit here, how could you determine for, let's
2  say, November of '08, what you were charged per
3  stall that month?
4  A.      It would be based on how many horses
5  were there.
6  Q.      How many were there?
7  A.      Looking at it, ten.
8  Q.      That's just because it's a round
9  number of $2,200?
10 A.      It makes sense.
11 Q.      And how about the next month?
12         Well, actually, for that month,
13 November, it lists $2,510, doesn't it?
14 A.      Which month are we looking at?
15 Q.      November of '08.  You wrote two
16 checks, one for $2,200, one for $310.
17 A.      Correct.
18 Q.      So that's $2,510, right?
19 A.      Correct.
20 Q.      So how many horses did you have in
21 November of '08?
22 A.      I had the same amount.  I had between
23 seven and ten horses.
24 Q.      That's the best you can do as you sit

Page 266

1  here now, that's your best estimate?
2  A.      I guess I'm not -- this is where
3  we're disconnecting, I'm not understanding what
4  difference it makes.
5  Q.      Ma'am, don't worry about what
6  difference it makes, just try to answer the
7  question.
8  A.      Well, I'm trying to understand.
9  Q.      I'm just trying to very simply get
10 what you were charged by Mr. Hagy in November of
11 '08 per stall?
12         MR. WADDELL: Hagy?
13 BY MR. WOLFSON:
14 Q.      Furr, I apologize.
15 A.      $220.
16 Q.      $220.
17         But how -- so then why is
18 there -- you had ten horses, you think?
19 A.      Yes.
20 Q.      So what's the additional $310?
21 A.      It may have been monies from another
22 stall from another time.  I've rented from him
23 before, I've rented just single stalls.  It's not
24 unusual.  He may have charged me a higher rate

Page 267

1  because it was just a single stall.
2  Q.      And of that month, how much was
3  reimbursed by Mr. Wratchford, for example?
4  A.      I believe Mr. Wratchford was
5  charged -- I don't know, you have the invoices.
6  Where are they?
7  Q.      If we go to the Wratchford invoices,
8  36 and 37.
9          No, I'm sorry, 35 and 36, my bad.
10         Let's look at 35 for a second.  What
11 year is that for, do you know?
12 A.      No.
13 Q.      You don't know what year that's for?
14 A.      Oh, yes, I'm sorry.  2008.
15 Q.      Where do you see that?
16 A.      I just know because I know when I had
17 his horses.
18 Q.      Okay.  That's fine.
19         Is this your handwriting or your
20 husband's?
21 A.      My husband's.
22 Q.      The next invoice, and again on this
23 one for July it shows he reimbursed you for two
24 stalls, right, stall rent?

Page 268

1  A.      Correct.
2  Q.      My colleague actually is going to
3  help us both out.  Thanks, Stacey.
4          If you go about to the middle of that
5  page, it says 10 percent, Mary second?
6  A.      Yes.
7  Q.      7/18/09.
8  A.      Yes.
9  Q.      Does this refresh your recollection
10 that this would have been '09, not '08?
11 A.      Okay.
12 Q.      Can we agree on that?
13 A.      Yes.
14 Q.      Let's go to the next page, June 1
15 through June 30.  Do you know if this was '08 or
16 '09?
17 A.      I don't.
18 Q.      I'm sorry?
19 A.      I don't.  I don't know which year.
20 Q.      Were you training for Mr. Wratchford
21 in both '08 and '09?
22 A.      Yes.  The reason I know that is
23 Mr. Wratchford was with me when I lost my stalls.
24 Q.      He lasted into the following year,

Page 269

1  right?
2  A.      I believe early.
3  Q.      At least through July.
4  A.      I don't know that that's not July
5  of -- okay.
6  Q.      It says '09.
7  A.      Where?
8  Q.      I'm sorry.  Let's go back to R 35?
9  A.      Okay.
10 Q.      The very first page.
11         Where it looks like you got ten
12 percent of the winnings for Mary --
13 A.      I see that now, yes.
14 Q.      That's '09?
15 A.      Correct.
16 Q.      So it looks like he was with you
17 through at least July of '09 --
18 A.      Correct.
19 Q.      -- right?
20 A.      Uh-huh.
21 Q.      These were all the invoices produced
22 to us from Mr. Wratchford?
23 A.      Uh-huh.
24 Q.      Let's go back to 36.

Page 270

1         Do you know if that's December, very
2  first page of R-36, whether that's December of
3  '08 or '09?
4  A.      No, I don't know.
5  Q.      The same for the next two pages,
6  November and October, do you know if those
7  are --
8  A.      I don't know which year.
9  Q.      -- '08 or '09?
10 A.      I don't know which year.
11 Q.      When did you -- do you know when you
12 stopped training for Mr. Wratchford?
13 A.      No.
14 Q.      So you don't know when he stopped
15 reimbursing you for stall rent?
16 A.      Probably whatever the last invoice
17 is.  He seemed to keep pretty good records.
18 Q.      We don't have all the invoices,
19 Ma'am, that's what I'm trying to find out.
20         MR. HAMMER:  I object to that
21 because those invoices came from Mr. Wratchford.
22         MR. WOLFSON:  Right.  But we
23 have only from the period -- exactly, let's back
24 up.

Page 271

1  BY MR. WOLFSON:
2  Q.      You didn't have any invoices from
3  Mr. Wratchford, right?
4  A.      No.
5  Q.      In order to find out what happened
6  with respect to Mr. Wratchford, we went to
7  Mr. Wratchford to get whatever he had --
8  A.      Correct.
9  Q.      -- right?
10         All we have are the ones that are
11 here which you have in front of you, right?
12 A.      Correct.
13 Q.      So that's my question, when did you
14 stop getting -- do you know when you stopped
15 training for him?
16 A.      I would say October 31st, but it's
17 easy for me to look up.  It's easy enough for me
18 to figure out by looking at when his horses ran
19 and getting exact time period.
20 Q.      Did you do that in order to determine
21 when he stopped reimbursing you for stall rent?
22 A.      Did I do it?
23 Q.      Yeah, before coming in today.
24 A.      No, no.  Because you have all the

Page 272

1  records.  I assumed this was inclusive.
2  Q.      You assumed what was inclusive?
3  A.      You have all the invoices.
4  Q.      Ma'am, you know we don't, right?
5  A.      You have all of Mr. Wratchford's, I
6  was told you have all of Mr. Wratchford's.
7  Q.      Ma'am, we have all of what he
8  produced.
9         But you will agree with me that you
10 were training for him before October of '08,
11 right?
12 A.      Yes.
13 Q.      So there was a period of time we
14 don't have his invoices, right?
15 A.      Correct.
16 Q.      Did you check to see when you stopped
17 training for him?
18 A.      I can easily do that.
19 Q.      Did you do it before coming in
20 today --
21 A.      No, I did not.
22 Q.      -- and trying to tell the Panel --
23 A.      No, I did not.
24 Q.      -- that you're entitled to money even

Page 273

1 **though you didn't look at when you stopped**
2 **getting reimbursed from him, did you do that?**
3 A.      I'm not asking for reimbursement from
4 Mr. Wratchford.
5 **Q.      So when did he stop reimbursing you?**
6 A.      October 31st of '09.
7 **Q.      What makes you say that?**
8 A.      That's approximately when his horses
9 left to my best recollection.
10          ARBITRATOR KARLIN:  I don't
11 want to interrupt your cross.  When you get a
12 break, I'd like to ask for a break.
13          MR. WOLFSON:  Let's take a
14 break.
15          ARBITRATOR KARLIN:  I don't
16 want to interrupt.
17          MR. WOLFSON:  That's fine.
18 This is as muddled as it's going to be, so that's
19 fine.
20              * * *
21          (Brief break)
22              * * *
23 BY MR. WOLFSON:
24 **Q.      Do you still have R-34?**

Page 274

1 A.      Yes.
2 **Q.      Is Hampshire Racing listed in the**
3 **stall rent?**
4 A.      Hampshire Racing?
5 **Q.      Oh, they were a client, right?**
6 A.      Yes.
7 **Q.      I'm sorry, my bad, my**
8 **misunderstanding.**
9 A.      Yes.
10 **Q.      Isn't it true, ma'am, that Hampshire**
11 **Racing also reimbursed you for stall rent?**
12 A.      No, not to my knowledge, no.
13 **Q.      We'll introduce that separately**
14 **through Mr. Mawing.**
15          **Now, with respect to the horses that**
16 **you co-owned, you trained those, right?**
17 A.      Yes.
18 **Q.      Do you get paid for those, do you get**
19 **a daily rate that you --**
20 A.      No.
21 **Q.      So co-owners don't pay something**
22 **towards the --**
23 A.      Are you talking about with my mother,
24 my father, my daughter, my son?  No.

Page 275

1 **Q.      Whatever it is.**
2 A.      No.
3 **Q.      Mr. Williamson?**
4 A.      Yes.  Mr. Williamson I do.
5 **Q.      So at least with him --**
6 A.      I would charge him a half rate.
7 **Q.      Let me now -- let me ask you to go to**
8 **the page that has Media Farms stall rent, Louise**
9 **Hobson at the top.**
10 A.      Okay.
11 **Q.      For the stall rent.**
12          ARBITRATOR WYCOFF:  3 --
13          MR. WOLFSON:  This is still
14 in 34, I'm sorry.  I think I dropped my voice, I
15 apologize.  It's still within 34.  It's the
16 fourth page in.
17 A.      Yes.
18 **Q.      Media Farm, stall rent, Earl**
19 **Fellinger, Louise Hobson?**
20 A.      Yes.
21 **Q.      I think you told us earlier that**
22 **originally you were writing the checks to**
23 **Mr. Fellinger, but it was Miss Hobson's farm?**
24 A.      Correct.

Page 276

1 **Q.      It looks like -- let me ask you the**
2 **question, did the amount per stall change?**
3 A.      Well, what do you mean?
4 **Q.      Well, in September -- and let's say**
5 **November of --**
6 A.      From '08 to '09?
7 **Q.      No, let's just start with November of**
8 **'08.**
9 A.      Okay.
10 **Q.      There are two checks to**
11 **Mr. Fellinger, right?**
12 A.      Correct.
13 **Q.      Total of $900?**
14 A.      Correct.
15 **Q.      What was the amount per stall?**
16 A.      It would have varied.  Not the amount
17 per stall, but he would give -- he would prorate,
18 so the amounts might be different --
19 **Q.      My question, ma'am -- my question is,**
20 **in November of '08 what was the amount per stall**
21 **you were being charged?**
22 A.      Probably -- you're asking me to
23 guess.
24 **Q.      I don't want you to guess.**

Page 277

1 A.     Thank you.
2 Q.     Now, let me ask you to turn back to
3 Exhibit 69.
4 A.     I'll get it.
5        ARBITRATOR KARLIN:  69-B?
6        THE WITNESS:  B?
7 BY MR. WOLFSON:
8 Q.     B, please.
9        MR. WOLFSON:  David, this is
10 one of the summaries we gave you based on the
11 invoices.
12        MR. HAMMER:  B.
13        MR. WOLFSON:  B, as in boy.
14 BY MR. WOLFSON:
15 Q.     Miss Mawing, I'll just give you a
16 quick background on this.  This was provided to
17 your counsel last week, I think it was.
18 A.     I've actually seen it.
19 Q.     What's that?
20 A.     I've seen it.
21 Q.     I'm not going to get into what your
22 counsel told you about it, so let me tell you --
23        MR. HAMMER:  We figured you
24 would ask her about it, so we showed her.

Page 278

1 BY MR. WOLFSON:
2 Q.     In that case for the Panel's
3 background, let me just explain what this is.
4 This is another summary chart that we prepared.
5 Ma'am, based on the invoices that we got in this
6 case from anybody.
7 A.     Right.
8 Q.     Whether Mr. Wratchford, from you,
9 wherever we could get them.  We listed where we
10 got them.  Do you see that column, invoices
11 provided by Mawing?
12 A.     Correct.
13 Q.     Right.
14        Then the date range that we have and
15 what we have --
16 A.     Correct.
17 Q.     -- whether they list stall rent or
18 not and the daily rate charge, do you see that?
19 A.     I'm not sure how you calculated the
20 daily rate charge.
21 Q.     Took it right off your invoices,
22 Ma'am.
23 A.     Oh, okay.
24 Q.     That's --

Page 279

1 A.     You mean my stall rate?  Okay.
2 Q.     No, not stall rate, your daily --
3 A.     That's what I mean, what I charge, my
4 training fee.
5 Q.     That's a training fee, that's about
6 what I was going to start explaining.  To make it
7 quick.
8 A.     Okay.
9 Q.     That $25 and $50, those numbers,
10 that's the amount you charge your clients per
11 horse per day to train the horse?
12 A.     Correct.
13 Q.     Now, some trainers -- I'm sorry, some
14 clients you make a deal to get $50 a day, right?
15 A.     Yes.
16 Q.     Some clients you make a deal you can
17 only get $40 a day, right?
18 A.     Correct.
19 Q.     Sometimes it's $45, right?
20 A.     Correct.
21 Q.     It varies, right?
22 A.     Correct.
23 Q.     And sometimes you tell the client
24 that if they pay you $50 instead of $45 you won't

Page 280

1 charge them stall rent, right?
2 A.     Only Mr. Wratchford.
3 Q.     Mr. Wratchford you actually charged
4 stall rent.
5 A.     What do you -- wasn't that the
6 question?
7 Q.     No, listen to my question, ma'am.
8 A.     Okay.
9 Q.     There are some clients you have where
10 you say to them, instead of me charging $40 or
11 $45, I'll charge $45 or $50, an extra five bucks
12 a day, and not charge you stall rent, right?
13 A.     No.  They could care less about stall
14 rent, that's my problem.  Nobody else charges
15 stall rent.
16 Q.     We'll deal with that through
17 Mr. Mawing as well.
18        MR. WOLFSON:  May I have a
19 moment, please?  One second.  I may be done.
20        * * *
21        (Whereupon, a discussion was
22 held off the record.)
23        * * *
24 BY MR. WOLFSON:

Page 281

1  Q.      Let me ask you to go back to R-34 for
2  a second.  And let me ask you to go to the -- to
3  the third page from the back, third page from the
4  back, Ma'am where you have the category for
5  vanning.
6  A.      Okay.
7  Q.      You have vanning expenses in August
8  of '12 and June of '12, do you see that?
9  A.      Absolutely.
10  Q.      Why?
11  A.      Sometimes I can't -- I need to get
12  all four horses in or more than the two I'm able
13  to, they might have races coming up.  I need to
14  bring in more than two.
15  Q.      And isn't it true, ma'am, that some
16  of these vanning expenses also include for
17  hauling -- isn't it true, ma'am -- go to the next
18  page for Jim Starkey.  That some of those are for
19  hauling to other tracks?
20  A.      No.  I only raced a couple times out
21  of, away from Charles Town.
22  Q.      So if your husband would have
23  testified to that, that would have been wrong?
24  A.      I have no idea.

Page 282

1      That we raced at other tracks?
2  Q.      We'll introduce that through your
3  husband, ma'am.
4  A.      I only recall two or three times we
5  ever raced at another track.
6  Q.      Ma'am, if your husband said that
7  Hampshire Racing reimbursed for stall rent at
8  times, would he be wrong on that, too?
9  A.      He would be mistaken.
10  Q.      He would be mistaken.
11      But Hampshire Racing are some of the
12  invoices we don't have, isn't that right?
13  A.      I assume -- no, you have them all.
14  Q.      Where did we get Hampshire Racing
15  invoices from, Ma'am?
16  A.      They were provided, the ones we had
17  were provided to you.
18  Q.      Isn't it true, ma'am, we have some
19  but not all of the Hampshire Racing invoices?
20  A.      I don't know which ones you're
21  missing.
22  Q.      Let me ask you to turn back to 69-B
23  for a second.
24      Tell me when you're there.

Page 283

1  A.      I'm here.
2  Q.      You see at the bottom it says Malcolm
3  Barr doing business as Hampshire Racing?
4  A.      Correct.
5  Q.      Do you see the column, the date range
6  not complete per racing records, do you see that?
7  A.      I see that you compiled this and
8  that's what you put.  I don't see what dates are
9  missing.  That doesn't give me the dates that are
10  missing.  Or the invoices that are missing.
11      ARBITRATOR KARLIN:  Are the
12  invoices exhibits?
13      MR. WOLFSON:  I believe they
14  are.  We marked all the exhibits.  We've marked
15  all the exhibits, we've marked the racing
16  records, I'm not going to waste time.  That's
17  fine.
18      Let me just have --
19  BY MR. WOLFSON:
20  Q.      Ma'am, let me ask you to turn to R-25
21  to identify the racing record.
22  A.      Okay.
23      This is the racing record?
24  Q.      Right.  That's the racing record that

Page 284

1  we've been talking about, right?
2  A.      Right.  This is different than what
3  you're talking about.  The racing record is
4  different than the training record.
5  Q.      That's right.
6      MR. WOLFSON:  Counsel, the
7  other exhibits, I don't think I need to waste
8  time, stipulation that Exhibits 46 through 51 are
9  the other invoices in the case?
10      MR. HAMMER:  Show me.
11      MR. WOLFSON:  Yeah, come
12  here.  46 regarding --
13      MR. HAMMER:  Right.
14      MR. WOLFSON:  Okay.
15      And there is a stipulation among
16  counsel that the remaining invoices, other than
17  the Wratchford, are 46 through 51.
18      MR. WADDELL:  Right.
19      MR. WOLFSON:  Right?
20      MR. WADDELL:  Yes.
21      MR. WOLFSON:  I have no
22  further questions.
23      I just want to identify the exhibits
24  I want moved in.

Page 285

1           MR. WADDELL: I'm assuming
2    everything we used was -- is --
3           ARBITRATOR CARNEY:  Well, why
4    don't we do this, at the close of your case,
5    let's just -- we'll take a few minutes and we'll
6    go down.  Because the reason I'm suggesting we do
7    it that way is because some of these exhibits,
8    which have been referred to, have limitations on
9    it.  So I'd like an accurate record.  But we
10   might as well do it at the close of your case.
11   I'm not sure he is going to admit everything,
12   move to admit everything he questioned the
13   witness on --
14          MR. WOLFSON: I wasn't
15   planning on that exactly.
16          ARBITRATOR CARNEY: So I'd
17   like to do it that way.
18          MR. WADDELL:  Okay.
19          ARBITRATOR KARLIN:  Can I ask
20   a couple questions?  Are you done?
21          MR. WOLFSON:  Yes.
22          ARBITRATOR KARLIN: I'm
23   confused about a few things here.  One in looking
24   over the documents that we were just referenced

Page 286

1    to I see rates per day of $25 to $50 or maybe
2    even more, at least.  And I know there was some
3    testimony about that, but it's a little unclear
4    to me.
5           Am I correct there is a range of
6    rates that you charge for training?
7           THE WITNESS:  Yes.  As an
8    independent contractor you can charge whatever
9    you want.
10          So my standard was $50 a day.  Now,
11   if I was in a partnership, of course it would be
12   $25.
13          If you had, sometimes if you had
14   multiple horses and Mr. Havens had three and I
15   think I might have only charged him $45 a day
16   because he had more than one horse in training
17   with me.
18          So it was completely up to my
19   discretion what to charge them.
20          ARBITRATOR KARLIN:  Okay.
21          Second question, and I know there was
22   some testimony on this, but I'm still a little
23   confused.
24          The records that we've gone over of

Page 287

1    your total stall charges for different places,
2    your total vanning charges.
3           THE WITNESS:  Correct.
4           ARBITRATOR KARLIN:  In any
5    given month, is there -- there is nothing in the
6    record or your testimony so far that tells us how
7    many horses that was for; is that correct?
8           THE WITNESS:  I had a minimum
9    of nine horses from the time I lost my stalls
10   until now.  I never dropped below that.  I have a
11   minimum of nine horses stabled off site.
12          ARBITRATOR KARLIN:  Okay.
13          THE WITNESS:  Does that help?
14          ARBITRATOR KARLIN:  But the
15   charges you've given us, are they for nine horses
16   or more than nine horses?
17          THE WITNESS:  They're nine
18   horses -- the maximum I ever got to, I think, was
19   12.
20          ARBITRATOR KARLIN:  Okay.
21          THE WITNESS:  So I did a
22   couple of the months submit the entire amount.
23   But that was because by the time I got to the
24   Hagy Farm because my -- I was -- what would

Page 288

1    happen was if I would drop below, like, say, 12,
2    and a month later when I needed the stall I
3    wouldn't be able to get it because someone else
4    would already occupy it.
5           So for the same amount of money, or
6    within $100, I could rent, be guaranteed these
7    ten stalls at the Hagy farm.
8           ARBITRATOR KARLIN:  Right.
9    But if I'm understanding what you said at least
10   your contention is that you should have continued
11   to have nine on track stalls from the time they
12   were taken away from you up until the present --
13          THE WITNESS:  Yes, sir.
14          ARBITRATOR KARLIN: -- am I
15   correct on that?
16          THE WITNESS:  Correct.
17          ARBITRATOR KARLIN:  So the
18   question is, what is the charge -- what is the
19   charge per month for those nine horses?
20          THE WITNESS:  Well, again, it
21   varied wherever I was at.  But it ran from a
22   minimum of $250 to $300 where I'm at at the Hagy
23   Farm.
24          ARBITRATOR KARLIN:  The

Page 289

1  vanning, the vanning charges would have been for
2  more than nine horses, right?
3          THE WITNESS:  They would have
4  been for the horses that were in training.
5          ARBITRATOR KARLIN:  So how
6  many -- is there any way of talking about what
7  percentage of the vanning charges might be
8  attributable to the nine horses?
9      Do you follow my question?
10          THE WITNESS:  I follow your
11  question.  That would be next to impossible.
12          ARBITRATOR KARLIN:  Otherwise
13  you're asking to be -- otherwise it sounds like
14  you're asking to be reimbursed for the cost of
15  vanning horses that probably would have been
16  stalled off site anyway, even if you had the
17  nine.
18          THE WITNESS:  Well, that's
19  reasonable.  But it's so difficult to extrapolate
20  which horses on what days got vanned and didn't
21  get vanned, I mean, it was a mess.
22      I mean, the bottom -- to me making it
23  simple the core issue was, I wouldn't have to van
24  if they hadn't taken all my stalls.

Page 290

1          ARBITRATOR KARLIN:  Wouldn't
2  you had have to van for any horses you had above
3  nine?
4          THE WITNESS:  No, because I
5  could rent one or two stalls across the street
6  easily and walk across.  The vanning became an
7  issue when I had nine horses to deal with getting
8  into the track every day.  That's when vanning
9  became an issue.  If it was one or two, I could
10  walk them across, there is no vanning whatsoever,
11  which is --
12          ARBITRATOR KARLIN:  I thought
13  at some point you indicated that you had no more
14  stalls across the street, or did I misunderstand
15  you?
16          THE WITNESS:  It waxed and
17  waned.  In other words, because horses get hurt
18  or you get another client and your census
19  essentially goes up and down, any number of
20  things can happen.  I always had enough horses to
21  fill my on site stalls.
22      However, if I had a couple extra
23  horses -- and if it went above one or two, if it
24  went more than what I could accommodate across

Page 291

1  the street and get stalls for, then I would just
2  have to turn the client down.
3          ARBITRATOR KARLIN:  Now, let
4  me ask you another question, we haven't talked
5  about but I saw, one of the exhibits, and I
6  forget which one, showed that you had two really
7  high years of earnings on the track.
8          THE WITNESS:  I did.
9          ARBITRATOR KARLIN:  Then they
10  declined.
11          THE WITNESS:  Yes.
12          ARBITRATOR KARLIN:  Why?
13          THE WITNESS:  Well...
14          ARBITRATOR KARLIN:  What
15  happened?
16          THE WITNESS:  I think that
17  shipping in created a severe handicapped for me,
18  my horses didn't perform as well.  I mean, it's a
19  handicap having to train off site, they don't
20  get --
21          MR. WOLFSON:  If this is
22  based on Exhibit 69-A, we didn't use that one
23  because they withdrew the claim for lost income
24  and all of that.  So I actually didn't use that

Page 292

1  one, if that is based on 69-A.
2      Sorry to interrupt.
3          ARBITRATOR KARLIN:  Is
4  that -- I was curious, I must admit, it's part of
5  my racing curiosity.
6          MR. WOLFSON:  It shouldn't be
7  at issue now.
8          MR. WADDELL:  I agree.  It
9  shouldn't be an issue because we are not making a
10  claim for lost profits.  If you want an answer
11  just out of curiosity I think she can answer.
12          ARBITRATOR KARLIN:  I think
13  she has.
14          THE WITNESS:  It was a huge
15  disadvantage because my horses lost fitness.
16  When they should be training every day, they get
17  to train maybe once or twice a week.  I mean it
18  was significant.
19          ARBITRATOR KARLIN:  Sorry,
20  I --
21          MR. WOLFSON:  In that case --
22          ARBITRATOR KARLIN:  It was
23  part of getting into a world that I didn't
24  understand.

Page 293

1           MR. HAMMER:  We withdrew the
2  lost profit claim.
3           ARBITRATOR KARLIN:  I
4  understood that piece.
5           MR. WOLFSON:  I have a couple
6  of follow-up, because I think something changed,
7  I want to make sure, I don't know.
8           Unless the Panel have other
9  questions, I just have a couple.
10 BY MR. WOLFSON:
11 **Q.        Ma'am, is it $250 a month or $220 a**
12 **month, what is the average?**
13 A.       It depends where I was, absolutely
14 depends on where I was.  And it depends on if
15 they were willing to work with me and pro -- it's
16 just like you want to look at a list that you've
17 compiled and see that I made a $3,000 every
18 single month.  There were times I made partial
19 payments.
20 **Q.        Let me move away from that.**
21 **         Getting to the issue of nine horses**
22 **versus how many -- I mean, there were some**
23 **months, ma'am, you paid for $5,000 worth of**
24 **stalls.**

Page 294

1  A.       I actually reviewed your list and
2  it's incorrect.  And I can refute that with the
3  canceled checks.
4           I mean, your list that you compiled
5  has me four months of paying zero stall rent.
6  I don't know anybody that ever gave me free stall
7  rents of four months.
8  **Q.        Ma'am, those are the checks that we**
9  **got from you, ma'am.**
10 A.       But I'm saying whoever compiled this
11 did so incorrectly.  Because they either
12 were -- I don't know what dates they were looking
13 at.  If you look at our 69-C.
14 **Q.        Right.**
15 A.       July 2010.  Zero stall rent.
16 **Q.        Right.**
17 A.       And it goes on, and on, and on.
18 So, you know, I did myself a great disservice and
19 didn't provide you with the checks which I
20 doubt --
21 **Q.        Well, ma'am, the checks speak for**
22 **themselves, we're not going to argue about that.**
23 A.       Or perhaps you credited them with the
24 wrong months, which would explain why they would

Page 295

1  be $5,000 in one month and only $2,500 in the
2  next.
3           MR. WOLFSON:  We'll let the
4  checks speak for themselves.  I'm not going to
5  argue with the witness over what the checks are,
6  they speak for themselves.
7           THE WITNESS:  And I'm saying
8  this is incorrect.
9  BY MR. WOLFSON:
10 **Q.        Well, ma'am, with all due respect,**
11 **all we can do is based on what you gave us.**
12 A.       And with all do respect, whoever
13 compiled this did it incorrectly.
14          ARBITRATOR CARNEY:  What
15 you've done is you totaled up what you spent from
16 August 2008 for stall rent and for vanning?
17          THE WITNESS:  Yes, sir.
18          ARBITRATOR CARNEY:  So what
19 we've got is a record of your expenditures.  But
20 you can't tell from these records how many horses
21 were involved in the expenditure?
22          THE WITNESS:  No.  I would
23 say a minimum of nine.
24          ARBITRATOR CARNEY:  Go ahead.

Page 296

1           MR. WADDELL:  Thank you.
2           * * *
3     R E D I R E C T  E X A M I N A T I O N
4  BY MR. WADDELL:
5  **Q.        Did you recently testify that you**
6  **paid anywhere from $250 to $300 for stall rent on**
7  **average?**
8  A.       Yes.
9  **Q.        Is $275 a reasonable average that you**
10 **paid on stall rent?**
11          MR. WOLFSON:  No, I'm going
12 to object to that based on her prior testimony
13 just a moment ago where she said it depended on a
14 month, she didn't know and she couldn't say.
15          Now counsel is feeding her by direct
16 questions, leading questions, something he wants
17 her to say that she couldn't say before.
18          MR. WADDELL:  Sir, you're the
19 one who elicited her statement that she was
20 charged, she paid stall rent anywhere from $250
21 to $300.  The average is $275.
22          MR. WOLFSON:  Well, we can go
23 back to the records and show she said $220
24 something.

Page 297

1          MR. WADDELL: I believe
2  you're incorrect.
3          MS. SCRIVANI: She just said
4  that.
5          ARBITRATOR KARLIN: Wait.
6  Hold on a second.  We're going to get a
7  transcript of this, right?
8          MR. WOLFSON: Right.
9          ARBITRATOR KARLIN: So the
10  transcript will say what it says.
11          MR. WOLFSON: Exactly.
12  That's fine.
13  BY MR. WADDELL:
14  **Q.      You said originally, I believe, and**
15  **correct me if I'm wrong, $250 to $300 a month?**
16  A.      Correct.
17  **Q.      Obviously, if we average that we come**
18  **up with $275 a month, correct?**
19  A.      Correct.
20  **Q.      I'm trying to figure out another way**
21  **to present this.**
22  A.      I mean it's ugly, it's complicated, I
23  understand that.  Again, your partial months I'm
24  paying for and...

Page 298

1          MR. WADDELL: Let's have that
2  marked.
3          * * *
4          (Whereupon, Claimant's Exhibit No. 41
5  marked for the purpose of identification.)
6          * * *
7  BY MR. WADDELL:
8  **Q.      Miss Mawing, this summary -- first of**
9  **all I want to ask if it's accurate that they took**
10  **away four stalls from you for the period from May**
11  **through August of 2008?**
12  A.      Correct.
13  **Q.      And if you were paying an average of**
14  **$275 per month during those months that would**
15  **equal $4,400.**
16  **Do you believe that to be correct?**
17  A.      Correct.
18  **Q.      Nine stalls were taken away from you**
19  **for the period of September 2008 currently up**
20  **through June 2013, you have -- had you nine**
21  **stalls, you now have no stalls and you haven't**
22  **had those stalls since June -- up through June of**
23  **2013, correct?**
24  A.      That's correct.

Page 299

1  **Q.      We used an average of $275 per month**
2  **for those nine stalls, the amount that you would**
3  **have had to pay out of pocket for stall rent**
4  **during that period would be $143,550.  Does that**
5  **appear to be correct?**
6  A.      147.
7  **Q.      That's total?**
8  A.      Correct.
9  **Q.      You had a minimum -- you always had a**
10  **minimum of nine horses that could have gone in**
11  **the stalls if they had been made available to**
12  **you?**
13  A.      Absolutely.
14          MR. WADDELL: No further
15  questions.
16          ARBITRATOR CARNEY: Miss
17  Mawing, one question, did you ever pay less than
18  $250 a month?
19          THE WITNESS: Yes, and only
20  reason might have been -- you saw Mr. -- I can't
21  think of his name right now.
22          MS. SCRIVANI: Furr.
23          THE WITNESS: No.  The
24  gentleman at Media Farm I sublet one from for

Page 300

1  $150.  That was just for one month.  And that was
2  an isolated occurrence, but I would be --
3          ARBITRATOR CARNEY: Other
4  than that?
5          THE WITNESS: I would be
6  lying by saying -- there were a couple outliers.
7  But, no.
8          ARBITRATOR CARNEY: I have no
9  other questions.
10          ARBITRATOR WYCOFF: No.
11          MR. WADDELL: Are we done
12  with this witness?
13          ARBITRATOR KARLIN: I just
14  wondered if somebody would get me a magnifying
15  glass to read some of these things.
16          MR. WOLFSON: The checks?
17          ARBITRATOR CARNEY: A lot of
18  this stuff.
19          MR. WADDELL: Are we finished
20  with the witness?
21          ARBITRATOR CARNEY: I don't
22  have any questions.
23          MR. WOLFSON: I don't have
24  any further questions.

Page 301

1          ARBITRATOR CARNEY:  We
2  will --
3          ARBITRATOR KARLIN:  Can I ask
4  one question?
5       I'm just curious, the checks that we
6  have in Exhibit 15, are those all the checks?
7          MR. WOLFSON:  That was 15,
8  and I think I mentioned it was also -- what's the
9  other one?
10          MR. HAMMER:  Supplemental
11  production.
12          MR. WOLFSON:  33.
13          ARBITRATOR KARLIN:  33?
14          MR. WOLFSON:  Yes.  There is
15  no dispute, those were copies of all the checks
16  produced in this case.
17  Right counsel?
18          MR. HAMMER:  Yes.  Those are
19  from the bank statements.
20          ARBITRATOR CARNEY:  Okay.
21       We will recess until 9:00 tomorrow
22  morning.
23          * * *
24          (Whereupon, this hearing was

Page 302

1  adjourned at 5:16 p.m.)
2          * * *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 303

1  THE STATE OF  :
   WEST VIRGINIA  :
2       :  SS: C E R T I F I C A T E
   COUNTY OF OHIO :
3
4       I, TAMELA G. SHEELER, Registered
   Professional Reporter within and for the State of
5  West Virginia duly commissioned and qualified, do
   hereby certify that the within-named witness was
6  called upon to testify in the within matter of
   arbitration and that the testimony then given by
7  the witness was by me reduced to stenotype in the
   presence of the witness; afterwards reduced to
8  Computer Aided Transcription under my direction
   and control; that the foregoing is a true and
9  correct transcript of the testimony so adduced
   during the trial of the within cause.
10
11       I do further certify that this
   testimony was taken at the time and place in the
12  foregoing caption specified, continued to another
   date.
13
14       I do further certify that I am not a
   relative, counsel or attorney of either party, or
15  otherwise interested in the event of this action.
16
17       IN WITNESS THEREOF, I have hereunto
   set my hand and affixed my seal of office at
18  Wheeling, West Virginia, on the 25th day of JUNE,
   2013.
19
20
21
     _____
22     TAMELA G. SHEELER, Registered
     Professional Reporter
23
24

Page 343

```
 1        AMERICAN ARBITRATION ASSOCIATION
 2
 3   CHARLES TOWN HORSEMAN'S  :
     BENEVOLENT AND PROTECTIVE :
 4   ASSOCIATION, INC., and    :
     TINA MAWING,            : NO. 55-196-Y-00015-12
 5        Claimants  :
              v      :
 6   PNGI CHARLES TOWN GAMING, :
     LLC,                 :
 7        Respondent :
 8
 9             * * *
10       ARBITRATION HEARING - VOLUME II
11      BEFORE:  JAMES T. CARNEY, ESQUIRE
12           WILLIAM M. WYCOFF, ESQUIRE
13           ALLAN N. KARLIN, ESQUIRE
14        Tuesday, June 11, 2013
15             8:59 a.m.
16             * * *
17
18        Holiday Inn
19        301 Foxcroft Avenue
20        Martinsburg, West Virginia 25401
21
22        Whereupon, the above-entitled matter
23   came on for hearing and the proceedings were as
24   follows:
```

Page 344

```
 1   APPEARANCES:
 2
 3        On behalf of the Claimant:
 4        DAVID M. HAMMER, Esquire
 5   Hammer, Ferretti & Schiavoni, 408 West King
 6   Street, Martinsburg, West Virginia 25401
 7        Telephone:  (304) 264-8505
 8        Fax:  (304) 264-8506
 9        E-mail:  dhammer@hfslawyers.com
10
11        On behalf of the Claimant:
12        HARRY P. WADDELL, Esquire
13   Waddell Law Offices, 300 West Martin Street,
14   Martinsburg, West Virginia 25401
15        Telephone:  (304) 263-4988
16        Fax:  (304) 262-2498
17        E-mail:  hwad50@aol.cmo
18
19
20
21
22
23
24
```

Page 345

```
 1   APPEARANCES (Cont.):
 2
 3        On behalf of the Respondent:
 4        JOSEPH E. WOLFSON, Esquire
 5   Stevens & Lee, 620 Freedom Business Center, Suite
 6   200, King of Prussia, Pennsylvania 19406
 7        Telephone:  (610) 205-6000
 8        Fax:  (610) 337-4374
 9        E-mail:  jwo@stevenslee.com
10
11        On behalf of the Respondent:
12        STACEY A. SCRIVANI, Esquire
13   Stevens & Lee, 111 North Sixth Street, Reading,
14   Pennsylvania 19603-0679
15        Telephone:  (610) 478-2086
16        Fax:  (610) 988-0812
17        E-mail:  sasc@stevenslee.com
18
19   ALSO PRESENT:
20        Tina Malgarini Mawing
21        Raymond J. Funkhouser
22        Erich Zimny
23
24
```

Page 346

```
 1             I N D E X
 2   WITNESS                      PAGE
 3   John Finamore
 4      (via digital video).........................
 5
 6   Raymond Funkhouser
 7      Direct Examination by Mr. Hammer.........354
 8      Cross-Examination by Mr. Wolfson.........389
 9      Redirect Examination by Mr. Hammer.......407
10      Recross-examination by Mr. Wolfson.......412
11
12   Melvin Michael Elliott
13      Direct Examination by Mr. Waddell........418
14
15   Melvin Michael Elliott (recalled)
16      Direct Examination by Ms. Scrivani.......444
17      Cross-examination by Mr. Waddell.........455
18      Redirect Examination by Ms. Scrivani.....465
19
20   Erich Zimny
21      Direct Examination by Ms. Scrivani.......498
22      Cross-examination by Mr. Waddell.........531
23      Redirect Examination by Ms. Scrivani.....549
24
```

Page 347

1         E X H I B I T S
2          MARKED  IDEN  ENTERED
3  Claimant's Exhibit No. 42.....372....373.......--
4  Claimant's Exhibit No. 43.....534....535.......--
5  Respondent's Exhibit No. 70...528...528......531
6
7    (Note:  Respondent's Exhibit No. 70 retained
8  by Attorney Hammer.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 348

1            * * *
2       P R O C E E D I N G S
3      MR. HAMMER:  Our next witness
4  we're going to call is John Finamore.  And we
5  have his video deposition.  I've provided a text
6  copy of that deposition to the court reporter so
7  she doesn't have to transcribe it and I've asked
8  her to insert that into the record so that it's
9  present.  Okay?
10      ARBITRATOR WYCOFF:  Are there
11  any objections during the deposition that we have
12  to rule on?
13      MR. HAMMER:  There are
14  several objections.  And I can stop the audio and
15  let you rule on them if that's how you want to do
16  it.  Given there is no jury present, I don't know
17  how you want to proceed.
18      ARBITRATOR CARNEY:  Why don't
19  we stop when we get to them?
20      MR. HAMMER:  Okay.
21      ARBITRATOR CARNEY:  Now, this
22  is also Exhibit No., Claimant Exhibit 35.
23      MR. HAMMER:  Yes, it is.
24            * * *

Page 349

1      (Whereupon, Claimant's Exhibit No.
2  35, Deposition of John Finamore, attached for
3  video reference.)
4         * * *
5      (Whereupon, video started at
6  Page 5, Line 21, Deposition of John Finamore.)
7         * * *
8      (Whereupon, video paused at
9  Page 26, Line 18.)
10         * * *
11      MR. WOLFSON:  There was an
12  objection then of counsel.
13      Do you agree we can go down to Page
14  27, Line 14, where the next question and answer,
15  actually --- actually 28, Line 2?
16      MR. HAMMER:  This doesn't
17  have the line number on it, so it's hard for me
18  to scroll.
19      If the Panel has a ruling one way or
20  another and wants me to skip ahead --
21      MR. WOLFSON:  There is a
22  back-and-forth between me and Mr. Waddell.
23      MR. HAMMER:  Maybe they can
24  just ignore it and we can play through that

Page 350

1  bit --
2      MR. WOLFSON:  I don't care,
3  go ahead, play it.  It will be quicker, let's do
4  it that way.
5         * * *
6      (Whereupon, video resumed at
7  Page 26, Line 18, Deposition of John Finamore.)
8         * * *
9      (Whereupon, video paused at
10  Page 71, Line 4.)
11         * * *
12      ARBITRATOR CARNEY:  If you
13  could stop the -- after a quick reading, the next
14  few pages deal with the issue of the relationship
15  between the collective bargaining agreement and
16  the stall application process.
17      In view of the Board's ruling,
18  Panel's ruling, yesterday, I don't think that we
19  need to hear that.  And had we had somebody
20  testify in person, I would sustain an objection
21  to that.
22      So I think maybe if we can skip ahead
23  to about Page 80, I think, or Page 79.
24      MR. HAMMER:  I'll skip ahead,

Page 351

1  but the problem for me is that on this I don't
2  have the page numbers.
3         MR. WOLFSON:  I think we can
4  do it this way, because it's along the bottom, if
5  we jump ahead we can...
6             * * *
7         (Whereupon, a discussion was
8  held off the record.)
9             * * *
10        MR. WOLFSON:  Okay.  We
11  skipped, approximate --
12        ARBITRATOR KARLIN:  Why don't
13  you just figure it out and when Mr. Karlin comes
14  back we'll put it on the record.
15        MR. WOLFSON:  Okay.
16            * * *
17        (Brief break)
18            * * *
19        MR. WOLFSON:  For the record,
20  in the transcript and by agreement of counsel
21  it's from Page 71, Line 4 through -- excuse me,
22  until, we pick up again at Page 79, Line 18.
23  Correct, counsel?
24        MR. HAMMER:  That sounds

Page 352

1  correct to me.
2         MR. WOLFSON:  Just because of
3  the way the video is set up, there is a little
4  bit of bantering before we get there.
5             * * *
6         (Whereupon, video resumed at
7  Page 79, Line 18, Deposition of John Finamore.)
8             * * *
9         (Whereupon, video paused at
10  Page 80, Line 1.)
11            * * *
12        MR. WOLFSON:  For the
13  record -- can we stop?
14        We're now about to get into a portion
15  which was appropriate for a deposition but at the
16  time of trial, I don't know, you'll see -- he is
17  asking the witness, Mr. Finamore, to comment
18  about what other people said at depositions.  And
19  I don't know that that's an appropriate line of
20  questioning for the final trial or arbitration.
21        MR. WADDELL:  Well, it's
22  Cross-Examination.
23        ARBITRATOR CARNEY:  Well, do
24  you want that next part?

Page 353

1         MR. WADDELL:  I do, yeah.
2         ARBITRATOR CARNEY:  All
3  right.
4             * * *
5         (Whereupon, video resumed at
6  Page 80, Line 1, Deposition of John Finamore.)
7             * * *
8         (Whereupon, video concluded.)
9             * * *
10        ARBITRATOR CARNEY:  Mr.
11  Wolfson, are you going to call Mr. Finamore?
12        MR. WOLFSON:  Yes, we are.
13        ARBITRATOR CARNEY:  Of
14  course, you're focused -- you won't be repetitive
15  on things he's already said, but you will be
16  focused on things which he did not testify to
17  such as things you have asked him --
18        MR. WOLFSON:  Exactly.  And
19  he may amplify on certain things that were
20  touched on but not fully explored.
21        But, yes, we will not be repetitive
22  and redundant.
23        MR. HAMMER:  If I could have
24  a moment to switch connections here I will be

Page 354

1  ready to call the next witness.
2         ARBITRATOR CARNEY:  Okay.
3             * * *
4         (Brief break)
5             * * *
6         MR. HAMMER:  As our next
7  witness we would like to call Randy Funkhouser.
8             * * *
9         RAYMOND J. FUNKHOUSER
10  being first duly sworn, was examined and
11  testified as follows:
12            * * *
13    D I R E C T   E X A M I N A T I O N
14  BY MR. HAMMER:
15  **Q.     Good morning, Mr. Funkhouser. Please**
16  **introduce yourself to the Panel.**
17  A.     Yes, my name is Raymond J.
18  Funkhouser, II, also known as Randy Funkhouser.
19  **Q.     What is your relationship to the**
20  **HBPA, the Horseman's Benevolent Protective**
21  **Association?**
22  A.     I am currently president of that
23  organization.  I was elected in 2012.  I will
24  serve through, I think it's November or December

Page 355

1  of 2015.
2  **Q.    So this is your current term right**
3  **now?**
4  A.    Current term.
5  **Q.    '12 to '15?**
6  A.    Yes.
7  **Q.    Were you previously the president of**
8  **the HBPA?**
9  A.    Yes, I was.  I was on the board from
10  1984 through 1990.  I was president from 1990
11  through 1997.  And I think in '97 through --
12  well, actually, I take that -- '97 I was not on
13  the board for a while.  I believe I was
14  re-elected to the board in 2003.  And I was asked
15  to take over after a year of the president that
16  was elected, the board did not feel that
17  they -- they lacked confidence in his ability,
18  whatever.  And he agreed to resign in, I think it
19  was in January of 2005.  So they -- the board
20  elected me president from 2005 through 2007.
21  **Q.    Were you a member of the board during**
22  **the period of 2007 until 2009?**
23  A.    Yes.
24  **Q.    Do you hold an occupational permit?**

Page 356

1  A.    Yes.
2  **Q.    What area is your occupational permit**
3  **in.?**
4  A.    My occupational permit has been
5  either as owner-trainer or owner.  And so I think
6  I'm currently licensed as an owner.
7  **Q.    All right.**
8        **Do you reside in Jefferson County?**
9  A.    Yes.
10  **Q.    What's the name of -- do you own a**
11  **farm?**
12  A.    Yes.
13  **Q.    What is the name of your farm?**
14  A.    O'Sullivan Farms, L.L.C.
15  **Q.    Is that farm engaged in business**
16  **activity?**
17  A.    Yes.
18  **Q.    What business activity is it?**
19  A.    Primarily -- it's farming, but
20  primarily horse farming.  But we do have cows, we
21  make hay.  But generally farming and primarily
22  horses.
23  **Q.    What type of horses do you raise?**
24  **I'm talking about racing horses or farm animals.**

Page 357

1  A.    Thoroughbred racehorses.  And we
2  breed them, we foal them, we take care of them
3  for other clients.  You know, just about
4  everything.  We also race them.
5  **Q.    Do you have a trainer -- let me back**
6  **up.**
7        **Did you have a trainer during the**
8  **time period from 2007, say, through 2009?**
9  A.    Yes.
10  **Q.    Who was that trainer?**
11  A.    That trainer was George Yetsook.
12  **Q.    Was George Yetsook solely employed by**
13  **you or was he also engaged by others?**
14  A.    He was a private trainer for us at
15  that time.
16  **Q.    Did you race horses through**
17  **Mr. Yetsook at Charles Town Races?**
18  A.    Yes.
19  **Q.    How frequently would you say that you**
20  **raced?**
21  A.    You know, again, we had, you know,
22  different number of horses.  You know, it would
23  vary from year to year.  I mean, some years it
24  would probably be 60 to 70.  There were some

Page 358

1  years it was over 100.
2        So, you know, that -- it would vary
3  depending on the horses that you have.  You have
4  to remember, we have two year olds, we're
5  breeders.  So when they come in, they take a lot
6  longer to run.  They have to get fit and many of
7  them don't even make it racing at two and we have
8  to turn them back out and bring them back in at
9  three.
10  **Q.    Let me ask you this, did you have**
11  **stalls at Charles Town through your trainer,**
12  **George Yetsook?**
13  A.    Yes.  We went through a number of
14  different arbitrations.  But I think -- I think
15  he had either five or six stalls during that
16  period.
17  **Q.    Did you have a clear understanding as**
18  **to the criteria to be awarded stalls?**
19  A.    There was nothing in writing.
20        Prior, you know, for many years, it
21  always dealt with starts per stall.  You know,
22  there always has sort of been an understanding,
23  you know, sort of an understanding as well of
24  the, you know, the quality of horses.  Which

Page 359

1  we've always been very high, you know, we race a
2  lot of allowance horses.  You know, we won money,
3  we had champions.
4  **Q.      So you're talking starts per stall,**
5  **quality of horses.  Any other criteria?**
6  A.      You know, basically, you know,
7  if -- you know, you're not in trouble, you know,
8  you manage your men so that they clean up the
9  barns and take care of the horses properly, you
10 know.  That they, you know, that you generally
11 comply with the rules.  And, you know, same sort
12 of things that I heard on the deposition from...
13 **Q.      Mr. Finamore's testimony?**
14 A.      Mr. Finamore's testimony.
15 **Q.      You sat here and heard today?**
16 A.      Yes.
17 **Q.      Now, the stalls themselves, are they**
18 **part of the barn area of the track?**
19 A.      The stalls that Mr. Yetsook had,
20 which were either five or six, I would have
21 to --
22 **Q.      I'm talking about the ones on the**
23 **track grounds, are they part of the barn area --**
24 A.      Yes.

Page 360

1  **Q.      -- where the stalls are located?**
2  A.      Yes.
3  **Q.      So we'll hear the barn referred to as**
4  **stables sometimes.  And those stables contain**
5  **stalls, is that the nomenclature?**
6  A.      That is correct.
7  **Q.      Now, in 2008, and I'm directing your**
8  **attention specifically to the first quarter of**
9  **2008, January through April, I guess that would**
10 **be the first third, of 2008.**
11 **        Were there specific rules that**
12 **governed using other trainers's stalls?**
13 A.      Not in anything in writing.  And
14 normally --
15          MR. WOLFSON:  I'm going to
16 object to the witness's testimony about his
17 understanding of using other people's stalls.
18 I'm not sure how that is relevant to what we're
19 talking about here.  Miss Mawing has already
20 testified to what she understood she did,
21 which is specific as to what is relevant here.
22 Any general understandings this witness may have,
23 I don't believe are relevant.
24          MR. HAMMER:  I'm going to tie

Page 361

1  it into the contract in just a moment as to
2  whether there were specific written rules.
3          ARBITRATOR CARNEY:  I think
4  he can ask if there are specific written rules.
5          THE WITNESS:  Yeah, there
6  were no specific rules.
7  BY MR. HAMMER:
8  **Q.      Are you familiar with the**
9  **contract --**
10         ARBITRATOR CARNEY:  If he's
11 testified there are no written rules, and he
12 said there are none, he can then testify as to
13 what his understanding of what the unwritten
14 rules were.
15         MR. HAMMER:  Thank you.
16 BY MR. HAMMER:
17 **Q.      Are you familiar with the contract,**
18 **the 2004 contract, that was in existence and is**
19 **in evidence in this case that was in existence**
20 **during 2008?**
21 A.      Yes.
22 **Q.      Are you familiar with when discipline**
23 **can be administered under that contract to**
24 **trainers who had stalls at the track?**

Page 362

1  **        Just yes or no and I'll --**
2  A.      You would have to refresh my memory
3  on that exact part of it.
4  **Q.      So would it help your testimony to**
5  **see the contract itself?**
6  A.      Yes.
7  **Q.      I'm going to direct your attention to**
8  **Claimant's Exhibit 1, Page 14, which I have up on**
9  **the screen in front of you.  And at the bottom**
10 **you'll see a sentence that begins Charles Town**
11 **Races.**
12 **        Can you read that sentence aloud,**
13 **please?  Or I'll read it for you, if it's a**
14 **problem.**
15 A.      That would be better, my eyes are not
16 that good, so...
17 **Q.      So the last sentence on Page 14**
18 **begins, Charles Town Races retains its right to**
19 **discipline including removal -- it goes to the**
20 **next page, Page 15.  Horsemen or their employees**
21 **who fail to obey Charles Town Races published**
22 **rules and regulations.**
23 A.      Yes, that would have been a part of
24 that contract.

Page 363

1  Q.      So that was a contractual term
2  between the HBPA and PNGI, is that correct?
3  A.      Yes.
4  Q.      Would you agree with me, sir, that
5  rodent control is a subject of this contract?
6  A.      Yes.  And --
7  Q.      And I have up before you Page 19 of
8  the contract.
9  A.      Uh-huh.
10 Q.      Do you see that?
11 A.      Yep.
12 Q.      So rodent and pest control
13 eradication is a concern of the HBPA and
14 obviously PNGI --
15 A.      Yes.
16 Q.      -- and is a subject of this contract?
17 Now, I want to take your attention back in time,
18 okay, back to the period immediately following
19 the voters of Jefferson County's rejection of
20 table games in West Virginia that happened in
21 2007.
22         Do you remember that time period?
23 A.      Yes.
24 Q.      And how would you describe the HBPA's

Page 364

1  relationship with PNGI at that time period?
2  A.      Well, the -- there had been on and
3  off negotiations in 2007.  And, you know, with
4  the horsemen who truly wanted to support it but
5  did not like the percentages that were given to
6  them as shareholders.
7  Q.      Let me just make sure we're clear
8  here.
9         There is a percentage of the handle
10 that goes to the HBPA, is that correct?
11 A.      Yes.
12 Q.      So the HBPA was unhappy with what
13 exactly?
14 A.      They were unhappy with the percentage
15 proposed.  They get 14 percent of the, 14 or 14
16 and a half percent, that go into their purses
17 with the slot machines, or the video lottery
18 machines.
19         The proposal was to give them 2
20 percent of the table games.
21 Q.      So the Panel is clear, because I
22 don't know their familiarity with gambling.
23 There are table games which are card playing and
24 whatnot?

Page 365

1  A.      Right.
2  Q.      Then there are video lottery
3  terminals, VLTs in the parlance of the State,
4  which are what we think of as the slot machines
5  or the one arm bandits, right?
6  A.      Right.
7  Q.      What was the take for the slot
8  machines?
9  A.      The slot machines was 14 and a half
10 percent, I believe, to the horsemen.
11 Q.      And there was a referendum put to the
12 Jefferson County voters?
13 A.      Yes.
14 Q.      To approve what?
15 A.      To try and approve the table games,
16 which were a new form of gambling and it required
17 a referendum with approval from the Jefferson
18 County citizens.
19 Q.      What was the take for the HBPA to be
20 on the table games?
21 A.      Two or two and a half percent, I
22 believe.
23 Q.      You were explaining when I
24 interrupted you why the HBPA was unhappy with

Page 366

1  that take?
2  A.      Yes.
3  Q.      Why is that?
4  A.      Well, we had had some studies done.
5  And at that point I think they had approximately
6  5,000 machines in operation.
7         The study recommended to us that we
8  would need more, a higher percentage because the
9  table games did not do the volume that the slot
10 machines did.
11         At that time I think it was
12 prognosticated and it probably holds that fairly
13 truly now that the slot machines, you know,
14 probably generate five times the revenue that the
15 table games do.  I don't know the exact figures.
16 Q.      What was the concern with the
17 percentage for the table games versus the
18 percentage for the VLTs, why was the HBPA
19 concerned about that?
20 A.      They were concerned because they
21 would get less money for their purses.  Mainly
22 through -- it was recommend, and I think this has
23 generally happened, they've gone from 5,000
24 machines to 3,200 machines.  And that the floor

Page 367

1  space would be used to put in the table games.
2  So that would reduce the number of slot machines
3  at which they would get 14 percent and replace
4  them with table games at which they would only
5  get two percent.
6  **Q.      Now, was there a split amongst the**
7  **membership as to whether to support the table**
8  **games referendum or oppose the table games**
9  **referendum?**
10 A.      I think up until a few days before
11 the referendum, the HBPA continued communications
12 to try and support them if they could get an
13 agreement upon changes in take.
14          Basically in the referendum we were
15 told, I think, Wednesday before that the train
16 had left the station, it was too late for us to
17 consider any support.  They wanted us to go to
18 the polling places and actively hold up banners
19 and participate.  Which members were in general
20 agreement to do provided they had some sort of
21 written agreement or assurances of getting more
22 out of the table games.
23 **Q.      Did that happen, did you receive that**
24 **assurance?**

Page 368

1  A.      We never received it.
2          And so basically everyone was agreed
3  to vote neutral, you know, vote, you know, their
4  own beliefs, or whatever.  That's the way it went
5  down.
6          Ultimately the referendum went down
7  in December and there was considerable angst, you
8  know, and I think anger, you know, by the track,
9  because they felt that was valuable to them.
10 **Q.      Was the track directed at the HBPA?**
11 A.      Was -- excuse me?
12 **Q.      I'm sorry.**
13 **Was the anger directed by the track**
14 **at the HBPA?**
15 A.      Well, yes.  I mean, I think there
16 were a number of people that were talked to that
17 were on our board.  And, you know, were saying,
18 why did you vote against this?  I mean, I don't
19 think some of them did vote against it.
20 But the general feeling was there was a lot of
21 ability for them to do what they could in the
22 community and with the horsemen to try and
23 readdress this issue in the two year time frame
24 that they were allowed to represent the

Page 369

1  referendum.
2  **Q.      Did the senior vice president of PNGI**
3  **corporate, John Finamore, direct his anger**
4  **towards the HBPA?**
5          MR. WOLFSON:  I'm going to
6  object to the form of the question.  He can
7  testify what he's aware Mr. Finamore did, what he
8  observed, what he heard.  But this general about
9  Mr. Finamore's alleged anger, directed it.  I
10 mean, it's a broad --
11 BY MR. HAMMER:
12 **Q.      Do you have an opinion as to whether**
13 **he was angry with the HBPA?**
14          MR. WOLFSON:  That is the
15 basis for my objection.  His opinion about
16 Mr. Finamore doesn't matter.
17          ARBITRATOR CARNEY:  You can
18 ask him if Mr. Finamore did anything or said
19 anything which indicated anger.
20 BY MR. HAMMER:
21 **Q.      Did Mr. Finamore do or say anything**
22 **which indicated anger towards the HBPA for the**
23 **HBPA's failure to provide the full support that**
24 **the track demanded of the HBPA?**

Page 370

1  A.      I can remember two specific
2  incidences.
3          First of all, I know Mr. Hale came on
4  board on the HBPA to be our executive secretary.
5  And I think he had a letter, he wrote a
6  letter --
7  **Q.      Who is the he?**
8  A.      Lenny Hale was the executive
9  director, newly hired executive director.  He
10 came on board in 2008.  I can't tell you exactly
11 when, but it was early in the year.
12          And he had written a letter.  And the
13 reply from Mr. Finamore was dated in April of
14 that year.
15          He had requested a meeting.  And
16 basically the letter said that there will be no
17 meeting unless the HBPA generally comes on board
18 with their support of table games.
19 **Q.      Did Mr. Finamore refuse to have any**
20 **discussions about anything with the HBPA until**
21 **the HBPA came on board with the table games?**
22          MR. WOLFSON:  Objection.
23 Unless he was involved in the request, this would
24 all be hearsay.

Page 371

1          THE WITNESS: I think there
2   is a letter --
3          MR. WOLFSON: My objection
4   stands.
5          ARBITRATOR CARNEY: Again,
6   he's testifying about a letter to Mr. Hale which
7   he believes shows anger. He can testify about
8   that. If there is anything else that he observed
9   or heard.
10         THE WITNESS: Right.
11  BY MR. HAMMER:
12  Q.      Did you actually observe a letter
13  that came --
14  A.      Yes.
15  Q.      -- from Mr. Finamore?
16  A.      Yes.
17  Q.      And that letter was directed to
18  Mr. Hale and the HBPA?
19  A.      Yes.
20  Q.      Where Mr. Finamore refused to have
21  discussions about anything with the HBPA?
22  A.      Yes.
23  Q.      Sir, I'm going to ask to direct your
24  attention to the screen.

Page 372

1          Is this the copy of the letter?
2   A.      Yes, it is.
3   Q.      Does that refresh your recollection
4   and help your testimony?
5   A.      Yes.
6   Q.      Do you see the bottom paragraph of
7   that letter where it's highlighted?
8          ARBITRATOR KARLIN: What's
9   the exhibit number?
10         MR. HAMMER: It's not marked
11  as an exhibit, I'm using it to refresh his
12  recollection. I will mark it here momentarily.
13         THE WITNESS: Yeah, if you
14  could read it. That's the letter I remember
15  seeing, though.
16  BY MR. HAMMER:
17  Q.      Do you recall the date of that
18  letter?
19  A.      I think it was -- it looks like
20  there, April 28th, I believe it is.
21         MR. HAMMER: Can I have this
22  marked as 42?
23              * * *
24         (Whereupon, Claimant's Exhibit No. 42

Page 373

1   marked for the purpose of identification.)
2              * * *
3          THE WITNESS: Yes, this is
4   the letter that I remember seeing, April 25th.
5   BY MR. HAMMER:
6   Q.      Will you read into the record the
7   last paragraph of this letter?
8   A.      While CTRS, meaning Charles Town
9   Races, is most interested in having a harmonious
10  and good working relationship with the HBPA, we
11  were unable to meet with you to discuss anything
12  until the HBPA pledges its support of table
13  games.
14  Q.      Was this in your view a continuation
15  of the trouble that you had had with Charles Town
16  Races and Slots?
17  A.      The -- you know -- basically I think
18  this was, you know, they were angry over what had
19  transpired with the loss of the election.
20         The -- you know. And I think they
21  were -- said, you know, we're going to pull out
22  all --
23         MR. WOLFSON: Objection as to
24  what he thought they may have said or what they

Page 374

1   were thinking.
2          MR. HAMMER: Yeah, I don't --
3          ARBITRATOR CARNEY: The
4   letter speaks for itself depending admission by
5   respondents. Again, what he heard, saw, that's
6   fine. But not his opinion.
7   BY MR. HAMMER:
8   Q.      Let me take you back in time to what
9   you saw, okay?
10  A.      Uh-huh.
11  Q.      Do you recall a time when there was a
12  charge brought by the West Virginia Racing
13  Commission against your occupational permit?
14  A.      Yes.
15  Q.      When was that?
16  A.      That was October the 2nd, I think, of
17  2007.
18  Q.      In just three sentences tell us what
19  happened with the charge, what was the charge
20  about?
21  A.      Basically the Racing Commission, or
22  the stewards, issued -- indefinitely suspended my
23  license without a hearing.
24  Q.      Was there then a hearing held?

Page 375

1  A.      Yes, there was.
2  Q.      When was that?
3  A.      That hearing was held -- first of all
4  we went to an injunction hearing with Judge
5  King --
6  Q.      Let's talk about the hearing --
7  A.      Right after that he ordered to have a
8  hearing.  And I think it was 20 --  I mean,
9  October 8th of 2007.
10  Q.      Where did that hearing take place?
11  A.      That hearing took place in the
12  Charles Town library.  There is a room underneath
13  that the County Commission meets.
14  Q.      So there was a judge present to
15  decide your case?
16  A.      A hearing officer, Oscar Bean.
17          COURT REPORTER:  I'm sorry,
18  the name?
19          THE WITNESS:  Oscar Bean.
20          MR. HAMMER:  B E A N.
21          THE WITNESS:  B E A N.
22  BY MR. HAMMER:
23  Q.      You were represented by counsel?
24  A.      Yes.

Page 376

1  Q.      The Racing Commission was there by
2  its counsel, correct?
3  A.      Yes.
4  Q.      And do you remember her name?
5  A.      Christie Utt.  Christie Utt, I think,
6  was the person that was the Attorney
7  General's --
8  Q.      Were you present in person?
9  A.      Yes.
10  Q.      For the entire day?
11  A.      Yes, 12 hours.
12  Q.      12-hour hearing.
13          From where you were seated, did you
14  have a view of what I'll call the gallery, where
15  spectators were seated?
16  A.      Yes, I saw people come in and out.
17  And we would take breaks and so forth, yes.  I
18  saw a number of people.
19  Q.      Did you see anyone present in that
20  gallery from the executive management team of
21  PNGI?
22  A.      Yeah --
23  Q.      Who did you see?
24  A.      I saw Dickie Moore, I saw Roger

Page 377

1  Ramey.
2  Q.      Who is Roger Ramey?
3  A.      Roger Ramey is, I think his official
4  title is vice president of, is it public affairs
5  or public relations maybe it is.
6  Q.      Did you see anyone else?
7  A.      Phyllis LeTart.
8  Q.      Who is Phyllis LeTart?
9  A.      She was at the time the in house
10  counsel, I believe, for PNGI.
11  Q.      The in house lawyer?
12  A.      In house lawyer.
13  Q.      By your counsel, did you call
14  witnesses at that hearing?
15  A.      Yes.
16  Q.      Did you subpoena those witnesses to
17  be present?
18  A.      I think most of them were subpoenaed.
19  Some of them may have come on their own.
20  Q.      Do you know Tina Mawing who is seated
21  here in the courtroom today?
22  A.      Yes.
23  Q.      Did you cause her to be Subpoenaed to
24  come and testify?

Page 378

1  A.      Yes.
2  Q.      And had you approved as president of
3  the HBPA her to come forward and testify?
4  A.      Yes.
5  Q.      Did Tina Mawing offer testimony in
6  that hearing?
7  A.      Yes.
8  Q.      Very quickly, what was the result of
9  the hearing?
10  A.      The result of the hearing was Oscar
11  Bean exonerated me on all charges that were
12  leveled at me.  And basically then we were able
13  to enter our two horses, Confucius Say and Julie
14  B, in the West Virginia Breeders Classics, which
15  was the biggest race at Charles Town, $500,000 a
16  piece.
17          MR. HAMMER:  The Panel, a
18  copy of that decision, which we move its
19  admission, is included within your exhibits.
20          ARBITRATOR WYCOFF:  Do you
21  know the number?
22          MR. HAMMER:  Off the top of
23  my head I don't.
24  BY MR. HAMMER:

Page 379

1  Q.     Now, I want to move you ahead in time
2  to the summer of 2008.
3         With regard to the status of contract
4  negotiations, what was the status of contract
5  negotiations in the summer of 2008?
6  A.     Well, we had met on several
7  occasions, I think, throughout the spring and
8  summer with management.  We had a negotiating
9  team.
10 Q.     Who was part of that negotiating
11 team?
12 A.     Mr. Martin was part of it.
13 Q.     Mr. Martin was your lawyer?
14 A.     Our lawyer at times.
15 Let's see.  I was.  I'm trying to think who was
16 on the board.
17 Q.     Do you remember Miss Mawing as being
18 part of the contract review team?
19 A.     She was part of the contract review
20 team.
21 Q.     Was that because of her role on the
22 HBPA?
23 A.     Yes.
24 Q.     What was her role?

Page 380

1  A.     Well, as a member you appoint the
2  different committees.  And, you know, and we
3  had -- she was one of the people on the, you
4  know, the -- you know, the contract committee to
5  look over the, you know, the contract and to
6  review it.
7  Q.     Was there a point in time when the
8  HBPA selected a delegation to travel to Charles
9  Town?
10 A.     Yes.  We were requested, the Governor
11 was apparently -- we were told that the Governor
12 would like us to come up there and meet with him.
13 Q.     Who was on that delegation?
14 A.     Basically the people that were
15 delegated, to the best of my remembrance, was
16 myself; I know Mr. Martin was there; Mr. Lenny
17 Hale was there, he was our executive director;
18 Tina Mawing was elected to go; Trish Sanderson,
19 who was a member of the board at the time; and I
20 believe it was Harold Shotwell was the other
21 member.
22 Q.     Okay.
23         When did that meeting occur?
24 A.     I think that meeting was called on

Page 381

1  August 18th, I believe, is when we went up to
2  meet with the Governor.
3  Q.     You say up, I say down.
4         Where did the meeting take place?
5  A.     It was in the governor's part of the
6  Capitol Building up there.  I'm not sure what
7  they call the room.  But I think it's a large
8  executive room with, you know, big fluffy chairs,
9  and... You know, I've been in there before for
10 meetings with the HBPA, and it's...
11 Q.     Who was present that was not on the
12 delegation?
13 A.     Well, the Governor was there,
14 Mr. Puccio was there and -- Larry Puccio and
15 James Pitrolo.  They were both aides for the
16 Governor.
17 Q.     Was anyone from PNGI present?
18 A.     No, they were not at that particular
19 meeting.
20 Q.     What were the topics of discussion
21 during that meeting?
22 A.     Well, basically the Governor was
23 concerned about moving the contractual process
24 forward.

Page 382

1  Q.     Why was he concerned about the
2  contractual process, if you know?
3  A.     Basically, I think that he really
4  wanted the table games referendum to pass the
5  next time it was brought up.
6  Q.     Why was the issue of the contract and
7  the table games interwoven, if you will?
8  A.     I think that he was feeling that
9  we -- you know, he did not want that to be used
10 as any kind of leverage by the HBPA in
11 negotiating a contract.
12         So basically I think that's why he
13 had called us up there to encourage us to support
14 the table games initiative and to see where we
15 were with, you know, our contractual meetings
16 with the racetrack.  And if there was anything
17 that he could find out or perhaps ameliorate the
18 contractual process.
19 Q.     Was there discussion about the
20 relationship between PNGI and the horsemen?
21 A.     Yes.
22 Q.     What was that discussion?
23 A.     Well, I mean, it dealt with a
24 multiplicity of, you know, things that we

Page 383

1  discussed.  I mean, problems that we were having
2  that we were trying to work at in the contract.
3      I mean, you know, horsemen always
4  sort of have some trouble with the maintenance of
5  the racetrack and the condition of the track,
6  horses breaking down.  Basically I think that
7  there was, you know, talks about, you know, a
8  number of contractually related issues and, you
9  know, that were bothersome to us.
10 **Q.      Was Ms. Mawing, did Miss Mawing**
11 **provide any examples of issues that were of**
12 **concern from the HBPA?**
13 A.      Yes.  I mean, she had brought up part
14 of the contractual agreement, different people
15 contributed, you know, their -- you know, it was
16 sort of a round table discussion.  And each one,
17 I remember Miss Sanderson talking about the race
18 track.  She had some horses, I think, break down
19 during that period.
20      Mrs. Mawing was concerned because of,
21 you know, poison and rat control eradication
22 issues.
23 **Q.      What was Miss Mawing's demeanor**
24 **during that meeting?**

Page 384

1  A.      You know, I think everything was
2  pretty business like.  You know, just talking
3  about the different issues with the Governor and
4  the staff.  I would say that she was trying to
5  point out, you know, her means of consideration
6  in a reasonable and rational manner.
7  **Q.      Did Miss Mawing provide any**
8  **photographs to the Governor?**
9  A.      I think Mr. Martin, you know, urged
10 her if she had any evidence of that to show it to
11 the Governor.  And she, you know, I -- you know,
12 produced those and --
13 **Q.      She produced --**
14 A.      -- showed him evidence of those.
15 **Q.      I have photographs that have been**
16 **marked generally C-40 here.**
17      **Are those the photographs you're**
18 **referring to?**
19 A.      Yes I remember seeing most, if not
20 all of these.
21 **Q.      Now --**
22 A.      And I think these are correct.
23 **Q.      Now, did Miss Mawing make any**
24 **allegation that the -- that PNGI deliberately**

Page 385

1  **poisoned her goat or her horse?**
2  A.      I think -- her concern was that she
3  was concerned that she had this problem with her
4  own goat and horse, but that she was concerned
5  with other people in the barn as apparently there
6  had been an exterminator in, at least in Barn 14
7  where she was stabled at that time.  And had been
8  there several times.  And so she was concerned,
9  you know, that she had had evidence of something
10 dying.  But that, you know, this was potentially
11 the problem is that --
12 **Q.      Did she say it was potentially a**
13 **problem or did she say the track deliberately**
14 **killed my goat?**
15 A.      I don't remember her saying
16 deliberately killed my goat or my horse.
17      You know, this was a problem.  She
18 did in the process of the discussion say, you
19 know, that I had this as a result.  We're trying
20 to determine the final, you know, why these
21 horses or the goat died.  But this seems to be,
22 you know, strong evidence when you look at this
23 and you see poison and your, what appears to be
24 poison anyway, there.  And there were other

Page 386

1  people in the barn that had seen, you know, a
2  pesticide.  I did not personally see that, but...
3  **Q.      All right.**
4      **Did Miss Mawing bring with her any**
5  **pictures of a rope or a wire of any type that was**
6  **strung in the stall area?**
7  A.      No.
8  **Q.      Was there any discussion of a rope or**
9  **a wire strung in stable area by Miss Mawing?**
10 A.      No.
11 **Q.      Do you recall any such discussion at**
12 **all during that meeting?**
13 A.      Mainly about this.  And this was, you
14 know --
15 **Q.      No, about the rope or the wire?**
16 A.      No.
17 **Q.      Was there any discussion at all about**
18 **a rope or a wire during that meeting?**
19 A.      No.
20 **Q.      Had you ever in your entire career at**
21 **Charles Town heard an allegation that PNGI**
22 **deliberately, or accidentally, or in any way**
23 **strung a wire or a rope to deliberately injure or**
24 **maim a horse or a rider?**

Page 387

1  A.      No.
2  Q.      That would be the most severe serious
3  of allegations you could imagine, wouldn't it?
4  A.      Yes.
5  Q.      You never heard such a thing?
6  A.      No.
7  Q.      Now, does Charles Town Races receive
8  money from the State of West Virginia to
9  maintain, build and improve the barn area?
10          MR. WOLFSON:  Objection.
11  BY MR. HAMMER:
12  Q.      To your knowledge.
13          MR. WOLFSON:  My objection
14  stands.  This gets to issues between Charles Town
15  and the State.  I mean, I don't know that there
16  is going to be much dispute on this, I just don't
17  know where this is going, I don't know if that
18  has any relevancy here today or if it's
19  appropriate for this witness.
20          ARBITRATOR CARNEY:  We'll
21  hear it.
22          THE WITNESS:  Yes.
23  BY MR. HAMMER:
24  Q.      To your knowledge does the racetrack

Page 388

1  receive money to maintain the barn area at
2  Charles Town Races?
3  A.      Yes.  They get money through the
4  video lottery, and I think it's through the
5  excess video lottery, there is an amount of
6  money.  I believe that's the source, I could be
7  wrong on that, but I'm pretty sure that's the
8  source.
9          And they have, on that excess video
10  lottery fund, I ran some figures last year, or
11  earlier this year, and they had received almost
12  $115 million out of that fund since it began.
13          And that is to be used by them as
14  they see fit for 96 percent of all the monies.
15  And four percent of the monies are supposed to be
16  approved by the horsemen to be used in the barn
17  area, for barn area improvements or stable
18  improvements, that kind of thing.
19          MR. HAMMER:  I would ask the
20  Panel to take judicial notice of West Virginia
21  Code Section 29 22(a) 10(c), Subsection B.
22          ARBITRATOR KARLIN:  Do we
23  know when that went into effect?
24          MR. HAMMER:  It says, for all

Page 389

1  fiscal years beginning on or after July 1, 2001.
2  That's the start of the statute.
3          That's all the questions I have,
4  thank you.
5          Just one second, if we could call
6  Mr. Elliott.
7          MS. SCRIVANI:  We're on it.
8          MR. WOLFSON:  If I may.
9          * * *
10      C R O S S - E X A M I N A T I O N
11  BY MR. WOLFSON:
12  Q.      Mr. Funkhouser, we've met before.
13  It's good to see you again, sir.
14          I'm going to start with that money
15  you talked about that comes from the State.
16  A.      Uh-huh.
17  Q.      You're aware, sir, that money is
18  actually paid to the State by Charles Town Casino
19  from the Charles Town operations to be held by
20  the State then to be redistributed back to
21  Charles Town with some of it going to the HBPA,
22  right?
23  A.      Well, that's considered a, you know,
24  a tax or whatever.

Page 390

1  Q.      Sir --
2  A.      That's the way that it works.
3          But, you know, all tracks contribute
4  to, you know, they take out, it goes to the State
5  and then it's divided by the Lottery
6  Commission --
7  Q.      Well, sir.
8  A.      -- and then it comes back to the
9  different entities.
10  Q.      Sir, we'll get -- you'll have time to
11  talk, let's just focus on my question for a
12  second.  It will just make it a lot easier.
13          What you're talking about the take
14  out now, that's a separate fund from the State
15  that goes to the State from Charles Town for
16  gaming operations, right?
17          That's a separate fund?
18  A.      There is a gaming and a video
19  lottery.  There are two separate funds.
20  Q.      Right.
21          The fund that we're talking about for
22  the barn areas is a very specific fund that
23  Charles Town pays to the State, to be held by the
24  State and then redistributed back from the State

Page 391

1 **for very specific purposes to Charles Town in the**
2 **one hand and the HBPA on the other, right?**
3       **You don't know?**
4 A.      It goes to the Lottery Commission, I
5 know that.  And they're the ones that distribute
6 it back.
7 **Q.      If you don't know, you don't know.**
8             MR. HAMMER:  He's answered
9 the question.
10        I mean, that is badgering the
11 witness, he's answered the question.
12            ARBITRATOR KARLIN:  Let's --
13            MR. WOLFSON:  Let's lower
14 this down.
15            ARBITRATOR KARLIN:  Keep
16 going.
17 BY MR. WOLFSON:
18 **Q.      All right, sir.**
19      **Let me talk about the '07 table games**
20 **referendum for a second.  Isn't it a fact, sir,**
21 **that the HBPA itself, as an organization,**
22 **remained neutral in the '07 referendum?**
23 A.      The final analyses, they remained
24 neutral.  We tried and presented to Dickie Moore

Page 392

1 on Wednesday before the Saturday referendum.
2 **Q.      Sir, sir, my question was only about**
3 **what the HBPA voted.**
4 A.      Okay, that's...
5 **Q.      All right?**
6 A.      Okay.
7 **Q.      So let me be clear.**
8       **The HBPA, as an entity with respect**
9 **to the '07 referendum, the HBPA Board voted to**
10 **remain neutral, correct?**
11 A.      That is correct.
12 **Q.      The HBPA itself didn't take a**
13 **position, it remained neutral, correct?**
14 A.      Yes.
15 **Q.      Now, there were individual horsemen,**
16 **such as yourself, who opposed the referendum on**
17 **the basis of the take out and the amount going to**
18 **the HBPA, right?**
19 A.      Yes.
20 **Q.      And there were other horsemen you**
21 **were aware of who supported the referendum, right?**
22 A.      Yes.
23 **Q.      So when you said earlier the horsemen**
24 **opposed the referendum, you didn't mean all the**

Page 393

1 **horsemen, did you?**
2 A.      I didn't mean all the horsemen, no.
3 The board voted.
4 **Q.      To remain neutral?**
5 A.      That's correct.
6 **Q.      Okay.**
7       **Now, sir, let me just ask a couple of**
8 **questions about the Forest Park hearing.**
9       **That was a 12-hour long hearing,**
10 **right?**
11 A.      Yes, sir.
12 **Q.      As I understand it, it opened with**
13 **arguments by the counsel, right?  By the various**
14 **attorneys, I should say, right?**
15 A.      I can't remember exactly, but, you
16 know, it was -- there were lots of witnesses
17 and -- you know, presented through the 12 hours.
18 **Q.      Right, it was a long day.**
19 A.      Yes.
20 **Q.      Then you testified at some point?**
21 A.      At the very end, yes, sir.
22 **Q.      But all before you testified you were**
23 **sitting at counsel table, right?**
24 A.      I can't remember if I was or not.

Page 394

1 **Q.      Weren't you sitting next to your**
2 **attorney?**
3 A.      Probably I was, but I can't remember,
4 I think I was.
5 **Q.      During that period you were facing**
6 **Judge Bean, right?**
7 A.      Yes.  I mean, I could see Judge Bean.
8 **Q.      Then the gallery, all the spectators,**
9 **were sitting behind you, right?**
10 A.      They were sitting off to my left,
11 actually.  I mean, Judge Bean was here, we were
12 sitting here, spectators were in the rows there,
13 chairs, over to our left.
14 **Q.      Okay.**
15       **Then during that at some point I**
16 **think it was towards, not long before you**
17 **testified, that's when Miss Mawing testified,**
18 **right?**
19 A.      No, she -- I think she testified
20 -- well, earlier than that.  I mean, I was last
21 one on the stand.
22 **Q.      Right.**
23 A.      There were a number of witnesses,
24 both.

Page 395

1  Q.      I understand.
2          You were the end the day, right?
3  A.      Yes.
4  Q.      Right.
5  A.      It was 8:00 at night.
6  Q.      That's because the State put on their
7  evidence first, right?
8  A.      Yeah, I guess that would be true.
9  Q.      Right.
10         So then you and your counsel put on
11 your witnesses long after that, right?
12 A.      Right.
13 Q.      So then Miss Mawing testified during
14 a portion of the time that you and your counsel
15 put on your evidence, right?
16 A.      Yeah.  It would have probably been
17 late afternoon, middle afternoon.
18 Q.      Now, you talked about the period that
19 you were president and, I think you said you were
20 president of the board until the end of '09,
21 isn't that right?
22 A.      Yes.
23 Q.      That's when Mr. Hale ran against you?
24 A.      No, no.

Page 396

1  Q.      Or excuse me, Mr. Lowe.  Mr. Hale was
2  executive --
3  A.      Yes.
4  Q.      I apologize.
5  A.      Right.
6  Q.      Mr. Lowe was the executive
7  director -- Mr. Lowe ran against you, Mr. Hale
8  was the executive director?
9  A.      Right.
10 Q.      So Mr. Lowe ran against you?
11 A.      Right.
12 Q.      He was elected in that, right?
13 A.      Uh-huh.
14 Q.      Is that a yes?
15 A.      Yes.
16 Q.      And did you remain on the board?
17 A.      No, I did not.
18 Q.      So you were off the board from '09 to
19 '12?
20 A.      That's correct.
21 Q.      Then you ran against Mr. Lowe at the
22 end of '12 and you were re-elected?
23 A.      Yes, sir.
24 Q.      And that's your current term?

Page 397

1  A.      Yes, sir.
2  Q.      Now, you mentioned that you went
3  through a number of arbitrations with
4  HBPA -- with -- you personally went through a
5  number of arbitrations with Charles Town about
6  the stall issue, right?
7  A.      Arbitrations with Mr. Yetsook, yes.
8  Q.      You went through a number of those,
9  right?
10 A.      Uh-huh.
11 Q.      You had a number of different ones?
12 A.      At different times, yes.
13 Q.      So you've had a, somewhat of a
14 contentious relationship with Charles Town,
15 haven't you, sir?
16 A.      No, you know, it's business to me.
17 We're there to serve the horsemen.  I work as a
18 volunteer.
19 Q.      Now, sir, Mr. Hammer showed you the
20 2004 agreement between the HBPA and Charles Town.
21 And I think that was the red book, Claimant's
22 Exhibit 1.
23         MR. WOLFSON:  Is that right,
24 counsel?

Page 398

1          If you would, please, put up Page 13.
2          MR. HAMMER:  Sure.
3  BY MR. WOLFSON:
4  Q.      Exhibit No. 1, please, sir?
5  A.      Exhibit No. 1?
6  Q.      Yes.
7  A.      Okay.
8  Q.      If you go to Page 13.
9  A.      I can't see how these pages are
10 marked here.
11 Q.      Can I help you, sir?
12 A.      No, it's okay, I've got it now.
13 Q.      You've got it, sir?
14 A.      This is it right here.
15 Q.      That's right.  Okay, great.
16         Now, you're familiar with that
17 provision, that Section 11 referring to stalls,
18 you're familiar with that, are you not, sir?
19 A.      Yes, sir.
20 Q.      Now essentially you're aware that
21 that requires Charles Town to allocate 1,148
22 stalls, right?
23 A.      Yes, sir.
24 Q.      Then it goes on to note that both

Page 399

1  parties recognize effective stall utilization is
2  important to management and equitable allocation
3  is essential to the livelihood of the horsemen,
4  right?
5  A.      Right.
6  Q.      Then the next paragraph is the
7  paragraph that prohibits Charles Town from using
8  HBPA activity against someone when allocating
9  stalls, right?
10 A.      Yes.
11 Q.      But then the last sentence of that
12 says, that other than that limitation, the
13 allocation of stalls is at the discretion of
14 Charles Town Races, right?
15 A.      Yes.
16 Q.      Now, sir, you were part of the,
17 familiar with some of the earlier contracts
18 between the HBPA on the one hand and Charles Town
19 on the other, right?
20 A.      Uh-huh.
21 Q.      Sir, you have to answer yes or no for
22 the court reporter --
23 A.      Yes.
24 Q.      Some of those earlier contracts had

Page 400

1  stronger language for the protection of stalls
2  for the horsemen, isn't that accurate?
3  A.      It had just cause and due process.
4  Q.      Right.
5          Before the stalls could not -- could
6  be taken away, right?
7  A.      Right.
8  Q.      And then at some point that was taken
9  out of the contract so that we're left with what
10 we have here, right?
11 A.      That was changed under Mr. Harrison's
12 presidency.
13 Q.      Right.
14         I'm not trying to imply you did it,
15 sir, I know --
16 A.      No, no.  And that's why he was sent
17 off after a year and I had to take back over
18 again.
19 Q.      So I get that.
20         Actually in this agreement you wanted
21 the due process language put back in, didn't you?
22 A.      Well, I think that's proper.  I mean,
23 if someone does something wrong, you know, and
24 there is a cause, I think it's proper language.

Page 401

1  This was put in and agreed to.
2  Q.      Sir, my question is a little
3  different.
4  A.      Okay.
5  Q.      When negotiating this contract, the
6  '04 agreement that you were part of, right?
7  A.      I was not a part of -- well, I was on
8  the board at the time, yes.
9  Q.      Yes.
10 A.      I voted against this contract.
11 Q.      Right, because you wanted the due
12 process and just cause language put back in,
13 right?
14 A.      I think it's better phrasing, yes.
15 Q.      But, sir, you would agree with me,
16 would you not, that when using its discretion as
17 referenced in Paragraph B here that the track can
18 take into account its own business interests,
19 right?
20 A.      As long as they don't discriminate,
21 you know, I mean.
22 Q.      Sure.
23 A.      Because we are charged under the by
24 laws of the HBPA that we -- for our full weight

Page 402

1  behind people who were discriminated against,
2  that's in our by laws.
3  Q.      Sir, I get that.
4          My only -- my question, though, was
5  different.  I apologize.
6          Other than the -- putting aside the
7  discrimination for HBPA activity, assume for me
8  that the track is not doing that, when allocating
9  stalls, they then can take into account their own
10 business interests, right?
11 A.      It says discretion of the Charles
12 Town Races.  I don't know if that means business
13 interests.  But, you know, it's up to their
14 discretion according to this language, yes.
15 Q.      So, yes, they can?
16 A.      Well, it's up to their discretion to
17 do it.  You know, again, I think that is a -- you
18 know, the first part of that, shall not
19 discriminate.  And the second part is, shall be
20 in the discretion of.
21         So I think the two are tied together
22 in the same paragraph.
23 Q.      Sir, do you recall giving a
24 deposition in the Yetsook arbitration matter on

Page 403

1 **March 3rd, 2011?**
2 A.      I don't remember specifics, no.
3 **Q.      You remember you and I sat together**
4 **at a deposition, don't you?**
5 A.      Right.
6          MR. HAMMER: Let me object, I
7 have not been provided a copy of this deposition
8 and it's a different proceeding.
9          MR. WOLFSON: Well, your
10 client certainly has these. It was -- the HBPA
11 was a part of it.
12          MR. HAMMER: I have not been
13 provided with a copy of this, it's in a different
14 proceeding.
15          MR. WOLFSON: If you want to
16 look over it, it's very simple.
17          * * *
18          (Whereupon, a discussion was
19 held off the record.)
20          * * *
21 BY MR. WOLFSON:
22 **Q.      Sir, at that time I asked you, in**
23 **using its discretion, do you have any reason to**
24 **believe that PNGI can't take into account what it**

Page 404

1 **believes to be in its own best interests --**
2 **business interests?**
3          Answer, I would say, as long as they
4 were not discriminating in the allocation of
5 stalls, then this particular, you know, second
6 sentence then would kick in.
7          Question, and would allow them to use
8 what they believe to be in their own best
9 interest, right?
10          Answer, Yeah, I guess, I guess that
11 would be correct.
12 **Q.      Do you recall giving that testimony**
13 **at the time, sir?**
14 A.      That would kind of be what I said
15 today. The two were tied together and, so...
16 **Q.      Now, sir, you've testified about a**
17 **meeting that was held with the Governor at which**
18 **Miss Mawing raised some concerns, I believe as**
19 **you put it, regarding the death of her goat and**
20 **horse, right?**
21 A.      Yes.
22 **Q.      And that was a meeting that the**
23 **Governor held that you understood to try to**
24 **mediate some of the problems regarding the**

Page 405

1 **contract between the HBPA on the one hand and the**
2 **track on the other, right?**
3 A.      Yes.
4 **Q.      And the Governor also raised the**
5 **issue of the table games during that meeting as**
6 **well, right?**
7 A.      He was always very plain and clear
8 about his support of table games.
9 **Q.      You understood that is because**
10 **addition of table games to the track would**
11 **increase revenue to the State because the State**
12 **gets a portion of whatever table games revenue**
13 **the track gets, right?**
14 A.      Well, that's -- that would be
15 correct.
16 **Q.      At that time did you see or observe**
17 **anything that led you to believe that the**
18 **Governor was acting, trying to hurt the horsemen**
19 **or any members of the HBPA?**
20 A.      At that meeting, I would say, no. I
21 mean, basically, you know, but he was -- you
22 know, there were numerous occasions that I had as
23 president where he made it very plain and clear
24 that he wanted our support for table games.

Page 406

1 **Q.      Right.**
2          That didn't surprise you that he
3 wanted support of table games because you knew
4 that was going to -- you knew he wanted to get
5 the revenue for the State, right?
6 A.      Well, that was his position, yes.
7 **Q.      Then, in fact, there was another**
8 **meeting, either late '09 or -- excuse me, late**
9 **'08 or early '09 where you and the HBPA members**
10 **went to the Governor's office and actually the**
11 **track personnel were there as well, right?**
12 A.      That's correct.
13 **Q.      And the Governor, again, tried to**
14 **mediate a final agreement and got sort of**
15 **agitated with both sides to try to get that**
16 **agreement done, right?**
17 A.      He was involved for a short period of
18 time and, you know, he sort of, you know, asked
19 both sides to try and get together. And
20 basically he had another -- something else on his
21 agenda and he had to leave the meeting.
22 **Q.      Now, with respect to the '09**
23 **referendum, then I'm going to close the loop on**
24 **that, ultimately there was an '09 referendum**

Page  407

1  regarding table games as well, right?
2  A.     Yes.
3  Q.     At that time the HBPA voted to
4  support the table games referendum, right?
5  A.     Yes.
6  Q.     That was with the same take out
7  percentages as were in the '07 referendum, right?
8  A.     As far as the HBPA were concerned,
9  yes.
10  Q.     Then after that time it then passed
11  and that's why there are table games up at the
12  track, at the casino now, is that right?
13  A.     That is correct.
14            MR. WOLFSON:  No further
15  questions.
16            * * *
17      R E D I R E C T   E X A M I N A T I O N
18  BY MR. HAMMER:
19  Q.     I'm going to direct your attention
20  back to the contract for a moment, Page 13,
21  Exhibit C-1.
22            Do you see the sentence that reads,
23  it is recognized by both parties that effective
24  stall utilization is important to Charles Town

Page  408

1  Races management and that equitable allocation is
2  essential to the livelihood of horsemen?
3            What do you understand the word
4  equitable to mean?
5  A.     That was when we were -- you know, I
6  remember when the whole contract was being done
7  by Harrison.  You know, they wanted to have the
8  change from just cause and due process to
9  equitable.  And that's, you know, I said, I did
10  not feel that equitable, you know, was a
11  substitute necessarily.  I mean, it was important
12  to be equitable.
13  Q.     What do you understand equitable to
14  mean?
15  A.     Equitable means, you know, that it is
16  equitable based on the merits of -- you know,
17  it's fair, it's just, based on the merits of, you
18  know, someone's achievements or participation.
19  Q.     So fair and just is your
20  understanding of the --
21  A.     Fair and just.
22  Q.     Okay.
23            Now, Mr. Wolfson brought up the topic
24  of the HBPA's involvement in the Yetsook

Page  409

1  arbitration.
2            Do you remember the Yetsook
3  arbitration?
4  A.     Yes.
5  Q.     And as a member of the board of the
6  HBPA, what was your understanding as to the
7  subject matter of the Yetsook arbitration?
8            MR. WOLFSON:  I'm going to
9  object to the question.  The only reason I raised
10  that at all is because he testified in his direct
11  that he was involved with arbitrations.  I didn't
12  get into the merits of the matter at all.
13            ARBITRATOR CARNEY:  Well, you
14  raised the issue, so...
15            MR. HAMMER:  He's opened the
16  door.
17            MR. WOLFSON:  I'm not sure
18  how I opened the door, because it was in direct,
19  but...
20            ARBITRATOR WYCOFF:  Well,
21  it's an arbitration.
22            MR. WOLFSON:  I understand.
23            ARBITRATOR WYCOFF:  Our
24  insatiable curiosity.

Page  410

1            ARBITRATOR CARNEY:  And we
2  trust it won't take us a long time.
3            MR. WOLFSON:  All right.  We
4  could be here all day.
5  BY MR. HAMMER:
6  Q.     What was your understanding as to the
7  subject matter of the Yetsook arbitration?
8  A.     Well, it all depends on -- there were
9  a number of them.  But, you know...
10  Q.     In its core, what was Mr. Yetsook's
11  issue?
12  A.     Mr. Yetsook felt that he made, in the
13  last one, adequate stall starts and he had, you
14  know, good horses.  And, you know, that he should
15  have been allocated more stalls.
16  Q.     Now, was Mr. Yetsook one of the
17  people who also testified during your hearing
18  with the Racing Commission?
19  A.     Yes, he did.
20            MR. WOLFSON:  Now, we're
21  really going to -- now I do have to speak up.
22            His testimony at Forest Park had
23  nothing to do with that arbitration or that
24  hearing.  Absolutely zero.  It wasn't an issue at

Page 411

1    all.
2            MR. HAMMER:  I just asked the
3    question, did Mr. Yetsook testify?
4            THE WITNESS:  Yes.
5            ARBITRATOR CARNEY:  We'll
6    hear whether he testified or not, but let's not
7    get into the --
8            MR. WOLFSON:  Because it had
9    absolutely zero.  It didn't come up at the --
10   BY MR. HAMMER:
11   **Q.      What was your understanding of the**
12   **ultimate outcome of the Yetsook arbitration, what**
13   **happened?**
14   A.      Well, basically the final arbitration
15   that happened recently was it -- that, you know,
16   he more/less, you know, he won the arbitration
17   and was allowed to keep, you know, basically the
18   arbitration said he gets to keep five stalls, you
19   know, until the end of his contract.
20           And so basically, I mean, he won,
21   they were trying to take all of the stalls away.
22           MR. HAMMER:  That's all of
23   the questions I have for you.  Thank you.
24                 * * *

Page 412

1        R E C R O S S - E X A M I N A T I O N
2    BY MR. WOLFSON:
3    **Q.      Sir, he was able to keep the stalls**
4    **until the end of '11, 2011, right?**
5            **Then after then he had to apply each**
6    **and every time and has been given stalls each and**
7    **every time since then, right?**
8    A.      I think that it was due to the
9    length -- as long as the contract was in
10   existence, that's the way I think that that read.
11   And the contract is still in existence.
12           MR. WOLFSON:  We can
13   introduce if necessary the final --
14           THE WITNESS:  The contract is
15   in existence.
16           MR. WOLFSON:  Sir, sir --
17           ARBITRATOR CARNEY:  If you
18   think it's relevant.
19           MR. WOLFSON:  Yeah, we'll let
20   it go.
21   BY MR. WOLFSON:
22   **Q.      He wasn't awarded damages in that**
23   **hearing was he?**
24   A.      No, he wasn't, because he didn't, his

Page 413

1    lawyer didn't apply for damages.
2    **Q.      All right.**
3    A.      And should have.
4            MR. HAMMER:  May this witness
5    step down?
6            ARBITRATOR KARLIN:  I have a
7    question, or a couple questions.
8            I want to go back to the hearing, the
9    Racing Commission hearing that you had to -- when
10   you were, I guess, when action was taken against
11   you at the recommendation of the stewards as I
12   understand.
13           THE WITNESS:  Yes, sir.
14           ARBITRATOR KARLIN:  On your
15   side of the table, you were represented by whom,
16   who were you represented --
17           THE WITNESS:  I was
18   represented by Mr. Hammer and Mr. Waddell.
19           ARBITRATOR KARLIN:  There
20   were, what, attorneys from the State representing
21   the other side?
22           THE WITNESS:  Christie Utt
23   was from the Attorney General's Office.  She was
24   representing the West Virginia Racing Commission

Page 414

1            ARBITRATOR KARLIN:  Who sat
2    at the table with her?
3            Did she have a client representative
4    of some kind?
5            THE WITNESS:  Let's see, she
6    had -- there was a fellow who was Mr. Ryan's
7    lawyer that had, I'm not sure the legal term, he
8    was not licensed to practice in West Virginia but
9    they allowed him to practice.  There is a legal
10   term for that.
11           MR. HAMMER:  Pro hac vice.
12           MR. WOLFSON:  Pro hac vice.
13           THE WITNESS:  Pro hac vice.
14           ARBITRATOR KARLIN:  Was there
15   a client or anything?
16           THE WITNESS:  There was
17   somebody else sitting at the table, I thought.
18   But I can't -- I can't remember who that would
19   have been.
20           ARBITRATOR KARLIN:  The
21   stewards, were any of them present for the --
22           THE WITNESS:  Yes, they were.
23           ARBITRATOR KARLIN:  Do you
24   recall how -- were they there all the time, part

Page 415

1  of the time?
2           THE WITNESS:  I know that
3  Danny Wright testified.  I'm not sure -- I think
4  he was a -- as I seem to remember it, I think was
5  the only steward.  He was the presiding steward,
6  he is the one that, or one of the ones, I guess,
7  that signed the order against me without, you
8  know, basically suspending my license without a
9  hearing, which is unusual.
10          ARBITRATOR KARLIN:  After he
11 testified, do you recall whether or not he
12 remained in the hearing room?
13          THE WITNESS:  I don't know.
14 You know, there were a lot of people in the
15 hearing room.
16          ARBITRATOR KARLIN:  Okay.
17          THE WITNESS:  I couldn't say.
18 I mean, the gallery was packed.  I mean, it was a
19 big thing around Charles Town and there were, you
20 know, 50 people or more in that room.
21          ARBITRATOR KARLIN:  Were
22 there news reports on the hearing?
23          THE WITNESS:  News reports?
24          ARBITRATOR KARLIN:  Yes.

Page 416

1           THE WITNESS:  Yes.  Only --
2  it didn't come out of the hearing, but it came
3  out after the decision.
4           And there were all kind of news
5  reports demeaning me.  I mean, every time I would
6  pick up the Martinsburg Journal for weeks it was,
7  like, accused of this and accused of --
8           ARBITRATOR KARLIN:  I
9  understand your concern, but --
10          THE WITNESS:  Right.
11          ARBITRATOR KARLIN:  That's
12 all I have.
13          ARBITRATOR WYCOFF:  At any
14 time when you were in your capacity with the
15 Horseman's Association, did you hear anyone who
16 was employed by the track in a management
17 position say that supporting the business
18 interests of the track or the parent company were
19 part of the criteria for awarding stalls?
20          THE WITNESS:  I never heard
21 that, no.
22          ARBITRATOR WYCOFF:  Nothing
23 else.
24          ARBITRATOR CARNEY:  Any

Page 417

1  questions from anybody else?
2           MR. HAMMER:  Thank you,
3  though.
4           ARBITRATOR CARNEY:  Off the
5  record.
6               *  *  *
7           (Whereupon, a discussion was
8  held off the record.)
9               *  *  *
10          ARBITRATOR CARNEY:  Now, we
11 were talking before lunch about what witnesses
12 would be put in by deposition.  And there was a
13 dispute about Mr. Yetsook.  Were you able to
14 resolve your dispute?
15          MR. WOLFSON:  I proposed a
16 stipulation and we're --
17          MR. HAMMER:  Yeah, we have a
18 very limited purpose for which we would use
19 Mr. Yetsook.  And we propose to stipulate to
20 that.
21          In turn, they provided me with a
22 proposed stipulation.  I haven't read it yet.
23 They just wrote it out for me.
24          ARBITRATOR CARNEY:  You'll

Page 418

1  work on language, but that's going to resolve the
2  problem?
3           MR. HAMMER:  Right.
4           ARBITRATOR CARNEY:  Why don't
5  we go ahead and hear your next live witness?
6           MR. WADDELL:  We'll call as
7  our next witness, Michael Elliott.
8               *  *  *
9           MELVIN MICHAEL ELLIOTT
10 being first duly sworn, was examined and
11 testified as follows:
12              *  *  *
13    D I R E C T   E X A M I N A T I O N
14 BY MR. WADDELL:
15 Q.      **Mr. Elliott, state your full name for**
16 **the record, please.**
17 A.      It's Melvin Michael Elliott.
18 Q.      **Where are you employed, sir?**
19 A.      Penn National Gaming.
20 Q.      **How long have you been an employee of**
21 **Penn National Gaming?**
22 A.      I was hired by Penn National Gaming
23 since they opened the track in '97.
24 Q.      **Were you an employee of the track**

Page 419

1  before Penn National Gaming?
2  A.      Yes, sir.  I became a racing official
3  in September of '86.
4  Q.      You were hired by Richard Moore,
5  Dickie Moore?
6  A.      Mr. Moore, yes, sir.
7  Q.      At some point you became assistant
8  racing secretary?
9  A.      Yes, when Mr. Dougie Lamp...
10 Q.      Left?
11 A.      Lamp.
12 Q.      Yes, you became assistant
13 racing -- I'm sorry.  I said, at some point did
14 you become assistant racing secretary.
15 A.      Yes, sir.
16 Q.      You said, yes.  Then you said --
17 A.      To Dougie Lamp.
18 Q.      To Dougie Lamp.  I'm sorry.
19         Then at some point Mr. Lamp left the
20 employ of the track, correct?
21 A.      Yes, sir.
22 Q.      Did you at any time fill in as racing
23 secretary for Mr. Lamp at any point in time?
24 A.      When Mr. Lamp left the property in

Page 420

1  late sometime in November of 2007 until May of
2  2008.
3  Q.      Let me ask you a question, how many
4  empty stalls does the track have right now?
5  A.      Well, when you say empty, there are
6  two kinds of empty stalls.  There could be empty
7  that is not allocated and empty that is
8  allocated.
9  Q.      Well, how many are empty that are not
10 allocated?
11 A.      Not allocated, I'm going to say off
12 the top of my head, roughly around 30.
13 Q.      How many empty that are
14 allocated?
15 A.      The last walkthrough I did, there
16 could be 80 to 100.
17 Q.      Those stalls that are allocated
18 to trainers?
19 A.      Yes, sir.
20 Q.      Why are they empty if they're
21 allocated to trainers?
22 A.      I mean, like a lot of horseman, you
23 go through horses -- I mean, they could have
24 downtimes, horses need to go to the farm,

Page 421

1  different things of that nature.
2  Q.      Is there any rule that the track has
3  regarding trainers who have allocated stalls that
4  are empty?
5  A.      What we try to do is keep them empty
6  for a minimum of time, yes, sir.
7  Q.      Is there a set time limit that, under
8  a rule, that the track --
9  A.      Not that I'm aware of, no, sir.
10 Q.      Who is charged with enforcing the
11 requirement that the stalls have horses?
12 A.      Well, that would go back to your
13 racing secretary.
14 Q.      Okay.
15         What is your present job?
16 A.      My title now has changed, I'm racing
17 operation's manager.
18 Q.      What were you -- when did that
19 happen, when did you --
20 A.      That changed in January of this year.
21 Q.      Okay.
22         January of 20 --
23 A.      '13.
24 Q.      -- 13?

Page 422

1          Before that what was your job, right
2  before that?
3  A.      My title was backside administrator.
4  Q.      The backside, will you explain to the
5  Panel, what -- when we refer to the backside of
6  the track, what we're referring to?
7  A.      The barn area itself.
8  Q.      So you were -- your job title, you
9  were basically administrator of the backside?
10 A.      Yes, sir.
11 Q.      The barn area?
12 A.      The barn area.
13 Q.      What did that entail as far as your
14 duties and responsibilities?
15 A.      Well, the main thing is, like I said,
16 we walk the barn area for the care of the horses
17 to make sure they are cared for properly and
18 being cared for properly.  And, again, to see if
19 there are empty stalls and for how long they're
20 empty.
21 Q.      You said we or did you --
22 A.      Well, it's usually -- at that time it
23 was me and Mr. James Taylor.
24 Q.      What was his job?

Page 423

1  A.        He is the actual stallman.
2  Q.        Is he also called, sometimes called
3  the stall superintendent?
4  A.        Yes, sir.
5  Q.        Were you, in August of 2008, if I can
6  take you back that far, do you recall what your
7  job was at that time?
8  A.        Yeah, I was the backside
9  administrator.
10 Q.        Was Mr. Taylor the stallman or the
11 stall superintendent at that time?
12 A.        Yes, sir.
13 Q.        Were you on the racing -- the track
14 has a stall allocation committee?
15 A.        Yes, sir.
16 Q.        Are you familiar with that?
17 A.        Yes, sir.
18 Q.        Were you on that stall allocation
19 committee in August of 2008?
20 A.        Yes, sir.
21 Q.        How long had you been on the
22 allocation committee?
23 A.        Possibly around the first or second
24 week of June when I took the job.

Page 424

1  Q.        Took the job of that --
2  A.        Right.
3            When I took that position as the
4  backside administrator.
5  Q.        Was James Taylor also on the stall
6  allocation committee back in August of 2008?
7  A.        Yes, sir.
8  Q.        Do you recall who the other members
9  were at that time besides yourself and
10 Mr. Taylor?
11 A.        It would have been Mr. Randy Wehrman.
12 Q.        He was the racing secretary?
13 A.        Yes, sir.
14           ARBITRATOR WYCOFF:  What was
15 the name again?
16           THE WITNESS:  Randy Wehrman.
17           ARBITRATOR WYCOFF:  Oh,
18 Wehrman, thank you.
19           THE WITNESS:  Richard Moore
20 and Al Britton.
21 BY MR. WADDELL:
22 Q.        Al Britton was the general manager of
23 the track?
24 A.        Yes, sir.

Page 425

1  Q.        Dickie Moore, Richard Moore, he was
2  the, what, general manager of racing or something
3  along those lines?
4  A.        Yes, sir.
5  Q.        How about Mr. Zimny, was he on the
6  committee at that time?
7  A.        I'm going to say no.  Not that I can
8  recall.  I don't recall him, no, not in 2008, I
9  don't recall Erich being on the committee at that
10 time.
11 Q.        Sir, I'm going to refer you to a
12 document that's already -- that is listed as an
13 exhibit in this case, it's Exhibit 39 as part of
14 a packet of documents.
15           Do you recognize -- can you see that
16 first of all?
17 A.        Yes, sir.
18 Q.        Do you recognize the document?
19 A.        Yes, sir.
20 Q.        Can you tell me what it is?
21 A.        Well, it's a letter from -- an
22 allocation saying that, you know, a stall
23 basically on -- how many stalls you get.
24 Q.        Can you see who signed it?

Page 426

1  A.        It says -- yeah, Randy Wehrman.
2  Q.        Do you see who it is addressed to?
3  A.        To Miss Mawing.
4  Q.        Do you see the date?
5  A.        Let me find it.
6            It says August 29th, 2008.
7  Q.        Do you see where it says based upon
8  the committee's review and then the exercise of
9  its discretion CTRS is unable to allocate any
10 stalls to you for the remainder of 2008?
11 A.        Yeah, I see it.
12 Q.        Now, there was a stall allocation
13 committee meeting sometime before August 29,
14 2008.
15 A.        Yes, sir.
16 Q.        Were you present at that meeting?
17 A.        Yes, sir.
18 Q.        Do you know why Miss Mawing had her
19 stalls taken away?
20 A.        No, sir.
21 Q.        Isn't it true that you were just
22 given a letter by Mr. Wehrman and told to give it
23 to her?
24 A.        What was that again?

Page 427

1  **Q.      Isn't it true that you were just**
2  **given this letter --**
3  A.      I was handed a letter to give to her,
4  yes.
5  **Q.      The racing secretary gave you that**
6  **letter and said give it to her?**
7  A.      Hand it out, yes, sir.
8  **Q.      You took it to -- took it down, I**
9  **think you said you gave it to Anthony?**
10  A.      When we delivered the letters from
11  Mr. Taylor we did hand her letter to Mr. Mawing,
12  yes, sir.
13  **Q.      About three minutes later she came**
14  **you to you?**
15  A.      Well, Mr. Mawing first approached us,
16  yes, sir.
17  **Q.      About three minutes, that time frame,**
18  **they're questioning this decision, correct?**
19  A.      What was that question again?
20  **Q.      They're asking why, you know, why**
21  **have the stalls been taken away?**
22  A.      Yes.
23  **Q.      What did you tell them?**
24  A.      I didn't know she'd have to go talk

Page 428

1  to Mr. Wehrman, because I didn't know what the
2  letter said.
3  **Q.      Did she ask you who was on the stall**
4  **committee --**
5  A.      At that time?
6  **Q.      -- that made the decision?  Yes.**
7  A.      Yes, she did ask who was on the stall
8  committee.
9  **Q.      Did you tell her Al Britton was on**
10  **the committee?**
11  A.      Yes, sir.
12  **Q.      Richard Moore?**
13  A.      Yes, sir.
14  **Q.      Randy Wehrman?**
15  A.      Yes, sir.
16  **Q.      Jim Taylor?**
17  A.      Jim Taylor.
18  **Q.      Yourself?**
19  A.      And myself.
20  **Q.      And Erich Zimny?**
21  A.      Well, if Erich was there, it had to
22  be his first one, too.  Because it was my first
23  one, too.
24  **Q.      Do you recall that you actually told**

Page 429

1  **her --**
2  A.      I know I had a conversation with her,
3  yes, sir, I do recall.  I don't recall saying
4  Erich's name, to be honest with you.
5  **Q.      Do you recall giving testimony in**
6  **this case by way of deposition where you did**
7  **mention his name as being on the stall committee?**
8  A.      I could have, yes, sir.
9  **Q.      There was no vote taken by the**
10  **committee whether or not to allocate stalls to**
11  **her, is that correct?**
12  A.      Not that I recall, no, sir.
13  **Q.      Were there any written minutes of**
14  **that meeting kept by anyone?**
15  A.      Not that I know, no, sir.
16  **Q.      Now, back at that time frame, what**
17  **was the criteria used by the stall committee to**
18  **allocate stalls to trainers?**
19  A.      What was the criteria?
20  **Q.      Yeah, to look at.**
21       **You were on the committee, what did**
22  **you guys look at?**
23  A.      In 2008 I couldn't tell you, no.
24  **Q.      You don't know?**

Page 430

1  A.      I'd be stretching, no, sir, I
2  couldn't tell you, no.
3  **Q.      Later did it change?**
4  A.      I can't say it's changed, it's just
5  more -- it's a lot more than just dealing with
6  seven starts a stall.
7  **Q.      Isn't it true when I took your**
8  **deposition you told me the criteria was you had**
9  **to have seven starts per stall, that was the**
10  **criteria used in 2008?**
11  A.      I'm going to say, yeah, that probably
12  would have been a criteria.
13  **Q.      You didn't mention to me anything**
14  **about winning percentages used in 2008, did you?**
15  A.      I'm going to say, I don't recall it,
16  no.
17  **Q.      Do you recall that at some point**
18  **Mr. Zimny started coming up with a chart that he**
19  **was using?**
20  A.      Yes, sir.
21  **Q.      This chart tracked how often a**
22  **trainer's started horses and percentages of wins**
23  **or percentages of money, I think is what you told**
24  **me?**

Page 431

1   A.       Yes, sir.
2   Q.       Do you remember that?
3   A.       Yes, sir.
4   Q.       When you say percentage of money, do
5   you mean percentage in the money?
6   A.       Well, no, it's the percentage of
7   what -- basically you're averaging what a horse
8   would be making, what he makes.
9   Q.       How is that calculated?
10  A.       I don't know, I couldn't tell you.
11  Q.       That was a new thing that Mr. Zimny
12  started at some point, correct?
13  A.       Yes, sir.
14  Q.       I think he started that in December
15  of 2009, is that your understanding?
16  A.       That would be my understanding, yes,
17  sir.
18  Q.       No chart like that tracking winning
19  percentages were used in 2008, correct?
20  A.       Again, that was my first one.  I'm
21  going to say no, you know.
22  Q.       It wasn't used at the meeting you
23  went to?
24  A.       Not that I know of, not that I

Page 432

1   recall.
2   Q.       In fact, isn't it true that if you're
3   taking all of the stalls away from a trainer you
4   don't even make that decision in the meeting,
5   isn't that true?
6   A.       I can't say that.  I mean, I don't
7   follow your question, but...
8   Q.       Okay.
9            I think you told me that if you're
10  reviewing a -- you're sitting in the committee,
11  you're reviewing trainers who have applied for
12  stalls.  And if a committee is going to decide
13  whether to take some away or give some, that's a
14  decision that's usually made in the meeting.
15  Do you remember the --
16  A.       Yes, sir.
17  Q.       You said, however, if you're taking
18  stalls completely away, that decision is not made
19  in the committee meeting?
20  A.       I don't recall that.
21  Q.       You don't?
22  A.       No, I don't.
23  Q.       The decision, first of all, the
24  decision to take stalls away from Tina Mawing was

Page 433

1   not made in that committee meeting, correct?
2   A.       No, sir, not that I recall.
3   Q.       How many other -- do you remember how
4   many other trainers had stalls taken away in that
5   committee meeting, all their stalls taken away?
6   A.       In 2008?
7   Q.       Yes, sir.
8   A.       No, sir.
9   Q.       Do you remember telling me James
10  Williams, Junior Hostler and Patty Burns were the
11  other three?
12  A.       That wouldn't have been in 2008.
13  Q.       When was that?
14  A.       Well, I mean, that's just people that
15  lost their stalls.
16  Q.       All their stalls?
17  A.       Right, at one point in time.
18  Q.       Do you know why James Williams lost
19  all his stalls?
20  A.       Not now, I would never be able to
21  tell you now.
22  Q.       Okay.
23           Well back in -- I believe your
24  deposition was taken in April of 2010.

Page 434

1            Do you remember me asking you, do you
2   know why Mr. Williams had all his stalls taken?
3   A.       Not in 2008.  Go ahead.
4   Q.       Well, here is your answer in the
5   deposition.
6            Yes, sir, I know why Mr. Williams
7   lost his stalls.  Because of his care of his
8   horses.
9            And my question was, substandard
10  care, substandard care of his horses?
11           You answered, yes, sir.
12           Does that refresh your recollection
13  that --
14  A.       Yeah, James Williams was stabled in
15  Barn 20.  And he did have some horses down there
16  that was basically left with no bedding and
17  things of that nature.
18           ARBITRATOR KARLIN:  I'm
19  sorry.  What was that?
20           THE WITNESS:  He had horses
21  stabled in Barn 20 at that point in time.  And
22  they were left with no bedding, no water, stuff
23  of that nature.  That's what got him in trouble.
24  BY MR. WADDELL:

Page 435

1  Q.      In fact, you're the one who reported
2  that?
3  A.      Yeah, I probably am the one that
4  reported it.
5          Well, actually, Danny Fry reported it
6  to me and then I reported it to my boss.
7  Q.      How about this other gentleman you
8  mentioned that had all stalls taken, Mr. Hostler,
9  do you know why he had his stalls taken away?
10 A.      Same thing, animal neglect.
11 Q.      What about Patty Burns, do you know
12 why she had her stalls taken away?
13 A.      No, sir.
14 Q.      Okay.
15         Do you remember me asking you in
16 2010, when they want to take, remove stalls
17 completely from a trainer, that's something
18 that's just not discussed at the allocation
19 meeting?
20 A.      What was --
21 Q.      Do you remember me asking a question,
22 when they want to take -- well, let me start a
23 page earlier.  This is Page 72.
24         I was asking you in this particular

Page 436

1  part of the deposition about George Yetsook.
2          And I said, did he not receive a
3  letter taking away all his stalls?
4          Do you remember me asking you that?
5  A.      Uh-huh, yes, sir.
6  Q.      And I said -- oh, and your answer
7  was, no -- your answer was, no, sir.  Oh, he did
8  receive a letter recently you're talking about?
9          And I said, yes.
10         Your answer was, yes, he did.
11         I said, were you involved in
12 delivering that letter?
13         Do you remember saying yes?
14 A.      Yes, sir.
15 Q.      Then I asked you the reason his
16 stalls were taken away?
17 A.      You mean all of them or just --
18 Q.      Yeah, all of them.
19 A.      You might have asked me.  I don't
20 know.
21 Q.      Do you remember what your answer was?
22 A.      What was my answer?
23 Q.      Your answer was, that wasn't
24 something that would have been discussed at one

Page 437

1  of our -- that was my -- I'm sorry, that was my
2  question.
3          That wasn't something that would have
4  been discussed at one of your --
5          You answered, committee meetings.
6          I finished my question, allocation
7  committee meetings?
8          You said, no, sir.
9          Do you remember that testimony?
10 A.      Yes, sir.
11 Q.      My question next was, that would have
12 been decided by upper level manager?
13         Your answer was -- do you remember
14 what it was?
15 A.      I would have said yes.
16 Q.      Then my next question was, when they
17 went to remove stalls completely from a trainer,
18 that's something that is just not discussed at
19 the allocation meeting.
20         Do you remember what your answer was?
21 A.      I probably would have said yes right
22 there.
23 Q.      Then my next question was, you have
24 to idea of the reason why they would want to do

Page 438

1  that, correct?
2          You said, what?
3  A.      No.
4  Q.      And I asked you, again, with regard
5  to Tina Mawing, you have no idea why they took
6  the stalls away from her, do you?
7  A.      When you say stalls --
8  Q.      All the stalls at this --
9  A.      At that point in time I have no idea,
10 no, sir.
11 Q.      Because it wasn't discussed at your
12 meeting?
13 A.      Not that I recall, no, sir.
14 Q.      You were at that -- well, he took it
15 down.
16 But at that time period, August 29, when all her
17 stalls were taken away, during that time period,
18 you were the backside --
19 A.      Administrator.
20 Q.      -- administrator?
21         Were there about 140 vacant stalls at
22 that time?
23 A.      I would say yes.
24         MR. WADDELL:  Thank you, I

Page 439

1  have nothing further.
2         ARBITRATOR KARLIN:  Was that
3  vacant stalls vacant because they weren't
4  allocated or vacant because they were allocated
5  but empty?
6         THE WITNESS:  That's the
7  Catch 22.
8         When you go looking at, I could say
9  there would have been -- if somebody had asked me
10  in 2008 again, I could say there could have been
11  80 stalls that was empty that was allocated and
12  30 empty because it wasn't allocated.
13        But when you're asking me how many
14  stalls are empty, like, right now, you could say
15  that back then there was probably 140 stalls.
16        But honestly for me to tell you was
17  it allocated or not?  I couldn't, because, like I
18  said, I just took the job a month earlier.
19        ARBITRATOR KARLIN:  Well, is
20  it safe to assume that a significant number of
21  those were not allocated?
22        THE WITNESS:  It's a
23  significant amount to say that most of there were
24  allocated.  That would be my say, that most of

Page 440

1  them are allocated.  That's where a lot of people
2  see empty stalls, because they're allocated to
3  trainers, and then some are left empty for a
4  period of time.
5         ARBITRATOR KARLIN:  But some
6  were unallocated?
7         THE WITNESS:  Yes, sir.
8         ARBITRATOR KARLIN:  You just
9  don't remember how many?
10        THE WITNESS:  No, sir, I
11  couldn't give you a definite answer.
12        ARBITRATOR CARNEY:  Your
13  testimony is that there was actually no
14  discussing of Miss Mawing's stall application at
15  the stall allocation meeting?
16        THE WITNESS:  Not that I
17  recall, no, sir.
18        ARBITRATOR KARLIN:  Let me
19  understand, you're sitting in the allocation
20  meeting in 2008 as you recall it?
21        THE WITNESS:  Yes, sir.
22        ARBITRATOR KARLIN:  And
23  somebody comes up and -- somebody gives you -- at
24  the meeting, Mr. Wehrman handed you --

Page 441

1         THE WITNESS:  No, sir.
2         ARBITRATOR KARLIN:  When did
3  he hand you the letter?
4         THE WITNESS:  That letter
5  wasn't given to me until days after the meeting.
6         ARBITRATOR KARLIN:  Was there
7  any discussion at the meeting about Miss Mawing?
8         THE WITNESS:  Not that I
9  recall, no, sir.
10        ARBITRATOR KARLIN:  Then
11  Mr. Wehrman, some days after the meeting, comes
12  up and said, give this letter to her?
13        THE WITNESS:  Actually, it
14  was weeks later when they did all the allocation
15  letters and they was given to us, the letters
16  given to everybody.
17        ARBITRATOR KARLIN:  You
18  didn't know what was in the letter at the time?
19        THE WITNESS:  No, sir.
20        ARBITRATOR KARLIN:  And he
21  just -- he was the racing secretary at the time?
22        THE WITNESS:  Yes, sir.
23        ARBITRATOR KARLIN:  I don't
24  have anything else.

Page 442

1         ARBITRATOR WYCOFF:  After
2  your discussion with Mrs. Mawing when she asked
3  you about the letter and why they were taken
4  away, did you have any conversations with anybody
5  in management of the track and ask why they were
6  taken away or that they told you why they were
7  taken away?
8         THE WITNESS:  No, sir.
9         MR. WADDELL:  I just have a
10  few more.
11  BY MR. WADDELL:
12  Q.     During this time period, again
13  focusing on August of 2008, you were familiar
14  with Miss Mawing's upkeep of her barn area,
15  weren't you?
16  A.     Yes, sir.
17  Q.     Was there any problem with that that
18  you're aware of?
19  A.     No, sir.
20  Q.     You're aware of her horses, the
21  quality of her horses?
22  A.     I know her horses.  I mean, you know,
23  I don't get into the quality, I'm not the racing
24  secretary.

Page 443

1  **Q.       That's not really your --**
2  A.       That's his decision there.
3  **Q.       Are you aware of whether she had**
4  **violated any rule of the track at that time?**
5  A.       Well, she did when she went in other
6  peoples' stalls is the only thing I could tell
7  you.
8  **Q.       That was a different meeting at a**
9  **different time, correct?**
10  A.       Yes, sir.
11  **Q.       I'm talking about during this period**
12  **of August 2008, was there any allegation she had**
13  **violated any track rule?**
14  A.       No, sir.
15  **Q.       I mean sitting here today, can you**
16  **think of any, based on any of the criteria you**
17  **were aware of that would support taking away**
18  **stalls, was there any criteria that she violated**
19  **that you're aware of that would have supported**
20  **taking away all her stalls?**
21             MS. SCRIVANI: I'm going to
22  object, he is asking to speculate. He said he
23  didn't know the reason why her stalls were taken.
24             MR. WADDELL: I'm asking a

Page 444

1  different question.
2             ARBITRATOR CARNEY: Go ahead
3  and answer the question.
4             THE WITNESS: No, sir.
5             MR. WADDELL: Thank you.
6             MS. SCRIVANI: I believe we
7  have an agreement that in order to avoid calling
8  Mr. Elliott back, I would -- because I would call
9  him in my case that I can just proceed with my
10  questions. Is that fair for everyone?
11             ARBITRATOR CARNEY: It
12  certainly makes sense to do so.
13             MS. SCRIVANI: I'll try not
14  to cover any ground duplicatively.
15             * * *
16        D I R E C T  E X A M I N A T I O N
17  BY MS. SCRIVANI:
18  **Q.       Mr. Elliott, I want to understand,**
19  **you're employed by Penn National, right?**
20  A.       Yes, ma'am.
21  **Q.       Who is it that you take your**
22  **direction from at Penn National?**
23  A.       The racing secretary.
24  **Q.       Who is employed by?**

Page 445

1  A.       PNGI.
2  **Q.       I want to talk a little bit more**
3  **about the stall allocation committee.**
4             **You've already identified for us who**
5  **is on it. Where do the meetings take place?**
6  A.       Mr. Britton's office.
7  **Q.       And how many times a year do those**
8  **meetings take place?**
9  A.       Twice.
10  **Q.       Can you describe for us the process**
11  **of those meetings?**
12             **Let me start with, who leads the**
13  **meetings?**
14  A.       Usually the racing secretary.
15  **Q.       And is there a procedure he follows**
16  **at every meeting in terms of the order of people**
17  **discussed?**
18  A.       We'd just go down alphabetized from
19  the barn area.
20  **Q.       So you start with people already with**
21  **stalls?**
22  A.       Yes, ma'am.
23  **Q.       You just do that alphabetically?**
24  A.       Yes, ma'am.

Page 446

1  **Q.       How does the amount of requests for**
2  **stalls compare with the amount of stalls that you**
3  **have available to allocate?**
4  A.       Well, it's been, if we -- I mean, if
5  you allocate it to anybody that asks you, you
6  would have to have 4,000 stalls.
7  **Q.       So there is more requests than you**
8  **have available?**
9  A.       Yes, ma'am.
10  **Q.       When you go down the alphabetized**
11  **list of trainers already on the property, do you**
12  **have a discussion about every single one of them?**
13  A.       Oh, No, ma'am.
14  **Q.       Do you discuss any of them?**
15  A.       I mean, not at any lengths or
16  anything. We're just looking for, you know, how
17  many stalls they're asking for and, for that
18  nature, and what they already have. If we can
19  accommodate them, we'll give them a couple more,
20  we'll talk it out.
21  **Q.       Is there ever a disagreement among**
22  **committee members about an allocation?**
23  A.       Sometimes, but not really -- not that
24  I can really recall any serious differences or

Page 447

1  anything like that.
2  Q.      Any recall any fists flying over --
3  A.      Oh, No, ma'am.
4  Q.      -- allocations?
5  A.      No, ma'am.
6  Q.      Nothing like that?
7        Has that been your understanding of
8  the process since you've been on the committee?
9  A.      Yes, ma'am.
10  Q.      What happens when you get to the end
11  of the list of people who are already on
12  property?
13  A.      Well, like I say, then we usually
14  bring out the people that is acquiring to be new.
15  Like I say, we'll -- we can discuss them, talk
16  about -- see what they're asking for and
17  hopefully we can bring some new people in.
18  Q.      How many stalls do you typically have
19  left available after you've been through the
20  people already on the property?
21  A.      Like I said, the last couple
22  allocations when we went through, we didn't
23  roughly have 70 stalls to give out to new people.
24  Q.      You had more requests than you had --

Page 448

1  A.      Stalls.
2  Q.      -- available?
3  A.      Yes, ma'am.
4  Q.      Is there any way in which the new
5  people are addressed, is that done alphabetically
6  or how is that done?
7  A.      No, it's just done by -- like I said,
8  the racing secretary will get most of them, you
9  know.  He reads over it, and, you know, he might
10  talk with Erich, you know, and see somebody
11  that -- you know, like if you'd get a Todd
12  Pletcher or somebody that's come to your
13  property, naturally you would try to help them
14  guys.
15        And that's what they look for, just
16  see what kind people are coming, what quality of
17  horses they can bring.
18  Q.      Why would a Todd Pletcher be someone
19  you'd be interested in?
20  A.      Well, you're looking for big name
21  people.  I mean, I bring his name up, I'm not
22  saying he would come.  But, you know, anybody of
23  that nature.  I mean, Shug McGaughey, I mean,
24  anybody of that stature, you're going to want in

Page 449

1  your barn.  I mean, it just puts you back on the
2  map more with thoroughbred racing.
3  Q.      Who is Shug McGaughey?
4  A.      Well, Shug McGaughey is a big time
5  trainer.  I mean, I've known him since I was a
6  kid when I was in the State of Maryland working.
7  He is a very good trainer.  He has the horse Orb.
8  Like, he is just a well known trainer around this
9  area.
10  Q.      Did he have any horses run in any
11  recent nationwide races?
12  A.      Yes, ma'am.  He runs on the Belmont
13  and the Derby.
14  Q.      Has an employee of the State Racing
15  Commission ever been at any stall allocation
16  meeting?
17  A.      No, ma'am.
18  Q.      Has any member of the State Racing
19  Commission ever instructed any member of the
20  stall allocation committee to provide stalls to a
21  trainer?
22  A.      No, ma'am.
23  Q.      Has any employee of the State Racing
24  Commission ever instructed the stall allocation

Page 450

1  committee to take stalls away from a trainer?
2  A.      Not to my knowledge, No, ma'am.
3  Q.      Sir, I'd like to turn your attention
4  now to the spring of 2008 when you were acting
5  racing secretary, is that right?
6  A.      Yes, ma'am.
7  Q.      Did there come a time when you were
8  approached by a trainer concerning Miss Mawing
9  having horses in that trainer's stalls?
10  A.      Yes, ma'am.
11  Q.      Who was the trainer that approached
12  you?
13  A.      George Yetsook.
14  Q.      Can you please explain to the Panel
15  the circumstances under which Mr. Yetsook
16  approached you?
17  A.      Yeah.  Mr. -- I mean,
18  Mr. Yetsook -- and this goes back, if we want to
19  fall back, to November of 2007.  Mr. Yetsook and
20  Miss Mawing came to the identifier's office.  And
21  as I said --
22        COURT REPORTER:  Came to
23  what?
24        THE WITNESS:  To the

Page 451

1  identifier's office, the horseman's identifier's
2  office.
3          And they had asked if they could
4  borrow a couple of stalls for the weekend.
5          At that time, like I said, Mr. Lamp
6  had just resigned, three placing judges was let
7  go, and I was acting in charge. And I told them
8  I had no issues with that. And that was in the
9  conversation.
10         March of the following year
11  Mr. Yetsook came back to complain that Miss
12  Mawing was stealing the stalls and would not get
13  out.
14  BY MS. SCRIVANI:
15  Q.      The stalls that she was supposed to
16  have for a weekend in November?
17  A.      Yes, ma'am.
18  Q.      What did you do with that
19  information?
20  A.      I took that information to Mr. Moore
21  at the time and went upstairs with it and talked
22  to Dickie. And then Mr. Moore talked about it,
23  we did a tattoo check.
24  Q.      Can you explain to the Panel what a

Page 452

1  tattoo check is?
2  A.      A tattoo check, we basically go down
3  to the barn -- when I say we, it was me,
4  Mr. Taylor and Danny Fry who is the state
5  inspector and we flip every horse in the barn and
6  check the tattoo.
7  Q.      What do you do with the information
8  that you learn from the tattoo?
9  A.      We bring it back and give it to the
10  racing secretary. Then, of course, we have to
11  sit in front of a computer and punch every tattoo
12  in to bring up every horse, and they want to know
13  who they are.
14  Q.      What did you learn when you did the
15  tattoo check in Miss Mawing's barn?
16  A.      In Barn 14 we found that Miss Mawing
17  was in two of Mr. Yetsook's that we knew, and two
18  of Mr. Richard P. Butts', and Ronnie J. Wilt, one
19  of his.
20  Q.      Was there a consequence for finding
21  those horses in those stalls?
22  A.      Yes, Mr. Butts lost two stalls,
23  Mr. Yetsook lost two stalls and Miss Mawing lost
24  five, Mr. Wilt lost a stall.

Page 453

1  Q.      Did Mr. Wilt lose any?
2  A.      One.
3  Q.      Was the barn, the tattoo check
4  limited to Barn 14 at that time?
5  A.      No, ma'am.
6  Q.      You checked other barns?
7  A.      Yes, ma'am.
8  Q.      Did you find a similar problem in
9  other barns with trainers having horses in stalls
10  that they didn't belong to?
11  A.      At that same time frame?
12  Q.      Around that time.
13  A.      You know, we have found several
14  times, but I can't recall anybody in that time
15  frame, No, ma'am.
16  Q.      Have you done tattoo checks regularly
17  since then?
18  A.      We try to do them on a regular basis.
19  Being shorthanded sometimes we don't get to do
20  them as much as we had. But we try to do them at
21  least twice a month.
22  Q.      Do you find trainers have horses in
23  other trainers' stalls?
24  A.      Yes, ma'am. I mean, it's just like I

Page 454

1  say before, with complaints. People complain to
2  us, we'd go down. Barn 17, I want to say it was,
3  like, February of this year, Mr. Dale Shockey,
4  who is a trainer at our property, had let
5  Mr. Peter Basios (phonetic) put four horses in
6  his stalls. So Mr. Basios has lost the three
7  stalls that was allocated to him and then plus
8  Mr. Shockey lost the four that he left somebody
9  else have.
10  Q.      Are the consequences the same for
11  every trainer when they violate this rule?
12  A.      Yes, ma'am.
13  Q.      Sir, at the time of the August 2008
14  stall allocation committee meeting, did you know
15  one way or the other whether Miss Mawing was a
16  member of the board of directors of the HBPA?
17  A.      No, ma'am, I didn't know.
18  Q.      At the time of that meeting, again,
19  did you know whether or not Miss Mawing had
20  testified the prior fall on Mr. Funkhouser's
21  behalf in the Forest Park hearing?
22  A.      No, ma'am.
23  Q.      At the time of the meeting in August
24  2008, did you know whether or not Miss Mawing

Page 455

1  had, in the weeks before, attended a meeting with
2  Governor Manchin?
3  A.      No, ma'am.
4              MS. SCRIVANI:  I have nothing
5  further, thank you.
6                  *  *  *
7        C R O S S - E X A M I N A T I O N
8  BY MR. WADDELL:
9  Q.       Sir, let me follow up with a few
10  questions.
11           This time frame in April, I guess it
12  was, in 2008, when you're alleging that
13  Mr. Yetsook made it -- was it around that time,
14  in April?
15  A.      March.
16  Q.       March.  You're alleging Mr. Yetsook
17  complained that Miss Mawing had horses in his
18  stalls?
19  A.      Stalls, in two stalls.
20  Q.       How many?
21  A.      Two.
22  Q.       Now, originally I think you said
23  three months prior to that or some time frame
24  along those lines --

Page 456

1  A.      In November.
2  Q.       -- they had asked for permission to
3  put those horses in the stalls --
4  A.      Yes, sir.
5  Q.       -- is that correct?
6  A.      Yes, sir.
7  Q.       Okay.
8           You gave them permission at that
9  time?
10  A.      Yes, sir.
11  Q.       Now, it was not unusual, was it, for
12  trainers to come to a racing secretary and ask
13  for permission to put a horse in another
14  trainer's stall, that wasn't unusual, was it?
15  A.      No, sir.
16  Q.       It wasn't a violation of any rule
17  that the track had that you're aware of?
18  A.      No, because they come and ask.
19  Q.       So as long as you have -- you've
20  asked it, you got permission, it's not a
21  violation of any rule?
22  A.      That's what I would say, no, sir.
23  Q.       There was no written rule at that
24  time, regardless of whether there was an

Page 457

1  unwritten rule, correct?
2           There is no written rule what says
3  you have to do that?
4  A.      Have to do, what's that?
5  Q.       Get permission.
6  A.      It's not a written rule, but it's an
7  etiquette thing, I mean, we've got to know.  You
8  just can't put horses in other people's stalls.
9  They knew that.  Everybody knows they just can't
10  put them in somebody else's stalls.
11  Q.       Sure.  It's a common understanding
12  that you go and you tell the racing secretary or
13  someone who, like yourself, who is in charge of
14  the barns, if you're doing that, correct?
15  A.      Right.
16  Q.       But as long as you do that, it's
17  accepted practice, correct?
18  A.      To a point.  I mean, because now
19  you're reaching.  Because, I mean, if a
20  lady -- what I was saying, if she answered -- if
21  horses get out, at a time, if you're saying
22  you're going to leave the horses in there for a
23  weekend, if they're gone by Monday, we're all
24  good, everybody is happy.

Page 458

1  Q.       I understand you're saying it's only
2  for a weekend, that is the testimony?
3  A.      That's what they asked for.  I mean,
4  that's what I recall them asking for.
5  Q.       Have you seen this letter before?
6  A.      I've seen them, I haven't seen this
7  one.
8  Q.       This -- you see the signature at the
9  bottom?
10  A.      Richard Moore?
11  Q.       Yes.
12  A.      Uh-huh.
13  Q.       He is the general manager of
14  racing --
15  A.      Yes, sir.
16  Q.       -- at this time?
17           You see the date, April 25th, 2008?
18  A.      Yes, sir.
19  Q.       Is it your understanding this is the
20  notice to Miss Mawing that she's losing four
21  stalls out of the nine that she had and that this
22  is because of this incident you're talking about
23  where there were horses in other trainers'
24  stalls?

Page 459

1   A.      Yes, sir.
2   **Q.      What I'm directing your -- down at**
3   **the bottom it says, take note that you do not**
4   **have permission to occupy any other stalls at**
5   **CTRS or to allow any other individual to use**
6   **stalls allocated to you without the written**
7   **permission of the racing secretary or assistant**
8   **racing secretary.**
9          **Do you see that notice?**
10  A.      I see it, yes, sir.
11  **Q.      That was not the case at the time you**
12  **went down and were looking at those stalls where**
13  **she had some horses in other trainers' stalls?**
14  **In other words, there was no requirement at that**
15  **time that you get written permission from a**
16  **racing secretary or assistant racing secretary,**
17  **correct?**
18  A.      None that I would have known of.
19  **Q.      So this is a new rule?**
20  A.      I can't say it's new, I didn't know
21  of it. I'm just saying I didn't know of it. I
22  don't --
23  **Q.      Well, you were --**
24  A.      I wasn't the racing secretary.

Page 460

1   **Q.      You were in charge of the barn,**
2   **though?**
3   A.      But I -- well, that doesn't mean I
4   knew these. Them I didn't see. I never even
5   seen that letter to tell you the truth.
6   **Q.      To your knowledge there was no**
7   **requirement at the time that you -- she lost**
8   **these stalls that she had written permission, is**
9   **that true?**
10  A.      No, not that I know of, no, sir.
11         MR. WADDELL: I have nothing
12  further.
13         MR. WOLFSON: Nothing.
14         ARBITRATOR KARLIN: I have a
15  couple questions. I'm confused.
16         So she lost four stalls, correct?
17         THE WITNESS: Yes, sir.
18         ARBITRATOR KARLIN: But she
19  was also supposed to get out of the stalls that
20  she wasn't supposed to be in?
21         THE WITNESS: Yes, sir.
22         ARBITRATOR KARLIN: Now, just
23  a couple more things.
24         You said that at any given time, am I

Page 461

1   correct, that there may be a number of stalls
2   that have not been allocated?
3          THE WITNESS: Yes, sir, it
4   changes.
5          ARBITRATOR KARLIN: But if
6   there is more requests for stalls than there are
7   stalls, am I correct in assuming that sometimes
8   it's decided not to give people stalls, even
9   though there are available stalls?
10         THE WITNESS: Depends on the
11  circumstances.
12         Like I said, it depends on what
13  they're bringing in to put in them stalls.
14         ARBITRATOR KARLIN: Well, so
15  if some people may -- you may look at their
16  applications but it may be determined that
17  they're not the kind of trainer or the kind of
18  horses that you want to give free stalls to?
19         THE WITNESS: That could be
20  true, yes, sir.
21         ARBITRATOR KARLIN: I mean,
22  that happens?
23         THE WITNESS: Yes. Could be.
24         ARBITRATOR KARLIN: And

Page 462

1   that's why even though there are more requests
2   for stalls than there are stalls, there
3   nonetheless remain some stalls unallocated at any
4   given point in time?
5          THE WITNESS: At any given
6   point in time.
7          ARBITRATOR KARLIN: You were
8   racing secretary at one point?
9          THE WITNESS: No, sir, I was
10  acting.
11         ARBITRATOR KARLIN:
12  Assistant.
13         THE WITNESS: I was assistant
14  racing secretary for Dougie Lamp. And when
15  Mr. Lamp resigned, I took the position until
16  Mr. Wehrman was hired.
17         ARBITRATOR KARLIN: How did
18  you get the position of acting racing secretary?
19         THE WITNESS: Well, like I
20  said, Dougie Lamp had resigned in November,
21  sometime in late November. And I was his
22  assistant. And I just got called in by
23  management and Dickie and them -- they asked me
24  if I wanted the job. I technically did not want

Page 463

1  the job. I just filled in the position until
2  somebody came and took it.
3              ARBITRATOR KARLIN: Do you
4  know how racing secretaries are supposed to be
5  appointed under the law?
6          Do you know, has anyone ever talked
7  to you about it?
8              THE WITNESS: No, sir. No
9  one's ever talked to me about it.
10             ARBITRATOR KARLIN: Do you
11 know if the racing commissioner has anything to
12 do with appointing or approving racing
13 secretaries?
14             THE WITNESS: Not that I know
15 of, no, sir.
16             ARBITRATOR KARLIN: When you
17 were given the position of acting racing
18 secretary, who was it that told you you were
19 acting racing secretary?
20             THE WITNESS: Mr. Moore.
21             ARBITRATOR KARLIN: Did he
22 tell you what your duties were or anything in
23 particular?
24             THE WITNESS: I mean, racing

Page 464

1  secretary -- I mean, being in the horse business
2  it's -- I mean, when you've a been in this
3  business as long as I have, it's pretty cut and
4  dry. I mean, you just got a job to do. And one
5  is for racing secretary. Your biggest thing as
6  being the racing secretary is you're nursemaid to
7  a lot of people. But you got to put out a
8  Condition Book. That is the toughest thing to
9  being the racing secretary is writing a Condition
10 Book.
11             ARBITRATOR KARLIN: Do you
12 know if any of the duties of the racing
13 secretary -- do you know or did you know that if
14 any of the duties of the racing secretary are
15 regulated by state laws or regulations?
16             THE WITNESS: No, sir.
17             ARBITRATOR KARLIN: If they
18 are, when you were appointed, nobody told you
19 that?
20             THE WITNESS: Nobody told me,
21 no, sir.
22             ARBITRATOR KARLIN: I don't
23 have anything further.
24             MS. SCRIVANI: I have a

Page 465

1  follow-up on that.
2              * * *
3     R E D I R E C T   E X A M I N A T I O N
4  BY MS. SCRIVANI:
5  Q.        Sir, do you have a license or
6  occupational permit by the State?
7  A.        Yes, ma'am.
8  Q.        Are you obligated to have it?
9  A.        Yes, ma'am.
10 Q.        Is everybody on the back -- anybody
11 who enters the backside of the racetrack
12 obligated to have an occupational permit?
13 A.        Yes, ma'am.
14             MS. SCRIVANI: That's it.
15             MR. WADDELL: I have nothing.
16             ARBITRATOR CARNEY: Anything
17 further?
18             MR. WADDELL: Nothing from
19 me.
20             ARBITRATOR CARNEY: You're
21 excused.
22             MR. HAMMER: Can we take a
23 short break?
24             ARBITRATOR CARNEY: Yes.

Page 466

1              * * *
2           (Brief break)
3              * * *
4              MR. HAMMER: So the parties
5  have stipulated to the following with regard to
6  George Yetsook who we've agreed not to call in
7  light of this stipulation. Parties have agreed
8  not to call in light of the stipulation.
9          1, Yetsook did not complain to anyone
10 that Tina Mawing was using stalls allocated to
11 Yetsook.
12         2, Yetsook lost two stalls in April
13 2008 in connection with having horses in other
14 trainers' stalls. This was the same audit in
15 which Miss Mawing had stalls reduced.
16         3, Yetsook took no legal action at
17 that time to regain those stalls.
18         4, Yetsook was allocated zero stalls
19 in December 2009. Yetsook initiated arbitration
20 to regain the five stalls he had in the
21 allocation immediately preceding December -- the
22 December 2009 allocation.
23             And 5, Yetsook awarded -- Yetsook was
24 awarded five stalls through the end of 2011 in

Page 467

1  arbitration.  Yetsook received five stalls in
2  each allocation since then.
3          MR. WOLFSON:  To be clear,
4  we're testifying -- that is what he would testify
5  if called.
6          ARBITRATOR CARNEY:  Yeah.  We
7  understand that is his testimony.  You're not
8  stipulating that those are the facts, but that is
9  what he would testify to.
10          MR. WOLFSON:  Yes.
11          ARBITRATOR KARLIN:  I
12  understand that.  But are not the arbitration
13  -- the arbitration result --
14          MR. WOLFSON:  That is, there
15  is no dispute as to that.  The only reason I
16  stood up is there is obviously a dispute as
17  to --
18          ARBITRATOR KARLIN:  Whether
19  he complained to anyone?
20          MR. WOLFSON:  That's it.
21  Everything else is not in dispute.
22          ARBITRATOR KARLIN:  That's
23  what I figured.
24          ARBITRATOR CARNEY:  Do I

Page 468

1  understand then that the stipulation is what he
2  would be asked, what he would testify to, it was
3  with respect to complaints or lack of complaints,
4  and stipulation at the other point is stipulation
5  period.
6          MR. WOLFSON:  I will leave
7  that to them.  I think that's accurate.
8          MR. HAMMER:  Yes.
9          MR. WOLFSON:  We're
10  stipulating that is the testimony.  I don't think
11  there is any argument or dispute as to the facts
12  regarding --
13          ARBITRATOR CARNEY:  Other
14  than the --
15          MR. WOLFSON:  Exactly.
16          ARBITRATOR KARLIN:  Do we
17  have -- I'm trying to remember if we have
18  testimony of whether Yetsook played any role in
19  the Funkhouser case or anything like that?
20          MR. HAMMER:  He testified in
21  the Funkhouser case.  There was testimony about
22  that.
23          ARBITRATOR KARLIN:  There
24  was.  I just couldn't remember as we sit here.

Page 469

1          MR. HAMMER:  Yetsook was not
2  present at the meeting with the Governor.
3          MR. WOLFSON:  That's the
4  testimony.
5          ARBITRATOR KARLIN:  Okay.
6          ARBITRATOR CARNEY:  Mr.
7  Hammer, do we have any more live witnesses?
8          MR. HAMMER:  We have no more
9  live witnesses.  The rest are by transcript.
10  And, of course, the defense reserves the right,
11  and I think is, calling its various --
12          MR. WOLFSON:  We plan on
13  putting on a defense, yes.
14          ARBITRATOR CARNEY:  Well
15  let's go through --
16          ARBITRATOR WYCOFF:  If I
17  could ask one thing.
18          Are you guys going to ask for sort of
19  a closing argument to us after you finish your
20  case?
21          MR. WOLFSON:  I anticipated
22  making one.  But, of course, that is up to the
23  Panel.
24          ARBITRATOR WYCOFF:  So in

Page 470

1  that argument, we haven't read those depositions.
2  Will you be discussing them and pointing out to
3  us these are the highlights of what this guy will
4  testify to and --
5          MR. HAMMER:  If you would
6  like us to do that we can.  My suggestion is,
7  since you'll likely require post arbitration
8  briefs based upon the record, that we would be
9  able to give you our full position based upon the
10  record including those depositions rather than
11  taking your time sitting here saying, see this,
12  see this, see this.
13          MR. WADDELL:  If you think
14  the closing would help clarify our positions,
15  we'll be happy to do it.  But, I think -- if you
16  want that.  Otherwise, we would propose we just
17  post arbitration --
18          ARBITRATOR WYCOFF:  We'll
19  discuss that before the next break, or something
20  like that.
21          MR. HAMMER:  In our briefs
22  we'll be saying which portions --
23          ARBITRATOR WYCOFF:  I
24  understand that.  But I wanted to know whether

Page 471

1  you wanted to highlight anything live in sort of
2  an argument.  Because we don't know how all those
3  depositions play into this.
4            ARBITRATOR KARLIN:  Yeah, the
5  missing pieces.
6        Is there much in the deposition about
7  what the racing secretary is?
8            MR. HAMMER:  I think in
9  Mr. Wehrman's deposition you'll find that
10  discussion.  I would also refer you to --
11            ARBITRATOR WYCOFF:  We're
12  still going to find out.
13            MR. HAMMER:  You can take
14  judicial notice that the statute itself is what
15  governs the races.
16            MR. WOLFSON:  There will be
17  testimony.
18            ARBITRATOR KARLIN:  Okay.
19  I --
20            ARBITRATOR CARNEY:  Before
21  Mr. Wolfson starts his case, let's just go
22  through these exhibits and make sure we know
23  which ones the parties have agreed on and which
24  depositions we want.

Page 472

1            Now, we've got Claimant 1 the
2  agreement.
3            Any objection to that admission?
4            MR. WOLFSON:  No.
5            ARBITRATOR CARNEY:  Claimant
6  2 is the Funkhouser decision.  Any objection to
7  that?
8            MR. WOLFSON:  Was that -- I
9  don't remember that being used.
10            ARBITRATOR CARNEY:  That's
11  the decision in the Funkhouser trial.
12            MR. HAMMER:  I actually moved
13  its admission during Mr. Funkhouser's testimony.
14            MS. SCRIVANI:  He didn't know
15  the exhibit number.
16            MR. WOLFSON:  Oh, that's
17  right.  It speaks for itself.
18            ARBITRATOR CARNEY:  Claimant
19  3 is a page from the January 2008 stall
20  agreement.
21            MR. WOLFSON:  Was that even
22  used?
23            MR. HAMMER:  I think given
24  the Panel's ruling on the issue of exclusive

Page 473

1  bargaining agent, I think that exhibit is
2  irrelevant.  So you can withdraw it.
3            ARBITRATOR CARNEY:  That's
4  -- I'll say withdrawn.
5            MR. HAMMER:  Yes.
6            ARBITRATOR CARNEY:  4 is the
7  4/29/08 meeting minutes.  And we were clear that
8  they're admitted only for limited purpose.  One,
9  showing Miss Mawing's state of mind.  And two,
10  corroborating her testimony that she complained
11  at the meeting.  But they're not admitted for
12  purpose of proof of the matter asserted by other
13  members of the...
14        Now, 5 is the May 20, '08 letter to
15  Hale -- stall wrongly occupied.
16            COURT REPORTER:  I'm sorry,
17  what was that again?
18            MR. WOLFSON:  That wasn't
19  used.
20            ARBITRATOR CARNEY:
21  Occupied --
22            MR. WOLFSON:  I don't believe
23  that was used.
24            MR. WADDELL:  We'll withdraw

Page 474

1  that.
2            ARBITRATOR CARNEY:  Okay.
3  That is withdrawn.
4            Then Exhibit C-6 is the Ehrlich bill.
5  Any objection to that?
6            Admitted.
7            Exhibit C-7 is a document I don't
8  think we referred to before, but the bill from
9  the veterinarian for the horse that died, I
10  assume.
11            MR. WOLFSON:  We had used
12  that.
13            MR. WADDELL:  You used it?
14            MR. WOLFSON:  Yeah.
15            MR. WADDELL:  That's fine.
16            MR. WOLFSON:  You don't have
17  any objection to it?
18            MR. HAMMER:  We don't have
19  any objection to it.
20            ARBITRATOR CARNEY:  Okay.
21            Exhibit C-8 is a sworn statement of
22  for --
23            MR. WOLFSON:  That was not
24  used.

Page 475

1  MR. WADDELL: That wasn't
2  used.
3  ARBITRATOR CARNEY: That's
4  withdrawn.
5  Exhibit C-9 is --
6  MR. WOLFSON: That is
7  superseded by the photos?
8  MR. WADDELL: I believe so,
9  C-9 is just the photocopy, we have the originals
10  already --
11  ARBITRATOR WYCOFF: The same
12  as 40?
13  MR. HAMMER: Essentially the
14  same, there are several differences, I think.
15  Those are the ones she actually took to the
16  Governor.
17  ARBITRATOR KARLIN: Since
18  those are going in the official record, could we
19  at least get photocopies of those today? Maybe
20  someone here making so I can know exactly which
21  photos are actually in evidence.
22  MR. HAMMER: Yes, we could
23  probably make color photocopies for you back at
24  our office.

Page 476

1  ARBITRATOR KARLIN: Whatever,
2  I would just like to have a set of what is
3  actually in evidence. That would be No. 40?
4  MR. WADDELL: 40A through F
5  with the exception of E.
6  COURT REPORTER: It was just
7  on regular paper.
8  MR. WOLFSON: 10 was not
9  used, right?
10  MR. WADDELL: 10, no.
11  ARBITRATOR CARNEY: So we
12  aren't taking pictures in C-9 but we're taking
13  the pictures in C-40?
14  MR. WOLFSON: Yes, sir.
15  ARBITRATOR CARNEY: Now, C-10
16  is a Carroll Butler bill.
17  MR. WADDELL: We'll withdraw.
18  ARBITRATOR CARNEY: C-11 is a
19  pesticide investigation.
20  MR. WOLFSON: That's in.
21  ARBITRATOR CARNEY: C-12 is a
22  8/19 statement to the Agriculture Department.
23  MR. HAMMER: Yes, we did use
24  it and testified about it, yes.

Page 477

1  MR. WOLFSON: Fine, we're not
2  going to argue over it.
3  ARBITRATOR CARNEY: C-18 is a
4  September, December 2008, stall agreement.
5  ARBITRATOR WYCOFF: 13. You
6  said 18.
7  ARBITRATOR CARNEY: That
8  again is withdrawn, because that went for the
9  association claim.
10  MS. SCRIVANI: This is part
11  of 39.
12  MR. WOLFSON: No, this is
13  part of 39.
14  MR. HAMMER: Yeah, so all of
15  these in the claimant's exhibits that are stall
16  applications or letters granting or denying
17  stalls, those are all part of Exhibit 39 now.
18  ARBITRATOR KARLIN: But was
19  C-13 ever --
20  MR. HAMMER: Yeah, C-13 was
21  used. That's the September to December 31, 2008,
22  stall application.
23  ARBITRATOR KARLIN: Was it
24  referenced -- I know it's also included in the

Page 478

1  other one. All I'm saying is was it referred to
2  in --
3  MR. HAMMER: Miss Mawing did.
4  ARBITRATOR KARLIN: -- in
5  connection with a witness, then we should keep
6  that in.
7  MR. WOLFSON: Whoa, whoa,
8  time out. As C-13 or part of 39?
9  MR. HAMMER: As part of 39.
10  ARBITRATOR KARLIN: So no one
11  ever said C-13.
12  MR. HAMMER: No one said
13  C-13.
14  MR. WOLFSON: That's what I
15  was trying to clarify.
16  ARBITRATOR CARNEY: Then C-14
17  the Hale letter to Manchin.
18  MR. WOLFSON: It wasn't used.
19  MR. HAMMER: I don't think it
20  was used.
21  MR. WADDELL: Let's withdraw
22  it.
23  ARBITRATOR WYCOFF: Is that
24  withdrawn?

Page 479

1          MR. WADDELL: Withdrawn, yes.
2          MR. WOLFSON: I don't think
3   there is anything further used until 27.
4          MR. WADDELL: What about the
5   February 2009 HBPA agreement, that was referenced
6   in testimony.
7          ARBITRATOR KARLIN: Which
8   one, I'm sorry?
9          MR. WADDELL: C-17.
10          MR. HAMMER: The 2009 copy.
11          MR. WOLFSON: I think it was
12   talked about.  We can leave it in if you want,
13   it's not a problem.  C-17 is in.  It wasn't used,
14   I may have used my copy, my version, that's fine.
15   It doesn't matter.
16          ARBITRATOR CARNEY: What
17   about the next --
18          MR. WOLFSON: 18 we didn't
19   use as an exhibit.  It is what it is, it's in the
20   pleadings.
21          MR. HAMMER: Yeah, we think
22   it's going to come in.  We're going to use it,
23   so...
24          MR. WOLFSON: You can use it.

Page 480

1          MR. HAMMER: Yeah, we're
2   going to.  We haven't yet, but we will.  So
3   don't --
4          MR. WOLFSON: So 17 --
5          ARBITRATOR WYCOFF: Which
6   number?
7          MR. HAMMER: C-18.
8          ARBITRATOR CARNEY: 18 and 19
9   are a part of the pleadings, so we'll admit
10   those.
11          MR. WOLFSON: 20 was not
12   used.
13          ARBITRATOR CARNEY: C-20?
14          MR. WADDELL: 20 is
15   withdrawn.
16          ARBITRATOR CARNEY:
17   Withdrawn.
18          C-21?
19          MR. WOLFSON: I don't have
20   C-21 in here.  What is it?
21          MR. HAMMER: It's the
22   declaration of Erich Zimny given in Federal
23   Court.
24          MR. WOLFSON: I guess, you're

Page 481

1   going to use it in Cross-Examination.
2          MR. HAMMER: It should be in
3   your binder.
4          MR. WOLFSON: We actually
5   don't have a copy in here.
6          It's all right, don't worry, we'll
7   get it later.
8          MR. WADDELL: I thought we
9   put it in the binder.
10          MR. HAMMER: It is in the
11   binder.
12          MR. WOLFSON: Whatever, we
13   can get a copy later, I'm not worried about it.
14          ARBITRATOR KARLIN: So leave
15   that?
16          MR. HAMMER: Leave that,
17   we're going to use it.
18          MR. WOLFSON: For the time
19   being.
20          MR. HAMMER: It's a filing.
21          ARBITRATOR CARNEY: Memo of
22   law in support of defendant's motion for summary
23   judgment.
24          MR. WADDELL: We withdraw 22.

Page 482

1          ARBITRATOR CARNEY: Stall
2   application is withdrawn.  And that goes to C-23,
3   24 and 25.
4          MR. WADDELL: Correct.
5          ARBITRATOR CARNEY: C-26 is a
6   check?
7          MR. WADDELL: Yes.
8          MR. WOLFSON: We used those
9   as ours.  I think they were admitted under the
10   respondent's No. 15 and 33.  You can leave them
11   in here, too, it doesn't make a difference.
12   That's up to you folks.
13          ARBITRATOR CARNEY: C-27 is
14   the material on the rat pellets.
15          MR. HAMMER: Yes, we used
16   that.
17          MR. WOLFSON: That was
18   admitted, I think, for limited purpose as well.
19          ARBITRATOR CARNEY: Subject
20   to my recollection to the fact that that talked
21   about pellets where the Ehrlich bill talked about
22   powder?
23          C-28 was yearly damages.
24          MR. HAMMER: Wasn't that the

Page  483

1   one that we agreed was substituted?
2          MR. WOLFSON:  Yes, that's not
3   operative.  It's not --
4          ARBITRATOR CARNEY:  That's
5   been replaced, if I recollect, by --
6          MR. WOLFSON:  R-34 I think it
7   was.
8          ARBITRATOR CARNEY:  I think
9   damage calculations.
10         Now we have a series of depositions.
11         The Britton deposition, that's in.
12  Moore deposition, and that's in.  The Zimny
13  deposition, and that's in.
14         There is the Wehrman deposition, and
15  that's in.
16         We have the Elliott deposition.  Do
17  we have -- we've had testimony from Mr. Elliott.
18  Is there any reason to have his deposition?
19         MR. WADDELL:  I would prefer
20  for you to have the deposition as well.
21         MR. WOLFSON:  I don't know
22  that it's necessary -- I mean, I don't know that
23  it matters.  I don't see what it adds.  He
24  testified, but...

Page  484

1          ARBITRATOR KARLIN:  So you're
2   not objecting?  I don't care, I just want to move
3   it.
4          MR. WOLFSON:  If they want it
5   in, that's fine.
6          ARBITRATOR CARNEY:  The
7   Taylor deposition is in.
8          The Finamore deposition was admitted.
9   36 is invoices.
10         MR. WADDELL:  We didn't use
11  invoices.
12         MR. WOLFSON:  We did, we used
13  our copies of the invoices.
14         ARBITRATOR CARNEY:  So we'll
15  say that's withdrawn.
16         37 and 38 are, again, stall
17  agreements.  Withdrawn.
18         39 is a consolidated group of stall
19  applications and rulings on Miss Mawing, that's
20  in.
21         40 is the pictures of rat poisoning,
22  rats, that's in.
23         41 is the damage estimate, that's in.
24         And 42 is the letter we talked about

Page  485

1   this morning, Mr. Finamore.  And that's in.
2          Now, are you moving admission of any
3   exhibit from the respondent?
4          MR. HAMMER:  Well, we used
5   our damages statement, the one we substituted our
6   exhibit with their exhibit.  So we would move the
7   admission of that damages statement.
8          ARBITRATOR CARNEY:  Somebody
9   has to pick up what exhibit that is.
10         MS. SCRIVANI:  34.
11         MR. WOLFSON:  Yeah, 34.
12         ARBITRATOR CARNEY:  24.
13         MR. WOLFSON:  34.
14         ARBITRATOR CARNEY:  Okay,
15  we'll admit that.
16         Any other exhibits from the
17  respondent's collection?
18         If you come up with something later
19  on, we'll deal with it then.  But right now it
20  looks like we've gone, at least, all through your
21  exhibits.
22         So at this point, Mr. Wolfson, I
23  guess the ball is in your court.
24         MR. WOLFSON:  First, we would

Page  486

1   move for judgment as a matter of law, or the
2   arbitration equivalent, as to the 1983 claim and
3   the retaliation claims.  Essentially the claims
4   for attorneys fees.  We would move as to those.
5   There really is no evidence whatsoever in the
6   record that the respondent in this case took any
7   action in retaliation from Miss Mawing testifying
8   at the Forest Park hearing.
9          And secondly, there is no evidence
10  whatsoever that as to the 1st Amendment claim or
11  the 1983 claim that that can survive.  Both as a
12  matter of law and as a matter of fact.
13         As to the 1983 claim, there is just
14  no evidence in the record at this point, nor
15  frankly will there be, upon which it can be
16  determined either that my client was a state
17  actor, that there was a property interest or
18  finally that the Governor was acting in such a
19  way to direct my client to not award stalls to
20  Miss Mawing.
21         And I encourage the Panel, to the
22  extent they have questions about this argument,
23  I'm happy to address them.  Because I really do
24  believe that, first, there is no evidence as to

Page 487

1  the retaliation.  There is absolutely zero
2  evidence that my client took any action based
3  upon the testimony that Miss Mawing gave at that
4  time.
5        And secondly, with respect to the
6  1983, or the 1st Amendment claims, again,
7  similarly, there is no evidence to support those
8  claims in the record.  And secondly, as a matter
9  of law, they have to fail.
10       So for the reasons I stated yesterday
11 as well as today, I'm not going to belabor,
12 you've heard the arguments before, the Panel has
13 deferred ruling on them until the claimant had an
14 opportunity to present the evidence.  And there
15 just isn't any.
16       For that reason, we would move to
17 have these dismissed at this time.
18       ARBITRATOR CARNEY:  The one
19 thing we asked you to address specifically was
20 prejudice that you suffered from allowing the
21 plaintiff to, in fact, amend other claims,
22 include a claim for retaliation under the West
23 Virginia statute.
24       MR. WOLFSON:  Yes.

Page 488

1        Well, as to that, and I'm just
2  frankly going to somewhat repeat what we've said
3  already, and I'm hesitant to do that.
4        It really does get to the opportunity
5  to fully address that and that specific statue in
6  discovery, fully investigate the defenses and
7  fully inquire during discovery.
8        To the extent it would have been
9  substantially different, I'm not going to try to
10 mislead the Panel, it very well may not have
11 been.
12       But really one of the biggest issues
13 we had is just the surprise.  And that I would
14 submit to the Panel is what should be avoided in
15 these matters.
16       So, as a result, I would submit that
17 the prejudice is the surprise, the lack of
18 opportunity.  But more importantly, as I've said
19 previously, it's just a lack of evidence to
20 support it, which in many ways goes to the
21 surprise that when there is nothing there, there
22 is no there there, than to have to be faced with
23 a new allegation.
24       ARBITRATOR KARLIN:  Is there

Page 489

1  a defense, do you think -- and I understand most
2  of your argument except for this.  Is there a
3  defense you could have presented under the
4  statute that you would not otherwise have
5  presented without the statute?
6        In other words, the argument, as long
7  as there is a factual argument, whatever the
8  evidence is, that the testimony was somehow a
9  motive or part of a motive for the removal of the
10 stalls.  To the extent that that is a factual
11 argument that was in the case before the statute
12 came in.  You agree that was in the case before
13 the statute came in?
14       MR. WOLFSON:  Without a
15 question.
16       ARBITRATOR KARLIN:  So once
17 the statute came in, is there some different
18 defense under the statute that doesn't exist
19 prior to the statute coming in?
20       MR. WOLFSON:  Well, I do
21 think there is a subtle difference, yes, there
22 is.  And what I would submit is that under the
23 way we've been focusing on this case, it's all in
24 connection with her activity on behalf of the

Page 490

1  HBPA.  So we've been focusing on whatever she
2  did, how did that fit into her position as an
3  HBPA board member.  It fit into her position as a
4  board member taking action.
5        So we investigated the entire
6  retaliation issue as a board member.  That is why
7  even when we were questioning her, you know, to
8  the extent we were focusing on what she did and
9  what she did as a board member, that goes into
10 the distinction I made in my opening.
11       About when she went to the Governor's
12 meeting, for example.  Talking about the
13 contractual issues and had we taken action
14 because of that.  And that's the subtle
15 difference I do think goes into play which is
16 solely the retaliation, solely based on whether
17 she is an HBPA board member or not.  This case
18 was always solely, even from the time we first
19 discussed with you the discovery, it all related
20 to, how does it fit into her position as an HBPA
21 board member and how was it retaliation because
22 of activities she took on behalf of the HBPA?
23 That's the difference.
24       ARBITRATOR WYCOFF:  But isn't

Page 491

1  there a fact that the Governor did make a
2  derogatory or incendiary statement of, who is
3  this crazy lady?
4          And isn't there a fact that Finamore,
5  after hearing that, directed an official of the
6  track to consider that in the stall allocation
7  and it's a fact that stalls were removed.  And
8  all of those you can infer, cannot an arbitration
9  or a jury panel infer from that, that there was
10  action taken as direction of the Governor?
11          MR. WOLFSON:  What I would
12  submit, I have case law on that, both for the
13  counsel and the Panel.
14          ARBITRATOR WYCOFF:  I thought
15  you might.
16          MR. WOLFSON:  May I?
17          And very specifically there are two
18  cases directly on point here.
19          The first case in your -- there is
20  the Hessami and the Givens case.
21          And simply making an allegation of a
22  conversation between a government official and a
23  private official that then causes the private
24  official to take action, that is not sufficient.

Page 492

1          The simple fact -- simple fact that a
2  conversation such as this, the case law -- the
3  Hessami case is really right on point.
4          Simply because the Governor discussed
5  this.  And then that caused even, let's make the
6  assumption that that caused the track to take
7  away the stalls.  That alone is not enough.
8          What they have --
9          ARBITRATOR CARNEY:  Before
10  1983?
11          MR. WOLFSON:  That's right.
12          What they have to demonstrate is that
13  the private party must establish an agreement or
14  an understanding, not simply an allegation or
15  even a conversation, there must be affirmative
16  proof of the agreement.  Affirmative proof of a
17  concerted effort, acting together.
18          So, in other words, there would have
19  to be an understanding or agreement in a place
20  between the Governor on the one hand and my
21  client on the other to take negative action with
22  respect to Miss Mawing.  Not simply that the
23  Governor said, what about this crazy lady, isn't
24  this terrible?

Page 493

1          In fact, the claimant's evidence
2  regarding the Governor's intent is to be a
3  mediator.
4          So there is no evidence whatsoever of
5  the concerted action or an explicit agreement
6  between the Governor on the one hand and my
7  client on the other.
8          So the point there is, under the case
9  law, they can't rely on that conversation to get
10  the state action.
11          ARBITRATOR WYCOFF:  Do you
12  have any counter law or disagree with the cases?
13          MR. WADDELL:  I haven't seen
14  the cases.  I mean, we would ask for time to
15  respond to these cases.  This is the first time
16  we were presented with this argument.  I didn't
17  even know we were having arguments like this in
18  arbitration.  I thought we would hear all the
19  evidence and then we present findings of fact and
20  conclusions of law, but...
21          ARBITRATOR KARLIN:  Let me
22  ask a different question, I don't know what's in
23  the depositions, first of all, so it's hard for
24  me to reach a decision on it.  But I'd like you

Page 494

1  to address the role of the racing commissioner.
2  I had thought, and maybe I've got it wrong, that
3  under the statutes and regs in West Virginia,
4  even at that time, the racing commissioner, even
5  though he was a private employee -- excuse me,
6  the racing secretary, was technically appointed
7  by the racing commissioner --
8          MR. WOLFSON:  No, no, no, no,
9  no.
10          ARBITRATOR KARLIN:  That's a
11  different racing secretary --
12          MR. WOLFSON:  Let's be clear.
13  The racing secretary is not appointed at any
14  time, never was, has never been by the racing
15  commission.  The racing --
16          ARBITRATOR KARLIN:  The
17  racing secretary has no state role?
18          MR. WOLFSON:  Like many
19  industries, there is an individual who has
20  certain responsibilities with respect to
21  regulated industries, but he's still a PNGI
22  employee appointed by, subject to, disciplined
23  by, fired by PNGI.  He is --
24          ARBITRATOR KARLIN:  I guess I

Page  495

1   had it all wrong.  I thought there was a statute
2   somewhere that said the commissioner shall
3   appoint a racing secretary.
4               MS. SCRIVANI:  Can I address
5   that briefly?
6               MR. WOLFSON:  Yeah.
7               MS. SCRIVANI:  Yes, there is
8   an executive secretary of the racing commission
9   who sometimes is called the racing secretary.
10  But that's a commissioned employee, it has
11  nothing to do with us.
12              MR. WOLFSON:  I misunderstood
13  the question.  Thank you, Stacey.
14         That gets to the commission that took
15  away Mr. Finamore's license.
16              MS. SCRIVANI:  Funkhouser.
17              MR. WOLFSON:  Funkhouser,
18  Excuse me.  What did I say?
19              MS. SCRIVANI:  Finamore.
20              ARBITRATOR CARNEY:  There is
21  a requirement that the tracks have a racing
22  secretary.
23              MR. WOLFSON:  There is a
24  requirement the track have one.  So they hire

Page  496

1   them, they pay them, they fire them, they
2   discipline them.  If they aren't happy with them,
3   they get rid of them.  So it actually has nothing
4   to do with the commission and the State.
5   Does that --
6               ARBITRATOR KARLIN:  Yeah.
7               MR. WOLFSON:  --  address the
8   question?
9         Okay.
10              ARBITRATOR WYCOFF:  I think
11  we should take a break.
12              MR. WOLFSON:  Thank you.
13              * * *
14         (Brief break)
15              * * *
16              ARBITRATOR CARNEY:  The Panel
17  has discussed the various arguments.  And here is
18  what we're going to do.
19         We're going to allow the plaintiff,
20  claimant to amend their claim to include a claim
21  for retaliation in violation of the West Virginia
22  statute.  We're going to defer ruling on the
23  defendant's, respondent's motion to dismiss both
24  the Section 1983 claim and the retaliation under

Page  497

1   the West Virginia statute claim until the close
2   of the case, because we need to give the
3   arbitrators a chance to look at the cases cited,
4   we need to give the claimants a chance to
5   respond.
6         So we'll go ahead and we'll hear from
7   the respondents.
8               MR. WOLFSON:  Very well.
9               MS. SCRIVANI:  Then we'll
10  call Mr. Zimny as our first witness.
11              * * *
12         ERICH ZIMNY
13  being first duly sworn, was examined and
14  testified as follows:
15              * * *
16              ARBITRATOR CARNEY:  Excuse
17  me, just one moment.  Off the record.
18              * * *
19         (Whereupon, a discussion was
20  held off the record.)
21              * * *
22
23
24

Page  498

1    D I R E C T   E X A M I N A T I O N
2   BY MS. SCRIVANI:
3   Q.      Mr. Zimny, would you please state
4   your name for the record?
5   A.      My name is Erich Zimny.
6   Q.      By whom are you employed?
7   A.      PNGI Charles Town Gaming, L.L.C.
8   Q.      What is your title with them?
9   A.      I'm the vice president of racing
10  operations.
11  Q.      How long have you been employed by
12  PNGI?
13  A.      A little over five years, I got there
14  in April of 2008.
15  Q.      What was your position when you
16  started?
17  A.      The title is racing administrator.
18  Q.      Have you had other positions since
19  becoming the vice president of racing operations?
20  A.      Director of racing was in the interim
21  between those two titles.  Functionally the job
22  was fairly similar, though.
23  Q.      Could you tell us a little bit about
24  your educational background?

Page 499

1   A.      I have a bachelor of arts from
2   Georgetown, '98. Law degree and an MBA from
3   Rutgers in '03. And a masters in science from
4   the University of Arizona in '07.
5   **Q.      Was there a concentration for your**
6   **masters in science from the University of**
7   **Arizona?**
8   A.      Yeah, it's done through the school of
9   agriculture. It's essentially an MBA with a
10  focus on racetrack management. It's called the
11  racetrack industry program. And the University
12  of Arizona has the preeminent one in the country.
13  **Q.      Can you tell us a little bit about**
14  **what your job functions are and have been?**
15  A.      Sure, it's in parts to oversee the
16  racing office; oversee the mutual's department,
17  which is the department who handles the wagering
18  on the track. It's both day to day stuff, long
19  term planning. And in over the last, I'd say, 18
20  months to 24 months, I've gotten involved in what
21  I would call product development at some of our
22  other tracks. As you heard we own eight or nine
23  other, you know, racing facilities. And I've
24  gotten involved there as well.

Page 500

1   **Q.      Are you involved in the allocation of**
2   **stalls at PNGI?**
3   A.      I'm part of the stall allocation
4   committee.
5   **Q.      We're going to come back to that.**
6   **Can you just give a physical description to the**
7   **Panel as to what the racetrack is like, what's**
8   **there?**
9   A.      Sure, we have a racetrack -- our
10  racetrack is three quarters of a mile in
11  circumference, most tracks are a mile, ours is a
12  little bit smaller.
13         We have 20 barns in our stable area.
14  19 of them are for horses, for trainers who are
15  allocated stalls that stay on the grounds. Then
16  there is roughly 50 of them, 50 stalls that are
17  in a receiving barn for people who ship in to
18  race at our track from wherever. It can be out
19  of state, it can be in state, it can be wherever.
20  So there is about 1,350 stalls in our barn area
21  all totaled.
22         Across the street is a training track
23  where the horses in the morning can, you know,
24  train. And that's adjacent to the private barn

Page 501

1   area that you may have heard some folks talk
2   about in the last two days.
3   **Q.      Is PNGI obligated by state law to**
4   **have barns at its track?**
5   A.      No, it is not.
6   **Q.      Is there a benefit to PNGI to having**
7   **barns?**
8   A.      Yes. I mean, you do as -- again, as
9   you've heard, you rely on horses to fill your
10  races. And there are horses on the grounds who
11  certainly do that.
12         In the harness racing industry, for
13  example, though, there usually are no barns on
14  the grounds, it's usually everyone ships in. But
15  thoroughbred racing in West Virginia, and pretty
16  much every track around the country has a barn
17  area like ours.
18  **Q.      What are some of the benefits to PNGI**
19  **in having barns?**
20  A.      Well, the horses, there is obviously
21  the expectation of the horses who inhabit them
22  are going to race and run and contribute
23  positively to our business. That's the No. 1
24  aim, certainly.

Page 502

1   **Q.      In what way does having full barns**
2   **contribute to your business?**
3   A.      The more horses you have to race,
4   then, generally speaking, the more horses you
5   have to race, the more money is wagered on those
6   races. Bettors do tend to like more horses per
7   race. That's obviously a sliding scale, because
8   when the quality enhances, you can get away with
9   a shorter field versus bad horses and a lot of
10  them.
11         You rely on the horses on our
12  grounds. And really more on the mid Atlantic
13  than anything to fill those races and help us
14  with our pari mutuel handle.
15  **Q.      Is PNGI the only one who benefits**
16  **from an increased handle?**
17  A.      No, that's -- the increase in handle
18  is cut 50/50 basically between us and the
19  horseman. Whatever commissions are retained, we
20  get half, they get half. Their half goes to
21  purses.
22  **Q.      Of the 1,350 and so stalls on the**
23  **backside, is there an obligation for PNGI to**
24  **allocate a number of those to HBPA members?**

Page 503

1  A.        As per contract, 1,148 stalls must be
2  allocated.  And since I've been there, that has
3  been exceeded every time.
4  Q.        By how much?
5  A.        By almost 200.  I mean 150 to 200.
6  The idea -- as Michael Elliott had said, with the
7  30 stalls that might get leftover at the end,
8  true that's some of them -- you could be putting
9  someone in there that is a net negative for your
10  business, that is definitely true.  You also like
11  to keep a small buffer in case you have so many
12  ships that the receiving barn can't hold them
13  all or you are to get some very high profile
14  applicant in the interim.  You know, 20 or 30
15  stalls is a very, very small percentage of the
16  number that are on the grounds that you do want
17  to keep as a little bumper.
18              ARBITRATOR WYCOFF:  Excuse
19  me.  Sorry to interrupt, it was going nicely.
20              But since you're getting away from
21  the overview, I was curious as to, does the State
22  divide it up that, like, the Charles Town track
23  doesn't have any competitors within X number of
24  miles or counties and how far away are the

Page 504

1  nearest competing racetracks?
2              THE WITNESS:  That's a very
3  good point, because it is very challenging in the
4  mid Atlantic because within maybe a four  or five
5  hour van ride, you have -- I could count them,
6  but there's probably, six, seven, eight tracks
7  that people can run at.  Delaware Park.  Tracks
8  in Maryland where they have the Preakness at
9  Pimlico, you can get there in 90 minutes.  Our
10  sister track, Penn National, you can get there in
11  two hours.  The competition for horses and
12  betting money in the region is pretty fierce.
13              ARBITRATOR KARLIN:  What
14  about in West Virginia, though, what is the
15  nearest track?
16  A.        Mountaineer across the state, on the
17  other side of the state, we actually compete less
18  with them, believe it or not, than we do with
19  some of the tracks in Maryland, or Delaware, or
20  even Pennsylvania.
21  BY MS. SCRIVANI:
22  Q.        You talked a little bit about the
23  split in handle with the HBPA, is there any other
24  part of PNGI's business at Charles Town that goe

Page 505

1  to the HBPA?
2  A.        There is a statutory delegated amount
3  from the video lottery terminals and from the
4  table games that goes into the horseman's purse
5  fund.
6  Q.        You heard Mr. Elliott testify earlier
7  that the number of requests for stalls at
8  allocation time exceeds the amount of stalls you
9  have.
10              Do you agree with that testimony?
11  A.        Yes, I do.
12  Q.        Let's talk a little bit about the
13  allocation process.
14              I think we've identified, for the
15  Board, the members of the committee.
16              I want to have you talk about the
17  racing secretary.  You've heard we had some
18  questions about the racing secretary's job.
19  By whom is the -- let me back up.
20              Who is the current racing secretary
21  at the track?
22  A.        It's Charlie McIntosh.
23  Q.        Immediately before him it was?
24  A.        Randy Wehrman.

Page 506

1  Q.        With respect to both of those
2  gentlemen, who hired them?
3  A.        With respect to Randy, he was hired
4  by our company, Dickie was the one who hired him.
5  Charlie Macintosh was hired by our company, he
6  was hired by myself.
7  Q.        His paycheck comes from?
8  A.        From our company, PNGI Charles Town
9  Gaming.
10  Q.        Who has the ability to fire either
11  Mr. McIntosh or Mr. Wehrman when he was there?
12  A.        That would be us as the company.
13  Q.        Are both of those gentlemen subject
14  to performance reviews by the company?
15  A.        Every year.
16              ARBITRATOR WYCOFF:  When
17  you're saying the company, on the record, who
18  exactly is the company you're referring to?
19              THE WITNESS:  I apologize,
20  PNGI Charles Town Gaming, L.L.C.
21              ARBITRATOR WYCOFF:  The
22  racetrack?
23              THE WITNESS:  The racetrack.
24              ARBITRATOR WYCOFF:  Not the

Page 507

1  parent company?
2         THE WITNESS:  Correct.
3  BY MS. SCRIVANI:
4  **Q.      You're employed by the racetrack and**
5  **not the parent company?**
6  A.      That's correct.
7  **Q.      There has been a little bit of**
8  **discussion here about whether there are some**
9  **regulations that govern some responsibility of**
10 **the racing secretary.**
11        **Are you generally familiar with those**
12 **regulations?**
13 A.      Yes.
14 **Q.      Has there been a recent change in the**
15 **racing regulations in West Virginia?**
16 A.      They changed, they hadn't been
17 updated in a long while and they were changed in
18 July, I believe, of 2010.
19 **Q.      Were you involved in the legislation**
20 **and changing the rules?**
21 A.      Yes, I was.
22 **Q.      In what capacity?**
23 A.      They had solicited a representative
24 from all the stake holders, the racetracks, the

Page 508

1  horseman's groups, the breeders.  And they all
2  met, probably, I don't know how many times, seven
3  or eight times, it's a pretty exhaustive process,
4  and they test us with rewriting the rules
5  essentially from front to back.
6  **Q.      In the rule -- prior to the change in**
7  **the rules, was there any reference in the racing**
8  **secretary's responsibilities to stalls?**
9  A.      No.  There was not any specific
10 reference to stalls, no, in the...
11 **Q.      Did that change when the legislation**
12 **changed?**
13 A.      Yes, it did.
14 **Q.      Can you explain how it became part of**
15 **the legislature?**
16 A.      Yeah.  There is also a group that's,
17 it's kind of a collaborative effort between the
18 University of Arizona and Louisville's Equine
19 studies program.  They have devised a set of
20 model rules, again to, you know, promote
21 uniformity in the industry.  Because with the
22 portability of horses, people -- you know,
23 different states have different rules.  They have
24 come up with these model rules.  And the section

Page 509

1  on the racing secretary was something that was
2  basically moved in from these model rules, which
3  are generally pretty good.
4  **Q.      I want to come back to that in a**
5  **minute.  But I want to close this out on the**
6  **legislation.  You just heard when we had argument**
7  **there was some question about a racing secretary,**
8  **whether it was appointed by the commission.**
9  **Is there a position that has the name secretary**
10 **in it that is appointed by the racing commission?**
11 A.      Yes.  And I -- it was very -- it was
12 confusing at the time.  And that was part of that
13 cleanup in 2010 to -- if you were a, I'd say, you
14 know, a layman, you wouldn't have -- you wouldn't
15 necessarily have known, but it was pretty clear
16 that that person was a commissioned employee.  It
17 was a woman named Linda Rutledge at the time.
18 And that person is strictly a commission person
19 as opposed to our racing secretary hired by us.
20 **Q.      What changed in order to clean it up**
21 **in the new regulations, the title?**
22 A.      Yeah, the title.  It might have gone
23 from executive secretary to executive director.
24 Something -- it was made a lot more clear in the

Page 510

1  statute.
2  **Q.      Now, back to the change in**
3  **regulations that specifically identifies stall**
4  **allocation as a responsibility of the racing**
5  **secretary, do the regulations contain any**
6  **explanation or description of what that**
7  **responsibility means?**
8  A.      No.
9  **Q.      At PNGI, has the role of the racing**
10 **secretary and allocations changed in any way as a**
11 **result of that change in regulation?**
12 A.      No, it has not.
13 **Q.      Can you explain to the Panel what the**
14 **racing secretary's responsibility for stall**
15 **allocation has been and continues to be --**
16 A.      Yeah.
17 **Q.      -- since you've been there?**
18 A.      Sure.  They were the one, he is the
19 one, it's always been a he, who puts out the
20 application of the horsemen, who collects them,
21 takes them in.  And he is the one who, as you've
22 heard, kind of directs the meeting.  Because he
23 is the one, again, who received all these
24 applications.  And he is a part of the committee.

Page 511

1  His input is taken just as anyone else's.
2  **Q.        Why is there a position of racing**
3  **secretary at the track, can you explain?**
4  A.        Well, the job, there are a lot of
5  facets to it.  I mean, they have to put together
6  the races, they have to -- everything that goes
7  on to the track at night that you see when you go
8  there as a fan starts in the racing secretary's
9  office with the racing secretary.  He is
10  responsible for writing the races, trying to fill
11  them.  He's got a lot of duties.  And it's
12  important to have someone oversee the office like
13  that.
14  **Q.        Are any of those duties, in order to**
15  **put the product on the track, authorized or**
16  **required by statute or is that part of the**
17  **business objective?**
18  A.        It certainly, I mean, the latitude to
19  do what he does to get that out there is all on
20  us.  I mean, I believe, he might be by the rules,
21  say the racing secretary or his designee or
22  office, is required to put out a racing program
23  or something like that.  But the latitude as to
24  how he gets there, that is on us.

Page 512

1  **Q.        You've mentioned that you were a**
2  **member of the stall allocation committee.**
3  **At any time have you -- has there been an**
4  **employee of the state racing commission who has**
5  **participated in stall allocation meetings.**
6  A.        Never.
7  **Q.        Have you ever been directed by a**
8  **racing commission employee concerning allocation**
9  **decisions?**
10  A.        No.
11  **Q.        Let's talk about the process for**
12  **evaluating.  You heard Mr. Elliott describe**
13  **physically what happens in terms of the order in**
14  **which you address people.**
15       **Do you agree with that?**
16  A.        Yes, we start with the people on the
17  grounds and go down alphabetically.
18  **Q.        Let's talk a little bit about the**
19  **factors that are considered in determining those**
20  **folks.**
21       **Let's start with what you consider**
22  **today at allocation meetings.**
23  A.        Sure, today, and I'm not so sure that
24  we didn't necessarily even consider it back then,

Page 513

1  I'd say more administrative tools at our disposal
2  to do that are a little more clear.  I mean, we
3  knew who would win at a higher rate or a lower
4  rate.  Now we just have some better descriptive
5  statistics to do that.
6       We'll take a look the their starts,
7  starts per stall, winning percentage, earnings
8  per start for both the previous -- usually now
9  the previous six months and the previous 12
10  months.
11  **Q.        Are there other things that are**
12  **considered by the committee?**
13  A.        Yeah.  You know, do they follow the
14  barn rules, keeping their area clean.  I would
15  like to just kind of lump it in under the more
16  behavioral aspect of it, as opposed to just the
17  simple statisticals, the objective metrics.
18  **Q.        Have you ever been in an allocation**
19  **meeting where the fact that a horseman is a**
20  **member of the HBPA board of directors was**
21  **discussed?**
22  A.        No.
23  **Q.        As you sit here today, are you aware**
24  **of, generally, who the HBPA board of directors**

Page 514

1  are?
2  A.        Very generally, I couldn't name them
3  all off the top of my head.
4  **Q.        But you deal with the board of**
5  **directors in your capacity?**
6  A.        I really don't deal with the board of
7  directors that directly.  I'll deal more with the
8  executive director of the HBPA typically.
9  **Q.        In terms of --**
10       ARBITRATOR WYCOFF:  Excuse
11  me, I didn't understand the question and the
12  answer that was given there a minute ago.
13       Are you saying that when you're doing
14  your stall allocation in the meeting that if
15  someone is on the board of directors of the
16  Horseman's Association they would not be
17  discussed in the meeting?
18       THE WITNESS:  No, I apologize
19  for not being clear.
20       No, it has never been discussed that
21  someone is on the board of directors.  That's
22  just not something --
23       MS. SCRIVANI:  My apologies,
24  that was an unclear question.  But he got it.

Page 515

1      ARBITRATOR WYCOFF: Thank
2  you.
3  BY MS. SCRIVANI:
4  Q.      But with respect to your knowledge
5  today of how stalls are allocated, let me back
6  up.
7          The board of directors of the HBPA, I
8  think Miss Mawing testified, is half owners and
9  half trainers, is that right?
10  A.      I believe that that's the makeup of
11  their board, right.
12  Q.      Who is allocated stalls, the trainers
13  or owners?
14  A.      The trainers are the ones allocated
15  the stalls.
16  Q.      Are you aware in general terms of the
17  allocation to members of the HBPA, either
18  directly to the trainers that are on the board or
19  the owners on the board who have trainers with
20  stalls?
21  A.      Yes, generally I am.
22  Q.      Can you tell us what that breakdown,
23  how that breakdown relates to the whole?
24  A.      Yes, I mean, there's -- we have more

Page 516

1  than 100 different trainers who have stalls in
2  our backstretch, probably somewhere between 100
3  to 120.  And anywhere between 20 and 30 percent
4  of those stalls are allocated to people who are
5  either on the HBPA board themselves or train for
6  owners who are on the HBPA board.
7  Q.      How frequently are allocations
8  completed?
9  A.      Every six months.
10  Q.      Are you aware of circumstances where
11  trainers have been, other than Miss Mawing, have
12  had their stalls zeroed out?
13  A.      Yes, I am.
14  Q.      Can you give us some examples of the
15  reasons why that has happened?
16  A.      Most recently in the last allocation
17  there was a gentleman, Raul Garrido, who had five
18  stalls on our grounds.  He has a bunch of horses
19  across -- I believe he had some on across the
20  street, I don't know how many.  And he was
21  essentially using these five stalls as a private
22  shipping and receiving barn.  And they were
23  empty a lot.  And we decided that these would be
24  better suited to be allocated elsewhere.  And

Page 517

1  Mr. Garrido was not allocated stalls.
2  Q.      How about some others?
3  A.      I remember Kevin Joy, and this was
4  going back several years now, where he was -- we
5  had very strong suspicions that he was acting as
6  a program trainer for somebody else.  What that
7  means is, somebody who was not allowed on the
8  grounds either by the commission or by us,
9  someone who cannot race at Charles Town, had
10  given him horses to train.  And that's a no, no.
11  And he lost all of his stalls.
12  Q.      Is there ever a time that the track
13  will take away stalls in the middle of an
14  allocation period?
15  A.      It can happen, it certainly can.
16  Someone who either refuses to move if -- a lot
17  of times -- with the number of horses we have,
18  the number of trainers, we do have to shift
19  people around the barn area sometimes, because
20  you like to keep all the people in one barn if
21  they have, you know, say, ten horses, you don't
22  like to split them up.  Sometimes people for
23  whatever reason literally refuse to move.  And
24  that can be a no, no as well.  And people have

Page 518

1  lost stalls for that.
2          Or if there is some other conduct
3  issue in the interim, that can be another reason.
4  Q.      Does the track keep a record of which
5  stalls are allocated to which trainers?
6  A.      The track does through a proprietary
7  software that we have, yes.
8  Q.      What is the purpose of keeping that
9  record?
10  A.      So you know which trainers are
11  allocated which stalls.  I mean, it can be
12  tough to keep track of 1,300 horses and stalls if
13  you didn't know who was supposed to be in them.
14  Q.      What happens when a trainer is found
15  in someone else's stall?
16  A.      They lose one stall for every horse
17  that that is the case with.
18  Q.      Other than Ms. Mawing, are you aware
19  of a situation where a trainer has lost as many
20  stalls for violating that rule of being in a
21  different trainer's stalls?
22  A.      As Mr. Elliott, I believe, said,
23  Mr. Basios.  There was a few.  I don't remember
24  if it was two, three, four or five.  But it was a

Page 519

1  handful that he had had in other people's stalls.
2  That's the only one I can think of off the top of
3  my head.
4  Q.      Do all the horses that race in your
5  races in the evening, are they all stalled on the
6  property?
7  A.      No, they're not.  About, I'd
8  say -- it used to be about 40 percent of them
9  ship in from other jurisdictions or other places,
10 it certainly could be within West Virginia.  Now
11 it's anywhere between 25 and maybe 35 percent.
12 It's gone down because Maryland, purses at the
13 tracks in Maryland have gone up and those horses
14 are just not leaving the Maryland tracks as much
15 to come to West Virginia to race.
16 Q.      Are there also people who ship in
17 locally who just have their horses on farms?
18 A.      Yes, I mean, Raul Garrido still runs
19 a lot of horses at our track.  There are people
20 that do that.
21 Q.      I want to direct your attention to
22 the April 2008 stall reduction for Miss Mawing
23 that we've been talking about.
24         Were you involved in any way in that?

Page 520

1  A.      In the meeting?
2  Q.      In the decision to reduce her stalls
3  in April of -- I'm sorry, April of 2008.
4  A.      I honestly don't recall any
5  discussion at that meeting.  I don't.
6  Q.      No, no.  Let me back up.  My question
7  was unclear.
8          April 2008 when Miss Mawing had a
9  reduction in stalls as a result of being in other
10 trainer's stalls, were you involved in any way in
11 the decision to reduce her stalls?
12 A.      No, I was -- I was -- I had not
13 really started my active job at that point.
14 Q.      Were you part of a meeting, but with
15 Miss Mawing, and Mr. Wehrman, and perhaps others,
16 when she claimed she complained about that
17 reduction in stalls?
18 A.      I have absolutely no recollection of
19 that meeting.
20 Q.      Were you aware in the summer of 2008
21 that Miss Mawing had a horse and a goat die while
22 on the backside of the property?
23 A.      I became aware of it at some point,
24 yes, later on.

Page 521

1  Q.      Did you know in the summer of 2008
2  about it?
3  A.      I don't recall, I don't think so, but
4  I can't say with 100 percent certainty.  I don't
5  believe I did.
6  Q.      Now, I want to direct your attention
7  to the August 2008 stall allocation meeting.
8  Was that your first meeting as a member of the
9  committee?
10 A.      Yes, it was.  I was there for that.
11 Q.      Do you have a recollection of that
12 meeting?
13 A.      Not only do I not have a recollection
14 of Miss Mawing's application not being discussed,
15 I don't have a recollection of any specific
16 horseman being discussed.  And not because they
17 weren't, just because, you know, there is 100
18 plus applications that go in front of you.
19 Q.      How long do committee meetings,
20 allocation committee meetings, typically last?
21 A.      They go a couple hours.  They used to
22 go a little bit longer.  Now that we have these,
23 like I said, more comprehensive, you know,
24 materials for the people on the committee, they

Page 522

1  tend to take a little less time.
2  Q.      At the time of that meeting did you
3  know that Miss Mawing was a member of the board
4  of directors of the HBPA?
5  A.      No, I did not.
6  Q.      At the time of that meeting did you
7  know that the prior fall Miss Mawing had
8  testified on Mr. Funkhouser's behalf at the
9  Forest Park hearing?
10 A.      No, I did not.
11 Q.      At the time of that meeting did you
12 know that a couple weeks prior she had met with
13 the Governor of West Virginia?
14 A.      No, I did not.
15 Q.      Are you aware that Miss Mawing has
16 subsequently applied for stalls in application
17 periods after August of 2008?
18 A.      Yes, I am.
19 Q.      Can you think of a time when she was
20 discussed at any of these meetings?
21 A.      No, I cannot.
22 Q.      Is it unusual for a trainer to not be
23 discussed at a stall allocation committee
24 meetings?

Page 523

1  A.        Trainers who are not allocated stalls
2  on the grounds and are dealt with kind of
3  separately after the ones on the grounds are
4  discussed.
5          The racing -- you know, there are not
6  many stalls out of that group that are eventually
7  allocated.  And you won't necessarily discuss all
8  of them.  You know, the racing secretary may have
9  a couple people he likes to, you know, he would
10 like to give stalls to.  It's usually going to be
11 a better outfit to get some new -- you know, who
12 may have been coming here for the first time in
13 order to get some new horses in.
14          So, no, it's not unusual for someone
15 to not be discussed.
16          ARBITRATOR CARNEY:  Are you
17 saying that once you're off the list of people
18 who you don't get -- that don't have stalls you
19 stay off that list?
20          THE WITNESS:  It can be.  But
21 it does happen where people do go off and then
22 are given stalls again.  Kevin Joy was given
23 stalls again ultimately.
24          ARBITRATOR CARNEY:  But

Page 524

1  normally, you're off -- once you're off, you're
2  off.
3          THE WITNESS:  It's more
4  difficult, I would certainly agree with that.
5          ARBITRATOR KARLIN:  Kevin Joy
6  was taken off for what reason?
7          THE WITNESS:  We had had some
8  pretty strong suspicions that he was not the in
9  fact trainer of the horses, that they were
10 actually there on behalf of someone else who is
11 not allowed to race at Charles Town.
12          And we, after some time had lapsed,
13 we had gotten comfortable with, through our own
14 people, gotten comfortable with that not being
15 the case anymore.
16          ARBITRATOR KARLIN:  But it
17 had been the case?
18          THE WITNESS:  It definitely
19 had been the case.
20          ARBITRATOR KARLIN:  He was
21 definitely violating the rule of the track?
22          THE WITNESS:  I think it's a
23 rule of both the track and -- yeah.  We had a
24 very strong suspicion that that was the case.

Page 525

1          ARBITRATOR KARLIN:  Yet he
2  was brought back?
3          THE WITNESS:  He was brought
4  back a few years later.
5          ARBITRATOR KARLIN:  A few
6  years later?
7          Let me just understand.  You've been
8  aware that there has been litigation going on in
9  this matter for how many years now?
10          THE WITNESS:  Five, I
11 suppose.
12          ARBITRATOR KARLIN:  During
13 those five years, Miss Mawing every six months
14 applied for stalls?
15          THE WITNESS:  I believe
16 that's correct, yes.
17          ARBITRATOR KARLIN:  That's
18 something you knew before today, right?
19          THE WITNESS:  Yeah.
20          ARBITRATOR KARLIN:  How long
21 have you known that she was re-applying for
22 stalls?
23          THE WITNESS:  I probably
24 would have known, because we send out those mail

Page 526

1  merge letters you saw up there, I mean, I would
2  have seen that at the end of any allocation
3  meeting.
4          ARBITRATOR KARLIN:  So at
5  every allocation meeting since she was taken out,
6  or she lost her stalls, you've been aware that
7  she had an application pending?
8          THE WITNESS:  Yeah, I was
9  aware that she was putting applications in, yes.
10          ARBITRATOR KARLIN:  You were
11 also aware during most of this time period that
12 she had litigation pending?
13          THE WITNESS:  Yes, I was.
14          ARBITRATOR KARLIN:  Nobody
15 ever brought -- her name never crossed anyone's
16 mouth at any meeting?
17          THE WITNESS:  Neither her nor
18 probably 100 other trainers.  It's a large group.
19 And the answer to that is no.  No, so...
20          ARBITRATOR KARLIN:  Okay.
21          MS. SCRIVANI:  May I
22 continue?
23          ARBITRATOR KARLIN:  Yeah.
24 BY MS. SCRIVANI:

Page 527

1  Q.      Mr. Zimny, you're aware that this
2  litigation actually started as a request for an
3  injunction?
4  A.      Yes.
5  Q.      Were you present at the injunction
6  hearing?
7  A.      I was physically present at the
8  injunction hearing, yes.
9  Q.      At the time of the injunction, was
10 Miss Mawing the only plaintiff?
11 A.      No. At the injunction hearing there
12 was probably between 20 and 25 plaintiffs in this
13 case.
14 Q.      What happened at the injunction
15 hearing concerning those plaintiffs?
16 A.      It turned out that most of them
17 either did not want to be included on this or had
18 explicitly said -- had explicitly said that or
19 did not know that they were included on it.
20 There was maybe 20 horsemen who were in the crowd
21 standing up and saying that they were not part of
22 this, they were put on this involuntarily. And
23 the list was whittled down after that.
24         MS. SCRIVANI: At this time

Page 528

1  we'd like to mark as Exhibit R-70 the transcript
2  from that injunction hearing and ask the Panel to
3  take judicial notice of the transcript.
4         ARBITRATOR WYCOFF: What is
5  the number again?
6         MS. SCRIVANI: R-70.
7         MR. WOLFSON: These don't
8  have the hole punch in them. I can do that
9  later.
10         * * *
11         (Whereupon, Respondent's Exhibit No.
12 R-70 marked for the purpose of identification.)
13         * * *
14         MR. WADDELL: I'm going to
15 enter an objection at this time to the relevance
16 of this particular exhibit and this line of
17 inquiry. Maybe counsel can inform us of what
18 relevance it has to the issues in this case.
19         ARBITRATOR CARNEY: Can we
20 have an offer of proof?
21         MS. SCRIVANI: Sure.
22         As Mr. Wolfson began yesterday as
23 part of his opening argument, this case has
24 really been about a moving target. And it

Page 529

1  started from the very first filing in this case,
2  that included people who never even wanted to be
3  a part of this case. So we started with 25
4  plaintiffs and then they backed off from it.
5  And that has been the progression of this case
6  ever since. Add a claim, take a claim away. Add
7  a party, take a party away. And this goes to
8  that same issue.
9         ARBITRATOR CARNEY: Let's
10 suppose it does. So what? Litigation often does
11 have moving targets.
12         I guess my question is, why is that
13 important to this Board right now? That's
14 assuming your statements are correct, why is that
15 important now?
16         MS. SCRIVANI: Well, we think
17 it also goes to the legitimacy of the plaintiff's
18 claim.
19         The transcript demonstrates that
20 those folks that were named as plaintiffs also
21 lost stalls in that August 2008 period, but they
22 didn't want to bring a lawsuit about it.
23         So Miss Mawing was not the only
24 person who lost stalls at the August 2008

Page 530

1  meeting. And the transcript demonstrates that
2  there were several others who did at that time.
3  And that goes to the issue of her retaliation.
4  Those other folks were not witnesses at the
5  Forest Park hearing, were not at the Governor's
6  meeting and they still lost stalls.
7         ARBITRATOR KARLIN: I'm just
8  a little confused. In order for that evidence
9  -- I think that is legitimate type of evidence.
10 But don't we need specific evidence of who those
11 people were and why they lost stalls as opposed
12 to -- I don't know how to draw an inference from
13 the fact that somebody was a party to a case and
14 knocked out of it. I know how to draw an
15 inference if you tell me John Jones lost X stalls
16 for X reason, you know.
17         MS. SCRIVANI: I don't think
18 that the reason is relevant. I think what the
19 transcript goes to is to identify the people who
20 did lose stalls and that there is not a dispute
21 that there were others who lost stalls during
22 that same allocation period.
23         ARBITRATOR WYCOFF: I mean, I
24 think it's very weak evidence, but we'll take it

Page 531

1  for whatever it is worth.
2              ARBITRATOR CARNEY: Go ahead.
3  We'll deny the objection.
4              MS. SCRIVANI: I have no
5  further questions for this witness.
6              ARBITRATOR CARNEY: Are you
7  offering Exhibit 70 into --
8              MS. SCRIVANI: We are, yes.
9              ARBITRATOR CARNEY: We will
10 accept that.
11             * * *
12      C R O S S - E X A M I N A T I O N
13 BY MR. WADDELL:
14 **Q.     Good afternoon, Mr. Zimny.**
15 A.       Mr. Waddell.
16 **Q.     You are the corporate representative**
17 **here for the respondent, is that correct?**
18 A.       Yes, I am.
19 **Q.     Because my line of questioning on the**
20 **first couple things goes to you as being a**
21 **corporate rep, because I'm going to address some**
22 **pleadings in this case.**
23         **The first one is the -- your answer,**
24 **the respondent's answer to the second amended**

Page 532

1  **complaint. I'm not sure when this was filed.**
2  **This was an allegation that was made in the**
3  **second amended complaint, which is the complaint**
4  **that is at issue in this hearing. The allegation**
5  **was, defendant was motivated in whole or in part**
6  **to discriminate against -- I can't read the whole**
7  **thing.**
8              ARBITRATOR KARLIN: This is
9  C-19, right?
10             MR. HAMMER: The answer to
11 the second amended complaint is one of our
12 exhibits.
13             ARBITRATOR KARLIN: The
14 answer is C-18.
15             MR. HAMMER: 18, okay.
16             MR. WADDELL: The allegation
17 here was, the defendant was motivated in whole or
18 in part discriminated against her by reducing the
19 number of stalls allocated to HBPA board member
20 Tina Mawing to zero in retaliation for
21 plaintiff's repeatedly expressed concerns to
22 track management, to the racing stewards
23 and -- the Governor of West Virginia regarding
24 the hazards and improper use around her barn area

Page 533

1  with powder, rodent poison.
2          Do you agree with me you all denied
3  that allegation?
4  A.       Yes, that's what the other answer is.
5  **Q.     Same document. Allegation is upon**
6  **information and belief defendant has**
7  **approximately 140 empty stalls at the time this**
8  **complaint was filed.**
9          **Answer is admitted, correct?**
10 A.       It is, yes. I don't know what date
11 that was filed.
12 **Q.     The original complaint was filed**
13 **shortly after the stalls were taken, was my**
14 **recollection. That's why there -- a TRO**
15 **injunction.**
16             ARBITRATOR KARLIN: It looks
17 like the second amended complaint was served on
18 August 24th, 2009.
19             THE WITNESS: I don't --
20             MR. WADDELL: That's correct,
21 but...
22             MR. HAMMER: The original
23 complaint was September of 2008.
24             ARBITRATOR KARLIN: I'm

Page 534

1  confused, was that an answer to the
2  original -- okay, got it. I misunderstood. I'm
3  sorry, I apologize.
4              ARBITRATOR CARNEY: The
5  injunction hearing was September 12th, 2008,
6  so...
7  BY MR. WADDELL:
8  **Q.     Now I'm going to refer you to, this**
9  **was in Federal Court after the case had been**
10 **removed by the respondent. The --**
11             MS. SCRIVANI: What exhibit
12 are you on?
13             MR. WADDELL: Pardon me?
14             MS. SCRIVANI: What Exhibit
15 are you on?
16             MR. WADDELL: We'll have that
17 marked.
18             MR. HAMMER: We have copies
19 for everyone.
20             MR. WADDELL: Can we mark
21 this?
22             * * *
23         (Whereupon, Claimant's Exhibit No. 43
24 marked for the purpose of identification.)

Page 535

```
 1                 * * *
 2  BY MR. WADDELL:
 3  Q.      Mr. Zimny, we've had Exhibit 43
 4  marked and it's being projected on the screen
 5  behind us.
 6          Do you recognize that document?
 7  A.      Are you asking have I seen it before?
 8  Q.      Yes.
 9  A.      I probably did at some point.
10  Q.      Would you agree with me it is the
11  respondent -- respondent's Rule 26(a)(3) initial
12  disclosure is made in federal court in the
13  Northern District of West Virginia on or
14  about -- according to this particular service,
15  November 18th, 2009?
16  A.      That -- yeah, that appears to be what
17  it is.
18  Q.      Okay.
19          And if we look what you informed us
20  of at that time as to the individuals that you
21  all, when I say you all, I mean the corporation,
22  people would likely have discoverable information
23  about the issues in this case.  You listed Mr.
24  Moore, yourself, Mr. Wehrman, Al Britton, Pamela
```

Page 536

```
 1  Sutphin, Rodney Walker, a representative of J.C.
 2  Ehrlich, and that was it.
 3          Do you agree?
 4  A.      Those were the folks that are listed
 5  on here, yes.
 6  Q.      You never -- when did you first know
 7  that Mr. Finamore had information relevant to
 8  this case?
 9          MS. SCRIVANI:  I'm going to
10  object.  Because there is a lack of foundation
11  that Mr. Zimny was involved at all in preparing
12  this or contributing to the preparation of it.
13  This is a document prepared by counsel, it's not
14  verified by the client.
15          ARBITRATOR CARNEY:  Why don't
16  you lay a foundation about asking him if he was
17  involved in preparing it?
18  BY MR. WADDELL:
19  Q.      You are the contact for the
20  respondent in this case, aren't you?
21  A.      The contact?
22  Q.      Yes.
23  A.      When you say contact, what do you
24  mean?
```

Page 537

```
 1  Q.      Well, you're the one who's given two
 2  affidavits or declarations under oath asserting
 3  certain facts, you did that, didn't you?
 4  A.      I certainly signed stuff regarding
 5  certain facts in the case, yeah.
 6  Q.      Under penalty of perjury?
 7  A.      Yes.
 8  Q.      Haven't you been the main contact?
 9  A.      I don't know what main contact means,
10  no.
11  Q.      Well, let me ask you this, when did
12  you first become aware that Mr. Finamore had any
13  facts that were relevant to this case?
14          MS. SCRIVANI:  I'm going to
15  object to the extent that question calls for
16  revelation of attorney/client privilege.
17  To the extent you can answer that without
18  disclosing discussions in which counsel was
19  involved, then you can answer.  But beyond that.
20          THE WITNESS:  I believe
21  everything was with counsel, so...
22  BY MR. WADDELL:
23  Q.      Okay.
24          You did give an affidavit in this
```

Page 538

```
 1  case?
 2          ARBITRATOR WYCOFF:  When you
 3  say this case, are you talking about the federal
 4  injunction case or this arbitration?
 5          MR. WADDELL:  I'm sorry, sir,
 6  yes.
 7  BY MR. WADDELL:
 8  Q.      I'm talking in the case as it was
 9  pending in the Northern District of West Virginia
10  Federal Court, did you give a declaration under
11  oath?
12  A.      I may have.  If I could see the
13  document I could certainly...
14          MR. WOLFSON:  What exhibit
15  number?
16          MR. HAMMER:  I think it's in
17  the documents.
18          MR. WADDELL:  It is an
19  exhibit.
20          ARBITRATOR WYCOFF:  C-21?
21          MR. HAMMER:  Yes, thank you.
22  BY MR. WADDELL:
23  Q.      I'm handing you what is C-21
24  Mr. Zimny.
```

Page 539

1  A.      Thank you.
2  Q.      Take a look at it and tell me if you
3  recognize it.
4  A.      That is my signature, yes.
5  Q.      This was a declaration that you gave
6  and signed, I think, on May 3rd, 2010, is that
7  correct?
8  A.      Yes.
9  Q.      Do you know the purpose for this
10 declaration?
11 A.      I really do not remember, no.
12 Q.      It's an attachment to a document.  If
13 you look at the top you'll see the case number
14 and it's Document 24-2.  So this is Exhibit 2 to
15 a document that was filed in this case.
16 Do you happen to know what document that was?
17 A.      No.
18 Q.      In this affidavit -- I'm going to
19 refer you first to the second page, Paragraph 10,
20 where you talk about the stall allocation
21 committee.
22       Do you see that?
23 A.      Yes, I do.
24 Q.      You list the members including

Page 540

1  yourself?
2  A.      Those are all -- that's correct.
3  Q.      Paragraph 12 you mention the
4  committee meets prior to the end of each stall
5  allocation term to review and consider the stall
6  applications for the upcoming term.
7  A.      That's correct.
8  Q.      You indicate at Paragraph 13 the
9  committee does not use any written criteria in
10 determining how to allocate stalls; however, you
11 mentioned various factors that are generally used
12 including the number of racing starts the
13 trainers have in proportion to the number of
14 stalls they have or are seeking, often referred
15 to as starts per stall.
16       You mentioned the quality of horses
17 they train in terms of their winning percentages,
18 the types of horses the trainer has and whether
19 the trainer follows the Charles Town Racetrack
20 rules, correct?
21 A.      That's what it says, correct.
22 Q.      14 you say, you endeavor to maintain
23 on the property a wide variety of quality horses,
24 correct?

Page 541

1  A.      All things being equal, that
2  certainly is a goal.
3  Q.      If we move down to Paragraph 16.
4  You say, by letter dated February 7, 2008 Miss
5  Mawing was allocated nine stalls for the period
6  March 1st, 2008 through August 31st, 2008.
7       Do you see that?
8  A.      Yes.
9  Q.      The next paragraph, 18, you indicate
10 that she had her stalls reduced by four stalls
11 giving her a total of five for the remainder of
12 that term, correct?
13 A.      That's correct.
14 Q.      Then you go on Paragraph 19 you go to
15 the stall allocation committee meeting on August
16 2008.  The committee decided not to grant Miss
17 Mawing any stalls for the September 1 through
18 December 31st, 2008 term, correct?
19 A.      That's correct?
20 Q.      Fair statement?
21 A.      That's what it says, yes.
22 Q.      Then on Paragraph 20 you say Miss
23 Mawing's racing statistics for that period,
24 January 1, 2008 through August 15, 2008, were as

Page 542

1  follows:  Starts 61, wins 2, winning percentage
2  3.2 percent.  This was a very low winning
3  percentage for trainers with stalls allocated to
4  them on the grounds of CTRS, correct?
5  A.      That's what it says, correct.
6  Q.      When did you compile those
7  statistics?
8  A.      I mean it would take a couple seconds
9  in the -- using the software we have.  I don't
10 remember the date or when those were compiled.
11 Q.      In fact, you compiled these
12 statistics after the law suit was filed, isn't
13 that true?
14 A.      I honestly don't recall, I honestly
15 don't recall.
16 Q.      Now, Paragraph 21 is during the
17 August 2008 stall application a number of stalls
18 CTRS had to allocate was approximately 1,338.
19 The number of requests for stalls exceeded the
20 number of available stalls.  Many other trainers
21 did not receive the number of stalls they
22 requested during this period, correct?
23 A.      That's correct.
24 Q.      Now, in this affidavit were you

Page 543

1  **attempting to suggest to the court that the**
2  **reason Miss Mawing received no allocation of**
3  **stalls in August was because of her stats here**
4  **that you mentioned in Paragraph 20, the wins, the**
5  **winning percentage, was that what you meant to**
6  **suggest in this affidavit to the court?**
7  A.     As far as I know these are factual
8  statements in here. I don't believe that was any
9  suggestion. I honestly don't recall how this
10  document was compiled.
11  **Q.     Well, we're all lawyers in this room,**
12  **except for the court reporter and Miss Mawing,**
13  **aren't we?**
14  A.     I guess, technically I'm an attorney,
15  not a lawyer, since I'm not licensed. But, yes.
16  **Q.     You know the purpose for an**
17  **affidavit, attesting to the truth, correct?**
18  A.     I was never involved in the
19  preparation of an affidavit in practice, believe
20  it or not. But I do know that this is obviously
21  certainly a truthful document.
22  **Q.     It's true you didn't have knowledge**
23  **in, today or at any time, how stalls were**
24  **allocated prior to August of 2008 at the**

Page 544

1  racetrack, is that correct?
2  A.     I was told there was an allocation
3  committee. The process thereof, I don't -- I
4  don't -- I don't know.
5  **Q.     The first stall allocation committee**
6  **meeting that you sat on was the August meeting**
7  **where Miss Mawing lost all her stalls?**
8  A.     Yeah, that would have been correct,
9  yeah.
10  **Q.     You weren't making and formulating**
11  **any stats at that meeting, were you?**
12  A.     Again, I don't believe -- I don't
13  recall if there was anything concrete produced
14  for that meeting, I don't. It certainly has
15  gotten much more intricate since then.
16  **Q.     In fact, the first time you actually**
17  **started producing charts with statistics and**
18  **using them at a meeting was in December 2009 at**
19  **that meeting, wasn't it?**
20  A.     Maybe in the form it currently has
21  now, I think. I honestly don't recall.
22  But there were statistics that were produced at
23  some point. I mean, starts per stall was a
24  statistics and I know that was produced.

Page 545

1  **Q.     Starts per stall?**
2  A.     Right. I'm just talking about the
3  complexity of the stats, they have gotten more,
4  they have evolved since 2008.
5  **Q.     You have no recollection of her name**
6  **coming up at that meeting?**
7  A.     No, nor anyone else.
8  **Q.     You have no recollection of anything**
9  **that occurred during that meeting regarding her,**
10  **do you?**
11  A.     No, I do not.
12  **Q.     And you don't have a recollection of**
13  **how, of your -- were you at the meeting in April**
14  **of 2009 when she lost four stalls?**
15          MS. SCRIVANI: 2008.
16          MR. WOLFSON: 2008.
17          MR. WADDELL: I'm sorry.
18  BY MR. WADDELL:
19  **Q.     2008. April of 2008, that stall**
20  **allocation meeting?**
21          MS. SCRIVANI: I'm going to
22  object, that is not the record. There is no
23  testimony that there was an allocation meeting in
24  April.

Page 546

1          MR. WOLFSON: I think you
2  just have it confused.
3          MR. WADDELL: I'm sorry.
4          MR. WOLFSON: That's okay.
5  Just trying to clarify.
6          THE WITNESS: It's no either
7  way.
8  BY MR. WADDELL:
9  **Q.     There was no meeting, you're right,**
10  **I'm wrong, there was no meeting then.**
11  A.     Right.
12  **Q.     If I refer you back to last time**
13  **there was a meeting, you weren't on the committee**
14  **at that time or you didn't participate at that**
15  **time?**
16  A.     No, I hadn't started my employment
17  until early April after orientation of the job
18  until mid April. I wasn't involved in the
19  allocation meeting prior to the one in August.
20  August 2008.
21  **Q.     So Paragraph 19 of your affidavit**
22  **where you state -- can you read what you stated**
23  **in Paragraph 19?**
24  A.     It says, at the stall allocation

Page 547

1  committee meeting the committee decided not to
2  grant Miss Mawing any stalls for the September 1
3  through December 31, 2008 term.
4  **Q.      That purported to be on your personal**
5  **information when you gave this affidavit,**
6  **correct?**
7  A.      It is in here, yes.
8  **Q.      In fact, you don't remember what**
9  **occurred at that meeting?**
10  A.      A half a decade and thousands of
11  decisions later, no, I don't have a recollection
12  of it.
13  **Q.      You didn't have a recollection when I**
14  **took your deposition in 2010 either, I believe?**
15  A.      I may not have.  I don't remember my
16  deposition to be honest.
17  **Q.      As I understand your testimony today,**
18  **Miss Mawing has continued to apply for stalls**
19  **every six months since August of 2008 and you're**
20  **still on that committee, right?**
21  A.      I am.
22  **Q.      You still have no knowledge**
23  **whatsoever you could tell us as to why she hasn't**
24  **been allocated stalls every time you have a**

Page 548

1  **committee meeting?**
2  A.      Do you mean now that she is in the
3  pile of folks who don't have stalls on the
4  grounds?
5  **Q.      Even after -- before that -- yes, any**
6  **time after August of 2008.**
7  A.      The reason would be she is not one of
8  the most attractive of the applicants in that
9  remaining pool.  And we don't always even go into
10  that pool.  I believe there was one allocation
11  where we may have only had one new person that
12  got stalls, but...
13  **Q.      So effectively once she was taken out**
14  **of the mix in August of 2008, her chances of ever**
15  **getting stalls again, according to your**
16  **testimony, is very slim indeed?**
17  A.      I'm not going say very slim.  It is
18  more difficult once you are -- if you don't have
19  stalls on grounds, yes, it is harder when you're
20  in that pool.
21  **Q.      In fact, you don't even remember her**
22  **name coming up at any committee meeting**
23  **since -- well, you don't remember August of 2008,**
24  **which is the crucial one, and you don't remember**

Page 549

1  **her name coming up at any subsequent meetings,**
2  **correct?**
3  A.      That's correct.  I mean, I do not
4  recall, not just her, as I said, I don't recall,
5  there are probably 50 people who were denied
6  stalls that I do not recall.  And I would venture
7  to say that the other folks at that meeting would
8  say the same.  With the number of papers we see
9  at this meeting, that's what happens.  There is a
10  lot of it and, no, I don't.
11  **Q.      Do you know how many people at that**
12  **meeting had all their stalls taken, at the August**
13  **8th meeting?**
14  A.      I don't recall, I don't.
15        MR. WADDELL:  All right, no
16  further questions.
17        MS. SCRIVANI:  A little bit
18  of redirect.
19              * * *
20  R E D I R E C T   E X A M I N A T I O N
21  BY MS. SCRIVANI:
22  **Q.      How many applications do you see at a**
23  **stall allocation meeting?**
24  A.      You've got the 100, 100 to 120 that

Page 550

1  you have with the people on the grounds.  Then
2  you're probably going to have a new pool of
3  applicants at numbers anywhere from 15 to 40, or
4  35, or something like that.  And you'll -- you
5  usually only have a couple people on that list
6  that you'll be able to allocate to.
7        MS. SCRIVANI:  No further
8  questions.
9        ARBITRATOR WYCOFF:
10  Mr. Zimny.
11        THE WITNESS:  Uh-huh.
12        ARBITRATOR WYCOFF:  This case
13  is narrowing down and focusing on that August
14  meeting and her losing all of her stalls.
15  You said that the statistics that are in
16  Paragraph 20 of your declaration were not the
17  reason why she lost her stalls, is that correct?
18        THE WITNESS:  Again, I don't
19  recall what specifically was discussed at the
20  meeting.  That could be something that could be
21  taken into account.
22        ARBITRATOR WYCOFF:  You don't
23  know whether it was or was not, true?
24        THE WITNESS:  No, I don't

Page 551

1  recall whether it was or was not, no.
2          ARBITRATOR WYCOFF:  Do you
3  agree with the answer to the second amended
4  complaint that it was not Tina Mawing's
5  complaints to the management, the Governor and
6  whomever else about the rat poison, that was not
7  a reason why she lost her stalls, was it?
8          THE WITNESS:  It was
9  a -- that was a conversation at the time that I
10  was not necessarily aware of, okay?
11          But I have no personal knowledge of
12  any of that stuff, so it really -- I don't think
13  it would be appropriate for me to answer that.
14  But this stuff, I do not recall it being
15  discussed at the meeting at all.
16          ARBITRATOR WYCOFF:  Well, I
17  mean, what the arbitrators want to know, why did
18  she lose those stalls?
19          Do you know why she lost the stalls
20  in August of '08?
21          THE WITNESS:  No, and I don't
22  recall, I really don't remember anything at the
23  meeting.  And I can't produce --
24          ARBITRATOR WYCOFF:  Not the

Page 552

1  meeting, anywhere.  Do you know why she lost the
2  stalls in August of '08?
3          THE WITNESS:  As of now, no.
4          ARBITRATOR WYCOFF:  Do you
5  know who does know?
6          THE WITNESS:  I do not.
7  Perhaps Mr. Finamore or Mr. Britton, who was the
8  general manager, he might.  I do not know.
9          ARBITRATOR WYCOFF:  So is it
10  your testimony -- I hate to be like Joe McCarthy.
11  I apologize.
12          THE WITNESS:  That's all
13  right.
14          ARBITRATOR WYCOFF:  Have you
15  in the five years that this litigation has been
16  going on, other than discussing anything with
17  counsel, have you discussed with anyone in
18  management as to why Tina Mawing is bringing this
19  suit and lost her stalls?
20          THE WITNESS:  I had heard
21  after the fact stuff that there was a meeting
22  with the Governor.  I did not know that probably
23  until, I don't even remember when I came into
24  that knowledge.  That's the only ancillary piece

Page 553

1  of info that I could give you that I came into
2  contact with after, you know, something like this
3  was...
4          ARBITRATOR WYCOFF:  But did
5  that information come in relation to a reason why
6  she lost her stalls or was it just a fact --
7          THE WITNESS:  Well, it was
8  just a fact.
9          ARBITRATOR WYCOFF:  Okay.
10          ARBITRATOR CARNEY:  But you
11  agree that August 2009 people weren't looking at
12  winning percentages?
13          THE WITNESS:  No, I wouldn't
14  necessarily agree with that.
15          I don't recall if it was hard and
16  fast on a piece of paper.  You would know if
17  someone wins at 40 percent, you would know if
18  someone wins at zero percent just by virtue of
19  being at the racetrack, watching a lot of horse
20  races.  I don't know if there were rudimentary
21  stats there or not.
22          ARBITRATOR CARNEY:  But you
23  heard testimony from the previous witness?
24          THE WITNESS:  Yes.

Page 554

1          ARBITRATOR CARNEY:  He
2  testified that that was not a consideration at
3  that point in time?
4          THE WITNESS:  He also didn't
5  remember that I was there, which I was, so...
6          ARBITRATOR CARNEY:  I have no
7  other questions.
8          Anybody on the Panel?
9          MR. WADDELL:  Nothing here.
10          ARBITRATOR KARLIN:  Is there
11  somebody you can point to who lost all their
12  stalls because of their winning percentage?
13          THE WITNESS:  I'd have to go
14  back and look, I'd have to go back and look.
15          ARBITRATOR KARLIN:  But you
16  can't remember anyone that lost all the stalls
17  because of the winning percentages as you sit
18  here today?
19          THE WITNESS:  I can't
20  remember anyone who lost all their stalls, other
21  than really the people who I told you, and I'm
22  sure there have been more.  But, no, I cannot.
23          ARBITRATOR WYCOFF:  Have you
24  been aware of what Mrs. Mawing's winning

Page 555

1  percentages have been since 2009 to the current
2  date?
3          THE WITNESS:  Since 2009,
4  generally I can't bring it up off the top of my
5  head.
6          ARBITRATOR WYCOFF:  Have you
7  ever looked at it?
8          THE WITNESS:  I may have, I
9  may have.  The new applicants you generally do
10  not -- when I say new applicants, I mean the
11  people who don't have stalls on grounds.  You
12  generally will not produce statistics as in
13  depth.  Because -- you know, you've heard starts
14  per stalls.  If you don't have stalls you can't
15  have a starts per stall ratio and stuff like
16  that.  So the statistics produced for the folks
17  who don't have stalls are not as great
18  as -- voluminous as the ones for the people that
19  do.
20          ARBITRATOR KARLIN:  I don't
21  have anything else.
22          ARBITRATOR CARNEY:  If you're
23  going to read inserts of depositions, why don't
24  we take a break right now.

Page 556

1          MR. WOLFSON:  Thanks.
2          * * *
3  (Brief break)
4          * * *
5          ARBITRATOR CARNEY:  Mr.
6  Hammer, are you offering into evidence Claimant
7  Exhibit 43?
8          MR. HAMMER:  That was the
9  answer --
10          ARBITRATOR CARNEY:  It's Rule
11  26(f).
12          MR. HAMMER:  Yes, sir.
13          MR. WOLFSON:  We would object
14  to the admission.  The witness testified he
15  wasn't involved in the preparation, he may or may
16  not have seen it, he wasn't even certain.  I'm
17  not sure what it is.
18          MR. HAMMER:  Our response
19  would be, he was the corporate representative --
20          MR. WOLFSON:  Not for that.
21          ARBITRATOR WYCOFF:  Wait,
22  we're talking about the pleadings, the initial
23  declaration?
24          ARBITRATOR CARNEY:  Rule

Page 557

1  26(f).
2          ARBITRATOR WYCOFF:  That's a
3  pleading.  I mean, it doesn't have to even be
4  admitted.  It is still part of the record which
5  we can refer to.
6          ARBITRATOR CARNEY:  I think
7  your point is it's really irrelevant --
8          MR. WOLFSON:  That's right.
9  It is really irrelevant to the matter.
10          ARBITRATOR WYCOFF:  We'll
11  take it for whatever it's worth.
12          MR. WOLFSON:  That's fine.
13          * * *
14          (Whereupon, a discussion was
15  held off the record.)
16          * * *
17          ARBITRATOR CARNEY:  You're
18  going to tell us to look at certain depositions
19  that are in your exhibit book?
20          MR. WOLFSON:  Yes.
21          ARBITRATOR CARNEY:  You're
22  going to read what you think are the relevant
23  sections?
24          MS. SCRIVANI:  That's right.

Page 558

1  We're going to start with Exhibit 55 which is the
2  deposition of Anthony Mawing on April 13th, 2013.
3          ARBITRATOR CARNEY:  Which
4  exhibit number is that?
5          MS. SCRIVANI:  55,
6  Respondent's 55.
7          MR. HAMMER:  Are you actually
8  going to read questions and answers or are we
9  going to designate for reading?
10          ARBITRATOR WYCOFF:  They said
11  this was short --
12          MS. SCRIVANI:  It is.  We're
13  going to read.
14          ARBITRATOR WYCOFF:  So they
15  are going to read just excerpts.
16          ARBITRATOR CARNEY:  But we're
17  going to mark our books because we want to know
18  what we need to have from that, except if
19  somebody else recites something.
20          ARBITRATOR WYCOFF:  Exhibit
21  50?
22          MS. SCRIVANI:  55.
23          ARBITRATOR WYCOFF:  Miss
24  Mawing?

Page 559

1          MS. SCRIVANI:  Mr. Mawing,
2  this is Anthony Mawing.  The first day of his
3  deposition.
4          And we're going to start at Page 25,
5  Line 19 and continue to Page 26, Line 11.
6  With respect to folks who have come to you to ask
7  you about perhaps having Miss Mawing train their
8  horses, have you had discussion with them about
9  what the cost will be for doing so?
10          MR. WOLFSON:  Absolutely.
11          MS. SCRIVANI:  Okay, you're
12  talking about daily rates?
13          MR. WOLFSON:  People always
14  try to wheel and deal.
15          MS. SCRIVANI:  You have done
16  some of that wheeling and dealing on Miss
17  Mawing's behalf?
18          MR. WOLFSON:  I don't wheel
19  and deal.
20          MS. SCRIVANI:  Have you had
21  discussions with people who have attempted to
22  wheel and deal with you on Miss Mawing's behalf?
23          MR. WOLFSON:  Absolutely.
24          MS. SCRIVANI:  Now turn to

Page 560

1  Page 52.  Beginning at Line 6 and going 53, Line
2  1.
3          ARBITRATOR CARNEY:  Excuse
4  me, the page?
5          MR. WOLFSON:  52.
6          MS. SCRIVANI:  52, Line 6.
7          ARBITRATOR WYCOFF:  Thank
8  you.
9          MS. SCRIVANI:  We've
10  established through testimony with your wife that
11  in 2007 she had seven stalls at the track?
12          MR. WOLFSON:  Right.
13          MS. SCRIVANI:  In February of
14  2008 she received two more for a total of nine?
15          MR. WOLFSON:  Nine.
16          MS. SCRIVANI:  In April of
17  2008 she lost four stalls and had five?
18          MR. WOLFSON:  Okay.
19          MS. SCRIVANI:  And in August
20  2008 she was awarded no stalls at that time.
21  So my question is, in February of 2008 when the
22  training operation had nine stalls, do you know
23  how many horses your wife was training?
24          MR. WOLFSON:  Approximately

Page 561

1  12.
2          MS. SCRIVANI:  Where were the
3  other four horses?
4          MR. WOLFSON:  In the
5  opposite -- opposites -- private barn.
6          MS. SCRIVANI:  Turn now,
7  please, to Page 94.  Beginning at Line 2 and
8  continuing to Line 20.
9          ARBITRATOR WYCOFF:  Okay.
10          MS. SCRIVANI:  Was that Titus
11  Hagy's Farm?
12          MR. WOLFSON:  Yes.
13          MS. SCRIVANI:  How far away
14  is Media Farm from the track?
15          MR. WOLFSON:  Three miles,
16  two miles.
17          MS. SCRIVANI:  How far is
18  Hagy's Farm from the track?
19          MR. WOLFSON:  Between three
20  and four miles.
21          MS. SCRIVANI:  When Norma
22  Rodney's horse was in one of the stalls, whether
23  it was at Media Farms or Hagy's Farm who paid the
24  stall rent.

Page 562

1          MR. WOLFSON:  I did.
2          MS. SCRIVANI:  Did you ever
3  pass that off to an owner?
4          MR. WOLFSON:  Yes, some
5  owners don't want to pay it.
6          MS. SCRIVANI:  So there are
7  some owners that will and some that won't?
8          MR. WOLFSON:  Yeah.
9          MS. SCRIVANI:  Did Miss
10  Rodney pay it?
11          MR. WOLFSON:  No, Miss Rodney
12  didn't pay it.
13          MS. SCRIVANI:  Continuing to
14  95 -- Page 95, Line 23 to 96, 17.
15          Who paid the stall rent in the period
16  of time 2006 to 200 --
17          MR. WOLFSON:  I did.
18          MS. SCRIVANI:  Did you ever
19  pass that cost off to an owner in that period of
20  time?
21          MR. WOLFSON:  Well, I'd tell
22  them but they don't want to pay.
23          MS. SCRIVANI:  Have you had
24  owners that do pay?

Page 563

1        MR. WOLFSON: Some, if you
2  tell them they've got to pay stall rent, they
3  take the horse away and say why should I be with
4  you and put it with the guy at the track.  So
5  it's part of the competition where you're trying
6  to maintain the horse, you're trying to stay with
7  the owner.
8        MS. SCRIVANI: I understand.
9  But have you had instances where you have asked
10  owners to pay stall rent and they have since
11  2008?
12        MR. WOLFSON: They have, yes.
13        MS. SCRIVANI: Turning to
14  Page 96, Line 23.  Sorry, we were on that same
15  page.
16        Mr. Wratchford, did Mr. Wratchford
17  pay stall rent?
18        MR. WOLFSON: No.
19        MS. SCRIVANI: Did he refuse
20  to pay stall rent?
21        MR. WOLFSON: Yeah.
22        MS. SCRIVANI: Did Hampshire
23  Racing pay stall rent?
24        MR. WOLFSON: He paid a

Page 564

1  couple of times.
2        MS. SCRIVANI: Okay.  Did
3  Born to Run Stables pay stall rent?
4        MR. WOLFSON: No.
5        MS. SCRIVANI: Did they
6  refuse?
7        I'll withdraw that question.
8        MR. WOLFSON: I'm trying to
9  think, because, I mean...
10        MS. SCRIVANI: Did you ask
11  them to pay stall rent?
12        MR. WOLFSON: Yeah.
13        MS. SCRIVANI: Did they
14  refuse?
15        MR. WOLFSON: I don't know if
16  they refused, they just didn't -- like I said,
17  sometimes they'll give a little bit extra and I
18  put it towards the stall rent.
19        MS. SCRIVANI: How about
20  Mr. Wratchford, did you specifically ask him to
21  pay?
22        MR. WOLFSON: Yeah, he
23  wouldn't pay.
24        MS. SCRIVANI: Turning to

Page 565

1  Page 98, Line 12.
2        How about Mr. Williamson, since 2008
3  has he been asked to pay stall rent?
4        MR. WOLFSON: He has made me
5  loans, but I have to pay it back.
6        MS. SCRIVANI: Without regard
7  to loans, have you asked him to pay stall rent
8  for his horses?
9        MR. WOLFSON: Yeah.
10        MS. SCRIVANI: Has he refused
11  do it?
12        MR. WOLFSON: He doesn't pay
13  stall rent.
14        MS. SCRIVANI: Why not?
15        MR. WOLFSON: Because his
16  rates are real cheap.  If I go up on the rate or
17  Tina goes up on the rate, I'm sure we'll lose the
18  horses.
19        MS. SCRIVANI: Have you had
20  discussions with him about that, about increasing
21  the rate?
22        MR. WOLFSON: No.
23        MS. SCRIVANI: So you're
24  speculating about whether he would take his

Page 566

1  horses if you asked him?
2        MR. WOLFSON: Probably.
3        MS. SCRIVANI: Let's talk a
4  little bit about the horse breeding -- oh, I'm
5  sorry, I wanted to end at Line 6.
6        Now turning to Page 108, Line 4.
7        ARBITRATOR KARLIN: Hold on a
8  second.  You're going too fast for me a few
9  times.
10        MS. SCRIVANI: Sorry.
11        MR. WOLFSON: I was
12  reading --
13        ARBITRATOR KARLIN: No, just
14  in between breaks so I could write down page
15  numbers.
16        ARBITRATOR WYCOFF: What
17  Page?
18        MS. SCRIVANI: 108, Line 4 to
19  Line 14.
20        Not with respect to all but with
21  respect to most, would you agree with me that
22  it's your signature that appears on these checks?
23        MR. WOLFSON: Absolutely.
24        MS. SCRIVANI: You're

Page 567

1  primarily responsible for writing the checks for
2  the training business at that time?
3          MR. WOLFSON:  Yes.
4          MS. SCRIVANI:  You were at
5  least as of the date of these checks?
6          MR. WOLFSON:  Yes.
7          MS. SCRIVANI:  Page 110, Line
8  22 through 111, 13.
9          Now, the horses have to eat at night
10 no matter where they are, right?
11         MR. WOLFSON:  Actually, Baker
12 was at Hagy's Farm, used to be owned by Tuffy
13 Furr, Robert Furr.
14         MS. SCRIVANI:  So would you
15 agree with me that the horses have to eat at
16 night no matter where they are, right?
17         MR. WOLFSON:  Hell, yeah.
18         MS. SCRIVANI:  Somebody has
19 got to feed them, right?
20         MR. WOLFSON:  They have to
21 feed them.
22         MS. SCRIVANI:  So there isn't
23 an expense that's related solely -- so this isn't
24 an expense that's related solely to being off the

Page 568

1  track, right?
2          MR. WOLFSON:  It isn't an
3  expense, because the groom is responsible for
4  feeding, the groom gets a set amount every week.
5  All the feeding, all the chores are inclusive in
6  that.
7          MS. SCRIVANI:  Let's go to
8  Page 113, Line 12 through 115, 13.
9          How about Rhonda Plymale, I think you
10 told me earlier that at least at some point she
11 did laundry?
12         MR. WOLFSON:  Then she drove
13 Phillip.
14         MS. SCRIVANI:  With respect
15 to the laundry, I want to go back to your
16 testimony earlier.  I thought you indicated that
17 she only started doing laundry after you weren't
18 on the track.
19         That's not right, is it?
20         I mean, horse laundry has to be done
21 no matter where the horse is.
22         MR. WOLFSON:  She does
23 laundry for everybody, a lot of people at the
24 track.

Page 569

1          MS. SCRIVANI:  She did your
2  laundry?
3          MR. WOLFSON:  When it comes
4  to the dates, I honestly can't recall when it
5  comes to the dates, it's been so long.
6          MS. SCRIVANI:  But she --
7          MR. WOLFSON:  I mean, I used
8  to do laundry as well.
9          MS. SCRIVANI:  Okay.
10         MR. WOLFSON:  But it just cut
11 into my day that I don't have time, two hours to
12 stand at the laundromat, I've got tons of things
13 to do.
14         MS. SCRIVANI:  But she does
15 laundry for people who are on the track?
16         MR. WOLFSON:  Yeah.
17         MS. SCRIVANI:  Did she do
18 laundry for this training operation when you were
19 on the track?
20         MR. WOLFSON:  To be honest, I
21 don't know.
22         MS. SCRIVANI:  Why was a
23 check for her included in here if she, you know,
24 could have done laundry for you, how is a check

Page 570

1  to Rhonda Plymale included in something that was
2  an expense related to being off the track?
3          MR. WOLFSON:  Well, she drove
4  Phillip.
5          MS. SCRIVANI:  You paid her
6  $80?
7          MR. WOLFSON:  Yeah, I paid
8  gas and everything.
9          MS. SCRIVANI:  How often did
10 you pay her?
11         MR. WOLFSON:  Probably every
12 week.
13         MS. SCRIVANI:  You paid her
14 $80 every week for strictly driving or does this
15 include laundry.
16 A.      It probably does include laundry.  I
17 mean, I couldn't tell you at this point whether
18 it was strictly for driving, that's '08, I
19 can't -- nobody can recall.
20         MS. SCRIVANI:  So would that
21 be true if we looked at every check that was to
22 Rhonda Plymale that unless there is a memo line
23 that says what it is, it could be include
24 driving, it could include laundry, it could

Page 571

1  include both?
2         MR. WOLFSON: Sure.
3         MS. SCRIVANI: Now, if you
4  would turn, please, to Exhibit 56, which is the
5  second day of Mr. Mawing's testimony at Page 8,
6  beginning at Line 23.
7         Mr. Mawing, I'm handing you what's
8  been marked as Exhibit R-34 -- and for the
9  Panel's purposes it's the same R-34 that is a
10  trial exhibit.
11        This was a document that was given to
12  me made by your counsel this morning.
13        Can you explain to me what this
14  document is?
15        MR. WOLFSON: It's just a
16  recollection of all the checks that we have had
17  and they are simplified.
18        MS. SCRIVANI: Did you
19  prepare this document?
20        MR. WOLFSON: Yes.
21        MS. SCRIVANI: How did you go
22  about preparing it?
23        MR. WOLFSON: Going through
24  the list of checks that we had.

Page 572

1         MS. SCRIVANI: They were
2  checks that had been produce to me?
3         MR. WOLFSON: Yes.
4         MS. SCRIVANI: What did you
5  try to do in this document, explain to me how you
6  categorized this?
7         MR. WOLFSON: Just everybody
8  that I used during the periods of between '08
9  and, you know.
10        MS. SCRIVANI: So you've
11  broken the checks down by vendor?
12        MR. WOLFSON: Yes.
13        MS. SCRIVANI: Now if you
14  turn to Page 35, Line 3.
15        Now, with respect to Jim Starkey,
16  what have you done to ensure that the checks you
17  have listed for him on Exhibit R-34 relate only
18  to hauling to and from Charles Town as opposed to
19  a different track?
20        MR. WOLFSON: What do you
21  mean what have I done?
22        MS. SCRIVANI: Have you done
23  anything to determine whether any of these checks
24  relate to hauling to another track?

Page 573

1         MR. WOLFSON: No.
2         MS. SCRIVANI: So it's
3  possible that they do?
4         MR. WOLFSON: Possible.
5         MS. SCRIVANI: That's it for
6  Mr. Mawing.
7         If we could turn to Mr. Barr's
8  transcript. He is at Exhibit --
9         ARBITRATOR KARLIN: Can you
10  refresh me who he is?
11        MS. SCRIVANI: Mr. Barr
12  was -- he is the principal for Hampshire Racing
13  and a client of Miss Mawing's. My apologies, we
14  don't seem to have Mr. Barr's transcript as an
15  exhibit. But we will provide copies and enter
16  it. So we'll just read the designations at this
17  point. We'll have to share.
18        Mr. Barr was deposed on March 13th,
19  2013. We're going to start at Page 8, Line 11
20  and go to 10, 11.
21        Were you aware prior to being
22  contacted by my office to come to this deposition
23  that Miss Mawing had filed a lawsuit against
24  PNGI?

Page 574

1         MR. WOLFSON: Yes.
2         MS. SCRIVANI: How were you
3  aware of that?
4         MR. WOLFSON: I was president
5  of a horse racing syndicate about four or five
6  years ago. And I think it came up at a meeting
7  of the Horseman's Benevolent Association and
8  later between she and I when the question of
9  stabling our horses off track arose.
10        MS. SCRIVANI: Okay.
11        Were you ever a member of the board
12  of directors of the horseman's Benevolent
13  Protective Association in Charles Town?
14        MR. WOLFSON: Invited, but
15  no.
16        MS. SCRIVANI: So when you
17  say it was a meeting, was it a meeting of the
18  general membership?
19        MR. WOLFSON: Yes. And I
20  don't even recall that it was part of the agenda,
21  it just came up. That's when I first learned of
22  it. But probably not as part of the agenda of
23  the meeting.
24        MS. SCRIVANI: Now, you said

Page 575

1 it came up again privately between you when a
2 question of stabling arose.  Can you tell me a
3 little bit about that?
4          MR. WOLFSON:  Yes, I've had
5 several trainers at Charles Town among other
6 tracks.  Tina Mawing was the first one to call me
7 and tell me that they were stabling their horses
8 off the track.  She stressed, I think, it's not
9 too far and convenient -- it's not convenient and
10 will ship the horses in for training.  I said, I
11 think first words out of my mouth, as I recall,
12 had to do, how much extra will it be.  And I
13 think it was about $15 a day.
14          MS. SCRIVANI:  Per horse?
15          MR. WOLFSON:  Per horse,
16 yeah.  $15 or $20, I forget.
17          MS. SCRIVANI:  Did you have a
18 concern about that additional $15 per day?
19          MR. WOLFSON:  Only that I had
20 to sell it to my partners.  We probably had 15 or
21 20 investors at the time and I needed to know
22 pretty specifically then, or I'm not answering
23 specifically now, to sell them on the idea that
24 Tina was a trainer for us and that it would cost

Page 576

1 extra money.
2          MS. SCRIVANI:  Turning now to
3 Page 14 beginning at Line 16 through 15, 4.
4          Sir, when did you first become
5 involved in horse racing?
6          MR. WOLFSON:  1989.
7          MS. SCRIVANI:  What was that
8 involvement?
9          MR. WOLFSON:  That was the
10 formation of Hampshire Racing Partnership.  It
11 was an L.L.C., International Press Club in
12 Washington, DC.  That was a formation meeting of
13 the L.L.C. and the initial perspective partners.
14 My partner then was William Joyce who then was
15 the justice department attorney to become an
16 immigration judge.  Now he is in private
17 immigration practice in Boston.
18          MS. SCRIVANI:  Page 18, Lines
19 11 through 20.
20          Did there come a time when the
21 corporation had partnerships that were racing on
22 more of a full time basis at Charles Town?
23          MR. WOLFSON:  Yeah, the time
24 came in the early 2000s.  Let me see, I retired

Page 577

1 from the federal government in 1996, we moved to
2 Front Royal and my wife retired in 19 --  in
3 2002.  And due to the proximity of the Charles
4 Town Racetrack, we hired our first full time
5 trainer there sometime after 2002.
6          MS. SCRIVANI:  Turning now to
7 Page 23 beginning at Line 19 and going through
8 24, Line 22.
9          After Mr. Yetsook, who did you hire
10 to train horses at Charles Town?
11          MR. WOLFSON:  After Yetsook
12 we got Tina Mawing.
13          MS. SCRIVANI:  How did you
14 come to hire Miss Mawing?
15          MR. WOLFSON:  Reputation,
16 actually.
17          MS. SCRIVANI:  What about her
18 reputation?
19          MR. WOLFSON:  She had a good
20 reputation for bringing along young horses.
21          MS. SCRIVANI:  Generally on
22 the track or was there someone specifically that
23 had told you about that?
24          MR. WOLFSON:  Yeah, it was

Page 578

1 track.  I knew a lot of people around the track,
2 trainers and a lot of horsemen and her name came
3 up.  And I went to visit with her and liked her
4 attitude and that it was my judgment call.  And I
5 put it to the owners of the day and they
6 generally agreed with what we were doing.  And
7 they agreed in this case for me to hire Tina
8 Mawing.
9          MS. SCRIVANI:  Do you recall
10 a date when that, around a year when that
11 happened?
12          MR. WOLFSON:  I'm trying to,
13 it was after Catino.  I've got all this in
14 written, we've got five years of Hampshire
15 records.  It would be around 2009.  I think we
16 had her for, until the end of the partnership
17 which was terminated in December 2010, the end of
18 December -- December 31st.
19          MS. SCRIVANI:  Turning now to
20 Page 27, Lines 3 through 24.
21          When you hired Miss Mawing, did she
22 have any stalls at the track?
23          MR. WOLFSON:  No, at least I
24 don't think so.  We were told that we would be

Page 579

1    obliged to have them kept off track.  I put the
2    proposal to the partners and they kind of said
3    okay.
4           MS. SCRIVANI:  Did you have
5    any reservations or concerns about the fact that
6    Miss Mawing was not going to stall them at the
7    track?
8           MR. WOLFSON:  I had
9    reservations about the extra charge that she told
10   us she would have to make to cover the costs of
11   the privately owned stalls.  And the vanning of
12   the horses to the track which was, about, I
13   guess, about three miles three or four times a
14   week.  Those concerns I took to the partners
15   because they were financial and impacted them and
16   recommended that we go ahead and try it.
17          I think I said there may be
18   advantages to having them off the track since
19   most of those that we knew were upcoming, were
20   young horses.
21          MS. SCRIVANI:  Finally Page
22   32, Line 20 through 33, 7.
23          Did you ever have any trainers at
24   Charles Town after Miss Mawing?

Page 580

1           MR. WOLFSON:  No.
2           MR. HAMMER:  Was the reason
3    that Miss Mawing ceased being a trainer for
4    Hampshire Racing Partnership was because the
5    partnership ended?
6           MR. WOLFSON:  Yes.
7           MS. SCRIVANI:  Was the
8    decision to cease using Miss Mawing as a trainer,
9    did it ever have anything to do with whether or
10   not she had stalls on the track?
11          MR. WOLFSON:  No.
12          MS. SCRIVANI:  Okay.
13   Mr. Hale.
14          MR. WOLFSON:  There is an
15   objection to one part, at least -- just one part
16   of Mr. Hale's designations.
17          Mr. Hale testified as the executive
18   director of the HBPA and for the HBPA in the
19   Yetsook arbitration.  And he is an unavailable
20   witness, as you know, he is no longer with the
21   HBPA, he lives up in Connecticut.
22          MR. HAMMER:  I think he lives
23   in Baltimore, but he is in New York now.
24          MR. WOLFSON:  Oh, he's in New

Page 581

1    York right now, he lives in Baltimore.
2           We intend to designate a small
3    portion of his testimony from the Yetsook
4    arbitration deposition.  And I understand there
5    is an objection to that.  We believe it is
6    appropriate, he was under oath, subject to
7    Cross-Examination, actually represented by the
8    HBPA at the time.
9           ARBITRATOR CARNEY:  What's
10   the objection?
11          MR. HAMMER:  They're trying
12   to use this as an admission against interest.
13   And it's not an admission against interest
14   against Miss Mawing.  She was not represented at
15   that proceeding at all.  She was not a party, had
16   no counsel there.
17          They had a full opportunity to depose
18   Mr. Hale, they did.  If they had any questions at
19   all to ask him, they should have and could have
20   asked them at the deposition that they took in
21   this case at which Miss Mawing's counsel was
22   present.
23          ARBITRATOR CARNEY:  What's
24   the purpose of, what in a general sense do you

Page 582

1    want to have us get out of the testimony?
2           MR. HAMMER:  May I interrupt
3    for one more moment?
4           I'd also like to note that I haven't
5    seen this testimony yet.  I was e mailed it today
6    at lunchtime.  So I haven't even seen it, I don't
7    know what it is.
8           MR. WOLFSON:  We frankly
9    didn't know that the HBPA didn't have the
10   transcripts from the prior arbitration that it
11   was a party to.
12          So honestly, we didn't know
13   Mr. Hammer didn't have it.  I mean, he's been
14   representing HBPA since before that time.
15          ARBITRATOR WYCOFF:  Do you
16   have it now?
17          MR. HAMMER:  No, I --
18          ARBITRATOR CARNEY:  Why don't
19   we give Mr. Hammer an opportunity to look at it
20   overnight.  And maybe he is not going to have an
21   objection to it.
22          So we'll resolve the issue in the
23   morning after he has had a chance to review it
24   and see if there is anything that you object to

Page 583

1  from a substantive standpoint.
2           MR. HAMMER:  Thank you.
3           MR. WOLFSON:  We'll proceed
4  with the -- so we'll introduce that portion of
5  Mr. Hale which was deposed in this case, for
6  which there is no objection, get that out of the
7  way.  We can do the other one tomorrow if and
8  when the Panel --
9           ARBITRATOR CARNEY:  Yeah.
10          MS. SCRIVANI:  Mr. Hale's
11  deposition is at Exhibit 60.
12          ARBITRATOR CARNEY:  Exhibit
13  60.
14          MS. SCRIVANI:  Yes.  And
15  we're going to begin at Page 12, Line 1 through
16  18.
17       Since you have ceased being the
18  executive director of the HBPA, have you spoken
19  to anyone about this lawsuit other than what
20  we've covered already?
21          MR. WOLFSON:  No.
22          MS. SCRIVANI:  Sir, when did
23  you cease being the executive director of the
24  Charles Town HBPA?

Page 584

1           MR. WOLFSON:  Let me back up.
2  It would have been in July -- no, August of 2011.
3           MS. SCRIVANI:  What were the
4  circumstances surrounding your --
5           MR. WOLFSON:  I resigned.
6           MS. SCRIVANI:  Okay.
7           MR. WOLFSON:  I was at
8  retirement age and decided, I spent 50 years on
9  the racetrack and that was enough.
10          MS. SCRIVANI:  Turning now to
11  Page 20, Line 17 through 22, 3.
12          MR. WOLFSON:  22, 3?
13          MS. SCRIVANI:  Yes.
14          ARBITRATOR WYCOFF:  You're
15  saying Page 29 --
16          MS. SCRIVANI:  No, I'm sorry.
17  Page 20, Line -- I'm sorry, Page 20, Line 17
18  through Line 21.
19       And then in April of 2008 there was a
20  barn audit that was conducted to check which
21  horses were in barns.
22       Do you have any knowledge of that?
23          MR. WOLFSON:  Yes, I do.
24          MS. SCRIVANI:  Turning to

Page 585

1  Page 22, Line 4 through 23, Line 7.
2       Do you know what the impetus was for
3  them doing it at the time?
4           MR. WOLFSON:  My
5  understanding, but I wasn't in on any meetings
6  that made the decision, was they needed a better
7  count of what horses were in the barn area and
8  who had control of them.
9           MS. SCRIVANI:  Were you aware
10  of any horses being brought on the grounds that
11  had an illness and a concern over that?
12          MR. WOLFSON:  Not in advance,
13  no.
14          MS. SCRIVANI:  Do you have an
15  understanding that that was part of the reason
16  now?
17          MR. WOLFSON:  There were some
18  horses that were brought on the ground that were
19  contaminated, yes.
20          MS. SCRIVANI:  Do you know if
21  the fact that those contaminated horses were
22  brought on the ground had anything to do with a
23  decision to do a barn check?
24          MR. WOLFSON:  I would hope

Page 586

1  so.
2           MS. SCRIVANI:  Were you aware
3  that as a result of the barn check it was
4  determined that some horsemen had their horses in
5  stalls that had been assigned to other horsemen?
6           MR. WOLFSON:  Yes.
7           MS. SCRIVANI:  Did you know
8  which horsemen were found to have horses in
9  stalls of other horsemen?
10          MR. WOLFSON:  I'm sure I
11  didn't know all of them, no.
12          MS. SCRIVANI:  Page 25, Line
13  11 through 26, 14 -- 26, 15.
14       Were there trainers -- you would
15  agree with me that Miss Mawing was a trainer that
16  lost stalls as a result of the barn check?
17          MR. WOLFSON:  One of them,
18  yes.
19          MS. SCRIVANI:  One of the
20  trainers?
21          MR. WOLFSON:  Yes.
22          MS. SCRIVANI:  But there were
23  more than Miss Mawing that lost stalls, correct?
24          MR. WOLFSON:  Yes.

Page 587

1      MS. SCRIVANI: Mr. Yetsook?
2      MR. WOLFSON: He lost stalls
3  but I don't think he was in somebody else's
4  stalls, I don't remember that.
5      MS. SCRIVANI: You don't
6  recall that Miss Mawing had one of her horses in
7  Mr. Yetsook's stalls?
8      MR. WOLFSON: Oh, yes, I'm
9  sorry.
10      MS. SCRIVANI: Do you recall
11  if Mr. Yetsook then lost stalls as a result of
12  having loaned his stalls to Miss Mawing?
13      MR. WOLFSON: I'm not sure
14  why he lost his stalls.
15      MS. SCRIVANI: Okay.
16      MR. WOLFSON: It was not -- I
17  saw the letter that he got, but it didn't spell
18  out the reason.
19      MS. SCRIVANI: Do you recall
20  how many people were on the list, without
21  recalling the names of the people, who lost
22  stalls as a result of the barn check?
23      MR. WOLFSON: I don't know,
24  somewhere between six and ten, I guess.

Page 588

1      MS. SCRIVANI: Page 37, Line
2  16 through 38, 1.
3      At or around the time that Miss
4  Mawing's horse and goat died, were you aware of
5  any other animals that were located in the barns
6  at Charles Town that had died?
7      MR. WOLFSON: No.
8      MS. SCRIVANI: Other than
9  Miss Mawing speculating that rat poisoning caused
10  her horse and goat to die, do you have any other
11  facts to indicate that that was the reason that
12  they died?
13      MR. WOLFSON: No.
14      MS. SCRIVANI: Page 38, Line
15  16 through 21. I'm sorry, 23.
16      When you say Miss Mawing was doing
17  all the talking for herself, what did you
18  mean -- I'm sorry, let me back up and do this
19  whole page, beginning at Line 2.
20  Did you ever talk to track management about Miss
21  Mawing's concerns that the rat poisoning had
22  killed her horse and goat?
23      MR. WOLFSON: Miss Mawing was
24  doing all the talking for herself.

Page 589

1      MS. SCRIVANI: Okay.
2  Did she ever ask you to do any on her behalf?
3      MR. WOLFSON: No. The only
4  thing I recall her asking was how do they do this
5  at other tracks? And I gave her a rundown of
6  what we did, which was normally to vacate the
7  barn before we put down rat poisoning.
8      MS. SCRIVANI: When you say
9  Miss Mawing was doing all the talking for
10  herself, what did you mean by that?
11      MR. WOLFSON: Well, I didn't
12  have firsthand knowledge or any medical reports
13  to substantiate anything. And I don't make it a
14  practice to go around spouting off stuff that
15  people have told me, because it usually is
16  inaccurate.
17      MS. SCRIVANI: Turning now to
18  Page 39, Line 17 and going to Page 44, Line 11.
19  Now did there come a time when you and Miss
20  Mawing and others attended a meeting with
21  Governor Manchin in Charles Town?
22      MR. WOLFSON: Charleston.
23      MS. SCRIVANI: Charleston.
24      MR. WOLFSON: Yes.

Page 590

1      MS. SCRIVANI: And can we
2  agree that that was on August 18th, 2008?
3      MR. WOLFSON: Yes.
4      MS. SCRIVANI: Who else was
5  was present at that meeting?
6      MR. WOLFSON: Oh, boy. Randy
7  Funkhouser, myself, Tina Mawing, the Governor,
8  the Governor's friend, assistant, or whatever he
9  was, Mr. Puccio and another fellow whose name I
10  don't recall from his office. I think Elaine
11  Hagy was there. There were so many meetings in
12  Charleston and one of which had the entire board
13  plus the Lottery Commission, plus the Governor's
14  staff, plus, you know, they all sort of run
15  together.
16      MS. SCRIVANI: Miss Mawing
17  testified yesterday that she thought, perhaps,
18  Trish Sanderson was at this meeting?
19      MR. WOLFSON: Oh, yes, that
20  was exactly right. Thank you.
21      MS. SCRIVANI: Okay.
22      Does that refresh your recollection
23  about anybody else that might have been there?
24      MR. WOLFSON: No.

Page 591

1    MS. SCRIVANI:  Nobody from
2  Penn National Gaming was there?
3    MR. WOLFSON:  I don't recall
4  anyone from Penn National.
5    MS. SCRIVANI:  What was the
6  purpose of that meeting?
7    MR. WOLFSON:  Well, one was
8  to discuss -- there was a slow down of
9  negotiations on the contract.  There were
10  discussions of the table games legislation coming
11  up.  The Governor agreed to meet with us to hear
12  what the horsemen had to say.  It was kind of a
13  roundtable discussion of all that for most of the
14  meeting.
15    MS. SCRIVANI:  Who called the
16  meeting, the Governor or horsemen?
17    MR. WOLFSON:  I think it was
18  mutually agreed to.
19    MS. SCRIVANI:  Was there an
20  agenda discussed prior to that meeting?
21    MR. WOLFSON:  I don't recall
22  one.
23    MS. SCRIVANI:  Was there an
24  agenda discussed when the meeting started?

Page 592

1    MR. WOLFSON:  There were
2  introductory remarks.  I don't remember an agenda
3  per se.
4    MS. SCRIVANI:  Was one of the
5  items that was expected to be discussed prior to
6  the start of the meeting was Miss Mawing's
7  allegation about the rat poisoning?
8    MR. WOLFSON:  I don't believe
9  that was an intentional part of the meeting.
10    MS. SCRIVANI:  It was brought
11  up, though?
12    MR. WOLFSON:  Yes.
13    MS. SCRIVANI:  How was it
14  brought up?
15    MR. WOLFSON:  She produced
16  pictures of the dead horse and goat for the
17  Governor.
18    MS. SCRIVANI:  Was that at
19  the --
20    MR. WOLFSON:  And his staff.
21  I'm sorry.
22    MS. SCRIVANI:  I'm sorry.
23  Was that at the beginning of the meeting, middle
24  or end?

Page 593

1    MR. WOLFSON:  Somewhere
2  towards the end, I think.
3    MS. SCRIVANI:  How did it
4  come up that she was producing these pictures?
5    MR. WOLFSON:  I don't know
6  that I can specifically answer that.
7    MS. SCRIVANI:  You don't
8  recall?
9    MR. WOLFSON:  No.
10    MS. SCRIVANI:  Okay.
11    What did Miss Mawing tell the
12  Governor with respect to those pictures and her
13  allegations?
14    MR. WOLFSON:  I certainly
15  don't remember her exact words.  But she brought
16  up that she was very obviously distressed.  And
17  she didn't think he would believe her without the
18  pictures.
19    MS. SCRIVANI:  Did she
20  present any medical evidence to the Governor
21  establishing the cause of death for the horse or
22  the goat?
23    MR. WOLFSON:  I don't recall
24  that anything was produced.

Page 594

1    MS. SCRIVANI:  Did the
2  Governor ask questions about confirming cause of
3  death?
4    MR. WOLFSON:  I believe he
5  did.
6    MS. SCRIVANI:  And was she
7  able to provide anything to him?
8    MR. WOLFSON:  That, I don't
9  know.
10    MS. SCRIVANI:  Were you
11  present during the entire meeting?
12    MR. WOLFSON:  Yes.
13    MS. SCRIVANI:  Did Miss
14  Mawing make any other comment about PNGI during
15  that meeting?
16    MR. WOLFSON:  I don't recall.
17    MS. SCRIVANI:  Do you recall
18  any discussions about conditions in the barn
19  during that meeting other than her allegation
20  about the rat poisoning?
21    MR. WOLFSON:  Other than the
22  rat problem, no.
23    MS. SCRIVANI:  From anyone,
24  whether it was Miss Mawing or any other member?

Page 595

1          MR. WOLFSON:  I don't recall.

2          MS. SCRIVANI:  Do you recall

3    anyone at that meeting alleging that Penn

4    National had strung up any sort of wire in a barn

5    or put a rope across the barn?

6          MR. WOLFSON:  There was

7    something about that, but I don't recall the

8    details.

9          MS. SCRIVANI:  It was during

10   that meeting?

11         MR. WOLFSON:  Yes.

12         MS. SCRIVANI:  You don't

13   recall who said it?

14         MR. WOLFSON:  No.

15         MS. SCRIVANI:  That completes

16   Mr. Hale's designations in part.

17         MR. WOLFSON:  Subject to

18   introducing the portions from Mr. Hale after the

19   Panel rules and we speak with counsel in the

20   morning, that would end our designations we

21   intend to read into the record.

22         And fortunately it looks like we

23   finished a little bit early today.

24         ARBITRATOR CARNEY:  Mr.

---

Page 596

1    Hammer, do you have anything else at this point?

2          MR. HAMMER:  I don't believe

3    we have anything for the Panel to take up at this

4    point.

5          ARBITRATOR CARNEY:  We'll

6    adjourn 'til 9:00 tomorrow morning.

7          MS. SCRIVANI:  Thank you.

8          * * *

9          (Whereupon, this hearing was

10   adjourned at 3:39 p.m.)

11         * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 597

1    THE STATE OF  :

2    WEST VIRGINIA  :

           : SS: C E R T I F I C A T E

3    COUNTY OF OHIO :

4

          I, TAMELA G. SHEELER, Registered

5    Professional Reporter within and for the State of
     West Virginia duly commissioned and qualified, do

6    hereby certify that the within-named witnesses
     were called upon to testify in the within matter

7    of arbitration and that the testimony then given
     by the witnesses was by me reduced to stenotype

8    in the presence of the witnesses; afterwards
     reduced to Computer Aided Transcription under my

9    direction and control; that the foregoing is a
     true and correct transcript of the testimony so

10   adduced during the trial of the within cause.

11

          I do further certify that this

12   testimony was taken at the time and place in the
     foregoing caption specified, continued to another

13   date.

14

          I do further certify that I am not a

15   relative, counsel or attorney of either party, or
     otherwise interested in the event of this action.

16

17        IN WITNESS THEREOF, I have hereunto
     set my hand and affixed my seal of office at

18   Wheeling, West Virginia, on the 27th day of June,
     2013.

19

20

21

22        _____
          TAMELA G. SHEELER, Registered

23        Professional Reporter

24

---

Page 598

1    THE STATE OF  :

     WEST VIRGINIA  :

2             : SS: C E R T I F I C A T E

     COUNTY OF OHIO  :

3

4

          I, TAMELA G. SHEELER, Notary Public

5    within and for the State of West Virginia, duly
     commissioned and qualified, do hereby certify

6    that the within-named witnesses were by me duly
     sworn to testify to the truth, the whole truth

7    and nothing but the truth in the cause aforesaid.

8

9

          I do further certify that I am not a

10   relative, counsel or attorney of either party, or
     otherwise interested in the event of this action.

11

12

13        IN WITNESS THEREOF, I have hereunto set
     my hand and affixed my seal of office at

14   Wheeling, West Virginia, on the 27th day of June,
     2012.

15

16

17

18        _____

          TAMELA G. SHEELER, Notary

19        Public within and for the State
          of West Virginia

20

21

          My Commission expires:

22        November 4, 2021

23

24

Page 634

```
 1        AMERICAN ARBITRATION ASSOCIATION
 2
 3   CHARLES TOWN HORSEMAN'S  :
     BENEVOLENT AND PROTECTIVE :
 4   ASSOCIATION, INC., and   :
     TINA MAWING,          : NO. 55-196-Y-00015-12
 5        Claimants  :
                       :
 6   PNGI CHARLES TOWN GAMING, :
     LLC,               :
 7        Respondent  :
 8
 9             * * *
10        ARBITRATION HEARING - VOLUME III
11     BEFORE:  JAMES T. CARNEY, ESQUIRE
12          WILLIAM M. WYCOFF, ESQUIRE
13          ALLAN N. KARLIN, ESQUIRE
14        Wednesday, June 12, 2013
15           8:30 a.m.
16             * * *
17
18        Holiday Inn
19        301 Foxcroft Avenue
20        Martinsburg, West Virginia 25401
21
22        Whereupon, the above-entitled matter
23   came on for hearing and the proceedings were as
24   follows:
```

Page 635

```
 1   APPEARANCES:
 2
 3        On behalf of the Claimant:
 4        DAVID M. HAMMER, Esquire
 5   Hammer, Ferretti & Schiavoni, 408 West King
 6   Street, Martinsburg, West Virginia 25401
 7        Telephone:  (304) 264-8505
 8         Fax:  (304) 264-8506
 9        E-mail:  dhammer@hfslawyers.com
10
11        On behalf of the Claimant:
12        HARRY P. WADDELL, Esquire
13   Waddell Law Offices, 300 West Martin Street,
14   Martinsburg, West Virginia 25401
15        Telephone:  (304) 263-4988
16         Fax:  (304) 262-2498
17        E-mail:  hwad50@aol.cmo
18
19
20
21
22
23
24
```

Page 636

```
 1   APPEARANCES (Cont.):
 2
 3        On behalf of the Respondent:
 4        JOSEPH E. WOLFSON, Esquire
 5   Stevens & Lee, 620 Freedom Business Center, Suite
 6   200, King of Prussia, Pennsylvania 19406
 7        Telephone:  (610) 205-6000
 8         Fax:  (610) 337-4374
 9        E-mail:  jwo@stevenslee.com
10
11        On behalf of the Respondent:
12        STACEY A. SCRIVANI, Esquire
13   Stevens & Lee, 111 North Sixth Street, Reading,
14   Pennsylvania 19603-0679
15        Telephone:  (610) 478-2086
16         Fax:  (610) 988-0812
17        E-mail:  sasc@stevenslee.com
18
19   ALSO PRESENT:
20        Tina Malgarini Mawing
21        Erich Zimny
22
23
24
```

Page 637

```
 1              I N D E X
 2   WITNESS                    PAGE
 3   John Finamore
 4     Direct Examination By Mr. Wolfson ..... 639
 5     Cross-Examination By Mr. Waddell ...... 706
 6     Examination By Arbitrator Karlin ...... 734
 7     Examination By Arbitrator Carney ...... 748
 8     Examination By Arbitrator Wycoff ...... 751
 9     Recross-Examination By Mr. Waddell .... 755
10     Redirect Examination By Mr. Wolfson ... 757
11   Albert Britton
12     Direct Examination By Mr. Wolfson ..... 762
13     Cross-Examination By Mr. Hammer ....... 807
14     Examination By Arbitrator Karlin ...... 861
15     Redirect Examination By Mr. Wolfson ... 879
16     Recross-Examination By Mr. Hammer ..... 880
17   Larry J. Puccio
18     Direct Examination By Mr. Wolfson ..... 884
19     Cross-Examination By Mr. Hammer ....... 899
20   Richard Moore
21     Direct Examination By Mr. Waddell ..... 918
22     Cross-Examination By Ms. Scrivani ..... 949
23   Tina Mawing
24     Rebuttal by Mr. Hammer ................ 952
```

Page 638

1    E X H I B I T S
2                              PAGE
3  Exhibit No. 44 .............................. 854
4  Exhibit No. R-71 ........................... 914
5  Exhibit No. R-72 ........................... 914
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 639

1                * * *
2    P R O C E E D I N G S
3                * * *
4        ARBITRATOR CARNEY:  We'll go
5   on the record.  You may proceed.
6        MR. WOLFSON:  We call John
7   Finamore.  Could you swear the witness, please?
8                * * *
9        JOHN FINAMORE
10  being first duly sworn, was examined and
11  testified as follows:
12        MR. WOLFSON:  May I proceed?
13        ARBITRATOR CARNEY:  Yes.
14                * * *
15    D I R E C T   E X A M I N A T I O N
16  BY MR. WOLFSON:
17  Q.      Can you identify yourself for the
18  record, please?
19  A.      John Finamore, Senior Vice President
20  of Regional Operations for Penn National Gaming.
21  Q.      And the entity with whom you're
22  directly employed, Penn National Gaming, that's
23  different than the entity here involved in this
24  case?

Page 640

1   A.      That's correct.  I am an employee of
2   the parent company and an officer of Penn
3   National Gaming, Incorporated.
4   Q.      And do you have some responsibility
5   for Penn National Gaming, Charles Town, the
6   Charles Town facility?
7   A.      I don't at this time.  I did several
8   years ago.  I started with the company in the
9   fall of 2002.  I was based at the Charles Town
10  property at that time in the same capacity,
11  Senior Vice President of Regional Operations, but
12  as of 2011 my responsibilities were realigned and
13  I have responsibility primarily for the mid-west
14  region of the company and our horse racing
15  operations throughout the country also report to
16  me and I no longer oversee the Charles Town
17  property.
18        MR. WOLFSON:  We went through
19  in the video his background.  I'm just going to do
20  it very quickly and if you don't mind I'd just
21  like to get through it real quickly.
22  BY MR. WOLFSON:
23  Q.      Sir, as I understand you graduated
24  from the Cornell Hospitality School in 1980?

Page 641

1   A.      Cornell School of Hotel
2   Administration in 1980.
3   Q.      Thank you.
4        And after that you worked for the
5   Westin Corporation, their hotels --
6   A.      Westin Hotels and Resorts for
7   approximately 14 years, six different locations.
8   Q.      And then you got into the gaming
9   business?
10  A.      I did in Las Vegas in 1994 for a
11  company called Station Casinos and subsequently a
12  company called Ameristar Casinos and then in 2002
13  with Penn National, my current role.
14  Q.      Okay.
15        Let's go through relatively quickly
16  your responsibility since you joined Penn
17  National Gaming.
18  A.      Okay.
19        Again, I started in '02 based in
20  Charles Town.  At that time I oversaw the
21  Charles Town property and our racetrack at Penn
22  National Racecourse near Hershey, Pennsylvania.
23  In short order I was given additional
24  responsibilities including, I don't know if I'll

Page 642

1 get the order right, but our property in Bangor,
2 Maine, our property of Hobbs, New Mexico. I'm
3 trying to think what came next, subsequent
4 properties were given to me, Casinorama in
5 Canada, the horse racing operation was given to
6 me over all, company wide operation, I believe,
7 in '04, and then I was given responsibility for
8 additional properties in Illinois and finally
9 Ohio and Indiana a couple of years ago.
10 **Q.      All right.**
11 **Let's talk about Penn National Gaming**
12 **a little bit. Can you describe to the panel with**
13 **Penn National Gaming is?**
14 A.      Sure.
15         Well, today the company is two
16 things. It's the largest operator of pari-mutuel
17 facilities in the country, pari-mutuel facilities
18 obviously include thoroughbred racing, harness
19 racing and dog tracks and we have all three of
20 those operations.  In fact, we have, I believe a
21 current count, 12 tracks in nine different
22 jurisdictions and as I said we are the largest
23 operator, we've eclipsed Niro, we've eclipsed
24 Churchill Downs of pari-mutuel facilities in the

Page 643

1 country.  We are also the largest operator of
2 regional casinos in the country.
3         Regional casinos are local casinos,
4 if you will, like the Charles Town facility here
5 that is frequented by local customers as supposed
6 to a resort on the strip in Las Vegas.  That's
7 not what we do but we are the largest operator of
8 regional casinos in the country.  So that's who
9 we are today.
10        The company started in 1971, very
11 humble beginnings with one racetrack, started as
12 a racing company founded by our current CEO Peter
13 Carlino and his father in 1971 with this one
14 track in Hershey, Pennsylvania that bears the
15 name of the company, Penn National Racecourse
16 also known as Hollywood Casino at Penn National
17 Racecourse.
18        From those very humble beginnings the
19 two Carlino grew the company.  Our operating
20 philosophy is very simple, four or five things
21 that Peter urges us every day to follow, one is
22 we are very decentralized. That means the
23 operators in Charles Town or Lawrenceburg,
24 Indiana or Chicago, Illinois have a tremendous

Page 644

1 amount of autonomy, the general managers.  We
2 have a very lean corporate staff.  The general
3 managers are given a lot of autonomy, therefore,
4 we look to hire the best that we can, let them
5 run their business and stay out of their way and
6 their local markets as much as possible.
7        Certainly there are ground rules and
8 requirements they have to follow, but we are the
9 most, safe to say, the most decentralized company
10 in the industry.  Our chairman is one to always
11 say do the right thing.  That sort of the guiding
12 principle of his and that means -- to me that
13 means do the right thing in the community, give
14 back to the community whether it be charitable
15 giving, treat our employees correctly, provide a
16 good opportunity for them to advance their
17 careers.
18        We've won a number of awards
19 nationally as being the employer of choice in our
20 communities and naturally we're very proud of
21 that.  Obviously, one of our tenants is growth.
22 I've mentioned how we've evolved over the past
23 30/40 years from this one little racetrack to
24 this very, very large company.  We've done

Page 645

1 through very aggressive, very managed and very
2 profitable growth.  Our track record has been
3 impressive and we are regarded on the street as a
4 very great success story.  So that's a little bit
5 about the company, you know, who we are, who we
6 strive to be, how we've gotten to where we are
7 today.
8 **Q.      You also mentioned about community**
9 **involvement; can you describe that a little bit**
10 **more?**
11 A.      Sure.
12         I mean, our general managers, as I've
13 said, have a tremendous amount of autonomy, but
14 we have a general manager's handbook with what we
15 call red fields and green fields.  Red fields are
16 things they can't get involved in. Green fields
17 are things that we expect them to get involved in
18 and run with the ball without our involvement,
19 and community involvement, charitable giving,
20 giving back in the community we do business and
21 is a huge part of our culture, our philosophy and
22 it is a green field.  The general manager has
23 free reign to get involved in the community.
24         I know the property here is very

Page 646

1  involved in a number of charities. We are the
2  largest -- Charles Town is the largest donator to
3  the United Way every year, in the Eastern
4  Panhandle here in West Virginia. All of our
5  employees get involved. We've been very involved
6  with the food bank here in the county; the
7  largest donations come from the Charles Town
8  property.
9        There is an employee challenge every
10 year at Thanksgiving where departments challenge
11 each other to see who can collect the most food
12 and I believe the record was set a few years ago,
13 actually when I was still here, several tons of
14 food were collected through this employee
15 challenge.
16       So we really focus on doing the right
17 thing in the community, giving back to the
18 community.
19       We've done that horse rescue as well.
20 Supporting a group locally that takes retired
21 racehorses and gives them to homes, farms if you
22 will, where they can live out the rest of their
23 lives. So we've given them a lot of money to
24 help in their efforts to help save these horses.

Page 647

1        These are just a few examples.
2  Q.    Is that policy with respect to
3  retirement of horses as opposed to slaughter;
4  something that's incorporated within the company
5  as a whole?
6  A.    The company made great strides a few
7  years ago. There was -- horse slaughter is a
8  very emotional issue in the industry if you
9  follow it, very difficult issue, what to do with
10 a racehorse after its prime. And a number of
11 horses were ending up at slaughterhouses in
12 foreign countries and the meat being shipped
13 overseas. And we saw an opportunity to do the
14 right thing, back to our -- one of our chairman's
15 guiding principles and we have a -- we were the
16 first company, the first racetrack company to
17 come out with an anti-slaughter policy that we
18 will not -- to the extent we can control it, we
19 will not allow horsemen on the backside to sell
20 horses for slaughter.
21       We have rules, it's in our racing
22 handbook that all horsemen are issued when they
23 stable with us and that is true not only here at
24 Charles Town, but that policy is throughout our

Page 648

1  thoroughbred tracks around the country.
2  Q.    Let's talk about Charles Town and
3  your work down here a little bit more thoroughly.
4  I think you said you started with PNGI in '02; is
5  that right?
6  A.    That's correct.
7  Q.    And that was actually -- you were
8  physically located down here in Charles Town?
9  A.    That's correct.
10 Q.    Okay.
11       And at that time you were the senior
12 VP of regional operations?
13 A.    Yes.
14 Q.    And I think someone by the name of
15 Buchanan was the general manager?
16 A.    Yes, Jim Buchanan was the general
17 manager in '02.
18 Q.    Okay.
19       And take us through what your
20 responsibilities were in Charles Town when you
21 were based here. I think just to cut through
22 it --
23 A.    Sure.
24 Q.    -- I think this was yesterday on the

Page 649

1  video just to expedite things. I think you were
2  down in from '02 to '07, right?
3  A.    '02 to '07, I was officed here in
4  that role, Senior Vice President of Regional
5  Operations.
6        There was a period in '04 where I was
7  the acting general manager for about six months.
8  Mr. Buchanan had left, Mr. Britton, the current
9  general manager has not been hired yet. So for
10 about a six-month period I was the acting GM, as
11 well as having the regional responsibilities,
12 always based here, but you know, I think
13 interestingly I spent a lot of my first few
14 months here back to '02 learning the horseracing
15 business. I did not know much about the
16 business.
17       I could understand very clearly it
18 was a very important part of who Penn National
19 was and certainly to this day who we are. We put
20 a lot of emphasis on racing. I mentioned we
21 operate 12 tracks in nine jurisdictions around
22 the country and I spent a lot of time from late
23 '02 when I joined the company through that '04
24 period learning about racing, getting involved in

Page 650

1  the operation here and frankly asking a lot of
2  questions as to why do we do things this way and,
3  you know, why can't we do things differently or
4  better.
5         Racing is a very old business and I
6  think I could argue that in some cases had run --
7  racing had run the way it had always run and
8  there were a lot of paradigms in racing and I
9  think some of them needed to be challenged and
10 taken a look at. So that's what I spent a lot of
11 those early periods doing.
12 **Q.     Now, in connection with the time that**
13 **racing has been here, that Penn National has had**
14 **it, you talked about the way it was done and what**
15 **the company started to do here, but overall, has**
16 **the -- has Penn National Gaming in terms of the**
17 **cash flow from just the racing operation, what's**
18 **been the experience with Penn National Gaming and**
19 **the cash flow as opposed to what's come in,**
20 **what's come in, explain that.**
21 A.     Look, I mean horseracing is at best a
22 breakeven proposition. There are some exceptions
23 nationally of racetracks that make money but the
24 business is a very challenged business and we

Page 651

1  strive to make money like everything else we do,
2  obviously we have a responsibility to our
3  shareholders, but racing is a very difficult
4  business.
5         So, at the Charles Town property it's
6  safe to say that when you look at the cost of
7  running the racing operation, everything
8  included, the track maintenance, the capital to
9  keep the track up, the labor, the purses, the
10 business is a loser. The racing business is a
11 loser.
12        So, everything that, you know, we've
13 plowed more money into the racing operation than
14 the profit we've taken out of it over the years
15 we operated here and that's really true of all of
16 our locations. It's a very challenging business.
17 **Q.        The company doesn't resent doing**
18 **that, does it?**
19 A.      No, not at all, I mean, again, back
20 to the roots of who we are, the roots of our
21 company, you know, we operate some stand-alone
22 racetracks around the country. When I say
23 stand-alone, I mean tracks without alternate
24 forms of gaming, no slots, no tables, but we also

Page 652

1  operate racetracks that have, as in the Charles
2  Town, alternate forms of gaming. We do both.
3  Obviously the tracks with alternate forms of
4  gaming are a lot more financially viable for us.
5  And, again, back to creating value for our
6  shareholders, it makes a lot more sense, but we
7  are comfortable operating both, we operate both
8  and we operate them as efficiently as we can in
9  both cases.
10       ARBITRATOR WYCOFF: Sir, are
11 you public company?
12       THE WITNESS: Yes, we are.
13 We're publicly traded. The company went public
14 in 19 -- I believe the IPO was 1993 and we trade
15 on NASDAQ, P-E-N-N is the ticker.
16       ARBITRATOR CARNEY: And the
17 reason you came in at a very high level is
18 because while you weren't involved or had no
19 experience with horseracing, you were very
20 experienced in running the gaming side, the
21 gambling side?
22       THE WITNESS: Correct,
23 correct, when I was with Station Casinos, I
24 started out as an assistant general manager, then

Page 653

1  I was a general manager, then I had -- in
2  Missouri I was president of Midwest operations
3  for the company. So I oversaw multiple
4  properties for Stations.
5         I did the same thing for Ameristar
6  for a period of time and Penn National, our CEO
7  recognized -- I think when I joined the company
8  we had maybe six casinos.
9         Today we have 20 -- I lose track
10 because we keep picking up so many, but we have
11 20-something casinos today nationally and the
12 company recognized they needed to recruit some
13 talent, that the company was in a growth mode and
14 I was one of several people who were recruited at
15 the time to come in.
16        I was the first senior vice president
17 of regional operations for the company; our CEO
18 recognized the need to have that regional
19 structure. Today we have three -- there are
20 three of us, the company is in three separate
21 regions, the East, the Midwest and West South
22 region. So, yes, that's an accurate statement.
23       ARBITRATOR CARNEY: Because
24 the casino side of business makes money?

27228234-391e-4c3e-a268-37fe29e9a583

Page 654

1    THE WITNESS:  Correct,
2  correct, and Charles Town was acquired by Penn
3  National in late '96, early '97, the first VLT
4  machines, video lottery terminals or slot
5  machines were installed and so I joined the
6  company about five years later.  Charles Town was
7  in a growth mode.  I think when I joined the
8  company it had about 1800 or 2000 machines at the
9  property.   At its peak it got to 5000 plus all
10  the tables.
11    So the company was in a very ramping
12  up growth mode.
13  BY MR. WOLFSON:
14  Q.    And you've been involved here in
15  Charles Town since from the time when it was just
16  the track with slots, right?
17  A.    Correct, when I joined the company
18  there were no tables, there was no live poker.
19  There was very limited food offerings.  There
20  wasn't even a parking garage there. There also
21  wasn't the racetrack as you see it today, did not
22  look like that.  We had light poles that were a
23  lot lower, the quality of our signal, our export
24  signal was very poor.

Page 655

1    I remember being in Las Vegas once
2  and being in a race book where people bet on
3  racing and looking at this image of this
4  racetrack and it looked like the horses were
5  racing underwater.  I mean you couldn't see what
6  was going on, our light poles were so low and the
7  light quality was so poor that the image was just
8  not very inviting for the betting customer.  So,
9  yeah, we invested a lot of money on the racing
10  side.  We spent 1.5 to 2 million dollars in a new
11  lighting system.  So now when you look at our
12  signal around the country, you can see what
13  racetrack it is and you feel more comfortable
14  betting on us.
15    So that commitment, capital
16  commitment was made on the casino side, added
17  food and beverage venues, added parking, and
18  certainly added a lot of racing amenities, a new
19  track surface, new lights, a new paddock, jock's
20  quarters and so on and all told we've spent to
21  this day well over $400 million at the Charles
22  Town property upgrading it and adding all of
23  these amenities, the hotel was another one we
24  added in '07.

Page 656

1  Q.    Now, just overall to make sure it's
2  clear, you're not saying that the Charles Town
3  property track and casino loses money?
4  A.    No, not at all.
5  Q.    Okay.
6  A.    No, the Charles Town facility has
7  been very profitable for Penn National.  It's
8  been good story for us.  The racing side is, as I
9  mentioned earlier, is a challenge and we manage
10  it to try to break even and again, that's true of
11  all of our racing facilities.  It's a very
12  challenged business.
13    ARBITRATOR KARLIN:  Let me
14  just ask one question.
15    THE WITNESS:  Sure.
16    MR. WOLFSON:  Sure.
17    ARBITRATOR KARLIN:  The
18  clientele for the racing, the slots and the
19  gaming, do they overlap or are they different
20  markets?
21    THE WITNESS:  That's a very
22  good question and one that we study a lot and
23  ideally we wish those three customer groups all
24  overlapped.  That would be the best thing.  We've

Page 657

1  tried over the years here and at our other racing
2  facilities to incent them to overlap but at the
3  end of the day the overlap, we only see and this
4  is true here and in all of our other experience,
5  is the racing customer plays poker, live poker
6  and maybe live tables.   The poker player and the
7  table player may go and bet a little bit on
8  horses, but there is not that crossover into the
9  slot area and the crossover that exists between
10  the racing customer and the table customer and
11  the table customer and the racing customer is not
12  very widespread.
13    It's very limited.  So Charles Town,
14  to give you an example of how we've tried to
15  convert, if you will, those customers, expose
16  them to other ends of our business, we built our
17  poker room in the grandstand right next to the
18  racing hoping, knowing, that some customers will
19  overlap, hoping we could expand that and there
20  has been -- you can watch the poker players come
21  out between races and bet and you can see the
22  racing customers come into the poker room, but
23  that overlap has not been what we had hoped for
24  and that's disappointing to us and again,

Page 658

1 consistent with what we see around the country.
2        ARBITRATOR KARLIN:  Thank
3 you.
4        THE WITNESS:  Thank you.
5 BY MR. WOLFSON:
6 **Q.       Now in connection with the gaming**
7 **revenue and I mean the casino revenue, let's just**
8 **talk about that for a second, the revenue at the**
9 **casino, does that benefit only Penn National**
10 **gaming?**
11 A.      No, the way the enabling legislation
12 was set up by the state of West Virginia in the
13 '90s, it really -- look, I can complain about
14 high the tax rate is as an operator in West
15 Virginia, but the way the legislature is set up,
16 the enabling legislation was very, in retrospect,
17 very smart.  They set it up so that the money
18 from slots, although taxed at a very high base
19 rate for us, approximately 60 percent, 6-0 off
20 the top goes to the state from our slot revenue,
21 which is -- to give you a perspective, in Nevada
22 the casinos are taxed at about six percent, six
23 versus 60.
24        The trade-off was in West Virginia

Page 659

1 the enabling legislation provided somewhat of a
2 protected market, of a monopoly.  They -- the
3 legislation doesn't allow for a casino to be here
4 at the Holiday Inn in Martinsburg.
5        So the trade-off was we're going to
6 tax you at a very high rate but we're going to
7 protect your market for you so you can invest and
8 know that your business will be viable tomorrow.
9        Now, of that 60 percent, which is
10 again a very high tax rate, a good portion of
11 that goes to the horsemen in one form or fashion,
12 whether it's through purse subsidies, breeders
13 subsidies, capital funds for us to tap into to
14 reinvest on the racing side.  It's a very good
15 model for the horsemen.  Of course, a portion of
16 that 60 percent also goes to the county, to the
17 five cities or five towns that we -- that
18 surround the racetrack and of course large
19 portion of it goes to the state, some goes to
20 veterans funds, education and so on.  So it's a
21 very good model.
22        It's worked very well for the state.
23 The funds from the lottery in the State of West
24 Virginia, lottery includes all the racetrack

Page 660

1 revenues and of course lottery tickets is the
2 third largest source of revenue for the state,
3 obviously state income tax is number one, state
4 sales tax is number two, lottery revenues are
5 number three for the state and it has produced a
6 significant amount of revenue for the state and
7 West Virginia has been a state that has
8 consistently run at a surplus.
9        As long as I've been working in this
10 state or been involved here, the state has had a
11 surplus and even in the tough years, '07 '08,
12 '09, the state ran a surplus and largely because
13 of this formula which was very forward thinking
14 by the legislature in the '90s.
15 **Q.      Now, is there --**
16        **ARBITRATOR WYCOFF:  I**
17 **apologize.  I'm cutting into what you were going**
18 **to ask, but with regard to the money that goes to**
19 **the horsemen you talked about and to the**
20 **breeders; does that just go to the Horsemen's**
21 **Association and it's up to them how it is**
22 **dispersed or is there any limits on it or is it**
23 **only people who stall horses at your racetrack**
24 **who get the benefit of that money?  How does that**

Page 661

1 **work?**
2        THE WITNESS:  Well, there are
3 multiple buckets.  The bulk of it, the largest
4 piece of it goes to the horsemen for their
5 purses, so it is earmarked for purses and purses
6 only, but another piece goes to breeders funds
7 and that is -- that money is allocated not by the
8 horsemen, by the state to breeders who apply for
9 -- obviously it's to encourage West Virginia bred
10 horses.  It makes sense.  Let's breed the horses
11 in West Virginia, let's get them to race at the
12 West Virginia track and let's get them to win the
13 purse money.
14        ARBITRATOR WYCOFF:  Who
15 controls how that money is dispensed?
16        THE WITNESS:  The state
17 controls the breeders' piece.  Now, there is
18 another piece of what's known as two percent
19 money which is money that is earmarked for the
20 health and welfare of the horsemen, the backside
21 employees, if you will.  Those are the employees
22 who work on the backside, the racetrack, they are
23 not employees of Penn National or Charles Town.
24 They work for the horsemen.

27228234-391e-4c3e-a268-37fe29e9a583

Page 662

1  BY MR. WOLFSON:
2  **Q.        That would be like the grooms and**
3  **people like that?**
4  A.  Correct.  People who work, exercise
5  riders, grooms, stall muckers, laborers on the
6  backside, that two percent money was intended to
7  be for their health and welfare.  That money, to
8  your question, is distributed by the horsemen at
9  their discretion, the state does not --
10          ARBITRATOR WYCOFF:  When
11  you're saying horsemen; are you talking about the
12  Association?
13          THE WITNESS:  Correct.  Yes.
14  BY MR. WOLFSON:
15  **Q.        The HBPA?**
16  A.  Yes, the HBPA.  Yes.
17          ARBITRATOR WYCOFF:  Thank
18  you.
19          ARBITRATOR KARLIN:  Can I ask
20  one question, please?  I know a little bit but
21  enough to be dangerous, so explain -- you said
22  the trade-off the state gives you is that
23  essentially it relieves you of competition, how
24  broad an area, how is that defined?

Page 663

1          THE WITNESS:  Well, you know,
2  that's a good question.  When the legislation was
3  enabled back in '93 or '94, whatever year that
4  was, there were four tracks earmarked for this
5  what was a pilot project at the time.  Charles
6  Town and Mountaineer on the northern panhandle,
7  which is a thoroughbred track and then two dog
8  tracks, one in Wheeling and one in Charleston,
9  West Virginia.  Those were the only four enabled
10  sites.  Any exception to that would require
11  legislative approval.  So if someone wanted to
12  build a racetrack in Martinsburg and put a casino
13  here, it would require legislative approval and
14  it would also require a county enabling vote.
15  One ever knows how legislators will look at that
16  but they have been very good for the past almost
17  20 years now in protecting these monopolies.
18  There has been one exception, one expansion of
19  gaming, if you will, in the state and that was
20  the Greenbrier Resort, which was given at first
21  very limited casino amenities.
22          It's been expanded a little bit but
23  it's in a very, very remote part of the state as
24  you know and it's not really a competitor,

Page 664

1  certainly not to us.  Obviously, we're watching
2  that carefully to make sure that a racetrack
3  doesn't end up in Martinsburg.
4          ARBITRATOR KARLIN:  Thank
5  you.
6  BY MR. WOLFSON:
7  **Q.        Now, in connection with the gaming**
8  **and the operations and the money flows through**
9  **the state, is there something that's required as**
10  **between the track and the HBPA to enable Charles**
11  **Town to operate?**
12  A.        There is.  Again, as a part of that
13  legislation, we are required to have an agreement
14  with the unit that represents the horsemen.  In
15  this case it's the HBPA and we're required to
16  have a contract in place with them.
17  **Q.        And what happens if a contract is not**
18  **in place with the HBPA?**
19  A.        The slot machines, the table games,
20  the live poker all must be turned off.
21  **Q.        And if they are turned off, what**
22  **happens to the revenue to the state?**
23  A.        Well, the revenue to the state, the
24  horsemen, the breeders, the veterans, the school

Page 665

1  kids, everyone, Penn National, everyone is turned
2  off.  Our employees are out of work.  It's a
3  pretty simple -- it's pretty simple math.
4          ARBITRATOR KARLIN:  I'm
5  sorry.
6          MR. WOLFSON:  No, go ahead.
7          ARBITRATOR KARLIN:  And when
8  you say it's turned off, I mean there's a period
9  when you're -- you mean if the one lapses and
10  it's not immediately replaced, it's turned off or
11  is there a --
12          THE WITNESS:  Strictly
13  speaking, if we don't have a contract today, we
14  cannot operate any of those amenities including
15  pari-mutuel broadcasting by the way.  We could
16  not operate anything at the facility.  I guess we
17  could keep the restaurants open, we could keep
18  the hotel open but all of the gaming, all of the
19  racing, all of the simulcast broadcasting turned
20  immediately, not next week, not next month,
21  immediately.
22          ARBITRATOR KARLIN:  You said
23  strictly speaking, is there wiggle room?
24          THE WITNESS:  No, I want to

Page 666

1  be very clear, turned off immediately, no wiggle
2  room, and as I said, instantly.
3            ARBITRATOR WYCOFF:  Has that
4  ever happened?
5            THE WITNESS:  It has not, has
6  not.  We've got to the brink but we didn't get to
7  Armageddon.
8  BY MR. WOLFSON:
9  Q.       That's talk about -- that's a good
10 leeway, now let me ask you to turn in your white
11 books, it's R-28, it's also C-1, I believe of the
12 '04 agreement, R-28, C-1, whichever of those in
13 front of you is easiest to use.  Yeah, you can
14 use R-28 in that one.  Do you have R-28 in front
15 of you, sir?
16 A.       This is the -- I believe so.  I just
17 want to make sure.  This is the '04 --
18 Q.       Agreement.
19 A.       -- '04 agreement, yes, I do.
20 Q.       And when we were discussing the kind
21 of agreement that -- the agreement that is
22 required between the HBPA on the one hand and
23 Charles Town Racing on the other, is this what
24 you're talking about?

Page 667

1  A.       This looks to be the document, yes.
2  Q.       Okay.
3            And were you involved in the
4  negotiations for this '04 agreement with the
5  HBPA?
6  A.       I did not sit in any of the sessions.
7  I was involved in the background, if you will,
8  talking to our attorneys and management who were
9  in the actual negotiating sessions but I had to
10 approve this final document as part of the
11 process.
12 Q.       Okay.
13           We're going to go to the -- yes, I
14 think everyone has seen this ad nauseam, but more
15 time, hopefully won't hurt.  Let me know when
16 you're there, sir?
17 A.       I've got it, page 13.
18 Q.       You familiar with paragraph 13,
19 relating to stalls; right?
20 A.       I'm sorry.  Page 13?
21 Q.       Page 13, paragraph 11.  I apologize.
22 A.       I've got it, yes.  No problem.  I'm
23 here, yes.
24 Q.       Are you familiar with that, sir?

Page 668

1  A.       Yes, I am.
2  Q.       Okay.
3            And just to cut through it, you're
4  familiar with the paragraph, A, the sentence that
5  talks about effective stall utilization being
6  important to Charles Town management and
7  equitable allocation being essential to the
8  livelihood of the horsemen?
9  A.       Yes.
10 Q.       And that was language you approved,
11 right?
12 A.       Yes, I did.
13 Q.       And why?
14 A.       The business model is very simple and
15 this goes back to what I found when I got to the
16 property.  I believed, as I mentioned to you
17 gentlemen earlier, that there were some things we
18 were doing on the racing side that we needed to
19 take a look at and frankly one of the things was
20 how we allocate stalls.
21           There were back in '02 a lot of empty
22 stalls, stalls that horses in them that, frankly,
23 had no business being in the stalls.  They didn't
24 race enough and I wasn't sure and I remember

Page 669

1  asking our general manager of racing at the time,
2  Dickie Moore, how do we decide who gets to go,
3  which horse gets to go in the stall, what's the
4  process because to your question, Mr. Wolfson,
5  the model is very simple.  The best horses in the
6  stalls, the most starts out of the stalls,
7  quality starts should lead to the highest handled
8  bet, the most interest from our customers, if the
9  horses are good and the product is good, they're
10 going to bet more money, we are going to make
11 more money, Penn National, the state is going to
12 make more money, the horsemen are going to make
13 more money.  It seemed to me a very simple model
14 and if we have empty stalls or broken down
15 horses, we're not maximizing the profitability
16 for all the constituents including Penn National.
17 Q.       So were the effective utilization and
18 equitable allocation connected in your mind?
19 A.       Absolutely.  I felt as though we had
20 to develop more objective criteria as to how
21 stalls were allocated.  Again, I don't know how
22 they were done, it seemed to me that it was not
23 done with a lot of thought put behind it and
24 again, when I say not without a lot of thought as

Page 670

1  to how we can maximize profitability, revenue,
2  for all the constituents as I mentioned.  So to
3  me the two were absolutely intertwined.
4  **Q.       So in connection with the effort to**
5  **maximize the business of racing and get the best**
6  **product and maximize betting and interest and get**
7  **people in the stands who were interested, what**
8  **was your view of what had to be done?**
9  A.       Well, back to what I thought as far
10  as developing criteria, objective criteria.
11  Look, it's not a black-and-white perfect science.
12  I wish it were, it's not, but it seemed to me
13  there was very little objectivity in the process
14  back in '02.  It started with the actual stall
15  application which we changed and I can't remember
16  if that was '03 or '04, but the actual
17  application was changed.  The entire process was
18  changed.  We developed a stall application or a
19  stall committee to overview or, or to, sorry, to
20  review stall applications with an eye on putting
21  the best horses in the stalls and, again,
22  maximizing the business opportunity for all
23  concerned.
24  **Q.       Now, let me also -- I'm going to come**

Page 671

1  **back to that maximizing business opportunity in a**
2  **minute, but now let me turn to paragraph B, the**
3  **one that talks about with respect to allocation**
4  **-- I'm summarizing, yeah, just so we cut through**
5  **it, that's the paragraph that says that Charles**
6  **Town can't discriminate in the allocation of**
7  **stalls on the basis or by reason of HBPA**
8  **membership or activity --**
9  A.       Yes.
10  **Q.       -- but also the last sentence says**
11  **subject to this limitation the allocation of**
12  **stalls shall be in the discretion of Charles Town**
13  **Races; do you see that?**
14  A.       I do.
15  **Q.       Did you also approve that?**
16  A.       Absolutely.
17  **Q.       Why?**
18  A.       That was very important.  We believed
19  that we had to have the discretion, the final say
20  as to putting the best horses possible in the
21  stalls.  Again, back to that business model that
22  I mentioned, we felt that it was very important
23  and very clear to all concerned that we had that
24  final say, that we had the discretion to say we

Page 672

1  think this is in everyone's best interest.  This
2  is nothing, it's not personal, it doesn't matter
3  that you've had a stall here for 20 years; you
4  have to produce out of that stall.  You have to
5  produce for all of us out of those stalls so we
6  can maximize profitability.
7  **Q.       Well, why did you need discretion if**
8  **you're talking about objective standards, is it**
9  **purely objective?**
10  A.       Well, again, back to what I said, I
11  wish it was all black-and-white.  It is not.  We
12  established certain black-and-white criteria, for
13  instance, starts per stall; there were never any
14  that I could see, any criteria for a certain
15  amount of starts per stall.  We established a
16  rule of seven starts per stall per year and you
17  were asking me when I walked in the room why
18  can't a horse or why does a horse race as
19  frequently as it does and we felt seven was a
20  reasonable number, seven starts per year.  It
21  seems pretty low actually but we thought it was a
22  good starting point.
23          We also then realized that just
24  having a start isn't good enough because if you

Page 673

1  start your horse seven times and it comes in dead
2  last every time, you're meeting the criteria but
3  you're really not when it comes to generating
4  quality product or producing quality product on
5  the track.  So then we started looking at quality
6  starts.  So you not only start the horse but it
7  has to be a competitive horse.
8          So we looked at a lot of other
9  factors, is the horseman, you know, a good
10  horseman.  Does he keep -- he or she keep his or
11  her tack room area in order?  Does he or she
12  follow the rules?  We talked about the racing
13  handbook a moment ago, before we had the racing
14  handbook we had rules.  Does the horseman follow
15  the rules on the backside?  So it was a
16  combination of some very black and white factors
17  and some that required some discretion and that's
18  where this language came from.
19  **Q.       And in connection with discretion,**
20  **what else was taken into account as this process**
21  **began moving forward from when you first got here**
22  **through later on with respect to the business**
23  **objectives and the discretion?**
24  A.       Well, again, it was all about

Page 674

1   maximizing the potential yield, if you will, from
2   the stall and it was, as I said, a very simple,
3   you know, formula of increase, better product on
4   the track.  We know this.  We operate these
5   tracks all over the country.  Better product on
6   the track will lead to higher interest from the
7   betting customer, it will lead to more money
8   invested and everyone benefits from that.
9   Q.        Now, in the prior agreement before
10  this '04, was the allocation of stalls at the
11  discretion of Charles Town limited in some way?
12  A.        I don't know the answer to that.
13  Q.        Do you remember a prior --
14  A.        I'm quite sure there was a prior
15  agreement, yes.
16  Q.        And in that agreement -- I apologize
17  if I'm unclear.  Was there some restriction
18  regarding the due process or just cause regarding
19  the stalls?
20  A.        Yes, I understand the question now.
21  Q.        Go ahead and explain.
22  A.        There was due process language in
23  here as far as opposed to the discretionary
24  language that is in here today, in here in the

Page 675

1   '04 version.
2   Q.        And that was in connection with
3   taking stalls away from horsemen?
4   A.        Correct, and it would have to be
5   taking stalls away as opposed to issuing them,
6   yes.
7   Q.        And why did Charles Town want that
8   out of the agreement?
9   A.        Well, again, for all the reasons I
10  mentioned, we felt it was very important for us
11  as the owner -- please remember, Gentlemen, these
12  stalls are provided at no cost to the horsemen,
13  no cost.  So we're paying for the water, the
14  utilities, we built the barns, we maintain them,
15  this is all at our expense and our belief was if
16  we're not charging rent for these stalls, we
17  should have the discretion to determine who goes
18  in them and, again, back to the business model
19  I've mentioned several times now, we own them, we
20  built them, we maintain them.  We pay for
21  everything and we think we have right to decide
22  who goes in there, which horses go in there to
23  better our business objectives that I've
24  mentioned.

Page 676

1   Q.        And of course there's one limitation
2   on that of course, you agree with that, right?
3   A.        There is, HBPA activity, we cannot
4   discriminate against somebody and we're very
5   clear about this, we cannot discriminate against
6   somebody on the basis of their work with the
7   HBPA.
8   Q.        Okay.
9             Now, sir, I'm sorry, I want to jump
10  ahead to the '08 time period.  Do you recall in
11  the '08 time period this agreement was still in
12  place, the one we're looking at?
13  A.        Yes.  Yes.
14  Q.        When was it set to expire?
15  A.        I believe it was set to expire at the
16  end of '08, December 31st of '08.
17  Q.        Now, as of let's say the middle of
18  '08, was there already discussions or preliminary
19  discussions or consideration of the subsequent
20  contract going on?
21  A.        There was, we had entered into
22  negotiations with the HBPA on a new contract
23  sometime in '08 and again, with an eye on getting
24  a new contract in place before this one expired

Page 677

1   at the end of the year.
2   Q.        Okay.
3             Now, let me take a step back, at this
4   time, the middle of '08, just to try to cut
5   through if I can, counsel, just for the table
6   games -- thanks, I appreciate that.  In '07 there
7   was a referendum to put table games at the
8   Charles Town Casino, right?
9   A.        Yes.
10  Q.        And that was defeated, right?
11  A.        Yes, June of 2007.
12  Q.        Okay.
13  A.        There was a referendum held per the
14  enabling legislation in the county, in Jefferson
15  County.  Again, that's a requirement, I've
16  mentioned that before that once the legislation
17  is passed, the residents of the host county,
18  whether it's here in Charles Town or Mountaineer
19  or Wheeling have to approve table games and we
20  held a referendum in June of '07 that was
21  defeated.
22            ARBITRATOR KARLIN:  What was
23  the vote?
24            THE WITNESS:  It wasn't

Page 678

1  close. I want to say it was probably 57/58
2  against and whatever that is 42/43 for. I
3  believe it was almost 60/40. It wasn't close.
4  BY MR. WOLFSON:
5  Q.      Now, prior to that time, prior to the
6  vote there were some discussions between
7  management and you on the one hand and the HBPA
8  and its leadership on the other about whether the
9  HBPA would support the table games, right?
10  A.      Yes, in fact, we worked with the HBPA
11  on the enabling legislation and I was very, very,
12  personally involved in the enabling legislation
13  getting that passed for table games in the '07
14  session in West Virginia. I spent the better
15  part of that session in Charleston, West Virginia
16  working with our government affairs people and
17  legislators to get table games passed and indeed
18  we got that bill passed in, I think, March of
19  '07. The horsemen were there as well and we
20  tried to work with them on the enabling
21  legislation and at the end of the day we got the
22  bill passed.
23        Soon thereafter we approached the
24  horsemen because we recognized that a referendum

Page 679

1  would be necessary here in Jefferson County, we
2  approached the horsemen and asked them to support
3  our efforts to get table games passed in the
4  county and we had a number of discussions with
5  the horsemen's group at that time.
6  Q.      Ultimately the HBPA voted to remain
7  neutral; is that fair?
8  A.      Ultimately, that's correct. That was
9  after agreeing to support table games, shaking
10  hands with me. We felt we had a deal, we felt we
11  had a deal several times.
12  Q.      What do you mean by that?
13  A.      We, Penn National, thought we had a
14  deal with the horsemen's group to support,
15  endorse table games in the county election in '07
16  and the horsemen's group reneged on their
17  commitment to support tables at that time.
18  Q.      And ultimately the HBPA as an entity
19  voted to remain neutral?
20  A.      Correct, despite repeated efforts,
21  the HBPA for that June '07 referendum decided to
22  remain neutral despite our best efforts to
23  convince them that they were going to leave a lot
24  of money on the table but they did choose to

Page 680

1  remain neutral.
2  Q.      So now let's jump ahead to the early
3  '08 period when you're starting to have the
4  discussions regarding the contract and with this
5  background of the table games, what was the
6  general relationship between Penn National Gaming
7  and the HBPA at that time?
8  A.      In a word, acrimonious. I think we
9  felt betrayed; we had lost that referendum. We
10  thought --again, having the horsemen support it
11  wouldn't have perhaps guaranteed that we would
12  have won, but I think it would have helped and
13  the relationship was very strained and we had
14  two significant issues looming that involved
15  the horsemen again, one was the contract as
16  Mr. Wolfson alluded to that was being
17  renegotiated in '08 with an eye to getting it
18  done by the end of the year.
19        The second issue was we had to wait
20  statutorily two years before we could run a
21  second table games referendum, so we lost in June
22  of '07. The earliest we could run a second
23  referendum would have been June of '09, so we
24  were sort of in the middle, if you go to the

Page 681

1  middle of '08, we were in the middle of that two
2  year window and we were trying to figure out when
3  best to run this referendum a second time with an
4  eye to try to win it of course.
5  Q.      Sir, I'm going to hand you what was
6  marked as Claimant's Exhibit 42, which is a
7  letter from you to Mr. Hale dated April 25, 2008.
8  Just read it to yourself for a second; I have
9  just a couple of questions for you. This is the
10  letter marked yesterday during Mr. Zimny's
11  testimony, maybe during Funkhouser's. Thanks
12  Mr. Hammer corrected me as always.
13  A.      Thank you. I read it.
14  Q.      Do you remember sending that to
15  Mr. Hale?
16  A.      I do.
17  Q.      Why did you send that?
18  A.      Several reasons, Mr. Hale was new in
19  his position as executive director of the
20  horsemen's group and I don't know how new but he
21  was relatively new and I had had the opportunity
22  to meet with him and I wanted for the record to
23  let him know of some of the history and the
24  background, if you will, with table games and as

Page 682

1  I read this letter, which I haven't seen for
2  quite a while, I remember now more clearly how we
3  -- we had a deal, we shook, we even exchanged
4  memos of understanding and yet the horsemen
5  reneged on that deal.  So this was an effort for
6  me to get Mr. Hale some history, some historical
7  perspective as to where we were and how we find
8  ourselves today.
9         I also attempted to point out based
10  on what revenues we were seeing at Mountaineer,
11  where they successfully passed their referendum
12  and by the way their horsemen supported their
13  attempts to pass their referendum in '07. I was
14  attempting to point out to Mr. Hale how much
15  money the horsemen were losing by not having
16  table games.
17         So I think that was an important
18  focus of this letter and I think I end by saying,
19  you know, we look to have a harmonious
20  relationship with you, we want to work with you
21  but we need your support in getting table games
22  passed.  It's good for you; it's good for us.
23  **Q.       Now, at the very end where you said**
24  **-- I don't have in front of me, if I could have**

Page 683

1  **that for one second, where you said while CTRS is**
2  **most interested in having a harmonious and good**
3  **working relationship with the HBPA, we are unable**
4  **to meet with you to discuss anything until the**
5  **HBPA pledges its support of table games; do you**
6  **see that?**
7  A.      Yes, I do.
8  **Q.       Did that cut off all communications**
9  **between the track on the one hand and the**
10  **horsemen on the other, just shut down all**
11  **communication whatsoever?**
12  A.      Not at all, not at all, the intent of
13  this was, I think I referenced in the first
14  paragraph, stop re-trading the arrangement.  We
15  got to a point, we agreed that we were going to
16  go forward and support a table games and every
17  time we met there was a new item on the table.
18  Well, we know we agreed last week but we now we
19  want this or now we want more race days or now we
20  want more concessions and we would say, okay, we
21  shook hands, we already have a framework of a
22  deal in place, stop re-trading and I -- to me
23  that's what I meant by this --
24         ARBITRATOR KARLIN:  Can I

Page 684

1  just ask one question?
2         MR. WOLFSON:  Sure.
3         ARBITRATOR KARLIN:  You
4  talked -- you're talking about the HBPA reneging
5  on its agreement, could you be a little more
6  specific and I don't want all the gory details
7  but who were you dealing with, who reneged?
8         THE WITNESS:  My principal
9  point of contact was Randy Funkhouser, the
10  president of the organization at that time.
11  However, he had some other individuals involved
12  also, you know, it wasn't just me. On our side it
13  was a few individuals and on the HBPA side it was
14  a few individuals, but back to '07 when the
15  enabling legislation was passed, I mentioned I
16  spent a lot of the session in Charleston, so
17  did Mr. Funkhouser and Mr. Funkhouser's lobbyist
18  at the time, Ken Martin, those were the two
19  gentlemen that we interacted with at that
20  time and subsequently it was other individuals
21  with the horsemen's group, but primarily
22  Mr. Funkhouser.
23         ARBITRATOR KARLIN:  And
24  again, I'm just trying to get a sense of it.

Page 685

1  You said you had a deal, you had a deal with
2  Mr. Funkhouser?  You had a deal with the --
3         THE WITNESS:  We had a deal
4  with Mr. Martin, the lobbyist, Mr. Funkhouser and
5  Mr. Funkhouser is a representative of the HBPA.
6  He did not do this in a dark room.  It was very
7  clear that the HBPA membership was talking about
8  this arrangement and they were very fractured
9  themselves.  There were a number of them that
10  said we need table games, it's the way to grow
11  our revenues, it's a way to be competitive. We
12  know Maryland is going to get casinos in the near
13  future. We've got to have something they don't
14  have because at the time Maryland was not going
15  to have tables.
16         So this was -- I don't think I'm
17  overstating it, this went from Mr. Funkhouser and
18  permeated the entire organization.  A lot of the
19  membership was aware of what was going on and
20  aware of the negotiations, but he represented the
21  horsemen, shook hands with me as president of the
22  horsemen's group.
23         ARBITRATOR KARLIN:  And then
24  later reneged on what you thought was a handshake

27228234-391e-4c3e-a268-37fe29e9a583

Page 686

1  agreement?
2          THE WITNESS:  Correct, and
3  documents were exchanged as well, in fact, one of
4  them was initialed by both parties.
5          ARBITRATOR KARLIN:  Initialed
6  by Mr. Funkhouser?
7          THE WITNESS:  Yes.
8          ARBITRATOR CARNEY:  Now, in
9  2004 you were not on the negotiating team; you
10  were in the background?
11          THE WITNESS:  For the
12  contract, that's correct.
13          ARBITRATOR CARNEY:  Okay.
14  Now, what about in 2007 and 2008, were you doing
15  the negotiating with Mr. Funkhouser or did you
16  have someone else doing that?
17          THE WITNESS:  I was -- since
18  I had been involved in the enabling legislation,
19  I remained involved in the table games referendum
20  discussions, the discussions to obtain support
21  from the horsemen.
22  BY MR. WOLFSON:
23  Q.     Did you mean with respect to the
24  contract or the table games?

Page 687

1  A.      Right, but with the contract, I think
2  to your question, I was not involved.  Again, I
3  never attended the session.  Our counsel briefed
4  me afterwards.  I was kept abreast of the
5  negotiations but I was not ever in a session.
6          ARBITRATOR CARNEY:  You're
7  talking about a series of meetings where you said
8  the Union would say we'll support the referendum
9  if you do X or if you do Y?
10          THE WITNESS:  That was the
11  table games discussion.
12          ARBITRATOR CARNEY:  Were
13  those meetings you attended?
14          THE WITNESS:  Yes, I attended
15  several of those, yes.
16          ARBITRATOR CARNEY:  Okay.
17          ARBITRATOR KARLIN:  Was the
18  percentage that was to go to the horsemen one of
19  the key issues or were there other issues too?
20          THE WITNESS:  That was one of
21  the issues that -- that was one of the issues
22  that would service and then disappear, but, yes,
23  that the horsemen felt -- I'm paraphrasing here,
24  that it wasn't a good enough deal for them.  Now,

Page 688

1  one day it was and the next day it wasn't, that's
2  why it was a moving target.
3          I mentioned they kept re-trading
4  things; they wanted more race days.  We are
5  obligated statutorily to race 210 race days a
6  year in West Virginia.  We have raced -- I
7  believe we're racing 235 this year per the
8  agreement.  It's a concession we made and the
9  horsemen wanted more race days over and above the
10  statutory requirements.  That was one of the
11  items that they mentioned.  But they loosely used
12  this frame or this term, it's not a good enough
13  deal for us.
14          ARBITRATOR KARLIN:  Thank
15  you.
16  BY MR. WOLFSON:
17  Q.     Now, sir, when you mentioned that
18  this didn't cut off all communications between
19  the track --
20  A.     Absolutely not.
21  Q.     Were there still the day-to-day
22  communications between the track personnel and
23  working on --
24  A.     Absolutely, this is a partnership.

Page 689

1  You know, we can't race 235 days a year, issue
2  stalls, run a big business without communication
3  with the horsemen who provide horses for the
4  show.  I mean it did not at any time shut off all
5  communication.  That's not what this was intended
6  to be.
7  Q.     Okay.
8          Now, in connection with this period
9  of time after April of '08, going into let's say
10  the summer, the negotiations were going between
11  the track on the one hand and the HBPA on the
12  other regarding the contract?
13  A.     Yes.
14  Q.     Okay.
15          How were they progressing?
16  A.     Not well.  It was not productive.  We
17  were not making headway, we felt.  We were
18  concerned that -- whether we could get to an
19  agreement with the horsemen, and again, there
20  were two issues here, the table games piece and
21  the contract piece, but not well.
22  Q.     Did there come a point in time where
23  then Governor Manchin, now Senator Manchin, go
24  involved?

Page 690

1  A.        Yes, there was.
2  Q.        What was your understanding of why
3  Governor Manchin was getting himself involved?
4  A.        You know, back to the simple math, we
5  took a look at what would happen if the track, if
6  there was no agreement with the horsemen and if
7  the track had to close.
8           Again, if we had to turn off all
9  gaming, racing, slots, and at that time we didn't
10 have tables, but racing and slots and what would
11 happen to the employees that would be laid off
12 and when we developed an analysis for what that
13 would cost, it was about one million dollars a
14 day in lost taxes, payroll and benefits in the
15 community and we were staggered by that.
16 Armageddon was going to come with a pretty steep
17 price tag.
18 Q.        So what did Governor Manchin do, to
19 your knowledge, in connection with his efforts
20 here?
21 A.        We had a meeting with him, "we" being
22 myself and our government affairs, our corporate
23 government affairs vice president from our
24 corporate office in Pennsylvania, we had a

Page 691

1  meeting with the Governor in Charleston to
2  explain this to him and to frankly ask for his
3  help and ask him to mediate or help us get to an
4  agreement and that was the first time we reached
5  out to him or asked of him.
6  Q.        Okay.
7           Just to cut through and get through
8  some of this, then you understood that he was
9  speaking with the horsemen and getting back to
10 you and getting back to them?
11 A.        Right, he did the right thing.  He
12 met with us.  He got our perspective.  He met
13 with the horsemen as we came to find out and he
14 got their perspective and then he put us in a
15 room together soon thereafter to try to get us to
16 work on our issues.
17 Q.        And that was later in the year, the
18 fall --
19 A.        That was later in the year.  That's
20 correct.
21 Q.        Okay.
22           So he got everyone finally in a room
23 and we'll -- well, let's actually get to that
24 meeting first.

Page 692

1  A.        Okay.
2  Q.        And then we'll circle back.
3  A.        Okay.
4  Q.        That end meeting, the one where he
5  got everyone in the room; what happened there?
6  A.        Yeah, I think that was the October
7  time frame.  I'm not sure of the exact date in
8  '08, but we met in Charleston in a room in the
9  capital, we, being myself, Mr. Britton, our
10 general manager, Phyllis LeTart who was our
11 in-house counsel at the time and a few other
12 individuals from Penn National and then a host of
13 horsemen, breeders, a large group with the
14 Governor and some staffers the Governor had with
15 him as well and he did a very nice job.
16          He said, look, I've listened to both
17 of you and it sounds like there are three or four
18 issues that are sticking points, this one, this
19 one, this one and I want to work it out and I'm
20 not going to allow the track to be closed.  I'm
21 not going to stand for that.  It's going to put
22 West Virginians out of work.  It's going to take
23 a bite out of the coffers of the state, there's a
24 lot at stake here for all of us and I want to get

Page 693

1  this resolved and he literally went down the
2  issues and said what about this one and there was
3  a lot of discussion and at the end of the day we
4  pretty much agreed to a framework that got us to
5  renew the contract.
6           ARBITRATOR KARLIN:  Did you
7  say when that was?
8           THE WITNESS:  I believe it
9  was October of '08.
10          ARBITRATOR KARLIN:  What was
11 the drop dead deadline?
12          THE WITNESS:  December 31st
13 of '08.
14 BY MR. WOLFSON:
15 Q.        And the '08 contract was extended a
16 few months to --
17 A.        I think it was, I think it was
18 February or March.  We ended up negotiating past
19 - we got up to the deadline and we agreed
20 together, the Horsemen and Penn National to
21 extend the agreement in its current form through,
22 I believe, March of '09, which is when we signed
23 the new agreement.
24 Q.        I think it was February of '09, but

Page 694

1  the date is whatever it was.
2  A.      Yeah, and again, it was with the
3  framework that the Governor helped us develop.
4  Q.      Okay.
5          Now, let me go back now to the August
6  of '08 period when the Governor is in the midst
7  of this mediation effort. Did there come a time
8  when you got a call from the Governor?
9  A.      I did.
10 Q.      And who was on that call?
11 A.      It was the Governor and his Chief of
12 Staff, I didn't know obviously who else was in
13 the room with him but I came to find out it was
14 his Chief of Staff, Larry Puccio, and as far as I
15 know it was just the two gentlemen on the phone
16 and I recall them being on a speakerphone because
17 they were conversing back and forth as we -- as I
18 spoke to them on my end.
19 Q.      And this was in the video yesterday,
20 so I'm going to go through it relatively quickly
21 with the panel's permission. I think you said in
22 the video it was on or about the 14th or the
23 middle of August, and just tell the panel quickly
24 what happened during that call after the 18th?

Page 695

1  A.      Yeah, yeah, it was a little later in
2  the month.
3  Q.      I apologize.
4  A.      Right.
5  Q.      Right.
6  A.      After the 18th?
7  Q.      I was looking at the wrong date. I
8  think in the video he said sometime after the
9  18th. That's right.
10 A.      Yeah, I know you saw the video
11 yesterday but a little history really quickly.
12 We met, the government affairs, the Penn National
13 government affairs person and myself met with the
14 Governor's Chief of Staff and our lobbyist in
15 early August to tell the Governor's Chief of
16 Staff about our concerns about the contract as we
17 mentioned.
18 Q.      The Chief of Staff was who?
19 A.      Larry Puccio. And, again, asking
20 Larry Puccio to get the Governor to assist in
21 mediating this issue. So just to be clear, the
22 call I received came later in the month of August
23 after this meeting with Larry Puccio and the
24 Governor said, listen, I had a meeting with the

Page 696

1  Horsemen and I'm engaged, again, I'm paraphrasing
2  here, but I understand, I'm going to try to help
3  both sides get this thing worked out, but I've
4  got to ask you some questions because some -- and
5  I don't know whether he said disturbing or some
6  strange information came to light that I've got
7  to ask you about in this meeting that I had with
8  the Horsemen.
9  Q.      And what was that?
10 A.      He said that he had been told by one
11 of the Horsemen, one of the representatives of
12 the Horsemen in this group that we had killed her
13 goat deliberately, her pet goat in the barn area
14 and that we also had strung some wire in the barn
15 area in the shed row, I never understood -- the
16 Governor couldn't explain it to me but some wire
17 was hung negligently or deliberately by Penn
18 National to harm or injure her horses and the
19 Governor said to me, you know, what the heck is
20 this about and why would you be doing these
21 things? That was the way he asked the question.
22 Q.      Was the person who made those
23 accusations identified in that phone call?
24 A.      He did, he identified Ms. Mawing as

Page 697

1  the person. He wasn't sure of her name. He
2  asked Mr. Puccio what was her name again? That's
3  how I know they were on speaker; bantering back
4  and forth, what was her name again and they
5  determined it was Ms. Mawing who made these
6  allegations against us.
7  Q.      After that call ended, did you call
8  anyone at the track to discuss what you had
9  learned?
10 A.      I did. I mean I've got to tell you;
11 first of all, I was very taken aback by the
12 information. You get a call from the Governor
13 with an allegation like that; I found that -- I
14 took it very seriously. I did not laugh that
15 off, here I am asking the Governor to help us
16 mediate a situation. I believe my credibility,
17 our credibility as a company is at stake and for
18 an allegation like that to be made, I took it
19 very seriously and I was concerned. I called
20 Mr. Britton the general manager of the Charles
21 Town track soon after I got off the phone with
22 the Governor and I asked Mr. Britton what -- I
23 told him what I had just been informed of by the
24 Governor and I asked Mr. Britton what he thought

Page 698

1  of it, what he knew of the allegations.
2  **Q.        Why did you do that?**
3  A.        Obviously I took them seriously and I
4  want to emphasize that and I want to, you know, I
5  -- again, as I said, it was something -- you get
6  a call from the Governor of the state, something
7  like that, you take it very seriously and I was
8  concerned.  I wanted to know if there was
9  legitimacy to these allegations although they
10  were so bizarre.  I couldn't imagine that there
11  were.  I know the way we operate and that's not
12  how we do things but I did ask Mr. Britton if he
13  was aware of them.
14  **Q.        And did you say anything else to**
15  **Mr. Britton during that call?**
16  A.        I did, I said to him, Al, if you find
17  out these are baseless allegations, you need to
18  -- I said I don't know when you're looking at
19  stall allocations again, I don't know what your
20  timeline is, please remember gentlemen, at this
21  point I was not based in Charles Town anymore.  I
22  was now based in our corporate office in
23  Wyomissing.  So Mr. Britton still reported to me.
24  I still had oversight for the track but I wasn't

Page 699

1  here day-to-day, so I remember saying to
2  Mr. Britton, I don't know when you're allocating
3  stalls next, but you better put this into to the
4  mix when you look at Ms. Mawing's stall
5  allocations.
6  **Q.        Why did you say that?**
7  A.        Again, to the point that I found
8  these allegations -- I don't know what other word
9  to use but slanderous, I mean they were bizarre,
10  as we came to find out they were baseless, but
11  they were bizarre, they were slanderous, they
12  were damaging.  For the Governor to make a phone
13  call to me, he obviously thought they were
14  serious or he was concerned enough and I thought
15  it was pretty significant.
16  **Q.        And did you have any concerns about**
17  **what else she might be saying?**
18  A.        Well, you know, you wonder if she's
19  saying those things, what else is she saying?  It
20  was a grave concern to me, you know, back to what
21  we talked about, how we assign stalls.  This
22  certainly fit in the category of behavior by a
23  horseman and slandering the company, I took as a
24  very serious issue.

Page 700

1  **Q.        Now, was there a subsequent meeting**
2  **that you had with the Governor after that call in**
3  **the middle of August?**
4  A.        Yeah, the call came sometime later in
5  the month of August and I think the meeting -- I
6  met with the Governor and our government affairs
7  person in his Charleston office, it would have
8  been early September, I believe September the
9  4th.
10  **Q.        I think you said in the video**
11  **September the 4th?**
12  A.        September the 4th as I recall and it
13  was Larry Puccio, his Chief of Staff, the
14  Governor, our government affairs vice president
15  from corporate and myself.  It was the four of
16  us.
17  **Q.        And was anything said at that meeting**
18  **about the allegations?**
19  A.        The first thing the Governor said to
20  me was, the first things after he says, hi, how
21  are you, did you look into that information I
22  asked you about a couple weeks ago and that is
23  that you poisoned this lady's goat and you tried
24  to harm her horse?

Page 701

1              And I said, Governor, I've looked
2  into it; it's completely baseless.  Well, why
3  would she tell me that is what the Governor said
4  and I said, Governor, I have no idea.  I just
5  want to assure you that the allegations are
6  baseless.  That's how the meeting started.
7  **Q.        Now, at the time you had those**
8  **conversations with the Governor towards the end**
9  **of August when you spoke to Mr. Britton and then**
10  **when you spoke to the Governor again, were you**
11  **aware that Ms. Mawing was an HBPA board member?**
12  A.        I had no idea.
13  **Q.        Were you aware that there had been**
14  **this Forest Park issue regarding Mr. Funkhouser's**
15  **license in October or something like that the**
16  **year before?**
17  A.        I was aware of that issue.  I played
18  no role in that issue.  In fact, our company
19  played no role in that issue.  That was
20  litigation or arbitration or whatever it was
21  between two other parties.  We had no role to
22  play in that.
23  **Q.        No horse in that race?**
24  A.        No horse in that race.  I was vaguely

Page 702

1  aware of that issue.
2  **Q.      Were you aware that she testified for**
3  **Mr. Funkhouser?**
4  A.      I had no idea.  Again, I wasn't
5  involved.  I didn't read any documents.  I was
6  not a party to any of the hearings.
7  **Q.      Did you ever come to learn that**
8  **Governor Manchin wanted the track to take action**
9  **against Ms. Mawing?**
10  A.      Absolutely not.  Gentlemen, he was
11  trying to mediate this, this situation between
12  the two of us.  He was -- we gave him that one
13  million-dollar analysis that I mentioned,
14  1,000,000 dollars a day, we gave him that so he
15  could see what this represented to the state and
16  to all of us, all of us, horsemen, the state, you
17  know, I don't need to run down the list again
18  including Penn National.  We gave him that and he
19  was stunned.  I mean he knew a lot of money came
20  from this facility and that we generated a lot of
21  payroll and payroll taxes and everything else
22  that spins out of that place.
23      He didn't know as we didn't until we
24  sat down and totaled it up.

Page 703

1      His role was to mediate and get this
2  resolved, mediate this situation and get it
3  resolved, why would he -- why would he go out of
4  his way to make it worse by telling me to take
5  some action against Ms. Mawing?  That's
6  preposterous.  It's absolutely preposterous.
7      He just kept saying, John, this is
8  not going to happen, this is not going to happen,
9  closing down the facility.  I am not going to
10  allow this to happen.  You are going to have to
11  give.  They are going to have to give; this is
12  not going to happen on my watch.  Why would he --
13  why would he look to make a challenging situation
14  worse by asking me to take action against
15  somebody?
16  **Q.      Now, you had further conversation**
17  **with Mr. Britton about this issue and you learned**
18  **from Mr. Britton that Ms. Mawing was allocated --**
19  **I'm sorry.**
20      ARBITRATOR WYCOFF:  You're
21  really leading him there.
22      MR. WOLFSON:  I was just
23  trying to cut through and I apologize.
24      ARBITRATOR WYCOFF:  Yeah, I'd

Page 704

1  like to hear --
2      MR. WOLFSON:  I apologize.  I
3  think it was in the video; that's why I was
4  trying to cut through it fast.  I apologize.  Let
5  me step back.
6  BY MR. WOLFSON:
7  **Q.      After your conversation with**
8  **Mr. Britton when you told him what you told him,**
9  **did you have further conversations with him about**
10  **Ms. Mawing?**
11  A.      Well, I want to make sure I answer
12  that, so let me ramble a little bit.  I mean the
13  conversation with Mr. Britton was, again, do you
14  know about these allegations and could you
15  investigate and then if they are found to be
16  baseless, you need to put that behavior into your
17  criteria mix, into your criteria for issuance of
18  stalls.
19      So that's the conversation I had with
20  Mr. Britton and I believe that was -- I believe
21  that was the end of it.
22  **Q.      Okay.**
23  **Did you have further conversations**
24  **with Mr. Britton?**

Page 705

1  A.      No.
2  **Q.      Okay.**
3  **At any time, did you direct anyone to**
4  **take action against Ms. Mawing because of her**
5  **HBPA activity or testifying at the Forest Park**
6  **hearing?**
7  A.      Look, I oversee nine properties plus
8  all of our racing operations.  I don't know who's
9  on the board of the HBPA and frankly I really
10  don't care.  So back in '08, I did not know who
11  was a board member.  I knew Mr. Funkhouser was
12  the president.
13      Again, I was not here in '08, I
14  was not based here, I was not interfacing
15  with the horsemen board with the exception of
16  Mr. Funkhouser as we talked about table games,
17  but I did not know Ms. Mawing was a board member.
18      MR. WOLFSON:  I have no
19  further questions.
20      ARBITRATOR CARNEY:  Let's
21  take a short break.
22      * * *
23      (Brief break)
24      * * *

Page 706

1    C R O S S - E X A M I N A T I O N
2  BY MR. WADDELL:
3  Q.      Good morning, Mr. Finamore.
4  A.      Good morning.  How are you?
5  Q.      Well.
6          I'm going to ask you a few questions
7  about what you mentioned today.  You mentioned
8  that the -- that your corporation is a business
9  and they want to make money and they want
10 consistency and they had certain agreements that
11 they relied upon and the Governor as far as and
12 the legislature as far as being protected with
13 regard to their business; correct?
14 A.      Well, enabling legislation for the
15 VLTs back in 1993 or so, that was one of the
16 stipulations or premises of that legislation if
17 that's what you're referring to, yes.
18 Q.      Okay.
19         Well, you understand that the -- and
20 you would agree with me, wouldn't you, that the
21 trainers that work and apply their profession at
22 the track are also operating a business?
23 A.      Absolutely.
24 Q.      And they appreciate and are entitled

Page 707

1  to some consistency from the track with regard to
2  their ability to operate at the track?
3  A.      Should they follow the rules, yes.
4  Q.      Okay.
5          And part of that is the equitable
6  distribution of the stalls, these free stalls
7  that you mentioned that are there and available
8  on the track, that's part of what they rely upon;
9  correct, as equitable allocation of stalls?
10 A.      Stall allocations are a privilege.
11 They're not a right, if they follow the rules,
12 they are entitled to apply for them and obtain
13 them.
14 Q.      Well, they're not completely just a
15 privilege, are they, I mean they're bargained for
16 in the agreement between your company and the
17 HBPA?
18 A.      An allocation of stalls, a number of
19 stalls is in the agreement, yes.
20 Q.      Right.  And in the agreement, it
21 states that they will be distributed equitably?
22 A.      It does.
23 Q.      Okay.
24         And isn't that part of the reason you

Page 708

1  wanted objective criteria established for the
2  allocation of stalls?
3  A.      In part, yes.
4  Q.      And you mentioned that you
5  implemented that when you began operating and
6  having responsibility for this track?
7  A.      I tried to, yes, that's correct.
8  Q.      Now, should not the trainers be
9  allowed to rely on that objective criteria?
10 A.      It's a fair assumption, yes.
11 Q.      And you mentioned under the prior
12 contract there was a -- there were certain due
13 process rights that the -- for instance, the
14 trainers can exercise if they felt that the
15 stalls were not being equitably allocated;
16 correct?
17 A.      I believe that's correct.  I don't
18 have that in front of me but I believe that
19 language was in there, yes.
20 Q.      Okay.
21         Now, under the current contract there
22 is no such provision, due process provision or
23 cause provision; correct?
24 A.      Correct.

Page 709

1  Q.      The limitation is non-discrimination
2  based on HBPA activity or membership?
3  A.      Correct.
4  Q.      Is there any right that the trainers
5  have at the present time under the contract today
6  or the contract that was in effect from 2004
7  until 2009 to actually challenge the allocation
8  of stalls?
9  A.      I'm not aware -- I don't believe so,
10 no.
11 Q.      Okay.
12         Does the track provide the trainers
13 with any explanation for why they're not being
14 allocated stalls if they have a question about
15 that?
16 A.      I think the answer to that is yes,
17 although, I can't tell you that I've been
18 involved with that but, you know, I would expect
19 that some communication goes forth between the
20 racing secretary and the trainer whether they've
21 got stalls or not, but I'm speculating.
22 Q.      Okay.
23 A.      There's no formal, to answer your
24 question, there's a formal notification letter

Page 710

1  but I don't believe there's any explanation given
2  formally in that letter.
3  Q.        And with specific regard to Tina
4  Mawing with regard to the period in August of
5  2008 when all her stalls were taken away, to your
6  knowledge was she provided any explanation for
7  why that was done?
8  A.        Well, I want to clarify one thing
9  that you just said, her stalls were not taken
10 away, stalls were not allocated to her.  These
11 stalls are not owned by her or by any horsemen.
12 Q.        No, they're leased to them?
13 A.        Well, I just wanted to clarify what
14 you said, her stalls were taken away.  Her stalls
15 were not taken away.
16 Q.        Okay.
17        Well, she had five stalls in August
18 of 2008 and after she received this letter she
19 had no stalls; you agree with that?
20 A.        There were no stalls issued to her.
21 I agree with that, yes.
22 Q.        Okay.
23        And to your knowledge was she ever
24 provided an explanation for that action?

Page 711

1  A.        I have no knowledge.  I saw this
2  letter in a deposition for the first time and I
3  assume that's the formal communication that was
4  given to her.  I am not a party to this.
5  Q.        Okay.
6        Let me talk to you a minute about the
7  referendum in 2007 that you mentioned.  I believe
8  you said that referendum occurred in June of
9  2007?
10 A.        Yes.
11 Q.        That's a vote among the voters of
12 Jefferson County; is that correct?
13 A.        Yes.  Correct.
14 Q.        Is it fair to say that the track
15 expected to win that referendum?
16 A.        Absolutely.
17 Q.        And they were shocked when they
18 didn't?
19 A.        Disappointed.
20 Q.        Weren't you shocked?
21 A.        Disappointed.
22 Q.        Okay.
23        Wasn't there a big celebration
24 already arranged to celebrate the passing of that

Page 712

1  referendum at the track?
2  A.        Again, you're going to have to give
3  me more to go by than that.  I'm not sure what
4  you mean.
5  Q.        You weren't there?
6  A.        There was not a celebration because
7  we lost the referendum.  There was an event
8  planned for our supporters, much as there would
9  be in any kind of an election, win or lose, to
10 thank our supporters with the hope that it would
11 be a positive outcome, but we had done polling.
12 So to your question about shocked, we saw that
13 coming in the last few days, so shocked, no.
14 Q.        Were you present there at the track
15 at the event?
16 A.        I was and I attempted to thank the
17 few supporters that were still in the room, yes.
18 Q.        Based on what I heard you say today,
19 you personally felt betrayed by Raymond
20 Funkhouser?
21 A.        That's a strong word but I think it's
22 an appropriate word.
23 Q.        It was your word?
24 A.        Yes, okay, I'm agreeing with you.

Page 713

1  Q.        Okay.
2        And you also mentioned that you were
3  vaguely aware that in October an attempt was made
4  by the Racing Commission actually to indefinitely
5  suspend his occupational permit, you were aware
6  of that?
7  A.        That's the Forest Park case?
8  Q.        Yes.
9  A.        Vaguely, yes, as I testified, yes.
10 Q.        Okay.
11        And you're aware of the implications
12 of when an occupational permit is suspended
13 indefinitely, or do you know what the implication
14 of that is, don't you?
15 A.        There are several, one of them is you
16 can't race.
17 Q.        Correct, I mean you're out of
18 business completely; correct?
19 A.        In the state of West Virginia, yes.
20 Q.        You mentioned that the Governor was
21 mediating the differences between HBPA and the
22 PNGI; correct?
23 A.        Yes.
24 Q.        Isn't it true that the Governor, A,

Page 714

1    wanted table games and was actively working with
2    you to see that table games were passed?
3    A.      Well, I can't speak for him, but I
4    think he recognized that was in the best interest
5    of the State of West Virginia from a tax revenue,
6    a tax generation standpoint to have table games.
7    I think he supported that.  He supported the
8    enabling legislation. It was passed on his watch.
9    Q.      Do you agree with me that he
10   certainly wanted table games to pass; correct?
11   A.      I believe so.
12   Q.      Okay.
13          And in order to do that, number one,
14   there would have to be a contract in effect with
15   the HBPA and your company; correct?
16   A.      There would.
17   Q.      Okay.
18          And of course, you wanted the HBPA to
19   actively endorse table games, this referendum;
20   correct?
21   A.      Yeah, I want to be clear here, we
22   wanted every business organization, every
23   business, every organization in the county to
24   support table games.  We had a campaign to get

Page 715

1    support from school teachers, policemen,
2    firefighters, the horsemen were just one piece of
3    this puzzle, so the answer to your question is I
4    wanted every resident in Jefferson County to
5    support the referendum.
6    Q.      Sure.
7    A.      We had worked hard for that.
8    Q.      But having the support of the HBPA
9    would be an important part of that?
10   A.      I testified to that, yes.
11   Q.      Because in the last referendum, they
12   remained neutral?
13   A.      They remained neutral.
14   Q.      Now, let's talk about the
15   conversation that you alluded to both in the
16   deposition we played yesterday and today with the
17   Governor and his Chief of Staff.  I think you
18   were consistent in the statement that the
19   Governor said that this -- the Governor said that
20   Ms. Mawing alleged that the track deliberately
21   killed her goat; is that what you said?
22   A.      That's correct.
23   Q.      Okay.
24          Now, what I heard you say today was

Page 716

1    the Governor also said that she alleged that the
2    track had strung wire or hung wire negligently or
3    deliberately to injure a horse.  Now, I heard you
4    yesterday be very clear, I mean when I reviewed
5    your deposition, it was played here, I think what
6    you said back then was the Governor stated that
7    her allegation was a wire was deliberately hung
8    to injure or slice through the neck of her horse;
9    isn't that what you said?
10   A.      I would have to reread my deposition
11   testimony, but it sounds like I said that.
12   Q.      Okay.
13          I was wondering why you mentioned
14   negligently today.  That would seem to negate
15   deliberate intent?
16   A.      I don't know, deliberate and
17   negligent when you're trying to harm an animal,
18   to me it's an interchangeable word.  I did say
19   I'm paraphrasing.  I'm not sure of the exact word
20   the Governor used but the sense I was left with
21   was that Ms. Mawing alleged that this wire was
22   strung deliberately by us to injure her horse.
23   Q.      Okay.
24   A.      So negligently, deliberately, I mean

Page 717

1    I guess if a wire is there to injure a horse it's
2    negligent to me.  So, again, I think its
3    semantics of what I said.
4    Q.      Well, I think it's important whether
5    she was alleging there was some negligence --
6    negligence is different from deliberate intent to
7    injure, would you agree with that?
8    A.      Fair enough.  Then let me be very
9    clear since I may have, maybe wasn't clear in the
10   two testimonies.  I recall the Governor telling
11   me that this wire was hung there deliberately to
12   injure her horse, deliberately to injure her
13   horse, to harm her horse, like we deliberately
14   killed her goat.
15   Q.      Okay.
16          That's what I wanted to clarify with
17   you.
18   A.      Thank you.
19   Q.      Now, after this conversation, I think
20   you testified that you called Al Britton the
21   general manager of the track; correct?
22   A.      After when?
23   Q.      After the conversation, which you
24   alluded to with the Governor and his Chief of

27228234-391e-4c3e-a268-37fe29e9a583

Page 718

1  Staff?
2  A.      Yes, you said testimony or something.
3  Q.      Yes.  Okay.
4         And you told Al -- your words today
5  were if you find out that these allegations are
6  baseless or these are baseless allegations, you
7  better put this into the mix when you're making
8  stall allocations?
9  A.      Something to the effect, yes.
10 Q.      Okay.
11        And you asked him to do an
12 investigation into this to see if the allegations
13 were baseless or not?
14 A.      Well, again, this is a conversation
15 from five years ago.  So I'm paraphrasing but my
16 recollection was I said to Mr. Britton
17 investigate it, look into it, see what you can
18 find out about it and if it's baseless, it's a
19 pretty serious accusation and it needs to go into
20 the mix.
21 Q.      The mix, and did he get back to you
22 or did you have a further conversation with him
23 about the results of any investigation?
24 A.      I recall, and again, its five years

Page 719

1  ago, I recall Mr. Britton saying something like
2  we've heard about the goat, there's nothing to
3  it.  I recall something like that, but no, I had
4  no subsequent conversations with Mr. Britton that
5  I recall.
6  Q.      Okay.
7         SO what you're telling --
8  A.      I left it with him, back to us being
9  a decentralized company, I said Al, this is what
10 the Governor told me, you look into it.  He's
11 paid a lot of money.  I don't spoon feed him and
12 this was his decision to investigate and to take
13 action.  I just gave him my opinion; if it was
14 baseless, I think it needs to go into the mix.
15 Q.      Okay.
16        So I just want to make sure I'm clear
17 on that last testimony.  You had one conversation
18 with him or more than one?
19 A.      I only recall that one phone call
20 with him.
21 Q.      Okay.
22        And during that phone call he said I
23 know about the goat, her complaint about the goat
24 and what did he tell you about that?

Page 720

1  A.      Again, I'm not certain but I think he
2  said that he had heard something about the goat
3  but that was it.
4  Q.      Okay.
5         Now, you had a second conversation
6  that I don't think you mentioned today though.  I
7  think you mentioned it in your deposition and
8  that's the conversation with Richard Moore?
9  A.      With Dickie?
10 Q.      Yes.  Did you not also call him?
11 A.      No, no, I don't recall testifying to
12 that and I don't recall calling Mr. Moore.  Maybe
13 you can refresh my memory, but I don't remember
14 that.
15 Q.      I thought you testified to that.  I
16 could be mistaken.  I mean the record will
17 reflect that.
18 A.      Sure, whatever it is.
19 Q.      In your -- in your deposition, --
20        MR. WOLFSON:  Please identify
21 where you are.
22        MR. WADDELL:  Page 21, let's
23 start at Line 10, it says, I also believe I
24 talked to Dickie Moore, our general manager,

Page 721

1  about the wire and he said there's, you know, we
2  have maintenance people, we have security people,
3  we don't go in the shed row area, there is no
4  wire, I don't know what she's talking about.
5         Do you remember --
6  A.      Thank you for refreshing my memory.
7  That sounds like a conversation I would have had
8  with him.
9  Q.      Okay.
10        I went on to say did he corroborate
11 when you talked to Dickie Moore, did he
12 corroborate that she had made such an allegation
13 about a wire and your answer was my recollection
14 is that neither Mr. Britton nor Mr. Moore were
15 aware of that allegation; do you recall that
16 testimony?
17 A.      Now that you're refreshing my memory,
18 yes.
19 Q.      Okay.
20        In your testimony here today after
21 you relayed the conversation you had with the
22 Governor and your conversation with Mr. Britton
23 you made the comment I wonder if she's saying
24 these things, what else she's saying; do you

Page 722

1  remember that statement?
2  A.      I do.
3  Q.      Did you ever find out that she was
4  saying anything else?
5  A.      I didn't.
6  Q.      Okay.
7          Let me -- I think you testified in
8  your deposition yesterday that you've received
9  periodic status reports regarding this litigation
10 from Mr. Britton; is that correct?  You don't
11 recall that?
12 A.      I don't.
13 Q.      You don't recall receiving periodic
14 status reports from Mr. Britton regarding this
15 litigation?
16 A.      This specific litigation?
17 Q.      Well, it began in court and now it's
18 in front of an arbitration panel but, yes.
19 A.      Yeah, and you're referring
20 specifically to the Mawing case, not the table
21 games or the contractor?
22 Q.      Oh, no, no, no, specifically to this?
23 A.      Yes, it's possible, I mean no written
24 formal communication.  I mean in passing perhaps.

Page 723

1  Q.      Right, I think we established
2  that you did not receive reports from anyone
3  but you did receive periodic status reports from
4  Mr. Britton regarding this?
5  A.      Status report, I want to be clear,
6  that's stretching it a little bit.  That sounds
7  like we had -- please remember, I no longer
8  oversee this property.  So if it was, it was in
9  passing, you know, there was no formal mechanism
10 for me to be updated.
11 Q.      Did you -- I think you testified you
12 did receive -- did you ever receive status
13 reports from in-house counsel regarding this
14 litigation?
15         MR. WOLFSON:  I'm going to
16 object to the question.  It's about --
17         ARBITRATOR WYCOFF:  It's just
18 a yes or no question.  That's a proper question.
19         MR. WOLFSON:  Okay.
20         THE WITNESS:  I'm sorry.
21 What was the question again?
22 BY MR. WADDELL:
23 Q.      Did you ever receive any sort of
24 communication regarding the status of this

Page 724

1  litigation from in-house counsel specifically
2  Phyllis LeTart?
3  A.      There is probably -- if there was any
4  communication, there was only one way that could
5  have happened and I don't recall it but it -- we
6  produce weekly reports, internal weekly reports
7  and it may have been referenced in one of her
8  weekly reports but, again, I didn't oversee the
9  property and haven't now for two years, going on
10 two years, so I don't recall.  I really don't
11 recall.
12 Q.      Okay.
13         Let me, just to clarify the issue
14 with Mr. Britton, I think  in your, -- well, I've
15 got the page here, it's Page 42, it's beginning
16 at Line 13 of your deposition, did you receive
17 verbal or written reports from anyone as to the
18 status of the legal action and your answer was
19 written, absolutely not, a verbal update from
20 time to time, again, my question, again, from Al
21 Britton, answer, probably for general, I'm sorry
22 I didn't mean to interrupt and your answer was,
23 yes, yes, probably yes from Al Britton and you
24 know just a general business update, yes.  That

Page 725

1  was your testimony.
2  A.      That's right.
3  Q.      Is that consistent with what you're
4  saying today?
5  A.      Yes.
6  Q.      Did you ever review any -- or were
7  you provided any of the pleadings in this action,
8  such as the complaint or the answer that the
9  track provided in this litigation?
10 A.      No.
11 Q.      Were you aware that Ms. Mawing was
12 making an allegation that she was retaliated
13 against for raising issues of pesticide or rodent
14 control with the Governor's office?
15         MR. WOLFSON:  Just to
16 clarify, you mean in connection with litigation?
17         MR. WADDELL:  Yes.
18         MR. WOLFSON:  well, I just
19 want to caution now because to the extent he
20 received updates from counsel and would have
21 learned that, that would be privileged.  I'm
22 going to object to anything he would have
23 discussed with counsel.
24         MR. WADDELL:  All I asked

Page 726

1  was -- I don't care whether it was with counsel
2  or with anyone. I'm not asking for
3  attorney-client communications. I'm asking
4  simply whether you reviewed the pleadings in this
5  case?
6           MR. WOLFSON: Well, no, he
7  said no to that. Then you asked did he ever
8  learn.
9           MR. WADDELL: You're right.
10          MR. WOLFSON: So now I'm
11  objecting because the only way -- if he spoke to
12  counsel and that's how he learned, that would be
13  part of a privileged communication and I'm going
14  to object to that.
15          ARBITRATOR CARNEY: I think
16  you can ask him if he had communications with
17  anyone other than counsel.
18          MR. WOLFSON: Right.
19          MR. WADDELL: I'll ask that.
20  BY MR. WADDELL:
21  Q.    Did you receive communications with
22  anyone else but legal counsel regarding an
23  allegation that Tina Mawing was making regarding
24  being retaliated against for comments that she

Page 727

1  made regarding pesticide control with the
2  Governor specifically in that meeting that you've
3  alluded to that he called you about?
4  A.    I really don't understand the
5  question. Can you start again for me?
6  Q.    All right.
7  A.    I want to --
8  Q.    Here's what I'm trying to understand,
9  put it up. In the complaint, this is page -- I
10  mean paragraph 43, Ms. Mawing is alleging the
11  Defendant was motivated in whole or in part to
12  discriminate against her by reducing the number
13  of stalls allocated to HBPA board member Tina
14  Mawing to zero in retaliation for Plaintiff's
15  repeatedly expressing concerns to track
16  management, to the racing stewards and once to
17  the Governor of West Virginia regarding the
18  hazardous and improper use around her barn area
19  of powdered rodent poison; can you see that?
20  A.    I do. I'm reading 43 now, yes.
21  Q.    Okay.
22          Have you finished reading? Do you
23  still need --
24  A.    No, I think I've got it. Thank you.

Page 728

1  Q.    Were you ever aware at any time --
2  well, I can't talk about communications with
3  counsel, so let's leave that out of the mix, but
4  did you ever become aware other that other than
5  communications with counsel that that was an
6  allegation being made in this case?
7  A.    That we -- there was rodent poison
8  used or --
9  Q.    That she talked to the Governor and
10  she was alleging retaliation for talking to the
11  Governor of West Virginia?
12          MR. WOLFSON: Other than
13  through counsel, conversation with counsel?
14          THE WITNESS: No. No.
15  BY MR. WADDELL:
16  Q.    All right.
17          Let's go to -- this is a document
18  that's already I believe has been admitted or
19  marked anyway, Defendants Rule 26 (a), initial
20  disclosures, this is in federal court. This is
21  the disclosure made by the respondent, which is
22  PNGI, LLC, whatever that name is, we asked for
23  individuals likely to have discoverable
24  information and can you see that, sir?

Page 729

1  A.    Yes, PNGI Charles Town Gaming, LLC,
2  so the subsidiary of Penn National Gaming, yes, I
3  can read that.
4  Q.    Okay.
5          And those are the individuals that
6  were identified to us as having discoverable
7  information; your name isn't on there?
8  A.    It's not.
9  Q.    When did you first realize you had
10  discoverable information?
11          MR. WOLFSON: Objection. I'm
12  going to object to the question. That gets into
13  the witness's understanding of legal issues if
14  ever in discussions with counsel about what prior
15  counsel frankly may or may not have done or
16  needed to do and to reveal in connection with
17  pleadings.
18          ARBITRATOR CARNEY: I think
19  you can ask him when he first learned, if he
20  understands what legal issue is, if he doesn't
21  understand what a legal issue is then he can
22  explain that.
23          MR. WOLFSON: Well, he's
24  asking -- I would suggest a little different, if

Page  730

1  I may, because the question is when did he know
2  he had discoverable information and, first of
3  all, he would have to have a legal understanding
4  as to when what information he may have would be
5  discoverable.  I would submit that that could
6  only occur as a result of conversations with
7  counsel since frankly he's not handling the case.
8  He's not a lawyer. He is not involved with the
9  case.
10        So it could only be as a result of
11  discussions with counsel.
12        ARBITRATOR CARNEY: I think
13  he can ask when he became aware that he was
14  involved with the case.
15        MR. WOLFSON: When did he
16  first have communication with counsel about the
17  case?
18        ARBITRATOR CARNEY: All
19  right, but we're not asking the substance of it,
20  we're just asking when he found out that he was
21  involved.
22        MR. WOLFSON: Well, --
23        MR. WADDELL: Let me --
24        MR. WOLFSON: The only

Page  731

1  caution there is, again, to the extent that he
2  doesn't reveal communications with counsel
3  because -- and I'm not trying to be difficult
4  here but I'm just leery of an issue being raised
5  which invades the privilege of our discussions
6  with the witness.
7        ARBITRATOR CARNEY: Well, it
8  can't go beyond that, but he can answer when.
9        MR. WOLFSON: The answer
10  when --
11        MR. WADDELL: I understand --
12  the question I will be asking if I'm allowed to
13  is when did you first become involved -- realize,
14  understand that you were involved in this case?
15        MR. WOLFSON: Well, again, I
16  would submit that --
17        ARBITRATOR WYCOFF: I think
18  that's okay.
19        MR. WOLFSON: Well, if we can
20  clarify -- maybe I'm being a little bit cautious.
21        ARBITRATOR WYCOFF: I mean
22  you're being picky about what this involves.
23        MR. WOLFSON: And, again, I
24  don't mean and I'm not trying to quibble.

Page  732

1        ARBITRATOR WYCOFF: I
2  understand, but I think the fact as to when he
3  had a realization that in his management position
4  he had something to do with this case and when.
5        MR. WOLFSON: And maybe a
6  witness -- and maybe have do be something
7  involved in the case.
8        ARBITRATOR WYCOFF: Yes.
9        MR. WOLFSON: That's fine.
10  I'll let that go.  That's fine.
11        ARBITRATOR WYCOFF: Okay.
12        MR. WOLFSON: Okay.
13        ARBITRATOR CARNEY: Mr.
14  Finamore, the question is when did you first
15  learn that you would have to testify in this
16  case?
17        MR. WOLFSON: I'll let that
18  go.  I mean I'm not going to try to quibble.
19  Let's go.
20        THE WITNESS: When did I
21  first learn that I would have to testify in this
22  case?
23        MR. WOLFSON: Before you
24  answer that, can I just have an understanding

Page  733

1  that the answer is not a waiver of the privilege
2  for any purpose?
3        ARBITRATOR CARNEY: No
4  waiver.
5        MR. WOLFSON: Okay. That's
6  what I'm trying to get to.  Fine.
7        THE WITNESS: Could you ask
8  the question, please? I'm sorry.  I want to make
9  sure I understand.  Could someone ask me the
10  question again?
11        ARBITRATOR CARNEY: When did
12  you first learn that you might have to testify
13  either in a deposition or at trial?
14        THE WITNESS: Okay.  It was
15  some months ago.  I don't know if it was three or
16  four or five months ago.  I don't know.
17        ARBITRATOR WYCOFF: Mr.
18  Waddell, may I ask a question?
19        MR. WADDELL: Please.
20        ARBITRATOR WYCOFF: In your
21  role in management, were you aware in 2008 that a
22  lawsuit was filed by Tina Mawing against the
23  track or the company?
24        THE WITNESS: I don't know

Page 734

1 when it was filed but I was aware that it was
2 filed.
3           ARBITRATOR WYCOFF: But not
4 the time was filed in 2008?
5           THE WITNESS: I don't know if
6 it was 2008, 2009, 2010, I didn't know.
7           MR. WADDELL: I have nothing
8 further.
9           ARBITRATOR KARLIN: I have a
10 few questions.
11               * * *
12        E X A M I N A T I O N
13 BY ARBITRATOR KARLIN:
14 Q.      How often did you talk to Mr. Britton
15 back in August, September, October of 2008?
16 A.      I typically talked to our general
17 managers once a week or once every two weeks,
18 informally, there's not set meeting or schedule.
19 So we have a phone conversation where I would
20 visit the property whether it's in Ohio or
21 wherever and spend a couple of days once a
22 quarter at the property.
23 Q.      So in August of 2008, you knew and
24 let me just get a timeline, in August of 2008,

Page 735

1 you knew that there was an issue there, you had
2 talked to Mr. Britton about putting Ms. Mawing's
3 conversation with the Governor in the mix for her
4 allocation?
5 A.      Yes, sir.
6 Q.      You now know that not long after that
7 she was allocated no stalls?
8 A.      Yes, August and September of '08,
9 yes.
10 Q.      And you now know that, am I correct,
11 in September of '08 a lawsuit was filed by
12 Ms. Mawing and others challenging among other
13 things,-- alleging among other things retaliation
14 against her?
15 A.      And again, I'm not certain of the
16 date it was filed but --
17 Q.      You know that now that it was filed
18 around then, you don't know the exact date?
19 A.      Correct.
20 Q.      But are you suggesting that this
21 lawsuit might have been filed against your
22 company or a subsidiary company and Al Britton
23 didn't tell you about it?
24 A.      No, I would have been aware of it at

Page 736

1 the time. I just don't recall when it was filed,
2 to be clear; I don't recall when it was filed.
3 Q.      So we know at the time it was
4 September 2008, fair, we now know that?
5 A.      I believe you. I don't know, but
6 yes, sometime, right.
7 Q.      So in September or October of 2008,
8 you would have been aware of that Tina Mawing
9 filed a lawsuit against your company or its
10 subsidiary or whatever alleging discrimination in
11 the allocation of stalls?
12 A.      Yes.
13 Q.      And since that was very close in time
14 to your conversation with Mr. Britton, would you
15 not have also realized this was the same person
16 that you talked to with Mr. Britton about
17 previously?
18 A.      Sure. Absolutely.
19 Q.      So didn't you then ask Mr. Britton
20 what happened with the allocation of her stalls?
21 A.      I don't recall, but it sounds right.
22 It sounds like that conversation probably
23 happened, yes.
24 Q.      Do you remember any conversation with

Page 737

1 Mr. Britton following your knowledge of the
2 lawsuit?
3 A.      I don't. It doesn't mean it didn't
4 happen.
5 Q.      You certainly would have realized in
6 September or October of 2008 that you had
7 important knowledge relevant to her lawsuit,
8 wouldn't you?
9 A.      I had knowledge of her lawsuit, yes.
10 Q.      Well, you knew her lawsuit was about
11 allocation of stalls?
12 A.      Yes.
13 Q.      And you knew you had just recently
14 spoken to Mr. Britton about allocation of her
15 stalls?
16 A.      Yes.
17 Q.      So you seem like a very bright guy,
18 you would have realized that you had information
19 that was germane to the issue of the allocation
20 of her stalls?
21 A.      I certainly had information, yes.
22 Q.      Okay.
23         I don't want to get into counsel;
24 Mr. Britton would also have known that you had

Page 738

1  information relevant to the allocation of those
2  stalls?
3  A.      Yes.
4  Q.      And he would've known that as early
5  as when the suit was filed, when he first became
6  aware of the suit being filed?
7  A.      Yes.
8  Q.      And Dickie Moore would have known
9  that you had knowledge?
10 A.      Well, I mean, again, my recollection,
11 my testimony as I think I had one conversation
12 with Dickie about, you know, about the
13 allegations.
14 Q.      About the tripwire?
15 A.      The wire, and the goat dying.
16 Q.      Well, he's -- I haven't met him yet
17 but I assume he's a reasonably bright guy?
18 A.      Sure.
19 Q.      He would've known that you and he
20 talked about Ms. Mawing and the tripwire?
21 A.      You know, it's five years ago --
22 Q.      Well, I know it's five years ago, but
23 at the time didn't you make some at least
24 contemporaneous notes to keep yourself -- so that

Page 739

1  you could later refresh your recollection if you
2  were called upon to testify?
3  A.      No, I did not.
4  Q.      Did it not strike you that you might
5  write then in September 2008 knowing that you
6  had had a conversation with Al Britton about
7  Ms. Mawing and knowing that Ms. Mawing had sued
8  about the very thing you two had a conversation
9  about, did it not occur to you at that time that
10 you might eventually have to be a witness in the
11 case?
12 A.      I did not keep any notes.  I did not
13 think I would be a witness.  I thought if I would
14 be a witness; I'll be a witness.  I'm going to
15 try to -- I oversee nine properties and our
16 entire racing operation. I can appreciate this
17 is the case we're to talk about today but I
18 process a lot of information, a lot of
19 litigation, a lot of other information.  You
20 know, I don't keep notes as to every conversation
21 I had or every meeting I attended.
22 Q.      But you don't get sued on every
23 conversation you had, your company doesn't get
24 sued on every conversation they had, does it?

Page 740

1  A.      That's correct.
2  Q.      And this is also a suit involving a
3  member of the HBPA; correct?
4  A.      Yes.
5  Q.      At a time that you were worried about
6  whether you would get HBPA support for the next
7  referendum?
8  A.      Yes.
9  Q.      So this also caused you some concern,
10 didn't it?
11 A.      The support, getting their support,
12 yes, it did.
13 Q.      And so at the time when you learned
14 about the lawsuit, were you not also concerned
15 about whether or not how this would affect the
16 interplay between the HBPA and the company?
17 A.      To answer that question, you've got
18 to know, you've got to understand the tactics of
19 the HBPA and this is not the first piece of
20 litigation that we're involved with them.  So I
21 mean the answer to your question is, yes, it was
22 important that we have a harmonious relationship
23 with them, that we got their support for tables,
24 that we got a contract done with them but we were

Page 741

1  in litigation with them and had been in
2  litigation with them repeatedly.
3  Q.      But that's relevant to whether or not
4  you're going to get their support, isn't it?
5  A.      I would argue not.
6  Q.      Okay.
7  A.      I would argue not because they'll do
8  what they need to do and they'll continue to try
9  to re-trade and renege on deals that were made to
10 us as I mentioned.
11         So, you know, I was aware of the
12 litigation, but --
13 Q.      Okay.
14         Let me ask you another question a
15 little different.  You talked about the way you
16 came in and tried to objectify the rules for the
17 allocation of stalls?
18 A.      Yes, I did.
19 Q.      Did that happen all at once or was
20 that over a period of time?
21 A.      No, it was definitely a process.  It
22 did not happen overnight.
23 Q.      Was the process ever put in writing?
24 A.      Uh --

Page 742

1  Q.      We haven't gotten a statement of what
2  the allocation was, that's why I asked.  I don't
3  know if it was an oversight or they never were
4  put in writing?
5  A.      You know, the stall -- I think I
6  mentioned the stall application itself was
7  completely reworked and there is some language in
8  that application but I don't -- I don't know if
9  it actually says seven starts per stall or
10  whatever.  I don't recall.
11  Q.      You never directed that this new
12  formulation be put in writing at any stage of its
13  development?
14  A.      No, I did not direct to do that, no,
15  sir.  No.
16  Q.      Okay.
17          Do you know if Mr. Britton, after
18  your conversation with Mr. Britton, do you know
19  if he ever went to talk to Ms. Mawing to try to
20  find out what she said happened there?
21  A.      I don't know the answer to that.
22  Q.      Do you recall ever asking him that?
23  A.      I don't believe so, no, I don't
24  believe.  I think what I said to him was look

Page 743

1  into it.  I didn't say here are the steps you
2  need to follow.  I don't recall doing that.
3  Q.      And after you learned about the
4  lawsuit in your weekly calls with him, do you
5  recall ever asking him if he had looked into it?
6  A.      I -- the recollection I have is that
7  he looked into the allegations, but I don't
8  believe he spoke with Ms. Mawing.  I don't know
9  that to be the case.
10  Q.      But that's from the conversation that
11  you had with him initially?
12  A.      Uh-huh (yes).
13  Q.      Is that right?
14  A.      Yes.
15  Q.      Do you know if he ever did anything
16  further to look into it?
17  A.      I believe looking into it meant
18  someone physically inspecting the barn area to
19  look for this wire and someone speaking to
20  Ehrlich or whoever the pest control company is
21  about this poison.
22  Q.      Is that what you recall Mr. Britton
23  telling you?
24  A.      That's what I recall, yeah.

Page 744

1  Q.      But you don't know when he told you
2  that?
3  A.      No.
4  Q.      But you don't know when he told you
5  that?
6  A.      No.
7  Q.      And you didn't ask him if he talked
8  to Ms. Mawing?
9  A.      I did not.  No, I don't recall doing
10  that, no.
11  Q.      How about Dickie Moore, do you know
12  if Dickie Moore ever looked into it?
13  A.      I don't -- as far as speaking to
14  Ms. Mawing, I don't know, as far as -- probably
15  what would've happened is Dickie or one of
16  Dickie's surrogates would've inspected the barn
17  area.  I would assume that's what would happen.
18  Mr. Britton wouldn't have done that.
19  Q.      But you don't recall anyone ever
20  telling that?
21  A.      That --
22  Q.      That Dickie Moore had someone inspect
23  the barn area?
24  A.      You're pushing my memory here, but I

Page 745

1  think all I was told is that there was no wire
2  found.
3  Q.      Okay.
4          Do you know when that happened?
5  A.      Soon after the conversation, after
6  the information I received from the Governor was
7  September 4th, it would have been soon
8  thereafter, probably that day I would have called
9  Al or the next day.
10  Q.      But you don't know and you don't know
11  if anyone ever went with Dickie Moore or anyone
12  on his behalf ever went to Ms. Mawing and say did
13  you say this, what did you mean?
14  A.      I don't know that, no, I don't know
15  that anyone did that.
16  Q.      Okay.
17          There are a couple -- I'm almost
18  done, there are some things I don't fully
19  understand like some of the jobs and stuff, the
20  racing stewards, are they employees of -- who are
21  they employees of?
22  A.      Of the state.
23  Q.      Okay.
24  A.      But there's also one who works for

Page 746

1  us. I think it's one that works for us. I think
2  there are three of them, one works for us, two
3  for the state.
4  **Q.      Who works for you; do you know?**
5  A.      I'm not sure, who by name, I'm not
6  sure.
7  **Q.      The complaint against Mr. Funkhouser**
8  **was filed by Danny Wright, Laurence Dupuy and**
9  **Robert Lotts?**
10 A.      Yeah, those are stewards and I'm not
11 sure who's the state employee, which one of those
12 is ours. I either need some help here or I'm
13 going to tell you I don't know at all, but the
14 answer is here in the room.
15 **Q.      Okay.**
16 **We can get that later, but you think**
17 **one of those was your employee?**
18 A.      I think so, yes.
19      MR. WOLFSON: I just want to
20 caution, we may be getting far beyond this
21 witness's, not far but beyond what this witness
22 knows, to the extent we speculate.
23      ARBITRATOR KARLIN: I don't
24 want to -- I only have a few questions.

Page 747

1      MR. WOLFSON: Listen, I don't
2  want to cut anything off. I just want to be
3  clear when he's trying to be helpful and maybe
4  speculating as opposed to testifying to what he
5  knows.
6      ARBITRATOR KARLIN: I mean we
7  can stipulate, any of these guys --
8      MR. WOLFSON: We can find
9  out. That's exactly my point.
10      ARBITRATOR CARNEY: I don't
11 think Mr. Karlin can ask the witness to
12 speculate. If you ask a question the witness
13 doesn't know the answer to, say you don't know.
14      THE WITNESS: Then I should
15 stop speculating and I should tell you that there
16 are three stewards but I don't know who our
17 employee is, if any of them.
18 BY ARBITRATOR KARLIN:
19 **Q.      If Mr. Funkhouser had not won his**
20 **hearing could he have continued to function in**
21 **the HBPA?**
22 A.      That causes me to speculate.
23 **Q.      Then don't answer?**
24 A.      I'm not sure. He couldn't race as

Page 748

1  Mr. Waddell asked me because he wouldn't have a
2  permit, a license. As far as membership in the
3  HBPA, I don't know what the rules are.
4  **Q.      Okay.**
5  **Is it fair to say that you were least**
6  **interested in what the outcome of it was?**
7  A.      I think you -- it's the third time
8  I've said this, I handle a lot of different
9  things, Charles Town Horsemen issues, I don't
10 live and die with them and whether Mr. Funkhouser
11 has a license or not, I really don't know and I
12 don't care, and I don't know what else to tell
13 you but to be straight and tell you that. I
14 don't follow it.
15      ARBITRATOR KARLIN: Thank
16 you.
17      ARBITRATOR CARNEY: I have
18 two questions for you.
19      * * *
20      E X A M I N A T I O N
21 BY ARBITRATOR CARNEY:
22 **Q.      After the defeat of the 2007**
23 **referendum, did you discuss that defeat and the**
24 **role of what the Association did not or did not**

Page 749

1  **do with the Governor?**
2  A.      I don't recall specifically, again,
3  I'm speculating here. It could've been a part of
4  the conversation but I don't recall a specific
5  conversation where we spoke about it.
6  **Q.      Okay.**
7  **Now, you also testified that when you**
8  **had the meeting, I think it was September 4th a**
9  **meeting with the Governor?**
10 A.      Yes.
11 **Q.      He asked you if you had investigated**
12 **the charges and you said in a general sense we**
13 **investigated, there's nothing to the charges?**
14 A.      Correct.
15 **Q.      Okay.**
16 **What did you do to investigate,**
17 **what's the basis of your statement to the**
18 **Governor?**
19 A.      Again, I asked Mr. Britton to look
20 into it, and you know, again, I'm speculating
21 here because I didn't go and walk the barn area
22 but I'm speculating that someone inspected the
23 barn area for this wire that was alleged to be
24 there and reported there was no wire.

Page 750

1        So when I responded to the Governor
2   when he asked did you look into it, I said we did
3   and we found -- we didn't kill the goat on
4   purpose and we don't have a wire hanging in the
5   barn area to harm the horse.
6   Q.      Someone reported back to you?
7   A.      Yes.  Yes.  It would've been
8   Mr. Britton, I believe.
9           ARBITRATOR CARNEY:  That's
10  all I have.
11          Do you have -- yeah.
12          ARBITRATOR WYCOFF:  Dave, could you
13  pull up Paragraph 19?
14          MR. HAMMER:  Paragraph?
15          ARBITRATOR WYCOFF:  Nineteen
16  (19) of Exhibit 1, the contract.
17          MR. HAMMER:  Oh, the
18  contract.
19          ARBITRATOR WYCOFF:  What I'm
20  going to ask you about is Paragraph 19 of the
21  contract, the 2004 contract, if it has to do with
22  rodent control.
23          MR. HAMMER:  Yes, I'll get
24  that for you in a second.

Page 751

1                * * *
2            E X A M I N A T I O N
3   BY ARBITRATOR WYCOFF:
4   Q.      You were involved as you said
5   tangentially in, you know, what was going on with
6   negotiating this contract; is that correct?
7   A.      I wouldn't say I was involved in
8   negotiating it; I was involved in approving the
9   negotiations.
10  Q.      And you had read the contract?
11  A.      Yes.
12  Q.      Okay.
13          And do you recall Paragraph 19?
14  A.      Yes.
15  Q.      And it says that the parties shall
16  use their best efforts to address and resolve in
17  a timely and expeditious manner the following
18  matters of mutual concerns to the parties, A,
19  rodent and pest control eradication?
20  A.      Yes.  I read that, yes.
21  Q.      All right, forget the wire, we're
22  talking about pest control poison.  Were you
23  aware that Mrs. Mawing had made complaints to the
24  management of the track regarding powdered pest

Page 752

1   poison being put in Barn 14 where her horses
2   were?
3   A.      I was not aware of that, no.
4   Q.      Did you learn at some point from
5   anyone in management, not counsel, anyone in
6   management that in fact her goat did die?
7   A.      The first I heard about that, I
8   recall was that her goat died was when I heard
9   that from the Governor.
10  Q.      And did you learn at any point that
11  she had a horse that was in the barn 14, where
12  rat poison was used, that a horse had in fact
13  died, one of her horses?
14  A.      I wasn't aware of that.
15  Q.      You never were aware of that?
16  A.      The first I heard of it as I recall.
17  Q.      And in your conversations with
18  Mr. Britton or the other management, did anyone
19  ever report to you or tell you that this issue
20  had been raised about the poison in her stalls?
21  A.      Again, my recollection is the first
22  that I'd heard of it was when the Governor asked
23  me about it.
24  Q.      And after that, you didn't learn that

Page 753

1   she had made allegations, not about the
2   deliberate, but about the fact that there was
3   poison powder that -- there was poison powder in
4   the area of her barn?
5   A.      Again, only from what the Governor
6   told me and that was the first time I heard of
7   it.
8   Q.      Did the Governor mention that she
9   brought pictures of dead rats and the poison and
10  the dead goat?
11  A.      I don't recall him saying that, no.
12  Q.      After stalls were not allocated to
13  Mrs. Mawing, did anyone in management; not
14  attorneys but anyone in management tell you why
15  the decision was made not to allocate stalls to
16  her?
17  A.      I don't recall having a conversation
18  with anyone.  If it was anyone, it was Al Britton
19  but I don't recall him explaining that.
20  Q.      You don't recall you ever learned
21  that?
22  A.      No.
23  Q.      And is it your opinion that it would
24  be Mr. Britton who would be the most likely to

Page 754

1 **know why the decision was made not to allocate**
2 **stalls to Mrs. Mawing?**
3 A.      I don't know if I agree with that.
4 There is a committee of three or four members,
5 again, I'm not involved and I don't know what it
6 looks like today but when I was there I think
7 there were three or four of us because we tried
8 to put the objective criteria together who would
9 meet and allocate stalls and it was a
10 collaborative, joint process.  So it was -- back
11 then it was myself, it was Dickie Moore, the
12 general manager of racing, it was the racing
13 secretary and perhaps the stall man.  There was a
14 gentleman in charge of the stalls, so that would
15 be the fourth person as I recall.
16 **Q.      I don't mean to put words into your**
17 **mouth, but your answer is with regard to this**
18 **specific not allocating stalls to Ms. Mawing, you**
19 **do not know who, in fact, made the decision?**
20 A.      I do not know.  I do not know, no.
21 **Q.      And would your supposition be**
22 **Mr. Britton could tell us?**
23 A.      He would have been in the meeting,
24 yes.

Page 755

1 **Q.      Okay.**
2        ARBITRATOR WYCOFF:  That's
3 all I have.  Thank you.
4        MR. WOLFSON:  I have one
5 follow-up, but if Harry wants to go, I'll wait.
6        MR. WADDELL:   I just have
7 one quick follow-up.
8        ARBITRATOR CARNEY:  Okay.
9 That's fine.
10          * * *
11    R E C R O S S - E X A M I N A T I O N
12 BY MR. WADDELL:
13 **Q.      I'm referring to Page 20 of your**
14 **deposition taken in the case, beginning at line**
15 **21, my question to you at that time was, did you**
16 **or did anybody at the track after you heard these**
17 **admittedly bizarre allegations the way you**
18 **relayed them contact Ms. Mawing about what the**
19 **Governor stated and you said I did not and I**
20 **said, okay, did you ask anyone to do that and you**
21 **responded, I'm now on Page 21, Line 4, well, I**
22 **asked Mr. Britton whether -- I think the way I**
23 **said it to him is what is she referring to and**
24 **what is she talking about.  And my question and**

Page 756

1 **what did he say in response and Line 8 your**
2 **answer was my recollection is that he was very**
3 **familiar with the allegations of the goat;**
4 **correct?**
5 A.      That sounds right.  Correct.
6 **Q.      So at that time you knew that he had**
7 **previous knowledge that complaints had been made**
8 **to track management about the issue with the**
9 **poison?**
10 A.      Okay.
11        MR. WOLFSON:  I'm going to
12 object.  I mean that's not inconsistent with what
13 he testified to.  So I just wanted to state that
14 and object to that because that's not
15 cross-examination.
16        MR. WADDELL:  I thought it
17 was inconsistent with some answers that were
18 given.
19        MR. WOLFSON:  It doesn't
20 matter.
21        ARBITRATOR KARLIN:  It's in
22 the record for whatever it's worth.
23        MR. WOLFSON:  That's fine.
24 Okay.  I just have one question.

Page 757

1          * * *
2    R E D I R E C T   E X A M I N A T I O N
3 BY MR. WOLFSON:
4 **Q.      Sir, after litigation is commenced**
5 **with respect to a property you're working on, do**
6 **you have a practice about whether you speak about**
7 **the litigation with track management?**
8 A.      No.
9 **Q.      Your answer is -- what is the**
10 **practice?**
11 A.      The practice is we don't discuss it.
12 I speak to counsel and that's it.
13        MR. WOLFSON:  No further
14 questions.
15        ARBITRATOR CARNEY:  Allan,
16 any follow-up?
17        ARBITRATOR KARLIN:  No
18 further questions.
19        ARBITRATOR CARNEY:  Okay.
20 You're excused, Mr. Finamore.
21 THE WITNESS:  Thank you.
22        ARBITRATOR CARNEY:  Let's
23 take a short break before your next witness.
24          * * *

Page 758

1        (Brief break)
2            * * *
3            ARBITRATOR CARNEY:  Let's go
4    back on the record.
5            MR. WOLFSON:  With respect to
6    the question regarding the stewards and who
7    they're employed by, until 2010 the stewards were
8    all employed by the racetrack -- excuse me, were
9    all employed by the Racing Commission.  All the
10   stewards were employed by the Racing Commission
11   but the track pursuant to the regulation funded
12   one of the positions.
13           ARBITRATOR WYCOFF:  Excuse
14   me, you said stewards, is that what you meant to
15   say?
16           MR. WOLFSON:  Yes, stewards.
17   What did I say?  Stewards.
18           ARBITRATOR WYCOFF:  Stewards,
19   okay.
20           MR. WOLFSON:  Yes.
21           ARBITRATOR WYCOFF:  All
22   right.  Fine.
23           MR. WADDELL:  Can you
24   clarify, did they also select that particular --

Page 759

1            MR. ZIMNY:  I'm not 100
2    percent sure.
3            MR. WOLFSON:  We don't
4    believe so.  We can check the reg on that too.
5            MR. HAMMER:  I believe it's
6    the opposite.  I believe they selected one, the
7    racetrack selected one steward and had to fund
8    the position, but we'll provide the reg on that.
9            MR. WOLFSON:  You know what,
10   we'll check that.
11           ARBITRATOR KARLIN:  Let's
12   wait and find out.
13           MR. WOLFSON:  Sure.  There is
14   no dispute, at least to this part, that the
15   stewards were Racing Commission employees and the
16   race track funded one of the positions, what's
17   unclear, we'll have to check and confirm with
18   counsel and we'll advise the panel whether we
19   selected it or whether it was just a fund of a
20   position without us selecting, but at no time
21   were they track employees.
22       Go ahead.
23           MR. HAMMER:  I'm sorry to
24   interrupt.

Page 760

1            MR. WOLFSON:  And in July of
2    2010, a rule change, we stopped funding it, in
3    July of 2010 the rule was changed that we no
4    longer funded any of the positions.  The stewards
5    remained Commission employees but we were no
6    longer funding any of the positions.
7            ARBITRATOR WYCOFF:  And
8    opposed to the stewards, the racing secretary was
9    an employee of the track?
10           MR. WOLFSON:  Yes, subject to
11   our discipline as explained, totally within our
12   control, exactly.  And that's separate from --
13           ARBITRATOR KARLIN:  Subject
14   to your --
15           MR. WOLFSON:  Who was an
16   employee, the racing secretary.
17           ARBITRATOR KARLIN:  Subject
18   to your discipline?
19           MR. WOLFSON:  Yes, completely
20   within our control and that again, just so we're
21   all clear, that's different from the person who
22   was on the Commission and who was an employee of
23   the state and the Commission, not --
24           MR. WADDELL:  An executive

Page 761

1    secretary of the Commission?
2            MR. WOLFSON:  That's right
3    and there was confusion about that.
4            MR. HAMMER:  But I want to be
5    clear about one thing, all of the officials at
6    the track, there are a lot of people who hold
7    official positions under the Racing Commission
8    regulations, they are all subject to the Racing
9    Commission's direction.
10           MR. WOLFSON:  Well, --
11           MR. HAMMER:  So the Racing
12   Commission can direct and take action with regard
13   to anybody who holds the position of a racing
14   official.
15           ARBITRATOR WYCOFF:  But
16   they're not employees.
17           MR. HAMMER:  They're not
18   necessarily employees, some are, some are not.
19   For example, stewards are, some are not, but
20   you'll see in the regs, it identifies the racing
21   officials.
22           MR. WOLFSON:  I don't want to
23   get into an argument now because this is where
24   he's headed apparently, that's no different than

Page 762

1  the trainers, the horsemen, also having
2  occupational permits and being subject to Racing
3  Commission sanction and regulation, just as we're
4  regulated, they're regulated.  There is no
5  dispute as to that part, but the direction of the
6  Commission, that I take strong dispute with and
7  if necessary we can argue that later.
8          ARBITRATOR WYCOFF:  Okay.
9          ARBITRATOR CARNEY:  Are you
10  ready to proceed, Mr. Wolfson?
11          MR. WOLFSON:  Thank you.
12      We call Mr. Britton, who is in the
13  hot seat.
14      Will you swear the witness, please?
15              * * *
16          ALBERT BRITTON
17  being first duly sworn, was examined and
18  testified as follows:
19              * * *
20      D I R E C T   E X A M I N A T I O N
21  BY MR. WOLFSON:
22  **Q.      Sir, can you identify yourself for**
23  **the record, please?**
24  A.      Al Britton, I'm the general manager

Page 763

1  of the Hollywood Casino at Charles Town Races.
2  **Q.      And for how long have you been the**
3  **general manager of the Charles Town facility?**
4  A.      Since September of 2004.
5  **Q.      Before we get into your testimony,**
6  **sir, I'd like to just go through your background**
7  **a little bit.  Could you tell the panel a little**
8  **bit about your educational and work history?**
9  A.      I have an accounting degree from
10  Glassboro State University Glassboro in -- or
11  Glassboro State College at the time in New
12  Jersey.  I worked in the casino industry,
13  starting in the accounting department in 1981, I
14  worked in that industry in that same facility,
15  the Claridge Casino for 20 years.
16      I have held a position with one other
17  gaming company before coming here.  That was the
18  then Harrah's organization, which is now Caesar's
19  and then came to Charles Town working for Penn
20  National.
21  **Q.      What year did you get your degree**
22  **from Glassboro?**
23  A.      1980.
24  **Q.      And was it shortly thereafter that**

Page 764

1  **you began working in the gaming industry?**
2  A.      1981, yeah, not long after.
3  **Q.      And has your entire career been spent**
4  **in the gaming industry?**
5  A.      Yes.
6  **Q.      And you said you were hired here at**
7  **the Charles Town facility as general manager in**
8  **-- was it September of 2004 you said?**
9  A.      September of 2004, yes.
10  **Q.      And have you had the same position**
11  **ever since you joined the company in September of**
12  **2004?**
13  A.      Yes.
14  **Q.      And who are you employed by, who does**
15  **your paycheck come from?**
16  A.      It is Penn National Gaming, LLC,
17  which is a wholly-owned subsidiary of Penn
18  National.
19  **Q.      Penn National of Charles Town, LLC?**
20  A.      Yes.
21  **Q.      So the local facility is who employs**
22  **you directly?**
23  A.      Yes.
24  **Q.      Okay.**

Page 765

1      As general manager, sir, can you
2  explain to the panel what your responsibilities
3  are for the facility here?
4  A.      It's quite simple.  I'm responsible
5  for the overall operation of the facility,
6  budgeting, planning and day-to-day operations.
7  **Q.      And does that include both the gaming**
8  **side and the racing side?**
9  A.      Yes, all aspects.
10  **Q.      Now, before coming to Charles Town,**
11  **did you have any work experience at all in the**
12  **racing side of the business?**
13  A.      I did not.
14  **Q.      So when you first got here, what did**
15  **you do to try to learn about that side of the**
16  **business?**
17  A.      I interacted with the folks on the
18  racing side of the business, Mr. Moore primarily
19  and Mr. Finamore who was at that time, I guess,
20  filling the quasi-interim role as general manager
21  when I came aboard.
22  **Q.      One thing I forgot to ask and I**
23  **apologize for having to jump around, is what was**
24  **your last position with Claridge Casino when you**

Page 766

1  left, I think you said in 2001?
2  A.        2001, I was the president and chief
3  operating officer.
4  Q.        And you left -- what were the
5  circumstances under which you left?
6  A.        The property was purchased by Bally
7  Gaming at the time and I was let go, my position
8  was eliminated.  I was replaced with another GM.
9  Q.        And did you have a package that you
10 had to sit out of the business for a little
11 while?
12 A.        Yes.  I had a two-year non-compete.
13 Q.        Okay.
14           And that was part of a severance
15 package?
16 A.        Yes.
17 Q.        And it was shortly after that that
18 you had your next position that you described?
19 A.        Yes.
20 Q.        And then it was not long after that
21 you came here?
22 A.        Yes.
23 Q.        Okay.
24           I'm sorry to -- I just wanted to get

Page 767

1  through it.  And you were telling us how you --
2  what you did to try to learn the racing side,
3  from the time you joined Charles Town in
4  September of 2004 through the present, do you
5  rely on people reporting to you in connection
6  with the operations of the racing as well as the
7  gaming side?
8  A.        Absolutely.
9  Q.        And in connection with the racing
10 side, describe for the panel the positions of the
11 people reporting to you who you rely on for the
12 operations of that side?
13 A.        The primary person is Dickie Moore,
14 who is the general manager of racing, he's been
15 there since certainly prior to my arrival and I
16 believe over 30 years, maybe even closing in on
17 40 years and then reporting to him is the racing
18 secretary who is responsible for the racing
19 office and the condition book, which is the book
20 of conditions or qualifications for the various
21 races.
22           There is a track maintenance manager
23 who is responsible for -- the title is
24 self-explanatory, for maintaining the track and

Page 768

1  the barn area and so forth, there is a mutuel
2  manager who is responsible for the pari-mutuel
3  tellers, the folks who take the bets and she also
4  is responsible for controlling the signal, the
5  simulcast signal both in and out and we hired
6  Mr. Zimny as a racing administrator who is
7  responsible for administrative and analysis types
8  of things.  Mr. Zimny has been since promoted
9  twice and is currently the vice president of
10 racing operations and those are the primary
11 folks.
12 Q.        Okay.
13           Now, in connection with your
14 management style, could you describe whether you
15 consider yourself and what you mean by that,
16 whether you're hands-on or you give discretion to
17 your people, direct reports?
18 A.        I would say a little bit of both.  I
19 mean I stay involved.  We have meetings on a
20 fairly regular basis but I give the folks in the
21 racing area discretion as well.
22 Q.        Okay.
23           Now, when you first joined -- I want
24 to now turn to the racing operations and talk a

Page 769

1  little bit about stall allocation committee.  Are
2  you familiar with something called a stall
3  allocation committee?
4  A.        I am.
5  Q.        And how did you become aware of that?
6  A.        It was actually established during my
7  time frame with the company.  It didn't exist
8  prior to my arrival and we felt like we wanted
9  the allocation of stalls to not be a one-person
10 decision process.  We wanted more folks involved
11 and so we set up the allocation committee.
12 Q.        And if you would, sort of describe
13 how the workings of the committee progressed from
14 the time you first set it up through the present?
15 A.        It's pretty similar from the
16 beginning to now.  We sit in a meeting, at that
17 time stalls were allocated on an annual basis,
18 they've since gone to an every six-month basis
19 and we sit down and go through a list that's
20 prepared by either Erich or the racing secretary
21 of all the folks that occupy stalls and we look
22 at their starts and win percentage and we have a
23 brief discussion as to whether or not its someone
24 who helps us out and keeps their shed row, their

Page 770

1  stalls in good shape and has a good relationship
2  with other folks in the barn area and generally
3  are good for our business, good citizens of the
4  barn area and very brief discussion and then we
5  make a decision.
6  Q.      And in that -- you've talked about
7  some, let's say numbers part of the discussion,
8  has it always been the same information that's
9  been reviewed or has that developed over time
10 also?
11 A.      It's developed over time, and
12 particularly since Mr. Zimny came onboard because
13 we didn't have anyone with the skill sets to put
14 together some of the statistical information that
15 we now review.  The one thing that has remained
16 consistent that we've used as a guideline and
17 only guideline, seven starts per stall as a, sort
18 of a gatekeeper for whether and how many stalls
19 we're going to issue.
20 Q.      What do you mean by that as a
21 guideline?
22 A.      It's just something we talk about,
23 how many -- we want to make sure that the stalls
24 are filled with horses that are racing and

Page 771

1  filling our program because that's what's
2  necessary for our business to be successful.
3  Q.      Why?
4  A.      If we don't have horses to fill the
5  races, that's fewer betting interests, the fewer
6  betting interests, the fewer interest in the
7  product and not just on-site but certainly in the
8  simulcast signal and bets that we take from
9  off-site.  So, again, the better the quality of
10 the horses, the higher the field size, the more
11 full the fields; the better it is for our
12 business.
13 Q.      Now, are these criteria written down
14 anywhere?
15 A.      The criteria for stall allocations,
16 no.
17 Q.      Well, then how do the Horsemen know
18 about these?
19 A.      We don't -- we exercise some
20 discretion in that regard, again, we're looking
21 at being able to assure that we're filling the
22 barn with horses that advance our objectives to
23 have full fields and quality product.
24 Q.      So is this --

Page 772

1              ARBITRATOR WYCOFF:  Excuse
2  me, a general interest question, are you open 52
3  weeks a year or --
4              THE WITNESS:  Yes.
5              ARBITRATOR WYCOFF:  You are,
6  year round?  And every week then there are
7  races?
8              THE WITNESS:  Yes.
9              ARBITRATOR WYCOFF:  How many
10 races per week?
11             THE WITNESS:  Usually about
12 45, we race generally five days a week, nine
13 races a day, we close the track during two
14 one-week intervals in the spring and in the fall
15 to refurbish the track surface but otherwise we
16 race year round.
17             ARBITRATOR WYCOFF:  So every
18 day, basically?
19             THE WITNESS:  Yes, we're
20 closed Mondays and we alternate depending on the
21 time of the year between Sundays and Tuesdays
22 also.
23             ARBITRATOR WYCOFF:  Thank
24 you.

Page 773

1              THE WITNESS:  You're welcome.
2              MR. WOLFSON:  I can take that
3  portion of the testimony out of the outline now.
4  That's fine.  I'm kidding.
5  BY MR. WOLFSON:
6  Q.      Sir, and how does that play into your
7  allocation process when you're considering the
8  fact that it is a 52-week a year operation on the
9  race side?
10 A.      It makes it that much more important
11 because we have to fill races all year long.  We
12 race a minimum of 220 days per year by law and by
13 contract, 235 days per year.
14 Q.      And, in fact, has there ever been a
15 time since you've been here where the track has
16 raced the absolute minimum contractual number of
17 235?
18 A.      Yes.  We stick pretty close to that
19 number, the 235 because that's what's in the
20 contract.  We do have issues from time to time
21 with -- where a night may be canceled due to
22 weather or other extenuating circumstances.  We
23 do our best to reschedule that evening of races.
24 If races are canceled and the middle races say

Page 774

1 were scheduled to race nine races and we only
2 race three because of weather or some other
3 circumstance, then that might count as a night
4 generally.
5          ARBITRATOR WYCOFF: General
6 interest; I apologize.
7          MR. WOLFSON: That's all
8 right. Don't apologize.
9          ARBITRATOR WYCOFF: What is
10 your average size of your crowd each night on
11 average?
12          THE WITNESS: It honestly is
13 fairly small, the on-site crowd. One of the
14 things that has happened in the racing industry,
15 over the course of time is on-site handle,
16 on-site participation has continued to sort of
17 dwindle and we've -- we rely much more heavily on
18 folks that watch us on simulcast, but I would say
19 it's probably maybe on one of our stakes nights,
20 we may get 1000 people, 1500 people in that
21 vicinity, a lot of people, put on a normal night,
22 it may be less than 100.
23          MR. WOLFSON: And I wasn't
24 planning on having this witness go through the

Page 775

1 cross-pollination between the gaming side and the
2 racing side. We did that with Mr. Finamore. So
3 I'm going to move on, but if there are other
4 questions about the people who come, the
5 spectators --
6          ARBITRATOR WYCOFF: Do you
7 have about tips?
8          THE WITNESS: No.
9          * * *
10          (Laughter)
11          * * *
12 BY MR. WOLFSON:
13 **Q.      Now in connection with everything**
14 **you've described, you mentioned earlier it's**
15 **important for the track to have discretion and**
16 **use discretion when allocating stalls. Can you**
17 **explain to the panel why that is in connection**
18 **with everything you've just described?**
19 A.      It's just not an exact science. And
20 believe me when I say I am far from the expert, I
21 do rely very heavily on the folks in the racing
22 area, Mr. Zimny and the racing secretaries over
23 the years and Mr. Elliott and Mr. Moore certainly
24 to advise. My role on the stall allocation

Page 776

1 committee quite frankly is just to ask some
2 questions and kind of go with the recommendations
3 of the group for the most part.
4 **Q.      Are there circumstances in which you**
5 **may state your opinion however?**
6 A.      Oh, sure.
7 **Q.      Okay.**
8 **          What types of circumstances are**
9 **those?**
10 A.      When I'm aware of something that and
11 I may be made aware of something where we've had
12 folks who have been accused of not taking care of
13 their horses, those things are serious and I want
14 to be made aware of those things and I am made
15 aware of those things, so if a name comes to mind
16 when we're going through a stall allocation that
17 we had an issue with somebody, that would
18 certainly crop up, if we have issues with folks
19 that don't follow rules of engagement, I am
20 sometimes aware of those as well and I may ask
21 questions about that.
22 **Q.      Now, sir, let me have you talk about**
23 **the meetings themselves, how they work. There's**
24 **already testimony from Mr. Zimny.**

Page 777

1          MR. WOLFSON: And I'm not,
2 again, Counsel, going to go lay all the
3 groundwork about who gets the applications, if
4 that's okay with you? There's no dispute, right?
5          MR. HAMMER: Who gets it?
6          MR. WOLFSON: Yeah, how the
7 process works, who gets them and then they get --
8 the racing secretary gets them. Right. I'm just
9 trying to cut through it.
10 BY MR. WOLFSON:
11 **Q.      There's already been testimony that**
12 **the racing secretary gets all the applications**
13 **and the racing secretary brings those to the**
14 **allocation committee meeting, right?**
15 A.      Yes.
16 **Q.      Okay, now let's go through -- tell us**
17 **and go through with us how the committee proceeds**
18 **from that point. I'm sorry.**
19          ARBITRATOR KARLIN: My sense
20 previously was that times have changed, are you
21 asking him today or a particular point in time or
22 is that unfair? I don't know.
23          MR. WOLFSON: No, let me do
24 it this way. I understand the question and

Page 778

1  perhaps I was unclear.
2  BY MR. WOLFSON:
3  **Q.     I'm not focusing on the factors**
4  **considered now, has the process generally been**
5  **the same of the way in which the committee works?**
6  A.     Yes, the committee works virtually
7  the same way that it did from the beginning.  The
8  only changes are in terms of the information
9  that's brought forward.  As I said, when it
10  started, we primarily just looked at as a
11  guideline the starts per stall and now we have
12  additional information about winning percentage
13  and those kinds of things.
14  **Q.     Okay.**
15  **Now, in terms -- take us through how**
16  **the meetings themselves work from when you sit**
17  **down and the racing secretary has the**
18  **applications, explain to the panel the process by**
19  **which you go through.**
20  A.     There is an alphabetical list of
21  folks that currently occupy stalls in the barn
22  area and the racing secretary has the stall
23  applications for those folks that occupy, that
24  currently occupy stalls in alphabetical order and

Page 779

1  we go through individual by individual.  The
2  sheet itself is actually a spreadsheet that does
3  a calculation of based starts per stall, what
4  they would qualify for again as a guideline
5  because it's not a hard and fast rule by any
6  stretch.
7  And then it also includes some win
8  percentage things and so the racing secretary
9  will look at the first name and he will have the
10  stall application and say that this individual
11  currently has, I'll just use numbers as an
12  example, this individual currently has ten
13  stalls, the sheet will have how many starts
14  during the current review period and that
15  calculates to eight stalls and this individual is
16  applying for ten stalls and we look and say,
17  okay, let's talk about the win percentage, is
18  this person -- does he take care of the horses,
19  is there anything we should talk about with this
20  individual and if not, we -- there's a
21  recommendation by -- usually it's kind of a
22  combination of recommendations by the racing
23  secretary and Mr. Elliott and Mr. Zimny and say,
24  you know, we're going to leave them at ten stalls

Page 780

1  because there may have been some mitigating
2  factors as to why he didn't get his starts during
3  that time frame.
4  So that's basically -- that's
5  probably the longest conversation that we'll have
6  regarding a trainer.  A lot of the applications
7  were, okay, this individual has ten stalls, based
8  on the starts, they qualify for ten and a half.
9  We sticking with ten, yes and we move on.  That's
10  how it goes through the entire alphabetical list
11  of folks that occupy stalls.
12  ARBITRATOR WYCOFF:  And for
13  clarity on the record, was that with the
14  information you're talking about, was that your
15  process in the summer of 2008?
16  THE WITNESS:  Yes.
17  ARBITRATOR WYCOFF:  Thank
18  you.
19  BY MR. WOLFSON:
20  **Q.     And has that general process changed**
21  **from the summer of 2008 to the present?**
22  A.     No.
23  **Q.     Other than some of the criteria and**
24  **additional statistical information, has that**

Page 781

1  **general process changed at all?**
2  A.     No.
3  **Q.     Okay.**
4  A.     No, it has not.
5  **Q.     So when you said before about that's**
6  **about how long it lasts for a long one I think**
7  **you said, what did you mean by that?**
8  A.     I mean generally, I'd say we may be
9  somewhere between a 30-second and two-minute
10  conversation regarding each one because we have
11  -- there may be around 100 folks occupying the
12  1250/1300 stalls that we have back there and so
13  we try to move through it pretty quickly unless
14  there's something remarkable to discuss.
15  **Q.     Now, so you go through the current**
16  **stall occupants A through Z in alphabetical**
17  **order?**
18  A.     Yes.
19  **Q.     Then what happens?**
20  A.     We and I have actually stopped doing
21  this, things have changed.  I used to kind of
22  keep a running total, but Mr. Zimny keeps a
23  running total of where we stand as we go through
24  the allocations and say, okay, of the stalls,

Page 782

1  we're plus or minus X number of stalls, so just
2  -- for instance, we have 30 stalls unallocated,
3  what do you have, who do you recommend to fill
4  those 30 stalls?  And the racing secretary will
5  have the next batch of applications in some sort
6  of priority order, because usually what they're
7  trying to do, and this is what actually happens
8  during the course of a stall allocation period,
9  too, when stalls become available, we may get a
10 request from a trainer that the guys are trying
11 to recruit because it's someone we would like to
12 have come in because they have a good quality of
13 stock and maybe some name recognition and those
14 kind of things because, again, we're looking to
15 create betting interests.
16      And so he will say, okay, trainer
17 John Doe, we would like to bring him in and he's
18 asking for 15 stalls and we think that would be a
19 good use of the stalls, okay, who's next, and so
20 on until those approximate 30 stalls in this
21 example are allocated.
22 **Q.      So this second batch you're talking**
23 **about, I was a little unclear, are these people**
24 **who are currently occupying stalls or people who**

Page 783

1  **are not on-site occupying stalls who want to come**
2  **on?**
3  A.      People who are not on-site, anyone
4  who is occupying stalls, their applications are
5  considered in alphabetical order during the first
6  part of the meeting.
7  **Q.      So the second part then is for people**
8  **who are not currently on-site who are seeking**
9  **stalls?**
10 A.      Yes.
11 **Q.      Okay.**
12      **Do you go through each and every one**
13 **of those applicants?**
14 A.      No, no, we only go through, again,
15 the racing secretary and Mr. Zimny kind of put a
16 priority together of folks that want to issue any
17 open stalls to and so once we go through the
18 however many and it's usually not more than a
19 dozen and I would say it's usually less than
20 that, that once we go through and have allocated
21 the stalls that are available at the -- that
22 we've calculated through first part of the
23 process, then we're done and that's all we talk
24 about is those however few they are, trainers

Page 784

1  that we're allocating the leftover stalls to.
2           ARBITRATOR CARNEY:  You might
3  have given a six-month period to not have any
4  stalls be allocated to people who are not on the
5  track?
6           THE WITNESS:  That's
7  possible.  I don't recall that ever occurring,
8  usually there are some stalls and again quite
9  often it's not very many, but usually there are
10 some stalls available because even as we go
11 through the stall allocations for folks that are
12 in, currently in stalls, there are times when
13 we're issuing additional stalls to those folks.
14      So I'll go back to my original
15 example, a trainer has, currently has 10 stalls,
16 has applied for 20 stalls, based on the starts
17 and the fact that this is someone who helps us
18 out and has horses that fit our program, our
19 conditions and stuff like that, we would like to
20 issue him 20 stalls.  So we may increase the
21 number of stalls for folks that are already in
22 the barn area.
23 BY MR. WOLFSON:
24 **Q.      So with respect to those applications**

Page 785

1  **for people off-site wanting to come on, you said**
2  **that you don't go through each and every one of**
3  **those applications; is that accurate?**
4  A.      No, we do not.
5  **Q.      Does the racing secretary who has**
6  **those applications tell you who is applying but**
7  **you're not getting to?**
8  A.      No.
9  **Q.      So would you know if someone applied**
10 **but wasn't brought up for discussion?**
11 A.      No.
12 **Q.      Let me do this and then come back.**
13 **Sir, you're aware that in August of 2008, we're**
14 **going to talk about this, Ms. Mawing was not**
15 **allocated any stalls?**
16 A.      Yes, I am.
17 **Q.      Okay.**
18      **We'll talk about that.  Since that**
19 **time, do you know whether she's applied for any**
20 **stalls?**
21 A.      I do not.  I'm only aware that she
22 has through this process.
23 **Q.      Okay.**
24      **Was her name ever brought up during**

Page 786

1  **the allocation committee meetings by anyone to**
2  **reallocate stalls to her?**
3  A.      Not since that meeting where her
4  stalls were not reissued.
5  Q.      **Is that shocking to you?**
6  A.  No.
7  Q.  **Why?**
8  A.      We have -- I don't even know, I don't
9  have an estimate of the number of applications
10  that we get but it's numerous.  Mr. Zimny could
11  probably tell you much better than I can the
12  number of applications that we get that never
13  rise to consideration because we have a finite
14  number of stalls and once we get there and once
15  we feel like we have them filled with the best
16  possible trainers and horses available that,
17  again, fit our business and create betting
18  interest, then that's where we're done and it's
19  certainly the end of my involvement in the
20  process.
21  Q.  **Okay.**
22      **Now, I want to talk about some issues**
23  **specific to Ms. Mawing, sir.  Are you aware there**
24  **came a point in time in April of '08, I always**

Page 787

1  **get that date confused, I apologize, in April of**
2  **'08 where Ms. Mawing had her allocation reduced**
3  **by four stalls?**
4  A.      I am.
5  Q.      **And can you explain what you**
6  **understand about that situation to the panel,**
7  **please?**
8  A.      There was a big issue at that time
9  where we had an equine herpes scare and that's
10  when there is the potential, when a horse is
11  showing signs of equine herpes you have to
12  quarantine your barn area.  You can't let any
13  horses in or out.  The horse in question as I
14  recall did not have the proper documentation to
15  be on-site.  I think it went somewhere and came
16  back and so when we did the investigation, the
17  one thing I asked is let's -- we need to take
18  another look at access to our barn area so that
19  we can avoid these kinds of situations in the
20  future.
21      And we started with a complete barn
22  audit and what that meant was Mr. Elliott and I
23  think he was accompanied by probably Mr. Hale and
24  some of our security folks did a complete barn

Page 788

1  audit where they went down and checked every
2  horse in every stall to make sure that it was a
3  horse that was assigned to a trainer that we had
4  issued stalls to and that the horse was in the
5  stalls issued to that trainer and we found some
6  things that quite frankly I was appalled by.
7      We found one horse in there, for
8  instance, without any tattoo and a tattoo on the
9  lip is how you identify the horses, but what we
10  also found was folks occupying stalls that were
11  not assigned to them and folks that were allowing
12  folks to occupy stalls that were -- one trainer
13  allowing another trainer to occupy stalls that
14  were not assigned to them.  So when we found this
15  out, we first tightened our access to our barn
16  area and we decided that as a result of what we
17  found that for each individual that was occupying
18  a stall that was not assigned to him or her, we
19  would take one stall away from their allocation.
20  We also decided that for each person who allowed
21  a trainer to occupy a stall, that we would take
22  one stall away from them as well.  So that's how
23  that process worked and apparently Ms. Mawing had
24  four situations that resulted in stalls being

Page 789

1  taken away as part of that process.
2  Q.      **Now, this was not part of an**
3  **allocation committee meeting?**
4  A.      No.
5  Q.      **This was between allocation periods?**
6  A.      Yes.
7  Q.      **Do you recall that in the prior**
8  **allocation period in February Ms. Mawing's**
9  **allocation actually went up from seven to nine?**
10  A.      I don't recall that specifically, but
11  again, it was in the document that was provided
12  to me during the course of my deposition.
13  Q.      **Oh, okay.**
14  A.      I'm aware of it from that
15  perspective.
16  Q.      **Did the decision to reduce**
17  **Ms. Mawing's allocation by four stalls have**
18  **anything to do with her HBPA activity?**
19  A.      No, none whatsoever.  It was a --
20  something that was consistently applied to
21  everyone we found during that barn audit.
22  Q.      **Did it have anything to do with the**
23  **fact that she had testified for or on behalf of**
24  **Mr. Funkhouser at a hearing regarding his**

Page 790

1  **licensing in or around October of the previous**
2  **year?**
3  A.      No.
4  **Q.      Did you even know she testified?**
5  A.      I did not.
6  **Q.      Now we move ahead to the August of**
7  **'08 allocation period.  Prior to that meeting,**
8  **which as I understand was towards the end of**
9  **August; is that right?**
10  A.      I'll rely on the dates in the
11  records.
12  **Q.      Okay.**
13  **Do you recall there being an August**
14  **'08 allocation committee meeting?**
15  A.      Yes.
16  **Q.      Okay.**
17  **Did you participate in that meeting?**
18  A.      Yes.
19  **Q.      Okay.**
20  **Now, before that meeting, did you**
21  **have any conversations with anyone regarding**
22  **Ms. Mawing?**
23  A.      There was an issue regarding a goat
24  that had died, the allegation being that we were

Page 791

1  using the wrong rodent poisoning in the barn
2  area, that was brought to my attention, I believe
3  by either our in-house counsel or Mr. Moore.
4  **Q.      I don't want you to talk about what**
5  **you learned from in-house counsel, just talk**
6  **about --**
7  A.      Okay, it would've been from one of
8  those sources and again likely Mr. Moore, would
9  probably have come through a steward's hearing
10  and I also received a --
11  **Q.      I'm sorry.  Go ahead.  Keep going.**
12  A.      The other piece of information that
13  I was aware of going into that meeting is that
14  Ms. Mawing had made an assertion that we strung
15  wires in the barn area to hurt horses somehow.
16  **Q.      Let's take those one at a time.  The**
17  **first thing you learned from someone at the track**
18  **regarding poisoning of animals, right?**
19  A.      Yes.
20  **Q.      What did you learn and what did you**
21  **do about that?**
22  A.      Well, we went to our exterminator and
23  asked him to review the type of poison that we
24  were using and we were assured that it wasn't

Page 792

1  something that would harm animals and I didn't
2  get involved in the specifics other than that's
3  when I became aware that it was not the type of
4  -- it was not a risk based on the type of poison
5  we were using.
6  **Q.      And who did you learn that**
7  **information from?**
8  A.      That probably would've been from our
9  risk manager, so whoever who was handling that
10  sort of case.
11  **Q.      Okay.**
12  **But you recall that there was someone**
13  **at the track who was given the responsibility of**
14  **looking into that issue; is that right?**
15  A.      Yes.
16  **Q.      And a report was given back to you?**
17  A.      A verbal report.
18  **Q.      That's what I meant, a verbal report.**
19  ARBITRATOR WYCOFF:  Excuse
20  me, did you know that Ms. Mawing was specifically
21  the person who made the complaint, that complaint
22  about the rat poison?
23  THE WITNESS:  Yes.
24  BY MR. WOLFSON:

Page 793

1  **Q.      I apologize if that wasn't clear**
2  **earlier.**
3  **So you learned that Ms. Mawing had**
4  **complained about rat poison possibly killing a**
5  **goat and horse; is that right?**
6  A.      I wasn't aware that she was claiming
7  it killed a horse.  I was aware that she was
8  claiming that we killed a goat.
9  **Q.      Okay.**
10  **And you caused an investigation to be**
11  **done?**
12  A.      Yes.
13  **Q.      And the result of the investigation**
14  **as reported back to you was what?**
15  A.      That the particular rat poison,
16  pesticide, whatever it's called that we were
17  using was not harmful to larger animals.
18  **Q.      And you understood that was a result**
19  **of the people at the track speaking with who?**
20  A.      The exterminators at the time, who I
21  believe was Ehrlich, I think.  I'm not positive
22  there either.  We switched back and forth a
23  couple of times.
24  **Q.      All right.**

Page 794

1    So that was one piece of information
2 you had before the allocation committee meeting?
3 A.    Yes.
4 Q.    And you referred to a second piece of
5 information; is that right?
6 A.    Yes.
7 Q.    And what was that second piece of
8 information you received?
9 A.    That Ms. Mawing had claimed to the
10 Governor that we were stringing wires up in the
11 barn area to harm horses somehow.
12 Q.    And who told you that?
13 A.    It would've been Mr. Finamore.
14 Q.    And did Mr. Finamore tell you
15 anything else during that conversation?
16 A.    I don't recall specifically. I know
17 he was very upset and he said is there any wires?
18 I mean he was asking questions about it, could
19 this even be possibly true and I said we would
20 check but I could virtually assure him then and
21 there that it was not true. We take the safety
22 of the horses on our property very seriously.
23 Q.    And did you, in fact, check?
24 A.    Yes.

Page 795

1 Q.    And what did you do?
2 A.    I had the track maintenance guys go
3 around the barn areas to see if there was any
4 potentially loose hanging wires, any electrical
5 wires, anything like that may be of a height that
6 could potentially be struck by a horse and the
7 answer was no. The answer that came back was no.
8 Q.    Okay.
9    Now, after you learned that, well,
10 let me put it this way, did you have that looked
11 into, did you get that information back before or
12 after the August '08 allocation committee
13 meeting?
14 A.    The information regarding whether or
15 not there were --
16 Q.    That's right.
17 A.    Yeah, it would've been before that
18 certainly. We looked into it right away. It's a
19 very serious allegation.
20 Q.    Why?
21 A.    Because it was saying that we were
22 doing things that are not -- that could be
23 dangerous to the animals that are, you know, not
24 completely under our care but we have -- we

Page 796

1 certainly have a responsibility and take it very
2 seriously for the animals that are stabled on our
3 site.
4 Q.    Now, did Mr. Finamore tell you
5 whether he learned from the Governor whether or
6 not Ms. Mawing was contending the track was
7 deliberately doing that to harm animals or it was
8 making a mistake; did he say anything about that?
9 A.    He said it was deliberate. The claim
10 was that we were doing things to deliberately
11 harm the animals.
12 Q.    And then you looked into it and found
13 that it wasn't true?
14 A.    Right.
15 Q.    Were you concerned by those
16 allegations?
17 A.    Absolutely. My immediate reaction
18 was certainly that it couldn't have been
19 deliberate because I know that -- I would know
20 that for a fact unless someone took it upon
21 themselves to do something like that. So I knew
22 it couldn't be deliberate, so wanted to check to
23 see if it was even vaguely true, if there were
24 something that maybe from a maintenance issue

Page 797

1 standpoint that could have caused a dangerous
2 situation and that wasn't true either.
3 Q.    So then you went to the allocation
4 committee meeting; is that right?
5 A.    At sometime after that, yes.
6 Q.    Did Ms. Mawing's name come up for
7 allocation at that committee meeting?
8 A.    Yes, because she was currently
9 stabled in the area, in the barn area.
10 Q.    And tell the panel what was said and
11 what you said about Ms. Mawing at that committee
12 meeting?
13 A.    Well, just like any other trainer, I
14 don't recall the specifics in terms of number of
15 starts or win percentages or anything like that,
16 but the first thing that would've been discussed
17 was here's Ms. Mawing, she has X number of stalls
18 based on her starts, she would qualify for a
19 maximum of this number of stalls, here's her win
20 percentage and I said isn't Ms. Mawing -- to the
21 group, the one, one of the people that was taking
22 liberties with our barn area, was occupying
23 stalls that were not allocated and those kinds of
24 things and everyone agreed yes and I said -- I

Page 798

1  asked the question again of the group, is there
2  anything outstanding or remarkable about the
3  horses that Ms. Mawing stables here?  Is there
4  any reason that we should go out of our way to
5  issue her stalls and no one had any reason that
6  they could think of based on her starts and
7  quality of starts and so I said, so based on the
8  fact that she didn't follow the rules of the
9  allocation, the stall allocation on her
10  application, I said we issue no stalls and no one
11  disagreed and we issued no stalls.
12  Q.      Did you tell anyone at the committee
13  meeting about the information you learned from
14  Mr. Finamore about what she said to the Governor?
15  A.      No, I did not.
16  Q.   Why not?
17  A.      I didn't feel it was an appropriate
18  forum, quite frankly.  I didn't feel a need to do
19  that.
20  Q.   Why?
21  A.      I didn't feel like the forum dictated
22  that kind of information.  It was a conversation
23  that Mr. Finamore had had with the Governor.
24  Mr. Finamore did not tell me not to share it with

Page 799

1  anyone but I certainly wasn't given permission to
2  share it and I just didn't feel that it was an
3  appropriate forum.
4  Q.      Did you have an understanding as to
5  why Mr. Finamore was having discussions with the
6  Governor at that time?
7  A.      He had, I think, regular discussions
8  with the Governor, I know one of the things that
9  was going on during that time was our contract
10  negotiation and I know the Governor had some
11  concerns with that.
12  Q.      And did that play a factor into why
13  you didn't say anything at the meeting about the
14  allegation?
15  A.      No, again, I just felt like the forum
16  didn't need to be said there and if -- well, I
17  just didn't feel like it needed to be said there.
18  Q.      Now, generally at these allocation
19  committee meetings, do you take into account
20  people generally bad mouthing the track?
21  A.      I mean generally bad mouthing the
22  track, no, because I think I even said it in my
23  deposition, if we kicked everyone out that had
24  something bad to say about the track, we would

Page 800

1  have an empty barn area because it's just a
2  fairly regular occurrence unfortunately.
3  Q.      So why was this different?
4  A.      This wasn't talking bad about the
5  track.  This was someone who told what I deemed
6  to be a vicious lie and almost to the point of
7  liable or slander to the Governor of the state
8  and so this wasn't just someone saying, oh, I
9  don't like management and they're bad guys, the
10  track isn't -- doesn't support racing or
11  whatever.  We get those kinds of comments on a
12  regular basis.  This was certainly not in that
13  realm.
14  Q.      Did you ever have any understanding
15  from anyone that the Governor wanted the track to
16  take action against Ms. Mawing or not allocate
17  stalls to her?
18  A.      No.
19  Q.      At that allocation committee meeting,
20  let me back up, you told me that Mr. Finamore
21  told you Ms. Mawing had made some comment to the
22  Governor at a meeting they had; is that right?
23  A.      Yes.
24  Q.      Did you try to find out who else was

Page 801

1  at that meeting?
2  A.   No.
3  Q.      Did you reduce stalls of anyone else
4  because they attended a meeting with the
5  Governor?
6  A.      No, I don't know who attended the
7  meeting with the Governor other than Ms. Mawing
8  because of the allegation that was brought
9  forward.
10  Q.      That was going to be my question; do
11  you even know who attended that meeting with
12  Ms. Mawing?
13  A.   I do not.
14  Q.   Did you care?
15  A.   No.
16  Q.      Did -- at that time, sir, did you
17  know whether or not Ms. Mawing was a member of
18  the Board of Directors of the HBPA?
19  A.      I didn't know specifically, no.
20  Q.      Now, sir, you're aware that in
21  October of '07 Mr. Finamore -- Mr. Funkhouser had
22  his license suspended by the Racing Commission;
23  are you aware of that?
24  A.      Yes.

Page 802

1   **Q.      Okay.**
2           **Do you know whether or not Ms. Mawing**
3   **attended that hearing and testified on behalf of**
4   **Mr. Funkhouser?**
5   A.      I did not.
6   **Q.      Did you take action against**
7   **Ms. Mawing at that August '08 allocation**
8   **committee meeting because she did anything with**
9   **respect to that Racing Commission meeting with**
10  **respect to Mr. Funkhouser?**
11  A.      No.
12  **Q.      Did you take any action at that**
13  **committee meeting because she was a member of**
14  **Board of Directors of the HBPA?**
15  A.      I did not.
16  **Q.      Okay.**
17          **Now, sir, there's been some**
18  **allegations -- well, let me put it this way, are**
19  **you familiar with Patty Burns?**
20  A.      Yes.
21  **Q.      How are you familiar with Patty**
22  **Burns?**
23  A.      It came to our attention that she had
24  threatened someone on our property who was

Page 803

1   testifying in a case or was going to testify in a
2   case against a family member of Ms. Burns.  It
3   may have been her husband, I don't recall
4   specifically who but that she threatened someone
5   on our property with respect to that individual
6   testifying against a family member of Ms. Burns.
7   **Q.      And what action did the track take or**
8   **what happened with respect to Ms. Burns because**
9   **of that?**
10  A.      We ejected her.
11  **Q.      And once she was ejected, did she**
12  **lose her stalls?**
13  A.      Yes.
14  **Q.      Okay.**
15          **Was that action taken because she did**
16  **anything as a member of the HBPA?**
17  A.      No.
18  **Q.      Do you know whether or not she**
19  **testified for Mr. Funkhouser at this hearing?**
20  A.      I do not.
21  **Q.      Did the track take action against**
22  **Ms. Burns because she may have supported**
23  **Mr. Funkhouser at this hearing he had over his**
24  **license?**

Page 804

1   A.      No.
2   **Q.      Why did the track take action against**
3   **Ms. Burns?**
4   A.      Because of the incident I described,
5   because she threatened someone on our property.
6   **Q.      Did the track ever take action**
7   **against anyone for testifying in connection with**
8   **that Funkhouser hearing?**
9   A.      No.
10          MR. WOLFSON:  May I have a
11  moment, please?
12          I have no further questions for the
13  witness.
14          ARBITRATOR WYCOFF:  Excuse
15  me, after Mr. Britton, how many live witnesses?
16          MR. WOLFSON:  Well, actually,
17  in light of the testimony of Mr. Britton, we're
18  just going to call Mr. Puccio, just one more live
19  witness.
20          ARBITRATOR WYCOFF:  I think
21  we should finish.
22          MR. WOLFSON:  Oh, today?
23          ARBITRATOR WYCOFF:  Yeah.
24          MR. WOLFSON:  We'll finish by

Page 805

1   2:00.
2           MR. HAMMER:  And I won't be
3   that long.
4           MR. WOLFSON:  Unless you have
5   rebuttal.
6           MR. WADDELL:  I'd like to
7   have Mr. Moore.  Are we bringing him on as
8   rebuttal to this witness?
9           MR. WOLFSON:  Well, we're not
10  calling Mr. Moore.
11          MR. WADDELL:  You were until
12  this moment.
13          MR. WOLFSON:  Just like you
14  were calling Mr. Yetsook until --
15          MR. WADDELL:  I want to
16  bring him on as rebuttal after you close.
17          MR. WOLFSON:  I don't know.
18  Well, we'll talk about it over lunch.
19          MR. HAMMER:  I can do my
20  cross-examination first.
21          ARBITRATOR WYCOFF:  We need
22  to do the cross-examination, but, you know, I
23  think you did represent you were calling him as a
24  witness and they could rely on that.  So

Page 806

1  therefore, you know, I think it would be fair.
2  I'm suggesting to my fellow arbitrators that you
3  call to see if he's available.
4           MR. WOLFSON:  I will
5  certainly do that.
6           The only thing I'll point out, this
7  was the exact flip of the Yetsook situation,
8  which was under their control.  It's the exact
9  situation where they wouldn't bring him in at
10 that point.
11          ARBITRATOR WYCOFF:  No, but
12 he was not employed by them, whereas Moore is
13 employed by you.  There's a difference.  You have
14 control.  I understand what you're --
15          MR. WOLFSON:  With all due
16 respect, I think we could argue that, but I'm not
17 going to waste the time arguing.  Fair enough.
18 His deposition is in the record already.
19          ARBITRATOR WYCOFF:  I need to
20 take a one-minute break.
21            * * *
22          (Brief break)
23            * * *
24          ARBITRATOR CARNEY:  All

Page 807

1  right.  Ready to go back on the record?
2           MR. HAMMER:  We are.  Thank
3  you.
4            * * *
5         C R O S S - E X A M I N A T I O N
6  BY MR. HAMMER:
7  Q.       Mr. Britton, my name is Dave Hammer.
8  I think we've met before.
9  A.       I believe so.
10 Q.       Okay.
11          So I have some questions for you in
12 follow-up to your testimony.  The first thing I
13 want to ask you is, do you know what a barn
14 captain is?
15 A.       Yes.
16 Q.       What is a barn captain?
17 A.       It's someone who is sort of the
18 liaison or go-to person for each barn.
19 Q.       For each barn.  So there's a person
20 designated for each barn as the go-to person?
21 A.       I believe so, yes.
22 Q.       And does the barn captain have
23 responsibility generally to address concerns that
24 arise from that barn?

Page 808

1  A.       Yes.
2  Q.       And that includes concerns about the
3  safety of the animals?
4  A.       Yes.
5  Q.       And you would agree with me, wouldn't
6  you, that Tina Mawing was the barn captain for
7  Barn 14?
8  A.       Was not aware.
9  Q.       Okay.
10          Were you aware the track management
11 selects the barn captains for each barn?
12 A.       Honestly not aware of the process,
13 no.
14 Q.       You didn't know that either?
15 A.       No.
16 Q.       Okay.
17          Did you know that it's a position of
18 trust that the track confers on a barn captain to
19 be responsible for the barn?
20 A.       I can tell you that I've never met
21 with a barn captain, so I'm not sure exactly what
22 their role is.  I know that -- or I'm sure Mr.
23 Elliott would give a better description of what a
24 barn captain is responsible for.  He's the one

Page 809

1  that would interact.
2  Q.       But to be sure, you do have overall
3  responsibility for the entire facility including
4  the barns themselves?
5  A.       Yes, I do.
6  Q.       You are just not familiar with the
7  barn selection, barn captain selection process,
8  or whether Tina Mawing was selected as a barn
9  captain?
10 A.       That's correct.
11 Q.       Okay.
12          Are you familiar with the duties of a
13 trainer at the racetrack?
14 A.       Vaguely.  I'm certainly no expert.
15 Q.       Okay.
16          Well, let me ask you this.  Are you
17 familiar with the idea that a trainer is
18 responsible for ensuring sanitary conditions in
19 the barn area?
20 A.       Yes.
21 Q.       And are you familiar that a trainer
22 is responsible for ensuring the health and safety
23 of the horses?
24 A.       As are we, yes.

Page 810

1  Q.      Yes.  So that's a rule obligation.
2  Now, you knew, didn't you, that Tina Mawing was a
3  member of the HBPA executive board?
4  A.      I did not.
5  Q.      You didn't?
6  A.      No.
7  Q.      Do you recall giving your deposition
8  in this case back on April the 23rd of 2010?
9  A.      Yes.
10 Q.      And did you get a chance to read that
11 deposition before you came in?
12 A.      I went through it.  I haven't read it
13 in detail but I have gone through it, yes.
14 Q.      You didn't read it carefully before
15 you came in here?
16 A.      I did read it, yes, but not -- only
17 once and just went through it.
18 Q.      When was the last time you read
19 through it?
20 A.      It was a few days ago.
21         Okay.
22         And would you agree with me that
23 after your deposition was over you had the
24 opportunity to make any corrections you needed to

Page 811

1  that testimony?
2  A.      Yes.
3  Q.      And would you agree with me that you
4  didn't change a thing in that testimony?
5  A.      I don't believe I did.
6  Q.      It was all correct as you stated at
7  the time?
8  A.      I believe so.
9  Q.      You told the truth to the best of
10 your knowledge at that time?
11 A.      To the best of my knowledge at that
12 time.
13 Q.      I'm going to ask you to turn to page
14 16 and 17. You don't have it in front of you; do
15 you?
16 A.      No.
17 Q.      All right.
18         I'm going to come over there.
19 Here's the original of your deposition
20 transcript.
21 A.      Okay.
22 Q.      And if you look at the bottom of page
23 16, I'm going to read the question that was asked
24 to you at your deposition.

Page 812

1  A.      Uh-huh (yes).
2  Q.      See Line 20.
3  A.      Yes.
4  Q.      Are you aware if she's a member of
5  the Board of the HBPA?
6  A.      Yes.
7  Q.      And your answer was?
8  A.      Yes.
9  Q.      Yes.  You were aware back then she
10 was a member of the HBPA?
11 A.      As part of this process.
12 Q.      Oh, you only learned it because of
13 this process?
14 A.      Yes.
15 Q.      You didn't know it at the time?
16 A.      I did not.
17 Q.      As the general manager of the
18 facility responsible for all operations, don't
19 you have to know who the executive members are?
20 A.      No, I don't.
21 Q.      Are you familiar with the contract in
22 this case?
23 A.      Of --
24 Q.      I'm sorry; I said that wrong.  Are

Page 813

1  you familiar with the contract of the HBPA?
2  A.      Again, I mean I couldn't cite it
3  chapter and verse but I'm familiar.
4  Q.      Well, it's the governing document for
5  the relationship between the track and the HBPA
6  isn't it?
7  A.      Yes.
8  Q.      You have to be familiar with it if
9  you're going to abide by it?
10 A.      Not chapter and verse.  It's just
11 like anything else.  I couldn't cite all of the
12 internal controls, which I'm also responsible for
13 for all aspects of running the property.
14 Q.      Okay.
15         Well, I'm not going to make a memory
16 test on you but you have a copy of that contract;
17 don't you?
18 A.      I'm not sure I actually have one in
19 my office.
20 Q.      You know people who can get you a
21 copy?
22 A.      Oh, yeah, absolutely.
23 Q.      You can call the legal department and
24 say, get me a copy of that contract today; can't

Page 814

1  you?
2  A.      Yes.
3  Q.      So you have access to it?
4  A.      Yes.
5  Q.      You can consult it anytime you need
6  to?
7  A.      Yes, I can.
8  Q.      And I'm going to show you a page from
9  the contract, which is page 4 of the contract.
10  And you see I have it highlighted in yellow.  Do
11  you see the paragraph that says Charles Town
12  Races does agree that it shall negotiate with and
13  conduct any and all business which is the subject
14  of this agreement and any matters reasonably
15  related to any provision of this agreement with
16  the duly elected officers of the HBPA or their
17  duly designated representatives?
18  A.      Uh-huh (yes).
19  Q.      So to abide by that provision you
20  have to know who is on the -- who is the
21  executive officers?
22  A.      I don't because we have very little
23  interaction, unfortunately, with that agency.
24  Q.      Well, let's turn to Exhibit 42, if we

Page 815

1  could. Back in the spring of 2008, the April time
2  period, isn't the reason that you were having
3  very little contact with anyone at the HBPA about
4  any matter is because Mr. Finamore said that
5  we're not going to meet with you and we're not
6  going to discuss anything until the HBPA pledges
7  its support of table games?
8  A.      Yeah, sure, certainly that would be a
9  reason.
10  Q.      So there was a clampdown by
11  Mr. Finamore, no discussions?
12  A.      That's true, but I also say that
13  there were very little discussions prior to that
14  clampdown.  We unfortunately do not have a good
15  relationship with our HBPA.
16  Q.      And you know that under the contract
17  that the subject matter of rodent and pest
18  control is a subject that must be discussed; the
19  parties will mutually make their best effort to
20  discuss those topics?
21  A.      I'm not aware.
22  Q.      Not aware.  Let me show it to you.
23  See if this refreshes your recollection.  Make it
24  a little bigger for you so you can see it.  Do

Page 816

1  you see Paragraph 19 of Page 19 of the contract?
2  A.      Uh-huh (yes).
3  Q.      The parties shall also use their best
4  efforts to address and resolve in a timely and
5  expeditious manner the following matters of
6  mutual concern to the parties. A, can you read
7  that?  What does it say?
8  A.      Rodent and pest control.
9  Q.      And eradication?
10  A.      And eradication.
11  Q.      So that's a subject that you're
12  supposed to make your best effort to discuss?
13  A.      That our company is supposed to make
14  the best efforts to discuss.
15  Q.      I'm a little lost.
16  A.      As with any other area in -- within
17  my purview, there are folks that I rely on to
18  handle those kinds of things.  In this case it
19  would be the folks that operate in the barn area
20  and folks that report to Mr. Moore.  I would not
21  be involved in selecting or monitoring the
22  specifics of pesticides that we use in the barn
23  area.  I would not -- I would not be aware, and I
24  would not be involved in that decision-making

Page 817

1  process.
2  Q.      Can you accept this proposition that
3  Ms. Mawing was a member of the HBPA executive
4  board in April of 2008? Can you accept that?
5  A.      You're stating that as a fact?
6  Q.      Can you accept that from me?
7  A.      Yes.
8  Q.      And that she continued to be a member
9  right through, much later than that, but right
10  through the summer of that year; can you accept
11  that fact from me?
12  A.      If that's the fact, yes.
13  Q.      And would you accept from me that as
14  an executive board member if she raises a concern
15  about pest, rodent and pest control eradication,
16  particularly given that she's a barn captain that
17  under the contract there is a duty to timely and
18  expeditiously discuss that with her?
19  A.      With her, no.  No, as I said, when it
20  came to our attention when it was brought to the
21  attention of the racing stewards who are there to
22  oversee the racing, the administration of racing,
23  we did an investigation.  We contacted the pest
24  control company, and we were informed that the

Page 818

1 type of pesticide they were using was not harmful
2 to animals.  That is our responsibility.  We took
3 that responsibility serious, and that was the end
4 of that issue.
5 **Q.        No, wait a minute.  That was all the**
6 **way at the end of August; wasn't it?  That was**
7 **when her phone calls with Mr. Finamore; wasn't**
8 **it?**
9 A.        No, no.  I was aware of the goat
10 poisoning thing well before that.  I was aware of
11 that almost immediately when it was brought to
12 the stewards, because I would've been made aware
13 of that to -- and I'm aware of what we did to
14 investigate to see if we were using some sort of
15 poison that would be harmful to goats or horses
16 or other animals in the barn area.
17 **Q.        Do you remember your testimony, page**
18 **67 of your transcript?  I'm sorry, let me direct**
19 **you to a different page.  I'm going to direct you**
20 **to Page 52 and 53.  Do you have Page 52 in front**
21 **of you?**
22 A.        I do.
23 **Q.        All right.**
24 **And if you start looking at Line 17?**

Page 819

1 A.        Okay.
2 **Q.        I'll read the questions and you read**
3 **the answers.**
4 **Were you aware that back in 2008 time**
5 **period Ms. Mawing was making complaints to track**
6 **management regarding the use of pesticides in the**
7 **barn areas?  Read your answer, please.**
8 A.        I don't as a result of this lawsuit
9 I'm aware that she had a horse and a goat die and
10 her contention is that from poisoning,
11 exterminator poisoning or whatever.
12 **Q.        Is it your testimony that the first**
13 **time you learned of those complaints to track**
14 **management was when you read the complaint in**
15 **this case?**
16 A.        No, because I would've been aware
17 when --
18 **Q.        Your answer, please, sir, in your**
19 **deposition that you gave under oath.**
20 A.        Oh, I'm sorry.  Or was advised of the
21 complaint, yes.
22 **Q.        So your testimony in April of 2010**
23 **was that the first you learned of it was a result**
24 **of this lawsuit?**

Page 820

1 A.        Yeah, I don't know why that was my
2 answer.  I was confused by the --
3 **Q.        And you never changed that answer?**
4 A.        No, I didn't.
5 **Q.        Now, you said something that really**
6 **confused me.  I asked you would you agree with me**
7 **given that she's an executive board member and a**
8 **barn captain that if she raises issues about**
9 **rodent and pest control you, corporate you, have**
10 **an obligation to work with her on that issue, and**
11 **you said, no, not with her?**
12 A.        Not me specifically, no.  There are
13 folks that would work with her.
14 **Q.        Who?**
15 A.        It would be starting with Mr. Elliott
16 who is responsible for maintaining the barn area
17 and the relationships, and it would go through
18 the process.  Mr. Elliott reports to the racing
19 secretary.  The racing secretary reports to
20 Mr. Moore.  Those folks would've been involved in
21 that.
22 **Q.        That's very helpful.  Did that**
23 **process happen?**
24 A.        As far as I know, because it never

Page 821

1 raised itself to me other than to be advised that
2 we had a claim that some -- we killed a goat.  I
3 wasn't even aware of the claim that we killed a
4 horse, but that a goat had died as a result of
5 rat poisoning, and I said that we check with the
6 pest control company and they said, yes, and
7 there wasn't any evidence that what they used was
8 harmful.
9 **Q.        But your sworn testimony is that you**
10 **weren't aware of that until after this lawsuit**
11 **was filed?**
12 A.        I don't know why.  At that time I'm
13 not sure if I was maybe nervous at that time or
14 -- but in retrospect, what I'm saying now is to
15 the best of my recollection.
16 **Q.        Okay.**
17 **So what you're saying now, so you're**
18 **changing your testimony now?**
19 MR. WOLFSON:  Objection.
20 He's not changing his testimony.  His testimony
21 is what it was then.  He's admitting it.  It is
22 what it is.
23 ARBITRATOR WYCOFF:  We'll
24 allow it.

Page 822

1  BY MR. HAMMER:
2  Q.        Now, so you just told me that
3  you have a process to follow, going up from
4  Mr. Elliott on up to -- on up through the process
5  but you never heard about it.  I want you to tell
6  me for a fact, did that process happen or not
7  when Ms. Mawing raised her concerns about the
8  rodenticide in the barn area?
9  A.        I am aware that we checked with the
10  pest control company to find out if the, whatever
11  the term is that you used, the rat poisoning.
12  Q.        Let me stop you there.  When did you
13  check with Ehrlich, with the pest company?
14  A.        I honestly don't remember the exact
15  time frame. I can't --
16  Q.        Was it after Mr. Finamore spoke to
17  you or before Mr. Finamore spoke to you?
18  A.        It would've been before.
19  Q.        Before he spoke to you?
20  A.        Yes.
21  Q.        So you knew about it before?  You
22  knew about the --
23  A.        The rat-poisoning claim, I knew about
24  before.

Page 823

1  Q.        And did you get back to Mrs. Mawing
2  and tell her that we checked with Ehrlich and we
3  don't think that the poison could harm a large
4  animal?
5  A.        I did not.
6  Q.        Did you direct anyone to do that?
7  A.        I did not.
8  Q.        Are you aware of anyone doing that?
9  A.        I'm not.
10  Q.        In fact, you failed to communicate
11  with her because Mr. Finamore said no
12  communications about anything; isn't that the
13  case?
14  A.        No, it's not.
15  Q.        And wouldn't you agree with me that
16  if you are concerned about your property being
17  destroyed, your goat and your valuable horse,
18  that it would be enormously frustrating and
19  upsetting not to hear back an answer as to
20  whether that is a concern or not?
21  A.        I can't -- I can't answer that.
22  Q.        You can't figure that out?
23  A.        I can't answer that, no.
24  Q.        You don't know, okay.

Page 824

1          Now, I want to talk about your
2  testimony just for a moment that I just heard
3  about the equine herpes in the barns.
4  Q.        Okay.
5          It was Dickie Moore's daughter who
6  brought the horse in with equine herpes; wasn't
7  it?
8  A.        Yes.
9  Q.        And it was Dickie Moore's daughter,
10  Mary, who did not have an in-slip to bring that
11  horse in?
12  A.        Yes.
13  Q.        And it was because of that, that
14  violation, that a barn check was necessary?
15  A.        Yes.
16  Q.        Now, did Dickie Moore receive any
17  discipline for this?
18  A.        No, he was -- with respect to his
19  daughter and any barns assigned, he would recuse
20  himself.  He would not be involved in that
21  decision.
22  Q.        Did anyone else besides Mary Moore
23  receive any discipline?
24  A.        Yeah, anyone who we found as I

Page 825

1  described in my testimony, anyone that we found
2  as a result of that audit that was occupying
3  stalls that were not allocated to them or was
4  allowing stalls allocated to them to be occupied
5  by other trainers.
6  Q.        My question wasn't clear, so I'm
7  going to have to ask it differently because
8  that's my fault.  Did anyone else receive
9  discipline for a horse coming in without an
10  in-slip?
11  A.        I'm not aware.  I don't think so.  I
12  think what we found was that our process was
13  faulty.
14  Q.        I mean, a horse is a large animal.
15  Someone has got to either trailer it in or walk
16  it in, but you can't miss a horse coming through;
17  can you?
18  A.        At that time, there was unfettered
19  access to the training track and horses coming
20  from the training track back over to the track
21  were not checked.  And so we believe that's how
22  we were getting horses in without in-slips in our
23  barn area.
24  Q.        So the bio-security procedures were

Page 826

1  put in place after this incident?
2  A.      Yes.
3  Q.      And the penalty for having your horse
4  in the wrong stable or in another person's
5  stable, that was put in place after this
6  incident?
7  A.      It was -- yes, it was put in place as
8  a result of this incident.
9  Q.      Yes.  So at the time that Ms. Mawing
10  was borrowing stalls, there was no penalty for
11  having your horse in the wrong stable, no
12  published penalty; was there?
13  A.      No published penalty, but there were
14  stall -- there is a stall application and there
15  are rules in the stall application that you are
16  to abide by and part of that application process
17  is that you stable your horses in the stalls
18  assigned, and when you are asked to vacate those
19  stalls you have a certain amount of time to
20  vacate stalls.
21  Q.      Didn't Mr. Elliott or Mr. Wehrman or
22  Dickie Moore or anyone else tell you that it's
23  the common practice at the track for trainers to
24  share stalls?

Page 827

1  A.      I'm aware that with the permission of
2  Mr. Elliott he has some discretion to allow folks
3  to on a very limited and temporary basis use a
4  stall that may not be allocated to them with the
5  agreement of the person to whom the stall was
6  allocated.
7          However, what's the point in having a
8  stall allocation committee and process if we're
9  going to allow any single individual to go down
10  there and make an agreement to -- that is not the
11  way we run the barn area.
12  Q.      Did Mr. Elliott tell you in the stall
13  allocation committee meeting of August of 2008
14  that he had given permission to Tina Mawing to
15  have her stalls, have her horses in different
16  stalls?
17  A.      I don't recall him saying that at
18  that meeting.
19  Q.      He didn't tell you that?
20  A.      I don't recall him saying that at
21  that meeting.
22  Q.      Wouldn't that be a critical factor in
23  the decision -- I mean you said it was critical
24  in deciding to give her stalls.  She had four

Page 828

1  horses in the wrong stalls, and no one spoke up
2  and said she had permission?
3  A.      No.
4  Q.      No one said a word?
5  A.      No.
6  Q.      And am I correct that you can contact
7  Ms. Mawing just about any time you want?
8  A.      I don't have any contact information
9  for Ms. Mawing, no.
10  Q.      In the entire operation of the gaming
11  of the Charles Town Races, you don't have her
12  contact information?
13  A.      I don't.
14  Q.      You couldn't contact the HBPA and get
15  it?
16  A.      I'm sure I could if I wanted to.  You
17  asked --
18  Q.      So you could get her telephone number
19  if you needed to?
20  A.      If I could, yeah.
21  Q.      Isn't she on the grounds just about
22  every single day or she was at that time?
23  A.      I don't know what her schedule was.
24  Q.      She's a trainer; right?

Page 829

1  A.      Yeah, but I still - you have trainers
2  that use assistant trainers that are on the site
3  every day to do all the stuff, so some trainers
4  aren't on the site every day.
5  Q.      So you had PNGI Security, you had
6  Dickie Moore, you had Mr. Elliott, you had all
7  the barn stable area personnel.  If you had sent
8  the message out and said I want to talk to Tina
9  Mawing, you would agree with me you could talk to
10  Tina Mawing; couldn't you?
11  A.      Sure.
12  Q.      You would get her number and speak to
13  her?
14  A.      Sure.
15  Q.      And you agree that never have you
16  picked up a phone or invited Ms. Mawing to come
17  in and ask for her side of the story?
18  A.      No, never.
19  Q.      Do you have any training or
20  experience in how to conduct investigations?
21  A.      No.
22  Q.      Don't you think it's fair in
23  conducting an investigation like you say
24  Mr. Finamore asked you to that you find out both

Page 830

1  sides of the story?
2  A.      We wanted to see if the condition
3  existed and it did not.
4  Q.      Now, that phone call was some time,
5  according to Mr. Finamore, was sometime between
6  August the 18th and August the 28th; right?  When
7  was this supposed rope or wire hung at the stall;
8  when did that happen?
9  A.      I don't know.  That was the claim
10 that Ms. Mawing apparently made to the governor.
11 I wouldn't -- there was no rope or anything hung.
12 That was the claim that Ms. Mawing made to the
13 governor.
14 Q.      Well, if you're going to investigate
15 that by sending someone down there, don't you
16 need to know when this supposedly happened?
17 A.      My understanding was that the
18 condition existed.
19 Q.      Oh, it continued to exist for how
20 long?
21 A.      I don't know.  That this condition
22 existed.
23 Q.      Existed?
24 A.      Yes.

Page 831

1  Q.      And so wouldn't you want to find out
2  to speak to other people in that area of the barn
3  and say, have you seen this?
4  A.      I wouldn't, no.  I would ask the
5  folks in the racing area would ask those
6  questions.  And I can say with great certainty
7  that they did.  I'm sure they talked to other
8  folks to say are you aware of any situation.
9  Q.      Did they tell you they talked to
10 other folks?
11 A.      No, but I'm --
12 Q.      So you're just basing that on
13 hearsay?
14 A.      No, I'm basing it on my confidence in
15 the folks that I work with.
16 Q.      Oh, you are speculating based on your
17 confidence in them they went and did that?
18 A.      Just like there's some speculation
19 that you are asking me to agree to in your
20 cross-examination.
21 Q.      Now, am I correct that you penalized
22 Ms. Mawing for four stalls, you were aware that
23 she was penalized for four stalls in April of
24 2008?

Page 832

1  A.      Yes.
2  Q.      Right after Mr. Finamore's letter
3  came out of April 25th?
4  A.      I guess that's the timing.  I'm not
5  sure of the time of the letter.
6  Q.      And you penalized her, or the track
7  did, you penalized her at that point in time, and
8  then you penalized her for the same conduct again
9  in August by taking all her stalls away, so first
10 she loses four, then you double punished her
11 again; is that correct?
12 A.      We took into consideration whether or
13 not she was someone who followed the barn rules
14 and so, yes, she was -- we decided to take the
15 stalls away or not reissue stalls I should say.
16 Q.      Okay.
17         Now, of all the people that lost
18 stalls in April of 2008 as a result of the barn
19 audit having their horses in the wrong stables,
20 did any of them lose all their stalls in August
21 of 2008?
22 A.      No.  Not that I'm aware of.  I
23 shouldn't say no.
24 Q.      So Mrs. Mawing was the only one who

Page 833

1  lost all of her stalls as a consequence of having
2  her horses in other people's stalls in April of
3  2008?
4  A.      Among other things, yes.
5  Q.      She was selected; wasn't she?
6  A.      I wouldn't say selected.  When her
7  name came up, the allegation of us trying to
8  intentionally harm horses was certainly rattling
9  around in my head and that was on my mind when I
10 asked the questions of the group, is there
11 anything remarkable about her starts and isn't
12 this someone who violated the barn rules.  I say
13 we don't issue any stalls.
14 Q.      Now, wasn't Ms. Mawing's application
15 set aside with three others at that August 2008
16 meeting?
17 A.      Not that I recall, no.
18 Q.      Wasn't it set aside with three people
19 who were horse abusers?
20 A.      Not that I recall, no.  I don't know
21 what set aside means quite frankly, so I don't
22 know.
23 Q.      Her request with the letter M. for
24 Mawing for stall allocations was pulled out and

Page 834

1  set aside?
2  A.      It would've just come up during -- in
3  alphabetical order when M. --
4  Q.      Do you remember?
5  A.      I don't remember specifically, but I
6  don't remember us doing anything out of the
7  ordinary and that's ordinary process.
8  Q.      So if Mr. Moore testified that her
9  application was set aside, you have no recall to
10 dispute that recollection; do you?
11 A.      Nor do I recall it.
12 Q.      And if Mr. Wehrman testified that her
13 application was never even discussed at that
14 meeting, you have no basis to dispute that
15 either; do you?
16 A.      Oh, yeah, I recall her being
17 discussed, as I said, when her name came up.  I
18 asked the questions.
19 Q.      And what were the reasons she was
20 rejected?  What were the questions you asked?
21 A.      I asked is there anything remarkable
22 about her horses?  Is -- does she have very high
23 quality, high win percentage, anything like that?
24 The answer was no.  I said, isn't this somebody

Page 835

1  who did not abide by the stall allocation and was
2  occupying other stalls which we discovered in
3  that barn audit?  The answer was yes.  And I
4  said, based on that I don't see a reason why we
5  issue any stalls and no one disagreed, and we
6  moved forward.  That is my recollection of how
7  that occurred.
8  Q.      If you turn to Page 37 of your
9  deposition.  Do you see beginning at Line 14 you
10 were asked the question, and did you participate
11 in this meeting that resulted in this allocation
12 decision being made?
13 A.      Yes.
14 Q.      You said I would have, yes.
15       ARBITRATOR CARLIN:  Is this
16 the August 2008 meeting?
17       MR. HAMMER:  Yes.
18 BY MR. HAMMER:
19 Q.      And question, what were the factors
20 that were considered in the decision not to
21 allocate any stalls to Ms. Mawing?
22 A.      Again, the best of my recollection is
23 we took into account the same criteria that we've
24 always taken into account; number of starts,

Page 836

1  quality of starts, win percentage, whether or not
2  this was someone who abided the stall
3  application, allocation, and barn rules.
4  Q.      Question, well, was there anything
5  wrong?  Are you contending there was something
6  below average in any way with your starts?
7  A.      I don't recall.  I don't recall
8  starts.  I do recall that there was a discussion
9  about the quality of starts.
10 Q.      Okay.
11       What do you recall about that?
12 A.      Just that there was nothing, there
13 was a low win percentage.  There was nothing that
14 was spectacular about the quality.
15 Q.      Do you personally know anything about
16 her winning percentage?
17 A.      I don't.  That's something that Erich
18 Zimny would more than likely calculate, he and
19 Randy.
20       MR. WOLFSON:  I'm going to
21 object to the question.  I think it was
22 inconsistent, so I don't understand the purpose
23 of the cross-examination.
24       MR. HAMMER:  I'm moving

Page 837

1  forward here, because I'm putting in his
2  testimony as evidence.  This is my opportunity.
3  BY MR. HAMMER:
4  Q.      And if you turn to page 40, was there
5  any allegation she mistreated her horses?
6  A.      No.
7       ARBITRATOR KARLIN:  Your
8  objection is that it was not impeachment, that it
9  was consistent when he testified before.  I agree
10 that it was that.  It is a deposition of a party.
11 I mean we can take the time and at the time of
12 the thing you can read it to us.
13       MR. WOLFSON:  I understand.
14 I just wanted to make sure I understood the
15 purpose for which it was being offered.
16 BY MR. HAMMER:
17 Q.      Have you had a chance to read over
18 your testimony on Page 38 and 39?
19 A.      As I said previously, I read through
20 it quickly.
21 Q.      If you look at Page 37 and 38 where I
22 ask what factors were considered, you listed the
23 factors; right?
24       MR. WOLFSON:  That's what you

Page 838

1 just went through.
2          MR. HAMMER: Yes.
3          THE WITNESS: Uh-huh (yes).
4 BY MR. HAMMER:
5 Q.      And was there any -- in that
6 testimony, you never testified about a phone call
7 with Mr. Finamore?
8          MR. WOLFSON: Objection.
9 That's not what he was asked about and that
10 record is clear. He was asked what the factors
11 considered at the meeting. He answered the
12 question. That's unfair.
13          ARBITRATOR CARNEY: He can
14 ask if he testified about the phone call with
15 Mr. Finamore.
16          MR. WOLFSON: There's no
17 doubt --
18          THE WITNESS: I did not --
19 there's no contention we did not discuss that
20 phone call --
21          ARBITRATOR KARLIN: We can
22 only take one voice at a time. She unfortunately
23 isn't a ventriloquist.
24          MR. WOLFSON: I objected to

Page 839

1 the way the question was asked.
2          ARBITRATOR WYCOFF: Yes.
3 BY MR. HAMMER:
4 Q.      So you've testified to the factors
5 you considered and my question was you didn't
6 mention that Mr. Finamore ever called you?
7 A.      I never mentioned it at that meeting
8 with that group of folks, no.
9 Q.      And you never mentioned it in your
10 deposition?
11 A.      No.
12 Q.      And page --
13 A.      I want to be clear, the question was
14 asked is what was considered at the meeting, and
15 I talked about what was discussed at the meeting.
16 That was my answer.
17 Q.      And are you confident that the
18 testimony you gave at the time was all the
19 factors that were considered at the meeting?
20 A.      At the meeting, yes.
21 Q.      And if you look at Page 42, the
22 bottom of page 42, he asked the question. So if
23 I'm hearing you correctly, are you confident in
24 your recollection of the meeting and the factors

Page 840

1 that resulted in all of her stalling being taken
2 away?
3 A.      Yes.
4 Q.      And your answer was, Page 43?
5 A.      I would say fairly confident, yes,
6 that's my recollection, yes, sir.
7          MR. WOLFSON: All right.
8 Again, object only on the basis of the question.
9 It's not proper impeachment, but of course, I'm
10 not disputing that it's admissible.
11          ARBITRATOR CARNEY: Haven't
12 said anything inconsistent with what he said
13 today.
14          MR. WOLFSON: That's my only
15 point.
16          ARBITRATOR CARNEY: Now,
17 that's a matter for us to determine whether or
18 not you have impeached, but so far we haven't
19 seen anything.
20          MR. WOLFSON: That was my
21 only objection.
22 BY MR. HAMMER:
23 Q.      So when we asked you all of the
24 factors and you listed them and said you were

Page 841

1 confident, you never mentioned that Mr. Finamore
2 called you?
3          MR. WOLFSON: I'm going to
4 object to that question, because that's improper
5 impeachment based on --
6          ARBITRATOR CARNEY: I think
7 that's asked and answered. He's testified
8 repeatedly that he did not talk about the
9 Finamore call.
10          MR. WOLFSON: The reason I
11 object to the question, that's implying the
12 question asked for something different.
13          ARBITRATOR KARLIN: Can I ask
14 a question because I'm confused about something?
15 You said -- I heard you didn't discuss it with
16 the group, but it also seemed like it was on your
17 mind; wasn't it?
18          THE WITNESS: It was on my
19 mind and caused me to ask some questions at the
20 meeting, yes.
21          ARBITRATOR KARLIN: What I'm
22 hearing from you and correct me if I'm wrong is
23 that while you didn't share the information from
24 Mr. Finamore with the group, the information from

27228234-391e-4c3e-a268-37fe29e9a583

Page 842

1  Mr. Finamore motivated you to raise questions
2  about whether she would get something; is that
3  not right?
4           THE WITNESS:  It was
5  certainly something on my mind, one of the
6  factors, yeah.
7           ARBITRATOR KARLIN:  It was
8  one of your motives for not giving her -- one of
9  your motives for your decision to not want to
10  give her stalls; was it not?
11           THE WITNESS:  It didn't come
12  to my decision.  As I said, we talked about those
13  factors that I discussed here in the meeting.  I
14  asked the group without telling the group about
15  the phone call based on the quality of her starts
16  and the fact that she didn't obey the barn rules,
17  is there any reason we should issue.
18           ARBITRATOR KARLIN:  Was it or
19  was it not part of your motivation to raise
20  questions about giving her?
21           THE WITNESS:  Yes.
22           ARBITRATOR KARLIN:  Yes, it
23  was?
24           THE WITNESS:  Yes,

Page 843

1  absolutely.
2           ARBITRATOR KARLIN:  And I
3  think if I recall your testimony before, you said
4  after you went over it, you said to them, well,
5  let's not give her stalls then; didn't you?
6           THE WITNESS:  I said -- yes,
7  but I asked the question first, does anyone -- is
8  there any reason anyone thinks we should give any
9  stalls, then I say, no stalls.
10           ARBITRATOR KARLIN:  You say
11  no stalls?
12           THE WITNESS:  Yeah.
13           ARBITRATOR KARLIN:  You
14  knowing that part of your motivation is what you
15  heard from Mr. Finamore?
16           THE WITNESS:  Sure, yeah.
17           ARBITRATOR KARLIN:  Sorry, I
18  didn't mean to interrupt you.
19  BY MR. HAMMER:
20  Q.      Do you agree with me that the track
21  would never retaliate against anyone for making
22  statements outside of the track denigrating the
23  track?
24  A.      I would agree that we do not.  Never

Page 844

1  is a very strong and infinite term, but I would
2  say that to my knowledge we have not
3  discriminated against folks that have made
4  negative comments about the track.
5  Q.      In fact, didn't you testify that you
6  had never discriminated against someone for
7  comments made outside the track?
8  A.      I don't know if I said never, just
9  not to my knowledge certainly.
10  Q.      All right.
11         Well, let's go to your Page 50 and
12  51; okay?
13         And we start out at the top talking
14  about an article that appeared in a periodical
15  called Mid-Atlantic Thoroughbred; do you see
16  that?
17  A.      Uh-huh (yes).
18  Q.      And there is a quote in the article
19  if you read through your testimony, and then I'll
20  ask you a question.
21  A.      Starting?
22  Q.      Well, if you just read through it
23  from 50 down to 51.
24  A.      The whole Page 50?

Page 845

1  Q.      Yes, if you read that so I could
2  orient you to what I'm talking about.
3  A.      On the second page, down this area if
4  you look here you'll see there's a gentleman
5  named Mr. Hale who is quoted in there as well.  I
6  think he's the executive director of the HBPA; is
7  the correct?
8  Q.      You can read to yourself.  That's
9  okay.
10  A.      Oh, okay.
11  Q.      Just let me know when you have had a
12  chance?
13  A.      Okay.
14  Q.      So the question was, well, is that
15  accurate that the management of the track has
16  never done anything to retaliate against local
17  trainers or anyone who has spoken negatively
18  about track management, and your answer was?
19  A.      I would say yes.
20  Q.      But that wasn't true.  You did
21  retaliate against Tina Mawing because she raised
22  concerns about the rodenticide and Mr. Finamore
23  called you and he told you you better put that in
24  the mix?

Page 846

1  A.        No.
2  **Q.        He didn't tell you that?**
3  A.        No.  The reason she did not get --
4  the reason -- what was rattling through my mind
5  was the bold-faced lie that was told to the
6  governor that we were doing things to purposely
7  harm animals in our area.
8            This raises itself far beyond the
9  level of someone speaking badly about the track.
10 When I was asked that question in this interview,
11 and again, the quotes, I guess you didn't ask me
12 about the quotes in the interview but I can't
13 take responsibility for edited copy, but when you
14 ask about whether or not we retaliated against
15 trainers who have spoken negatively, we have --
16 we are spoken about negatively on a very regular
17 basis, and I can say with great confidence that
18 just because someone speaks negatively about us,
19 we don't retaliate.
20           So I stand by my answer.
21           Now, again, as I said, never is a
22 very extensive word, but as I sit here today, I
23 can't think of an incident where someone has said
24 something, just said something bad about the

Page 847

1  track, again, not a lie, not going to the
2  governor saying we're trying to intentionally
3  harm animals on our site, we have not taken
4  action.  So that's how I interpreted the
5  question.  That was my answer.
6  **Q.        You do agree with me that you have an**
7  **obligation to equitably allocate stalls?**
8  A.        Yes.
9  **Q.        And would you agree with me that**
10 **equitable means that it's fair?**
11 A.        Yes.
12 **Q.        And you would agree with me that you**
13 **never tell the trainers why they do or don't get**
14 **stalls?**
15 A.        We do not.
16 **Q.        And would you agree with me then the**
17 **trainer has no way to know whether the allocation**
18 **is fair or not fair?**
19 A.        We exercise discretion, certainly, in
20 going through that process.  The things that we
21 use are guidelines.  We do communicate to the
22 trainers that as a minimum guideline we expect
23 seven starts per stall.  They are aware of that,
24 and in fact, during the course of an allocation

Page 848

1  period they may be communicated with about where
2  they stand from a start perspective and so on.
3  When I think of equitable, it's the reason we put
4  in the stall allocation committee, because I was
5  not convinced that it could be done equitably
6  when one person was making a decision that that
7  person may be treating folks unfairly. So it's a
8  panel now, and that's to fulfill our obligation
9  of equitable.
10 **Q.        The panel was in position in April**
11 **and August of 2008; correct?**
12 A.        Yes.
13 **Q.        And yet you never told Ms. Mawing**
14 **this is why you're not getting any stalls at all?**
15 A.        I did not, no.
16 **Q.        And you didn't direct anyone else to**
17 **tell her why she's getting no stalls?**
18 A.        No.
19 **Q.        So there is no way for her to breathe**
20 **life into the equitable allocation of stalls**
21 **contract term if you don't tell her?**
22           MR. WOLFSON:  I'm going to
23 object to the question.  Arguing with the witness
24 about what equitable means and what can breathe

Page 849

1  life, what can't breathe life, I don't believe
2  that's a proper basis of cross-examination.
3            ARBITRATOR KARLIN:  I don't
4  think as to argue is not proper, but he can
5  certainly ask his understanding of what it means
6  in the contract.
7            MR. WOLFSON:  Different
8  issue, different question.
9  BY MR. HAMMER:
10 **Q.        So we agree that equitable means**
11 **fair; right?**
12 A.        That's part of the meaning, yes, I
13 would say.
14 **Q.        And so how is Ms. Mawing supposed to**
15 **know whether or not what you've done is fair?**
16 A.        I can't answer that.  I don't know.
17 **Q.        And you didn't tell her, and is the**
18 **reason you didn't tell her because Mr. Finamore**
19 **said no discussions about anything?**
20 A.        No, we don't have discussions -- if
21 someone comes to the racing office and ask
22 questions, I'm sure the racing secretary answers
23 those questions but they never come back to me in
24 terms of -- and I don't have any communications

Page 850

1  with trainers regarding the allocation process.
2  Q.      Now, isn't it true that you kept
3  Mr. Finamore apprised of the status and what was
4  going on in Ms. Mawing's lawsuit?
5  A.      This lawsuit.
6  Q.      Yes, sir.
7  A.      I'm sure I had discussions with him
8  as if there were any status changes, yes.  I had
9  regular discussions with Mr. Finamore.
10  Q.      And isn't it also true that you had
11  regular discussions with Ms. LeTart?
12  A.      Yes.
13  Q.      Ms. LeTart was in the legal
14  department?
15  A.      Yes.
16  Q.      And isn't it true that you knew that
17  Ms. LeTart attended the functions of the hearing?
18          MR. WOLFSON:  Objection,
19  objection. The only way he could know someone is
20  physically present would be communication with
21  Counsel.  Now --
22          MR. HAMMER:  I don't think
23  that's the only way you could know that.
24          MR. WOLFSON:  Well, you know

Page 851

1  what, fine, ask the question.
2          THE WITNESS:  I was not aware
3  that she was there.  She was not directed to
4  attend the hearing.
5  BY MR. HAMMER:
6  Q.      Aren't you aware that Dickie Moore
7  was present at the Finamore hearing?
8  A.      I was not aware of anyone who may or
9  may not have attended the --
10          ARBITRATOR KARLIN:  At which
11  hearing?
12          MR. HAMMER:  At the
13  Funkhouser hearing.
14          ARBITRATOR KARLIN:
15  Funkhouser hearing.
16          MR. HAMMER:  What did I say,
17  Finamore?
18          ARBITRATOR KARLIN:  Yes.
19          MR. HAMMER:  Might have.
20  BY MR. HAMMER:
21  Q.      At the Funkhouser hearing?
22  A.      I'm not aware of who attended that
23  hearing.
24  Q.      Mr. Moore didn't tell you that he

Page 852

1  attended that hearing?
2  A.      No.
3          MR. HAMMER:  If I may have
4  just a moment?
5  BY MR. HAMMER:
6  Q.      Did you ever discuss with Dickie
7  Moore Ms. Mawing's complaints about the rat
8  poison?
9  A.      Yes.
10  Q.      When did that happen?
11  A.      I don't recall specifically.  It
12  would've been sometime probably right after the
13  complaints came to light because that's when we
14  went to the pest control company to try and find
15  out are we using the right kind of pesticides.
16  Q.      Did you get any written report from
17  Ehrlich about that?
18  A.      I did not.
19  Q.      Did anyone to your knowledge?
20  A.      I don't know.  I assume somebody had
21  a written report, probably our facility or track
22  maintenance.
23  Q.      But you don't know?
24  A.      I don't know.

Page 853

1  Q.      What exactly did you discuss about
2  the rat poison with Dickie Moore?
3  A.      Just whether or not it was the
4  appropriate kind, did we change it, was it
5  something that could be harmful to animals.
6  Q.      What kind of poison was it?
7  A.      I have no idea.
8  Q.      What concentration was it?
9  A.      I have no idea.
10  Q.      Where was it applied?
11  A.      I have no idea.
12  Q.      How much was applied?
13  A.      I don't know that.
14  Q.      Was it broadcast or was it just put
15  down?
16  A.      I don't know.  I'm not aware of the
17  specifics of how the insecticide were applied.
18  Q.      What form was it put down?  Was it
19  powder or was it bait blocks?
20  A.      I have no idea.
21  Q.      Did you direct Mr. Moore to do
22  anything?
23  A.      Other than to find out if the poison
24  was the kind that was of a nature that could harm

Page 854

1  animals, no.
2  **Q.      And did Mr. Moore tell you it's not**
3  **of a kind that could harm animals?**
4  A.      Yeah, I believe it was Mr. Moore that
5  told me that, yes.
6  **Q.      And when did that happen?**
7  A.      I don't recall specifically.
8  **Q.      Did he do it in writing?**
9  A.      No.
10 **Q.      It was just a phone conversation or**
11 **in person?**
12 A.      Probably a personal conversation.
13 **Q.      Was someone else present?**
14 A.      His office is right next to mine.  I
15 don't recall if anyone else was present.
16 **Q.      Sir, you do know that Tina Mawing is**
17 **a member of the HBPA executive board; don't you?**
18 A.      I don't.
19           MR. HAMMER: Can I have this
20 marked as an exhibit.
21           * * *
22           (Whereupon, Exhibit No. 44 marked
23 for purposes of identification.)
24           * * *

Page 855

1  BY MR. HAMMER:
2  **Q.      Let me know when you've had a chance**
3  **to look at it, Mr. Britton.**
4  A.      Okay.
5  **Q.      Would you agree with me that's your**
6  **signature at the bottom?**
7  A.      It is.
8  **Q.      Signed as general manager?**
9  A.      Yes.
10 **Q.      And would you agree this is a**
11 **memorandum you prepared?**
12 A.      Yes.  I was involved in preparing,
13 sure.
14 **Q.      Well, it's from you; right?**
15 A.      Yeah, but it was probably drafted
16 primarily by someone else.
17 **Q.      Who else drafted this?**
18 A.      More than likely our attorney,
19 Phyllis LeTart would've drafted.  It's very
20 common for Phyllis to draft memoranda that I sign
21 as general manager.
22 **Q.      And you sent this to among other**
23 **people the board members of the HBPA; didn't you?**
24 A.      I sent it to this distribution, yes.

Page 856

1  **Q.      Yes.  And Tina Mawing is one of those**
2  **people?**
3           MR. WOLFSON:  The only reason
4  I'm going to object to this, it's not
5  inconsistent with what he testified about being
6  not aware at the time of the August '08.  This is
7  over a year later.
8           ARBITRATOR WYCOFF:  I don't
9  think that was the question.
10          ARBITRATOR CARNEY:  He's just
11 asking if he was aware of Ms. Mawing's
12 involvement.  Now, he admitted at some point he
13 became aware that she's a board member.  Now,
14 he's using this as evidence to show that he was
15 aware apparently in October of 2009.  That
16 doesn't mean he was aware in August 2008, but --
17 so it may have limited probative value, but he's
18 certainly entitled to ask.
19          MR. WOLFSON:  I understand.
20          ARBITRATOR KARLIN:  Did we
21 establish when she became a board member?
22          MR. HAMMER:  I believe we
23 talked about there were three elections and she
24 was in her third term according to the testimony.

Page 857

1           MR. WOLFSON:  Currently in
2  her third term now.
3           MR. HAMMER:  Currently in her
4  third term is her testimony.
5           MR. WOLFSON:  There's no
6  dispute she was a board member in '08.
7           ARBITRATOR KARLIN:  What
8  about '07?
9           MR. WOLFSON:  I don't
10 remember.  I'll trust whatever you guys say.
11          MR. HAMMER:  She says yes.
12 She was in her third consecutive term.
13          MR. WOLFSON:  Fair enough.
14 Fair enough.  I wasn't trying to cause any
15 issues.
16          ARBITRATOR KARLIN:  No, but
17 go ahead, the point you were trying to make when
18 you got interrupted.
19          MR. HAMMER:  Sure, no
20 problem.  It's very simple.
21 BY MR. HAMMER:
22 **Q.      This memo you wrote is addressed to**
23 **dear board members of the Charles Town HBPA?**
24 A.      Yes.

Page 858

1  **Q.      So you knew who they were?**
2  A.      At that point, yes.  And as I had
3  testified as a result of this suit I had become
4  aware that Ms. Mawing was a member, but the -- I
5  couldn't tell you today other than maybe two or
6  three folks who are on the board of the HBPA.  We
7  do not meet with the board of the HBPA.  It's
8  just not something that I have -- I am required
9  to have knowledge of.  It's just not something
10  that is top of mind for me.
11  **Q.      Certainly under the contract, you**
12  **have the right to know who every member of the**
13  **HBPA executive officers are?**
14  A.      The right, but not the obligation.
15  **Q.      So you could pick up the phone**
16  **anytime you wanted to find out who they were?**
17  A.      If I wanted.  There was no reason for
18  me to do that.  No reason for me to check that
19  out.  I wasn't doing anything -- none of the
20  discussions -- none of these discussions was the
21  fact that she was or was not a member of the
22  board was that brought up, never.
23  **Q.      So Dickie Moore didn't tell you that**
24  **this is a complaint being raised by a person**

Page 859

1  who's a member of the executive board?
2  A.      No.
3  **Q.      And no one else in track management**
4  **told you that this was a member of the executive**
5  **board?**
6  A.      No.
7  **Q.      And under the contract you have an**
8  **obligation to speak with her?**
9  A.      No, I don't have an obligation to
10  speak with her.
11          ARBITRATOR CARNEY:  I think
12  the contract speaks for itself.  There's no
13  such --
14          THE WITNESS:  It doesn't say
15  that the general manager has to speak with her.
16  It says that the track manager -- I'm sorry.
17          ARBITRATOR CARNEY:  What the
18  contract says, you can testify that you didn't
19  know.
20  BY MR. HAMMER:
21  **Q.      You understood the Charles Town Races**
22  **had an obligation to speak with her?**
23  A.      That someone in management would
24  speak with her regarding her claims, and I

Page 860

1  believe that happened at a board of stewards
2  meeting if I'm not mistaken, but again, that's
3  just the best my recollection.
4  **Q.      Is the board of stewards is that**
5  **Charles Town management?**
6  A.      No, but Charles Town management
7  would've been called to that hearing.
8  **Q.      Are you telling me that they were and**
9  **this happened or are you saying this is your**
10  **speculation?**
11  A.      That's my speculation.
12          MR. HAMMER:  I think that's
13  all the questions I have for you.
14          ARBITRATOR KARLIN:  I have a
15  few questions if I could.
16          ARBITRATOR WYCOFF:  Do you
17  have any Redirect?
18          MR. WOLFSON:  I can wait
19  until --
20          ARBITRATOR CARNEY:  Yes, you
21  want to wait until we ask.
22          ARBITRATOR KARLIN:  Because
23  you may want to follow up on what we ask.
24          MR. WOLFSON:  That's right.

Page 861

1          * * *
2          E X A M I N A T I O N
3  BY ARBITRATOR KARLIN:
4  **Q.      I am a little confused about this.**
5  **Am I understanding from other things we've heard**
6  **here, correct me if I'm wrong, is that in 2007**
7  **prior to the referendum on the gaming, there were**
8  **a number of meetings with and discussions with at**
9  **least Mr. Funkhouser about whether or not the**
10  **HBPA would support the referendum; are you aware**
11  **of that?**
12  A.      Yes.
13  **Q.      Were you involved in any of those**
14  **discussions?**
15  A.      Sure.
16  **Q.      And my understanding -- so where did**
17  **those discussions take place?**
18  A.      I don't recall specifically.  Some of
19  them may have taken place in our offices.  It
20  would be somewhere on our property for sure.
21  **Q.      Was Mr. Funkhouser the only one who**
22  **came?**
23  A.      I don't recall specifically whether
24  or not he was the only one or not.  He was the one

Page 862

1  that we dealt with primarily because he was the
2  one making the decision.
3  Q.        My understanding also was that at
4  that time there was a great deal of discomfort,
5  dissatisfaction, perhaps even more from your end,
6  not you personally, but from the end of your
7  company towards Mr. Funkhouser and at least some
8  of the HBPA because there was a feeling that he
9  had reneged on promises made to support the
10 referendum; do you recall that?
11 A.        Yes.  Mr. Funkhouser?
12 Q.        Yes.
13 A.        Yes.
14 Q.        And my understanding also is that
15 there may have been some division within the
16 HBPA; is that true?
17 A.        I assume so, yes, I think that's
18 correct.  To the best of my recollection not
19 everyone was on the same page.
20 Q.        So must not you and Mr. Finamore and
21 perhaps others have had discussions about what
22 you could do to convince the HBPA to support the
23 gaming table referendum?
24 A.        Yes.

Page 863

1  Q.        And in trying to come up with
2  strategies as to what you could do, you would
3  certainly try to figure out who you could rely
4  on, who you could not rely on in terms of HBPA
5  leadership; wouln't you?
6  A.        No, we primarily wanted to appeal to
7  the organization, not the board, the organization
8  to support and rally support from their board.
9  Q.        Is it really your testimony that in
10 trying to come up with a strategy to turn the
11 HBPA leadership around you never once made an
12 attempt to find out who was the HBPA leadership?
13 A.        No, not to the -- no conversation
14 specifically regarding who each individual member
15 of the board was.
16 Q.        Well, any conversations about
17 individuals who supported or didn't support you?
18 A.        No.
19 Q.        You had no interest during this time
20 -- this was a real important issue; wasn't it?
21 A.        Oh, yes, absolutely.
22 Q.        It meant millions and millions of
23 dollars to your company?
24 A.        Uh-huh (yes).

Page 864

1  Q.        And it turned on what the final vote
2  was going to be with the HBPA?
3  A.        Well, no, that was one piece of -- we
4  would've liked to have had the HBPA support. They
5  were simply one organization of many
6  organizations with which we needed -- that we
7  were seeking support from.
8  Q.        It was an important piece, though;
9  wasn't it?
10 A.        It was one of the pieces, yes.
11 Q.        And in trying to figure out how to
12 win that support -- would the HBPA vote on
13 support by the entire membership or by the board?
14 A.        I'm not sure exactly. My
15 understanding is they would have membership
16 meetings when they discussed things like this to
17 determine support, maybe take straw polls or
18 whatever.
19 Q.        From your own work at business, are
20 boards not important in influencing membership?
21 A.        Yes, and vice versa.
22 Q.        But it's your testimony that you,
23 Mr. Finamore, and those others were involved in
24 trying to turn the HBPA around never discussed or

Page 865

1  had any interest in finding out who was on the
2  board?
3  A.        I can tell you that there were no
4  specific conversations as to who was on that
5  board and who specifically one-by-one supported
6  us or did not. We were more looking for with the
7  individual that was supportive of us on the board
8  dealing with him and listening to him in terms of
9  what we could do to influence the board to
10 support us.
11 Q.        So you found the individuals who were
12 supportive with you --
13 A.        An individual.
14 Q.        An individual?
15 A.        Yeah.
16 Q.        You found one board member who was
17 supportive of your position?
18 A.        Yes.
19 Q.        And you talked to him about how to
20 get more support from the board?
21 A.        Yes.
22 Q.        And in talking to him about how to
23 get more support from the board, there was never
24 -- not once did he mention the name of anybody or

Page 866

1  the board?
2  A.       No, that wasn't part of the
3  discussion.  The discussion was surrounded the --
4  really what it surrounded was the number of races
5  and the race days, that that was what they were
6  interested in negotiating for in return for their
7  support, the number of race days.
8  Q.       Is it also true then, Mr. Britton,
9  that after the letter was sent out to the board
10  and what was the date of that letter, 44?
11  A.       October of 2009.
12  Q.       Okay.
13  A.       No, not that letter, 44, the letter
14  that was sent out saying we're not going to have
15  any more conversations.
16             ARBITRATOR CARNEY:  No,
17  that's --
18             MR. HAMMER:  Forty-two (42),
19  that's to Mr. Hale.
20  BY ARBITRATOR KARLIN:
21  Q.       To Mr. Hale, what date was that?
22  A.       I don't have that one.
23             MR. WOLFSON:  April 25, '08.
24  BY ARBITRATOR KARLIN:

Page 867

1  Q.       April 25, '08 a letter was sent to
2  Mr. Hale by Mr. Finamore with a copy to you.  I
3  don't know if it is up there.  Can you take a
4  look at it?
5  A.       Certainly.
6  Q.       Do you recall getting that letter,
7  and please read it?
8  A.       Yes.
9  Q.       And so there was concern in April of
10  2008 as to what the HBPA would do; right?
11  A.       Yes.
12  Q.       And I take it's your testimony again
13  that there was no interest on your part or that
14  of anybody else in the organization in knowing
15  who was on the board in dealing with them?
16  A.       No, we dealt primarily with and
17  almost exclusively, quite frankly, with
18  Mr. Funkhouser and Mr. Hale.
19  Q.       Now, when you had the deposition with
20  Mr. Hammer or Mr. Waddell, I'm not sure who took
21  it, when you had that deposition with him, did
22  you recall at that time that Mr. Finamore was the
23  one who had told you that -- he was the one who
24  had told you that there had been a meeting with

Page 868

1  the governor?
2  A.       I don't recall that question ever
3  being asked.
4  Q.       That's not my question.
5          Did you know that at that time?
6  A.       Again, as a -- I would say, yes, I
7  knew that at that time, but I don't think it ever
8  came up as a question.
9  Q.       Okay.
10          So what you're saying today is if
11  they had said to you where did you -- did you
12  learn anything about a meeting with the governor,
13  who told you about it, you would've remembered
14  Mr. Finamore?
15  A.       Yes.
16  Q.       And you would've told them
17  Mr. Finamore?
18  A.       Yes.
19  Q.       They just didn't ask you the right
20  question?
21  A.       Well, they asked me did you know
22  anything about the pesticide issue and being
23  poisoned and as I said that came from a different
24  source.

Page 869

1  Q.       So they didn't learn about
2  Mr. Finamore because they didn't ask the right
3  question?
4  A.       They didn't ask me that question,
5  yeah.  It never came up.
6  Q.       Could you turn to Page 41 in your
7  deposition?
8  A.       Okay.
9  Q.       And look at Line 12.
10  A.       Okay.
11  Q.       You were asked were you aware that
12  about a week, at most two weeks, prior to this
13  decision made Ms. Mawing had met with the
14  Governor of West Virginia and complained about
15  the tracks use of the pesticides in the barn
16  area?
17  A.       Yes.
18  Q.       And your answer is, I recall hearing
19  that.  I don't know when or from whom.
20  A.       Yes.
21  Q.       You do recall hearing that?
22  A.       Yes.
23  Q.       Did you forget when that question was
24  asked that it was Mr. Finamore that told you?

Page 870

1   A.      I think I misinterpreted.
2           MR. WOLFSON: Mr. Karlin,
3   with all due respect as to that issue what he
4   testified I would object if this was opposing
5   Counsel asking the question because what he
6   testified was about the wire hearing for Mr.
7   Finamore, and what they asked is about a
8   complaint about pesticides.
9   BY ARBITRATOR KARLIN:
10  Q.      Did Mr. Finamore not tell you that
11  there was a complaint about pesticides?
12  A.      I recall the pesticide thing being
13  raised prior to that by either Mr. Moore or our
14  Counsel.  I recall -- the thing I recall that was
15  remarkable about the conversation with Mr.
16  Finamore was the claim that we strung wires to
17  harm horses.
18  Q.      So you don't have any recollection of
19  Mr. Finamore raising the question of pesticides
20  in that conversation?
21  A.      I don't recall it specifically.
22  Again, I was focused on the wire in the barn area
23  because the pesticide thing had already been
24  raised and investigated by that time.

Page 871

1   Q.      You didn't tell Mr. Finamore that
2   you'd already dealt with the pesticide issue
3   during that conversation?
4   A.      No.  No, he would've been aware of
5   that beforehand too.  So he was just telling me
6   about a conversation with the governor.
7   Q.      Mr. Finamore would've been aware of
8   the pesticide issue before that?
9   A.      Sure, in my -- in regular
10  conversations.
11  Q.      Now, you were aware at that
12  deposition --
13  A.      Let me correct myself.
14          I can't speak for what Mr. Finamore
15  was or was not aware of during that so I really
16  can't speak to that issue of what Mr. Finamore
17  may or may not have been aware of.  I'm making
18  some -- to use Mr. Hammer's words, speculation
19  there that I would've had a conversation about
20  the fact that there was a claim of pesticides,
21  but again, from a timing standpoint, I don't
22  recall the timing of that.
23  Q.      Okay.
24          My understanding is that the

Page 872

1   conversation with Mr. Finamore was before you
2   sent Ms. Mawing the letter in August -- at the
3   end of August telling her she wasn't getting any
4   stalls?
5   A.      Yes.
6   Q.      So before that letter went out you
7   talked to Mr. Finamore?
8   A.      Yes.
9   Q.      And you were aware of the meeting
10  with governor?
11  A.      Yes.
12  Q.      And you were aware that she had said
13  some things at the meeting with the governor?
14  A.      Yes.
15  Q.      On Page 42, you were asked the
16  question, okay, and are you aware of that meeting
17  before this August 29th, 2008 letter came out to
18  Ms. Mawing; do you see that?
19  A.      I'm sorry, which line is that, sir?
20  Q.      Twelve (12).  It's a continuation.
21  A.      Okay.
22  Q.      And it's talking about the meeting
23  with the governor, and you were asked about
24  whether you were aware about that meeting before

Page 873

1   the letter to Ms. Mawing.  And you said, I don't
2   know.  And you were asked again it could've been
3   and it says, I don't know.
4           It looks to me at the deposition by
5   these two lawyers over here when you were asked
6   if you were aware of the meeting with the
7   governor that we have just been talking about
8   before you took the stalls away from Ms. Mawing
9   or didn't allocate them to her, you said you
10  didn't know if you knew about the meeting with
11  the governor before or after the letter went out;
12  isn't that what this says?
13  A.      It does, but elsewhere in here it
14  also says that I was aware of it prior to that
15  meeting.
16  Q.      It doesn't say that here?
17  A.      It just says I don't know.  It
18  doesn't say I -- it doesn't say I was not aware.
19  I just couldn't recall specifically the timing at
20  that point.
21  Q.      How could you not recall the timing
22  of when you learned about the meeting with the
23  governor if that was, in fact, on your mind when
24  you were deciding not to allocate her stalls?

Page 874

1   A.      So I would've been aware as I
2   testified earlier in the testimony.  I said that
3   I was aware of that prior to that meeting.
4   **Q.      If I understood you right, you said**
5   **that in the allocation meeting since 2008 nobody**
6   **has ever told you that Ms. Mawing had applied for**
7   **more stalls?**
8   A.      That's correct.
9   **Q.      Were you unaware that she applied for**
10  **more stalls?**
11  A.      I was not aware because she wouldn't
12  have come up at the stall allocation meeting.
13  **Q.      If that's true what you're telling us**
14  **then it was the decision -- then the reason it**
15  **didn't come up is because she didn't have any**
16  **active stalls?**
17  A.      Yes.
18  **Q.      So if she had not had all her stalls**
19  **taken away from her in 2008, her name would've**
20  **come up for allocation of stalls every six months**
21  **thereafter?**
22  A.      If she was onsite her name would've
23  come up, yes.
24  **Q.      So, in a way by taking her out of the**

Page 875

1   **allocation in 2008, according to your testimony,**
2   **it not only led to her not being allocated in**
3   **2008 but it led to her not being allocated year**
4   **after year after year?**
5   A.      As is true with any horseman, anyone
6   that puts in an allocation that is not currently
7   onsite when the process takes place.  That's true
8   of everybody.
9   **Q.      Yes, but some people have been**
10  **reallocated; haven't they?**
11  A.      Yeah, and again, if they're on the --
12  in the group of priorities that are brought up by
13  the racing secretary.
14  **Q.      Wasn't there a trainer who had lost**
15  **his allocations because he was basically fronting**
16  **for another trainer?  I forget the name of the**
17  **fellow?**
18  A.      I'm not aware of --
19  **Q.      You don't know anything about him**
20  **getting reallocated stalls after he was --**
21  A.      I'm not sure who you're talking
22  about.
23  **Q.      Well, do you recall other people --**
24  **do you recall if there were any other people who**

Page 876

1   **lost other stalls but then later got some?**
2   A.      I'm sure that's occurred, but I don't
3   recall specifically.
4   **Q.      Do you recall any, why that would**
5   **happen?**
6   A.      Because they were on the -- in the
7   group of priority trainers as determined by the
8   racing secretary and Mr. Zimny.
9   **Q.      Well, the racing secretary would be**
10  **and Mr. Zimny would be employees of your company;**
11  **right?**
12  A.      Yes.
13  **Q.      So in any case your company --**
14  **somebody in your company decided not to let her**
15  **get consideration again?**
16  A.      She was not considered a priority to
17  be issued stalls, yes.
18  **Q.      And just a couple more questions and**
19  **I'm done. You understood that the meeting that**
20  **she was at was with the governor?**
21  A.      Yes.
22  **Q.      And Mr. Finamore certainly told you**
23  **that that was a meeting where the governor was**
24  **trying to help mediate issues between your**

Page 877

1   **company and the HBPA?**
2   A.      Yes.
3   **Q.      So that you knew she was involved in**
4   **HBPA activity at the time she made those**
5   **statements?**
6   A.      Again, I wasn't aware of the -- who
7   was at the meeting, the content of the meeting,
8   what was discussed at the meeting, so I don't
9   know that the sole purpose of that meeting -- I
10  wasn't at the meeting, so I don't know what the
11  governor discussed at the meeting.
12  **Q.      Mr. Finamore from what he told you**
13  **you knew that it was at least a purpose of the**
14  **meeting.**
15  A.      Okay.
16  **Q.      And you knew that she made these**
17  **statements at a meeting where that was at least a**
18  **purpose?**
19  A.      A purpose, yes.
20  **Q.      Okay.**
21  **And this thing about the wire or the**
22  **rope or whatever it was, to your knowledge, did**
23  **anybody ever ask her what that -- ask Ms. Mawing**
24  **herself what that was all about or even if she**

Page 878

1 knew what it was all about?

2 A.      Not that I know of.

3 Q.      Okay.

4         And to your knowledge, did anybody

5 ever go tell her, personally tell her, and this

6 may have been answered but I didn't get it in my

7 notes, go personally tell her to your knowledge

8 what exactly you found out?

9 A.      I don't know if anyone told her

10 personally or if she was aware from any other

11 means.

12 Q.      Did you ever direct anyone to tell

13 her personally?

14 A.      No, I did not.

15 Q.      Did you ever direct anybody to ask

16 her specifically what this wire rope story was?

17 A.      No, I did not.

18         ARBITRATOR KARLIN: Okay.

19 Thank you.

20         ARBITRATOR CARNEY: Do you

21 have any questions?

22         ARBITRATOR WYCOFF: No.

23         MR. WOLFSON: I just have one

24 or two.

Page 879

1         * * *

2     R E D I R E C T   E X A M I N A T I O N

3 BY MR. WOLFSON:

4 Q.      Sir, turning back to C-42, the

5 April 25, '08 letter that Mr. Finamore sent to

6 Mr. Hale?

7 A.      Oh, okay, yes.

8 Q.      You were copied on it.  Did you give

9 a copy of this to anyone down in the barn area?

10 A.      No.

11 Q.      Did you ever direct anyone in the

12 barn area to stop communicating with the horsemen

13 about the issues, the everyday issues going on in

14 the barn?

15 A.      No.

16 Q.      Now, with respect to Dickie Moore's

17 daughter who had the undocumented horse, was any

18 penalties taken against her?

19 A.      Yes, she lost her stalls.

20 Q.      Did she ever get any of those back?

21 A.      No.

22         MR. WOLFSON: No further

23 questions.

24         * * *

Page 880

1     R E C R O S S - E X A M I N A T I O N

2 BY MR. HAMMER:

3 Q.      Sir, do you understand that

4 Ms. Mawing is going to have an opportunity for

5 rebuttal in this case; do you understand that?

6 A.      Yes.

7 Q.      Do you admit that you took Ms. Mawing

8 and all the other executive board members of the

9 HBPA out for dinner at the Epic Buffet during

10 these contract negotiations?

11 A.      I honestly do not recall that

12 specifically. I don't recall --

13 Q.      Do you recall actually sitting at the

14 table with Ms. Mawing?

15 A.      I don't recall specifically.  How

16 long ago was that?

17 Q.      It was during contract negotiations,

18 sir.

19 A.      I don't recall that dinner or who was

20 there, quite frankly.

21         MR. HAMMER: That's all the

22 questions I have.

23         ARBITRATOR CARNEY: If no one

24 has further questions, you are excused, Mr.

Page 881

1 Britton.

2         We're going to take a recess for

3 lunch for about an hour.

4         MR. WOLFSON: Mr. Puccio will

5 be here. I believe he's here now.

6         ARBITRATOR CARNEY: What

7 about Mr. Moore?

8         MR. WOLFSON: We'll speak

9 with Counsel about that.

10         ARBITRATOR CARNEY: Okay.

11         MR. WOLFSON: The only other

12 issue, also there was an issue regarding the

13 deposition transcript of Mr. Hale from the

14 Yetsook. And I think that the panel was going to

15 consider the propriety of introducing Mr. Hale's

16 testimony.

17         ARBITRATOR KARLIN: I thought

18 you all were going to look at it.

19         MR. HAMMER: They didn't tell

20 me what portions they wanted designated. It's

21 111 pages. I read it all last night. We do

22 object because Ms. Mawing was not present and as

23 this panel has ruled the HBPA is just a nominal

24 party here, so we do object to that deposition

27228234-391e-4c3e-a268-37fe29e9a583

Page 882

1   being introduced again, sir.  They had an
2   opportunity to take Mr. Hale's deposition in this
3   case.  They did.  They could've asked any
4   questions they wanted to ask.  We've agreed to
5   submit that deposition into evidence.  We don't
6   think it should come in.
7           ARBITRATOR WYCOFF:  I'm
8   sorry, you've agreed that which deposition should
9   go into evidence?
10          MR. HAMMER:  Mr. Hale's
11  deposition in this case, not a deposition from
12  another case at which neither I, nor Mr. Waddell
13  were present.  Ms. Mawing was not represented, so
14  we do object to that.
15          ARBITRATOR CARNEY:  We'll
16  take it under consideration.
17          MR. WADDELL:  Can I request,
18  make sure I'm making a formal request to the
19  panel that I would like Mr. Moore to be made
20  available for testimony in this case as a
21  rebuttal witness.  And if we're going to discuss
22  this at some unknown date in the future, how are
23  we going to get him here?
24          ARBITRATOR CARNEY:  We

Page 883

1   understand your position.  He should be here --
2           ARBITRATOR WYCOFF:  I mean is
3   he at the track today?
4           MR. WOLFSON:  We believe he
5   is, yes.
6           ARBITRATOR WYCOFF:  And
7   that's 20 minutes away?
8           MR. WOLFSON:  That's right,
9   yes.
10          ARBITRATOR WYCOFF:  And he
11  has a cell phone?
12          MR. WOLFSON:  We will make
13  the call.  Yes, yes.  We just haven't had a chance
14  to do it yet.  That's all it is.
15          MR. WADDELL:  I didn't
16  understand whether you're agreeing to do it or
17  not.  Are you agreeing to do it?
18          MR. WOLFSON:  We're going to
19  call him, yes.
20          MR. WADDELL:  Okay.
21          ARBITRATOR CARNEY:  We're in
22  recess.
23              * * *
24      (Lunch break taken)

Page 884

1               * * *
2           ARBITRATOR CARNEY:  We're
3   ready to proceed.
4               * * *
5           LARRY J. PUCCIO
6   being first duly sworn, was examined and
7   testified as follows:
8               * * *
9    D I R E C T  E X A M I N A T I O N
10  BY MR. WOLFSON:
11  Q.      Sir, could you identify yourself for
12  the panel, please?
13  A.      My name is Larry James Puccio.
14  Q.      And you could spell the last name so
15  we all have it straight?
16  A.      P, as in Paul, U-C-C-I-O.
17  Q.      And Mr. Puccio, are you currently
18  employed?
19  A.      I am self-employed.
20  Q.      And what do you do?
21  A.      I am a real estate developer,
22  builder, government relations specialist for
23  several companies, and consulting.
24  Q.      And is one of the -- are you familiar

Page 885

1   with Charles Town -- Penn National Gaming Charles
2   Town, LLC?
3   A.      Yes, I am.
4   Q.      Is that one of the companies with
5   which you consult and do government relations
6   work?
7   A.      That is correct.
8   Q.      Let's talk about your background,
9   please, sir.  Describe for the panel, explain to
10  the panel, your educational and employment
11  background?
12  A.      I practiced for many years as a
13  commercial and residential real estate appraiser,
14  certified general appraiser, and specialized also
15  in turnaround in companies that were having
16  growing pains or financial difficulties, and
17  managed and ran campaigns, managed and was the
18  campaign manager for Joseph Manchin when he ran
19  for Secretary of State.  Served for approximately
20  three years as a chief of staff to Secretary of
21  State Manchin.  Left that office to manage a
22  campaign for governor and served as chief of
23  staff for approximately five-and-a-half years as
24  his chief of staff for governor.

Page 886

1  **Q.        And when you say his campaign, his**
2  **chief of staff, I think we all know but so the**
3  **record is clear who are you referring to?**
4  A.      I'm sorry, Governor Manchin's chief
5  of staff.
6  **Q.        And for how many years did you hold**
7  **the position as chief of staff for Governor**
8  **Manchin?  I think you said --**
9  A.      Approximately, five-and-a-half years.
10 **Q.        And when did you step down or when**
11 **did leave that position?**
12 A.      December 31st, let's see, three years
13 ago.  It's terrible, but I have to think back.
14 That would've been December 31st of '10.
15 **Q.        And why did you leave the governor's**
16 **office at that time?**
17 A.      I just decided that it was time for
18 me to go into -- back into the private sector
19 that I had been into for some time.
20 **Q.        And that's when you began to do the**
21 **work that you explained earlier that you're**
22 **currently doing?**
23 A.      That is correct.
24        And I'm sorry, I would like to

Page 887

1  clarify.  I'm trying to think if I left in '09 or
2  '10.  I've been gone three-and-a-half years and
3  we're '13.
4  **Q.        I guess it would be the end of '09?**
5  A.      '09, I'm sorry.  I want to correct
6  that.
7  **Q.        And Governor Manchin at some point no**
8  **longer was Governor Manchin.  He had some other**
9  **-- he obtained some other honorific title I**
10 **believe?**
11 A.      That's correct.  He ran in the
12 special election for the United States Senator
13 for West Virginia and was successful and was
14 elected to the United States Senate.
15 **Q.        And he is currently a Senator from**
16 **West Virginia?**
17 A.      That is correct.
18 **Q.        Now, I want to take you back to about**
19 **the '08 time frame, 2008?**
20 A.      Yes.
21 **Q.        And at that point in time your**
22 **position was chief of staff?**
23 A.      That is correct.
24 **Q.        As chief of staff to Governor**

Page 888

1  **Manchin, did you have an opportunity or was the**
2  **office of the governor involved in discussions**
3  **between the Horsemen's Benevolent Protective**
4  **Association or HBPA at the Charles Town Racetrack**
5  **on the one hand and the Charles Town management**
6  **on the other?**
7  A.      That is correct, yes.
8  **Q.        And can you explain just generally**
9  **how that came to be; what was going on to your**
10 **understanding?**
11 A.      It was my understanding -- it is my
12 understanding to this day that there was a
13 contract that would be negotiated between the
14 track and the HBPA and that there were concerns,
15 and it was very common for then Governor Manchin
16 to try to get both parties to come together and
17 work out their differences and their problems and
18 that is how we at the governor's office were
19 speaking to both parties.
20 **Q.        Did you have an understanding as to**
21 **why the governor's office was interested in**
22 **getting a contract done between these parties?**
23 A.      Well, the governor's office is always
24 interested in getting any contract result if it

Page 889

1  means jobs to West Virginia and tax dollars to
2  West Virginia.
3  **Q.        Now, so just to sort of expedite**
4  **things a little bit, so just generally if you can**
5  **explain for the panel what the governor generally**
6  **did?  Was he talking with the parties?  What did**
7  **he do?**
8  A.      Yes, most generally what we would do,
9  and of course, it was a little different in
10 different situations, but we would bring parties
11 together.  In this case, bring parties together,
12 hear the concern of both parties, and attempt to
13 get them to spend more time communicating and
14 work towards solving their differences.
15 **Q.        Now, let me direct your attention to**
16 **about the August '08 time period.  Did there come**
17 **a time when you attended a meeting with the**
18 **governor with members of the Charles Town HBPA**
19 **and the governor's office?**
20 A.      Yes?
21 **Q.        And tell the panel generally what the**
22 **purpose of that meeting was?**
23 A.      My understanding of that meeting is
24 that the HBPA was coming in to share their

Page 890

1  concerns and what they were not satisfied with
2  the track.
3  Q.      And at that meeting, did you happen
4  to see or overhear Ms. Mawing who is in the court
5  here today -- the room here today?
6  A.      As I recall she was in that meeting.
7  Q.      Do you recall her saying anything?
8  A.      I recall her being concerned and very
9  upset with the track for different reasons, but I
10 do remember her speaking and being concerned at
11 that time.
12 Q.      Okay.
13        Now, at that meeting do you -- I'm
14 focusing now on the meeting itself.  Do you have
15 a specific recollection of anything she said at
16 that meeting?
17 A.      I remember that she was upset and she
18 was speaking out that she was upset against the
19 track.  I do not have a recollection of sitting
20 there in that room hearing exactly what she said
21 because from time to time I would go to the door
22 and speak with different members of the
23 governor's office about other issues that they
24 would need to call me to the side for.  But I

Page 891

1  remember she was concerned and upset.  And at the
2  end of the meeting, I did not know exactly her
3  concerns.
4  Q.      Now, after the conclusion of the
5  meeting did you then have an opportunity to talk
6  to Governor Manchin?
7  A.      Yes, most generally we spoke after
8  all of our meetings, and I specifically asked
9  what she was very upset about at that time at the
10 end of the meeting.
11 Q.      And what did Governor Manchin tell
12 you?
13        MR. HAMMER:  Objection,
14 hearsay.
15        MR. WOLFSON:  We're not
16 offering it for the truth.
17        MR. HAMMER:  They are
18 offering it for the truth of the matter.
19        MR. WOLFSON:  No.
20        MR. HAMMER:  This is the
21 truth of the matter as to what Ms. Mawing said.
22        MR. WOLFSON:  Yes, just for
23 the fact that it was stated and Governor Manchin
24 stated.  We're certainly not offering it for the

Page 892

1  truth.  We don't believe it to be true.  This is
2  -- at no time are we offering  what Ms. Mawing
3  said, offering it for the truth, merely that it
4  was, in fact, stated.
5        ARBITRATOR CARNEY:  It's an
6  admission by a party opponent.
7        MR. WOLFSON:  That's right.
8        ARBITRATOR WYCOFF:  Wait a
9  minute, admission by a party opponent?
10       MR. WOLFSON:  No, if I may --
11       ARBITRATOR CARNEY:  No, an
12 admission by Ms. Mawing.
13       MR. HAMMER:  It's not
14 Ms. Mawing that they're asking about what she
15 said.  It's asking the governor what he said to
16 him about what Ms. Mawing said, so we're in
17 hearsay.
18       ARBITRATOR CARNEY:  We can't
19 hear that for the matter asserted.
20       MR. WOLFSON:  Exactly.
21       ARBITRATOR WYCOFF:  Yes, but
22 I'm not understanding what the purpose is as an
23 exception to hearsay.  I'm not hearing an
24 exception.

Page 893

1        MR. WOLFSON:  We're offering
2  it simply for the fact that a statement was made
3  and the statement was made from the governor to
4  this witness and that ultimately to Mr. Finamore,
5  just the fact that statements were made to get to
6  Mr. Finamore's understanding and Mr. Britton's
7  understanding.
8        ARBITRATOR KARLIN:  So you're
9  not offering it for the truth that's what she
10 said?
11       MR. WOLFSON:  No.  We're
12 simply offering it for -- well, let me say it
13 this way.  What she said to the governor would
14 qualify as an admission.
15       ARBITRATOR WYCOFF:  If he
16 were here testifying.
17       MR. WOLFSON:  If he were here
18 testifying, exactly.  The fact that the governor
19 said it, that's what we're offering, that the
20 governor said to this witness that statement.
21       ARBITRATOR KARLIN:  But it's
22 not evidence of what she said.
23       MR. WOLFSON:  We're not
24 offering it for that purpose.

Page 894

1      MR. HAMMER: Then I don't see
2  its relevance if it's not evidence of what she
3  said.
4      MR. WOLFSON: It certainly
5  goes to why the track took action. That's what
6  we're offering it for. We're offering this
7  testimony as evidence of why the track took
8  action.
9      ARBITRATOR WYCOFF: No, but
10  he didn't take any action, so whose state of mind
11  are you talking about?
12      MR. WOLFSON: Ultimately it
13  becomes -- what this is all about --
14      ARBITRATOR WYCOFF: If you're
15  doing a chain of custody --
16      MR. WOLFSON: That's what we
17  have. That's exactly right. Ultimately what this
18  case is about, they have to prove we took certain
19  action for a bad motive. If we took action for an
20  incorrect motive but not a bad motive, that would
21  not get them where they need to be. If my client
22  believed certain things happened and they
23  believed because the governor said something that
24  something happened because the governor said and

Page 895

1  the track then took action because of that, that
2  would defeat their claims because they have to
3  prove my client's intent because they have to
4  prove my client retaliated specifically because
5  of testimony at a hearing, that's one claim now.
6  Retaliation only because of testimony at a
7  hearing or alternatively discrimination, intent
8  to discriminate, we did something to her because
9  of HBPA activity. My client took action because
10  they had a different understanding. That's the
11  defense of this case and an absolute defense.
12      ARBITRATOR CARNEY: Well,
13  isn't her speaking up at a meeting a union
14  activity?
15      MR. WOLFSON: Not -- well,
16  first of all, it's not a union.
17      ARBITRATOR KARLIN: An
18  association activity, the HBPA activity.
19      MR. WOLFSON: This is where
20  if the governor is making allegations that this
21  woman said things that the track was deliberately
22  and we're going to get there to what he said, the
23  track took certain action with a certain intent,
24  a bad intent on the part of the track, I would

Page 896

1  submit that would not be HBPA activity.
2      ARBITRATOR CARNEY: Well, he
3  could testify to what he heard the governor say
4  to Mr. Finamore.
5      MR. WOLFSON: And that's what
6  we're offering.
7      ARBITRATOR WYCOFF: No, no,
8  no. That's not what he's saying. Not what he
9  said to Mr. Finamore. He's saying what did the
10  governor tell you at the end of the meeting
11  Ms. Mawing was upset about.
12      MR. WOLFSON: I'll go ahead
13  to the conversation with Mr. Finamore.
14      ARBITRATOR WYCOFF: No, no, I
15  mean I think it's very -- do we want to talk
16  about this for a minute?
17      ARBITRATOR KARLIN: We should
18  probably step outside.
19      ARBITRATOR CARNEY: Let's go
20  off the record.
21          * * *
22      (Whereupon, a discussion was
23  held off the record)
24          * * *

Page 897

1      ARBITRATOR CARNEY: Mr.
2  Wolfson, you can ask the witness what he heard
3  the governor tell Mr. Finamore, but we're not
4  going to hear testimony what the governor told
5  him when Mr. Finamore was not present.
6      MR. WOLFSON: That's fine.
7  BY MR. WOLFSON:
8  Q.     If I may, let me jump ahead.
9      Some time after that meeting, was
10  there a telephone conversation that you
11  participated in with Mr. Finamore?
12  A.     And the governor.
13  Q.     And tell the panel what was said in
14  that conversation?
15  A.     The governor --
16      ARBITRATOR CARNEY: And you
17  were a party?
18      THE WITNESS: I was in the
19  office when that conversation was taking place.
20  And the governor was sharing some concerns with
21  Mr. Finamore, and he spoke up and he asked me the
22  lady's name of the lady that was very concerned
23  and upset at that meeting. And I allowed the
24  governor and Mr. Finamore to know who that was.

Page 898

1  BY MR. WOLFSON:
2  Q.      And what did you say?
3  A.      Ms. Mawing.  And he told Mr. Finamore
4  that she had stated that there was rat poison
5  purposely placed to kill an animal and then later
6  said a goat and that there was and I -- some form
7  of wire that was put in there that could harm
8  their horses.
9  Q.      And did the governor say anything
10 else to Mr. Finamore about those comments from
11 Ms. Mawing?
12 A.      It was -- he was relaying the
13 concerns to Mr. Finamore at the same time knowing
14 the governor as I did it was more or less like,
15 you know, asking and telling at the same time of
16 these terrible situations.
17 Q.      Now, was there -- after that
18 conversation ended, did there then come a time
19 where a meeting was held in early September
20 that you attended between the governor and
21 Mr. Finamore?
22 A.      I attended a meeting that the
23 discussion came up again on this.
24 Q.      And tell the panel what was discussed

Page 899

1  at that meeting between the governor and
2  Mr. Finamore?
3  A.      As I remember, the governor was
4  bringing up concerns again, and Mr. Finamore
5  explained to the governor that he had checked
6  into that and assured him that that had not
7  happened.
8  Q.      At anytime did the governor ever
9  mention or instruct Mr. Finamore to take any
10 action against Ms. Mawing?
11 A.      No.
12 Q.      Did he ever mention any stall
13 allocation to Ms. Mawing to Mr. Finamore?
14 A.      Not to my knowledge.
15        MR. WOLFSON:  No further
16 questions.
17            * * *
18     C R O S S - E X A M I N A T I O N
19 BY MR. HAMMER:
20 Q.      Mr. Puccio, we met before we went
21 back on the record.  My name is David Hammer.
22 I'm here with Harry Waddell.  We are Counsel for
23 Tina Mawing seated in the back.
24        You testified that you have your own

Page 900

1  business?
2  A.      Currently.
3  Q.      Currently, yes.
4  A.      That is correct.
5  Q.      So you're an independent businessman?
6  A.      That is correct.
7  Q.      Do you have a current contract with
8  PNGI or any of its subsidiaries including Charles
9  Town Races or PNGI or whatever they call it here
10 at the racetrack?
11 A.      Yes.
12 Q.      And what is that contract for?
13 A.      That contract is for government
14 relations for the State of West Virginia for this
15 particular track in West Virginia.
16 Q.      Are you represented by Counsel here?
17 A.      No, I am not.
18 Q.      How long have you had this contract
19 with PNGI?
20 A.      I would approximate three-and-a-half
21 years.
22 Q.      And was this the first contract you
23 had with them or was there an earlier contract as
24 well?

Page 901

1  A.      I believe this was the original
2  contract that continues on unless it is canceled
3  or expires -- or is canceled by either party.
4  Q.      Now, under this contract do you
5  receive a regular payment or do you bill by the
6  hour?
7  A.      I'm on a retainer.
8  Q.      You are on a retainer, okay.  And is
9  that retainer paid yearly, quarterly, monthly?
10 A.      Monthly.
11 Q.      Monthly.  How much is the retainer,
12 sir?
13 A.      $10,000 per month.
14 Q.      And you've been receiving $10,000 a
15 month for three-and-a-half years?
16 A.      That is correct.
17 Q.      And as a part of your job, what is
18 your job description under that contract?  What
19 are you supposed to do for them?
20 A.      Daily, I work with different
21 individuals if it would be a tax department issue
22 or question and they would contact me, I would
23 work with them.  Primarily, the contract is for
24 lobbying efforts during the legislative session

Page 902

1  or at any interims that I would speak on their

2  behalf and lobby for them on any bills that they

3  are attempting to pass or bills that they are

4  attempting to not have passed.

5  Q.        Have you also provided assistance to

6  them with regard to the Flowing Springs Bypass

7  Project that's going on right now?

8  A.        No, I haven't.

9  Q.        Did you provide any assistance to

10  them with the Department of Highways in which

11  property would be adversely condemned and where

12  that road would run?

13  A.        Absolutely not.

14  Q.        Now, when is the first time that you

15  met with any counsel, any lawyer to discuss your

16  role in this Tina Mawing event?

17  A.        Today is the first time that

18  face-to-face meeting.

19  Q.        Have you had phone conversations?

20  A.        I had phone conversations, yes, sir.

21  Q.        When was the first one of those?

22  A.        With an attorney?

23  Q.        Yes.

24  A.        Mr. Wolfson, and I cannot tell you

Page 903

1  what day, but it was probably I'm going to guess

2  in the last four to five days picked up the phone

3  and contacted me.

4  Q.        Had any attorney representing PNGI

5  spoken to you before four or five days ago?

6  A.        To the best of my knowledge that's

7  the first time that I've spoken with attorney.

8  Q.        Just so I'm clear because I'm

9  confused, when was that first conversation?

10  A.        To be safe, I would say not more than

11  five to six days ago.

12  Q.        Not more than five to six days ago.

13  Have you spoken to any paralegal or anyone else

14  from Stevens and Lee Law Firm?

15  A.        Not to my knowledge.

16  Q.        Had you spoken with anyone from

17  Bowles Rice Law Firm?

18  A.        Not to my knowledge.  Now, you're

19  speaking about this particular case?

20  Q.        Yes, about this particular case.

21  A.        Not to my knowledge.

22  Q.        That was the absolute very first

23  time?

24  A.        That is correct.

Page 904

1  Q.        So if PNGI submitted a statement to

2  this panel proffering what it was that you were

3  going to say, that was before, what did you say,

4  five to seven days ago?

5  A.        That is correct.

6  Q.        You don't know where they would've

7  gotten that statement from?

8  A.        I would have no way of knowing.

9  Q.        Okay.

10        Now, I would imagine because I've

11  never been in this role so I have to imagine that

12  being the chief of staff for a governor means

13  that you have to work with the governor on a

14  daily basis?

15  A.        That is correct.

16  Q.        And I would imagine, again, that the

17  governor of any state, including West Virginia,

18  takes on a whole range of different matters at

19  any given time?

20  A.        That is correct.

21  Q.        And during a legislative session

22  there could be meetings nonstop with different

23  constituents, different interest groups about

24  pending legislation on every matter under West

Page 905

1  Virginia code?

2  A.        That is correct.

3  Q.        And wouldn't you agree that it would

4  be very important to keep accurate notes of

5  what's said at those meetings?

6  A.        I agree that some meetings require

7  notes and some meetings do not.

8  Q.        What's the criteria for when a

9  meeting requires notes and when a meeting doesn't

10  require notes?

11  A.        There is not a set criteria.  It's we

12  as the individuals that are responsible in

13  working with the individuals would make the

14  decision when we believe that a note would be

15  needed.

16  Q.        Do you make that decision before the

17  meeting or after the meeting or during the

18  meeting?

19  A.        We always have a pad of paper in

20  front of us and a pen and we would make that

21  decision at any time during the meeting.

22  Q.        Well, would you agree with me that

23  the issue of the HBPA contract and the table

24  games getting resolved was of paramount

Page 906

1  **importance to the governor?**
2  A.        It's very important to the governor.
3  **Q.        So as a very important issue, I mean**
4  **we've heard testimony in this case that the take**
5  **is nearly one-third of the state's budget; is**
6  **that your understanding?**
7  A.        That is my understanding.
8  **Q.        And so with such an important issue,**
9  **isn't that the kind of meeting at which you take**
10 **notes about what's said?**
11 A.        I would not question if I took notes
12 or if the governor took notes at that time.  I'm
13 not saying by any means that there was not a note
14 taking.
15 **Q.        Well, weren't you asked by the**
16 **lawyers in this case to produce any notes or**
17 **memos that were taken at that meeting?**
18 A.        Yes, they had asked me if I had any
19 notes and I had explained to them I did not at
20 this time.
21 **Q.        Well, where are your notes?**
22 A.        If you think that every note that I
23 took in those years I would have today, I'd have
24 to rent a warehouse and continue to pay for that.

Page 907

1  So those notes, when we took those notes, they
2  would be in place as long as we needed to work
3  from them and then they would be disposed.
4  **Q.        Did you make any effort to retrieve**
5  **those notes so that you could provide those notes**
6  **to us so it might be evidence in this case?**
7  A.        I would not have those notes to
8  retrieve.
9  **Q.        Who has them?**
10 A.        They would've been disposed.  If it
11 wasn't something that our attorneys required to
12 put away in a file, I would've kept those notes
13 as long as I needed them and then I would've
14 disposed of them.
15 **Q.        So you made no permanent memorandum**
16 **or document from those notes that we can look**
17 **back on now?**
18 A.        If you're asking if I have a note
19 today from that specific meeting my answer would
20 be no.
21 **Q.        And you don't have access to a note**
22 **from that meeting either?  Not just that you**
23 **don't have it, but you don't even have access to**
24 **it?**

Page 908

1  A.        Absolutely not.
2  **Q.        Okay.**
3            **What was the date of that meeting?**
4  A.        I do not recall.
5  **Q.        Who was present?**
6  A.        I cannot tell you each and every
7  person. I can tell you that myself -- now, which
8  meeting are you referring to?
9  **Q.        Well, the meeting at which you**
10 **testified that Tina Mawing was concerned and**
11 **upset?**
12 A.        Members of the HBPA, myself, the
13 governor, and I cannot tell you if another member
14 of the governor's staff was in that meeting.
15 **Q.        Who was present from the HBPA?**
16 A.        I cannot tell you all the
17 individuals.
18 **Q.        Can you tell me how many individuals?**
19 A.        You know what, I don't want to guess.
20 It wasn't a large crowd, but there were members
21 there that were sharing their concerns.  I can't
22 -- would not even attempt to tell you.
23 **Q.        Can you give me the breakdown between**
24 **men and women?  How many women were there?**

Page 909

1  A.        I couldn't tell you.
2  **Q.        Do you remember that there was one**
3  **woman or more than one woman there?**
4  A.        I don't want to say because I just
5  could not remember how many women would be there
6  **Q.        Had you ever met Tina Mawing before**
7  **this meeting?**
8  A.        Not -- you mean before that meeting
9  that you're referring to?
10 **Q.        Yes, sir.**
11 A.        Not to my knowledge.
12 **Q.        And have you ever seen her since?**
13 A.        Not to my knowledge.  Not that I can
14 recall.
15 **Q.        What exactly to the best of your**
16 **recollection sitting here today under oath do you**
17 **recall Tina Mawing saying at that meeting?**
18 A.        I recall her being upset and I heard
19 something about death or purposely injuring or
20 death and that's what allowed me afterward to ask
21 the question what was stated in that meeting from
22 that lady about something done purposely to cause
23 death to an animal.  I heard, but I didn't get to
24 hear the details of what type of animal or I

Page 910

1  probably wouldn't have went and directly asked
2  that question afterwards because that's something
3  that stood out in my mind.
4  **Q.      So you don't know what she was saying**
5  **was done purposely?**
6  A.      I heard purposely and I heard -- I
7  heard purposely, poison, and death and I couldn't
8  tell you past that, and so I won't attempt to
9  tell you because I wouldn't have asked him if I
10  knew that.
11  **Q.      Now, do you remember Ms. Mawing or**
12  **anyone else bringing anything to the meeting?**
13  A.      You would have to explain bringing.
14  You mean carrying a book in or anything?
15  **Q.      Anything?**
16  A.      I would not remember anything like
17  that.
18  **Q.      Did you see any photographs at the**
19  **meeting?**
20  A.      I do not recall.
21  **Q.      Did you hear the governor say that**
22  **Tina hung some wire in a shed row that was**
23  **intended on PNGI's part to slit the throat of**
24  **Ms. Mawing's horse?**

Page 911

1          MR. WOLFSON: David, you may
2  have misspoke.
3  BY MR. HAMMER:
4  **Q.      Did you hear the governor say that?**
5  A.      Would you read that again to me?  I
6  want to understand what you're saying.
7  **Q.      Did you hear the governor say to**
8  **Mr. Finamore that PNGI's hung some wire in the shed**
9  **row that was intended on PNGI's part to slit the**
10  **throat of Ms. Mawing's horse?**
11  A.      I heard the governor say, and I do
12  not remember if it was those words, that there
13  was wire hung purposely to damage a horse in the
14  stalls.  So I can't say, sir, that it was that
15  exact wording.
16  **Q.      In how many stalls?**
17  A.      I can't say that.
18  **Q.      Was it wire or was it rope?**
19  A.      As I remember it was wire.
20  **Q.      That's your memory.  And where was it**
21  **hung?**
22  A.      Those details were not -- I do not
23  recall tremendous details.
24  **Q.      How long was the wire hung for**

Page 912

1  **supposedly?**
2  A.      I wouldn't have gotten -- I wouldn't
3  have heard that that I can recall.
4  **Q.      Now, if the Governor of West Virginia**
5  **speaks to a high-ranking official of a company**
6  **and says that a woman is crazy -- did the**
7  **governor actually say to Mr. Finamore that you**
8  **heard the Tina Mawing was crazy?**
9  A.      I do not recall hearing him say that
10  she was crazy.
11  **Q.      What do you recall him saying about**
12  **her to characterize her?**
13  A.      What I remember him speaking about
14  Mrs. Mawing was that she was extremely concerned
15  and had made the statements that we had discussed
16  here today.  That animals were poisoned purposely
17  by the track and that wire was hung to damage
18  horses purposely, and that's what I remember
19  hearing the governor say on a few different
20  occasions.
21  **Q.      But you never heard the governor say**
22  **that Tina Mawing was a crazy lady or was acting**
23  **crazy?**
24  A.      I'm sorry, I did not remember hearing

Page 913

1  that at all.
2          MR. HAMMER:  No further
3  questions.  Thank you.
4          MR. WOLFSON:  I have no
5  questions.
6          ARBITRATOR CARNEY:  Al?
7          ARBITRATOR KARLIN:  No
8  questions.
9          ARBITRATOR CARNEY:  No
10  questions.
11          Thank you very much.  Have a good
12  day.
13          THE WITNESS:  Thank you.
14          MR. WOLFSON:  Prior to
15  resting -- and Mr. Moore is upstairs, as you
16  know.
17          MR. WADDELL:  I saw.  Thank
18  you.
19          MR. WOLFSON:  Prior to
20  resting, we're going to introduce the deposition
21  transcript of, and I can't see the name, the full
22  name, Malcolm G. Barr, as Exhibit 71.
23          ARBITRATOR WYCOFF:  Malcolm
24  Barr?

Page 914

1          MR. WOLFSON: Yes. We
2  designated portions --
3          ARBITRATOR WYCOFF: You're
4  adding the whole thing today.
5          MR. WOLFSON: Now we're just
6  for the panels -- this will be 71.
7              * * *
8      (Whereupon, the document was marked
9  as Exhibit No. R-71 for identification.)
10             * * *
11         MR. WOLFSON: And finally,
12  the last exhibit we would have marked and this
13  gets to the spoliation issue that the panel
14  mentioned. We could introduce certain evidence
15  to go to that issue is an email. It's an email
16  from Counsel regarding the destruction of records
17  and retaining and what happened just to get into
18  that. This would be R-72.
19             * * *
20     (Whereupon, the document was marked
21  as Exhibit R-72 for identification.)
22             * * *
23         MR. HAMMER: I object to 72.
24  If they wanted to ask Ms. Mawing questions about

Page 915

1  this topic she was on the stand, they should've
2  done it. But I can't be made a witness in the
3  case to explain this or do that, so I object to
4  this exhibit.
5          ARBITRATOR CARNEY: Well, you
6  can ask -- you can recall Ms. Mawing and ask her
7  about it and what she did correctly and so on.
8          MR. WOLFSON: And here are
9  copies of 71 and 72. And with that --
10         ARBITRATOR WYCOFF: Excuse
11  me.
12         ARBITRATOR KARLIN: You would
13  rather have her recalled than admit this?
14         MR. HAMMER: Well, we're
15  going to recall her anyway so I can -- I mean
16  they can ask her about it, I can ask her about
17  it.
18         MR. WOLFSON: It's not a
19  dispute; is it?
20         ARBITRATOR CARNEY: Well,
21  this is a statement by you as an agent for
22  Ms. Mawing, so it's totally admissible for that.
23  What I was saying was if you wanted to call her
24  to testify about it in rebuttal you are certainly

Page 916

1  permitted to do that. Now, we have one other
2  issue, there is a deposition -- excuse me, I
3  shouldn't say a deposition, not in this case.
4  There's a transcript of testimony by Mr. Hale, a
5  proceeding in which Ms. Mawing was not
6  represented by counsel and was not a participant.
7  So we are going to sustain the hearsay objection
8  to that exhibit.
9          MR. WOLFSON: Understood.
10  And with that, we rest.
11         MR. WADDELL: We'll call
12  Dickie Moore then.
13         MR. WOLFSON: And Stacey was
14  on her way to get him.
15         MR. WADDELL: He anticipates
16  my every move.
17         ARBITRATOR WYCOFF: We have a
18  list in the front of the book of all of your
19  exhibits. Can we go over which ones you're --
20         MR. WOLFSON: Can we wait
21  until Ms. Scrivani got back for that. She was
22  keeping track. I apologize.
23         ARBITRATOR WYCOFF: Yes.
24         ARBITRATOR CARNEY: And what

Page 917

1  we'll do, we'll ask her to -- I think maybe it
2  will be more helpful for her to say which one
3  specifically should like to have added.
4          MR. WOLFSON: Yes.
5          ARBITRATOR CARNEY: Now, Mr.
6  Hammer, are you anticipating any rebuttal
7  witnesses?
8          MR. HAMMER: Yes, we are.
9  We're anticipating calling Ms. Mawing for about
10  two minutes.
11         ARBITRATOR WYCOFF: You're
12  limited to that.
13         MR. HAMMER: I'll keep it.
14  You can guess what the topic is.
15         ARBITRATOR WYCOFF: We can go
16  off the record.
17             * * *
18      (Brief break.)
19             * * *
20         ARBITRATOR CARNEY: Why don't
21  we go ahead and take the testimony from him and
22  then Ms. Mawing so we don't hold anybody up more
23  than necessary. And of course, we're going to
24  consider Mr. Moore as being called as on Cross.

Page 918

1           MR. HAMMER: Rebuttal
2    witness, we understand.
3           ARBITRATOR CARNEY: We're
4    ready to proceed.
5           MR. WADDELL:   Thank you.
6                * * *
7           RICHARD MOORE
8    being first duly sworn, was examined and
9    testified as follows:
10                * * *
11        D I R E C T  E X A M I N A T I O N
12   BY MR. WADDELL:
13   Q.      Good afternoon, Mr. Moore.  How are
14   you?
15   A.      Fine, thank you.
16   Q.      I guess you got called on short
17   notice today; is that correct?
18   A.      That's correct.
19   Q.      Would you please tell the panel what
20   your job position was at the track in August of
21   2008?
22   A.      In August of 2008, I was general
23   manager of racing operations.
24   Q.      And as general manager of racing

Page 919

1    operations were you a member of the stall
2    allocation committee in August of 2008?
3    A.      Yes, I was.
4    Q.      And do you recall who else was on
5    that committee with you at that time?
6    A.      I think it was Al Britton, Erich
7    Zimny, Randy Wehrman, Mike Elliott, and Jim
8    Taylor.
9    Q.      What was Jimmy Taylor's position at
10   that time?
11   A.      He was a stall superintendent.
12          ARBITRATOR WYCOFF:  You
13   mentioned a Harry somebody; is that right?
14          MR. WADDELL:  Randy Wehrman,
15   I think.
16          THE WITNESS: Randy Wehrman.
17          ARBITRATOR WYCOFF: No,
18   before him I thought there was somebody.
19          MR. WADDELL:  There was
20   Elliott.
21          ARBITRATOR WYCOFF: Britton.
22          THE WITNESS: Erich Zimny.
23          ARBITRATOR WYCOFF: Okay.
24   BY MR. WADDELL:

Page 920

1    Q.      Why don't you just run through it
2    again?
3    A.      There was myself, Al Britton, Erich
4    Zimny, Randy Wehrman, Mike Elliott, and Jim
5    Taylor.
6           ARBITRATOR WYCOFF: Thank
7    you.
8    BY MR. WADDELL:
9    Q.      You were general racing of racing?
10   A.      Racing operations, correct.
11   Q.      Racing operations, Mr. Wehrman who
12   has not testified in this case at this point
13   won't be because we'll be submitting his
14   deposition, what was his position?
15   A.      He was racing secretary at the time.
16   Q.      Isn't that the individual who
17   typically runs the stall allocation committee
18   meetings?
19   A.      That's correct.
20   Q.      Now, do you recall having a meeting
21   of the stall allocation committee in August of
22   2008?
23   A.      I do not recall in August of 2008,
24   no, sir.

Page 921

1    Q.      Do you recall having a stall
2    allocation committee meeting where Tina Mawing
3    either lost all of her stalls or was allocated no
4    stalls?
5    A.      Do not.
6    Q.      You do not recall that meeting?
7    A.      I do not recall Tina Mawing's name
8    mentioned losing stalls.
9    Q.      Okay.
10          Do you remember giving a deposition
11   in this case, sir?
12   A.      Yes, I do.
13   Q.      Okay.
14          I think the deposition was taken in
15   April 22nd of 2010?
16   A.      Okay.
17   Q.      Okay.
18          Do you recall discussing a stall
19   allocation meeting in that deposition where Tina
20   Mawing lost stalls?
21   A.      I knew she was reduced stalls.
22   Q.      How many stalls do you recall her
23   being reduced?
24   A.      I think it was four at the time.

Page 922

1  Q.        Now, were you present in a stall
2  allocation -- strike that.
3          What occasion do you recall where she
4  lost four stalls?
5  A.        I think that was the occasion where
6  Mr. Elliott came to me and said that somebody --
7  Mr. Yetsook had complained that she was in her --
8  she was in his stalls, and I said, well, we need
9  to check tattoos and see if that's the case.
10 Q.        Okay.
11         And as a result of that she did lose
12 stalls, I believe?
13 A.        Yes, she did.
14 Q.        Four stalls?
15 A.        Four or five.  I can't recall the
16 exact number.
17 Q.        And the reason she lost the stalls
18 was because she had horses that were in stalls
19 that actually were assigned to other trainers; is
20 that your understanding?
21 A.        That's correct.
22 Q.        And wasn't that done -- do you recall
23 sitting here right now when that occurred?
24 A.        What time, what date?

Page 923

1  Q.        Yes.
2  A.        No, I don't.  I don't recall.
3  Q.        Okay.
4          Mr. Moore, I'm going to hand you what
5  is part of Exhibit 39 and let you take a look at
6  that.
7          Do you recognize that document?
8  Thirty-nine (39), it's the April 25th, 2008
9  letter to Ms. Mawing from you from Mr. Moore
10 A.        Yes, sir.
11 Q.        Have you had a chance to look at
12 that?
13 A.        Yes, sir.
14 Q.        Do you recognize it?
15 A.        I signed it.
16 Q.        What is it?
17 A.        That's a letter given to Mrs. Mawing
18 deducting her stalls.
19 Q.        What's the date?
20 A.        April 25th, 2008.
21 Q.        Okay.
22         How many stalls were taken away at
23 that time?
24 A.        Five.

Page 924

1  Q.        Five?
2  A.        Four, four.
3  Q.        How many did she have before you took
4  those four stalls away?
5  A.        Nine.
6  Q.        So if we do the math she still had
7  five stalls left at that point; correct?
8  A.        Correct.
9  Q.        Okay.
10         And you told me that the reason this
11 was done was because of the problem with the
12 horses and other trainers' stalls?
13 A.        Correct.
14 Q.        Okay.
15         Let's move to August of 2008.
16 A.        Okay.
17 Q.        Did she lose stalls in August of
18 2008?
19 A.        I don't recall.
20 Q.        It's on the screen here.  Can you see
21 that, sir?
22 A.        Sure.
23 Q.        Can you read it, because I'm having
24 trouble?  Can you read that?

Page 925

1  A.        I can read that.
2  Q.        Now I have my glasses on.  You see
3  the date on there, August 29, 2008?
4  A.        Yes, I do.
5  Q.        And it's addressed to Ms. Mawing?
6  A.        Correct.
7  Q.        Signed by Randy Wehrman; correct?
8  A.        Correct.
9  Q.        That we've already said was the
10 racing secretary in August of 2008?
11 A.        That's correct.
12 Q.        And it says the stall allocation
13 committee has reviewed your 2008 stall
14 application; correct?
15 A.        That's correct.
16 Q.        And it says based upon the
17 committee's review and the exercise of its
18 discretion, Charles Town Races and Slots is
19 unable to allocate any stalls to you for the
20 remainder of 2008; correct?
21 A.        Correct.
22 Q.        Were you at that meeting when this
23 decision was made?
24 A.        I'm pretty sure I was.  I didn't miss

Page 926

1   many.
2   Q.        Do you recall describing for me what
3   occurred at that meeting when I took your
4   deposition?
5   A.        I think Mr. Wehrman had individuals
6   that with his statistics that were going to get
7   stalls and some people that were going to be
8   deducted stalls and some people would lose their
9   stalls.
10  Q.        Okay.
11            So there were three groups of people
12  that you just mentioned?
13  A.        Right.
14  Q.        People who were going to get stalls,
15  people who were going to have stalls reduced, and
16  people who were going to lose their stalls
17  completely?
18  A.        Correct.
19  Q.        How many were in the last category,
20  the ones who were going to lose their stalls
21  completely?
22  A.        I can't recall.
23  Q.        Do you recall there being four?
24  A.        I can't recall that, no.

Page 927

1   Q.        Okay.
2             Do you recall that there were about
3   70 to 75 trainers whose applications were being
4   reviewed at this particular allocation meeting?
5   A.        I don't recall that time.
6   Q.        All right.
7             I'm going to -- I took your
8   deposition in this case.  I think it was me.
9   Maybe it wasn't.  One of us did.  And as I said,
10  it was April 22nd of 2010?
11  A.        Okay.
12  Q.        And I'll be happy to show you this if
13  you'd like to see it, but on Page 21 at Line 8, I
14  asked approximately how many trainers are we
15  talking about and your answer was, I would have
16  to say there was probably 70 or 75; does that
17  refresh recollection?
18  A.        If that's what I said, I guess that's
19  what it was, 70 or 75.
20  Q.        I also had asked you at Line 4, all
21  right, we'll get back to that.  Before you
22  considered you had a list of trainers A through
23  Z, and you said correct?
24  A.        That's correct.

Page 928

1   Q.        Okay.
2             So the normal process was to bring in
3   an alphabetical listing of the trainers who had
4   stall applications; is that correct?
5   A.        Correct.  Whatever Mr. Wehrman had at
6   the time.
7   Q.        Okay.
8             And that's trainers who actually
9   already have stalls allocated to them?
10  A.        Correct.
11  Q.        Now, in this particular meeting
12  didn't you take out three or four of those
13  applications and set them aside?
14  A.        I think Mr. Wehrman had those set
15  aside, yes.
16  Q.        Before you even discussed any of
17  these trainers those three or four were set
18  aside; is that correct?
19  A.        That's correct.
20  Q.        And those -- there were actually four
21  set aside; weren't there?
22  A.        I don't recall the exact number.
23  Q.        Again, I'm referring to your
24  deposition, Page 22, Line 7.  My question was,

Page 929

1   first of all, who were the individuals, trainers
2   who were set aside? Your answer was, as I can
3   recall Ms. Mawing was one.  I think Robert Birr,
4   B-I-R-R, was one.  I think a lady by the name of
5   Gladys Mercer was one, and I think another
6   gentleman by the name of James Williams was one.
7   The next question was, okay, so you think there
8   were four?  And you answered, I think there were
9   four; does that refresh your recollection?
10  Q.        Okay.
11  A.        Okay.
12  Q.        Do you agree with --
13  A.        I agree with you.
14  Q.        And I asked you why Ms. Mawing was
15  put in that group?
16  A.        I have no idea.  She lost her stalls
17  by going -- when she went into other stalls.
18  Q.        Well, that was back in April; wasn't
19  it?
20  A.        That's correct.
21  Q.        We're now in August?
22  A.        That's correct.
23  Q.        Are you saying she lost her stalls in
24  August for the same reason?

Page 930

1  A.      I would assume.  I never heard
2  Mrs. Mawing's name mentioned other than she was
3  losing her stalls.  There was never a topic with
4  Mrs. Mawing.
5  Q.      At that August meeting, she wasn't
6  even discussed; was she?
7  A.      I don't recall her being discussed at
8  all.
9  Q.      In fact, according to your testimony,
10  there were -- she was set aside with three other
11  people?
12  A.      Correct.
13  Q.      Do you know why Mr. Birr lost -- and
14  he lost all his stalls, Mr. Birr; is that your
15  recollection?
16  A.      Yes, sir, I think he did.
17  Q.      And the reason was for a violation of
18  alcohol?
19  A.      I think that's correct.
20  Q.      Do you remember any specifics of
21  that?
22  A.      I think he had a steward's violation
23  with alcohol I think.
24  Q.      Gladys Mercer, she was not allocated

Page 931

1  any stalls.  She had them all taken away; correct?
2  A.      I think she only had one or two.
3  Q.      Whatever they were they were taken?
4  A.      They were all taken, correct.
5  Q.      And the reason hers were taken away
6  because she had not performed at all?  In other
7  words, she had not run a horse at all?
8  A.      No activity at all.
9  Q.      And then James Williams, he was not
10  allocated any stalls as well; correct?
11  A.      That's correct.
12  Q.      And do you remember why?
13  A.      I don't recall.
14  Q.      Is it possible it was animal abuse?
15  A.      I don't think it was animal abuse,
16  but I don't recall.
17  Q.      Okay.
18          And your testimony in your
19  deposition, Page 28, Line 19, my question was,
20  okay, and the only reason -- your testimony is,
21  the only reason Ms. Mawing was placed in that
22  group because of the fact she had horses in some
23  other stalls?  And your answer was that's what I
24  can remember being brought up.  And then I asked

Page 932

1  you, was there possibly something else brought
2  up?  Answer, I don't recall.  Is that consistent
3  with your recollection today?
4  A.      I don't recall anything else being
5  brought up.
6  Q.      Were you aware of any discussion at
7  that meeting of any problems with Mrs. Mawing's
8  starts; how many horses she started per stall?
9  A.      I was not aware of any problems.
10  Q.      Any problem with the condition of her
11  horses brought up?
12  A.      Not to my knowledge.
13  Q.      Any claim that her horses were
14  somehow not of sufficient quality or were
15  inferior in any way?
16  A.      Not to my knowledge.
17  Q.      Was there any problem with her
18  winning percentage or how many horses she had in
19  the money on this occasion?
20  A.      Not to my knowledge.
21  Q.      You don't even recall that being
22  discussed; do you?
23  A.      I do not.
24  Q.      Was there any allegation of animal

Page 933

1  abuse by Ms. Mawing?
2  A.      Not that I recall.
3  Q.      Was there any allegation she did not
4  keep her stall area or barn area in proper
5  condition?
6  A.      I didn't hear of any.
7  Q.      Was there any allegation she violated
8  any rule of racing?
9  A.      Not to my knowledge.
10  Q.      Now, as I understand what you recall
11  happening based on your deposition testimony is
12  you go in the room, those four applications are
13  set aside, you go through A through Z on the
14  people that have stalls; correct?
15  A.      Correct.
16  Q.      And they're either granted more
17  stalls, reduced for some reason, or they remain
18  the same; correct?
19  A.      That's correct.
20  Q.      And then after that is done, there is
21  no discussion about Ms. Mawing or is there a
22  discussion about Ms. Mawing at that time?
23  A.      I don't recall any discussion at all.
24  Q.      The four people lost their stalls?

Page 934

1  A.      That's correct.
2  Q.      And was there any appeal available to
3  her regarding this action?
4  A.      None that I'm aware of.
5  Q.      There's nothing the track made
6  available where she could question it; challenge
7  it in any way?
8  A.      No.
9  Q.      Was she even told why her stalls were
10  taken away?
11  A.      Not by me.  I don't know if anybody
12  else did, but not by me.
13  Q.      Let me ask you another question.
14         Do you remember the hearing in
15  October of 2007 where Randy Funkhouser, his
16  occupational permit was suspended indefinitely
17  and there was a hearing in Charles Town to fight
18  that; do you remember that?
19  A.      I recall that.
20  Q.      You were present there in person at
21  that hearing; correct?
22  A.      I was there.
23  Q.      And so was Phyllis LeTart, the legal
24  Counsel for the track; do you recall her being

Page 935

1  there?
2  A.      Yes, I recall Phyllis being there.
3  Q.      Do you remember a complaint being
4  made by Tina Mawing regarding pesticide use in
5  the barn area?
6  A.      I do.
7  Q.      Tell me what you remember about that.
8  A.      She came to me, and it was in the
9  evening because I was leaving a meeting at the
10  racing office and said that she thought someone
11  had poisoned her goat and horse and that's the
12  first I had heard of it.  She said nobody was
13  responding to her.  I said I would look into it.
14  Q.      She stopped you as you were leaving
15  the track; correct?
16  A.      In the office.
17  Q.      In the office?
18  A.      Where the racing secretary's office
19  is.
20  Q.      All right.
21         I think her testimony was she stopped
22  you in the parking lot as you were leaving; is
23  that --
24  A.      No, we were in the hallway outside

Page 936

1  the racing secretary's office.  I do remember
2  that.
3  Q.      Okay.
4         And she told you she had a complaint
5  about her goat and her horse being poisoned?
6  A.      Correct.
7  Q.      Was she alleging that they were
8  deliberately poisoned by the track?
9  A.      That's all she said to me.  She said
10  she was not getting any response.
11  Q.      She never, to you anyway, alleged
12  that the track had deliberately poisoned any of
13  her animals; did she?
14  A.      No.
15  Q.      Did she ever allege to you that the
16  track strung some sort of wire in the shed row to
17  decapitate a horse?
18  A.      Not to me, no.
19  Q.      Did she make any allegation
20  whatsoever to you about any wire being stretched
21  in the shed row?
22  A.      No.
23  Q.      And did you conduct any investigation
24  about any such thing?

Page 937

1  A.      No.
2  Q.      What did you do after you talked to
3  her about the issue with the pesticides?
4  A.      I called the track superintendent.
5  Q.      Which was?
6  A.      Doug Bowling.
7  Q.      Okay.
8  A.      And asked him if he knew anything
9  about it. He said he had heard about it and
10  that's all he had done, he heard about it.
11  Q.      So he didn't tell you he had done
12  anything about it, he just heard about it?
13  A.      He just heard about it.
14  Q.      Then what did you do?
15  A.      I called the track maintenance
16  supervisor.
17  Q.      And who was that, sir?
18  A.      Rodney Walker at the time.
19  Q.      And what did you -- what discussions
20  did you have with him?
21  A.      I asked him if he was aware of it.
22  He said he had heard of it.  I had asked him if
23  there had been poison placed and he said, yes,
24  there had been, that week.

Page 938

1  **Q.      What did you do if anything else**
2  **after that discussion?**
3  A.      The next day I got a phone call --
4  the next morning I got a phone call from Danny
5  Wright.
6  **Q.      And who was Danny Wright?**
7  A.      He was the head steward at the time.
8  **Q.      Okay.**
9      **And what was that discussion?**
10  A.      It was concerning the allegations
11  about the goat and the horse being poisoned.
12  **Q.      Okay.**
13  A.      He recommended that I look into it,
14  and I told him I would.  He --
15  **Q.      Was Danny -- I'm sorry, I didn't mean**
16  **to interrupt.  Was Danny Wright aware of that**
17  **allegation or was this the first time he heard**
18  **of --**
19  A.      I have no idea.
20  **Q.      Okay.**
21      **So he did what now?  I didn't mean to**
22  **interrupt. What did he say he was doing?**
23  A.      He told me to talk to Doctor
24  Starcher.

Page 939

1  **Q.      Who is Doctor Starcher?**
2  A.      He was a state veterinarian.
3  **Q.      Did you talk to Doctor Starcher?**
4  A.      I did talk to Doctor Starcher.
5  **Q.      Can you tell me about that**
6  **discussion?**
7  A.      I asked him what he had heard and he
8  said he had heard that -- he got a phone call.
9  He didn't say from who.  That there has been
10  poison placed, and there was a sick horse and a
11  sick goat.
12  **Q.      So he had already heard that?**
13  A.      That's what he said to me.
14  **Q.      From some source, that's what he told**
15  **you?**
16  A.      That's what he said to me.
17  **Q.      Okay.**
18      **Anything further in that discussion?**
19  A.      And he asked me who the vendor was at
20  the time, and I told him it was a vendor that we
21  had used for years by the name of Ehrlich.
22  **Q.      Let me back you up.**
23      **You had used Ehrlich for years for**
24  **pest control purposes?**

Page 940

1  A.      Correct.
2  **Q.      For rat control in the barns?**
3  A.      Correct.
4  **Q.      And what type of control did they**
5  **implement over those years?  What did they do;**
6  **are you familiar with that?**
7  A.      They usually used some black box that
8  they sat along the shed or close to the tack
9  rooms.
10  **Q.      Did you ever know them to actually**
11  **use -- to spread powder not confined to any sort**
12  **of box?**
13  A.      No, I was not aware of that, no, sir.
14  **Q.      So the history of their eradication**
15  **that you're aware of is using boxes with some**
16  **sort of rodenticide in it?**
17  A.      Correct.
18  **Q.      Did you understand that Tina Mawing's**
19  **complaint was that there was powder that she had**
20  **seen that she felt was poison and that it was**
21  **related to the death of her goat and possibly her**
22  **horse?**
23  A.      I was not aware of that, no, sir.
24  **Q.      So you talked to Ehrlich?**

Page 941

1  A.      Correct.
2  **Q.      And tell us about that discussion?**
3  A.      I had asked him if he had placed
4  poison in it, and he said he had.  And I told him
5  to stop it until I had talked to -- Doctor
6  Starcher had got back to us and he said he was
7  going to talk to Doctor Starcher.
8  **Q.      Okay.**
9      **Did you -- I think I asked you in**
10  **your deposition.  Did you make any determination**
11  **whether the powder was confined to boxes or was**
12  **being spread around various areas of the barn?**
13  **That was my question.  It was at page 50 of your**
14  **deposition.  I think your answer was --**
15      MR. WOLFSON:  I'm going to
16  object.  If he's questioning the witness on -- if
17  all he's doing is reading the deposition --
18      ARBITRATOR CARNEY:  Why don't
19  you ask him what he did about the powder found,
20  ask him the same question you asked in the
21  deposition and if he answers the same way we'll
22  go on.  If he answers it differently, he's
23  impeached.
24  BY MR. WADDELL:

Page 942

1  **Q.    Who is Mr. Walker?**
2  A.    He was a track maintenance
3  supervisor.
4  **Q.    Were you told by him that this**
5  **Ehrlich rodenticide was in boxes?**
6  A.    Yes.
7  **Q.    That's what he told you in August of**
8  **2008?**
9  A.    Correct.
10 **Q.    And is that the assumption you used**
11 **when you talked to the various people you talked**
12 **to about this?**
13 A.    I seen it for myself.
14 **Q.    You saw little boxes?**
15 A.    Correct.
16 **Q.    Did you see any powder anywhere?**
17 A.    No, sir.
18 **Q.    Did you look in Barn 14?**
19 A.    14, 9, and 4 as I recall.
20 **Q.    And you, yourself, did not see any**
21 **powder?**
22 A.    No, sir.
23 **Q.    When did you look?**
24 A.    Probably it was two days later.

Page 943

1  **Q.    Did you ever -- I'm sorry, go ahead.**
2  **Was there any further discussion with Doctor**
3  **Starcher and yourself?**
4  A.    Doctor Starcher said to me that he
5  didn't think that the pesticide or whatever they
6  were using was strong enough to kill a horse or a
7  goat.
8  **Q.    And were you aware of what**
9  **information he had available to him about how the**
10 **pesticide was being administered?**
11 A.    I do not.
12 **Q.    What did you do after you talked to**
13 **Doctor Starcher?**
14 A.    I talked to Mr. Walker and I talked
15 to a gentleman by the name of Greg Demski who was
16 the supervisor for Ehrlich and told him what
17 Doctor Starcher had said and they could go ahead
18 and use the pesticide that they was using.
19 **Q.    In the form of the box?**
20 A.    Correct.
21 **Q.    Were you aware at this time around**
22 **this time frame of August 2008 that Ms. Mawing**
23 **had had a meeting with the governor where she**
24 **raised concerns about the poison in Barn 14?**

Page 944

1  A.    Did not.
2  **Q.    Nobody ever told you that?**
3  A.    No, sir.
4  **Q.    You never had a conversation with**
5  **Mr. Finamore where he said that she had made**
6  **certain allegations about poison or a wire to the**
7  **governor?**
8  A.    No, sir.
9  **Q.    You're sure?**
10 A.    Positive.
11 **Q.    Did you ever discuss Ms. Mawing's**
12 **complaints regarding rat poison with Al Britton?**
13 A.    I think I mentioned to Mr. Britton at
14 the time that I heard about the allegations that
15 I was going to look into it.
16 **Q.    Now, did he come to you and ask,**
17 **inquire about that or --**
18 A.    No, I went to him.
19 **Q.    Okay.**
20 **Did you tell him what the allegations**
21 **were?**
22 A.    I did.
23 **Q.    Did you tell him that Ms. Mawing was**
24 **contending that the track had deliberately**

Page 945

1  **poisoned her goat or horse?**
2  A.    No, I did not.
3  **Q.    Did you tell Mr. Britton that**
4  **Ms. Mawing was contending that some sort of wire**
5  **tripwire or wire was in the shed row in the barn**
6  **that was potentially being used to kill her**
7  **horse?**
8  A.    Did not.
9  **Q.    Because no one ever made that**
10 **allegation to you at the time; did they?**
11 A.    Did not.
12 **Q.    Now, in August of 2008, the criteria**
13 **being used by the stall allocation committee in**
14 **their normal evaluation of stall applications was**
15 **type of horse, how many starts, how the trainers**
16 **take care of the animal, quality of the horse,**
17 **quality of the stall area; is that correct?**
18 A.    Correct.
19 **Q.    None of that was discussed with**
20 **regard to Ms. Mawing on August 8th; was it?**
21 A.    I don't recall of any.
22 **Q.    Can you tell me of any criticism of**
23 **Ms. Mawing based on any of those criteria at any**
24 **time while she was at the track?**

Page 946

1  A.      I cannot.
2  Q.      When her stalls, four stalls were
3  taken away in April of 2008, at that time you
4  were instrumental and involved in doing that;
5  correct?
6  A.      Correct.
7  Q.      Did you feel that that was an
8  appropriate and sufficient action for the
9  infraction that was alleged at that time?
10  A.      That is kind of the policy and
11  procedure we had in place.
12  Q.      Did you think she required any
13  additional discipline or adverse action taken
14  against her based on that?
15  A.      No.
16  Q.      Do you know of anyone else since --
17  you've been at the track for how many years?
18  A.      Forty-nine (49).
19  Q.      Do you know anyone else at the track
20  who has ever had all of their stalls taken away
21  because they had one or more horses in some other
22  trainer's stalls in that entire time period
23  except for Ms. Mawing?
24  A.      I'm going back a long ways, but yes,

Page 947

1  I do.
2  Q.      Okay.
3          Tell me about it.
4  A.      There was a gentleman by the name of
5  Mr. Spears.
6  Q.      When did this occur?
7  A.      This had to occur back in the '80s.
8  Q.      Okay.
9          And what happened?
10  A.      He had stalls in another gentleman's
11  -- horses in another gentleman's stalls.
12  Q.      What happened to him?
13  A.      He lost all of his stalls.
14  Q.      Did he ever get them back?
15  A.      Yes.
16  Q.      Is that the only other occasion you
17  can remember in 49 years?
18  A.      That's the one that I can recall.
19          MR. WADDELL:  No further
20  questions. Oh, sorry.
21  BY MR. WADDELL:
22  Q.      Let me -- on August 8th, Mr. Moore --
23  I'm sorry, not August 8th, August of 2008, you
24  were certainly aware that Ms. Mawing was on the

Page 948

1  board of the HBPA; weren't you?
2  A.      I knew she was a member.
3  Q.      How long had you known that?
4  A.      That she was a member of the board?
5  Q.      Yes.
6  A.      Probably since she was elected on the
7  board.
8  Q.      Isn't that something most of the
9  management at the track would know?
10          MR. WOLFSON:  Objection.
11  He's asking the witness what others may or may
12  not know.
13          ARBITRATOR CARNEY:  He's been
14  asked if anybody else told him that they were
15  aware of it.
16          MR. WOLFSON:  That's a
17  different question.  He's asking the witness to
18  speculate there.
19  BY MR. WADDELL:
20  Q.      Did anyone else tell you that they
21  were aware that Tina Mawing was on the board?
22  A.      No.
23  Q.      Did you tell anybody that Tina Mawing
24  was on the board?

Page 949

1  A.      No.
2  Q.      Were you ever at a dinner where Al
3  Britton hosted the members of the board?
4  A.      I don't recall of any.
5          MR. WADDELL:  Okay. Thank
6  you.
7          * * *
8      C R O S S - E X A M I N A T I O N
9  BY MS. SCRIVANI:
10  Q.      I just have a couple of questions,
11  Mr. Moore. Mr. Waddell asked you about the Forest
12  Park hearing and he asked you whether you were
13  present at the hearing; do you recall that
14  testimony?
15  A.      I do.
16  Q.      Were you there the whole day?
17  A.      I was there the first day.
18  Q.      The whole day?
19  A.      No.
20  Q.      When were you present?
21  A.      In the morning.
22  Q.      Approximately, how long did you stay?
23  A.      Maybe an hour, hour-and-a-half.
24  Q.      Did you see anybody testify?

Page 950

1  A.       The Chairman of the West Virginia
2  Racing Commission.
3  Q.       Was that the only witness you saw
4  testify?
5  A.       Correct.
6  Q.       Do you recall seeing Ms. Mawing at
7  the hearing that day?
8  A.       Did not.
9  Q.       Did you see Ms. Mawing testify at the
10 hearing?
11 A.       Did not.
12 Q.       Do you know as you sit here today
13 whether or not Ms. Mawing testified at that
14 hearing?
15 A.       Do not.
16 Q.       Do you know how long Ms. LeTart
17 stayed at the hearing?
18 A.       I do not.
19           MS. SCRIVANI:  Nothing
20 further.
21           ARBITRATOR CARNEY:  Al, do
22 you have any questions?
23           ARBITRATOR KARLIN:  No, I
24 don't.

Page 951

1            ARBITRATOR CARNEY:  Bill?
2            ARBITRATOR WYCOFF:  No
3  questions.
4            ARBITRATOR CARNEY:  Anything
5  more?
6            MR. WADDELL:  I have nothing
7  further.
8            ARBITRATOR CARNEY:  Mr.
9  Moore, you may be excused.
10           MR. WOLFSON:  Thank you,
11 Dick.
12           ARBITRATOR CARNEY:  Now,
13 Mr. Wolfson, you rested?
14           MR. WOLFSON:  Yes, we rested
15 before.
16           ARBITRATOR CARNEY:  And you
17 have a further rebuttal witness?
18           MR. HAMMER:  Yes, we have one
19 short piece of testimony.
20           ARBITRATOR CARNEY:  We're
21 taking a short break here.
22           MR. HAMMER:  No, we can go
23 ahead.
24           * * *

Page 952

1           TINA MAWING
2  having been previously first duly sworn, was
3  examined as follows:
4           * * *
5       R E B U T T A L
6  BY MR. HAMMER:
7  Q.       Ms. Mawing, you heard the testimony
8  of Al Britton about his knowledge or lack thereof
9  of you being a member of the board?
10 A.       I did.
11 Q.       Was there occasion when you were
12 invited to a dinner during contract -- back
13 during the time period of contract negotiations
14 over the 2009 contract?
15 A.       It was slightly prior to that, so it
16 was right before we entered into negotiations.
17 The 2007 referendum for table games was defeated.
18 So in early 2008, I want to say February/March
19 Albert hosted a dinner in the Epic Buffet at the
20 Charles Town Casino for HBPA Board Members only.
21 Q.       And did you attend?
22 A.       I did.
23 Q.       And did you sit -- where did you sit
24 during that dinner?

Page 953

1  A.       Right next to Albert.
2  Q.       Did you introduce yourself?
3  A.       Of course.  I mean he knew me.  It
4  was hi Al. Hi Tina, how are you?  But it was only
5  board members present.
6            MR. HAMMER:  Thank you.
7  No further questions.
8            MR. WOLFSON:  No questions.
9            ARBITRATOR KARLIN:  No
10 questions.
11           ARBITRATOR WYCOFF:  No
12 questions.
13           ARBITRATOR CARNEY:  Okay.
14 The witness may be excused.
15       Let's go off the record for a moment
16 and talk.
17           ARBITRATOR KARLIN:  Did you
18 have something for the record?
19           MR. WOLFSON:  Well, we still
20 have our exhibits to finalize.  I didn't want
21 that to be overlooked.  Do you want to do it now
22 or do you want to go off the record and do it
23 when we come back on?  Whatever you prefer.
24           ARBITRATOR CARNEY:  Let's go

Page 954

1  off the record.
2         * * *
3         (Whereupon, a discussion was
4  held off the record.)
5         * * *
6         ARBITRATOR CARNEY:  Back on
7  the record.
8         MR. WOLFSON:  Do you just
9  want to tell him those are the pages?
10        MR. HAMMER:  I'm just going
11 to tell you the pages.
12        ARBITRATOR KARLIN:  Are you
13 going to tell us to only read those or do you
14 want us to pay particular attention?
15        MR. HAMMER:  No, this is what
16 I've picked out to use that I felt was important,
17 Al, but we're going to submit the entire thing
18 and we may designate other pages.
19        ARBITRATOR KARLIN:  Now, what
20 about, just for my clarification, was Moore's
21 deposition was designated previously.  Do you
22 still want Moore's deposition in?
23        MR. WOLFSON:  Yes.  They
24 admitted it.

Page 955

1         ARBITRATOR CARNEY:  Okay.
2  It's been admitted previously.
3         MR. HAMMER:  It might be
4  better if we did this actually read it into the
5  record.  What is the preference?  Does the panel
6  have a preference?
7         ARBITRATOR WYCOFF:  We're
8  going to be reading it anyway, so just tell us
9  the pages.
10        MR. HAMMER:  All right.  I'm
11 going to tell you Page 82, Randy Wehrman, he's
12 the secretary who was at the August 2008 meeting.
13 He says as far as he remembers --
14        MR. WOLFSON:  If you're
15 summarizing, I'm going to object to that.  Now
16 you're arguing what the testimony is and the
17 relevance.  It's a difference.  That's the only
18 thing.
19        ARBITRATOR CARNEY:  Why don't
20 you give us the page number?
21        MR. WOLFSON:  I have no
22 problem with that.
23        ARBITRATOR CARNEY:  We're
24 going to read the deposition, but we're going to

Page 956

1  be specifically directed to these pages.
2         MR. HAMMER:  Okay.
3         Just my only concern was we're going
4  to get into arguments here at some point.  My
5  position is we should just submit Findings of
6  Fact, Conclusions of Law and make all of
7  arguments at that point in time.  If we're going
8  to have a little argument here at the end, I want
9  this information available.
10        ARBITRATOR KARLIN:  Well, but
11 if you're going to have a little argument here at
12 the end, excuse me, Jim, you can say that in the
13 little argument at the end.
14        MR. HAMMER:  Okay.  I will.
15        ARBITRATOR KARLIN:  But give
16 us the pages now.
17        MR. HAMMER:  I understand,
18 Mr. Karlin.  I understand.
19        The problem with these arguments is
20 we have depositions we're submitting that you
21 haven't had an opportunity to read.
22        ARBITRATOR CARNEY:  Let's go
23 off the record.
24        * * *

Page 957

1         (Whereupon, a discussion was
2  held off the record.)
3         * * *
4         ARBITRATOR CARNEY:  I think
5  what we are going to do is set a timetable, and
6  I'll ask the court reporter how long it will take
7  her to produce or her group to produce a
8  transcript.
9         COURT REPORTER:  I would say
10 at least two weeks.
11        ARBITRATOR CARNEY:  Now,
12 measuring from the date that the court reporter
13 produces the transcript, I recognize that you may
14 or may not order one, but we use the date of
15 production, how long do we want for initial
16 briefs, which we like to have simultaneously?
17        MR. HAMMER:  Twenty (20) days
18 if that's agreeable.
19        MR. WOLFSON:  Well, how do we
20 want to do it, simultaneous?
21        MR. HAMMER:  Simultaneous.
22        ARBITRATOR WYCOFF:  We would
23 prefer simultaneously, and then each side reply.
24        MR. WOLFSON:  That's what I

Page 958

1 was going to ask about, exactly. I think that
2 makes the most sense in these kinds of
3 situations. Simultaneous, so 20 days for the --
4          MR. HAMMER: Post receipt of
5 the transcript.
6          MR. WOLFSON: Okay. Let's
7 figure this out.
8          ARBITRATOR WYCOFF: So let's
9 say 20 days. That takes us to the 4th of July
10 weekend almost.
11          MR. WOLFSON: Well, it would
12 be 20 days from when we get the transcript.
13          ARBITRATOR WYCOFF: Oh, so
14 two weeks from now is the 26th, let's say 27th of
15 June.
16          MR. WOLFSON: Something like
17 that.
18          MR. HAMMER: My suggestion is
19 not to set the actual date, just to set the key
20 events.
21          MR. WOLFSON: Yes, yes. No,
22 I'm just trying to think --
23          ARBITRATOR WYCOFF: Well, I'm
24 just trying to think through when it's going to

Page 959

1 be because some of us have vacations out of town
2 and we then have a time limit when we have to get
3 our opinion in, and we want to make sure we're
4 within the proper time frame.
5          MR. WOLFSON: Unless the
6 parties agree to suspend that.
7          MR. HAMMER: Which we can
8 easily do.
9          MR. WOLFSON: I think that
10 makes sense.
11          MR. HAMMER: If it falls on
12 vacation, we'll work with you.
13          MR. WOLFSON: How about this,
14 do we want to say assuming it's two weeks or
15 assuming we get it by the end of the month, I
16 know I have vacation in the early part of July, I
17 don't know what you guys are doing.
18          MR. HAMMER: I have a week in
19 July myself.
20          MR. WOLFSON: Right. Do we
21 want to say simultaneous can we say by the end of
22 July let's say July 30, 31st? What is that day
23 of the month? The 31st is what?
24          MS. SCRIVANI: Wednesday.

Page 960

1          MR. WOLFSON: Wednesday, so
2 the 31st, assuming that's okay with the panel?
3          ARBITRATOR WYCOFF: Of July?
4          MR. WOLFSON: Yes, for the
5 initial submission?
6          ARBITRATOR WYCOFF: For
7 initial submission.
8          MR. WOLFSON: Is that okay
9 with you folks?
10          ARBITRATOR WYCOFF: Okay.
11 And then you want what, two weeks, three weeks?
12          MR. WOLFSON: I don't think
13 three weeks, no.
14          MR. HAMMER: Fifteen (15)
15 days?
16          MR. WOLFSON: Pardon?
17          MR. HAMMER: Due 15 days?
18          MR. WOLFSON: Yes, I was
19 going to say two weeks.
20          ARBITRATOR WYCOFF: I leave
21 the 15th of August for 10 days.
22          ARBITRATOR CARNEY: Why don't
23 we do this? Why don't we say that the initial
24 brief will be July 31st? The response brief will

Page 961

1 be August 31st. Will that get us through
2 everybody's vacation schedule?
3          MR. WOLFSON: That's fine.
4 That's certainly more time than we need but it
5 doesn't kick off your time yet.
6          ARBITRATOR CARNEY: And
7 August 31st will be the deadline for us to get an
8 award or start our deadline.
9          ARBITRATOR WYCOFF: No, no,
10 September, September 31st.
11          ARBITRATOR CARNEY: Yes,
12 start the deadline. Yes, 30 days from August
13 31st.
14          MR. WOLFSON: That's fine. I
15 think that makes perfect sense.
16          ARBITRATOR CARNEY: I
17 recognize we may not need all this time but it
18 seems to be the best way to avoid interfering
19 with anybody's summer vacation.
20          MR. HAMMER: The Claimant
21 agrees with the schedule.
22          MR. WOLFSON: Yes, and so
23 does Respondent for the record.
24          ARBITRATOR WYCOFF: Now, are

Page 962

1  we clear as to what depositions we're supposed to
2  be reading? Are there any depositions in these
3  books that we're not reading?
4          ARBITRATOR CARNEY: Well, we
5  don't have to read Britton's deposition if I
6  understand it.
7          MR. WOLFSON: Or Finamore.
8          ARBITRATOR CARNEY: Because
9  he's testified under oath and you all have asked
10 him the questions you wanted to ask him.
11         MR. WOLFSON: The same with
12 Finamore, as I understand it, you folks marked
13 that one.
14         MR. HAMMER: Well, Finamore,
15 we played the video, so however you want to do
16 it.
17         ARBITRATOR CARNEY: Yes,
18 that's on the record.
19         MR. WOLFSON: I forgot. I
20 stand corrected. Anything other than Britton.
21         ARBITRATOR KARLIN: So
22 Britton is the only one we're crossing off, well,
23 except for Finamore because we heard it.
24         MR. WOLFSON: Right.

Page 963

1          ARBITRATOR WYCOFF: Well,
2  it's in the record.
3          MR. WOLFSON: Right. One way
4  or another.
5          ARBITRATOR CARNEY: Okay.
6          MR. WOLFSON: We need to go
7  through all our exhibits.
8          ARBITRATOR WYCOFF: Now, are
9  you talking about July 31st, are you planning to
10 file Findings of Fact and Conclusions of Law or
11 just a brief arguing the facts and the law for
12 us?
13         MR. WOLFSON: Findings. I
14 anticipate Findings of Fact and Conclusions of
15 Law. Is that the most helpful thing for you?
16         ARBITRATOR CARNEY: It's up
17 to you what you want to do. I think we can
18 operate with a brief if you want to go that
19 route, but if you want to file Findings of Fact
20 and Conclusions we're not prohibiting you from
21 doing so.
22         MR. WOLFSON: Okay.
23         MR. HAMMER: So it's just the
24 exhibits then.

Page 964

1          MR. WOLFSON: Yes.
2          ARBITRATOR CARNEY: Well,
3  let's go through the exhibits for the Respondent,
4  and Ms. Scrivani, what I'm going to ask you to do
5  is to tell us what exhibits you want to put in
6  and we'll hear objection from you if you have any
7  objections. If you don't we'll consider the
8  exhibits admitted. We're going to do it that way
9  because there's a long list of exhibits, very few
10 of which have been referred to, so I think it's
11 probably easier to get a positive indication
12 rather than checking for each one.
13         MS. SCRIVANI: Exhibits 69-B
14 and C, which were the summary exhibits regarding
15 stall invoices and damages issues.
16         ARBITRATOR WYCOFF:
17 Sixty-nine (69)?
18         MS. SCRIVANI: B, as in boy,
19 and C, as in cat.
20         ARBITRATOR WYCOFF: Okay.
21         ARBITRATOR CARNEY: Any
22 objection?
23         MR. HAMMER: B is agreed and
24 C is agreed.

Page 965

1          MS. SCRIVANI: Exhibit 35,
2  which is -- 35 and 36, which are the Ratchford
3  invoices.
4          MR. HAMMER: No objection.
5          MS. SCRIVANI: And Exhibit
6  25, which was the racing record.
7          MR. HAMMER: Did we use that?
8  Was that used?
9          MS. SCRIVANI: Yes, we did
10 use that at the end of Ms. Mawing's testimony.
11         MR. HAMMER: Okay.
12         MR. WOLFSON: And then
13 Exhibits 46 through 51, which are the invoices of
14 the other owners that were provided.
15         ARBITRATOR CARNEY: Forty-six
16 (46) through 51?
17         MS. SCRIVANI: Yes.
18         MR. HAMMER: No objection.
19         MS. SCRIVANI: I think that's
20 it.
21         ARBITRATOR WYCOFF: You're
22 not submitting the deposition of Anthony Mawing?
23         ARBITRATOR CARNEY: You read
24 the sections --

Page 966

1    MR. WOLFSON:  We read
2  portions from it.
3    ARBITRATOR WYCOFF:  But
4  you're not giving the whole thing?
5    MR. WOLFSON:  No.
6    ARBITRATOR CARNEY:  If I
7  understood what you did yesterday was you read
8  into the record portions of the deposition that
9  you had taken which you wanted to call our
10  attention to.  So as long as we're looking at the
11  record we won't have to look at the deposition.
12    MS. SCRIVANI:  Right.
13    MR. WOLFSON:  That included
14  Mr. Hale's deposition as well taken in this case.
15    MR. HAMMER:  I think that's
16  it for the Claimant.
17    ARBITRATOR CARNEY:  Okay.
18  Well, we'd like to thank you all.  It looks
19  like --
20    ARBITRATOR WYCOFF:  Excuse
21  me; there was Exhibit 71 and 72.
22    MR. WOLFSON:  I thought I
23  introduced those.  I thought I moved those.
24    MS. SCRIVANI:  Yes, I thought

Page 967

1  they --
2    ARBITRATOR WYCOFF:  We'll go
3  over and make sure everything has been put in.
4    MR. WOLFSON:  Yes, there was
5  the Barr deposition transcript that I had marked
6  as well as --
7    MR. HAMMER:  The Hammer
8  email.
9    ARBITRATOR CARNEY:
10  Seventy-two (72) is the email.
11    MR. WOLFSON:  And our 70 was
12  the transcript from the injunction hearing which
13  was admitted over objection.  Seventy-one (71)
14  was --
15    MS. SCRIVANI:  We just did
16  it.  That was the email.
17    MR. WOLFSON:  Oh, 71 was the
18  email.
19    MS. SCRIVANI:  No, I'm sorry,
20  71 was Barr.
21    ARBITRATOR CARNEY:  No, 72 is
22  the email.
23    MR. WOLFSON:  Seventy-one
24  (71) was Barr, the transcript of Barr.

Page 968

1  Seventy-two (72) was the email, right, and those
2  were admitted as well.
3    ARBITRATOR CARNEY:  Anything
4  else?
5    ARBITRATOR WYCOFF:  Thank
6  you.
7    ARBITRATOR KARLIN:  Thank
8  you.
9    ARBITRATOR CARNEY:  Thank
10  everybody for your participation and a fine
11  presentation by both sides.
12    * * *
13    (Whereupon, this arbitration
14  hearing was concluded at 3:15 p.m.)
15    * * *
16
17
18
19
20
21
22
23
24

Page 969

1  THE STATE OF  :
   WEST VIRGINIA :
2     :  SS: C E R T I F I C A T E
   COUNTY OF OHIO :
3
       I, DEBRA A. VOLK, Professional Court
4  Reporter, duly commissioned and qualified, do
   hereby certify that the within-named witnesses
5  were called upon to testify in the within matter
   of arbitration and that the tesitmony then given
6  by them was by me reduced to stenotype in the
   presence of the witnesses; afterwards reduced to
7  Computer Aided Transcription under my direction
   and control; that the foregoing is a true and
8  correct transcript of the testimony so adduced
   during the trial of the within cause.
9
       I do further certify that this
10 testimony was taken at the time and place in the
   foregoing caption specified, and was completed
11 without adjournment.
12     I do further certify that I am not a
   relative, counsel or attorney of either party, or
13 otherwise interested in the event of this action.
14     IN WITNESS THEREOF, I have
   hereunto set my hand and affixed my seal of office
15 at Wheeling, West Virginia, on the 1st day of
   July, 2013.
16
17
18  DEBRA A. VOLK
    Notary Public within and for
19  the State of Ohio
20
21
22
23
24

27228234-391e-4c3e-a268-37fe29e9a583

Page 970

```
 1   THE STATE OF   :
     WEST VIRGINIA  :
 2               : SS: C E R T I F I C A T E
     COUNTY OF OHIO  :
 3
 4
           I, DEBRA A. VOLK, Notary Public within
 5   and for the State of West Virginia, duly
     commissioned and qualified, do hereby certify
 6   that the within-named witnesses were by me duly
     sworn to testify to the truth, the whole truth
 7   and nothing but the truth in the cause aforesaid.
 8
 9
           I do further certify that I am not a
10   relative, counsel or attorney of either party, or
     otherwise interested in the event of this action.
11
12
13         IN WITNESS THEREOF, I have hereunto set
     my hand and affixed my seal of office at
14   Wheeling, West Virginia, on the 1st day of July,
     2013.
15
16
17
18        _____
          DEBRA A. VOLK, Notary Public
19        within and for the State of
          West Virginia
20
21
     My Commission expires:
22   July 25, 2015
23
24
```