# EXHIBIT 2
# Pages 1 - 570

## A G R E E M E N T

THIS AGREEMENT, made and entered into this as of the 21st day of December, 2004, by and between PNGI CHARLES TOWN GAMING LIMITED LIABILITY COMPANY, a West Virginia Limited Liability Company (hereinafter "Charles Town Races"), and CHARLES TOWN HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC., a West Virginia not-for-profit corporation (hereinafter "HBPA").

### W I T N E S S E T H:

WHEREAS, Charles Town Races is licensed by the West Virginia Racing Commission, pursuant to Chapter 19, Article 23-1, et seq., of the West Virginia Code, to conduct live thoroughbred horse racing with pari-mutuel wagering and, in accordance with that licensure, Charles Town Races owns and operates a thoroughbred racing facility under the trade name Charles Town Races (hereinafter the physical facility will be referred to as the "Racetrack"); and

WHEREAS, the HBPA is an Association comprised of owners, trainers and owner-trainers (the "members") of thoroughbred racing horses; and

WHEREAS, the HBPA provides benevolent programs and other services for its members and their employees who are engaged in live thoroughbred racing at the Racetrack; and

C-1

WHEREAS, the parties desire to reaffirm their mutual interest in the promotion, preservation, and enhancement of live thoroughbred racing at the Racetrack; and

WHEREAS, the parties hereto reaffirm their support for quality live thoroughbred racing activities and reaffirm their desire to the promotion of such activities in the State of West Virginia; and

WHEREAS, Charles Town Races acknowledges that the HBPA is the exclusive bargaining agent and representative of its members, as certified by the West Virginia Racing Commission. Charles Town Races shall only negotiate with the exclusive bargaining agent and representatives of the Horsemen as certified by the West Virginia Racing Commission during the term of this Agreement and any amendments thereto or any Agreement which shall supersede this Agreement for the provision of services in connection with live thoroughbred racing activities, safety and back stretch conditions; and

WHEREAS, the parties hereto desire to memorialize and set forth in writing the contractual agreements by and between Charles Town Races and the HBPA concerning live thoroughbred racing at the Racetrack.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties desire to be legally bound, do agree as follows:

2



C-1

1.   **Term of Agreement.**  This Agreement shall become effective as of January 1, 2005, and shall remain in full force and effect until December 31, 2007 (the " Initial Term"). At the end of the Initial Term, the term of this Agreement shall automatically be extended under the same terms and conditions for a period of one (1) year (hereinafter the "First Extension Term") unless either party shall give notice to the other party, in writing, of its intent to terminate the Agreement not later than September 30, 2007. At the end of the First Extension Term, the term of the Agreement shall automatically be extended under the same terms and conditions for a period of an additional one (1) year (hereinafter the "Second Extension Term"), unless either party shall give notice to the other party, in writing, of its intent to terminate the Agreement not later than September 30, 2008.

2.   **Exclusive Representation.**  The HBPA is currently recognized by the West Virginia Racing Commission to be the duly qualified and exclusive representative of the owners, trainers, and owner-trainers of live thoroughbred horse racing at the Racetrack as certified by the West Virginia Racing Commission. Charles Town Races shall only negotiate with the exclusive bargaining agent and representative of the Horsemen as certified by the West Virginia Racing Commission. Any negotiation or discussion of the terms and provisions of this Agreement, or any amendment thereto, or any Agreement which shall supersede the terms and provisions of this Agreement with any person, entity or representative of an entity

3

that is not the exclusive bargaining agent and representative of the Horsemen, as certified by the West Virginia Racing Commission, shall constitute a breach of this Agreement.

Charles Town Races does agree that it shall negotiate with and conduct any and all business which is the subject of this Agreement and any matters reasonably related to any provision of this Agreement with the duly elected officers of the HBPA or their duly designated representatives.

The HBPA does agree that it shall provide to Charles Town Races, in writing, on an annual basis, the name and address of each and every duly elected member of the Board of Directors, the name and address of each duly elected officer of the HBPA who shall have the authority to negotiate with the Charles Town Races, and the name and address of each representative duly designated by the Board of Directors of the HBPA to negotiate on its behalf.

3.  <u>Racing Schedule</u>.  During the term of this Agreement, Charles Town Races shall each year request a license from the West Virginia Racing Commission to conduct racing, and in fact conduct racing, for not less than the minimum number of days required by the West Virginia racing statute, which is currently two hundred ten (210) days per year.  Charles Town Races shall provide a copy of it's Annual License Application filed with the West Virginia Racing Commission to the HBPA within three (3) days of the date of its filing.  Notwithstanding the first sentence of this paragraph, it is understood and agreed that, subject to receiving approval

4



C-1

from the West Virginia Racing Commission, Charles Town Races shall schedule a total of 245 racing days, with not less than 10 races per racing day, during 2005.   In the event racing days are cancelled due to weather, track conditions, unavailability of horses or any other reason beyond the reasonable control of Charles Town Races, any such cancellation and the fact that 245 racing days are not held, shall not be considered a breach of this Agreement.

Within seven (7) days of cancellation of a race day, Charles Town Races shall reschedule such race day and provide notice to the HBPA of the rescheduled date to the extent necessary to achieve the minimum number of racing days required by the West Virginia racing statute.   Charles Town Races agrees, subject to availability of horses, to program no less than the minimum number of races per day for not less than the minimum number of days per year, as required under applicable law for the remaining months of the year.

Charles Town Races agrees that it will not discontinue racing for a period of more than one (1) three (3) week period in any calendar year, unless agreed upon by the HBPA, except in the event of an act of God or other catastrophe, or conditions beyond the reasonable control of Charles Town Races.

4.   <u>Minimum Purse and Purse Scheduling.</u>

A.   <u>Minimum Daily Purses.</u>  The daily minimum purse schedule payable by Charles Town Races during the term of this Agreement shall be not less than One Hundred Twenty-five Thousand Dollars ($125,000.00) per day, except as provided herein below.  It

5



is mutually agreed that, as far as possible and consistent with the foregoing, the principle of "better purse for better horses" shall be followed in establishing the purse payable for any one race. Charles Town Races further agrees that, if necessary, better purses will be reduced to maintain minimum purse schedules. Charles Town Races may increase or decrease the purse schedule each year by up to 20%. The daily purse schedule as of January 1, 2005, is deemed to be One Hundred Eighty-five Thousand Dollars ($185,000.00) as an average for each Condition Book. Any increase or decrease in the purse schedule of more than twenty percent (20%) during any calendar year shall be subject to the approval of HBPA, which approval shall not be unreasonably withheld or unduly delayed. Except as provided below with respect to Stake Races, Charles Town agrees to pay purses back through not less than six (6) places.

B. __Purse Schedule Distribution__. Charles Town Races and HBPA will establish and publish a purse schedule distribution, which shall show the purse distribution planned for various classes of horses at various distances. Such schedule shall be updated as necessary. Said schedule with any amendments thereto shall be posted in the Racing Secretary's office. In the event of a purse schedule distribution decrease, the purses for bottom claiming races shall not be reduced unless the purses for all races are also reduced (though not necessarily by the same percentage).

At such time as the Underpayment Money reaches One Million Dollars ($1,000,000.00) or below, Charles Town Races and HBPA shall



6

C-1

mutually agree to decrease the daily purse distribution in an attempt to avoid an overpayment.

C. **Stakes Schedule.** Each year purses for Stake races shall not exceed, in the aggregate, eight percent (8%) of the total purses paid, from the purse account, in the immediately preceding calendar year excluding the amounts paid for stake races and amounts received for sponsorship of races unless otherwise authorized by the HBPA. Charles Town Races shall determine the number of and purses for stake races and submit the stakes schedule to HBPA for written comment prior to submission of the stakes schedule to the West Virginia Racing Commission.

D. Charles Town Races agrees to pay purses for Stakes Races back through not less than five (5) places.

E. It is understood by both parties that purse schedules shall not be in conflict with the rules of racing of the West Virginia Racing Commission as presently constituted or as may be amended.

F. **West Virginia Accredited Races.** Charles Town Races shall include in its Conditions Book a minimum of one (1) race on every live racing day devoted exclusively for West Virginia accredited horses unless sufficient horses and purse funds are not available therefore, in accordance with the requirements of the West Virginia Racing Commission pursuant to the provisions of §19-23-13(b) of the West Virginia Code. Races devoted exclusively for

7



West Virginia accredited horses shall be run if no less than seven (7) betting interests have been entered therein.

5.   **Purse Funds**.

A.   During the term of this Agreement, Charles Town Races shall allocate and pay purse moneys as provided by state law, including any additional percentage of the mutuel handle which may be legislated and incorporated into the West Virginia Code during the period of this Agreement, if specifically legislated for purses.

B.   In the event any Underpayment Money exists in the purse account at the end of any calendar year, then said Underpayment Money shall be added to the sum available for the payment of purses for the next year.

C.   This is the Agreement regarding the proceeds from video lottery terminals as provided in West Virginia Code §29-22A-7(a) (6).

6.   **Revenue from Off-Track Betting, Telephone Wagering, Table Gaming, or any other form of Gaming**.   In the event additional revenue or payments from telephone wagering, off-track betting, table gaming, or any other form of gaming of any kind or nature is available as a result of legislation, the percentage distribution as set forth in the legislation shall determine the party's interest in such additional revenue.   In the event there is no division of revenue in the statutory legislation, the parties agree

8

C-1

to negotiate in good faith whether a division of revenue is to occur and if so, the amount thereof.

7.  **Condition Book.**  HBPA represents that it has created a Condition Book Committee to consult with Horsemen concerning the conditions of racing and to make known to Charles Town Races the results of their consultations.  Charles Town Races agrees that this Committee shall have the right to meet with appropriate Charles Town Races personnel to discuss and approve each Condition Book at least seventy-two (72) hours before printing in order to permit Committee review, suggestions, and recommendations.  Charles Town Races shall make an effort to comply with the Committee's suggestions and recommendations.

8.  **Horsemen's Bookkeeper.**  A Horsemen's Bookkeeper shall be employed by Charles Town Races and shall be subject to the policies generally applicable to Charles Town Races' employees.  The Horsemen's Bookkeeper shall perform those functions set forth from time to time by statute and the West Virginia Rules of Racing, and Charles Town Races shall provide such equipment as shall be reasonably necessary for the performance of the Horsemen's Bookkeeper's statutory duties.

9.  **Segregated Bank Accounts.**  The following bank accounts shall be maintained by Charles Town Races in a bank approved by the West Virginia Racing Commission.  Currently, the approved bank is United Bank.

A.   **Purse Account.**   Charles Town Races shall establish and maintain a separate overnight investment account and a separate checking account into which all monies received for the future payment of purses are to be deposited.   All disbursements from these accounts shall be solely for the payment of earned purses and such other disbursements as may be authorized by law or as otherwise directed by the West Virginia Racing Commission.   All interest earned on this Purse Account shall be added to the funds available for the payment of purses.   These accounts shall be subject to inspection and audit by the Racing Commission at any time.   The HBPA shall also be permitted to review these accounts upon request during normal business hours.

B.   **Horsemen's Trust Accounts.**   Charles Town Races shall establish and maintain a separate investment account (the "Horsemen's Investment Account") and a separate checking account (the "Horsemen's Daily Account") (collectively hereafter the "Horsemen's Trust Accounts") into which the Horsemen's Bookkeeper shall receive, maintain and disburse the purses of each race and all stakes, entrance money, jockey fees, purchase money in claiming races, along with all applicable taxes and other monies that properly come into the Horsemen's Bookkeepers' possession in accordance with the provisions of the Racing Commission Rules.

All of the funds in Horsemen's Trust Accounts are recognized as being trust funds held for the benefit of all of the

C-1

respective account owners, as reflected by the records maintained by the Horsemen's Bookkeeper.

Charles Town Races agrees to transfer from the Purse Account and deposit into the Horsemen's Daily Account the full amount of daily earned purses within two (2) business days. Purse winnings will be posted within two (2) business days and made available to the earners thereof when the race results are declared official, i.e. once drug test results have been received; provided further, however, that in the event of any dispute as to the result of a race due to a drug test or other regulatory inquiry, the purse money shall not be made available to the earners thereof until there has been a final non-appealable resolution thereof by the Charles Town Races Stewards, the West Virginia Racing Commission, or a court of competent jurisdiction, as the case may be.

The Horsemen's Bookkeeper will deduct from the owner ledger accounts, jockey fees, pony fees, valet fees, track lasix fees, nomination fees, entry fees, starting fees, valet pool, photographs, veterinary lasix charges, and sales tax on claiming amounts. No other deductions shall be made by the Horsemen's Bookkeeper unless requested in writing by the person, persons or entities to whom such monies are payable, or to his, her or its duly authorized representative, or as required by order of the Charles Town Races Stewards, the West Virginia Racing Commission, or a court of competent jurisdiction. Notwithstanding the preceding clause, nothing herein shall be construed as requiring

11



the Horsemen's Bookkeeper to provide personal accounting services to any horseman and/or the payment of any expenses of any horsemen not contemplated by the provision of this paragraph, even if authorized in writing.

The Horsemen's Trust Accounts shall be subject to inspection by the Racing Commission at any time and may be examined by the President of the HBPA or his or her duly designated representative at the offices of Charles Town Races at such reasonable time or times as shall be determined upon the mutual agreement of Charles Town Races and the HBPA.   Such consent shall not be unreasonably withheld.

The interest earned on monies invested in the Horsemen's Investment Account will be transferred to the Horsemen's Daily Account and paid to Charles Town Horsemen's Welfare & Benefit Trust.

10. Racing Committee/Arbitration.

A.   Charles Town Races and the HBPA shall organize and maintain a joint committee (hereinafter the "Racing Committee") to address issues related to and associated with live thoroughbred racing at the Racetrack.   The HBPA and Charles Town shall each appoint three (3) representatives to the Racing Committee.   This Committee shall meet at the request of any member of the Racing Committee.   The Racing Committee shall have no authority to alter the terms and conditions of this Agreement.

B.   Arbitration.   In the event there is a disagreement between the parties as to whether any party has complied with the terms or conditions in this Agreement, then Charles Town Races and the HBPA shall each choose an Arbitrator and the two Arbitrators shall choose a third Arbitrator.   The Board of Arbitrators shall decide the issues involved and each party agrees to be bound by the decision of the arbitration panel.

11.   **Stalls.**

A.   Charles Town Races shall make available a minimum of 1,148 stalls, free of charge, to Horsemen each race meeting.   It is recognized by both parties that effective stall utilization is important to Charles Town Races management and that equitable allocation is essential to the livelihood of Horsemen.   During the Initial Term of this Agreement, Charles Town Races agrees that it will not tear down or demolish the existing Charles Town stalls unless required to do so as a result of governmental order or an act of God beyond the reasonable control of Charles Town Races.

B.   Charles Town Races shall not discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls.   Subject to this limitation, the allocation of stalls shall be in the discretion of Charles Town Races.

C.   Charles Town Races shall establish a cut-off date for stall applications.   Charles Town Races shall make every effort to provide Horsemen with five (5) days prior notice of the

13

C-1

acceptance or rejection of stall applications and may demand immediate confirmation from the Horsemen of their intent to use allotted stalls.

D.   The terms and conditions for all stall applications shall be determined by and set forth in an application by Charles Town Races.  Charles Town Races shall send to the HBPA, not later than ten (10) days prior to the first day of each Race Meeting, a copy of its current Stall Application Agreement.

E.   Charles Town Races agrees to provide stall and shed row area with proper fill within a reasonable time period, upon written request of HBPA.

12.  **Barn Area.**

A.   Barn area will be available to Horsemen at all times and the Racetrack will be available to Horsemen during scheduled training times (including scheduled training times during the period racing is discontinued).

B.   HBPA recognizes an obligation of Horsemen and backside personnel to maintain the stable area in a sanitary condition, free from litter and other foreign objects.  HBPA will use its best efforts to ensure that Horsemen and their employees fulfill their obligations in this regard.  Horse washing will only be permitted in certain areas designated by Charles Town Races for such purposes.  This provision has been made mandatory by the Rules of the West Virginia Department of Environment Protection.  Charles Town Races retains its right to discipline (including removal)

14



C-1

Horsemen or their employees who fail to obey Charles Town Races' published rules and regulations.

C.     Charles Town Races shall maintain all barn area restroom facilities in a safe and healthy environment.

D.     During winter months, Charles Town Races agrees to maintain both main roads leading to and from the Racetrack, between all barns and all Horsemen parking lots, for both training and racing purposes.   Charles Town Races further agrees to make necessary repairs to the backside and stall areas as Charles Town Races considers appropriate giving consideration to any input provided by the HBPA.

E.     Charles Town Races agrees to remove all manure from the barn area at no cost to the Horsemen.

F.     Charles Town Races in conjunction with the HBPA shall establish Barn Area Rules and Regulations for the purpose of promoting safety and security on the backstretch, which shall remain in full force and effect and shall be binding upon the parties pursuant to their own terms and provisions during the term or terms of these agreements.

13.   **Racing Surfaces.**

A.     The Track Surface Committee, consisting of two Horsemen, two jockeys (appointed by their respective associations), the Charles Town Races Superintendent, at least one steward, and a representative of Charles Town Races, shall meet pursuant to a published schedule to assess track surface conditions.   Charles

15



C-1

Town Races shall maintain the Racetrack as it determines to be appropriate giving consideration to input provided by the Track Surface Committee.

B.    Trainers shall have the right to enter onto the Racetrack for the purpose of determining the safety of the racing surface.

14.  <u>Racetrack Facilities</u>.  The racing strip, the barns, and related backside facilities at the Racetrack (collectively known as the "backside facilities") necessary for training purposes shall be made available by Charles Town Races without charge to Horsemen who have horses training for the immediate upcoming live race meet. Charles Town Races will, at its own expense, make water, hot water, tack room heating, and electricity available to each barn in use and keep the racing surface harrowed and watered.

The racing strip, barns, tack rooms and other facilities of Charles Town Races useful for training purposes, shall be made available for Horsemen approved by Charles Town Races, without charge.  Charles Town Races agrees that these facilities shall be made available to Horsemen during reasonable hours for training purposes, subject to weather conditions.

At least thirty (30) days written notice shall be given to the HBPA of any intended shut-down of the Racetrack.  Included with such notice shall be the date of closing, the date of re-opening, and any plans concerning the availability of stalls in the stable area during the shutdown.  The notice period shall be calculated



from the last scheduled race meeting day of the then current race meeting.

15. **New Training Facility**. Charles Town Races has agreed to construct a new training track. The training track shall be a minimum 3/8 of a mile in length with a width of 45 feet. However, Charles Town Races acknowledges the HBPA's desire for a longer training track. The track surface shall be the same as the track surface on the Charles Town track after the resurfacing project. There shall be a chute with a small starting gate together with a necessary crew of not less than three (3) individuals for training purposes only as well as a warning system for loose horses. An outrider during training hours, a general shack for trainers and proper guards to manage the facility shall likewise be provided. Charles Town agrees to provide the HBPA's consultant with a copy of the design plans for review.

In connection with the training track, three (3) new barns for approximately two hundred forty (240) horses with not less than two washing stalls per barn shall be constructed.

Until such time as the training track and barns are completed, the existing Agreement between Charles Town Races and HBPA relative to use of Shenandoah Downs Racetrack as a training track facility shall remain in full force and effect.

16. **Racetrack Kitchen**. As of this date of this Agreement, Charles Town Races provides a Racetrack kitchen which includes a seating area, for use by the Horsemen and Charles Town Races shall

17



continue to provide and not reduce the size of the Racetrack kitchen during the Term of this Agreement.  The HBPA may propose modifications and improvements to the Racetrack kitchen for review and consideration by Charles Town Races provided that the HBPA shall pay the cost and expense of such modifications and improvements.  The Racetrack kitchen shall continue to be equipped with customary fixtures and equipment for the operation of a food service operation of its type.   It is understood and agreed that the space provided for the Racetrack kitchen and the fixtures and equipment shall be provided by Charles Town Races at no cost to the HBPA or the operator of the kitchen. The HBPA shall be permitted to select an operator of its choice to provide provisions and prepare food, subject to the approval of Charles Town Races which shall not be unreasonably withheld or unduly delayed.  The Racetrack kitchen must be operated in compliance with all health, sanitation and regulatory requirements for the legal and safe operation of the Racetrack kitchen.   The operator selected by the HBPA shall be required to have general liability and personal injury insurance coverage in amounts customarily required of similarly situated vendors conducting business on Charles Town Races' property. Evidence of such coverage shall be provided and the operator shall be required to name Charles Town Races and the HBPA as an additional insured on such policy(ies).

18

C-1

17.  **Paddock Blacksmith.**  Charles Town Races shall provide a paddock blacksmith to be available in the paddock for each and every race day.

18.  **HBPA Amenities.**

A.  Charles Town Races shall provide one (1) grandstand box with twelve (12) seats available to Horsemen on each racing day.

B.  Charles Town Races shall provide parking consisting of seventy-five (75) spaces designated for trainers only.

C.  Charles Town Races shall provide seventy-five (75) parking spaces for owners.

D.  Charles Town Races shall provide the HBPA with at least two hundred (200) programs each racing day during the week and three hundred (300) programs on each racing day that falls on a Saturday, Sunday, or holiday at an agreed upon location.

19.  **Other Agreements.**  The parties shall also use their best efforts to address and resolve in a timely and expeditious manner the following matters of mutual concern to the parties:

A.  Rodent and pest control and eradication.

B.  Uniform rules and regulations concerning the operation of all vending or concession enterprises in the stable area.

C.  Creation and continuing maintenance of a common fund for the payment of rewards for information leading to a conviction for theft, conversion, or malicious destruction of personal

19



property belonging to Horsemen or their employees, Charles Town Races or its employees, and the general public.

20.   **Racing Officials.**   Charles Town Races shall mail to the President of the HBPA a written list of the persons appointed by Charles Town Races to serve as racing officials during any race meeting on the same date that it submits said list to the West Virginia Racing Commission in accordance with the provisions of the West Virginia Regulations.

21.   **HBPA Facilities.**   Charles Town Races shall provide, at no cost to the HBPA, an office for its use.   The office shall be located on Charles Town Races property, shall be approximately 17 feet 8 inches by 12 feet 10 inches and shall have separate access from the exterior of the building.   The office shall be provided with lighting, heat and air conditioning at no cost to the HBPA. The HBPA shall be responsible for providing its own office furniture and equipment and for the interior cleaning of the office.   It is understood and agreed that the HBPA shall be permitted, at HBPA's cost, to partition the interior of the office to create a separate office.

22.   **HBPA Administrative Fund.**   In accordance with Chapter 19, Article 23, Section 9(b) (1) of the West Virginia Code, Charles Town Races agrees to pay to HBPA during the term of this Agreement an amount equal to two percent (2%) of regular purses (excluding stakes races, accredited races and other sponsored races) actually paid during the preceding month from the special fund, i.e., "purse



account" required by this section for the HBPA's medical trusts for backstretch personnel and administrative fees.  The sums due HBPA shall be paid by the end of each month.

23.  <u>Indemnification</u>.  The HBPA shall indemnify and save harmless Charles Town Races, its agents, representatives, employees, officers, directors and shareholders, and their respective successors and assigns, and all persons acting by, through, under or in concert with any of them, from and against any and all demands, liabilities, loss, cost, damages or expenses of whatever nature or kind, including attorney's fees and all other expenses, costs or loss arising out of or in any way related to or occasioned by Charles Town Races' performance under paragraph 22 of this Agreement relating to contributions to the HBPA.

24.  <u>No Monopoly on Goods and Services</u>.  Charles Town Races shall not establish or impose upon Horsemen a monopoly, restriction or requirement regarding the use of blacksmiths, feed men, track suppliers, veterinarians or other services customarily used by Horsemen.  Charles Town Races will permit any supplier of commodities or services to enter the stable area; provided, however, that such supplier of services or commodities has received a clearance from management and the West Virginia Racing Commission, which will authorize admission to the stable area. Charles Town Races agrees not to unreasonably withhold said clearance.  Any owner or trainer stabled on grounds will be permitted at any time to haul in hay or grain for his own use only.

21

C-1

25. <u>Security</u>. Charles Town Races agrees to provide and maintain reasonable security at its main gate and such other gates providing ingress and egress to its stable areas.

26. <u>Starting Gate</u>.

A. Charles Town Races agrees to provide a minimum of ten (10) assistant starters for the safety of jockeys and horses for each and every race and on each and every race day.

B. Charles Town Races agrees to double load horses into the starting gate for each and every race.

27. <u>Daily Meeting Figures</u>. The pari-mutuel handle and purse distribution figures as well as the percentage figures which represent the relationship between purses and the total of pari-mutuel handle, shall be given to the HBPA office each day of a race meet in progress.

28. <u>Valuable Property Right</u>. Charles Town Races recognizes that the horses and participants in races and related events occurring prior or subsequent to the running of a race are valuable property rights belonging to the owners and trainers, and Charles Town Races will not produce or exhibit still or motion pictures, videotapes, radio or television programs, or authorize or license others to make or exhibit motion pictures or television programs of any of said events without prior consultation and written agreement of the HBPA. Notwithstanding the preceding sentence, it is understood and agreed that Charles Town Races shall have the right to use pictures, still or moving, of the horses and participants to

22



advertise and/or promote the Racetrack facility at no cost and without prior consultation and written agreement of the HBPA.

29.   **HBPA Fire and Hazard Insurance.**   Charles Town Races agrees to pay to HBPA's national office on or before May 15th of each year during the term of this Agreement, its proportional share of the total annual premium as determined annually by the National HBPA for a national policy of fire and other hazards insurance covering horses and tack belonging to HBPA members stabled at Charles Town Races or at locations covered by such HBPA policy.  It is understood, however, by and between the parties, that the limits and types of coverage and the annual premium amount will not be increased without the prior written consent of Charles Town Races.

30.   **Dead Horse Removal.**   The cost of removing dead horses from the racing strip shall be paid by Charles Town Races.   The cost of removing dead horses from the Racetrack facility generally shall be paid one-half by the HBPA and one-half by Charles Town Races.

31.   **Right to Terminate.**   Each party may terminate this Agreement upon the other party's failure to substantially perform its duties and obligations as required under the terms and provisions of this Agreement, and such failure continues for thirty (30) days following the date in which written notice of default is mailed in accordance with paragraph 35, Notices, of this Agreement. Such termination shall not constitute an election of remedy, nor

23



C-1

shall it constitute a waiver of a party's other remedies at law or in equity.

32. **Further Assurances**. The HBPA and Charles Town Races shall execute such instruments and documents, and give such further assurances as may be necessary to accomplish the purposes and intent of this Agreement.

33. **Counter-part Originals**. This Agreement may be executed in two or more counter-part originals, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

34. **Notices**. All notices, requests, demands or other communications which may be required by this Agreement shall be in writing, and if mailed, shall be mailed by certified mail, return receipt requested, and shall be deemed to have been given when received by personal delivery or otherwise. A courtesy copy of such communication shall also be sent via facsimile to the last known facsimile number of the other party. Current addresses of the persons to whom communications are to be sent are as follows:

Charles Town:      Albert Britton, General Manager
                   U. S. Route 340
                   P. O. Box 551
                   Charles Town, WV   25414

Copy to:           Kevin DeSanctis, President
                   c/o Penn National Gaming, Inc.
                   Wyomissing Professional Center
                   825 Berkshire Blvd., Suite 203
                   Wyomissing, PA   19610

24



C-1

Copy to:                Carl Sottosanti, VP/Deputy General
                        Counsel
                        c/o Penn National Gaming, Inc.
                        Wyomissing Professional Center
                        825 Berkshire Blvd., Suite 203
                        Wyomissing, PA   19610

Copy to:                Phyllis LeTart, VP/Legal Affairs
                        c/o Charles Town Races
                        P. O. Box 551
                        Charles Town, WV 25414

HBPA:                   Wayne Harrison, President
                        Charles Town HBPA, Inc.
                        P. O. Box 581
                        Charles Town, WV   25414

Copy to:                Harry L. Buch, Esq.
                        Bailey, Riley, Buch & Harman, L.C.
                        P. O. Box 631
                        Wheeling, WV   26003

35.  **Waivers.**  No waiver of any breach of this Agreement or any term hereof shall be effective unless such waiver is in writing.  No waiver of any breach shall be deemed a waiver of any other or subsequent breach.

36.  **Simulcasting.**  Simulcasting at Charles Town Races shall be governed by the West Virginia statutes and the Federal Interstate Horse Racing Act of 1978.  Prior to February 1, 2005, and prior to February 1 of each year of this Agreement, a Simulcasting Agreement in the form attached as Exhibit "A", for a term of twelve calendar months, being February 1 of each year through January 31 of the following year, containing site approvals will be executed by the parties and shall be a part of this Agreement.   Any additions or deletions to the scheduled



C-1

simulcasting locations will be provided to the HBPA for review and approval, which shall not be unreasonably withheld or unduly delayed.

37. **Applicable Law.** This Agreement shall be executed and delivered by the parties hereto in the State of West Virginia, and shall be interpreted, construed and enforced in accordance with the laws of the State of West Virginia. Nothing in this Agreement is intended to or has the effect of contradicting, superseding or construing the provision of Article 23, Chapter 19 (§§19-23-1 et seq.), Horse and Dog Racing and/or Article 29, Chapter 22A (§§22-A-1 et seq.) The Racetrack Video Lottery Act.

38. **Severability.** If any provision of this Agreement is declared invalid by any Court of competent jurisdiction, or becomes invalid or inoperative by the operation of law, the remaining provisions of this Agreement shall not be affected thereby and shall remain in full force and effect.

39. **Entire Agreement; Modification.** This Agreement contains the entire agreement between the parties and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject hereof. No modification, variation or amendment of this Agreement shall be effective unless such modification, variation or amendment shall be in writing and has been signed by all parties to this Agreement.

40. **Binding Effect.** This Agreement shall be binding upon the

26



C-1

parties, their successors and assigns.

WITNESS the following signatures:

PNGI CHARLES TOWN GAMING
LIMITED LIABILITY COMPANY

By: *Richard Moore*

    Richard Moore

Its: General Manager Racing

CHARLES TOWN HORSEMEN'S
BENEVOLENT AND PROTECTIVE
ASSOCIATION, INC.

By: *Wayne A. Harrison*

    Wayne A. Harrison

Its: President

C-1

EXHIBIT A

Re:    Simulcast Agreement and Site Approval

Charles Town Horsemen's Benevolent & Protective Association ("the HBPA") hereby authorizes Charles Town Race Track ("the Track") to export live thoroughbred horse races conducted at the Track to the attached list of guest site and to import live thoroughbred and harness horse races and dog races from the attached list of host sites from February 1, 2005 through January 31, 2006, subject to the following conditions:

1.    That fees derived therefrom shall be divided according to the mandates of the West Virginia statutes;

2.    That any thoroughbred racetrack approved as an interstate off-track betting ("OTB") outlet maintains a contract with the applicable thoroughbred horsemen's group as defined in the 1978 Interstate Horse Racing Act;

3.    That present circumstances at any approved OTB outlet do not materially change hereafter such that live thoroughbred horse racing becomes threatened or adversely affected;

4.    That no approved OTB outlet combines with other OTB outlets to threaten not to, or refuse to purchase interstate simulcasts except upon similar terms and conditions for purchase being made to each of any combination of such outlets;

5.    That all approved OTB outlets obtain all other consents or approvals required by the 1978 Interstate Horse Racing Act;

6.    That the Track agrees, upon five (5) days written notice from the HBPA, to discontinue export/import of live races to/from any guest/host site that is deemed not to be in good standing with such site's local HBPA or the National HBPA, at the discretion of the HBPA.

7.    That re-disseminating the Track's races to facilities not named on the attached list is prohibited without the prior written approval of the HBPA and the Track.

8.    That the Track agrees to provide a copy of all executed contracts with host/guest tracks and their sites to the HBPA; and

9.    That the HBPA agrees that from time to time the Track may choose to add new sites to the attached list of guest/host sites and may do so with written approval of the HBPA.

The HBPA expressly reserves the right to rescind this consent hereafter should any of the foregoing conditions be violated.

Wayne A. Harrison
President
Charles Town HBPA

Richard Moore
General Manager – Racing
Charles Town Race Track

C-1

**STATE OF WEST VIRGINIA**

**COUNTY OF JEFFERSON,** to wit:

I, Margaret A. Fineagan, a notary public for the County and State aforesaid certify that Richard Moore, whose name is signed to the foregoing as General Manager Racing of **PNGI CHARLES TOWN GAMING LIMITED LIABILITY COMPANY,** a West Virginia Limited Liability Company, dated December 23, 2004 acknowledged the same on behalf of the Limited Liability Company before me in the County and State aforesaid.

Given under my hand and official seal this 23rd day of December, 2004.



Notary Public

**STATE OF WEST VIRGINIA**

**COUNTY OF JEFFERSON,** to wit:

I, Margaret A. Fineagan, a notary public for the County and State aforesaid certify that Wayne Harrison, whose name is signed to the foregoing as President of **CHARLES TOWN HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC.,** a West Virginia not-for-profit Corporation, dated December 23, 2004 acknowledged the same on behalf of the Corporation before me in the County and State aforesaid.

Given under my hand and official seal this 23rd day of December, 2004.

Notary Public

C-1

STATE OF WEST VIRGINIA
COUNTY OF ~~~~~~~~~~

I, Margaret A. Fineagan, a notary public in and for said state, do hereby certify that
Richard Moore and Wayne A. Harrison, whose name is signed to the writing attached,
has this day acknowledged the same before me.

     Given under my hand this ____ day of _____, 2004.

     My commission expires _____.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
MARGARET A. FINEAGAN
200A CHARLES TOWN ROAD
MARTINSBURG, WV 26401
My Commission Expires June 21, 2012

_____
          Notary Public

C-1

## BEFORE THE WEST VIRGINIA RACING COMMISSION OF THE STATE OF WEST VIRGINIA

**IN THE MATTER OF RAYMOND J. FUNKHOUSER, DOB: 3/1/1951, OCCUPATIONAL PERMIT HOLDER NO. 34168**

### DECISION

### Statement of the Case

On October 2, 2007, Raymond Funkhouser's occupational permit issued by the West Virginia Racing Commission was indefinitely suspended pursuant to a *Notice of Suspension* signed by Racing Stewards Danny R. Wright, Laurance A. Dupuy and L. Robert Lotts.

The *Notice of Suspension* alleges that Mr. Funkhouser "made false, misleading and improper statements to the Racing Commission, in violation of §§ 60.1 [dishonest or corrupt practices, fraudulent act], 60.5 [commission of a corrupt or fraudulent act], 60.16 [improper, obnoxious, unbecoming conduct detrimental to the best interest of racing] 61.6 [defining a "protest"] of the [West Virginia Racing Commission] Regulations...."

Upon notice of such suspension, Mr. Funkhouser filed a *Petition for Writ of Prohibition, Request for Temporary Restraining Order and Injunctive Relief* in the Circuit Court of Kanawha County, West Virginia. On October 9, 2007, a hearing on the Petition was heard before the Honorable Charles E. King, Jr. Pursuant to agreement of the parties, Judge King ordered that the issues raised in the *Notice of Suspension* be brought on for hearing on or before Monday, October 15, 2007 before a hearing examiner agreed upon by the parties. Judge King further ordered that the hearing shall be

1

conducted pursuant to the West Virginia Rules of Evidence and that the hearing examiner shall render a decision before the close of business on the day following the hearing. Pursuant to Judge King's order, the decision of the hearing examiner shall be final and binding on the parties and no appeal may be taken. The outcome of the hearing will determine whether Mr. Funkhouser will be permitted to race four of his horses in the Breeder's Classic to be conducted on October 20, 2007. The outcome of the hearing will also determine whether or not Mr. Funkhouser's ability to pursue his livelihood will be indefinitely suspended.

## Applicable Law

The following sections Legislative Rules governing the Racing Commission, Series 1 – Thoroughbred Racing, are germane to this decision:

178-1-2.25: "Complaint" means all signed written complaints made to the Racing Commission or any of its representatives.

178-1-39.38: Any horse, which has been removed from starting due to sickness or physical disability, is not eligible to start for a minimum of five (5) calendar days, exclusive of the day of the horse's removal. The entry shall be accompanied by a written certificate of fitness from the Racing Commission veterinarian and be approved by the stewards.

178-1-61.3:  A protest, except a protest involving fraud may be filed only by the owner (or his or her authorized agent) trainer, or jockey of a horse engaged in the race in which the protest is made or by a racing official of the meeting.

178-1-61.6:  A protest, except for an allegation relating to the incidents in the running of the race, shall be made in writing, signed by the complainant and filed with the stewards before post time of the race in question.

The follow general principles of law are applicable to this decision:

"A party seeking to prove fraud, mistake or other equally serious fault must do so by clear and convincing evidence...."  Syllabus pt. 2, *Lutz v. Orinick*, 184 W. Va. 531, 401 S.E.2d 464 (1990).

"The authority of an officer of a corporation to do a particular act may be inferred from proof of his habitual doing of such acts, with the acquiescence of the directors of the corporation.  And where no such acts are proven, if any act or contract of such officer, made without authority, is subsequently ratified by the directors upon full knowledge of all the circumstances of the case, the corporation shall be bound thereby as fully as if the officer had been expressly authorized to the act or make the contract."  Syllabus pt. 3, *Third Nat. Bank of Cumberland, MD., v. Laboringman's Mercantile & Mfg. Co.*, 56 W. Va. 446, 49 S.E. 544 (1904).

## Burden of Proof

It is not contested that the Racing Commission bears the burden of providing sufficient evidence that Mr. Funkhouser violated one or more regulations of the Racing Commission to justify the heavy penalty which it wishes to impose.  Furthermore, such proof must meet the "clear and convincing" standard required for allegations of fraud. The Racing Commission has accused Mr. Funkhouser of *corrupt or fraudulent* acts or practices.  See, *Notice of Suspension* and *Title 178 Legislative Rule, Racing Commission, Series 1*, Thoroughbred Racing) specifically Sections 60.1 and 60.5.  The accusations that Mr. Funkhouser made "false, misleading and improper" statements to the Racing Commission and sought to "improperly influence" the Commission for personal gain are allegations of fraud which require the Commission to prove their allegations by clear and convincing evidence.  The Racing Commission did not controvert this in its proposed Decision which it submitted to the Hearing Examiner, and Mr. Funkhouser's Pre-Hearing Statement asserted that the clear and convincing standard applied, which was not controverted.

## Findings of Fact

After hearing all of the testimony and after considering the evidence presented during the hearing held on October 15, 2007, I find the following facts to be true:

1.      A race at the Charles Town Races (CTR) called the Charles Town Dash was scheduled to be run on July 4, 2007.

C-2

2.      Nominations for horses to run in this race closed on June 20, 2007.

3.      A horse named "Forest Park", owned by Dan Ryan, was not identified in the list of horses identified by a publication called a "Nomination Sheet" whose publication is overseen by the Stewards, which includes each horse's name and its owner, published after the deadline for nominations to the Charles Town Dash to be run on July 4, 2007 had closed.  Resp. Ex. 5.

4.      Forest Park was not identified in the "Weight Sheet" published by the authority of the Stewards that shows in alphabetical order the weight assigned to each horse.  Resp. Ex. 5.

5.      "Confucius Say" is a horse owned by Raymond Funkhouser.  Confucius Say is identified by owner in on the Nomination sheet and is also identified first on the Weight Sheet.  Resp. Ex. 5.

6.      Forest Park, a horse owned by Dan Ryan, was entered in a race at Delaware Park on June 25, 2007 for a race to be run on June 30, 2007.

7.      Entries for the Charles Town Dash issued by the CTR racing secretary on Friday, June 29, 2007 show that Forest Park had been listed as an entrant overnight.  The parties stipulated to this fact.

C-2

8.      Patty Burns and Tina Mawing, both members of the Board of Directors of the Charles Town HBPA, were disturbed and surprised by the sudden, and to them, unexplained appearance of Forest Park on the overnight sheet because Forest Park had not been previously listed on the Nomination or Weight sheets for the Charles Town Dash.

9.      Both Ms. Burns and Ms. Mawing voiced their concerns to George Yestsook, an alternate member of the Board of Directors, who is also a trainer for Raymond Funkhouser.

10.     Mr. Yetsook telephoned the Chairman of the Racing Commission, George Sidiropolis, to express the HBPA Board members' concerns that the Racing Commission's rules on nomination and entry were not being followed.  Mr. Sidiropolis directed Mr. Yetsook to contact Joseph Cuomo, the Racing Commission's Director of Racing.  In addition, Mr. Sidiropolis sent an e-mail message to Mr. Cuomo advising that Mr. Sidiropolis had advised Mr. Yetsook to telephone Mr. Cuomo.

11.     Mr. Cuomo spoke with Mr. Yetsook two times, either both times on Saturday, June 30, 2007 or one time on Saturday and then again on Sunday, July 1, 2007. By the time of the second telephone call, Mr. Yetsook had learned that Forest Park had been scratched from the Delaware race in which it was entered as a result of a veterinarian scratch issued on June 30, 2007 and informed Mr. Cuomo of the veterinarian scratch.  Mr. Yetsook and Mr. Cuomo discussed the veterinarian scratch in the context of

6

C-2

a February 5, 2001 Memorandum to the Stewards of Charles Town Races that Mr. Cuomo had authored. *See* Resp. Ex. 4 and attached Memorandum. Mr. Cuomo advised Mr. Yetsook, just as he had done in the past with regard to anyone else who had a complaint, that Mr. Yetsook should make that complaint in writing to the Racing Commission. Mr. Cuomo believed that Mr. Yetsook brought this problem to him because of Mr. Yetsook's perceived problem with the conduct of chief racing steward Danny Wright in allowing Forest Park into the race in what Mr. Yetsook and other HBPA Board Members felt was an unlawful act. Mr. Yetsook did not disclose to the Chairman or Mr. Cuomo that he had a horse in the race with Forest Park.

10.     A stipulated exhibit establishes that on June 30, 2007, Forest Park was scratched from the race at Delaware Park on the morning of the race. This was a veterinarian scratch with a quarter crack listed as the reason. Pursuant to the scratch, Forest Park was deemed ineligible to run at Delaware Park for 72 hours. Resp. Ex. 7.

11.     Mr. Funkhouser had been on a family vacation in Pocohantas County, West Virginia, and without access to cellular telephone service from Thursday, June 28, 2007 until his return around midnight on Sunday, July 1, 2007. On Monday, July 2, 2007 at about 10:00 a.m., Mr. Funkhouser was informed by Mr. Yetsook of the issues that other HBPA Board members, including himself, had with the late entry of Forest Park as well as the June 30, 2007 veterinarian scratch of Forest Park. Mr. Yetsook advised Mr. Funkhouser that Mr. Cuomo had said to call him about the issue of Forest Park's eligibility to race on July 4, 2007.

12.     Late in the morning of July 2, 2007 Mr. Funkhouser telephoned Mr. Cuomo and informed him of the problems of which he had just been made aware with Forest Parks' eligibility to race in the Charles Town Dash.  There has been a long established practice of the HBPA president contacting Mr. Cuomo directly regarding various concerns.

11.     Mr. Cuomo advised Mr. Funkhouser that he needed a letter to be sent to the Racing Commission[1] before the end of the business day if the Racing Commission was to consider hearing  the issue, however, there was no promise that the Racing Commission would hear the issue.  Mr. Funkhouser did not  advise Mr. Cuomo that he had a horse in the race with Forest Park, and Mr. Cuomo did not inquire about this.

12.     Mr. Funkhouser attempted to contact the HBPA's regular legal counsel, C. E. Martin, Esq., however, Mr. Martin was on vacation and not available.  Mr. Funkhouser was referred to attorney Paul Weiss of Martin & Seibert, who himself was at lunch and unavailable.  Later in the afternoon, Mr. Funkhouser informed Mr. Weiss of the facts as he understood them and requested that a letter be immediately sent via facsimile to the Racing Commission and copied to chief steward Danny Wright and Joseph Cuomo.  *See* Resp. Ex. 4 with attachments.

13.     Upon receipt of the letter on July 2, 2007 and given its tenor, Mr. Cuomo contacted Racing Commission attorney Christie Utt.  Thereafter, a telephonic hearing

---

[1] The stewards are off from work on Mondays.

C-2

was set for 4 p.m. on July 3, 2007 to address the issue of Forest Park's eligibility to race in the Charles Town Dash.

14.   Danny Wright, Chief Steward, received a copy of the July 2, 2007 letter on July 3, 2007.  Although he had the authority as a steward to take action to scratch Forest Park, Danny Wright did not do so.  Danny Wright did not believe the February 21, 2001 memorandum to be controlling and believed that it was not applicable to the facts of this case.  Mr. Cuomo testified that the February 21, 2001 memorandum was still the current and correct interpretation of the Racing Commission's rules.  There appears to be a divergence between the Racing Commission interpretation of this memorandum and the way it is locally interpreted by the Stewards.

15.   The minutes of the July 3, 2007 hearing reflect that lawyers participated on behalf of the Racing Commission and the West Virginia Department of Revenue as well as other individuals including Danny Wright and Forest Park's trainer, Michael Pino.  Resp. Ex. 6.

16.   Mr. Cuomo testified that Mr. Funkhouser acted appropriately throughout the Racing Commission meeting and made his arguments based entirely on the rules and legal opinions as set forth in Paul Weiss's July 2, 2007 letter.  Mr. Cuomo testified that in turn, Mr. Funkhouser was treated with the same measure of courtesy as any other person appearing before the Racing Commission would be afforded and that his statements were given no more, or no less weight than his rule based arguments themselves merited.  In

other words, Mr. Funkhouser's statements were not given extra or special weight because of his status as the President of the HBPA. The Chairman of the Racing Commission did not participate in the July 3, 2007 meeting, and Ms. Lacy was not present at said hearing.

17.    At no time during the July 3, 2007 Racing Commission meeting did anyone inquire as to whether Mr. Funkhouser had a horse entered in the July 4, 2007 Dash, including Michael Pino, who at least in theory, was adverse to Mr. Funkhouser. Mr. Funkhouser himself, because of the repute of Confucius Say,[2] thought that most people in the meeting knew that he had a horse in the race (that information was published by the Racing Commission) but that whether or not he had a horse in the race was not an issue before the Commission. The fact that Raymond Funkhouser had a horse entered in the Charles Town Dash was known to Danny Wright, the chief steward overseeing the race and who participated in the July 3, 2004 telephone conference.

18.    If the Commission or its legal counsel present and participating in the July 3, 2007 meeting had a question about the Commission's jurisdiction or of Mr. Funkhouser, they could readily have inquired of Mr. Funkhouser. However, Danny Wright first testified that he thought he had mentioned during the meeting that Mr. Funkhouser had a horse in the race. He later testified, that upon his own inquiry of himself, he thought that perhaps he had not said what he knew -- Mr. Funkhouser's horse, Confucius Say, was entered in the race. It never occurred to Mr. Funkhouser to mention

---

[2] There was abundant testimony about the fame of Confucius Say, including the fact that he was a 2006 winner at the Charles Town Breeder's Classic.

he had a horse in the race during the telephone conference since he assumed it was well known that Confucius Say was entered in the race and that he was the owner.

19.    During the meeting it was reported to the Racing Commission that Forest Park was scratched from a race at Delaware Park on June 30, 2007 due to a sore foot. Danny Wright was directed by the Racing Commission to contact Delaware State Park to confirm that Forest Park was a veterinarian scratch.  That fact was confirmed.

20.    Racing Commissioner Fred Peddicord made a motion to scratch Forest Park from the July 4, 2007 Charles Town Dash, seconded by Commissioner Mitchell and unanimously carried based on Rule 178-1-39.38.

21.    Racing Commission Rule 178-1-39.38 provides:

"Any horse, which has been removed from starting due to sickness or physical disability, is not eligible to start for a minimum of five (5) calendar days, exclusive of the day of the horse's removal. The entry shall be accompanied by a written certificate of fitness from the Racing Commission veterinarian and be approved by the stewards".

Mr. Funkhouser did not raise this Rule as a ground for the disqualification of Forest Park.

22.    Rule 178-1-39.38 is a health and safety regulation that, according to Chief Steward Danny Wright, is for the safety of jockeys and horses competing at Charles Town Races.  Mr. Wright testified that if a horse falls during a race, jockeys can be injured or even killed.

23.    It is undisputed that the five day disqualification resulting from the veterinarian scratch on June 30, 2007 would have rendered Forest Park ineligible for the July 4, 2007 dash.   Likewise, there was no evidence that the Racing Commission's veterinarian had certified Forest Park as fit as required by the Racing Commission's rule.

24.    The decision of the Racing Commission to scratch Forest Park was not appealed by the owner or trainer of Forest Park.

25.    This Hearing Examiner does not have the authority to overturn the July 3, 2007 decision of the Racing Commission.  Nonetheless, it is obvious that the decision to scratch Forest Park was within the discretion of the Racing Commission, appropriate  and in accordance with the clear rules and regulations of the Racing Commission and that such decision was entirely based upon the Rules of the Racing Commission and not, in any way, upon the testimony of Mr. Funkhouser or his alleged enhanced credibility before the Racing Commission as the President of the HBPA.

26.    The Notice of Suspension accuses Mr. Funkhouser of improperly filing a "complaint or protest" with the Racing Commission.

27.    A "Complaint" under the Racing Commission's Rule 2.25 means "all signed written complaints made to the Racing Commission or any of its representatives".

C-2

28.     Raymond Funkhouser, as President of the HBPA, acted properly and in good faith based upon the concerns of three members of the Board of Directors in having the HPBA's counsel forward a letter on behalf of the HBPA to the Racing Commission at the request for Joseph Cuomo making a complaint about the eligibility of Forest Park.

29.     Mr. Funkhouser in his capacity as president of the HBPA is charged by the bylaws of the HBPA as the "principal executive officer of the Association." State Ex. 11, [Bylaws of the HBPA] page 18.  In the past, Mr. Funkhouser has taken action in emergency situations in his capacity as the president of the HBPA.  In this situation, if there had been time permitting, of which there was very little time if he was to deliver a letter to the Racing Commission by the close of business on July 2, 2007, the HBPA Board of Directors had the authority to authorize Mr. Funkhouser's July 2, 2007 letter. Subsequently, the HBPA, by vote of its Board of Directors taken at the September 6, 2007 meeting, ratified Mr. Funkhouser's actions in causing the July 2, 2007 letter to be sent to the Racing Commission on behalf of the HBPA.

30.     Racing Commission Rule 61.3 requires that a protest, except one involving fraud, be filed by the owner, trainer, or jockey of a horse engaged in the race in which the protest is made. However, there is no Racing Commission rule that requires a person to file a protest.

31.     Neither the Chairman of the Racing Commission, George Sidiropolis, or the Racing Director, Joseph Cuomo, perceived any violation of the Racing Commission's

C-2

rules by the receipt of a letter from the HBPA to the Racing Commission and agreed that a written letter of complaint is contemplated by Rule 2.25.  Moreover, there is substantial evidence that suggests that Mr. Funkhouser was told to send a written letter of complaint to the Racing Commission.

32.     While the better rule would have been for  Raymond Funkhouser to proactively disclose that he had a financial interest in the July 4, 2007 Charles Town Dash because he had a horse entered, his  failure to disclose this fact does not seem material because: (1) this was not some clandestine fact, i.e. Chief Steward Danny Wright knew that Raymond Funkhouser had a horse entered and testified at one time that he thought he mentioned this during the hearing and then reconsidered and said he did not.  A transcript of the telephonic hearing would have been helpful. (2) The Racing Commission's rule 61.3  requires a protest be filed by an owner, trainer or jockey, i.e., someone  with a financial interest in the race, so it is foreseeable that this should have been discussed in the telephonic  hearing as part of the proof. (3) The Racing Commission was represented by counsel; and (4) Mike Pino, who was Forest Park's trainer and affiliated with Dan Ryan, owner of Forest Park, and presumably adverse, was present during the phone call.

## Conclusions of Law

1.     In order to prove its allegation that Raymond Funkhouser made false representations to improperly influence the Racing Commission, the Commission must prove by clear and convincing evidence that (1) the alleged representations were material; (2) the alleged representations were false; (3) that the Racing Commission

C-2

relied upon the misrepresentations and were justified under the circumstances in relying upon them; and (4) that the Racing Commission was damaged by relying upon the misrepresentations. *See, Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981).

2.      The Racing Commission failed to prove that the act of submitting a written complaint to the Racing Commission violated any rule of the Racing Commission.  To the contrary, written complaints to the Racing Commission are expressly contemplated by Rule 2.25.

3.      The July 2, 2007 letter with attachments to the Racing Commission and copied to the Chief Steward was not materially false in any respect.  The Racing Commission has failed to prove that Raymond Funkhouser made any alleged misrepresentations of fact knowing they were false or were made under circumstances such that he should have known of their falsity.

4.  The July 2, 2007 letter with attachments to the Racing Commission and copied to the Chief Steward was sent at the direction of the President of the HBPA.  While hindsight may demonstrate the President should have polled the board of directors, the President of the HBPA has the inherent authority to act as the principal executive officer of the Association.  Thereafter, the HBPA Board of Directors ratified his actions in all respects.

5.      The State has failed to prove by clear and convincing evidence any intent to deceive the Racing Commission by Raymond Funkhouser during the July 3, 2007 Racing Commission hearing.  Mr. Funkhouser believed that it was known that he had a

horse in the race; the Racing Commission's own documents establish constructive knowledge, at the very least, that he had a horse in the race; Danny Wright knew that he had a horse in the race and may even have so stated that fact during the July 3, 2007 meeting; and, Mr. Cuomo confirmed that Mr. Funkhouser's statements were entirely rule based and not improper in any regard; and that despite the presence of two lawyers for the Racing Commission, including Ms. Utt, counsel for the Racing Commission, no one asked Mr. Funkhouser whether he had a horse in the race.

6.      The Racing Commission has failed to prove that it relied on any alleged misrepresentations of Raymond Funkhouser in reaching its decision on July 3, 2007 to scratch Forest Park from the Charles Town Dash.  To the contrary, the Racing Commission based its decision on grounds not asserted by Mr. Funkhouser and which, in any event, were strictly "rules based" and true.

6.      The Racing Commission failed to prove any of the grounds upon which it relied in the *Notice of Suspension* by clear and convincing evidence, and the Hearing Examiner will not enter an adverse judgment against Raymond Funkhouser based upon evidence which requires this Examiner to guess and speculate as to the truthfulness of the allegations.

7. This Hearing Examiner would make the same findings with a preponderance of evidence standard.   The evidence is susceptible of two reasonable interpretations, one which is consistent with the Racing Commission's allegations, and another which does

not involve bad sportsmanship, corruption, self-dealing and dishonesty. When the evidence is evenly balanced, the party with the burden of proof has failed.

## CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, the suspension of Raymond Funkhouser's occupational permit is hereby VACATED and he shall therefore be afforded all rights and privileges attendant to such occupational permit, including the right to enter his horses in the upcoming races to take place at Charles Town Races on October 20, 2007 as provided for under the law of West Virginia and the rules and regulations of the West Virginia Racing Commission.

Entered: October 16, 2007

_____
Oscar Bean, Hearing Examiner
By authority of the Circuit Court of
Kanawha County, West Virginia
W. Va. State Bar ID 278

## CERTIFICATE OF SERVICE

I, Oscar M. Bean, Hearing Examiner, do hereby certify that a true copy of the foregoing Decision was served on the parties % of their counsel of record by fax, by email, and by depositing a true copy of this Decision in the U. S. Mail and transmitting it by first class mail, postage prepaid on this the 16th day of October, 2007, as follows:

Christie S. Utt
Deputy Attorney General
State Capitol Complex, Room 26-E
Charleston, W. Va. 25305

C-2

David M. Hammer
Hammer, Ferretti & Schiavoni
408 W. King Street
Martinsburg, W. Va. 25401

Harry P. Waddell, Esq
399 W. Martin Street
Martinsburg, WV 25401-3333

with original to the West Virginia Racing Commission, 106 Dee Drive, Charleston, W. Va. 25311.

Oscar M. Bean, Hearing Examiner
116 Washington Street, PO Dr. 30
Moorefield, W. Va. 26836
304 530 6198; Fax: 304 530 7155
W. Va. State Bar ID 278

# CHARLES TOWN HBPA BOARD OF DIRECTORS MEETING MINUTES

Tuesday, April 29, 2008                    6:00 P.M.                    HBPA Office

The meeting was called to order by the President, Randy Funkhouser at 6:10 p.m. Those in attendance were:

Randy Funkhouser, President
Lenny Hale, Executive Director

Kenneth Lowe                              Jim Casey
Elaine Hagy                               Tina Mawing
Harold Shotwell                           Jeff Runco
Sharon Johnson                            John Stahlin
Larry Miller                              Tim Grams

Alternates
Wade Sanderson
                                          George Yetsook
                                          Skoobie Schneider
                                          James Starkey

Absent
Patricia Sanderson (Alt).

Guest
Frank Petramalo                           Robin Richards

Mr. Funkhouser announced that the minutes of the past two meetings would be tabled until our next meeting, explaining that Mrs. Evans did not have time to type and send prior to this meeting.

Guest Speaker
Mr. Frank Petramalo was introduced to the board. Mr. Petramalo is an attorney, who serves as Executive Director for the VAHBPA and is Vice President of the newly formed Thoroughbred Horsemen's Group (THG).
The advantages of this organization will be
a.    Having a united front with track management dealing with simulcast contracts.
b.    To be able to draw on the resources and knowledge dealing with the simulcast issues
c.    To remove ourselves from the simulcast coordinator and the negotiating process with the race track.
d.    The THG will be the agent for its members. They negotiate percentages but we (the CTHBPA) will still have to approve the negotiated percentages.

The board had a few questions that were clearly answered. At the end of the presentation, Mr. Petramalo was offered to send copies of the association's Articles of Corporation and an application for membership. He was thanked for his time and was assured that the board would discuss and consider becoming members.

*Page 1*

C-4

After Mr. Petramalo left the meeting the board continued this discussion. Mr. Stahlin made a motion to get the contract, and discuss at the next board meeting the possibility of joining the THG at a cost of $17,000 membership, second by Mrs. Mawing. Those in favor were asked to signify by saying "aye". The ayes were unanimous with none opposed. The motion carried.

Approval for Proposed New Race Track Kitchen
Mr. Hale presented the blue prints for the new track kitchen. He explained that it will be constructed in the same location with basically the same layout with rest rooms added, one for the men and one for the women. During the discussion Mr. Stahlin informed the board that when a temporary mobile kitchen is set in place, Mrs. Hostler will have to purchase a license to operate it. Then when the new building is completed she will have to buy another license. Mr. Stahlin asked the board to consider helping to pay for these licenses. Mr. Funkhouser said this would have to be looked into but may be some type of reimbursement could be made. At the conclusion of this discussion, **Mr. Stahlin made a motion to accept the proposed blue prints for the new kitchen, second by Mr. Runco. Those in favor were asked to signify by saying "aye". The ayes were unanimous with none opposed. The motion carried.** Mr. Funkhouser will sign and send the form letter back CT&RS approving the blueprints for the new kitchen.

2008 Groom Elite Program
- Mr. Miller informed the board of the following:
- This year the program will offer level 101 and the advanced session #201.
- Mrs. Evans is currently working on a flyer
- It is Mr. Miller's intent to go from barn to barn, himself and handout the fliers to the grooms.
- He also wants fliers put out in the HBPA Office and an announcement on the overnight.
- There will be a translator for the Hispanics.

Mr. Lowe asked where Reid stays when he is here and do we pay for it. Mrs. Evans said she would have to look at the records and see if that is included in the bill and Reid stayed at the Holiday Express when he was here last year.
Mr. Lowe then offered to put Reid up at one of his facilities if it would be helpful. This will be passed on to Reid.

Welfare Benefit Trust
Mrs. Hagy reported the following:
- Mrs. Evans sent a letter to Mr. DeJong requesting that he review the bylaws and bring them up to date with the law.
- Mr. DeJong has accepted the job and will have a conference call with the committee once the work has begun.
- Since Donna Hayes is not serving on the board, Mrs. Hagy asked that Mrs. Mawing be appointed to the WBT committee as the second board member.

Mr. Funkhouser asked the board if anyone objected, no one objected, Mr. Funkhouser appointed Mrs. Mawing.
Mrs. Hagy also informed the board that Kim Langar from the Dept. of Labor had been here for a few days, reviewing the books and has made some suggestions that would be helpful to the WBT.

Legal Fee Application

Mr. Funkhouser informed the board that the corrections were made to the resolution for legal fees and that there was a copy in their packet. Mr. Stahlin said that the title needed to be corrected before copies are made. Charles Town HBPA, Inc. Mr. Funkhouser asked for an approval of the resolution and application with the correction, **Mr. Stahlin so moved, second by Mrs. Hagy. Those in favor were asked to signify by saying "aye". The ayes were unanimous with none opposed. The motion carried.**

Chubb Insurance Update

Mr. Funkhouser stated that the Insurance Company has refused to pay his legal fees and according to legal counsel, the only way to get them to pay is to sue for more than the bill ($300,000) and they will probably want to negotiate a settlement rather than go to court. The bill for Mr. Hammer is $37,000 and a retainer to the attorney that would represent the HBPA will require a retainer of $3,000 to $5,000.

CTHBPA Employee Manuel

The board was informed that sometime ago a copy of the Mountaineer Employee's Manual was acquired to use as a guide to set up one for this HBPA. Any board member that wanted a copy was welcome to take one, look it over and Mr. Funkhouser would like to get started on a manual as soon as possible.

Mr. Hale's Report

Mr. Hale asked the board to refer to the two letters in their packet. He noted that one letter was his to Mr. Finamore requesting a meeting. The second letter was Mr. Finamore's response which was delivered this morning (4/29/08) by security. A discussion took place regarding the response from Finamore. During this discussion Mr. Hale asked the 2 board members and 1 alternate if they would like to share their meeting with the Governor that nobody seemed to know about

Mr. Lowe informed the board of the following:
- He, Mr. Casey and Mr. Schneider had dinner with the Governor to discuss some of the problems the horsemen were having with CTR&S.
- It is Mr. Lowe's opinion that the Governor was interested in what is happening here and he is aware that PNGI would like to get rid of racing but the Governor said that will never happen.
- The Governor suggested sending some one from his office to talk with the horsemen's committee and try to negotiate/address the problems here at Charles Town.

Mr. Grams suggested that Mr. Lowe should consider being on the negotiating committee and make is a 4-man committee. Mr. Lowe said he would have to think about it.

Trailering issues were discussed.

Mr. Hale explained that without getting a meeting with CTR&S it was impossible to get anything accomplished for the horsemen. A lengthy discussion took place.

The Stall notification letters were combined with the trailering issues.

There was a lengthy discussion.

Mrs. Mawing spoke about having stalls taken from her, adding that the letter gave no reason and she has more than made her starts with a balance stable of horses and only running 3 away from

3

C.T.   Addressing Mr. Schneider, Mrs. Mawing asked him why he has been telling her, since January, that she was next to having all of her stalls taken away.  Mr. Schneider stated that he may have said something like that.  Mr. Shotwell asked where he gets his information and Mr. Schneider informed the board he was not at liberty to say.

Mr. Stahlin spoke at length about Mr. Funkhouser not signing the simulcast contract in a timely manner, stating that Mr. Finamore has a problem with Mr. Funkhouser not signing contracts on time.

Mr. Funkhouser corrected Mr. Stahlin explaining that it was the Video Lottery Commission letter that is submitted by June 30th of each year for the CTR&S license.  He added that all correspondence sent to this office is 5 to 7 days after the date on the letters.

Mrs. Evans spoke about the simulcast contracts. She explained that on Dec. 21st and Dec. 26th, 2007 Mrs. Lushbaugh delivered stacks of contracts to be reviewed.  These contracts were not reviewed until after the holiday at which time Mr. Funkhouser read each and every contract before signing an approval letter.  In a scant count there were approximately 153 tracks named in the contracts.  In addition, some of the contracts sent to this office were already a month to 6 weeks old from the time they were signed by the simulcasting coordinator and the individual track named in the contract.  Since that time, all contracts have been read and approved in a more timely manner by this office, even though some of the contracts are still weeks old when they are received.

The discussion continued, some board members felt:

- Unless we agree to support table games we will not get any issues resolved with management.
- Unless the Video Lottery letter is signed now, we will not get any issued resolved with management.

**Mr. Stahlin made a motion to sign the Video Lottery letter now, second by Mr. Grams.  There was a roll call vote, all those in favor of signing the letter now were asked to answer yes, those opposed were asked to answer no.**

| | | | |
|---|---|---|---|
| Kennth Lowe | Y | James Casey | Y |
| Elaine Hagy | Y | Tina Mawing | Y |
| Harold Shotwell | Y | Jeff Runco | Y |
| Sharon Johnson | Y | John Stahlin | Y |
| Larry Miller | Y | Tim Grams | Y |
| Randy Funkhouser | Y | | |

Total in favor 11          Total not in favor 0

The motion passed.

The discussion continued.  Mr. Lowe stated he wanted to go on record as being interested in serving on the negotiating committee.

He then made a few suggestions for the board's consideration:

- The board give the support to table games with the following stipulations:
- 235 days of racing
- Initiate immediately after the signing of this agreement.
- Make it for 2 years.
- Make it simple and make it short

Another discussion ensued regarding backstretch problems and getting management to work with the HBPA.  Mrs. Johnson spoke about 2006 and what happened to the horsemen on Race Track Street.  She informed the board that all of the horsemen on that street (except for one)

4

signed a letter/document agreeing to go under the jurisdiction of the CTR&S. They did not respond to thethis letter.  She added that in a recent conversation with someone in the track offices, she was informed that complaints about Race Track Street horsemen are from the horsemen stabled on the grounds, and expressed her dismay with Mr. Stahlin and his comments about horsemen on Race Track Street being able to milkshake their horses.  The conversation continued.  Mr. Funkhouser suggested that a letter go to Mr. Finamore stating that the agreement was signed early in good faith and would like to meet and discuss all our issues.  Mr. Funkhouser stated that he would hope that a meeting can be arranged and begin working together.
**Mrs Hagy made a motion that Lenny send another letter stating that we have signed the contract early, the kitchen approval has been signed in good faith and ask for a meeting to discuss table games, trailering, and any other issues second by Mrs. Mawing.  Those in favor were asked to say "aye".  The ayes were unanimous with none opposed.  The motion carried.**

Mr. Grams made a motion to add Mr. Lowe to the negotiating committee as a 4th person, there was no second.

Mr. Funkhouser asked that Mr. Hale finish his report.  Mr. Hale made the following points:
<u>Regulatory Rules</u>
There are just a few days left to send in any rule changes that we would like to see. On Mr. Hale's list he has double loading, pay back to 10th (last 4 horses gets $100), pre-exam, bleeder rule and scratch time. He suggests that anyone with any suggested changes give them to him. Mr. Runco offered to get together with Mr. Hale to help.

The race track <u>in house rules</u> have never been acquired.
The condition book committee did not have an opportunity to meet which is a violation of the rules.  Mr. Hale is going to try to communicate with the new racing secretary about working together.
The <u>new racing secretary</u> will be available to horsemen, beginning this coming Thursday.

**Mr. Grams again made a motion to add Mr. Lowe to the negotiating committee as a 4th person, second by Mr. Stahlin.  Those in favor were asked to signify by saying "aye".  The ayes were unanimous with none opposed.  The motion carried.**

Mr. Funkhouser informed the board that, in their packets, there was a draft copy of a letter written and sent to PNGI by NHBPA Legal Counsel.  The subject is exclusion and he recommends that the board take time to read it at their convenience.

**With no further business, Mrs. Hagy made a motion to adjourn, second by Mrs. Mawing.  Those in favor were asked to signify by saying "aye".  The ayes were unanimous with none opposed.  The motion carried.  The meeting closed at 9:51 p.m.**

Respectfully submitted,

Patricia M. Evans
Secretary

5

C-4



**Ehrlich** 500 Spring Ridge Dr, READING, PA 19612  Phone: (800) 488-9495

The 911 of Pest Control

| | | | |
|---|---|---|---|
| Servicing Office: | EHRLICH - 20 HUMP RD, HAGERSTOWN, MD 21740  Phone: (301) 791-6950 | | |
| Client: | PNGI CHARLES TOWN GAMING LLC | Service Location: | PNGI CHARLES TOWN GAMING LLC |
| Client Address: | PO BOX 551 | 00005 | HORSE BARNS/FLOWING SPRINGS RO |
| | CHARLES TOWN, WV 25414 | | CHARLES TOWN, WV 25414 |
| Work Started: | 6/3/08 10:57:28 AM | Work Finished: | 6/3/08 11:45:56 AM |

Customer Signature:

Technician Signature:

Customer Name:  PNGI BARNS

Technician Name:  JOHN SHEELEY JR  Lic.#: 28425-5221 , 53184C  , C02348

## Service Order Details for Visit

| Service Order # | Service Type |
|---|---|
| 017512528-000 | RODENT MAINT SER -C |

## Device Summary For Visit

| Device Type | Activity | No Activity | Total Inspected |
|---|---|---|---|
| Area | 0 | 1 | 1 |

## Device Exceptions For Visit

| Device Type | Repaired | Replaced | Removed | Inaccessible |
|---|---|---|---|---|
| Area | 0 | 0 | 0 | 0 |

## Site Deficiencies

No Site Deficiencies Exist

## Device Deficiencies

No Device Deficiencies Exist

## Recommendations

No Recommendations Exist

## Device Pesticide Applications

| EPA Number | Lot Number | Pesticide | | |
|---|---|---|---|---|
| 7173-113 | | Rozol Tracking Powder | | |
| Site\Device | | | Qty | Conc. |
| INTERIOR \ AREA WORKSITE | | | 2 OUNCES | 0.2% |
| Method:  Crack and Crevice | | Target Pest:  Norway Rat | | |

## Site Pesticide Applications

No Site Pesticide Applications Exist

## Site Inspections

| Site | Time |
|---|---|
| INTERIOR | 10:59:15 AM |

## Notes

BARNS 6-7-11 14    *Barn 14*

12/17/2012  12:14     5489559130             CLARKE EQUINE                        PAGE  02/08

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

| Bill for Services | |
|---|---|
| DATE | INV. NUM |
| 06/19/08 | 14807 |

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV  25430
304-725-0653

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| 1 | 6/19/08 | Marigot Bay | Admission Fee - Repeat Client/ | MR | $0.00 | $0.00 | |
| 1 | 6/19/08 | Marigot Bay | Office Visit-Urgent Care-Busine | MR | $72.00 | $72.00 | |
| 1 | 6/19/08 | Marigot Bay | Exam - Physical | MR | $42.00 | $42.00 | |
| 1 | 6/19/08 | Marigot Bay | IV Fluid Administration - 1st 10 l | MR | $0.00 | $0.00 | |
| 1 | 6/19/08 | Marigot Bay | IV Catheter Placement | MR | $55.00 | $55.00 | |
| 1 | 6/19/08 | Marigot Bay | Large Animal - IV Set Lg Bore 1 | MR | $0.00 | $71.00 | |
| 1 | 6/19/08 | Marigot Bay | IV Fluid Admin - 1st 5 Liters | MR | $18.00 | $18.00 | |
| 1 | 6/19/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $12.00 | |
| 2 | 6/19/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 1 | 6/19/08 | Marigot Bay | Catheter - over the wire 14g x 8 | MR | $0.00 | $40.00 | |
| 1 | 6/19/08 | Marigot Bay | Sedation - Administration Fee | MR | $25.00 | $25.00 | |
| 0.5 | 6/19/08 | Marigot Bay | Dormosedan Inj. - per ml | MR | | $15.00 | |
| 1 | 6/19/08 | Marigot Bay | CBC - Chemistry w/ Fibrinogen | MR | $88.00 | $88.00 | |
| 1 | 6/19/08 | Marigot Bay | I-Stat - EC8 - In House | MR | $45.00 | $45.00 | |
| 1 | 6/19/08 | Marigot Bay | PCV/TP - In House | MR | $20.00 | $20.00 | |
| 1 | 6/19/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/19/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $40.25 | |
| 2 | 6/19/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/19/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 120 | 6/19/08 | Marigot Bay | DMSO - per ml | MR | | $8.00 | |
| 1 | 6/19/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/19/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $40.25 | |
| 2 | 6/19/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/19/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 1 | 6/19/08 | Marigot Bay | Botulinum Antitoxin | MR | | $665.00 | |
| 1 | 6/19/08 | Marigot Bay | Courier Service - Botulinum Ant | MR | $125.00 | $125.00 | |
| 1 | 6/19/08 | Marigot Bay | Plasma Administration Set | MR | $0.00 | $16.00 | |
| 1 | 6/19/08 | Marigot Bay | IV Plasma Administration | MR | $45.00 | $45.00 | |

C-7

Invoice # 14807 for Tina & Anthony Mawing, Page 2

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

| Bill for Services | |
|---|---|
| DATE | INV. NUM |
| 06/19/08 | 14807 |

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-725-0653

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| | | | | Subtotal | | $1,643.50 | |
| | | | | Tax | | $0.00 | |
| Pmnt 1: | | Amt: | $0.00 | Bill total | | $1,643.50 | |
| Note: | | | | Prev balance | | $0.00 | |
| Pmnt 2: | | Amt: | $0.00 | Payment | | $0.00 | |
| Note: | | | | NEW BALANCE | | $1,643.50 | |

12/17/2012 12:14   5409559130   CLARKE EQUINE   PAGE 04/08

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

| Bill for Services | |
|---|---|
| DATE | INV. NUM |
| 06/20/08 | 14815 |

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-726-0653

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| 1 | 6/20/08 | Marigot Bay | #1 Hospitalization - General | MR | $42.00 | $42.00 | |
| 1 | 6/20/08 | Marigot Bay | ICU Level 2-Fluids/Constant Mc | MR | $96.00 | $96.00 | |
| 1 | 6/20/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/20/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $40.26 | |
| 5 | 6/20/08 | Marigot Bay | Flunixin Inj. - per ml | MR | | $10.00 | |
| 2 | 6/20/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/20/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 1 | 6/20/08 | Marigot Bay | Administration Fee - IV K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/20/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 2 | 6/20/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/20/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 120 | 6/20/08 | Marigot Bay | DMSO - per ml | MR | | $8.00 | |
| 1 | 6/20/08 | Marigot Bay | Administration Fee - IV - Flun | MR | $12.00 | $12.00 | |
| 5 | 6/20/08 | Marigot Bay | Flunixin Inj. - per ml | MR | | $10.00 | |
| 1 | 6/20/08 | Marigot Bay | IV Plasma Administration | MR | $45.00 | $45.00 | |
| 1 | 6/20/08 | Marigot Bay | Plasma Administration Set | MR | $0.00 | $16.00 | |
| 1 | 6/20/08 | Marigot Bay | Botulinum Antitoxin | MR | | $665.00 | |
| 2 | 6/20/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 1 | 6/20/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $22.00 | |
| 1 | 6/20/08 | Marigot Bay | Plasmalyte - 5 liter | MR | | $22.00 | |

| | | |
|---|---|---|
| | Subtotal | $1,219.00 |
| | Tax | $0.00 |
| Pmnt 1:   Amt:   $0.00 | Bill total | $1,219.00 |
| Note: | Prev balance | $1,593.50 |
| Pmnt 2:   Amt:   $0.00 | Payment | $0.00 |
| Note: | NEW BALANCE | $2,812.50 |

Received Time Dec. 17. 2012 12:05PM No. 6882

C-7

12/17/2012  12:14   5409559130                    CLARKE EQUINE                          PAGE  05/08

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

| | | Bill for Services | |
|---|---|---|---|
| | DATE | | INV. NUM |
| | 06/21/08 | | 14910 |

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-725-0653

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| 1 | 6/21/08 | Marigot Bay | #2 Hospitalization - General | MR | $42.00 | $42.00 | |
| 1 | 6/21/08 | Marigot Bay | ICU Level 2-Fluids/Constant Mo | MR | $96.00 | $96.00 | |
| 1 | 6/21/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/21/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 1 | 6/21/09 | Marigot Bay | Administration Fee - Topical - D | MR | $4.00 | $4.00 | |
| 1 | 6/21/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $12.00 | |
| 1 | 6/21/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $22.00 | |
| 1 | 6/21/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/21/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 5 | 6/21/08 | Marigot Bay | Flunixin inj. - per ml | MR | | $10.00 | |
| 2 | 6/21/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/21/08 | Marigot Bay | Lactated Ringers - 5 L | MR | | $43.00 | |
| 360 | 6/21/08 | Marigot Bay | DMSO - per ml | MR | | $8.00 | |
| 2 | 6/21/08 | Marigot Bay | Administration Fee - Topical - D | MR | $4.00 | $8.00 | |
| 1 | 6/21/08 | Marigot Bay | Bac-neo-poly O.O. - tube | MR | | $8.00 | |
| 2 | 6/21/08 | Marigot Bay | Administration Fee - Ophthalmic | MR | $6.00 | $12.00 | |
| 1 | 6/21/08 | Marigot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/21/08 | Marigot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 2 | 6/21/08 | Marigot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/21/08 | Marigot Bay | Plasmalyte - 5 liter | MR | | $43.00 | |
| 1 | 6/21/08 | Marigot Bay | Bac-Neo-Poly w/ Dex O.O. | MR | | $8.00 | |
| 1 | 6/21/08 | Marigot Bay | Administration Fee - Ophthalmic | MR | $6.00 | $6.00 | |
| 1 | 6/21/08 | Marigot Bay | Administration Fee - IV - Flun | MR | $12.00 | $12.00 | |
| 5 | 6/21/08 | Marigot Bay | Flunixin inj. - per ml | MR | | $10.00 | |

12/17/2012 12:14 3405553130 CLARKE EQUINE PAGE 06/08

Invoice # 14910 for Tina & Anthony Mawing, Page 2

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

| Bill for Services | |
|---|---|
| DATE | INV. NUM |
| 06/21/08 | 14910 |

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-725-0653

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| | | | | Subtotal | | $574.25 | |
| | | | | Tax | | $0.00 | |
| Pmnt 1: | | Amt: | $0.00 | Bill total | | $574.25 | |
| Note: | | | | Prev balance | | $2,762.50 | |
| Pmnt 2: | | Amt: | $0.00 | Payment | | $0.00 | |
| Note: | | | | NEW BALANCE | | $3,336.75 | |

C-7

12/17/2012  12:14  5409559130                CLARKE EQUINE                    PAGE  07/08

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-725-0653

| | Bill for Services | |
|---|---|---|
| **DATE** | **INV. NUM** |
| 06/22/08 | 14911 |

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| 1 | 6/22/08 | Margot Bay | #3 Hospitalization - General | MR | $42.00 | $42.00 | |
| 1 | 6/22/08 | Margot Bay | ICU Level 2-Fluids/Constant Mo | MR | $96.00 | $96.00 | |
| 2 | 6/22/08 | Margot Bay | Administration Fee - Ophthalmic | MR | $6.00 | $12.00 | |
| 1 | 6/22/08 | Margot Bay | Administration Fee - Topical - D | MR | $4.00 | $4.00 | |
| 1 | 6/22/08 | Margot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/22/08 | Margot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 1 | 6/22/08 | Margot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $12.00 | |
| 1 | 6/22/08 | Margot Bay | Plasmalyte - 5 liter | MR | | $22.00 | |
| 1 | 6/22/08 | Margot Bay | Administration Fee - IV - K-Pen | MR | $12.00 | $12.00 | |
| 40 | 6/22/08 | Margot Bay | Penicillin K+ Inj. - per ml | MR | | $48.75 | |
| 5 | 6/22/08 | Margot Bay | Flunixin Inj. - per ml | MR | | $10.00 | |
| 1 | 6/22/08 | Margot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $12.00 | |
| 1 | 6/22/08 | Margot Bay | Plasmalyte - 5 liter | MR | | $22.00 | |
| 1 | 6/22/08 | Margot Bay | Administration Fee - IV - Valium | MR | $12.00 | $12.00 | |
| 2 | 6/22/08 | Margot Bay | Valium Inj. - per ml | MR | | $4.00 | |
| 1 | 6/22/08 | Margot Bay | Administration Fee - IV - Flun | MR | $12.00 | $12.00 | |
| 10 | 6/22/08 | Margot Bay | Flunixin Inj. - per ml | MR | | $10.00 | |
| 2 | 6/22/08 | Margot Bay | IV Fluid Admin - Add'l 5 Liters | MR | $12.00 | $24.00 | |
| 2 | 6/22/08 | Margot Bay | Plasmalyte - 5 liter | MR | | $43.00 | |

| | | |
|---|---|---|
| | Subtotal | $458.50 |
| | Tax | $0.00 |
| | Bill total | $458.50 |
| | Prev balance | $3,336.75 |
| | Payment | $0.00 |
| | NEW BALANCE | $3,795.25 |

Pmnt 1:      Amt:      $0.00
Note:

Pmnt 2:      Amt:      $0.00
Note:

12/17/2012  12:14  5409555130  CLARKE EQUINE  PAGE  08/08

# R.E.A.C.H

P.O. Box 400
Millwood, VA 22646

Tel: 540-837-3224

Tina & Anthony Mawing
483 Paulas Circle
Middleway, WV 25430
304-725-0653

| | Bill for Services |
|---|---|
| DATE | INV. NUM |
| 06/23/08 | 14912 |

Acct no.: 747

Mitchell K. Rode, DVM

| Qty | Date | Patient | Description | Staff | Price | Ext | Tx |
|---|---|---|---|---|---|---|---|
| 1 | 6/23/08 | Marigot Bay | #4 Hospitalization - General | MR | $42.00 | $42.00 | |
| 1 | 6/23/08 | Marigot Bay | ICU Level 2-Fluids/Constant Mo | MR | $96.00 | $96.00 | |
| 1 | 6/23/08 | Marigot Bay | Exam - Post-Mortem | MR | $75.00 | $75.00 | |
| 1 | 6/23/08 | Marigot Bay | EEE Titer - Warrenton | MR | | $55.00 | |
| 1 | 6/23/08 | Marigot Bay | Disposition | MR | $175.00 | $175.00 | |

| | | |
|---|---|---|
| | Subtotal | $443.00 |

| | | |
|---|---|---|
| Pmnt 1: | Amt: | $0.00 |
| Note: | | |
| | Tax | $0.00 |
| | Bill total | $443.00 |
| | Prev balance | $3,795.25 |
| Pmnt 2: | Amt: | $0.00 |
| Note: | | |
| | Payment | $0.00 |
| | NEW BALANCE | $4,238.25 |

C-7

# Marigot Bay

Owner: Mitchell, Susan G. and Holgoshi-Hoving, Tina
Trainer: Tina Holgoshi-Hoving

B.m.5 Valid Wager –High Delight by Mt. Livermore
Bred in California by Donna Kisela (Apr 02, 2004)

| | 2009: | 0 0 0 0 | $0 | Turf: | 1 0 0 0 | $0 |
| | 2008: | 5 0 3 1 | $17,660 | Off Track: | 3 0 2 0 | $10,150 |
| | Life: | 16 1 4 3 | $17,762 | Distance: | 0 0 0 0 | $0 |
| | CT: | 15 1 4 3 | $17,762 | Course: | 0 0 0 0 | $0 |

Copyright 2009 EQUIBASE Company LLC. All Rights Reserved.

C-7



**Plant Industries Division**
**PESTICIDE REGULATORY PROGRAMS**
Phone: (304) 558-2209

| NOTICE OF INSPECTION | DATE 7/16/08 | HOUR 10:15 AM PM |
|---|---|---|

| NAME OF INDIVIDUAL Tina Mawing | TITLE Owner |
|---|---|

| NAME (Firm, Farmer, Homeowner, etc.) Tina Mawing | ADDRESS (Number, Street, City, State and ZIP Code) 483 Paolas Circle |
|---|---|
| PHONE NO. 503-720-9527 | Middleway, WV 25930 |

| INSPECTOR'S SIGNATURE | TITLE P.R.O. |
|---|---|

REASON FOR INSPECTION: TO DETERMINE COMPLIANCE WITH THE WEST VIRGINIA PESTICIDE LAW.

☒ For the purpose of inspecting and obtaining samples of any pesticide devices packages, labeled, and released for shipment, and samples of any containers or labeling for such pesticides or devices in places where pesticides or devices are held for distribution or sale.

☐ For the purpose of inspecting and obtaining copies of those records

☐ For the purpose of inspecting sites where pesticides are being used to collect data on the use of pesticides

☐ For the purpose of inspecting sites where pesticides have been used

☒ For the purpose of interviewing individuals to collect data for a pesticide investigation.

VIOLATION SUSPECTED:

To determine compliance with the WV 1990 pesticide control Act

Permission to conduct this inspection/investigation is hereby granted

Signature Tina Malani Mawi

Owner, Operator or Agent

Original — Establishment
Copy — Pesticide Office

**West Virginia Department of Agriculture**
1900 Kanawha Blvd., E., Charleston, WV 25305-0190
Gus R. Douglass, Commissioner

C-11



STATE OF WEST VIRGINIA
DEPARTMENT OF AGRICULTURE
State Capitol
Charleston, WV 25305

STATEMENT OF

NAME Phillip Rideoutt          cell    304 - 778
                               HOME PHONE 268 - 778

ADDRESS 42 Autumn Terrace apt 1206
                               BUS. PHONE
Ranson, WV 25438
                               COUNTY Jefferson

PAGE _____ OF _____

                               CASE NO. _____

1. I am employed as a groom in Barn 14 at
2. Charles Town race trade. When cleaning stalls
3. I have seen many large rats. I have also
4. seen an exterminator putting powder first
5. down to kill rats near horses and a goat.
6. The horse and goat later died. After it was
7. put down the horse started getting sick about
8. a week after that. Two days after the horse
9. died the goat died. We have also had many
10. dead rats that no one will remove. I am
11. concerned about the powder blowing around
12. The shedrow and making me or more horses ill.

This statement of ___12___ lines is given of my own free will and
without promise of payment or compensation. The facts are accurate and
true to the best of my knowledge.

Signed Phillip B. Rideout Sr. /mmm

                               Date AUG 19 2008

WVDA Inspector _____

                               Date _____

C-12

13. I saw the exterminator as many as three
14. times in one week in the barn area. He was
15. using a bucket and scoop to scoop out the
16. powder. He was placing in front of stalls
17. and under mats and was seen going in one
18. stall.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.
32.
33.
34.
35.
36.
37.

This statement of _____ lines is given of my own free will and
without promise of payment or compensation. The facts are accurate and
true to the best of my knowledge.

Signed _____ Date _____

WVDA Inspector _____ Date _____

C-12

02/20/09

# A G R E E M E N T

THIS AGREEMENT, made and entered into this 20th day of February, 2009, by and between **PNGI CHARLES TOWN GAMING LIMITED LIABILITY COMPANY**, a West Virginia Limited Liability Company (hereinafter "Charles Town Races"), and **CHARLES TOWN HBPA, INC.**, a West Virginia not-for-profit corporation (hereinafter "HBPA").

## W I T N E S S E T H:

WHEREAS, Charles Town Races is licensed by the West Virginia Racing Commission, pursuant to Chapter 19, Article 23-1, et seq., of the West Virginia Code, to conduct live thoroughbred horse racing with pari-mutuel wagering and, in accordance with that licensure, Charles Town Races owns and operates a thoroughbred racing facility under the trade name Charles Town Races (hereinafter the physical facility will be referred to as the "Racetrack"); and

WHEREAS, the HBPA is an Association comprised of owners, trainers and owner-trainers (the "members") of thoroughbred racing horses; and

WHEREAS, the HBPA provides benevolent programs and other services for its members and their employees who are engaged in live thoroughbred racing at the Racetrack; and

WHEREAS, Charles Town Races and the HBPA validly extended the prior Agreement between the parties through February 28, 2009 and cooperatively worked toward a new agreement; and

WHEREAS, the parties desire to reaffirm their mutual interest in the promotion, preservation, and enhancement of live thoroughbred racing at the Racetrack; and



C-17

February 20, 2009

WHEREAS, the parties hereto reaffirm their support for quality live thoroughbred racing activities and reaffirm their desire for the promotion of such activities in the State of West Virginia; and

WHEREAS, Charles Town Races acknowledges that the HBPA is the exclusive bargaining agent and representative of its members, as certified by the West Virginia Racing Commission.   Charles Town Races shall only negotiate with the exclusive bargaining agent and representatives of the Horsemen as certified by the West Virginia Racing Commission during the term of this Agreement and any amendments thereto or any Agreement which shall supersede this Agreement for the provision of services in connection with live thoroughbred racing activities, safety and back stretch conditions; and

WHEREAS, the parties hereto desire to memorialize and set forth in writing the contractual agreements by and between Charles Town Races and the HBPA concerning live thoroughbred racing at the Racetrack.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, the parties desire to be legally bound, do agree as follows:

1.    **Term of Agreement.**  This Agreement shall become effective as of March 1, 2009, and shall remain in full force and effect until December 31, 2011 (the " Initial Term").  At the end of the Initial Term, the term of this Agreement shall automatically be extended under the same terms and conditions for a period of one (1) year (hereinafter the "First Extension Term") unless either party shall give notice to the other party, in writing, of its intent to terminate the Agreement not later than September 30, 2011.  At the end of the First Extension Term, the term of the Agreement shall automatically be extended under the same terms and conditions for a period of an additional one (1) year (hereinafter the

2

February 20, 2009

"Second Extension Term"), unless either party shall give notice to the other party, in writing, of its intent to terminate the Agreement not later than September 30, 2012.

Notwithstanding the term of this Agreement or anything else in this Agreement to the contrary, in the event of a cessation of Video Lottery activity at Charles Town Races for any reason, the obligations of the parties under this Agreement are suspended for such period of inactivity. For clarity, neither Charles Town Races nor any of its affiliates shall be responsible for any expenses or lost profits of the HBPA or its members during any such period of inactivity.

2.    **Exclusive Representation.**  The HBPA is currently recognized by the West Virginia Racing Commission as the duly qualified and exclusive representative of the owners, trainers, and owner-trainers of live thoroughbred horse racing at the Racetrack as certified by the West Virginia Racing Commission.  Charles Town Races shall only negotiate with the exclusive bargaining agent and representative of the Horsemen as certified by the West Virginia Racing Commission.  Any negotiation or discussion of the terms and provisions of this Agreement, or any amendment thereto, or any Agreement which shall supersede the terms and provisions of this Agreement with any person, entity or representative of an entity that is not the exclusive bargaining agent and representative of the Horsemen, as certified by the West Virginia Racing Commission, shall constitute a breach of this Agreement.

Charles Town Races agrees that it shall negotiate with and conduct any and all business which is the subject of this Agreement and any matters reasonably related to any provision of this Agreement with the duly elected officers of the HBPA or their duly designated representatives.

3



February 20, 2009

The HBPA agrees that it shall provide to Charles Town Races, in writing, on an annual basis, the name and address of each and every duly elected member of the Board of Directors, the name and address of each duly elected officer of the HBPA who shall have the authority to negotiate with the Charles Town Races, and the name and address of each representative duly designated by the Board of Directors of the HBPA to negotiate on its behalf.

3.   **Racing Schedule.**   During the term of this Agreement, Charles Town Races shall request a license each year from the West Virginia Racing Commission to conduct racing, and in fact conduct racing, for not less than the minimum number of days required by the West Virginia Code, which is currently two hundred twenty (220) days per year. Charles Town Races shall provide a copy of its Annual License Application filed with the West Virginia Racing Commission to the HBPA within three (3) days of the date of its filing. Notwithstanding the first sentence of this paragraph, it is understood and agreed that, subject to receiving approval from the West Virginia Racing Commission, Charles Town Races shall schedule a total of 235 racing days, with not less than 9 races per racing day, during each year of this Agreement. Any reduction in race days below 235 shall be subject to the prior approval of the HBPA, which shall not be unreasonably withheld or unduly delayed, and the West Virginia Racing Commission. In the event racing days are cancelled due to weather, track conditions, unavailability of horses or any other reason beyond the reasonable control of Charles Town Races, any such cancellation and the fact that 235 racing days are not held, shall not be considered a breach of this Agreement.

Charles Town Races shall reschedule such race day and provide notice to the HBPA of the rescheduled date as soon as practicable.



4

February 20, 2009

Charles Town Races agrees that it will not discontinue racing for a period of more than one (1) three (3) week period in any calendar year, unless agreed upon by the HBPA, except in the event of an act of God or other catastrophe, or conditions beyond the reasonable control of Charles Town Races.

### 4.   Minimum Purse and Purse Scheduling.

A.   **Minimum Daily Purses.**  With respect to the daily minimum purse distribution, Charles Town Races shall make reasonable efforts to maintain a ratio of the then current minimum daily purse schedule for a given month to the then current amount generated for daily purses for that month that is equal to the historical ratio of One Hundred Twenty-Five Thousand Dollars ($125,000) to the average daily  amount generated for purses between January 1, 2005 and December 31, 2008.

It is mutually agreed that, as far as possible and consistent with the foregoing, the principle of "better purse for better horses" shall be followed in establishing the purse payable for any one race.  Charles Town Races further agrees that, if necessary, better purses will be reduced to maintain minimum purse schedules.

Notwithstanding anything in this Agreement to the contrary, it is understood and agreed that the funding of purses shall be solely in accordance with applicable provisions of W.Va. Code §19-23-1, et seq., Horse and Dog Racing; W.Va. Code §29-22-A-1, et seq., The Racetrack Video Lottery Act; W.Va. Code 29-22C-1, West Virginia Lottery Table Games Act, and any such further legislation that may be enacted which provides for the payment of monies into the purse fund as more fully provided for in Section 7 of this Agreement, and that Charles Town Races shall not be required to otherwise fund the payment of purses.

5

C-17

February 20, 2009

Except as provided below with respect to Stake Races, Charles Town agrees to pay one hundred dollars ($100.00) to the owner's account for horses finishing in places seven through ten which shall be paid from the purse fund.

B. **Purse Schedule Distribution.** Charles Town Races and HBPA will establish and publish a purse schedule distribution, which shall show the purse distribution planned for various classes of horses at various distances. Such schedule shall be updated as necessary. Said schedule with any amendments thereto shall be posted in the Racing Secretary's office and the Condition Book. In the event of a purse schedule distribution decrease, the purses for bottom claiming races shall not be reduced unless the purses for all races are also reduced (though not necessarily by the same percentage).

C. **Stakes Schedule.** Each year purses for Stake races shall not exceed, in the aggregate, eight percent (8%) of the total purses paid, from the purse account, in the immediately preceding calendar year excluding the amounts paid for stake races and amounts received for sponsorship of races unless otherwise authorized by the HBPA. Charles Town Races shall determine the number of and purses for stake races and submit the stakes schedule to HBPA for written comment prior to submission of the stakes schedule to the West Virginia Racing Commission.

D. Charles Town Races agrees to pay purses for Stakes Races back through not less than five (5) places.

E. It is understood by both parties that purse schedules shall not be in conflict with the rules of racing of the West Virginia Racing Commission as presently constituted or as may be reconstituted..

F. **West Virginia Accredited Races.** Charles Town Races shall include in its Condition Book a minimum of two (2) races on every live racing day devoted exclusively for

6



C-17

February 20, 2009

West Virginia accredited horses unless sufficient horses and purse funds are not available therefore, in accordance with the requirements of the West Virginia Racing Commission pursuant to the provisions of §19-23-13(b) of the West Virginia Code.  Races devoted exclusively for West Virginia accredited horses shall be run if no less than seven (7) betting interests have been entered therein.

5.    **Purse Funds.**

A.    During the term of this Agreement, Charles Town Races shall allocate and pay purse moneys as required by applicable state law

B.    In the event any Underpayment Money exists in the purse account at the end of any calendar year, then said Underpayment Money shall be added to the sum available for the payment of purses for the next year.

C.    This is the Agreement regarding the proceeds from video lottery terminals as provided in West Virginia Code §29-22A-7(a) (6).

6.    **Simulcasting.**   Charles Town Races shall conduct simulcasting, both import and export, in accordance with applicable provisions of State and Federal Law, including the West Virginia Horse Racing Statute, §19-23-1 et seq, and the Interstate Horseracing Act of 1978, as amended, 15 U.S.C. §3001, et seq.

With respect to obtaining the approval of the HBPA of each simulcast contract, Charles Town Races shall make commercially reasonable efforts to get either the proposed contract or a summary of the principal terms of the contract, including the name and location of the entity, any secondary recipients of said entity for exports, commission rates charged to, for exports, or from, for imports, the simulcast entity and the term of the contract to the HBPA for its review and approval not less than fifteen

7



February 20, 2009

(15) days prior to the commencement date of the contract. The HBPA shall have seventy-two (72) hours from receipt of the proposed contracts to either approve or disapprove. The HBPA agrees not to unreasonably withhold or unduly delay its approval of simulcast contracts and, in the event it elects to disapprove a contract, to promptly support its disapproval with the detailed written reasons therefore. Charles Town Races shall provide the HBPA with copies of any contract for which it has provided the HBPA a summary of contract terms, within two days of receipt.

To enable the HBPA to verify receipts for simulcasting, commissions retained or deducted, costs of transmission, taxes paid and payments into the purse fund, Charles Town Races shall provide the HBPA with copies of any and all documentation within its possession or under its control or which it is able to obtain by written request, reflecting such payments and expenses.

7.      **Revenue from Off-Track Betting, Telephone Wagering, Table Gaming, or any other form of Gaming.** In the event additional revenue or payments from telephone wagering, off-track betting, table gaming, or any other form of gaming of any kind or nature is available as a result of legislation, the percentage distribution as set forth in the legislation shall determine the party's interest in such additional revenue. In the event there is no division of revenue in the statutory legislation, the parties agree to negotiate in good faith whether a division of revenue is to occur and if so, the amount thereof.

8.      **Condition Book.** The HBPA shall create a condition book committee which shall be comprised of not less than three nor more than five individuals, being trainers and owners who are actively racing a cross section of thoroughbred horses at Charles Town Races ("the HBPA Condition Book Committee"). Charles Town Races

8



February 20, 2009

will provide the HBPA Condition Book Committee with a draft copy of each Condition Book not less than five days prior to the printing date and the HBPA Condition Book Committee shall have three days from receipt to review and provide its recommendations to the Charles Town Races Racing Secretary for inclusion in the Charles Town Races Condition Book.  Charles Town Races promises to give good faith consideration and not unreasonably refuse the recommendations of the HBPA Condition Book Committee.  However, the decision of Charles Town Races with respect to the contents of the Condition Books shall be final and unappealable.

9.   **Horsemen's Bookkeeper.**  A Horsemen's Bookkeeper shall be employed by Charles Town Races and shall be subject to the policies generally applicable to Charles Town Races' employees.  The Horsemen's Bookkeeper shall perform those functions set forth from time to time by statute and the West Virginia Rules of Racing, and Charles Town Races shall provide such equipment as shall be reasonably necessary for the performance of the Horsemen's Bookkeeper's statutory duties.

10,   **Segregated Bank Accounts.**  The following bank accounts shall be maintained by Charles Town Races in a bank approved by the West Virginia Racing Commission.  Currently, the approved bank is United Bank.

A.   **Purse Account.**   Charles Town Races shall establish and maintain a separate overnight investment account and a separate checking account into which all monies received for the future payment of purses are to be deposited.  All disbursements from these accounts shall be solely for the payment of earned purses and such other disbursements as may be authorized by law or as otherwise directed by the West Virginia Racing Commission.  All interest earned on this Purse Account shall be added to the funds available for the payment of purses.  These accounts shall be subject to inspection and

February 20, 2009

audit by the Racing Commission at any time. The HBPA shall also be permitted to review these accounts upon request during normal business hours.

B.   **Horsemen's Trust Accounts.** Charles Town Races shall establish and maintain a separate investment account (the "Horsemen's Investment Account") and a separate checking account (the "Horsemen's Daily Account") (collectively hereafter the "Horsemen's Trust Accounts") into which the Horsemen's Bookkeeper shall receive, maintain and disburse the purses of each race and all stakes, entrance money, jockey fees, purchase money in claiming races, along with all applicable taxes and other monies that properly come into the Horsemen's Bookkeepers' possession in accordance with the provisions of the Racing Commission Rules.

All of the funds in Horsemen's Trust Accounts are recognized as being trust funds held for the benefit of all of the respective account owners, as reflected by the records maintained by the Horsemen's Bookkeeper.

Charles Town Races agrees to transfer from the Purse Account and deposit into the Horsemen's Daily Account the full amount of daily earned purses within two (2) business days. Purse winnings will be posted within two (2) business days and made available to the earners thereof when the race results are declared official, i.e. once drug test results have been received; provided further, however, that in the event of any dispute as to the result of a race due to a drug test or other regulatory inquiry, the purse money shall not be made available to the earners thereof until there has been a final non-appealable resolution thereof by the Charles Town Races Stewards, the West Virginia Racing Commission, or a court of competent jurisdiction, as the case may be.

The Horsemen's Bookkeeper will deduct from the owner ledger accounts, jockey fees, pony fees, track lasix fees, nomination fees, entry fees, starting fees,  photographs,



February 20, 2009

veterinary lasix charges, and sales tax on claiming amounts. No other deductions shall be made by the Horsemen's Bookkeeper unless requested in writing by the person, persons or entities to whom such monies are payable, or to his, her or its duly authorized representative, or as required by order of the Charles Town Races Stewards, the West Virginia Racing Commission, or a court of competent jurisdiction.   Notwithstanding the preceding clause, nothing herein shall be construed as requiring the Horsemen's Bookkeeper to provide personal accounting services to any horseman and/or the payment of any expenses of any horsemen not contemplated by the provision of this paragraph, even if authorized in writing.

The Horsemen's Trust Accounts shall be subject to inspection by the Racing Commission at any time and may be examined by the President of the HBPA or his or her duly designated representative at the offices of Charles Town Races at such reasonable time or times as shall be determined upon the mutual agreement of Charles Town Races and the HBPA.  Such consent shall not be unreasonably withheld.

The interest earned on monies invested in the Horsemen's Investment Account will be transferred to the Horsemen's Daily Account and paid to a joint account to be set up by the HBPA Welfare Benefit Trust and the HBPA as more fully set forth in a written agreement between the HBPA and the Charles Town Welfare Benefit Trust , a copy of which will be provided to Charles Town Races. The HBPA and the HBPA Welfare Benefit Trust shall jointly establish a bank account dedicated to the receipt of the funds paid by Charles Town Races pursuant to this section and divide the money between them pursuant to that agreement. .

11.   <u>**Racing Committee**</u>.



C-17

February 20, 2009

Charles Town Races and the HBPA shall organize and maintain a joint committee (hereinafter the "Racing Committee") to address issues related to and associated with live thoroughbred racing at the Racetrack.  The HBPA and Charles Town shall each appoint three (3) representatives to the Racing Committee.  This Committee shall meet at the request of any member of the Racing Committee.  The Racing Committee shall have no authority to alter the terms and conditions of this Agreement.

12.   **Stalls.**

A.   Charles Town Races shall make available a minimum of 1,148 stalls, free of charge, to Horsemen each race meeting.  It is recognized by both parties that effective stall utilization is important to Charles Town Races management and that equitable allocation is essential to the livelihood of Horsemen.  During the Initial Term of this Agreement, Charles Town Races agrees that it will not tear down or demolish the existing Charles Town stalls unless required to do so as a result of governmental order or an act of God beyond the reasonable control of Charles Town Races.

B.   Charles Town Races shall not discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls.  Subject to this limitation, the allocation of stalls shall be in the discretion of Charles Town Races.

C.   Charles Town Races shall establish a cut-off date for stall applications. Charles Town Races shall make every effort to provide Horsemen with five (5) days prior notice of the acceptance or rejection of stall applications and may demand immediate confirmation from the Horsemen of their intent to use allotted stalls.

D.   The terms and conditions for all stall applications shall be determined by and set forth in an application by Charles Town Races.  Charles Town Races shall send to the



February 20, 2009

HBPA, not later than ten (10) days prior to the first day of each Race Meeting, a copy of its current Stall Application Agreement.

E.   Charles Town Races agrees to provide the stall and shed row area with proper fill within a reasonable time period, upon written request of HBPA.

13.   **Barn Area.**

A.   The Barn area will be available to Horsemen at all times and the Racetrack will be available to Horsemen during scheduled training times (including scheduled training times during the period racing is discontinued).

B.   The HBPA recognizes an obligation of Horsemen and backside personnel to maintain the stable area in a sanitary condition, free from litter and other foreign objects. HBPA will use its best efforts to ensure that Horsemen and their employees fulfill their obligations in this regard.  Horse washing will only be permitted in certain areas designated by Charles Town Races for such purposes, which is consistent with the Rules of the West Virginia Department of Environment Protection.  Charles Town Races retains its right to discipline (including removal) Horsemen or their employees who fail to obey Charles Town Races' published rules and regulations.

C.   Charles Town Races shall maintain all barn area restroom facilities in a safe and healthy environment.

D.   During winter months, Charles Town Races agrees to maintain both main roads leading to and from the Racetrack, between all barns and all Horsemen parking lots, for both training and racing purposes.  Charles Town Races further agrees to make necessary repairs to the backside and stall areas as Charles Town Races considers appropriate giving consideration to any input provided by the HBPA.



13

February 20, 2009

    E.    Charles Town Races agrees to remove all manure from the barn area at no cost to the Horsemen.

    F.    Charles Town Races, in conjunction with the HBPA, shall establish Barn Area Rules and Regulations for the purpose of promoting safety and security on the backstretch, which shall remain in full force and effect and shall be binding upon the parties pursuant to their own terms and provisions during the term or terms of these agreements. Charles Town Races agrees to provide a copy of barn area rules to the HBPA and post the rules in the Track kitchen.

    14.    **Racing Surfaces.**

    A.    The Track Surface Committee, consisting of two Horsemen, two jockeys (appointed by their respective associations), the Charles Town Races' Superintendent, at least one steward, and a representative of Charles Town Races, shall meet pursuant to a published schedule to assess track surface conditions. Charles Town Races shall maintain the Racetrack as it determines to be appropriate giving consideration to input provided by the Track Surface Committee.

    B.    Trainers shall have the right to enter onto the Racetrack for the purpose of determining the safety of the racing surface.

    15.    **Racetrack Facilities.** The racing strip, the barns, and related backside facilities at the Racetrack (collectively known as the "backside facilities") necessary for training purposes shall be made available by Charles Town Races without charge to Horsemen who have horses training for the immediate upcoming live race meet. Charles Town Races will, at its own expense, make water, hot water, tack room heating, and electricity available to each barn in use and keep the racing surface harrowed and watered.

14



February 20, 2009

The racing strip, barns, tack rooms and other facilities of Charles Town Races useful for training purposes, shall be made available for Horsemen without charge. Charles Town Races agrees that these facilities shall be made available to Horsemen during reasonable hours for training purposes, subject to weather conditions.

At least thirty (30) days written notice shall be given to the HBPA of any intended shut-down of the Racetrack. Included with such notice shall be the date of closing, the date of re-opening, and any plans concerning the availability of stalls in the stable area during the shutdown. The notice period shall be calculated from the last scheduled race meeting day of the then current race meeting.

16.   **Training Facility.**   The track surface of the Training Facility shall be the same as the track surface on the Charles Town track. There shall be a chute with a small starting gate together with a necessary crew of not less than three (3) individuals for training purposes only as well as a warning system for loose horses. An outrider during training hours, a general shack for trainers and proper guards to manage the facility shall likewise be provided. Charles Town agrees to provide the HBPA's consultant with a copy of the design plans for review.

17.   **Training Track Gate.**   Charles Town Races agrees to allow ingress and egress to the training track, main track and barn area of horses on foot through a gate to be constructed on the Northwest side of 5th Avenue ("the Training Track Gate"), subject to the following conditions:

a)      the HBPA will reimburse Charles Town Races its actual cost of constructing and installing the gate and constructing and outfitting a guard shack at the Training Track Gate. Charles Town Races will provide the HBPA with a detailed accounting of its costs associated with the construction and outfitting of the guard shack

15

February 20, 2009

and the HBPA will reimburse Charles Town Races within fifteen (15) days of receipt of such accounting;

b) the HBPA shall reimburse Charles Town Races each calendar quarter its costs of operating the Training Track Gate including, but not limited to, Charles Town Races labor costs to man the Training Track Gate, and for maintenance, repair and replacement of the guard shack and equipment. Charles Town Races will provide the HBPA with a detailed accounting of all operating costs for which it seeks reimbursement;

c) ingress and egress through the Training Track Gate may only take place during training hours and such other times as may be specified by Charles Town Races;

d) ingress and egress shall be subject to reasonable policies and procedures established by Charles Town Races and provided to the HBPA in writing which are designed to ensure the biosecurity of the track, enforce the health certificate and Coggins rules of the State of West Virginia, and

e) initial and continuing approval of the West Virginia Department of Agriculture and/or any other governmental agency having jurisdiction over Charles Town Races, of the use of the Training Track Gate and the policies and procedures in place. In the event the West Virginia Department of Agriculture and/or any other governmental agency having jurisdiction over Charles Town Races, disapproves of the use of the Training Track Gate, the parties shall use their reasonable efforts to promptly obtain such approval and shall implement such procedures as may be required to keep the training gate open during the approval process.

16

C-17

February 20, 2009

18.   **Racetrack Kitchen.**  Charles Town Races has constructed a new Racetrack kitchen which has received the approval of the HBPA and which includes a seating area, for use by the Horsemen.  Charles Town Races shall continue to provide and not reduce the size of the Racetrack kitchen during the Term of this Agreement.  The Racetrack kitchen shall continue to be equipped with customary fixtures and equipment for the operation of a food service operation of its type.  It is understood and agreed that the space provided for the Racetrack kitchen and the fixtures and equipment shall be provided by Charles Town Races at no cost to the HBPA or the operator of the kitchen. The HBPA shall be permitted to select an operator of its choice to provide provisions and prepare food, subject to the approval of Charles Town Races which shall not be unreasonably withheld or unduly delayed.  The Racetrack kitchen must be operated in compliance with all health, sanitation and regulatory requirements for the legal and safe operation of the Racetrack kitchen.  The operator selected by the HBPA shall be required to have general liability and personal injury insurance coverage in amounts customarily required of similarly situated vendors conducting business on Charles Town Races' property.  Evidence of such coverage shall be provided and the operator shall be required to name Charles Town Races and the HBPA as an additional insured on such policy(ies).

19   **Paddock Blacksmith.** Charles Town Races shall provide a paddock blacksmith to be available in the paddock for each and every race day.

20.   **HBPA Amenities.**

A.   Charles Town Races shall provide one (1) grandstand box with twelve (12) seats available to Horsemen on each racing day.

B.   Charles Town Races shall provide parking consisting of seventy-five (75) spaces designated for trainers only.

17

February 20, 2009

       C.    Charles Town Races shall provide seventy-five (75) parking spaces for owners.

       D.    Charles Town Races shall provide the HBPA with at least two hundred (200) programs each racing day during the week and three hundred (300) programs on each racing day that falls on a Saturday, Sunday, or holiday at an agreed upon location.

    21.   **Other Agreements.**  The parties shall also use their best efforts to address and resolve in a timely and expeditious manner the following matters of mutual concern to the parties:

       A.    Rodent and pest control and eradication.

       B.    Uniform rules and regulations concerning the operation of all vending or concession enterprises in the stable area.

       C.    Creation and continuing maintenance of a common fund for the payment of rewards for information leading to a conviction for theft, conversion, or malicious destruction of personal property belonging to Horsemen or their employees, Charles Town Races or its employees, and the general public.

    22    **Racing Officials.**  Charles Town Races shall mail the President of the HBPA a written list of the persons appointed by Charles Town Races to serve as racing officials during any race meeting on the same date that it submits said list to the West Virginia Racing Commission in accordance with the provisions of the West Virginia Rules of Racing.

    23.    **HBPA Administrative Fund.**  In accordance with Chapter 19, Article 23, Section 9(b) (1) of the West Virginia Code, Charles Town Races agrees to pay to HBPA during the term of this Agreement an amount equal to two percent (2%) of regular purses actually paid during the preceding month from the special fund required by this section, i.e.,

18



C-17

February 20, 2009

"purse account", (excluding, however, all purses funded from sources other than the purse account, including by way of example and not limitation accredited stakes races and other sponsored races, and as may be otherwise excluded by applicable law) to be divided between the HBPA Welfare Benefit Trust for backstretch personnel and the HBPA for administrative fees, as more fully set forth in a written agreement between the HBPA and the HBPA Welfare benefit Trust, a copy of which will be provided to Charles Town Races. The HBPA and the HBPA Welfare Benefit Trust shall jointly establish a bank account dedicated to the receipt of the funds paid by Charles Town Races pursuant to this section which shall be promptly paid after the end of each month.

24. **Indemnification.** The HBPA shall indemnify and save harmless Charles Town Races, its agents, representatives, employees, officers, directors and shareholders, and their respective successors and assigns, and all persons acting by, through, under or in concert with any of them, from any and all loss, costs or expenses (including reasonable attorneys' fees), arising out of any claim of a person or entity pertaining to the Charles Town Race's performance, excluding Charles Town Race's negligence or willful misconduct, under paragraph 23 of this Agreement relating to contributions to the HBPA,

25. **No Monopoly on Goods and Services.** Charles Town Races shall not establish or impose upon Horsemen a monopoly, restriction or requirement regarding the use of blacksmiths, feed men, track suppliers, veterinarians or other services customarily used by Horsemen. Charles Town Races will permit any supplier of commodities or services to enter the stable area; provided, however, that such supplier of services or commodities has received a clearance from management and the West Virginia Racing Commission, which will authorize admission to the stable area. Charles Town Races

19



February 20, 2009

agrees not to unreasonably withhold said clearance.  Any owner or trainer stabled on grounds will be permitted at any time to haul in hay or grain for his own use only.

26.   **Security.**  Charles Town Races agrees to provide and maintain reasonable security at its main gate and such other gates providing ingress and egress to its stable areas.

27.   **Starting Gate.**

A.   Charles Town Races agrees to provide a minimum of ten (10) assistant starters for the safety of jockeys and horses for each and every race and on each and every race day.

B.   Unless prohibited by applicable law, Charles Town Races agrees to double load horses into the starting gate for each and every race.

28.   **Daily Meeting Figures.** The pari-mutuel handle and purse distribution figures as well as the percentage figures which represent the relationship between purses and the total of pari-mutuel handle, shall be provided to the HBPA office each day of a race meet in progress.

29.   **Valuable Property Right.** Charles Town Races recognizes that the horses and participants in races and related events occurring prior or subsequent to the running of a race are valuable property rights belonging to the owners and trainers, and Charles Town Races will not produce or exhibit still or motion pictures, videotapes, radio or television programs, or authorize or license others to make or exhibit motion pictures or television programs of any of said events without prior consultation and written agreement of the HBPA. Notwithstanding the preceding sentence, it is understood and agreed that Charles Town Races shall have the right to use pictures, still or moving, of the horses and

20



February 20, 2009

participants to advertise and/or promote the Racetrack facility at no cost and without prior consultation and written agreement of the HBPA.

     30.    **HBPA Fire and Hazard Insurance.**  Charles Town Races agrees to pay to HBPA's national office on or before May 15th of each year during the term of this Agreement, its proportional share of the total annual premium as determined annually by the National HBPA for a national policy of fire and other hazards insurance covering horses and tack belonging to HBPA members stabled at Charles Town Races or at locations covered by such HBPA policy.  It is understood, however, by and between the parties, that the limits and types of coverage and the annual premium amount will not be increased without the prior written consent of Charles Town Races.

     31.    **Dead Horse Removal.**  The cost of removing dead horses from the racing strip shall be paid by Charles Town Races.  The cost of removing dead horses from the Racetrack facility generally shall be paid one-half by the HBPA and one-half by Charles Town Races.

     32.    **Arbitration.**  Any all disputes between the parties arising out of this Agreement or the alleged breach thereof, which the parties are unable to amicably resolve on their own, shall, upon the written demand of either party, be submitted to arbitration by the American Arbitration Association ("AAA").  The arbitration shall be conducted in accordance with rules and guidelines of the AAA, with each party selecting an arbitrator from the list of qualified arbitrators provided by the AAA.  The two chosen arbitrators shall select a third arbitrator from the same list.  If they cannot agree to a selection, the AAA shall make the selection for them.  Each party shall bear the costs of its arbitrator and shall share equally the costs of the third arbitrator and the arbitration process.  A decision agreed to by two of the arbitrators shall be binding and

21



C-17

February 20, 2009

enforceable by a court of competent of competent jurisdiction.  The locale for all arbitration proceedings shall be Charles Town, West Virginia, unless otherwise agreed to by the parties.

By execution of this Agreement, the parties acknowledge that arbitration is intended to be the exclusive means of resolving grievances, disputes and disagreements between the parties arising out of this Agreement, except that this provision shall not foreclose a party from obtaining initial equitable relief from a court of compentent jurisdiction pending outcome of arbitration.

33.    **Right to Terminate**.  Each party may terminate this Agreement upon the other party's failure to substantially perform its duties and obligations as required under the terms and provisions of this Agreement, and such failure continues for thirty (30) days following the date in which written notice of default is mailed in accordance with paragraph 36, Notices, of this Agreement. Such termination shall not constitute an election of remedy, nor shall it constitute a waiver of a party's other remedies at law or in equity.

34.    **Further Assurances**.  The HBPA and Charles Town Races shall execute such instruments and documents, and give such further assurances as may be necessary to accomplish the purposes and intent of this Agreement.

35.    **Counter-part Originals**.  This Agreement may be executed in two or more counter-part originals, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

36.    **Notices**.  All notices, requests, demands or other communications which may be required by this Agreement shall be in writing, and if mailed, shall be mailed by certified mail, return receipt requested, and shall be deemed to have been given when received by

22



February 20, 2009

personal delivery or otherwise.  A courtesy copy of such communication shall also be sent

via facsimile to the last known facsimile number of the other party.  Current addresses of

the persons to whom communications are to be sent are as follows:

**Charles Town RACES:** General Manager
        Charles Town Races
        U. S. Route 340
        P. O. Box 551
        Charles Town, WV  25414

Copy to:     President
        Penn National Gaming, Inc.
        Wyomissing Professional Center
        825 Berkshire Blvd., Suite 203
        Wyomissing, PA  19610

Copy to:     VP/Deputy General Counsel
        Penn National Gaming, Inc.
        Wyomissing Professional Center
        825 Berkshire Blvd., Suite 203
        Wyomissing, PA  19610

Copy to:     VP/Legal Affairs
        Charles Town Races
        P. O. Box 551
        Charles Town, WV 25414

**HBPA:**      President
        Charles Town HBPA, Inc.
        P. O. Box 581
        Charles Town, WV  25414

Copy to:     Clarence E. Martin, Esq.
        Martin & Seibert
        P. O. Box 1286
        Martinsburg, WV  25402

  37. **Waivers.**  No waiver of any breach of this Agreement or any term hereof shall

be effective unless such waiver is in writing.  No waiver of any breach shall be deemed a

waiver of any other or subsequent breach.

23

February 20, 2009

38.   **Applicable Law.**  This Agreement shall be executed and delivered by the parties hereto in the State of West Virginia, and shall be interpreted, construed and enforced in accordance with the laws of the State of West Virginia.   Nothing in this Agreement is intended to or has the effect of contradicting, superseding or construing the provision of Article 23, Chapter 19 (§§19-23-1 et seq.), Horse and Dog Racing, Article 29, Chapter 22A (§§22-A-1 et seq.) The Racetrack Video Lottery Act, and/or Article 29, Chapter 22C (§§29-22C-1, et seq.)   Reference in this Agreement to the West Virginia Racing Commission will refer to the present Commission or to any successor regulatory body having jurisdiction over thoroughbred racing at Charles Town Races.

39.   **Severability.**  If any provision of this Agreement is declared invalid by any Court of competent jurisdiction, or becomes invalid or inoperative by the operation of law, the remaining provisions of this Agreement shall not be affected thereby and shall remain in full force and effect.

40.   **Entire Agreement; Modification.**  This Agreement contains the entire agreement between the parties and, as of the date of this Agreement, supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject hereof.   No modification, variation or amendment of this Agreement shall be effective unless such modification, variation or amendment shall be in writing and has been signed by all parties to this Agreement.

41.   **Binding Effect.**  This Agreement shall be binding upon the parties, their successors and assigns.

WITNESS the following signatures:

## SIGNATURE PAGES FOLLOW

24



C-17

**PNGI CHARLES TOWN GAMING LIMITED LIABILITY COMPANY**

By: _____

      Albert Britton
      General Manager

**STATE OF WEST VIRGINIA**

**COUNTY OF JEFFERSON,** to wit:

I, _Margaret A Finnegan_____, a notary public for the County and State aforesaid, certify that **Albert Britton**, whose name is signed to the foregoing Agreement by and between PNGI Charles Town Gaming, Limited Liability Company and the Charles Town Horsemen's Benevolent and Protective Association, Inc. as the General Manager of PNGI Charles Town Gaming, Limited Liability Company, a West Virginia Limited Liability Company, dated the ~~20th~~ day of ~~February 2009~~, 2009, acknowledged the same on behalf of the Limited Liability Company before me in the County aforesaid.

Given under my hand and official seal this 20th day of February, 2009.

_Margaret A Finnegan_____
Notary Public

My commission expires on _June 21, 2012_.


OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
MARGARET A. FINEAGAN
911 ALL AMERICAN WAY
CHARLESTOWN, WV 25405
My Commission Expires June 21, 2012

C-17

**CHARLES TOWN H.B.P.A., INC.**

By: _Raymond J. Funkhouser_
        Raymond J. Funkhouser
        President

**STATE OF WEST VIRGINIA**

**COUNTY OF JEFFERSON,** to wit:

I, _Patricia M. Evans_____, a notary public for the County and State aforesaid, certify that **Raymond J. Funkhouser**, whose name is signed to the foregoing Agreement by and between PNGI Charles Town Gaming, Limited Liability Company and Charles Town H.B.P.A., Inc. as the President of the Charles Town H.B.P.A., Inc., a West Virginia not-for-profit Corporation, dated the _20th_ day of _February_____, 2009, acknowledged the same on behalf of the Corporation before me in the County aforesaid.

Given under my hand and official seal this _20th_ day of _February_____, 2009.

_Patricia M. Evans_
Notary Public

My commission expires on _September 18, 2016_.

```
┌─────────────────────────────────────┐
│              OFFICIAL SEAL           │
│   Notary Public, State Of West Virginia │
│           PATRICIA M. EVANS          │
│            1101 Brucetown Rd.        │
│          Kearneysville, WV 25430     │
│ My Commission Expires September 13, 2016 │
└─────────────────────────────────────┘
```



IN THE CIRCUIT COURT OF JEFFERSON COUNTY, WEST VIRGINIA

TINA MAWING, and the
CHARLES TOWN
HORSEMEN'S BENEVOLENT
PROTECTIVE ASSOCIATION,

     Plaintiffs,

v.                                    Civil Action No. 08-CV-354

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES
AND SLOTS,

     Defendant.

## ANSWER TO SECOND AMENDED COMPLAINT

     COMES NOW the Defendant, PNGI CHARLES TOWN GAMING, LLC, d/b/a CHARLES TOWN RACES AND SLOTS, by counsel, and files this Answer to the Second Amended Complaint as follows:

### FIRST DEFENSE

     The Second Amended Complaint should be dismissed for failure to state a claim upon which relief can be granted.

### SECOND DEFENSE

     The Plaintiffs' claims for equitable relief are barred by the equitable defenses of waiver, unclean hands, laches and estoppel.

### THIRD DEFENSE

     Defendants invoke the doctrine of mitigation of damages and allege that to the extent plaintiffs failed to mitigate such damages, if any, Plaintiffs' recovery, if any, should be reduced by the amount of damages which might have been avoided by mitigation.

## FOURTH DEFENSE

The Plaintiffs' claims are barred by lack of privity of contract.

## FIFTH DEFENSE

The Plaintiffs' claims are barred by lack of standing.

## SIXTH DEFENSE

With regard to the numbered paragraphs of the Second Amended Complaint which are reproduced below, Defendant makes the following responses:

1. The plaintiff, Tina Mawing, is an individual and a member of the Board of Directors The Charles Town Horsemen's Benevolent Protective Association ["HBPA"], who is the holder of an occupational permit issued by the State of West Virginia, through the West Virginia Racing Commission, to train thoroughbred horses.

ANSWER:    Defendant admits that Tina Mawing is an individual and a member of the Board of Directors of the HBPA, that she holds a racing permit issued by the State of West Virginia, and that she trains thoroughbred horses.  Defendant denies the remaining allegations of paragraph 1.

2. The Horsemen's Benevolent Protective Association ["HBPA"] is a non-profit association organized under the laws of the State of West Virginia and is the statutory bargaining representative for the horsemen, including all of the individual plaintiffs herein.

ANSWER:    Defendant admits that the HBPA is a non-profit association and is a bargaining agent and representative of its members.  Upon information and belief, Defendant admits that Plaintiff Mawing is an HBPA member.  Defendant denies the remaining allegations of paragraph 2.

2

3. It is the HBPA's purpose to, *inter alia*, represent all horsemen's interests and property rights when dealing with racing associations, such as the defendant.

**ANSWER:**   Admitted.

4. The HBPA is the exclusive bargaining agent and representative of its members.

**ANSWER:**   Admitted.

5. The defendant, PNGI Charles Town Gaming, LLC, d/b/a Charles Town Races and Slots [hereinafter "CTRS"] is the owner and operator of, among other things, a thoroughbred horse racing track, training track, horse stalls, testing barn and other facilities located at its facilities in Charles Town, West Virginia.

**ANSWER:**   Admitted.

6. CTRS is a licensed racing association in the State of West Virginia.

**ANSWER:**   Admitted.

7. The Defendant is a party to the Agreement between it and the HBPA entered into on December 21, 2004 [hereinafter "Agreement"].

**ANSWER:**   Denied as stated.  It is admitted that Defendant is a party to an Agreement between it and the HBPA entered into as of December 21, 2004.

8. Defendant acknowledged in the Agreement that during the term of the Agreement it "shall only negotiate" with the HBPA.

3

ANSWER:    Admitted in part.   The Agreement states "Charles Town Races shall only negotiate with the exclusive bargaining agent and representative of the Horsemen as certified by the West Virginia Racing Commission during the term of this Agreement...." The Agreement does not explicitly state that Defendant "'shall only negotiate' with the HBPA." However, at the current time, the HBPA is the exclusive bargaining agent and representative of its members.

9. Notwithstanding its acknowledgement to only negotiate with the HBPA, CTRS has sought to unilaterally impose a separate agreement with individual members of the HBPA called a "Revocable Stall License Agreement" that by its terms purports to "govern and control" in the event of a conflict over the Agreement between the HBPA and the Defendant.

ANSWER:    Denied as stated.   It is admitted only that horse trainers and the horse owners for whom they act who are members of the HBPA and who desire to avail themselves of free stall space on Defendant's grounds are required to enter into a stall license agreement, the terms of which speaks for itself.  The Defendant denies the remaining allegations of this Paragraph 9.

10. CTRS' attempt to negotiate with individual members of the HBPA for stalls in contravention of its recognition of the HBPA as the exclusive bargaining agent constitutes a breach of the Agreement.

ANSWER:    Denied.

11. To the extent that any member of the HBPA has signed the "Revocable Stall License Agreement" such agreement constitutes a contract of adhesion.

C-18

ANSWER:   Denied.

12. The West Virginia Legislature has created a statutory structure for the regulation of thoroughbred racing in WV Code § 19-23-1 et seq. and the Code of State Rules.

ANSWER:   Admitted.

13. The underlying reason for the regulation of the thoroughbred racing industry by the West Virginia Legislature was best defined in WV Code § 29-22C2(b)(1), in which the Legislature found that "horse racing .... and breeding play a critical role in the economy of this state, enhance the revenue collected at the racetracks, contribute vital revenues to the counties and municipalities in which the activities are conducted, provide for significant employment and protect and preserve green space and, that a substantial state interest exists in protecting these industries. Furthermore, it finds that the breeding and racing of thoroughbred horses is an integral part of West Virginia's agriculture, and that agriculture is a critical ingredient in West Virginia's economy."

ANSWER:   Paragraph 13 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 13.

14. The West Virginia Legislature granted to the West Virginia Racing Commission in WV Code §19-23-6 the jurisdiction and power to supervise all horse racing and all persons involved in the holding or conducting of horse racing.

C-18

ANSWER:   Paragraph 14 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 14.

15. An individual's ability to own and train a thoroughbred at a particular track is regulated through the issuing of permits as defined in WV Code §§ 19-23-7 and 19-23-8.

ANSWER:   Paragraph 15 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 15.

16. Only the West Virginia Racing Commission, as governed in WV Code § 19-23-15, may suspend or revoke an occupational permit at a horse racing track in West Virginia.

ANSWER:   Admitted.

17. The Racing Commission's ability to suspend or revoke a trainer holding an occupational permit [sic] ability to operate at a horse racing track is restricted to the due process procedures of the Racing Commission as defined in WV Code § 19-23-16.

ANSWER:   Paragraph 17 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 17.

18. Furthermore, the Code of State Rules pertaining to Thoroughbred Racing as stated in § 178-1-8, et al, control the licensing of all associations wishing to conduct a thoroughbred race in West Virginia.

C-18

**ANSWER:**   Paragraph 18 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 18.

19. As noted in § 178-1-37.1 of the Code of State Rules, no racing official other than the stewards may impose a fine or suspension on an occupational permit holder.

**ANSWER:**   Paragraph 19 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 19.

20. If a person holds an occupational permit issued by the Racing Commission, then pursuant to § 178-1-8.14 said person is granted admission to in and around the stables of the grounds of racing association.

**ANSWER:**   Paragraph 20 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 20.

21. Plaintiff Mawing has a property interest in the occupational permits issued by the West Virginia Racing Commission as said permit allows her to conduct her training activities at CTRS.

**ANSWER:**   Paragraph 21 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 21.

22. A racing association operating a thoroughbred track located in West Virginia is required by law to accept a duly-issued occupational permit from the Racing Commission to operate at said track.

**ANSWER:**   Paragraph 22 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 22.

23. A thoroughbred racing track in West Virginia does not have the ability to revoke the occupational permit of an owner or trainer.

**ANSWER:**   Admitted.

24. The Defendant, as a racing association as defined by the Rules of Thoroughbred Racing and a license holder from the West Virginia Racing Commission, provides a location to occupational permit holders to conduct horse racing for the purpose of pari-mutuel wagering, a regulated activity in the State of West Virginia.

**ANSWER:**   Defendant admits that it is a licensed racing association under the Rules of Thoroughbred Racing in West Virginia and that it conducts horse racing for the purpose of pari-mutuel wagering.  The remaining allegations are denied.

25. The Defendant has state authority granted by the West Virginia Racing Commission and is bound by the statutes and rules governing thoroughbred racing, including the interaction with occupational permit holders such as the Plaintiff.

8

C-18

**ANSWER:**   Paragraph 25 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 25.

26. As such, the Defendant is a quasi-governmental actor for the State of West Virginia in the conducting of the regulated activity of thoroughbred racing for the purpose of pari-mutuel wagering.

**ANSWER:**   Defendant denies that is a "quasi-governmental actor." The remainder of paragraph 26 states legal conclusions to which no response is required.  To the extent a response is required, the Defendant denies the allegations of paragraph 26.

27. As part of its quasi-governmental role in licensed thoroughbred racing in West Virginia, Defendant provides stalls free of charge to trainers for the purpose of stabling thoroughbred horses training and competing at the CTRS and thereby assisting with the promotion of thoroughbred racing as referenced in WV Code §29-22C-2(b)(1).

**ANSWER:**   Defendant admits it provides stalls free of charge to trainers for the purpose of stabling thoroughbred horses training and competing at CTRS.  Defendant denies the remaining allegations of paragraph 27.

28. Defendant had further contracted with the Charles Town HBPA to hold a minimum of 1148 free stalls for members of the Charles Town HBPA.

**ANSWER:**   Admitted.

29. Upon information and belief, Defendant has approximately 140 empty stalls at the time the Complaint was filed.

ANSWER:   Admitted.

30. Notwithstanding the availability of stalls, the Defendant has successively stripped all the stalls it had allotted to Tina Mawing in previous allocations without due process and without any option of appeal or other recourse as evidenced most recently in a notice hand-delivered to her husband on August 29, 2008 advising that she must vacate her remaining stalls by September 12, 2008.

ANSWER:   Defendant admits that its stall agreement with Ms. Mawing expired by its terms.   Defendant denies that any "due process" was required as a matter of law, and Defendant denies the remaining allegations of paragraph 30.

31. The free stalls located at CTR which have been occupied by horses trained by the individual Plaintiff Patricia Mawing is the only means by which said Plaintiff can utilize her occupational permit issued by the West Virginia Racing Commission, as the Plaintiffs does not have other free training facilities available to her and cannot financially afford to buy or rent stalls at off-track stables.

ANSWER:   Denied.

32. Moreover, off-track stables present numerous disadvantages to owners and trainers of thoroughbred horses. Thoroughbred races horses must be trailered into and trailered-off the grounds of CTRS. Trailering of thoroughbred race horses poses a serious risk of injury to the horses; some thoroughbreds cannot be trailered without first administering anesthetics which

10

thereby cause such horses to be ineligible to race due to the presence of a foreign substance in the horse. Trailering thoroughbred race horses often stresses and exhausts the horses leaving them at a competitive disadvantage.

ANSWER:   Defendant admits that some thoroughbred race horses which are not maintained at CTR&S stalls are transported by trailers to and from the property.  Defendant denies the remaining allegations of paragraph 32.

33. Without any access to stalls for the training and racing of owner-clients' horses, Tina Mawing will be unable to continue her training operations as allowed under her occupational permit issued by the West Virginia Racing Commission..

ANSWER:   Denied.

34. Such reduction constitutes a breach of the implied duty of good faith and fair dealing in the Agreement.

ANSWER:   Denied.

35. In addition, thoroughbred races horses are highly trained and conditioned athletes who, without daily and direct access to the training facilities at Charles Town Race Track, will lose their competitive status.

ANSWER:   Denied.

36. The Defendant has not alleged or claimed that Tina Mawing has at any time violated any statute or rule governing thoroughbred horse racing in West Virginia. To the contrary, she has made all of her starts and otherwise fully complied with all applicable rules.

C-18

ANSWER:   Denied as stated.  Defendant admits that it has not alleged that Tina Mawing has violated any statute or rule governing thoroughbred horse racing in West Virginia.  The remaining allegations of Paragraph 36 are denied.

37. In effecting the reduction in the number of stalls available to the Plaintiff the Defendant has not alleged or claimed any violation of any statute or rule governing thoroughbred horse racing in West Virginia.

ANSWER:   Defendant denies that it effected a reduction in the number of stalls available to the individual Plaintiff.   The stall license agreements expired by their terms. Defendant admits that it has not alleged or claimed any violation of any statute or rule governing thoroughbred horse racing in West Virginia as to Plaintiff.

38. The decision by the Defendant as a quasi-governmental actor to strip the Plaintiffs of some or all of their stalls without due process is a violation of the Plaintiff's rights and property interests as granted in the occupational permit from the West Virginia Racing Commission.

ANSWER:   Denied.

39. The decision by the Defendant as a quasi-governmental actor to strip the Plaintiff of stalls without due process is a violation of WV Code § 19-23-16, as in essence the Plaintiff will be unable to use, or be sharply curtailed in her use of occupational permits due to the lack of training facilities and the inevitable loss of owner-clients.

ANSWER:   Denied.

12

C-18

40. The decision by the Defendant to strip the Plaintiff of stalls has caused damage to and will continue to damage the Plaintiff in numerous ways including but not limited to the loss of clients, the loss of present and future income, and damage to her reputation as a trainer.

**ANSWER:**   Denied.

41. Pursuant to R.C.P., Rule 65, the Plaintiffs are entitled to and request injunctive relief from the Defendant's unconstitutional actions and violations of Article 23 of Chapter 19 of the West Virginia Code pursuant to WV Code §19-23-25 because

  a.  The loss of owner-clients, damage to the Plaintiff's business reputation, and loss of conditioning of horses trained by the Plaintiff is irreparable;

  b.  The proposed injunction will not harm the Defendant; indeed, upon information and belief the Defendant has numerous vacant stalls at this time;

  c.  The grant of an injunction and requirement that the Defendant comply with the due process benefits the public's interest as expressed in the statutes and rules governing thoroughbred horse racings;

  d.  The Plaintiff, having committed no offense that would warrant stalls being taken from her, are likely to prevail on the merits when this matter comes for trial;

  e.  Imposing a stall agreement that purports to control and govern any conflicts in derogation of the Agreement causes irreparable harm to the HBPA as the recognized exclusive bargaining agent of the horsemen.

C-18

ANSWER:    Denied.

42. The Defendant was motivated in whole or in part to discriminate against Plaintiff Mawing by reducing the number of stalls allocated to the Plaintiff from eleven to nine in retaliation for her testimony in a proceeding involving the West Virginia Racing Commission styled In the Matter of Raymond J. Funkhouser, DOB 3/1/1951, Occupational Permit Holder 34168.

ANSWER:    Denied.

43. The Defendant was motivated in whole or in part to discriminate against her by reducing the number of stalls allocated to HBPA Board member Tina Mawing to zero in retaliation for the Plaintiff's repeatedly expressed concerns to track management, to the Racing Stewards, and once to the Governor of West Virginia, regarding the hazardous and improper use around her barn area of powdered rodent poison.

ANSWER:    Denied.

44. The Plaintiff believes that CTRS's improper application of said rodent poison sickened and killed one of her thoroughbred horses and a companion goat.

ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44, and therefore denies the same.

45. Such retaliation violates the substantial public policies of West Virginia in testifying truthfully and reporting of the improper use of poisons that one reasonably believes

14

may cause injury or even death to people, horses, and livestock as such public policy is evinced by W. Va. Code § 19-16A-1 et seq.

 **ANSWER:** Denied.

 46. It is a violation of the existing collective bargaining agreement between CTRS and the HBPA to engage in discrimination against HBPA Board members for their activities on behalf of the HBPA and/or its members.

 **ANSWER:** Paragraph 46 states legal conclusions to which no response is required. To the extent a response is required, the Defendant denies the allegations of paragraph 46. Defendant denies that it engaged in any form of unlawful discrimination or that it violated the HBPA agreement.

 51. Defendant denies that the Plaintiff is entitled to any of the relief requested in the Second Amended Complaint.

 52. Defendant denies all allegations not expressly admitted herein.

 WHEREFORE the Defendant requests that this action be dismissed with prejudice and that Defendant be granted its costs.

15

Respectfully submitted,

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES AND
SLOTS
Defendant
By Counsel,

Brian M. Peterson, Esq. WVSB #7770
Charles F. Printz, Jr., Esq. WVSB #2985
Bowles Rice McDavid Graff & Love LLP
Post Office Drawer 1419
Martinsburg, West Virginia 25402-1419
(304) 263-0836

## CERTIFICATE OF SERVICE

I, Brian M. Peterson, counsel for Defendant, do hereby certify that I have served a true and correct copy of the foregoing **ANSWER TO SECOND AMENDED COMPLAINT** upon the below named counsel or party on the date indicated by depositing a true and correct copy of the foregoing in the United States Mail, first class postage prepaid to them at their addresses as follows:

David M. Hammer, Esquire
HAMMER, FERRETTI & SCHIAVONI
408 West King Street
Martinsburg, West Virginia 25401

on the 24th day of August, 2009.

Brian M. Peterson

16

2616894.1

C-18

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, WEST VIRGINIA

TINA MAWING,
THE CHARLES TOWN
HORSEMEN'S BENEVOLENT
PROTECTIVE ASSOCIATION,

      Plaintiffs,

v.

                                  Civil Action No. 08-CV-354
                                  JURY TRIAL REQUESTED

PNGI CHARLES TOWN
GAMING, LLC, d/b/a
CHARLES TOWN RACES
AND SLOTS,

      Defendant.

## SECOND AMENDED COMPLAINT

1.  The plaintiff, Tina Mawing, is an individual and a member of the Board of
    Directors The Charles Town Horsemen's Benevolent Protective Association
    ["HBPA"], who is the holder of an occupational permit issued by the State of
    West Virginia, through the West Virginia Racing Commission, to train
    thoroughbred horses.

2.  The Horsemen's Benevolent Protective Association ["HBPA"] is a non-profit
    association organized under the laws of the State of West Virginia and is the
    statutory bargaining representative for the horsemen, including all of the
    individual plaintiffs herein.

3.  It is the HBPA's purpose to, *inter alia*, represent all horsemen's interests and
    property rights when dealing with racing associations, such as the defendant.

4.  The HBPA is the exclusive bargaining agent and representative of its
    members.

5.  The defendant, PNGI Charles Town Gaming, LLC, d/b/a Charles Town Races
    and Slots [hereinafter "CTRS"] is the owner and operator of, among other
    things, a thoroughbred horse racing track, training track, horse stalls, testing
    barn and other facilities located at its facilities in Charles Town, West
    Virginia.

6.  CTRS is a licensed racing association in the State of West Virginia.

C-19

7. The Defendant is a party to the Agreement between it and the HBPA entered into on December 21, 2004 [hereinafter "Agreement"].

8. Defendant acknowledged in the Agreement that during the term of the Agreement it "shall only negotiate" with the HBPA.

9. Notwithstanding its acknowledgement to only negotiate with the HBPA, CTRS has sought to unilaterally impose a separate agreement with individual members of the HBPA called a "Revocable Stall License Agreement" that by its terms purports to "govern and control" in the event of a conflict over the Agreement between the HBPA and the Defendant.

10. CTRS' attempt to negotiate with individual members of the HBPA for stalls in contravention of its recognition of the HBPA as the exclusive bargaining agent constitutes a breach of the Agreement.

11. To the extent that any member of the HBPA has signed the "Revocable Stall License Agreement" such agreement constitutes a contract of adhesion.

12. The West Virginia Legislature has created a statutory structure for the regulation of thoroughbred racing in WV Code § 19-23-1 *et seq.* and the Code of State Rules.

13. The underlying reason for the regulation of the thoroughbred racing industry by the West Virginia Legislature was best defined in WV Code § 29-22C-2(b)(1), in which the Legislature found that "horse racing …. and breeding play a critical role in the economy of this state, enhance the revenue collected at the racetracks, contribute vital revenues to the counties and municipalities in which the activities are conducted, provide for significant employment and protect and preserve green space and, that a substantial state interest exists in protecting these industries. Furthermore, it finds that the breeding and racing of thoroughbred horses is an integral part of West Virginia's agriculture, and that agriculture is a critical ingredient in West Virginia's economy."

14. The West Virginia Legislature granted to the West Virginia Racing Commission in WV Code §19-23-6 the jurisdiction and power to supervise all horse racing and all persons involved in the holding or conducting of horse racing.

15. An individual's ability to own and train a thoroughbred at a particular track is regulated through the issuing of permits as defined in WV Code §§ 19-23-7 and 19-23-8.

16. Only the West Virginia Racing Commission, as governed in WV Code § 19-23-15, may suspend or revoke an occupational permit at a horse racing track in West Virginia.

17. The Racing Commission's ability to suspend or revoke a trainer holding an occupational permit ability to operate at a horse racing track is restricted to the due process procedures of the Racing Commission as defined in WV Code § 19-23-16.

18. Furthermore, the Code of State Rules pertaining to Thoroughbred Racing as stated in § 178-1-8, et al, control the licensing of all associations wishing to conduct a thoroughbred race in West Virginia.

19. As noted in § 178-1-37.1 of the Code of State Rules, no racing official other than the stewards may impose a fine or suspension on an occupational permit holder.

20. If a person holds an occupational permit issued by the Racing Commission, then pursuant to § 178-1-8.14 said person is granted admission to in and around the stables of the grounds of a racing association.

21. Plaintiff Mawing has a property interest in the occupational permit issued by the West Virginia Racing Commission as said permit allows her to conduct her training activities at CTRS.

22. A racing association operating a thoroughbred track located in West Virginia is required by law to accept a duly-issued occupational permit from the Racing Commission to operate at said track.

23. A thoroughbred racing track in West Virginia does not have the ability to revoke the occupational permit of an owner or trainer.

24. The Defendant, as a racing association as defined by the Rules of Thoroughbred Racing and a license holder from the West Virginia Racing Commission, provides a location to occupational permit holders to conduct horse racing for the purpose of pari-mutuel wagering, a regulated activity in the State of West Virginia.

25. The Defendant has state authority granted by the West Virginia Racing Commission and is bound by the statutes and rules governing thoroughbred racing, including the interaction with occupational permit holders such as the Plaintiff.

26. As such, the Defendant is a quasi-governmental actor for the State of West Virginia in the conducting of the regulated activity of thoroughbred racing for the purpose of pari-mutuel wagering.

27. As part of its quasi-governmental role in licensed thoroughbred racing in West Virginia, Defendant provides stalls free of charge to trainers for the purpose of

stabling thoroughbred horses training and competing at the CTRS and thereby assisting with the promotion of thoroughbred racing as referenced in WV Code §29-22C-2(b)(1).

28. Defendant had further contracted with the Charles Town HBPA to hold a minimum of 1148 free stalls for members of the Charles Town HBPA.

29. Upon information and belief, Defendant had approximately 140 empty stalls at the time the Complaint was filed.

30. Notwithstanding the availability of stalls, the Defendant has successively stripped all the stalls it had allotted to Tina Mawing in previous allocations without due process and without any option of appeal or other recourse as evidenced most recently in a notice hand-delivered to her husband on August 29, 2008 advising that she must vacate her remaining stalls by September 12, 2008.

31. The free stalls located at CTR which have been occupied by horses trained by the Plaintiff Mawing is the only means by which said Plaintiff can utilize her occupational permit issued by the West Virginia Racing Commission, as the Plaintiff does not have other free training facilities available to her and cannot financially afford to buy or rent stalls at off-track stables.

32. Moreover, off-track stables present numerous disadvantages to owners and trainers of thoroughbred horses. Thoroughbred races horses must be trailered-into and trailered-off the grounds of CTRS. Trailering of thoroughbred race horses poses a serious risk of injury to the horses; some thoroughbreds cannot be trailered without first administering anesthetics which thereby cause such horses to be ineligible to race due to the presence of a foreign substance in the horse. Trailering thoroughbred race horses often stresses and exhausts the horses leaving them at a competitive disadvantage.

33. Without any access to stalls for the training and racing of owner-clients' horses, the Tina Mawing will be unable to continue her training operations as allowed under her occupational permit issued by the West Virginia Racing Commission.

34. Such reduction constitutes a breach of the implied duty of good faith and fair dealing in the Agreement.

35. In addition, thoroughbred races horses are highly trained and conditioned athletes who, without daily and direct access to the training facilities at Charles Town Race Track, will lose their competitive status.

36. The Defendant has not alleged or claimed that Tina Mawing has at any time violated any statute or rule governing thoroughbred horse racing in West

Virginia. To the contrary, she has made all of her starts and otherwise fully complied with all applicable rules.

37. In effecting the reduction in the number of stalls available to the Plaintiff the Defendant has not alleged or claimed any violation of any statute or rule governing thoroughbred horse racing in West Virginia.

38. The decision by the Defendant as a quasi-governmental actor to strip the Plaintiff of stalls without due process is a violation of the Plaintiff's rights and property interests as granted in the occupational permit from the West Virginia Racing Commission.

39. The decision by the Defendant as a quasi-governmental actor to strip the Plaintiff of stalls without due process is a violation of WV Code §19-23-16, as in essence the Plaintiff will be unable to use, or be sharply curtailed in her use of her occupational permit due to the lack of training facilities and the inevitable loss of owner-clients.

40. The decision by the Defendant to strip the Plaintiff of stalls has caused damage to and will continue to damage to the Plaintiff in numerous ways including but not limited to the loss of clients, the loss of present and future income, and damage to her reputation as a trainer.

41. Pursuant to R.C.P., Rule 65, the Plaintiff is entitled to and requests injunctive relief from the Defendant's unconstitutional actions and violations of Article 23 of Chapter 19 of the West Virginia Code pursuant to WV Code §19-23-25 because

    a. The loss of owner-clients, damage to the Plaintiff's business reputation, and loss of conditioning of horses trained by the Plaintiff is irreparable;

    b. The proposed injunction will not harm the Defendant; indeed, upon information and belief the Defendant has numerous vacant stalls at this time;

    c. The grant of an injunction and requirement that the Defendant comply with the due process benefits the public's interest as expressed in the statutes and rules governing thoroughbred horse racings;

    d. The Plaintiff, having committed no offense that would warrant stalls being taken from her, is likely to prevail on the merits when this matter comes for trial;

    e. Imposing a stall agreement that purports to control and govern any conflicts in derogation of the Agreement causes irreparable harm to the HBPA as the recognized exclusive bargaining agent of the horsemen.

42. The Defendant was motivated in whole or in part to discriminate against Plaintiff Mawing by reducing the number of stalls allocated to the Plaintiff

from eleven to nine in retaliation for her testimony in a proceeding involving the West Virginia Racing Commission styled In the Matter of Raymond J. Funkhouser, DOB 3/1/1951, Occupational Permit Holder 34168.

43. The Defendant was motivated in whole or in part to discriminate against her by reducing the number of stalls allocated to HBPA Board member Tina Mawing to zero in retaliation for the Plaintiff's repeatedly expressed concerns to track management, to the Racing Stewards, and once to the Governor of West Virginia, regarding the hazardous and improper use around her barn area of powdered rodent poison.

44. The Plaintiff believes that CTRS's improper application of said rodent poison sickened and killed one of her thoroughbred horses and a companion goat.

45. Such retaliation violates the substantial public policies of West Virginia in testifying truthfully and reporting of the improper use of poisons that one reasonably believes may cause injury or even death to people, horses, and livestock as such public policy is evinced by W. Va. Code § 19-16A-1 et seq.

46. It is a violation of the then existing collective bargaining agreement between CTRS and the HBPA to engage in discrimination against HBPA Board members for their activities on behalf of the HBPA and/or its members.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter a temporary restraining order enjoining the defendant, its officers, directors, employees and agents (collectively "CTRS") during the pendency of the present litigation from (1) taking any action to remove the Plaintiffs' livestock, equipment and/or property from stall areas at the Charles Town Races facility presently occupied by the Plaintiff other than through judicial process; (2) imposing any restriction or limitation upon the Plaintiff's access to the said stall areas which is not imposed generally upon all horse trainers practicing their trade at the Defendant's facility; (3) imposing any restriction or limitation upon the Plaintiff's access to training areas and facilities at the Charles Town Races facility which is not imposed generally upon all horse trainers practicing their trade at the Defendant's facility; and (4) refusing to accept from the Plaintiff the entry of any qualified horse to compete in any horse race at the Charles Town Races facility.

The Plaintiff further requests a preliminary injunction incorporating the terms of the temporary restraining order and prohibiting the Defendant from evicting the Plaintiff from her stalls at CTR and restoring all stalls to Tina Mawing that were ordered vacated by letter to the Plaintiff dated on or about August 29, 2008; enter an injunction forbidding the Defendant from impairing the privileges and rights attendant to the holder of an occupational permit; and that a jury award all such other relief for general compensatory damages, annoyance, aggravation, and distress, punitive damages, attorney's fees, costs and all other legal and equitable damages and costs to which a jury determines the Plaintiff is entitled.

Dated this the 22nd day of June, 2009.

David M. Hammer, Esq.
WV Bar ID #5047
HAMMER, FERRETTI & SCHIAVONI
408 West King Street
Martinsburg, WV 25401
(304) 264-8505
dhammer@hfslawyers.com

Counsel for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
*MARTINSBURG DIVISION*

TINA MAWING, et al.,

    Plaintiffs,

v.                              Civil Action No. 3:09-CV-68

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES
AND SLOTS,

    Defendant.

## DECLARATION OF ERICH ZIMNY

        I, Erich Zimny, declare under penalty of perjury that the foregoing is true and correct:

        1.     I am an adult over the age of twenty-one (21) years.

        2.     I am currently employed as the Director of Racing at Charles Town Races & Slots (referred to herein as "CTRS"), and I have personal knowledge of the following.

        3.     Tina Mawing is a horse trainer who holds an occupational permit issued by the West Virginia Racing Commission.

        4.     Her permit has not been revoked, suspended or affected in any way by the West Virginia Racing Commission or the Board of Stewards.

5.      CTRS has no power or authority to issue, suspend, or revoke occupational permits.

6.      CTRS owns approximately 1,338 horse stalls which are its private property.  It licenses these stalls to horse trainers on an individual basis through Revocable Stall License Agreements, which typically last for 6 months at a time, and are not automatically renewable.

7.      An occupational permit does not entitle anyone to stable their horses in stalls owned by Charles Town Races and Slots.   The permit is simply one prerequisite to allowing the permit holder to conduct his or her occupation at the race track.

8.      Although many trainers at CTRS do stable their horses in stalls at our property, many other horses are stabled off site.

9.      CTRS has created a stall allocation committee to allocate its stalls.

10.     The stall allocation committee consists of 6 individuals -- General Manager Al Britton, General Manager of Racing Operations Richard (Dickie) Moore, Director of Racing Erich Zimny, Racing Secretary Randolph (Randy) Wehrman, Barn Superintendent Mike Elliott, and Assistant Barn Superintendent James Taylor.

11.     The Racing Stewards are not members of the stall committee, and they do not participate in any way in the stall allocation process.

12.     The stall allocation committee meets prior to the end of each stall allocation term to review and consider the stall applications for the upcoming term.

2

13.     The committee does not use any written criteria in determining how to allocate stalls.  However, the factors they generally consider are the number of racing starts the trainers have in proportion to the number of stalls they have or are seeking (often referred to as "starts per stall"); the quality of the horses they train in terms of their winning percentages, the types of horses the trainer has, and whether the trainer follows CTRS's rules.  Particular emphasis is placed on these factors over the last stall allocation term.

14.     CTRS endeavors to maintain on its property a wide variety of quality horses.

15.     At every stall allocation meeting, CTRS has received more requests for stalls than it has supply.  Therefore, CTRS must deny stalls to many trainers each allocation term.

16.     Pursuant to a stall license agreement dated 12/21/2006, Ms. Mawing was allocated 7 stalls on the grounds at CTRS for the year 2007.

17.     By letter dated February 7, 2008, Ms. Mawing was allocated 9 stalls for the period March 1, 2008 through August 31, 2008.

18.     On April 25, 2008, Ms. Mawing had her stall allocation reduced by 4 stalls, giving her a total of 5 for the remainder of that term.  The reason for the reduction was that Ms. Mawing violated CTRS rules by placing four horses in four stalls belonging to other licensees without the written permission of the Racing Secretary.

3

19.   At the stall allocation committee meeting in August, 2008, the committee decided not to grant Ms. Mawing any stalls for the September 1 through December 31, 2008 term.

20.   Ms. Mawing's racing statistics for the period January 1, 2008 through August 15, 2008 were as follows:  Starts: 61 ; Wins: 2 ; Winning Percentage: 3.2%.  This was a very low winning percentage for trainers with stalls allocated to them on the grounds at CTRS.

21.   During that August 2008 stall application, the number of stalls CTRS had to allocate was approximately 1,338, and the number of requests for stalls exceeded the number of available stalls.  Many other trainers did not receive the number of stalls they requested during that allocation period.

22.   To this day, even though she does not have a stall license agreement with CTRS, Tina Mawing continues to train horses and race them at CTRS.

23.   According to the data I have reviewed, the horses that are stabled off-site are at no competitive disadvantage as compared to those horses stabled at CTRS.  In fact, horses stabled off-site tend to win more races than horses stabled on the property.

24.   Ms. Mawing is not, and has never been, an employee of CTRS.


Executed this 3rd day of May, 2010.

Erich Zimny

4

C-21

Ck# 7324 Date 12/9/2008 Amt $100.00



Ck# 9104 Amt $150.00 Date 9/4/2012



Ck# 7317 Date 12/9/2008 Amt $80.00



Ck# 8924 Amt $3,000.00 Date 4/23/2012



Ck# 7267 Date 11/7/2008 Amt $70.00



Ck# 9090 Amt $300.00 Date 8/13/2012



Ck# 7306 Date 12/4/2008 Amt $450.00



Ck# 8886 Amt $110.00 Date 6/20/2012



Ck# 8875 Amt $50.00 Date 9/5/2012



Ck# 8888 Amt $420.00 Date 6/22/2012



Ck# 9100 Amt $3,000.00 Date 8/20/2012



Ck# 8892 Amt $200.00 Date 6/25/2012



Ck# 8873 Amt $126.00 Date 4/18/2012



Ck# 9077 Amt $420.00 Date 7/31/2012

C-26

Ck# 7179 Date 10/2/2008 Amt $85.00

Ck# 7208 Date 9/30/2008 Amt $500.00

Ck# 7242 Date 10/15/2008 Amt $80.00

Ck# 7227 Date 10/21/2008 Amt $270.00

Ck# 7219 Date 10/1/2008 Amt $80.00

Ck# 7209 Date 10/2/2008 Amt $1,000.00

Ck# 7225 Date 10/6/2008 Amt $100.00

Ck# 7262 Date 10/30/2008 Amt $40.00

Ck# 7228 Date 10/7/2008 Amt $2,200.00

Ck# 7265 Date 11/7/2008 Amt $400.00

Ck# 7204 Date 9/25/2008 Amt $300.00

Ck# 7249 Date 10/... Amt $50.00

Ck# 7195 Date 9/23/2008 Amt $35.00

Ck# 7264 Date 11/3/2008 Amt $290.00

C-26

Ck# 7259 Date 11/7/2008 Amt $250.00

Ck# 7272 Date 11/10/2008 Amt $2,200.00

Ck# 7257 Date 11/6/2008 Amt $150.00

Ck# 7290 Date 11/14/2008 Amt $80.00

Ck# 7249 Date 10/21/2008 Amt $50.00

Ck# 7252 Date 11/22/2008 Amt $75.00

Ck# 7328 Date 12/11/2008 Amt $90.00

Ck# 7273 Date 11/7/2008 Amt $80.00

Ck# 7282 Date 11/19/2008 Amt $310.00

Ck# 7280 Date 11/14/2008 Amt $500.00

Ck# 7281 Date 11/18/2008 Amt $450.00

Ck# 7269 Date 11/5/2008 Amt $275.00

Ck# 7295 Date 11/21/2008 Amt $375.00

Ck# 7218 Date 9/30/2008 Amt $55.00

Ck# 7323 Date 12/15/2008 Amt $2,500.00

C-26

Ck# 7136 Date 8/26/2008 Amt $600.00

Ck# 7141 Date 8/19/2008 Amt $60.00

Ck# 7143 Date 8/19/2008 Amt $150.00

Ck# 7154 Date 9/2/2008 Amt $250.00

Ck# 7153 Date 9/3/2008 Amt $75.00

Ck# 7192 Date 9/24/2008 Amt $375.00

Ck# 7177 Date 9/19/2008 Amt $50.00

Ck# 7181 Date 9/18/2008 Amt $450.00

Ck# 7187 Date 9/22/2008 Amt $40.00

Ck# 712 Date

Ck# 7189 Date 9/18/2008 Amt $60.00

Ck# 0 Date 8/25/2008 Amt $65.00

Ck# 7175 Date 9/10/2008 Amt $300.00

Ck# 7182 Date 9/24/2008 Amt $500.00

C-26

Ck# 7643 Date 7/20/2009 Amt $702.65



Ck# 7690 Date 8/20/2009 Amt $120.00



Ck# 7644 Date 7/16/2009 Amt $80.00



Ck# 7689 Date 8/24/2009 Amt $2,650.00



Ck# 7645 Date 7/16/2009 Amt $2,850.00



Ck# 7741 Date 10/1/2009 Amt $350.00



Ck# 7698 Date 9/8/2009 Amt $75.00



Ck# 7585 Date 5/26/2009 Amt $80.00



Ck# 7707 Date 8/31/2009 Amt $750.00



Ck# 7587 Date



Ck# 3823 Date 11/12/2009 Amt $300.00



Ck# 7599 Date 6/12/2009 Amt $3,000.00



Ck# 7784 Date



Ck# 8040 Date

C-26

Ck# 7334  Date 12/17/2008  Amt $150.00



Ck# 7343  Date 12/23/2008  Amt $50.00



Ck# 7339  Date 12/31/2008  Amt $150.00



Ck# 7368  Date 1/9/2009  Amt $70.00



Ck# 7342  Date 12/18/2008  Amt $75.00



Ck# 7354  Date 1/2/2009  Amt $100.00



Ck# 7344  Date 1/13/2009  Amt $450.00



Ck# 7333  Date 12/16/2008  Amt $150.00



Ck# 7369  Date 1/13/2009  Amt $2,700.00



Ck# 7375  Date 1/15/2009  Amt $80.00



Ck# 7381  Date 1/20/2009  Amt $150.00



Ck# 7438  Date 2/13/2009  Amt $80.00

C-26

Ck# 7378 Date 1/23/2009 Amt $250.00

Ck# 7457 Date 2/23/2009 Amt $300.00

Ck# 7396 Date 1/22/2009 Amt $80.00

Ck# 7473 Date 3/5/2009 Amt $80.00

Ck# 7434 Date 2/12/2009 Amt $2,905.00

Ck# 7450 Date 2/19/2009 Amt $125.00

Ck# 7431 Date 2/9/2009 Amt $75.00

Ck# 7449 Date 2/19/2009 Amt $80.00

Ck# 7427 Date 2/6/2009 Amt $80.00

Ck# 7461 Date 2/26/2009 Amt $80.00

Ck# 7424 Date 2/9/2009 Amt $90.00

Ck# 7482 Date 3/12/2009 Amt $80.00

Ck# 7483 Date 3/13/2009 Amt $2,850.00

Ck# 7414 Date 4/2/2009 Amt $50.00

Ck# 7466 Date 2/27/2009 Amt $75.00

Ck# 7412 Date 4/3/2009 Amt $90.00

Ck# 7469 Date 3/4/2009 Amt $260.40

Ck# 7513 Date 4/10/2009 Amt $80.00

Ck# 7468 Date 3/4/2009 Amt $250.00

Ck# 7515 Date 4/14/2009 Amt $3,100.00

Ck# 7407 Date 3/23/2009 Amt $250.00

Ck# 7504 Date 4/1/2009 Amt $100.00

Ck# 7490 Date 3/19/2009 Amt $80.00

Ck# 7497 Date 3/27/2009 Amt $80.00

C-26

Ck# 7530 Date 4/24/2009 Amt $80.00

Ck# 7551 Date 5/14/2009 Amt $80.00

Ck# 7538 Date 5/1/2009 Amt $80.00

Ck# 7544 Date 5/7/2009 Amt $105.00

Ck# 7524 Date 4/20/2009 Amt $80.00

Ck# 7585 Date 5/31/2009 Amt $80.00

Ck# 7552 Date 5/14/2009 Amt $2,850.00

Ck# 7596 Date 6/5/2009 Amt $75.00

Ck# 7571 Date 5/14/2009 Amt $225.00

Ck# 7598 Date 6/11/2009 Amt $100.00

Ck# 7572 Date 5/15/2009 Amt $300.00

Ck# 7563 Date 6/3/2009 Amt $80.00

Ck# 7548 Date 5/8/2009 Amt $80.00

Ck# 7560 Date 6/4/2009 Amt $150.00

Ck# 7778 Date 10/28/2009 Amt $2,650.00

Ck# 7917 Amt $200.00 Date 12/21/2010

Ck# 7786 Date 11/18/2009 Amt $240.00

Ck# 7824 Date 11/13/2009 Amt $50.00

Ck# 7846 Date 12/1/2009 Amt $100.00

Ck# 7809 Date 11/4/2009 Amt $2,650.00

Ck# 7803 Date 11/4/2009 Amt $300.00

Ck# 7819 Date 11/13/2009 Amt $125.00

Ck# 7842

Ck# 7856 Date 12/14/2009 Amt $100.00

Ck# 7857 Date 12/14/2009 Amt $250.00

Ck# 7615 Date 7/2/2009 Amt $80.00



Ck# 7628 Date 7/8/2009 Amt $100.00



Ck# 8968 Amt $3,000.00 Date 5/18/2012

Ck# 7589 Date 5/29/2009 Amt $80.00

Ck# 7568 Date 6/18/2009 Amt $100.00

Ck# 7633 Date 7/14/2009 Amt $1,750.00

Ck# 7607 Date 6/25/2009 Amt $80.00

Ck# 7614 Date 7/3/2009 Amt $200.00

Ck# 7625 Date 7/8/2009 Amt $100.00

Ck# 7678 Date 8/13/2009 Amt $100.00

Ck# 7737 Date 10/2/2009 Amt $300.00

Ck# 7748 Date 10/2/2009 Amt $750.00

Ck# 7750 Date 10/6/2009 Amt $500.00

Ck# 7669 Date 8/7/2009 Amt $140.00

Ck# 7665 Date 7/30/2009 Amt $120.00

Ck# 7653 Date 7/23/2009 Amt $120.00

C-26

Ck# 8056 Date 4/30/2010 Amt $300.00

Ck# 8199 Amt $2,100.00 Date 8/10/2010

Ck# 8100 Amt $2,000.00 Date 6/1/2010

Ck# 8296 Amt $2,000.00 Date 10/28/2010

Ck# 8148 Amt $250.00 Date 7/6/2010.

Ck# 8323 Amt $125.00 Date 11/23/2010

Ck# 8136 Amt $1,750.00 Date 7/2/2010

Ck# 7166 Date 9/15/2008 Amt $150.00

Ck# 8146

Ck# 7175 Date 9/15/2008 Amt $300.00

Ck# 7167 Date 9/15/2008 Amt $300.00

Ck# 8207 Amt $50.00 Date 5/30/2010

Ck# 8186 Amt $300.00 Date 7/27/2010

C-26

Ck# 7944 Date 2/1/2010 Amt $650.00

Ck# 7936 Date 1/27/2010 Amt $2,050.00

Ck# 7972 Date 2/22/2010 Amt $300.00

Ck# 7974 Date 3/1/2010 Amt $200.00

Ck# 7898 Date 1/19/2010 Amt $600.00

Ck# 8002 Date 3/11/2010 Amt $225.00

Ck# 8080 Amt $250.00 Date 5/17/2010

Ck# 7975 Date 2/23/2010 Amt $2,650.00

Ck# 7976 Date 2/23/2010 Amt $600.00

Ck# 8001 Date 3/11/2010 Amt $225.00

Ck# 0 Date 3/24/2010 Amt $2,650.00

Ck# 7969 Date 2/19/2010 Amt $250.00

Ck# 8018 Date 3/23/2010 Amt $100.00

Ck# 0 Date 4/22/2010 Amt $2,650.00

C-26

Ck# 8672  Amt $100.00  Date 10/28/2011

Ck# 8739  Amt $3,000.00  Date 12/8/2011

Ck# 8636  Amt $250.00  Date 10/11/2011

Ck# 8619  Amt $4,000.00  Date 9/29/2011

Ck# 8657  Amt $100.00  Date 10/24/2011

Ck# 8688  Amt $2,500.00  Date 11/9/2011

Ck# 8658  Amt $100.00  Date 10/24/2011

Ck# 8740  Amt $300.00  Date 12/12/2011

Ck# 8676  Amt $2,000.00  Date 10/31/2011

Ck# 7894  Date 1/12/2010  Amt $50.00

Ck# 8603  Amt $120.00  Date 10/7/2011

Ck# 7869  Date 12/22/2009  Amt $2,690.00

Ck# 8603  Amt $120.00  Date 10/7/2011

Ck# 7932  Date 1/25/2010  Amt $200.00

C-26

CK# 8424  Amt $175.00  Date 4/4/2011



CK# 8581  Amt $40.00  Date 8/8/2011



CK# 8488  Amt $80.00  Date 6/14/2011



CK# 8404  Amt $300.00  Date 3/17/2011



CK# 8418  Amt $2,000.00  Date 3/31/2011



CK# 8536  Amt $2,175.00  Date 8/17/2011



CK# 8442  Amt $125.00  Date 5/11/2011



CK# 0  Amt $210.00  Date 9/12/2011



CK# 8471  Amt $2,000.00  Date 6/6/2011



CK# 8592  Amt $40.00  Date 8/29/2011



CK# 8463  Amt $2,000.00  Date 5/4/2011



CK# 8597  Amt $300.00  Date 8/31/2011



CK# 8525  Amt $2,000.00  Date 7/15/2011



CK# 8584  Amt $410.00  Date 8/16/2011

C-26

Ck# 8336 Amt $100.00 Date 1/6/2011

Ck# 8408 Amt $200.00 Date 3/11/2011

Ck# 7930 Amt $250.00 Date 1/10/2011

Ck# 8401 Amt $200.00 Date 3/11/2011

Ck# 7918 Amt $3,000.00 Date 12/20/2010

Ck# 8385 Amt $2,000.00 Date 3/4/2011

Ck# 7923 Amt $200.00 Date 1/7/2011

Ck# 8398 Amt $350.00 Date 3/7/2011

Ck# 0 Amt $3,000.00 Date 1/18/2011

Ck# 8415 Amt $1,638.00 Date 3/28/2011

Ck# 8357 Amt $1,000.00 Date 1/31/2011

Ck# 8412 Amt $550.60 Date 3/22/2011

Ck# 8373 Amt $200.00 Date 2/23/2011

Ck# 8416 Amt $150.00 Date 3/24/2011

CK# 9052  Amt $3,000.00  Date 7/13/2012

CK# 9091  Amt $124.00  Date 8/10/2012

CK# 9062  Amt $300.00  Date 8/2/2012

CK# 9181  Amt $225.00  Date 9/24/2012

CK# 9048  Amt $150.00  Date 7/30/2012

CK# 9189  Amt $40.00  Date 9/26/2012

CK# 8995  Amt $50.00  Date 7/10/2012

CK# 9169  Amt $3,000.00  Date 9/18/2012

CK# 8976  Amt $120.00  Date 6/18/2012

CK# 8975  Amt $300.00  Date 5/29/2012

CK# 8978  Amt $326.13  Date 6/20/2012

CK# 9014  Amt $300.00  Date 6/8/2012

CK# 9079  Amt $100.00  Date 8/3/2012

CK# 9026  Amt $3,000.00  Date 6/15/2012

C-26

Ck# 9286  Amt $3,000.00  Date 11/19/2012


Ck# 8764  Amt $3,000.00  Date 1/25/2012


Ck# 9300  Amt $630.00  Date 12/5/2012


Ck# 8817  Amt $300.00  Date 2/1/2012


Ck# 8718  Amt $100.00  Date 12/22/2011


Ck# 8829  Amt $3,000.00  Date 2/16/2012


Ck# 8721  Amt $100.00  Date 12/22/2011


Ck# 8792  Amt $300.00  Date 3/21/2012


Ck# 8755  Amt $200.00  Date 12/28/2011


Ck# 8800  Amt $3,000.00  Date 3/19/2012


Ck# 8725  Amt $410.00  Date 12/27/2011


Ck# 8910  Amt $630.00  Date 4/5/2012

C-26

Ck# 8924 Amt $3,000.00 Date 4/23/2012



Ck# 8873 Amt $126.00 Date 4/18/2012



Ck# 8968 Amt $3,000.00 Date 5/18/2012



Ck# 8825 Amt $300.00 Date 2/9/2012



Ck# 8940 Amt $150.00 Date 5/22/2012

## PRECAUTIONARY STATEMENTS

**Hazard to Humans and Domestic Animals**

**CAUTION:** Keep away from humans, domestic animals and pets. Keep away from feed or foodstuffs. May be harmful or fatal if swallowed or absorbed through the skin because this material may reduce the clotting ability of blood and cause bleeding. This product should be handled with gloves. Do not get in eyes, on skin or on clothing. Wash arms, hands and face with soap and water after using and before eating and smoking.

**FIRST AID:** Have this label with you when obtaining treatment advice. If swallowed: Call a poison control center or doctor immediately for treatment advice. Do not induce vomiting unless told to do so by the poison control center or doctor. Note to Physician: If ingested, administer Vitamin K₁ intramuscularly or orally as indicated in bishydroxycoumarin antidotes. Repeat as necessary based on monitoring of prothrombin times.

**ENVIRONMENTAL HAZARDS:** This product is toxic to fish and wildlife. Keep out of lakes, streams or ponds. Do not contaminate water by cleaning of equipment or disposal of wastes.

## STORAGE AND DISPOSAL

Do not contaminate water, food or feed by storage or disposal.

Storage: Store in original container in a cool, dry place inaccessible to children and pets.

Pesticide Disposal: Wastes resulting from the use of this product may be disposed of on site or at an approved waste disposal facility.

Container Disposal: Nonrefillable container. Do not reuse or refill this container. Then dispose of empty bag in a sanitary landfill or by incineration, or, if allowed by State and local authorities, by burning. If burned, stay out of smoke.

WARRANTY: Seller makes no warranty, expressed or implied, concerning the use of this product other than indicated on the label. Buyer assumes all risk of use and/or handling of this material when such use and/or handling is contrary to label instructions.

EPA Reg. No. 7173-151
EPA Est. No. 7173-WI-1   Label No. 150-50028-1203-C
Product No. 84313



# ROZOL

# PELLETS

## FOR INDOOR AND OUTDOOR USE

### KILLS HOUSE MICE, NORWAY RATS, AND ROOF RATS

See side panel for additional precautionary statements.

## KEEP OUT OF REACH OF CHILDREN

## CAUTION

Active Ingredient:
Chlorophacinone
2-[(p-Chlorophenyl)phenylacetyl]-1,3-indandione* ..... 0.005%

Inert Ingredients: ..... 99.995%

Total: ..... 100.00%

*Chlorophacinone = Liphadione

**LIPHA·TECH®**

Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209
1-800-351-1476

**Net Weight: 50 pounds (22.7 kg)**

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

READ THIS LABEL: Read this entire label and follow all use directions and use precautions.

IMPORTANT: Do not expose children, pets, or other nontarget animals to rodenticides.

To prevent accidents:
1. Store product not in use in a location out of reach of children and pets.
2. Apply bait in locations out of reach of children, pets, domestic animals and wildlife, or in tamper-resistant bait stations. These stations must be resistant to destruction by dogs and children under six years of age, and must be used in a manner that prevents such children from reaching into bait compartments and obtaining bait. If bait can be shaken from stations when they are lifted, units must be secured or otherwise immobilized. Even stronger bait stations are needed in areas open to hoofed livestock, raccoons, bears, or other potentially destructive animals, or in areas prone to vandalism.

USE RESTRICTIONS: For control of Norway Rats, Roof Rats and House Mice in and around homes, industrial, agricultural and similar man-made structures. Do not place bait in areas where there is a possibility of contaminating food or surfaces that come in direct contact with food. Do not broadcast bait.

Selection of Treatment Areas: Determine areas where rats and/or mice will most likely find and consume the bait. Generally, these are along walls, by gnawed openings, in or beside burrows, in corners and concealed places, between floors and walls, or in locations where rodents or their signs have been seen. Remove as much alternative food as possible.

APPLICATION DIRECTIONS:

Rats: Apply 4 to 16 ounces of bait per placement. Maintain an uninterrupted supply of fresh bait for at least 10 days.

Mice: Apply 1/4 to 1/2 oz. (1 - 2 level tablespoons) of bait at 8- to 12-foot intervals. Larger placements (up to 2 oz.) may be needed at points of very high mouse activity. Maintain an uninterrupted supply of fresh bait for at least 15 days.

Rats and Mice: Replace contaminated or spoiled bait immediately. Collect and dispose of all dead animals and leftover bait properly. To prevent reinfestation, limit sources of rodent food, water and harborage as much as possible. If reinfestation does occur, repeat treatment. Where a continuous source of infestation is present, establish permanent bait stations and replenish as needed.

(6320)

# PELLETS

FOZZOL

## FOR INDOOR AND OUTDOOR USE

## KILLS HOUSE MICE, NORWAY RATS, AND ROOF RATS

**Active Ingredient:**
2-[(p-chlorophenyl)phenylacetyl]-1,3-indandione* ...... 0.005%
Inert Ingredients: ........................................... 99.995%
Total: .......................................................... 100.00%
*Chlorophacinone - Liphadione

### KEEP OUT OF REACH OF CHILDREN
### CAUTION

See side panel for additional precautionary statements.

**LIPHA-TECH®**

Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209
1-800-351-1476

EPA Reg. No. 7173-151
EPA Est. No. 7173-WI-1

Product No. 84313
Label No. 150-5028-1203-C

**Net Weight: 50 pounds (22.7 kg)**

## PRECAUTIONARY STATEMENTS
Hazard to Humans and Domestic Animals

**CAUTION:** Keep away from humans, domestic animals and pets. Keep away from feed or foodstuffs. May be harmful or fatal if swallowed or absorbed through the skin because this material may reduce the clotting ability of blood and cause bleeding. This product contains an anticoagulant. Do not get in eyes, on skin or on clothing. Wash arms, hands and face with soap and water after applying and before eating and smoking.

**FIRST AID**
Have this label with you when obtaining treatment advice. If swallowed, call a poison control center or doctor immediately for treatment advice. Do not induce vomiting unless told to do so by the poison control center or doctor. Note to Physician: If ingested, administer Vitamin K₁ intramuscularly or orally as indicated in bishydroxycoumarin overdose. Repeat as necessary based on monitoring of prothrombin times.

ENVIRONMENTAL HAZARDS: This product is toxic to fish and wildlife. Keep out of lakes, streams, or ponds. Do not contaminate water by cleaning of equipment or disposal of wastes.

## STORAGE AND DISPOSAL
Do not contaminate water, food or feed by storage or disposal.
Storage: Store in original container in a cool, dry place inaccessible to children and pets.
Pesticide Disposal: Wastes resulting from the use of this product may be disposed of on site or at an approved waste disposal facility.
Container Disposal: Completely empty bag. Then dispose of empty bag in a sanitary landfill or by incineration, or, if allowed by State and local authorities, by burning. If burned, stay out of smoke.

**WARRANTY:** Seller makes no warranty, expressed or implied, concerning the use of this product other than indicated on the label. Buyer assumes all risk of any such use and/or handling of this material when such use and/or handling is contrary to label instructions.

## DIRECTIONS FOR USE
It is a violation of Federal law to use this product in a manner inconsistent with its labeling.
READ THIS LABEL: Use directions below to prevent infestation. Follow use directions and use precautions.
IMPORTANT: Do not expose children, pets or other nontarget animals to rodenticides. To help prevent accidents:
1. Store product not in use in a location out of reach of children and pets.
2. ...resistant bait stations that are resistant to destruction by dogs and children under six years of age, and that can be fixed in place. These stations must be resistant to destruction by dogs and by children under six years of age, and must be used in a manner that prevents such children from reaching into bait compartments and obtaining bait. If bait can be shaken from stations when they are lifted, units must be resealed or otherwise immobilized, or stronger bait stations such as those that are bolted or otherwise secured must be used. In areas open to livestock, raccoons, bears, other potentially destructive animals, or in areas prone to vandalism, place bait stations in locations not accessible to these animals.
3. Dispose of product container, unused, spoiled, and unconsumed bait as specified on this label.
USE RESTRICTIONS: For control of Norway Rats, Roof Rats and House Mice.
Selection of Treatment Areas: Determine areas where rats and mice will most likely find and consume the bait. Generally, these are along walls, by gnawed openings, in or beside burrows, in corners and concealed places, between floors and walls, or in locations where rodents or their signs have been seen. Remove as much alternative food as possible.
APPLICATION DIRECTIONS:
Rats: Apply 4 to 16 ounces of bait per placement. Maintain an uninterrupted supply of fresh bait for at least 10 days.
Mice: Apply 1/4 to 1/2 oz. (1 - 2 level tablespoons) of bait at 8- to 12-foot intervals. Larger placements (up to 4 oz.) may be needed at points of very high mouse activity. Maintain an uninterrupted supply of fresh bait for at least 15 days.
Rats and Mice: Replace contaminated or spoiled bait immediately. Collect and dispose of all dead animals and leftover bait. To prevent reinfestation, limit sources of rodent food, water, and harborage as much as possible. If reinfestation does occur, repeat treatment. Where a continuous source of infestation is present, establish permanent bait stations and replenish as needed.

(0201)

## PRECAUTIONARY STATEMENTS

**Hazard to Humans and Domestic Animals**

**CAUTION:** Keep away from humans, domestic animals and pets. Keep away from food or feedstuffs. This material may be absorbed through the skin because this product is formulated with a material that can reduce the clotting ability of blood and cause bleeding. This product should be handled with gloves. Do not get in eyes, on skin or on clothing. Wash hands and face with soap and water after applying and before eating and smoking.

**FIRST AID** Have this label with you when obtaining treatment advice. If swallowed: Call a poison control center or doctor immediately for treatment advice. Do not induce vomiting unless told to do so by the poison control center or doctor. Note to Physician: If ingested, administer Vitamin K₁ intramuscularly or orally as indicated in bishydroxycoumarin overdose. Repeat as necessary based on monitoring of prothrombin times.

**ENVIRONMENTAL HAZARDS:** This product is toxic to fish and wildlife. Keep out of lakes, streams or ponds. Do not contaminate water by cleaning of equipment or disposal of wastes.

## STORAGE AND DISPOSAL

Do not contaminate water, food or feed by storage or disposal.
**Storage:** Store in original container in a cool, dry place inaccessible to children and pets.
**Pesticide Disposal:** Wastes resulting from the use of this product should be disposed of on site or at an approved waste disposal facility.
**Container Disposal:** Completely empty bag. Then dispose of empty bag in a sanitary landfill or by incineration, or, if allowed by State and local authorities, by burning. If burned, stay out of smoke.

**WARRANTY:** Seller makes no warranty, expressed or implied, concerning the use of this product other than indicated on the label. Buyer assumes all risk of such use and/or handling of this material when contrary to label instructions. such use

EPA Reg. No. 7173-151
EPA Est. No. 7173-WI-1

Product No. 84313

Label No. 150-5026-1203-C

## LIPHA·TECH®

See side panel for additional precautionary statements.

**KEEP OUT OF REACH OF CHILDREN**

**CAUTION**

Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209
1-800-351-1476

**Active Ingredient:**
2-[(p-chlorophenyl)phenylacetyl]-1,3-indandione* ..... 0.005%
*Chlorophacinone • Liphadione

**Inert Ingredients:** ..... 99.995%
**Total** ..... 100.000%

## ROZOL® PELLETS

**FOR INDOOR AND OUTDOOR USE**

**KILLS HOUSE MICE, NORWAY RATS, AND ROOF RATS**

**Net Weight: 50 pounds (22.7 kg)**

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

**READ THIS LABEL:** Read this entire label and follow all use directions and use precautions. Use only for the purpose and on the sites specified on this label.

**IMPORTANT:** Do not expose children, pets, or other nontarget animals to rodenticides. To help prevent accidents:
1. Store product not in use in a location out of reach of children and pets.
2. Apply bait in locations out of reach of children, pets, domestic animals and nontarget wildlife, or in tamper-resistant bait stations. These stations must be resistant to destruction by dogs and children under six years of age, and must be used in a manner that prevents such children from reaching into bait compartments and obtaining bait. If bait can be shaken from stations when they are lifted, or if it is visible outside the stations, use a different type of station. Even stronger bait stations are needed in areas open to hoofed livestock, raccoons, bears, other potentially destructive animals, or in areas prone to vandalism.
3. Dispose of product, unused, spoiled, and unconsumed bait as specified on this label.

**USE RESTRICTIONS:** For control of Norway Rats, Roof Rats and House Mice in and around homes, industrial and agricultural buildings, and similar man-made structures. Do not apply this product into areas where there is a possibility of contaminating food or feed. Do not broadcast bait. All bait must be placed in locations not accessible to children, pets and nontarget animals, or in direct contact with food. Do not place near or inside ventilation duct openings.

**APPLICATION DIRECTIONS**

**Selection of Treatment Areas:** Determine areas where rats and/or mice will most likely find and consume the bait and/or mice will most likely find and consume the bait. Usually, these are along walls, by gnawed openings, in or beside burrows, in corners and concealed places, between floors and walls, or in locations where rodents or their signs have been seen. Remove as much alternative food as possible.

**Rats and Mice:** Apply 4 to 16 ounces of bait per placement. Maintain an uninterrupted supply of fresh bait for at least 10 days.

**Mice:** Apply ¼ to ½ oz. (1 - 2 level tablespoons) of bait at 8 - to 12-foot intervals. Larger placements (up to 2 oz.) may be needed at points of very high mouse activity. Maintain an uninterrupted supply of fresh bait for at least 15 days.

**Rats and Mice:** Replace contaminated or spoiled bait immediately. Collect and dispose of all dead animals and leftover bait. To prevent reinfestation, limit sources of rodent food, water and harborage as much as possible. If reinfestation does occur, repeat treatment. Where a continuous source of infestation is present, establish permanent bait stations and replenish as needed.

(0321)

Case 2:14-cv-00062-JPB Document 84-14 Filed 04/14/17 Page 144 of 571 PageID #: 384

# ROZOL® PELLETS
## MATERIAL SAFETY DATA SHEET

## SECTION 1 — PRODUCT & COMPANY IDENTIFICATION

**Material Name:** Rozol® Pellets
**Other Designation:** Anticoagulant rodenticide with 0.005% Chlorophacinone
**Chemical Formula:** Mixture
**Manufacturer:** Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209

**Registration No.:** EPA Reg. No. 7173-151
**Emergency Telephone:** 414-351-1476
Monday-Friday, 8:00 am - 4:30 pm CST
**After Hours:** Call CHEMTREC at 1-800-424-9300

## SECTION 2 — INGREDIENT INFORMATION

| Hazardous Ingredient: | CAS Number: | OSHA PEL: | ACGIH TLV: | ACGIH STEL: |
|---|---|---|---|---|
| Chlorophacinone | 3691-35-8 | Not assigned | Not assigned | Not assigned |

## SECTION 3 — HAZARDS IDENTIFICATION

**Emergency Overview:** May be harmful or fatal if swallowed or absorbed through the skin, because this material may reduce the clotting ability of the blood and cause bleeding.

**Primary Entry Routes:** Oral (swallowing), dermal (absorption through skin)

**Acute Effects (Signs and Symptoms of Overexposure):**
**Eyes:** May cause minor, transient eye irritation (redness).
**Skin:** May be harmful or fatal if absorbed through the skin. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.
**Inhalation:** Due to this product's solid form, inhalation is unlikely.
**Ingestion:** May be harmful or fatal if swallowed. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.

**Chronic Effects:** Prolonged and/or repeated exposure to small amounts of product can produce cumulative toxicity. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.

**Medical Conditions Aggravated by Exposure:** Bleeding disorders
**Target Organs:** Liver
**Carcinogenicity:** Contains no known or suspected carcinogens.
**HMIS:** Health – 2, Flammability – 0, Reactivity – 0

## SECTION 4 — FIRST AID MEASURES

**Eyes:** Flush with water. Get medical attention if irritation persists.
**Skin:** Wash with soap and water. Get medical attention if irritation persists.
**Inhalation:** If inhaled, remove person to fresh air. Get medical attention.
**Ingestion:** Call a physician or poison control center immediately. Have the product label available for medical personnel to read.

Induce vomiting under the direction of medical personnel. Drink 1 or 2 glasses of water and induce vomiting by touching the back of throat with finger. If syrup of ipecac is available, give 1 tablespoon (15ml) followed by 1 or 2 glasses of water. If vomiting does not occur within 20 minutes, repeat this dosage once. Do not induce vomiting or give anything by mouth to an unconscious person.

**Note to Physician:** This rodenticide contains an anticoagulant ingredient. If ingested, administer vitamin $K_1$ intramuscularly or orally, as indicated in bishydroxycoumarin overdoses. Repeat as necessary based on monitoring of prothrombin times.

For information on this pesticide product (including health concerns, medical emergencies, or pesticide incidents) call the National Pesticide Telecommunications Network at 1-800-858-7378.

## SECTION 5 — FIRE FIGHTING MEASURES

NFPA
**Flash Point:** None
**Autoignition Temp.:** Not determined
**Explosive Limits:** LEL: Not applicable
UEL: Not applicable

**Extinguishing Media:** Use media suitable for the surrounding fire
**Unusual Fire or Explosion Hazards:** None known
**Fire Fighting Instructions:** Firefighters should wear self-contained breathing apparatus (full facepiece) and full protective clothing. Contain runoff to prevent pollution.

## SECTION 6 — ACCIDENTAL RELEASE MEASURES

**Large Spill/Leak Procedures:** Isolate and restrict spill. Limit access to the spill area to necessary personnel. Do not allow spilled material to enter sewers, streams or other waters. Scoop up spilled material and place in a closed, labeled container for use or disposal.

## SECTION 7 — STORAGE AND HANDLING

**Storage Requirements:** Store in original container in a cool, dry area out of reach of children, pets and domestic animals. Do not contaminate water, food or feed. Keep container tightly closed. Do not remove or destroy the product label.
**Handling Precautions:** Read the entire product label before using this rodenticide. Carefully follow all cautions, directions and use restrictions on the label. Do not get in eyes, on skin or on clothing.

## SECTION 8 — EXPOSURE CONTROLS/PERSONAL PROTECTION

**Ventilation:** Special ventilation is not required for the normal handling and use of this product when following the label instructions.
**Protective Clothing/Equipment:** No special requirements.
**Respirator:** None required when used according to label instructions.
**Contaminated Equipment:** Damaged or unwanted bait stations and bait holders should be wrapped in paper and discarded in trash.
**Comments:** Never eat, drink or smoke in work areas. Practice good personal hygiene after using this product. Wash arms, hands and face with soap and water after handling this product, and before eating and smoking. Launder contaminated clothing separate from street clothes.

## SECTION 9 — PHYSICAL AND CHEMICAL PROPERTIES

| | | | |
|---|---|---|---|
| **Physical State:** | Solid pellets | **Water Solubility:** | Negligible |
| **Color:** | Tan | **% Volatile (Volume):** | Not applicable |
| **Odor:** | None | **Specific Gravity:** | 1.26 g/cc |
| **Melting Point:** | Not available | **Vapor Pressure:** | Not applicable |
| **Boiling Point:** | Not applicable | **Vapor Density:** | Not applicable |
| **Freezing Point:** | Not applicable | **pH:** | Not applicable |

## SECTION 10 — STABILITY AND REACTIVITY

**Stability:** Stable
**Conditions to Avoid:** None
**Hazardous Polymerization:** Will not occur
**Chemical Incompatibilities:** Alkaline materials
**Hazardous Products of Decomposition:** Oxides of carbon

## SECTION 11 — TOXICOLOGICAL INFORMATION

| | |
|---|---|
| **Eye Effects/Eye Irritation:** | Mild, transient irritant |
| **Acute Oral Effects:** | $LD_{50}$ (ori-rat): >5000 mg/kg |
| **Acute Inhalation Effects:** | No data available |
| **Acute Dermal Effects:** | $LD_{50}$ (derm-rbt): >2000 mg/kg |
| **Skin Irritation:** | Non-irritating |
| **Skin Sensitization:** | Not a skin sensitizer |

## SECTION 12 — ECOLOGICAL INFORMATION

This product is toxic to fish and wildlife. Do not apply this product directly to water, where surface water is present or to intertidal areas below the mean high water mark. Follow label cautions and instructions to reduce hazards to non-target animals.

## SECTION 13 — DISPOSAL CONSIDERATIONS

**Disposal:** Wastes which result from the use of this product according to the label instructions must be disposed of as specified on the product label.
**RCRA Waste Status:** This product is not regulated as a hazardous waste under RCRA. State and local regulation may affect the disposal of this product. Consult your state or local environmental agency for disposal of waste generated other than by use according to label instructions.

## SECTION 14 — TRANSPORT INFORMATION

**Transportation Data (49 CFR):** This product is not regulated as a hazardous material for all modes of transportation within the U.S.
**Hazard Class:** Not applicable **ID No.:** Not applicable

## SECTION 15 — REGULATORY INFORMATION

**TSCA:** All components of this product are listed on the TSCA inventory.
**SARA Section 313:** Contains no reportable components.
**OSHA Hazard Classification:** Acute health hazard, chronic health hazard.
**Proposition 65:** Contains no components subject to warning requirements.

## SECTION 16 — OTHER INFORMATION

**Prepared by:** T. Schmit **Date:** 7/24/2003
Information presented on this Material Safety Data Sheet is believed to be accurate at the time of publication. No warranty, expressed or implied, is made with regard to this information. This information may not be adequate for

# ROZOL® PELLETS
## MATERIAL SAFETY DATA SHEET

## SECTION 1  PRODUCT & COMPANY IDENTIFICATION

**Material Name:** Rozol® Pellets
**Other Designation:** Anticoagulant rodenticide with 0.005% Chlorophacinone
**Chemical Formula:** Mixture
**Manufacturer:** Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209

**Registration No.:** EPA Reg. No. 7173-151
**Emergency Telephone:** 414-351-1476
Monday-Friday, 8:00 am - 4:30 pm CST
**After Hours:** Call CHEMTREC at 1-800-424-9300

## SECTION 2  INGREDIENT INFORMATION

| Hazardous Ingredient: | CAS Number: | OSHA PEL: | ACGIH TLV: | ACGIH STEL: |
|---|---|---|---|---|
| Chlorophacinone | 3691-35-8 | Not assigned | Not assigned | Not assigned |

## SECTION 3  HAZARDS IDENTIFICATION

**Emergency Overview:** May be harmful or fatal if swallowed or absorbed through the skin, because this material may reduce the clotting ability of the blood and cause bleeding.
**Primary Entry Routes:** Oral (swallowing), dermal (absorption through skin)
**Acute Effects (Signs and Symptoms of Overexposure):**
**Eyes:** May cause minor, transient eye irritation (redness).
**Skin:** May be harmful or fatal if absorbed through the skin. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.
**Inhalation:** Due to this product's solid form, inhalation is unlikely.
**Ingestion:** May be harmful or fatal if swallowed. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.
**Chronic Effects:** Prolonged and/or repeated exposure to small amounts of product can produce cumulative toxicity. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.
**Medical Conditions Aggravated by Exposure:** Bleeding disorders
**Target Organs:** Liver
**Carcinogenicity:** Contains no known or suspected carcinogens.
**HMIS:** Health – 2, Flammability – 0, Reactivity – 0

## SECTION 4  FIRST AID MEASURES

**Eyes:** Flush with water. Get medical attention if irritation persists.
**Skin:** Wash with soap and water. Get medical attention if irritation persists.
**Inhalation:** If inhaled, remove person to fresh air. Get medical attention.
**Ingestion:** Call a physician or poison control center immediately. Have the product label available for medical personnel to read.

Induce vomiting under the direction of medical personnel. Drink 1 or 2 glasses of water and induce vomiting by touching the back of throat with finger. If syrup of ipecac is available, give 1 tablespoon (15ml) followed by 1 or 2 glasses of water. If vomiting does not occur within 20 minutes, repeat this dosage once. Do not induce vomiting or give anything by mouth to an unconscious person.

**Note to Physician:** This rodenticide contains an anticoagulant ingredient. If ingested, administer vitamin K₁ intramuscularly or orally, as indicated in bishydroxycoumarin overdoses. Repeat as necessary based on monitoring of prothrombin times.

For information on this pesticide product (including health concerns, medical emergencies, or pesticide incidents) call the National Pesticide Telecommunications Network at 1-800-858-7378.

## SECTION 5  FIRE FIGHTING MEASURES

NFPA

**Flash Point:** None
**Autoignition Temp.:** Not determined
**Explosive Limits:** LEL: Not applicable
UEL: Not applicable

**Extinguishing Media:** Use media suitable for the surrounding fire
**Unusual Fire or Explosion Hazards:** None known
**Fire Fighting Instructions:** Firefighters should wear self-contained breathing apparatus (full facepiece) and full protective clothing. Contain runoff to prevent pollution.

## SECTION 6  ACCIDENTAL RELEASE MEASURES

**Large Spill/Leak Procedures:** Isolate and contain spill. Limit access to the spill area to necessary personnel. Do not allow spilled material to enter sewers, streams or other waters. Scoop up spilled material and place in a closed, labeled container for use or disposal

## SECTION 7  STORAGE AND HANDLING

**Storage Requirements:** Store in original container in a cool, dry area out of reach of children, pets and domestic animals. Do not contaminate water, food or feed. Keep container tightly closed. Do not remove or destroy the product label.
**Handling Precautions:** Read the entire product label before using this rodenticide. Carefully follow all cautions, directions and use restrictions on the label. Do not get in eyes, on skin or on clothing.

## SECTION 8  EXPOSURE CONTROLS/ PERSONAL PROTECTION

**Ventilation:** Special ventilation is not required for the normal handling and use of this product when following the label instructions.
**Protective Clothing/Equipment:** No special requirements.
**Respirator:** None required when used according to label instructions.
**Contaminated Equipment:** Damaged or unwanted bait stations and bait holders should be wrapped in paper and discarded in trash.
**Comments:** Never eat, drink or smoke in work areas. Practice good personal hygiene after using this product. Wash arms, hands and face with soap and water after handling this product, and before eating and smoking. Launder contaminated clothing separate from street clothes.

## SECTION 9  PHYSICAL AND CHEMICAL PROPERTIES

| | | | |
|---|---|---|---|
| **Physical State:** | Solid pellets | **Water Solubility:** | Negligible |
| **Color:** | Tan | **% Volatile (Volume):** | Not applicable |
| **Odor:** | None | **Specific Gravity:** | 1.26 g/cc |
| **Melting Point:** | Not available | **Vapor Pressure:** | Not applicable |
| **Boiling Point:** | Not applicable | **Vapor Density:** | Not applicable |
| **Freezing Point:** | Not applicable | **pH:** | Not applicable |

## SECTION 10  STABILITY AND REACTIVITY

**Stability:** Stable
**Conditions to Avoid:** None
**Hazardous Polymerization:** Will not occur
**Chemical Incompatibilities:** Alkaline materials
**Hazardous Products of Decomposition:** Oxides of carbon

## SECTION 11  TOXICOLOGICAL INFORMATION

| | |
|---|---|
| **Eye Effects/Eye Irritation:** | Mild, transient irritant |
| **Acute Oral Effects:** | LD₅₀ (orl-rat): >5000 mg/kg |
| **Acute Inhalation Effects:** | No data available |
| **Acute Dermal Effects:** | LD₅₀ (dml-rbt): >2000 mg/kg |
| **Skin Irritation:** | Non-irritating |
| **Skin Sensitization:** | Not a skin sensitizer. |

## SECTION 12  ECOLOGICAL INFORMATION

This product is toxic to fish and wildlife. Do not apply this product directly to water, where surface water is present or to intertidal areas below the mean high water mark. Follow label cautions and instructions to reduce hazards to non-target animals.

## SECTION 13  DISPOSAL CONSIDERATIONS

**Disposal:** Wastes which result from the use of this product according to the label instructions must be disposed of as specified on the product label.
**RCRA Waste Status:** This product is not regulated as a hazardous waste under RCRA. State and local regulation may affect the disposal of this product. Consult your state or local environmental agency for disposal of waste generated other than by use according to label instructions.

## SECTION 14  TRANSPORT INFORMATION

**Transportation Data (49 CFR):** This product is not regulated as a hazardous material for all modes of transportation within the U.S.
**Hazard Class:** Not applicable   **ID No.:** Not applicable

## SECTION 15  REGULATORY INFORMATION

**TSCA:** All components of this product are listed on the TSCA inventory.
**SARA Section 313:** Contains no reportable components.
**OSHA Hazard Classification:** Acute health hazard, chronic health hazard.
**Proposition 65:** Contains no components subject to warning requirements.

## SECTION 16  OTHER INFORMATION

**Prepared by:** T. Schmit   **Date:** 7/24/2003
Information presented on this Material Safety Data Sheet is believed to be accurate at the time of publication. No warranty, expressed or implied, is made with regard to this information. This information may not be adequate

# ROZOL PELLETS

## MATERIAL SAFETY DATA SHEET

### SECTION 1  PRODUCT & COMPANY IDENTIFICATION

**Material Name:**  Rozol® Pellets
**Other Designation:**  Anticoagulant rodenticide with 0.005% Chlorophacinone
**Chemical Formula:**  Mixture
**Manufacturer:**  Liphatech, Inc.
3600 W. Elm Street
Milwaukee, WI 53209

**Registration No.:**  EPA Reg. No. 7173-151
**Emergency Telephone:**  414-351-1476
Monday-Friday, 8:00 am – 4:30 pm CST
**After Hours:**  Call CHEMTREC at 1-800-424-9300

### SECTION 2  INGREDIENT INFORMATION

| Hazardous Ingredient: | CAS Number: | OSHA PEL: | ACGIH TLV: | ACGIH STEL: |
|---|---|---|---|---|
| Chlorophacinone | 3691-35-8 | Not assigned | Not assigned | Not assigned |

### SECTION 3  HAZARDS IDENTIFICATION

**Emergency Overview:** May be harmful or fatal if swallowed or absorbed through the skin, because this material may reduce the clotting ability of the blood and cause bleeding.

**Primary Entry Routes:** Oral (swallowing), dermal (absorption through skin)

**Acute Effects (Signs and Symptoms of Overexposure):**

**Eyes:** May cause minor, transient eye irritation (redness).

**Skin:** May be harmful or fatal if absorbed through the skin. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.

**Inhalation:** Due to this product's solid form, inhalation is unlikely.

**Ingestion:** May be harmful or fatal if swallowed. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.

**Chronic Effects:** Prolonged and/or repeated exposure to small amounts of product can produce cumulative toxicity. Symptoms of toxicity include lethargy, loss of appetite, reduced clotting ability of blood.

**Medical Conditions Aggravated by Exposure:** Bleeding disorders
**Target Organs:** Liver
**Carcinogenicity:** Contains no known or suspected carcinogens.
**HMIS:** Health – 2, Flammability – 0, Reactivity – 0

### SECTION 4  FIRST AID MEASURES

**Eyes:** Flush with water. Get medical attention if irritation persists.
**Skin:** Wash with soap and water. Get medical attention if irritation persists.
**Inhalation:** If inhaled, remove person to fresh air. Get medical attention.
**Ingestion:** Call a physician or poison control center immediately. Have the product label available for medical personnel to read.

Induce vomiting under the direction of medical personnel. Drink 1 or 2 glasses of water and induce vomiting by touching the back of throat with finger. If syrup of ipecac is available, give 1 tablespoon (15ml) followed by 1 or 2 glasses of water. If vomiting does not occur within 20 minutes, repeat this dosage once. Do not induce vomiting or give anything by mouth to an unconscious person.

**Note to Physician:** This rodenticide contains an anticoagulant ingredient. If ingested, administer vitamin K₁ intramuscularly or orally, as indicated in bishydroxycoumarin overdoses. Repeat as necessary based on monitoring of prothrombin times.

For information on this pesticide product (including health concerns, medical emergencies, or pesticide incidents) call the National Pesticide Telecommunications Network at 1-800-858-7378.

### SECTION 5  FIRE FIGHTING MEASURES

**Flash Point:**  None
**Autoignition Temp.:**  Not determined
**Explosive Limits:**  LEL: Not applicable
UEL: Not applicable

**NFPA**

**Extinguishing Media:**  Use media suitable for the surrounding fire
**Unusual Fire or Explosion Hazards:**  None known
**Fire Fighting Instructions:**  Firefighters should wear self-contained breathing apparatus (full facepiece) and full protective clothing. Contain runoff to prevent pollution.

### SECTION 6  ACCIDENTAL RELEASE MEASURES

**Large Spill/Leak Procedures:** Isolate and contain spill. Limit access to the spill area to necessary personnel. Do not allow spilled material to enter sewers, streams or other waters. Scoop up spilled material and place in a closed, labeled container for use or disposal.

### SECTION 7  STORAGE AND HANDLING

**Storage Requirements:** Store in original container in a cool, dry area out of reach of children, pets and domestic animals. Do not contaminate water, food or feed. Keep container tightly closed. Do not remove or destroy the product label.

**Handling Precautions:** Read the entire product label before using this rodenticide. Carefully follow all cautions, directions and use restrictions on the label. Do not get in eyes, on skin or on clothing.

### SECTION 8  EXPOSURE CONTROLS/ PERSONAL PROTECTION

**Ventilation:** Special ventilation is not required for the normal handling and use of this product when following the label instructions.
**Protective Clothing/Equipment:** No special requirements.
**Respirator:** None required when used according to label instructions.
**Contaminated Equipment:** Damaged or unwanted bait stations and bait holders should be wrapped in paper and discarded in trash.
**Comments:** Never eat, drink or smoke in work areas. Practice good personal hygiene after using this product. Wash arms, hands and face with soap and water after handling this product, and before eating and smoking. Launder contaminated clothing separate from street clothes.

### SECTION 9  PHYSICAL AND CHEMICAL PROPERTIES

| | | | |
|---|---|---|---|
| **Physical State:** | Solid pellets | **Water Solubility:** | Negligible |
| **Color:** | Tan | **% Volatile (Volume):** | Not applicable |
| **Odor:** | None | **Specific Gravity:** | 1.26 g/cc |
| **Melting Point:** | Not available | **Vapor Pressure:** | Not applicable |
| **Boiling Point:** | Not applicable | **Vapor Density:** | Not applicable |
| **Freezing Point:** | Not applicable | **pH:** | Not applicable |

### SECTION 10  STABILITY AND REACTIVITY

**Stability:** Stable
**Conditions to Avoid:** None
**Hazardous Polymerization:** Will not occur
**Chemical Incompatibility:** Alkaline materials
**Hazardous Products of Decomposition:** Oxides of carbon

### SECTION 11  TOXICOLOGICAL INFORMATION

| | |
|---|---|
| **Eye Effects/Eye Irritation:** | Mild, transient irritant |
| **Acute Oral Effects:** | LD₅₀ (orl-rat): >5000 mg/kg |
| **Acute Inhalation Effects:** | No data available |
| **Acute Dermal Effects:** | LD₅₀ (dml-rbt): >2000 mg/kg |
| **Skin Irritation:** | Non-irritating |
| **Skin Sensitization:** | Not a skin sensitizer |

### SECTION 12  ECOLOGICAL INFORMATION

This product is toxic to fish and wildlife. Do not apply this product directly to water, where surface water is present or to intertidal areas below the mean high water mark. Follow label cautions and instructions to reduce hazards to non-target animals.

### SECTION 13  DISPOSAL CONSIDERATIONS

**Disposal:** Wastes which result from the use of this product according to the label instructions must be disposed of as specified on the product label.
**RCRA Waste Status:** This product is not regulated as a hazardous waste under RCRA. State and local regulation may affect the disposal of this product. Consult your state or local environmental agency for disposal of waste generated other than by use according to label instructions.

### SECTION 14  TRANSPORT INFORMATION

**Transportation Data (49 CFR):** This product is not regulated as a hazardous material for all modes of transportation within the U.S.
**Hazard Class:** Not applicable    **ID No.:** Not applicable

### SECTION 15  REGULATORY INFORMATION

**TSCA:** All components of this product are listed on the TSCA inventory.
**SARA Section 313:** Contains no reportable components.
**OSHA Hazard Classification:** Acute health hazard, chronic health hazard.
**Proposition 65:** Contains no components subject to warning requirements.

### SECTION 16  OTHER INFORMATION

**Prepared by:** T. Schmit    **Date:** 7/24/2003

Information presented on this Material Safety Data Sheet is believed to be accurate at the time of publication. No warranty, expressed or implied, is made with regard to this information. This information may not be adequate for

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3     TINA MAWING, AND THE

 4     HORSEMEN'S BENEVOLENT

 5     PROTECTIVE ASSOCIATION,

 6     Plaintiffs,                    Civil Action No.

 7     v.                             3:09-CV-68

 8     PNGI CHARLES TOWN GAMING, LLC,

 9     Defendant.

10            Pursuant to Notice, the deposition of.

11     ALBERT BRITTON, was taken on Friday, the 23rd day of

12     April 2010, commencing at 9:15a.m., at 101 South

13     Queen Street, Martinsburg, West Virginia, before

14     Robert L. Crespo, a Notary Public.

15

16

17

18

19

20

21
```

```
1                    A P P E A R A N C E S:

2     FOR THE PLAINTIFFS (Tina Mawing, and The Horsemen's

3     Benevolent Protective Association)

4               DAVID M. HAMMER, ESQUIRE

5               408 West King Street

6               Martinsburg, West Virginia 25401

7                    (304) 264-8505

8               HARRY P. WADDELL, ESQUIRE

9               300 West Martin Street

10              Martinsburg, West Virginia 25401

11                   (304) 263-4988

12              FOR THE DEFENDANT (PNGI Charles Town

13              Gaming, LLC)

14              BRIAN M. PETERSON, ESQUIRE

15              Bowles Rice McDavid Graff & Love, PLLC

16              101 South Queen Street

17              Martinsburg, West Virginia 25401

18              ALSO PRESENT: TINA MAWING

19

20

21
```

```
 1                    I N D E X

 2          WITNESS:  ALBERT BRITTON              PAGE

 3      Direct Examination by Harry P. Waddell     4

 4      EXHIBIT #   DESCRIPTION.

 5      1           2007 Stall Allocation Letter

 6      2           2008 Stall Allocation Letter

 7      3           Revocable Stall Agreement

 8      4           2008 September Stall Allocation

 9                  Letter

10      5           Extension to Vacate Stalls

11      6           2010 Stall Allocation Letter

12      7           Publication Article

13

14

15

16

17

18

19

20

21
```

```
 1                   MARTINSBURG, WEST VIRGINIA

 2                   FRIDAY, APRIL 23, 2010

 3                        - - -

 4                P R O C E E D I N G S

 5      Whereupon,

 6                   ALBERT BRITTON,

 7      a witness herein, having been first duly sworn, was

 8      examined and testified upon his oath as follows:

 9                   DIRECT EXAMINATION

10      BY MR. WADDELL:

11          Q.   Mr. Britton, I just was introduced to you.

12      I'm Harry Waddell. I represent Tina Mawing, one of

13      the attorneys representing Tina Mawing, in this

14      lawsuit involving Charles Town Races and Slots.

15      We're here today to take your deposition in

16      connection with that suit.  Do you understand that?

17          A.   Yes.

18          Q.   Have you had a deposition taken before?

19          A.   Yes.

20          Q.   Okay.  On how many occasions?

21          A.   Three or four, maybe.
```

```
1          Q.    So you're familiar with the process?

2          A.    Yes.

3          Q.    One of the things you have to do is say,

4    yes.

5          A.    It's been quite some time.

6          Q.    You need to verbally respond and no

7    uh-huhs or anything like that.  Because the court

8    reporter can't take that down.  Please wait until I

9    finish my question, and I'll awe allow you to finish

10   your answer.  If you don't understand or want me to

11   clarify any question, let me know, and I'll do that.

12   If you don't ask me to clarify or explain one, I'll

13   assume that you understood my question when you

14   answer it, okay?

15         A.    Yes.

16         Q.    Basics.  Would you state your full name

17   for the record.

18         A.    My name is Albert Britton.

19         Q.    And Mr. Britton, what is your home

20   address?

21         A.    64 Don Quixote Drive in Charles Town.
```

1        Q.    What is your current employment status?

2    You're employed where?

3        A.    At Charles Town Races and Slots.

4        Q.    What's the corporate name of your

5    employer, the actual corporate name?

6        A.    I think it's PNGI Charles Town.  Honestly,

7    I'm not sure.  We do business at Charles Town Racing

8    and Slots.

9        Q.    Okay.  So in this deposition I'm just

10   going to refer to the Charles Town Racing and Slots

11   as the track.  And we understand what we're talking

12   about, correct?

13       A.    Yes.

14       Q.    How long have you been employed at that

15   location?

16       A.    Since September of 2004.

17       Q.    And when you came there in September,

18   2004, what was your job position that you assumed?

19       A.    General manager.

20       Q.    Has your job title changed since September

21   2004?

1          A.   No.

2          Q.   Have your job duties or responsibilities

3     changed in any way since September 2004?

4          A.   No.

5          Q.   What are your, in general terms, a summary

6     of what is it that you do as general manager at

7     Charles Town Races and Slots?

8          A.   I'm responsible for the operation of the

9     facility.

10         Q.   You're in charge of the entire facility?

11         A.   Yes.

12         Q.   Are you the top management person from

13    PNGI at that facility?

14         A.   Yes.

15         Q.   And who do you report to?

16         A.   John Finnermore.

17         Q.   And what's his job title?

18         A.   He is the senior vice-president of

19    regional operations.

20         Q.   And who does he report to, if you know?

21         A.   Tim Wilmont.

1          Q.    And what's Tim Wilmont's job title?

2          A.    Chief operating officer.

3          Q.    If I can get some background information.

4     Can you just tell me briefly, tell me what your

5     educational history is, where you went to school and

6     so forth.

7          A.    I went the school in New Jersey.  College

8     was Glassboro State College.

9          Q.    College was where?

10         A.    Glassboro, New Jersey.

11         Q.    Okay.  Did you graduate?

12         A.    Yes.

13         Q.    In what year?

14         A.    1980.

15         Q.    And what type of degree did you receive?

16         A.    Business administration, accounting.

17         Q.    After you graduated in 1980 with your

18    degree in accounting, what did you do?

19         A.    I went to work in the casino industry in

20    Atlantic City.

21         Q.    Okay.

1        A.   That was in 1981.

2        Q.   And who were you employed by at that time?

3        A.   The Claridge Casino.

4        Q.   How long did you work for the Claridge

5    Casino?

6        A.   20 years.

7        Q.   Until?

8        A.   2001.

9        Q.   2001?

10        A.   Uh-huh.

11        Q.   What was your job position with the casino

12    when you left in 2001?

13        A.   President and chief operating officer.

14        Q.   What was your reason for leaving in 2001?

15        A.   The property was purchased by a larger

16    gaming company who reorganized management.

17        Q.   They chose not to have you stay on with

18    the company?

19        A.   Yes.

20        Q.   And that was 2001.  So what did you do

21    after that?

1          A.    I had a two-year non-compete.

2          Q.    So what did you do for that two-year

3     period?

4          A.    Basically nothing.  My wife has a small

5     business.  So I helped out there.  And my father was

6     battling cancer.  And so that's what took up most of

7     my time during that time period.

8          Q.    Okay.  And after your non-compete period

9     was expired, you were able to look for other work in

10    the industry, what did you do?

11         A.    Worked for the Showboat Casino in Atlantic

12    City.

13         Q.    Okay.  When did you begin working there?

14         A.    I think in November of '03.

15         Q.    Okay.  And what job did you have with the

16    Showboat Casino?

17         A.    Direct of customer service.

18         Q.    And why did you leave your job with that

19    casino?

20         A.    There was a consolidation of management.

21    They consolidated two properties of management.  Two

1    separate properties as one management team.

2        Q.   Was your job eliminated?

3        A.   Yes.

4        Q.   And when did that occur?

5        A.   May of 2004, I believe.

6        Q.   What did you do after that?

7        A.   Nothing until I started working here.

8        Q.   Okay.

9        A.   I think those are the dates.

10       Q.   Do you want to clarify any of those dates?

11       A.   I believe those are the dates, but I'm

12   just not positive.

13       Q.   All right.  How did you go about obtaining

14   the job at Charles Town?

15       A.   I had been in contact with the management

16   team at PNGI.  And looking for an opportunity there

17   for a while.  Initially, I was looking at the

18   Pennsylvania property.

19       Q.   Okay.

20       A.   But that sort of took longer than

21   expected.  And this opportunity arose, and I was

1    offered employment.

2         Q.   Who hired you?

3         A.   John Finnermore.

4         Q.   And did you replace someone?

5         A.   Yes.

6         Q.   Who did you replace?

7         A.   Jim Buchanon.

8         Q.   We've taken a number of depositions in

9    this case of different individuals.  I'm trying to

10   think of any of those would have come after you.

11   Zimny, was he already on board when you --

12        A.   No, I hired him.

13        Q.   Okay.  And how did that come about?

14        A.   We were looking for a racing analyst

15   administrator.  And I can't remember how his resume

16   came to me.  But we talked.  He was in a program at

17   the, I believe, the University of Arizona that's was

18   racing related.  He hadn't finished that, we brought

19   him on as an intern.  I don't know which summer that

20   was.  He then returned to complete his curriculum.

21   And then we hired him after that with the full-time

1    position.

2         Q.   Did you make that hiring decision?

3         A.   It was Dicky Moore and I.

4         Q.   Okay.  How many people report directly to

5    you?

6         A.   I guess around ten.

7         Q.   Can you tell me who they are?

8         A.   Position?

9         Q.   Positions and names?

10        A.   Dicky Moore, general manager of racing;

11   Bill Hale is the assistant general manager.  Phyllis

12   Latart or vice president of compliance and legal

13   affairs; Karen Raffo is the vice president of human

14   resources.  Aaron Rosenthal is the vice president of

15   the marketing.  Mark Lemon is the director of

16   internal audit.  Roger Brown is the surveillance

17   manager.  Nicole Silver is the administration

18   assistant.

19        Q.   That's about eight?

20        A.   That's probably about right.  I think

21   that's everybody.

1       Q.   Okay.  When you say administration

2    assistant, is Nicole working directly for you as

3    sort of an office capacity?

4       A.   Yeah.  She's on office

5    manager/administration assistant.

6            The CFO reports to me as well:  Anthony

7       Casdia.

8       Q.   Can you spell his last name?

9       A.   C-a-s-d-i-a.

10      Q.   Okay.  You said you were married.  You're

11   wife's name is?

12      A.   Debbie.

13      Q.   Does she still maintain some business?

14      A.   Yes.

15      Q.   What type of business does she run?

16      A.   Medical billing.

17      Q.   Do you have any other relatives who live

18   in Jefferson County other than yourself and your

19   wife?

20      A.   No.

21      Q.   You're familiar with the, I guess the,

1    Charles Town HBPA?

2        A.   Yes.

3        Q.   I think a new contract was negotiated, I

4    think in 2009.  Were you involved in that?

5        A.   Yes.

6        Q.   Were you part of the negotiating team for

7    the track?

8        A.   Off and on.  The primary negotiating team

9    was Phyllis Latart and Erich Zimny.  And I came in

10   later in the process.

11       Q.   Okay.  I think the previous contract was

12   dated back from 2004, I believe.  Does that seem

13   correct to you?

14       A.   Probably.  I'm not sure.

15       Q.   Okay.  I know the previous contract had a

16   contractual provision in it that required the track

17   allocate a certain number of stalls, free of charge,

18   to members of the HBPA.  Are you familiar with that

19   provision?

20       A.   Vaguely.  I couldn't cite it chapter and

21   verse.

1      Q.   Okay.

2      A.   I'm aware the provision exists.

3      Q.   My understanding is that that's still a

4   provision in the current contract?

5      A.   Yes.

6      Q.   Are you aware that in the 2004 contract, I

7   believe it's in the 2009 contract, there's a

8   provision that the track will not discriminate in

9   the allocation of stalls on the basis of either HBPA

10   membership or activity?

11      A.   Yes.

12      Q.   Do you know Ms. Mawing?

13      A.   I know that's her.

14      Q.   I'm trying to get a feel for how well you

15   know her?

16      A.   I don't know that we've ever spoken

17   directly together.  I know she's a horsemen.

18      Q.   All right.  You've never spoken to her?

19      A.   I don't recall speaking directly to her.

20      Q.   Are you aware she's a member of the board

21   of the HBPA?

1          A.   Yes.

2          Q.   Do you have any direct involvement with

3     the racing commission?

4          A.   No.

5          Q.   My understanding from previous testimony

6     in this case is there is a committee that allocates

7     stalls to the horsemen; is that correct?

8          A.   Yes.

9          Q.   And you're a member of that committee?

10         A.   Yes.

11         Q.   Is there somebody who -- how often does

12    that committee meet?  Let me you ask you that

13    question.

14         A.   Each time it's time to reallocate stalls.

15         Q.   How often are stalls reallocated?

16         A.   It's every six months now.

17         Q.   And when that occurs, how is the committee

18    operated?  Is there someone who acts as the chair or

19    president or takes a leadership role in the

20    committee?

21         A.   I mean, if I were to -- there's no one

1    designated as a chair or president or anything like

2    that.  So it's pretty much a free form committee.

3        Q.   Okay.  I think I know the answer to this

4    question, but I want ask you as well.  Who are the

5    current members of the committee?

6        A.   It's myself, Dicky Moore, Randy Wehrman,

7    Erich Zimny, Mike Elliott, and Jim Taylor.

8        Q.   And was that the case when you came on

9    board with the track in 2004?  Was that the same

10   members on the committee?

11       A.   Not that I'm aware of.  Obviously, I

12   wasn't on the committee.

13       Q.   You weren't?

14       A.   At the time.

15       Q.   Sure.  By I mean the rest of them?

16       A.   Wehrman wasn't there; Zimny wasn't there.

17   I know, that Wehrman came after me as well, Randy

18   Wehrman.

19       Q.   Okay.  Were you involved in his hiring?

20       A.   Yes.

21       Q.   So when you came in 2004, Wehrman wasn't

```
1    on the committee and Zimny certainly, wasn't on the

2    committee?

3         A.   Right.

4         Q.   Because they weren't here yet.  Were the

5    other members that you mentioned on the committee?

6         A.   I don't know.

7         Q.   You don't know?

8         A.   No.

9         Q.   Okay.  When did you first -- do you

10   remember the first time you sat on the committee for

11   the allocation of stalls?

12        A.   I don't remember the time frame.

13        Q.   Okay.  Would it have been in 2004 or early

14   2005?

15        A.   I honestly, don't recall.

16        Q.   Okay.  Wehrman is the racing secretary?

17        A.   Yes.

18        Q.   And whoever was his predecessor, would

19   that person have been on the committee?

20        A.   His predecessor was, yes.

21        Q.   Do you remember who that gentlemen was?
```

1          A.   Doug Lamp.

2          Q.   With Mr. Zimny, was the position that he

3     accepted a new position?

4          A.   Yes.

5          Q.   No one previously had filled that

6     position?

7          A.   No.

8          Q.   Was there some need that you felt could be

9     filled by having someone take this position that he

10    now fills?

11         A.   Yes, analysis administrator of functions.

12         Q.   And what does he analyze?

13         A.   The racing operations.  He looks at and

14    recommends ways to improve racing, quality of

15    racing, and increase revenue and all those kinds of

16    things.  And he analyzes that.

17         Q.   Okay.  Is that his primary job?

18         A.   Well, he's been promoted since.

19         Q.   What is his current job?

20         A.   Director of racing operations.

21         Q.   Okay.  Was there a previous director of

1    racing operations?

2         A.   No.

3         Q.   This is again, a new position?

4         A.   Yes.

5         Q.   And does this entail additional

6    responsibilities over and beyond what he was

7    originally hired to do?

8         A.   Yes.

9         Q.   What are the additional responsibilities

10   taken on?

11        A.   The racing secretary reports to him.

12        Q.   Okay.  Does the allocation committee that

13   we've been speaking about use any written criteria

14   in making their allocation decisions?

15        A.   No.

16        Q.   How does the committee decide who's going

17   to receive stalls and who's either going to have

18   stalls added or taken away?

19        A.   We look at a number of criteria:  the

20   number of starts, quality of starts, win percentage,

21   those kind of things; and whether or not someone has

```
 1    violated our barn rules of the stall, application

 2    guidelines.

 3         Q.   Are those all the factors?  Are there any

 4    other factors that are taken into consideration?

 5         A.   I think that pretty much covers them all.

 6         Q.   Is there a set number of starts that a

 7    trainer/stall holder must maintain in order to have

 8    stalls allocated?

 9         A.   It's not a set number.  We use seven

10    starts per stall as a guideline.

11         Q.   Okay.  And how do you determine when

12    you're making these -- I'm assuming you have a

13    number of people who either currently have stalls

14    who want to maintain their stalls or want additional

15    stalls.  And you have people that don't have stalls,

16    that want stalls.  All these people submit

17    applications to this committee?

18         A.   Yes.

19         Q.   And typically, is there an average number

20    of applications you consider at a typical meeting?

21         A.   I don't know the number of applications.
```

1    I know we have north of 100.  I don't know what the

2    exact number is of trainers that have stalls:  100,

3    probably somewhere between 100 and 150.

4         Q.   Okay.  Who's conducting the meeting when

5    you have a meeting like this?

6         A.   It's usually Randy Wehrman.  He comes with

7    a Pendeflex folder that has all the applications in

8    it.  And a list of the trainers that currently have

9    stalls along with their number of starts.

10        Q.   Okay.  So he maintains the applications.

11   And he has a list of trainers.  And he also has

12   written stats on the number of starts they had?

13        A.   Yes, I'm sorry.

14        Q.   You mentioned about quality of what, the

15   horse?

16        A.   Quality of starts; meaning winning

17   percentage, what places you're finishing in, those

18   kind of things.

19        Q.   Okay.  And are there written stats that he

20   has regarding that information?

21        A.   Yeah.  There are stats.  I don't recall

1    the name of the system.  But there's a system that

2    we have that tracks all that.  And that's brought to

3    the meeting as well.

4        Q.   Okay.  Any other written information

5    that's supplied the racing secretary at the meeting?

6        A.   No, not that I can think of.  Those are

7    the primary documents.

8        Q.   How long do these meetings typically last?

9        A.   Usually, about two hours, in that range.

10       Q.   Are they held in your office?

11       A.   Yes.

12       Q.   Typically, in a meeting of this committee,

13   are the allocation decisions made at the meeting?

14       A.   Yes.

15       Q.   When you're finished with the meeting,

16   you've made the decisions about who's going to have

17   stalls given to them or taken away from them?

18       A.   I'd say yes.  There may be some questions

19   that the racing secretary may have to come back and

20   answer.  And even saying that, my recollection is

21   that the decisions are made at this meeting.

```
1          Q.   How are they made?  I mean is there a vote

2     taken or?

3          A.   No, just discussion and sort of a

4     consensus of the number.

5          Q.   Does anyone have the final say.  I mean,

6     is there anyone in that room that can say or

7     overrule the consensus and say:  no, we're going to

8     do it that way?

9          A.   Sure, me.

10         Q.   Okay.

11         A.   As with any decision that's made at the

12    property, I have the final decision making

13    authority.

14         Q.   Okay.  Once these decisions have been

15    made, Mr. Britton, is there a process provided by

16    the track for the trainers to challenge the decision

17    or appeal the decision?

18         A.   No.

19         Q.   Does the committee provide any of the

20    applicants with the basis or reason for the

21    decisions that have been made?
```

1          A.   No, just the decision has been made.   The

2    racing secretary usually handles that aspect.

3          Q.   Let me go through some of these again.   Go

4    ahead and have these marked separately.   Mr.

5    Britton, I'm handing you what's been marked as

6    Exhibit No. 1 to your deposition.   I'm going to ask

7    you first:  do you recognize what this document is?

8                              (Whereupon, Deposition Exhibit

9                              No. 1 was marked for

10                             identification)

11         A.   It looks like it's the notification of the

12    stall allocation.

13         Q.   Okay.  Is this typically the type of

14    notification that an applicant will get after a

15    decision has been made by the committee as to the

16    allocation of stalls?

17         A.   I believe so.

18         Q.   Okay.  And it looks like that one -- if we

19    look down here, we see that Doug Lamp was the racing

20    secretary who sent this out, it looks like, correct?

21         A.   Yes.

1      Q.   And this applies to Ms. Mawing.  And it

2   looks like it's dated December 21, 2006.  So you

3   were already at the track at that time?

4      A.   Yes.

5      Q.   And in December of 2006, were you a member

6   of the committee, allocation committee?

7      A.   Yes.

8      Q.   It appears that she was allocated seven

9   stalls for 2007.  Do you recall the committee

10  meeting when that occurred?

11     A.   No.

12     Q.   Do you have any recollection of what

13  factors were discussed or went into the decision to

14  allocate Ms. Mawing 7 stalls in 2007?

15     A.   I don't.

16     Q.   Do you have any present recollection of

17  anything that was even discussed at that meeting?

18     A.   No. I would say no.

19     Q.   I'm going to hand you Exhibit No. 2.

20                    (Whereupon, Deposition Exhibit

21                    No. 2 was marked for

```
 1                        identification)

 2        Q.   And again, can you identify what that

 3   document is?

 4        A.   Looks like the document advising Ms.

 5   Mawing of how many stalls she'll be allocated.

 6        Q.   This one appears to be signed by Richard

 7   Moore, the general manager of racing operations,

 8   correct?

 9        A.   Yes.

10        Q.   And the date again, is on this one is,

11   February 7.  2008?

12        A.   Yes.

13        Q.   And Ms. Mawing is being allocated 9 stalls

14   for it looks like a 6-month period commencing in

15   March of 2008 through August 31, 2008.  Do you see

16   that?

17        A.   Yes.

18        Q.   Did you participate in the committee

19   allocation meeting where this decision was made?

20        A.   I don't recall.

21        Q.   Do you recall how the committee arrived at
```

1      the decision to allocate Ms. Mawing 9 stalls?

2           A.   I don't.

3           Q.   Do you have any recollection at all of any

4      discussion at all regarding the allocation of stalls

5      to Ms. Mawing at a meeting?

6           A.   No.

7           Q.   -- prior to this going out?

8           A.   No I'm going to hand you another one.

9      This is Exhibit No. 3.

10                         (Whereupon, Deposition Exhibit

11                          No. 3 was marked for

12                          identification)

13          Q.   And can you identify that for me?

14          A.   It appears to be a notice reducing the

15     stall allocations of Ms. Mawing.

16          Q.   And this appears to be signed by, again by

17     Richard Moore, the general manager of racing?

18          A.   Yes.

19          Q.   And this document is dated April 25, 2008.

20     And it's addressed to Ms. Mawing?

21          A.   Yes.

1        Q.   And it advises her, does it not, that

2    Charles Town Races and Slots is reducing her stall

3    allocation by four stalls?

4        A.   Yes.

5        Q.   And it also notes that she previously had

6    nine stalls in barn 14.  And with this reduction,

7    she now has five stalls in barn 14, correct?

8        A.   Yes.

9        Q.   Did you participate in any discussion or

10   decision that resulted in this action being taken?

11       A.   Yes.

12       Q.   What do you recall about that?

13       A.   I recall we had an incident where there

14   was a horse in the barn area that was showing signs

15   of equine herpes.

16       Q.   Okay.

17       A.   And we had to quarantine the barn.  As a

18   result, we did a full barn audit at that time.  And

19   we discovered a lot of folks using stalls that were

20   not allocated to them or allowing others to use

21   stalls.  And there were horses in there that we

1    weren't aware that didn't have, I guess inslips.

2    And so we discovered a lot of discrepancies at that

3    time.  And so we took action against the folks that

4    were violating the rules.

5         Q.    Okay.  Are you telling me that there were

6    a number of stall trainers or people who had stalls

7    that had a horse in stalls that weren't assigned to

8    them?

9         A.    Yes.

10        Q.    And Ms. Mawing was one of those?

11        A.    Yes.

12        Q.    And what stalls did she have horses in

13    that didn't belong to her?

14        A.    I don't recall, I don't.

15        Q.    Do you know how many there were?

16        A.    Apparently, four, according to this.

17        Q.    Do you know who the owner, the actual

18    registered individuals, were that she should not

19    have horses, but she did have horses?

20        A.    I don't recall.

21        Q.    Where did you obtain your information

1    from?

2          A.   From the barn audit that was conducted,

3    primarily by Mike Elliott and our security staff.

4          Q.   Do you know who on your security staff was

5    involved in that audit?

6          A.   I don't.

7          Q.   How many security staff people do you have

8    that would be involved in something like that?

9          A.   We have, I want to say somewhere around 80

10   or 90 security staff.

11         Q.   So it could have been any of them?

12         A.   For the most part, I think they rotate.

13   Some rotate through barn area, not all.  So I don't

14   know what the number is of folks that do that.

15         Q.   Did you get an actual written, something

16   in writing regarding the audit showing this

17   information about who had stalls assigned to whom?

18         A.   Not that I recall.

19         Q.   So this was a verbal report to you?

20         A.   I believe there's a written report, but it

21   was discussed with me verbally.

1          Q.   Okay.  And who discussed it with you

2     verbally?

3          A.   I think it would have been Dicky Moore and

4     Mike Elliott.

5          Q.   Other than Ms. Mawing, how many other

6     trainers having stalls were involved in this

7     situation?

8          A.   I don't recall.

9          Q.   You said lots of folks were, I mean?

10         A.   My characterization.  I'm not sure.  I

11    don't even have a ballpark.

12         Q.   I mean, was it more than two or three?

13         A.   I would say, yes.  It is more than two or

14    three.

15         Q.   And what was your understanding of the

16    rule in effect at the time regarding stalls?

17         A.   You're allocated a number of stalls.  And

18    those are the stalls that you can use.

19         Q.   Was there any written rule or requirement

20    that governed one trainer allowing another trainer

21    to use a vacant stall?

1        A.   No, there's nothing that's provided for

2   that in the stall allocation as far as I'm aware.

3        Q.   What I'm saying is:  Is there any rule

4   saying you can't do that?

5        A.   I'm sure there is.  I think there is a

6   barn rule that says you can only use the stalls

7   you're assigned.

8        Q.   You think there is, but you're not sure?

9        A.   I'm not sure.

10        Q.   Who would be sure about that?

11        A.   One of the racing folks.

12        Q.   Such as?

13        A.   Dicky Moore, Randy Wehrman, Mike Elliott.

14        Q.   Now, so you don't really, you can't tell

15   me how many other people or trainers were in the

16   same situation as Ms. Mawing, you don't know?

17        A.   I don't know.  I mean, at least the folks

18   that were involved here were those four horses were,

19   they would have been sanctioned as well.

20        Q.   You're saying the people who actually were

21   -- had been assigned those stalls where she had

1    horses would have been sanctioned in some way?

2        A.   The same way.  One-for-one loss of stalls

3    was the action we took.

4        Q.   Okay.  You're sure about that:  One-for-

5    one loss of stalls?

6        A.   To the best of my recollection, yes.

7        Q.   So in this case for instance, if she had

8    horses, if Ms. Mawing had horses in four stalls that

9    didn't belong to her, then you're saying the penalty

10   was she lost four of her stalls?

11       A.   Yes.

12       Q.   And you're telling me that was true for

13   anyone in this situation?

14       A.   Yes, to the best of my recollection, yes.

15       Q.   And that also included the trainers or

16   owners who lent the stalls?

17       A.   Yes.

18       Q.   Do you know whether Ms. Mawing challenged

19   this decision in any way?

20       A.   I'm not aware.

21       Q.   Okay.

1          A.   Other than this lawsuit.

2          Q.   So you're not aware that Ms. Mawing

3    approached Dicky Moore, some of the racing people

4    under you and told them that she had permission from

5    the prior racing secretary who approved the use of

6    those stalls by her?

7          A.   No.

8          Q.   You don't know?

9          A.   I'm not -- no one has come and talked to

10   me about that.

11         Q.   Nobody has ever told you that?

12         A.   Not that I recall.

13         Q.   Let me show you Exhibit No. 4.

14                    (Whereupon, Deposition Exhibit

15                    No. 4 was marked for

16                    identification)

17                    (Whereupon, Deposition

18                    Exhibit No. 5 was

19                    marked for identification)

20   BY MR. WADDELL:

21         Q.   Do you recognize that document?

1        A.   It's a document informing Ms. Mawing that

2   she would not be issued stalls during this

3   allocation.

4        Q.   Okay.  This appears to be signed by Randy

5   Wehrman, racing secretary?

6        A.   Yes.

7        Q.   And addressed to her and dated August 29,

8   2008?

9        A.   Yes.

10       Q.   And this is one of the those notices that

11   comes out of a meeting of the stall allocation

12   meeting, correct?

13       A.   Yes.

14       Q.   And did you participate in this meeting

15   that resulted in this allocation decision being

16   made?

17       A.   I would have, yes.

18       Q.   And what were the factors that were

19   considered in the decision not to allocate any

20   stalls to Ms. Mawing?

21       A.   Again, to the best of my recollection, it

1    was we took into account the same criteria that we

2    always take into account:  The number of starts, the

3    quality of starts, win percentage, and whether or

4    not this was someone that abided by the stall

5    application/allocation and the barn rules.

6         Q.   Well, was there anything wrong -- are you

7    contending that there was something below average in

8    any way with her starts?

9         A.   I don't recall starts.  I do recall that

10   there was a discussion about the quality of the

11   starts.

12        Q.   Okay.  What do you recall about that?

13        A.   Just that there was nothing, there was a

14   low win percentage.  There was nothing that was

15   spectacular about the quality.

16        Q.   Do you know, personally know, anything

17   about her winning percentage?

18        A.   I don't.  That's something that Erich

19   Zimny would, more than likely, calculate, he and

20   Randy.

21        Q.   Do you recall who said anything about her

1    having a low winning percentage?

2         A.   It probably would have been Zimny.   I

3    don't recall specifically.  But that's who more than

4    likely would have given that input.

5         Q.   Okay.  Was there any discussion of any

6    violation of any track rule or racing rule of any

7    sort?

8         A.   There was the discussion about her having

9    horses in stalls that were not allocated to her.

10        Q.   You mean since the -- she had the four

11   taken away back --

12        A.   No, that was the instance that was

13   discussed.

14        Q.   Okay.  Well, why would that be discussed.

15   I thought she had one-for-one penalty.  She had four

16   stalls taken away from her.  Why is that a new topic

17   of discussion at this meeting?

18        A.   It's not the new topic.  It's a topic that

19   existed.  And this was part of the, as I said

20   earlier, a part of the criteria that we look at,

21   whether or not someone violates the barn rules.  We

1    also take into account how they treat their horses

2    and so on and so forth.

3         Q.   Was there any allegation she mistreated

4    her horse?

5         A.   No.

6         Q.   You're contending that there was somebody

7    who's going to come in and has evidence that she had

8    a low winning percentage?

9         A.   They are statistical.  I don't recall what

10   the percentage was --

11        Q.   So that can either be proven or disproven?

12        A.   Yes.

13        Q.   Have you ever seen any actual statistics

14   that actually demonstrate she had a low winning

15   percentage?

16        A.   I have not seen them.  They have been

17   communicating to me.

18        Q.   By who?

19        A.   Erich Zimny, at this meeting.

20        Q.   You specifically remember that?

21        A.   Yes, I do.  I mean recall a conversation

1    in that regard.

2        Q.    Okay.    I'm assuming then that all the

3    other individuals who had stalls taken away from

4    them back in August, also had all their stalls taken

5    away?

6        A.    I don't recall.

7        Q.    Do you know any who did?

8        A.    I don't.

9        Q.    Okay.    And you can't give me names of any

10   of those individuals, sitting here today?

11       A.    No.

12       Q.    Were you aware that about a week, at most

13   two weeks, prior to this decision made, Ms. Mawing

14   had met with the governor of West Virginia and

15   complained about the track's use of pesticides in

16   the barn area?

17       A.    I recall hearing that.    I don't know when

18   or from whom.    I do recall hearing that.

19       Q.    Was there any contact between you and

20   anyone in the governor's office regarding that

21   matter?

1        A.   No.

2        Q.   You never had any communication with the

3   governor saying:  I had this meeting with the HBPA

4   board members, and certain things were discussed?

5        A.   No.

6        Q.   Okay.  Did you have any discussions with

7   Phyllis Latart or anyone else on your management

8   staff about the meeting that the Governor had with

9   the board members of the HBPA?

10       A.   I don't recall any specific discussions.

11  I just recall being -- I'm aware of this meeting.

12       Q.   Okay.  And were you aware of that meeting

13  before this August 29, 2008 letter came out to Ms.

14  Mawing?

15       A.   I don't know.

16       Q.   It could have been?

17       A.   I don't know.

18       Q.   So if I'm hearing you correctly, are you

19  confident in your recollection of the meeting and

20  the factors that resulted in all her stalling being

21  taken away?

1          A.   I would say fairly confident, yes.   That's

2     my recollection, yes, sir.

3          Q.   So if I'm hearing you correctly then, the

4     factors that were taken into consideration and

5     resulted in this action being taken by the track

6     were:  she had a low winning percentage.  And she

7     had the incident back in April of 2008 with the four

8     stalls or horses were in that were actually assigned

9     to other trainers.  Those are the two factors?

10         A.   That I recall, yes.

11         Q.   Let me show you Exhibit No. 6.

12                         (Whereupon, Deposition Exhibit

13                          No. 6 was marked for

14                          identification)

15         Q.   Do you recognize that document?

16         A.   It looks like a notice that was given to

17    Ms. Mawing saying:  That no stalls would be

18    allocated for January to June of 2010.

19         Q.   Correct.  It looks like it was signed by

20    Randy Wehrman, the racing secretary?

21         A.   Uh-huh.

1        Q.   Addressed to her and dated December 17,

2   2009?

3        A.   Yes.

4        Q.   And again, this is the notice that would

5   have been sent out after the meet of the stall

6   allocation committee?

7        A.   Yes.

8        Q.   And were you present in attending ha

9   meeting?

10       A.   Yes.

11       Q.   What factors went into the decision of

12  this committee not to allocate any stalls to Ms.

13  Mawing in December of 2009?

14       A.   I don't know that her stalling application

15  was ever discussed.  I don't recall discussing it at

16  that meeting.

17       Q.   And why would her stall application not be

18  discussed at the meeting?

19       A.   When we go through and allocate stalls, we

20  go through the list of folks that are in stalls

21  first.  And when that process is done, we calculate

1     how many stalls are remaining.  And then the racing

2     secretary, on a priority basis, recommends who of

3     the applicants should be considered for the stalls

4     that are available.  And that's how we go through to

5     process.

6          Q.  So if I understand the process as your

7     describing it, because she had no stalls at this

8     point, she was not in the initial process where

9     people with stalls were considered; is that correct?

10         A.  That's how we start the meeting.

11         Q.  Now, do you individually assess and

12    discuss each application of individuals who have

13    stalls already?

14         A.  Yes.

15         Q.  And then for these individuals with no

16    stalls who have submitted applications, they're put

17    in a separate category; is that correct?

18         A.  Randy brings the applications to the

19    meeting.  And once we see how many stalls are

20    remaining, he then, as I said on a priority basis,

21    will present the applications.  We'll discuss those

1    and the reasons why he thinks they should have the

2    stalls.  And then once they're full, they're full.

3         Q.   Okay.  So he does present the remaining

4    applications to the committee from individual

5    discussion?

6         A.   To the point that, until we fill the

7    stalls.

8         Q.   Well, how does he determine the order he's

9    going to present those applications.  Because once

10   you fill the stalls, you're done.  So how does he

11   determine the order?  How does the committee

12   determine that order?

13        A.   It's based on his opinion as to whether or

14   not it's a trainer that fits our program and can

15   improve the quality of the product at Charles Town.

16        Q.   So what Wehrman's looking at when he

17   prioritizes the consideration of those remaining

18   applicants, is the same factors you mentioned

19   before:  the quality of the horses, whether these

20   horses will start and have a winning percentage --

21        A.   And fit our condition book and so on.

1      Q.   What do you mean by, fit your condition

2   book?

3      A.   Well, there's a condition book that's

4   written for each meet that describes the conditions.

5   So we obviously want horses that are going to race.

6   I'm not an expert on conditions so I couldn't even

7   explain to you what the conditions would be or --

8      Q.   So what you're telling me, if I understand

9   you correctly, is her application never got

10   discussed at this meeting because she wasn't in that

11   priority list -- her application was still in the

12   group that hadn't been considered when you filled

13   your stalls?

14      A.   Yes.  That's how the process works.  So

15   that's why I assumed that she did not come up at

16   that meeting.  At least, I don't recall her coming

17   up at that meeting.

18      Q.   Now, at the end of this meeting you still

19   had like 140 vacant stalls.  Am I wrong on that?

20      A.   Not that I'm aware of.  We pretty much go

21   through and allocate all of the stalls during the

1    course of the meeting.

2        Q.    Now, would you know for sure whether or

3    not you had any vacant stalls at the end of the

4    meeting?

5        A.    I would not.

6        Q.    Who would know that?

7        A.    Usually, Randy and/or keep a statistical

8    count.  I know that we were having to refurbish one

9    of the barns.  Actually, I'm not sure it's even

10   completed yet, so there may have been stalls

11   available as a result of that.  But they weren't

12   really available because we had to vacate one of the

13   barns in order to refurbish it.

14       Q.    Okay.  Again, if I'm understanding your

15   recollection of how this meeting went down, Randy

16   Wehrman, it was his option to prioritize the

17   applications that were going to be considered of the

18   people who had no present stalls at the track?

19       A.    Yes.

20       Q.    So that was his decision how to do that?

21       A.    Yes.

1      Q.    Okay.  Is there any written record kept of

2    the committee meetings?

3      A.    No.

4      Q.    And I think you've already answered this.

5    But is there any process the track has in place to

6    allow for review of their decisions of the committee

7    or to challenge the decisions of the committee?

8      A.    No.

9      Q.    Are there any factors taken into

10   consideration in making these allocation decisions

11   such as, whether or not a trainer is denigrating the

12   track or being disruptive, things of that nature?

13   Are those considered?

14     A.    No.

15     Q.    Never considered?

16     A.    No. Because if we threw out everybody that

17   denigrated the track or spoke out against us, we

18   would have an empty barn area largely.  There's, I'm

19   sure, a number of cases of folks that have spoke out

20   against us and that have stalls.

21     Q.    Mr. Britton, I'm handing you what I've had

1    marked as Exhibit No. 7, which I'll represent to is

2    an article that appeared in a periodical called the

3    Mid-Atlantic Thoroughbred.  I think that's the name

4    of the periodical.  You're quoted in this.  You may

5    remember being quoted in it.  I don't know.  But I

6    wanted to ask you about your quote.

7         A.   Yes.

8                        (Whereupon, Deposition Exhibit

9                         No. 7 was marked for

10                        identification)

11        Q.   It's on the second page.  And it's down in

12   this area if you look over here, you'll see.

13        A.   Yes.

14        Q.   There's gentlemen named, Mr. Hale who's

15   quoted in here as well.  I think he's the executive

16   director of the HBPA; is that correct?

17        A.   I don't know what his title is.  He is

18   affiliated with the HBPA.

19        Q.   Okay.  He's quoted as saying:  the

20   perception is that anybody who speaks up against

21   them in any way is cut stalls, talking about the

1    track, okay.  And then it says:  Britton said that

2    management has never done anything to retaliate

3    against local trainers or anyone who has spoken

4    negatively about track management.  Rather, he said:

5    horsemen lose stalls only when they fail to start an

6    adequate number of horses.  That's not in quotes.

7    Is that an accurate paraphrase of what you told the

8    reporter writing this article?

9         A.   I don't recall specifically.  I was

10   interviewed many times during that period.  So I

11   don't recall specifically, what I said.

12        Q.   Well, is that accurate, that the

13   management at the track has never done anything to

14   retaliate against local trainers or anyone who has

15   spoken negatively about track management?

16        A.   I would say, yes.

17        Q.   And is it accurate that horsemen lose

18   stalls only when they fail to start an adequate

19   number of horses?

20        A.   No, that's not accurate.

21        Q.   What would need to be added to that to

1   make it accurate?

2         A.   Anyone who mistreats horses, doesn't take

3   proper care of them, anyone who violates the barn

4   rules or the stall license agreement, and folks that

5   don't contribute to the quality of racing have --

6   based or their quality of starts?

7         Q.   Okay.  Is that everything?

8         A.   I would say that pretty much sums it up.

9         Q.   Is it your contention that Ms. Mawing's

10  horses are inferior in any way to the other horses

11  that are racing at the track?

12        A.   I don't contend that.  Again, I recall

13  that there was a discussion about the quality of

14  starts and, I believe, it was winning percentage,

15  specifically.  I'm not a horse racing expert so I

16  don't know.

17        Q.   Okay.  Were you aware that back in 2008

18  time period Ms. Mawing was making complaints to

19  track management regarding the use of pesticides in

20  the barn area?

21        A.   I don't.  As a result of this lawsuit, I'm

1    aware that she had a horse and a goat die.  And her

2    contention is it is from poisoning, exterminator

3    poisoning or whatever.

4         Q.   Is it your testimony that the first time

5    you learned of those complaints to track management

6    was when you read the Complaint in this case?

7         A.   Or was advised of the Complaint, yes.

8         Q.   Do you agree with me that there's no

9    contention and you have no evidence that Ms. Mawing

10   has ever violated any written statute or rule of

11   racing that would justify taking her stalls away?

12        A.   I'm not aware.  All I'm aware of is the

13   reason why we did not issue free stalls to Ms.

14   Mawing during the last allocation process.

15        Q.   As you already testified?

16        A.   Yes.

17        Q.   Do you acknowledge that under the contract

18   between the track and the HBPA, the track does not

19   have the discretion in allocating stalls to

20   discriminate against HBPA members like Tina Mawing

21   for engaging in HBPA activity?

1          A.    I'm aware that we cannot discriminate

2     based on HBPA activity.

3          Q.    Okay.   Do you know Raymond Funkhauser?

4          A.    Yes.

5          Q.    Who is Mr. Funkhauser?

6          A.    He's the former president of the HBPA.

7          Q.    Were you present, I think you would have

8     been here.   Were you present when there was a

9     hearing held in Charles Town by the Racing

10    Commission regarding whether he'd be permitted to

11    have a horse entered in the Breeder's Classic.   Do

12    you remember that incident at all?

13         A.    Vaguely, none of the specifics.

14         Q.    Did you attend the hearing?

15         A.    No.

16         Q.    Did you direct any of your management

17    employees to attend the hearing?

18         A.    Not that I'm aware of.

19         Q.    I know there were a number that were

20    there.   I just don't know why they came there.   You

21    didn't talk to any of them about going?

1          A.   No.

2          Q.   Did you authorize any audio or video

3    equipment to be sent to the hearing room as part of

4    the hearing?

5          A.   Not that I'm aware of, no.

6          Q.   Did you have any outside attorneys that

7    were retained by the track, attend the hearing?

8          A.   Not that I'm aware of.

9          Q.   Did Phyllis Latart ever provide you any

10   sort of report or status, written status, of any

11   sort on the Funkhauser hearing?

12         A.   No, not that I'm aware of.

13         Q.   Do you know the outcome of the hearing?

14         A.   I do not.  Did that hearing involve

15   Charles Town Races and Slots?  Were we a party?

16         Q.   I don't think you were a direct party.

17   Your stewards were the ones who initiated the

18   charges against -- the stewards at the track were

19   the ones who initiated the charges against Mr.

20   Funkhauser.  I think you had certainly, Mr. Printz,

21   who's an attorney from the track, was present with

1    other members of track management at the hearing.

2    Even though you were not a party to it, there seemed

3    to be a high degree of interest by the track in the

4    hearing?

5        A.   I'm not aware.

6        Q.   Would you agree with me that -- well, let

7    me represent to you that Ms. Mawing testified at

8    that hearing as an HBPA board member on behalf of

9    Raymond Funkhauser.  You'd agree with me that if the

10   track had taken any action to take stalls away from

11   her because of her activity and testimony at that

12   hearing, that would be a violation of that

13   discrimination provision in the contract, correct?

14       A.   Not knowing the nature of her testimony or

15   whether or not she was testifying as an HBPA board

16   member or as an individual, or what Mr. Funkhauser's

17   suit was as part, or whether it was HBPA president

18   or --

19       Q.   Let me rephrase my question.  Let's assume

20   that she was there and testified as an HBPA board

21   member on behalf of Mr. Funkhauser, would you agree

1    with me that if the track then took action to

2    retaliate against her by taking stalls away, that

3    would be a violation of the antidiscrimination

4    provision in the contract?

5         MR. PETERSON:  I'm going to object to the

6         form of the question as being a vague,

7         hypothetical, and calling for speculation.  But

8         you can answer.

9         Q.   (By Mr. Hammer)  You can still respond to

10   my question.  Would you consider that to be a

11   violation of the antidiscrimination provision?

12        A.   I can't say because I don't know the

13   nature of her testimony.  I can only say, as I

14   testified earlier, that I'm aware that we cannot

15   discriminate for HBPA activity.

16        Q.   Okay.

17        MR. WADDELL:  Let's take a break.  I want

18        to consult with Ms. Mawing.

19                  (Whereupon, a discussion was

20                  held off the record)

21        Q.   (By Mr. Waddell)  Mr. Britton, I just have

1    a couple more questions for you.  First question:

2    would you not have been billed by Bowles & Rice if

3    Chaz, one of their partners, had attended this

4    Funkhauser hearing for an entire day?

5            MR. PETERSON:  I'm going to object to the

6        question.  Our billing is protected by

7        attorney/client privilege.

8            MR. WADDELL:  It is?

9            MR. PETERSON:  Sure.

10           MR. WADDELL:  The fact you bill is

11       protected by attorney/client privilege.

12           MR. PETERSON:  I'm going to assert the

13       privilege as to anything that's contained in

14       the bill.  If he knows that answer, he can --

15       Q.   (By Mr. Waddell)  If Chaz Printz, a

16    partner at Bowles & Rice, had spent the entire day

17    at Randy Funkhauser's hearing on behalf of the

18    track, would you not have received a bill for that,

19    is my question?

20       A.   I'm not aware of any lawyer that does

21    anything for free.  So I guess the answer to that

1    would be, yes.

2         Q.   Do you ever see a bill or get a bill?

3         A.   No.

4         Q.   Do you normally review the legal bills of

5    any attorneys that do work for you?

6         A.   Not necessarily.  It depends on whether or

7    not they meet -- we have strict financial

8    thresholds.

9         Q.   Who does normally monitor that?  Would

10   that be Phyllis Latart?

11        A.   Yes.  I would assume Phyllis Latart and

12   someone in finance.

13        Q.   Did you receive a report from Bowles Rice

14   regarding the Funkhauser hearing?

15        A.   No.

16        Q.   Are you familiar Mary Moore, who's related

17   to --

18        A.   Yes.  It's Dicky's daughter, yes.

19        Q.   Were you involved in take stalls away from

20   her?

21        A.   Yes.

1          Q.   Tell me what you recall about that.

2          A.   I recall that it was her horse that was

3     displaying the signs of equine herpes.

4          Q.   Okay.

5          A.   Which prompted the quarantine and the

6     whole barn audit.

7          Q.   Did she have stalls taken away for this?

8          A.   Yes.

9          Q.   How many did she have taken away?

10         A.   I don't recall.

11         Q.   Why did she have stalls taken away?

12         A.   As part of this barn audit.  I believe the

13    horse -- she didn't have an inslip, maybe, for the

14    horse that displayed these signs.  One of the issues

15    that came up during that time frame was we had "to

16    free" of access to the barn area.  Because we

17    allowed folks to walk horses back and forth from

18    stalls that we do not own across the street.  As a

19    result of this and the barn audit and what we found

20    we actually stopped that.  We required folks to ship

21    in from across the street, whether they were

1    shipping in from 100 feet or 100 miles, they had to

2    ship in.  That since has been changed as part of the

3    agreement with the HBPA.  The HBPA paid for another

4    gate to be opened.  They still have to go to the

5    same process that would if they shipped in, but

6    there's another gate that allows them to walk in

7    from the privately-owned barn across the street.

8        Q.   Okay.

9        A.   And so that was part -- and I recall that

10   the Department or Agriculture was involved and

11   agreed with the steps that we took.  And it was a

12   pretty big to-do, that event.

13       Q.   I don't recall whether you answered my

14   question or not.  Why specifically were Mary Moore's

15   allocations of stalls, whatever the number was,

16   taken away?  Were you the one who did that, correct?

17       A.   Well, it was a group -- but in a case

18   where a family member was involved, Dicky would

19   recuse himself.  But as I said before, with any

20   decision, I'm the final decision maker.

21       Q.   Are you saying there was a group that made

1    the decision to take away these stalls because of

2    this --

3         A.   I'm sure it was a discussion that would

4    have included myself and Erich and possibly, Randy.

5    That's how that would normally go.

6         Q.   Is it your testimony that there was such a

7    discussion between yourself, Mr. Zimny, and Mr.

8    Wehrman, regarding reducing Ms. Mawing's allocations

9    by four stalls?

10        A.   Yes.   There would have been a discussion

11   about what action we were going to take overall

12   based on what we discovered in that barn audit.

13        Q.   Okay.   You said lots of trainers had this

14   happen to them.   And I asked you numbers.   And you

15   said you really didn't know numbers?

16        A.   I really don't know.

17        Q.   But was there a meeting between yourself,

18   Mr. Wehrman, Mr. Zimny, that you actually recall,

19   where this was all reviewed regarding all the

20   trainers involved?

21        A.   That I specifically recall, no. But this

1    would not be a decision that I would make on my own

2    without the input from those individuals.

3        Q.    Those individuals are:  Mr. Wehrman,

4    Racing Secretary; Mr. Zimny?

5        A.    And Mr. Moore.

6        Q.    Mr. Moore, Dicky Moore.   Would James

7    Taylor and Mike Elliott have been party to this

8    meeting or discussion regarding this incident?

9        A.    It's certainly possible.  I don't recall

10   specifically.   Knowing that Mike Elliott was

11   intimately involved in the audit, I would assume

12   that his input was involved as well.

13       Q.    Okay.  Does the track ever make decisions

14   regarding the allocation of stalls based on outside

15   conduct of trainers?  For instance, I believe

16   there's some contention in this case that Mary Moore

17   had some drug charges in April of 2008 that were

18   brought against her.  Is that type of thing ever

19   considered in allocation decisions?

20       A.    I don't recall that was specifically -- in

21   fact, I don't recall ever hearing that directly that

1    she had any kind of drug problem.  Are you talking

2    about drugs, horse drugs or personal.

3        Q.   No. I'm talking about being stopped and

4    arrested and charged with intent to distribute

5    drugs?

6        A.   Oh, no. I wasn't aware of that.  And I

7    don't think that was taken into consideration, as

8    far as I know, with taking her stalls away.

9    However, if we're aware of illegal activity that

10   could possibly take place on our property, we would

11   take action.

12       Q.   Okay.  There's also some testimony about

13   -- are you particular with Dick Watson?

14       A.   Yes.

15       Q.   I think he had all of his stalls take

16   away, did he not?

17       A.   Yes.  He's not longer on the property.

18       Q.   Are you familiar with how and why that

19   occurred?

20       A.   Yes.

21       Q.   Why was that?

1       A.   It's because he was involved in an illegal

2   activity at president of the HBPA.  There's a signed

3   confession to that effect.  And one of the things we

4   take very seriously, is the integrity of racing.

5   Because the betting public has to be confident that

6   we are of the highest integrity.  And so we felt

7   that Dick and Jeanine Watson, as a result of their

8   activities, which were pretty highly publicized,

9   that they cast appall on the integrity of racing at

10  Charles Town.  And so we ejected them.

11      Q.   As I understand it, the activity was the

12  misappropriation of money from the HBPA itself?

13      A.   Yeah.  I think there were a number of

14  things that had committed.  I don't recall all the

15  specifics.

16      Q.   But it had nothing to do directly, with

17  the track itself?

18      A.   No.

19      Q.   I guess the thrust of my question is:  are

20  those types of things that have nothing to do

21  directly with the track but may reflect on the

1    track, are those factors that are taken into

2    consideration in the allocation of stalls?

3        A.   Usually, it's not at the stall allocation

4    committee.  Those are usually actions that are taken

5    during the course of business when we become aware

6    of those sorts of things.

7        Q.   Let me put it this way:  stalls were taken

8    away from Mr.  Watson because of his activity,

9    alleged improper activity, dealing with the HBPA,

10   correct?

11       A.   Not at a stall allocation committee, not a

12   part of that process.

13       Q.   No, I understand.  But, I mean, the track

14   took all his stalls away from him?

15       A.   We actually evicted him, ejected him

16   completely.  So he's not allowed on property.

17       Q.   He had no stalls and he had no ability to

18   even race --

19       A.   Correct.

20       Q.   -- horses as a result of the HBPA

21   improprieties.

1      A.   Correct.

2      Q.   Were you aware, at any time, about Ms.

3  Mawing's complaint to the Department of Agriculture

4  concerning the use of pesticides by the track in the

5  barn area and the death of one of her horses and a

6  goat?

7      A.   Only as part of this process.

8      Q.   So it's your testimony:  Prior to the

9  lawsuit but filed, you were not aware of that?

10     A.   Not that I recall, no.

11          MR. WADDELL:  I don't have anything

12       further.

13          MR. PETERSON:  He'll read and sign.

14              (The deposition concluded at

15              10:42a.m.)

16                  - - -

17

18

19

20

21

1                    CERTIFICATION OF NOTARY

2              I, Robert L. Crespo, the officer before

3         whom the foregoing deposition was taken, do

4         hereby certify that the witness whose testimony

5         appears in the foregoing deposition was duly

6         sworn by me; that the testimony of said witness

7         was taken by me stenographically and thereafter

8         reduced to typewriting by me; that said

9         deposition is a true record of the testimony

10        given by said witness; that I am neither

11        counsel for, related to, or employed by any of

12        the parties to the action in which this

13        deposition is taken and further, that I am not

14        a relative or employee of any attorney or

15        counsel employed by the parties thereto, nor

16        financially or otherwise interested in the

17        outcome of this action.

18        _____

19                    Robert L. Crespo

20             Notary Public - State of West Virginia

21             My Commission Expires:  March 15, 2020

```
1                   MAXIM REPORTING, LLC

2                      64 FOAL LANE

3            MARTINSBURG, WEST VIRGINIA 25405

4                     (304) 260-0670

5    MAY 20, 2010

6    DEAR SIR OR MADAM:

7              BOUND HEREWITH IS THE TRANSCRIPT OF

8    TESTIMONY GIVEN, INCLUDING THE CERTIFICATION PAGE OF

9    NOTARY PUBLIC.  PLEASE READ THE TRANSCRIPT AND ANY

10   ADDITIONS OR CORRECTIONS MADE SHOULD BE LISTED ON

11   THE ERRATA SHEET.  AFTER REVIEW, PLEASE SIGN ERRATA

12   SHEETS AND DECLARATION PAGES AND RETURN THEM TO THE

13   ADDRESS LISTED ABOVE FOR PROCESSING.

14             IF THE READING AND SIGNING HAS NOT BEEN

15   COMPLETED WITHIN THIRTY DAYS FROM THE DATE OF

16   DELIVERY, WE WILL ASSUME THAT THE RIGHT TO READ THE

17   DEPOSITION TRANSCRIPT HAS BEEN WAIVED.  THIS IS IN

18   ACCORDANCE WITH RULE 30(c) OF THE FEDERAL RULES OF

19   CIVIL PROCEDURE.

20

21
```

```
1                        ERRATA SHEET

2    DEPOSITION OF: ALBERT BRITTON

3    DATE OF DEPOSITION:  4-23-2010

4    CASE NAME:  Tina Mawing, HBPA v PNGI 3:09-CV-68

5    United States District Court

6    The following are the corrections which I have made

7    to my deposition transcript:

8    PAGE   LINE  CORRECTION              CORRECTED TO

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21
```

```
 1              ERRATA SHEET (PAGE 2 OF 2)

 2    PAGE   LINE CORRECTION              CORRECTED TO:

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    I, the undersigned, declare under penalty of perjury

11    that I have read the above-referenced deposition and

12    have made any corrections, additions, or deletions

13    that I was desirous of making; and that the

14    transcript contains my true and correct testimony.

15    EXECUTED THIS_____DAY OF _____

16    2010, at (CITY)_____(STATE)_____

17    DEPONENT'S SIGNATURE_____

18

19

20

21
```

1

1      IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2                DISTRICT OF WEST VIRGINIA

3      TINA MAWING, AND THE

4      HORSEMEN'S BENEVOLENT

5      PROTECTIVE ASSOCIATION,

6      Plaintiffs,

7      v.                    Civil Action

8      PNGI CHARLES TOWN GAMING,  No. 3:09-CV-68

9      LLC,

10     Defendant.

11           Pursuant to Notice, the deposition of

12     RICHARD L. MOORE, was taken on Thursday, the 22nd

13     day of April 2010, commencing at 9:15 a.m., at 101

14     South Queen Street, Martinsburg, West Virginia,

15     before Robert L. Crespo, a Notary Public.

16

17

18

19

20

21

1                    A P P E A R A N C E S:

2      FOR THE PLAINTIFFS (Tina Mawing, and The Horsemen's

3      Benevolent Protective Association)

4                DAVID M. HAMMER, ESQUIRE

5                408 West King Street

6                Martinsburg, West Virginia 25401

7                     (304) 264-8505

8                HARRY P. WADDELL, ESQUIRE

9                300 West Martin Street

10               Martinsburg, West Virginia 25401

11                    (304) 263-4988

12               FOR THE DEFENDANT (PNGI Charles Town

13               Gaming, LLC)

14               BRIAN M. PETERSON, ESQUIRE

15               Bowles Rice McDavid Graff & Love, PLLC

16               101 South Queen Street

17               Martinsburg, West Virginia 25401

18               ALSO PRESENT:  TINA MAWING

19

20

21

```
1                    I N D E X

2            WITNESS:  RICHARD L. MOORE            PAGE

3         Direct Examination by Mr. Waddelll        4

4         Cross-examination by Brian M. Peterson    116

5         Re-Direct Examination by Mr. Waddell      117

6                        EXHIBITS

7    EXHIBIT #   DESCRIPTION                        PAGE

8    NO. 1   STALL ALLOCATION                        62

9    NO. 2   STALL ALLOCATION                        65

10   NO. 3   STALL ALLOCATION                        68

11   NO. 4   LETTER DATED MAY 2, 2008, TO LENNY

12           HALE, EXECUTIVE DIRECTOR, CT HBPA       83

13   NO. 5   LETTER FROM CTR&S TO TINA MAWING

14           DATED AUGUST 29, 2008                   85

15   NO. 6   SEPTEMBER 12, 2008, LETTER TO TINA

16           MAWING FROM CTR&S                       90

17   NO. 7   LETTER FROM CTR&S TO TINA MAWING

18           DATED DECEMBER 17, 2009                 92

19

20

21
```

```
1                 MARTINSBURG, WEST VIRGINIA

2                 WEDNESDAY, APRIL 22, 2010

3                        - - -

4                 P R O C E E D I N G S

5    Whereupon,

6                 RICHARD L. MOORE,

7    a witness herein, having been first duly sworn, was

8    examined and testified upon his oath as follows:

9                 DIRECT EXAMINATION

10   BY MR. WADDELL:

11        Q.   Mr. Moore, you've been introduced to me.

12   I'm Harry Waddell.  I'm here to take your deposition

13   today in connection with Ms. Mawing's suit against

14   the race track, for lack of a better term.  Do you

15   understand your deposition is being taken in

16   connection with that case?

17        A.   Yes, sir.

18        Q.   Have you had your deposition taken before?

19        A.   Yes, sir.

20        Q.   More than once?

21        A.   A few times.
```

5

```
1              Q.    A few times.  What's the last time you

2        recall?

3              A.    Probably two or three years ago.

4              Q.    What was that in connection with?

5              A.    Placing judges at Charles Town Race Track.

6              Q.    Was that a civil suit filed in that case,

7        in that matter?

8              A.    You know, I don't recall.

9              Q.    Where was your deposition taken?

10             A.    Martin & Seibert.

11             Q.    And you were represented by whom at that

12       time?

13             A.    Chaz Prince.

14             Q.    What was the issue in the case?

15             A.    The placing judges were termed for a

16       violation.

17             Q.    And they were filing suit against PNGI?

18             A.    Yes, sir.

19             Q.    Were you individually named in the suit?

20             A.    No.

21             Q.    And do you know what court that suit was
```

1      pending in?

2            A.    Jefferson County.

3            Q.    It was two or three years ago?

4            A.    I think it was three years ago.

5            Q.    Okay.

6            A.    Maybe longer.

7            Q.    All right.   Would you state your full name

8      for the record, please.

9            A.    Richard L. Moore.

10           Q.    And what is your home address, Mr. Moore?

11           A.    1683 Withers Larue Road, Summit Point,

12     West Virginia.

13           Q.    Can you give me a little background

14     information on your education.   Where did you attend

15     high school?

16           A.    St. Joseph, here in Martinsburg.

17           Q.    What year did you graduate?

18           A.    1964.

19           Q.    And did you attend college?

20           A.    Shepherd College.

21           Q.    Did you graduate from Shepherd?

1          A.    No, sir, two years.

2          Q.    Have you had any other academic training

3     beyond the two years at Shepherd?

4          A.    No, sir.

5          Q.    What year did you leave Shepherd College?

6          A.    '66.

7          Q.    Did you grow up in this area?

8          A.    Yes, sir, I did.

9          Q.    Where were born?

10         A.    Martinsburg.

11         Q.    After you left Shepherd in 1966, what did

12    you for employment?

13         A.    Charles Town Race Track.

14         Q.    So you went to work for Charles Town Race

15    Track in 1966?

16         A.    It was 1964.

17         Q.    '64?

18         A.    Yes, sir.

19         Q.    So you've been there a long time?

20         A.    Yes, I have.

21         Q.    Have you been there continuously since

1      1964?

2           A.   Yes, I have.

3           Q.   What was your first position at the track

4      when you obtained employment with them?

5           A.   Mutuel Clerk.

6           Q.   And can you tell me what other positions

7      you've progressively held over the years?

8           A.   Mutuel clerk, racing official, assistant

9      general manager, and general manager of racing

10     operations.

11          Q.   What your present job title?

12          A.   General manager of racing operations.

13          Q.   And who's your present employer?

14          A.   PNGI.

15          Q.   And when did PNGI become your employer?

16          A.   1997.

17          Q.   And were you still employed there when the

18     track shut down or it was taken over by PNGI?

19          A.   Yes, I was.

20          Q.   In 1997, when PNGI became the owner of the

21     track, what was your job?

9

1          A.    Assistant general manager.

2          Q.    In 1997, when PNGI took over, who did you

3     report to at that time?

4          A.    Jay Fortney.

5          Q.    And what was Mr. Fortney's position?

6          A.    He was the general manager.

7          Q.    And who did he report to at that time?

8          A.    Bill Bork.

9          Q.    What was Mr. Bork's position?

10         A.    He was president of racing.

11         Q.    And who did he report to?

12         A.    The CEO.

13         Q.    And at that time, that would have been?

14         A.    Peter Carlino.

15         Q.    What did your job position or title next

16    change after PNGI took over?

17         A.    I think it was -- you mean general manager

18    of racing operations?

19         Q.    Well, if that was the next change, yes?

20         A.    2001.  I think it was 2001.

21         Q.    Who promoted you at that time?

```
 1          A.    A gentlemen by the name of Jim Buchanon.

 2          Q.    And what was his position at the time?

 3          A.    He was the COO.

 4          Q.    The job you were promoted to was general

 5    manager of racing?

 6          A.    Yes, sir.

 7          Q.    And that's the same job you hold today?

 8          A.    Yes, sir.

 9          Q.    Who was your immediate supervisor at that

10    time?

11          A.    James Buchanon.

12          Q.    Okay.  And when did that change?

13          A.    Mr. Buchanon left, I think, in 2004.

14          Q.    And when he left, who became your

15    immediate supervisor?

16          A.    Al Britton.

17          Q.    And what was Mr. Britton's job at that

18    time?

19          A.    The general manager.

20          Q.    Who is your immediate supervisor today?

21          A.    Al Britton.
```

```
 1          Q.   And is he still the general manager?

 2          A.   Yes, he is.

 3          Q.   So since 2004, Al Britton has your

 4      immediate boss, correct?

 5          A.   Yes.

 6          Q.   And who does he report to?

 7          A.   John Finnermore.

 8          Q.   And John Finnermore's job title is?

 9          A.   Senior vice-president.

10          Q.   And who does he report to?

11          A.   The president of the corporation.

12          Q.   And who is that?

13          A.   Tim Wilmont.

14          Q.   Jim?

15          A.   Tim Wilmont.

16          Q.   Okay.  What are your duties as general

17      manager of racing?

18          A.   Oversee all the racing operations.

19          Q.   Okay.  And are there various departments

20      or --

21          A.   Yes.
```

1          Q.    What departments are we talking about that

2     you have oversight responsibility for?

3          A.    Track superintendent, mutuel department,

4     the motor pool.  I'm not directly over the racing --

5     well, I am directly over the racing office also.

6          Q.    Did you have some confusion on that?

7          A.    Well, there's a Director of Racing, who is

8     Mr. Zimny.  And he reports to me.

9          Q.    Okay.  Any other departments or operations

10    that you have oversight or responsibility for?

11         A.    No.

12         Q.    Who is the track superintendent?

13         A.    Doug Bowling.

14         Q.    And what are the responsibilities of the

15    track superintendent?

16         A.    To make sure the track is maintained well,

17    in good racing condition, and safe.

18         Q.    So the track superintendent is mainly

19    concerned with the physical condition of the track

20    itself?

21         A.    Correct.

1          Q.    The mutuel department is concerned with

2     what?

3          A.    Mutuel tellers.

4          Q.    Okay.   The taking bets and paying bets and

5     that sort of thing?

6          A.    Correct.

7          Q.    And what kind of motor pool do you have?

8          A.    He takes care of all the vehicles on the

9     property.

10         Q.    Okay.   Every vehicle that's operated on

11    the property?

12         A.    Every vehicle that's there.

13         Q.    And then the racing office, what does that

14    encompass?

15         A.    Well, it encompasses the racing secretary,

16    and all the officials.

17         Q.    Okay.   And you have a racing secretary.

18    And that is whom?

19         A.    William Wehrman.

20         Q.    Is he known as Randy?

21         A.    Correct.

1      Q.   Do you have an assistant racing secretary?

2      A.   Yes, sir.

3      Q.   What who is that?

4      A.   Ron Anthony.

5      Q.   Ron?

6      A.   Anthony.

7      Q.   How long has he been the assistant racing

8   secretary?

9      A.   He's going on two years.

10      Q.   Who did he replace?

11      A.   Mike Elliott.

12      Q.   What other racing officials are in the

13   racing office?

14      A.   Placing judges, identifier, paddock judge,

15   clerk of scales.

16      Q.   Is that it?

17      A.   Pretty much.

18      Q.   Is James Taylor an employee of the racing

19   office?

20      A.   Yes, he is.

21      Q.   What is his position?

1          A.   He's stall superintendent.

2          Q.   So that's another position in the racing

3     office?

4          A.   Correct.

5          Q.   Are there any other ones you've neglected

6     to mention?

7          A.   Mike Elliott is senior racing official.

8     And I think his title is also back stretch

9     supervisor.

10         Q.   Okay.  So Mike Elliott is senior racing

11    official.  And he also has the title of back stretch

12    supervisor.  There's a stall superintendent.  And

13    that is James Taylor.  There's a clerk of scales.

14    And that is --

15         A.   It changes.  I think right now it's a

16    young lady by the name of Melissa Stuarts.

17         Q.   There's a paddock judge?

18         A.   I think it's Wayne Jamgard.

19         Q.   How do you spell that?

20         A.   J-a-m-g-a-r-d.

21         Q.   Is there more than one placing judge?

1          A.     Three.

2          Q.     Three.   Who are they?

3          A.     Scott Kitchen is one; Gary Leslie, I think

4     is the other.

5          Q.     Is there a third?

6          A.     Sonny Martinez, I think, is the third one.

7     They change.   They rotate.   And I'm not sure when

8     they're in those positions, but they do change.

9          Q.     You mean other people rotate in the

10    position of placing judge?

11         A.     Correct.

12         Q.     What other individuals do that?

13         A.     They all do.

14         Q.     What do you mean:   they all do?   Who is

15    they?

16         A.     Every racing official can switch to any

17    position.

18         Q.     You're saying any of these people we've

19    mentioned could rotate into that placing position?

20         A.     Correct.

21         Q.     Okay.   How many people actually report

1       directly to you, Mr. Moore?

2              A.    Five.

3              Q.    Can you identify them for me?

4              A.    Well, there's Doug Bowling, the track

5       superintendent; Joey Lushball, the mutuel manager;

6       Erich Zimny, the director of racing; and Gary

7       Kelligan, the motor pool supervisor.  So it's four,

8       I said five.  It's four.

9              Q.    Okay.  What have you done to prepare for

10      this deposition?

11             A.    I had a meeting with Mr. Peterson.

12             Q.    Just one?

13             A.    Yes.

14             Q.    And when did that meeting take place?

15             A.    Tuesday.

16             Q.    Okay.  Here at Bowles Rice?

17             A.    Charles Town Race Track.

18             Q.    Okay.  And physically, where did you meet

19      with him?

20             A.    In my office.

21             Q.    Was it just the two of you?

1          A.   Yes, sir.

2          Q.   And how long did your meeting take place?

3     How long was your meeting?

4          A.   I would probably 40 minutes.

5          Q.   In preparation for your deposition, did

6     you review any records, documents, anything of that

7     nature?

8          A.   No, sir.

9          Q.   So you looked at absolutely no records or

10    documents; is that correct?

11         A.   No, sir, didn't look at anything.

12         Q.   When did Al Britton come to you and

13    indicate that he wanted Ms. Mawing to receive no

14    stalls?

15              MR. PETERSON:   Object to the form of the

16         question.

17         Q.   (By Mr. Waddell)  When did that occur?

18         A.   He never did.

19         Q.   That never occurred?

20         A.   He never come to me.

21         Q.   Who'd he come to?

1          A.    He didn't go to anybody, to my knowledge.

2          Q.    Well, then who made that decision not to

3      allocate her any stalls?

4          A.    I think it was a group decision of the

5      committee, of the stall committee.

6          Q.    And who participated in that decision?

7          A.    There was the Racing Secretary, the

8      director of racing, myself, the general manager, and

9      the two stall superintendents.

10         Q.    Okay.  Let's go through them.  You've

11     named the positions.  Now, name the actual names of

12     those people who participated?

13         A.    It was Al Britton, myself, Erich Zimny,

14     Randy Wehrman, and Mike Elliott, and James Taylor.

15         Q.    You're saying all those participated in a

16     decision to not allocate any stalls to Ms. Mawing?

17         A.    Everybody that's there, yes.

18         Q.    Well, they were in the room and they

19     actually participated in a decision that was made:

20     we're not going to allocate any stalls to Tina

21     Mawing?

1        A.   Yes.

2        Q.   Did somebody make that recommendation to

3    this group?

4        A.   No.

5        Q.   Well, how did it come about that that

6    decision was made?

7        A.   As I can recall, there's a list of all the

8    trainers that have stalls.  And it starts from A to

9    Z. And you go to each individual:  and they keep

10   their stalls or reduce stalls or deduct stalls.  And

11   there was, I think three or four individuals that

12   were put off to the side that were not going get

13   stalls or get a reduction.  And I think we had a

14   meeting after we met with all of the others.  And

15   looked at these four or five individuals.  I can't

16   remember the others.  It was four or five, and Ms.

17   Mawing was one of them.

18       Q.   Okay.  So as I understand what you're

19   telling me, you were meeting in a where ever --

20   where do you conduct this?

21       A.   Mostly in Mr. Britton's.

1          Q.    And when did the meeting take place?

2          A.    I can't recall what day or month, I really

3     can't.

4          Q.    All right.  Well, we'll got back to that.

5     Before you considered -- you had a list of trainers:

6     A through Z?

7          A.    Correct.

8          Q.    Approximately, how many trainers are we

9     talking about?

10         A.    I would have to say there's probably 70,

11    75.

12         Q.    And you put to the side three or four; or

13    four or five of those trainers to be looked at?

14         A.    Correct.

15         Q.    And those were the ones that were either

16    going to have their allocation of stalls taken away

17    or reduced?

18         A.    Correct.

19         Q.    Was everyone else either going to keep

20    their stalls or have an increase?

21         A.    Correct.

1          Q.    Okay.   Now, who made the decision to set

2     aside those four or five; or three or four

3     individuals we talked about?

4          A.    It was from the information that we've had

5     from Mr. Wehrman and Mr. Zimny of the performance of

6     what they had had in the past.

7          Q.    First of all, who were the

8     individuals/trainers who were set aside?

9          A.    As I can recall, Ms. Mawing was one.  I

10    think Robert Birr was one.  I think a lady by the

11    name of Gladys Mercer was one.  And I think another

12    gentlemen by the name of James Williams was one.

13         Q.    Okay.  So you think there were four?

14         A.    I think there was four.

15         Q.    Okay.  Well, why was Ms. Mawing put in

16    that group?

17         A.    As I recall, Ms. Mawing had stalls of

18    horses in other individual's stalls, is the reason

19    why her stalls were deducted prior.  And then that's

20    the reason why, I think, she was not allocated

21    stalls or all of her stalls were taken way.

1          Q.    You're telling me:  You think all of her

2     stalls were taken away because she did what?

3          A.    I think she was reduced prior because she

4     was in other individual's stalls.

5          Q.    Okay.

6          A.    And then when this meeting took place

7     where she was not allocated stalls, I think that

8     that was the reason why.

9          Q.    You think that was the reason why or you

10    know?

11         A.    I'm almost positive that was the reason

12    why.

13         Q.    Do you recall a specific discussion among

14    these individuals you've mentioned:  Mr. Briton,

15    Erich Zimny, Randy Wehrman, Mike Elliott, and James

16    Taylor, where this topic about her having horses in

17    other stalls was specifically discussed at this

18    meeting?

19         A.    That was brought up, yes.

20         Q.    And that was brought up as the reason to

21    put her in the pile?

```
1          A.    Correct.

2          Q.    -- to have no stalls allocated to her?

3          A.    Correct.

4          Q.    Okay.  Do you remember why Mr. Birr had

5    stalls removed?

6          A.    I think Mr. Birr's was a violation, I

7    think, with alcohol.

8          Q.    Okay.  Did he have -- was he allocated any

9    stalls?

10         A.    No, sir.

11         Q.    Gladys Mercer, was she allocated any

12   stalls?

13         A.    No, she was not allocated any stalls.

14         Q.    Okay.  And why not?

15         A.    She hadn't performed at all.

16         Q.    She had not performed at all?

17         A.    No.

18         Q.    What does that mean?

19         A.    She had not run a horse at all.

20         Q.    She hadn't run any horses at all?

21         A.    No.
```

1          Q.    And how about Mr. Williams, did he have

2      any allocation of stalls at all?

3          A.    He was not allocated any stalls.

4      Everything was taken away from Mr. Williams.

5          Q.    And the reason for that?

6          A.    You know, I can't remember what Mr.

7      Williams reason really was.  I can't recall what his

8      was.

9          Q.    Was it animal abuse?

10         A.    I can't recall, I really can't.

11         Q.    Okay.  So these four individuals who were

12     put in this separate pile from everyone else and had

13     no stalls allocated to them?

14         A.    Correct.

15         Q.    You mentioned that Ms. Mawing had had some

16     stalls reduced previously for this reason of having

17     horses in other stalls.  Am I understanding you

18     correctly?

19         A.    Correct.

20         Q.    And when did that occur?

21         A.    I can't recall a date or a time.  I know

1      it happened, but I can't give you a date or a time

2      when it happened.

3          Q.    Okay.  I'm going take you through a few

4      exhibits here.  First of all, before I do that, I

5      want to ask you some questions about the stall

6      allocation committee.  Let me ask you this:  you

7      indicated there was a meeting where these

8      individuals were set aside and there was a second

9      meeting?

10         A.    No second meeting.

11         Q.    Well, was there a second discussion?

12         A.    After we went through the individuals that

13     were going keep their stalls?

14         Q.    Uh-huh.

15         A.    -- or gain, or reduce, then I think what

16     was said:  Does anybody see where we should give any

17     of these individuals their stalls or allocate them

18     any stalls.  And nobody said anything.  So

19     everything reduced.

20         Q.    And who was the one who said:  is there

21     any reason why we should give any of these

1    individuals --

2        A.   You know, I can't recall who made that

3    statement.

4        Q.   Was there any record kept of this

5    decision, written record?

6        A.   Not to my knowledge.

7        Q.   Who did the speaking about this decision,

8    somebody had to do the talking?

9        A.   I think Mr. Wehrman led most of the --

10   because he had all the documentation.

11       Q.   I'm talking about the discussion of the

12   four individuals.  You're saying he led that.  He's

13   the one who did most of the talking regarding

14   whether to allocate those stalls or not?

15       A.   Not on these four individuals, on

16   everyone.

17       Q.   I'm talking the four individuals.  Who did

18   the talking?

19       A.   I can't recall.

20       Q.   Now, you said there was a second -- you

21   said there was not is second meeting.  Was there a

1    second discussion at the meeting you're referring to

2    about the four individuals?

3         A.   There was hardly any discussion at all.

4         Q.   Okay.  Well, what do you remember?  Tell

5    me your best recollection of what you recall being

6    dis cussed about those four individuals.

7         A.   Went back and after we checked all the

8    individuals that were going to get stalls or

9    increase stalls or reduce stalls, there was these

10   four or five that was here.  And anybody -- I can't

11   recall who said:  What we going do with these

12   individuals.  And nothing was ever done.  None of

13   them had any stalls.  All their stalls were reduced.

14        Q.   All right.  Well before they were put in

15   that room, do you recall specific discussions about

16   each one of them about why they were being placed

17   aside?

18        A.   Yes, I do.

19        Q.   Okay.  And the only reason -- your

20   testimony is:  That the only reason Ms. Mawing was

21   placed in that group was because of the fact she had

1      horses in some other stalls?

2           A.    That's what I can remember being brought

3      up.

4           Q.    Was there possibly something else brought

5      up?

6           A.    I don't recall it.

7           Q.    You named the people that were at this

8      meeting.  Are those the normal members of this stall

9      allocation committee?

10          A.    Yes, sir.

11          Q.    How often does this committee meet?

12          A.    Usually, about two or three times a year.

13          Q.    Is there a set time or a set reason for

14     these meetings?

15          A.    Prior to each stall allocation.  Usually

16     it's in December and June.  Stall allocations are in

17     January and July.

18          Q.    Okay.

19          A.    So it's usually in December and June.

20          Q.    And they usually meet in Al Britton's

21     office?

1          A.    Correct.

2          Q.    There's no written record kept of the

3    meetings?

4          A.    Not to my knowledge.

5          Q.    And what exactly is reviewed during these

6    meetings.  Is anything reviewed during these?

7          A.    Statistics that Mr. Wehrman keeps.  You

8    know, how many stalls they have, how many starts

9    they've made.

10         Q.    Uh-huh.

11         A.    Conditions of their stalls, their horses.

12         Q.    Was there any problem with Ms. Mawing's

13   starts?

14         A.    I don't recall that being mentioned.

15         Q.    Any problem with the condition of her

16   horses?

17         A.    I don't recall that being mentioned.

18         Q.    Is the allocation of stalls made at these

19   meetings reviewed by anyone following the meeting?

20              MR. PETERSON:  I'll object to the form,

21         it's vague.

1          A.    I don't understand your question.

2          Q.    (By Mr. Waddell)  Well, you make an

3    allocation at this meeting.  Does it go anywhere for

4    review or approval?

5          A.    The committee.

6          Q.    The committee has final say?

7          A.    Yes.

8          Q.    Is there any process the track provides

9    for a trainer to challenge these decisions as to the

10   allocation of stalls?

11         A.    I'm not aware of any.

12         Q.    Are the trainers adversely affected by

13   your decisions provided with the reason or the basis

14   for the allocation?

15         A.    Not to my knowledge.

16         Q.    So the only factor based on your

17   recollection that was considered with regard to the

18   decision to allocate Tina Mawing no stalls was this

19   issue with horses in other stalls.  That's your

20   testimony?

21         A.    That's what I can recall.

1          Q.    Okay.  There's no claim here her horses

2     were inferior to other horses, correct?

3          A.    Not to my knowledge.

4          Q.    There's no such claim to your knowledge,

5     correct?

6          A.    Correct.

7          Q.    You didn't hear that brought up or

8     discussed?

9          A.    No, I did not.

10         Q.    There's no claim there was any problem

11    with her starts.  That wasn't discussed or brought

12    up at this meeting, correct?

13         A.    Not to my knowledge.

14         Q.    There's no problem with her winning

15    percentage or how many horses she had in the money.

16    That was not a factor that was discussed or brought

17    up?

18         A.    I don't recall that being brought up.

19         Q.    Okay.  There's not allegations that she

20    abused any of her animals, correct?

21         A.    Not to my knowledge.

1        Q.    There's no allegation that she did not

2   upkeep her stall area or the barn area in proper

3   condition, correct?

4        A.    Not to my knowledge.

5        Q.    There was no allegation that she was

6   disruptive with either trainers or racing officials

7   or anything of that nature?

8        A.    None that I'm aware of.

9        Q.    There's no allegation that she violated

10  any rules of racing?

11       A.    I don't know of any, if she has.

12       Q.    That was not a factor in this decision?

13       A.    No.

14       Q.    Do you know Raymond Funkhauser?

15       A.    Yes, I do.

16       Q.    Who is Raymond Funkhauser?

17       A.    He's a horse trainer and horse owner.

18       Q.    And he was the former president of the

19  HBPA?

20       A.    Yes, he was.

21       Q.    And what is the HBPA?

```
1              A.    HBPA is an organization of horsemen

2       helping horsemen.

3              Q.    And it is the exclusive bargaining entity

4       for the horsemen as far as the track is concerned?

5              A.    Correct.

6              Q.    There's a contract between the track or

7       PNGI and the HBPA, correct?

8              A.    Yes, there is.

9              Q.    And are you involved in negotiating that

10      contract?

11             A.    Yes, I am.

12             Q.    When was the contract last negotiated?

13             A.    2009.

14             Q.    And prior to that there was a contract

15      that had been negotiated and entered into in 2004, I

16      believe?

17             A.    I think that's correct.

18             Q.    And pursuant to that contract in 2004, the

19      track was obligated to make available for the

20      horsemen a number of stalls free of charge, correct?

21             A.    Correct.
```

1        Q.    And do you recall the number of stalls?

2        A.    1148 is what's in the contract.

3        Q.    Okay.  Now, is that the new contract or is

4   that changed in any way?

5        A.    It's in the contract as we speak.

6        Q.    I think the contract, you'd agree with me,

7   the contract actually recognizes that the equitable

8   allocation of those stalls is essential to the

9   livelihood of a horsemen.  Would you agree with

10  that?

11       A.    I think that's stated in the contract.

12       Q.    And I believe the contract prohibits the

13  track from discriminating in the allocation of

14  stalls because the stall holder has engaged in HBPA

15  activity or membership.  Do you recognize that?

16       A.    I recognize that statement.

17       Q.    Would you agree with me that taking stalls

18  away from Tina Mawing because -- for instance, she

19  may have testified on behalf of Raymond Funkhauser

20  at a proceeding of the Racing Commission, would

21  violate the contractual agreement between the track

1      and the HBPA?

2                MR. PETERSON:   Object to the form.

3           A.   I don't recall her testifying, myself.

4           Q.   (By Mr. Waddell)   Well, do you remember

5      there was a hearing regarding Mr. Funkhauser?

6           A.   I do remember the hearing.

7           Q.   Do you remember what it was about?

8           A.   About a horse called, Forest Park, that

9      was entered.   And I think Mr. Funkhauser thought he

10     shouldn't be entered.

11          Q.   Were you aware that on October 2, 2007,

12     Mr. Funkhauser's occupational permit issued by the

13     West Virginia Racing Commission was indefinitely

14     suspended pursuant to a notice of suspension signed

15     by racing stewards, Danny Wright, Lawrence Dipoi,

16     and L. Robert Lotts?   Were you aware of that?

17          A.   I do remember that.

18          Q.   And these racing stewards, are they

19     employees of the PNGI?

20          A.   One of them is.

21          Q.   Which one?

1          A.    Mr. Lotts.

2          Q.    And who are the other two employees of?

3          A.    State of West Virginia.

4          Q.    And are you aware that the stewards

5    alleged that Mr. Funkhauser made false, misleading,

6    and improper statements to the racing commission?

7          A.    I don't recall that statement.  I don't

8    recall that.

9          Q.    You are aware there was a hearing held in

10   Charles Town at which the commission put on their

11   case and Mr. Funkhauser also put on his case?

12         A.    I'm aware of the hearing.

13         Q.    And did you attend the hearing?

14         A.    I think I was there one day, yes.

15         Q.    You're aware that Mr. Funkhauser prevailed

16   at that hearing and his suspension was vacated?

17         A.    Yes, I am.

18         Q.    You attended one day of that hearing?

19         A.    Yes, I did.

20         Q.    Were you there with counsel for the PNGI?

21         A.    No, sir.

1       Q.    Was counsel for PNGI there?

2       A.    Yes, sir.

3       Q.    Do you recall seeing counsel for PNGI

4   there?

5       A.    Yes, sir.

6       Q.    And who was counsel?

7       A.    I'm trying to recall.

8       Q.    Does the name Charles Printz mean anything

9   to you?

10      A.    I know Chaz Printz, but I don't remember

11  seeing him there, to be honest with you.

12      Q.    Well, who did you see there that was

13  counsel for PNGI?

14      A.    Well, Mrs. La Tart was there.  But she

15  wasn't the counsel.  I can't recall.

16      Q.    Well, Mrs. La Tart is an employee of PNGI?

17      A.    Of the race track, correct.

18      Q.    She is an attorney?

19      A.    Correct, I can't recall.

20      Q.    Do you remember any other management,

21  employees of PNGI being present at the hearing?

1        A.   No, I don't?

2        Q.   You don't?

3        A.   No, because I was by myself.

4        Q.   Which day of the hearing did you attend?

5        A.   First day.  I don't recall if it went more

6    than a day.  I was there the first day.

7        Q.   Were you there from the beginning of the

8    hearing until end of the hearing that day?

9        A.   No, sir, I wasn't.

10       Q.   How long were you there?

11       A.   Maybe an hour, hour and a half.

12       Q.   During what time?

13       A.   The start.

14       Q.   In the morning then.  You were there in

15   the morning for about an hour, hour and a half?

16       A.   Correct.

17       Q.   Did you direct that audio equipment

18   provided by PNGI be brought into the hearing?

19       A.   No, sir.

20       Q.   Do you know, did anyone from the track

21   have audio equipment brought to the hearing, to your

1      knowledge?

2            A.    Not to my knowledge.

3            Q.    You had no involvement in that?

4            A.    None whatsoever.

5            Q.    Who testified at this hearing while you

6      were there?

7            A.    It was a racing commissioner, Mr.

8      Sidiropoulos.

9            Q.    Okay.  Anyone else you saw testify?

10           A.    No.

11           Q.    Is it your testimony that you were not

12     aware that Tina Mawing testified on behalf of Mr.

13     Funkhauser at that hearing?

14           A.    I was not aware of that.

15           Q.    You were never informed of that by anyone?

16           A.    No, sir.

17           Q.    Getting back to my original question, if

18     PNGI had taken away stalls or refused to allocate

19     stalls to Ms. Mawing because she testified on behalf

20     Raymond Funkhauser at that hearing, that would be a

21     violation of the contractual agreement between PNGI

1      and the HBPA, would it not?

2           A.   It would.

3           Q.   Now, you're aware, are you not, that Tina

4      Mawing complained to not only track management but

5      to others outside of track management regarding the

6      use of pesticides in the barn area?

7           A.   Yes, I am.

8           Q.   When did you first become aware of that?

9           A.   She stopped me one night when I was

10     leaving the racing office.  And told me that she

11     needed to talk to me about, it was either her horse

12     or goat, had been poisoned.  And I told her I would

13     look in to it.  I had been aware of it, and that I

14     would look in to it.

15          Q.   Was that the extent of the discussion or

16     do you remember anything else that was said during

17     that?

18          A.   I can't recall of anything else.

19          Q.   What did you do in response to that

20     meeting?

21          A.   That was in the evening.  And I talked to

1    Doug bowling, who was track superintendent.   And

2    asked him if he was aware of it.   He said he had

3    heard about it, but he was not aware of it.   He had

4    heard talk of it.   The facility maintenance man who

5    was in charge of the rodent issues was not in. So I

6    called him the next morning.

7        Q.   And who was that?

8        A.   Rodney Walker.   And I asked him if he was

9    aware of it.   He said he was not.   Then I asked if

10   we had put any poison in any of the barns.   And he

11   said, we had.

12       Q.   He said what?

13       A.   We had had poison in the barns.

14       Q.   Okay.   This is Rodney Walker?

15       A.   Rodney Walker.   In that same day, I got a

16   call from Danny Wright that Dr. Joe Starcher had

17   called him; that I guess Ms. Mawing may have called

18   Dr. Starcher.

19       Q.   First of all, who's Dr. Joe Starcher?

20       A.   Dr. Starcher was the State veterinarian.

21       Q.   Okay.

1          A.    State of West Virginia.

2          Q.    Is he employed by the racing commission?

3          A.    I don't think so.  I'm not sure.  I don't

4     think he is.

5          Q.    Well, who is he employed by?

6          A.    By the State.

7          Q.    By the State?

8          A.    Yes.

9          Q.    Of West Virginia?

10         A.    Of West Virginia, but not by the

11    commission.

12         Q.    And what is his job responsibility as the

13    State veterinarian?

14         A.    Well, to my understanding, he has

15    jurisdiction over all the State veterinarians in the

16    state of West Virginia.

17         Q.    Where's he located?

18         A.    I think he's in Charles Town.  That's

19    where I reached him, in Charles Town.

20         Q.    Okay.  You were telling us that you had

21    got a call from Danny Wright, correct?

1          A.    Right.

2          Q.    Danny Wright, at this time, was a steward?

3          A.    Correct.

4          Q.    Employed by whom?

5          A.    The State of West Virginia.

6          Q.    Racing Commission?

7          A.    Correct.

8          Q.    And he's the one who told you that Ms.

9     Mawing had contacted the State Veterinarian, Joe

10    Starcher.  Am I understanding you correctly?

11         A.    No, he told me that Dr. Starcher had

12    called him.

13         Q.    And what else did he tell you, anything

14    else?

15         A.    That I should call Dr. Starcher.

16         Q.    So you called Dr. Starcher?

17         A.    Correct.

18         Q.    And then what happened?

19         A.    I asked him what was the problem.  And he

20    said:  He said he had gotten a call from Ms. Mawing;

21    that we had had poison spread over the barn area.  I

1       said, let me call the vendor and look in to it.

2              Q.    Okay.

3              A.    Then I called the gentlemen from Erlick.

4              Q.    What is Erlick?

5              A.    He is the vendor who takes care of the

6       rodents.

7              Q.    Is this something you knew before this all

8       came up or is it something you learned of?

9              A.    I knew that we had used Erlick for many

10      years.

11             Q.    To do what?

12             A.    To take care of the rodents in the barn

13      area.

14             Q.    And how did they take care of the rodents

15      in the barn area?

16             A.    Well, they have a little box, I guess,

17      with some sort of powder in it that they use.

18             Q.    You mean some kind of rodicide or

19      pesticide?

20             A.    Correct.

21             Q.    All right.  So you knew this was

1       happening; that they used this in the barn area?

2              A.    Have used it ever since I've been

3       involved.

4              Q.    Okay.   So you contacted somebody at

5       Erlick?

6              A.    Correct.

7              Q.    And who did you talk to?

8              A.    Greg Dempski.

9              Q.    And what's his position?

10             A.    He was a supervisor of our area, Charles

11      Town area.

12             Q.    He's an employee of Erlick?

13             A.    Correct.

14             Q.    Tell me about that discussion with him?

15             A.    I told him what Dr. Starcher had said and

16      the allegations that they were spreading poison that

17      had either caused Ms. Mawing's horse to die or get

18      sick, one or the other.   I wasn't sure which.   And I

19      told him to wait until I heard again from Dr.

20      Starcher before he put any more poison down.

21             Q.    Okay.

1       A.   I probably talked to Dr. Starcher two days

2    later.  Dr. Starcher said to me that he felt that

3    what Erlick was using was not strong enough to kill

4    a horse or a goat.

5       Q.   Okay.  Did Dr. Starcher indicate to you

6    that he had done any kind of investigation since the

7    last time you spoken to him?

8       A.   That's what he had told me.  I didn't ask

9    him about any investigation.  That's what he told

10   me.

11      Q.   Well, how did Dr. Starcher know what

12   Erlick was using?

13      A.   I have no idea.

14      Q.   Okay.

15      A.   He was in communication with Erlick.  I do

16   know that.

17      Q.   How do you know that?  Did he say so?

18      A.   Because he was going to call Erlick.

19      Q.   Okay.

20      A.   Because he asked who the vendor was.  And

21   I told him who the vendor was.

1          Q.   All right.  So you had this second

2     conversation with Dr. Starcher about two days later

3     when he said he didn't think what they were using

4     was strong enough to kill a horse or a goat?

5          A.   Correct.

6          Q.   So then what?  What's the next thing that

7     you did?

8          A.   I asked Erlick if we could pursue using

9     the same pesticide that he was using.  And he said

10    he was not going use anything until he got a release

11    from Dr. Starcher that it was okay to use.

12         Q.   Do you know what kind of pesticide was

13    being used?

14         A.   I have no idea.

15         Q.   You never determined that?

16         A.   No.

17         Q.   All right.  What happened after that?

18         A.   I did not talk to Erlick later.  Mr.

19    Walker called me.  And told me that Erlick did have

20    permission from Dr. Starcher to keep using what they

21    were using.

1          Q.    So Mr. Walker told you that?

2          A.    Correct.

3          Q.    And what action did you take after that?

4          A.    I told him if the state veterinarian said

5      it was fine to use, that we could keep on using it.

6          Q.    Are you aware of the results of the

7      necropsy that was done on Ms. Mawing's goat?

8          A.    No, sir, I'm not.

9          Q.    Did you ever make any attempt to determine

10     what the results of that were?

11         A.    No, sir, I did not.

12         Q.    Did you ever have a conversation with Ms.

13     Patty Evans of the HBPA, that Ms. Mawing's should

14     back off on this issue?

15         A.    No, sir.

16         Q.    So you never said anything -- did you have

17     a conversation with Patty Evans about Ms. Mawing

18     interfering with Erlick placing poison or pesticide?

19         A.    I don't recall any conversation with Patty

20     Evans.

21         Q.    So you have no recollection of any such

1      conversation?

2           A.    No, sir.

3           Q.    Okay.   Did you ever make the statement

4      that the Erlick exterminator would be allowed to

5      carry on with quote, business as usual, until it

6      could be proven that Ms. Mawing's horse and goat

7      died of rat poisoning?

8           A.    No, sir.

9           Q.    You never made such a statement?

10          A.    No, sir.

11          Q.    Did you make any determination whether

12     this was powder confined to boxes or whether it was

13     powder being spread around various areas of the barn

14     area?

15          A.    I was told by Mr. Walker that it was in

16     boxes.

17          Q.    Okay.   Did you ask Ms. Mawing about that?

18          A.    No, sir, I did not.

19          Q.    Did you ask any of the people that work in

20     the -- any of the employees of yours that work

21     around the barn area and back stretch area, what

1     they observed?

2         A.    No, sir, I did not.

3         Q.    Did you go down and make any observations

4     on your own as to where the pesticide or rodicide

5     was located and how it was being used?

6         A.    Yes, sir, I did.

7         Q.    What did you do in that regard?

8         A.    I went to barn 14.

9         Q.    Uh-huh.

10        A.    I went to barn 4, and went to barn 9.

11        Q.    And what did you observe?

12        A.    There was little black containers.

13        Q.    Of Rodicide?

14        A.    I couldn't tell you what was inside of

15    them.

16        Q.    Did you just go there by yourself?

17        A.    Yes, sir.

18        Q.    And just make your own observations?

19        A.    Yes, sir.

20        Q.    Did you hear from the Governor's office

21    regarding this matter?

1          A.    No, sir, I did not.

2          Q.    You were aware that Ms. Mawing did have a

3     meeting with the governor along with other board

4     members of the HBPA where this was a topic of

5     discussion?

6          A.    Not to my knowledge.

7          Q.    Do you know who Mr. Puccio is?

8          A.    Do I know Mr. Puccio?

9          Q.    Yes.

10          A.    I've met him once.  I think he's the Chief

11     of Staff for the governor.

12          Q.    Okay.  Is that his current job?

13          A.    That I don't know.

14          Q.    Do you know who his current employer is?

15          A.    I think he was a lobbyist for PNGI in the

16     last legislative session.

17          Q.    So he was Chief of Staff for the Governor,

18     whose now been hired by PNGI as a lobbyist, is that

19     correct?

20          A.    He was at the last legislative session,

21     yes.

```
1            Q.    Would you agree with me that if Ms.

2     Mawing's complaints to you about this rat poison or

3     to any other members of management or to the

4     Governor's office or to the State veterinarian; if

5     any of that was a factor in the decision not to

6     allocate her stalls, that would be a violation of

7     the contractual provision against discrimination

8     based on HBPA activity?

9            MR. PETERSON:   Object to the form of the

10           question.   It calls for a legal conclusion, and

11           it calls for speculation.

12           Q.    (By Mr. Waddell) You can answer the

13    question.

14           A.    Would you repeat it again?

15           Q.    Sure.   You told me that if her testimony

16    to the Funkhauser hearing was a factor you all use

17    not to allocate her stalls, that would be a

18    violation of the contractual provision that prevents

19    discrimination?

20           A.    Uh-huh.

21           Q.    I'm asking the same question with regard
```

1       to her complaints about the rat poison.  If this was

2       a factor that you all used to take her stalls away

3       from her or not to allocate her stalls, would you

4       agree with me, that would be a violation of this

5       contract?

6               A.   Yes.

7               Q.   You agree with me that the track's

8       discretion or PNGI's discretion to allocate stalls

9       is not absolute.  The track does not have the

10      discretion to discriminate against the HBPA members

11      like Tina Mawing for engaging in HBPA activity,

12      correct?

13              A.   Correct.

14              Q.   And you agree with me that that

15      contractual provision in the contract between the

16      track and HBPA is specifically intended to protect

17      the members of the HBPA?

18              MR. PETERSON:  Objection, calls for

19          speculation as to what the intent was.  But if

20          you know the answer to that, you can answer it.

21              Q.   (By Mr. Waddell) That provision there is

1     designed to protect the HBPA members?

2          A.    That's why it's in there.

3          Q.    Did you ever discuss Ms. Mawing's

4     complaints regarding rat poison with Al Britton?

5          A.    I may have mentioned to him in passing,

6     you know.  But I pretty much did all that on my own.

7          Q.    Okay.  Do you think you might have

8     mentioned it to him?

9          A.    I think I may have.

10         Q.    You don't recall specifically what you

11    said?

12         A.    I don't recall specifically, but I may

13    have.

14         Q.    Do you remember any discussion you may

15    have had with Al Britton at any time or any other

16    member of management regarding Ms. Mawing either

17    supporting Raymond Funkhauser, testifying for

18    Raymond Funkhauser, or anything of that nature?

19         A.    No conversations at all.

20         Q.    I think you've testified you're aware that

21    Raymond Funkhauser prevailed at that hearing,

1        correct?

2              A.    Which hearing?

3              Q.    The hearing that was held by the Racing

4        Commission?

5              A.    Yes.

6              Q.    Did you ever review the decision of the

7        hearings?

8              A.    No, sir.

9              Q.    Were you ever provided a copy of that?

10             A.    No, sir.

11             Q.    Do you know if Al Britton or anyone at the

12       track management was provided a copy of that

13       decision?

14             A.    I do not know.

15             Q.    Okay.  You've been around, obviously, the

16       track for years.  Would you agree with me that

17       placing thoroughbred horses in trailers for the

18       purpose transporting them, poses a risk of injury to

19       those horses?

20             A.    There's always a chance of an injury,

21       sure.

1          Q.    So the more you would have to engage in

2     that sort of transport, the more risk you would

3     create for a thoroughbred horse?

4          A.    If it's done on a daily basis seven days a

5     week, there's always a possibility something could

6     happen, absolutely; like in anything.

7          Q.    And you agree with me that horses, some

8     horses, do become stressed during that process of

9     loading, transporting, and unloading from trailers,

10    may act erratically and may cause injury to

11    themselves?

12         A.    That's correct.

13         Q.    And if you're transporting a horse, for

14    instance, from an off-site stable or farm to the

15    track for the purposes of racing, you wouldn't be

16    permitted to tranquilize the horse in any way

17    because substances that would show up in a drug

18    test, would be prohibited by the rules of racing?

19         A.    That's correct.

20         Q.    At the time PNGI made this decision to not

21    allocate any stalls to Ms. Mawing, there were

1     approximately, 140 vacant stalls available?

2          MR. PETERSON:  Object to the form.  It's

3        vague as to the term, vacant.

4     A.   I didn't have that knowledge of being that

5   many empty.

6     Q.   But there were empties stalls available?

7     A.   There's usually some empty stalls, yes.  I

8   don't know how many.  I couldn't tell you how many

9   is empty today.

10     Q.   Do you know who Doug Lamp is?

11     A.   Yes, I do.

12     Q.   And who is Mr. Lamp?

13     A.   He's a former employee of PNGI.

14     Q.   Okay.  He was a former racing secretary?

15     A.   That's correct.

16     Q.   Doesn't the racing secretary -- under the

17   license agreement that you use with the trainers for

18   the allocation of stalls, isn't the racing secretary

19   the one who is supposed to have the final decision

20   on the allocation of stalls?

21     A.   That's on the stall application.

1          Q.    Well, that stall application is something

2    prepared by PNGI?

3          A.    Correct.

4          Q.    And it informs the trainers that the

5    racing secretary has the final decision making

6    authority with regard to the allocation of stalls,

7    doesn't it?

8          A.    That's what it says on there, yes.

9          Q.    Well, is that or is that not the policy of

10   PNGI?

11         A.    That was not the policy when Doug Lamp was

12   racing secretary.

13         Q.    All right.  First of all, what was the

14   policy when Doug Lamp was racing secretary?

15         A.    When Doug Lamp became racing secretary,

16   that's when we formed a stall committee; taking the

17   final decision away from Doug.  I guess prior to

18   that, there was a lot of allegations that there was

19   favoritism and so on.  And then that's when Mr.

20   Britton wanted to form a stall committee which

21   consists of the racing secretary at the present

1     time, Mr. Briton, myself, and the stall

2     superintendents.

3          Q.   Okay.  So you're saying this stall

4     committee was first formed when?

5          A.   Well, when Doug became racing secretary.

6     And I'm trying to think of when.  Maybe 2006.

7          Q.   You're saying prior to 2006, there was no

8     committee that allocated stalls?

9          A.   No.

10         Q.   Prior to 2006, who made the decision

11    regarding the allocation of stalls?

12         A.   The racing secretary.

13         Q.   And you're saying the reason a committee

14    was formed was because of allegations of favoritism?

15         A.   That's what was mentioned to us, yes.

16         Q.   Mentioned to you by whom?

17         A.   Different trainers.

18         Q.   Trainers that complained there was

19    favoritism?

20         A.   Yes.

21         Q.   Which trainers had complained?

1          A.    Numerous.

2          Q.    And who were they complaining against?

3          A.    The racing secretary.

4          Q.    Who was that racing secretary?

5          A.    Well, it was Mr. Hammond at the time.  And

6     also Mr. Lamp, when he first started.

7          Q.    Okay.  But you said that the decision was

8     made before he started?

9          A.    No.

10         Q.    No?

11         A.    No. When he took the position, maybe a few

12    months after he had the position, we formed a stall

13    committee.

14         Q.    And you're saying in part, because of the

15    complaints made against Mr. Lamp.  Is that your

16    testimony?

17         A.    Yes.

18         Q.    I'm going to show you a few exhibits here

19    that I have questions about, Mr. Moore.  I'm going

20    to hand you Exhibit No. 1.  These are the same

21    exhibits we used yesterday.

```
 1                      (Whereupon, Deposition Exhibit

 2                      No. 1 was marked for

 3                      identification)

 4        Q.    Have you seen this document before, first

 5   of all?

 6        A.    Yes, I have.

 7        Q.    When did you last see it?

 8        A.    It's been a long time ago.

 9        Q.    All right.  Did you see it at around the

10   time of the date on it, which is December 21, 2006.

11   Is that around the time you first saw it?

12        A.    Probably, yes.

13        Q.    And why would you have occasion to see it

14   at that time, Mr. Moore?

15        A.    I think Mr. Lamp took all these and showed

16   them, you know, who was going to get what stalls.

17        Q.    Who'd he show them to, you?

18        A.    Probably the committee, because the

19   committee had started then, I'm sure.

20        Q.    Okay.  Well, if the committee had started

21   then, was the committee involved in this allocation
```

1        of stalls that occurred on or about December 21,

2        2006?

3            A.   I think the committee was in operation

4        then, yes.

5            Q.   Okay.  Do you have a recollection of that

6        committee meeting when Ms. Mawing was allocated 7

7        stalls for 2007?

8            A.   No.

9            Q.   Do you recall any discussion at all

10       regarding the reasons for the allocation decision

11       being made?

12           A.   No.

13           Q.   Did you have any criteria, specific

14       criteria, that the committee used in making

15       allocation decisions?

16           A.   Same criteria that I mentioned to you

17       earlier.

18           Q.   And that is again, for my benefit, what?

19           A.   There's statistics, what type horses they

20       have, how many starts they have made in their

21       previous meet, how they take care of their animals,

1    how they take care of their stalls, quality of the

2    horses.

3         Q.   And I think we've established that you

4    cannot tell me any criticism of Ms. Mawing, based on

5    any of those criteria at any time she was at the

6    track training, correct?

7         A.   I can't, no, sir.

8         Q.   How long has she been a trainer at the

9    track, do you know that?

10        A.   She's been there quite a while.  I don't

11   remember what year she started.

12        Q.   Okay.  Would you agree that until 2008,

13   she consistently had been successful in receiving

14   more and more allocations of stalls, based on her

15   record at the track?

16        A.   I don't know what she started with.  I

17   don't know what she's ever been deducted prior to

18   this, what we've had or increased.  I think at one

19   time there was an increase of her stalls.  I think

20   she went from 7 to 10, if I'm not mistaken, at one

21   time.

1          Q.    We've established, I guess, you don't have

2     a present recollection of any reasons or factors

3     that went into the allocation of 7 stalls for 2007;

4     is that correct?

5          A.    I have no recollection at all.

6          Q.    Let me show you what I've had marked as

7     Exhibit No. 2 to your deposition.

8                         (Whereupon, Deposition Exhibit

9                          No. 2 was marked for

10                         identification)

11         Q.    Have you seen that document before.   I

12    presume you have, since you signed it?

13         A.    Yes, I have.

14         Q.    That your signature?

15         A.    Yes, it is.

16         Q.    And this is dated February 7, 2008.   Was

17    there a stall allocation committee meeting held

18    sometime prior to this date, February 7, 2008?

19         A.    At that time that I did this, I don't

20    think so, no, sir.

21         Q.    There was no meeting?

```
 1          A.    No, sir.

 2          Q.    How come there had been no meeting prior

 3    to?

 4          A.    Because there was not a racing secretary

 5    at the time.  Doug Lamp had resigned and I was

 6    performing both duties.

 7          Q.    I see.

 8          A.    I was acting as the general manager and as

 9    the acting racing secretary until I turned it over

10    to Mr. Elliott.

11          Q.    Okay.  When did Mr. Lamp resign, if you

12    know?

13          A.    I think it was in '07.

14          Q.    Do you know the circumstances why he

15    resigned?

16          A.    He just said he was going resign.

17          Q.    Okay.  You're not privy to any reasons why

18    he resigned; is that correct?

19          A.    That's correct.

20          Q.    Okay.  In this particular document,

21    Exhibit No. 2, which you signed and which is dated
```

 1      February 7, 2008; this is notifying Ms. Mawing she's

 2      being allocated 9 stalls, correct?

 3          A.    Correct.

 4          Q.    How did you reach that decision as acting

 5      racing secretary?  Were you doing this as acting

 6      racing secretary?

 7          A.    Probably from the stats that I had

 8      received from --

 9          Q.    Were you doing this in your capacity as

10      acting racing secretary?

11          A.    Yes.

12          Q.    Okay.  And you're saying probably, you

13      made this decision based on what?

14          A.    With her starts; what she had in the barn,

15      what have you.

16          Q.    Okay.  You say probably.  Do you know

17      specifically how you reached this decision?

18          A.    I can't recall what she had, you know.  It

19      looks like to me that we gave her an increase.  So

20      she was probably running quite a few horses, and

21      probably had applied for 9 stalls, I would assume.

1      And I see no reason why not to give her 9 at that

2      present time.

3            Q.    Okay.  Is that your best recollection of

4      this?

5            A.    That would be my best recollection.

6            Q.    All right.

7                        (Whereupon, a discussion was

8                         held off the record)

9            Q.    Mr. Moore, I'm handing you what's been

10     mark Exhibit No. 3 to your deposition?

11                       (Whereupon, Deposition Exhibit

12                        No. 3 was marked for

13                        identification)

14           Q.    This appears to be a document, again, that

15     you signed; that is correct?

16           A.    Yes, sir.

17           Q.    And it's dated April 25, 2008, correct?

18           A.    Correct.

19           Q.    Tell me what this is?

20           A.    As I recall, there was a tattoo check of

21     the barn area.

```
1          Q.    First of all, what is a tattoo check?

2          A.    Go by and check all horse tattoos.

3          Q.    Horses have some tag on their --

4          A.    On their upper lip.

5          Q.    What does that do, identifies?

6          A.    Identifies the horses.

7          Q.    By owner or trainer or --

8          A.    What trainer has what horse.

9          Q.    Okay.  How often are these tattoo checks

10   performed?

11         A.    It's random.

12         Q.    Okay.

13         A.    As I can recall, the reason why it was

14   done:  there was a horse, I think sometime in the

15   latter part of March, that showed signs of equine

16   herpes, which is kind of a contagious disease.

17         Q.    Uh-huh.

18         A.    And it wasn't in the stall it should have

19   been in. So --

20         Q.    Whose horse was that?

21         A.    It was a horse that belonged to Mary
```

1      Moore.

2           Q.   Mary Moore?

3           A.   Correct.

4           Q.   And whose stall was that?

5           A.   It was in Bushanda Armstrong's stall.

6           Q.   All right.

7           A.   So we got a complaint.  As I recall, Mr.

8      Elliott said there was a complaint from Mr. Yetsook

9      about Ms. Mawing having horses in his stall.  So my

10     response was, other than check Mr.  Yetsook's and

11     Ms. Mawing's, we're going to check everybody's.

12          Q.   So you're telling me that's why the tattoo

13     check was performed?

14          A.   Correct.

15          Q.   All right.  Let me make sure I just

16     understand you correctly.  There was an incident

17     with Mary Moore having -- she's a trainer?

18          A.   She was a trainer, yes.

19          Q.   -- having a horse with equine herpes --

20          A.   Allegedly had had equine, but it did.

21          Q.   But it did, okay.  But it was in a stall

1    that belonged to another trainer, Armstrong?

2        A.   Correct.

3        Q.   And how is that connected to Elliott

4    coming to you with a complaint.  I mean, what's the

5    connection there?  Is there a connection there?

6        A.   Well, he said that Mr. Yetsook had

7    complained that Ms.  Mawing was in his stall.

8        Q.   I mean, how is that connected to the

9    Moore/Armstrong issue, if it is, at all?

10       A.   That's why we started to do the checks.

11       Q.   Because of the Moore/Armstrong issue?

12       A.   Correct.

13       Q.   Given the name Moore, is Moore any

14    relation to you?

15       A.   Daughter.

16       Q.   Daughter, okay.  Now, so at some point

17    during this time period then, Mike Elliott comes to

18    you and says:  he received a complaint?

19       A.   Right.

20       Q.   -- from George Yetsook?

21       A.   Correct.

1        Q.    -- about Ms. Mawing having a horse in his

2    stall.  Is that your testimony?

3        A.    Correct.

4        Q.    Did you talk to Mr. Yetsook to confirm

5    that he did indeed have such a complaint?

6        A.    No.

7        Q.    What was your action that you took.  Your

8    action was to do a tattoo check?

9        A.    All barns.

10        Q.    All barns?

11        A.    Correct.

12        Q.    That was done when, approximately?

13        A.    Sometime, I think, early part of April, if

14    I recall.

15        Q.    So what happened after that?

16        A.    Well, we found Ms. Mawing in, I think, one

17    of Mr.  Yetsook's, and maybe one or two of Mr.

18    Butt's.  But I see here where she was reduced four

19    stalls, so she must have been in four other stalls.

20    I can't recall of who else.  I do know about Mr.

21    Yetsook and Mr. Butts.

1         Q.    Okay.  Do you know a Mr. Wilt?

2         A.    I do know Ronny Wilt.

3         Q.    Does that refresh your memory about the

4    stalls?

5         A.    I don't recall his name, but evidently it

6    must have been.  And there may have been one or two

7    others.  I can't recall, but it was more than Ms.

8    Mawing.

9         Q.    You mean there may have been one or two

10   other trainers who had horses in stalls other than

11   the ones assigned to them?

12        A.    Yes.

13        Q.    Well, who were they?

14        A.    I can't recall.

15        Q.    So we don't know who they were?

16        A.    There was, of course, there was Mary and

17   Bushanda Armstrong.  And there was Ms. Mawing.

18        Q.    Uh-huh.

19        A.    There was another one or two, I do know.

20        Q.    Okay.

21        A.    And they all received the same letter.

1          Q.    So your daughter received the same letter?

2          A.    Yes.  She lost her stalls.

3          Q.    How many stalls did she have?

4          A.    Three or four.

5          Q.    Did she lose all of her stalls?

6          A.    Yeah.

7          Q.    How about the other one or two other

8    trainers, other than Ms. Mawing?

9          A.    I think Mrs. Armstrong lost one.

10          Q.    She lost one.  Why did she lose one?

11          A.    Because she let Mary Moore in her stall.

12          Q.    What about Mr. Yetsook or Mr. Butts, did

13    they lose any stalls?

14          A.    I don't recall.  I don't recall those

15    losing stalls.

16          Q.    Why wouldn't they lose stalls if they

17    allowed Ms. Mawing to --

18          A.    They might have.  I just don't recall.  I

19    recall this because I'm looking at the letter.

20          Q.    And you're saying there are one or two

21    other trainers who lost stalls?

1        A.    Correct.

2        Q.    But you don't recall who they were?

3        A.    There was more than Ms. Mawing.

4        Q.    You don't recall how many stalls they had?

5        A.    No.

6        Q.    You don't recall how many stalls they

7    lost?

8        A.    No, I do not.

9        Q.    Was there any reason why Mary Moore lost

10   her stalls other than this Armstrong issue?

11       A.    That was Mr. Britton's.  He thought it was

12   best that she lose all her stalls.  I stayed out of

13   it because it was a conflict of interest.

14       Q.    I understand that.  But was there any

15   other reason why she lost her stalls other than the

16   fact this horse was in the Armstrong stall?

17       A.    Not to my knowledge.

18       Q.    You're not aware of any other reason?

19       A.    No.

20       Q.    All right.  Is there a record of who these

21   one or two trainers are?

1          A.    There should be letters.

2          Q.    And where would those letters be?

3          A.    In the racing secretary's office.

4          Q.    Would you have been the one who signed and

5     sent out all these letters?

6          A.    At that time, I'm sure I would have been,

7     yes.

8          Q.    Did your daughter currently have stalls at

9     the track?

10          A.    No, sir.

11          Q.    Did she ever receive any stalls back or

12     additional stalls?

13          A.    No.

14          Q.    This notice you sent to her April 25,

15     advises her that her stall allocation is being

16     reduced by four stalls.  It says she was previously

17     allocate 9 stalls in barn 14.  With this reduction

18     you are now allocated five stalls in barn 14,

19     correct?

20          A.    That's what it says, yes, sir.

21          Q.    How did you arrive this reduction, the

1      number of stalls that she was being reduced?

2           A.   I guess there was four horses in four

3      other stalls that were not allocated to her.

4           Q.   You believe that four of these stalls were

5      not hers?

6           A.   She had four horses.

7           Q.   Yeah.

8           A.   -- in stalls that were not allocated to

9      her.

10          Q.   For that reason, you took four of her

11     stalls?

12          A.   Correct.

13          Q.   Is that your testimony?

14          A.   Correct.

15          Q.   And how many stalls did your daughter

16     have?

17          A.   I think three or four.

18          Q.   And she only had -- did she have more than

19     one horse in other stalls?

20          A.   No.

21          Q.   Why did she lose all her stalls?

1          A.    That was Mr. Britton's decision.

2          Q.    So you based your reduction of her to four

3     stalls based on the fact that she had horses in four

4     stalls that weren't assigned to her.  Is that your

5     testimony?

6          A.    Correct.

7          Q.    Now, I thought there was a policy at the

8     track that you could obtain permission to have your

9     horse in another trainer's stalls if the stalls were

10    vacant and the trainer wasn't using them and you

11    provided permission; isn't that correct?

12         A.    There was at one time, written permission,

13    yes.

14         Q.    Now, is it not a fact that Ms. Mawing

15    advised you all that she had received permission

16    from Doug Lamp, who was the racing secretary at the

17    time, to have her horses in these four stalls that

18    were vacant, but were assigned to other trainers?

19         A.    I don't recall her advising me of that.

20         Q.    She never came up -- you have no knowledge

21    of that issue?

1        A.    Never come the me, no, sir.

2        Q.    And isn't it a fact that Mr. Yetsook, Mr.

3   Butts, and I believe, Mr. Wilt, all verified or

4   corroborated Ms. Mawing's statements that she had

5   permission from Doug Lamp to have horses in these

6   stalls?

7        A.    I'm not aware of it.

8        Q.    Okay.  Is it your testimony, Mr. Moore,

9   that you're unaware that Ms. Mawing had a meeting

10  shortly after this letter was received, in Randy

11  Wehrman's office at which Mr. Zimny, Lenny Hale, and

12  George Yetsook, and Ms. Mawing were all present over

13  this issue?

14       A.    Not aware it.

15       Q.    No one ever informed you of that?

16       A.    No, sir.

17       Q.    And Randy Wehrman would have been the

18  racing secretary at that time?

19       A.    Yes, sir.

20       Q.    Now, you said something about written

21  permission for a trainer to use another trainer's

1      stalls; is that correct?

2          A.   Yes, sir.

3          Q.   Are you aware of any trainers who ever

4      actually had gotten written permission to have

5      horses in other trainer's stall?

6          A.   Yes, I do.

7          Q.   Who?

8          A.   Well, when I was acting racing secretary,

9      I think Mr. Gramms was one.

10         Q.   Gramm?

11         A.   Tim Gramms.

12         Q.   And he got permission to do what?

13         A.   Use a stall.

14         Q.   Whose stall?

15         A.   I think it was Mr. Runcoe.  He was putting

16     a horse in Mr. Runcoe's stall.

17         Q.   Okay.

18         A.   And he had written permission.

19         Q.   From whom?

20         A.   From me.

21         Q.   When did you give that to him,

1      approximately, time frame?

2          A.   It had to be in the time when Doug Lamp

3      was gone and before Randy Wehrman came.

4          Q.   It was while you were acting racing

5      commissioner between Lamp and Wehrman?

6          A.   Right.  It was also done in the past,

7      prior before the stall committee.  And it always had

8      to be done in writing.

9          Q.   Well, had you ever seen any other written

10     permissions given by anybody to trainers to have --

11         A.   No.

12         Q.   Is there an actual document or written

13     requirement about having this permission in writing?

14         A.   No.

15         Q.   So you're saying there's nothing in

16     writing that requires written permission?

17         A.   No.

18         Q.   No written policy of the track?

19         A.   No.

20         Q.   Now, you testified you weren't aware of

21     this meeting.  I'll represent to you at this

1      meeting, Ms. Mawing said that she had gotten

2      permission from the racing secretary at the time, to

3      use these stalls.  It was argued that she had no

4      permission to use.  She said she had permission.

5      And she was advised that Doug Lamp would corroborate

6      that, and that having that would be helpful.  And

7      are you aware that Doug Lamp did, in fact,

8      corroborate that she had been given permission to

9      use these stalls?

10          A.   Never was brought to my attention.

11          Q.   Okay.  Now, this was your decision in

12     April 25, 2008 to take the four stalls away from her

13     for the reason that she had been using, what you at

14     that time contended, were four stalls she was

15     unauthorized to use, correct?

16          A.   Correct.

17          Q.   And did you feel that was appropriate and

18     sufficient action for the track to take with regard

19     to this infraction, alleged infraction of the rules?

20          A.   Correct.

21          Q.   Let me hand you Exhibit No. 4.

```
 1                        (Whereupon, Deposition Exhibit

 2                        No. 4 was marked for

 3                        identification)

 4          Q.    This is again, a document that appears to

 5    be signed by you.  Can you identify that document

 6    for us?

 7          A.    Yes, sir, I do.

 8          Q.    Can you tell me what this is?

 9          A.    That probably stemmed from the -- this all

10    stemmed from why we did the barn audit or the tattoo

11    check from the horse that had the alleged equine

12    herpes.

13          Q.    Okay.

14          A.    And it was recommended from Dr. Starcher

15    that we needed to tighten up the barn area.  As a

16    matter of fact, I think he sent a letter to that

17    effect to me and to Mr. Hale.

18          Q.    So anyway, this is a letter, if I'm

19    correct, you wrote, signed and sent to Mr. Hale, the

20    executive of the Charles Town HBPA?

21          A.    Correct.
```

1          Q.    And it's dated May 2, 2008.  And it's

2     dealing with the issue trainers, these instances of

3     trainers, occupying stalls to which they were not

4     assigned without the required written consent,

5     according to your letter, correct?

6          A.    Correct.

7          Q.    And I guess the issue here is that there

8     were some horsemen who were not vacating the stalls?

9          A.    I think we give them, like, 14 days, if

10    they were in other stalls, correct.

11         Q.    And which horsemen were not complying with

12    your 14-day requirement?

13         A.    I can't recall the names.

14         Q.    Was Tina Mawing one of them?

15         A.    I can't recall if Tina Mawing was or not.

16    I don't know whether she got out in appropriate time

17    or not.  I don't recall.

18         Q.    So you have evidence to support the fact

19    she didn't comply with your original directive?

20         A.    No, I don't.

21         Q.    And the people copied at the bottom of

1      this letter, are they the board of directors of the

2      HBPA?

3          A.    Yeah.  It looks like the board of

4      directors there, yes, sir.

5          Q.    Okay.  Did you write this letter on your

6      own or were you directed by anyone to write it?

7          A.    No, I wrote this letter.

8          Q.    Nobody came to you and said:  I want you

9      to do this.  It was your decision to write the

10     letter?

11         A.    Correct.

12         Q.    I'm going to hand you Exhibit No. 5.

13                        (Whereupon, Deposition Exhibit

14                        No. 5 was marked for

15                        identification)

16         Q.    It appears to be a letter written and

17     signed by Randy Wehrman and directed to Ms. Mawing,

18     dated August 29, 2008.  Have you seen this document

19     before?

20         A.    No, I haven't.

21         Q.    Would you agree with me this letter is

1     advising Ms.  Mawing that her 2008 stall application

2     has been reviewed by the stall allocation committee.

3     And based upon the committee's review, it's unable

4     to allocate any stalls to her for the remainder of

5     year 2008?

6          A.   Yes, sir.  That's what it says.

7          Q.   Now, we previously discussed a meeting of

8     the stall allocation committee that resulted in Ms.

9     Mawing being allocated no stalls at the track,

10    correct?

11         A.   Correct.

12         Q.   And is that the meeting that led to this

13    letter being sent to her on August 29, 2008?

14         A.   I don't recall.

15         Q.   All right.  Now, previously, you said that

16    the reason she was not allocated any stalls was

17    because of this issue of having horses in another

18    trainer's stalls, correct?

19         A.   The five, correct.

20         Q.   Were you confused.  Did that relate to the

21    other exhibit, the one where she had four stalls

1      taken away?

2          A.    No.

3          Q.    So what you're saying -- you took four

4      stalls away from her back in April of 2008?

5          A.    Correct.

6          Q.    And you're saying she then had all her

7      stalls taken away at a later meeting for the same

8      reason?

9          A.    I don't recall.  The only time I can

10     recall Tina Mawing's name being brought up was in

11     that meeting where we took the five away.

12         Q.    The five away?

13         A.    When she -- the last five that she had.

14         Q.    Her last five?

15         A.    Right.

16         Q.    Okay.

17         A.    She was with that other group of

18     individuals I mentioned earlier.

19         Q.    And you believe that to be a meeting that

20     took place around August of 2008 or not?

21         A.    I think it must have been, because that's

1      why he sent her this letter.

2          Q.    Okay.  So is it still your testimony that

3      you remember her name being mentioned.  And the

4      reason she was placed in that group of people who

5      had all their stalls, or no stalls allocated; the

6      reason you recall, was because of the issue with

7      having horses in other stalls?

8          A.    That's the only reason I can remember

9      being mentioned.

10         Q.    You specifically, remember that being

11     mentioned at that meeting?

12         A.    That's why she was set aside.

13         Q.    Okay.  Now, there's no issue here, is

14     there -- after April 25, 2008, there's no contention

15     here that she ever, in any way, violated any rules

16     of the track regarding stalling of horses, is there?

17         A.    Not to my knowledge.

18         Q.    Okay.  So if, in fact, she was penalized

19     for stalling her horses in other trainer's stalls,

20     that related back to what occurred in April of 2008?

21         A.    Correct.

1          Q.   I'm just confused.  If that was

2     appropriate and adequate action to be taken in April

3     of 2008 for this alleged infraction, why then is the

4     track taking away all her stalls in August?

5          A.   That was the committee's decision.

6          Q.   Well, did you have any input in to that

7     decision?

8          A.   I was just with the other five or six or

9     however many was there.  I'm saying her name was put

10    off to the side.

11         Q.   Did you say to the rest of the committee:

12    hey, I already took four stalls away from her in

13    April for that?

14         A.   No, I did not.

15         Q.   Why not.  Why didn't you bring that up?

16         A.   Didn't bring anything up.

17         Q.   Did you feel it was unfair to have all her

18    stalls taken away in August for something that you

19    had already taken four stalls away in April?

20         A.   I don't recall anything being mentioned.

21         Q.   You don't recall anything being mentioned?

1          A.    No.

2          Q.    You didn't mention anything?

3          A.    No, sir.

4          Q.    Nobody else mentioned anything?

5          A.    No, sir.

6          Q.    Randy Wehrman didn't say:  well, Doug Lamp

7    gave her permission to have those stalls?

8          A.    No.

9          Q.    You don't recall that being said?

10         A.    Not that I recall, no, sir.

11         Q.    You don't recall Randy Wehrman or anybody

12   saying, or Zimny saying:  well, George Yetsook and

13   Mr. Butts, and Mr. Wilt, all gave her permission to

14   use those stalls.  And that was approved by Doug

15   Lamp.  That never came up?

16         A.    No, sir, I did not, not that I can recall.

17         Q.    Okay.  Let me show you Exhibit No. 6, Mr.

18   Moore.

19                          (Whereupon, Deposition Exhibit

20                          No. 6 was marked for

21                          identification)

```
 1          Q.    This is a letter signed by you, is it not?

 2          A.    Yes, it is.

 3          Q.    Okay.  And can you identify what it is?

 4          A.    Evidently, we were giving her additional

 5    time to revert her stalls back.

 6          Q.    Okay.  So this relates to the August 29,

 7    2009 letter where Randy Wehrman is taking those

 8    stalls away from her?

 9          A.    Correct.

10          Q.    And this is your letter --

11          A.    Giving her additional time.

12          Q.    To vacate?

13          A.    To vacate.

14          Q.    All right.  Do you recall any discussion

15    with her or with anyone else about writing this

16    letter?

17          A.    I don't recall.

18          Q.    Did she come to you and say she needed

19    additional time?

20          A.    Don't ever recall.

21          Q.    You don't have any recollection of why you
```

1     wrote this letter at all?

2          A.   Evidently, Mr. Wehrman or someone told me

3     that she had not vacated.  That's the only reason

4     why the letter would be written.

5          Q.   Is that an assumption?  Do you have any

6     recollection of such a conversation taking place?

7          A.   No, I don't.

8          Q.   So basically, you don't recall why or the

9     circumstances of writing the letter?

10         A.   I don't recall it.

11         Q.   Let me show you Exhibit No. 7.

12                        (Whereupon, Deposition Exhibit

13                        No. 7 was marked for

14                        identification)

15         Q.   Now, this is appears to be a letter

16    written by Randy Wehrman to Tina Mawing, dated

17    December 17, 2009, correct?

18         A.   Yes, sir.

19         Q.   And again, the subject of this letter is:

20    revocable stall license agreement, January 1, 2010

21    through June 30, 2010.  Do you see that?

```
1          A.    Yes, I do.

2          Q.    So would you agree with me from your --

3    first of all, have you ever seen this before?

4          A.    This letter?

5          Q.    Yeah.

6          A.    No, sir.

7          Q.    Okay.  Would you agree with me it says:

8    the stall allocation committee has reviewed your

9    stall application for the period covering January 1,

10   2010 through June 30, 2010, correct?

11         A.    Yes, sir.

12         Q.    Also advises her that based upon the

13   committee's review, it's unable to allocate any

14   stalls to her for this period, correct?

15         A.    Correct.

16         Q.    Was there a meeting of the stall

17   allocation committee where her application was

18   reviewed?

19         A.    I don't ever recall Tina Mawing's name

20   being mentioned in the stall allocation committee at

21   all.
```

1          Q.    For this time period?

2          A.    Yes, sir.

3          Q.    So you don't even recall her name coming

4     up?

5          A.    No, sir.

6          Q.    So there was no discussion that you recall

7     about whether to allocate her any stalls or not?

8          A.    I don't recall her name being mentioned at

9     all.

10         Q.    So who made this decision not to allocate

11    her any stalls?

12         A.    It's a committee decision.

13         Q.    But there's no discussion?

14         A.    None whatsoever that I can recall her name

15    being brought up.

16         Q.    Well, then how could it be a committee

17    decision, if the committee didn't discuss it?

18         A.    If Mr. Wehrman would have said:  I have

19    Tina Mawing's application here to discuss, then we

20    would have discussed it.  But it was never brought

21    to my attention or the committee's attention.  It's

1    probably not just hers, probably numerous stall

2    allocations that weren't discussed.

3         Q.   How do you know there were numerous stall

4    allocations that weren't discussed?

5         A.   There usually is numerous stall

6    allocations.

7         Q.   That aren't discussed?

8         A.   Yes.

9         Q.   Why is that?

10        A.   It's based on the information that Mr.

11   Wehrman has and the stalls that are available.

12        Q.   Well, were people allocated stalls after

13   this meeting?

14        A.   Not after this meeting, during this

15   meeting.

16        Q.   Well, during the meeting, people were

17   allocated stalls?

18        A.   Absolutely.

19        Q.   People got an increase in their allocation

20   of stalls?

21        A.   They got on increase, they got a

1    reduction, may have had new people in.

2         Q.   Now, Tina Mawing was still a trainer with

3    horses racing at the track, wasn't she; even though

4    you had taken away all of her stalls, she still had

5    horses --

6         A.   To my knowledge, yes, she was.

7         Q.   So she would still have statistics as to

8    her horses, and their winning percentages, and the

9    quality of her horses, all these criteria that you

10   say you use, correct?

11        A.   Correct.

12        Q.   And Mr. Wehrman would have had those

13   statistics available at this meeting?

14        A.   Correct.

15        Q.   You're not aware that there was any

16   criteria she didn't fail to meet with regard to the

17   quality of her horses, her number of starts, or her

18   winning percentage?

19        A.   Not to my knowledge, never brought to my

20   attention.

21        Q.   Okay.  She's never had a problem with

1       those issues, has she?

2               A.    Not to my knowledge.

3               Q.    Okay.  But there was absolutely no

4       discussion at this meeting about allocating her any

5       stalls?

6               A.    I don't recall Ms. Mawing's name being

7       brought up at all.

8               Q.    Was Mr. Britton present at this meeting?

9               A.    Yes, he was.

10              Q.    Was Randy Wehrman present?

11              A.    Yes, he was.

12              Q.    Was Mr. Zimny present?

13              A.    Yes, sir, he was.

14              Q.    Mr. Taylor present?

15              A.    Yes, sir, he was.

16              Q.    Mr. Elliott present?

17              A.    Yes, sir, he was.

18              Q.    Anyone else present that I forgotten?

19              A.    No, sir.  I think that's the committee.

20              Q.    Would you agree with me that Tina Mawing

21      is a member of the board of directors of the Charles

1    Town HBPA, correct?

2          A.   At the present time?

3          Q.   Yes.

4          A.   I think she is, yes, sir.

5          Q.   She's also the holder of a racing permit

6    issued by the state of West Virginia, correct?

7          A.   Yes, sir.

8          Q.   And she trains thoroughbred horses.  And

9    they race at the race track?

10         A.   Yes, sir.

11         Q.   Do you agree that the purpose of the HBPA

12   is to represent the horsemen's interest and their

13   property rights when dealing with a racing

14   association such as Charles Town Races, correct?

15         A.   Yes, sir.

16         Q.   Do you agree that the Horsemen's

17   Benevolent Protective Association is a non-profit

18   association and is the bargaining representative for

19   the horsemen with the track?

20         A.   I know they are the bargaining

21   representative.

1          Q.   Okay.  PNGI Charles Town Gaming, LLC,

2     doing business as:  Charles Town Race, and Slots, is

3     the owner and the operator of a thoroughbred horse

4     racing track, a training track, horse stalls,

5     testing barn, and other facilities located in

6     Charles Town West Virginia, correct?

7          A.   Yes, sir.

8          Q.   And Charles Town Races and Slots is a

9     licensed racing association with the state of West

10    Virginia?

11         A.   Correct.

12         Q.   And it is a party to the agreement between

13    it and the HBPA.  I guess it was entered into on

14    2009, correct?

15         A.   Correct.

16         Q.   And that Charles Town Races and Slots was

17    a party to the previous agreement with the HBPA that

18    was entered into in 2004?

19         A.   Correct.

20         Q.   Pursuant to that agreement, both

21    agreements, the track is contractually obligated to

1    make available a minimum number of stalls free of

2    charge to the horsemen represented by the HBPA,

3    correct?

4         A.   Correct.

5         Q.   And what is that number of stalls

6    currently that the track is obligated to provide

7    free of charge?

8         A.   1148.

9         Q.   Now, the track, when I say track, I mean

10   the Charles Town Races and Slots or the corporate:

11   PNGI Charles Town Gaming, LLC.  We're agreed when I

12   say track, that's what I mean, correct?

13        A.   Correct.

14        Q.   All right.  Do you agree with me the

15   track's discretion to allocate stalls is limited by

16   the contractual obligation in the agreement, that it

17   shall not discriminate in the allocation of stalls

18   by reason of HBPA membership or activity or condone

19   its representatives or employees in discriminating

20   in the allocation of stalls, correct?

21        A.   Correct.

1          Q.    Would you agree with me, would you not,

2     that Tina Mawing has not and never has violated any

3     statute or rule governing thoroughbred horse racing

4     in West Virginia?

5          A.    Not to my knowledge.

6          Q.    You would agree with me that the West

7     Virginia legislature has created a statutory

8     structure for the regulation of thoroughbred racing

9     in West Virginia, correct?

10         A.    They do, yes, sir.

11         Q.    And under the legislative rules of racing

12    promulgated by West Virginia, association or racing

13    association means any individual partnership, firm,

14    association, corporation, or any other entity or

15    organization of whatever character description

16    licensed by the racing commission to conduct a

17    meeting where horse racing is permitted for any

18    purse involving paramutual wagering, according to

19    the rules, correct?

20         A.    According to the rules.

21         Q.    And so the track would be a racing

1       association under those rules?

2               A.   Correct.

3               Q.   And under the rules, association grounds,

4       which is a term. It means all real property utilized

5       by the association in the conduct of its race

6       meeting, including the stable area, correct?

7               A.   Correct.

8               Q.   Okay.  And the steward, as that term is

9       used under the regulations, are the persons

10      designated to represent the racing commission whose

11      duty it is:  is to supervise any horse race meeting

12      as may be provided by the reasonable rules of the

13      racing commission, correct?

14              A.   Correct.

15              Q.   And the racing commission or the stewards

16      of any licensed racing meeting, may permit and

17      direct any individual authorized to enter in upon

18      the stable area, correct?

19              A.   That's correct.

20              Q.   And each racing association, including in

21      this case, Charles Town track, is required by the

1      legislative racing rules to police its grounds at

2      all times in a manner to prevent the admission of

3      persons in and around the stables unless they hold

4      occupational permits issued by the racing

5      commission, correct?

6          A.   That's correct, we have to have security

7      present, that's correct.

8          Q.   Okay.  Now, when we talk officials at a

9      race meeting, by the rules of the racing commission,

10     that includes three stewards and the association's

11     racing secretary and assistants, correct?

12         A.   All licensees.

13         Q.   What do you mean by licensees then?

14         A.   Anybody that has a license, that's issued

15     a license from the West Virginia Racing Commission.

16         Q.   Is considered an official under the

17     legislative rules, race official?

18         A.   Right.

19         Q.   Okay.  Now, the racing commission in its

20     sole discretion may determine the eligibility of a

21     racing official, correct?

1          A.    They have to approve his license, yes,

2      sir.

3          Q.    In their discretion, they may approve or

4      disapprove any official for an occupational permit?

5          A.    That's correct.

6          Q.    And the stewards are strictly responsible

7      to the racing commission for all conduct of all race

8      meetings in every detail directly or indirectly

9      pertaining to the racing law and rules of the racing

10     commission, correct?

11         A.    Correct.

12         Q.    Stewards have general supervision and

13     authority over the association grounds during a race

14     meeting, correct?

15         A.    Correct.

16         Q.    Any complaint against any official on the

17     track is supposed to be made to the stewards in

18     writing and be signed by the complaint, correct?

19         A.    That's stated in the rules, correct.

20         Q.    And the stewards are required, it's

21     mandatory, that they should report all complaints to

```
 1        the association's general manager and the racing

 2   commission?

 3        A.    That's correct.

 4        Q.    And the association's general manager

 5   would be whom?

 6        A.    Al Britton.

 7        Q.    At the present time?

 8        A.    Yes, sir.

 9        Q.    And the stewards are the ones authorized

10   by the legislative racing rules to interpret the

11   rules and decide questions of racing, correct?

12        A.    Correct.

13        Q.    Now, the racing secretary or his

14   assistant, under the rules, is required to discharge

15   all the duties of his office expressed or implied

16   that are required by the racing rules, correct?

17        A.    Repeat the question for me?

18        Q.    Yeah.  Legislative Racing Rule, Section

19   178-1-111, says in effect:  That the association's

20   racing secretary or his or her assistants shall

21   discharge all duties of his or her office expressed
```

1      or implied that are required by this rule.  And he

2      or she shall report to the stewards in writing, all

3      violations of the rule, correct.

4            A.    Correct.

5            Q.    Okay.  All owners and trainers of horses

6      and their stable employees are subject to the laws

7      of West Virginia and the rules promulgated by the

8      racing commission upon acceptance and occupancy of

9      stabling accommodations from a racing association

10     such as the track, correct?

11           A.    Correct.

12           Q.    Would you agree with me that horse racing

13     in West Virginia is subject to extensive State

14     regulation, correct?

15           A.    Correct.

16           Q.    The Racing Commission maintains a

17     continuous presence at each track through the racing

18     racing stewards, the racing officials who oversee

19     the administration and enforcement of the

20     commission's rules and policies, correct?

21           A.    Correct.

1          Q.    Stewards may actually override the

2     management of the track in matters pertaining to

3     racing?

4               MR. PETERSON:  Objection to the form, it's

5     vague.

6          A.    It just depends on what you're talking

7     about when you say racing.

8          Q.    (By Mr. Waddell)  Well, can you elaborate

9     for me?  When is a steward authorized to override

10    the management of the track?

11         A.    Well, they have mostly all jurisdiction

12    when it comes to violation, when it comes to

13    jockeys, trainers, anything that -- individuals that

14    may be undesirables.  They have all the jurisdiction

15    there.

16         Q.    The stewards do?

17         A.    Yes.

18         Q.    They also have general supervision

19    authority over the association's grounds, including

20    the stalls during a racing meet, correct?

21              MR. PETERSON:  Objection to the form,

1          vague.

2          A.    I don't think they have jurisdiction over

3     allocations.

4          Q.    Okay.  I didn't ask that.  I said under

5     legislative, and I'm referring to legislative racing

6     rule section 1781-10-.3; that the stewards have

7     general supervision and authority of the association

8     grounds, including stalls?

9          A.    If that's what the rules say, that's got

10    to be correct.

11         Q.    Okay.  And the racing rules also govern

12    the registration of stable personnel with the track

13    where the horses are stabled for racing, correct?

14         A.    Correct.

15         Q.    Now, at Charles Town Races, stalling

16    decisions are made by the Racing Secretary pursuant

17    to the revocable stall license agreement that says:

18    quote, the agreement is not accepted and does not

19    become final until signed by the CTRS racing

20    secretary, correct?

21         A.    Correct.

1        Q.    Did the track take away or attempt to take

2    away all the stalls allocated to George Yetsook?

3        A.    Have they?

4        Q.    Did they attempt to take away his stalls,

5    all his stalls?

6        A.    Yes, they did.

7        Q.    They were prevented, I guess, by a court

8    order, correct?

9        A.    That's correct.

10       Q.    What was the basis for their decision to

11   take away his stalls?

12       A.    I wasn't involved in that.  I can't

13   comment, I don't know.

14       Q.    Who was involved in that?

15       A.    Mrs. Latart, legal counsel.

16       Q.    Anyone else?

17       A.    I don't know off the top of my head, no,

18   sir, I don't know.

19       Q.    How about Mr. Zimny, was he involved in

20   that in any way, in the decision?

21       A.    I don't know.

```
 1          Q.    How about Mr. Britton, do you know whether

 2    he was involved?

 3          A.    I do not know.

 4          Q.    How about Mr. Wehrman, do you know whether

 5    he was involved?

 6          A.    I do not no, sir.

 7          Q.    Were you aware that George Yetsook

 8    testified for Raymond Funkhauser at the racing

 9    commission hearing that Funkhauser had?

10          A.    Yes, I do.

11          Q.    You were aware of that?

12          A.    I was aware of that, yes.

13          Q.    And how did you become aware of that?

14          A.    I was there.

15          Q.    Okay.

16          A.    I was trying to think, but I couldn't

17    remember.

18          Q.    So you actually were present when he

19    testified?

20          A.    Yes, I was.

21          Q.    Where are you aware that there were
```

1    trainers that testified at that commission hearing.

2    One was Tina Mawing; one was George Yetsook; one was

3    Patty Burns.  Are you aware that all three of them

4    have had all their stalls taken away?

5         MR. PETERSON:  Yetsook?

6         MR. WADDELL:  Well, Yetsook hasn't only

7         because the court has prevented that.

8         A.   I don't remember Ms. Mawing at that.  And

9    I don't remember Mrs. Burns at the one I'm thinking

10   of.

11        Q.   (By Mr. Waddell)  Okay.  Are you aware

12   that the track has taken away all the stalls of Ms.

13   Mawing and Patty Burns?

14        A.   Yes, I am.

15        Q.   And has attempted to take away all the

16   stalls of George Yetsook?

17        A.   Yes, I am.

18        Q.   Were you aware that approximately a week

19   after Ms. Mawing met with the governor on behalf of

20   the HBPA and discussed the issue of pesticide use at

21   the track, within a week after that meeting all her

```
 1    stalls were taken away?

 2         A.   No, sir.  I was not aware that Ms. Mawing

 3    met with the governor.

 4              MR. WADDELL:  We'll take a short break.

 5         We may be finishing up.

 6                        (Whereupon, a recess

 7                        was taken)

 8         Q.   Dick Watson was one of the trainers who

 9    had all his stalls taken, is that correct?

10         A.   Yes, he did.

11         Q.   Was that at the same time?  Was he in that

12    group of people that was set aside at that meeting

13    or was that a different meeting?

14         A.   Dick Watson lost his stalls, I think, in

15    2004.

16         Q.   2004?

17         A.   Maybe 2005.

18         Q.   Okay.  What was your position at the time

19    he lost his stalls?

20         A.   I think I was general manager of racing

21    operations then.
```

1          Q.    Okay.  Why did he lose his stalls?

2          A.    I think there was some allegations towards

3    Mr. Watson that he had done concerning the HBPA.  I

4    think PNGI thought it was appropriate at that time

5    that he not have stalls.

6          Q.    Was the allegation that he had

7    misappropriated funds from the HBPA?

8          A.    I think that might have been it.

9          Q.    Why would that -- that's not directly

10   related to operation of the track.  That would be

11   something between him and the HBPA, wouldn't it?

12         A.    Well, the association thought it was best

13   that he not have stalls.

14         Q.    Who made that decision?

15         A.    I think that was Mr. Britton's decision at

16   that time.

17         Q.    What was Mr. Watson's position?  Was he a

18   board member of the HBPA?

19         A.    If I recall, I think he was.  He was

20   either a board member or the president.  I'm not

21   sure.  I can't recall.

1          Q.    Okay.  Is it a practice for PNGI to use

2     outside conduct not directly involving the track as

3     a criteria in allocation of stalls?

4          A.    I guess if it reflects back onto the

5     association, they will.

6          Q.    Now, is your daughter a trainer?

7          A.    She's a licensed trainer.

8          Q.    And is she still racing horses or training

9     horses?

10         A.    No.

11         Q.    She has no presence at the track at all?

12         A.    She's there, but she don't train any

13    longer.

14         Q.    What's she there for?

15         A.    Her friend trains.

16         Q.    Who's her friend?

17         A.    David Smith.

18         Q.    Is Mr. Smith allocated stalls at the

19    track?

20         A.    No, sir.

21         Q.    Is your wife a trainer?

1          A.    She has an owner and trainers license.

2          Q.    Okay.  Is she allocated stalls at the

3     track?

4          A.    No, sir.

5          Q.    You previously testified Al Britton

6     handled the issue of your daughter losing her

7     stalls.  And you're not familiar exactly with the

8     reasoning behind that; is that correct?

9          A.    No.  He pretty much controlled all that

10    when it came to her.

11         Q.    Okay.  Is it not true that around that

12    time period she had a criminal issue with outside

13    conduct involving drugs?

14         A.    Not to my knowledge.

15         Q.    You're not aware of any arrest or charges

16    related to either the possession or the intent to

17    distribute illegal drugs?

18         A.    No, sir.

19         Q.    No criminal violation that came up?

20         A.    First I've heard of it was from you.

21         Q.    Never heard of that?

1          A.   No, sir.

2          Q.   You say your wife is an owner and a

3     trainer?

4          A.   Uh-huh.

5          Q.   And is she involved with horses that are

6     racing at the track?

7          A.   Yes, she is.

8          Q.   Is there any issue of conflict of

9     interest, since you're a manager at the track?

10         A.   The State licensed her.

11         Q.   Since the State licensed her, the track

12    isn't concerned about any potential conflict or --

13         A.   She's had a license every since I've known

14    her.

15              MR. WADDELL:  I'm done, I have no further

16         questions for you.  Your counsel might.

17              MR. PETERSON:  Yeah, I did have one

18         question.

19                        CROSS-EXAMINATION

20    BY MR. PETERSON:

21         Q.   Mr. Moore, you had indicated that you were

1    present when Mr. Yetsook testified or gave

2    testimony.  Could you explain where you heard Mr.

3    Yetsook give testimony?

4         A.   That was at the Jefferson County

5    Courthouse.

6         Q.   Was that part of the lawsuit that Mr.

7    Yetsook brought?

8         A.   Yes.

9         Q.   That wasn't part of the Funkhauser hearing

10   on Forest Park, was it?

11        A.   No, that's the only one I -- was Mr.

12   Sidripoulos is the only one I heard testify.

13             MR. PETERSON:  That's all I have.

14                  REDIRECT EXAMINATION

15   BY MR. WADDELL:

16        Q.   So just a follow up.  You were confused

17   before when you said:  You were aware that George

18   Yetsook had testified at the Funkhauser hearing?

19        A.   Right.  The only one that I heard at the

20   Funkhauser hearing was George Sidiropoulos.

21        Q.   And you weren't aware at all that George

```
1      Yetsook had testified about any others?

2           A.   No.

3                MR. PETERSON:  He'll read and sign.

4                     (The deposition concluded at

5                     11:45a.m.)

6                          -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
```

1                          CERTIFICATION OF NOTARY

2                  I, Robert L. Crespo, the officer before.

3       whom the foregoing deposition was taken, do hereby

4       certify that the witness whose testimony appears in

5       the foregoing deposition was duly sworn by me; that

6       the testimony of said witness was taken by me

7       stenographically and thereafter reduced to

8       typewriting by me; that said deposition is a true

9       record of the testimony given by said witness; that

10      I am neither counsel for, related to, or employed by

11      any of the parties to the action in which this

12      deposition is taken and further, that I am not a

13      relative or employee of any attorney or counsel

14      employed by the parties thereto, nor financially or

15      otherwise interested in the outcome of this action.

16              _____

17                       Robert L. Crespo

18              Notary Public - State of West Virginia

19              My Commission Expires:  March 15, 2020

20

21

```
 1                  MAXIM REPORTING, LLC

 2                     64 FOAL LANE

 3            MARTINSBURG, WEST VIRGINIA 25405

 4                    (304) 260-0670

 5     MAY 20, 2010

 6     DEAR SIR OR MADAM:

 7              BOUND HEREWITH IS THE TRANSCRIPT OF

 8     TESTIMONY GIVEN, INCLUDING THE CERTIFICATION PAGE OF

 9     NOTARY PUBLIC.  PLEASE READ THE TRANSCRIPT AND ANY

10     ADDITIONS OR CORRECTIONS MADE SHOULD BE LISTED ON

11     THE ERRATA SHEET.  AFTER REVIEW, PLEASE SIGN ERRATA

12     SHEETS AND DECLARATION PAGES AND RETURN THEM TO THE

13     ADDRESS LISTED ABOVE FOR PROCESSING.

14              IF THE READING AND SIGNING HAS NOT BEEN

15     COMPLETED WITHIN THIRTY DAYS FROM THE DATE OF

16     DELIVERY, WE WILL ASSUME THAT THE RIGHT TO READ THE

17     DEPOSITION TRANSCRIPT HAS BEEN WAIVED.  THIS IS IN

18     ACCORDANCE WITH RULE 30(c) OF THE FEDERAL RULES OF

19     CIVIL PROCEDURE.

20

21
```

```
 1                    ERRATA SHEET

 2    DEPOSITION OF: RICHARD L. MOORE

 3    DATE OF DEPOSITION:  April 22, 2010

 4    CASE NAME:  TINA MAWING, AND THE HORSEMEN'S

 5    BENEVOLENT ASSN. PLAINTIFFS, V. PNGI CHARLES TOWN

 6    GAMING, LLC.  CASE NO. 3:09-cv-68

 7    The following are the corrections which I have made

 8    to my deposition transcript:

 9    PAGE   LINE  CORRECTION           CORRECTED TO

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20

21    _____
```

1                    ERRATA SHEET (PAGE 2 OF 2)

2     PAGE   LINE CORRECTION              CORRECTED TO:

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    I, the undersigned, declare under penalty of perjury

11    that I have read the above-referenced deposition and

12    have made any corrections, additions, or deletions

13    that I was desirous of making; and that the

14    transcript contains my true and correct testimony.

15    EXECUTED THIS_____DAY OF _____

16    2010 (CITY)_____(STATE)_____

17    DEPONENT'S SIGNATURE_____

18

19

20

21

1    IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2                DISTRICT OF WEST VIRGINIA

3    TINA MAWING, AND THE

4    HORSEMEN'S BENEVOLENT

5    PROTECTIVE ASSOCIATION,

6    Plaintiffs, v.           Civil Action

7    PNGI CHARLES TOWN GAMING,    No. 3:09-CV-68

8    LLC,

9    Defendant,

10           Pursuant to Notice, the deposition of

11   ERICH ZIMNY, was taken on Wednesday, the

12   21st day of April 2010, commencing at 9:50 a.m. at

13   the law offices of Bowles Rice McDavid Graff & Love,

14   LLP, located at 101 South Queen Street, Martinsburg,

15   West Virginia, before Robert L. Crespo, a Notary

16   Public.

17

18

19

20

21

```
 1

 2

 3                    A P P E A R A N C E S:

 4            FOR THE PLAINTIFFS (Tina Mawing, and The

 5         Horsemen's Benevolent Protective Association)

 6            HARRY P. WADDELL, ESQUIRE

 7            300 West Martin Street

 8            Martinsburg, West Virginia 25401

 9                    (304) 263-4988

10            FOR THE DEFENDANT (PNGI Charles Town

11         Gaming, LLC)

12            BRIAN M. PETERSON, ESQUIRE

13            Bowles Rice McDavid Graff & Love, PLLC

14            101 South Queen Street

15            Martinsburg, West Virginia 25401

16      ALSO PRESENT:  TINA MAWING

17

18

19

20

21
```

1

2

3                            I N D E X

4              WITNESS:  ERICH ZIMNY                    PAGE

5          Direct Examination by Harry P. Waddell    4

6      EXHIBIT #    DESCRIPTION                       PAGE

7      1    Stall Allocation Letter                 45

8      2    Review Letter                           46

9      3    Stall License Notice                    47

10     4    Notice For Occupying Stalls Not Allowed  52

11     5    Notice To Vacate Stalls                 53

12     6    Notice To Vacate Stalls #2              57

13     7    Notice To Eliminate All Stalls          58

14

15

16

17

18

19

20

21

1

2

3                    MARTINSBURG, WEST VIRGINIA

4                    WEDNESDAY, APRIL 21, 2010

5                           - - -

6                P R O C E E D I N G S

7    Whereupon,

8                         ERICH ZIMNY,

9    a witness herein, having been first duly sworn, was

10   examined and testified upon his oath as follows:

11                    DIRECT EXAMINATION

12   BY MR. WADDELL:

13        Q.   How do you pronounce your name, Mr. Zimny?

14        A.   Zimny.

15        Q.   Mr. Zimny, my name is Harry Waddell. I'm

16   counsel for, one of the counsel, for Tina Mawing in

17   this case that she has pending against the track.

18   We're here today to take your deposition, of course,

19   in connection with that case.  Have you had your

20   deposition taken before?

21        A.   No.

5

1          Q.   We always go through these ground rules.

2     Let me finish my question before you try to respond.

3     Because the court reporter can't take down two

4     people talking at the same time.  Please respond

5     verbally rather than with a nod of the head.

6     Because again, the court reporter can't take that

7     down.  Try and answer my questions to the best of

8     your ability.  If you don't understand a question,

9     let me now.  And I will try and make it

10    understandable to you.  I don't want you to try to

11    answer a question if you're not fully understanding.

12    If you do respond to a question, I'm going to assume

13    understood it, okay?

14         A.   Okay.

15         Q.   For the record, would you state your full

16    name.

17         A.   It's Erich Zimny.

18         Q.   And you're current home address, sir.

19         A.   Is 1319 Steed Street, Ranson, West

20    Virginia.

21         Q.   Are you currently employed by the track?

```
 1        A.   Yes, I am.

 2        Q.   What's the name of your actual employer,

 3   as far as the corporate name?

 4        A.   I guess it would be PNGI Charles Town,

 5   LLC, I guess is the legal name.

 6        Q.   And how long have you been an employee

 7   there?

 8        A.   About two years.

 9        Q.   Approximately, when did you start?

10        A.   It would have been the first week in April

11   2008.

12        Q.   Where did you -- let me get a little

13   background information, if I could.  Where did you

14   attend high school?

15        A.   Glen Ridge High school, Glen Ridge, New

16   Jersey.

17        Q.   And what year did you graduate?

18        A.   '94.

19        Q.   And then upon graduation from high school,

20   what did you do?

21        A.   I went to college.
```

1          Q.    And what college did you attend?

2          A.    Georgetown University.

3          Q.    And did you receive a degree?

4          A.    Yes, I did.

5          Q.    What was the degree?

6          A.    It was a Bachelor of Arts in Theology.

7          Q.    And what year did you receive it?

8          A.    1998.

9          Q.    After receiving that degree, then what did

10   you do?

11         A.    I was a racing official at Suffolk Downs

12   in Massachusetts from graduation for about 13

13   months.

14         Q.    Okay.  How did you come to -- you have a

15   B.A. in theology.  And how do you become working as

16   a racing official?

17         A.    It's gets weirder.  I just love horse

18   racing.  It's not more complicated than that.

19         Q.    Did you have any experience in the horse

20   racing prior to going to work at Suffic?

21         A.    Just as a fan.

1       Q.   You worked there 13 months.  And then what

2   did you do?

3       A.   I was home in New Jersey for, I guess, 11

4   months caring for primarily a family member who was

5   sick.

6       Q.   Is that why you left the job at Suffolk

7   Downs?

8       A.   That was one of the reasons, yeah.

9       Q.   Did you leave -- was it voluntarily?

10      A.   Yes.

11      Q.   So you didn't work for some period of the

12  time leaving Suffolk Downs?

13      A.   Not for that period until I went back to

14  school in August of 2000.

15      Q.   Okay.  And where did go to school at that

16  time?

17      A.   I went to Rutgers University in Newark.

18      Q.   Okay.

19      A.   Received my JD and my MBA from Rutgers,

20  Newark.

21      Q.   Okay.  And what year did you receive those

```
1    degrees?

2         A.   They were the same year, 2004.

3         Q.   What did you do after receiving those

4    degrees?

5         A.   I was an associate of a law firm in New

6    York for two years.

7         Q.   And what law firm were your working for?

8         A.   Cahill Gordon and Reindell.

9         Q.   What type of law practice did you do?

10        A.   They do primarily, underwriters counsel

11   and high yield bond deals.

12        Q.   And you were there from what date to what

13   date?

14        A.   It was right around August of -- right

15   when I took the bar, August of '04, to when I went

16   back to Arizona in August of '06.

17        Q.   Okay.  And you lived in Arizona?

18        A.   No.

19        Q.   I thought you said you went back to

20   Arizona?

21        A.   I did -- well, I went back to school in
```

1    Arizona.   They have a program out there for horse

2    racing.

3         Q.    Where did you attend school there?

4         A.    University of Arizona in Tucson.

5         Q.    What type of program were you enrolled in?

6         A.    I don't know what the degree technically

7    is.  I think it's a Masters in science.   But it's

8    business name is the racetrack industry program of

9    Arizona.   It's essentially, I mean to break down

10   into more simpler layman's simpler terms.   It's an

11   MBA with a horse racing focus to it, pretty much.

12        Q.    Okay.

13        A.    That's the program I was in.

14        Q.    So you attended that program at the

15   University specifically, because you wanted to land

16   a job in racing.   Is that the rational behind that?

17        A.    Yes, correct.

18        Q.    And I think you said you completed that in

19   August of '06?

20        A.    No, that was law school.

21        Q.    Oh, that's law school?

1       A.   That was the commencement of my employment

2   as a lawyer.

3       Q.   Right.  You worked as a lawyer from August

4   '04?

5       A.   Yes.  The Arizona would have been, and I

6   apologize on the dates.  Just give me a minute.  It

7   would have been December of '07.  It was three

8   semesters.  So it would have been like August of

9   '06/September '06, to December of '07.

10      Q.   Okay.  And after you received your degree,

11  what did you do?

12      A.   Chose between my job -- I didn't

13  originally come to Charles Town.  I worked for the

14  New Jersey Sports and Exposition Authority.

15      Q.   Okay.

16      A.   Just for a few months.  It was a

17  developmental job for their off-track wagering

18  network.  And then I came here in April of, like I

19  said, April of '08.  And all jobs and everything

20  there is voluntary departure.

21      Q.   Okay.  When you started working in April

1    of '08 -- let me ask you this.  How did you come to

2    be hired by the track?  I'm just going to say track

3    for lack of --

4        A.   That's fine.  I'll know what you mean.

5        Q.   How did you come to be hired by the track?

6        A.   I met Chris McErlean.  And he's the

7    corporate vice president of racing out at one of the

8    Arizona symposiums, which is the biggest industry

9    conference.  Just spoke with him about any potential

10   openings.  I worked there in the summer of '07, I

11   guess it would have been:  the track, just doing

12   projects; getting a lay of the land, sort of.  And

13   then I had an offer for a full-time employment which

14   had subsequently commenced in April of '08.

15       Q.   Okay.  You mentioned Chris.  And I didn't

16   catch his last name?

17       A.   McErlean:  M-c-E-r-l-e-a-n.

18       Q.   Okay.  And he was the vice president,

19   corporate vice president, of racing?

20       A.   Yeah.  He oversees all the racing

21   operations at all of Penn's tracks.

1          Q.    Okay.  How many tracks does Penn have?

2          A.    Physical tracks, I guess it's either five

3     or six.  I don't know off the top of my head.

4          Q.    You say you work the summer at the track

5     here at Charles Town?

6          A.    Uh-huh.

7          Q.    And who was your immediate supervisor

8     while you were working there that summer?

9          A.    Dicky Moore.

10         Q.    Can you just describe what you did that

11    summer?

12         A.    It was really just -- I mean, I rotated

13    around all the different departments for a week or

14    two just to see if this was something that I'd be

15    interested in.  Get me a little taste of how they

16    ran their operations in each one of those

17    departments.

18         Q.    Okay.

19         A.    There was some miscellaneous projects that

20    I did here and there.  But like I said, it was

21    valuable.  It was more of a primer than anything.

1        Q.    When you say you rotated around various

2    departments, what departments specifically, did you

3    work at?

4        A.    You know, there's racing, mutuels,

5    security, track maintenance.  I mean, those are the

6    main ones.

7        Q.    Okay.

8        A.    I mean, there might be sub-parts in some

9    of those.

10       Q.    All right.  When you came to work in '08

11   full-time, on a full-time basis, what was your job

12   title at that time?

13       A.    My job title at the time was racing

14   administrator.

15       Q.    Okay.  And who was your immediate

16   supervisor at that time?

17       A.    It was Dicky Moore.

18       Q.    And his job at that time was --

19       A.    General Manager of Racing Operations.

20       Q.    Was this racing administrator job a job

21   that someone else had been filling or was it a new

1    position?

2         A.   No, it was a new position.

3         Q.   And what were you told your duties and

4    responsibilities would be when you took that

5    position?

6         A.   There wasn't a real formal job description

7    that was written out.   It was really an operations

8    position across the racing department, across the

9    mutuals department.   More on the racing side than

10   the mutuel side.

11        Q.   Okay.   And who would -- did you have

12   direct reports to you in that position as racing

13   administrator?

14        A.   Not for the first year I guess, no.

15        Q.   After the first year, what occurred that

16   changed?

17        A.   The title changed -- I guess actually it

18   was probably about 16 months, not a year -- the

19   title was changed to Director of Racing Operations.

20   I mean functionally, I pretty much do the same

21   thing, nuts and bolts stuff.   But in terms of direct

1    reports, there are a few.

2         Q.   All right.   So if I'm hearing you

3    correctly, the nuts and bolts, day-to-day job as

4    racing administrator pretty much stayed the same

5    when you became Director of Racing Operations?

6         A.   Yeah.   I would say that's accurate.

7         Q.   Okay.   And can you describe in general

8    terms what that involves?

9         A.   Well, it's kind of two-fold.   It's

10   handling the day-to-day stuff that we do on the

11   racing side.   You know, kind of supervising the

12   racing office, as well as there's also some bigger-

13   picture projects that I'm kind of working on that

14   are more long-term.   So it's kind of blend of

15   day-to-day stuff with project management.

16        Q.   Okay.   Who reports directly to you at the

17   present time?

18        A.   Randy Wehrman, the racing secretary; Fran

19   Demario, who is our head starter and starting gate.

20        Q.   Okay.

21        A.   Dennis, who manages the jockey's room.

1       Q.    Dennis --

2       A.    Kirk, K-i-r-k.

3       Q.    And he does what?

4       A.    He's the jockeys room manager.

5       Q.    Okay.  And do you still report directly to

6    Dicky Moore?

7       A.    Correct.

8       Q.    Randy Wehrman, he's the racing secretary?

9       A.    Correct.

10       Q.    And that's a racing official position that

11   requires an appointment by the West Virginia Racing

12   Commissions?

13       A.    No, that's not correct.  It requires a

14   license.  But the employment decision is ours.  We

15   hire the racing secretary.

16       Q.    You hire who you want.  But the Commission

17   has to approve that, do they not?

18       A.    Not as a racing secretary.  Our employment

19   is conditional upon him getting the license.  So

20   that would have to happen before we hire the guy as

21   the racing secretary.

1        Q.   He has to be licensed by the race

2    commission?

3        A.   Yeah, he does.

4        Q.   Do you?

5        A.   Yes, I do.

6        Q.   Okay.  Does Dicky Moore?

7        A.   I believe he has to be licensed, yeah.

8    There's no job -- I mean there's not a license

9    category or anything like that though.

10        Q.   Okay.  So Dicky Moore is the general

11    manager?

12        A.   Of racing operations.

13        Q.   Of racing operations?

14        A.   Yes.

15        Q.   He's required to be licensed.  He's

16    required to hold a license issued by the West

17    Virginia Racing Commission?

18        A.   I believe that's correct, yes.

19        Q.   And that same would hold true, as you

20    mentioned, for yourself and for Randy Wehrman; is

21    that correct?

1          A.   Yes.

2          Q.   Okay.  How do you obtain a license from

3    the racing commission?

4          A.   You fill out a form that's very short.

5    You submit it.

6          Q.   What information do they require that you

7    give them?

8          A.   Other than name and address, I don't

9    remember of the top of my head.

10         Q.   Do they run any criminal checks or things

11   like that, do you know?

12         A.   I don't know if they do or don't.

13         Q.   So you don't what they do with the form.

14   It's an application for a license?  What is the

15   form?

16         A.   Yeah.  It's an application.  But I don't

17   know what they do with it after I give it to them.

18         Q.   Okay.  Have you done anything in

19   preparation for your deposition today?

20         A.   I spoke with Brian, met with Brian, that's

21   all.

1          Q.    And when did that meeting take place?

2          A.    Yesterday.

3          Q.    Okay.  Have you had more than one meeting

4    in preparation for the deposition?

5          A.    We had one short one I think, a couple

6    weeks ago.  But that was it.

7          Q.    What documents have you reviewed in

8    preparation for your deposition?

9          A.    Really, none.

10         Q.    Didn't look at anything?

11         A.    No, I mean, other than the Complaint.  I

12   did look at that.

13         Q.    All right.  Are you familiar Ms. Mawing?

14         A.    I know Ms. Mawing.  I know who she is,

15   yes.

16         Q.    Okay.  When did you first become familiar

17   with her?

18         A.    I can't give you an exact date.  I don't

19   know.

20         Q.    Obviously, you didn't know her before you

21   started working at the track?

1          A.   Correct.  I did not know her.

2          Q.   Did you meet her during the summer when

3     you worked, that one summer?

4          A.   I may have, I don't recall.  I don't

5     remember.

6          Q.   Okay.  Are you aware she's a member of the

7     board of directors of the Charles Town Horsemen's

8     Benevolent Protective Association?

9          A.   I am aware she is now, yes.

10         Q.   And are you familiar with that particular

11    organization?

12         A.   I know who the body is, yes.

13         Q.   Do you know what their purpose is?

14         A.   I really -- I mean, I'm not in their

15    meetings.  I really don't what they discuss about.

16    I know that they're a representative body of the

17    horsemen.  Beyond that, what their purpose is,

18    that's a good question I don't know.

19         Q.   You don't?

20         A.   No.

21         Q.   Do you have any duties or responsibilities

1    that are related to the HBPA?

2         A.   That are related to the HBPA.  I'm not

3    sure what you're getting at there.

4         Q.   Well, do you have any -- do you deal -- as

5    part of your job, do you have any dealings with the

6    board of the HBPA?

7         A.   There's communications with the board,

8    sure.

9         Q.   What aspects, what things are you involved

10   in?

11        A.   That's usually just dissemination of

12   information when I'll send an e-mail or a letter to

13   the board of directors.  That's really all my

14   communication is with the board.

15        Q.   Okay.  Are you familiar with the contract

16   between the track and the HBPA?

17        A.   Yes, I am.

18        Q.   And how did you become familiar with that?

19        A.   I was part of the people of our team, if

20   you will, who negotiated the contract with the HBPA.

21        Q.   When was that?  When did you do that?

1        A.    It was around from Thanksgiving in '08

2    through -- I don't remember when it was signed.

3    Sometime in the first Q-1 of '09.

4        Q.    Okay.  Now, there was a previous contract

5    I think from 2004?

6        A.    I mean I know there was a contract.  I

7    don't know how -- I don't recall exactly how it

8    materially deviated from the one that's there now,

9    though.

10       Q.    Okay.  You say you were involved in

11   negotiating -- there is a new contract?

12       A.    There is a new contract, yes.

13       Q.    And you were involved in that negotiation?

14       A.    Yes, I was.

15       Q.    Was there anyone else on the track side or

16   management side that was also involved in that

17   negotiation besides yourself?

18       A.    It would have been Phyllis Latard, our

19   vice president of business and legal affairs.

20       Q.    Okay.

21       A.    Dicky Moore, our General Manager of Racing

1      Operations.  And for the last meeting or two or

2      maybe more than that, Al Britton, our general

3      manager of the facility.

4          Q.    Okay.  So am I correct then that there has

5      been a new contract agreed to between the track and

6      the board?

7          A.    A new contract?

8          Q.    A new contract.

9          A.    The contract dates from Q 1 of '09,

10     whatever that date is, February through now.

11         Q.    That's the contract?

12         A.    Correct.

13         Q.    Okay.  Were you familiar with or did you

14     review the actual contract that was in effect prior

15     to that?

16         A.    Yeah, I'm sure I reviewed it.

17         Q.    Your understand, if I assume right, that

18     the HBPA is the statutory bargaining representative

19     for the horsemen at the track?

20         A.    The statutory bargaining -- I'm not aware

21     of the statutory provision.  I know that there's a

1    clause in the current contract.

2         Q.   It says what?

3         A.   I believe it's, you know, the standard

4    labor contract language about them being the

5    exclusive bargaining agent for the horsemen.

6         Q.   Okay.  Do you, as part of your job,

7    interface with the members of the West Virginia

8    Racing Commission?

9         A.   What do you mean by interface?

10        Q.   I mean do you have any contact with them

11   either by telephone or in person?

12        A.   Of the commissioners, no, nothing with the

13   commission that's outside of a public commission

14   meeting.

15        Q.   Okay.  Is the track still contractually

16   obligated to make available stalls free of charge to

17   the HBPA horsemen?

18        A.   Yes, 1148.

19        Q.   And is the track -- does the contract

20   still provide that the track will not discriminate

21   in the allocation of stalls by reason of HBPA

1    membership or activity?

2         A.   I don't remember the exact, you know,

3    language in the contract.  But it does use something

4    similar to that.  I don't know if those are the

5    exact terms though or the exact verbiage.

6         Q.   Have you ever reviewed any of the

7    statutory code of language applicable to racing, the

8    regulation of racing in West Virginia?

9         A.   Yes.

10        Q.   Do you do that as a part of your job?

11        A.   If there's a question I have about

12   something that's in -- whether I want to know it's

13   in violation of the rules, yes, I'd like to follow

14   those.

15        Q.   So you're familiar that these statutory

16   code sections applies to racing as well as the

17   regulations?

18        A.   I mean, I'm not familiar with all of them.

19        Q.   You're aware they govern --

20        A.   I'm aware that they exist, yes.

21        Q.   They govern racing as far as in West

1      Virginia and what the track can do and not do in

2      regard to racing, correct?

3           A.   Certain things, yes.

4           Q.   There are stewards that work at the track,

5      correct?

6           A.   Correct.

7           Q.   And do you know what their duties, in

8      general, are?

9           A.   To interpret the thoroughbred rules of

10     racing.

11          Q.   And they also are charged with supervising

12     the racing that occurs at the track?

13          A.   Supervising, no. I mean they're in charge

14     of officiating.  That might be a better word.

15     Supervising is, you know, no. I wouldn't say that

16     they are.

17          Q.   Have you ever read legislative racing rule

18     178-1-2.102?

19          A.   I have no idea.

20          Q.   Do you have any supervisory role with

21     regard to the stewards?

1          A.   No.

2          Q.   Are you aware that under the legislative

3     rules of the racing commission, the racing

4     commission in its sole discretion may determine the

5     eligibility of a racing official.  And at its

6     discretion may approve or disapprove any official

7     for an occupational permit?

8          A.   I wasn't of ware of the verbiage of the

9     rule at all.

10         Q.   Okay.  Are you aware that they have --

11         A.   They can choose not to license somebody.

12         Q.   And would you agree with me that under the

13    legislative racing rules in West Virginia that

14    stewards are strictly responsible to the racing

15    commission for the conduct of all meetings, meaning

16    races, and every detail directly or indirectly

17    pertaining to the racing law and rules of the racing

18    commission?

19         A.   I don't interpret the racing rules.  No, I

20    don't.

21         Q.   Are you ever called upon to interpret

1    racing rules as part of your job at the track?

2         A.   In connection with my job with the track?

3         Q.   Uh-huh.

4         A.   I mean interpret them, no. Read them if I

5    have a question, yes.  But interpret them if there's

6    some ambiguity, no.  That's their job.  And we seek

7    counsel on them when there is one.

8         Q.   Okay.  Since you do have a legal degree,

9    does any part of your job include acting in the

10   capacity of a lawyer or a legal counsel or advisor?

11        A.   No. Phyllis is the one who handles the

12   majority, and who handles that.  When I say the

13   majority, there may be someone from corporate or

14   something like that, but I don't.  High yield bond

15   work and the race track, there's not much of an

16   intersection.

17        Q.   Would you agree with me would you not,

18   that horse racing in West Virginia is a subject of

19   extensive state regulation?

20        A.   It's regulated.  I don't know how you

21   quantify substantial or heavily.

1        Q.    Well, many aspects of track management are

2    governed by detailed regulation issued by the state

3    racing commission, aren't they?

4        A.    Could you repeat that please.

5        Q.    Sure.  Many aspects of track management

6    are governed by detailed regulations issued by the

7    state racing commission?

8        A.    Of the actual management?

9        Q.    Uh-huh.

10       A.    No. I mean we're bound by certain

11   regulation, but as far as management, no. We're

12   bound by regulations, that's all.

13       Q.    Does the racing commission maintain a

14   continuous presence at the track through the racing

15   stewards and racing officials who oversee the

16   administration/enforcement of the commission rules

17   and regulations?

18       A.    Not the racing officials.  Through the

19   stewards, yes.  Not the racing officials.  That's

20   not the commission's presence.

21       Q.    Are the stewards paid by management of the

1     track?

2          A.   Through the rules of racing, there is one

3     of them who is paid by the track.

4          Q.   Do you agree with me that stewards may

5     override the management of the track in matters

6     pertaining to racing if it's governed by a racing

7     commission rule or regulation?

8          A.   We don't violate the rules intentionally

9     in any way, shape, or form.  So I mean, can they

10    overrule something?  I don't know what that means.

11    I know that they can enforce their rules.

12         Q.   My question was:  can they -- do you agree

13    with me that they can override management of the

14    track in matters that pertain to racing if there's a

15    specific rule or regulation that applies?

16              MR. PETERSON:  I'm going to object to

17    the form of the question, it's vague.

18         A.   Can they override management?  There's no

19    overriding of management there.  They're enforcing

20    their rules or interpreting and enforcing their

21    rules.  It's not overriding any business decision of

1    ours.

2         Q.   Do the stewards have general supervision

3    authority over the track grounds, including stalls

4    during a racing meet?

5         A.   Over stalls?  No, the stalls are our

6    property.

7         Q.   Okay.  Are you familiar with legislative

8    racing rule section 178-1-10.3?  Have you ever

9    reviewed that?

10        A.   I don't know.

11        Q.   There's a legislative racing rule that

12   governs the registration of stable personnel with

13   the track.  Are you aware of that?

14        A.   Of stable personnel at the track?

15        Q.   Yes.  There's rules that govern that.

16   That are issued and promulgated by the racing

17   commission?

18        A.   I couldn't cite them.  Stable personnel

19   meaning, hired by the trainers?

20        Q.   Stable personnel -- well, could be people

21   who are hired by the trainers.  Yeah, that's true.

1    Who makes the stalling decisions?  When I say

2    stalling decision, I'm talking about who has

3    responsibility for allocating stalls to the trainers

4    under the HBPA agreement with the track?

5         A.   There's nothing in the HBPA agreement that

6    cites who from the track is responsible for that.

7         Q.   But there's a contract between the track

8    and the HBPA that provides that the track will

9    provide a certain amount of stalls, correct?

10        A.   Correct.

11        Q.   And under that agreement -- let me take

12   that out if that's a problem for you.  Who makes the

13   decisions as to the allocation of stalls to trainers

14   at the track?

15        A.   A committee of six people.

16        Q.   Okay.  And at the current time, who are

17   those six people?

18        A.   It's Al Britton, Dicky Moore, myself,

19   Randy Wehrman, Mike Elliott, Jim Taylor.

20        Q.   Okay.  And how long, if you know -- well,

21   let me ask it this way:  How long have you been a

1    member of this committee?

2         A.   Since the first stall allocation I would

3    have been here for would have been, I guess, in

4    August of '08.

5         Q.   Okay.

6         A.   I think it would have been August.

7         Q.   And were there six members of the

8    committee, the stall allocation committee, at that

9    time?

10        A.   Yes.

11        Q.   And were those six members the ones that

12   you just mentioned?

13        A.   Yes.

14        Q.   Do you have any knowledge of how stalls

15   were allocated or who was on the committee prior to

16   August of '08?

17        A.   No.

18        Q.   Are you currently on the stall allocation

19   committee?

20        A.   Yes.

21        Q.   How often does that committee meet?

1          A.   We meet whenever there is a stall

2     application that's coming due, if you will:  two or

3     three weeks before that, about two weeks.

4          Q.   When you say stall application -- isn't

5     there a set time period when applications are

6     tendered to the track by?

7          A.   Currently, it's on a six month, January 1

8     to June 30; July 1 to December 31.  There's two of

9     them.

10         Q.   Okay.  And allocation is made in January?

11         A.   At the end of December for January 1.

12         Q.   And then another one --

13         A.   For July 1.

14         Q.   So a couple weeks prior to those

15    allocations being made, the committee meets.  Is

16    that your testimony?

17         A.   Yes.

18         Q.   Where does the committee normally meet,

19    physically?

20         A.   Physically, in Mr. Britton's office.

21         Q.   And how do they receive notice of when the

1    meeting is to take place?

2         A.   I'll usually send out a meeting maker.

3    Just because I'll have all the schedules of people

4    in front of us; pick a time, pick a date.  Usually,

5    like I said, two to three weeks prior to.

6         Q.   Okay.  Meeting maker?

7         A.   I'm sorry.  Microsoft Outlook.  It's

8    nothing more than physically sending a meeting

9    request through Outlook to the stall committee

10   members.

11        Q.   Okay.  And you're the one who does it?

12        A.   Yeah.

13        Q.   Is there anyone on the committee who is

14   responsible for strike that.  First of all, is there

15   any written record kept of the meetings of the stall

16   allocation committee?

17        A.   What do you mean by written record?

18        Q.   Record of what's done?

19        A.   There's a record of what stalls are

20   allocated.  There's no minutes or anything like

21   that, if that's what you're --

```
 1          Q.    There's no minutes kept?

 2          A.    No.

 3          Q.    But there's a record of what stalls have

 4    been allocated to what individuals?

 5          A.    We have to tell them what their allocated,

 6    so yes.

 7          Q.    Who maintains that record?

 8          A.    Usually, Randy and myself would just jot

 9    it down at the meeting when we're going around.  You

10    know, going through the stall applications.

11          Q.    Okay.  Is this a situation where the

12    committee arrives at some sort of consensus or takes

13    a vote?  How is the decision made about the

14    allocation of stalls?

15          A.    I mean there's no vote.  I mean there's

16    no, you know, raising of hands around the table or

17    anything like that.

18          Q.    Right.

19          A.    Randy will have an application.  What is

20    the person applying for.

21          Q.    Uh-huh.
```

1          A.   And we'll, you know, take a look at

2    starts, quality, and arrive at a committee decision.

3    I mean it's not complicated.

4          Q.   Well, who has the final say?

5          A.   The final say?

6          Q.   Yeah.

7          A.   It would be much like any decision on our

8    property.  It's going to be our general manager.

9    But quite honestly, we've never -- I'm asked that

10   question about:  well, who has the final say in a

11   meeting?  We've never come to some absolute deadlock

12   where somebody has to put their fist down and say:

13   this is what's it's going to be.  It's never

14   happened.

15         Q.   Okay.  Well, we've already deposed some of

16   these individuals.  And most of them said they don't

17   make the decision?

18         A.   That's correct.

19         Q.   Okay.

20         A.   That's correct.  I don't make the

21   decision, nor does Al, nor does Dicky.

1      Q.   You're saying the committee as a whole

2    somehow arrives at a decision?

3      A.   Yes, right.   I mean it's nothing more than

4    a committee discourse.   Yeah, it really is.   There's

5    no one person.   I mean Randy will make like a

6    recommendation because he's the one who receives the

7    stall applications.   But after that, yeah, there's

8    no one person who has -- any meeting I've ever been

9    in, has made a decision like that.

10      Q.   Okay.   What are the criteria that are used

11    at these meetings to determine the stall

12    allocations?

13      A.   Starts.

14      Q.   Starts, okay.

15      A.   Quality of starts, winning percentage.

16      Q.   Anything else?

17      A.   Upkeep, care of your area, following of

18    the house rules.

19      Q.   Upkeep of the stalls?   Is that what you're

20    talking about?

21      A.   Stalls, shed row, barn; in general, horses

1    if applicable, whether or not someone is following

2    the rules of the grounds and that sort of thing.

3         Q.    Anything else, any other criteria that you

4    use?

5         A.    Not that I can think of off the top of my

6    head.

7         Q.    Okay.  Well, how does starts, how are they

8    evaluated at part of this process?  You said that's

9    one of the criteria when you're looking at their --

10        A.    The number of starts a person has made in

11   the previous stall allocation period.

12        Q.    And is there some kind of record kept of

13   those that you can refer to for each application?

14        A.    Yes.

15        Q.    Who maintains that?

16        A.    Equidata.  And the RTO and compass system

17   maintains all of the data.  We don't.

18        Q.    Okay.

19        A.    We just print it out or put it in an Excel

20   spread sheet.  But that's -- we don't maintain all

21   of that.  That's done through the software.

1      Q.    Would somebody print it out and bring it

2   to the meeting?

3      A.    Yeah.  Randy will usually print out the

4   starter's book.  It's a listing of -- it's got a lot

5   of kind of clutter on it.  And I'll usually just

6   take it and cut and paste into an Excel spread

7   sheet.  And get rid of the clutter, so to speak.

8      Q.    Is there a set criteria of how many starts

9   per stall?  Is there anything of that nature?

10     A.    No.

11     Q.    What are you looking at, and how do you

12   evaluate the quality of the starts.  You mentioned

13   that was one of the criteria?

14     A.    Well, two things:  winning percentage, and

15   the other thing we started using is, amount of money

16   earned per start.

17     Q.    When did you start utilizing that as part

18   --

19     A.    I don't recall.  I don't recall which

20   stall period that was.

21     Q.    And what information is brought to the

1    meeting and utilized at the meeting to evaluate the

2    quality of the starts?  What do you have there that

3    you can look at?

4         A.   Those numbers.

5         Q.   What?

6         A.   Those numbers that I just told you about.

7         Q.   Money earned --

8         A.   Per start, winning percentage.

9         Q.   Okay.  Again, is that something that's

10   printed off and brought to the meeting and looked

11   at?

12        A.   Yes.

13        Q.   How is the upkeep with the care -- you

14   said upkeep or care of the area, stall area and

15   other, I forget what else you said.  What else

16   besides the stall area are you looking at there?

17        A.   Shed row, barn, in general.

18        Q.   Okay.  How is that evaluated?

19        A.   How is that evaluated.  Well, Mike

20   Elliottt and Jim Taylor are kind of our feet on

21   ground in the barn area.  And there's, obviously,

1    nothing objective there.  They give us any feedback

2    as to --

3        Q.   Okay.  You also look at the care of the

4    horse themselves?

5        A.   Mike and Jim do.

6        Q.   Okay.  And you mentioned following the

7    rules of the grounds.  I think that's the phrase you

8    used?

9        A.   Correct.

10       Q.   What did you mean by that?

11       A.   There are certain property rules that we

12   have, guidelines that we like people to follow if

13   they're on our property and if they're using our

14   stalls.

15       Q.   Can you tell me what they are?

16       A.   You want me to enumerate them all?

17       Q.   Well, are they in writing?

18       A.   Right now, yeah, they are.

19       Q.   How would one go about obtaining a copy of

20   the written criteria?

21       A.   The written criteria for stall allocation

1    or for --

2         Q.   Well, first of all, do you have written

3    criteria for stall allocation?

4         A.   No.

5         Q.   Okay.  So there is no written criteria for

6    stall allocation, correct?

7         A.   That's correct.

8         Q.   Okay.  Now, you said there is written

9    criteria of these rules of the ground, I guess you

10   said?

11        A.   Yeah.

12        Q.   What document is that?

13        A.   There are two documents:  one is on the

14   back of the stall application itself.  There are

15   rules that we expect people to follow.

16        Q.   Okay.

17        A.   And second, we have a horsemen's guide

18   that you can find online.

19        Q.   And where do I go online to find that?

20        A.   Www.Ctownraces.Com/horsmensguide.

21        Q.   Have we discussed all the criteria you can

1    think of that is used by the stall allocation

2    committee in determining the allocation of stalls at

3    the track?

4         A.   Yes.  I think we have.

5         Q.   I'm going to hand you some exhibits, and

6    ask you some questions about them.  First, is what

7    I've had marked as Exhibit No. 1 to your deposition.

8    And I don't know if you've seen the document before,

9    have you?

10        A.   I don't know.  I don't think so, maybe.

11                        (Whereupon, Deposition Exhibit

12                         No. 1 was marked for

13                         identification)

14        Q.   I'll represent to you it's signed by Doug

15   Lamp, who was the racing secretary at the time.  And

16   it's dated December 21, 2006.  And it's addressed to

17   Ms. Mawing.  And it's allocating her 7 stalls for

18   2007.  Do you see that?

19        A.   Yes.

20        Q.   I take it you weren't at the track at this

21   point in time?

1          A.   Correct.

2          Q.   So you would have no knowledge of how the

3     stalls were allocated?

4          A.   No.

5          Q.   Let's look at Exhibit No. 2, which is a

6     document -- first of all, let me ask you if you've

7     seen this document?

8          A.   This one?

9          Q.   Uh-huh.

10         A.   I don't know.  I don't think so.

11                         (Whereupon, Deposition Exhibit

12                          No. 2 was marked for

13                          identification)

14         Q.   Okay.  I'll represent for the record, it

15    appears to be signed by Richard Moore, General

16    Manager of Racing Operations, to Ms. Mawing dated

17    February 7 of '08; allocating 9 stalls.  Were you a

18    member of the stall allocation committee when this

19    allocation was made?

20         A.   No.

21         Q.   Okay.  Do you have any knowledge of how

1     this allocation was made?

2           A.   None.

3           Q.   Okay.  Let's take a look at Exhibit No. 3.

4                          (Whereupon, Deposition Exhibit

5                          No. 3 was marked for

6                          identification)

7           Q.   And have you seen this document?

8           A.   This one I can say, I have not.

9           Q.   Okay.  Again, this is signed by, appears

10    to be signed by Richard Moore, General Manager of

11    Racing.  It's dated April 25, 2008.  It's entitled:

12    2008 revocable stall license agreement.  Again, it's

13    to Ms. Mawing.  And it's providing notice that the

14    track is reducing her stall allocation by four

15    stalls.  Were you on the allocation committee at

16    this time?

17          A.   No.

18          Q.   You were at the track?

19          A.   I don't think this was an allocation

20    committee thing though.  Doesn't sound like it.

21    Doesn't seem like it.

1        Q.    Okay.  But you weren't on the committee at

2    this time?

3        A.    Well, the committee didn't convene again

4    until August of that year.

5        Q.    Okay.

6        A.    I may have been on the committee.  But I

7    was not --

8        Q.    The committee hadn't met yet?

9        A.    Yes, correct.

10       Q.    Were employed at this time?

11       A.    Yes, I was.

12       Q.    Okay.  Did you have any input into the

13   reduction of Ms.  Mawing's stalls?

14       A.    No, absolutely not.

15       Q.    None.  Do you have any knowledge why her

16   stalls were reduced?

17       A.    Because she had horses in other horsemen's

18   stalls.

19       Q.    And how do you know that?

20       A.    The Complaint in this case, I believe, was

21   how I became aware of it.  I heard anecdotally, you

```
 1    know, after the fact.  But I really didn't know

 2    anything until this got going.  And we started

 3    looking at some of the stuff that Mike Elliott had,

 4    and who was in other people's stalls, so no.

 5         Q.   Okay.  I guess my question would be:  at

 6    the time this was sent out, did you have any

 7    personal knowledge or involvement in to this at all?

 8         A.   No.

 9         Q.   Okay.  You didn't make the decision to

10    take away the stalls?

11         A.   No.

12         Q.   You didn't participate in any way in that

13    decision?

14         A.   No.

15         Q.   You had no discussions with Mr. Moore or

16    any other member of track management about taking

17    away these stalls?

18         A.   No.

19         Q.   And you had no personal knowledge of why

20    it was taken away other than what you looked at --

21         A.   When I came to know, yeah.  Not at this
```

1    time, no, I did not.

2         Q.   You came to know something.  What is it

3    you came to know about this?

4         A.   That she had four stalls that were no

5    longer allocated to her because she had horses in

6    other horsemen's stalls, four of them.

7         Q.   And again, how did you come to know that?

8         A.   I don't remember how I came to know that.

9    I mean, the details again, I said weren't fully made

10   known to me until we started this.

11        Q.   All right.  Did you ever meet either with

12   Mr. Wehrman or by yourself with Ms. Mawing regarding

13   this matter?

14        A.   No.

15        Q.   You don't recall any such meeting?

16        A.   No.

17        Q.   Do you recall any discussion in a meeting

18   with Ms. Mawing and Mr. Wehrman about Doug Lamp and

19   Doug Lamp providing information regarding the fact

20   that she'd been given permission to use the stalls

21   of these other individuals?

1          A.   I don't remember any of that.

2          Q.   You have no recollection of that?

3          A.   No.

4          Q.   Have we exhausted your knowledge regarding

5     this particular matter reflected in this Exhibit No.

6     3?  Is there anything else you know about it?

7               MR. PETERSON:  Objection to form, it's

8     vague.

9          Q.   (By Mr. Waddell)  Well, do you have any

10    other personal knowledge of anything?

11         A.   Any personal knowledge, no.

12         Q.   Okay.  You don't recall any meeting with

13    anyone, either before or after these stalls were

14    taken away, about this subject.  Is that what you're

15    telling me?

16         A.   About this, other than in preparation for

17    -- other than with the Complaint and reading through

18    this?

19         Q.   Yeah.  Other than in preparation for your

20    testimony?

21         A.   I genuinely, do not know.  I do not have

 1    personal knowledge of what horses.  I don't know,

 2    no.

 3         Q.   All right.  That's what I'm trying to

 4    figure out?

 5         A.   Okay.

 6         Q.   Let me show you Exhibit No. 4.

 7                        (Whereupon, Deposition Exhibit

 8                        No. 4 was marked for

 9                        identification.)

10         Q.   I'm going to ask you the same question

11    I've asked on all of these.  Have you ever seen the

12    document before?

13         A.   I don't recall.

14         Q.   Okay.  Again, this is a letter apparently

15    signed by Mr.  Moore addressed to a Mr. Lenny Hale,

16    executive director of the Charles Town HBPA

17    regarding trainers occupying stalls to which they

18    were not assigned and without the required consent,

19    is what the letter says.  Again, I just want to

20    know:  Do you have any personal knowledge of the

21    matters reflected in this exhibit?

1        A.   I don't know of any letters other than the

2    one you just showed me about people getting out of

3    their stalls or Ms. Mawing only getting out of her

4    stalls within 14 days.  I couldn't tell you if

5    anyone else was a person involved in this barn

6    audit, if you will.

7        Q.   As a member of management, you had no

8    involvement in this issue over stalls being used by

9    other trainers?

10       A.   At this time, no, I did not.  No,

11   absolutely not.

12       Q.   Okay.  Let me show you Exhibit No. 5.

13                    (Whereupon, Deposition Exhibit

14                    No. 5 was marked for

15                    identification)

16       Q.   Have you seen this document before?

17       A.   I don't recall seeing this one

18   specifically.  But this is the form that we use, I

19   believe, if you let me read it.  Yeah, this is the

20   form we use for people who weren't allocated stalls.

21       Q.   Okay.  Now, this appears to be signed by

1       Randy Wehrman, who was the racing secretary?

2            A.   Correct.

3            Q.   Are you familiar with his signature?

4            A.   That looks like Randy's signature.

5            Q.   It's addressed to Ms. Mawing.  And it's

6       dated August 29, 2008.  It says that the stall

7       allocation committee of Charles Town Races and Slots

8       has reviewed her 2008 stall application for the

9       period covering September 1, 2008 through December

10      31, 2008.  And I'm not reading the entire thing.  I

11      getting to the point here.  It says they were unable

12      to allocate any stalls to her for the remainder of

13      2008.  Do you see that?

14           A.   I do.

15           Q.   Was this a decision that was reached at a

16      meeting of the stall allocation committee which you

17      were participating?

18           A.   I cannot recall any single individual

19      person being discussed at this meeting.  It was two

20      years ago.  So if you just --

21           Q.   Well, was there a meeting?

1          A.    Yeah, there was definitely a meeting, as

2    we do for every stall application:   two weeks

3    before.

4          Q.    Okay.  Do you have any present

5    recollection of what occurred at this meeting two

6    years later?

7          A.    No, I really don't.

8          Q.    Do you have any recollection of Ms.

9    Mawing's application being discussed at the meeting?

10         A.    No.

11         Q.    Okay.  Do you have any knowledge of why

12    she was not allocated any stalls for this time

13    period?

14         A.    The only thing I remember, and it's, you

15    know, only because of litigation at the time was

16    that there was, you know, very low single digit

17    winning percentage.  Other than that, I don't

18    remember any individual applications.  There's a lot

19    of them that pass before our eyes.  And I don't go

20    home and think about Ms.  Mawing's stall

21    application.  I don't remember ever discussing it,

1    no.

2         Q.   You said there was a low -- say that

3    again.  Low what?

4         A.   Low single digit winning percentage.

5    Whether it was 1, 2, 4; I don't know what it was.  I

6    don't remember.

7         Q.   You're saying she had a low single digit

8    winning percentage?

9         A.   Over the course of the previous stall

10   application period.

11        Q.   You specifically recall that fact?

12        A.   I don't recall what the number was.

13        Q.   Okay.  But you specifically recall that

14   being discussed at the stall --

15        A.   No, I don't.  I recall it being discussed

16   at the TRO hearing down at the courtroom.  But I

17   don't remember it being discussed in the meeting.  I

18   don't remember any detail being discussed in that

19   meeting whatsoever.

20        Q.   So you don't actually have any

21   recollection of anything that would have been

1    discussed in the meeting itself regarding her

2    allocations?

3        A.   No.

4        Q.   And this issue about what you're saying

5    is:  low single digit winning percentage is

6    something you remember at a TRO hearing?

7        A.   Yeah, very vaguely.  If I could quote the

8    number, I would.  But I don't remember it.

9        Q.   Let me show you Exhibit No. 6.

10                    (Whereupon, Deposition Exhibit

11                     No. 6 was marked for

12                     identification)

13       Q.   And this again, is this a document you've

14   seen before?

15       A.   I don't remember.

16       Q.   Okay.  This appears to be signed by

17   Richard Moore; dated September 12, 2008; address to

18   Ms. Mawing.  It appears to be notifying her of the

19   same information that was in the previous exhibit we

20   just looked at that she's not getting any stalls

21   allocated to her for the remainder of 2008.  The

1    second paragraph has new information that extends to

2    her a time period to vacate her stalls.  My question

3    simply to you is:  do you have any personal

4    knowledge of the decision -- I think we've already

5    established you really don't, as to the taking away

6    or non-allocation of stalls to Ms. Mawing.  You have

7    no personal knowledge?

8         A.   No personal recollection.

9         Q.   Okay.  And were you involved in any way in

10   the decision reached in the second paragraph to

11   extend the time period for vacating the stalls.

12   Were you involved in that?

13        A.   I don't recall what that was or why there

14   was some extension.  I don't know.

15        Q.   Did you have any discussion with anybody

16   at management about doing that?

17        A.   I don't remember.  I don't know.

18        Q.   Okay.  Exhibit No. 7.

19                    (Whereupon, Deposition Exhibit

20                     No. 7 was marked for

21                     identification)

1        Q.   Have you seen this document before?

2        A.   I don't recall individually seeing this

3    document before.

4        Q.   This appears to be a letter signed by

5    Randy Wehrman, racing secretary, to Ms. Mawing;

6    dated December 17, 2009 regarding a stall license

7    agreement for the period of January 1, 2010 through

8    June 30, 2010.  It advises that the stall allocation

9    committee has reviewed her stall application for

10   that period and is unable to allocate her any

11   stalls.  Again, was this a decision taken at a

12   meeting of the stall allocation committee?

13       A.   I don't remember her name being

14   specifically discussed.  But we allocate stalls at

15   the stall allocation committee meetings.

16       Q.   Okay.  Assuming there was a meeting of the

17   stall allocation committee and you were there, just

18   assuming that, do you have any personal recollection

19   of why she was not allocated any stalls?

20       A.   No.

21       Q.   Do you recall any discussion of her at

1     all?

2          A.   No.

3          Q.   Are you aware any other trainers who had

4     stalls at the track who have had all their stalls

5     taken away from them by the track?

6          A.   Taken away or not allocated?

7          Q.   Either way.  Have had stalls, and then

8     have been allocated no stalls?

9          A.   The only one that I recall off the top of

10    my head is Robert Birr.  But I couldn't tell you.

11    I'm pretty sure there have been others.  I don't

12    know.  I couldn't give you names.

13         Q.   The only one you can remember

14    specifically, would be a gentlemen named Robert

15    Birr?

16         A.   Just because this was a more detailed

17    story that just, for whatever reason, stood out.

18         Q.   And what was that detailed story that

19    stood out?

20         A.   Just that he had a habit of coming into

21    his barn very late, disruptive.  We had received,

1    you know, several complaints about him coming in

2    intoxicated and what have you, so that was all.

3        Q.   And is that the reason he was not

4    allocated any stalls?

5        A.   I remember that being discussed.  I don't

6    remember if that was the final concrete reason.

7    But, I remember that being discussed.  And I

8    remember him not being allocated stalls, which was

9    the original question.

10       Q.   Okay.  I know we've already addressed this

11   in part.  But I just want to make sure, in case I

12   can refresh your recollection at all.  My

13   understanding is on May 11, 2008, there was a

14   meeting with you, Randy Wehrman, George Yetsook,

15   Lenny Hale, and Ms. Mawing regarding this issue of

16   stalls being taken away or not allocated as a result

17   of having horse in other trainer's stall, that

18   issue.  You don't recall such a meeting?

19       A.   No, I don't.  And it doesn't mean it

20   didn't happen or it did happen.

21       Q.   You just have no recollection?

1        A.   I don't, no.

2             MR. WADDELL:  Why don't we take a break.

3        I want to review some things with my client.

4                      (Whereupon, a recess

5                       was held)

6        Q.   (By Mr. Waddell)  I just have a couple

7    questions.  Number one, between January of '08 and

8    August of '08, am I correct that there were four

9    people who were either racing secretary or acting

10   racing secretary during that period?

11       A.   I don't know the exact number.  I think

12   Mike Elliott was, but I don't remember anyone else.

13       Q.   Doug Lamp, Mike Elliott, Dicky Moore was

14   acting racing secretary, then Wehrman, I think?

15       A.   The only one who I'm aware was -- or had

16   personal, you know, is Randy, who was there two

17   weeks after I was.

18       Q.   Okay.  You're aware Ms. Mawing's husband

19   is part of a group of, I guess 7 jockeys, who were

20   investigating by the track.  And now there's a

21   controversy pending over that with the racing

1    commission, correct?

2         A.   Not exactly correct.   We investigated our

3    employee.   And the commission, the stewards are the

4    ones who are the body going after Ms. Mawing's

5    husband.

6         Q.   I understand that.   But the track

7    initiated the investigation?

8         A.   Into our employee, yes.

9         Q.   Into your employee?

10        A.   Correct.

11        Q.   Meaning?

12        A.   The clerk of scales at the time.

13        Q.   Yeah.   And who initiated -- were you

14   involved in that investigation?

15        A.   Yes.

16        Q.   Did you initiate that investigation?

17        A.   I don't think there was one person who

18   initiated.   It was discussed, and it was Mr. Britton

19   who made the suggestion:   is there any way we could

20   put cameras in to see if this is going on.   I said,

21   I don't know.   We will check with our director of

1    surveillance.  And this was done.

2         Q.   Okay.  So you didn't initiate the

3    investigation?

4         A.   I had heard of the possibility that was

5    going on down there, that are employee was involved

6    in wrong doing.

7         Q.   Uh-huh.

8         A.   But as far as initiating it, the cameras,

9    that was initiated and approved by our general

10   manager.  I don't know about initiating the

11   investigation as a whole.  I don't know how you

12   would characterize that.

13        Q.   Okay.  Are you familiar a trainer named, I

14   think it's Scooby Schneider?

15        A.   Yes.

16        Q.   Okay.  He was investigated in 2009 for

17   animal neglect, I believe, was he not?

18        A.   I know there was some issue with -- I

19   don't know if it was animal neglect.  I know there

20   was some issue with the care of his stalls.

21        Q.   Uh-huh.

1        A.   Yeah.

2        Q.   Were you involved in that investigation?

3        A.   Again, the word investigation, I mean I

4   don't know if there was an investigation in the --

5        Q.   Well, just tell me, however you want to

6   characterize it?

7        A.   Yeah.  Well, we were told that there was,

8   or I believe Randy was told that there were stalls

9   in his barn that weren't being kept up.  There was

10  perhaps a lack of feed one morning.  That was all I

11  recall from that.  I don't really remember anything

12  that his horses were (inaudible) I don't recall

13  that, no.

14       Q.   Based on those reports, was anything done

15  by anyone at the track, either yourself or Mr.

16  Wehrman, as far as looking into those?

17       A.   I don't remember if there's any official

18  report done.

19       Q.   Well, what was done?  I assume animal

20  neglect or not taking -- one of the criteria for

21  allocating stalls is:  you told me, I think, would

1    include things like upkeep of stalls, barn areas,

2    and animals.  And if that was an issue with Mr.

3    Schneider, what did the track do to look into that?

4        A.   Neglect, that's the end, you know.  After

5    you conclude that there's neglect -- I mean, I think

6    we had Mike Elliott go down there, look at the

7    horses.  And the horses were fed.  Mr. Schneider

8    said that there was going to be feed delivered to

9    the barn later that day, which it was to my

10   knowledge.  Other than that, I mean, I don't recall

11   anything anymore specific than that.  The horses are

12   -- he had on owner take a couple of horses away from

13   him.  But other than that --

14       Q.   The track didn't take any action against

15   him?

16       A.   Take any action against him?  We didn't

17   take any stalls from him.  I don't believe so.

18       Q.   Okay.  So who would be the end of jewel at

19   the track, the employee at the track with the most

20   knowledge regarding this incident?  Would that be

21   Mike Elliott?

1          A.   I have no idea who would have the most

2     knowledge.

3          Q.   Okay.

4          A.   Mike would have been down there.

5          Q.   Okay.  Did you have any involvement at all

6     in this?  Did you direct anything or tell anybody to

7     do anything?  Who was looking into this?  I'm trying

8     to find out who was looking into it?

9          A.   Who was looking into it?  It would have

10    been the person with their feet on the ground.  It

11    would have been Mike.

12         Q.   Okay.

13         A.   I mean, if we had come back and there was,

14    you know, true neglect, and these animals had gone a

15    week without food or something like that, I'm sure

16    we would have, you know, gone down there taken

17    whatever action we deemed appropriate.

18         Q.   Well, who told Mike Elliott to go down and

19    look?

20         A.   I have no idea.

21         Q.   You didn't?

1          A.    No, it wasn't me.

2          Q.    Okay.  Are you telling me you didn't have

3     any involvement in this?

4          A.    I know of it.  I didn't have any

5     involvement in going down there, directing Mike

6     Elliott to go look at these horses.

7          Q.    All right.  You didn't go down there.  You

8     didn't direct anyone to go down there.  You're only

9     involvement was, you knew that there was some

10    questioning going on?

11         A.    Yeah.

12         Q.    I'm just trying get a clear picture?

13         A.    From what I remember, yes.  Mike said we

14    have an issue with some horses down here.  Are the

15    horses being fed.  Scooby says there's going to be

16    food that's coming to the barn, you know, later.

17    One of the owners didn't like the way his horses

18    were being cared for, I guess.  I don't know.  That

19    was his decision to take them away.

20         Q.    Uh-huh.

21         A.    Yeah.  I don't know what that was based on

1    or what conversations that they had.  I mean, that

2    was the end of it.  To the best of my knowledge,

3    those horses were fed.

4         Q.   Okay.  And just so I'm clear, are you

5    aware of any basis, are you personally aware of any

6    basis for the non-allocating any stalls to Ms.

7    Mawing.  Are you aware of any justification for not

8    allocating stalls to her?

9         A.   Like I said, what I remember was the low

10   winning percentage -- I'm going to go back to what I

11   said before.  There's 200 of these that come before

12   our eyes in the course of a morning that we do this.

13   And I don't want to, you know, hurt anyone's

14   feelings, I do not eat, breathe, and sleep, Ms.

15   Mawing's stall application.

16        Q.   No, but she does.

17        A.   And you're absolutely right, she does.

18   But to sit here and say we should have some, you

19   know, first-hand knowledge and remember exactly what

20   happened with Ms. Mawing's stall application.  I'm

21   sorry, I can't do that.  And it's not because I

1    don't want to, it's because I can't.

2          Q.   I understand your explanation.  But how

3    many times have -- Ms. Mawing at one point had 9, at

4    least, stalls allocated, 14 stalls allocated to her.

5    And all of those stalls eventually, were taken away

6    from her.  That's unusual, isn't it?

7          A.   I don't know if there's any other

8    circumstances.  I believe that Mr. Joy had 10

9    stalls.  I don't know how many he had.  And I don't

10   believe he has any.

11         Q.   Mr. Joy.  Do you know why his stalls were

12   taken away?

13         A.   I don't remember there being one concrete

14   reason.  I don't remember off the top of my head.

15   It was in affiliation with some people who were

16   ruled off the grounds.

17         Q.   Did he have some drug charges?

18         A.   I don't recall that.

19         Q.   Do you recall anybody else who has had all

20   -- I mean however you want to phrase it, all their

21   stalls taken away or not allocated any stalls, where

1    they had stalls before?

2         A.   Names?

3         Q.   Yes.

4         A.   Other than Robert Birr, who I gave you?

5         Q.   Right.

6         A.   I don't even know if we took Kevin's, all

7    of them.  Maybe they were.  I don't remember off the

8    top of my head, no.

9         Q.   How about Yetsook?

10        A.   He's still in stalls.

11        Q.   He's got stalls?

12        A.   Yeah.

13        Q.   He has stalls because he went to court,

14   right?

15        A.   He received a temporary retraining order

16   to --

17        Q.   I mean, it's not because the track was

18   trying to take all his stalls away, they just

19   weren't successful, correct?

20        A.   If that's your characterization of it.

21        Q.   Okay.  Why were his stalls taken away or

1    why did the track attempt to take away all his

2    stalls?

3         A.   Mr. Yetsook is a person who does not like

4    us.  That's evident.

5         Q.   Uh-huh.

6         A.   He is -- I don't say negative, because

7    that minimizes it.  Someone who is constantly, you

8    know, bashing our business; bashing us; saying how

9    we do everything wrong.  He was still allowed to run

10   horses here.  It's just a matter of not giving the

11   individual a pulpit to go and, you know, bash us

12   with.  It's not giving the man free stall space.

13   That's what it is:  not giving somebody free stall

14   space on our grounds that we pay for.  That's why.

15        Q.   But you provide free stall space because

16   you have an agreement with the HBPA that you will

17   provide free stalls; is that correct?

18        A.   Yeah.  1100 --

19        Q.   I'm just saying:  this is not something

20   done voluntarily on your part?

21        A.   Well, we're required to provide 1148 as

1    per the agreement.  And we provide about 1350.  So

2    to some extent, yeah, there is about 200 of them

3    that's, you know, about a 7th of them that are

4    voluntarily.

5        Q.    Okay.  About a 7th.  Are you aware of any

6    -- let me ask you a couple things here.  There was

7    an issue with Raymond.  You're familiar with Raymond

8    Funkhauser, correct?

9        A.    Randy.  Yes, I do.

10       Q.    Yeah, Randy.  At one point in time, there

11   was a hearing that was held over whether he could

12   have a horse entered into a Breeder's Classic Race.

13   I think that was before you were employed at the

14   track, if I'm correct.  Do you recall that at all?

15       A.    Because that was summer I was here, I

16   remember the racing question.

17       Q.    Uh-huh.

18       A.    But then that was when I went back to

19   school.  I don't remember anything about, you know,

20   other than there was horse who was scratched,

21   perhaps impermissibly, Forest Park.  Other than that

1    I couldn't tell you.  Just because it doesn't really

2    matter to me.  I mean, I couldn't tell you any of

3    the substance of that.

4         Q.   Did you attend the hearing that they had?

5         A.   No.

6         Q.   Okay.  Another issue in this case.  There

7    was an issue of rat poison being placed in the barn

8    where Ms. Mawing had horses stalled.  Some issues of

9    the death of a horse and goat.  Are you familiar

10   with that as an issue?

11        A.   Again, anecdotally.  As an issue, nobody

12   ever came to me and said anything about that, no.

13        Q.   She never came to you to talk about that?

14        A.   I don't remember her ever coming to me.

15        Q.   Are you aware she spoke to the governor's

16   office or the governor about that issue?

17        A.   About the issue of rat poison.

18        Q.   Uh-huh.

19        A.   I knew there was some meeting with the

20   governor, and that's all I know.

21        Q.   How did you become aware of that meeting?

1        A.   Again, anecdotally.  I couldn't tell you

2    the person who told me about it.

3        Q.   Okay.  Did you ever have any discussions

4    with anyone else at management, either Al Britton,

5    Dicky Moore, or anyone else in management at track

6    about her complaints regarding the use of rat poison

7    or insecticide or whatever you want to call it?

8        A.   Prior to this, no. Again, I knew about it.

9    I knew anecdotally, that there was some complaint

10   that she made.  But that was it.  I don't know what

11   it was about.

12       Q.   When you say prior to this, you mean prior

13   to this lawsuit?

14       A.   Exactly.

15       Q.   Okay.

16       A.   When was the Forest Park, that was in

17   October of '07, right, that decision?

18       Q.   Yes, I think it was.

19       A.   Okay.

20       Q.   I believe that's right.

21       A.   I was just curious.  She went from 7 to 9

1    stalls from before the Forest Park thing to after

2    it.

3        Q.   You weren't involved in that?

4        A.   No, I wasn't.  I don't know why.  I just

5    saw that here, which was kind of weird.

6        Q.   Right.

7            MR. WADDELL:  I have no further questions.

8            MR. PETERSON:  I don't have any questions

9        for him.  And Erich, you have the right to read

10        and sign your transcript.  I would recommend

11        that you do that.

12            THE WITNESS:  Okay.

13            MR. PETERSON:  He'll read and sign.

14                (The deposition concluded at

15                11:31a.m.)

16                    - - -

17

18

19

20

21

```
 1

 2

 3                    CERTIFICATION OF NOTARY

 4          I, Robert L. Crespo, the officer before.

 5    whom the foregoing deposition was taken, do hereby

 6    certify that the witness whose testimony appears in

 7    the foregoing deposition was duly sworn by me; that

 8    the testimony of said witness was taken by me

 9    stenographically and thereafter reduced to

10    typewriting by me; that said deposition is a true

11    record of the testimony given by said witness; that

12    I am neither counsel for, related to, or employed by

13    any of the parties to the action in which this

14    deposition is taken and further, that I am not a

15    relative or employee of any attorney or counsel

16    employed by the parties thereto, nor financially or

17    otherwise interested in the outcome of this action.

18

19          _____

20                    Robert L. Crespo

21          Notary Public - State of West Virginia
```

1          My Commission Expires:  March 15, 2020

2

3                    MAXIM REPORTING, LLC

4                      64 FOAL LANE

5          MARTINSBURG, WEST VIRGINIA 25405

6                     (304) 260-0670

7     MAY 20, 2010

8     DEAR SIR OR MADAM:

9          BOUND HEREWITH IS THE TRANSCRIPT OF

10    TESTIMONY GIVEN, INCLUDING THE CERTIFICATION PAGE OF

11    NOTARY PUBLIC.  PLEASE READ THE TRANSCRIPT AND ANY

12    ADDITIONS OR CORRECTIONS MADE SHOULD BE LISTED ON

13    THE ERRATA SHEET.  AFTER REVIEW, PLEASE SIGN ERRATA

14    SHEETS AND DECLARATION PAGES AND RETURN THEM TO THE

15    ADDRESS LISTED ABOVE FOR PROCESSING.

16          IF THE READING AND SIGNING HAS NOT BEEN

17    COMPLETED WITHIN THIRTY DAYS FROM THE DATE OF

18    DELIVERY, WE WILL ASSUME THAT THE RIGHT TO READ THE

19    DEPOSITION TRANSCRIPT HAS BEEN WAIVED.  THIS IS IN

20    ACCORDANCE WITH RULE 30(c) OF THE FEDERAL RULES OF

21    CIVIL PROCEDURE.

```
1                      ERRATA SHEET

2   DEPOSITION OF: ERIC ZIMNY

3   DATE OF DEPOSITION:  4-21-2010

4   CASE NAME:  Mawing v. PNGI 3:09-CV-68 U.S. District

5   The following are the corrections which I have made

6   to my deposition transcript:

7   PAGE   LINE  CORRECTION            CORRECTED TO

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18

19  _____

20

21  _____
```

1  _____

2  _____

3           ERRATA SHEET (PAGE 2 OF 2)

4  PAGE   LINE CORRECTION              CORRECTED TO:

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  I, the undersigned, declare under penalty of perjury

13  that I have read the above-referenced deposition and

14  have made any corrections, additions, or deletions

15  that I was desirous of making; and that the

16  transcript contains my true and correct testimony.

17  EXECUTED THIS_____DAY OF _____

18  2010, at (CITY)_____(STATE)_____

19  DEPONENT'S SIGNATURE_____

20

21

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3                    MARTINSBURG DIVISION

 4    TINA MAWING, AND THE

 5    HORSEMEN'S BENEVOLENT

 6    PROTECTIVE ASSOCIATION,

 7    Plaintiffs,           Civil Action

 8    v.                    No. 3:09-cv-68

 9    PNGI CHARLES TOWN

10    GAMING, LLC,

11    Defendant,

12            Pursuant to Notice, the deposition of

13    WILLIAM RANDOLPH WEHRMAN, was taken on Tuesday, the

14    6th day of April 2010, commencing at 1:30, at 101

15    South Queen Street, Martinsburg, West Virginia,

16    before Robert L. Crespo, a Notary Public.

17

18

19

20

21
```

```
 1              A P P E A R A N C E S:

 2  FOR THE PLAINTIFFS (Tina Mawing, and The Horsemen's

 3  Benevolent Protective Association)

 4          DAVID M. HAMMER, ESQUIRE

 5          408 West King Street

 6          Martinsburg, West Virginia 25401

 7                  (304) 264-8505

 8          FOR THE DEFENDANT (PNGI Charles Town

 9          Gaming, LLC):

10          BRIAN K. PETERSON, ESQUIRE

11          Bowles Rice McDavid Graff & Love LLP

12          101 South Queen Street

13          Martinsburg, West Virginia 25401

14                  (304) 264-4223

15          ALSO PRESENT:  TINA MAWING

16

17

18

19

20

21
```

```
 1                    I N D E X

 2        WITNESS:  WILLIAM RANDOLPH WEHRMAN    PAGE

 3     Direct Examination by David M. Hammer       4

 4     EXHIBIT #   DESCRIPTION

 5     1           Stall Application            61

 6     2           Committee Letter             88

 7     3           Notice of Suspension        105

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
```

```
 1                MARTINSBURG, WEST VIRGINIA

 2                TUESDAY, APRIL 6, 2010

 3                       -  -  -

 4              P R O C E E D I N G S

 5   Whereupon,

 6              WILLIAM RANDOLPH WEHRMAN,

 7   a witness herein, having been first duly sworn, was

 8   examined and testified upon his oath as follows:

 9                 DIRECT EXAMINATION

10   BY MR. HAMMER:

11       Q.   Good afternoon, Mr. Wehrman.  Would you

12   please tell the court reporter your full name.

13       A.   William Randolph Wehrman.

14       Q.   And you go by the name of Randy?

15       A.   Yeah.

16       Q.   How would you like me to address you

17   during this deposition?

18       A.   Randy is fine.

19       Q.   Randy is fine.

20       A.   Yeah.

21       Q.   Okay.  Have you ever had your deposition
```

1    taken before?

2        A.   No.

3        Q.   All right.  Perhaps your counsel has

4    explained it to you, but I'll just give you a few

5    general instructions.  It's not a complicated

6    process.  I ask questions, you listen to the

7    question.  If you understand the question, go ahead

8    and answer it truthfully.  If you don't understand

9    the question, let me know, and I'll be glad to

10   repeat the question for you or rephrase the question

11   for you so that you do understand it.  If you answer

12   the question, I'm going to assume that you

13   understood the question, okay.

14       A.   Okay.

15       Q.   Now, because the court reporter is here,

16   and he's going the prepare a transcript of this

17   deposition, it's important that we don't act like a

18   general conversation where I interrupt you or you

19   interrupt me because you know what I'm asking or I

20   know what you're saying.

21       A.   Okay.

```
 1        Q.   It's important that we allow it to go in a

 2   question and answer format.

 3        A.   Okay.

 4        Q.   And I'll just apologize in advance if I

 5   step on your answer right now.  It's my intention to

 6   allow you to make a full and complete answer.

 7        A.   Okay.

 8        Q.   Now, the court reporter has more trouble

 9   taking down head nods and, uh-huhs, huh-uhs, eye

10   rolls.

11        A.   Right.

12        Q.   So it's best to make your answers verbally

13   with yes or no. And if you need the explain it, go

14   ahead and explain it.

15        A.   Okay.  Very good.

16        Q.   If at any time you need to take a break

17   for any reason, let me know.  I'll to happy to stop

18   the deposition so you can get a breath of air, get a

19   drink of water, use the restroom, whatever it is.

20        A.   Okay.

21        Q.   Do you understand the instructions?
```

```
 1        A.   Yes.

 2        Q.   What's your address, Mr. Wehrman?

 3        A.   Actually, 3746 Parkview Drive, Alexandria,

 4   Kentucky.

 5        Q.   Is that the address you live at while

 6   you're working at Charles Town Races?

 7        A.   No.

 8        Q.   What address do --

 9        A.   That's on Hidden Hallow Road.  And I can't

10   tell you what the number is.  It's out in

11   Kearneysville.  It's an apartment.

12        Q.   Okay.  Do you rent the apartment?

13        A.   Yes.  It's a little efficiency apartment.

14        Q.   I guess when you're not working, you

15   commute back to Kentucky?

16        A.   Yeah, I just got back last night.

17        Q.   Who do you rent from?

18        A.   A gentlemen by the name of Ernest M.

19   Haynes.  It's H-a-y-n-e-s.

20        Q.   H-a-y-n-e-s?

21        A.   Yes.
```

```
 1        Q.    Is he any relation to a Haynes that's a

 2   trainer?

 3        A.    Yes.

 4        Q.    What relation is he?

 5        A.    Oh, no.  He's no relation.  He is a

 6   trainer.

 7        Q.    He is a trainer himself?

 8        A.    Uh-huh.

 9        Q.    Okay.  That's maybe who I'm thinking of.

10        A.    Yeah, uh-huh.

11        Q.    And does he have stalls at Charles Town?

12        A.    Yes, he does.

13        Q.    How many stalls does he have?

14        A.    I want to say around 20, maybe 23,

15   something like that.

16        Q.    How long has he had his stalls?

17        A.    Prior to my getting there, I don't know

18   exactly how long.  I came back there to work a

19   couple years ago.

20        Q.    And we'll get to that.  Has Mr. Haynes'

21   number of stalls increased since you've been back at
```

1    the race track?

2        A.   As far as I remember, he has gotten an

3    increase of maybe three.  He had a lot more prior to

4    my coming there.  And he rescinded them, gave them

5    up.

6        Q.   So he had more stalls at one point, and he

7    voluntarily gave up some stalls?

8        A.   Yes, prior to my coming there.

9        Q.   And now, since you've been there he's been

10   allocated three more stalls?

11       A.   As far as I remember, yeah.

12       Q.   For a total of about 23?

13       A.   23, yeah.

14       Q.   How long have you been employed by, I'll

15   call it Charles Town Races, is that fair?

16       A.   Yeah, that's fair.

17       Q.   Okay.  How long have you been employed by

18   Charles Town Races?

19       A.   At this tenure?

20       Q.   Yes, sir.

21       A.   Since April 28.  Officially, it was May 1,

```
1   2008.  But I landed there April 28 in the office.

2       Q.   And what job title did you have on April

3   28, 2008?

4       A.   Racing secretary.

5       Q.   Who did you replace?

6       A.   Actually, they had no current racing

7   secretary right then.  For as far as I know, it was

8   a good five months or better.  It was, from what I

9   recall, it was from November of the prior year.

10  That prior race secretary, if I'm correct, I'm not a

11  100 percent.  It was Doug Lamp.

12      Q.   Was there any interaction between you and

13  Mr. Lamp with regard to you taking over duties of

14  racing secretary?

15      A.   No, but he did work for me before when I

16  was race secretary here before.

17      Q.   Okay.  I'll tell you what, let's go right

18  back into that then.

19      A.   Okay.

20      Q.   What was your earlier period of employment

21  there?
```

1        A.   It was from February, sometime in February

2   '97 to August 1, '99.

3        Q.   Two and a half years, approximately?

4        A.   Yes.  I worked for Penn National Gaming

5   prior to that, it wasn't called that then, from '87

6   to '97.  From May '87 to that time in February of

7   '97, I worked at the Penn National Race Course.  And

8   for nine of those years I was assistant race

9   secretary.

10        Q.   Was that a race course in another state?

11        A.   Yeah.  It's owned by them.  It was their

12   first race track, as far as I know, in Grantfield,

13   Pennsylvania.

14        Q.   You were the racing secretary, and that

15   was the track?

16        A.   I was assistant race secretary there for

17   nine years of those years, approximately.

18        Q.   So in February of '97, you moved down to

19   the Charles Town Races?

20        A.   Yes, after Penn Gaming, whatever the name

21   of the company was then.  Then Penn National

```
1    purchased Charles Town.  And I interviewed for the

2    race secretary job.  And it was my first race

3    secretary job.

4         Q.   Why did you leave in August 1, 1999?

5         A.   They dismissed me.

6         Q.   You were terminated from employment?

7         A.   Yes.

8         Q.   What reason was given to you?

9         A.   Actually, none.  I never asked for one.

10   And to this day, never asked for one.  I wasn't

11   clearly given one.

12        Q.   Did you have any idea yourself as to what

13   the reason was?

14        A.   I had some ideas.  I wasn't really clear.

15   And I didn't, to be honest with you, I didn't care.

16   I figured they didn't want me there anymore.  I was

17   good with that.  They gave me severance so I left.

18   And that was it.

19        Q.   Did you have to sign some type of

20   severance agreement?

21        A.   They asked me to, and I didn't.
```

1        Q.   But you still received the severance?

2        A.   Yes.

3        Q.   And so that's when you went to Kentucky?

4        A.   Yes.   That's my home state where I grew

5   up.

6        Q.   Okay.   What job did you hold in Kentucky

7   from about August of '99, when you left Charles

8   Town, to April of 2008, when you came back to

9   Charles Town?

10       A.   Excuse me.   I might jump around here a

11  little bit.   But the first job I had was placing

12  judge racing official at Kentucky Downs, which was

13  at September of that year.   That meet was a short

14  meet.

15       Q.   Just a matter of a few months?

16       A.   Actually, they only race, like at that

17  time, I would say it was eight or nine days.   So I

18  was there for two weeks, a little over two weeks,

19  maybe.   They pay your room and board in a hotel and

20  give you so much per diem.

21       Q.   And then after your two-week,

```
 1   approximately two-week tenure ended as a racing

 2   official, what job did you hold next?

 3        A.   Well, I was a beer distributor.  Training

 4   for assistant for running a beer distributorship

 5   called R & L in Harrisburg, Pennsylvania.  Because

 6   from a friend that knew that somebody vacated that,

 7   I just thought, well, I'll try something different.

 8   And that lasted until I resigned from there on the

 9   day before Thanksgiving or a couple of days before

10   Thanksgiving because I knew I had a job back at

11   Turfway Park in Kentucky, which was the same race

12   secretary that hired me for Kentucky Downs.  I

13   wanted to get back in the Kentucky circuit.  And I

14   was training for the beer distributorship to run the

15   warehouse in the distributorship in Harrisburg.  And

16   then I was offered this other position as a racing

17   official full-time in the racing office at Turfway

18   Park.

19        Q.   Okay.

20        A.   Then I moved back at the end of the year,

21   the end of '99, back full-time into the Kentucky.
```

1      Q.   So it would be the end of '99 --

2      A.   Uh-huh.

3      Q.   -- until you left that job when?

4      A.   Well, I didn't officially leave it until

5  the end of March of 2008 because they have a

6  seasonal meet.  All the tracks of Kentucky, they

7  don't overlap, except for Kentucky Downs overlaps a

8  couple days with a couple tracks, or with one track.

9  But you have seasonal meets.  You have Turfway, runs

10 fall and the winter.  So I worked there.  Then

11 Kingland opens.  Now, I didn't work at Kingland

12 first right away.  I did that like the last three or

13 fours months that I worked in Kentucky.  I worked as

14 Kingland Race Track's padding judge and other

15 capacities.  But the first jobs I had was with

16 Turfway.  And then I went to River Downs, which is

17 the other Cincinnati racetrack.  They're on both

18 sides of the river.  And I worked there about three

19 or four summers until '06.  Then I worked Turfway,

20 Kingland.  And in '06 and '07, I got the race

21 secretary job in Virginia, the only paramutual

```
 1   track. And there was race secretary in Virginia, '06

 2   and '07.

 3        Q.   How old are you?

 4        A.   I am 50.

 5        Q.   How long have you been in the horse racing

 6   industry?

 7        A.   Pretty much, not full-time, but I've

 8   worked around horses since '77 or '78 when I was in

 9   -- just between the transition between high school

10   and college.

11        Q.   And you've worked under the state

12   regulatory schemes in Virginia, West Virginia,

13   Kentucky, and Ohio?

14        A.   Pennsylvania, Ohio, New Hampshire.

15        Q.   All right.  And in each of those places

16   you've held a position as some type of racing --

17        A.   Some type of racing official, right.

18        Q.   Are you married?

19        A.   Yes, 25 years.

20        Q.   And your wife lives in Kentucky?

21        A.   Yes.
```

```
 1       Q.   All right.  Did you graduate from high

 2   school?

 3       A.   Yes.

 4       Q.   What year did you graduate?

 5       A.   '77.

 6       Q.   Which high school?

 7       A.   Highlands High school.

 8       Q.   That's in Kentucky?

 9       A.   Yes.

10       Q.   Did you attend college?

11       A.   Yes.

12       Q.   Which college?

13       A.   University of Kentucky one year, then I

14   finished my major in management at Northern Kentucky

15   University.

16       Q.   Is that a four-year program or a two-year?

17       A.   It's four years.  I got a Bachelor's

18   Degree, Bachelor's of Science, in two tracks of

19   management.  Mine is a Bachelor's of Science of

20   Management Behavioral track.

21       Q.   What year did you receive that degree?
```

```
 1        A.   It was either '85 or '86.  Because I

 2   worked my way through school.  I went and worked to

 3   cut a track or two, couple tracks.  And went back to

 4   finish my degree.

 5        Q.   So you were married, working, and going to

 6   college?

 7        A.   Yeah.  Oftentimes working two or three

 8   jobs.

 9        Q.   I have a list of questions.  Do you have

10   any criminal history?

11        A.   No history to speak of.  I had a parking

12   ticket in Winchester.

13        Q.   I think we'll all forgive you that.

14        A.   Okay.

15        Q.   I don't think that counts as criminal

16   history.  If it does, Mr. Peterson is probably in

17   trouble.  In your current employ at Charles Town

18   races, is the only job you've held has been racing

19   secretary?

20        A.   Yes.  I hesitated because I know I can't

21   do head nods.  But I'm not sure exactly if it was
```

```
 1   titled that the whole time.  But I believe that's

 2   been my title the whole time.

 3       Q.   Okay.  Who is your immediate supervisor?

 4       A.   Now for a few months it's been Eric Zimny.

 5   Prior to that in my last tenure and this tenure,

 6   it's always been Richard Moore.

 7       Q.   So how many months has Mr. Zimny been your

 8   supervisor?

 9       A.   It's been at least, I want to say, about 6

10   months.  I can't tell you exactly.  I'm not lying.

11   I can't tell you exactly so I'll say approximately

12   six months.

13       Q.   What's his job title, if you know?

14       A.   Prior to that, he was race administrator.

15   Right now his title is Director of Racing, I

16   believe.

17       Q.   Do you know who Mr. Zimny reports to?

18       A.   Richard Moore and Al Briton.  I'm not sure

19   that he -- the chain of command in the

20   organizational chart, in my mind, is to Richard

21   Moore, but I'm not sure that it's as much as with Al
```

1    Briton.

2         Q.   Do you know what Mr. Moore's job --

3         A.   He is the Vice-President of Racing

4    Operations.  Just like, I guess Eric Zimny's

5    complete title is Director of Racing Operations.

6         Q.   And do you know what Mr. Briton's title

7    is?

8         A.   Excuse me.  I want to say general manager.

9    I'm sorry, I don't know exactly.  Hopefully that

10   doesn't get me fired, immediately anyway.

11        Q.   Now, you indicated that you thought that

12   Mr. Zimny reports more to Al Briton then he does

13   really to Richard Moore?

14        A.   That's my assumption.

15        Q.   Why do you --

16        A.   I'm speculating that.  I believe that

17   there's more communication that goes there.

18        Q.   Does Mr. Briton sometimes communicate

19   directly with you?

20        A.   Well, that's an interesting question

21   because we -- not on a regular basis really.

1   Although we had a structured biweekly meeting on

2   Friday because he wanted to keep a report going with

3   me.  And we really have only had one meeting because

4   of his other preoccupying activities since the table

5   games got voted in.  And actually, prior to that I'd

6   say that we've had one meeting in the last maybe

7   four months, three months, where it was just us two,

8   one-on-one.

9        Q.   Does he tend to communicate with you by

10  e-mail or in person?

11       A.   We're not afraid to talk to one another.

12  He tells me I can come in his office and say

13  something to him any time.  Open-door policy is

14  pretty much like that way with anybody.  But when we

15  communicate in a meeting, that's when I'm the one in

16  his office.  But other than that, if I say something

17  with him, it's either in passing or e-mail.

18       Q.   Do you have any employees who report to

19  you?

20       A.   Yes.

21       Q.   Who reports to you?

```
 1        A.    The racing officials are under my report.

 2   That would be the assistant race secretary, Ron

 3   Anthony.  I have Mike Kelly, Senior Racing

 4   Official/Stall Superintendent; Tim Taylor, who was

 5   the full-time, still in my mind, the full-time Stall

 6   Superintendent.  You have Scott Kiching, who is a

 7   racing official.

 8        Q.    Which racing official position is that?

 9        A.    Well, see we have them all now as listed

10   on the program as racing officials.  And the reason

11   being is:  Even though some people have strengths,

12   in my mind I like to train everyone to do every job.

13   And so we rotate people around for periods of time

14   for cross-training and motivational purposes.

15        Q.    So all the racing officials rotate?

16        A.    Yes.

17        Q.    What job does Mr. Kiching most often fill?

18        A.    Placing judge.

19        Q.    Who else do you have?

20        A.    Stephanie Miller.  She's a racing official

21   that does our program.  She publishes proofs of the
```

```
 1    facial racing program which we're responsible for.

 2    It comes under my responsibility area.  Other member

 3    placing judges, let's see, Gary Leslie.  I have

 4    Wayne Jamtgaard. Don't ask me again.

 5        Q.   He's a placing judge as well?

 6        A.   Yes.  He's currently padding judge.  But

 7    you're asking me the primary -- major roles.  Alma

 8    Martinez, everybody calls her Sunny.  That's what

 9    she goes by.

10        Q.   And Ms. Martinez primarily performs what

11    job?

12        A.   She primarily performs, actually, stakes

13    coordination.  But she's not listed as that.

14        Q.   What is she listed as?

15        A.   Her main job since I've been there is

16    padding judge.  But she isn't currently doing that.

17    She'll probably go back in there soon.  Let's see

18    here, we have -- let's see, Tim just left.  Melissa

19    Storts.  She is right now primarily a placing judge.

20    But she fills in as identifier.  Well, right now

21    actually, this week she's clerk of scales.  You have
```

1    Mark London, who's the identifier usually.  He also

2    substitutes as clerk of scales.  How many is that?

3        Q.   Ten.

4        A.   Okay.  You have Henry Allen, who is a

5    clocker.  Alky Darlington is a substitute clocker.

6    He also clocks in the morning.  And he's claims

7    clerk at night, or during the races.  His first name

8    is Gardener, but everybody calls him Alky.  That's

9    his nickname.  It has to do with his drinking.

10   That's the best I remember without looking at a

11   roster.  I believe that's about everybody.  I'm

12   thinking we just have the gentlemen who resigned.

13   We just had a person moved a few months ago from our

14   department to security.  That's off the top of my

15   head, that's everybody.

16       Q.   Okay.  Now, as to each of these people,

17   are called racing officials, correct?

18       A.   Yes.

19       Q.   And then am I correct that each of these

20   racing officials is subject to approval by the West

21   Virginia Racing Commission?

```
 1        A.   Correct.

 2        Q.   And so each of these people has been

 3   approved to be a racing official?

 4        A.   Yes, and licensed, currently licensed.

 5        Q.   And is that true as to yourself as well?

 6        A.   Yes.

 7        Q.   And I take it that each of these racing

 8   officials works on the grounds of Charles Town

 9   Races?

10        A.   Yes.

11        Q.   And how would you define the grounds, as

12   that term is used in the regulations?

13        A.   Any of our property that we own.  Although

14   sometimes our responsibilities take us out of the

15   grounds.

16        Q.   Any property owned by PNGI?

17        A.   Yes.

18        Q.   At Charles Town?

19        A.   At Charles Town, yeah.

20        Q.   What are your job duties?

21        A.   My primarily responsibilities are the
```

1    writing of the condition book, which is, if you

2    will, to explain in layman's terms, would be a menu,

3    if you will, of the races offered to enter in each

4    day.  And then also, then out of that, choosing the

5    races that we use.  And I set the races as to what

6    order they are to be on the program and published.

7    And I'm responsible for the official publication of

8    the racing program.  The supervision of the proper

9    procedures and the integrity of the race officials

10   responsibility.  And the barn area, I have been put

11   on.

12        Q.   You mentioned that Mr. Taylor is one of

13   the people that you supervise?

14        A.   Yes.

15        Q.   You have supervisory responsibility over

16   the entirety of the barn area?

17        A.   Yes.

18        Q.   And does your supervisory extend to the

19   condition of the barns themselves?

20        A.   I can have input.  Honestly, that's more

21   facilities and maintenance, but I can direct input.

1      Q.   What do you mean by you can direct input?

2      A.   Well, if I see something that needs

3  repaired, I'll, you know, send an e-mail or report

4  it verbally.  See the facilities manager or Mike or

5  Jim and say something needs to be done.

6      Q.   Okay.  And is facility management obliged

7  to follow your direction?

8      A.   Not really.  And I say facilities

9  management, but actually, it comes under Doug

10  Bowling.  Doug Bowling is the track maintenance.

11  And track maintenance takes its responsibility for

12  the barn area.  So my correction there.  But

13  facilities management does get involved with

14  contracts, et cetera.

15      Q.   So if you see a problem with the physical

16  structure, you contact track maintenance and say,

17  this needs to be fixed?

18      A.   Yeah, Doug Bowling.

19      Q.   And how about if you see a problem --

20      A.   Or with anything with maintenance.  I'm

21  sorry to step on you.  But anything like -- mainly

1    what I'm concerned with is things that would be

2    safety with the -- say if there's ice or something

3    sticking, a pipe or something.  For instance,

4    something laying out in the horse path.  And I

5    physically would see or somebody reports it to me.

6        Q.   So if there was either ice or some object

7    in the path that would pose a risk to both human and

8    animal safety?

9        A.   If I'm aware of it, then I am obligated to

10   report it.  But as far as I know, at least if it's

11   an integrity thing, I have to report it.

12       Q.   Okay.  So is it fair to say that you have

13   supervisory responsibility over the barn area in

14   terms of the health and safety of humans and animals

15   using that area?

16       A.   I have input.  That would be safe to say.

17       Q.   Okay.  Who else has input other than track

18   maintenance that you've identified already?

19       A.   Well, to be honest, it would be Richard

20   Moore.  He's the one that has the ultimate.

21       Q.   I guess Mr. Briton has the ultimate

1    responsibility?

2        A.    Ultimate over him, but Dicky, as we call

3    him.  I'm sorry if I say Dicky.  I'm used to saying

4    dicky like that.  But Richard Moore.

5        Q.    Okay.

6        A.    Yeah.

7        Q.    So in terms of the chain of command, you

8    have supervisory responsibility --

9        A.    Over the gentlemen working on the

10   backside.

11       Q.    And that's why you say that you have

12   input?

13       A.    Right.

14       Q.    And then Mr. Moore would have input?

15       A.    Yes.  But he's more in charge of

16   everything back there than I am.  I just have input

17   as far as my employees.  I don't mean to say my

18   employees.  That's against the company policy, but

19   our team of employees.

20       Q.    Over the people you supervise?

21       A.    Yes.

```
 1        Q.   All right.  And then ultimately Mr. Briton

 2   has final responsibility for health and human safety

 3   and animals?

 4        A.   Well, that would --

 5        Q.   Let me finish the question because I

 6   didn't do a very good job of that.  Ultimately, Mr.

 7   Briton has responsibility for the safety of humans

 8   and animals in the barn area?

 9        A.   Well, to be honest, I'd have to be

10   speculating other than, I know that Dicky has had a

11   lot of control over that in the past.

12        Q.   Okay.

13        A.   And he's the one that he knows everything.

14        Q.   All right.  So in terms of when I use the

15   word ultimate, that's what you're quibbling about:

16   it could be Mr. Moore who has that responsibility or

17   it would be Mr. Briton?

18        A.   It would be.  I'd be speculating.

19        Q.   You're just not sure?

20        A.   Yeah.

21        Q.   But one of those two?
```

1     A.   Yes.

2     Q.   And your role is to provide direction and

3  control to the extent, you see an issue and provide

4  input to either Mr. Moore or Mr. Briton?

5     A.   Very well put.

6     Q.   Okay.

7                    (Whereupon, a discussion was

8                    held off the record)

9          MR. HAMMER:  We've taken a brief break to

10         address a technical problem.  While we are off

11         the record, you indicated that a few more

12         people over whom you have supervisory

13         responsibility came the mind.  And I recognize

14         that you don't have an organizational chart in

15         front of you so you're doing this from memory.

16    Q.   (By Mr. Hammer)  Please go ahead.

17    A.   Dennis Kirk is the jockey's room

18  custodian, I believe is his title.  Also, there are

19  five outriders, three full-time, two part-time.

20  There's Dean Johnston, I believe has the most

21  seniority.  He's a full-time outrider.  They're

1  responsible for the safety and integrity of people

2  once they enter the race track in the morning and

3  during training and then during racing time.  Nancy

4  Tollatta, who's a full-time outrider.  You have

5  Crystal Smith, who's a full-time outrider.  You have

6  two part-time outriders:  Lori Born is also a

7  trainer in the stable area.  There's a gentlemen,

8  he's a part-time outrider by the name of Bruce

9  Hammond.

10      Q.   To the best of your recollection, is that

11  a full list of the people you supervise?

12      A.   To the best of my recollection.  I'm sorry

13  about that.

14      Q.   That's all right.  What have you done to

15  prepare for today's deposition?

16      A.   Not much.  Trying to jog my memory.  I

17  talked a little bit, just prior to coming in here,

18  with Brian here.

19      Q.   How many minutes was that meeting?

20      A.   Probably 10-15 minutes while I was

21  drinking a drink.  That's about it.

```
 1              MR. PETERSON:  Of --

 2      A.   A non-alcoholic drink.  We better clarify

 3  that.  I felt like I needed one, thinking about

 4  that.  I wanted it to be.

 5      Q.   (By Mr. Hammer)  Okay.  Did you review

 6  documents in preparation?

 7      A.   No.

 8      Q.   Did you speak with anyone else other than

 9  Mr. Peterson in preparation?

10      A.   Just my wife.

11      Q.   Okay.  Did you speak with Mr. Moore or Mr.

12  Briton?

13      A.   No.

14      Q.   Have you discussed this case with Mr.

15  Moore or Mr. Briton at any time?

16      A.   No, not to my knowledge, not to my

17  recollection.  At least not in months anyway.

18      Q.   Do you remember a discussion sometime in

19  the past about this subject matter of this case?

20      A.   No.

21      Q.   Do you know the woman seated to my right?
```

1        A.    Yes, Tina Mawing.

2        Q.    How long have you known Ms. Mawing?

3        A.    On a face-to-face basis, since I landed

4   here in April of '08.  It was a year or two before.

5   That's when I called you from Kentucky asking you

6   about a horse I was trying to get nominated, which I

7   believe you did nominate to a stake race down at

8   Turfway.  I can't remember what horse that was now.

9        Q.   I'm sorry, go ahead.

10        A.   I'm sorry.  That's the best of my

11   recollection.

12        Q.   So while you were in Kentucky, you

13   actually encouraged Ms. Mawing to enter a horse in a

14   Kentucky stakes race?

15        A.   Yeah.  We call it nominating.

16        Q.   To nominate?

17        A.   Yeah.  You got on the nomination list to

18   be eligible to enter and race in the stakes race

19   when it comes entry time.  And I thought that she

20   had a horse that was -- she's has a couple nice

21   horses every year.  And that's part of my

```
 1   responsibility because I was stakes coordinator at

 2   Turfway Park.  And also at Colonial I recruit

 3   horses.  That's what I was known for around the

 4   country, for recruiting the best horses, quality

 5   horses for races.

 6        Q.   And so Ms. Mawing was known to you to have

 7   had some quality horses?

 8        A.   She had a couple.  I looked on charts,

 9   that looked notable that would have fit in our race.

10   And she was even considering, I thought, unless she

11   was leading me on.

12        Q.   What's her reputation at the races?

13        A.   You know, personally, if it is me

14   speaking, I think she's a professional person.

15        Q.   Do you know what she does when she's not

16   training horses?

17        A.   No.

18        Q.   Do you know whether she's a nurse,

19   employed as a nurse?

20        A.   I just found that out in a conversation we

21   had recently.
```

```
 1        Q.   Okay.  Are you aware of an organization

 2  called the HBPA?

 3        A.   Yes.

 4        Q.   What is that organization?

 5        A.   The Horses Benevolent Protective

 6  Association.  And every person who is licensed, as

 7  far as I know, that pays dues that runs horses in

 8  the State of West Virginia, and forgive if I'm

 9  wrong, but any state I've raced in or held an

10  official capacity, some horsemen organization, I

11  believe every place I've been, the HBPA has had

12  every horsemen as one of their members.

13        Q.   And to your knowledge, was Ms. Mawing or

14  is Ms. Mawing a member of the HBPA?

15        A.   Yes.

16        Q.   All right.  To your knowledge has Ms.

17  Mawing ever served as an officer of the HBPA?

18        A.   To my knowledge, I'm not aware one way or

19  the other.

20        Q.   Okay.

21        A.   I just found out a couple of weeks ago
```

```
 1    that she was a nurse.  And I couldn't believe that

 2    that's the first that I found out, when she called

 3    me.

 4        Q.   Are you familiar with a trainer named

 5    Scooby Schneider?

 6        A.   Yes.

 7        Q.   And do you know whether or not he's a

 8    member of the HBPA?

 9        A.   Yes, he is.  He's a trainer.  All trainers

10    are members, as far as I know.

11        Q.   And do you know whether Mr. Schneider as

12    ever had a role on the board of the HBPA?

13        A.   To the best of my knowledge, he does.  He

14    is a member of the condition book committee.  So I'm

15    not sure he's on the board, but he is one of they're

16    committee members.

17        Q.   How often do you come into contact with

18    Mr. Schneider?

19        A.   On a professional basis, one week prior

20    to, approximately, to sending, to publishing the

21    condition books, signing the final draft to the
```

1   final proof to the printer.  The condition book

2   committee comes in and meets with us.  And he'll

3   come in from time to time, like most trainers.  To

4   be honest with you, any trainer that asks for my

5   audience, I will give or grant.

6       Q.   So it might not be an official meeting,

7   it's just that you would run into them when he's

8   over at the office?

9       A.    Typically, it's my job.  If they ask for a

10  race -- that there's a horse they're not getting in

11  a race, it's my job to create the best, within the

12  realms of pride and the best racing of wagerable

13  product, to try to bring the most competitive horses

14  together.  And some horses get left out of races.

15  Maybe that particular race doesn't go.  And so they

16  bring that to my attention, some much more vocally

17  than others.  He's usually one that's more vocal.

18      Q.   So you've seen Mr. Schneider a number of

19  times over at the office?

20      A.   Yes.

21      Q.   Does he, I use the word hang, out there,

```
 1   for lack of a better term, does he hang out there

 2   sometimes?

 3        A.   Not on a regular basis, but once in a

 4   while I'll see him out across the counter.  Horsemen

 5   are not allowed regular admittance inside our office

 6   unless they are asked to come in or they are asked.

 7   And then we provide admittance to our office.

 8        Q.   Okay.

 9        A.   Or unless they're on official capacity,

10   like the committee.

11        Q.   Would you see him around the track?

12        A.   Yes, on a regular basis.

13        Q.   On a regular basis?

14        A.   Yeah, almost every race day.

15        Q.   When you see him, what do you typically

16   do?  Do you say hi to him or talk to him?

17        A.   I acknowledge.  I say hi.  Try not to be

18   unfriendly to any of them.  Because I have to be,

19   it's like Dicky said before, I have to live with

20   them.  And that's his expression.  But I basically

21   have to be professionally courteous to the people
```

1    that help me and our department fill races.

2         Q.   Have you ever discussed stall allocations

3    with Mr. Schneider?

4         A.   I don't specifically remember when, but

5    I'm sure at some point since I've been there in this

6    tenure.  He's come in and asked about a stall or

7    made some suggestion about something about stalls.

8    I do remember one conversation.  It was about a pony

9    that he had.  Because one horse that he has, which

10   happens to be a pony because they're allowed a pony

11   with them once they are allotted these eight stalls.

12   That was part of the stall license agreement with

13   HBPA.  Well, it's a part of our agreement that we

14   have irrevocable stall license agreement.  Forgive

15   me if I don't have the right terminology there.

16   Every place calls it something different.  But I

17   call it stall application.  And you're allowed one

18   pony, at least for each eight stalls that you're

19   allotted.  And he has one that happens to be on the

20   other side of his shed.  He has all of his

21   thoroughbreds in one line and one pony around the

1    other side.  And I was just asking why that was

2    there.  Just because we had another outfit, which

3    happened to be our outrider, Crystal Smith, moving

4    it over there.  And I wanted to make it as

5    convenient for her as possible.

6        Q.   Uh-huh.

7        A.   That's the conversation I had with him.

8        Q.   The ponies serve as companions from the

9    thoroughbreds?

10       A.   Yes.

11       Q.   All right.  Have you ever discussed Ms.

12   Mawing's stall allocations with Mr. Schneider?

13       A.   Not that I recall.

14       Q.   Do you recall him ever asking about Ms.

15   Mawing's stall allocations?

16       A.   Not that I remember.  You have to remember

17   with this gentlemen too though, he wants to discuss

18   everyone with everybody there.  And I've learned to

19   stay away from him because he loves to discuss

20   everyone's business.

21       Q.   Okay.  So he engages in gossip at the

MAXIM REPORTING, LLC
(304) 260-0670  / (301) 992-5264

C-32

1    track?

2        A.   Yes.  Very well put.  And as I'm

3    discovering, that it's usually not in my best

4    interest, other than to entertain or listen.

5    Because sometimes you pick up tidbits of

6    information.

7        Q.   So if Mr. Schneider was asking someone in

8    the office about Ms. Mawing's allocation for stalls,

9    that wouldn't surprise you?

10       A.   Would not at all, no, anyone for any

11   reason.

12       Q.   Do you agree that it's the HBPA's purpose

13   to represent the horsemen's interest in property

14   rights when dealing with racing associations such as

15   Charles Town Races?

16       A.   I'm not understanding the question.

17       Q.   Well, what I'm asking you is whether or

18   not you understand that the HBPA is a representative

19   of the Horsemen contract, you're dealing the

20   association?

21       A.   You're saying they represent as

1   intermediary if there's a disagreement or something?

2       Q.   Well, yeah.  They're contractually obliged

3   to represent the horsemen at the races.

4       A.   Yes.

5       Q.   All right.  And is it your understanding

6   that the HBPA is the exclusive bargaining agent and

7   representative of its members?

8       A.   As far as I know, yes.

9       Q.   Do you agree that the Horsemen's

10  Benevolent Protection Association is a nonprofit

11  association, do you know?

12      A.   I don't know.  I don't want to conjecture.

13  Because if I think about it, I might answer wrong.

14      Q.   If you don't know, that's fine.

15      A.   I don't know.

16      Q.   Do you agree that the HBPA is the

17  statutory bargaining representative for the

18  horsemen?

19      A.   As far as I know.

20      Q.   And do you agree PNGI Charles Town Gaming,

21  LLC, doing business as Charles Town Races and Slots

```
 1   is the owner and operator of, among other things, a

 2   thoroughbred horse racing track, training track,

 3   horse stalls, testing barn, and other facilities

 4   located at its facilities in Charles Town, West

 5   Virginia?

 6        A.   Is that PNGI?

 7        Q.   Yes.

 8        A.   Yes.

 9        Q.   And do you agree that Charles Town Races

10   and Slots is a licensed racing association in the

11   state of West Virginia?

12        A.   I would hope so.

13        Q.   And is it your understanding that Charles

14   Town Races and Slots is a party to an agreement

15   between it and the HBPA?

16        A.   Yes.  As far as I know.

17        Q.   Have you ever read that agreement?

18        A.   When I first actually -- honestly, before

19   I came here to work, I read the current one that was

20   in place at that time.  I have not read it since

21   then.
```

```
 1       Q.   Is that the one that was in place during

 2   your first tenure here?

 3       A.   It was the one in place prior to my coming

 4   here in '08, whatever that was.  I didn't read the

 5   whole thing.  I just skimmed through it.

 6       Q.   Is it your understanding that pursuant to

 7   the agreement between PNGI Charles Town Gaming and

 8   the HBPA, that the race track is supposed to

 9   provide, I think it's 1148, stalls free of charge to

10   the horsemen?

11       A.   Well, I'm not sure how to answer that.

12   Because it's my perception of things it's not free

13   of charge.  Because we are still paying for

14   everything associated with -- well, yeah, I guess to

15   them it's free of charge as far as they're not

16   paying any fee, daily fee.  If that's what you're

17   asking.

18       Q.   Yeah.  Let me just show you and I'll read

19   this sentence and see if it's familiar to you.

20   Charles Town Races shall make available a minimum of

21   1148 stalls free of charge to horsemen each race
```

1    meeting?

2         A.    That makes sense.

3         Q.    Is that your understanding?

4         A.    Yes.

5         Q.    And during the time periods that you've

6    been the racing secretary, has Charles Town Races

7    made a minimum of 1148 stalls available free of

8    charge to the horsemen?

9         A.    As far as I know, although I don't know

10   the exact number now because we've had, at various

11   times we've had, certain stalls down.  And then also

12   right now, we have barn 2, which for months has been

13   vacated and being remodeled.  So I'm not sure of the

14   exact number.  I think at least that.  Because I

15   believe with that operational, we have closer to

16   1300 so that would make sense.

17        Q.    Was it true back in 2008 that you had

18   about 1300 stalls?

19        A.    As far as I remember, it's around 1200

20   anyway.

21        Q.    Okay.  So somewhere between 1200 and 1300,

```
 1   you're thinking?

 2        A.   Best of my knowledge, yes.

 3        Q.   And that would be true in 2008?

 4        A.   Yes, to the best of my knowledge.

 5        Q.   And at any given time, how many stalls are

 6   available?

 7        A.   And that's including the receiving barn,

 8   which is approximately 46 stalls.  I think so. I'm

 9   sorry.

10        Q.   Do the best that you can.

11        A.    44 or 46 besides the test barn, which is

12   adjacent to it.

13        Q.   So 44 to 46 stalls in the receiving barn?

14        A.   Right.

15        Q.   Does not count the testing barn?

16        A.   No.

17        Q.   All right.  And at any given time, how

18   many stalls are available?

19             MR. PETERSON:  I'm going to object to the

20        form -- just to clarify what may be available.

21             MR. HAMMER:  Sure.
```

1     Q.    (By Mr. Hammer)   How many stalls are

2   occupied versus how many are unoccupied?

3     A.    Over 1100 to the best of my knowledge.

4     Q.    Over 1100 typically occupied?

5     A.    Yes.

6     Q.    And so the difference between the 1100 and

7   however many stalls you have is what's typically

8   unoccupied?

9     A.    Yeah.  It's probably closer to 1200 that's

10  occupied.  I couldn't tell you exactly.  Honestly,

11  it fluctuates.  Plus we're a barn down right now.

12  And the receiving barn is occupied typically, except

13  during races.

14    Q.    In 2008 -- let me talk about in the

15  August/September time period of 2008.  How many

16  unused stalls were available at that time?

17    A.    Maybe on the whole backside, and I'm just

18  speculating, between 50 and 100 at most.  And that

19  would be scattered across the whole barn area.  You

20  might have two in a barn.  You might have five or

21  six in another barn.  That's just speculation.

1        Q.   Okay.  So I understand that periodically

2    you have to consolidate the stalls so that you keep

3    unoccupied stalls together and occupied stalls

4    together?

5        A.   In theory, that would be nice.  It never

6    happens that way because you always have fluctuation

7    of horse population.  Somebody's horse gets sick,

8    they take one out that gets hurt.  You know, you

9    might have somebody leave you.

10       Q.   Okay.

11       A.   You might have to make room for somebody.

12   You got to move somebody in order to make them fit.

13   Typically, in everybody's allotment, you'll have at

14   various times, one or two empty.

15       Q.   It's simply because of the in and out,

16   they're always open stalls at the race track?

17       A.   Yes, because of in and outs, horses

18   getting hurt, sick, horses coming that are getting a

19   different owner.  They get fired from one owner.

20       Q.   So if it was your decision to give someone

21   three or four stalls, is it your testimony that you

```
 1   always have stalls available to do that?

 2        A.   No, it isn't.  Because right now we have a

 3   stall freeze.  Because there are people that we

 4   allotted stalls at the beginning of year we have

 5   given stalls to.

 6        Q.   That's in 2010?

 7        A.   Yes.

 8        Q.   How about in 2008?

 9        A.   To the best of my knowledge, there were

10   empty stalls and -- I'm sorry, rephrase the

11   question.

12        Q.   Yeah.  If someone came to you and you just

13   made a determination that they should get say five

14   stalls, is it a true statement to say that in 2008,

15   you could find five empty stalls?

16        A.   You could find five empty.  They might be

17   in five different places in the barn area.

18        Q.   So it might not be convenient that they're

19   not all together?

20        A.   Correct.

21        Q.   But there would be five empty stalls?
```

1      A.   Correct.

2      Q.   And was that true in 2009 as well?

3      A.   It would have to be that you'd have at

4   least five empty or more.  Now, as far as me having

5   input as to whether or not they should get them, I

6   don't have that input.

7      Q.   Okay.  All you can say is that there are

8   always, at least in 2008 and 2009, there were always

9   empty stalls?

10      A.   Yeah.  And there's a reason for that.  For

11   one thing is that we have a very small receiving

12   barn.  And it's actually the smallest of any place,

13   other than maybe one track, I've worked at.  And we

14   get approximately 40 to 50 percent, sometimes over

15   60 percent ship-ins on any race card.  So if you do

16   the math and you have 90 horses running and you have

17   60 horses entered and you got 44 available and maybe

18   you have a couple that are down in the same barn.

19   So you have 40 stalls available for whatever reason,

20   the company maintenance.

21      Q.   Uh-huh.

1      A.   So now you got to find to other stalls for

2   these horses shipping in for racing.

3      Q.   Am I correct that a horse shipped in

4   trailer then has to go through the receiving barn

5   process?

6      A.   As far as I know, the whole time I've been

7   there and prior to my coming there, they have to

8   come through there to get their tattoo checked.

9   They present the proper paperwork in terms of health

10  certificates, virus -- vaccination or certificate

11  saying they're negative.  And so the negative

12  Caughins and health certificate are presented at the

13  gate.  And they get their tattoo checked to verify

14  their authenticity of that racehorse.

15     Q.   Uh-huh.

16     A.   And then they go into their allotted stall

17  for that night, which could be the same barn or it

18  could be another barn.

19     Q.   Once some space is allocated for them?

20     A.   Right.

21     Q.   Now, what is the typical delay when a

1  horse has to come through the receiving barn and be

2  admitted?

3      A.   Honestly, here I would hope it's not more

4  than a few minutes.  Other than that, I can't tell

5  you but sometimes it's more time.

6      Q.   Are you aware of situations were it's been

7  more than an hour?

8      A.   Not here.  I've been places where it's

9  happened, that I'm aware of.  I may have happened

10  here since I've been here.  I know that they've

11  waited out there one or two days, I couldn't tell

12  you exactly when, that there have been people backed

13  up to the gate for whatever reason.

14      Q.   During those time periods when they're

15  backed up to the gate, the horses must remain in

16  their trailers, correct?

17      A.   Yes.

18      Q.   And would you agree with me that the

19  activity of loading, storing the horse in a trailer

20  and unloading in the trailer presents greater risk

21  to the horse than for a horse that doesn't have to

1   go to through those activities?

2        A.   To me that's a generalization, I'm sorry.

3   But for some horses it presents a problem, some it

4   doesn't.

5        Q.   All right.  And so some horses react

6   poorly to being trailered, some horses go on and

7   off?

8        A.   Some react poorly, some like it.

9        Q.   And the ones that react poorly, sometimes

10  they injure themselves?

11       A.   That happens anywhere.  It can happen no

12  matter where a horse is, a thoroughbred.

13       Q.   Right.  And am I correct that sometimes

14  it's necessary to tranquilize horses that are being

15  trailered?

16       A.   If that happened, they wouldn't be racing

17  legally.

18       Q.   They're not eligible to race?

19       A.   Right.

20       Q.   Because?

21       A.   Because they would have a foreign

1    substance, foreign to their natural body at race

2    time.

3        Q.   As we know from a West Virginia Supreme

4    Court decision just handed town, West Virginia is a

5    zero tolerance state?

6        A.   Correct.

7        Q.   And so that any foreign substance in a

8    horse disqualifies the horse from the race?

9        A.   Right.

10       Q.   With the exception of the butte adjunct or

11   --

12       A.   Correct.

13       Q.   If it's not one of those three exceptions,

14   any foreign substance will disqualify the horse?

15       A.   As far as I know, yes, that's the law.

16       Q.   That's the rule for racing?

17       A.   Yeah, that's right.

18       Q.   And so if --

19       A.   You're correct.  I said law, but I think

20   there's a difference there:  Rule of racing.

21       Q.   Right.  And so if a trainer has a horse

```
 1   that reacts poorly to being trailered and typically

 2   needs to be tranquilized in order to be trailered,

 3   that horse is a poor candidate to race at Charles

 4   Town Races?

 5        A.   Well, I don't agree with that.  I don't

 6   think that's true.  Because me being race secretary,

 7   any horsemen calls me and asks me to trailer in

 8   their horse early and if any horsemen would do that

 9   because of those circumstances, I provide stall

10   space no matter who they are for as many days as

11   they would need prior to their racing so that they

12   could come in so that doesn't happen.  So they would

13   be safe to run by the time the race night occurred.

14        Q.   How many days do they have been to be

15   foreign substance free in order to be eligible?

16        A.   It depends on the withdrawal guidelines

17   for those substances.  Which I'm not a veterinarian

18   so I can't speculate.  It's typically one to five

19   days.

20        Q.   All right.  And so that would require

21   additional cost and expense to the owner in order to
```

```
 1   trailer in the horse ahead of time and get a

 2   veterinarian certificate certifying the horse --

 3        A.   I don't know that.  I really can't -- that

 4   would be speculation on my part.

 5        Q.   Okay.  Would you agree with me that under

 6   West Virginia law and rules of racing, no horse can

 7   be removed from the association grounds or brought

 8   on to the association grounds without being first

 9   reported to you, the racing secretary?

10        A.   Yeah.  They're supposed to have a

11   permission slip.  Now, they do not have to come to

12   me for a permission to leave, but they're supposed

13   to be documented leaving the gate by our security

14   department.  That's a rule.

15        Q.   And the security keeps track of the

16   tattoo?

17        A.   Yes.

18        Q.   And do you always know what horses are on

19   the grounds and what horses are off the grounds?

20        A.   Well, we record those in the computer.

21   And how accurate that is -- we're supposed to.
```

1    Security does record those.

2         Q.   And have you ever known Tina Mawing to

3    violate any statute or rule governing thoroughbred

4    horse racing in West Virginia?

5         A.   Statute or rule, to the best of my

6    knowledge, I'm not aware of any of West Virginia.

7    Not that I'm aware of.

8         Q.   Would you agree with me that stewards are

9    the persons designated to represent the racing

10   commission and whose duty it is to supervise any

11   horse race meeting as may be provided by the

12   reasonable rules of the Racing Commission?

13        A.   Yes.

14        Q.   I don't mean to make this into a test for

15   you, but I have a few rules to go over.

16        A.   Oh, boy, I might flunk it.

17        Q.   Okay.  And would you agree that it's the

18   responsibility of the Race Association to police its

19   grounds at all times in a manner to prevent of

20   admission of persons in or around the stables,

21   unless they hold occupational permits issued by the

```
1   Racing Commission?

2         A.   That's according to rule.

3         Q.   And is that a rule that you enforce?

4         A.   To the best of my knowledge, the people

5   that are in my department -- well, it's security is

6   supposed to enforce that rule.  And the stewards

7   have proof.  Is it purveyor.  I'm looking for the

8   noun here.  It's stewards oversee that also.

9         Q.   Jurisdiction?

10        A.   Jurisdiction, correct.

11        Q.   And do you agree that the Racing

12   Commission in its sole discretion, may determine the

13   eligibility of a race official?  And in it's

14   discretion, may it approve or disapprove any

15   official for on occupational permit?

16        A.   Yes.

17        Q.   Do you agree that the stewards are

18   strictly responsible to the Racing Commission for

19   the conduct of all meetings and every detail

20   directly or indirectly pertaining to the racing law

21   and the rules of the Racing Commission?
```

```
1        A.   I believe that's a rule.

2        Q.   And just so the jury understands, can you

3   define what a meeting is?

4        A.   A meeting?

5        Q.   Yes.

6        A.   A race meeting that you're referring to?

7        Q.   That's right.

8        A.   It would be a time that you're racing

9   horses -- the racing.  You have horse racing, not

10  just a simulcast, importing a signal from other

11  tracks.  And we have four a year, which is broken

12  down by seasons, which is January through March on

13  three-month blocks.

14       Q.   Follows the quarters basically?

15       A.   Follows the quarters, correct.

16       Q.   That's the way it is currently?

17       A.   Yes.

18       Q.   In 2008, was it semiannual, 6-month racing

19  association meeting?

20       A.   I can't remember.

21       Q.   Did the curator of the licenses for
```

1    stalls, revocable stall licenses, coincide with the

2    period of the race meeting?

3        A.   Since I've been there, it's been

4    semiannually, to the best of my knowledge.

5        Q.   This is Exhibit No. 1 just as an example?

6                        (Whereupon, Deposition Exhibit

7                        No. 1 was marked for

8                        identification)

9        Q.   (By Mr. Hammer)  Let me ask you to

10   identify what's been marked as Exhibit No. 1.  Can

11   you identify that document?

12       A.   Yes, that's a stall application for

13   September 1 to December 31.

14       Q.   Okay.  And does this inform your testimony

15   as to the race meeting periods?

16       A.   No, for some reason or another, and I

17   can't tell you why, this was when the new stall

18   applications were due prior to the September 1

19   period.  But since that period, to the best of my

20   knowledge, it has been bi-annually.  It's been at

21   the beginning of the year.  And then the next

```
 1   six-month period stated July 1.  It probably was

 2   that there was no new stall applications during the

 3   time that I first came there.  So I landed here May

 4   1, approximately.  And then the first time that Eric

 5   said, well, we need to put out a new stall

 6   application instead of annually.  It might have been

 7   annually.  I can't remember prior to my coming here.

 8   But Eric said, well, let's put out the new one.  And

 9   so September 1 was the beginning of that period.

10        Q.   This is Mr. Zimny that told you to put

11   that out, a new --

12        A.   Yeah.  He drafted this up or we drafted it

13   up.

14        Q.   Did you participate in drafting this one?

15        A.   Just input.

16        Q.   And I'll tell you the origin of this

17   document has a front and back.

18        A.   Uh-huh.

19        Q.   Unfortunately, I didn't bring the back

20   with me.  I just want the record to be clear.  I'm

21   not trying to mislead you or hide something from
```

```
 1   you.

 2        A.   No, no.

 3        Q.   I just don't have the backside.

 4        A.   No, I'm aware of that.

 5        Q.   But in a box in the top center of this

 6   document, is a box that I think is called

 7   eligibility rules.  Do you see that?

 8        A.   On the back, right here.

 9        Q.   Yeah.

10        A.   Yes.

11        Q.   And are those the rules that govern stall

12   allocations?

13        A.   No.

14        Q.   What do these rules have to do with?

15        A.   They are to govern -- they're part of the

16   criteria so the horses -- from what I'm reading

17   here, it gives you eligibility rules of the horses

18   -- we cannot run any maiden six years or older.  So

19   it excludes them.  So we're not going to stable

20   horses that -- basically we can't stable horses that

21   are ineligible to run for various rules.  And like,
```

```
 1   it has a clause on two-year-olds not eligible before

 2   February 15.  A horse that wouldn't be eligible to

 3   run anyway during that period.  It basically

 4   excludes from what I see.  And some of them cover

 5   racing rules like the bleeders, maiden rules,

 6   bleeders.  The claiming prize rule, that's an old

 7   eligibility rule we have to weed out horses that

 8   have inferior performance, a string of inferior

 9   performance.  That's the first one.  Maidens, in

10   this state at our race track, you can't run a

11   six-year-old maiden or older.  The C coincides with

12   A, actually for maidens once they've run for a tag

13   of five or less.  And then they have so many starts,

14   you know, if they're not going to be a betable

15   horse, then we don't want them on the grounds if

16   they can't race.  So basically it covers horses that

17   would not be allowed to race during that time

18   period.  We're not going to allow them stabling on

19   the grounds for the most part.  And the

20   two-year-olds, it covers them.  We don't want them

21   coming on the grounds too early and getting hurt,
```

```
 1    which they're subject to getting hurt and getting a

 2    sickness.  And you can't race them until mid-year

 3    anyway.  They're not physically able to, for the

 4    most part, generally speaking.

 5        Q.   So take me through the stall application

 6    process as it existed in 2008 and is referenced by

 7    Exhibit No. 1.

 8        A.   Uh-huh.

 9        Q.   What was the process?

10        A.   The stall application process?

11        Q.   Right.

12        A.   Any trainer or horsemen whether they're

13    stabling the grounds or not stabling the grounds, in

14    order to be eligible to have horses stabled on the

15    grounds, must complete a stall application.  And it

16    has to be completed and turned in within the

17    requirement time period.  And that's a minimum

18    requirement.

19        Q.   All right.  And at the bottom of this

20    document it has a number of columns.

21        A.   Uh-huh.
```

```
 1        Q.    The name of the horse, the sex, what's MD?

 2        A.    Maiden.

 3        Q.    Maiden or not?

 4        A.    Right.

 5        Q.    Claiming, long, last start, name of --

 6        A.    Right.  And that should be name of owner.

 7        Q.    Okay.  And I think there's a half of an O

 8   there on the last column.  So that's the name of

 9   owner?

10        A.    Yeah, I believe so.  That's as far as I

11   recollect.

12        Q.    Okay.

13        A.    That was not proofed sufficiently, as I

14   can tell.

15        Q.    And so a trainer who wanted to stable

16   horses would list the horses that they want to

17   stable by providing the information on the bottom

18   half of this document?

19        A.    And on the top corner here, and on the

20   back, they must sign it and put their personal

21   information as far as where to locate them, like
```

```
 1   phone numbers, address.

 2        Q.   Contact information?

 3        A.   Contract information, correct.

 4        Q.   Now, this information on the top left,

 5   track, barn, stall, trainer?

 6        A.   Uh-huh.

 7        Q.   Is that for the applicant to fill out or

 8   is that for the --

 9        A.   Well, we can fill it out.  I make sure

10   it's filled out when it goes into my file when I

11   place in the file prior to going to the stall

12   committee meeting.

13        Q.   And what is the use of this document?  How

14   do you use it?

15        A.   Well, it's your application.  It's for

16   them to apply for stalls and for us to have a record

17   of the horse's stable on the grounds with that

18   trainer.

19        Q.   Are the trainers provided any other rules

20   that guide them in knowing whether or not they'll be

21   allocated a stall?
```

1        A.    No, there is no specific guidelines that

2   I'm aware of.

3        Q.    In 2008 there were no written guidelines

4   governing the stall allocation process?

5        A.    Other than these eligibility rules as far

6   as I know, there's a list of policies which they're

7   supposed to have which are the stable rules policy.

8        Q.    What types of rules are covered in the

9   stable rules?

10        A.    Like for instance, which I think is on the

11   back of the document, that to be allowed subject to

12   a race secretary approval, if you have a pony, you

13   need to be allotted at least eight stalls, minimum

14   of eight stalls allotted to be eligible to have a

15   pony with your stable.  Basically, it's a list of

16   some stable rules on the back.  I wish I had one

17   now.

18        Q.    I'm sorry I didn't bring it with me.  But

19   you're identifying the types of rules that are on

20   there?

21        A.    Yeah, the policies.

1      Q.   How do you receive this stall application?

2      A.   They turn it in to one of the officials or

3  the -- usually, it would be the stall superintendent

4  or they can mail it in or fax it in to our office,

5  various means of communication where they can place

6  it in to our hands.  And then I'll receive it.  And

7  then I'll file it.  I'll make sure I got a checkoff

8  list and make sure that various items, like the

9  contact information, different blocks, are all

10  filled in by them.  Or else I fill in the blanks.

11  Of course, I can't fill in their signature.  But I

12  make sure that those are filled in. And then use a

13  check off to make sure I have everyone submitted

14  that's on the grounds.

15      Q.   And do you administer these documents in

16  your official capacity at the racing secretary?

17      A.   Administer, what do you mean?

18      Q.   Well, it means you check the document for

19  completeness.  Fill in what needs to be completed?

20      A.   Yes.

21      Q.   And do you take those actions in your

1    official capacity as the racing secretary?

2         A.    In my official capacity, yes.  I'm like an

3    editor of that, as far as their information goes.

4         Q.    And then what's the next step in the

5    process of handling the application?

6         A.    The next step is we schedule -- well, I'm

7    dictated to by my bosses that we have a stall

8    committee meeting.  And the various members of the

9    stall committee then meets.  It's always been at

10   Al's office in the past, ever since I've been here,

11   as far as I remember.  And we go through all the

12   stall applications in two sections.  I have one of

13   those collapsible files that I keep for temporary.

14   Each trainer has a file that's been on the grounds

15   or has been allotted stalls for so many years that

16   we have files of stall applications on everyone

17   that's submitted one whether they have stalls or

18   not.  And I take the ones that were submitted for

19   this time period in one of those collapsible binders

20   that is alphabetized in two sections.  One is by new

21   applicants, meaning people that aren't on the

```
 1   grounds and people that are currently on the grounds

 2   in alphabetical order.  And I take those in front of

 3   the stall committee.

 4       Q.   Is there a preference for people that are

 5   currently on the grounds?

 6       A.   I'm not aware of any preferences.

 7       Q.   Do you have any written rules that guide

 8   the stall allocation?

 9       A.   No. There's no written rules.

10       Q.   Who, in 2008, was of member of the stall

11   allocation committee?

12       A.   Lest see.  From the best of my memory it

13   would be Al Briton, Dicky Moore, Eric Zimny, myself,

14   Jim Taylor, Michael Elliot.

15       Q.   How were these people selected to be on

16   the stall allocation committee?

17       A.   Pardon me.  I don't want sound stupid.

18       Q.   If you know.

19       A.   I don't know exactly.  I mean it's just

20   logical those are the people that should be on

21   there.  I've never participated in a stall committee
```

```
 1   meeting.  So pardon me if I'm smiling.  I've never

 2   been on a stall committee before coming here.  Where

 3   I worked before, I was a judge, jury and

 4   executioner.

 5        Q.   Was it Al Briton, to your knowledge, who

 6   dictates whose on this committee?

 7        A.   I'd be speculating.  It might be him, it

 8   might be Eric, it might be Dicky.

 9        Q.   So Mr. Zimny, Mr. Moore, or Mr. Briton?

10        A.   That chooses who's on the stall committee.

11        Q.   But you know, it's not you?

12        A.   I know it's not me.

13        Q.   And you know it's not Mr. Taylor?

14        A.   Right.

15        Q.   And you know it's not Mr. --

16        A.   Right.

17        Q.   So it's someone at the level of the

18   organization above you?

19        A.   Yes, it might even be somebody above them.

20        Q.   Okay.

21             MR. PETERSON:  Can we take a break.
```

```
 1              MR. HAMMER:  Sure, I'm sorry.

 2                        (Whereupon, a discussion was

 3                        held off the record)

 4              MR. HAMMER:  We've taken a brief break.

 5        Q.   (By Mr. Hammer)  Do you have any questions

 6   or want to change any of your testimony you've given

 7   so far?

 8        A.   Not that I'm aware of.

 9        Q.   Okay.  I had asked you earlier and I think

10   in response to the question you had told me that you

11   currently have one barn that's under construction

12   right now?

13        A.   Yes, barn two.

14        Q.   Barn two.  How many stalls would barn two

15   have when it's completed?

16        A.   Approximately 60.

17        Q.   And is that 60 additional stalls over what

18   you had in 2008 or is it just a rehab of barn two?

19        A.   It's a rehab of barn two.

20        Q.   Okay.

21        A.   So we're actually short on stalls right
```

1    now compared to 2008.

2        Q.   Now, when we took a break, we were

3    speaking about the process for administering these

4    stall applications.  And you had taken me to the

5    point where the stall allocation committee meets and

6    you'd identified the members of the stall allocation

7    committee?

8        A.   Yes.

9        Q.   Who calls the stall allocation meeting?

10       A.   It's someone above me.  It's either going

11   to be Eric, Dicky, or Al, I assume.  It's not me.

12   It's not Michael, and not Jim Taylor.

13       Q.   All right.  And how often are these

14   meetings called?

15       A.   Right after the deadline for the

16   applications.

17       Q.   So are they regularly scheduled?

18       A.   After the application deadline, sometime

19   within a short period, within a week or two,

20   generally after that from my experience here.

21       Q.   What do you do in preparation for the

```
 1   stall allocation meeting?

 2        A.   Myself?

 3        Q.   Yeah.

 4        A.   I go through an alphabetized barn list to

 5   make sure that everyone currently on the grounds has

 6   one filled out.  And I'll, out of courtesy, call

 7   them if they don't to make sure prior to the

 8   deadline that they have one in. And I also make sure

 9   that all the clerical items that I edited are -- by

10   editing, I mean that all the blanks are filled in.

11   And if not, then I'll call them up and make sure

12   that they have that information filled out and

13   completed properly on their stall application.

14   Other than that, nothing for myself.  Stats are

15   provided by Eric Zimny.

16        Q.   What types of stats?

17        A.   Their starts, basically.  They have a

18   number of stats, which all of us actually have

19   access to that with our computers system.

20        Q.   So by stats, you mean that you can check

21   how many times each horse in each stall has made a
```

1    start?

2         A.   Each horse that's started there.  I can't

3    tell you specifically which horse is in each stall.

4    I can just tell you how many horses that each

5    trainer has started and how many times they've

6    started in any period.

7         Q.   You do that by the tattoo on the horse's

8    lip?

9         A.   No, we just print out a starter's book.

10   It's called a starter's book.  Which you can print

11   out and do it on individual horses or individual

12   horse's, horsemen and get information as to what

13   they've run in.

14        Q.   So you do that by trainer?

15        A.   Typically, I'll do it myself.  Just

16   personally, just for some background to make sure

17   that I'm covering by bases.

18        Q.   And is that what Mr. Zimny does, he does

19   it by trainer?

20        A.   To the best of my knowledge, yes.  He

21   might have other ways, but that's what I've seen.

1      Q.   So he prints out the number of starts per

2  trainer.  Is there a minimum number of starts that a

3  trainer is required to have in order to receive a

4  stall?

5      A.   We have HBPA guidelines.  That's one

6  criteria that I'm aware of.  It's not my criteria.

7  It's not what I would go by.

8      Q.   In 2008, what was the guideline?

9      A.   There are many guidelines.  And I'm not

10  sure if that's what they are exactly.  In my mind as

11  a race secretary from my past experience, I can tell

12  you what my guidelines are.  But I don't know what

13  all their guidelines are.

14      Q.   I appreciate that.  And I know you're very

15  knowledgeable with your career in this industry.

16  But really what I'm looking for is Charles Town?

17      A.   Yeah.  I don't know what all the

18  guidelines are.  I know what some of them are that

19  we look at.  And I provide input.  I'm not

20  necessarily listened to, but I do provide input.

21      Q.   So it's your testimony that in 2008, you

1    personally did not know all the guidelines used to

2    allocate stalls?

3        A.   Not all of them, no.

4        Q.   And the ones that you did know were, the

5    number of starts per trainer?

6        A.   Yeah.  That would be one of them.

7        Q.   What other information did you have of the

8    guidelines?

9        A.   Other guidelines that I gave input on are

10   the quality of their starts, meaning the type of

11   horse; what class level; and where they finish and

12   how often for each individual horse that I'll give

13   input on; and other factors such as the number of

14   times that particular trainer might run out of town

15   and ship to another race track when we have our

16   races here -- as far as teamwork ethics, in my

17   opinion I'll just -- that's my thing.  That, you

18   know, what horsemen help us with the racing and also

19   filling entries; how many times they scratch their

20   horses once they have them entered; how well they

21   take care of their horses.  The list could go on and

1   on.  Those are my guidelines.  But I'm not sure.

2   That's what I give input on.  I'm not sure exactly

3   that they're listened to or what preference level

4   they would have.

5       Q.   Okay.  I'm still trying to understand this

6   process.  So someone other than you calls the

7   meeting?

8       A.   Uh-huh.

9       Q.   And do all six of you attend the meeting?

10      A.   Yes.

11      Q.   And is the meeting conducted by a vote or

12  by agreement in terms of who gets how many stalls?

13      A.   Basically, it's input by people that have

14  items, data about the horses or horsemen.  I will

15  give my input.  And I, if you will, kind of play the

16  non-devil's advocate.  I tend to be the horsemen's

17  voice.

18      Q.   So you advocate?

19      A.   I advocate.

20      Q.   And do you provide to the group a total

21  breakdown of how many stalls you think each trainer

1  should get?

2      A.   No.  Basically, that decision is out of my

3  hands.  All I do is give input as to what I think

4  the person has done for us or hurt us.

5      Q.   Okay.  And who decides how many stalls

6  each trainer receives?

7      A.   That's a good question.  Honestly, I don't

8  know.

9      Q.   Okay.  So it's not done at the meeting?

10     A.   Some of them are.  Amongst us we'll agree.

11  Some of them are -- it's no set in stone process.

12     Q.   But it is your testimony that in 2008, you

13  did not participate in the decisions as to each

14  horsemen or as to many stalls they would receive?

15     A.   I participated by providing input, but as

16  far as the final number derived or deducted that

17  each one had, all I basically did was write it down.

18     Q.   So someone dictated to you what that

19  number would be?

20     A.   Yeah, mainly my boss or superiors when we

21  all we're sitting there after giving our input.

1   Then they dictated between Eric, Al, and Dicky.

2       Q.   Okay.  You confused me a little bit when

3   you say your bosses/superiors do it.  Do you mean

4   that Mr. Zimny's bosses, Mr. Moore, and Mr. Briton,

5   dictate the number of stalls that you receive by

6   each horsemen?

7       A.   My experience has been that that's been

8   true.

9       Q.   Okay.  So was that true in 2008?

10      A.   To the best of my recollection at that

11  time.

12      Q.   In 2009 was that true?

13      A.   To the best of my recollection, yeah.  I

14  didn't dictate, that's for sure.

15      Q.   Okay.  It wasn't Mr. Elliot or Mr. Taylor

16  that dictated?

17      A.   No.

18      Q.   It wasn't done by vote around the table?

19      A.   No.

20      Q.   So someone presented a sheet and said this

21  is how many they get?

1         A.    No, We went down one-by-one.

2         Q.    And was everybody done at that meeting or

3    a decision had been made as to some people before

4    the meeting?

5         A.    That I couldn't answer you because I don't

6    know.

7         Q.    But do you know whether or not you decided

8    on each person at that meeting?

9         A.    I can't remember.  The only thing I can

10   tell you is everyone that had stalls on the grounds,

11   it seemed like from the best of my remembrance, that

12   we came up with a number at that meeting.

13        Q.    How about people whose stalls were taken

14   away from them in entirety?  Was that decided at

15   that meeting as well?

16        A.    Not as far as I can remember.

17        Q.    Did you participate in a meeting to remove

18   stalls from, for example, Ms. Mawing?

19        A.    I can't remember.  To be honest with you,

20   I remember looking at her stall application with the

21   other ones that were in what I considered my new

```
 1   pile.  And I do not remember any -- I did not give

 2   any input one way or another.  And I don't remember

 3   any conversation.

 4        Q.   How come you didn't give any input as to

 5   Ms. Mawing?

 6        A.   How come I didn't?  That's a good

 7   question.  I can't remember at that time.  I was

 8   pretty new then.

 9        Q.   Well, if you had felt that the quality of

10   her horses did not meet Charles Town standards,

11   would you have provided that input?

12        A.   I would try to advocate for her, yes.

13        Q.   I'm asking it the other way.  If you felt

14   that her horses were not of sufficient quality,

15   would you have spoken and said, I don't think her

16   horses are of sufficient quality.  We should reduce

17   or eliminate her stalls?

18        A.   Yes.  I've done that before for trainers

19   if I've seen that.  But not for her.  But I have for

20   certain new applicants, I did that, yes.

21        Q.   So is it true then that in 2008, you were
```

```
 1   of the opinion that her horses were of a quality

 2   that she should have stalls at Charles Town Races?

 3        A.   The quality part of the formula, if you

 4   will, I would agree with for the most part.

 5        Q.   So you would agree that in terms of the

 6   type, the level, the finish, the number of -- all

 7   the criteria you went through earlier, she met those

 8   objective criteria in 2008?

 9        A.   I don't know.  I really, honestly, do not

10   know.  I'd have to look at everything back again and

11   look at it myself.  And it would be just my opinion.

12        Q.   Okay.  Well, I'm asking your opinion.  But

13   you do know that in 2008, you did not speak against

14   her?

15        A.   Correct.

16        Q.   And so that would indicate to you that you

17   were satisfied in 2008 that her quality, her horses'

18   quality, met Charles Town standards to receive

19   stalls?

20        A.   As far as I remember -- you know, I don't

21   even remember discussing her stalls, actually.
```

```
 1   Honestly, I remember looking at her stall

 2   application.

 3        Q.   Uh-huh.

 4        A.   Honest to God, I remember looking at the

 5   stall application at that meeting.  I jogged my

 6   memory and cannot remember even discussing anything

 7   about her.

 8        Q.   But you would remember if you'd said

 9   something negative about her?

10        A.   Oh, exactly.  Yeah, I would.

11        Q.   And you didn't do that?

12        A.   I would not have done that, no.

13        Q.   Did Mr. Elliot have any negative comments

14   about Ms.  Mawing?

15        A.   Not that I remember, no.

16        Q.   Did Mr. Taylor have any negative comments

17   about Ms. Mawing?

18        A.   No, he wouldn't of anyone.

19        Q.   How about Mr. Zimny, did he have any

20   negative comments about Ms. Mawing?

21        A.   Not that I recall.
```

1      Q.   Mr. Moore, did he have any comments?

2      A.   Not that I recall.

3      Q.   Did Mr. Briton have any negative comments?

4      A.   Not that I recall.

5      Q.   So to the best of your recollection in

6  2008, there were no negative comments about Ms.

7  Mawing's application for stalls?

8      A.   I don't remember any.

9      Q.   Now, as part of your review in this

10  process, do you also look at the person's history in

11  terms of number of stalls they received in prior

12  years?

13      A.   Yeah.  That's part of the formula, I'm

14  sure.  I would hope.

15      Q.   And in your observation of Ms. Mawing's

16  application, did you observe that the number of

17  stalls she had, had increased over prior years?

18      A.   I can't remember that.

19      Q.   Who actually makes the decision as to

20  who's deserving of stalls and who's not?

21      A.   I know it's not me.  I know it's not Mike

1   Kelly, Jim Taylor or myself.

2        Q.   Okay.

3        A.   But I will provide input if there's a new

4   applicant and their stock is not of sufficient

5   quality, then I will give that input.

6        Q.   Yeah.  I understand your providing input.

7   But I'm looking for the decision maker.  Who is the

8   decision maker?

9        A.   Good question.  I don't know.

10        Q.   Okay.  And you didn't know in 2008?

11        A.   No. I was pretty new then.

12        Q.   And did you know in 2009?

13        A.   No.

14        Q.   And at this point, do you know?

15        A.   I could have suspicions.  It would be

16   speculation.

17        Q.   But you don't know for a fact?

18        A.   I don't know for a fact.

19        Q.   Is the only way to receive stalls through

20   the application process?  And I'm referring

21   specifically to the application that's marked as

```
 1   Exhibit No. 1?

 2        A.   As far as I know.

 3        Q.   Are any stalls allocated to anyone else

 4   who hasn't completed the stall application?

 5        A.   Not to my knowledge.

 6        Q.   Now, are there changes in stall

 7   allocations outside of stall allocation meetings?

 8        A.   Yes.  Yeah, there has been.

 9        Q.   And who makes those stall allocations?

10        A.   It comes from above me.  Good question.

11   I'll get a letter from Eric.  And it's a form letter

12   which has my signature on it informing them.  And we

13   give them so many days that we're going to reduce

14   their number to be that amount.

15        Q.   Let me show you an example.  And ask you

16   if this is one?

17        A.   Yes.

18        Q.   Lest have this marked as Exhibit No. 2?

19                  (Whereupon, Deposition Exhibit

20                   No. 2 was marked for

21                   identification)
```

1      Q.   I'm handing you what's marked as Exhibit

2  No. 2.  Can you identify that document?

3      A.   Yes.

4      Q.   And is this the type of form letter you

5  just testified to?

6      A.   Yes.

7      Q.   And so it's your testimony that in this

8  specific instance, you did not actually prepare this

9  letter?

10     A.   Correct.  I did not prepare it.

11     Q.   All right.  What you did do was, you

12  signed it?

13     A.   Yes.

14     Q.   And you signed it in your official

15  capacity as racing secretary?

16     A.   Correct, that's correct.

17     Q.   Now, referring specifically to Exhibit No.

18  2, do you know why CRTS was unable to allocate any

19  stalls to Ms. Mawing for the remainder of 2008?

20     A.   Honestly, I don't.

21     Q.   Did you ask at the time?

```
 1        A.    No.

 2        Q.    Was there a reason why not?

 3        A.    Not specifically.  It was handed to me by

 4   Eric.

 5        Q.    Did you understand that not having stalls

 6   affects the livelihood of a trainer?

 7            MR. PETERSON:  Objection to the form of

 8        the question.  You can go ahead and answer.

 9        A.    Personally, I don't know agree with that

10   because we have a majority of horsemen that win

11   there and finish in the money, to my knowledge,

12   they've won from shipping off the grounds.  Many

13   nights we'll have six or eight trainers that ship in

14   and win races out of the nine races.

15        Q.    That's your personal opinion though, isn't

16   it?

17        A.    Statistically, I would say -- from my

18   observation, is the majority of horsemen that win on

19   a lot of nights, maybe not the majority of nights,

20   but ship in and win.  They ship in from out of the

21   grounds.  I don't know what the breakdown is,
```

1    actually.

2        Q.    You realize that your employers are

3    signatory to the agreement with the HBPA?

4        A.    Yes.

5        Q.    And you understand that your employer has

6    agreed that quote:  "it is recognized by both

7    parties that effective stall utilization is

8    important to Charles Town races management.  And

9    that equitable allocation is essential to the

10   livelihood of horsemen"?

11       A.    If that's what it says.

12       Q.    Do you want to see that?

13       A.    Yes.

14       Q.    Are you satisfied that I've read that

15   accurately to you?

16       A.    Yes.

17       Q.    And so you agree that it is your

18   employer's position that equitable allocation is

19   essential to the livelihood of horsemen?

20            MR. PETERSON:  Object to the form of the

21       question.  It calls for speculation.  And I'm

1          not sure what you mean by the employer's

2          position.  I mean you read it, what's in the

3          agreement.  It says what it says.  But he's not

4          speaking on behalf of the company.  He's just

5          here as an evidentiary --

6          Q.   (By Mr. Hammer)  I understand that you're

7    not designated by the company.  But you do

8    understand that it is your employer's position, as

9    evidenced by this contract it signed with HBPA, that

10   the equitable allocation of stalls is essential to

11   the livelihood of the horsemen?

12          MR. PETERSON:  Object, it calls for

13          speculation.  You can answer if you want.

14   A.   I don't know how to answer that, honestly.

15   Because I kind of disagree with the wording,

16   personally.  Does that make sense?  I just don't

17   understand --

18   Q.   But you do understand that's the

19   contractual agreement?

20   A.   That's a contractual agreement, yes.

21   Q.   And knowing that that was the position of

```
 1    the parties who contracted to this agreement, did

 2    you make any effort on behalf of Tina Mawing to find

 3    out why it was that all her stalls were taken from

 4    here?

 5         A.   I did not personally make any effort, no.

 6         Q.   Did Mr. Zimny discuss with you why it was

 7    that all the stalls were taken from Ms. Mawing?

 8         A.   Just gave me the letter.  And I know it

 9    came from probably, as far as you know, it came from

10    above me.  I mean there's no -- as far as I know it

11    came from above me.  That's all I know.

12         Q.   Do you know whether or not it came from

13    above Mr. Zimny or whether it was his decision?

14         A.   That would be speculation.

15         Q.   Did you ask him at the time:  is this your

16    decision?

17         A.   No, I did not.

18         Q.   Did he explain himself at all to you?

19         A.   No.

20         Q.   How was this letter delivered to Ms.

21    Mawing?
```

```
 1        A.   I want to assume that it was handed in an

 2   envelope to her by one of two people.  It could have

 3   been Jim Taylor, but probably it was Michael Elliot

 4   or Danny Frye or between the two or those two

 5   together.

 6        Q.   Did anyone come back to you and indicate

 7   whether Ms. Mawing had any questions or concerns

 8   about content of Exhibit No.  2?

 9        A.   Not that I remember.

10        Q.   To this day, have you gained any

11   understanding as to why all of Ms. Mawing's stalls

12   were taken from her in August of 2008?

13        A.   No, and I was pretty new at the time.  And

14   I understand half of them were or a certain

15   percentage were taken away before I got there.

16        Q.   Yeah.  But I'm really asking from then

17   until now, have you come to any understanding as to

18   why her stalls were taken from her?

19        A.   I'm not really understanding completely,

20   no.

21        Q.   You have spoken to someone about why her
```

```
 1  stalls were taken away then?

 2      A.   Not really, no.  No, I can't remember any

 3  specific conversations, no.

 4      Q.   No one has taken the time to explain to

 5  you at this point, why all her stalls were taken

 6  away?

 7      A.   No.

 8      Q.   Are you aware of whether Ms. Mawing sought

 9  to get a stall allocation in any subsequent racing

10  dates after all her stalls were taken away from her?

11      A.   I'm sorry, would you mind repeating that.

12      Q.   Sure.  Do you know whether Ms. Mawing

13  sought to get more stalls allocated to her after all

14  her stalls were taken away?

15      A.   By more stalls, you mean just to get back

16  on the grounds?

17      Q.   Any stalls.

18      A.   Yeah, I saw letters, I believe to the best

19  of my recollection, saw an application for

20  re-admittance each time that they were due again.

21      Q.   Okay.  And do you know what action, if
```

```
 1   any, was taken on her request?

 2        A.   No, I don't.

 3        Q.   Well, you are aware that she was not given

 4   stalls back?

 5        A.   Correct.

 6        Q.   And do you know why she wasn't given any

 7   stalls?

 8        A.   No.

 9        Q.   Did you seek to find out why she wasn't

10   given any stalls?

11        A.   No, I didn't.

12        Q.   Has anyone explained to you why Ms. Mawing

13   was not allocated any stalls in the 2009 or 2010?

14        A.   No, no one has.

15        Q.   Have you asked?

16        A.   No.

17        Q.   Were her stall applications considered at

18   the stall allocation committee meetings that

19   occurred after all her stall applications --

20        A.   Yep, I had each one in my hand at the

21   stall application committee meeting.
```

1       Q.   And did you advocate for or against her?

2       A.   Really, neither.

3       Q.   Did you stay silent on her application?

4       A.   Yes, on basically all of them except for a

5  couple people that a horsemen that had inferior

6  stock.  And I gave that input.

7       Q.   So basically you stay silent as to all of

8  the applications except for a couple that you felt

9  were inferior?

10      A.   Inferior stock, as far as I can remember,

11  yes.

12      Q.   Did Mr. Elliot advocate on behalf of Ms.

13  Mawing to get stalls?

14      A.   Not that I recall.

15      Q.   Did Mr. Taylor?

16      A.   Not that I recall.

17      Q.   Did Mr. Zimny?

18      A.   If he did, I can't remember it.

19      Q.   How about Mr. Moore?

20      A.   I can't honestly remember.

21      Q.   Mr. Briton?

1      A.   I don't remember.

2      Q.   Was there any discussion at all as to

3   whether or not she would be given stalls or not?

4      A.   Just hearsay.  You know, that I'd hear

5   horsemen.  That's only saying that I heard.

6      Q.   Okay.  How about at the stall allocation

7   committee?

8      A.   No.

9      Q.   So essentially she was passed over?

10     A.   Her and a lot of other ones, you know, not

11  a lot.  But there were probably a good 30 or 40 each

12  time that get passed over, especially this last

13  current meeting.  Because we just had one barn down.

14  And actually, a lot of stalls of people that we have

15  not found space for.

16     Q.   Now, is it true that there are some people

17  that have 20, 30, 40, stalls?

18     A.   Yes.  There's some that have in the

19  neighborhood of 20.  There's some that have in the

20  neighborhood of 30 or 40, just a few.  There's one

21  person, I believe, has close to 50, 46, 47,

1   somewhere around there.

2       Q.   How is the quality of Ms. Mawing's horses

3   compared to the quality of horses in general of

4   people who receive stall allocations in 2008?

5       A.   To the best of my knowledge, they're not

6   inferior or -- for the most part the average quality

7   isn't any worse than most trainers back there.

8       Q.   Is this true in 2009 as well?

9       A.   As far as I remember.

10      Q.   How about in 2010 the extent?

11      A.   As far as I remember, she's probably as

12  good or better.

13      Q.   How many people are you able to identify

14  who have lost all of their stalls?

15      A.   To my recollection let's see:  A guy name

16  Robert Birr, Jim Williams.  There's another one.

17  John Carlisle.  And I want to say there's somebody

18  else.  I can't think of the top of my head.

19      Q.   Tina?

20      A.   Tina.  I thought you said other than.

21      Q.   If I did, I'm sorry?

```
 1        A.    Yeah.

 2        Q.    How about George Yetsook?

 3        A.    Yeah.  He was given letters saying to

 4   vacate.  But he has stalls on the grounds.

 5        Q.    And that's as a result of a court

 6   injunction?

 7        A.    Yes.

 8        Q.    Okay.  But as far as Charles Town Races is

 9   concerned, all his stalls were taken away?

10        A.    Yes.  He's still got horses there on the

11   grounds.

12        Q.    Anyone else that you can think of?

13        A.    There's somebody else.  I'm trying to jog

14   my memory, but I can't remember.  I'm thinking there

15   might be one other person.  Charlie Hostler, that's

16   it.

17        Q.    Now, Charlie Hostler I understand, had an

18   issue with mistreatment of animals.  That's why he

19   lost his stalls?

20        A.    Yes.  Actually, all those individuals,

21   yes.
```

```
 1        Q.    So Robert Birr mistreated animals?

 2        A.    Poor upkeep from what I can recollect.

 3        Q.    Jim Williams?

 4        A.    Yes.  It was related to that or upkeep of

 5   his maintenance of his stock or shed row.  The same

 6   with Mr. Birr.  And Birr is spelled B-i-r-r.

 7        Q.    Thank you.  Mr. Carlisle?

 8        A.    That was separate issues.  There were a

 9   few issues with him.  It didn't have to do with

10   upkeep of animals that I'm aware of.  Although, that

11   could have been a factor.

12        Q.    What were the issues with Mr. Carlisle?

13        A.    Having unoccupied stalls most of the time.

14   And perhaps using those stalls as an aid to other

15   trainers, from the best of my knowledge, from what I

16   recall.  And his having a hostile attitude towards

17   the people in the office.

18        Q.    How about Mr. Yetsook?

19        A.    That's a good question because I don't

20   remember.  And I don't know.

21        Q.    You simply don't know the reason?
```

```
 1        A.   No.

 2        Q.   And Mr. Hostler I think we discussed

 3   already?

 4        A.   Upkeep, yes, poor upkeep of the horses

 5   there.

 6        Q.   Okay.  And Tina Mawing we've already

 7   talked about?

 8        A.   Yes.

 9        Q.   You just simply don't know for a fact?

10        A.   I don't know.  I know what I was told why

11   she lost three or four stalls, it might have been

12   five stalls.  I don't know the specific number.

13   Prior to my getting there was for having horses in

14   other people's stalls.  Which we also sent letters

15   to everyone that I have knowledge of that occupied

16   other horsemen's stalls without our prior

17   permission.

18        Q.   Now, that occurred before you were there?

19        A.   Correct.  Other people it's happened,

20   since I've been there.

21        Q.   Now, did you have any discussion with
```

1    either Mr. Yetsook or Ms. Mawing or anyone else

2    about Ms. Mawing having permission to have her

3    horses in other stalls?

4        A.   Not that I recall.  But if anyone calls me

5    and asks permission to me and there's legislate

6    reason, I usually grant it to my superiors.

7        Q.   So really the issue is just keeping track

8    of what horses are in what stalls, in your mind?

9        A.   I don't know.  It seems like I'm being led

10   with that.  I'm sorry.  I'm not following the

11   question.

12       Q.   Well, I guess my question is:  you sound

13   like you have a liberal permission policy.  That if

14   they call you, you typically give permission?

15       A.   If they call me and ask for permission to

16   put a horse in another person's stall for temporary

17   basis for whatever reason that makes logical sense

18   for operation, like they need to get the horse in

19   there ahead of their racing so it doesn't go crazy

20   in the van or they are sorting one out, and I tell

21   them -- they would show me their past performance on

1  a horse they want to bring and they don't have a

2  stall for it or it's for a legitimate business

3  reason, I'll tell my bosses that I think we should

4  do it.  And then I'll grant them.  And if they give

5  approval, Eric gives me approval in this case, then

6  I will call up the trainer or they'll call me back,

7  and I'll say permission granted for a short time

8  period.  But it doesn't mean that we're allotting

9  them more stalls.

10      Q.   So you don't actually give the approval or

11  make the decision?

12      A.   Correct.

13      Q.   It's actually Mr. Zimny who makes the

14  decision?

15      A.   In these cases, yes.

16      Q.   Okay.

17      A.   If it's a temporary stall usage.

18      Q.   Now, did anyone at all tell you that Ms.

19  Mawing had permission to use other stalls at the

20  time that she was accused of --

21      A.   Not that I recall.

```
 1              MR. HAMMER:  Can I have this document

 2       marked as Exhibit No. 3.

 3                         (Whereupon, Deposition Exhibit

 4                         No. 3 was marked for

 5                         identification)

 6       Q.   (By Mr. Hammer)  I'm handing you what's

 7  been marked as Exhibit No. 3, which is a decision of

 8  the West Virginia Racing Commission.  When is the

 9  first time you've seen this document?

10       A.   Actually, I don't recall ever seeing

11  before now.

12       Q.   Has anyone ever discussed with you the

13  decision in this case as it relates to Mr.

14  Funkhauser's occupational permit?

15       A.   Never really had any conversation with

16  anybody about that matter.

17       Q.   Okay.  So you didn't -- up until I just

18  handed you this document --

19       A.   No.

20       Q.   You didn't know anything about this issue?

21       A.   Just hearing horsemen talk across the
```

```
 1   counter, that's all.

 2       Q.   What type of talk have you heard?

 3       A.   Well, I'd guess I'd have to read this

 4   whole thing to actually -- you're asking me

 5   specifically what kind of talk I've heard.

 6       Q.   Yeah.

 7       A.   Just about his -- now if this is

 8   pertaining to, you know -- actually, the only talk

 9   I've heard is about suspensions or reverse of order

10   on his horses before.  But nothing actually related

11   to this, if this is what I'm thinking it is:  notice

12   of suspension.  I don't know anything about this.

13   This is the first knowledge of this that I've seen.

14       Q.   I don't think you were employed at Charles

15   Town Races at the time of this decision?

16       A.   No.

17       Q.   Do you know a person named Mary Moore?

18       A.   Yes.

19       Q.   Is she a trainer?

20       A.   I'm trying to remember what Moore is

21   which.  Because I know that Richard Moore/Dicky
```

```
 1    Moore's wife, which she goes by Renee Moore, is a

 2    trainer.  Perhaps Mary Moore had a trainer's license

 3    and maybe still does.  But I'm not knowledgeable of

 4    that fact.  If Mary Moore is her daughter.

 5         Q.   Do you recognize the name Mary Moore as

 6    Richard Moore's daughter?

 7         A.   Yes.

 8         Q.   Okay.  And does Mrs. Moore, Mary's Moore's

 9    mother --

10         A.   Which I know her by Renee.

11         Q.   Renee, does she stable horses at Charles

12    Town?

13         A.   I don't think so.  If she does, I don't

14    recollect seeing them on the stall list.

15         Q.   Do you know whether Mary Moore stables

16    horses at Charles Town?

17         A.   Not anymore that I'm aware of, that I have

18    knowledge of.

19         Q.   When was the last time she had horses?

20         A.   I couldn't tell you.

21         Q.   Was it during your employment?
```

MAXIM REPORTING, LLC
(304) 260-0670  / (301) 992-5264

1      A.   Not that I remember.  She may have had a

2  couple right when I first got there.  But I can't

3  remember.

4      Q.   Did you participate in the decision to

5  take her stalls away?

6      A.   No.

7      Q.   Were you aware that her stalls were taken

8  away?

9      A.   No. If there were, I do not remember,

10  that's for sure.

11      Q.   Did you or your agents, other racing

12  officials, allow Ms. Mawing to enter a horse named

13  Virginia Harbor three times, and then refuse the

14  entry?

15      A.   I remember the horse entering the few

16  times.  I can't tell you exactly how many.  We don't

17  have the legal right to refuse any entries.  And I'm

18  constantly reminded of that by our legal counsel and

19  Eric Zimny.  So that is a touchy subject here in my

20  mind.  And it's a safeguard to me that I just don't

21  refuse entries unless I'm given go ahead not to by

1    the Commissioner, by the stewards that represent the

2    commission, that we cannot exempt an entry on a

3    horse unless it's ineligible to run.

4        Q.   Do you have a recollection as to why

5    Virginia Harbor was not permitted to run?

6        A.   No, I don't.  There are certain

7    qualifications or disqualifications for horses not

8    being eligible to one.  Which would be the

9    conditions of race, maybe the horse is on a

10   veterinarian's list.  They're given so many days for

11   ones they scratch, they place them on the vet's

12   list/starter's list.  You cannot enter a horse that

13   can be ineligible to run.  They have a rule of

14   racing that states that any horse on a schooling

15   list or veterinarian's is not eligible to enter or

16   participate in racing until it gets off that list.

17       Q.   Right.  But to your knowledge, was

18   Virginia Harbor missing a veterinarian's certificate

19   or was on the veterinarian list?

20       A.   I don't remember anything about that horse

21   other than I thought it got in just the other day,

1    sometime or another just recently.

2        Q.   Would you agree that Ms. Mawing's conduct

3    has not in any way been detrimental to the horse

4    racing industry?

5        A.   That would be a personal opinion.  I don't

6    see anything detrimental.

7        Q.   Has Ms. Mawing ever attacked you

8    personally or the business operations?

9        A.   Not that I'm aware of.

10       Q.   What's a barn captain?

11       A.   Barn captains are -- that's a good

12   question.  I hope that I don't get fired or fined

13   for not knowing.  Because I've never seen one prior

14   to coming here.  It's a person that's supposed to

15   supervise the barn and make sure that, as far as I

16   know, one or two bar captains per barn are to

17   oversee that people are complying with various

18   health standards of upkeep and complying with our

19   policies on the backside.  That's to be best of my

20   knowledge.  And they inform horsemen of their barn.

21   They're kind of like an intermediary role is what I

```
 1   see them as to make sure that things are being

 2   complied with.  And that their constituents in the

 3   barn aren't getting themselves in trouble.

 4        Q.   Is it a position of responsibility?

 5        A.   It is a position of responsibility.

 6        Q.   Who picks the person to be barn captain?

 7        A.   I don't know specifically.  I know that

 8   I've recommended that and told a person that I

 9   didn't want them as barn captain.  And I can't

10   remember who that was.  But I did pick one myself

11   one time, Freddy Johnson, in one barn.  I told him

12   I'd like him to be barn captain so the other guy

13   gave it up.  And I told him I'd like him to be barn

14   captain.  That's the only time I've been involved.

15        Q.   Are you aware that Tina Mawing was a barn

16   captain?

17        A.   No, I was not.

18        Q.   So I take then that you were not the one

19   who removed her as the barn 14 barn captain?

20        A.   No.

21        Q.   Do you know who did?
```

1        A.    No.

2        Q.    Do you know whether she was removed while

3   she still had stalls on the grounds?

4        A.    I don't know.

5        Q.    And you only know of one barn captain

6   that's been removed?

7        A.    That I had anything to do with, yes.

8        Q.    Do you know if anyone else has been

9   removed where you didn't have something to do with

10  it?

11       A.    For some reason or another, I want to say

12  that there's one other since I've been there, and I

13  can't remember who that was.

14       Q.    Is any input sought from stewards as to

15  the stall allocations?

16       A.    No, never.  I've never seen that happen in

17  a jurisdiction where I've worked.

18       Q.    But you don't know what it is that your

19  supervisors do when making selections for stall

20  allocations; is that correct?

21       A.    Not all the criteria, no.

1      Q.   So you don't know whether or not any of

2  your supervisors consult with the stewards?

3      A.   That would be speculation on my part.

4      Q.   Do you believe that there should be good

5  cause or just cause to take stalls from a trainer?

6      A.   I'm surmising something if I said yes or

7  no for that.

8      Q.   Do you think it should be just done on a

9  whim, in other words without cause or reason?

10      A.   No, I don't think so.  That should be a

11  reason.

12      Q.   You think that it's fair there should be a

13  reason?

14      A.   I think that's fair, if you want use to

15  word fair for that, yes.

16      Q.   And to your knowledge is there any process

17  by which a trainer or horsemen can appeal the stall

18  allocations?

19      A.   I'm not aware of any process.

20      Q.   Do you know whether Mr. Schneider has been

21  investigated for neglect and cruelty?

1       A.   This is information from -- Mike Kelly is

2   where I got it.  Is that he was neglecting and one

3   or two times neglected some of his horses as far as

4   feed and maintaining the stalls properly.  That's

5   one time at least, if not a couple times.

6       Q.   What time periods are we talking about?

7       A.   It's been within the last -- I want to say

8   it was sometime during this current winter, past

9   winter.

10      Q.   The winter of 2009/2010?

11      A.   Yes, unless it was in the fall.  It seems

12  like it's fresh in my mind.  It's definitely since

13  fall.

14      Q.   Was there an investigation?

15      A.   If there was, I'm not aware to what extent

16  that was.  I'm sure the stewards were made aware of

17  it.  And whenever I get any word on that, then the

18  stewards are notified.  And they usually bring that

19  person in.

20      Q.   Was Mr. Elliot the one who observed the

21  neglect of animals?

1      A.   I'm not sure what you mean by observed.

2   But he did report to me and the stewards and my

3   superiors about his improper care of his horses and

4   stalls.

5      Q.   And what action, if any, was taken to

6   remedy the situation?

7      A.   Well, the first thing that I recommend is

8   that we make sure they get feed and straw regardless

9   of what other action, is taking care for the benefit

10  of the horses.

11     Q.   So you were concerned with the health of

12  the horses right away?

13     A.   Yes.  After that I don't know what

14  happened.

15     Q.   Do you know whether or not there was a

16  recommendation to take Mr. Schneider's stalls away

17  from him?

18     A.   I'm not aware of any recommendation one

19  way or another.

20     Q.   Would you be advocating that his stalls be

21  taken away for the abuse of the animals?

1       A.   That would be speculation.  I'd have to

2   say I'd have to look at all of the evidence myself.

3   And I'm not really in that position here.

4       Q.   But am I correct that abuse and neglect of

5   animals is grounds to have your stalls removed?

6       A.   Yeah.  I detest it.

7       Q.   Let me ask a few more questions of you?

8       A.   Sure.

9       Q.   Do you agree that horse racing in West

10  Virginia is the subject of extensive state

11  regulation?

12      A.   Is the subject of -- I'm not sure I know

13  what your meaning is.

14      Q.   It's extensively regulated by the state?

15      A.   Yes.

16      Q.   Do you agree that race tracks in West

17  Virginia are privately owned, but the racing itself

18  and many aspects of track management are governed by

19  detailed regulations issued by the State Racing

20  Commission?

21      A.   Yes.

1    Q.   And do you agree that the racing

2  commission maintains a continuous presence at each

3  track through racing stewards, officials, who

4  oversee in the administration and enforcement of

5  commission rules and policies?

6    A.   Yes.

7    Q.   And do you agree that one steward is paid

8  by the management of each track?

9    A.   Not 100 percent on that.  But I do know

10  that one is here.  I thought it differed at both

11  tracks.  There are rules that I'm not sure of.  Even

12  though it's the same state, that are different at

13  the two tracks.

14    Q.   So that's part of the expensive rules of

15  West Virginia?

16    A.   Yes.

17    Q.   So it would be governed by those rules?

18    A.   Yes.

19    Q.   And would you agree that all the stewards

20  are an arm of the racing commission and are

21  answerable directly to the commission?

```
 1        A.   Yes.

 2        Q.   All right.  And do you agree that stewards

 3   may override management of the track in matters

 4   pertaining to racing?

 5             MR. PETERSON:  I'm going to object to the

 6        form.  It's vague.  You can answer if you

 7        understand it.

 8        A.   I'm not sure I do.

 9        Q.   (By Mr. Hammer)  What don't you

10   understand?

11        A.   Can you rephrase it or repeat it.

12        Q.   Sure.  Do you agree when it comes to

13   matters pertaining to racing, stewards have final

14   authority over the race track management?

15        A.   I don't know what matters pertain to

16   racing that we're discussing.

17        Q.   Anything and everything.

18        A.   I'm not sure.

19             MR. PETERSON:  I'm going to object to the

20        form.

21        A.   I'm not sure if they would.
```

1      Q.    (By Mr. Hammer)   Are there some areas of

2    racing that stewards do not have jurisdiction over?

3      A.    I would hope that they wouldn't.

4      Q.    Which areas?

5      A.    Sometimes with the -- for one thing the

6    way the condition book is written or because

7    sometimes stewards oftentimes don't have any

8    experience, prior experience, in a racing office; or

9    might not have been an actual horsemen, other than a

10   jockey.  And perhaps some rules of relevant

11   stabling.

12     Q.    Would you agree that the stewards have

13   jurisdiction over the health and safety of animals

14   and humans in the barn area?

15     A.    They should always have a say and input.

16     Q.    Do you agree that no trainer can enter a

17   horse for racing unless the horse is stabled on the

18   grounds of the association conducting the race or

19   other stabling facilities?

20     A.    Doesn't it say -- isn't the wording other

21   proofs stabling.

1        Q.   You know, I think it probably does.  Let

2   me pull that.  I'm going to hand what I think is the

3   correct code section:  39.3.

4        A.   Uh-huh.  Yes, I'm aware of that rule.

5        Q.   So you would agree that Rule 39.3 is a

6   rule of the State of West Virginia?

7        A.   Yes.

8        Q.   And what is an approved stabling facility?

9        A.   That's a good question.  I don't know.

10        Q.   Do you apply any criteria to determine

11   whether or not --

12        A.   I don't personally.

13        Q.   Do you know who does?

14        A.   No.

15        Q.   At the stall allocation committee

16   meetings, are there any notes kept?

17        A.   Not that I'm aware of.

18        Q.   Are there any records kept of the

19   decisions?

20        A.   Not on any form that I'm aware of.

21        Q.   Just someone jots down how many stalls

1    each person is going to have?

2         A.   Yeah.  And then with these letters.

3         Q.   Is the decision of the stall allocation

4    committee reviewed by anyone else?

5         A.   Now, to go back to the last question.

6    Mike Kelly does input that data for the number of

7    stalls allocated per person and the location in the

8    computer system.

9         Q.   That's after the meeting?

10        A.   Yes.

11        Q.   And done from notes at the meeting?

12        A.   Right.  And what was the last question,

13   I'm sorry.

14        Q.   Is the decision as to the allocation of

15   stalls reviewed by anyone else?

16        A.   Not that I'm aware of.

17        Q.   Do you know whether it's approved by

18   anyone else?

19        A.   Not that I'm aware of.

20        Q.   Are you able to tell me what factors were

21   actually considered in the decision at to whether to

```
 1    allocate and how many to allocate, how many stalls

 2    to allocate to Tina Mawing?

 3         A.   No, I don't remember what all that

 4    criteria were.

 5         Q.   Did you know that Ms. Mawing testified on

 6    behalf of Raymond Funkhauser at his occupation

 7    permit revocation hearing?

 8         A.   Just from what I was told by horsemen.

 9         Q.   Just from what you were told my horsemen?

10         A.   Yes.

11         Q.   Okay.  In the people you listed who lost

12    all their stalls, you didn't mention a woman named

13    Patty Burns?

14         A.   Oh, yeah.

15         Q.   Is she another person who lost all her

16    stalls?

17         A.   Yes, prior to my coming here to work in

18    the second tenure.

19         Q.   Do you know the reason why she lost her

20    stalls?

21         A.   Just recently.  Actually, I just hearsay.
```

```
 1    I just that she had had some type of hostile threats

 2    to someone.  And that was just rumor.  That's all I

 3    know.

 4         Q.   Who told you that?

 5         A.   Good question.  Probably another horsemen.

 6         Q.   Do you remember who?

 7         A.   No, uh-huh.

 8         Q.   Did that person say what the threats were?

 9         A.   Uh-huh, no.

10         Q.   Was it male or female horsemen?

11         A.   I can't remember.  It was a few months

12    ago.

13         Q.   Are you familiar with a rat problem in the

14    barn area?

15         A.   I've seen them out there when I've been in

16    the barns.

17         Q.   How big are they?

18         A.   There's some pretty big ones.

19         Q.   What's done to try and control the rats?

20         A.   Right now, I don't know.  I do know that

21    we had a contract with Erlik.  And that's the only
```

1    contract that I'm aware of.  As far as I know, it

2    was Erlik that put poisoning around for the rats.

3         Q.   Do you still have a contract with Erlik?

4         A.   As far as I know, we do.

5         Q.   Do you know what kind of poison Erlik put

6    out?

7         A.   No, the person who would handle this

8    contract, to the best of my knowledge, would be Doug

9    Bowling with track maintenance.  Because he oversees

10   that type of thing, overseeing the barn area and

11   maintenance.

12        Q.   Are there any health or safety concerns

13   for the people or animals with regard to the use of

14   rat poisoning?

15        A.   I've never heard of any.

16        Q.   Have you ever read any material safety

17   data handling sheets for rat poisoning?

18        A.   No, I have not.

19        Q.   Have you instructed any one of your racing

20   officials to do so?

21        A.   No, we don't have any input or control

1   over that.

2       Q.   Have you taken any steps or action to

3   inform yourself as to any possible safety hazards

4   with regard to the use of rat poisoning?

5       A.   No, I haven't.

6       Q.   And have you directed anyone else to do

7   so?

8       A.   No.

9       Q.   What's done with the rat once it dies?

10      A.   I don't know.  As far as I know, they

11  dispose of them over at -- I don't know.  I'm

12  speculating.  I'd be guessing.

13      Q.   Is it someone's job to collect the dead

14  rats?

15      A.   I would hope it's the barn maintenance

16  people.  I would doubt that security does, but then

17  that's speculation.

18      Q.   So you're speculating it might be barn

19  maintenance?

20      A.   Yeah.

21      Q.   Are you aware of any steps or action being

1    taken to control the spread of disease from the dead

2    rats?

3         A.   I'm not aware of any policies or

4    practices.

5         Q.   Are you aware of, in what form the rat

6    poisons is put out?

7         A.   No.

8         Q.   Have you ever observed the rat poison

9    being put out?

10        A.   No, that's all done by whoever applies it.

11        Q.   Did you or did anyone to your knowledge

12   provide any guidance to Erlik as to any safety

13   concerns or issues with regard to the use of rat

14   poisoning?

15        A.   Not that I'm aware of.  They could have,

16   but I'm not aware to what extent.

17        Q.   Have you ever seen the rat poison in

18   powdered form spread around the barns?

19        A.   No.

20        Q.   Have you ever heard of any complaints

21   regarding the use of powdered rat poisoning?

1      A.    No one has complained to me.

2      Q.    Have you heard of anyone making

3  complaints?

4      A.    No, not here.

5      Q.    Are you aware that Tina Mawing made

6  complaints about the use of rat poisoning?

7      A.    I just heard about that recently.

8      Q.    How did you hear about?

9      A.    I'm trying to think.  I heard that from

10  another horsemen.  I just heard a group of them

11  talking about it, that she presented some

12  information down at the state about complaining

13  about the rat poisoning.

14      Q.    Were you aware that she had both a horse

15  and a goat die?

16      A.    Yes.  She had called me about the horse.

17  And I found about the goat afterwards.

18      Q.    When did she call you about the horse?

19      A.    It was after it was dead.  I'm sorry, that

20  was stupid.  I can't remember exactly when that was.

21  And honestly, I mean, you know we have horse -- I

```
 1   didn't know of any others dying and didn't connect

 2   it with the goat.  And just saw the report on the

 3   horse being taken across the road at Shenandoah,

 4   just like other horses that are put down or die.

 5   It's a weekly occurrence.

 6        Q.   Well, did she say why she was calling you?

 7        A.   No. I can't even tell you if it

 8   specifically was for that matter.  I do remember a

 9   conversation where we did discuss it once and I

10   can't tell you when that was.  I thought it was -- I

11   can't tell you when it was.  And I don't know what

12   action was taken.  But I saw the report on the horse

13   as going out because I look at all the horse's

14   reports, and the horses leaving the grounds, that

15   die.  And that's it.

16        Q.   It's standard practice that you would be

17   aware of a horse dying and being taken off the

18   grounds?

19        A.   Right.

20        Q.   And that's for the purposes of the stall

21   allocation?
```

```
 1        A.   Well, yeah, for control.

 2        Q.   But this is a different situation that she

 3   was calling you about, wasn't it?

 4        A.   It might have been a totally different

 5   subject that she called about.  But I do remember

 6   her mentioning that to me.

 7        Q.   Okay.  She wasn't speaking about a routine

 8   death of a horse?

 9        A.   Well, I can't remember that.

10        Q.   You don't remember?

11        A.   No.

12        Q.   You don't remember anything about the

13   conversation?

14        A.   I remember that she just did mention to me

15   about a horse dying.

16        Q.   Did you keep any notes of the

17   conversation?

18        A.   No, I did not document anything.  I just

19   saw the documentation of the horse leaving the

20   grounds.

21        Q.   And was it after that point in time that
```

```
1   you learned about the goat dying as well?

2        A.   Yeah.  Just recently.  And I can't

3   remember who told me about that.  I didn't put the

4   two and two together, honestly.

5        Q.   Who told you about the goat dying

6   recently?

7        A.   I just heard some horsemen talking about

8   it.  I hear them talking across the counter all the

9   time.  A lot of things.

10       Q.   When you say recently, what are we talking

11  about?

12       A.   A few weeks ago.  I can't remember who it

13  was.

14       Q.   Do you remember what was said?

15       A.   Just that a goat had died, that one or her

16  goats died.  I can't remember if she told me that or

17  not, to be honest with you.

18       Q.   Are you aware of whether Charles Town

19  Races has any safety policies with regard to the use

20  of poisons in and around the barn area?

21       A.   I'm not aware of any.
```

1      Q.   Did Mr. Briton ever discuss with you

2   Tina's concerns about the poison which she stated to

3   the governor of West Virginia?

4      A.   No, not with me.

5      Q.   Do you know whether he did with anyone

6   else?

7      A.   No.

8      Q.   He just didn't do that around you?

9      A.   No, he did not around me.  I'm not aware

10   of it.

11      Q.   You're just not aware of it?

12      A.   Yeah.

13      Q.   Were you aware that Ms. Mawing contacted

14   the West Virginia Department of Agriculture to

15   investigate the possible improper application of

16   pesticides?

17      A.   No, I was not aware of that.

18      Q.   Were you aware of whether she complained

19   to any other track management about the hazardous

20   improper use of rat poisoning?

21      A.   No.

1        Q.    Were you aware that she complained to the

2    racing stewards about the hazardous and improper use

3    of rat poison?

4        A.    They never mentioned anything to me.

5        Q.    Did you personally tell anyone that Tina

6    Mawing would be losing all of her stalls in advance

7    of Ms. Mawing being informed that she was losing all

8    of her stalls?

9        A.    Not that I can recall.

10       Q.    Do you know a gentlemen named Phillip

11   Rideout?

12       A.    No, the name is familiar, but I don't know

13   who he is.  Maybe I'd recognize the face.

14       Q.    Let's take the few minutes.  I may finish

15   up here pretty soon.

16       A.    Okay.

17                    (Whereupon, a discussion was

18                     held off the record)

19       Q.   (By Mr. Hammer)  Other than Ms. Mawing's

20   goat dying, were you aware of any problems with

21   other goats dying as well?

```
1        A.    I was not.

2        Q.    Have you learned about that subsequently?

3        A.    No.

4        Q.    Okay.  So you have not knowledge?

5        A.    No.

6        Q.    Now, if a trainer wants to take his horse

7   off the grounds, does he have to provide any reason

8   as to why he's taking it off the grounds?

9        A.    If they want re-admittance to the grounds.

10       Q.    Okay.

11       A.    For racing return purposes only.

12       Q.    So if they want to go race at some other

13  racing track?

14       A.    Right.

15       Q.    They don't have to tell you why they're

16  leaving.  But to gain re-admittance, they have to

17  tell you why they left?

18       A.    Yeah.  They have to give what -- we give a

19  permission slip, race and return, and we advertise

20  that as subject to my approval, of the race

21  secretary's approval.
```

```
 1       Q.   But in terms of the horse leaving, all

 2   they have to do is --

 3       A.   Sign them out the gate.

 4       Q.   Sign them out the gate.  They don't have

 5   state any reason to security or anyone else?

 6       A.   No.

 7       Q.   Okay.  I think that's all the questions I

 8   have for you?

 9       A.   Okay.

10       Q.   Mr. Peterson may have some, I don't know.

11            MR. PETERSON:  I don't have any questions.

12                      (The deposition concluded at

13                      4:00p.m.)

14                          -  -  -

15

16

17

18

19

20

21
```

```
1              CERTIFICATION OF NOTARY

2         I, Robert L. Crespo, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me

7    stenographically and thereafter reduced to

8    typewriting by me; that said deposition is a true

9    record of the testimony given by said witness; that

10   I am neither counsel for, related to, or employed by

11   any of the parties to the action in which this

12   deposition is taken and further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties thereto, nor financially or

15   otherwise interested in the outcome of this action.

16        _____

17             Robert L. Crespo

18        Notary Public – State of West Virginia

19        My Commission Expires:  March 15, 2020

20

21
```

MAXIM REPORTING, LLC

64 FOAL LANE

MARTINSBURG, WEST VIRGINIA 25405

(304) 260-0670

DEAR SIR OR MADAM:

BOUND HEREWITH IS THE TRANSCRIPT OF

TESTIMONY GIVEN, INCLUDING THE CERTIFICATION PAGE OF

NOTARY PUBLIC.  PLEASE READ THE TRANSCRIPT AND ANY

ADDITIONS OR CORRECTIONS MADE SHOULD BE LISTED ON

THE ERRATA SHEET.  AFTER REVIEW, PLEASE SIGN ERRATA

SHEETS AND DECLARATION PAGES AND RETURN THEM TO THE

ADDRESS LISTED ABOVE FOR PROCESSING.

IF THE READING AND SIGNING HAS NOT BEEN

COMPLETED WITHIN THIRTY DAYS FROM THE DATE OF

DELIVERY, WE WILL ASSUME THAT THE RIGHT TO READ THE

DEPOSITION TRANSCRIPT HAS BEEN WAIVED.  THIS IS IN

ACCORDANCE WITH RULE 30(c) OF THE FEDERAL RULES OF

CIVIL PROCEDURE.

```
                          ERRATA SHEET

DEPOSITION OF: WILLIAM RANDOLPH WEHRMAN

DATE OF DEPOSITION:  4-6-10

CASE NAME:  TINA MAWING V. PNGI, CHARLES TOWN

GAMING   3:09-CV-68

The following are the corrections which I have made

to my deposition transcript:

PAGE   LINE  CORRECTION           CORRECTED TO

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
```

ERRATA SHEET (PAGE 2 OF 2)

PAGE   LINE CORRECTION            CORRECTED TO:

_____

_____

_____

_____

_____

_____

_____

I, the undersigned, declare under penalty of perjury

that I have read the above-referenced deposition and

have made any corrections, additions, or deletions

that I was desirous of making; and that the

transcript contains my true and correct testimony.

EXECUTED THIS_____DAY OF _____

2010, AT (CITY)_____(STATE)_____

DEPONENT'S SIGNATURE_____

**'**

'06 [3] 15/19 15/20 16/1
'07 [2] 15/20 16/2
'08 [2] 34/4 45/4
'77 [2] 16/8 17/5
'78 [1] 16/8
'85 [1] 18/1
'86 [1] 18/1
'87 [2] 11/5 11/6
'97 [4] 11/2 11/6 11/7 11/18
'99 [4] 11/2 13/7 14/21 15/1

**0**

0670 [1] 136/4

**1**

10 [1] 137/3
10-15 [1] 32/20
100 [3] 10/11 48/18 117/9
101 [2] 1/14 2/12
105 [1] 3/7
1100 [3] 48/3 48/4 48/6
1148 [3] 45/9 45/21 46/7
1200 [3] 46/19 46/21 48/9
1300 [3] 46/16 46/18 46/21
14 [1] 111/19
15 [3] 32/20 64/2 135/19
1999 [1] 12/4
1:30 [1] 1/14

**2**

20 [3] 8/14 98/17 98/19
2008 [30] 10/1 10/3 13/8 15/5 46/17 47/3 48/14 48/15 50/8 50/14 51/8 60/18 65/6 68/3 71/10 73/18 74/1 77/8 77/21 80/12 81/9 83/21 84/8 84/13 84/17 86/6 87/10 89/19 94/12 99/4
2009 [6] 51/2 51/8 81/12 87/12 96/13 99/8
2009/2010 [1] 114/10
2010 [7] 1/14 4/2 50/6 96/13 99/10 114/10 138/16
2020 [1] 135/19
23 [3] 8/14 9/12 9/13
25 [1] 16/19
25401 [2] 2/6 2/13
25405 [1] 136/3
260-0670 [1] 136/4
264-4223 [1] 2/14
264-8505 [1] 2/7
28 [3] 9/21 10/1 10/3

**3**

30 [4] 98/11 98/17 98/20 136/17
304 [3] 2/7 2/14 136/4
31 [1] 61/13
3746 [1] 7/3
39.3 [2] 120/3 120/5
3:09-cv-68 [2] 1/8 137/5

**4**

4-6-10 [1] 137/3
40 [5] 51/14 51/19 98/11 98/17 98/20
408 [1] 2/5
4223 [1] 2/14
44 [3] 47/11 47/13 51/17
46 [4] 47/8 47/11 47/13 98/21
47 [1] 98/21
4:00p.m [1] 134/13

**5**

50 [4] 16/4 48/18 51/14 98/21

**6**

6-month [1] 60/18
60 [4] 51/15 51/17 73/16 73/17
61 [1] 3/5
64 [1] 136/2
68 [2] 1/8 137/5
6th [1] 1/14

**8**

**A**

able [3] 85/3 99/13 121/20
about [72] 9/12 13/7 15/18 19/9 24/11 27/19 30/15 32/13 32/21 33/3 33/19 34/6 40/6 40/7 40/7 40/9 41/14 42/8 43/13 46/18 48/14 50/8 74/3 79/14 82/13 85/7 85/9 85/14 85/17 85/19 85/20 86/6 94/8 94/21 97/19 98/6 99/10 100/2 101/18 102/7 103/2 105/16 105/20 106/7 106/9 106/12 109/20 114/6 115/3 127/6 127/7 127/8 127/11 127/12 127/13 127/16 127/17 127/18 129/3 129/5 129/7 129/12 129/15 130/1 130/3 130/5 130/7 130/11 131/2 131/19 132/2 133/2
above [9] 72/18 72/19 74/10 88/10 93/10 93/11 93/13 136/12 138/11
above-referenced [1] 138/11
abuse [2] 115/21 116/4
access [1] 75/19
ACCORDANCE [1] 136/17
according [1] 59/2
accurate [1] 57/21
accurately [1] 91/15
accused [1] 104/20
acknowledge [1] 39/17
across [5] 39/4 48/19 105/21 128/3 130/8
act [1] 5/17
action [9] 1/7 95/21 115/5 115/9 125/2 125/21 128/12 135/11 135/15
actions [1] 69/21
activities [2] 21/4 54/1
activity [1] 53/19
actual [1] 119/9
actually [28] 7/3 10/6 12/9 13/16 21/5 23/12 23/21 27/9 34/13 44/18 51/12 64/12 73/21 75/18 84/21 86/19 89/8 91/1 98/14 100/20 104/10 104/13 105/10 106/4 106/8 106/10 121/21 122/21
additional [2] 56/21 73/17
additions [2] 136/9 138/12
address [7] 4/16 7/2 7/5 7/8 31/10 67/1 136/12
adjacent [1] 47/12
adjunct [1] 55/10
administer [2] 69/15 69/17
administering [1] 74/3
administration [1] 117/4
administrator [1] 19/14
admission [1] 58/20
admittance [5] 39/5 39/7 95/20 133/9 133/16
admitted [1] 53/2
advance [2] 6/4 132/6
advertise [1] 133/19
advocate [6] 79/16 79/18 79/19 83/12 97/1 97/12
advocating [1] 115/20
affects [1] 90/6
afraid [1] 21/11
after [14] 11/20 13/21 74/15 74/18 74/20 80/21 95/10 95/13 96/19 115/13 121/9 127/19 129/21 136/10
afternoon [1] 4/11
afterwards [1] 127/17
again [3] 23/4 84/10 95/20
against [3] 29/18 84/13 97/1
agent [1] 43/6
agents [1] 108/11
ago [5] 8/19 24/13 36/21 123/12 130/12
agree [28] 42/12 43/9 43/16 43/20 44/9 53/18 56/5 57/5 58/8 58/17 59/11 59/17 80/10 84/4 84/5 90/9 91/17 110/2 116/2 118/2 116/16 117/1 117/7 117/19 118/2 118/12 119/12 119/16 120/5
agreed [1] 91/6
agreement [13] 12/20 40/12 40/13 40/14 44/14 44/17 45/7 79/12 91/3 92/3 92/19 92/20 93/1
Agriculture [1] 131/14
ahead [8] 5/7 6/14 31/16 34/9 57/1 90/8

Al's [1] 70/10
alcoholic [1] 33/2
Alexandria [1] 7/3
Alky [2] 24/5 24/8
all [72] 5/3 15/6 16/15 17/1 18/13 22/9 22/15 30/1 30/14 32/14 36/16 37/9 40/20 41/11 42/10 43/5 47/17 50/19 51/7 54/5 56/20 58/19 59/19 65/19 69/9 70/11 74/13 75/9 75/10 75/18 77/13 77/17 78/1 78/3 79/9 80/3 80/17 80/21 84/6 89/11 93/3 93/7 93/11 93/18 94/11 95/5 95/10 95/13 96/19 97/4 97/7 98/2 99/14 100/9 100/20 104/18 106/1 112/21 116/2 117/19 118/2 122/3 122/12 122/15 123/2 126/10 128/13 130/8 132/6 132/7 134/1 134/7
Allen [1] 24/4
allocate [5] 78/2 89/18 122/1 122/1 122/2
allocated [7] 9/10 52/19 67/21 88/3 95/13 96/13 121/7
allocation [20] 42/8 68/4 71/8 71/11 71/16 74/5 74/6 74/9 75/1 88/7 91/9 91/18 92/10 95/9 96/18 98/6 120/15 121/3 121/14 128/21
allocations [10] 40/2 41/12 41/15 63/12 88/7 88/9 99/4 112/15 112/20 113/18
allotment [1] 49/13
allotted [7] 40/11 40/19 50/4 52/16 68/13 68/14 70/15
allotting [1] 104/8
allow [4] 6/1 6/6 64/18 108/12
allowed [5] 39/5 40/10 40/17 64/17 68/11
Alma [1] 23/7
almost [1] 39/14
alphabetical [1] 71/2
alphabetized [2] 70/20 75/4
already [3] 28/18 102/3 102/6
also [13] 2/15 24/1 24/6 26/4 31/18 32/6 35/2 46/11 59/8 75/8 78/18 86/10 102/14
although [4] 21/1 25/13 46/9 101/10
always [9] 19/6 49/6 49/16 50/1 51/8 51/8 57/18 70/9 119/15
am [9] 16/4 24/19 28/9 29/16 52/3 54/13 116/4 135/10 135/12
among [1] 44/1
Amongst [1] 80/10
amount [1] 88/14
animal [1] 28/8
animals [11] 28/14 30/3 30/8 100/18 101/1 101/10 114/21 115/21 116/5 119/13 124/13
annually [3] 61/20 62/6 62/7
another [16] 11/10 21/11 41/2 48/21 52/18 61/16 78/15 83/2 99/16 103/16 110/1 112/11 115/19 122/15 123/5 127/10
answer [12] 5/8 5/11 6/2 6/5 6/6 43/13 45/11 82/5 90/8 92/13 92/14 118/6
answerable [1] 117/21
answers [1] 6/12
Anthony [1] 22/3
any [104] 6/16 6/17 8/1 10/12 12/12 18/10 21/13 21/18 25/13 25/16 33/15 36/9 38/4 39/18 42/10 45/16 47/5 47/17 51/12 51/15 55/7 55/14 56/7 56/8 58/3 58/6 58/10 59/14 63/18 65/12 67/19 71/6 71/7 73/5 73/6 76/6 83/1 83/2 83/3 83/4 85/13 85/16 85/19 86/1 86/3 86/8 88/3 89/18 93/2 93/5 94/7 94/10 94/17 95/2 95/9 95/17 96/1 96/6 96/10 96/13 98/2 99/7 102/1 105/15 108/17 109/14 110/3 112/14 113/1 113/16 113/19 114/17 115/5 115/18 119/7 120/10 120/16 120/18 120/20 124/12 124/15 124/16 124/19 124/21 125/2 125/3 125/21 126/3 126/12 126/12 126/20 128/1 129/16 130/19 130/21 131/19 132/20 133/7 134/5 134/11 135/13 135/13 136/8 138/12
anybody [2] 21/14 105/16
anymore [2] 12/16 107/17
anyone [21] 33/8 42/10 85/18 88/3 94/6 96/12 100/12 103/1 103/4 104/18 105/12 112/8 121/4 121/15 121/18 125/6 126/11 127/2 131/5 132/5 134/5
anything [12] 27/20 27/21 85/6 105/20

**A**

apologize [1] 6/4
appeal [1] 113/17
appears [1] 135/4
applicant [2] 67/7 87/4
applicants [2] 70/21 83/20
application [24] 3/5 40/17 61/12 62/6 65/5 65/10 65/15 67/15 69/1 70/5 74/18 75/13 82/20 85/2 85/5 86/16 87/10 87/21 88/4 95/19 96/21 97/3 131/15
applications [9] 61/18 62/2 70/12 70/16 74/4 74/16 96/17 96/19 97/8
applies [1] 126/10
apply [2] 67/16 120/10
appreciate [1] 77/14
approval [7] 24/20 68/12 104/5 104/5 104/10 133/20 133/21
approve [1] 59/14
approved [3] 25/3 120/8 121/17
approximately [9] 11/3 11/17 14/1 19/11 37/20 47/8 51/14 62/4 73/16
April [7] 1/14 4/2 9/21 10/1 10/2 13/8 34/4
are [100] 16/3 16/18 22/1 24/17 25/20 25/21 26/6 31/10 31/18 36/1 37/4 37/10 39/5 39/6 39/6 40/11 45/13 47/5 47/18 48/1 48/2 49/18 50/3 51/7 51/18 52/12 53/6 54/14 56/10 57/18 57/19 58/8 59/5 59/17 63/11 63/15 63/21 67/19 68/7 68/8 68/19 69/9 69/12 71/1 71/4 71/20 74/13 74/17 75/9 75/10 75/14 77/9 77/10 77/12 77/13 77/18 77/18 78/9 79/1 80/10 80/11 83/16 88/3 88/6 91/2 91/14 95/8 96/3 98/16 99/13 103/8 103/20 109/6 110/11 110/16 110/17 111/1 111/15 114/6 114/18 116/17 116/18 117/11 117/12 117/20 117/20 119/1 120/16 120/18 121/20 123/13 123/17 124/12 125/21 126/5 127/5 128/4 130/10 130/18 137/6
area [14] 23/2 26/10 26/16 27/12 28/13 28/15 30/8 32/7 48/19 50/17 119/14 123/14 124/10 130/20
areas [2] 119/1 119/4
aren't [2] 70/21 111/3
arm [1] 117/20
around [16] 8/14 13/10 16/8 22/13 35/3 39/11 40/21 46/19 58/20 81/18 99/1 124/2 126/18 130/20 131/8 131/9
as [163]
ask [9] 5/6 23/4 38/9 61/9 88/15 89/21 93/15 103/15 116/7
asked [8] 12/9 12/10 12/21 39/6 39/6 40/6 73/9 96/15
asking [12] 5/19 23/7 34/5 41/1 41/14 42/7 42/17 45/17 83/13 84/12 94/16 106/4
asks [3] 38/4 56/7 103/5
aspects [1] 116/18
assistant [4] 11/8 11/16 14/4 22/2
associated [1] 45/14
association [12] 1/6 2/3 36/6 42/20 43/10 43/11 44/10 57/7 57/8 58/18 60/19 119/18
associations [1] 42/14
assume [4] 5/12 74/11 94/1 136/15
assumption [1] 20/14
at [111] 1/14 1/14 6/16 7/5 7/6 8/11 8/21 9/6 9/19 11/7 13/12 13/13 13/16 14/10 14/17 14/20 15/11 17/14 18/17 19/9 24/7 24/10 25/18 25/19 28/10 33/15 33/17 34/7 35/1 35/2 35/12 38/8 38/19 40/5 40/18 41/21 42/10 43/3 44/4 44/20 46/10 46/14 47/5 47/17 48/16 48/18 49/13 49/16 50/4 51/3 51/8 51/13 52/12 55/1 56/3 58/19 61/20 64/10 65/19 68/13 69/16 70/9 72/17 77/19 80/9 81/10 82/2 82/8 82/12 82/14 82/20 83/7 84/2 84/10 84/11 85/1 85/4 85/5 86/10 87/14 89/21 93/15 93/18 94/13 95/5 96/17 96/20 98/2 98/16 104/18 104/19 106/14 106/15 107/11 107/16 114/5 116/2 117/2 117/10 117/12 120/15 121/11 121/21 122/6 125/11 127/12 128/3 128/13 133/12 134/12 138/16

**audience** [1] 38/5
August [6] 14/2 12/4 13/7 48/15 94/12
August/September [1] 48/15
authenticity [1] 52/14
authority [1] 118/14
available [9] 45/20 46/7 47/6 47/18 47/20 48/16 50/1 51/17 51/19
average [1] 89/4
aware [46] 28/9 36/1 36/18 53/6 53/9 58/6 58/7 63/4 68/2 71/6 73/8 77/6 95/8 96/3 101/10 107/17 108/7 110/9 111/15 113/19 114/15 114/16 115/18 120/4 120/17 120/20 121/16 121/19 124/1 125/21 126/3 126/5 126/15 126/16 127/5 127/14 128/17 130/18 130/21 131/9 131/11 131/13 131/17 131/18 132/1 132/20
away [14] 15/12 41/19 82/14 94/15 95/1 95/6 95/10 95/14 100/9 108/5 108/8 115/12 115/16 115/21

**B**

B-i-r-r [1] 101/6
Bachelor's [3] 17/17 17/18 17/19
back [27] 7/15 7/16 8/18 8/21 10/18 13/8 14/10 14/13 14/20 14/21 18/3 23/17 29/16 46/17 62/17 62/19 63/8 66/20 68/11 68/16 84/10 94/6 95/15 96/4 99/7 104/6 121/5
backed [2] 53/12 53/15
background [1] 76/16
backside [4] 29/10 48/17 63/3 110/19
bar [1] 110/16
bargaining [2] 43/6 43/17
barn [53] 26/10 26/16 27/12 28/13 30/8 44/3 46/12 47/7 47/11 47/13 47/15 48/11 48/12 48/19 48/20 48/21 50/17 51/12 51/18 52/4 52/17 52/18 53/1 67/5 73/11 73/13 73/14 73/14 73/18 73/19 75/4 98/13 110/10 110/11 110/15 110/16 110/20 111/3 111/6 111/9 111/11 111/12 111/13 111/15 111/19 111/19 112/5 119/14 123/14 124/10 125/15 125/18 130/20
barns [3] 26/19 123/16 126/18
bases [1] 76/17
basically [12] 39/20 60/14 63/20 64/3 64/16 68/15 75/17 79/13 80/2 80/17 97/4 97/7
basis [7] 20/21 34/3 37/19 39/3 39/12 39/13 103/17
be [106] 5/7 12/15 15/1 22/2 25/3 26/2 26/6 27/5 27/17 28/1 28/16 28/19 28/19 30/9 30/9 30/16 30/17 30/18 30/18 33/4 34/18 38/4 38/6 39/17 39/18 39/21 40/10 40/19 41/3 47/3 47/20 48/19 49/5 50/16 50/18 50/21 51/3 52/17 52/18 53/1 54/16 56/2 56/2 56/13 56/14 56/15 57/4 57/7 57/13 58/11 60/8 62/20 64/2 64/14 64/17 65/14 65/16 66/6 67/20 68/11 68/13 68/14 69/3 69/19 71/13 71/15 71/20 72/7 72/7 72/8 72/8 72/19 74/11 78/6 79/16 80/9 82/19 84/11 87/15 88/14 93/14 98/3 100/15 108/9 109/13 110/5 110/19 110/6 111/12 111/13 111/15 112/9 113/10 113/12 115/20 115/20 116/1 117/17 124/8 125/12 125/18 128/16 130/17 132/6 136/6 136/20 137/20

**behavioral** [1] 17/20
being [15] 22/11 46/13 54/6 54/14 56/1 56/6 57/8 103/9 108/4 111/1 123/21 126/9 128/3 128/17 132/7
believe [15] 19/1 19/16 20/16 24/11 31/18 31/20 34/7 36/11 37/1 46/15 60/1 66/10 95/18 98/21 113/4
benefit [1] 115/9
BENEVOLENT [4] 1/5 2/3 36/5 43/10
besides [1] 47/11
best [30] 6/12 24/10 32/10 32/12 34/10 35/4 37/13 38/11 38/12 42/3 47/2 47/4 47/10 48/3 50/9 58/5 59/4 61/4 61/19 71/12 76/20 81/10 81/13 82/11 86/5 95/18 99/5 101/15 110/19 124/8
betable [1] 64/14
better [4] 10/8 33/2 39/1 99/12
between [10] 10/12 16/9 16/9 44/15 45/7 46/21 48/6 48/18 81/1 94/4
bi [1] 61/20
bi-annually [1] 61/20
big [2] 123/17 123/18
binders [1] 70/19
Birr [4] 99/16 101/1 101/6 101/6
bit [3] 13/11 32/17 81/2
biweekly [1] 21/1
blanks [2] 69/10 75/10
bleeders [2] 64/5 64/6
blocks [2] 60/13 69/9
board [3] 13/19 37/12 37/15
body [1] 55/1
book [6] 26/1 37/14 38/1 76/9 76/10 119/6
books [1] 37/21
Born [1] 32/6
boss [1] 80/20
bosses [4] 70/7 81/3 81/4 104/3
bosses/superiors [1] 81/3
both [5] 15/17 28/7 91/6 117/10 127/14
bottom [2] 65/19 66/17
BOUND [1] 136/6
Bowles [2] 2/11
Bowling [4] 27/10 27/10 27/18 124/9
box [2] 63/5 63/6
boy [1] 58/16
break [5] 6/16 31/9 72/21 73/4 74/2
breakdown [2] 79/21 90/21
breath [1] 6/18
BRIAN [2] 2/10 32/18
brief [2] 31/9 73/4
bring [6] 38/13 38/16 62/19 68/18 104/1 114/18
Briton [18] 19/18 20/1 20/12 20/18 28/21 30/1 30/7 30/17 31/4 33/12 33/15 71/13 72/5 72/9 81/4 86/3 97/21 131/1
Briton's [1] 20/6
broken [1] 60/11
brought [1] 57/7
Bruce [1] 32/8
Burns [1] 122/13
business [4] 41/20 43/21 104/2 110/8
but [91] 5/4 10/1 10/15 13/1 13/11 15/9 15/15 16/7 18/21 19/1 19/21 21/14 21/16 23/6 23/13 23/16 23/20 24/8 26/21 27/9 27/12 27/21 28/10 29/2 29/4 29/15 29/18 30/21 36/9 37/15 39/3 39/20 40/4 40/16 50/21 53/5 54/3 55/19 57/12 58/15 61/19 62/8 63/5 68/18 69/11 72/11 76/21 77/12 77/16 77/20 79/1 80/12 80/15 82/7 83/19 83/19 84/12 85/8 87/3 87/7 87/17 90/20 92/3 92/7 92/18 94/3 94/16 98/11 100/4 100/8 100/14 103/4 104/8 106/10 107/3 108/2 109/17 111/10 112/18 115/2 116/4 116/17 117/9 125/16 126/16 128/12 129/2 129/5 132/12 133/16 134/1
butte [1] 55/10

**C**

call [11] 9/15 29/2 34/15 40/17 75/6 75/11 103/14 103/15 104/6 104/6 127/18
called [11] 11/5 14/5 24/17 34/5 36/2 37/2 63/6 74/14 76/10 127/16 129/5

# C

chair [35]  8/16 21/12 26/20 26/21 27/1
47/10 51/7 54/11 57/6 60/2 61/10 66/14
67/9 69/4 69/5 72/21 75/20 76/4 76/10
77/11 82/9 82/16 89/2 90/8 92/13 97/10
100/12 101/2 105/1 109/13 113/17 118/6
118/11 119/16 132/9
can't [39]  7/9 18/20 19/10 19/11 34/8 53/4
56/18 57/3 60/20 61/17 62/7 63/20 64/10
64/16 65/2 69/11 76/2 82/9 82/19 83/7
86/18 95/2 97/18 97/20 99/18 100/4 108/2
108/16 111/9 112/13 123/11 127/20 128/7
128/10 128/11 129/9 130/2 130/12 130/16
candidate [1]  56/3
cannot [4]  63/18 65/6 109/2 109/12
capacities [1]  15/15
capacity [6]  36/10 39/9 69/16 70/1 70/2
89/15
captain [8]  110/10 111/6 111/9 111/12
111/14 111/16 111/19 112/5
captains [2]  110/11 110/16
card [1]  51/15
care [4]  12/15 78/21 115/3 115/9
career [1]  77/15
Carlisle [3]  99/17 101/7 101/12
case [5]  33/14 33/19 104/5 105/13 137/4
cases [1]  104/15
Caughins [1]  52/12
cause [3]  113/5 113/5 113/9
center [1]  63/5
certain [4]  46/11 83/20 94/14 109/6
certificate [4]  52/10 52/12 57/2 109/18
certificates [1]  15/15
CERTIFICATION [2]  135/1 136/7
certify [1]  135/4
certifying [1]  57/2
cetera [1]  27/14
chain [2]  19/19 29/7
change [1]  73/6
changes [1]  88/6
charge [6]  29/15 45/9 45/13 45/15 45/21
46/8
CHARLES [35]  1/9 2/8 7/6 8/11 9/15 9/18
11/19 12/1 13/7 13/9 18/17 25/8 25/18
25/19 42/15 43/20 43/21 44/4 44/9 44/13
45/7 45/20 46/6 56/3 77/16 83/10 84/2
84/18 91/8 100/8 106/14 107/11 107/16
130/18 137/4
Charlie [2]  100/15 100/17
chart [2]  19/20 31/14
charts [1]  35/8
check [3]  69/13 69/18 75/20
checked [2]  52/8 52/13
checkoff [1]  69/7
chooses [1]  72/10
choosing [1]  26/4
Cincinnati [1]  15/17
circuit [1]  14/13
circumstances [1]  56/9
CITY [1]  138/16
Civil [2]  1/7 136/18
claiming [2]  64/6 66/5
claims [1]  24/6
clarify [2]  33/2 47/20
class [1]  78/11
clause [1]  64/1
clear [2]  12/14 62/20
clearly [1]  12/11
clerical [1]  75/9
clerk [3]  23/21 24/2 24/7
clocker [2]  24/5 24/5
clocks [1]  24/6
close [1]  98/21
closer [2]  46/15 48/9
code [1]  120/3
coincide [1]  61/1
coincides [1]  64/11
collapsible [2]  70/13 70/19
collect [1]  125/13
college [4]  16/10 17/10 17/12 18/6

comes [6]  23/2 27/9 34/19 38/2 88/10
118/12
coming [11]  9/4 9/8 32/17 45/5 49/18 52/7
62/7 64/21 72/2 110/14 122/17
command [2]  19/19 29/7
commencing [1]  1/14
comments [6]  85/13 85/16 85/20 86/1
86/3 86/6
commission [15]  24/21 58/10 58/12 59/1
59/12 59/18 59/21 105/8 109/2 116/20
117/2 117/5 117/20 117/21 135/19
Commissioner [1]  109/1
committee [22]  3/6 37/14 37/16 38/2
39/10 67/12 70/8 70/9 71/3 71/11 71/16
71/21 72/2 72/6 72/10 74/5 74/7 96/18
96/21 98/7 120/15 121/4
communicate [3]  20/18 21/9 21/15
communication [2]  20/17 69/5
commute [1]  7/15
companions [1]  41/8
company [5]  11/21 29/18 51/20 92/4 92/7
compared [2]  74/1 99/3
competitive [1]  38/13
complained [3]  127/1 131/18 132/1
complaining [1]  127/12
complaints [3]  126/20 127/3 127/6
complete [3]  6/6 20/5 65/15
completed [6]  65/16 69/19 73/15 75/13
88/4 136/14
completely [1]  94/19
completeness [1]  69/19
complicated [1]  5/5
complied [1]  111/2
complying [2]  110/17 110/18
computer [2]  57/20 121/8
computers [1]  75/19
concerned [3]  28/1 100/9 115/11
concerns [4]  94/7 124/12 126/13 131/2
concluded [1]  134/12
condition [6]  26/1 26/19 37/14 37/21 38/1
119/6
conditions [1]  109/9
conduct [2]  59/19 110/2
conducted [1]  79/11
conducting [1]  119/18
confused [1]  81/2
conjecture [1]  43/12
connect [1]  128/1
considered [3]  82/21 96/17 121/21
considering [1]  35/10
consolidate [1]  49/2
constantly [1]  108/18
constituents [1]  111/2
construction [1]  73/11
consult [1]  113/2
contact [4]  27/16 37/17 67/2 69/9
contacted [1]  131/13
contains [1]  138/14
content [1]  94/8
continuous [1]  117/2
contract [7]  42/19 67/3 92/9 123/21 124/1
124/3 124/8
contracted [1]  93/1
contracts [1]  27/14
contractual [2]  92/19 92/20
contractually [1]  43/2
control [6]  30/11 31/3 123/19 124/21
126/1 129/1
convenient [1]  41/5 50/18
conversation [9]  5/18 35/20 40/8 41/7
83/3 105/15 128/9 129/13 129/17
conversations [1]  95/3
coordination [1]  23/13
coordinator [1]  35/1
corner [1]  66/19
correct [26]  10/10 24/17 24/19 25/1 50/20
51/1 52/3 53/16 54/13 55/6 55/12 55/19
59/10 60/15 67/3 84/15 89/10 89/16 89/16
96/5 102/19 104/12 112/20 116/4 120/3
138/14
CORRECTED [2]  137/8 138/2

couldn't [5]  37/1 48/10 53/11 82/5 107/20
counsel [4]  5/3 108/18 135/10 135/13
count [1]  47/15
counter [3]  39/4 106/1 130/8
country [1]  35/4
counts [1]  18/15
couple [13]  8/19 14/9 15/8 15/8 18/3 34/20
35/8 36/21 51/18 97/5 97/8 108/2 114/5
course [3]  11/7 11/10 69/11
court [6]  1/1 4/12 5/15 6/8 55/4 100/5
courteous [1]  39/21
courtesy [1]  75/6
cover [1]  64/4
covered [1]  68/8
covering [1]  76/17
covers [2]  64/16 64/20
crazy [1]  103/19
create [1]  38/11
Crespo [3]  1/16 135/2 135/17
criminal [2]  18/10 18/15
criteria [8]  63/16 77/6 77/6 84/7 84/8
112/21 120/10 122/4
cross [1]  22/14
cross-training [1]  22/14
CRTS [1]  89/18
cruelty [1]  113/21
Crystal [2]  32/5 41/3
curator [1]  60/21
current [5]  10/6 18/17 44/19 98/13 114/8
currently [6]  23/6 23/16 25/4 60/16 71/1
71/5 73/11 75/5
custodian [1]  31/18
cut [1]  18/3
cv [2]  1/8 137/5

# D

daily [1]  45/16
Danny [1]  94/4
Darlington [1]  24/5
data [3]  79/14 121/6 124/17
DATE [2]  136/14 137/3
dates [1]  95/10
daughter [2]  107/4 107/6
DAVID [2]  2/4 3/3
day [8]  1/14 12/10 14/9 26/4 39/14 94/10
109/21 138/15
days [10]  13/17 14/9 15/8 53/11 56/10
56/14 56/19 88/13 109/10 136/14
dead [3]  125/13 126/1 127/19
deadline [3]  74/15 74/18 75/8
dealing [2]  42/14 42/19
Dean [1]  31/20
DEAR [1]  136/5
death [1]  129/8
December [1]  61/13
decided [2]  82/7 82/14
decides [1]  80/5
decision [18]  49/20 55/4 80/2 82/3 86/19
87/7 87/8 93/13 93/16 104/11 104/14 105/7
105/13 106/15 108/4 121/3 121/14 121/21
decisions [2]  80/13 120/19
DECLARATION [1]  136/11
declare [1]  138/10
deducted [1]  80/16
Defendant [2]  1/11 2/8
define [2]  25/11 60/3
definitely [1]  114/12
degree [3]  17/18 17/21 18/4
delay [1]  52/21
deletions [1]  138/12
delivered [1]  93/20
DELIVERY [1]  136/15
Dennis [1]  31/17
department [5]  24/14 40/1 57/14 59/5
131/14
depends [1]  56/16
DEPONENT'S [1]  138/17
deposition [19]  1/12 4/17 4/21 5/17 6/18
32/15 61/6 88/19 105/3 134/12 135/3 135/5
135/8 135/12 136/16 137/2 137/3 137/7
138/11

# D

detail [1] 59/18
detailed [1] 116/19
determination [1] 50/13
determine [2] 59/12 120/10
detest [1] 116/6
detrimental [2] 110/3 110/6
devil's [1] 79/16
dicky [10] 29/2 29/3 29/4 30/10 39/19
71/13 72/8 74/11 81/1 106/21
dictate [2] 81/5 81/14
dictated [4] 70/7 80/18 81/1 81/16
dictates [1] 72/6
did [78] 10/2 10/5 10/15 12/4 12/12 12/19
13/6 14/2 15/12 17/1 17/4 17/10 17/21 33/5
33/8 33/11 34/7 60/21 62/14 78/1 78/4 78/7
80/13 80/17 82/17 83/1 83/10 83/20 84/13
85/13 85/16 85/19 86/1 86/3 86/16 87/12
89/8 89/10 89/11 89/21 90/5 93/1 93/5 93/6
93/15 93/17 93/18 94/6 96/9 97/1 97/3
97/12 97/15 97/17 97/18 99/21 102/21
104/18 108/4 108/11 111/10 111/21 115/2
122/5 123/8 126/11 126/11 127/8 127/18
128/6 128/9 129/14 129/16 129/18 131/1
131/5 131/9 132/5
didn't [26] 12/15 12/15 12/16 12/21 15/4
15/11 30/6 45/4 62/19 68/18 81/14 83/4
83/6 85/11 87/10 96/11 101/9 105/17
105/20 111/9 112/9 122/12 128/1 128/1
130/3 131/8
die [3] 127/15 128/4 128/15
died [2] 130/15 130/16
diem [1] 13/20
dies [1] 125/9
differed [1] 117/10
difference [2] 48/6 55/20
different [8] 14/7 40/16 49/19 50/17 69/9
117/12 129/2 129/4
direct [4] 3/3 4/9 26/21 27/1
directed [1] 125/6
direction [2] 27/7 31/2
directly [3] 20/19 59/20 117/21
Director [2] 19/15 20/5
disagree [1] 92/15
disagreement [1] 43/1
disapprove [1] 59/14
discovering [1] 42/3
discretion [2] 59/12 59/14
discuss [5] 41/17 41/19 93/6 128/9 131/1
discussed [5] 33/14 40/2 41/11 102/2
105/12
discussing [3] 84/21 85/6 118/16
discussion [6] 31/7 33/18 73/2 98/2
102/21 132/17
disease [1] 126/1
dismissed [1] 12/5
dispose [1] 125/11
disqualifications [1] 109/7
disqualifies [1] 55/8
disqualify [1] 55/14
distributor [1] 14/3
distributorship [3] 14/4 14/14 14/15
DISTRICT [2] 1/1 1/2
DIVISION [1] 1/3
do [128] 5/11 6/21 7/8 7/12 7/17 18/9
18/21 19/17 20/2 20/6 20/15 21/4 22/12
22/19 24/9 27/1 30/6 33/18 33/21 35/15
35/18 37/7 37/11 37/17 39/15 39/16 39/16
40/8 41/14 42/12 43/9 43/11 43/16 43/20
44/9 47/10 50/1 51/15 56/8 56/14 57/11
57/18 59/11 59/17 63/7 63/14 63/14 67/14
69/1 69/15 69/17 69/21 71/7 73/5 74/21
74/21 76/7 76/11 76/14 76/15 77/20 79/9
79/20 80/3 81/3 81/2 82/7 83/1 84/9 84/13
85/11 86/10 87/14 89/11 89/18 91/12 92/7
92/18 93/12 95/12 95/21 96/6 101/9 104/4
106/17 107/5 107/15 108/9 109/4 111/21
112/2 112/7 112/8 112/9 112/19 113/4
113/8 113/20 115/15 116/9 116/16 117/1
117/7 117/9 118/2 118/8 118/12 119/2

documentation [1] 128/9
documented [1] 57/13
documents [2] 33/6 69/15
does [30] 8/11 8/12 8/13 18/16 20/12
20/18 21/9 22/17 22/21 26/18 27/13 35/15
37/13 38/21 39/1 47/15 58/1 61/14 76/18
76/18 92/16 107/3 107/8 107/11 107/13
120/1 120/13 121/6 125/16 133/7
doesn't [8] 20/10 38/15 53/21 54/4 56/12
103/19 104/8 119/20
doing [3] 23/16 31/15 43/21
don't [60] 5/8 5/17 8/17 15/7 18/15 20/9
23/4 29/17 31/14 40/4 40/15 43/12 43/12
43/14 43/15 46/9 51/6 56/5 56/5 57/3 58/14
63/3 64/15 64/20 71/17 71/19 75/7 77/12
77/17 80/7 82/5 83/2 83/15 84/9 84/20 86/8
87/9 87/17 87/18 89/20 90/9 90/21 92/14
92/16 96/2 98/1 101/19 101/20 101/21
102/9 102/10 102/12 103/9 104/1 104/10
105/10 106/12 106/14 107/13 107/13
108/16 108/20 109/6 109/20 110/5 110/12
111/7 112/4 112/18 113/1 113/10 115/13
118/9 118/15 119/7 120/9 120/12 122/3
123/20 124/21 125/10 125/11 128/11
129/10 129/12 132/12 133/15 134/4 134/10
134/11
done [13] 27/5 32/14 80/4 80/9 81/18 82/2
83/18 85/12 113/8 121/11 123/19 125/9
126/10
door [1] 21/13
doubt [1] 125/16
Doug [5] 10/11 27/9 27/10 27/18 124/8
down [13] 6/9 11/18 34/7 46/11 48/11
51/18 60/12 80/17 82/1 98/13 120/21
127/12 128/4
Downs [4] 13/12 14/12 15/7 15/16
draft [1] 37/21
drafted [2] 62/12 62/12
drafting [1] 62/14
drink [3] 6/19 32/21 33/2
drinking [2] 24/9 32/21
Drive [1] 7/3
due [2] 61/18 95/20
dues [1] 36/7
duly [2] 4/7 135/5
during [13] 4/17 24/7 32/3 32/3 45/1 46/5
48/13 53/14 62/2 64/3 64/17 107/21 114/8
duties [2] 10/13 25/20
duty [1] 58/10
dying [7] 128/1 128/17 129/15 130/1 130/5
132/20 132/21

# E

e-mail [3] 21/10 21/17 27/3
each [27] 16/15 24/16 24/19 25/2 25/7
26/3 40/18 45/21 70/14 75/21 75/21 76/2
76/3 76/4 78/12 79/21 80/6 80/13 80/17
81/6 82/8 95/20 96/20 98/11 117/2 117/8
121/1
earlier [3] 10/20 73/9 84/7
early [2] 56/8 64/21
edited [1] 75/9
editing [1] 75/10
editor [1] 70/3
effective [1] 91/7
efficiency [1] 7/13
effort [2] 93/2 93/5
eight [6] 13/17 40/11 40/18 68/13 68/14
90/13
either [6] 18/1 21/17 28/6 31/4 74/10
103/1
eligibility [5] 59/13 63/7 63/17 64/7 68/5
eligible [9] 34/18 54/18 56/15 64/1 64/2
65/14 68/14 109/8 109/15
eliminate [1] 83/17
Elliot [6] 71/14 81/15 85/13 94/3 97/12
114/20
else [16] 22/19 28/17 33/8 69/10 88/3
99/18 100/12 100/13 103/1 112/8 121/4

employees [4] 21/18 29/17 29/18 29/19
employer [1] 91/5
employer's [3] 91/18 92/1 92/8
employers [1] 91/2
employment [3] 10/20 12/6 107/21
empty [7] 49/14 50/10 50/15 50/16 50/21
51/4 51/9
encouraged [1] 34/13
end [4] 14/20 14/21 15/1 15/5
ended [1] 14/1
enforce [2] 59/3 59/6
enforcement [1] 117/4
engages [1] 41/21
enter [8] 26/3 32/2 34/13 34/18 108/12
109/12 109/15 119/16
entered [2] 51/17 78/20
entering [1] 108/15
entertain [1] 42/4
entirety [2] 26/16 82/14
entries [3] 78/19 108/17 108/21
entry [3] 34/19 108/14 109/2
envelope [1] 94/2
equitable [3] 91/9 91/18 92/10
Eric [13] 19/4 20/4 62/4 62/8 71/13 72/8
74/11 75/15 81/1 88/11 90/4 105/4 108/19
Erlik [5] 123/21 124/2 124/3 124/5 126/12
Ernest [1] 7/18
ERRATA [4] 136/10 136/10 137/1 138/1
especially [1] 98/12
ESQUIRE [2] 2/4 2/10
essential [3] 91/9 91/19 92/10
essentially [1] 98/9
et [1] 27/14
ethics [1] 78/16
even [7] 22/11 35/10 72/19 84/21 85/6
117/11 128/7
ever [17] 4/21 36/17 37/12 40/2 41/11
41/14 44/17 58/2 70/10 105/10 105/12
110/7 124/16 126/8 126/17 126/20 131/1
every [8] 22/12 34/21 36/6 36/11 36/12
39/14 40/16 59/19
everybody [6] 23/8 24/8 24/11 24/15
41/18 82/2
everybody's [1] 49/13
everyone [7] 22/12 41/18 69/13 70/16 75/5
82/10 102/15
everyone's [1] 41/20
everything [5] 29/16 30/13 45/14 84/10
118/17
evidence [1] 116/2
evidenced [1] 92/9
evidentiary [1] 92/5
exact [2] 46/10 46/14
exactly [13] 8/18 18/21 19/10 19/11 20/9
48/10 53/12 71/19 77/10 79/2 85/10 108/16
127/20
Examination [2] 3/3 4/9
examined [1] 4/8
example [3] 61/5 82/18 88/15
except [4] 15/7 48/12 97/4 97/8
exception [1] 55/10
exceptions [1] 55/13
excludes [2] 63/19 64/4
exclusive [1] 43/6
Excuse [2] 13/10 20/8
EXECUTED [1] 138/15
executioner [1] 72/4
exempt [1] 109/2
EXHIBIT [14] 3/4 61/5 61/6 61/10 65/7
88/1 88/18 88/19 89/1 89/17 94/8 105/2
105/3 105/7
existed [1] 65/6
expense [1] 56/21
expensive [1] 117/14
experience [5] 74/20 77/11 81/7 119/8
119/8
Expires [1] 135/19
explain [5] 6/13 6/14 26/2 93/18 95/4
explained [2] 5/4 96/12
expression [1] 39/20
extend [1] 26/18

C-32

## F

face-to-face [1] 34/3
facial [1] 23/1
facilities [7] 26/21 27/4 27/8 27/13 44/3 44/4 119/19
facility [2] 27/6 120/8
fact [4] 87/17 87/18 102/9 107/4
factor [1] 101/11
factors [2] 78/13 121/20
fair [6] 9/15 9/16 28/12 113/12 113/14 113/15
fall [3] 15/10 114/11 114/13
familiar [4] 37/4 45/19 123/13 132/12
far [39] 9/2 9/11 10/7 11/12 28/10 29/17 36/7 37/10 43/8 43/19 44/16 45/15 46/9 46/19 51/4 52/6 55/15 66/10 66/21 68/5 70/3 70/11 73/7 78/16 80/16 82/16 84/20 88/2 93/9 93/10 97/10 99/9 99/11 100/8 110/15 114/3 124/1 124/4 125/10
fax [1] 69/4
February [5] 11/1 11/1 11/6 11/18 64/2
FEDERAL [1] 136/17
fee [2] 45/16 45/16
feed [2] 114/4 115/8
felt [4] 33/3 83/9 83/13 97/8
female [1] 123/10
few [14] 5/4 13/15 19/4 24/13 31/11 53/4 58/15 98/20 101/9 108/15 116/7 123/11 130/12 132/14
figured [1] 12/16
file [4] 67/10 67/11 69/7 70/14
files [2] 70/13 70/16
fill [7] 22/17 40/1 67/7 67/9 69/10 69/11 69/19
filled [6] 67/10 69/10 69/12 75/6 75/10 75/12
filling [1] 78/19
fills [1] 23/20
final [5] 30/2 37/21 38/1 80/16 118/13
financially [1] 135/14
find [5] 50/15 50/16 52/1 93/2 96/9
fine [3] 4/18 4/19 43/14
fined [1] 110/12
finish [6] 18/4 50/15 78/11 84/6 90/11 132/14
finished [1] 17/14
fired [3] 20/10 49/19 110/12
first [18] 4/7 11/12 12/2 13/11 15/12 15/15 24/7 37/2 44/18 45/2 57/8 62/3 62/4 64/9 105/9 106/13 108/2 115/7
fit [2] 35/9 49/12
five [12] 10/8 31/19 48/20 50/13 50/15 50/16 50/17 50/21 51/4 56/18 64/13 102/12
fixed [1] 27/17
fluctuates [1] 48/11
fluctuation [1] 49/6
flunk [1] 58/16
FOAL [1] 136/2
follow [1] 27/7
following [1] 103/10 137/6
follows [3] 4/8 60/14 60/15
foregoing [2] 135/3 135/5
foreign [5] 54/21 55/1 55/7 55/14 56/15
forgive [1] 18/13 36/8 40/14
form [10] 47/20 88/11 89/4 90/7 91/20 118/6 118/20 120/20 126/5 126/18
format [1] 6/2
formula [2] 84/3 86/13
found [5] 35/20 36/21 37/2 98/15 127/17
four [7] 15/19 17/16 17/17 21/7 49/21 60/11 102/11
four-year [1] 17/16
fours [1] 15/13
Freddy [1] 111/11
free [6] 45/9 45/12 45/15 45/21 46/7 56/15
freeze [1] 50/3
fresh [1] 114/12
Friday [1] 21/2
friend [1] 14/6
front [3] 31/15 62/17 71/2

Funkhauser [1] 122/6
Funkhauser's [1] 105/14
further [1] 135/12

## G

gain [1] 133/16
gained [1] 94/10
games [1] 21/5
GAMING [7] 1/10 2/9 11/4 11/20 43/20 45/7 137/5
Gardener [1] 24/8
Gary [1] 23/3
gate [6] 52/13 53/13 53/15 57/13 134/3 134/4
gave [7] 9/4 9/7 12/17 78/9 93/8 97/6 111/13
general [4] 5/5 5/18 20/8 99/3
generalization [1] 54/2
generally [2] 65/4 74/20
gentlemen [6] 7/18 24/12 29/9 32/7 41/17 132/10
George [1] 100/2
get [28] 6/18 6/18 8/20 14/13 20/10 27/13 34/6 38/14 49/19 50/13 51/5 51/14 52/8 52/13 57/1 76/12 80/1 81/21 88/11 95/9 95/13 95/15 97/13 98/12 103/18 110/12 114/17 115/8
gets [4] 49/7 49/8 79/12 109/16
getting [9] 8/17 38/10 49/18 49/18 64/21 65/1 65/1 102/13 111/3
give [17] 5/4 13/20 38/5 49/20 78/12 79/2 79/15 80/3 83/1 83/4 87/5 88/13 103/14 104/4 104/10 133/18 133/18
given [15] 12/8 12/11 47/5 47/17 50/5 73/6 96/3 96/6 96/10 98/3 100/3 108/21 109/10 135/9 136/7
gives [2] 63/17 104/5
giving [1] 80/21
glad [1] 5/9
go [23] 4/14 5/7 6/1 6/13 10/17 23/17 31/16 34/9 38/15 52/4 52/16 54/1 54/6 58/15 70/11 75/4 77/7 78/21 90/8 103/19 108/21 121/5 133/12
goat [7] 127/15 127/17 128/2 130/1 130/5 130/15 132/20
goats [2] 130/16 132/21
God [1] 85/4
goes [5] 20/17 23/9 67/10 70/3 107/1
going [16] 5/12 5/16 18/5 21/2 47/19 63/19 64/14 64/18 67/11 74/10 88/13 118/5 118/19 120/2 121/1 128/13
good [16] 4/11 6/15 10/8 12/17 30/6 80/7 83/6 87/9 88/10 98/11 99/12 101/19 110/11 113/4 120/9 123/5
gossip [1] 41/21
got [16] 7/16 15/20 17/17 21/5 34/17 49/12 51/17 52/1 69/7 94/15 100/10 108/2 109/21 114/2
gotten [1] 9/2
govern [2] 63/11 63/15
governed [2] 116/18 117/17
governing [2] 58/3 68/4
governor [1] 131/3
graduate [2] 17/1 17/4
Graff [1] 2/11
grant [3] 38/5 103/6 104/4
granted [1] 104/7
Grantfield [1] 11/12
greater [1] 53/20
grew [1] 13/4
grounds [36] 25/8 25/11 25/15 57/7 57/8 57/19 57/19 58/19 64/15 64/19 64/21 65/13 65/13 65/15 67/17 69/14 70/14 71/1 71/1 71/5 75/5 82/10 90/12 90/21 95/16 100/4 100/11 112/3 116/5 119/18 128/14 128/18 129/20 133/7 133/8 133/9
group [2] 79/20 127/10
guess [6] 7/14 20/4 28/21 45/14 103/12 106/3
guessing [1] 125/12
guidance [1] 126/12

## H

Hazy, He's [2] 7/18 7/20
had [56] 4/21 8/16 9/3 9/6 10/6 12/14 13/11 14/10 15/15 18/11 21/1 21/3 21/6 24/13 30/10 34/20 35/7 35/8 35/21 36/11 37/12 40/9 41/2 41/7 46/10 46/11 46/17 68/16 73/9 73/10 73/18 74/4 80/17 82/3 82/10 83/9 86/17 86/17 94/7 96/20 97/5 98/13 100/17 104/19 105/15 107/2 107/19 108/1 112/3 112/7 123/1 123/1 123/21 127/14 127/16 130/15
half [4] 11/3 66/7 66/18 94/14
Hallow [1] 7/9
HAMMER [13] 2/4 3/3 4/10 31/16 33/5 48/1 61/9 73/5 92/6 105/6 118/9 119/1 132/19
Hammond [1] 32/9
Hampshire [1] 16/14
hand [2] 96/20 120/2
handed [4] 55/4 90/3 94/1 105/18
handing [1] 89/1 105/6
handle [1] 124/7
handling [2] 70/5 124/17
hands [2] 69/6 80/3
hang [2] 38/21 39/1
happen [3] 54/11 56/12 112/16
happened [6] 41/3 53/9 53/9 54/16 102/19 115/14
happens [4] 40/10 40/19 49/6 54/11
happy [1] 6/17
Harbor [3] 108/13 109/5 109/18
Harrisburg [2] 14/5 14/15
has [57] 5/3 6/8 8/16 8/20 9/2 18/18 19/7 24/9 25/2 28/17 28/20 28/21 30/2 30/7 30/10 30/16 31/20 34/20 36/11 36/16 40/9 40/19 40/20 46/6 46/12 52/4 53/1 55/21 61/20 62/17 64/1 65/16 65/20 70/14 70/15 75/5 75/21 76/5 80/4 81/7 88/8 88/12 91/5 95/4 96/12 96/14 98/21 100/4 105/12 110/3 110/7 112/8 113/20 127/1 130/19 136/13 136/16
hasn't [1] 88/4
have [202]
haven't [1] 125/5
having [7] 4/7 51/4 90/5 101/13 101/16 102/13 103/2
Haynes [2] 7/19 8/1
Haynes' [1] 8/10
hazardous [2] 131/19 132/2
hazards [1] 125/3
HBPA [15] 36/2 36/11 36/14 36/17 37/8 37/12 40/13 42/18 43/6 43/16 44/15 45/8 77/5 91/3 92/9
HBPA's [1] 42/12
he [57] 8/1 8/4 8/5 8/7 8/11 8/12 8/13 8/16 9/2 9/3 9/4 9/6 9/6 10/15 19/4 19/19 20/3 20/12 21/2 21/9 21/12 24/1 24/6 30/13 37/9 37/13 37/13 37/15 38/21 39/1 40/9 40/9 40/19 40/20 41/17 41/19 41/21 62/12 76/18 76/20 77/1 85/18 85/19 86/1 93/18 97/18 100/3 100/4 100/18 114/2 115/2 124/9 131/5 131/8 131/9 132/13 133/7
he'll [1] 38/2
he's [21] 5/16 8/5 9/9 23/5 23/6 24/6 28/20 29/15 30/13 31/21 32/8 37/7 37/9 37/15 38/7 38/17 40/6 92/3 92/4 100/10 133/8
head [4] 6/9 18/21 24/15 99/18
health [8] 28/14 30/2 52/9 52/12 110/18 115/11 119/13 124/12
hear [3] 98/4 127/8 130/8
heard [11] 98/5 106/2 106/5 106/9 124/15 126/20 127/2 127/7 127/9 127/10 130/7
hearing [2] 105/21 122/7
hearsay [2] 98/4 122/21
held [6] 16/16 18/18 31/8 36/9 73/3 132/18
help [2] 40/1 78/18
Henry [1] 24/4
her [48] 23/8 23/15 35/12 41/5 82/20 83/10 83/12 83/14 83/15 83/17 83/19 84/1 84/14 84/17 84/17 84/21 85/1 85/7 85/9 93/3 94/2 94/15 94/16 94/21 94/21 94/21 95/17 95/18 95/19

# H

**H** [33]  5/13 10/16 13/10 23/18 32/17
32/18 34/4 44/19 45/2 45/4 53/3 53/8 53/10
53/10 59/8 62/3 62/7 63/8 63/17 66/19
70/10 72/2 74/20 78/16 92/5 93/4 108/19
110/14 116/3 117/10 122/17 127/4 132/15
**hereby** [1]  135/3
**herein** [1]  4/7
**HEREWITH** [1]  136/6
**hesitated** [1]  18/20
**hi** [2]  39/16 39/17
**Hidden** [1]  7/9
**hide** [1]  62/21
**high** [4]  16/9 17/1 17/6 17/7
**Highlands** [1]  17/7
**him** [21]  21/13 21/17 24/8 29/2 29/3 39/4
39/11 39/15 39/16 39/16 41/7 41/14 41/19
72/7 93/15 101/9 111/11 111/12 111/13
111/13 115/17
**himself** [2]  8/7 93/18
**hired** [1]  14/12
**his** [28]  4/8 8/16 19/13 19/15 21/4 21/12
21/16 24/7 24/9 24/9 31/18 39/20 40/20
40/20 93/13 100/9 100/19 101/5 101/5
101/16 106/7 106/10 114/3 115/3 115/3
115/20 122/6 133/6
**history** [4]  18/10 18/11 18/16 86/10
**hold** [3]  13/6 14/2 58/21
**home** [1]  13/4
**honest** [7]  12/15 28/19 30/9 38/4 82/19
85/4 130/17
**honestly** [12]  26/20 44/18 48/10 53/3 80/7
84/9 85/1 89/20 92/14 97/20 127/21 130/4
**hope** [6]  44/12 53/3 86/14 110/12 119/3
125/15
**Hopefully** [1]  20/9
**horse** [64]  16/5 28/4 34/6 34/8 34/13
34/20 38/10 40/9 44/2 44/3 49/7 49/7 52/3
53/1 53/19 53/21 53/21 54/12 55/8 55/8
55/14 55/21 56/3 56/8 57/1 57/2 57/6 58/4
58/11 60/9 64/2 64/15 66/1 75/21 76/2 76/3
78/11 78/12 103/16 103/18 104/1 108/12
108/15 109/3 109/9 109/12 109/14 109/20
110/3 116/9 119/17 119/17 127/14 127/16
127/18 127/21 128/3 128/12 128/17 129/8
129/15 129/19 133/6 134/1
**horse's** [4]  67/17 76/7 76/12 128/13
**horsemen** [34]  36/10 36/12 39/4 42/19
43/3 43/18 45/10 45/21 46/8 56/7 56/8
65/12 76/12 78/18 79/14 80/14 81/6 90/10
90/18 91/10 91/19 92/11 97/5 98/5 105/21
110/20 113/17 119/9 122/8 122/9 123/5
123/10 127/10 130/7
**horsemen's** [6]  1/5 2/2 42/13 43/9 79/16
102/16
**horses** [60]  16/8 34/21 35/3 35/4 35/5
35/7 35/16 36/5 36/7 38/13 38/14 49/17
49/18 51/16 51/17 52/2 53/15 54/3 54/5
54/6 54/14 57/18 57/19 60/9 63/16 63/17
63/20 63/20 64/7 64/16 65/14 66/16 66/16
76/4 76/11 78/20 78/21 79/14 83/10 83/14
83/16 84/1 99/2 99/3 100/10 102/4 102/13
103/3 103/8 106/10 107/11 107/16 107/19
109/7 114/3 115/3 115/10 115/12 128/4
128/14
**horses'** [1]  84/17
**hostile** [2]  101/16 123/1
**Hostler** [3]  100/15 100/17 102/2
**hotel** [1]  13/19
**hour** [1]  53/7
**how** [58]  4/16 8/13 8/16 8/18 9/14 9/17
16/3 16/5 19/7 24/2 25/11 27/19 32/19 34/2
37/17 45/11 47/5 47/17 48/1 48/2 48/15
50/8 56/14 57/21 67/13 69/1 71/15 73/14
74/13 75/21 76/4 76/5 78/12 78/19 78/20
79/12 79/21 80/5 81/21 82/13 83/4 83/6
85/19 92/14 93/20 97/19 98/6 99/2 99/10
99/13 100/2 101/18 108/16 120/21 122/1
122/1 123/17 127/8
**however** [1]  48/7

# I

**human** [2]  28/7 30/2
**humans** [3]  28/14 30/7 119/14
**hurt** [5]  49/8 49/18 64/21 65/1 80/4

# I

**I'd** [14]  21/5 30/9 30/18 72/7 84/10 98/4
106/3 106/3 111/12 111/13 116/1 116/2
125/12 132/13
**I'll** [24]  5/4 5/9 6/4 6/17 9/14 10/17 14/7
19/11 27/3 39/4 45/18 62/16 69/6 69/7 69/7
75/6 75/11 76/15 78/12 78/17 88/11 104/3
104/4 104/7
**I'm** [115]  5/12 5/19 8/9 10/10 10/10 18/21
19/10 19/18 19/21 20/9 20/16 21/15 24/11
26/7 27/20 28/1 28/9 29/3 29/3 32/12 34/9
34/10 36/8 36/18 37/14 40/5 42/2 42/16
42/17 45/11 46/13 47/8 47/19 48/17 50/10
53/9 54/2 56/17 58/6 58/7 59/7 62/20 63/4
63/16 68/2 68/18 70/2 70/6 71/6 72/1 73/1
73/8 76/17 77/6 77/9 77/16 77/19 79/1 79/2
79/5 83/13 84/12 86/13 87/7 87/20 89/1
91/21 94/16 94/19 95/11 99/21 100/13
100/14 101/10 103/9 103/10 103/10 105/6
106/11 106/20 107/3 107/17 108/17 108/21
110/9 113/6 113/19 114/15 114/16 115/1
115/18 116/3 116/12 117/11 118/5 118/8
118/18 118/19 118/21 120/2 120/4 120/17
120/20 121/13 121/16 121/19 124/1 125/11
126/3 126/15 126/16 127/9 127/19 130/21
131/9
**I've** [31]  16/7 23/15 36/9 36/11 40/5 41/18
51/13 52/6 53/8 53/10 61/3 70/10 71/21
72/1 76/21 83/18 83/19 91/14 102/20 106/5
106/9 106/13 110/13 111/8 111/14 112/12
112/16 112/17 123/15 123/15 124/15
**ice** [2]  28/2 28/6
**idea** [1]  12/12
**ideas** [1]  12/14
**identification** [3]  61/8 88/21 105/5
**identified** [2]  28/18 74/6
**identifier** [2]  23/20 24/1
**identify** [4]  61/10 61/11 89/2 99/13
**identifying** [1]  68/19
**if** [84]  5/7 5/8 5/11 6/4 6/13 6/16 10/10
18/16 18/21 19/13 21/16 26/1 26/3 27/2
27/15 27/19 28/2 28/6 28/9 28/10 29/3
35/13 36/8 38/9 40/15 42/7 43/1 43/13
43/14 45/16 45/19 49/20 50/12 51/15 54/16
55/13 55/18 55/21 56/8 64/14 64/15 68/12
71/18 72/1 75/7 75/11 77/10 79/15 83/9
83/13 83/19 84/3 85/8 87/3 88/16 91/11
92/13 95/21 97/18 99/21 103/4 103/13
103/15 104/4 104/17 106/7 106/11 107/4
107/13 108/9 112/8 113/6 113/14 114/5
114/15 115/5 118/6 118/21 128/7 130/16
133/6 133/9 133/12 136/13
**immediate** [1]  19/3
**immediately** [1]  20/10
**important** [3]  5/17 6/1 91/8
**importing** [1]  60/10
**improper** [4]  115/3 131/15 131/20 132/2
**in** [269]
**including** [2]  47/7 136/7
**increase** [1]  9/3
**increased** [2]  8/21 86/17
**indicate** [2]  84/16 94/6
**indicated** [2]  20/11 31/11
**indirectly** [1]  59/20
**individual** [3]  76/11 76/11 78/12
**individuals** [1]  100/20
**industry** [3]  16/6 77/15 110/4
**ineligible** [3]  63/21 109/3 109/13
**inferior** [6]  64/8 64/8 97/5 97/9 97/10 99/6
**inform** [3]  61/14 110/20 125/3
**information** [13]  42/6 66/17 66/21 67/2
67/3 67/4 69/9 70/3 75/12 76/12 78/7 114/1
127/12
**informed** [1]  132/7
**informing** [1]  88/12
**injunction** [1]  100/6
**injure** [1]  54/10

# I (continued)

**ins** [1]  51/15
**inside** [2]  39/5
**instance** [3]  28/3 66/10 89/8
**instead** [1]  62/6
**instructed** [1]  124/19
**instructions** [2]  5/5 6/21
**integrity** [3]  26/9 28/11 32/1
**intention** [1]  6/5
**interaction** [1]  10/12
**interest** [2]  42/4 42/13
**interested** [1]  135/15
**interesting** [1]  20/20
**intermediary** [2]  43/1 110/21
**interrupt** [2]  5/18 5/19
**interviewed** [1]  12/1
**into** [7]  10/18 14/21 37/17 38/7 52/16
58/14 67/10
**investigate** [1]  131/15
**investigated** [1]  113/21
**investigation** [1]  114/14
**involved** [2]  27/13 111/14
**irrevocable** [1]  40/14
**is** [192]
**isn't** [5]  23/16 50/2 90/15 99/7 119/20
**issue** [4]  31/3 100/18 103/7 105/20
**issued** [2]  58/21 116/19
**issues** [4]  101/8 101/9 101/12 126/13
**it** [217]
**it's** [92]  5/5 5/17 6/1 6/5 6/12 7/10 7/11
7/13 7/19 11/11 17/17 19/4 19/6 19/9 19/21
21/17 28/10 38/7 38/9 38/11 39/19 40/13
42/3 42/12 45/9 45/12 45/12 45/15 45/19
46/19 48/9 49/15 51/12 53/3 53/5 53/6 53/8
54/14 55/13 56/18 58/17 59/5 59/8 59/13
61/3 61/20 67/10 67/15 67/15 68/15 70/9
71/19 72/11 72/12 72/13 72/15 72/17 73/15
73/19 74/10 74/10 74/11 74/12 76/10 77/6
77/7 77/21 79/13 80/9 80/11 86/21 86/21
88/11 89/7 102/19 104/2 104/13 104/17
108/20 109/3 110/14 113/12 114/7 114/12
114/12 116/14 117/12 118/6 121/17 125/15
128/5 128/16
**items** [3]  69/8 75/9 79/14
**its** [5]  27/11 43/7 44/4 58/18 59/12
**itself** [1]  116/17

# J

**Jamtgaard** [1]  23/4
**January** [1]  60/12
**Jim** [7]  27/5 71/14 74/12 87/1 94/3 99/16
101/3
**job** [21]  10/2 12/2 12/3 13/6 13/11 14/2
14/10 15/3 15/21 18/18 19/13 20/2 22/12
22/17 23/11 23/15 25/20 30/6 38/9 38/11
125/13
**jobs** [2]  15/15 18/8
**jockey** [1]  119/10
**jockey's** [1]  31/17
**jog** [2]  32/16 100/13
**jogged** [1]  60/9
**John** [1]  99/17
**Johnson** [1]  111/11
**Johnston** [1]  31/20
**jots** [1]  120/21
**judge** [8]  13/12 15/14 22/18 23/5 23/6
23/16 23/19 72/3
**judges** [1]  23/3
**July** [1]  62/1
**jump** [1]  13/10
**jurisdiction** [5]  59/9 59/10 112/17 119/2
119/13
**jury** [2]  60/2 72/3
**just** [77]  5/4 6/4 7/16 13/15 14/7 16/9 20/4
21/7 23/18 24/12 24/13 29/16 30/19 32/17
33/10 35/20 36/21 38/7 41/1 41/2 45/5
45/18 47/20 48/17 48/21 50/12 55/4 60/2
60/10 61/5 62/15 62/20 63/3 71/19 73/18
76/4 76/9 76/15 76/16 78/17 84/11 89/5
92/4 92/16 93/8 95/15 98/4 98/13 98/20
102/9 103/7 105/17 105/21 106/7 108/20
109/21 110/1 113/5 113/8 120/21 122/8

## K

keep [4] 27/24 27/13 125/16
keeping [1] 103/7
keeps [1] 57/15
Kelly [2] 23/3 87/1 114/1 121/6
Kentucky [20] 7/4 7/15 13/3 13/6 13/12
14/11 14/12 14/13 14/21 15/6 15/7 15/13
16/13 16/20 17/8 17/13 17/14 34/5 34/12
34/14
kept [2] 120/16 120/18
Kiching [2] 22/6 22/17
kind [5] 79/15 92/15 106/5 110/21 124/5
King [1] 2/5
Kingland [4] 15/11 15/11 15/14 15/20
Kirk [1] 31/17
knew [2] 14/6 14/10
know [137] 5/9 5/19 5/20 6/17 8/17 10/7
11/12 18/20 19/13 19/17 20/2 20/6 20/9
27/3 28/10 30/10 33/21 35/13 35/15 35/18
36/7 37/7 37/10 37/11 43/8 43/11 43/12
43/14 43/15 43/19 44/16 46/9 46/9 49/8
52/6 53/10 55/3 55/15 57/3 57/18 64/14
68/6 71/18 71/19 72/11 72/12 72/13 72/15
77/12 77/14 77/17 77/18 78/1 78/4 78/18
80/8 82/6 82/7 84/9 84/10 84/13 84/20
86/21 86/21 87/9 87/10 87/12 87/14 87/17
87/18 88/2 89/18 90/9 90/21 92/14 93/8
93/9 93/10 93/11 93/12 95/12 95/21 96/6
98/4 98/10 101/20 101/21 102/9 102/10
102/10 102/12 103/9 105/20 106/8 106/12
106/17 106/21 107/10 107/15 110/16 111/7
111/7 111/21 112/2 112/4 112/5 112/8
112/18 113/1 113/20 115/13 115/15 116/12
117/9 118/15 120/1 120/9 120/13 121/17
122/5 122/19 123/3 123/20 123/20 124/1
124/4 124/5 125/10 125/10 125/11 127/21
128/1 128/11 131/5 132/10 132/12 134/10
knowing [3] 67/20 92/21 110/13
knowledge [28] 33/16 36/13 36/16 36/18
37/13 47/2 47/4 48/3 50/9 58/6 59/4 61/4
61/20 72/5 76/20 88/5 90/11 99/5 101/15
102/15 106/13 107/18 109/17 110/20
113/16 124/8 126/11 133/4
knowledgeable [2] 77/15 107/3
known [4] 34/2 35/3 35/6 58/2
knows [1] 30/13

## L

lack [1] 39/1
Lamp [2] 10/11 10/13
landed [3] 10/1 34/3 62/3
LANE [1] 136/2
last [11] 7/16 15/12 19/5 21/6 66/5 66/8
98/12 107/19 114/7 121/5 121/12
lasted [1] 14/8
law [4] 55/15 55/19 57/6 59/20
laying [1] 28/4
layman's [1] 26/2
leading [1] 35/11
learned [3] 41/18 130/1 133/2
least [9] 19/9 28/10 33/17 40/18 46/14
51/4 51/8 68/13 114/5
leave [4] 12/4 15/4 49/9 57/12
leaving [5] 57/13 128/14 129/19 133/16
134/1
led [1] 103/9
left [7] 12/17 13/7 15/3 23/18 38/14 67/4
133/17
legal [2] 108/17 108/18
legally [1] 54/17
legislate [1] 103/5
legitimate [1] 104/2
Leslie [1] 23/3
less [1] 64/13
Lest [2] 71/12 88/18
let [9] 5/9 6/17 30/5 45/18 48/14 61/9
88/15 116/7 120/1
let's [7] 10/17 23/3 23/17 23/18 62/8 99/15
132/14
letter [7] 3/6 88/11 88/11 89/4 89/9 93/8

licensed [4] 25/4 25/4 36/6 44/10
licenses [2] 60/21 61/1
like [36] 4/16 5/17 5/17 13/6 15/12 20/9
21/14 22/12 27/21 29/4 33/3 38/3 39/10
39/19 54/8 63/21 64/5 66/21 68/10 69/8
70/2 82/11 103/9 103/13 103/18 110/21
111/12 111/13 114/12 128/4
line [3] 40/21 137/8 138/2
lip [1] 76/8
list [16] 18/9 32/11 34/17 66/16 68/6 68/15
69/8 75/4 78/21 107/14 109/10 109/12
109/12 109/15 109/16 109/19
list/starter's [1] 109/12
listed [6] 22/9 23/13 23/14 122/11 136/9
136/12
listen [2] 5/6 42/4
listened [2] 77/20 79/3
little [5] 7/13 13/11 13/18 32/17 81/2
live [2] 7/5 39/19
livelihood [4] 90/6 91/10 91/19 92/11
lives [1] 16/20
LLC [4] 1/10 2/9 43/21 136/1
LLP [1] 2/11
loading [1] 53/19
locate [1] 66/21
located [1] 44/4
location [1] 121/7
logical [2] 71/20 103/17
London [1] 24/1
long [7] 8/16 8/18 9/14 9/17 16/5 34/2 66/5
128/13
looked [2] 35/8 35/9
looking [7] 24/10 59/7 77/16 82/20 85/1
85/4 87/7
Lori [1] 32/6
losing [2] 132/6 132/7
lost [6] 99/14 100/19 102/11 122/11
122/15 122/19
lot [7] 9/3 30/11 90/19 98/10 98/11 98/14
130/9
Love [1] 2/11
loves [1] 41/19
lying [1] 19/10

## M

MADAM [1] 136/5
made [10] 40/7 46/7 50/13 75/21 82/3
114/16 127/5 136/9 137/6 138/12
maiden [5] 63/18 64/5 64/11 66/2 66/3
maidens [2] 64/9 64/12
mail [4] 21/10 21/17 27/3 69/4
main [1] 23/15
mainly [2] 27/21 80/20
maintaining [1] 114/4
maintains [1] 117/2
maintenance [12] 26/21 27/10 27/11
27/16 27/20 28/18 51/20 101/5 124/9
124/11 125/15 125/19
major [2] 17/14 23/7
majority [3] 90/10 90/18 90/19
make [25] 6/6 6/12 41/4 45/20 46/16 49/11
49/12 58/14 67/9 69/7 69/8 69/12 69/13
75/5 75/7 75/8 75/11 76/16 92/16 93/2 93/5
104/11 110/15 111/1 115/8
maker [2] 87/7 87/8
makes [4] 46/2 86/19 88/9 103/17 104/13
making [3] 112/19 127/2 138/13
male [1] 123/10
management [12] 17/14 17/19 17/20 27/6
27/9 27/13 91/8 116/18 117/8 118/3 118/14
131/19
manager [2] 20/8 27/4
manner [1] 58/19
many [34] 8/13 19/7 24/2 32/19 47/5 47/18
48/1 48/2 48/7 48/15 56/10 56/14 64/13
70/15 73/14 75/21 76/4 76/5 77/9 78/19
79/12 79/21 80/5 80/14 81/21 88/13 90/12
99/13 108/16 109/10 116/18 120/21 122/1
122/1
March [3] 15/5 60/12 135/19

MARTINSBURG [6] 1/3 1/15 2/6 2/13 4/1
136/3
Mary [5] 106/17 107/2 107/4 107/5 107/15
Mary's [1] 107/8
material [1] 124/16
math [1] 51/16
matter [6] 13/15 33/19 54/12 56/10 105/16
128/8
matters [3] 118/3 118/13 118/15
MAWING [39] 1/4 2/2 2/15 34/1 34/2 34/13
35/6 36/13 36/14 36/17 58/2 82/18 83/5
85/14 85/17 85/20 89/19 93/2 93/7 93/21
94/7 95/8 95/12 96/12 97/13 102/6 103/1
103/2 104/19 108/12 110/7 111/15 122/2
122/5 127/5 131/13 132/6 132/7 137/4
Mawing's [9] 41/12 41/15 42/8 86/7 86/15
94/11 99/2 110/2 132/19
MAXIM [1] 136/1
may [12] 9/21 11/6 47/20 53/9 58/11 59/12
59/14 62/3 108/1 118/3 132/14 134/10
maybe [13] 8/9 8/14 9/3 13/19 21/6 38/15
48/17 51/13 51/17 90/19 107/3 109/9
132/13
McDavid [1] 2/11
MD [1] 66/1
me [78] 4/16 5/9 5/19 6/17 10/15 12/5
12/16 12/17 12/21 13/10 14/12 20/8 20/10
21/3 21/12 23/4 23/7 28/5 30/5 35/11 35/13
37/3 40/1 40/15 45/18 48/14 51/4 53/18
54/2 56/6 56/7 56/7 57/5 57/12 58/8 61/9
62/20 65/5 68/18 71/17 72/1 72/12 73/10
74/4 74/10 74/11 81/2 86/21 88/10 88/15
90/3 93/8 93/10 93/11 103/4 103/5 103/15
103/21 104/5 104/6 106/4 108/20 115/2
116/7 120/2 121/20 127/1 127/16 129/6
129/14 130/3 130/16 131/4 131/9 132/4
135/5 135/6 135/8
mean [15] 27/1 29/17 58/14 74/19 74/19
75/10 75/20 81/3 92/1 92/2 93/10 95/15
104/8 115/1 127/21
meaning [3] 70/21 78/10 116/13
means [2] 69/5 69/18
meet [4] 13/13 13/14 15/6 83/10
meeting [34] 21/1 21/3 21/6 21/15 32/19
38/6 46/1 58/11 60/3 60/4 60/6 60/19 61/2
61/15 67/12 70/8 72/1 74/9 75/1 79/7 79/9
79/11 80/9 82/2 82/4 82/8 82/12 82/15
82/17 85/5 96/21 98/13 121/9 121/11
meetings [5] 59/19 74/14 88/7 96/18
120/16
meets [4] 15/9 38/2 70/9 74/5
Melissa [2] 23/18
member [5] 23/2 36/14 37/8 37/14 71/10
members [6] 36/12 37/10 37/16 43/7 70/8
74/6
memory [5] 31/15 32/16 71/12 85/6
100/14
mention [2] 122/12 129/14
mentioned [2] 26/12 132/4
mentioning [1] 129/6
menu [1] 26/2
met [2] 84/7 84/18
Michael [3] 71/14 74/12 94/3
mid [1] 65/2
mid-year [1] 65/2
might [22] 13/10 38/6 43/13 48/20 48/20
49/9 49/11 50/16 50/18 58/16 62/6 72/7
72/8 72/8 72/19 76/21 78/14 100/15 102/11
119/9 125/18 129/4
Mike [5] 22/3 27/4 86/21 114/1 121/6
Miller [1] 22/20
mind [9] 19/20 22/5 22/12 31/13 77/10
95/11 103/8 108/20 114/12
Mine [1] 17/19
minimum [5] 45/20 46/7 65/17 68/13 77/2
minutes [4] 32/19 32/20 53/4 132/14
mislead [1] 62/21
missing [1] 109/18
mistreated [1] 101/1
mistreatment [1] 100/18
money [1] 90/11

C-32

## M

Moore.. [20]  29/4 29/14 30/16 31/4 33/11
33/15 71/13 72/9 81/4 86/1 97/19 106/17
106/20 106/21 107/1 107/2 107/4 107/5
107/8 107/15
Moore's [4]  20/2 107/1 107/6 107/8
Moore/Dicky [1]  106/21
more [19]  6/8 9/3 9/6 9/10 20/12 20/17
26/20 29/15 31/11 38/16 38/17 51/4 53/3
53/5 53/7 95/13 95/15 104/9 116/7
morning [2]  24/6 32/2
most [11]  22/17 31/20 38/3 38/13 48/18
64/19 65/4 84/4 99/6 99/7 101/13
mother [1]  107/9
motivational [1]  22/14
move [1]  49/12
moved [3]  11/18 14/20 24/13
moving [1]  41/3
MR [80]  4/10 4/11 7/2 8/20 10/13 18/16
19/7 19/17 20/2 20/6 20/12 20/18 22/17
26/12 28/21 29/14 30/1 30/6 30/16 30/17
31/4 31/4 31/16 33/5 33/9 33/11 33/11
33/14 33/15 37/11 37/18 38/18 40/3 41/12
42/7 48/1 61/9 62/10 72/9 72/9 72/9 72/13
72/15 73/5 76/18 81/4 81/4 81/4 81/15
81/15 85/13 85/16 85/19 86/1 86/3 92/6
93/6 93/13 97/12 97/15 97/17 97/19 97/21
101/6 101/7 101/12 101/18 102/2 103/1
104/13 105/6 105/13 113/20 114/20 115/16
118/9 119/1 131/1 132/19 134/10
Mrs [1]  107/8
Ms [37]  23/10 34/2 34/13 35/6 36/13 36/14
36/16 41/11 41/14 42/8 82/18 83/5 85/14
85/17 85/20 86/6 86/15 89/19 93/7 93/20
94/7 94/11 95/8 95/12 96/12 97/12 99/2
103/1 103/2 104/18 108/12 110/2 110/7
122/5 131/13 132/7 132/19
much [6]  13/20 16/7 19/21 21/14 32/16
38/16
must [3]  53/15 65/15 66/20
my [101]  6/5 8/17 9/4 9/8 12/2 13/4 17/14
18/2 18/4 19/2 19/5 19/20 20/14 22/1 22/5
22/12 23/2 24/14 25/21 27/12 29/17 29/17
32/12 32/16 33/10 33/16 33/16 33/21 34/10
34/21 36/18 37/13 38/4 38/9 38/11 38/16
42/3 45/3 45/12 47/2 47/4 48/3 50/9 52/7
57/4 58/5 59/4 59/5 61/4 61/19 62/7 67/10
70/2 70/7 71/12 74/20 76/20 77/6 77/10
77/11 77/12 78/16 78/17 79/1 79/15 80/2
80/20 81/7 81/10 81/13 82/11 82/21 84/11
85/5 88/5 88/12 90/11 90/17 95/19 96/20
99/5 99/15 99/18 100/14 101/15 102/13
103/6 103/12 104/3 108/19 110/19 113/3
114/12 115/2 122/9 122/17 124/8 133/20
135/19 137/7 138/14
myself [8]  71/13 75/2 75/14 76/15 84/11
87/1 111/10 116/2

## N

name [14]  4/12 4/14 7/18 11/20 24/7 32/8
66/1 66/5 66/6 66/8 99/15 107/5 132/12
137/4
named [5]  37/4 106/17 108/12 122/12
132/10
Nancy [1]  32/3
National [3]  11/4 11/7 11/21
natural [1]  55/1
necessarily [1]  77/20
necessary [1]  54/14
need [6]  6/13 6/16 56/11 62/5 68/13
103/18
needed [1]  33/3
needs [5]  27/2 27/5 27/17 56/2 69/19
negative [8]  52/11 52/11 85/9 85/13 85/16
85/20 86/3 86/6
neglect [3]  113/21 114/21 116/4
neglected [1]  114/3
neglecting [1]  114/2
neighborhood [2]  98/19 98/20
neither [2]  97/2 135/10

## O

nice [2]  34/20 49/5
nickname [1]  24/9
night [4]  7/15 24/7 52/17 56/15
nights [3]  90/13 90/19 90/19
nine [4]  11/8 11/17 13/17 90/14
no [116]  1/8 5/2 6/13 7/7 8/5 8/5 10/6
10/15 11/11 33/7 33/13 33/16 33/20 35/17
42/10 47/16 50/2 54/11 56/10 57/6 61/5
61/7 61/10 61/16 62/2 63/2 63/2 63/4 63/13
65/7 68/1 68/1 68/3 71/9 71/9 76/9 78/3
80/2 80/11 81/17 81/19 82/1 85/12 85/15
85/18 86/6 87/11 87/13 88/1 88/18 88/20
89/2 89/17 90/1 93/5 93/10 93/17 93/19
94/8 94/13 94/20 95/2 95/2 95/3 95/4 95/7
96/2 96/8 96/11 96/14 96/14 96/16 98/8
102/1 105/2 105/4 105/7 105/19 106/16
108/6 108/9 109/6 111/17 111/20 112/1
112/16 112/21 113/7 113/10 119/16 120/14
122/3 122/17 123/9 124/7 124/18 124/21
125/5 125/8 126/7 126/10 126/19 127/1
127/4 128/7 129/11 129/18 131/4 131/7
131/9 131/17 131/21 132/12 133/3 133/5
134/6
nods [2]  6/9 18/21
nominate [2]  34/7 34/16
nominated [1]  34/6
nominating [1]  34/15
nomination [1]  34/17
non [2]  33/2 79/16
non-alcoholic [1]  33/2
non-devil's [1]  79/16
none [1]  12/9
nonprofit [1]  43/10
nor [1]  135/14
NORTHERN [2]  1/2 17/14
not [181]
notable [1]  35/9
Notary [4]  1/16 135/1 135/18 136/8
notes [3]  120/16 121/11 129/16
nothing [2]  75/14 106/10
notice [3]  1/12 3/7 106/11
notified [1]  114/18
noun [1]  59/8
November [1]  10/9
now [40]  5/15 6/5 6/8 9/9 15/11 19/4 19/15
20/11 22/9 23/19 23/20 24/16 34/8 46/10
46/12 48/11 50/2 51/4 52/1 52/21 57/11
67/4 68/17 73/12 74/1 74/2 86/9 88/6 89/17
94/17 98/16 100/17 102/18 102/21 104/18
105/11 106/7 121/5 123/20 133/6
number [21]  7/10 8/21 38/18 46/10 46/14
65/20 75/18 77/1 77/2 78/5 78/13 80/16
80/19 81/5 82/12 84/6 86/11 86/16 88/14
102/12 121/6
numbers [1]  67/1
nurse [3]  35/18 35/19 37/1

## O

oath [1]  4/8
object [6]  28/6 47/19 91/20 92/12 118/5
118/19
Objection [1]  90/7
objective [1]  84/8
obligated [1]  28/9
obliged [2]  27/6 43/2
observation [2]  86/15 90/18
observe [1]  86/16
observed [3]  114/20 115/1 126/8
occupation [1]  122/6
occupational [3]  58/21 59/15 105/14
occupied [6]  48/2 48/4 48/10 48/12 49/3
102/15
occurred [3]  56/13 96/19 102/18
occurrence [1]  128/5
off [13]  24/14 31/8 31/10 54/7 57/19 69/13
73/3 90/12 109/16 128/17 132/18 133/7
133/8
offered [2]  14/16 26/3
office [13]  10/1 14/17 21/12 21/16 38/8
38/19 39/5 39/7 42/8 69/4 70/10 101/7
119/8

officially [2]  9/21 15/4
officials [11]  22/1 22/10 22/15 24/17 24/20
25/8 26/9 69/2 108/12 117/3 124/20
often [4]  22/17 37/17 74/13 78/12
oftentimes [2]  18/7 119/7
Oh [4]  8/5 58/16 85/10 122/14
Ohio [2]  16/13 16/14
okay [66]  4/21 5/13 5/14 5/21 6/3 6/7 6/15
6/20 7/12 8/9 9/17 10/17 10/19 13/6 14/19
18/14 19/3 24/4 24/16 27/6 28/12 28/17
29/5 30/12 31/6 33/5 33/11 36/1 36/20 39/8
41/21 46/21 49/1 49/10 51/7 57/5 58/17
61/14 66/7 66/12 72/20 73/9 73/20 79/5
80/5 80/9 81/2 81/9 81/15 84/12 87/2 87/10
95/21 98/6 100/8 102/6 104/16 105/17
107/8 122/11 129/7 132/16 133/4 133/10
134/7 134/9
old [3]  16/3 64/6 64/11
older [2]  63/18 64/11
olds [2]  64/1 64/20
on [105]  1/13 6/5 7/9 10/2 14/8 15/17
20/21 21/1 21/8 22/10 25/8 26/6 26/11
27/21 29/9 34/3 34/17 35/8 35/11 37/12
37/15 37/19 39/3 39/9 39/12 39/13 40/19
48/17 51/15 54/6 56/16 57/4 57/8 57/18
59/15 60/12 63/8 64/1 64/15 64/18 64/21
65/14 66/8 66/17 66/19 66/19 67/4 67/17
68/10 68/16 68/19 69/14 70/14 70/16 70/21
71/1 71/5 71/15 71/20 72/2 72/6 72/10
73/21 75/5 73/13 76/7 76/11 78/9 78/13
78/21 79/1 79/2 82/8 82/10 88/12 90/18
92/4 93/2 95/16 96/1 97/3 97/4 97/12 100/4
100/10 103/21 106/10 107/14 109/2 109/9
109/11 109/14 109/19 110/19 112/3 113/3
113/8 114/17 117/9 119/17 120/20 122/5
128/2 128/12 136/9
once [8]  32/2 39/3 40/11 52/19 64/12
78/20 125/9 128/9
one [86]  9/6 12/9 12/10 12/11 15/8 17/13
21/3 21/6 21/8 21/8 21/11 21/15 26/12
28/20 30/13 30/21 33/3 36/12 36/18 37/15
37/19 38/17 40/8 40/9 40/17 40/19 40/21
40/21 44/19 45/1 45/3 49/8 49/14 49/19
51/11 51/13 53/11 55/13 56/18 62/8 62/14
64/9 68/16 69/2 70/12 70/17 70/19 70/20
73/11 75/6 75/8 77/5 78/6 80/17 82/1 82/1
83/2 88/16 94/2 95/4 96/14 96/20 98/13
98/20 99/16 100/15 103/20 109/8 110/13
110/16 111/10 111/11 111/11 111/18 112/5
112/12 114/2 114/5 114/20 115/18 117/7
117/10 119/5 124/19 127/1 130/15
one-by-one [1]  82/1
one-on-one [1]  21/8
ones [7]  54/9 70/18 78/4 82/21 98/10
109/11 123/18
only [12]  13/16 15/21 18/18 21/3 82/9
87/19 98/5 106/8 111/14 112/5 123/21
133/11
open [2]  21/13 49/16
Open-door [1]  21/13
opens [1]  15/11
operation [1]  103/18
operational [1]  46/15
operations [3]  20/4 20/5 110/8
operator [1]  44/1
opinion [6]  78/17 84/1 84/11 84/12 90/15
110/5
or [164]
order [9]  26/6 49/12 56/2 56/15 56/21
65/14 71/2 77/3 106/9
organization [4]  36/1 36/4 36/10 72/18
organizational [2]  19/20 31/14
origin [1]  62/16
other [53]  14/16 15/14 15/17 21/4 21/16
23/2 28/17 30/10 33/8 36/19 40/20 41/1
42/4 44/1 44/3 51/13 52/1 53/4 60/10 67/19
68/5 75/14 76/21 78/7 78/9 79/8 79/9 79/9
82/21 83/13 98/10 99/20 100/15 101/14
102/14 102/16 102/19 103/3 103/19 108/11
109/21 109/21 111/12 112/12 113/9 115/9
119/9 119/19 119/20 128/4 131/19 132/19

Case 3:11-cv-00903-JPB Document 50-1 Filed 01/06/14 Page 566 of 571 PageID #: 816

## O

102/16 108/18 110/18
out [41]  7/10 25/14 26/4 28/4 35/20 36/21
37/2 38/14 38/21 39/1 39/4 49/8 49/15
53/11 62/5 62/8 62/11 64/7 67/7 67/9 67/10
75/6 75/12 76/9 76/11 77/1 78/14 80/2
90/14 90/20 93/3 96/9 103/20 123/15 124/6
126/6 126/9 128/13 134/3 134/4
outcome [1]  135/15
outfit [1]  41/2
outrider [5]  31/21 32/4 32/5 32/8 41/3
outriders [2]  31/19 32/6
outs [1]  49/17
outside [1]  88/7
over [25]  10/13 13/18 26/15 28/13 29/2
29/9 29/20 30/11 31/12 38/8 38/19 41/4
48/3 48/4 51/14 58/15 73/17 86/17 98/9
98/12 118/14 119/2 119/13 125/1 125/11
overlap [1]  15/7
overlaps [1]  15/7
override [1]  118/3
oversee [3]  59/8 110/17 117/4
overseeing [1]  124/10
oversees [1]  124/9
own [1]  25/13
owned [3]  11/11 25/16 116/17
owner [6]  44/1 49/19 49/19 56/21 66/6
66/9

## P

padding [3]  15/14 23/6 23/16
PAGE [5]  3/2 136/7 137/8 138/1 138/2
PAGES [1]  136/11
paid [1]  117/7
paperwork [1]  52/9
paramutual [1]  15/21
pardon [2]  71/17 72/1
Park [3]  14/11 14/18 35/2
parking [1]  18/11
Parkview [1]  7/3
part [17]  31/19 32/6 32/8 34/21 40/12
40/13 57/4 63/15 64/19 65/4 84/3 84/4 86/9
86/13 99/6 113/3 117/14
part-time [3]  31/19 32/6 32/8
participate [5]  62/14 80/13 82/17 108/4
109/16
participated [2]  71/21 80/15
particular [2]  38/15 78/14
parties [4]  91/7 93/1 135/11 135/14
party [1]  44/14
passed [2]  98/9 98/12
passing [1]  21/17
past [6]  30/11 33/19 70/10 77/11 103/21
114/8
path [2]  28/4 28/7
Patty [1]  122/13
pay [1]  13/19
paying [2]  45/13 45/16
pays [1]  36/7
penalty [1]  138/10
Penn [4]  11/4 11/7 11/20 11/21
Pennsylvania [3]  11/13 14/5 16/14
people [33]  22/11 22/13 24/16 25/2 26/13
29/20 31/12 32/1 32/11 39/21 50/3 53/12
59/4 70/21 71/1 71/4 71/15 71/20 79/13
82/3 82/13 94/2 97/5 98/14 98/16 99/4
99/13 101/17 102/19 110/17 122/11 124/13
125/16
people's [1]  102/14
per [13]  13/20 77/1 78/5 110/16 121/7
percent [4]  10/11 51/14 51/15 117/9
percentage [1]  94/15
perception [1]  45/12
performance [2]  64/8 64/9 103/21
performs [2]  23/10 23/12
perhaps [4]  5/3 101/14 107/2 119/10
period [14]  10/20 48/15 61/2 61/19 61/19
62/1 62/9 64/3 64/18 65/17 70/19 74/19
76/6 104/8

133/19
permit [3]  59/15 105/14 122/7
permits [1]  58/21
permitted [1]  109/5
person [18]  21/10 24/13 35/14 36/6 80/4
82/8 82/11 100/15 106/17 110/14 111/6
111/8 114/19 121/1 121/7 122/15 123/8
124/7
person's [1]  86/10 103/16
personal [3]  66/20 90/15 110/5
personally [5]  35/13 76/16 78/1 90/9
92/16 93/5 110/8 120/12 132/5
persons [2]  58/9 58/20
pertain [1]  118/15
pertaining [4]  59/20 106/8 118/4 118/13
pesticides [1]  131/16
PETERSON [4]  2/10 18/16 33/9 134/10
Phillip [1]  132/10
phone [1]  67/1
physical [1]  27/15
physically [2]  28/5 65/3
pick [2]  42/5 111/10
picks [1]  111/6
pile [1]  83/1
pipe [1]  28/3
place [9]  36/11 40/16 44/20 45/1 45/3
51/12 67/11 69/5 109/11
places [5]  16/15 50/17 53/8
placing [3]  53/11 22/18 23/3 23/5 23/19
Plaintiffs [2]  1/7 2/2
play [1]  79/15
please [4]  4/12 31/16 136/8 136/10
Plus [1]  48/11
PNGI [7]  1/9 2/8 25/16 43/20 44/6 45/7
137/4
point [6]  9/6 40/5 74/5 87/14 95/5 129/21
poison [5]  124/5 126/8 126/17 131/2 132/3
poisoning [9]  124/2 124/14 124/17 125/4
126/14 126/21 127/6 127/13 131/20
poisons [2]  126/6 130/20
police [1]  58/18
policies [6]  68/6 68/21 110/19 117/5 126/3
130/19
policy [4]  21/13 29/18 68/7 103/13
ponies [1]  42/1
pony [7]  40/8 40/10 40/10 40/18 40/21
68/12 68/15
poor [3]  56/3 101/2 102/4
poorly [4]  54/6 54/8 54/9 56/1
population [1]  49/7
pose [1]  28/7
position [10]  14/16 16/16 22/8 91/18 92/2
92/8 92/21 111/4 111/5 116/3
possible [3]  41/5 125/3 131/15
powdered [2]  126/18 126/21
practice [1]  128/16
practices [1]  126/4
preference [2]  71/4 79/3
preferences [1]  71/6
preoccupying [1]  21/4
preparation [3]  33/6 33/9 74/21
prepare [4]  5/16 32/15 89/8 89/10
presence [1]  117/2
present [2]  2/15 52/9
presented [2]  52/12 81/20 127/11
presents [2]  53/20 54/3
President [1]  20/3
pretty [7]  16/7 21/14 83/8 87/11 94/13
123/18 132/15
prevent [1]  58/19
pride [1]  38/12
primarily [4]  23/10 23/12 23/19 25/21
primary [1]  23/7
print [2]  76/9 76/10
printer [1]  38/1
prints [1]  77/1
prior [5]  8/17 9/3 9/8 10/9 10/10 11/5
19/5 19/14 21/5 32/17 37/19 45/3 52/7
56/11 61/18 62/7 67/11 75/7 86/11 86/17
102/13 102/16 110/13 119/8 122/17
privately [1]  116/17

problems [1]  132/20
PROCEDURE [1]  136/18
procedures [1]  26/9
process [14]  5/6 52/5 65/6 65/9 65/10
68/4 70/5 74/3 79/6 80/11 86/10 87/20
113/16 113/19
PROCESSING [1]  136/12
product [1]  38/13
professional [2]  35/14 37/19
professionally [1]  39/21
program [6]  17/16 22/10 22/21 23/1 26/6
26/8
proof [2]  38/1 59/7
proofed [1]  66/13
proofs [2]  22/21 119/21
proper [2]  26/8 52/9
properly [2]  75/13 114/4
property [3]  25/13 25/16 42/13
Protection [1]  43/10
PROTECTIVE [3]  1/6 2/3 36/5
provide [11]  31/2 31/3 39/7 45/9 56/9
77/19 77/20 79/20 87/3 126/12 133/7
provided [4]  58/11 67/19 75/15 83/11
providing [3]  66/17 80/15 87/6
Public [3]  1/16 135/18 136/8
publication [1]  26/7
published [1]  26/6
publishes [1]  22/21
publishing [1]  37/20
pull [1]  120/2
purchased [1]  12/1
purpose [1]  42/12
purposes [3]  22/14 128/20 133/11
pursuant [2]  1/12 45/6
purveyor [1]  59/7
put [14]  26/10 31/5 42/2 62/5 62/8 62/10
66/20 103/16 124/2 124/5 126/6 126/9
128/4 130/3

## Q

qualifications [1]  109/7
quality [14]  35/4 35/7 78/10 83/9 83/14
83/16 84/1 84/3 84/17 84/18 87/5 99/2 99/3
99/6
quarters [2]  60/14 60/15
Queen [2]  1/15 2/12
question [27]  5/7 5/7 5/9 5/10 5/10 5/12
5/13 6/2 20/20 30/5 42/16 50/11 73/10 80/7
83/7 87/9 88/10 90/8 91/21 101/19 103/11
103/12 110/12 120/9 121/5 121/12 123/5
questions [7]  5/6 18/9 73/5 94/7 116/7
134/7 134/11
quibbling [1]  30/15
quote [1]  91/6

## R

race [58]  9/1 10/10 10/16 11/7 11/8 11/10
11/12 11/16 12/2 12/2 13/16 14/11 15/14
15/20 16/1 19/14 22/2 26/9 32/2 34/7 34/14
34/18 34/18 35/9 38/10 38/11 38/15 39/14
45/8 45/21 49/16 51/15 54/18 55/1 55/8
56/3 56/6 56/13 58/11 58/18 59/3 60/6
61/2 61/15 64/10 64/16 64/17 65/2 68/12
77/11 78/15 109/9 116/16 118/14 119/18
133/12 133/19 133/20
raced [1]  36/9
racehorse [1]  52/14
races [31]  7/6 9/15 9/18 11/19 18/18 24/7
25/9 26/3 26/5 26/5 35/5 35/12 38/14 40/1
42/15 43/3 43/21 44/9 44/14 45/20 46/6
48/13 56/4 78/16 84/2 90/14 90/14 91/8
100/8 106/15 130/19
racetrack [1]  15/17
racing [82]  10/4 10/6 10/14 11/14 13/12
14/1 14/16 14/17 16/5 16/16 16/17 18/18
19/15 20/3 20/5 22/1 22/3 22/7 22/8 22/10
22/15 22/20 23/1 24/17 24/20 24/21 25/3
25/7 26/8 32/3 38/12 42/14 44/2 44/10 46/6
52/2 54/16 55/16 55/20 56/1 57/6 57/9
58/4 58/9 58/12 59/1 59/11 59/18 59/20
59/21 60/8 60/9 60/9 60/18 64/5 69/16 70/1

**R**

Case 3:11-cv-00993-JPB Document... Filed 01/06/14 Page 567 of 571

RANDOLPH [5] 1/13 3/2 4/6 4/13 137/2
Randy [3] 4/14 4/18 4/19
rat [14] 123/13 124/14 124/17 125/4 125/9
126/5 126/8 126/13 126/17 126/17 126/21 127/6
127/13 131/20 132/3
rats [4] 123/19 124/2 125/14 126/2
Raymond [1] 122/6
re [3] 95/20 133/9 133/16
re-admittance [3] 95/20 133/9 133/16
react [3] 54/5 54/8 54/9
reacts [1] 56/1
read [12] 44/17 44/19 44/20 45/4 45/18
91/14 92/2 106/3 124/16 136/8 136/15
138/11
reading [2] 63/16 136/13
realize [1] 91/2
really [15] 12/14 20/13 20/21 21/3 27/8
57/3 77/16 84/9 94/16 94/19 95/2 97/2
103/7 105/15 116/3
realms [1] 38/12
reason [21] 6/17 12/8 12/13 22/10 42/11
51/10 51/19 53/13 61/16 90/2 101/21 103/6
103/17 104/3 112/11 113/9 113/11 113/13
122/19 133/7 134/5
reasonable [1] 58/12
recall [13] 10/9 41/13 41/14 85/21 86/2
86/4 97/14 97/16 101/16 103/4 104/21
105/10 132/9
receive [9] 17/21 69/1 69/6 77/3 80/14
81/5 84/18 87/19 99/4
received [2] 13/1 86/11
receives [1] 80/6
receiving [6] 47/7 47/13 48/12 51/11 52/4
53/1
recently [7] 35/21 110/1 122/21 127/7
130/2 130/6 130/10
recognize [3] 31/13 107/5 132/13
recognized [1] 91/6
recollect [3] 66/11 101/2 107/14
recollection [10] 32/10 32/12 33/17 34/11
81/10 81/13 86/5 95/19 99/15 109/4
recommend [1] 115/7
recommendation [2] 115/16 115/18
recommended [1] 111/8
record [9] 31/8 31/11 57/20 58/1 62/20
67/16 73/3 132/18 135/9
records [1] 120/18
recruit [1] 35/2
recruiting [1] 35/4
reduce [2] 83/16 88/13
reduced [1] 135/7
referenced [2] 65/6 138/11
referring [3] 60/6 87/20 89/17
refuse [3] 108/13 108/17 108/21
regard [5] 10/13 124/13 125/4 126/13
130/19
regarding [1] 126/21
regardless [1] 115/8
regular [5] 20/21 39/3 39/5 39/12 39/13
regularly [1] 74/17
regulated [1] 116/14
regulation [1] 116/11
regulations [2] 25/12 116/19
regulatory [1] 16/12
rehab [2] 73/18 73/19
related [2] 101/4 106/10 135/10
relates [1] 105/13
relation [3] 8/1 8/4 8/5
relative [1] 135/13
relevant [1] 119/10
remain [1] 53/15
remainder [1] 89/19
remedy [1] 115/6
remember [61] 9/2 9/11 24/10 33/18 34/8
40/4 40/8 41/16 41/16 46/19 60/20 62/7
70/11 82/9 82/16 82/19 82/20 83/1 83/2
83/7 84/20 84/21 85/3 85/6 85/8 85/15
86/8 86/18 94/9 95/2 97/10 97/18 97/20
98/1 99/9 99/11 100/14 101/20 106/20

reminded [1] 108/18
remodeled [1] 46/13
remove [1] 82/17
removed [6] 57/7 111/19 112/2 112/6
112/9 116/5
Renee [3] 107/1 107/10 107/11
rent [2] 7/12 7/17
repaired [1] 27/3
repeat [2] 5/10 118/11
repeating [1] 95/11
rephrase [3] 5/10 50/10 118/11
replace [1] 10/5
report [9] 21/2 21/18 22/1 27/3 28/10
28/11 115/2 128/2 128/12
reported [1] 57/9
reporter [3] 4/12 5/15 6/8
REPORTING [1] 136/1
reports [5] 19/17 20/12 21/21 28/5 128/14
represent [5] 42/13 42/21 43/3 58/9 109/1
representative [3] 42/18 43/7 43/17
reputation [1] 35/12
request [1] 96/1
require [1] 56/20
required [1] 77/3
requirement [2] 65/17 65/18
rescinded [1] 9/4
resigned [2] 14/8 24/12
response [1] 73/10
responsibilities [2] 25/14 25/21
responsibility [15] 23/2 26/10 26/15 27/11
28/13 29/1 29/8 30/2 30/7 30/16 31/13 35/1
58/18 111/4 111/5
responsible [4] 23/1 26/7 32/1 59/18
restroom [1] 6/19
result [1] 100/5
return [3] 133/11 133/19 136/11
reverse [1] 106/9
review [3] 33/5 86/9 136/10
reviewed [2] 121/4 121/15
revocable [1] 61/1
revocation [1] 122/7
Rice [1] 2/11
Richard [8] 19/6 19/18 19/20 20/13 28/19
29/4 106/21 107/6
Rideout [1] 132/11
right [57] 5/3 6/5 6/11 10/7 10/17 15/12
16/15 16/17 17/1 19/15 23/19 23/20 29/13
30/1 30/14 32/14 33/21 36/16 40/15 41/11
43/5 46/12 47/14 47/17 48/11 50/2 52/20
54/5 54/13 54/19 55/9 55/17 55/21 56/20
60/7 63/8 65/11 65/19 66/4 66/6 72/14
72/16 73/12 73/21 74/13 74/15 89/11 108/2
108/17 109/17 115/12 118/2 121/12 123/20
128/19 133/14 136/15
rights [1] 42/14
risk [2] 28/7 53/20
river [2] 15/16 15/18
road [2] 7/9 128/3
Robert [5] 1/16 99/16 101/1 135/2 135/17
role [3] 31/2 37/12 110/21
roles [1] 23/7
rolls [1] 6/10
Ron [1] 22/2
room [3] 13/19 31/17 49/11
roster [1] 24/11
rotate [2] 22/13 22/15
routine [1] 129/7
row [1] 101/5
rule [16] 55/16 55/20 57/14 58/3 58/5 59/2
59/3 59/6 60/1 64/6 64/7 109/13 120/4
120/5 120/6 136/17
rules [26] 57/6 58/12 58/15 59/21 63/7
63/11 63/14 63/17 63/21 64/5 64/5 67/19
68/5 68/7 68/8 68/9 68/16 68/19 71/7 71/9
117/5 117/11 117/14 117/17 119/10 136/17
rumor [1] 123/2
run [13] 14/14 38/7 56/13 63/18 63/21
64/3 64/10 64/12 76/13 78/14 109/3 109/5
109/13
running [1] 14/4 51/16
runs [2] 15/9 36/7

119/13 124/12 124/16 125/3 126/12 130/19
said [13] 39/19 55/19 62/5 62/8 81/20
83/15 85/8 99/20 116/6 130/14 135/6 135/8
135/9
same [5] 14/11 51/18 52/17 101/5 117/12
satisfied [2] 84/17 91/14
saw [5] 95/18 95/19 128/2 128/12 129/19
say [34] 8/14 13/17 19/9 19/11 20/8 21/6
21/12 21/16 27/5 27/8 27/16 28/2 28/12
28/16 29/3 29/11 29/17 39/16 39/17 50/13
50/14 51/7 81/3 90/17 99/17 104/7 112/11
114/7 116/2 119/15 119/20 123/8 128/6
130/10
saying [6] 5/20 29/3 42/21 52/11 98/5
100/3
says [3] 91/11 92/3 92/3
scales [2] 23/21 24/2
scattered [1] 48/19
schedule [1] 70/6
scheduled [1] 74/17
schemes [1] 16/12
Schneider [8] 37/5 37/11 37/18 38/18 40/3
41/12 42/7 113/20
Schneider's [1] 115/16
school [5] 16/9 17/2 17/6 17/7 18/2
schooling [1] 109/14
Science [2] 17/18 17/19
Scooby [1] 37/5
Scott [1] 22/6
scratch [2] 78/19 109/11
seasonal [2] 15/6 15/9
seasons [1] 60/12
seated [1] 33/21
second [1] 122/18
secretary [23] 10/4 10/7 10/10 10/14
10/16 11/9 11/14 11/16 12/2 12/3 14/12
15/21 16/1 18/19 22/2 46/6 56/6 57/9 68/12
69/16 70/7 77/11 89/15
secretary's [1] 133/21
section [1] 120/3
sections [2] 70/12 70/20
security [7] 24/14 57/13 57/15 58/1 59/5
125/16 134/5
see [21] 22/9 23/3 23/17 23/18 27/2 27/4
27/15 27/19 28/5 31/3 39/4 39/11 39/15
45/19 63/7 64/4 71/12 91/12 99/15 110/6
111/1
seeing [2] 105/10 107/14
seek [1] 96/9
seemed [1] 82/11
seems [2] 103/9 114/11
seen [9] 38/18 76/21 83/19 105/9 106/13
110/13 112/16 123/15 126/17
selected [1] 71/15
selections [1] 112/19
semiannual [1] 60/18
semiannually [1] 61/4
send [1] 27/3
sending [1] 37/20
Senior [1] 22/3
seniority [1] 31/21
sense [4] 46/2 46/16 92/16 103/17
sent [1] 102/14
sentence [1] 45/19
separate [1] 101/8
September [5] 13/13 48/15 61/13 61/18
62/9
serve [1] 41/8
served [1] 36/17
set [2] 26/5 80/11
severance [3] 12/17 12/20 13/1
sex [1] 66/1
shall [1] 45/20
she [50] 22/21 23/9 23/12 23/14 23/16
23/19 23/20 34/19 35/8 35/10 35/10 35/15
37/1 37/2 84/2 84/7 86/17 96/3 96/6 96/9
98/3 98/9 102/11 104/20 106/19 107/1
107/11 107/13 107/19 108/1 112/2 112/3
122/15 122/19 123/1 127/11 127/14 127/16
127/18 128/6 128/6 129/2 129/5 129/7
129/14 130/16 131/2 131/18 132/1 132/7

**S**

sheets [2] 124/17 136/11
Shenandoah [1] 128/3
ship [5] 51/15 78/15 90/13 90/20 90/20
ship-ins [1] 51/15
shipped [1] 52/3
shipping [2] 52/2 90/12
short [4] 13/13 73/21 74/19 104/7
should [14] 50/13 51/5 66/6 71/20 80/1 83/16 84/2 104/3 113/4 113/8 113/10 113/12 119/15 136/9
show [3] 45/18 88/15 103/21
sick [2] 49/7 49/18
sickness [1] 65/2
side [2] 40/20 41/1
sides [1] 15/18
sign [5] 12/19 66/20 134/3 134/4 136/10
signal [1] 60/10
signatory [1] 91/3
signature [3] 69/11 88/12 138/17
signed [3] 89/12 89/14 92/9
signing [2] 37/21 136/13
silent [2] 97/3 97/7
simply [3] 49/15 101/21 102/9
simulcast [1] 60/10
since [16] 8/21 9/9 9/21 16/8 21/4 23/15 34/3 40/5 44/20 53/10 61/3 61/19 70/10 102/20 112/12 114/12
sir [2] 9/20 136/5
sitting [1] 80/21
situation [2] 115/6 129/2
situations [1] 53/6
six [7] 19/12 48/21 62/1 63/18 64/11 79/9 90/13
six-month [1] 62/1
six-year-old [1] 64/11
skimmed [1] 45/5
slip [2] 57/11 133/19
Slots [3] 43/21 44/10 44/14
small [1] 51/11
smallest [1] 51/12
smiling [1] 72/1
Smith [2] 32/5 41/3
so [115] 5/11 6/12 6/18 9/6 11/18 12/17 13/3 13/17 13/20 15/1 15/10 18/5 19/7 19/11 22/13 22/15 25/2 27/12 27/15 28/6 28/12 29/7 30/14 31/15 34/12 35/6 37/4 38/6 38/15 38/18 41/21 42/7 44/12 46/13 46/16 46/21 47/8 47/13 48/6 49/1 49/2 49/20 50/18 51/15 51/19 52/1 52/11 54/5 55/7 55/18 55/21 56/11 56/12 56/12 56/18 56/20 60/2 62/3 62/9 63/16 63/18 63/19 64/13 64/16 65/5 66/8 66/10 66/15 70/15 72/1 72/9 72/17 73/7 73/21 74/17 75/20 76/14 77/11 77/21 79/6 79/18 80/9 80/18 81/9 81/20 83/21 84/5 84/16 86/5 88/13 89/7 91/17 97/7 98/9 101/1 103/7 103/19 104/10 105/17 107/13 108/19 109/10 111/12 111/18 113/1 113/10 115/11 117/14 117/17 120/5 124/20 125/7 125/18 133/4 133/12
sole [1] 59/12
some [41] 9/7 12/14 12/19 16/16 16/17 22/11 28/6 35/7 36/10 38/14 38/16 40/5 40/7 52/19 54/3 54/3 54/5 54/6 54/8 54/8 61/16 64/4 68/16 76/16 77/18 80/10 80/11 82/3 98/16 98/18 98/19 112/11 114/3 119/1 119/10 123/1 123/18 127/11 130/7 133/12 134/10
somebody [8] 14/6 28/5 49/9 49/11 49/12 72/19 99/17 100/13
Somebody's [1] 49/7
someone [11] 42/7 49/20 50/12 72/17 74/10 79/6 80/18 81/20 94/21 120/21 123/2
someone's [1] 125/13
something [6] 8/15 14/7 21/13 21/16 27/2 27/5 28/2 28/3 28/4 40/7 40/16 43/1 62/21 85/9 112/9 113/6
sometime [5] 11/1 33/18 74/18 110/1 114/8

**34**/10 47/9 50/10 54/2 68/18 73/1 95/11 99/21 103/10 121/13 127/18
sorting [1] 103/20
sought [3] 95/8 95/13 112/14
sound [2] 71/17 103/12
South [2] 1/15 2/12
space [3] 52/19 56/10 98/15
speak [4] 101 33/8 33/11 84/13
speaking [5] 35/14 65/4 74/3 92/4 129/7
specific [4] 68/1 89/8 95/3 102/12
specifically [8] 40/4 76/3 87/21 89/17 90/3 106/5 111/7 128/8
speculate [1] 56/18
speculating [7] 20/16 30/10 30/18 48/18 72/7 125/12 125/18
speculation [9] 48/21 57/4 87/16 91/21 92/13 93/14 113/3 116/1 125/17
spelled [1] 101/6
spoken [2] 83/15 94/21
spread [2] 126/1 126/18
stable [11] 32/7 63/19 63/20 66/15 66/17 67/17 68/7 68/9 68/15 68/16 107/11
stabled [2] 59/20 107/15
stables [2] 58/20 107/15
stabling [7] 64/18 65/13 65/13 119/11 119/19 119/21 120/8
stake [1] 34/7
stakes [4] 23/12 34/14 34/18 35/1
stall [73] 3/5 22/4 22/5 40/2 40/6 40/12 40/14 40/17 41/12 41/15 50/3 52/16 56/9 61/1 61/12 61/17 62/2 62/5 63/11 65/5 65/10 65/15 67/5 67/11 67/21 68/4 69/1 69/3 70/7 70/9 70/12 70/16 71/3 71/8 71/10 71/16 71/21 72/2 72/10 74/4 74/5 74/6 74/9 75/1 75/13 75/21 76/3 77/4 82/20 85/1 85/5 88/4 88/6 88/7 88/9 91/7 95/9 96/17 96/18 96/19 96/21 98/6 99/4 103/16 104/2 104/17 107/14 112/15 112/19 113/17 120/15 121/3 128/20
stalls [121] 8/11 8/13 8/16 8/21 9/6 9/7 9/10 40/7 40/11 40/18 42/8 44/3 45/9 45/21 46/7 46/11 46/18 47/5 47/8 47/13 47/18 48/1 48/7 48/16 49/2 49/3 49/3 49/16 49/21 50/1 50/4 50/5 50/10 50/14 50/15 50/21 51/9 51/19 52/1 61/1 67/16 68/13 68/14 70/15 70/17 73/14 73/17 73/21 78/2 79/12 79/21 80/5 80/14 81/5 82/10 82/13 82/18 83/17 84/2 84/19 84/21 86/7 86/11 86/17 86/20 87/19 88/8 88/9 90/5 92/10 93/3 93/7 94/11 94/18 95/1 95/5 95/10 95/3 95/14 95/15 95/17 96/4 96/7 96/16 96/3 97/13 98/3 98/14 98/17 99/14 100/4 100/9 100/19 101/13 101/14 102/11 102/12 102/14 102/16 103/3 103/8 104/9 104/19 108/5 108/7 112/3 113/5 114/4 115/4 115/16 115/20 116/5 120/21 121/7 121/15 122/1 122/12 122/16 122/20 132/6 132/8
standard [1] 128/16
standards [3] 83/10 84/18 110/18
start [2] 66/5 76/1
started [3] 76/2 76/5 76/6
starter's [3] 76/9 76/10 109/12
starts [6] 64/13 75/17 77/1 77/2 78/5 78/10
state [17] 11/10 13/4 16/11 36/8 36/9 44/11 55/5 64/10 116/10 116/14 116/19 117/12 120/6 127/12 134/5 135/18 138/16
stated [2] 62/1 131/2
statement [1] 50/14
states [2] 1/1 109/14
Statistically [1] 90/17
stats [4] 75/14 75/16 75/18 75/20
statute [2] 58/3 58/5
statutory [1] 43/17
stay [3] 41/19 97/3 97/7
stenographically [1] 135/7
step [4] 6/5 27/21 70/4 70/6
Stephanie [1] 22/20
steps [2] 125/2 125/21
steward [1] 117/7
stewards [18] 58/8 59/6 59/8 59/17 109/1

**112**/3 124/3
stock [4] 87/4 97/6 97/10 101/5
stone [1] 80/1
stop [1] 6/17
storing [1] 53/19
Storts [1] 23/19
straw [1] 115/8
Street [3] 1/15 2/5 2/12
strengths [1] 22/11
strictly [1] 59/18
string [1] 64/8
structure [1] 27/16
structured [1] 21/1
stupid [2] 71/17 127/20
subject [9] 24/20 33/19 65/1 68/11 108/19 116/10 116/12 129/5 133/20
submitted [3] 69/13 70/17 70/18
subsequent [1] 95/9
subsequently [1] 133/2
substance [4] 55/1 55/7 55/14 56/15
substances [1] 56/17
substitute [1] 24/5
substitutes [1] 24/2
such [2] 42/14 78/13
sufficient [3] 83/14 83/16 87/4
sufficiently [1] 66/13
suggestion [1] 40/7
summers [1] 15/19
Sunny [1] 23/8
superintendent [3] 22/4 22/6 63/6
superiors [4] 80/20 81/3 103/6 115/3
supervise [5] 26/13 29/20 32/11 58/10 110/15
supervision [1] 26/8
supervisor [2] 19/3 19/8
supervisors [2] 112/19 113/2
supervisory [5] 26/15 26/18 28/13 29/8 31/12
supposed [7] 45/8 57/10 57/12 57/21 59/6 68/7 110/14
Supreme [1] 55/3
sure [40] 18/21 19/18 19/21 30/19 37/15 40/5 45/11 46/13 47/21 67/9 69/7 69/8 69/12 69/13 73/1 75/5 75/7 75/8 75/11 76/16 77/10 79/1 79/2 81/14 86/14 92/1 95/12 108/10 110/15 111/1 114/16 115/1 115/8 116/8 116/12 117/11 118/8 118/12 118/18 118/21
surmising [1] 113/6
surprise [1] 42/9
suspension [2] 3/7 106/12
suspensions [1] 106/9
suspicions [1] 87/15
sworn [2] 4/7 135/5
system [2] 75/19 121/8

**T**

table [2] 21/4 81/18
tag [1] 64/12
take [16] 6/16 25/7 25/14 49/8 65/5 69/21 70/18 71/2 72/21 78/21 108/5 111/18 113/5 115/16 132/14 133/6
taken [29] 1/13 5/1 31/9 73/4 74/4 82/13 93/3 93/7 94/12 94/15 94/18 95/1 95/4 95/5 95/10 95/14 96/1 100/9 108/7 115/5 115/21 125/2 126/1 128/3 128/12 128/17 135/3 135/6 135/12
takes [1] 27/11
taking [4] 6/9 10/13 115/9 133/8
talk [7] 21/11 39/16 48/14 105/21 106/2 106/5 106/8
talked [2] 32/17 102/7
talking [5] 114/6 127/11 130/7 130/8 130/10
tattoo [4] 52/8 52/13 57/16 76/7
Taylor [10] 22/4 26/12 71/14 72/13 74/12 81/15 85/16 87/1 94/3 97/15
team [1] 29/19
teamwork [1] 78/16
technical [1] 31/10
tell [27] 4/12 7/10 10/17 19/10 19/11 48/10

C-32

**T**

Ten [1] 24/3
tend [2] 21/9 79/16
tenure [7] 9/19 14/1 19/5 19/5 40/6 45/2 122/18
term [2] 25/12 39/1
terminated [1] 12/6
terminology [1] 40/15
terms [9] 26/2 28/14 29/7 30/14 52/9 79/12 84/5 86/11 134/1
test [2] 47/11 58/14
testified [3] 4/8 89/5 122/5
testimony [11] 49/21 61/14 73/6 77/21 80/12 89/7 135/4 135/6 135/9 136/7 138/14
testing [2] 44/3 47/15
than [20] 21/16 28/17 29/16 30/10 33/8 38/17 42/4 51/13 53/4 53/4 53/7 53/21 68/5 75/14 79/6 99/7 99/20 109/21 119/9 132/19
Thank [1] 101/7
Thanksgiving [2] 14/9 14/10
that [517]
that's [99] 7/9 8/1 8/9 9/16 13/3 13/4 17/8 19/1 20/14 20/20 21/15 23/8 24/8 24/10 24/11 24/14 24/15 26/20 29/11 29/18 30/15 32/14 32/21 34/5 34/10 34/21 35/3 37/2 38/17 39/20 41/7 43/14 45/16 47/7 48/9 48/21 50/6 54/2 55/15 55/16 55/17 56/6 57/14 59/2 60/1 60/7 60/16 61/12 64/6 64/9 65/17 66/8 66/10 69/14 70/14 70/17 73/11 76/2 76/21 77/5 77/10 78/17 79/2 80/7 81/7 81/14 83/6 86/13 87/21 89/16 90/15 91/11 92/18 92/20 93/11 98/5 100/5 100/15 100/18 101/19 106/1 108/10 110/11 110/14 110/19 111/14 112/6 113/14 114/4 117/14 120/9 121/9 123/2 123/21 125/17 126/10 128/15 128/20 134/7
their [27] 11/11 36/12 52/8 52/13 52/14 52/16 53/16 55/1 56/8 56/11 66/20 69/11 70/3 75/13 75/17 77/13 77/13 78/10 78/19 78/21 87/4 88/14 99/14 103/19 103/21 110/20 111/2 122/12
them [51] 9/4 9/4 11/11 22/9 38/7 39/18 39/20 40/11 45/15 49/12 51/5 52/19 63/19 64/4 64/15 64/18 64/20 64/20 65/2 66/21 67/16 67/20 69/10 72/19 75/7 75/11 77/18 78/3 78/6 78/20 80/10 80/11 82/14 88/12 88/13 94/14 97/4 103/21 104/4 104/9 107/14 109/11 111/1 111/9 123/15 125/11 127/10 130/8 134/3 134/4 136/11
themselves [3] 26/19 54/10 111/3
then [49] 10/7 10/18 11/5 11/21 11/21 13/21 14/16 14/20 15/10 15/16 15/19 17/13 20/12 24/19 26/4 26/4 28/9 29/14 30/1 32/3 39/7 44/21 46/11 52/4 52/16 61/21 62/4 64/13 64/15 69/6 69/7 69/12 70/4 70/9 75/11 81/1 83/8 83/21 87/5 87/11 94/16 95/1 104/4 104/5 108/13 111/18 114/17 121/2 125/16
theory [1] 49/5
there [88] 8/17 8/18 9/4 9/8 9/9 10/1 10/12 10/21 11/16 12/16 13/18 14/8 15/10 15/18 16/1 20/17 23/15 23/17 27/12 28/6 29/16 31/18 38/21 39/1 40/5 40/15 41/2 41/4 41/18 50/3 50/9 50/21 51/7 51/8 52/7 52/7 52/8 53/11 53/12 55/20 61/3 62/2 62/3 66/8 68/1 68/3 68/20 71/4 71/21 76/2 77/2 77/9 80/21 86/6 88/6 88/8 90/2 90/11 94/15 98/2 98/11 98/16 99/1 99/7 100/10 100/14 101/8 102/5 102/13 102/18 102/20 103/19 108/2 108/9 109/6 112/12 113/4 113/12 113/16 114/14 114/15 115/15 117/11 119/1 120/16 120/18 123/15 124/12
there's [22] 20/17 28/2 31/20 32/7 38/10 43/1 51/10 55/20 66/7 68/6 71/9 87/3 93/10 98/18 98/19 98/20 99/16 99/17 100/13 103/5 112/12 123/18
thereafter [1] 135/7
thereto [1] 135/14
these [14] 24/16 24/19 25/2 25/7 40/11

50/16 51/5 52/7 52/9 52/13 52/16 54/10 54/16 54/21 56/10 56/11 56/11 56/12 56/14 57/11 58/21 63/15 64/13 64/16 66/16 68/20 69/2 69/4 69/5 70/17 74/17 75/7 75/8 75/12 75/17 77/10 78/11 78/19 78/20 78/20 79/4 80/14 81/1 81/21 86/11 90/20 95/20 103/14 103/18 103/20 103/21 104/1 104/1 104/19 109/11 109/13 110/20 114/18 115/8 118/21 119/3 119/15 123/17 125/10 126/15 132/4 133/9 133/12 133/15 133/16 133/17 133/18 134/2 134/4
they'll [2] 67/20 104/6
they're [26] 15/17 31/21 37/15 38/10 39/9 40/10 43/2 45/15 49/16 50/18 52/11 53/14 54/18 57/10 57/12 63/15 64/14 65/1 65/3 65/12 68/6 79/3 99/5 109/10 110/21 133/15
they've [5] 53/10 64/12 76/5 76/13 90/12
thing [9] 28/11 45/5 51/11 78/17 82/9 106/4 115/7 119/5 124/10
things [5] 28/1 44/1 45/12 111/1 130/9
think [30] 18/13 18/15 35/14 43/13 45/9 46/14 47/8 55/19 56/6 63/6 66/7 68/10 79/2 79/21 80/3 83/15 99/18 100/12 102/2 104/3 106/14 107/13 113/8 113/10 113/12 113/14 120/1 120/2 127/9 134/7
thinking [6] 8/9 24/12 33/3 47/1 100/14 106/11
THIRTY [1] 136/14
this [72] 4/17 5/16 9/19 12/10 14/16 19/5 23/21 27/17 31/15 33/14 33/19 33/19 40/5 41/17 45/19 58/14 61/5 61/14 61/17 62/10 62/12 62/14 62/16 63/5 64/10 65/19 66/18 67/4 67/13 69/1 70/19 72/6 77/15 79/5 81/20 86/9 87/14 88/16 88/18 89/4 89/7 89/8 92/9 93/1 93/15 93/20 94/10 95/5 98/12 99/8 104/5 105/1 105/9 105/13 105/18 105/20 106/3 106/7 106/11 106/11 106/12 106/13 106/13 106/15 114/1 114/8 124/7 129/2 135/11 135/15 136/16 138/15
thoroughbred [3] 44/2 54/12 58/3
thoroughbreds [2] 40/21 41/9
those [25] 11/8 11/17 16/15 30/21 53/14 54/1 55/13 56/9 56/17 57/20 58/1 63/11 69/12 69/21 70/13 70/19 71/2 71/20 79/1 84/7 88/9 94/4 100/20 101/14 117/17
though [4] 22/11 41/17 90/15 117/12
thought [8] 14/7 20/11 34/19 35/10 99/20 109/21 117/10 128/10
threats [2] 123/1 123/8
three [12] 9/3 9/10 15/12 15/18 18/7 21/7 31/19 49/21 55/13 60/13 102/11 108/13
three-month [1] 60/13
through [13] 18/2 45/5 52/4 52/8 53/1 54/1 60/12 65/5 70/11 75/4 84/7 87/19 117/3
ticket [1] 18/12
tidbits [1] 42/5
Tim [2] 22/4 23/18
time [62] 6/16 11/6 13/17 14/17 14/21 16/7 19/1 19/2 21/13 22/5 22/5 22/13 31/19 31/19 31/21 32/3 32/4 32/5 32/6 32/8 33/15 34/19 38/3 38/3 44/20 46/5 47/5 47/17 48/15 48/16 52/6 53/5 53/14 55/2 56/13 57/1 60/8 62/3 62/4 64/17 65/17 70/19 71/18 81/11 83/7 89/21 93/15 94/13 95/4 95/20 98/12 101/13 104/7 104/20 105/19 106/5 107/19 111/11 111/14 114/5 114/6 129/21 130/9
times [12] 38/19 46/11 49/14 58/19 75/21 76/5 78/14 78/19 108/13 108/16 114/3 114/5
TINA [14] 1/4 2/2 2/15 34/1 58/2 93/2 99/19 99/20 102/6 111/15 122/2 127/5 132/5 137/4
Tina's [1] 131/2
title [17] 10/2 19/2 19/13 19/15 20/5 20/6 31/18
titled [1] 19/1
today's [1] 32/15
together [6] 38/14 49/3 49/4 50/19 94/5 130/4
told [12] 62/10 73/10 102/10 111/8 111/11

took [1] 74/2
top [5] 24/14 63/5 66/19 67/4 99/18
total [2] 9/12 79/20
totally [1] 129/4
touchy [1] 108/19
towards [1] 101/16
town [37] 1/9 2/8 7/6 8/11 9/15 9/18 11/19 12/1 13/8 13/9 18/17 25/8 25/18 25/19 42/15 43/20 43/21 44/4 44/9 44/14 45/7 45/20 46/6 55/4 56/4 77/16 78/14 83/10 84/2 84/18 91/8 100/8 106/15 107/12 107/16 130/18 137/4
track [32] 9/1 11/12 11/15 15/8 16/1 17/20 18/3 27/10 27/11 27/16 28/17 32/2 39/11 42/1 44/2 44/2 45/8 49/16 51/13 57/15 64/10 67/5 78/15 103/7 116/18 117/3 117/8 118/3 118/14 124/9 131/19 133/13
Track's [1] 15/14
tracks [8] 15/6 15/8 17/18 18/3 60/11 116/16 117/11 117/13
trailer [5] 52/4 53/19 53/20 56/7 57/1
trailered [4] 54/6 54/15 56/1 56/2
trailers [1] 53/16
train [1] 22/12
trainer [30] 8/2 8/6 8/7 32/7 37/4 37/9 38/4 55/21 65/12 66/15 67/5 67/18 70/14 76/5 76/14 76/19 77/2 77/3 78/5 78/14 79/21 80/6 90/6 104/6 106/19 107/2 113/5 113/17 119/16 133/6
trainer's [1] 107/2
trainers [7] 37/9 38/3 67/19 83/18 90/13 99/7 101/15
training [6] 14/3 14/14 22/14 32/3 35/16 44/2
tranquilize [1] 54/14
tranquilized [1] 56/2
transcript [6] 5/16 136/6 138/6 136/16 137/7 138/14
transition [1] 16/9
trouble [3] 6/8 18/17 111/3
true [14] 25/5 46/17 47/3 50/14 51/2 56/6 81/8 81/9 81/12 83/21 98/16 99/8 135/8 138/14
truthfully [1] 5/8
try [5] 14/7 38/13 39/17 83/12 123/19
trying [7] 32/16 34/6 62/21 79/5 100/13 106/20 127/9
Tuesday [2] 1/13 4/2
Turfway [7] 14/11 14/17 15/9 15/16 15/19 34/8 35/2
turn [1] 69/2
turned [1] 65/16
two [35] 11/3 13/18 13/18 13/21 14/1 17/16 17/18 18/3 18/7 21/7 30/21 31/19 32/6 34/4 48/20 49/14 53/11 64/1 64/20 70/12 70/20 73/13 73/14 73/14 73/18 73/19 74/19 94/2 94/4 94/4 110/16 114/3 117/13 130/4 130/4
two-week [1] 13/21 14/1
two-year [1] 17/16
two-year-olds [2] 64/1 64/20
type [9] 12/19 16/16 16/17 78/10 84/6 89/4 106/2 123/1 124/10
types [3] 68/8 68/19 75/16
typewriting [1] 135/8
typical [1] 52/21
typically [10] 38/9 39/15 48/4 48/7 48/12 49/13 56/1 56/18 76/15 103/14

**U**

uh [16] 6/9 8/8 8/10 15/2 41/6 51/21 52/15 62/18 65/8 65/21 67/6 79/8 85/3 120/4 123/7 123/9
uh-huh [15] 8/8 8/10 15/2 41/6 51/21 52/15 62/18 65/8 65/21 67/6 79/8 85/3 120/4 123/7 123/9
uh-huhs [1] 6/9
uhs [1] 6/9
ultimate [4] 28/20 28/21 29/2 30/15
ultimately [2] 30/1 30/6
unable [1] 89/18

## U

understand... [5] 92/18 94/14 100/17
118/7 118/10
understanding [8] 42/16 43/5 44/13 45/6
46/3 94/11 94/17 94/19
understands [1] 60/2
understood [1] 5/13
Unfortunately [1] 62/19
unfriendly [1] 39/18
UNITED [1] 1/1
University [2] 17/13 17/15
unless [8] 35/10 39/6 39/9 58/21 108/21
109/3 114/11 119/17
unloading [1] 53/20
unoccupied [4] 48/2 48/8 49/3 101/13
until [8] 14/8 15/3 15/4 15/19 65/2 94/17
105/17 109/16
unused [1] 48/16
up [14] 9/5 9/7 13/5 42/5 53/13 53/15
62/12 62/13 75/11 82/12 104/6 105/17
111/13 132/15
upkeep [6] 101/2 101/4 101/10 102/4
102/4 110/18
upon [1] 4/8
us [9] 21/7 25/14 38/2 67/16 75/18 78/18
80/4 80/4 80/10
usage [1] 104/17
use [17] 6/19 26/5 30/14 38/21 67/13
67/14 69/12 104/19 113/14 124/13 125/4
126/13 126/21 127/6 130/19 131/20 132/2
used [3] 25/12 29/3 78/1
using [2] 28/15 101/14
usually [6] 24/1 38/17 42/3 69/3 103/6
114/18
utilization [1] 91/7

## V

vacate [1] 100/4
vacated [2] 14/6 46/13
vaccination [1] 52/10
vague [1] 118/6
van [1] 103/20
various [7] 46/10 49/14 63/21 69/5 69/8
70/8 110/17
verbally [2] 6/12 27/4
verify [1] 52/13
versus [1] 48/2
very [6] 6/15 30/6 31/5 42/2 51/11 77/14
vet's [1] 109/11
veterinarian [3] 56/17 57/2 109/19
veterinarian's [3] 109/10 109/15 109/18
Vice [1] 20/3
Vice-President [1] 20/3
violate [1] 58/3
VIRGINIA [30] 1/2 1/15 2/6 2/13 4/1 15/21
16/1 16/12 16/12 24/21 36/8 44/5 44/11
55/3 55/4 57/6 58/4 58/6 105/8 108/13
109/5 109/18 116/10 116/7 117/15 120/6
131/3 131/14 135/18 136/3
virus [1] 52/10
vocal [1] 38/17
vocally [1] 38/16
voice [1] 79/17
voluntarily [1] 9/7
vote [2] 79/11 81/18
voted [1] 21/5

## W

wagerable [1] 38/12
waited [1] 53/11
WAIVED [1] 136/16
want [22] 8/14 12/16 19/9 20/8 43/12
62/20 64/15 64/20 66/16 71/17 73/6 91/12
92/13 94/1 99/17 104/1 111/9 112/11
113/14 114/7 133/9 133/12
wanted [5] 14/13 21/2 33/4 41/4 66/15
wants [2] 41/17 133/6
warehouse [1] 14/15
was [158]
wasn't [9] 11/5 12/10 12/14 81/15 81/18

ways [1] 76/21
we [75] 5/17 6/1 20/21 21/1 21/3 21/14
22/9 22/13 25/18 24/12 24/13 25/13 28/9
29/2 31/10 33/2 34/15 35/20 39/7 40/13
41/2 45/13 46/12 46/15 50/2 50/3 50/4
51/11 51/13 55/3 57/20 60/11 62/5 62/12
63/18 63/20 64/7 64/15 64/20 67/9 70/6
70/7 70/11 70/16 72/21 74/2 74/2 76/9 77/5
77/19 78/15 80/20 82/1 82/12 83/16 88/12
90/10 98/13 98/14 102/2 102/14 104/3
108/16 109/2 114/6 115/8 123/21 124/4
124/21 127/21 128/9 130/10 133/18 133/19
136/15
we'll [4] 8/20 18/13 80/10 90/13
we're [11] 21/11 23/1 48/11 57/21 63/19
64/18 73/21 80/21 88/13 104/8 118/16
we've [6] 21/6 31/9 46/10 46/11 73/4 102/6
weed [1] 64/7
week [5] 13/21 14/1 23/21 37/19 74/19
weekly [1] 128/5
weeks [4] 13/18 13/18 36/21 130/12
WEHRMAN [7] 1/13 3/2 4/6 4/11 4/13 7/2
137/2
well [43] 14/3 14/7 15/4 20/20 22/9 23/5
23/20 25/5 27/2 28/19 30/4 30/9 31/5 40/13
42/2 42/17 43/2 45/11 45/14 51/2 56/5
57/20 59/5 62/5 62/8 67/9 67/15 69/18 70/6
78/20 82/15 83/9 84/12 96/3 99/8 103/12
106/3 115/7 128/6 129/1 129/9 130/1
132/21
went [6] 13/3 15/16 18/2 18/3 82/1 84/7
were [55] 11/12 14/19 15/8 34/12 48/16
50/9 51/8 53/6 61/18 68/3 70/18 71/15 74/2
78/4 82/13 82/21 83/14 83/21 84/1 84/17
86/6 93/3 93/7 94/12 94/14 94/15 94/18
95/1 95/5 95/10 95/14 95/20 96/17 97/9
98/11 100/9 101/8 101/12 102/18 106/14
108/7 108/7 108/9 111/18 114/16 115/11
121/20 122/4 122/9 123/8 127/14 131/13
131/18 132/1 132/20
WEST [25] 1/2 1/15 2/5 2/6 2/13 4/1 16/12
24/20 36/8 44/4 44/11 55/3 55/4 57/6 58/4
58/6 105/8 116/9 116/16 117/15 120/6
131/3 131/14 135/18 136/3
what [111] 5/19 5/20 7/8 7/10 8/4 10/2
10/8 10/17 10/20 12/8 12/12 13/6 14/2 17/4
17/21 20/2 20/6 22/17 23/8 23/10 23/14
25/20 26/5 27/1 28/1 30/15 32/14 34/8 35/3
35/15 36/4 39/15 42/17 45/16 47/20 52/21
57/18 57/19 60/3 63/14 63/16 64/4 65/9
67/13 68/8 69/17 69/19 73/17 74/21 75/16
76/12 76/18 76/21 77/7 77/8 77/10 77/12
77/12 77/16 77/17 77/18 78/7 78/11 78/18
79/2 79/3 80/3 80/18 82/21 89/11 90/21
91/11 92/1 92/3 95/21 101/2 101/12 101/15
102/10 103/8 103/8 106/2 106/5 106/11
106/20 110/21 112/18 114/6 114/15 115/1
115/5 115/9 115/13 116/13 118/9 118/15
120/2 120/8 121/12 121/20 122/3 122/8
122/9 123/8 124/5 126/5 126/16 128/11
130/10 130/14 133/18
what's [13] 7/2 19/13 35/12 48/7 61/10
66/1 70/4 89/1 92/2 105/6 110/10 123/19
125/9
whatever [6] 6/19 11/20 45/4 51/19 53/13
103/17
when [41] 7/14 10/15 13/3 13/7 13/8 15/3
16/8 21/14 21/15 30/14 34/5 34/19 35/15
37/2 38/7 39/15 40/4 42/14 44/18 52/21
53/12 53/14 61/17 67/10 67/10 73/15 74/2
78/15 80/20 81/2 105/8 107/19 108/2
112/19 118/12 123/15 127/18 127/20
128/10 128/11 130/10
whenever [1] 114/17
where [14] 5/18 13/4 21/7 53/8 54/12
66/21 69/5 72/2 74/5 78/11 112/9 112/17
114/2 128/9
Whereupon [7] 4/5 31/7 61/6 73/2 88/19
105/3 132/17
whether [26] 35/18 37/7 37/11 42/17 51/5
65/12 67/10 70/17 82/7 93/12 93/13 94/7

47/11 52/17 56/17 60/11 60/12 65/1 68/6
68/7 68/19 75/18 76/3 76/10 88/12 102/14
105/7 106/21 107/1 107/1 107/10 109/8 113/17
119/4 131/2 135/11 137/6
while [6] 7/5 31/10 32/20 34/12 39/4 112/2
whim [1] 113/9
who [47] 7/17 8/9 10/5 19/3 19/17 21/18
21/21 22/4 22/6 22/19 24/4 24/12 28/17
30/16 36/6 56/10 66/15 71/10 72/5 74/9
79/12 80/5 86/19 87/7 88/4 88/9 93/1 99/4
99/14 104/13 111/6 111/10 111/19 111/21
112/13 114/20 117/3 120/13 122/11 122/15
123/4 123/6 124/7 130/3 130/5 130/12
132/13
who's [6] 24/1 32/4 32/5 72/10 86/20
86/20
whoever [1] 126/10
whole [7] 19/1 19/2 45/5 48/17 48/19 52/6
106/4
whom [2] 31/12 135/3
whose [4] 58/10 72/6 82/13 135/4
why [24] 12/4 20/15 29/11 41/1 61/17
89/18 90/2 93/3 93/6 94/11 94/18 94/21
95/5 96/6 96/9 96/12 100/18 102/10 109/4
122/19 128/6 133/8 133/15 133/17
wife [3] 16/20 33/10 107/1
will [11] 26/2 26/3 38/5 55/14 79/14 79/15
84/4 87/3 87/5 104/6 136/15
WILLIAM [5] 1/13 3/2 4/6 4/13 137/2
Williams [2] 99/16 101/3
win [4] 90/10 90/14 90/18 90/20
Winchester [1] 18/12
winter [4] 15/10 114/8 114/9 114/10
wish [1] 68/16
withdrawal [1] 56/16
within [6] 38/11 65/16 74/19 74/19 114/7
136/14
without [4] 24/10 57/8 102/16 113/9
witness [4] 4/7 135/4 135/6 135/9
woman [2] 33/21 122/12
won [1] 90/12
word [4] 30/15 38/21 113/15 114/17
wording [2] 92/15 119/20
words [1] 113/9
work [5] 8/18 10/15 15/11 44/19 122/17
worked [14] 11/4 11/7 15/10 15/13 15/13
15/18 15/19 16/8 16/11 18/2 18/2 51/13
72/3 112/17
working [5] 7/6 7/14 18/5 18/7 29/9
works [1] 25/8
worse [1] 99/7
would [84] 4/11 4/16 13/17 15/1 22/2
25/11 26/2 28/1 28/5 28/7 28/16 28/19
29/14 30/4 30/17 30/18 35/9 38/7 39/11
42/10 44/12 46/16 47/3 48/19 49/5 50/21
51/3 53/3 53/18 54/21 56/8 56/11 56/12
56/20 57/4 57/5 58/8 58/17 60/8 64/17
66/16 69/3 71/13 73/14 77/7 77/7 78/6 79/4
80/14 80/19 83/11 83/12 83/15 84/4 84/5
84/11 84/16 85/8 85/10 85/12 86/14 87/15
90/17 93/14 95/11 98/3 103/21 109/8 110/2
110/5 113/3 115/20 116/1 117/17 117/19
118/21 119/3 119/12 120/5 124/7 124/8
125/15 125/16 128/16 132/6
wouldn't [5] 42/9 54/16 64/2 85/18 119/3
write [1] 80/17
writing [1] 26/1
written [4] 68/3 71/7 71/9 119/6
wrong [2] 36/9 43/13

## Y

yeah [50] 4/15 4/20 7/16 8/10 9/11 9/13
9/16 11/11 18/7 25/19 27/18 29/6 30/20
34/15 34/17 39/14 43/2 45/14 45/18 48/9
50/12 51/10 55/17 57/10 62/12 63/9 66/10
68/21 75/3 77/17 78/6 80/20 81/13 85/10
86/13 87/6 88/9 94/16 95/18 100/1 100/3
106/6 116/6 121/2 122/14 125/20 129/1
130/2 131/12 133/18          C-32
year [17] 10/9 13/13 14/20 17/4 17/13
17/16 17/16 17/21 34/4 34/21 50/4 60/11

**Y**

yes... [103]  9/20 11/4 11/20 12/7 13/2 13/4
16/19 16/21 17/3 17/9 17/11 18/20 21/20
22/16 23/6 24/18 25/4 25/6 25/10 25/17
26/14 26/17 29/15 29/21 31/1 34/1 36/3
36/15 37/6 37/9 38/20 39/12 41/10 42/2
43/4 43/8 44/7 44/8 44/16 46/4 47/2 47/4
48/5 49/17 50/7 53/17 55/15 57/17 58/13
59/16 60/5 60/17 61/12 63/10 69/20 70/2
72/19 73/13 74/8 76/20 79/10 83/12 83/18
83/20 88/8 88/17 89/3 89/6 89/13 91/4
91/13 91/16 92/20 97/4 97/11 98/18 100/7
100/10 100/20 100/21 101/4 102/4 102/8
104/15 106/18 107/7 112/7 113/6 113/15
114/11 115/13 116/15 116/21 117/6 117/16
117/18 118/1 120/4 120/7 121/10 122/10
122/17 127/16
Yetsook [3]  100/2 101/18 103/1
you [463]
you'd [3]  51/13 74/6 85/8
you'll [1]  49/13
you're [22]  5/20 7/6 7/14 23/7 30/15 30/19
31/15 40/17 40/18 42/19 42/21 45/16 47/1
55/19 60/6 60/8 68/19 77/14 92/6 106/4
125/18 131/11
you've [10]  8/21 9/9 16/11 16/16 18/18
28/18 38/18 46/5 73/6 105/9
your [62]  4/12 4/21 5/3 6/5 6/12 7/2 10/20
13/19 13/21 16/20 18/17 19/3 19/7 25/20
26/18 27/7 31/2 32/10 36/13 36/16 43/5
44/13 45/2 45/6 46/3 49/20 49/21 61/14
67/15 68/15 69/16 69/21 72/5 73/6 77/15
77/21 80/12 81/3 84/12 86/5 86/9 86/15
87/6 89/7 89/14 90/15 91/2 91/5 91/17 92/8
93/15 103/8 107/21 108/11 109/17 112/18
113/2 113/16 116/5 116/13 124/19 126/11
yourself [3]  12/12 25/5 125/3

**Z**

zero [1]  55/5
Zimny [15]  19/4 19/7 19/17 20/12 62/10
71/13 72/9 75/15 76/18 85/19 93/6 93/13
97/17 104/13 108/19
Zimny's [2]  20/4 81/4

C-32