# EXHIBIT 2 – Cont'd
# Pages 571 - 752

1          IN THE UNITED STATES DISTRICT COURT

       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

2               Martinsburg Division

3   TINA MAWING, and

    THE HORSEMEN'S BENEVOLENT

4   PROTECTIVE ASSOCIATION,

         Plaintiffs,

5

    vs.                     Case No.: 3:09-CV-68

6                            Judge Bailey

    PNGI CHARLES TOWN GAMING, LLC,

7        Defendant.

8

9          Pursuant to Notice, the deposition of MIKE

10  ELLIOT, was taken on Monday, the 5th day of April 2010,

11  commencing at 9:35 a.m., at the law offices of BOWLES,

12  RICE, MCDAVID, GRAFF & LOVE, LLP, located at 101 South

13  Queen Street, Martinsburg, West Virginia before Tracy

14  Rice, a Registered Professional Reporter.

15

16

17

18

19

20

21

```
 1                  A P P E A R A N C E S:

 2      FOR THE PLAINTIFF:

            HARRY P. WADDELL, ESQUIRE

 3          Law Offices of Harry P. Waddell

            300 West Martin Street

 4          Martinsburg, West Virginia 25401

 5

        FOR THE PLAINTIFF:

 6          DAVID M. HAMMER, ESQUIRE

            Hammer, Ferretti & Schiavoni

 7          408 West King Street

            Martinsburg, West Virginia 25401

 8

        FOR THE DEFENDANT:

 9          BRIAN PETERSON, ESQUIRE

            Bowles, Rice, McDavid, Graff & Love, LLP

10          101 South Queen Street

            Martinsburg, West Virginia 25401

11

12

13

14

15

16

17

18

19

20

21
```

1                          I N D E X

2     WITNESS:                                  PAGE:

3     MIKE ELLIOT

          Direct Examination by Mr. Waddell

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

```
 1                 MARTINSBURG, WEST VIRGINIA

 2                  MONDAY, APRIL 5, 2010

 3                          ___

 4               P R O C E E D I N G S

 5    Whereupon,

 6                  MELVIN MICHAEL ELLIOT,

 7    a witness herein, having been first duly sworn, was

 8    examined and testified upon his oath as follows:

 9    DIRECT EXAMINATION

10    BY MR. WADDELL:

11         Q.   Mr. Elliot, what's your full name?

12         A.   Melvin Michael Elliot.

13         Q.   Melvin?

14         A.   Melvin.  Please don't call me that.

15         Q.   Call you Mike?

16         A.   Yes, sir.

17         Q.   What's your home address?

18         A.   69 Clems Drive, Ranson, West Virginia.

19         Q.   What's your home phone number?

20         A.   304-728-0080.

21         Q.   What's your business address?
```

1        A.   My business?

2        Q.   Business address.  You work at the track,

3    don't you?

4        A.   Depends.  I guess it's P.O. Box 551, Charles

5    Town.

6        Q.   What is your marital status?

7        A.   I'm married.

8        Q.   What's your wife's name and employment status?

9        A.   What was that?

10        Q.   Name and employment status.

11        A.   My wife is Mary Frances Elliot.  She works for

12    Diagon of Washington County over in Hagerstown.

13        Q.   What does she do there?

14        A.   It's assisting elderly.  Elderly assistance.

15        Q.   What high school did you attend?

16        A.   Charles Town.

17        Q.   What year did you graduate?

18        A.   I did not graduate.  I went and got a GED in

19    1996.

20        Q.   What college did you attend?

21        A.   Never attended college.

1      Q.   What jobs have you held since you began full-

2   time employment?

3      A.   What jobs have I held?  Well, that goes a long

4   way back.  I guess I picked cherries.  I worked the

5   orchards when I was a kid.  From the time I was 15

6   years old I been on the racetrack.  I worked on the

7   racetrack basically for Frank Smith, Jr. in 1970.  I

8   worked for Jim Palmer -- James A. Palmer and actually

9   you have to back up.  I worked for Bob Roberts Lee in

10   1980 and then I went to work for James A. Palmer in

11   '83.  Worked for Jim from probably '83 to '86 and then

12   I became a racing official September 7th of 1986.

13      Q.   September 7th?

14      A.   1986.

15      Q.   1986?

16      A.   Uh-huh.

17      Q.   You got your GED what year?

18      A.   I'm going to say '90 -- it was in the late

19   '80s, early -- '87, '89 right before the racetrack went

20   to close I went and got a GED.  I don't have my wallet

21   on me.  I have a card.

1        Q.    You became a racing --

2        A.    Official.

3        Q.    Official September 7th, 1986?

4        A.    Uh-huh.

5        Q.    And how old were you at that time?

6        A.    Roughly 30 some years old.  I was born in '54.

7        Q.    Okay.  Before that the gentleman you mentioned

8    that you worked for what were they?  Were they owners,

9    trainers?

10       A.    Trainers.

11       Q.    Trainers?

12       A.    Actually the one just past away.

13       Q.    What type of work did you do for those

14   gentlemen?

15       A.    I galloped a few horses when I was first

16   here.  Pony horses.  Rode horses mostly.  Was a groomer

17   I guess is how you would pronounce it.

18       Q.    Who hired you as a racing official in 1986?

19       A.    Richard Moore.  That's who the racing

20   secretary was at the time.

21       Q.    What did you do as a racing official?

1          A.   What have I done as a racing official?

2          Q.   What did you do when you were first hired?

3          A.   I was in the office personnel.  Just handed

4     out programs and answered phones.

5          Q.   How long did you do that?

6          A.   Approximately about three months.

7          Q.   What did you do after --

8          A.   '87 I became a horse identifier.  I was

9     probably horse identifier, you know, guesstimating here

10    about a year and then in 1988 I became paddock judge.

11    I was a paddock judge for off the top of my head I'm

12    going to say until about June of 1990 and that's when I

13    became the clerk of scales for the first time.  Then I

14    was clerk and then I been a placing judge off and on

15    since that point in time.

16         Q.   So you were clerk of scales for some period of

17    time?

18         A.   I was clerk from probably 1990 to about '93

19    for about two or three years off and on.  Then I became

20    back and forth as a placing judge and then as we add

21    other clerks we filled in.  We alternated that very few

1    times so it's kind of hard to give you every time I was

2    in every job.

3         Q.   Have you worked in the racing office

4    continuously since 1986?

5         A.   I worked as -- I haven't been in the racing

6    office per se as taking entries or any part of the

7    racing office interaction for the last -- in 2008 I

8    what they call backstretch administrator is when they

9    moved me from the racing office because I was the

10   assistant and then I took over the barn overseeing the

11   barn area.

12        Q.   Why don't we do this.  Why don't you just tell

13   me -- give me all the jobs that you've held --

14        A.   I --

15        Q.   -- at the track.  You've mentioned --

16        A.   Here is what --

17        Q.   -- clerk of scales, placing judge.

18        A.   Go ahead.

19        Q.   You mentioned clerk of scales, placing judge,

20   horse identifier.  What other jobs --

21        A.   Assistant identifier, paddock judge, assistant

1    racing secretary.  That's about -- acting racing

2    secretary for a while.

3         Q.   What years were you the assistant racing

4    secretary?

5         A.   Assistant racing secretary I think Wayne

6    Sowers left in April of 2006, if I'm not mistaken, and

7    I was there until May of 2008.

8         Q.   What did you do in May then of 2008?

9         A.   That's when I became the backstretch

10   administrator.

11        Q.   How long did you hold that position?

12        A.   Still have it.

13        Q.   So from May 2008 until today?

14        A.   Yes, sir.  And also what I should say what

15   they clarify me as a senior racing official in case

16   they need a fill in I also fill in.

17        Q.   Okay.  So assistant racing secretary from

18   April of 2006 to May of 2008 you've been backstretch

19   administrator from May 2008 until currently today

20   that's still your position, correct?

21        A.   Uh-huh.

1    Q.   And you're also designated as a senior racing

2    official which allows you, I guess, to fill in where

3    needed on some of these other job positions in the

4    racing office?

5    A.   Correct, sir.

6    Q.   You mentioned you were acting racing secretary

7    at some point in time.   When was that?

8    A.   From November of '07 until, like I say, May of

9    2008 when they hired Mr. Wehrman, Randy Wehrman.

10   Q.   So Randy Wehrman became an assistant racing --

11   A.   Assistant racing secretary.

12   Q.   Okay.  In May of 2008?

13   A.   Yes, sir.  To my best recollection, yes.

14   Q.   And who was the racing secretary between April

15   of 2006 and May of 2008?

16   A.   Dougie Lamp.

17   Q.   What happened to Mr. Lamp in May of 2008?

18   A.   Mr. Lamp resigned.

19   Q.   Resigned from the track completely?

20   A.   Yes, sir.

21   Q.   No longer employed at all?

1        A.    No, sir.

2        Q.    How do you spell Wehrman, if you know?

3        A.    I think it's W-H-E-R-M-A-N if I'm not

4    mistaken.  W-H-E-R-M-A-N.

5        Q.    You may want to take that with a grain of

6    salt.  I think it's spelled --

7        MR. PETERSON:  I believe it's W-E-H-R-M-A-N.

8        MR. WADDELL:  (resumed)

9        Q.    Before we go on if you don't understand any of

10   my questions feel free to tell me that and I will

11   rephrase my questions so you can understand it.  If you

12   don't tell me that I'm going to assume you understood

13   my question and answered it as honestly and to the best

14   of your ability.

15       A.    Okay.  Uh-huh.

16       Q.    Try not to talk over me when I'm talking and I

17   won't do that to you because the court reporter it's

18   difficult for her to take down two people talking at

19   the same time, okay?

20       A.    Okay.

21       Q.    Try to verbalize your answers rather than

1    shaking your head or going uh-huh or something like

2    that because again --

3        A.   I understand.

4        Q.   -- the court reporter -- it makes it unclear

5    what your response is.

6        What did you do to prepare for your deposition

7    today?

8        A.   What did I do to prepare?

9        Q.   If anything.

10       A.   Really nothing really.  I mean, just that

11   Mr. Peterson told me to be here at -- I thought he said

12   nine but he said 9:30.

13       Q.   Had you met with Mr. Peterson or any other

14   attorneys to prepare you for your deposition?

15       A.   Just Mr. Peterson and Mr. Zimny.

16       Q.   Mr. Zimny?

17       A.   Erich Zimny.

18       Q.   When did that meeting take place?

19       A.   I'm going to say today is Monday, it would

20   have been Friday -- Thursday.  Excuse me.  Thursday.

21       Q.   So last Thursday you met with Erich Zimny?

1       A.    Zimny.

2       Q.    And Mr. Peterson at the same time?

3       A.    Uh-huh.

4       Q.    You have to go yes.

5       A.    Yes, sir.

6       Q.    Where did this meeting take place?

7       A.    In Mr. Al Britton's office.

8       Q.    Was there anyone else present during the

9    meeting?

10      A.    No, sir.

11      Q.    And approximately how long was your meeting

12   with these gentlemen?

13      A.    I'm going to say probably 20 minutes.

14      Q.    Have you reviewed any records or documents of

15   any sort in preparation for your --

16      A.    No, sir.

17      Q.    I know you're anticipating what my question is

18   but let me finish it so we're not talking over each

19   other.

20           So you reviewed nothing?  You reviewed no

21   documents?

```
 1        A.   No, sir.

 2        Q.   Do you have any criminal history at all?

 3        A.   No, sir.

 4        Q.   You never have been charged with any crime?

 5        A.   No, sir.

 6        Q.   What is the name of your current employer?

 7        A.   P -- well, unless it changes it's PNGI,

 8   Charles Town Gaming.

 9        Q.   As far as you know that's the name of your

10   current employer?

11        A.   Yes, sir.

12        Q.   And your current job title is?

13        A.   Backstretch -- senior racing official,

14   backstretch administrator.

15        Q.   What are the duties of a backstretch

16   administrator at the track?

17        A.   Basically just oversee the barn area.  Just

18   oversee it.

19        Q.   What does that require you to do on --

20        A.   I just walk by and look for empty stalls and

21   make sure the horses are properly taken care,
```

1    hopefully, things of that nature.   That's what I do.

2        Q.   If you find a horse that looks like it's being

3    improperly taken care of what is your responsibility?

4        A.   My responsibility the first person I notify is

5    our Board of Stewards and then, of course, Mr. Zimny

6    because he is now director of racing.

7        Q.   So Mr. Zimny is now the director of racing?

8        A.   Yes, sir.   That's what I understand, yes, sir.

9        Q.   Do you know how long he has been in that

10   position?

11       A.   Honestly I don't know.

12       Q.   Who was the director of racing prior to

13   Mr. Zimny?

14       A.   Mr. Richard L. Moore.

15       Q.   What is Mr. Moore's position currently other

16   than being on vacation?

17       A.   Nothing.   Mr. Moore is not on vacation.

18   Mr. Moore I would say I guess still as racing --

19   general operator, like the general manager of racing.

20       Q.   Al Britton is on vacation.

21       A.   Right.

1        Q.   He's the what?  What is he?

2        A.   I would say he's general manager of racing is

3    what it's always been titled.

4        Q.   Current racing secretary is Randy Wehrman?

5        A.   Yes, sir.

6        Q.   Are there any assistant racing secretaries?

7        A.   Yes, sir.  Mr. Ron Anthony.

8        Q.   Okay.  Anyone else?

9        A.   No, sir.

10        Q.   Is there normally just one assistant racing

11    secretary?

12        A.   Yes, sir.  I mean, usually they try to have

13    someone fill in but there's just one.

14        Q.   What is the name of your immediate supervisor?

15        A.   Would be Ron Anthony.

16        Q.   And his job title?

17        A.   The assistant.

18        Q.   Racing secretary?

19        A.   Racing secretary.

20        Q.   And what would be the name of his immediate

21    supervisor?

1        A.   Randy Wehrman.

2        Q.   What would be the name of Randy Wehrman's

3   immediate supervisor?

4        A.   You would guess on me.  You could split

5   hairs.  It could be Erich Zimny, I would say, and go

6   back to Richard L. Moore.

7        Q.   Are there any employees that report to you?

8        A.   No, sir.

9        Q.   Have you ever during your employment with the

10  track have you ever been suspended for any reason?

11       A.   No, sir.

12       Q.   Have you ever been disciplined for any reason?

13       A.   No, sir.

14       Q.   What is your knowledge of Tina Mawing?

15       A.   My knowledge?

16       Q.   Uh-huh.

17       A.   That's an open-ended question.  I really don't

18  know what you mean.

19       Q.   Let me rephrase it.  Do you know Tina Mawing?

20       A.   Yes, sir.

21       Q.   How do you know her?

1      A.    From training horses and her husband rode.

2      Q.    And do you know her husband's name?

3      A.    Anthony.

4      Q.    Is your knowledge of Mrs. Mawing restricted to

5   simply working at the track, you coming in contact with

6   her at the track or do you have any other means of

7   knowing her?

8      A.    Actually, I knew -- met Mrs. Mawing also

9   because she's a nurse at the hospital in Charles Town

10  and she helped take care of my mother.

11     Q.    So you had occasion to meet with her there?

12     A.    Well, I just seen her, yes, sir.

13     Q.    Any other way you know Mrs. Mawing?

14     A.    No, sir.

15     Q.    What's your knowledge of the HBPA?  Do you

16  know what that is?

17     A.    The Horsemen's Protection Association.

18     Q.    Uh-huh.

19     A.    Uh-huh.

20     Q.    What is it?

21     A.    Just a group of horsemen that oversee the

1     interests of the horsemen.

2          Q.   Are you a member of the organization?

3          A.   No, sir.

4          Q.   Have you ever been a member?

5          A.   No, sir.

6          Q.   Are you aware that Mrs. Mawing is a member of

7     the Board of Directors of the HBPA?

8          A.   I don't know who all the members are, no, sir.

9          Q.   My question was are you aware that she's a

10    member of the Board of Directors of --

11         A.   Am I aware of it?

12         Q.   Yes.

13         A.   Not really, no.

14         Q.   So you didn't know that?

15         A.   I don't know who all is or who all isn't.  I

16    thought all horsemen could be members.  I don't know

17    who their officers are.

18         Q.   You're aware that she trains thoroughbred

19    horses, correct?

20         A.   Yes, sir.

21         Q.   And she holds a racing permit issued by the

1    state of West Virginia?

2         A.    Yes, sir.

3         Q.    Do you know the purpose of the HBPA?

4         A.    Horsemen Protection Association is all I ever

5    know.

6         Q.    Would you agree with me the purpose is to

7    represent the horsemen's interests in property rights

8    in dealing with racing associations such as Charles

9    Town Races?

10        A.    That would be speculation for me to guess.  I

11   -- my best guess HBPA is for the betterment of all

12   horses to make sure everybody is on the same playing

13   field fairly whether it's races or whatever.

14        Q.    Do you know -- or do you agree with me that

15   the HBPA is an exclusive bargaining agent for its

16   members?

17        A.    I don't know what you mean by that question.

18        Q.    So you have no knowledge of that?

19        A.    I don't know what you mean by the question.

20        Q.    Okay.  Are you familiar with the racing rules

21   and regulations of the state of West Virginia?

1        A.    A few of them, yes, sir.

2        Q.    How did you become familiar with them?

3        A.    Reading the rule book.

4        Q.    Are you provided a rule book?

5        A.    Uh-huh.  Yeah.  We mostly all have the rule

6    book once we get into racing.

7        Q.    Does the track provide you a rule book?

8        A.    No.  The stewards usually if they have one.

9        Q.    Do you have to consult the rules in connection

10   with your job, current job?

11       A.    Rules of my job I'm going to say there's not

12   as many rules stipulating coming on the racetrack.

13   It's pretty simple.  To come on what I do, you know,

14   you just you need in-slips, cognizance, health

15   certificates to come on the property and after that the

16   rules of racing follow on what category we're into

17   depending on what you're asking me, you know, as the

18   rules follow it.

19       Q.    My question was do you ever look at the rules

20   in connection with your job?

21       A.    Yeah.  There's occasions we have to look at

1    them.

2        Q.    How about as assistant racing secretary, was

3    it necessary for you to be familiar with the rules of

4    racing?

5        A.    Yes, sir.

6        Q.    Did you have occasion to look at them to do

7    your job?

8        A.    Yes, sir.

9        Q.    If you had a question concerning a rule or

10   regulation who would you ask?

11       A.    The Board of Stewards.

12       Q.    Do you know what a racing association is?

13       A.    What a racing association is?

14       Q.    Uh-huh.

15       A.    No.  I would say no.  I don't understand the

16   question.  I mean other than --

17       Q.    Okay.  You would agree with me that the

18   track -- Charles Town Races and Slots is the owner and

19   operator of a thoroughbred horse racing track we can

20   agree on that, correct?

21       A.    Yes.

1        Q.    They also own a training track?

2        A.    Across the street, yes, sir.

3        Q.    They own horse stalls?

4        A.    Yes, sir.

5        Q.    Testing barn?

6        A.    Uh-huh.

7        Q.    Yes?

8        A.    Yes, sir.

9        Q.    And they have to be -- track has to be

10   licensed by the state of West Virginia in order to

11   operate, doesn't it, as a racetrack?

12       A.    Uh-huh.

13       Q.    Yes?

14       A.    I would say yes, sir.

15       Q.    Are you aware there's a written contractual

16   agreement between the track and the Horsemen's

17   Benevolent Protection Association or HBPA, are you

18   aware of that?

19       A.    I'm aware of the contract.  Don't know what it

20   contains but I do know there's a contract between

21   horsemen and the track, yes.

1          Q.    Have you ever had any reason to review that

2     contract?

3          A.    No, sir.

4          Q.    Does the track provide stalls to horsemen?

5          A.    Yes, sir.

6          Q.    Who are members of the HBPA?

7          A.    Yes.  Yes, sir.

8          Q.    How many?

9          A.    How many?

10         Q.    Stalls does the track provide to the horsemen?

11         A.    I think off the top of my head I think we have

12    roughly like 1300 and some stalls.

13         Q.    Are you aware of any contractual requirement

14    on the part of the track to supply those stalls, make

15    those stalls available?

16         A.    I don't understand your question.

17         Q.    Are you aware that there's a contractual

18    requirement that the track make those stalls available

19    for the use of the horsemen, did you know that?

20         A.    Contractual?

21         Q.    Legal.  The track -- were you aware the track

1    is legally obligated to make stalls available for the

2    use of the horsemen at Charles Town Races?

3         A.   No.  I don't -- I don't think -- I don't

4    understand the legal part.

5         Q.   You're not aware of that?

6         A.   No.

7         Q.   Are there any empty stalls at the present

8    time?

9         A.   Any empty stalls?

10        Q.   Yeah.

11        A.   Yes, sir.

12        Q.   How many?

13        A.   Off the top of my head I could say 40, 50.

14        Q.   Have there ever been as many as 140 empty

15   stalls at the track?

16        A.   140?  I would say no.

17        Q.   How are these stalls -- who uses these stalls?

18        A.   Depends on who they're allocated to.

19        Q.   Okay.  All right.  And in your capacity --

20   various capacities at the track in the racing -- as a

21   racing official, okay, have you ever become aware that

1    Mrs. Mawing has ever violated any law, statute, or rule

2    governing thoroughbred horse racing in West Virginia?

3         A.   The only thing I knew Mrs. Mawing to have done

4    was when she lost five stalls because she was in the

5    stalls that are allocated to other trainers.  That's

6    all I know.

7         Q.   You're saying that you know she lost five

8    stalls because these stalls were allocated to another

9    trainer?

10        A.   Other trainers, yes, sir.

11        Q.   Other trainers, okay.  When did that occur?

12        A.   Huh?

13        Q.   When did that occur?

14        A.   I'm going to say back in 2008 to my best

15   recollection right now.  I would say around March of

16   2008.

17        Q.   How do you know about those?  Do you have

18   personal knowledge of this?

19        A.   They did a tattoo check to the one area.

20        Q.   Did a tattoo check?

21        A.   Barn check.

1        Q.    You're going to have to help me out there.

2    What's a barn check or a tattoo check?

3        A.    That's when we go by and flip the horse's lips

4    and we go back to find out who they belong to.

5        Q.    When you say they did a check, who is they?

6        A.    Me, Jim Taylor.  I want to say Danny Frye off

7    the top of my head.  I would say that's who was with

8    us.

9        Q.    So it was you, Jim Taylor, and who else?

10       A.    Could have been Daniel Frye.  He's the state

11   inspector.

12       Q.    Daniel Frye.  He is the state inspector.  You

13   mean he is an employee of the Racing Commission?

14       A.    Commission, yes, sir.

15       Q.    And what was his business at the track when he

16   was doing this?

17       A.    He just represents the state to make sure

18   that's all we do.

19       Q.    I'm sorry?

20       A.    He just represents the state to make sure

21   that's all we go through the barn and do, that we don't

1    bother anything else other than check horses.

2         Q.   And the reason for doing this tattoo or barn

3    check?  What was your purpose in doing this?

4         A.   The same thing we just talked about to make

5    sure the proper horses are in the proper places and

6    trained by the proper people.

7         Q.   Okay.  Does the Racing Commission inspector

8    accompany you whenever you do this?

9         A.   When he's available, yes, sir.

10        Q.   And is he available on the track or is he --

11        A.   Yes, sir, he's usually there.  He works there.

12        Q.   So he works there all the time?

13        A.   Wednesday through Saturday, I would say,

14   Sunday, something like that.

15        Q.   Okay.  What else does he do?

16        A.   All I know he's a state inspector, sir.  I

17   don't have any other clue what his other jobs are.

18        Q.   When you check -- when you go into stalls to

19   check horses, see who the trainers are, owners are,

20   what stalls the horses are in, he's there overseeing

21   that; is that correct?

1          A.    Uh-huh.

2          Q.    Yes?

3          A.    Yes, sir.

4          Q.    So this is how you had personal knowledge of

5     the loss of these five stalls, is that what you're

6     telling me because you went in and did this barn check?

7          A.    Uh-huh -- yes, sir.

8          Q.    What happened during the barn check that

9     allowed you to know that Mrs. Mawing was losing stalls?

10         A.    We didn't know that at that time.  We just did

11    a barn check.

12         Q.    I'm trying to see how does that -- you

13    mentioned that when I asked you about her losing

14    stalls.

15         A.    You asked me did she ever -- ever in any

16    trouble.  The only thing that I ever knew Mrs. Mawing

17    to do was that.  Like I said, Mr. George Yetsook was

18    the first trainer to come up and make a complaint that

19    she was in his stalls so that's why we had to go down.

20         Q.    You're saying you went down there pursuant to

21    a complaint?

1      A.    George Yetsook.

2      Q.    So George -- who is George?

3      A.    He's a trainer.

4      Q.    Is he a member of the --

5      A.    HB --

6      Q.    HBPA?

7      A.    Yes, sir.

8      Q.    Is he on the board of the HBPA?

9      A.    That I don't know, sir.

10     Q.    Did he make a complaint to you?

11     A.    He came up to me, like I said, roughly in I'm

12   going to say 2009 and we had talked about it because

13   that's right after Mr. Lamp had left and he said he had

14   loaned some stalls and Mrs. Mawing wouldn't get out.

15   We went down there and that's when we discovered that

16   she was in two other trainers' barns.

17     Q.    Okay.  Doug Lamp had left?

18     A.    Mr. Lamp had resigned.

19     Q.    That was in when?

20     A.    November.  I'm going to say the closest I can

21   get to you is like November of 2007.

1          Q.    Okay.   So he resigned in November 2007?

2          A.    Uh-huh.

3          Q.    And how does that have any connection with

4     something that happened in 2009?  You just said 2009 is

5     when George Yetsook made a complaint to you?

6          A.    2008.   Excuse me.

7          Q.    When in 2008?

8          A.    Like I told you, around February, March, in

9     that area he came up about his stalls.

10         Q.    Okay.   Take me through that.  He came to you

11    directly?

12         A.    Uh-huh.

13         Q.    What exactly did he say to you?

14         A.    Same thing I told you.  He asked me roughly

15    three months ago they had asked to borrow the stalls

16    which I told him at that point in time --

17         Q.    Wait, wait, wait.  You're losing me.  Roughly

18    three months ago who had done what?

19         A.    Mr. Yetsook and Mrs. Mawing come up and they

20    wanted to borrow some stalls.  I told him at that point

21    in time if it was okay with him I had no issues with

1    that.   I was doing three jobs.   They came back in, like

2    I told you, it's roughly around March of that year, and

3    he said that he wanted the stalls back but he couldn't

4    get them back so we had -- he had asked her to get out

5    of the stalls and evidently she didn't so when we did a

6    tattoo check through that barn she was found to be in

7    Mr. Yetsook's stalls.   There was a horse of hers in

8    Mr. Butts' stalls and also Ronnie Wilt's stall which

9    are all trainers.

10        Q.   Okay.   So if I'm understanding you correctly,

11   three months before February, March of 2008 Mrs. Mawing

12   and Mr. Yetsook came to you?

13        A.   Uh-huh.

14        Q.   And they came to you because you were what at

15   that time?

16        A.   Doing a lot of acting.   I was filling in

17   because Mr. Lamp had resigned so I was acting racing

18   secretary, assistant racing secretary and paddock judge

19   at night.

20        Q.   They came to you because you were assistant

21   racing secretary?

1      A.   Yes, sir.

2      Q.   And they wanted -- do I understand that what

3  was going on here was Tina Mawing wanted to use some

4  stalls that were allocated to Mr. Yetsook?

5      A.   Yes, sir.

6      Q.   And that is something that is governed by the

7  Racing Commission rules?

8      A.   No.  Well, as far as what do you mean?

9      Q.   Well, do -- did they have to come to you as a

10  racing official in order to change the stall

11  arrangements?

12      A.   Yes.  They have to have our permission, yes.

13      Q.   That's a matter of the rules of the Racing

14  Commission, correct?

15      A.   Right.  Yes.

16      Q.   So she wanted to borrow some of his stalls, is

17  that --

18      A.   Yes, sir.

19      Q.   At that time you approved that?

20      A.   Yes, sir.

21      Q.   In your capacity as racing -- assistant racing

1    secretary?

2        A.    Uh-huh.

3        Q.    Yes?

4        A.    Yes, sir.

5        Q.    Later, three months later in February or March

6    of 2008, Mr. Yetsook approached you and stated to you

7    that he wanted his stalls back?

8        A.    Yes, sir.

9        Q.    And he approached you because you were

10   assistant racing secretary?

11       A.    At that point in time, like I told you, I was

12   doing all three jobs.  There was no -- they hadn't

13   hired a racing secretary yet.

14       Q.    So you were acting as assistant racing

15   secretary and you were also holding two other racing

16   official positions, correct?

17       A.    Yes.

18       Q.    And those were?

19       A.    Well, like I said, I was filling in as the

20   racing secretary and I was paddock judge at night.

21       Q.    So you were actually wearing three hats;

1    assistant racing secretary, acting racing secretary and

2    assistant paddock judge?

3        A.   I was paddock judge.

4        Q.   Paddock judge.  These are all positions that

5    have to be approved -- you have to be approved and

6    appointed through the Racing Commission to hold these

7    positions, don't you?

8        A.   You have to be a racing official.

9        Q.   All right.  So you have to be approved as a

10   racing official to hold these positions?

11       A.   Yes, sir.

12       Q.   And the Racing Commission has to approve you

13   being a racing official?

14       A.   Yes, sir.

15       Q.   So I mean, they have -- they decide who is

16   going to fill these positions?

17       A.   Well, not the Racing Commission.  Our --

18   inside of our racing office, you know, our management,

19   Mr. Moore at that time, was the actual director of

20   racing.

21       Q.   Right, but subject -- he can put in who he

1    wants subject to the approval of the Racing Commission?

2        A.   Yes.

3        Q.   Is that right?

4        A.   Yes.  As long as they're approved then they're

5    racing officials.

6        Q.   So Yetsook comes to you and makes a complaint

7    that he wants the stalls back, is that my

8    understanding?

9        A.   That's my understanding.  I'm not trying to be

10   rude here but this has been two years ago.  Mr. Yetsook

11   came back and he wanted the stalls back and that's when

12   Mrs. Mawing was still in them.  Then once we found out

13   Mrs. Mawing was still in them which they was the ones

14   we okayed, I had no knowledge of Mr. Wilt's or

15   Mr. Butts' and then when they never came out that's

16   when the thing blew out of proportion and she lost five

17   stalls.

18       Q.   You mentioned Mr. Butts.  What's his full

19   name?

20       A.   Richard P. Butts and Ronald J. Wilt.

21       Q.   Wilt?

1      A.    Wilt, W-I-L-T.

2      Q.    Are they trainers?

3      A.    Yes, sir.

4      Q.    When did you -- when did they get involved in

5   this situation to your knowledge?

6      A.    March of -- March of --

7      Q.    I mean, did they approach you?

8      A.    No.  Mr. Wilt did not approach me.  He did not

9   know the stall belonged to him.  He said he had been

10  told by Mrs. Mawing that the stall was not his.  That's

11  all I can tell you on that.

12     Q.    What about Butts, did he approach you?

13     A.    Yes.  Mr. Butts -- no.  When we did a barn

14  flip, we found her horse in Mr. Butts' stall.

15     Q.    So you have a -- you have some kind of record

16  of the stall allocation, correct?

17     A.    They have them in the racing office from the

18  stall allocations from years past.

19     Q.    I mean, when you go down to the barn to do a

20  barn check there's something you can consult, some

21  written record of who is allocated that particular

1    stall?

2         A.    Yeah.   It's in the computer.

3         Q.    It's in the computer?

4         A.    Right.

5         Q.    So you go down to do the barn check in March

6    2008, around that time period, with the state racing

7    inspector.   You determined that -- what you're telling

8    me is you're determining that Mrs. Mawing has some

9    horses in stalls that are allocated to Mr. Butts,

10   Mr. Wilt and Mr. Yetsook?

11        A.    Yes.

12        Q.    So when you determine -- make that

13   determination when you do your barn check, what do you

14   do?

15        A.    I just report it back to my peers.

16        Q.    Who's your peers?

17        A.    At that time it was Richard Moore and Al

18   Britton.

19        Q.    So did you actually personally go and talk to

20   Mr. Britton?

21        A.    No.   I just sent back to my boss which at that

1    point in time now Mr. Wehrman also was hired.

2         Q.   All I'm trying to do is figure out,

3    Mr. Elliot, is after you did this barn check who did

4    you talk to about it?  Who did you go to?  Your boss?

5         A.   My boss and --

6         Q.   At that time --

7         A.   -- which is Mr. Wehrman and then it goes

8    upstairs.

9         Q.   So you went to Mr. Wehrman?

10        A.   And to Mr. Moore.

11        Q.   Did you speak directly to Mr. Moore about it?

12        A.   Uh-huh.  Yes, sir.

13        Q.   Yes.  Did you speak to Mr. Wehrman and

14   Mr. Moore at the same time?

15        A.   No.

16        Q.   Who did you speak to first?

17        A.   Mr. Wehrman.

18        Q.   What did you tell Mr. Wehrman?

19        A.   What we found.  We just gave him what we

20   found, what we do every day.  We take back our tattoo

21   check and this is what we found.

1        Q.    How often do you do these tattoo checks?

2        A.    Now we do two a week.

3        Q.    Is this something you do routinely every week?

4        A.    No.  Honestly, we started doing them again I'm

5    going to say recently we just did -- what's this, we

6    did barns three, four, five, six, seven, eight, nine,

7    10, 11, and 13 so I'm going to say we started about a

8    month or so ago re-doing them all again.

9        Q.    So you started a month ago?

10       A.    Roughly in that time frame.

11       Q.    Checking every stall?

12       A.    Yes, sir, checking every barn.

13       Q.    And when is the last time you did that prior

14   to a month ago?

15       A.    I couldn't tell you.  I would be lying if I

16   tried.

17       Q.    So it's not something you do routinely every

18   week?

19       A.    No.  They started it back up now.  No, we

20   hadn't done it in I'm going to guess and say a year

21   until we started back.

```
1        Q.   When you say we went to Mr. Wehrman, are you

2   meaning you --

3        A.   Me and Mr. Taylor.

4        Q.   And James Taylor.

5        A.   Right.

6        Q.   Not the racing secretary?

7        A.   No, sir.

8        Q.   And then when you say we went to Mr. Moore,

9   was that just you or was it you and Mr. Taylor?

10       A.   No.  I, myself, went to Mr. Moore.

11       Q.   Why did you go to him if you had already

12  reported this to Mr. Wehrman?

13       A.   Because Mr. Moore is the director of racing.

14       Q.   So you felt you should report it to him as

15  well?

16       A.   Yes, sir.

17       Q.   Was anyone -- was he aware that a complaint

18  had been made?

19       A.   I don't know, sir.  I don't recall having any

20  conversation with Mr. Moore about the complaint.

21       Q.   Was Wehrman aware that the complaint had been
```

1    made before you --

2         A.   I couldn't --

3         Q.   -- ran the check?

4         A.   Again, I can't recall ever having any

5    conversation with Mr. Moore about a complaint from

6    Mr. Yetsook.

7         Q.   When you went to them and told them about

8    this, did it seem to be something new that they hadn't

9    heard before?

10        A.   No.  No.

11        Q.   It did not seem to be something they hadn't

12   heard?

13        A.   No.  It's happened before with other people.

14   It's not like this is just a surprise, you know.

15        Q.   Well, what I'm driving at did they know you

16   were checking on Mrs. Mawing's stalls?

17        A.   Oh yeah.  They sent me there.  Mr. Wehrman is

18   the one who sent me down to check the stalls out.

19        Q.   So it was Wehrman that sent you down to check

20   the stalls?

21        A.   I would say, yes, sir.  Off the top of my

1    head, yes.

2        Q.   How about Mr. Moore, did he send you down?

3        A.   No.  It came from the racing secretary.

4        Q.   When did he -- when did he tell you to do

5    this?

6        A.   Again, we're going back in time here.  I can't

7    give you an approximate time.

8        Q.   Was this before or after the complaints?

9        A.   It was after.  It was when Mr. Yetsook came to

10   us.

11       Q.   Did Yetsook come directly to you?

12       A.   Yetsook came to the identifier's office to

13   talk to me, yes.

14       Q.   But Wehrman is the one who sent you down to do

15   the barn check?

16       A.   Yes.  Mr. Wehrman is the racing secretary and

17   he's the one that sent us to check the barns.

18       Q.   So if I understand you correctly, when were

19   -- were these stalls then taken away from Mrs. Mawing?

20       A.   I can't give you exact date, but yes, there

21   were five stalls taken away from Mrs. Mawing, yes.

1       Q.   Sometime after February or March of 2008,

2    correct?

3       A.   Yes, sir.

4       Q.   How soon afterwards?

5       A.   I couldn't begin to give you that.  I would

6    have to go back and look.  I just know they did a barn

7    check I'm going to say roughly in March and it was

8    probably two weeks, it might have been two weeks, it

9    might not have been.

10      Q.   Are you aware of any other stalls ever being

11   taken away from Mrs. Mawing?

12      A.   No, sir.

13      Q.   That's it, just these five stalls?

14      A.   Just the five that -- I mean, for being in and

15   then she lost them all eventually.  But these five I

16   know about.

17      Q.   You also know that she lost all her stalls?

18      A.   Yes.

19      Q.   And when were all her stalls taken?

20      A.   That, again, we're speculating here.  I

21   couldn't begin to give you the exact date.  I couldn't

1    tell you the exact date.  I just know she did lose all

2    her stalls.

3         Q.   Do you know why she lost all her stalls?

4         A.   Do I know why she lost all her stalls?  No, I

5    have no idea.  I was just given the letter to give out.

6         Q.   You just what?

7         A.   I was given a letter to give out.

8         Q.   Somebody gave you a letter to give out?

9         A.   The racing secretary gave me a letter to

10   give -- Mr. Taylor and myself a letter to take down and

11   hand out and that's what we hand out.

12        Q.   Who did you hand out the letter to?

13        A.   If I'm not mistaken, off the top of my head I

14   think Mr. Anthony actually had the letter in his hand,

15   her husband, Tony, he was there with Tina and we handed

16   him the letter.

17        Q.   So who was the racing secretary that gave you

18   the letter?

19        A.   Mr. Wehrman.

20        Q.   Wehrman.  And the letter advised?

21        A.   I don't know what the letter said, sir.

1       Q.   You didn't read the letter?

2       A.   No.  We don't get to read them.  They're in an

3    envelope, sir.

4       Q.   So you're handed a letter within an envelope

5    by Mr. Wehrman and you were told give this letter --

6       A.   Hand these letters out.

7       Q.   To who?

8       A.   Mrs. Mawing.

9       Q.   You said letters.  Is there more than one

10   letter?

11      A.   There's more than one letter.  We were just

12   handing out letters at that time.  There's allocation

13   letters.  She's got stalls.  We don't know what they

14   say.

15      Q.   Were you handing out letters to other

16   trainers?

17      A.   Uh-huh.  At the same time.

18      Q.   So you were handing out allocation letters to

19   a number of different trainers?

20      A.   Right, sir.

21      Q.   And how did you -- since you didn't read the

1    letter and it was in an envelope, how did you learn

2    that she lost all her stalls?

3        A.   When Mr. Mawing first come around and

4    approached us was Anthony and was saying they took

5    their stalls and I said you would have to bring Tina, I

6    don't know.  We don't -- privilege reading the letters

7    and that's when they said they had lost all their

8    stalls.  That's when Mrs. Mawing asked me at that point

9    in time who was on this committee about the stalls.

10       Q.   So if I understand you correctly, Mrs. Mawing

11   came to you at some point after she got the letter,

12   advised you -- her husband advised you that they lost

13   all their stalls?

14       A.   And Mrs. Mawing was around there then at that

15   time too.

16       Q.   How soon was that after they got the letter?

17       A.   Three minutes.

18       Q.   So it was as soon as you handed it to them

19   they opened it up and said we lost all our stalls, who

20   is on the committee that made this allocation, right?

21       A.   They asked who was on the committee for the

1    stall committee.

2         Q.   What did you tell them?

3         A.   There was a group of people.

4         Q.   Did you know?

5         A.   Did I know at the time?  Everybody that was on

6    it at that point in time I didn't know who was all on

7    this committee where it all went through, no, sir.

8         Q.   Were you on the committee?

9         A.   As a stall committee, yes.  We're all on a

10   committee, uh-huh.

11        Q.   So you were on the stall committee?

12        A.   Uh-huh.

13        Q.   And you were on the stall committee in your

14   capacity as what, assistant racing secretary?

15        A.   No.  At that time I'm the backside

16   administrator.

17        Q.   And did you know who the other committee

18   members were?

19        A.   At that time?

20        Q.   Yes.

21        A.   No, sir, not all of them, no, sir.

1     Q.   Do you know now?

2     A.   Yes, sir.

3     Q.   Who are they?

4     A.   I would say right now it's Al Britton, Richard

5  L. Moore, Erich Zimny, Randy Wehrman, Jim Taylor, and

6  myself, Mike Elliot.

7     Q.   And is it your understanding that that was the

8  membership of the stall committee at the time

9  Mrs. Mawing approached you and asked who was on the

10 committee?

11    A.   Yes, sir.

12    Q.   You're telling me you didn't know that at that

13 time?

14    A.   I didn't know.  I couldn't give all them names

15 because I didn't know who all was on it at that time.

16 When that moment that she approached me, no.

17    Q.   How did you learn who was on it?

18    A.   Once I had my very first stall meeting.

19    Q.   So when did you have your very first --

20    A.   That would have probably been in June or July

21 of '08 when we went upstairs.  I want to say June more

1    or less.

2         Q.   So your testimony is you have your first

3    meeting of the stall committee in June or July of 2008?

4         A.   Yes, sir.

5         Q.   And that's when you first realized who the

6    other committee members were?

7         A.   Right, sir.

8         Q.   Where does this stall -- how many stall

9    meetings have you attended since June of 2008 or July

10   of 2008?

11        A.   Honestly, about three.

12        Q.   Three more in addition to the one you had?

13        A.   Yeah.  I don't go to all of them.  About

14   three.  That's all I really been sitting on.

15        Q.   How often are there meetings of this

16   committee?

17        A.   Usually the only meetings we go to is when

18   they decide to allocate, whatever, or to go over the

19   people that's in our barn area, in our barn area

20   already to go over their stalls.

21        Q.   When they decide to allocate, who is they?

1      A.   Again, the committee.   Now, that committee is

2   the names we exist of.   They have a meeting, they go

3   upstairs and there's a lot more now, I guess,

4   considered in this thing.   Mr. Zimny put together a

5   thing.   We all sit around the table.   The people that

6   are on the property they go down the list of names with

7   their stalls whether they've asked for more or asked

8   for less then they discuss it.

9      Q.   Who calls the meetings?

10     A.   Who calls them?

11     Q.   Yeah.   Who tells you there's a meeting?

12     A.   I would say now Mr. Zimny would be the one

13  that calls that and sends out a e-mail that there's a

14  stall allocation meeting coming up whatever day it is.

15     Q.   Does he send you something in writing?

16     A.   Usually sends e-mails.

17     Q.   Do you have a computer at the track that you

18  use?

19     A.   I've had -- in the last year or so, no.   I've

20  only had one computer because when I was the assistant

21  I used to sit at the desk and I had a computer but

1   because I became the backside administrator there's a

2   building -- a new receiving barn and my office will be

3   in the receiving barn when it's completed.  As I do now

4   I use a computer that's in the racing office to get my

5   e-mails off of.

6        Q.   And is that how you received notice of these

7   stall allocation meetings through the computer?

8        A.   Any e-mails I go to that computer and just

9   read my e-mails in the morning and go from there.

10        Q.   Is this a computer in the racing office

11   itself?

12        A.   Yes, sir, it's in the racing office.

13        Q.   Is it assigned to any particular employee?

14        A.   Me and Gary Lesley right now is who can

15   basically get on it.

16        Q.   When you went to the June, July 2000

17   allocation meeting did you receive notice by e-mail?

18        A.   I would say -- back two years ago?

19        Q.   June or July your first meeting.

20        A.   I would say it would have been by e-mail, yes,

21   sir.  Like I say, Ms. Gramm may give us a courtesy

1    phone call.  That's Dickie Moore's secretary.

2        Q.   Again, is there any regular schedule for these

3    allocation meetings?

4        A.   No, sir.

5        Q.   Does the committee meet once a month?

6        A.   No, sir.

7        Q.   Every three months?

8        A.   No, sir.

9        Q.   It's whenever somebody decides to have a

10   meeting?

11       A.   It's usually, like I say, it's twice a year.

12   Usually June and December.

13       Q.   So it's actually there is a schedule to it?

14       A.   Just a two time a year thing.

15       Q.   Two times a year?

16       A.   Uh-huh.

17       Q.   You never went to any of these meetings

18   before?

19       A.   June of '08.  That's my first one because

20   that's when I took over.

21       Q.   Took over as what?

```
 1          A.   Backside administrator.

 2          Q.   Jim Taylor's job currently?

 3          A.   He's a stall man.

 4          Q.   Stall --

 5          A.   Stall man.  He's actually the stall man.

 6          Q.   Stall man.  Now, does this committee vote on

 7     how to allocate stalls?

 8          A.   Is there a vote?

 9          Q.   Do you take a vote?

10          A.   I would say no.  I don't remember voting on

11     anything.

12          Q.   So you're not given a vote as to who should

13     get stalls?

14          A.   No, sir.

15          Q.   Is there anybody keeping a written record?

16          A.   Yes.  Mr. Zimny usually does the record

17     keeping and all the stats and all that.

18          Q.   Do you get -- after the meeting do you ever

19     get any kind of written minutes?

20          A.   No, sir.

21          Q.   So what record is he making during the
```

1    meeting?

2         A.   What Mr. Zimny -- it's not, I guess, for the

3    meeting.   What Mr. Zimny puts together is a chart on

4    the starts of all the horsemen, quality of starts,

5    percentage of wins.

6         Q.   Okay.   Let's slow down a minute.   He puts

7    together a list of -- a chart on the starts which means

8    how often a horse races?

9         A.   Or how often the trainer starts their horses.

10        Q.   Which means racing the horse, right?   When you

11   say start you mean race, right?

12        A.   You're not talking about one horse.   You're

13   talking about multiple horses.   Starts.   Not just one

14   horse.   It's multiple starts.   How many starts.

15        Q.   A trainer has more than one horse?

16        A.   Right.

17        Q.   And you keep a chart on how often that

18   trainer's horses start?

19        A.   Yes, sir.

20        Q.   You also keep a chart on what else?

21        A.   The percentage of their wins, the percentage

1    of their money.

2         Q.    Percentage of wins.   That means they actually

3    won a race?

4         A.    And --

5         Q.    Percentage of money?

6         A.    Percentage of money per start.

7         Q.    You can win money without winning the race?

8         A.    Yes, sir.

9         Q.    You're saying he actually keeps a chart on how

10   often the horse starts, the percentage of wins a horse

11   has?

12        A.    That's the new thing he came up with.

13        Q.    New thing.   When did that start?

14        A.    Actually the first one I seen was this year.

15   What are we into now?

16        Q.    2010.

17        A.    So that would have been last December is when

18   I seen that one for the first time.

19        Q.    December 2009?

20        A.    Yes, sir.

21        Q.    So that's something new?

1        A.    Yes, sir.

2        Q.    How about the percentage of horses and the

3    money, is that something new as well?

4        A.    Yes, sir.

5        Q.    Did that start in December of 2009?

6        A.    All that started on that new chart, yes, sir.

7        Q.    So prior to December of 2009 there was a chart

8    on how often a horse started -- the horses start?

9        A.    No.  I didn't -- I don't know -- honestly I

10   can't answer your question on what they did or how they

11   came up with their things before 2009.

12       Q.    What I'm hearing from you is there was no

13   record kept prior to December of 2009, am I right?

14       A.    Not by me.  I didn't keep it.

15       Q.    And not by Mr. Zimny?

16       A.    I can't answer that.

17       Q.    You were there in the meetings?

18       A.    No.  I said I don't -- see no record.  I never

19   seen any records as far as 2009.  I only went to a few

20   meetings.  The first meeting I went to was in 2008 and

21   I did not see anything as far as chart ways go.  He was

1    trying to build something to this fact what he made in

2    2009.

3        Q.    That's what I'm driving at.   The first time he

4    came in with charts on starts, percentage of wins,

5    percentage of money was in December of 2009?

6        A.    As far as I knew, yes, sir, 2009.

7        Q.    Okay.   So let's get back to my original.   How

8    about in June, your first meeting, was Zimny there?

9        A.    Yes, sir, Mr. Zimny was there.

10        Q.    Al Britton there?

11        A.    Yes, sir.

12        Q.    Dickie Moore?

13        A.    Yes, sir.

14        Q.    Randy Wehrman?

15        A.    Yes, sir.

16        Q.    Jim Taylor?

17        A.    Yes, sir.

18        Q.    And yourself?

19        A.    Yes, sir.

20        Q.    Anyone else present?

21        A.    No, sir.

1          Q.   Is there anyone there to take minutes?

2          A.   No, sir.

3          Q.   Keep a written record?

4          A.   Not to my knowledge.

5          Q.   Did you see anybody keep any written record?

6          A.   Not to my knowledge.

7          Q.   Let me finish.  In June or July of 2008 did

8     you see anybody keep a written record?

9          A.   Not to my knowledge.

10         Q.   In December of 2009 did you see anybody keep a

11    written record?

12         A.   Not to my knowledge.

13         Q.   At any meeting that you've ever attended of a

14    stall committee, have you ever seen anyone keep a

15    written record?

16         A.   You mean minutes as far as -- not to my

17    knowledge.

18         Q.   Or any other record.  Does --

19         A.   The records what they do -- the only records I

20    know we keep is what we allocate when we do our

21    stalls.  We have a list of trainers and we have what

1    stalls they have now and what they are eligible for,

2    maybe what they're asking for.

3        Q.   Okay.  So you have a list of trainers?

4        A.   Uh-huh.

5        Q.   And a list -- as part of a list you have all

6    their stalls?

7        A.   Yes, sir.

8        Q.   And you have a list of stalls they're eligible

9    for?

10       A.   Yes, sir.

11       Q.   And you have a list of what stalls they want?

12       A.   Yes, sir.

13       Q.   And that's all on one list?

14       A.   It's on one sheet of paper.

15       Q.   One sheet.  Who puts that together?

16       A.   Mr. Zimny now.

17       Q.   Who did it in June of 2008?

18       A.   There was none.  Not like that.

19       Q.   Was there any such list prior to December of

20   2009?

21       A.   Not that I know of, sir; no, sir.

1      Q.   So how did you keep track of who was being

2  allocated stalls back at these other meetings?

3      A.   That's something you will have to ask the

4  other people.   I can't answer that.

5      Q.   Who made the decision in this meeting who

6  would get what stalls?

7      A.   Who made the decision?

8      Q.   Who made the decision what trainers would be

9  allocated stalls?

10     A.   Like I said, they're already allocated

11  stalls.   Most of them are already allocated.   It's just

12  a question of whether we give or take away.

13     Q.   Who would make that decision --

14     A.   You would have to ask --

15     Q.   Let me finish the question.   Who would make

16  the decision as to who would have stalls taken away?

17     A.   You mean all their stalls or some of their

18  stalls?

19     Q.   Any of their stalls.

20     A.   Well, it depends -- see, that's an open-ended

21  question for me.   If they're losing a couple of stalls

```
 1    to there, it's done right at the meeting.  If it comes

 2    to a decision whether management is taking everybody's

 3    stalls that's not done at that meeting.

 4        Q.   So if a trainer -- if all a trainer's stalls

 5    are being taken away, that's not something decided at

 6    this meeting?

 7        A.   No, sir.

 8        Q.   It's decided somewhere else?

 9        A.   Yes, sir.

10        Q.   By somebody else?

11        A.   By somebody else, yes, sir.

12        Q.   By who?

13        A.   I can't tell you, sir.  Don't know.

14        Q.   Now, if you're taking one or two stalls away?

15        A.   It's done at that meeting.

16        Q.   Done at that meeting?

17        A.   Yes, sir.

18        Q.   By who?  Who makes that decision?

19        A.   By the board.

20        Q.   Do you vote?

21        A.   We just go around the table.  They might say
```

1    he's eligible, he's eligible, he's got 18 stalls, he's

2    eligible for 14 stalls, let's take two.

3       Q.   And how do you determine whether a trainer is

4    eligible for 18 stalls as opposed to 14 stalls?

5       A.   That's, again, out of my realm.  It's a whole

6    lot of criteria that upper management uses.  It's not

7    just normally based on starts anymore.  That I do know.

8       Q.   Back in 2008 how did they determine

9    eligibility?

10      A.   As far as I knew starts per stall.

11      Q.   Was that true of the other meetings you

12   attended other than the last meeting in December of --

13      A.   Yes.  Starts per stall.

14      Q.   That was the eligibility criteria used by this

15   committee?

16      A.   That's all I know of, yes, sir.

17      Q.   How many starts did you have to have per stall

18   to be eligible?

19      A.   Seven at that time, sir.

20      Q.   Seven starts per stall for the trainer to

21   maintain eligibility for that stall?

1        A.    Yes, sir.

2        Q.    Correct?

3        A.    Yes, sir.

4        Q.    That's the criteria that was used prior to

5    December of 2009?

6        A.    As far as I know, yes, sir.

7        Q.    You were in those meetings, correct?

8        A.    Uh-huh.

9        Q.    You were in the meeting in June or July of

10   2008, correct?

11       A.    Yes, sir.

12       Q.    You were in at least three other meetings?

13       A.    Since.

14       Q.    Since.

15       A.    Yes.

16       Q.    And that was the eligibility that --

17       A.    Now they've changed it.

18       Q.    In December of --

19       A.    2008.  I just told you it was seven starts per

20   stall as far as I know, yes, sir.

21       Q.    They didn't change that until the meeting of

1     December of 2009?

2          A.    As far as I know, yes, sir.

3          Q.    Has any -- you know Mrs. Mawing had all her

4     stalls taken away, correct, you're aware of that?

5          A.    Yes, sir, I'm aware of that, yes, sir.

6          Q.    So that wasn't done at a committee meeting of

7     the stall allocation?

8          A.    No, sir.  No, sir.

9          Q.    Has any other trainer had all their stalls

10    taken away?

11         A.    Yes, sir.

12         Q.    Who else?

13         A.    James Williams and Junior Hostler -- Charles

14    Hostler, excuse me.

15         Q.    James?

16         A.    James Williams.

17         Q.    And who else?

18         A.    Charles Hostler.  And also I forgot the other

19    one, Ms. Patty Burns.

20         Q.    Patty Burns, Charles Hostler?

21         A.    Hostler.

1          Q.    H-O-S-T-L-E-R?

2          A.    Yes, sir.   Junior.

3          Q.    Junior?

4          A.    Yes, sir.

5          Q.    Mr. Williams, Mr. Hostler and Ms. Burns are

6      all trainers?

7          A.    Yes, sir.

8          Q.    Do you know why Mr. Williams all his stalls

9      were taken?

10          A.    Yes, sir.   I know why Mr. Williams lost his

11      stalls because of the care of his horses.

12          Q.    Substandard care of his horses?

13          A.    Yes, sir.

14          Q.    Do you know why Mr. Hostler lost his stalls?

15          A.    Same reason.

16          Q.    Substandard care of his horses?

17          A.    Yes, sir.

18          Q.    Do you know why Patty Burns lost her stalls?

19          A.    I have no idea, sir.

20          Q.    Can you think of any reason why she might have

21      lost all of her stalls?

1      A.   No, sir.  Again, I can tell you the only thing

2    I knew about Ms. Burns is while I was filling in as

3    acting racing secretary and as assistant and paddock

4    judge, I was paddock judge one day.  Again, I was asked

5    to deliver a letter.  I delivered a letter to Ms. Burns

6    in the paddock and five minutes later Ms. Patty came

7    back saying the same thing that they taken all her

8    stalls.  At that time she asked me the same thing, can

9    you tell me why.  I have no reason.  Still don't have

10   any reason why she lost her stalls.

11     Q.   How do you know why Mr. Williams lost his

12   stalls?

13     A.   Because I was the backside administrator and

14   watched him abuse his horses long enough to where I was

15   the one that pressed that issue.  Same with

16   Mr. Hostler.

17     Q.   Was that discussed the fact that they're

18   abusing their horses, was that discussed at a meeting

19   of the stall allocation committee?

20     A.   It was discussed with the stall committee and

21   also discussed with the Board of Stewards.  Actually it

1 was discussed with the Board of Stewards before it went

2 anywhere else.

3   Q. Did it go to the committee itself, the

4 allocation committee?

5   A. It went to the committee -- well, I shouldn't

6 say the committee.  It went to Mr. Moore and, of

7 course, Mr. Wehrman, Mr. Moore.  Then Mr. Moore and

8 Mr. Zimny and them, they had their own meeting

9 upstairs.  It was called back to me and we took their

10 stalls.

11   Q. Other than Mrs. Mawing, Ms. Burns, Mr. Hostler

12 and Mr. Williams, are you aware of any other trainer

13 who has ever had all of their stalls taken away by the

14 track?

15   A. No, sir.  I just can't think of any off the

16 top of my head, no, sir.

17   MR. WADDELL:  Why don't we take a short break?

18   (Recess was had.)

19   MR. WADDELL:  (resumed)

20   Q. Mr. Elliot, you're not aware that Tina Mawing

21 ever had any issues regarding care of her horses, are

1    you?

2         A.   No, sir.

3         Q.   As far as you know she took good care of her

4    horses?

5         A.   Absolutely.  As far as I know, sir.

6         Q.   Are you aware she ever had any problems

7    meeting that eligibility requirement for seven starts

8    per stall?

9         A.   Well, as we go back on that that's one thing

10   we need to, I guess, say the seven starts per stall was

11   I guess you want to call them rule of thumb.  I guess

12   they took more things -- I shouldn't say guess.

13   There's more things involved than just seven starts per

14   stall.  Now, at that time, no, I didn't know of

15   Mrs. Mawing doing anything other than that, no.

16        Q.   So between the time we took a break and the

17   time we're back you've now thought of other things that

18   were taken into consideration?

19        A.   I would only say it is the quality of your

20   starts and your percentage of wins.  As we all know, we

21   would all like to have nice horses.  We all can't get

1    great horses.

2         Q.    Are you saying her horses were inferior in any

3    way?

4         A.    No, sir.

5         Q.    So there's no claim you're making that her

6    horses were not quality horses?

7         A.    No.  I don't see any unquality horses she

8    didn't have.

9         Q.    So she had quality horses?

10        A.    Yes.

11        Q.    What other factors were taken into

12   consideration that you thought of since we broke?

13        A.    Like I say, your quality of starts, quality of

14   wins, percentage of money.  As we all know, we like to

15   have quality horses, we like to have great horses but

16   we all can't have great horses.

17        Q.    Again, prior to December of '09 you attended

18   four meetings of the allocation committee, correct?

19        A.    Uh-huh.  Around that area, uh-huh.

20        Q.    Was there any record kept of quality of

21   starts, quality of --

```
1          A.   I can't answer that, sir.  I don't know.  I

2     really don't know, sir.

3          Q.   You mentioned George Yetsook?

4          A.   Yes, sir.

5          Q.   Did he not receive a letter taking away all

6     his stalls?

7          A.   Taking away all his stalls?

8          Q.   Uh-huh.

9          A.   No, sir.  Oh, did he receive a letter recently

10    you're talking about?

11         Q.   Yes.

12         A.   Yes, he did.

13         Q.   Were you involved in delivering that letter?

14         A.   Yes, sir.

15         Q.   Do you know the reason --

16         A.   No, sir.

17         Q.   That wasn't something that would have been

18    discussed at one of your --

19         A.   Committee meetings.

20         Q.   -- allocation committee meetings?

21         A.   No, sir.
```

1      Q.   That would be decided by upper level

2   management?

3      A.   Yes, sir.

4      Q.   When they want to take -- remove stalls

5   completely from a trainer, that's something that's just

6   not discussed at the allocation meeting?

7      A.   Yes, sir.  Not discussed with us.

8      Q.   You have no idea of the reason why they would

9   want to do that, correct?

10      A.   No, sir.

11      Q.   You do not?

12      A.   No, sir.  I don't know, sir.

13      Q.   As a member of this committee are you aware of

14   any limitation placed on the track in regard to

15   allocation of stalls?

16      A.   What do you mean by limitation?

17      Q.   Do they have any criteria or restrictions on

18   how they go about their business of allocating stalls?

19      A.   I don't know, sir.

20      Q.   Are you aware that the contractual agreement

21   between the Horsemen's Association and the track

1    requires that the track not discriminate in the

2    allocation of stalls by reason of HBPA membership or

3    activity?

4         A.   The contract between the track and them, I

5    have no idea about the contract, sir.

6         Q.   So even though you're on the committee that

7    allocates stalls, you're not aware of --

8         A.   Contract.

9         Q.   You're not aware of the provisions in the

10   contract that govern the allocation of stalls?

11        A.   No, sir.  Don't know nothing about that.

12        Q.   You never heard that discussed in any

13   committee meeting?

14        A.   No, sir.

15        Q.   Do you agree with me that the process of

16   trailering thoroughbred horses poses a risk of injury

17   to the horses?

18        A.   Trailering them?

19        Q.   Yes.

20        A.   Lord, that's a loaded question.  You can walk

21   a horse and get a horse hurt.  Yeah, any time you put a

1    horse on the trailer, absolutely, you can get them

2    hurt.

3         Q.   When you trailer a horse you have to load the

4    horse, you have to transport, you're unloading,

5    correct?

6         A.   But in my opinion that's the trainer's

7    decision in my opinion.  I mean, if you're going to

8    travel somewhere to ship your horse you're going to

9    travel.  People travel every day to ship horses.  It's

10   not like they're dying, no.  Some horses ship better

11   than others.  Some don't ship at all.

12        Q.   You agree with me it does pose a risk of

13   injury to the horses though?

14        A.   Not all of them.  Depending on the horse.

15        Q.   Well, if a horse gets stressed being

16   transported it may act erratically and may cause

17   themselves injury, correct?

18        A.   I wouldn't -- personally I wouldn't transfer

19   them.

20        Q.   But that could happen?

21        A.   Yes, sir, it could.

1      Q.   It can also exhaust -- when you're trailering

2   your horse you can also exhaust the horse leaving them

3   at a competitive disadvantage in a race?

4      A.   I'm not an expert on that.  Yeah, I could say

5   it could take some races out of you but that's your

6   choice too of trailering your horse.

7      Q.   Yeah, if you have a choice -- if you're a

8   trainer and you have a choice whether to trailer or not

9   it's your choice?

10      A.   Right.

11      Q.   If you don't have any stalls at the track and

12   you've got to trailer it's not your choice, correct?

13      A.   Absolutely.  So it doesn't matter where he's

14   going he's going to be in a bad situation at that time.

15      Q.   Now, we talked about stewards somewhat here in

16   this deposition.  What is a steward?

17      A.   They just govern racing.

18      Q.   Pardon?

19      A.   They govern racing.

20      Q.   Are they officials of the West Virginia State

21   Racing Commission?

1        A.   Two of them are.  One of them aren't.  Two

2    stewards are state stewards and one steward is state

3    association steward.

4        Q.   When you say association steward, what does

5    that mean?

6        A.   A steward hired by the company by management.

7    He is paid by management.

8        Q.   So the association you're referring to is

9    the --

10       A.   PNGI.

11       Q.   Track?

12       A.   Yes, PNGI.

13       Q.   Are the other two stewards paid by the state?

14       A.   Yes, sir.

15       Q.   And their job by law -- by West Virginia law

16   is to supervise racing?

17       A.   Govern racing, yes, sir.

18       Q.   According to the rules of the Racing

19   Commission?

20       A.   Yes, sir.

21       Q.   As part of the rules of racing isn't it that

1    stewards have the authority to permit and direct any

2    individual authorized to enter in or upon the stables

3    at the track?

4         A.   What do you mean by that question?

5         Q.   Well, the Legislative Racing Rule Section

6    17814.4 says the Racing Commission or the stewards of

7    any licensed meeting may permit and direct any

8    individual authorized to enter in or upon the stables.

9    So if you have an individual who is authorized to enter

10   in or upon the stables they're under the control of the

11   stewards?

12        A.   Right.  They govern everybody that's licensed.

13        Q.   Right.  By law?

14        A.   By law.

15        Q.   Also, each racing association -- we've

16   established that Charles Town Races is an association,

17   racing association, correct?

18        A.   Yes, sir.

19        Q.   Each racing association by law is required to

20   police its grounds at all times in a manner to prevent

21   the admission of persons in or around the stables

1    unless they hold occupational permits issued by the

2    Racing Commission; is that correct?

3        A.   Right, sir.

4        Q.   Now, at a race or race meeting, the officials

5    include three stewards and the association's racing

6    secretary and his assistants; is that correct?

7        A.   What do you mean by that question?

8        Q.   Legislative Rule 17819.1 provides that the

9    officials of a racing meeting include three stewards

10   and the association's racing secretary and assistants,

11   are you aware of that?

12       A.   No, sir.

13       Q.   Are you aware that the Racing Commission in

14   its sole discretion may determine the eligibility of a

15   racing official and may approve or disapprove any

16   official for an occupational permit?

17       A.   No.

18       Q.   You don't know that?

19       A.   No.  The only thing I know is we always fill

20   out license application and send it in.  That I do not

21   know.

1      Q.   Now you're aware, however, that by law the

2  stewards are strictly responsible to the Racing

3  Commission for the conduct of all races?

4      A.   Yes, sir.

5      Q.   And every detail, directly or indirectly,

6  pertaining to the racing law, correct?

7      A.   Correct.

8      Q.   And the stewards have general supervision and

9  authority over the racing -- the association grounds

10  during a race?

11      A.   Yes, sir.

12      Q.   And any complaint against any official such as

13  yourself shall be made to the stewards?

14      A.   Right, sir.

15      Q.   In writing and be signed by the complainant?

16      A.   Yes, sir.

17      Q.   And that's pursuant to West Virginia Rules?

18      A.   Rules.

19      Q.   And then the stewards are required by law to

20  report all complaints to the general manager of the

21  track?

1        A.    Yes, sir.

2        Q.    And to the Racing Commission?

3        A.    Yes, sir.

4        Q.    And is the stewards' authority to interpret

5    the rules and decide all questions of racing not

6    specifically covered by a specific rule, is that your

7    understanding?

8        A.    What's that now?

9        Q.    It's the stewards who interpret the racing

10    rules?

11        A.    Uh-huh.

12        Q.    And if the rule doesn't directly address the

13    situation, it's the stewards who have to make a

14    decision?

15        A.    That I don't know.

16        Q.    Now, you've been -- you have been an assistant

17    racing secretary, correct?

18        A.    Yes, sir.

19        Q.    You're aware, aren't you, that the racing

20    secretary and the assistant shall discharge all the

21    duties of their offices expressed or implied that are

1     required by the rules of racing?

2          A.   What does that mean?

3          Q.   In other words, you have the responsibility to

4     see that the rules of racing established by the state

5     of West Virginia are properly followed?

6          A.   Yes, sir.  I understand that.

7          Q.   And if there are any violations you have the

8     responsibility to report those violations to the

9     stewards?

10         A.   To the stewards, yes, sir.

11         Q.   And all the owners and trainers of horses and

12     their stable employees are subject to the laws of West

13     Virginia and the rules promulgated by the Racing

14     Commission, correct?

15         A.   Correct, sir.

16         Q.   And that occurs -- they become subject to

17     those rules immediately upon acceptance and occupancy

18     of stabling accommodations from a racetrack, correct?

19         A.   Or being licensed as far as I always knew.

20         Q.   We can agree, can't we, that horse racing in

21     West Virginia is a subject of extensive state

1    regulation, can't we?

2         A.   What's that mean?

3         Q.   It means there are very extensive Racing

4    Commission rules that govern horse racing in West

5    Virginia, correct?

6         A.   Yes, sir.

7         Q.   And, in fact, although the racetrack itself is

8    privately owned many aspects of track management are

9    governed by detailed regulations issued by the state

10   Racing Commission, correct?

11        A.   By the state rules.

12        Q.   Correct?

13        A.   Correct.

14        Q.   And doesn't -- the Racing Commission maintains

15   a continuous presence at each track; the racing

16   stewards, officials who oversee the administration

17   enforcement of the Commission's rules and policies,

18   correct?

19        A.   Correct.

20        Q.   The stewards are actually an arm of the Racing

21   Commission and are answerable directly to the Racing

1    Commission in West Virginia, aren't they?

2         A.   Yes, sir.

3         Q.   And the stewards actually as officials of the

4    state are allowed to override the management of a track

5    and matters pertaining to racing.

6         MR. PETERSON:  Objection to the form.  It's vague.

7         MR. WADDELL:  (resumed)

8         Q.   Is that your understanding?

9         A.   Read that to me again.

10        Q.   That a steward can actually override the

11   management of a track if the track is violating a

12   racing rule?

13        A.   If the track is violating a racing rule?

14        Q.   Uh-huh.

15        A.   I can't honestly say -- I don't know because I

16   don't know what you're asking me to really say.

17        Q.   Okay.  The racing rules govern the

18   registration of stable personnel with the racetrack, do

19   they not?

20        A.   The rules of racing?

21        Q.   Yes.

1      A.   Yes, sir.

2      Q.   Are you aware that no trainer is permitted to

3   move any horse under his or her care from the grounds

4   of the track without the permission from the racing

5   secretary or the stewards?

6      A.   That's not true.

7      Q.   You don't agree with that?

8      A.   I don't agree with that.  You mean taking a

9   horse off the property?

10     Q.   Have you ever read Legislative Racing Rule

11  Section 178154.12?

12     A.   What does it say?

13     Q.   It says no trainer is permitted to move any

14  horse under his care from the grounds of the

15  association without permission from the racing

16  secretary or the stewards.

17     A.   Never heard of it.

18     Q.   Are you aware that under the racing rules in

19  West Virginia no trainer can enter a horse for racing

20  unless the horse is stabled on the grounds of the track

21  conducting the race or at other stabling facilities?

1      A.   You're telling me that -- the way that reads

2  to me saying they can only be stabled on our property

3  to be entered?

4      Q.   No.  They have to either be stabled on your

5  property or some other stabling facility in order to

6  be --

7      A.   A farm.

8      Q.   Well, am I correct that that's true that under

9  the rules of racing in West Virginia no trainer can

10 enter a horse for racing unless the horse is stabled on

11 the grounds of the association conducting the race or

12 at other stabling facilities, is that a true statement?

13     A.   I -- you lose me on the facility.  Because we

14 take entries from people on farms.  So if a farm is

15 included on that I would say it's correct.

16     Q.   At Charles Town Races stalling decisions are

17 made by this committee, is that who makes -- the

18 allocation committee, do they make stalling decisions

19 or are the stalling decisions made by the racing

20 secretary?

21     A.   What do you mean by -- new allocations or

1    people that are already there?

2        Q.    Allocations.   New allocations, who makes that

3    decision?

4        A.    New allocations are strictly given to the

5    racing secretary.

6        Q.    So the racing secretary makes those decisions

7    themselves?

8        A.    That's where we left -- like we talked before,

9    I haven't seen new allocations.   Anybody that comes

10   with new allocations we stamp it and give to the racing

11   secretary and that's as far as we see it.

12       Q.    As far as trainers who already have

13   allocations of stables those decisions regarding

14   allocations are supposed under the track rules to be

15   made by this committee we've talked about; is that

16   correct?

17       A.    Yes, sir.

18       Q.    Unless, as you already said, they're taken

19   away --

20       A.    Right.

21       Q.    -- completely all stalls?

1        A.   Completely or denied.

2        Q.   Or denied.   Is there any appeal available to a

3    trainer who has had stall space taken away?

4        A.   Stall space taken away.   You mean just

5    completely or just a few?

6        Q.   Let's first go with --

7        A.   Completely?

8        Q.   Completely.

9        A.   Everybody always can reapply.   I mean, they've

10   been reapplying and reapplying.   You can always turn in

11   a stall application the next Wednesday --

12       Q.   Then if a person reapplies, who makes the

13   decision --

14       A.   As far as, like I said, it goes to the racing

15   secretary and then after that if they're new applicants

16   they're put into a new folder and I have never been in

17   a conversation with new applicants.

18       Q.   So there's no way to appeal beyond the

19   decision of the racing secretary if you don't like your

20   allocation of stalls?

21       A.   I can't say that.   I just know he gets them,

1    sir.

2         Q.   Where does the committee that allocates stalls

3    where do they normally meet?

4         A.   Mr. Britton's office.

5         Q.   Are we agreed or not, is there any written

6    record kept of those meetings?

7         A.   Off the top of my head I would say there's no

8    written record unless what we write down on our paper.

9         Q.   Is there any written record kept that you're

10   aware of how the committee arrives at their allocation

11   decisions?

12        A.   No, sir.

13        Q.   Is there any written criteria that the

14   committee applies when they're making their

15   allocation --

16        A.   I can't give you an answer to that.  I don't

17   know.

18        Q.   Is the decision made as to the allocation of

19   stalls by the committee reviewed by anyone at the

20   track?

21        A.   As far as when they make their applications?

1      Q.   No.   Let's say you go to -- you're a member of

2  the committee.   You sit in there.   Do you make a

3  decision actually while you're in there as to the

4  allocation of stalls?

5      A.   Only of who is on property.   Whoever is only

6  on property at that time.

7      Q.   Right.   Okay.   So you're looking at whoever's

8  trainers have stalls already?

9      A.   Yes, sir.

10      Q.   And you're making decisions regarding whether

11  they're going to have stalls taken away or given to

12  them?

13      A.   Given, right.

14      Q.   Is that decision made right there at --

15      A.   Right there at that table.

16      Q.   Is that reviewed by anyone at the track?

17      A.   Not that I know of, sir.

18      Q.   Does that decision have to be approved by

19  anyone?

20      A.   Meaning?

21      Q.   Well, the committee makes its decision.   Then

1    does the -- who is the highest official at the track?

2         A.    I would say that would be Mr. Britton.

3         Q.    Mr. Britton he's a part of the committee?

4         A.    He's right there, yes.

5         Q.    So he knows what the decision is?

6         A.    It's, like I say, if they're taking away a few

7    stalls here and there it's done right at the meeting.

8    Whether we add or take away a couple or two or three

9    stalls it's right there at that meeting so everybody is

10   right there to do that.

11        Q.    Okay.  Is there any process provided by the

12   track for a trainer to challenge the decision as to the

13   allocation of stalls?

14        A.    Yeah.  I'm sure -- I personally don't know of

15   any.  I'm sure they're free to go talk to the committee

16   to Mr. Britton and Mr. Moore or the racing secretary.

17        Q.    But you're not aware of any formal process?

18        A.    Not aware of any, no, sir.

19        Q.    Does the track provide trainers who are

20   adversely affected by decisions of the committee with

21   the reasons or the basis of the committee's decision as

1      to the allocation of stalls?

2          A.   You have to give me a little bit.

3          Q.   Committee makes a decision to take stalls away

4      from a trainer, okay, let's assume that's true, okay?

5          A.   All of them or just a few?

6          Q.   Just a few.

7          A.   Okay.  Yes, sir.

8          Q.   Does the track provide the trainer with any

9      reason or basis for that decision?

10         A.   No, I don't know, sir.  I couldn't give you an

11     answer to that.

12         Q.   How about if a decision is made to take away

13     all the stalls of a trainer?

14         A.   Again, I don't know.  We just hand out

15     letters.  I don't have a clue why they take them.

16         Q.   If a trainer is causing problems for the

17     track, is that a reason to take away their stalls?

18         MR. PETERSON:  Objection to the form.  It's

19     vague.

20         A.   To me, I don't know.  I wouldn't say no.  I

21     mean, it's vague to me.  I would say no, they can be

1    fined, they can be anything.

2         Q.   I'm sorry?

3         A.   They could be fined.  They don't have to take

4    their stalls away.  It depends on what you're asking.

5         Q.   I'm asking what are the -- we discussed a

6    little bit about the criteria.  We're taking away

7    stalls from a trainer during a committee meeting,

8    correct?

9         A.   Uh-huh.

10        Q.   Or otherwise, I mean, we've had Mr. Williams

11   who had all his stalls taken away and Mr. Hostler who

12   had all his stalls taken away because they had problems

13   with the way they were caring for their horses.

14        A.   Uh-huh.

15        Q.   And that was something you initiated?

16        A.   I did that myself.

17        Q.   Because you knew there was a problem,

18   correct?

19        A.   Absolutely.

20        Q.   And we talked about the starts that a trainer

21   -- starts per stall, quality of horse?

1       A.   Right.   Quality of starts, quality of racing.

2       Q.   Are there any other objective criteria that

3    you can think of that are taken into consideration by

4    the track and the allocation of stalls?

5       A.   No, sir, I can't.

6       Q.   Is there any subjective -- do you know what

7    subjective criteria means?

8       A.   No, sir.

9       Q.   That just means track pretty much decides to

10   do whatever they want to.  Do they do that with the

11   allocation of stalls?

12      A.   I've never seen them do that.

13      Q.   So they usually have objective criteria that

14   they're supposed to use?

15      A.   I can't answer all their criteria because I

16   don't know all their criteria honestly.

17      Q.   But you're on the committee that makes the

18   allocation?

19      A.   I'm only on the committee that, like I said,

20   if you're already on the stalls to take or receive.  I

21   don't know of any criteria that says we're going to

1    send out and take your stalls because of this and that.

2        Q.   What were the factors considered in taking all

3    the stalls allocated to Tina Mawing?

4        A.   I couldn't tell you, sir.

5        Q.   We've already discussed her horses were not

6    inferior to other horses?

7        A.   No.  I couldn't say that, no, sir.

8        Q.   She had sufficient starts per stall, didn't

9    she?

10       A.   I couldn't tell you that because I don't take

11   care of it.  I don't run the records on that.

12       Q.   Who keeps the records on that?

13       A.   I'm going to go back and say that's all

14   Mr. Zimny.  I would say Mr. Zimny does all the records

15   and all that.

16       Q.   Do you know who Raymond Funkhouser is?

17       A.   Raymond Funkhouser or Randy?

18       Q.   I'm sorry.  Randy.

19       A.   Yes, sir, I know Randy.

20       Q.   Who is he?

21       A.   He was the president of the HBPA.

1      Q.   Former president?

2      A.   Former president of the HBPA.

3      Q.   Were you aware there was a proceeding against

4   him by the West Virginia Racing Commission?

5      A.   No.  I wasn't there, no, sir.

6      Q.   Were you aware that on October 2nd, 2007 his

7   occupational permit issued by the West Virginia Racing

8   Commission was indefinitely suspended pursuant to a

9   notice of suspension signed by racing stewards Danny

10   Wright, Laurence Dupuy --

11      A.   Dupuy.

12      Q.   And Robert Lotts?

13      A.   No, sir.

14      Q.   You didn't know that?

15      A.   To me, no.

16      Q.   You didn't attend any hearing that he had --

17   he had a hearing in Charles Town?

18      A.   For Mr. Funkhouser?

19      Q.   Yeah.

20      A.   No, sir.

21      Q.   You didn't attend that I take it?

1    A.   No, sir.

2    Q.   Did you hear about it?

3    A.   No, sir.

4    Q.   I guess you wouldn't have any knowledge who

5    testified?

6    A.   No, sir.

7    Q.   You wouldn't be aware that Tina Mawing

8    testified on behalf of Randy Funkhouser?

9    A.   No, sir, I wouldn't know nothing about that,

10   sir.

11   Q.   You wouldn't be aware that Patty --

12   A.   Patty Burns.

13   Q.   You wouldn't be aware that Patty Burns

14   testified on behalf of Mr. Funkhouser?

15   A.   No, sir.

16   Q.   How about George Yetsook, you didn't know he

17   testified either?

18   A.   Wasn't there, sir.

19   Q.   Do you know how many stalls Mrs. Mawing

20   originally had before you started taking --

21   A.   Off the top of my head I want to say ten.

1        Q.    Ten?

2        A.    I'm pretty sure it was ten.   I think I'm close

3    in that area.

4        Q.    When Patty -- you testified that Patty Burns

5    had all her stalls taken away?

6        A.    You gave me a list of people that had been

7    -- that's when I forgot but Ms. Burns had her stalls

8    taken away.

9        Q.    Of course, you don't know why because --

10       A.    I wasn't there, sir.   I just know she got a

11   letter that she lost all her stalls.

12       Q.    Do you know how many stalls that was?

13       A.    Off the top of my head, sir, I'm going to say

14   close to 20, maybe 22.   I'm guessing here right now.

15       Q.    She must have done something pretty bad for

16   that to happen.

17       A.    I couldn't tell you, sir.   I wasn't there.

18       Q.    You don't have any idea why they took away all

19   23 of her stalls?

20       A.    Sir, like I say, I've known Patty for a long

21   time.   I don't have a clue why she lost all her stalls.

1      Q.    Do you know how many stalls George Yetsook

2    has?

3      A.    Five.

4      Q.    Is your current position backstretch --

5      A.    Senior racing official, backstretch

6    administrator.

7      Q.    Are you involved at all in -- the

8    backstretch is the --

9      A.    Barn area.

10      Q.    Barn area?

11      A.    Barn area.

12      Q.    Stall area?

13      A.    Stall area.

14      Q.    Are you involved -- have any involvement at

15    all in the administration of pesticides or rat poison?

16      A.    No, sir.

17      Q.    Who does that?

18      A.    I can't tell you right now, sir.  I would be

19    lying to you.  Before it was Ehrlich.

20      Q.    Ehrlich?

21      A.    Ehrlich.

1       Q.    That's the company?

2       A.    Yes.  That's the company that did it.

3       Q.    As I understand it, the track would contract

4    with that company to --

5       A.    Come in and put it.

6       Q.    You have no involvement in that at all?

7       A.    No, sir.

8       Q.    Who at the track would be involved in that?

9       A.    You would probably have to get ahold of

10   facilities maintenance.  They would probably be the

11   only one to tell you.  I'm sure one of them would go

12   around with them.

13      Q.    Who is in charge of facilities maintenance?

14      A.    Rodney Walker.

15      Q.    Rodney Walker?

16      A.    Walker.

17      Q.    As backstretch administrator how much time do

18   you actually spend in the barn and stall areas?

19      A.    Like right now well, I'm usually there every

20   day in the back walking through the barn area but in

21   the last two months I have been training other people

1       to also be clerk of scales so it varies.   Sometimes I'm

2       in the barn area, you know, Monday, Wednesday,

3       Thursday, Friday, Saturday and sometimes on Sunday

4       before the races, but the last two months or so I've

5       been training other people to be clerks.   Mr. Taylor

6       has been there more than I have.

7          Q.    Mr. --

8          A.    Taylor.

9          Q.    James Taylor?

10         A.    Yes, sir.

11         Q.    His job is?

12         A.    Stall man.

13         Q.    Stall man.   What's that involve?

14         A.    I mean, the stall man actually he just goes

15      around the same way to make sure your stalls -- the

16      barns are kept, your stalls look nice, horses look

17      nice, the right people is in the right place, and I

18      just oversee the whole area basically in a nutshell.

19         Q.    That's his direct responsibility to see that

20      the stalls are kept well, the horses --

21         A.    The barns, the stalls, that area.

1     Q.   And you oversee that?

2     A.   Yes.

3     Q.   Do the barn areas sometimes have a problem

4  with rats?

5     A.   People complain about rats, yes, sir.  It's a

6  barn.  Yes, sir.

7     Q.   Right.  How would you describe the rat

8  situation as far as the barn is concerned at the track?

9     A.   I've seen them in barn 14.  I've seen them in

10  barn seven.  Honestly, that's the two barns I've really

11  seen them probably worst is in barn 14 and barn seven.

12     Q.   Barn 14 is where --

13     A.   When you --

14     Q.   -- Mrs. Mawing had her --

15     A.   Horses in 14, yes, sir.

16     Q.   What were you going to say?

17     A.   I thought you asked me where it was.

18     Q.   Where is it?

19     A.   When you pull into the stable gate it's to

20  your left, first barn to your left.

21     Q.   Do you have any personal knowledge of the

1      administration of rat poison or pesticide in barn 14?

2         A.   No, sir.  That's not done by us.

3         Q.   Do you have any personal knowledge of Tina

4      Mawing complaining about the track's use of pesticides

5      in and around the stalls?

6         A.   Mrs. Mawing did make a complaint about that.

7         Q.   What do you know about that?

8         A.   Just that she made a complaint about rat

9      poison being near her horse and goat.  That's all I

10     know.

11        Q.   What's the source of your -- where did you

12     learn that?

13        A.   Mrs. Mawing.

14        Q.   She came to you?

15        A.   Yes.  She said something to me about rat

16     poison being in her barn and like I said to her that if

17     there was, I mean, it was Ehrlich, I don't know any

18     other way to put it because I didn't see it, I wasn't

19     there.  I was just doing second-hand because I never

20     seen any of it, never seen the horse, never seen the

21     goat.

1      Q.   When she came to you when was that, do you

2   recall?

3      A.   Back in 2008.  I'm going to say it was still

4   while she was on property and Mrs. Mawing just said she

5   had problems with rats in her barn and asked again --

6   we always called facility maintenance and facility

7   maintenance took it from there.

8      Q.   I mean, she came to you with a complaint about

9   the rat poison, didn't she?

10      A.   First she came to me about her horse and goat

11   dying from rat poison.

12      Q.   Okay.  She came with a complaint that she had

13   a horse and a goat that died from rat poison placed by

14   Ehrlich?

15      A.   I didn't -- she just said her horse and goat

16   died by rat poison.

17      Q.   She was coming to you to make a complaint

18   about that?

19      A.   She talked to me about it.  I'm not going to

20   say she came to me to complain about it.  She just told

21   me about it.  That's how I found out.

1      Q.   Did she complain to other people --

2      A.   I don't know, sir.  I'm sure she did.

3      Q.   I'm just asking for your knowledge.

4      A.   I don't know.  I don't know, sir.

5      Q.   Do you know -- were you aware she called the

6  West Virginia Department of Agriculture to investigate

7  the improper application of pesticides?

8      A.   No, sir.

9      Q.   You are aware that she complained about the

10  hazardous and improper use of rat poison by the track?

11      A.   Yes, sir.

12      Q.   Were you aware that she complained to the

13  racing stewards about the hazardous and improper use of

14  rat poison?

15      A.   No, sir.

16      Q.   Were you aware she complained to the governor

17  of West Virginia about the track's hazardous and

18  improper use of rat poison?

19      A.   No, sir.

20      Q.   Have you ever had any specific discussions

21  with Dickie Moore, you and him directly, specifically

106

1    regarding the allocation of Tina Mawing's stalls?

2         A.   No, sir.

3         Q.   Have you ever had any discussions with Doug

4    Lamp regarding that?

5         A.   About?

6         Q.   Allocation of her stalls?

7         A.   No.

8         Q.   Randy Wehrman?

9         A.   No, sir.

10        Q.   Any discussions with Dickie Moore regarding

11   her complaints about rat poison?

12        A.   No, sir.

13        Q.   Any specific discussions with Randy Wehrman

14   concerning that?

15        A.   No, sir.

16        Q.   Is it true that if you're transporting a horse

17   for the purposes of racing that you can't tranquilize

18   them in any way while they're being transported because

19   the substances that would be used would show up in drug

20   tests?

21        A.   Sure.

1      Q.   And that would be prohibited by the rules of

2    racing, correct?

3      A.   Uh-huh.

4      Q.   Yes?

5      A.   I would say so, sir.

6      MR. WADDELL:  Let's take a short break.  I'm

7    winding down unless I hear otherwise.

8      (Recess was had.)

9      MR. WADDELL:  (resumed)

10     Q.   One or two more questions, Mr. Elliot.  You

11   were assistant racing secretary and your job was

12   switched to backstretch administrator, correct?

13     A.   Yes, sir.

14     Q.   Was that considered a demotion?

15     A.   No, sir.  No.  They actually gave -- it was a

16   promotion.  When the new racing secretary came,

17   Mr. Wehrman came, naturally a lot of racing secretaries

18   like to have their own assistant and he had his

19   people.  Then when his new assistant was coming which

20   was Mr. Ron Anthony I transferred to the barn area to

21   take that position as the basically what they call

1    stall man, backside administrator, and eventually I'm

2    assuming that Mr. Taylor would be retiring shortly

3    because he's got some age on him, no offense to

4    Mr. Taylor.  He's a great man but that's why I took

5    that position because eventually when Mr. Taylor

6    retires that will be my job and Mr. Wehrman and

7    Mr. Ron --

8        Q.   When Mr. Taylor retires what will be your job?

9        A.   Just basically the same thing.  Whether you

10   want to call it the stall man, backside administrator

11   or anything to that nature.

12       Q.   Okay.  He's the -- Mr. Taylor is the stall

13   man?

14       A.   Stall man right now, yes, sir.

15       Q.   And you're the backside administrator?

16       A.   Yes, sir.

17       Q.   So you're currently the backside

18   administrator?

19       A.   Right, sir, I'm currently the backside

20   administrator.

21       Q.   You're saying once Mr. Taylor retires you will

1    become the stall man?

2        A.   I wouldn't say -- if Mr. Taylor retires I just

3    probably could keep the same title.  I would just do

4    the same job I'm doing now.

5        Q.   You're saying that moving from assistant

6    racing secretary to backside administrator was a

7    promotion?

8        A.   It wasn't a demotion if you want to say that.

9    I didn't get demoted.

10       Q.   Did it involve a change in pay?

11       A.   Yes, sir.  I got more.

12       Q.   You got more when you went from racing

13   secretary, assistant racing secretary to backside

14   administrator?

15       A.   Right.

16       Q.   What did you earn as racing secretary?

17       A.   What did I earn?

18       Q.   Yes.  Did you get paid by the hour or salary?

19       A.   No.  I've always been salaried.

20       Q.   Okay.

21       A.   I'm going to say --

1        Q.   You don't need to tell me that number but tell

2    me how much of an increase you got.

3        A.   I'm going to say right around $3,000.

4        Q.   Are you telling me that if you switch from

5    backside administrator to stall man that will be a

6    promotion as well?

7        A.   It's pretty much the same thing.  It's pretty

8    much the same job.

9        Q.   So right now you've got two people -- you got

10   yourself and Mr. Taylor doing pretty much the same job?

11       A.   Right.  Just overseeing what he's doing, yes,

12   sir.  In a roundabout way, yes, sir.

13       MR. WADDELL:  Thank you.  I don't have any further

14   questions.

15       MR. PETERSON:  I don't have any questions.

16       MR. WADDELL:  You have a right to read -- the

17   court reporter is going to make a transcript of your

18   testimony.  You have the right to review it if you

19   choose and if anything was taken down incorrectly or

20   you feel changes are necessary you have the right to do

21   that.  I don't know whether you want to advise him on

1   that or not.

2       MR. PETERSON:  He'll read and sign.

3       MR. WADDELL:  The court reporter will make

4   arrangements with counsel or with you to see that that

5   happens.

6       (Deposition was concluded at 11:31 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1                CERTIFICATION OF NOTARY

2        I, Tracy Rice, the officer before whom the foregoing

3   deposition was taken, do hereby certify that the

4   witness whose testimony appears in the foregoing

5   deposition was duly sworn by me; that the testimony of

6   said witness was taken by me stenographically and

7   thereafter reduced to typewriting by me; that said

8   deposition is a true record of the testimony given by

9   said witness; that I am neither counsel for, related

10  to, or employed by any of the parties to the action in

11  which this deposition is taken and further, that I am

12  not a relative or employee of any attorney or counsel

13  employed by the parties thereto, nor financially or

14  otherwise interested in the outcome of this action.

15

16          _____

17                      Tracy Rice

18          Notary Public - State of West Virginia

19          My Commission Expires: September 16, 2013

20

21

22

1              IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

2                     Martinsburg Division

3    TINA MAWING, and

     THE HORSEMEN'S BENEVOLENT

4    PROTECTIVE ASSOCIATION,

          Plaintiffs,

5

     vs.                        Case No.: 3:09-CV-68

6                               Judge Bailey

     PNGI CHARLES TOWN GAMING, LLC,

7         Defendant.

8

9         Pursuant to Notice, the deposition of JAMES

10   TAYLOR, was taken on Monday, the 5th day of April 2010,

11   commencing at 11:34 a.m., at the law offices of BOWLES,

12   RICE, MCDAVID, GRAFF & LOVE, LLP, located at 101 South

13   Queen Street, Martinsburg, West Virginia before Tracy

14   Rice, a Registered Professional Reporter.

15

16

17

18

19

20

21

```
1                 A P P E A R A N C E S:

2      FOR THE PLAINTIFF:

           HARRY P. WADDELL, ESQUIRE

3      Law Offices of Harry P. Waddell

       300 West Martin Street

4      Martinsburg, West Virginia 25401

5

       FOR THE PLAINTIFF:

6          DAVID M. HAMMER, ESQUIRE

           Hammer, Ferretti & Schiavoni

7          408 West King Street

           Martinsburg, West Virginia 25401

8

       FOR THE DEFENDANT:

9          BRIAN PETERSON, ESQUIRE

           Bowles, Rice, McDavid, Graff & Love, LLP

10         101 South Queen Street

           Martinsburg, West Virginia 25401

11

12

13

14

15

16

17

18

19

20

21
```

1                            I N D E X

2       WITNESS:                                PAGE:

3       JAMES TAYLOR

            Direct Examination by Mr. Waddell          4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

```
 1                  MARTINSBURG, WEST VIRGINIA

 2                  MONDAY, APRIL 5, 2010

 3                           ____

 4               P R O C E E D I N G S

 5      Whereupon,

 6                      JAMES TAYLOR,

 7      a witness herein, having been first duly sworn, was

 8      examined and testified upon his oath as follows:

 9      DIRECT EXAMINATION

10      BY MR. WADDELL:

11          Q.   Mr. Taylor, my name is Harry Waddell and I'm

12      an attorney representing Tina Mawing in a suit that

13      we've got here and you're testifying in connection with

14      that.  I'm going to be asking you some questions.  If

15      you don't understand my questions tell me and I will

16      rephrase them for you.  You need to answer loudly so

17      the court reporter can take down your answer and you

18      need to answer verbally rather than shaking your head

19      obviously.

20          A.   Yeah.

21          Q.   Because the court reporter can't take that
```

1    down.   Do you have any questions for me?

2         A.    No, I don't have any.

3         Q.    Would you just state your full name for the

4    record?

5         A.    James Edward Taylor.

6         Q.    And can you give me your home address?

7         A.    201 East 14th Avenue, Ranson, West Virginia

8    25438.

9         Q.    Your home phone number?

10        A.    725-1142.

11        Q.    Are you married?

12        A.    No.   My wife she past 29th of August.

13        Q.    Oh recently?

14        A.    Yes.

15        Q.    Oh, I'm sorry to hear that.

16        Did you attend high school in Jefferson County?

17        A.    Yeah.   Page Jackson.

18        Q.    Did you graduate?

19        A.    No.

20        Q.    What year did you go through?

21        A.    Eleventh.

1       Q.    Do you ever get a GED?

2       A.    No.

3       Q.    I'm trying -- what year did you -- what year

4    was it that you left high school?  That will tell me

5    how far --

6       A.    Wait a minute.  I got to think.  It was -- I

7    don't know exactly what year it was.

8       Q.    Okay.

9       A.    It's been a long time ago.

10      Q.    How old are you?

11      A.    Seventy-seven.

12      Q.    How long have you actually worked at the

13   track?

14      A.    Since '85.

15      Q.    And have you worked actually as an employee of

16   whoever owned the track since '85 or did you work for

17   trainers and things --

18      A.    Before that I worked for trainers and since

19   for the track '85 now.

20      Q.    '85.  What job -- when you started in '85 what

21   job did you have?

1          A.    Clocking.

2          Q.    Clocking.  Is that a job in the racing office?

3          A.    No.  It's on the track.  You clock the horses

4    as they training.

5          Q.    Is that part of the racing office job?  I

6    mean, as part of the racing office?

7          A.    Yeah.  Everything goes back to the office.

8          Q.    How long did you do that?

9          A.    Well, Shenandoah.  I've been doing it and

10   still doing it.  I still clock a couple days a week

11   now.

12         Q.    What else do you do currently?

13         A.    Stall person.

14         Q.    Stall person?

15         A.    Yeah.  Stall man.  Stall superintendent is

16   correct.  Stall man they use it.

17         Q.    Who is your immediate supervisor?

18         A.    Randy Werhman, racing secretary.

19         Q.    Your primary job is stall superintendent job,

20   is that your primary job?

21         A.    Yeah.

1        Q.   Can you just tell me what you do?   What does

2    that job involve?

3        A.   It's involved horses being in the right barn,

4    right stalls and all that certain things.

5        Q.   Have you looked at any documents of any sort

6    in preparation for your deposition?

7        A.   No.

8        Q.   Did you have any involvement at all in the

9    decision -- any decisions regarding allocation of

10   stalls for Tina Mawing?

11       A.   No.

12       Q.   Have you ever been on -- there's a committee

13   that is involved in stall allocation.   You're on that

14   committee, aren't you?

15       A.   I'm a member, I guess.   I never go to it too

16   much.   The clocking part of it.

17       Q.   How many committee meetings do you recall

18   attending?

19       A.   I don't know.   A few.   I don't know.   I don't

20   remember number wise but a few of them I been to.

21       Q.   More than three?

1          A.   Not all of them.  I haven't been to all of

2     them.

3          Q.   You haven't been to all of them?

4          A.   No.

5          Q.   Have you been to three?

6          A.   Yeah, I guess maybe three over the years,

7     yeah.

8          Q.   How long have you been on the committee?

9          A.   I don't know.  Ever since it started, I

10    guess.  I don't know when it may have been.

11         Q.   Do you know when it started?

12         A.   No.

13         Q.   Do you know who the other committee members

14    are?

15         A.   Well, I know some of them, yeah.

16         Q.   Okay.

17         A.   I don't know how many it is though.

18         Q.   Give me the names of the ones you know for

19    sure on the committee.

20         A.   Mike -- Mike Elliot.  Who else.  There's quite

21    a few I know but I can't come up with the names.

1        Q.    Okay.  How about is Al Britton on the

2    committee?

3        A.    I don't know.  He wouldn't be on the

4    committee.  He would be the head of it I imagine.

5        Q.    When you went to the meetings was he there?

6        A.    No, I never seen him at the meetings.

7        Q.    So you never --

8        A.    Not these particular meetings, no.

9        Q.    I'm sorry?

10       A.    Not these particular meetings, no, I haven't

11   seen him there.

12       Q.    How about Dickie Moore?

13       A.    Yeah.

14       Q.    Randy Werhman?

15       A.    Yeah.

16       Q.    So what happens at these committee meetings?

17       A.    Discuss different things and concerns of the

18   stable area just like things, you know, what's going

19   on, what should be going on and things like that.

20       Q.    I mean, what's the purpose of the committee?

21       A.    I don't know what their purpose are but that's

1    what goes on at the meeting.

2        Q.   Well, isn't the committee -- isn't the purpose

3    of the committee to review the allocation of stalls at

4    the track?

5        A.   I imagine that's included, yeah.

6        Q.   Is --

7        A.   A lot of little things goes on on the track

8    more than stall allocations, you know.

9        Q.   I'm talking about at the meetings of this

10   committee, do a lot of other things go on besides the

11   allocation of the stalls at the committee meeting?

12       A.   Yeah, I guess you could say so.

13       Q.   I don't know.  I'm asking you.

14       A.   Like different barns that need things done.  A

15   lot of things go on at the meeting.  Quite a few

16   things.

17       Q.   Do you vote?  Do you get a vote at the

18   meeting?

19       A.   Yeah, they take care of the majority.

20       Q.   Do you vote on the allocation of stalls?

21       A.   No.  That come from the office.

1       Q.    Which office?

2       A.    The racing secretary's office.

3       Q.    Is there any discussion at the committee

4    meetings we're going to take some stalls from this

5    trainer and we're going to give stalls to this trainer,

6    do you have that type of discussion?

7       A.    No, not at the meeting, no.  Never had that

8    come up.

9       Q.    It's never come up?

10      A.    Not any that I've been to, no.

11      Q.    Is there ever been any voted in any of these

12   meetings about we're going to take two stalls from Tina

13   Mawing and give them to some other trainer?

14      A.    No.  Nothing come up like that.  That don't

15   come up in no meeting, no, who is going to take

16   stalls.  No, that don't never come up.

17      Q.    So at the stall allocation committee meetings

18   you never vote or discuss the allocation of stalls?

19      A.    No.  We don't have no say over that.

20      Q.    Who does?

21      A.    The racing secretary.

1        Q.    At these meetings, does the racing secretary

2     indicate who is going to be allocated stalls?

3        A.    Not really, no.   That goes in his office.

4        Q.    So that's all done at the --

5        A.    That's all in his office.

6        Q.    What you're telling me is this committee

7     doesn't really allocate anything?

8        A.    No, it don't allocate no stalls or nothing.

9     It don't have no jurisdiction over it.

10       Q.    Does the -- well, this is going to be a short

11    deposition.   I just want to make sure I'm clear.

12    There's a committee.   How often does that committee

13    meet?

14       A.    I couldn't say because I'm not aware of all

15    the meetings they have.

16       Q.    Okay.   There was a meeting in December of

17    2009, I think.   Did you attend that meeting?

18       A.    Man, I can't remember.

19       Q.    Do you --

20       A.    I don't know because they have -- some of them

21    I attend and some of them I don't.   I don't go to every

1    meeting they have.   They notify me when they want me to

2    come to the meeting.

3         Q.   So if they want you to come to the meeting

4    they let you know?

5         A.   Yeah.

6         Q.   How do they do that?

7         A.   They tell me.

8         Q.   Who says --

9         A.   Racing secretary.

10        Q.   Randy Werhman?

11        A.   Yeah.

12        Q.   If he wants you to come to the meeting he will

13   come and say I want you to be at this meeting; is that

14   correct?

15        A.   Right.

16        Q.   And if he doesn't tell you that then you don't

17   attend?

18        A.   A lot of time I don't know the meeting is

19   going on, right.

20        Q.   Is there any other way that they notify you of

21   meetings?

1       A.   Ain't no other way to notify me but tell me.

2       Q.   I don't know.  Mr. Elliot testified that he

3    gets notification of these meetings by e-mail.

4       A.   No, I'm not into the computer thing.

5       Q.   So if anybody is going to tell you about it --

6       A.   They tell me.

7       Q.   -- they're going to have to come to you and

8    tell you in person?

9       A.   Yes.

10      Q.   And you don't go unless somebody tells you

11   they want you to come; is that correct?

12      A.   Yeah, correct.

13      Q.   And do you know the last time you -- actually,

14   can you remember the last time you actually attended

15   one of these meetings?

16      A.   Not really.  It's been --

17      Q.   Has it been over a year?

18      A.   No, it hasn't been over a year but it's been a

19   while.

20      Q.   So --

21      A.   It haven't been no year.

1          Q.    So you've been to a meeting in 2009?

2          A.    Oh yeah, nine, sure.

3          Q.    Have you been to a meeting in 2010?

4          A.    Not yet.

5          Q.    But what I'm hearing from you, I want to make

6     sure I'm clear on this, is that there are no

7     discussions at the meetings you've attended about

8     allocating stalls --

9          A.    Stalls to nobody, no.

10         Q.    So what types of things are discussed at the

11    meeting?

12         A.    Still your barn, things need to be done in the

13    stall area and just things like that but never no

14    discussion about who is getting this and who is not

15    getting this.

16         Q.    Right.

17         A.    Like you might need some work done in barn 12

18    or two or something and that will come up or whatever

19    need to be done in the bathrooms.  They have different

20    things come up besides stalls.

21         Q.    To your knowledge, the decisions about

17

1    allocations of stalls are made somewhere else outside

2    of this committee meeting?

3        A.   Yes.  That comes out of the office.  All the

4    stall allocation come out of the office.

5        Q.   Do you have any knowledge at all regarding

6    stalls being taken away from Tina Mawing?

7        A.   Not really, no.

8        Q.   Nothing?

9        A.   No.

10       Q.   Do you have any knowledge of her complaining

11   about the use of pesticides or rat poison in the barn

12   14?

13       A.   No.

14       Q.   No?

15       A.   No.

16       Q.   No, okay.  Do you have any knowledge of the

17   condition of barn 14 with regard to rats, do you know

18   anything about that?

19       A.   Well, I know rats in most of the barns.  I

20   don't know why they wouldn't be in 14.

21       Q.   So you don't --

1    A.   I don't know what barns has more.

2    Q.   The rats don't discriminate between which barn

3    they want to be in?

4    A.   No.  You can find them everywhere.

5    Q.   Any issues or problems you're aware of

6    regarding the use of rat poison in any of these barns?

7    A.   No.

8    Q.   Were you aware that Mrs. Mawing had a horse

9    and a goat that died and there was some concern on her

10   part that it was as a result of exposure to rat poison?

11   A.   I've heard but I don't know, no.

12   Q.   Where did you hear that from?

13   A.   Through the racetrack gossip.  I can't name no

14   one particular person that told me but you hear it, you

15   know.

16   Q.   Right.  You didn't have any personal

17   involvement or knowledge of that situation?

18   A.   No.

19   Q.   Anybody keep any -- at these committee

20   meetings on allocation of stalls, does anybody keep any

21   written record of those meetings?

```
1          A.    The stall application?

2          Q.    Yes.

3          A.    Yeah, they keep them in the office.  I don't

4     know if they bring them to the meeting every time they

5     meet, but Randy he got a file on everybody that got

6     stalls -- allotted stalls.

7          Q.    Is that something that's discussed at the

8     committee meeting, the applications for stalls?

9          A.    Not every time, no.

10         Q.    At the meetings you've attended has there been

11    discussions regarding the application for stalls?

12         A.    Not really.

13         Q.    No?

14         A.    We already, you know, stalls already been

15    allotted and we just about know everybody that has the

16    stalls so it wouldn't be no point in them keep bringing

17    it up to the people taking care of the stalls.

18         Q.    Sometimes stalls are reallocated, right?

19         A.    Yeah.

20         Q.    Is that done --

21         A.    That come from the office.
```

1      Q.   Is that done at the committee meeting?

2      A.   No.  It comes from the office.

3      Q.   So you're going to tell me that no matter how

4  many times I ask you.

5      A.   That's where it come from.  I can't tell you

6  it come from somewhere it don't.

7      Q.   That's all I want to know.

8      A.   That's where it come from.

9      Q.   I want to make sure we're clear on that.

10      A.   It come from the office.

11      Q.   Have you ever seen any powdered rat poison put

12  out in the barn areas?

13      A.   No, I haven't.  I never seen exterminators

14  around there myself.

15      Q.   You haven't even personally seen any

16  exterminators there?

17      A.   I haven't, no.

18      Q.   You're not saying they don't come, you're just

19  saying --

20      A.   No, I'm not saying they don't come.  I just

21  haven't seen them.

1       MR. WADDELL:  Let's take a break for a minute.  I

2  will be right back.

3       THE WITNESS:  All right.

4       (Recess was had.)

5       MR. WADDELL:  (resumed)

6       Q.   All right, Mr. Taylor, as part of your job as

7  the stall man or stall superintendent, do you do tattoo

8  or barn checks?

9       A.   No.  That's another occupation there.

10       Q.   Who does that?

11       A.   The tattoo man they call him.

12       Q.   Tattoo man.  Who is that person?

13       A.   Sam.  What is his last name?

14       MRS. MAWING:  Geris, G-E-R-I-S.

15       MR. WADDELL:  (resumed)

16       Q.   So as part of your job do you ever go down and

17  check the stalls to see which horses and which trainers

18  are in which stalls, do you ever do that?

19       A.   Go down?  What you mean go down?

20       Q.   Go down to the barns.

21       A.   They supposed to be in the stall they

1    allotted.  We check to see if they're there, see if

2    anything is empty and if they took anything out or

3    something.

4        Q.   Who is we when you say we do that?

5        A.   I do it, Mike do it, either one of us.

6        Q.   Mike Elliot?

7        A.   Yes.

8        Q.   How often do you do that?

9        A.   No set time.  No three days or every other

10   day.  Just, you know, when you going through you

11   see all the stalls.  You see if they're going to refill

12   them or what they going to do.

13       Q.   Say there's empty stalls, would it not be

14   unusual for trainers to allow another trainer to use an

15   empty stall that they --

16       A.   They loan stalls out, yeah.

17       Q.   Happens all the time, doesn't it?

18       A.   It happen a lot.

19       Q.   As long as they get approval from the racing

20   secretary?

21       A.   They should but they don't sometime.

1     Q.   But if they did get approval from the racing

2    secretary there's nothing wrong with loaning or

3    borrowing stalls?

4     A.   No.  How there going to be something wrong if

5    they done told you you can loan the stall to somebody?

6     Q.   Do you know -- you know who Doug Lamp is?

7     A.   Yeah.  He was the ex-racing secretary.

8     Q.   Did you -- was he racing secretary when you

9    were there as a stall man?

10     A.   Yeah.

11     Q.   How close -- would you say he kept close tabs

12    on the stalls?

13     A.   Listen, I don't know all that what he done.  I

14    don't know how he, you know, kept his variation of

15    stalls so I don't know that.

16     Q.   That's not something you would have personal

17    knowledge of?

18     A.   No, I don't.

19     Q.   Were you ever involved in -- strike that.  Did

20    you become aware at some point that the track took away

21    all the stalls of Tina Mawing?

1        A.   Yeah, I knew that.

2        Q.   Do you know why that was done?

3        A.   No.  They don't give me no reason why they

4    doing anything.

5        Q.   Do you know who made that decision?

6        A.   No, I don't know that either.  That's done

7    from the office.

8        Q.   It wasn't anything that was ever discussed at

9    a --

10       A.   No.

11       Q.   -- committee meeting?

12       A.   No, I never heard it come up at a committee

13   meeting.  We don't have no jurisdiction over that no

14   way.

15       Q.   How about are you aware that all the stalls of

16   Patty Burns were taken away?

17       A.   Yeah.

18       Q.   Do you know -- again, do you know -- have any

19   knowledge of why?

20       A.   Why?  No, I don't know why.

21       Q.   And were you ever present at any kind of

```
1      committee allocation meeting when that was discussed?

2          A.   No.   Let me say something.   When them meetings

3      come up they don't discuss who they going to take

4      stalls from not at these particular meetings, you

5      understand what I'm saying?

6          Q.   Yeah.

7          A.   They don't never tell us who they going to

8      take stalls from or how many they going to take or

9      nothing.

10         Q.   That just never comes up at those meetings?

11         A.   No.

12         Q.   Is that right?

13         A.   Yeah.

14         Q.   Do you know who Mr. Randy Funkhouser is?

15         A.   Yeah.

16         Q.   Do you remember there was a hearing a few

17     years ago in Charles Town where a hearing -- a big

18     hearing was held, do you remember that where Randy

19     Funkhouser was involved?

20         A.   I've heard things about some kind of meeting

21     but I didn't know whole facts about it or what kind of
```

1    meeting it was even.

2        Q.    You didn't attend the hearing?

3        A.    No.  No.  That's for the wheels.

4        Q.    Pardon?

5        A.    That's for the wheels.  That's for the big

6    wheels.  No, I wasn't there.

7        Q.    How many -- do you know how many vacant stalls

8    there are at the present time at the track?

9        A.    No, I don't have no idea.

10       Q.    Are you aware that -- do you know George

11   Yetsook?

12       A.    Yeah.

13       Q.    Are you aware that the track wanted to take

14   all his stalls away?

15       A.    No.  I heard about it but they didn't do it.

16   I don't know why or what happened.

17       Q.    Where did you hear it from?

18       A.    Just racetrack talk.

19       Q.    You have no personal knowledge?

20       A.    No one individual told me about it.  Just you

21   hear things, you know.

1       Q.    Sure.  And you don't know why?

2       A.    I don't know where it come from even.

3       Q.    Do you know anything about transporting horses

4    by trailer?  Do you have any experience with that?

5       A.    Vans, no.  All I know they come and go, you

6    know.  That's the only way to travel with them.  I

7    don't know any other way to get them to the track and

8    from the track.

9       Q.    If you don't have a stall at the track then

10   you're going to have to transport your horses by --

11      A.    Ship them in and ship them out.

12      Q.    Right.  Doesn't that present a risk of injury

13   to the horse?

14      A.    It's always a chance of injury to a horse,

15   yeah.  You can be walking them and get a chance of

16   injury to a horse.

17      Q.    Doesn't trailering a horse increase the risk

18   of injury to a horse?

19      A.    I wouldn't say so, no.  They been doing it for

20   years.  No, I can't see no increase in risk.  It's the

21   only way to do it.  Ain't no other way to bring them in

1    and out.

2         Q.   Right.  If you don't have a stall --

3         A.   You got to ship them in and out.

4         Q.   So it would be -- it's important to trainers

5    to have stalls to be able to use stalls at the track,

6    isn't it?

7         A.   Yeah.

8         Q.   Yes?

9         A.   Oh sure.  Avoid all that shipping then if you

10   got the stalls at the track.  You got to bring them

11   from the farm to the track or wherever you're bringing

12   them from.

13        MR. WADDELL:  Okay.  Mr. Taylor, thanks for

14   coming.  I don't have any further questions unless your

15   counsel -- or counsel does.

16        MR. PETERSON:  I don't have any questions for

17   him.

18        MR. WADDELL:  You have the right, if you choose,

19   to read -- the transcript is going to be made by the

20   court reporter what you said.  If you want to you can

21   request the right to be provided a copy of that and

1    review it to see if there's any changes you feel should

2    be made as to what was taken down here today or you

3    don't have to do that if you don't want to.   You can

4    waive that right but you need to let the court reporter

5    know now whether you want to do it or you don't.

6        THE WITNESS:   I'm satisfied everything is written

7    down what I said because you can't tell but one truth.

8        MR. WADDELL:   That's true.

9        THE WITNESS:   You can't tell one lie so it's as

10   simple as that.   I don't need no copy.

11       MR. WADDELL:   So are you waiving?

12       MR. PETERSON:   Yes, he's waiving.

13       MR. WADDELL:   Thank you.

14       (Deposition was concluded at 12:04 p.m.)

15

16

17

18

19

20

21

```
 1               CERTIFICATION OF NOTARY

 2       I, Tracy Rice, the officer before whom the foregoing

 3   deposition was taken, do hereby certify that the

 4   witness whose testimony appears in the foregoing

 5   deposition was duly sworn by me; that the testimony of

 6   said witness was taken by me stenographically and

 7   thereafter reduced to typewriting by me; that said

 8   deposition is a true record of the testimony given by

 9   said witness; that I am neither counsel for, related

10   to, or employed by any of the parties to the action in

11   which this deposition is taken and further, that I am

12   not a relative or employee of any attorney or counsel

13   employed by the parties thereto, nor financially or

14   otherwise interested in the outcome of this action.

15

16                _____

17                        Tracy Rice

18            Notary Public - State of West Virginia

19            My Commission Expires: September 16, 2013

20

21

22
```

# John Fenimore Deposition Transcript

## May 17 2013

## (when received)

# CHARLES TOWN RACES & SLOTS

Via Hand Delivered

Date: 12/21/06

Dear Tina Mawing

Charles Town Races & Slots ("CTRS") has reviewed your 2007 Stall Application. You are being allocated ___7___ stalls for 2007, subject to the terms and conditions of the Revocable Stall License Agreement. Your specific assignments will be separately provided.

CTRS management wishes you a successful 2007 racing year.

In connection with your stall allocation, CTRS is also pleased to provide you with a revocable license to use ___C___ tack room(s). The specific location of the tack room(s) will be separately provided. Your acceptance and use of the tack room(s) constitutes your understanding and agreement that this revocable license to use the tack room(s) is subject to all terms and conditions of the Revocable Stall License Agreement, including specifically and without limitation, Paragraph No. 6, and shall be subject to periodic and random inspection by Track Security and the Racing Stewards. The tack room(s) may only be used to store tack and other equipment. Under no circumstances may a tack room be used for human habitation.

Yours truly,

Doug Lamp, Racing Secretary



EXHIBIT
moore



*Exhibit 1*

# CHARLES TOWN ⬤ RACES & SLOTS

Date: February 7, 2008

Dear *Mrs. Manning*:

Charles Town Races & Slots ("CTRS") has reviewed your 2008 Stall Application. You are being allocated ___7___ stalls, subject to the terms and conditions of the Revocable Stall License Agreement. Your specific stall assignments will be separately provided.

Due to the delay in this allocation, CTRS is modifying the term of the License Agreement. The Term of the License Agreement shall be the six month period commencing March 1, 2008 through August, 31, 2008. CTRS management wishes you a successful 2008 racing year.

Yours truly,

*Richard Moore*

Richard L. Moore
General Manager Racing Operations.



From:CTR_LEGAL          13047244250          09/11/2008 17:31     #065 P.002/099

**2008 STALL APPLICATION RACING DATES: January 1 - June 30**

# CHARLES TOWN ⚜ RACES & SLOTS

P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**PHONES:**
(800) 795-7001
Racing Office-
(800) 331-7070
(304) 725-7001
FAX:
(304) 724-4326

Track

Barn   14

Stall

Trainer   MAWING

**NO DOGS ALLOWED**

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

**Eligibility Rules**

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and since then have not finished first, second, or third for the Minimum Claiming Price in their next five starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by CTRS in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their next five starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by CTRS in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performances.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Charles Town Races and Slots("CTRS") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by CTRS in all races for which they qualify. Subject to the terms and conditions on the reverse side of this application, it is expected that you will average seven (7) starts per allocated stall.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

| NAME OF HORSE | SEX AGE | MD | CLAIMING PRICE | LONG SHORT | LAST START DATE | TRACK | NAME OF OWNER | OFFICE USE ONLY |
|---|---|---|---|---|---|---|---|---|
| 1. Vella E | F3 | N | ALW | L/S | 12/07 | CTR | G. Williamson | |
| 2. Bama | M5 | Y | 5000 | L/S | 12/07 | CTR | " | |
| 3. Lucky Mommy | F3 | N | 10,000 | L/S | 12/07 | CTR | Eddie Frishack | |
| 4. Shorty Cain | G | N | 5-10K | L | 11/07 | CTR | " | |
| 5. Extra High | FS | Y | ALW | L/S | 12/07 | CTR | " | |
| 6. Queens English | M | N | 10,000 | L/S | 12/07 | CTR | Tom Lynn | |
| 7. Arsiero | G2 | Y | ALW | | | | Tina Mawing | |
| 8. Slug Blaster | G2 | Y | ALW | L/S | 10/07 | CTR | Pandleston Farm | |
| 9. Valentines Humor | F2 | Y | ALW | L/C | | | " | |
| 10. A Little Risky | G2 | Y | ALW | S | | CTR | " | |
| 11. California Classic | F3 | N | ALW | S | 5/07 | SA | Alec Mawing | |
| 12. Mariget Bay | F3 | N | ALW | L/S | 12/07 | CTR | Mawing/Davis | |
| 13. Up to Mischief | G2 | Y | MSW | | | | Tina Mawing | |
| 14. | | | | | | | | |
| 15. | | | | | | | | |

Version: November 28, 2007

**APPLICATION DEADLINE DECEMBER 15, 2007**



EXHIBIT R-5

From:CTR_LEGAL      13047244250      09/11/2008 17:33      #065 P.003/099

Revocable Stall License Agreement
Terms and Conditions

This Agreement ("Agreement") sets forth the terms and conditions governing the January 1 through June 30, 2008 Race Meeting at Charles Town Races and Slots ("CTRS"). The agreement is not accepted and does not become final until signed by CTRS Racing Secretary.

Applicant agrees that in consideration for and as a condition of the granting of permission to stable and race at CTRS to any or all of the horses listed on this application and any other horses for which stabling may be provided the Applicant agrees to notify all persons, agents or entities for whom he is acting (collectively, the "Affiliates") of the terms and conditions and further agrees to be responsible for any breach of the terms and conditions set forth herein by the Affiliates.

Applicant represents and warrants to CTRS that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to enter this Agreement and to bind such Owner(s) and Applicant as the Trainer of the horses listed on this application, to the terms and conditions of this Agreement.

1. It is understood and agreed that this Application for and of all the horses listed on this Application by the Applicant and Applicant hereby authorizes CTRS to cross out the names of any or all of the horses listed herein to which CTRS does not wish to assign stall space and to assign stall space only to the horses whose names are not crossed out. Applicant agrees to be bound by the terms and conditions of this Agreement as set forth, even though the Agreement may be altered by CTRS with respect to the named horses.

2. This agreement shall not be binding upon CTRS until signed by the CTRS Racing Secretary, and when signed shall obligate CTRS to provide stall space only to those horses listed on this Agreement whose names have not been crossed out by the CTRS Racing Secretary. Except as described herein, NO changes or amendments to this Agreement shall be valid, unless the amendment is in writing and signed by Applicant and the CTRS Racing Secretary.

3. CTRS reserves the right to reject any racing entry for any reason or no reason.

4. (a) It is understood and agreed that this is not a lease of any space, but is merely a revocable license granted by CTRS only on the terms and conditions set forth. CTRS reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this license at will, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel of CTRS premises within fourteen (14) days after receiving written notice to vacate from CTRS. Such notice to vacate may be given at any time during the term of this License and for any reason or no reason entirely at the discretion of CTRS.

    (b) Should Applicant fail to vacate the stalls and move all horses, equipment and personnel off CTRS' premises within fourteen (14) days after receiving written notice to vacate from CTRS and should legal recourse become necessary, Applicant shall be responsible for all costs and expenses, including but not limited to reasonable attorneys fees, incurred by CTRS in enforcing its rights pursuant to this Agreement. In addition, Applicant shall be responsible for and pay CTRS Liquidated Damages equal to $15 per day for each Stall that Applicant refuses to vacate and give up peaceably from the day Applicant was to vacate the stall space as directed by CTRS until the day Applicant vacates the stall space. Applicant hereby agrees that the Liquidated Damages set forth herein represents a fair estimate and adjustment between the parties regarding damages.

    (c) This License shall automatically terminate in the event Applicant's Occupational Permit as a Trainer is suspended or revoked and Applicant shall be required to vacate the stalls within three (3) days of such suspension or revocation.

5. CTRS may refuse admittance to or eject anyone whom it considers undesirable in accordance with applicable law.

6. CTRS shall not be liable or responsible for, and Applicant agrees to indemnify and hold harmless CTRS, its affiliated entities, their respective directors, officers and employees from, any and all claims or suits alleging any personal injury and/or property damage, caused or suffered by Applicant, any individuals performing services on behalf of Applicant or making deliveries to Applicant, or otherwise present on CTRS' property as a result of this License Agreement, including by way of example and not limitation, grooms, exercise riders, jockeys, blacksmiths, veterinarians, visitors and any minors who Applicant permits or tolerates being present on CTRS' property. Applicant, on behalf of himself and all owners of horses in his care or custody, assumes the risk for all injury to horses or equipment in the custody, ownership or control of Applicant regardless of the cause. The cost of removal of any dead horse is as provided for in the Agreement between CTRS and the Charles Town Horsemen's Benevolent and Protective Association dated as of December 21, 2004.

7. No pony is permitted with less than eight (8) horses.

8. Stall allocations will be made and revised, if necessary, by the CTRS Racing Secretary and he shall solely determine all conflicting claims of stable privileges. Cooperation with the CTRS Racing Secretary on stall changes is required.

9. Horsemen will be allotted stalls with the understanding that their horses are ready to run. All horses must be in physical condition that would permit them to race within 60 days of the date of arrival on the grounds in the sole discretion of the Racing Secretary. CTRS reserves the right to require horsemen to leave the property after a period of inactivity by not entering their horses in races that are available and for which they are eligible.

10. Horses that leave the stable area to race at another track for a claiming price of less than our Minimum Claiming Price are not eligible to return.

11. No horse shall be allowed to start unless a jockey club registration certificate is on file in the office of the horse identifier and unless the horse has been tattooed.

12. All horses approved for stabling at CTRS are subject to be checked for tattoo numbers. Any proposed changes of horses must be approved by the CTRS Racing Secretary. Horses found that are not the ones approved for stabling must be removed immediately. Horses coming and going must be identified at the gate. Any violation of this rule may subject Applicant to refusal of all entries, loss of stalls, fines, and/or eviction.

13. Horses that are no longer eligible, as defined on the front page of this application, must be immediately removed from the grounds.

14. All horses, including ponies, are required to have a negative Coggins test certificate dated within the past 12 months.

15. The Eligibility Rules set forth on the front page of this Revocable Stall License Agreement are incorporated in these terms and conditions by reference. CTRS shall have the right, from time to time to adopt and revise Rules and Regulations for the stable area and such Rules and Regulations are incorporated into and made a part of these terms and conditions by reference. Copies of current Rules and Regulations governing the stable area are available at the office of the Racing Secretary upon request.

The effective or authorized period for the license granted by this Agreement is from January 1, 2008 to June 30, 2008 unless terminated by CTRS prior thereto. This Agreement may not be assigned by Applicant and does not automatically renew. None of the terms of this Agreement or any right to remedy thereunder shall be deemed waived by CTRS, unless such waiver is in writing and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy. If any part of this Agreement is declared unenforceable or invalid the remainder of this Agreement shall survive unless such survival vitiates the intent of the parties. In the event of a conflict between the terms of this Agreement and any Agreement between CTRS and the Horsemen's Benevolent and Protective Association the terms of this Agreement shall govern and control. This Agreement represents the entire Agreement between the parties and supersedes all prior agreements and understandings.

I HAVE READ THE TERMS AND CONDITIONS AND ELIGIBILITY RULES SET FORTH IN THIS APPLICATION AND I AGREE TO OBSERVE THEM AND ALL OTHER TRACK RULES IF GRANTED STALL SPACE AT CTRS.

Trainer's Signature _Timi Melodious Monson_      Date _____

Social Security No. _on file_      Date of Birth _11-24-56_

Trainer's Address _483 Paulas Circle_      Phone Number _503-720-9522_

_Kearneysville WV 25430_      WV License No. _304-725-0653_

Approved _____

I request space for:

☑ Pony    ☐ Walking Machine      Racing Secretary _____



*Exhibit 1*

# CHARLES TOWN ▦ RACES & SLOTS

VIA HAND DELIVERY

April 25, 2008

Ms. T. Mawing

Re:     2008 Revocable Stall License Agreement ("License Agreement")

Dear Ms. T. Mawing:

Notice is hereby given that PNGI Charles Town Gaming, LLC, t/a "Charles Town Races & Slots" is reducing your stall allocation by __4__ stalls. You were previously allocated __9__ stalls in Barn __14__. With this reduction, you are now allocated __5__ stalls in Barn __14__.

In accordance with Paragraph 4(a) of the License Agreement, you have fourteen (14) days from receipt of this Notice to vacate stall(s) __61-64__ in Barn __14__.

You are reminded that if you fail to vacate the stalls as directed, legal action will be commenced against you to recover possession of the stalls and to collect liquidated damages of $15 per day per stall for each day from the date you were directed to vacate the stalls until your horses and property are removed.

TAKE NOTE THAT YOU DO NOT HAVE PERMISSION TO OCCUPY ANY OTHER STALLS AT CTRS OR TO ALLOW ANY OTHER INDIVIDUAL TO USE STALLS ALLOCATED TO YOU WITHOUT THE WRITTEN PERMISSION OF THE RACING SECRETARY OR ASSISTANT RACING SECRETARY.

Yours truly,

Richard Moore
General Manager Racing



EXHIBIT
Moore
3

From:CTR_LEGAL                    13047244250              09/11/2008 17:34      #065 P.004/099

# CHARLES TOWN ✦ RACES & SLOTS™

## 2008 STALL APPLICATION RACING DATES: September 1 - December 31

P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**PHONES:**
(800) 795-7001
Racing Office-
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326

Track: Charles Town
Barn: 14
Stall:
Trainer: MAWING

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**



**NO DOGS ALLOWED**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and since then have not finished first, second, or third for the Minimum Claiming Price in their next five starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by CTRS in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their next five starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by CTRS in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Charles Town Races and Slots("CTRS") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by CTRS in all races for which they qualify. Subject to the terms and conditions on the reverse side of this application, it is expected that you will average eight (8) starts per allocated stall on an annualized basis.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

| NAME OF HORSE USE | SEX | MD | CLAIMING | LONG | LAST START | NAME OF | OFFICE |
|---|---|---|---|---|---|---|---|
| 1. Up to Mischief | G | No | 5TK | ✓ | 8/9/08 | Malgarini | |
| 2. Octavio | G | No | 7500 | ✓ | 7/22/08 | Dehner | |
| 3. Queens English | M | NO | 10K + ALW | L/S | 7/14/08 | Mawing | |
| 4. Savanna Dawn | F | Yes | MSW | S | 8/2/08 | Williamson | |
| 5. Viva E | F | No | ALW | L | 5/25/08 | Williamson | |
| 6. Natural Gump | G | Yes | ALW | L/S | 12/8/07 | Kopecki | |
| 7. Arsiero | G | Yes | MDN 5 | L/S | 8/7/08 | Mawing | |
| 8. Shes a hot honey | F | Yes | No | L/S | ✓ | Armaker | |
| 9. Key Prospect | F | Yes | No | L/S | ✓ | Armaker | AUG 14 AM10:43 |
| 10. | | | | | | | |
| 11. | | | | | | | |
| 12. | | | | | | | |
| 13. | | | | | | | |
| 14. | | | | | | | |
| 15. | | | | | | | |

Version: August 1, 2008

**APPLICATION DEADLINE August 15, 2008**



EXHIBIT
R-2

From:CTR_LEGAL                    13047244250              09/11/2008 17:35       #065 P.005/099

Revocable Stall License Agreement
Terms and Conditions

This Agreement ("Agreement") sets forth the terms and conditions governing the September 1 through December 31, 2008 Race Meeting at Charles Town Races and Slots (" CTRS). This agreement is not accepted and does not become final until signed by CTRS Racing Secretary.

Applicant agrees that in consideration for and as a condition of the granting of permission to stable and race at CTRS to any or all of the horses listed on this application and any other horses for which stabling may be provided the Applicant agrees to notify all persons, agents or entities for whom he is acting (collectively, the "Affiliates") of the terms and conditions and further agrees to be responsible for any breach of the terms and conditions set forth herein by the Affiliates.

Applicant represents and warrants to CTRS that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to enter this Agreement and to bind such Owner(s) and Applicant as the Trainer of the horses listed on this application, to the terms and conditions of this Agreement.

1.  It is understood and agreed that CTRS may assign stall space to any or all of all the horses listed on this Application by the Applicant and Applicant hereby authorizes CTRS to cross out the names of any or all of the horses listed herein to which CTRS does not wish to assign stall space and to assign stall space only to the horses whose names are not crossed out. Applicant agrees to be bound by the terms and conditions of this Agreement as set forth, even though the Agreement may be altered by CTRS with respect to the named horses.

2.  This agreement shall not be binding upon CTRS until signed by the CTRS Racing Secretary, and when signed shall obligate CTRS to provide stall space only to those horses listed on this Agreement whose names have not been crossed out by the CTRS Racing Secretary. Except as described herein, NO changes or amendments to this Agreement shall be valid, unless the amendment is in writing and signed by Applicant and the CTRS Racing Secretary.

3.  CTRS reserves the right to reject any racing entry for any reason or no reason.

4.  (a)   It is understood and agreed that this is not a lease of any space, but is merely a revocable license granted by CTRS only on the terms and conditions set forth. CTRS reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this license at will, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel of CTRS premises within fourteen (14) days after receiving written notice to vacate from CTRS. Such notice to vacate may be given at any time during the term of this License and for any reason or no reason entirely at the discretion of CTRS.
    (b)   Should Applicant fail to vacate the stalls and move all horses, equipment and personnel off CTRS' premises within fourteen (14) days after receiving written notice to vacate from CTRS and should legal recourse become necessary, Applicant shall be responsible for all costs and expenses, including but not limited to reasonable attorneys fees, incurred by CTRS in enforcing its rights pursuant to this Agreement. In addition, Applicant shall be responsible for and pay CTRS Liquidated Damages equal to $15 per day for each Stall that Applicant refuses to vacate and give up peaceably from the day Applicant was to vacate the stall space as directed by CTRS until the day Applicant vacates the stall space.  Applicant hereby agrees that the Liquidated Damages set forth herein represents a fair estimate and adjustment between the parties regarding damage.
    (c)   This License shall automatically terminate in the event Applicant's Occupational Permit as a Trainer is suspended or revoked and Applicant shall be required to vacate the stalls within three (3) days of such suspension or revocation.

5.  CTRS may refuse admittance to or eject anyone whom it considers undesirable in accordance with applicable law.

6.  CTRS shall not be liable or responsible for, and Applicant agrees to indemnify and hold harmless CTRS, its affiliated entities, their respective directors, officers and employees from, any and all claims or suits alleging any personal injury and/or property damage, caused or suffered by Applicant, any individuals performing services on behalf of Applicant or making deliveries to Applicant, or otherwise present on CTRS' property as a result of this License Agreement, including by way of example and not limitation,  grooms, exercise riders, jockeys, blacksmiths  veterinarians, visitors and any minors who Applicant permits or tolerates being present on CTRS' property. Applicant, on behalf of himself and all owners of horses in his care or custody, assumes the risk for all injury to horses or equipment in the custody, ownership or control of Applicant regardless of the cause. The cost of removal of any dead horse is as provided for in the Agreement between CTRS and the Charles Town Horsemen's Benevolent and Protective Association dated as of December 21, 2004.

7.  No pony is permitted with less than eight (8) horses.

8.  Stall allocations will be made and revised, if necessary, by the CTRS Racing Secretary and he shall solely determine all conflicting claims of stable privileges. Cooperation with the CTRS Racing Secretary on stall changes is required.

9.  Horsemen will be allotted stalls with the understanding that their horses are ready to run. All horses must be in physical condition that would permit them to race within 60 days of this date of arrival on the grounds in the sole discretion of the Racing Secretary. CTRS reserves the right to require horsemen to leave the property after a period of inactivity by and with respect to their horses in races  that are available and for which they are eligible.

10. Horses that leave the stable area to race at another track for a claiming price of less than our Minimum Claiming Price are not eligible to return.

11. No horse shall be allowed to start unless a jockey club registration certificate is on file in the office of the horse identifier and unless the horse has been tattooed.

12. All horses approved for stabling at CTRS are subject to be checked for tattoo numbers. Any proposed changes of horses must be approved by the CTRS Racing Secretary. Horses found that are not the ones approved for stabling must be removed immediately. Horses coming and going must be identified at the gate. Any violation of this rule may subject Applicant to refusal of all entries, loss of stalls, fines, and/ or eviction.

13. Horses that are no longer eligible, as defined on the front page of this application, must be immediately removed from the grounds.

14. All horses, including ponies, are required to have a negative Coggins test certificate dated within the past 12 months.

15. The Eligibility Rules set forth on the front page of this Revocable Stall License Agreement are incorporated in these terms and conditions by reference. CTRS shall have the right, from time to time to adopt and revise Rules and Regulations for the stable area and such Rules and Regulations are incorporated into and made a part of these terms and conditions by reference. Copies of current Rules and Regulations governing the stable area are available at the office of the Racing Secretary upon request.

The effective or authorized period for the license granted by this Agreement is from September 1 through December 31, 2008 unless terminated by CTRS prior thereto. This Agreement may not be assigned by Applicant and does not automatically renew. None of the terms of this Agreement or any right to remedy thereunder shall be deemed waived by CTRS, unless such waiver is in writing and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy. If any part of this Agreement is declared unenforceable or invalid the remainder of this Agreement shall survive unless such survival vitiates the intent of the parties.  In the event of a conflict between the terms of this Agreement and any Agreement between CTRS and the Horsemen's Benevolent Protective Association the terms of this Agreement shall govern and control. This Agreement represents the entire Agreement between the parties and supersedes all prior agreements and understandings.

I HAVE READ THE TERMS AND CONDITIONS AND ELIGIBILITY RULES SET FORTH IN THIS APPLICATION AND I AGREE TO OBSERVE THEM AND ALL OTHER TRACK RULES IF GRANTED STALL SPACE AT CTRS.

Trainer's Signature _____        Date  8-8-08

Social Security No. _____        Date of Birth _____

Trainer's Address  483 Paulas Circle                Phone Number 503-720-9522
                   Kearneysville, WV 25430

Approved _____                   WV License No. _____

I request space for:                               Racing Secretary _____
☑ Pony     ☐ Walking Machine

# CHARLES TOWN ⊞ RACES & SLOTS

Date:  August 29, 2008

Dear Ms. Tina Mawing:

The Stall Allocation Committee of Charles Town Races & Slots ("CTRS") has reviewed your 2008 Stall Application (for the period covering September 1, 2008 through December 31, 2008). There is a large demand for stalls. Based upon the Committee's review and in the exercise of its discretion, CTRS is unable to allocate any stalls to you for the remainder of 2008.

You have fourteen (14) days from receipt of this notice to vacate the number of stalls currently allocated to you for 2008.  Your attention is directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should you fail to vacate the stalls in a timely manner.

Yours Truly,


Randy Wehrman, Racing Secretary

*W. Randy Wehrman*



# CHARLES TOWN ⚜ RACES & SLOTS

Date:  September 12, 2008

Dear Ms. Tina Mawing:

As you are aware, the Stall Allocation Committee of Charles Town Races & Slots ("CTRS") has reviewed your 2008 Stall Application (for the period covering September 1, 2008 through December 31, 2008). There is a large demand for stalls. Based upon the Committee's review and in the exercise of its discretion, CTRS is unable to allocate any stalls to you for the remainder of 2008.

On August 29, 2008, we extended you a fourteen (14) day window from the receipt of notice to vacate the number of stalls currently allocated to you for 2008. As a courtesy, we have agreed to extend this window. You must vacate the number of stalls previously allocated to you for 2008 by no later than noon on Wednesday, September 17, 2008. Your attention is directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should you fail to vacate the stalls in a timely manner.

Yours Truly,

Richard Moore, General Manager of Racing



**2009 STALL APPLICATION**
**RACING DATES:**
January 1 - June 30

# CHARLES TOWN ⚜ RACES & SLOTS™
## P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**PHONES:**
(800) 795-7001
Racing Office-
(800) 331-7070
(304) 725-7001
FAX:
(304) 724-4326

| Track |  |
|---|---|
| Barn |  |
| Stall |  |
| Trainer |  |



**NO DOGS ALLOWED**

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and have not finished first, second, or third for the Minimum Claiming Price in their seven starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by CTRS in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by CTRS in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Charles Town Races and Slots("CTRS") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by CTRS in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

| NAME OF HORSE USE | SEX | AGE | MD | CLAIMING | LONG | LAST START | NAME OF OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. Luzmy Worthy Mgy | M |  | N | ALW | L/S |  | D. Wratchford |  |
| 2. Queens English | M |  | N | ALW | L/S |  | T. Mawing |  |
| 3. Up to Mischief | G |  | N | ALW | L |  | Halperin y Mawi |  |
| 4. Octavio | G |  | N | 7500 | L |  | Kyle Och001 |  |
| 5. Arsicro | G |  | Y | 5000 | L |  | T Mawing |  |
| 6. Jenny's Vow | F |  | Y | ALW | S |  | D. Wratchford |  |
| 7. Neura 'E. | F |  | N | 10000 | L/S |  | G. Williamson |  |
| 8. Shes a Hot Honey | F |  | Y | ALW | L |  | T. Mawing y Axmaker |  |
| 9. Key Prospect | F |  | Y | ALW | L |  | Mawing y Axmaker |  |
| 10. Savanna Dash | F |  | Y | ALW | S |  | G. Williamson |  |
| 11. |  |  |  |  |  |  |  |  |
| 12. |  |  |  |  |  |  |  |  |
| 13. |  |  |  |  |  |  |  |  |
| 14. |  |  |  |  |  |  |  |  |
| 15. |  |  |  |  |  |  |  |  |

**APPLICATION DEADLINE December 15, 2008**

C-16

# CHARLES TOWN RACES & SLOTS

Ms. Tina Mawing

Date:  December 17, 2009

Re:     Revocable Stall License Agreement –
         January 1, 2010 through June 30, 2010

Dear Ms. Mawing:

The Stall Allocation Committee of Charles Town Races & Slots ("CTRS") has reviewed your Stall Application for the period covering January 1, 2010 through June 30, 2010.  Based upon the Committee's review and in the exercise of its discretion, CTRS is unable to allocate any stalls to you for this period in 2010.

If you are currently allocated stalls, you have fourteen (14) days from receipt of this notice to vacate the number of stalls currently allocated to you for 2009.  Your attention is directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should you fail to vacate the stalls in a timely manner.

Yours Truly,

*V. Randolph Wehrman*

Randy Wehrman
Racing Secretary



EXHIBIT

MOORE

7

# CHARLES TOWN ✠ RACES & SLOTS™

**2009 STALL APPLICATION**

RACING DATES:
July 1 -
December 31

P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**PHONES:**
(800) 795-7001
Racing Office-
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326

| | |
|---|---|
| Track | CHARLES TOWN |
| Barn | |
| Stall | |
| Trainer | TINA MAWING |



**NO DOGS ALLOWED**

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

**Eligibility Rules**

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and have not finished first, second, or third for the Minimum Claiming Price in their seven starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by CTRS in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000;
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by CTRS in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Charles Town Races and Slots("CTRS") Racing Program;

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by CTRS in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

| NAME OF HORSE | SEX | AGE | MD | CLAIMING | LONG | LAST START OWNER | NAME OF USE | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. VEVA E | F | | | 4000 - 6000 | 4½ | | | |
| 2. QUEEN'S ENGLISH | F | | | 15000 → | 6½ - 7. | | | |
| 3. MERRY MONTH OF MAY | | | | ALW. | 6½ - 7 | | | |
| 4. WEST HAMPSHIRE WAY | | | | MSW | 6½ | | | |
| 5. MARGARET'S RUBY | | | | MSW. | 6½ → | | | |
| 6. KIM PROSPECT | | | | 5000 → | 4½ | | | |
| 7. SHE'S A HOT HONEY | | | | 5000 → | 4½ | | | |
| 8. JENNY'S URN | | | | ALW. | 4½ | | | |
| 9. SAVANNA DAWN | | | | ALW. | 4½ | | | |
| 10. YES QUI SI | | | | MSW | 4½ → 6½ | | | |
| 11. SMOKING BOBBY | | | | MSW | 4½ → 6½ | | | |
| 12. ANOTHER OREO | | | | MSW | 4½ → 6½ | | | |
| 13. PRINCE AFLEET | | | | MSW | 6½ | | | |
| 14. UP TO MISCHIEF | | | | 10000 → | 6½ - 7. | | | |
| 15. ARSIERO | | | | 5000 → | 6½ - 7. | | | |

**APPLICATION DEADLINE June 15, 2009**

**Revocable Stall License Agreement**
**Terms and Conditions**

This Agreement ("Agreement") sets forth the terms and conditions governing the July 1 through December 31, 2009 Race Meeting at Charles Town Races and Slots (" CTRS"). The agreement is not accepted and does not become final until signed by CTRS Racing Secretary.

Applicant agrees that in consideration for and as a condition of the granting of permission to stable and race at CTRS to any or all of the horses listed on this application and any other horses for which stabling may be provided the Applicant agrees to notify all persons, agents or entities for whom he is acting (collectively, the "Affiliates") terms and conditions and further agrees to be responsible for any breach of the terms and conditions set forth herein by the Affiliates.

Applicant represents and warrants to CTRS that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to enter this Agreement and to bind such Owner(s) and Applicant as the Trainer of the horses listed on this application, to the terms and conditions of this Agreement.

1. It is understood and agreed that CTRS may assign stall space to any or all of the horses listed on this Application by the Applicant and Applicant hereby authorizes CTRS to cross out the names of any or all of the horses listed herein to which CTRS does not wish to assign stall space and to assign stall space only to the horses whose names are not crossed out. Applicant agrees to be bound by the terms and conditions of this Agreement as set forth, even though the Agreement may be altered by CTRS with respect to the named horses.
2. This agreement shall not be binding upon CTRS until signed by the CTRS Racing Secretary, and when signed shall obligate CTRS to provide stall space only to those horses listed on this Agreement whose names have not been crossed out by the CTRS Racing Secretary. Except as described herein, NO changes or amendments to this Agreement shall be valid, unless the amendment is in writing and signed by Applicant and the CTRS Racing Secretary.
3. CTRS reserves the right to reject any racing entry for any reason or no reason.
4. (a)   It is understood and agreed that this is not a lease of any space, but is merely a revocable license granted by CTRS only on the terms and conditions set forth. CTRS reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this license at will, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel off CTRS premises within fourteen (14) days after receiving written notice to vacate from CTRS. Such notice to vacate may be given at any time during the term of this License and for any reason or no reason entirely at the discretion of CTRS.
   (b)   - Should Applicant fail to vacate the stalls and move all horses, equipment and personnel off CTRS' premises within fourteen (14) days after receiving written notice to vacate from CTRS and should legal recourse become necessary, Applicant shall be responsible for all costs and expenses, including but not limited to reasonable attorneys fees, incurred by CTRS in enforcing its rights pursuant to this Agreement. In addition, Applicant shall be responsible for and pay CTRS Liquidated Damages equal to $15 per day for each Stall that Applicant refuses to vacate and give up peaceably from the day Applicant was to vacate the stall space as directed by CTRS until the day Applicant vacates the stall space. Applicant hereby agrees that the Liquidated Damages set forth herein represents a fair estimate and adjustment between the parties regarding damages.
   (c)   This License shall automatically terminate in the event Applicant's Occupational Permit as a Trainer is suspended or revoked and Applicant shall be required to vacate the stalls within three (3) days of such suspension or revocation.
5. CTRS may refuse admittance to or eject anyone whom it considers undesirable in accordance with applicable law.
6. CTRS shall not be liable or responsible for, and Applicant agrees to indemnify and hold harmless CTRS, its affiliated entities, their respective directors, officers and employees from, any and all claims or suits alleging any personal injury and/or property damage, caused or suffered by Applicant, any individuals performing services on behalf of Applicant or making deliveries to Applicant, or otherwise present on CTRS' property as a result of this License Agreement, including by way of example and not limitation, grooms, exercise riders, jockeys, blacksmiths, veterinarians, visitors and any minors who Applicant permits or tolerates being present on CTRS' property. Applicant, on behalf of himself and all owners of horses in his care or custody, assumes the risk for all injury to horses or equipment in the custody, ownership or control of Applicant regardless of the cause. The cost of removal of any dead horse is as provided for in the Agreement between CTRS and the Charles Town Horsemen's Benevolent and Protective Association dated as of December 21, 2004.
7. pony is permitted with less than eight (8) horses.
8. Stall allocations will be made and revised, if necessary, by the CTRS Racing Secretary and he shall solely determine all conflicting claims of stable privileges. Cooperation with the CTRS Racing Secretary on stall changes is required.
9. Horsemen will be allotted stalls with the understanding that their horses are ready to run. All horses must be in physical condition that would permit them to race within 60 days of the date of arrival on the grounds in the sole discretion of the Racing Secretary. CTRS reserves the right to require horsemen to leave the property after a period of inactivity by not entering their horses in races that are available and for which they are eligible.
10. Horses that leave the stable area to race at another track for a claiming price of less than our Minimum Claiming Price are not eligible to return.
1. No horse shall be allowed to start unless a jockey club registration certificate is on file in the office of the horse identifier and unless the horse has been tattooed.
2. All horses approved for stabling at CTRS are subject to be checked for tattoo numbers. Any proposed changes of horses must be approved by the CTRS Racing Secretray. Horses found that are not the ones approved for stabling must be removed immediately. Horses coming and going must be identified at the gate. Any violation of this rule may subject Applicant to refusal of all entries, loss of stalls, fines, and/ or eviction.
3. Horses that are no longer eligible, as defined on the front page of this application, must be immediately removed from the grounds.
4. All horses, including ponies, are required to have a negative Coggins test certificate dated within the past 12 months.
5. The Eligibility Rules set forth on the front page of this Revocable Stall License Agreement are incorporated in these terms and conditions by reference. CTRS shall have the right, from time to time to adopt and revise Rules and Regulations for the stable area and such Rules and Regulations are incorporated into and made a part of these terms and conditions by reference. Copies of current Rules and Regulations governing the stable area are available at the office of the Racing Secretary upon request.

The effective or authorized period for the license granted by this Agreement is from July 1 through December 31, 2009 unless terminated by CTRS prior thereto. This agreement may not be assigned by Applicant and does not automatically renew. None of the terms of this Agreement or any right to remedy thereunder shall be deemed waived by CTRS, unless such waiver is in writing and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy. If any part of this Agreement is declared unenforceable or invalid the remainder of this Agreement shall survive unless such survival vitiates the intent of the parties. This Agreement represents the entire Agreement between the parties and supersedes all prior agreements and understandings, written or otherwise between CTRS and applicant.

HAVE READ THE TERMS AND CONDITIONS AND ELIGIBILITY RULES SET FORTH IN THIS APPLICATION AND I AGREE TO OBSERVE THEM AND ALL OTHER TRACK RULES IF GRANTED STALL SPACE AT CTRS.

Trainer's Signature _Penn Mann_   Date _06 - 14 - 09_

_Signed under duress. Contract of adhesion_

Social Security No. _____   Date of Birth _____

Address _483 Paulas Circle, Middleway, WV_   Phone Number _(503) 720 9522_

Approved _____   WV License No. _____

request space for:   ✓ Pony   ☐ Walking Machine   Racing Secretary _____

# CHARLES TOWN ⊕ RACES & SLOTS

Ms. Tina Malgarini-Mawing

Date: June 25, 2009

Dear Ms. Malgarini-Mawing,

The Stall Allocation Committee of Charles Town Races & Slots ("CTRS") has reviewed your 2009 Stall Application (for the period covering July 1, 2009 through December 31, 2009). Based upon the Committee's review and in the exercise of its discretion, CTRS is unable to allocate any stalls to you for this period in 2009.

If you are currently allocated stalls, you have fourteen (14) days from receipt of this notice to vacate the number of stalls currently allocated to you for the period covering January 1, 2009 to June 30, 2009. Your attention is directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should you fail to vacate the stalls in a timely manner.

Yours Truly,

Randy Wehrman
Racing Secretary

✠ New ✠

# CHARLES TOWN ⚜ RACES & SLOTS™

### P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**2010 STALL APPLICATION RACING DATES:**
July 1 - December 31

**PHONES:**
(800) 795-7001
**RACING OFFICE:**
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326

| Track | |
|---|---|
| CHARLES TOWN | |
| Barn | |
| Stall | |
| Trainer | |
| TINA MAWING | |

**NO DOGS ALLOWED**

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and have not finished first, second, third or fourth for the Minimum Claiming Price in their seven starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by CTRS in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by CTRS in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 16th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Charles Town Races and Slots("CTRS") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by CTRS in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

| NAME OF HORSE | SEX | AGE | MD | CLAIMING OR ALLOWANCE | LONG/ SHORT | LAST START OWNER | NAME OF CURRENT OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. WEST HAMPSHIRE WAY | G | 4 | | 10000 | L | | HAMPSHIRE RACING | |
| 2. ANOTHER OREO | G | 3 | | MSW | S | | TINA M & G WILLIAMSON | |
| 3. QUEENS ENGLISH | M | 6 | | 8-12.5 | 6½-7 | | T. MAWING | |
| 4. UP TO MISCHIEF | G | 5 | | 5-8 | 6½-7 | | T. MAWING | |
| 5. YES OUI SI | G | 3 | | MS.W | S | | T. MAWING | |
| 6. SHE'S A HOT HONEY | M | 4 | | 5000 | S | | T. MAWING | |
| 7. SAVANNAH DAWN | M | 4 | | 8-10 | S | | G. WILLIAMSON | |
| 8. ARSIERO | GT | 5 | | 5000-8 | 6½-7 | | T. MAWING | |
| 9. MARGARETS RUM | F | 3 | | MDN 5000 | S | | T. MAWING | |
| 10. | | | | | | | | |
| 11. | | | | | | | | |
| 12. | | | | | | | | |
| 13. | | | | | | | | |
| 14. | | | | | | | | |
| 15. | | | | | | | | |

**APPLICATION DEADLINE June 15, 2010**

CONTRACT OF ADHESION.

C-23

# HOLLYWOOD Casino

## AT CHARLES TOWN RACES

P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**2011 STALL APPLICATION**

**RACING DATES:**
January 1 - June 30

**PHONES:**
(800) 795-7001
**RACING OFFICE:**
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326

Track _C.T._

Barn

Stall

Trainer _Tina Mawing_

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

**NO DOGS ALLOWED**

**All ponies must be clearly marked as such on this Stall Application**

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and have not finished first, second, third or fourth for the Minimum Claiming Price in their seven starts since starting for the "Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by HCCTR in its sole and non-reviewable discretion.
   b) Any maiden 8 years old or older.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by HCCTR in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Hollywood Casino at Charles Town Races ("HCCTR") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed herein which have been assigned free stall space by HCCTR in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

5. Workers Compensation Requirement: This application will not be considered unless a Certificate of Insurance is attached evidencing that the Applicant has procured workers compensation insurance, in statutorily required limits, covering individuals performing services on Applicant's behalf. This provision applies without regard to how Applicant may classify such individuals.

| NAME OF HORSE | SEX | AGE | MD | CLAIMING OR ALLOWANCE | LONG/ SHORT | LAST START OWNER | NAME OF CURRENT OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. Queens English | M | 6 | | Claiming | Short/L | T. Mawing | T. Mawing | |
| 2. Another Oreo | G | 3 | | Alw. | Short/L | T. M & G. Williamson | | |
| 3. Margarets Ruby | F | 3 | | Claiming | Short/L | T. Mawing | T. Mawing | |
| 4. Up to Mischief | G | 5 | | Claiming | Short/L | T. Mawing | T. Mawing | |
| 5. Arsieed | G | 5 | | Claiming | Short/L | T. Mawing | T. Mawing | |
| 6. Cathedral Peak | F | 2 | MSW | | Short | T. Mawing | T. G. Williamson | |
| 7. Lucky Lips Louie | C | 2 | MSW | | Short/ | T. Mawing | T. Mawing | |
| 8. Yes Oui Si | G | 3 | MSW | | Short/L | Malgarini & Coogan | Malgarini & Coogan | |
| 9. | | | | | | | | |
| 10. | | | | | | | | |
| 11. | | | | | | | | |
| 12. | | | | | | | | |
| 13. | | | | | | | | |
| 14. | | | | | | | | |
| 15. | | | | | | | | |

**APPLICATION DEADLINE December 10, 2010**

C-24



# AT CHARLES TOWN RACES

Ms. Tina Mawing

Date:  December 15, 2010

Re:     Revocable Stall License Agreement –
         January 1, 2011 through June 30, 2011

Dear Ms. Mawing:

The Stall Allocation Committee of Hollywood Casino at Charles Town Races ("HCCTR") has reviewed your 2011 Stall Application (for the period covering January 1, 2011 through June 30, 2011).  Based upon the Committee's review and in the exercise of its discretion, HCCTR is unable to allocate any stalls to you for this period in 2011.

If you are currently allocated stalls, you have fourteen (14) days from receipt of this notice to vacate the number of stalls currently allocated to you for 2010.  Your attention is directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should you fail to vacate the stalls in a timely manner.

HCCTR management wishes you a successful 2011 racing year.

Yours Truly,
Hollywood Casino at Charles Town Races Stall Allocation Committee



**HOLLYWOOD Casino**

**AT CHARLES TOWN RACES**

P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**2011 STALL APPLICATION RACING DATES:**
July 1 - December 31

PHONES:
(800) 795-7001
RACING OFFICE:
(800) 331-7070
(304) 725-7001
FAX:
(304) 724-4326

| Track | |
|---|---|
| Barn | |
| Stall | |
| Trainer | TINA MALGARINI MANING |

NO DOGS ALLOWED

DO NOT SHIP WITHOUT STALL CONFIRMATION

VALID COGGINS TEST REQUIRED ON ALL HORSES!

No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows

All ponies must be clearly marked as such on this Stall Application

**Eligibility Rules**

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have started for the Minimum Claiming Price or less and have not finished first, second, third or fourth for the Minimum Claiming Price in their seven starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by HCCTR in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older with 10 or more lifetime starts.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by HCCTR in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Hollywood Casino at Charles Town Races ("HCCTR") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by HCCTR in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/or eviction.

5. Workers Compensation Requirement: This application will not be considered unless a Certificate of Insurance is attached evidencing that the Applicant has procured workers compensation insurance, in statutorily required limits, covering individual performing services on Applicant's behalf. This provision applies without regard to how Applicant may classify such individuals.

| NAME OF HORSE | SEX | AGE | MD | CLAIMING OR ALLOWANCE | LONG/ SHORT | LAST START OWNER | NAME OF CURRENT OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. another Oreo | G | 4 | | ALW | L | MANING | MANING | |
| 2. Yes Oui Si | G | 4 | | ALW | S | MALGARINI | COOGA | |
| 3. West Hampshire | | | | | | | | |
| 4. Way | G | 5 | | ALW | L | West Hampshire Way Syline | Maning | |
| 5. Queen Emyth | M | 6 | | CLM | 4/S | Maning | MANING | |
| 6. Lucky Lift | | | | | | | | |
| 7. house | C | 2 | ✓ | ALW | | MANING | MANING | |
| 8. Johns Glory | filly | 2 | ✓ | ALW | | Maning | MANING | |
| 9. Cathedral Peak | f | 2 | | unstarted | | | Maning Williamson | |
| 10. | | | | | | | | |
| 11. | | | | | | | | |
| 12. | | | | | | | | |
| 13. | | | | | | | | |
| 14. | | | | | | | | |
| 15. | | | | | | | | |

*ABSOLUTELY NO SUBSTITUTIONS OR ADDITION OF HORSES WITHOUT PERMISSION MUST BE SUBMITTED*

APPLICATION DEADLINE June 10, 2011

C-25

# HOLLYWOOD
## *Casino*
## AT CHARLES TOWN RACES

Ms. Tina Mawing

Date:  June 21, 2011

Re:      Revocable Stall License Agreement –
         July 1, 2011 through December 31, 2011

Dear Ms. Mawing:

The Stall Allocation Committee of Hollywood Casino at Charles Town Races ("HCCTR")
has reviewed your 2011 Stall Application (for the period covering July 1, 2011 through
December 31, 2011).  Based upon the Committee's review and in the exercise of its
discretion, HCCTR is unable to allocate any stalls to you for this period in 2011.

If you are currently allocated stalls, you have fourteen (14) days from receipt of this notice
to vacate all stalls allocated to you for the first six (6) months of 2011.  Your attention is
directed to Paragraph 4(b) which sets forth the costs and expenses you will incur should
you fail to vacate the stalls in a timely manner.

HCCTR management wishes you a successful second half of the 2011 racing year.

Yours Truly,
Hollywood Casino at Charles Town Races Stall Allocation Committee

# HOLLYWOOD Casino

### AT CHARLES TOWN RACES
### P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**2012**
STALL
APPLICATION
RACING DATES:
July 1 -
December 31

**PHONES:**
(800) 795-7001
RACING OFFIC[
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326

DO NOT SHIP
WITHOUT STAL[
CONFIRMATION

VALID COGGIN[
TEST REQUIRE[
ON ALL
HORSES!

No Smoking
Permitted in or
Around Stalls,
Feed Rooms or
Shedrows

All ponies must
be clearly marke[
as such on this
Stall Application


NO DOGS
ALLOWED

| Track | |
|---|---|
| Barn | 08:07 Hd 6-9 80: |
| Stall | |
| Trainer | J. MAWING |

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have not finished first, second, third or fourth in seven consecutive starts since starting for the Minimum Claiming Price. The "Minimum Claiming Price" for the purposes of this Paragraph 1a shall be determined by HCCTR in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older with 10 or more lifetime starts.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by HCCTR in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before February 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Hollywood Casino at Charles Town Races ("HCCTR") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by HCCTR in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/ or eviction.

5. Workers Compensation Requirement: This application will not be considered unless a Certificate of Insurance is attached evidencing that the Applicant has procured workers compensation insurance, in statutorily required limits, covering individual performing services on Applicant's behalf. This provision applies without regard to how Applicant may classify such individuals.

| | NAME OF HORSE | SEX | AGE | MD | CLAIMING OR ALLOWANCE | LONG/ SHORT | LAST START OWNER | NAME OF CURRENT OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|---|
| 1. | Another Oreo | G | 6 | | ALW/STK | L | MAWING | SAME | |
| 2. | Yes Oui Si | G | 5 | | ALW | S | MALGARINI/Coogan | same | |
| 3. | Up to Mischie | G | 7 | | CLM | L | MALGARINI | same | |
| 4. | Smoken Bobba | G | 6 | | ALW | L | WILLIAMSON | same | |
| 5. | Cathedral Peak | F | 3 | V | ALW | S | MAWING | same | |
| 6. | Lucky Lips Lottie | G | 3 | V | ALW | S/L | MAWING | same | |
| 7. | Hale Bop | G | 2 | | NS | | MALGARINI | MAWING | |
| 8. | John's Glory | F | 3 | V | NS | | MALGARINI | MAWING | |
| 9. | Nick's Monster | G | 4 | | | L | Norma Rodney | same | |
| 10. | Ghost of halo | G | 2 | | NS | | MAWING | same | |
| 11. | Queens English | G | | CLM | 4S | | MAWING | same | |
| 12. | | | | | | | | | |
| 13. | | | | | | | | | |
| 14. | | | | | | | | | |
| 15. | | | | | | | | | |

**APPLICATION DEADLINE June 10, 2012**

C-37

**Terms and Conditions**

This Agreement ("Agreement") sets forth the terms and conditions governing the July 1 through December 31, 2012 Race Meeting at Hollywood Casino at Charles Town Races ("HCCTR"). The agreement is not accepted and does not become final until signed by HCCTR Racing Secretary.

Applicant agrees that in consideration for and as a condition of the granting of permission to stable and race at HCCTR to any or all of the horses listed on this application and any other horses for which stabling may be provided the Applicant agrees to notify all persons, agents or entities for whom he is acting (collectively, the "Affiliates") of the terms and conditions and further agrees to be responsible for any breach of the terms and conditions set forth herein by the Affiliates.

Applicant represents and warrants to HCCTR that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to enter this Agreement and to bind such Owner(s) and Applicant as the Trainer of the horses listed on this application, to the terms and conditions of this Agreement.

1. It is understood and agreed that HCCTR may assign stall space to any or all of all the horses listed on this Application by the Applicant and Applicant hereby authorizes HCCTR to cross out the names of any or all of the horses listed herein to which HCCTR does not wish to assign stall space and to assign stall space only to the horses whose names are not crossed out. Applicant agrees to be bound by the terms and conditions of this Agreement as set forth, even though the Agreement may be altered by HCCTR with respect to the named horses.

2. This agreement shall not be binding upon HCCTR until signed by the HCCTR Racing Secretary, and when signed shall obligate HCCTR to provide stall space only to those horses listed on this Agreement whose names have not been crossed out by the HCCTR Racing Secretary. Except as described herein, NO changes or amendments to this Agreement shall be valid, unless the amendment is in writing and signed by Applicant and the HCCTR Racing Secretary.

3. HCCTR reserves the right to reject any racing entry for any reason or no reason.

4. (a)   It is understood and agreed that this is not a lease of any space, but is merely a revocable license granted by HCCTR only on the terms and conditions set forth. HCCTR reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this license at will, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel off HCCTR premises within fourteen (14) days after receiving written notice to vacate from HCCTR. Such notice to vacate may be given at any time during the term of this License and for any reason or no reason entirely at the discretion of HCCTR.
   (b)   Should Applicant fail to vacate the stalls and move all horses, equipment and personnel off HCCTR' premises within fourteen (14) days after receiving written notice to vacate from HCCTR and should legal recourse become necessary, Applicant shall be responsible for all costs and expenses, including but not limited to reasonable attorneys fees, incurred by HCCTR in enforcing its rights pursuant to this Agreement. In addition, Applicant shall be responsible for and pay HCCTR Liquidated Damages equal to $15 per day for each Stall that Applicant refuses to vacate and give up peaceably from the day Applicant was to vacate the stall space as directed by HCCTR until the day Applicant vacates the stall space. Applicant hereby agrees that the Liquidated Damages set forth herein represents a fair estimate and adjustment between the parties regarding damages.
   (c)   This License shall automatically terminate in the event Applicant's Occupational Permit as a Trainer is suspended or revoked and Applicant shall be required to vacate the stalls within three (3) days of such suspension or revocation.

5. HCCTR may refuse admittance to or eject anyone whom it considers undesirable in accordance with applicable law.

6. HCCTR shall not be liable or responsible for, and Applicant agrees to indemnify and hold harmless HCCTR, its affiliated entities, their respective directors, officers and employees from, any and all claims or suits alleging any personal injury and/or property damage, caused or suffered by Applicant, any individuals performing services on behalf of Applicant or making deliveries to Applicant, or otherwise present on HCCTR' property as a result of this License Agreement, including by way of example and not limitation, grooms, exercise riders, jockeys, blacksmiths veterinarians, visitors and any minors who Applicant permits or tolerates being present on HCCTR' property. Applicant, on behalf of himself and all owners of horses in his care or custody, assumes the risk for all injury to horses or equipment in the custody, ownership or control of Applicant regardless of the cause. The cost of removal of any dead horse is as provided for in the Agreement between HCCTR and the Charles Town Horsemen's Benevolent and Protective Association dated as of February 20, 2009.

7. During the term of any license that may be granted, Applicant shall purchase and maintain workers compensation insurance in statutorily required limits, covering the individuals who are performing services on Applicant's behalf. This provision applies to all Applicants who have individuals other than themselves, performing services, without regard to how the horsemen may classify such individuals.

8. No pony is permitted with less than ten (10) stalls and requires approval by the HCCTR Racing Secretary. If those conditions are met, one (1) pony will be permitted.

9. Stall allocations will be made and revised, if necessary, by the HCCTR Racing Secretary and he shall solely determine all conflicting claims of stable privileges. Cooperation with the HCCTR Racing Secretary on stall changes is required.

10. Horses will be allotted stalls with the understanding that their horses are ready to run. All horses must be in physical condition that would permit them to race within 60 days of the date of arrival on the grounds in the sole discretion of the Racing Secretary. HCCTR reserves the right to require horsemen to leave the property after a period of inactivity by not entering their horses in races that are available and for which they are eligible.

11. Horses that leave the stable area to race at another track without obtaining a race and return from the Racing Secretary may not be allowed back on the grounds at the Racing Secretary's discretion.

12. No horse shall be allowed to start unless a jockey club registration certificate is on file in the office of the horse identifier and unless the horse has been tattooed.

13. All horses approved for stabling at HCCTR are subject to be checked for tattoo numbers. Any proposed changes of horses must be approved by the HCCTR Racing Secretary. Horses found that are not the ones approved for stabling must be removed immediately. Horses coming and going must be identified at the gate. Any violation of this rule may subject Applicant to refusal of all entries, loss of stalls, fines, and/ or eviction.

14. Horses that are no longer eligible, as defined on the front page of this application, must be immediately removed from the grounds.

15. All horses, including ponies, are required to have a negative Coggins test certificate dated within the past 12 months.

16. The Eligibility Rules set forth on the front page of this Revocable Stall License Agreement are incorporated in these terms and conditions by reference. HCCTR shall have the right, from time to time to adopt and revise Rules and Regulations for the stable area and such Rules and Regulations are incorporated into and made a part of these terms and conditions by reference. Copies of current Rules and Regulations governing the stable area are available at the office of the Racing Secretary upon request.

The effective or authorized period for the license granted by this Agreement is from July 1 through December 31, 2012 unless terminated by HCCTR prior thereto. This Agreement may not be assigned by Applicant and does not automatically renew. None of the terms of this Agreement or any right to remedy thereunder shall be deemed waived by HCCTR, unless such waiver is in writing and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy. If any part of this Agreement is declared unenforceable or invalid the remainder of this Agreement shall survive unless such survival violates the intent of the parties. This Agreement represents the entire Agreement between the parties and supersedes all prior agreements and understandings, written or otherwise between HCCTR and applicant.

I HAVE READ THE TERMS AND CONDITIONS AND ELIGIBILITY RULES SET FORTH IN THIS APPLICATION AND I AGREE TO OBSERVE THEM AND ALL OTHER TRACK RULES IF GRANTED STALL SPACE AT HCCTR.

Trainer's Signature _Tina Malgiere Monroe_   Date _06-10-12_

Social Security No. _on file_   Date of Birth: _11-24-56_

Trainer's Address _483 Paulas Cir Kearneysville WV_   Phone Number _503.720.9522_

Approved _____   WV License No. _13487_

I request space for:   Racing Secretary _____

☐ Pony

C-37

# 2013
## STALL
## APPLICATION
**RACING DATES:**
Jan 1 -
June 30

# HOLLYWOOD
## Casino
## AT CHARLES TOWN RACES
### P.O. BOX 551, CHARLES TOWN, WV 25414-0551

**PHONES:**
(800) 795-7001
**RACING OFFICE:**
(800) 331-7070
(304) 725-7001
**FAX:**
(304) 724-4326



**Track**

**Barn**

**Stall**

**Trainer** MARGARINI MAWING



## NO DOGS ALLOWED

**DO NOT SHIP WITHOUT STALL CONFIRMATION**

**VALID COGGINS TEST REQUIRED ON ALL HORSES!**

**No Smoking Permitted in or Around Stalls, Feed Rooms or Shedrows**

**All ponies must be clearly marked as such on this Stall Application**

### Eligibility Rules

1. Entries will not be accepted or stalls allocated:
   a) To horses, which have not finished first, second, third or fourth in seven consecutive starts since starting the Minimum Claiming Price. The "Minimum Claiming Price" for the purpose of this Paragraph 1a shall be determined by HCCTR in its sole and non-reviewable discretion.
   b) Any maiden 6 years old or older with 10 or more lifetime starts.
   c) Maidens which have started for a Maiden claiming price of $5,000 or less and have not finished second, third or fourth for a claiming price of at least Maiden $4,500 in their last seven starts since starting for Maiden $5,000.
   d) Any horse that has been a three time Bleeder, as that term is defined in the Rules of the West Virginia Racing Commission, within a 12 month period.
   e) Horses that are currently racing and receive an injury or illness serious enough such that they cannot compete within a reasonable period of time, as determined by HCCTR in its sole and non-reviewable discretion, as confirmed by a Veterinarian.
   f) Horses that are barred in West Virginia or any other Racing Jurisdiction or appear on any Veterinarian, Starter or Steward's List (for reasons including but not limited to Poor Performance.)
   g) No two year old is permitted on the grounds before January 15th.

2. Eligibility of a horse does not imply automatic approval for a stall as it also includes consideration of potential, performance and participation in Hollywood Casino at Charles Town Races ("HCCTR") Racing Program.

3. Applicant shall enter and, if accepted, race the horses listed hereon which have been assigned free stall space by HCCTR in all races for which they qualify.

4. Horses that are no longer eligible, as defined above, must be removed from the grounds. If applicant fails to remove horses no longer eligible, he will be subject to refusal of all entries and/or eviction.

5. Workers Compensation Requirement: This application will not be considered unless a Certificate of Insurance is attached evidencing that the Applicant has procured workers compensation insurance, in statutorily required form, covering individual performing services on Applicant's behalf. This provision applies without regard to how Applicant may classify such individuals.



| NAME OF HORSE | SEX | AGE | MD | CLAIMING OR ALLOWANCE | LONG/ SHORT | LAST START OWNER | NAME OF CURRENT OWNER | OFFICE |
|---|---|---|---|---|---|---|---|---|
| 1. Another Oreo | G | 7 | | ALW | L | MAWING | Same | |
| 2. Yes Oui Si | G | 5 | | ALW/10 | S | MARGARINI-COGGAN | | |
| 3. Cathedral Peaks | F | 3 | | ALW | S | MAWING-WILLIAMSON | | |
| 4. Smoken Bobbe | G | 5 | | ALW | L | WILLIAMSON | | |
| 5. Ephsians Time | F | 3 | V | ALW | S | HAVENS | — | |
| 6. Nick's Monster | G | 4 | | 5000 | L | MAWING | | |
| 7. Up to Mischief | G | 7 | | 10,000- 7,000- | L | MARGARINI— | MAWING | |
| 8. Magdelene Rose | F | 3 | | 5000 | L/S | HAVENS | | |
| 9. Lucky Lips Louie | G | 3 | V | 10,000 | L/S | MAWING COGGAN | MARGARINI | |
| 10. Gideon Gun | G | 3 | | MSW | L | HAVENS, RALPH | Same | |
| 11. Ghost of Maco | G | 2 | V | MSW | S | MAWING | MAWING | |
| 12. | | | | | | | | |
| 13. | | | | | | | | |
| 14. | | | | | | | | |
| 15. | | | | | | | | |

## APPLICATION DEADLINE December 10, 2012

C-38

Revocable Stall License Agreement
Terms and Conditions

This Agreement ("Agreement") sets forth the terms and conditions governing the January 1 through June 30, 2013 Race Meeting at Hollywood Casino at Charles Town Races ("HCCTR"). The agreement is not accepted and does not become final until signed by HCCTR Racing Secretary.

Applicant agrees that in consideration for and as a condition of the granting of permission to stable and race at HCCTR to any or all of the horses listed on this application and any other horses for which stabling may be provided the Applicant agrees to be responsible for any breach of the terms and conditions set forth herein by the Affiliates. the "Affiliates") of the terms and conditions and further agrees to HCCTR that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to

Applicant represents and warrants to HCCTR that the Applicant has been granted authority by the Owner(s) of all horses in his care to make this application, to enter this Agreement and to bind such Owner(s) and Applicant as the Trainer of the horses listed on this application, to the terms and conditions of this Agreement.

1.  It is understood and agreed that HCCTR may assign stall space to any or all of all the horses listed on this application by the Applicant and Applicant hereby authorizes HCCTR to cross out the names of any or all of the horses listed herein to which HCCTR does not wish to assign stall space and to assign stall space only to the horses whose names are not crossed out.

2.  This agreement shall not be binding upon HCCTR until signed by the HCCTR Racing Secretary, and when signed shall obligate HCCTR to provide stall space only to those horses listed on this Agreement whose names have not been crossed out by the HCCTR Racing Secretary. Except as described herein, NO the Agreement may be altered by HCCTR with respect to the named horses.

3.  HCCTR reserves the right to reject any racing entry for any reason or no reason.
    changes or amendments to this Agreement shall be valid, unless the amendment is in writing and signed by Applicant and the HCCTR Racing Secretary.

4.  (a)  It is understood and agreed that this is not a lease of any space, but is merely a revocable license granted by HCCTR only on the terms and conditions set forth. HCCTR reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this license at will, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel off HCCTR premises within fourteen (14) days after receiving written notice to vacate from HCCTR. Such notice to vacate may be given at any time during the term of this License and for any reason or no reason entirely at the discretion of HCCTR.

    (b)  Should Applicant fail to vacate the stalls and move all horses, equipment and personnel off HCCTR' premises within fourteen (14) days after receiving written notice to vacate from HCCTR and should legal recourse become necessary, Applicant shall be responsible for all costs and expenses, including but not limited to reasonable attorneys fees, incurred by HCCTR in enforcing its rights pursuant to this Agreement. In addition, Applicant shall be responsible for and pay HCCTR Liquidated Damages equal to $15 per day for each Stall that Applicant refuses to vacate and give up peaceably from the day Applicant was to vacate the stall space as directed by HCCTR until the day Applicant vacates the stall space. Applicant hereby agrees that the Liquidated Damages set forth herein represents a fair estimate and adjustment between the parties regarding damages.

    (c)  This License shall automatically terminate in the event Applicant's Occupational Permit as a Trainer is suspended or revoked and Applicant shall be required to vacate the stalls within three (3) days of such suspension or revocation.
    HCCTR may refuse admittance to or eject anyone whom it considers undesirable in accordance with applicable law.

HCCTR shall not be liable or responsible for, and Applicant agrees to indemnify and hold harmless HCCTR, its affiliated entities, their respective directors, officers and employees from, any and all claims or suits alleging any personal injury and/or property damage, caused or suffered by Applicant, any individuals performing services on behalf of Applicant or making deliveries to HCCTR' property, or otherwise present on HCCTR' property as a result of this License Agreement, including by way of example and not limitation, grooms, exercise riders, jockeys, blacksmiths, veterinarians, visitors and any minors who Applicant permits or tolerates being present on HCCTR' property. Applicant, on behalf of himself and all owners of horses in his care or custody, assumes the risk for all injury to horses or equipment in the custody, ownership or control of Applicant regardless of the cause. The cost of removal of any dead horse is as provided for in the agreement between HCCTR and the Charles Town Horsemen's Benevolent and Protective Association dated as of February 20, 2009. During the term of any license that may be granted, Applicant shall purchase and maintain workers compensation insurance in statutorily required limits, covering individuals who are performing services on Applicant's behalf. This provision applies to all Applicants who have individuals other than themselves, performing services, without regard to how the horsemen may classify such individuals. pony is permitted with less than ten (10) stalls and requires approval by the Racing Secretary.

allocations will be made and revised, if necessary, by the HCCTR Racing Secretary and he shall solely determine all conflicting claims of stable privileges. operation with the HCCTR Racing Secretary on stall changes is required. If those conditions are met, one (1) pony will be women will be allotted stalls with the understanding that their horses are ready to run. All horses must be in physical condition that would permit them to within 60 days of the date of arrival on the grounds in the sole discretion of the Racing Secretary. HCCTR reserves the right to require horsemen to leave property after a period of inactivity by not entering their horses in races that are available and for which they are eligible. that leave the stable area to race at another track without obtaining a race and return from the Racing Secretary.

Racing Secretary's discretion. ses shall be allowed to start unless a jockey club registration certificate is on file in the office of the horse identifier and unless the horse has been tattooed. ses approved for stabling at HCCTR are subject to be checked for tattoo numbers. Any proposed changes of horses must be approved by the HCCTR Secretary. Horses found that are not the ones approved for stabling must be removed immediately. Horses coming and going must be identified at the ry violation of this rule may subject Applicant to refusal of all entries, loss of stalls, fines, and/ or eviction. that are no longer eligible, as defined on the front page of this application, must be immediately removed from the grounds. es, including ponies, are required to have a negative Coggins test certificate dated within the past 12 months. ibility Rules set forth on the front page of this Revocable Stall License Agreement are incorporated in these terms and conditions by reference. HCCTR e the right, from time to time to adopt and revise Rules and Regulations for the stable area and such Rules and Regulations are incorporated into and part of these terms and conditions by reference. Copies of current Rules and Regulations governing the stable area are available at the office of the Secretary upon request.

or authorized period for the license granted by this Agreement is from January 1 through June 30, 2013 unless terminated by HCCTR prior thereto. nt may not be assigned by Applicant and does not automatically renew. None of the terms of this Agreement or any right to remedy thereunder d waived by HCCTR, unless such waiver is in writing and in no event by reason of any failure to assert or delay in asserting any such term, right or part of this Agreement is declared unenforceable or invalid the remainder of this Agreement shall survive unless such survival vitiates the intent of is Agreement represents the entire Agreement between the parties and supersedes all prior agreements and understandings, written or otherwise R and applicant.

THE TERMS AND CONDITIONS AND ELIGIBILITY RULES SET FORTH IN THIS APPLICATION AND I AGREE TO OBSERVE THEM AND ALL RULES IF GRANTED STALL SPACE AT HCCTR.

ture _Tina McGuire Mann_

No. _on file_                                                   Date _12-10-12_

s _423 Paulas Circle, Kearneysville_                           Date of Birth _____
                              _WV_

r: _____     Phone Number _503-720-9523_     _860-901-2012_

           Racing Secretary _____      WV License No. _____



DEPOSITION
EXHIBIT
C - 40 A
TGS 6-10-13
PENGAD 800-631-6989











DEPOSITION
EXHIBIT
C-40B
TGS 6-10-13






DEPOSITION
EXHIBIT
C - 40 C
TGS 6-10-13







DEPOSITION
EXHIBIT
C-40 0
TGS 6-10-13
PENGAD 800-631-6989






DEPOSITION
EXHIBIT

C-40  F
TGS  6-10-13

PENGAD 800-631-6989

# STALL DAMAGE CALCULATIONS

Assuming an average cost per stall of $275 per month, then:

- 4 stalls for the period May through August, 2008:       $   4,400

- 9 stalls for the period September 2008 through June 2013[1]:       $143,550

Total       $147,950

---

[1] 58 months



# CHARLES TOWN ⛫ RACES & SLOTS

VIA HAND DELIVERY

April 25, 2008

Mr. Leonard C. Hale
Executive Director
Charles Town HBPA, Inc.
P. O. Box 581
Charles Town, WV  25414

Dear Lenny:

Thank you for your letter of April 22, 2008.

As you have only recently joined the HBPA, you need to be aware that considerable negotiations took place in Spring of 2007 regarding table games. During the legislative session, an agreement was reached between Charles Town Races & Slots ("CTRS") and the HBPA's attorney that the HBPA would support table games in exchange for CTRS scheduling 235 races in 2007, 2008 and 2009. Unfortunately, despite agreement being reached, management of the HBPA sought to continually extract more and more from CTRS in exchange for its support of table games. Ultimately, the HBPA took a neutral stance on table games which we believe contributed, in part, to the failure of the table games referendum. Based upon the initial results at Mountaineer and Wheeling Island, it is projected that your membership lost annually approximately $7.4 million dollars for its purse fund ($2.6 million dollars annually from table games and $4.8 million dollars annually from increased video lottery revenues) as a result, at least in part, of that stance.

While CTRS is most interested in having a harmonious and good working relationship with the HBPA, we are unable to meet with you to discuss anything until the HBPA pledges its support of table games.

Yours truly,

John V. Finamore
Senior Vice President – Regional Operations
Penn National Gaming, Inc.

C:     Albert Britton
       General Manager

       Dickie Moore
       General Manager – Racing



DEPOSITION
EXHIBIT
C-42
TGS 6-10-13

Post Office Box 551, Charles Town, WV 25414  Phone: 304.725.7001, Fax: 304.725.6979

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

TINA MAWING, et. al.,

    Plaintiffs,

v.                                  Civil Action No. 3:09-CV-68

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES
AND SLOTS,

    Defendant.

## DEFENDANT'S RULE 26(A) INITIAL DISCLOSURES

    COMES NOW the Defendant, PNGI Charles Town Gaming, LLC, by counsel,

pursuant to the Court's scheduling order and Rule 26(a) of the Federal Rules of Civil Procedure,

and makes the following initial discovery disclosures.

    1.    **Individuals likely to have discoverable information:**

        **Richard "Dickie" Moore – General Manager of Racing Operations**
        **Erich Zimny – Racing Administrator**
        **Randy Wehrman – Racing Secretary**
        **Al Britton – General Manager**
        **Pamela Sutphin – Purchasing Manager**
        **Rodney Walker – Facilities Manager**
        **Representative of J.C. Ehrlich Co., Inc. Pest Control - 20 Hump Road, Hagerstown, MD 21740.**

    2.    **Documents Defendant may use to support its claims or defenses**

        **2004 HBPA Agreement**
        **Stall Applications and Revocable Stall License Agreements**
        **Correspondence with Tina Mawing regarding Stall Licenses**
        **Documents produced in discovery in the state court action.**



PENGAD 800-631-6989  DEPOSITION
EXHIBIT
C- 43
TGS 6-11-13

3.    **Computation of damages**

None claimed by Defendant.

4.    **Insurance Agreement**

None applicable.

PNGI CHARLES TOWN GAMING, LLC
Defendant, by counsel

Brian M. Peterson (WVSB #7770)
Charles F. Printz, Jr. (WVSB #2985)
Bowles Rice McDavid Graff & Love LLP
101 South Queen Street
Post Office Drawer 1419
Martinsburg, West Virginia  25402-1419
Phone: (304) 263-0836
Fax:    (304) 267-3822

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

TINA MAWING, et. al.,

      Plaintiffs,

v.                                                                        Civil Action No. 3:09-CV-68

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES
AND SLOTS,

      Defendant.

## CERTIFICATE OF SERVICE

      I, Brian M. Peterson, counsel for Defendant, do hereby certify that I have served a true and correct copy of the foregoing **DEFENDANT'S RULE 26(A) INITIAL DISCLOSURES** upon the below named counsel or party on the date indicated by depositing a true and correct copy of the foregoing in the United States Mail, first class postage prepaid to them at their addresses as follows:

      David H. Hammer, Esquire
      HAMMER, FERRETTI & SCHIAVONI
      408 West King Street
      Martinsburg, West Virginia 25401

      Clarence E. Martin, III Esquire
      Matthew R. Whitler, Esquire
      Martin & Seibert, LC
      Post Office Box 1286
      Martinsburg, West Virginia 25402

on the 18th day of November, 2009.

                          /s/ Brian M. Peterson
                          Brian M. Peterson

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
*MARTINSBURG DIVISION*

TINA MAWING, et al.,

     Plaintiffs,

v.                                                   Civil Action No. 3:09-CV-68

PNGI CHARLES TOWN GAMING, LLC,
d/b/a CHARLES TOWN RACES
AND SLOTS,

     Defendant.

### DECLARATION OF ERICH ZIMNY

     I, Erich Zimny, declare under penalty of perjury that the foregoing is true and correct:

     1.    I am an adult over the age of twenty-one (21) years.

     2.    I am currently employed as the Director of Racing at Charles Town Races & Slots (referred to herein as "CTRS"), and I have personal knowledge of the following.

     3.    Tina Mawing is a horse trainer who holds an occupational permit issued by the West Virginia Racing Commission.

     4.    Her permit has not been revoked, suspended or affected in any way by the West Virginia Racing Commission or the Board of Stewards.

**EXHIBIT
B**

5.     CTRS has no power or authority to issue, suspend, or revoke occupational permits.

6.     CTRS owns approximately 1,338 horse stalls which are its private property. It licenses these stalls to horse trainers on an individual basis through Revocable Stall License Agreements, which typically last for 6 months at a time, and are not automatically renewable.

7.     An occupational permit does not entitle anyone to stable their horses in stalls owned by Charles Town Races and Slots. The permit is simply one prerequisite to allowing the permit holder to conduct his or her occupation at the race track.

8.     Although many trainers at CTRS do stable their horses in stalls at our property, many other horses are stabled off site.

9.     CTRS has created a stall allocation committee to allocate its stalls.

10.    The stall allocation committee consists of 6 individuals – General Manager Al Britton, General Manager of Racing Operations Richard (Dickie) Moore, Director of Racing Erich Zimny, Racing Secretary Randolph (Randy) Wehrman, Barn Superintendent Mike Elliott, and Assistant Barn Superintendent James Taylor.

11.    The Racing Stewards are not members of the stall committee, and they do not participate in any way in the stall allocation process.

12.    The stall allocation committee meets prior to the end of each stall allocation term to review and consider the stall applications for the upcoming term.

2

13.    The committee does not use any written criteria in determining how to allocate stalls. However, the factors they generally consider are the number of racing starts the trainers have in proportion to the number of stalls they have or are seeking (often referred to as "starts per stall"); the quality of the horses they train in terms of their winning percentages, the types of horses the trainer has, and whether the trainer follows CTRS's rules. Particular emphasis is placed on these factors over the last stall allocation term.

14.    CTRS endeavors to maintain on its property a wide variety of quality horses.

15.    At every stall allocation meeting, CTRS has received more requests for stalls than it has supply. Therefore, CTRS must deny stalls to many trainers each allocation term.

16.    Pursuant to a stall license agreement dated 12/21/2006, Ms. Mawing was allocated 7 stalls on the grounds at CTRS for the year 2007.

17.    By letter dated February 7, 2008, Ms. Mawing was allocated 9 stalls for the period March 1, 2008 through August 31, 2008.

18.    On April 25, 2008, Ms. Mawing had her stall allocation reduced by 4 stalls, giving her a total of 5 for the remainder of that term. The reason for the reduction was that Ms. Mawing violated CTRS rules by placing four horses in four stalls belonging to other licensees without the written permission of the Racing Secretary.

19.     At the stall allocation committee meeting in August, 2008, the committee decided not to grant Ms. Mawing any stalls for the September 1 through December 31, 2008 term.

20.     Ms. Mawing's racing statistics for the period January 1, 2008 through August 15, 2008 were as follows:  Starts: 61 ; Wins: 2 ; Winning Percentage: 3.2%.  This was a very low winning percentage for trainers with stalls allocated to them on the grounds at CTRS.

21.     During that August 2008 stall application, the number of stalls CTRS had to allocate was approximately 1,338, and the number of requests for stalls exceeded the number of available stalls.  Many other trainers did not receive the number of stalls they requested during that allocation period.

22.     To this day, even though she does not have a stall license agreement with CTRS, Tina Mawing continues to train horses and race them at CTRS.

23.     According to the data I have reviewed, the horses that are stabled off-site are at no competitive disadvantage as compared to those horses stabled at CTRS.  In fact, horses stabled off-site tend to win more races than horses stabled on the property.

24.     Ms. Mawing is not, and has never been, an employee of CTRS.

Executed this 3rd day of May, 2010.

Erich Zimny

4



# CHARLES TOWN ✦ RACES & SLOTS

## MEMORANDUM

TO: James W. Casey, Randy Funkhouser, Tim Grams, Elaine Hagy, Lenny Hale, Sharon Johnson, Ken Lowe, Tina Mawing, Larry Miller, Jeff Runco, Harold Shotwell, John Stahlin

CC: Clarence E. Martin III

DATE: October 8, 2009

RE: HBPA Support for the December 5th Table Games Referendum

Dear Board Members of the Charles Town HBPA,

We appreciate the Charles Town HBPA's support for the upcoming table games referendum. We're happy that you recognize its passage as being not only important, but vital, to both of our organizations.

Each of your Board Members should have received a letter from me towards the end of September stating that it is important that your leadership translate that support into action. I indicated that we'd be contacting individuals on your Board to see if they'd help with various parts of the campaign, and several have done just that. Now, we'd like to reach out to your Board as a group with the following suggestions to help convey your support and help ensure passage of the December 5th referendum:

- A full page ad in the local newspapers created jointly in which the HBPA Board reaffirms its support for the December 5th table games referendum.
- The distribution of factual information we provide to both fellow HBPA members as well as Jefferson County residents.
- Mutually agreed upon op-eds/letters to the editors of the local newspapers.
- A direct mail piece to your membership.
- "VOTE YES" signs in and on your office building.
- Fact sheets visibly available in your office.

Your active support with your membership and in the community is important and appreciated. We'll be following up with your Board very soon to go ahead with as many of these plans as possible. In the meantime, feel free to contact us with any questions you may have.

Regards,

Al Britton
General Manager



EXHIBIT
C-44
DAN 6-12-13