# EXHIBIT 3  - Cont'd
# Pages 111 - 238

Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**BILL TO**

Malcolm Barr
Hampshire Racing

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Westy | Jan 1 to Jan 31 | 31 | 45 | 1395 |
| Toby | to | | | |
| | to | | | |
| | to | | | |
| | to | | | [2790] |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 110 x 2 | 220 - |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: FROM: TO: | | |
| Pony to post | 25 x 1 | 25 |
| Misc. | | |
| Misc. | | |
| | Total | 3085 |
| | Previous Balance | 0 |
| | Balance to Date | 3035 |

thank you!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:

Malcolm Barr
Hampshire Alliance

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Tobig | Feb 1 | to Feb 28 | 28 | 45 | 1260 |
| Wesly | 1 | to 1 | 28 | 1 | 1260 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | 2520 |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 110 × 2 | 220 — |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM: TO: | |
| Pony to post | 25 × 2 | 50 |
| Misc. | | |
| Misc. | | |

| | |
|---|---|
| Total | 2790 — |
| Previous Balance | 0 |
| Balance to Date | 2790 — |

Thank you!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

BILL TO:

Malcolm Barr
Hampshire Racing

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Westy | Mar 1 to Mar 31 | | 31 | 45 | 1395 |
| Toby | / to / | | 31 | 45 | 1395 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | [2790] |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Blacksmith | 110×2 | 220— |
| Veterinary | | |
| Medicine and Vitamins | ½ bottle clen | 60— |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | 25×2 | 50 |
| Misc. | | |
| Misc. | | |
| | Total | 3120— |
| | Previous Balance | 0 |
| | Balance to Date | 3120 |

Thank you!

Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**

Malcolm Barr
Hampshire Alliance

| Name of Horse | Per Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Westy | Apr 1 | to Apr 21 | 21 | 45 | 945— |
| Toby | Apr 1 | to Apr 30 | 30 | 45 | 1350— |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

| OTHER CHARGES | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 110 x 2 | 220— |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | 25 x 2 | 50— |
| Misc. | | |
| Misc. | | |
| Total | | 2565— |
| Previous Balance | | 0 |
| Balance to Date | | 2565— |

Thank you!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**BILL TO:**

Malcolm Barr
Hampshire Racing

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Toby | May 1 to May 31 | 31 | 50 | 1550- |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 110 | 110- |
| Veterinary | (Sorry, statement from vet | 104- |
| Medicine and Vitamins | came late) | |
| Licenses | was billed to my acct | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | 25 x 2 | 50- |
| Misc. | | |
| Misc. | | |
| **Total** | | 1814- |
| **Previous Balance** | | 0 |
| **Balance to Date** | | 1814 |

Thanks!



Tina Malgarini Mowing
483 Paulas Circle
Kearneysville, WV
25430
Home: 304-725-0653
Mobile: 503-720-9522

Bill To:
Mr. James Carter

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| A Little Risky | Aug 8 | to Aug 31 | 23 | 45 | 1035 |
| Sky Blaster | " | to " | " | / | / |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | 2070 |

**OTHER CHARGES**

| | |
|---|---|
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Blacksmith   2×100 | 200— |
| Veterinary | |
| Medicine and Vitamins | |
| Licenses | |
| Nominations | |
| Shipping:   FROM:   TO: | |
| Pony to post | |
| Misc. | 25— |
| Misc. | |

| | |
|---|---|
| Total | 2295 |
| Previous Balance | Ø |
| Balance to date | 2295 |

Thank you!

EXHIBIT

R-48



*Tina Malgarini Manning*
*483 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0653*
*Mobile: 503-720-9522*

Bill To:



Mr. James Carter

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| A little Risky | Sept 1 | to Sept 29 | 29 | 45 | 1305 — |
| Sky Blaster | 1 | to Sept 30 | 30 | 45 | 1350 — |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | 2655 — |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | Sky | |
| Veterinary | | 100 — |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | Risky × 2 | |
| Misc. | | 50 — |
| Misc. | | |

Balance + 870⁰⁰ (Anthony's
Colonial bill)
(TOTAL. $5970⁰⁰)

| | |
|---|---|
| Total | 2805 — |
| Previous Balance | 2295 — Aug |
| Balance to Date | 5100 — |

Thank you!



433 *Paulas Circle*

*Kearneysville, WV*

25430

*Home: 304-725-0653*

*Mobile: 503-720-9322*

**BILL TO:**
Mr. James Carter

| Horse Name | Billing Dates | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Sky Blaster | Oct 1 to Oct 31 | 31 | 45— | 1395— |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | |
|---|---|
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Percentage of winning % of $ | |
| Blacksmith | |
| Veterinary | 100— |
| Medicine and Vitamins   Clenbuterol $200   SMZ—$50 | 250— |
| Licenses | |
| Nominations | |
| Shipping:        FROM:              TO: | |
| Pony to post | |
| Misc. | 25— |
| Misc.        Paddock fee | 50— |
| **Total** | .1820— |
| **Previous Balance** | 970— |
| **Balance to Date** | 2790— |
| | Thank you! |



*Tina Malgarini Mawing*
*453 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0653*
*Mobile: 503-720-9322*

**Billed to**

Mr. James Carter

| Name of Horse | Board Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Sky Blaster | Nov 1 | to Nov 30 | 30 | 45 — | 1350 — |
| Valentines Humor | " | to " | " | " | 1350 — |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Blacksmith | X 2 | 200 — |
| Veterinary | teeth floated | 55 — |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping:          FROM:          TO: | | |
| Pony to post | | |
| Misc. | | |
| Misc. | | |

| | |
|---|---|
| Total | 2955 — |
| Previous Balance | 2790 — Aug - Oct |
| Balance to Date | 5745 — |

*Thank you!*



*Tina Malgarini Manning*
*453 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0653*
*Mobile: 303-720-9522*

**Bill to:**

Mr. James Carter

| Name of Horse | For period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Valentines Humor | Dec 1 | to Dec 31 | 31 | 45— | 1395— |
| Sky Blaster / KO Bride | Dec 1 | to Dec 31 | " | " | " |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | 2790 |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Blacksmith | 100 x 2 | 200— |
| Veterinary | teeth Knockout Bride floated | 50— |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | | |
| Misc. | horse blanket (1) | 75— |
| Misc. | | |
| | **Total** | 3115— |
| | **Previous Balance** | 0 |
| | **Balance to Date** | 3115— |

*Thank you!*



*Tina Malgarini Rawing*
*483 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0633*
*Mobile: 503-720-9322*

**To:**
Mr. James Carter
Randleston Farm
445 Randleston Lane
Bluemont VA 20135

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Valentines Humor | Jan 1 to Jan 31 | 31 | 45— | 1395 |
| Knockout Bride | / to / | / | / | 1395 |
|  | to |  |  |  |
|  | to |  |  |  |
|  | to |  |  |  |
|  | to |  |  | 2790— |

**OTHER CHARGES**

| | |
|---|---|
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Blacksmith | |
| Veterinary | 200— |
| Medicine and Vitamins | |
| Licenses | |
| Nominations | |
| Shipping:    FROM:          TO: | |
| Pony to post | |
| Misc. | |
| Misc. | |

| | |
|---|---|
| Total | 2990— |
| Previous Balance | 0 |
| Balance to Date | 2990— |

Thank you—



*Tina Malgarini Manning*
*483 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0653*
*Mobile: 503-720-9522*

**Bill To:**
James Carter
Randleston Farm
445 Randleston Ln
Bluemont VA 20135

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Valentine's Humor | Feb 1 | to Feb 29 | 29 | 45 | 1305— |
| Knockout Bride | " | to Feb 3 | 3 | 1 | 135— |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winnings% of $ | | |
| Percentage of winnings% of $ | | |
| Percentage of winnings% of $ | | |
| Percentage of winnings% of $ | | |
| Blacksmith | | |
| Veterinary | | 100— |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | | |
| Misc. | | |
| Misc. | Swim card /pool use | 75— |

| | |
|---|---|
| Total | 1615— |
| Previous Balance | 0 |
| Balance to Date | 1615— |

*Thank you!*



*Tina Margaret Keuning*
*453 Paulas Circle*
*Kearneysville, WV*
*25430*
*Home: 304-725-0653*
*Mobile: 503-720-9522*

**BILL TO:**
Mr. James Carter

| Name of Horse | In Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Valentine's Humor | March 1 to March 31 | 31 | 45— | 1395— |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | |
|---|---|
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Percentage of winnings of $ | |
| Blacksmith | |
| Veterinary | 110— |
| Medicine and Vitamins | |
| Licenses            Worm | 12— |
| Nominations | |
| Shipping:     FROM:          TO: | |
| Pony to post | |
| Misc. | 25— |
| Misc. | |

| | |
|---|---|
| Total | 1542— |
| Deposits Rec'd | 0 |
| Balance Due | 1542 |

*Threaten arms*



304-725-0033
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

Bill To:

JACK JORDAN
NORMA RODNEY.

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| NICKS MONSTER | Nov 01 to Nov 30 | | 30 | 50 | 1500 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | 0 |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | |
| Medicine and Vitamins | Jug & Formula | 40 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:                TO: | 0 |
| Pony to post | 25 X 1 | 25 |
| Misc. | WORMER X 1 | 10 |
| Misc. | | |
| **Total** | | 1690 |
| Previous Balance | | |
| Balance to Date | | |

THANKS!

**EXHIBIT**

**R-49**

exhibitsticker.com



# Tina Malgarini Mawing
## 304-725-0653
## 483 Paulas Circle
## Kearneysville, WV
## 25430

**Bill To:**

JACK JORDAN.

NORMA RODNEY.

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| NICKS MONSTER. | 01 DEC | to 31 | 31 | 50 | 1550 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 x 1 | 115 |
| Veterinary | JUG & FARMCALL | 60 |
| Medicine and Vitamins | 1 BOTTLE CLEN. | 180 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:            TO: | |
| Pony to post | 25 x 1 | 25 |
| Misc. | TEETH | 60 |
| Misc. | | |

THANKS!

| | |
|---|---|
| Total | $ 1990 |
| Previous Balance | + 1190 |
| Balance to Date | $ 3180 |



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**

JACK JORDAN.
NORMA RODNEY.

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| NICKS MONSTER | 01 JAN | to 31 | 31 | 50 | 1550 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | Ø |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | Ø |
| Medicine and Vitamins | ELECTROLYTES 3 X 7 | 21 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM: TO: | |
| Pony to post | 25 X 1 | 25 |
| Misc. | SWIMCARD | Ø |
| Misc. | | |

THANKS!

| | |
|---|---|
| Total | $ 1711 |
| Previous Balance | $ 1990 |
| Balance to Date | $ 37-01 |



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**
JACK JORDAN.
NORMA ROONEY

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Nicks MONSTER | FEB 01 | to 29 | 29 | 50 | 1450. |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | 4 th. | ∅ |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 × 1 | 115 |
| Veterinary | Jug & French | 40 |
| Medicine and Vitamins | ELECTROLYTES × 4 | 28 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | 25 × 2 | 50 |
| Misc. | MEDS FOR LIVER TREATMENT. | ∅ |
| Misc. | SWIMCARD | ∅ |

| | |
|---|---|
| Total | 1683. |
| Previous Balance | |
| Balance to Date | |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**
JACK JORDAN
NORMA RODNEY

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| NICKS MONSTER | APRIL 01 to 30 | 30 | 50 | 1500 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | PLACED 2ND | 520 |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | SCOPE | 50 |
| Medicine and Vitamins | ELECTROLYTES | 28 |
| Licenses | 1 BOTTLE CLEN | 160 |
| Nominations | | |
| Shipping: | FROM:          TO: | Ø |
| Pony to post | 25 X 2 | 50 |
| Misc. | SWIMCARD | 80 |
| Misc. | PAST DUE | 46 |

| Total | $2549 |
|---|---|
| Previous Balance | |
| Balance to Date | |

THANKS!



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

Bill To:

JACK JORDAN

NORMA RODNEY

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| NICKS MONSTER | MAY 01 | to 31 | 31 | 50 | 1550 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | |
| Medicine and Vitamins | ELECTROLYTES | 28 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:            TO: | ∅ |
| Pony to post | 25 X 1 | 25 |
| Misc. | SWIMCARD | 80 |
| Misc. | PAST DUE APRIL PAYMENT | 2549 |
| Total | | |
| Previous Balance | | |
| Balance to Date | | 4347 |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**

Jack Jordan
Norma Rodney.

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Nicks Monster | June 01 to 30 -12 | 30 | 50 | 1500 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | Placed 2ND | 340 |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 × 1 | 115 |
| Veterinary | Electro Jug × 2 | 50 |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | 25 × 2 | 50 |
| Misc. | Swimcard | 80 |
| Misc. | Past Due May Payment. | 1798 |

| | |
|---|---|
| Total | |
| Previous Balance | |
| Balance to Date | $3933 |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:

NORMA ROONEY

JACK JORDAN

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| NICKS MONSTER | July 01 to 31 – 12 | | 31 | 50 | 1550 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | Ø |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | |
| Medicine and Vitamins | MEDS | Ø |
| Licenses | | |
| Nominations | | |
| Shipping:   FROM:        TO: | | Ø |
| Pony to post | 25 X 1 | 25 |
| Misc. | SWIMCARD | Ø |
| Misc. | PAST DUE MAY & JUNE | 3933 |

| | |
|---|---|
| Total | |
| Previous Balance | |
| Balance to Date | $ 5623 |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

| Billed to |
|---|
| JACK IBRAHIM |
| NORMA RODNEY |

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| NICKS MONSTER | AUG-01 to 31-12 | 31 | 50 | 1550 |
|  | to |  |  |  |
|  | to |  |  |  |
|  | to |  |  |  |
|  | to |  |  |  |
|  | to |  |  |  |

| OTHER CHARGES | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | 0 |
| Medicine and Vitamins | | 0 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:          TO: | |
| Pony to post | | |
| Misc. | PAST DUE | |
| Misc. | MAY - JUNE - JULY | 5623 |
| | Total | |
| | Previous Balance | |
| | Balance to Date | $7288 |

PLEASE PAY YOUR BILL!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill of:
JACK JORDAN
NORMA RODNEY

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| NICKS MONSTER | SEPT 01 to 30-12 | 30 | 50 | 1500 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | 115 X 1 | 115 |
| Veterinary | | |
| Medicine and Vitamins | 150 | 150 |
| Licenses | | |
| Nominations | | |
| Shipping | FROM          TO: | |
| Pony to post | | |
| Misc. | PAST DUE | |
| Misc. | MAY - JUNE - JULY - AUG | 7288. |

PLEASE PAY YOUR BILL !!!

| | |
|---|---|
| Total | |
| Previous Balance | |
| Balance to Date | $ 9053. |



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**

RALPH HAVERS

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| GYPSY | 01 – 31 to 13. | 31 | 40 | 1240 |
| LUKE | " to | 31 | 40 | 1240 |
| GIDEON | " to | 31 | 40 | 1240 |
| ROSE | " to | 31 | 25 | 775 |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Percentage of winning% of $ | | |
| Blacksmith | [PAID BY RALPH] | |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM: TO: | |
| Pony to post | 25×2 | 50 |
| Misc. | | |
| Misc. | | |

| | |
|---|---|
| Total | 4545 |
| Previous Balance | |
| Balance to Date | |

PD
THANKS!

**EXHIBIT**

R-50



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:



RALPH HALFWS

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| Gypsy | 02-28 to 13 | 28 | 25 | 700 |
| Luke | " to | 28 | 40 | 1120 |
| Gideon | " to | 28 | 40 | 1120 |
| Rose | " to | 28 | 25 | 700 |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | | |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping: FROM: TO: | | |
| Pony to post | | |
| Misc. SWIMCARE | | 160 |
| Misc. | | |

| | |
|---|---|
| Total | 3800 |
| Previous Balance | |
| Balance to Date | # 8600 |

THANKS!



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

**Bill To:**



RALPH HAVENS

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| GYPSY | 03—31 to 13 | | 31 | 25 | 775 |
| LUKE | " to | | 31 | 40 | 1240 |
| GIDEON | " to | | 31 | 40 | 1240 |
| ROSE | " to | | 31 | 40 | 1240 |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning/% of $ | 10% LUKES WIN | 1560 |
| Percentage of winning/% of $ | | |
| Percentage of winning/% of $ | | |
| Percentage of winning/% of $ | | |
| Blacksmith | 1 TRIM | 30 |
| Veterinary | 110 X 3 | 330 |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping | FROM:          TO: | |
| Pony to post | 25 X 1 | 25 |
| Misc. | | |
| Misc. | | |

| Total | 6440 |
|---|---|
| Previous Balance | 860 |
| Balance to Date | 7300 |

THANKS!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Garvis Williamson
1020 Antioch Rd.
Fayetteville, Ga.
30215

| Name of Horse | For Period | | Number of Days | Rate | Total Amount |
|---|---|---|---|---|---|
| Smoken Bobbe | Jan 1 | to Jan 31 | 31 | 50 | 1500 — |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | Bobbe 3rd place | 270 — |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | Bobbe | 110 — |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | owners licence | 30 — |
| Nominations | | |
| Shipping:   FROM:              TO: | | |
| Pony to post | 25 x 2 | 50 — |
| Misc. | Jockey clerb Papers | 200 — |
| Misc. | | |

| | |
|---|---|
| Total | 2160 — |
| Previous Balance | 0 |
| Balance to Date | 2160 — |

**EXHIBIT**

R-51

exhibitsticker.com



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

**Bill To:**
Jarvis Williamson
1020 Antioch Rd.
Fayetteville, Ga 30215

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Smoken Bobbe | Apr 1 to Apr 30 | | 30 | 50⁰⁰ | 1500 — |
| Cathedral Peak | " to " | | 30 | 25⁰⁰ | 750 — |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

| OTHER CHARGES | | |
|---|---|---|
| Percentage of winning % of $ (3rd place Bobbe) | | 260 — |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith    Bobbe | | 110 — |
| Veterinary    Cat | | 55 — |
| Medicine and Vitamins  ‡ bottle clenbuterol /Bobbe | | 210 — |
| Licenses    omeprazole paste 25x2 | | 50 — |
| Nominations | | |
| Shipping   FROM:      TO: | | |
| Pony to post | | |
| Misc.    swim card | | 160 — |
| Misc. | | |
| | Total | 3095 — |
| | Previous Balance | 0 |
| | Balance to Date | 3095 |

Thank you!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**
Jarvis Williamson
1020 Antioch Rd
Fayetteville, Ga
30215

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Bobbe | May 1 to May 31 | | 31 | 50 | 1550— |
| cat | to | | 31 | 25 (½) | 775— |
| Lilly Belle | to | | 31 | 35 | 1085— |
| | to | | | | |
| | to | | | | |
| | to | | | | |

| OTHER CHARGES | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Blacksmith | Bobbe / cat | 110 / 55 (½) |
| Veterinary | | |
| Medicine and Vitamins | Wormer/ omeprazde paste /smz's | 155— |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:            TO: | |
| Pony to post | | |
| Misc. | | |
| Misc. | | |
| **Total** | | 3725— |
| **Previous Balance** | | 0 |
| **Balance to Date** | | 3725— |

Thank you!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill to:
GARVIS WILLIAMSON

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| BOBBE | 01 JUNE to 30-12 | 30 | 50 | 1500 |
| CAT | to | 30 | 25 | 750 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

| OTHER CHARGES | | |
|---|---|---|
| Percentage of winning/% of $ | | |
| Percentage of winning/% of $ | | |
| Percentage of winning/% of $ | | |
| Percentage of winning/% of $ | BOBBE | 110 |
| Blacksmith | CAT | 55 |
| Veterinary | X-RAYS FOR CAT | 600 |
| Medicine and Vitamins | TREATMENT / TUG | 25 |
| Licenses | | |
| Nominations | | |
| Shipping | FROM:          TO: | |
| Pony to post | 25 X 2 | 50 |
| Misc. | | |
| Misc. | | |

| Total | 3090 |
|---|---|
| Previous Balance | |
| Balance to Date | |

THANKS!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:

GARVIS WILLIAMSON.

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| SMOKEN BOBBE | 01 JULY to 31 -12 | | 31 | 50 | 1550 |
| CAT | to | | 31 | 50 | 775 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | CAT 5% | 575 |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | BOBBE 110 X 1 | 110 |
| Blacksmith | CAT 55 + 100 (TURF SHOES) | 155 |
| Veterinary | | |
| Medicine and Vitamins | VITA JUG ON BOBBE & CAT | 40 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:                    TO: | |
| Pony to post | 25 X 3 | 75 |
| Misc. | | |
| Misc. | | |

| | |
|---|---|
| Total | 3220 |
| Previous Balance | |
| Balance to Date | |

THANKS!



Tina Malgarini Mawing
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:
GARVIS WILLIAMSON

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| SMOKEN BOBBE | 01 AUG to 31 | | 31 | 80 | 1550 |
| CAT | to | | 31 | 25 | 775 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | SMOKEN BOBBE  110 X 1 | 110 |
| Blacksmith | CAT  55 X 1 | 55 |
| Veterinary | | 145 |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | | |
| Shipping | FROM:  TO: | |
| Pony to post | 25 X 1 | 25 |
| Misc. | | |
| Misc. | | |
| | Total | $2660 |
| | Previous Balance | |
| | Balance to Date | |



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

Bill To:

GARVIS WILLIAMSON

| Name of Horse | For Period | | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|---|
| BOBBE | 01 SEPT | to | 30 | 30 | 50 | 1500 |
| CAT | | to | | 30 | 25 | 750 |
| | | to | | | | |
| | | to | | | | |
| | | to | | | | |
| | | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | BOBBE        110 × 1 | 110 |
| Blacksmith | CAT        55 × 1 | 55 |
| Veterinary | | |
| Medicine and Vitamins | 1 BOTTLE  GEN | 160 |
| Licenses | 2 ELECTROLYTES | 15 |
| Nominations | | |
| Shipping | FROM:          TO: | |
| Pony to post | 25 × 2 | 50 |
| Misc. | | |
| Misc. | | |

| | |
|---|---|
| Total | $2640 |
| Previous Balance | |
| Balance to Date | |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**



GARVIS  WILLIAMSON

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| CAT | 01 Oct | to 31-12 | 31 | 25 | 775 |
| BOBBE | " | to " | 31 | 50 | 1550 |
| | | to | | | |
| | | to | | | |
| | | to | | | |
| | | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | CAT | 55 |
| Blacksmith | BOBBE | 110 |
| Veterinary | | |
| Medicine and Vitamins | | |
| Licenses | | |
| Nominations | OREO TO BREEDERS CLASSIC | 250 |
| Shipping: | FROM:          TO: | |
| Pony to post | 25 × 2 | 50 |
| Misc. | HOTWALKER | 20 |
| Misc. | | |
| **Total** | | 2810 |
| **Previous Balance** | | |
| **Balance to Date** | | |

THANK U !



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

| OWNER |
|---|
| GARVIS WILLIAMSON |

| Name of Horse | For period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| BOBBIE | 01 NOV to 30 | 30 | 50 | 1500 |
| CAT | to | 30 | 25 | 750 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

| OTHER CHARGES | | | |
|---|---|---|---|
| | | | |
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | BOBBIE | 110 x 1 | 110 |
| Blacksmith | CAT | 55 x 1 | 55 |
| Veterinary | | | |
| Medicine and Vitamins | | | |
| Licenses | | | |
| Nominations | | | |
| Shipping | FROM: | TO: | |
| Pony to post | 25 x 2 | | 50 |
| Misc. | SWIMCARD | | 160 |
| Misc. | 2 WINTER BLANKETS | | 340 |

| | |
|---|---|
| Total | |
| Previous Balance | 2965 |
| Balance to Date | |

THANKS



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

Bill To:

GARVIS WILLIAMSON

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| SMOKEN BOBBE | 01 DEC to 31 – 12 | 31 | 25 | 775 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Percentage of winnings % of $ | | |
| Blacksmith | 110 X1 | 110 |
| Veterinary | | |
| Medicine and Vitamins | BOTTLE CLEN | 160 |
| Licenses | | |
| Nominations | | |
| Shipping | FROM:          TO: | |
| Pony to post | 25 X1 | 25 |
| Misc. | SWIMCARD | 160 |
| Misc. | TEETH | 75 |
| Total | | $1305 |
| Previous Balance | | |
| Balance to Date | | |

THANKS!



**Tina Malgarini Mawing**
**304-725-0653**
**483 Paulas Circle**
**Kearneysville, WV**
**25430**

Bill To:



GARVIS WILLIAMSON

| Name of Horse | For Period | Number of Days | Rate | Amount |
|---|---|---|---|---|
| SMOKEN BOBBS | 01 JAN to 31 ~13 | 31 | 50 | 1550 |
| CATHEDRA PEAK | to | 31 | 25 | 775 |
| | to | | | |
| | to | | | |
| | to | | | |
| | to | | | |

**OTHER CHARGES**

| | |
|---|---|
| Percentage of winning/% of $ | |
| Percentage of winning/% of $ | |
| Percentage of winning/% of $ | |
| Percentage of winning/% of $ | BOBBS    110 × 1 | 110 |
| Blacksmith | CAT.    55 × 1 | 55 |
| Veterinary | ULCER MEDS | 60 |
| Medicine and Vitamins | WORMERS | 60 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:        TO: | |
| Pony to post | 25 × 1 | 25 |
| Misc. | SWIMCARD | 160 |
| Misc. | | |
| | Total | $2795 |
| | Previous Balance | |
| | Balance to Date | |

THANK U ?



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**

Garvis Williamson

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| Smoken Bobbe | 01 Feb to | 28 | 28 | 50 | 1400 |
| Cat | to | | 28 | 25 | 700 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | |
|---|---|---|
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | | |
| Percentage of winning % of $ | Bobbe | 110 |
| Blacksmith | Cat | 55 |
| Veterinary | Ulcer Meds | 60 |
| Medicine and Vitamins | Blood Check | 50 |
| Licenses | | |
| Nominations | | |
| Shipping: | FROM:        TO: | |
| Pony to post | 25 × 2 | |
| Misc. | | 50 |
| Misc. | | |
| | Total | 2425 |
| | Previous Balance | |
| | Balance to Date | |

THANKS!



**Tina Malgarini Mawing**
304-725-0653
483 Paulas Circle
Kearneysville, WV
25430

**Bill To:**



GARVIS WILLIAMSON

| Name of Horse | For Period | | Number of Days | Rate | Amount |
|---|---|---|---|---|---|
| SMOKEN BOBBE | 01 MAR to | 31 – 13 | 31 | 50 | 1550 |
| CAT | to | | 31 | 25 | 775 |
| | to | | | | |
| | to | | | | |
| | to | | | | |
| | to | | | | |

**OTHER CHARGES**

| | | | |
|---|---|---|---|
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | | | |
| Percentage of winning % of $ | BOBBE | 110 × 1 | 110 |
| Blacksmith | CAT | 55 × 1 | 55 |
| Veterinary | | | |
| Medicine and Vitamins | ELECTROLYTES × 2 | | 15 |
| Licenses | | | |
| Nominations | | | |
| Shipping: | FROM: | TO: | |
| Pony to post | | | |
| Misc. | | | |
| Misc. | | | |

THANKS

| | |
|---|---|
| Total | $2505 |
| Previous Balance | |
| Balance to Date | |

## CHART OF OWNERS[1] AND INVOICES PROVIDED

| OWNER NAME | INVOICES PROVIDED BY MAWING | DATE RANGE | STALL RENT CHARGE | DAILY RATE CHARGED |
|---|---|---|---|---|
| Garvis Williamson | Yes | Jan. 2012-March 2013 (missing Feb. and March 2012). Williamson has been a client for years – no invoices prior to 2012 were produced | No | $25-50 |
| Ralph Havens d/b/a R and R Racing Stables | Yes | Jan. 2013-March 2013. Has been a client since 2012, no 2012 invoices provided | No | $25-40 |
| Jack Jordan/Norma Rodney | Yes | Nov. 2011- Sept. 2012. These appear to be complete from a comparison of the racing records | No | $50 |
| Brook Barack | No | | | |
| Gloria Malgarini- and Rory Coogan | No | | | |
| Betty Williamson | No | | | |
| Charles W. Engle Sr. | No | | | |
| Malcolm Barr d/b/a/ Hampshire Racing | Yes | March 2009-May 2010 (not complete per the racing records) | No | $25-50 |
| James Carter/Born to Run Stables | Yes | Aug. 2007 to March 2008 (prior to relevant damages period) | No | $45 |
| David Wratchford | No[2] | Oct. 2008 to  July 2009 | Yes | $25-40 |
| Krista Dehnert | No | | | |
| Todd Harding | Yes | August –Sept. 2008 | No | $45 |

---

[1] This document reflects the owners that could be gleaned from the publicly available racing records, but does not necessarily reflect all of the owners of horses trained, but not raced by Ms. Mawing.  As Ms. Mawing testified at her deposition, her training records would reflect other such owners, but those records were not produced here.
[2]  The Wratchford invoices we have to date were provided by Wratchford, not Mawing.

EXHIBIT

R-69b

exhibitsticker.com

| Period Ending | Stall Rent | No. horses/month | Invoices prodcued by Wratchford showing # of horses per month for which he was charged stall rent | Vanning |
|---|---|---|---|---|
| 9/1/2008 | $0.00 | 0.0 | | $225.00 |
| 10/1/2008 | $2,575.00 | 10.3 | | $640.00 |
| 11/1/2008 | $2,450.00 | 9.8 | 2 | $580.00 |
| 12/1/2008 | $3,410.00 | 13.6 | 2 | $1,550.00 |
| 1/1/2009 | $2,950.00 | 11.8 | 2 | $450.00 |
| 2/1/2009 | $3,100.00 | 12.4 | 2 | 0 |
| 3/1/2009 | $3,415.00 | 13.7 | 2 | $450.00 |
| 4/1/2009 | $2,850.00 | 11.4 | 2 | $250.00 |
| 5/1/2009 | $5,950.00 | 23.8 | 2 | $150.00 |
| 6/1/2009 | $2,850.00 | 11.4 | 2 | $1,280.00 |
| 7/1/2009 | $3,000.00 | 12.0 | 2 | $225.00 |
| 8/1/2009 | $5,402.65 | 21.6 | 2 | $200.00 |
| 9/1/2009 | $1,350.00 | 5.4 | | 0 |
| 10/1/2009 | $3,200.00 | 12.8 | | $425.00 |
| 11/1/2009 | $3,680.00 | 14.7 | | $500.00 |
| 12/1/2009 | $3,400.00 | 13.6 | | $1,025.00 |
| 1/1/2010 | $3,040.00 | 12.2 | | $100.00 |
| 2/1/2010 | $2,050.00 | 8.2 | | $850.00 |
| 3/1/2010 | $3,250.00 | 13.0 | | $1,400.00 |
| 4/1/2010 | $2,650.00 | 10.6 | | $550.00 |
| 5/1/2010 | $2,650.00 | 10.6 | | $300.00 |
| 6/1/2010 | $2,000.00 | 8.0 | | $250.00 |
| 7/1/2010 | 0 | 0.0 | | $350.00 |
| 8/1/2010 | $1,750.00 | 7.0 | | $550.00 |
| 10/1/2010 | 0 | 0.0 | | $50.00 |
| 12/1/2010 | 0 | 0.0 | | $125.00 |
| 1/1/2011 | $3,000.00 | 12.0 | | $400.00 |
| 2/1/2011 | $4,000.00 | 16.0 | | $350.00 |
| 3/1/2011 | $2,000.00 | 8.0 | | $200.00 |
| 4/1/2011 | $3,838.00 | 15.3 | | $1,250.00 |
| 5/1/2011 | $2,000.00 | 8.0 | | $300.00 |
| 6/1/2011 | $2,000.00 | 8.0 | | 0 |
| 7/1/2011 | 0 | 0.0 | | $80.00 |
| 8/1/2011 | $2,000.00 | 8.0 | | 0 |
| 9/1/2011 | $2,585.00 | 10.3 | | $380.00 |
| 10/1/2011 | $4,210.00 | 16.8 | | 0 |
| 11/1/2011 | $2,000.00 | 8.0 | | $250.00 |
| 12/1/2011 | $2,500.00 | 10.0 | | 0 |
| 1/1/2012 | $3,810.00 | 15.2 | | $300.00 |
| 2/1/2012 | $3,300.00 | 13.2 | | 0 |
| 3/1/2012 | $3,000.00 | 12.0 | | 0 |
| 4/1/2012 | $3,300.00 | 13.2 | | 0 |
| 5/1/2012 | $3,630.00 | 14.5 | | 0 |
| 6/1/2012 | $3,600.00 | 14.4 | | 0 |
| 7/1/2012 | $3,720.00 | 14.9 | | $110.00 |
| 8/1/2012 | $3,520.00 | 14.1 | | $150.00 |
| 9/1/2012 | $5,550.00 | 22.2 | | $50.00 |
| 10/1/2012 | $3,000.00 | 12.0 | | $40.00 |
| 11/1/2012 | $3,000.00 | 12.0 | | 0 |
| 12/1/2012 | $3,000.00 | 12.0 | | 0 |
| 1/1/2013 | $630.00 | 2.5 | | 0 |
| 2/1/2013 | | | | |
| 3/1/2013 | | | | |
| 4/1/2013 | | | | |
| Totals | $140,165.65 | | | $16,335.00 |

EXHIBIT

R-69c

1

```
 1        IN THE CIRCUIT COURT OF JEFFERSON COUNTY, WEST VIRGINIA

 2   TINA MAWING, et. al.,
                    Plaintiffs,         RECEIVED

 3        vs.                                           08-C-354
                                        DEC 12 2008
 4   PNGI CHARLES TOWN GAMING,
 5   LLC, d/b/a CHARLES TOWN RACES        ...COUNTY
     AND SLOTS,                           ...COURT
 6                   Defendant.
                                     /
 7   _____

 8
                REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
 9

10                           September 12, 2008

11                           Charles Town, West Virginia

12        BEFORE:

13             HONORABLE DAVID H. SANDERS, Judge

14
     APPEARANCES:
15
          Counsel for the Plaintiff:
16
               DAVID M. HAMMER, Esq.
17             MATHEW R. WHITLER, Esq.

18        Counsel for the Defendant:

19             BRIAN M. PETERSON, Esq.

20

21

22   MARCIA L. CHANDLER, RPR
     Official Court Reporter
23   380 W. South Street
     Suite 4400
24   Martinsburg, WV  25401
```

December 12, 2008  Jefferson County

2

P R O C E E D I N G S

    THE COURT:  This is a whole lot of people for a
case before yesterday or the day before didn't exist, but we
are calling ourselves into session in the case of -- I am
not going to read all of the names but I will read
Tina Mawing, Plaintiff, et. al., Plaintiffs, versus
PNGI Charles Town Gaming, d/b/a Charles Town Races and
Slots, Civil Action 2008-C-354.

    There is a notice of hearing that was faxed to the
Court yesterday afternoon.  My fax is dated September 11th
at 1:53 p.m. signed by Mr. David Hammer who is here today
asking for an emergency hearing for temporary restraining
order and preliminary injunction.

    I will have you know this is normally something
that would be on Judge Steptoe's docket.  Judge Steptoe is
at the end of a several week vacation in which he was taking
children to school and otherwise and he is not here holding
cases or holding hearings today.

    Judge Steptoe was contacted through his secretary
Brenda and this will be his case and the only thing I
intend to do in this case is deal with the issue that comes
before us positioned as some sort of emergency issue.

    So we have as I noted David Hammer who is the
attorney who has filed this matter.

December 12, 2008 Jefferson County

3

1        Mr. Hammer, how are you this morning?  You have

2   with you several of the named Plaintiffs, do you?

3        MR. HAMMER:  Yes, Your Honor.  I have Tina Mawing

4   to my right and Randy Funkhouser to my left joined by

5   Matt Whitler my co-counsel from Martin & Seibert.

6        I have for Your Honor an amended request for

7   temporary restraining order that primarily amends the names

8   of the Plaintiffs.  There are a few minor typographical

9   corrections in the body of it, but substantially the same

10   except for reducing the number of names of Plaintiffs.

11        THE COURT:  All right, sir.

12        MR. HAMMER:  If I may tender what I filed this

13   morning.

14        THE COURT:  Okay, thank you very much.  We are not

15   attended by a clerk today.  Are we going to need a clerk?

16   Are exhibits going to be offered?

17        MR. HAMMER:  We have two exhibits.

18        THE COURT:  Well, maybe we'll get a clerk.

19   Brenda, maybe we can get a clerk.  Thank you very much.

20        Brian Peterson is here representing Penn National.

21        MR. PETERSON:  Yes, Your Honor.

22        THE COURT:  Mr. Peterson, do you want to tell us

23   who you have with you here today?

24        MR. PETERSON:  This is my client representative

4

1    his name is Dicky Moore.

2         THE COURT:  I know Mr. Moore.

3         MR. PETERSON:  You know Mr. Moore.  Over here we

4    have Mr. Zimny, Erich Zimny, Racing Administrator for

5    Charles Town Races and Slots.  He's the general manager of

6    racing, Dicky is.

7         THE COURT:  Okay, I see.  Well, in the brief time

8    this matter has been before us, that is yesterday afternoon,

9    I managed to read through the petition that is here, but

10   rather than reciting my understanding of it, does anybody

11   have any preliminaries before we -- Mr. Kratovil.

12        MR. KRATOVIL:  Thank you, Your Honor.

13   I represent Leslie Condon who is one of the named Plaintiffs

14   in this action.

15        THE COURT:  Yes.

16        MR. KRATOVIL:  Ms. Condon indicated she does not

17   wish to be a Plaintiff in this action and that she has no

18   complaint against PNGI or Charles Town Races and Slots.

19        I spoke to Mr. Hammer minutes ago and he indicated

20   to me that the amended pleading he filed had taken her name

21   off of that list so I think my work here is done.  I just

22   wanted to make that known for the record.

23        THE COURT:  Is that lady here?

24        MR. KRATOVIL:  Yes, Ms. Condon is here.

December 12, 2008  Jefferson County

5

1         THE COURT:  Okay.

2         MR. KRATOVIL:  In person.  I would since an

3 amended complaint has now been filed with the Court, I would

4 ask my leave to withdraw.

5         THE COURT:  All right, sir.  Anybody have any

6 objection to that?

7         MR. PETERSON:  No objection.

8         MR. HAMMER:  No objection.

9         THE COURT:  Have a good day, Mr. Kratovil.

10       So any other preliminaries that you want to take

11 up before we invite I guess, you, Mr. Hammer, as the

12 petitioner, to go ahead and start laying out your case?

13       MR. PETERSON:  Your Honor, I would just like to

14 have some understanding of what the scope of this hearing

15 today is.  As you mentioned this was just filed yesterday

16 and I have had a very limited amount of time to meet with my

17 client to even talk about this and today he hands me --

18       THE COURT:  I tell you what, maybe it would be

19 best if I would just recite my brief understanding of what

20 this is about from going through it once just to tell you

21 what I think.

22       Sir, are you represented by an attorney, who is

23 this back there?

24       SPECTATOR:  I am listed as a Plaintiff before you.

6

1          THE COURT:  What is your name?

2          SPECTATOR:  John Stahlin.

3          THE COURT:  Are you raising your hand because you

4     don't consider yourself to be represented by these folks the

5     same way Mr. Kratovil did?

6          SPECTATOR:  Yes.  I have questions of the Court.

7          THE COURT:  Well, we are not in a question and

8     answer phase right now, but are you wishing not to be

9     considered as represented by Mr. Hammer?  Is that the

10    purpose of your raising your hand at this moment?

11         SPECTATOR:  Yes.  I had no idea that I was

12    involved in this until last night.  I was never notified of

13    this action.

14         THE COURT:  Well, I tell you what, I will get

15    right back to you.  How many are present here who are in the

16    position of Mr. Kratovil's client, Ms. Condon, who have been

17    named as parties and who feel that you are not here

18    represented by Mr. Hammer?  So we have five, four hands

19    there.  Why don't you identify yourselves?  Let's start in

20    the front row, the gentleman in the white shirt, what is

21    your name, sir?

22         SPECTATOR:  James Casey.

23         THE COURT:  James Casey.

24         MR. HAMMER:  Mr. Casey has been removed from the

December 12, 2008   Jefferson County

7

1    complaint, Your Honor.

2            THE COURT:  Okay, then the next person over in the

3    striped shirt.

4            SPECTATOR:  Raimondo Di Cola.

5            MR. HAMMER:  Mr. Di Cola has been removed from the

6    complaint, Your Honor.

7            THE COURT:  Okay, thank you.  Then the gentleman

8    who started this by raising his hand, your name?

9            SPECTATOR:  My name is John Stahlin.  I don't know

10   if this is appropriate now but there are actually only five,

11   after you remove the names that Mr. Hammer took off, there

12   are only five names left.  Two of them have been contacted

13   this morning who do not wish to be represented as Plaintiffs

14   which leaves three people and one person was unable to be

15   contacted.

16           THE COURT:  Well, you're not representing them?

17           SPECTATOR:  I do not represent them.  I am just

18   telling you that what you have is actually after you remove

19   Mr. Hammer's list of 10 of 19 that leaves five and two of

20   those five knew nothing about it and they do not wish to be

21   represented but I can't speak for them.

22           THE COURT:  And the hand behind Mr. Stahlin, your

23   name?

24           SPECTATOR:  Karen Freer.

8

1          THE COURT:  Karen Freer.

2          Your new pleading reduces it to five?

3          MR. HAMMER:  Tina Mawing, George Yetsook, Lynn

4    Venham, Robert Bir, John Milton.  We just received word at

5    10:15 this morning he does not want to be included.

6          THE COURT:  Does not want to be included?

7          MR. HAMMER:  No.

8          THE COURT:  The gentleman who Mr. Stahlin there

9    says that he has some sort of word that there is one other

10   person who doesn't wish --

11         SPECTATOR:  Two others, Ryan Beattie and

12   Lynn Venham.  I am not giving it to you firsthand.

13         THE COURT:  I am not taking it from you firsthand

14   either.

15         MR. HAMMER:  Mr. Beattie has been removed as well.

16   We understood that Ms. Venham, the last word she did want to

17   participate subject to some change.

18         THE COURT:  All right.  So that is whittling down

19   the Plaintiffs then.  I guess you folks who raised your hand

20   saying you didn't want to participate, of course, obviously

21   this is a public hearing, you are free to be here to observe

22   and invited to do so, you're also free to go if you want to

23   just as Mr. Kratovil made his exit but no one is telling you

24   you have to leave.

Case 3:14-cv-00002-JPB   Document 2-6   Filed 01/06/14   Page 58 of 129  PageID #: 1173

1         So, Mr. Hammer, we would then having now

2   straightened out how extensive the list of Plaintiffs is,

3   we'll invite you to lay out your case here.

4         Again, I will tell you all that I am only acting

5   on the alleged emergency basis sitting in this case

6   temporarily until Judge Steptoe comes back and he will take

7   whatever is left of the case after today.

8         MR. HAMMER:  Thank you, Your Honor.

9         We are here, of course, pursuant as Your Honor

10   just indicated to Rule 65 seeking temporary restraining

11   order.

12         As my first exhibit, I would like to tender to

13   Your Honor the contractual agreement between PNGI Gaming and

14   Racing and the Charles Town Horsemen's Benevolent and

15   Protective Association.  To understand why we are here it is

16   important to work through several clauses in this contract.

17         THE COURT:  Frankly, that contract I think is

18   actually available on-line, I think, on the internet.

19         Thank you, Shayna, and good morning to you.

20         All right, Mr. Hammer.

21         MR. HAMMER:  This is the contract between the

22   Racetrack and between Charles Town HBPA.  You will see, Your

23   Honor, as you turn to page 2 and page 3 of the contract, the

24   numbers are down at the very bottom of the page in very

10

1   small print, you will see that page 3 Charles Town Races

2   acknowledges that the HBPA is the exclusive bargaining agent

3   representative of the HBPA members.  The HBPA has been

4   acknowledged by the Racing Commission to be that

5   representative and this contract acknowledges and

6   incorporates that.

7           Now, at the bottom of page 2 it indicates the

8   parties intend to be bound by this contract.

9           (Cell phone rings.)

10           THE COURT:  Apparently, someone is wanted on the

11   phone.  Turn off all phones, please, everyone, thank you.

12           All right, thank you.

13           Go ahead, Mr. Hammer.

14           That is the same thing as what they call a close

15   shop, in other words, anyone who is maintaining horses at

16   the track must negotiate through the HBPA?

17           MR. HAMMER:  Yes, Your Honor.

18           THE COURT:  Ma'am, perhaps you can take that phone

19   outside of the hearing room.

20           SPECTATOR:  It is off now.

21           THE COURT:  Let's have a moment while everyone

22   checks their pockets to make sure that it's off so someone

23   doesn't feel unnecessarily humiliated.

24           I will tell one story just to break the ice here,

11

1    there was a head medical examiner in the State of West

2    Virginia who was testifying in a murder trial, very

3    important murder trial in this room, and was on the stand

4    when his phone rang while he was testifying.

5         Anyhow, go ahead, Mr. Hammer.

6         MR. HAMMER:  Thank you, Your Honor.

7         Turning to the bottom of page 3 it discusses

8    exclusive representation in some more detail.  You will see

9    that the last full sentence of that page says, "Any

10   negotiation or discussion of the terms and provisions of

11   this Agreement, or any amendment thereto, or any Agreement

12   which shall supersede the terms and provisions of this

13   Agreement with any person, entity or representative of an

14   entity that is not the exclusive bargaining agent and

15   representative of the Horsemen, as certified by the West

16   Virginia Racing Commission, shall constitute a breach of

17   this agreement."

18        So the parties are firmly acknowledging that not

19   only is the HBPA an exclusive bargaining agent, but if there

20   is any negotiation with any other person that constitutes a

21   breach of this agreement.

22        Indeed, the next paragraph affirmatively places an

23   obligation on the parties on the Racetrack to not only

24   negotiate this agreement but any matters reasonably related

12

1   to any provision of this agreement.  So the agreement both

2   incorporates its terms within the four corners and any

3   matters reasonably related to this agreement.  It is in

4   other words a broad obligation to bargain.

5          Now, turning to page 13 at the top of page 13 it

6   sets forth an arbitration provision.  It is clear that if,

7   "There is a disagreement between the parties as to whether

8   any party has complied with the terms or conditions in this

9   agreement, then Charles Town Races and the HBPA shall each

10  choose an Arbitrator and the two Arbitrators shall choose a

11  third Arbitrator.  The Board of Arbitrators shall decide the

12  issues involved."

13         Below that Section 11 Stalls.  We now deal with

14  the topic of stalls.

15         THE COURT:  Okay, all right.

16         Now, Mr. Hammer, in fairness Mr. Peterson started

17  to address the Court with regard to a question as to what

18  the scope of our hearing would be, and we got sidetracked by

19  all those persons who wished to opt out of this and never

20  went back to Mr. Peterson, I was going to simply say what my

21  understanding was.

22         Let me do a real brief thumbnail sketch of what I

23  thought we were here for today, that is, there was a

24  representation made and I learned it yesterday afternoon in

13

1    reading through it that there was a situation coming up

2    today where several members of the HBPA were being asked to

3    remove horses from stalls at Charles Town Races as of

4    today's date, the 12th of September, that was in violation

5    of an agreement, and that the emergency arose from the fact

6    that the horses would be stripped of their stall rights I

7    think that is as of today and that is why it needed to be

8    considered today.

9              MR. HAMMER:  Precisely.

10             THE COURT:  That is my entire understanding of why

11   we were here.

12             MR. PETERSON:  Just so we are clear, we would

13   consider today only a temporary restraining order and not

14   the preliminary injunction on the merits.  There would be a

15   separate hearing for the preliminary injunction.

16             THE COURT:  My understanding with Judge Steptoe.

17   I would only handle the TRO.

18             MR. HAMMER:  Okay.

19             THE COURT:  That is the only --

20             MR. PETERSON:  That is what I wanted to make sure

21   about.

22             THE COURT:  Well then I have the same

23   understanding.

24             MR. PETERSON:  Okay.

14

1        THE COURT:  Go ahead.

2        MR. HAMMER:  That is right.  So below the

3   arbitration provision now turns to stalls and importantly in

4   the first paragraph the second sentence, "It is recognized

5   by both parties that effective stall utilization is

6   important to the Charles Town Races management and that

7   equitable allocation is essential to the livelihood of

8   Horsemen."

9        That is one of the grounds for the TRO is that

10  there is irreparable harm and the parties by this legally

11  binding agreement have recognized that equitable allocation

12  of stalls is essential to the horsemen's livelihood.

13        It goes on to say in paragraph B on page 13,

14  "Charles Town Races shall not discriminate in the allocation

15  of stalls by reason of HBPA membership or activity or

16  condone its representatives or employees discriminating in

17  the allocation of stalls."

18        So why we are here is because they have attempted

19  in a manner specified to not only allocate stalls but to

20  strip stalls away from my clients.  The HBPA is here because

21  this contract is being violated by the purported stall

22  agreement which I would like to tender to Your Honor next.

23        This is a copy of the revocable stall license

24  agreement terms and conditions and it sets forth in the body

December 12, 2009   Jefferson County

15

1   of the document various considerations that Charles Town

2   Races has to insure that the people who have the stalls are

3   actually racing and participating in the process which is

4   there.

5        But here is what the concern is, in the bottom

6   paragraph of this agreement, the paragraph that begins, "The

7   effective or authorized period," you can see this one is for

8   January 1, 2008 to June 30th of 2008, it wasn't tendered

9   until recently so actually those dates are wrong, but this

10  is the operable agreement.

11       The next to the last sentence begins, "In the

12  event of a conflict between the terms of this Agreement and

13  any Agreement between CTRS and the Horsemen's Benevolent

14  Protective Association the terms of this agreement shall

15  govern and control.  This agreement represents the entire

16  Agreement between the parties and supersedes all prior

17  agreements and understandings."

18       On its face the Charles Town Races in

19  consideration of the contract it has with HBPA is trying to

20  say that this stall agreement which has never been

21  negotiated with the HBPA Supersedes and controls over the

22  actual contract that is in place.

23       It is further in violation of the agreement

24  because it represents an effort by the Charles Town

16

1    Racetrack to negotiate individually or not even to negotiate

2    technically by contract of adhesion to require that they

3    sign this agreement also in violation of the main agreement

4    which requires that any negotiation over matters pertaining

5    to the agreement or reasonably related to the agreement be

6    subject to arbitration.  So we have an agreement here that

7    is in violation of the stall agreement and that is in

8    violation of the main contract.

9          Now, 9 U.S.C. Section 2 embodies the Federal

10   Arbitration Act and that Act is given supremacy under the

11   Supremacy Clause of the United States Constitution and it

12   requires that, "A written provision in a contract evidencing

13   a transaction involving commerce to settle by arbitration a

14   controversy thereafter arising out of such contract or

15   transaction, or the refusal to perform the whole or any part

16   thereof, or any agreement in writing to submit to

17   arbitration an existing controversy arising out of such

18   contract, transaction or refusal, shall be valid,

19   irrevocable, and enforceable, save upon such grounds as

20   exist at law or in equity for the revocation of any

21   contract."

22         We have a valid agreement in place the

23   interpretation of which and application of which is very

24   much at issue by this attempt to impose a contract of

17

1    adhesion upon members of the HBPA that interferes with the

2    enforceable and agreed upon arbitration clause in the main

3    contract.   Therefore, pursuant to federal law, the Federal

4    Arbitration Act, this Court should stay this action and

5    should grant temporary injunction and should put some such

6    temporary injunction in place until such time as the parties

7    can exercise the arbitration clause set forth in the main

8    agreement.

9         To do otherwise is to vitiate the terms of the

10   contractually agreed upon arbitration clause and allow the

11   Racetrack to force members of the HBPA to sign a contract of

12   adhesion that is in its very terms violative and reneging

13   upon the main agreement.   So it is for this reason that we

14   come to Your Honor and ask for this TRO.

15        Irreparable harm to the members, clearly, the

16   parties acknowledge that by the terms in the agreement

17   saying that the livelihood of the horsemen is at stake in

18   the equitable allocation of stalls, so we have satisfied

19   that requirement for temporary injunction.

20        Can it be remedied by monetary damages?   No, it

21   cannot be.   These are conditioned athletes.   These are

22   horses.   To move them out of the stalls will mean they fall

23   out of condition; they will not have the same training

24   facilities available to them, if they have any, and they

18

1    will not be competitive in upcoming races.

2            So we feel we have met all the requirements for a

3    TRO and we ask the Court to stay the enforcement or stay the

4    action of the Racetrack in evicting members of the HBPA from

5    any of their stalls or in the case of Tina Mawing from all

6    of her stalls.

7            THE COURT:  Mr. Hammer, are you representing that

8    some of your members have signed this contract?

9            MR. HAMMER:  Some have signed this contract, yes,

10   they have and some have signed it in the past.

11           THE COURT:  Are you representing that the named

12   parties that you have here today are all signatures to this

13   type of contract?

14           MR. HAMMER:  No, Tina Mawing who is to my right

15   was not offered this contract because all of her stalls were

16   stripped away so she hasn't been given the opportunity to

17   sign that so that is not equitable allocation.

18           As to her you will see specific allegations in the

19   complaint that it is her activity as a board member and

20   member of the HBPA that has caused the Charles Town Races to

21   retaliate against her, to discriminate against her, that too

22   is properly the subject of arbitration.

23           THE COURT:  All right.  Just for purposes for

24   illustrating whether or not there is an emergency nature to

1    this, how many of your clients or your members are you

2    saying are actually to be stripped of their stalls today?

3           MR. HAMMER:  Right now we believe that we have

4    three or four.  Ms. Mawing is being stripped of all five of

5    her stalls.  Mr. Ryan Beattie is being stripped of three of

6    his stalls.  George Yetsook is being stripped of and removed

7    from three of his stalls.  Lynn Venham is being removed from

8    two of her stalls.  Robert Bir is being removed from all

9    four of his stalls.  Larry Myers is being removed from two

10   of his stalls.  Larry Myers is removed.

11          THE COURT:  Even though this came before the Court

12   yesterday your petition says that this notice was sent to

13   your members at the end of last month on the 29th of August.

14          MR. HAMMER:  Yes, it was.  Now, in the contract

15   itself if you turn to page 25 of the agreement, there is a

16   provision in paragraph 35 that provides, "No breach of this

17   agreement or any term hereof shall be effective unless such

18   waiver is in writing," it goes on to say, "No waiver of any

19   breach shall be deemed a waiver of any other or subsequent

20   breach."

21          The fact there is some past conduct by the

22   Racetrack that is in breach of the main agreement not by the

23   very terms of the agreement operates as a waiver of that

24   agreement.

1    Now, the HBPA is here because obviously its status

2 as the exclusive bargaining agent of the members of the HBPA

3 is under attack by this effort to force its members to enter

4 into an agreement that by its very terms supersedes the main

5 agreement, so that is why the HBPA is here and that is why

6 we ultimately will ask for a preliminary injunction.  Today

7 we are asking for a TRO in order to allow Judge Steptoe time

8 to attend to the issue of whether these issues are

9 arbitrable or not arbitrable which we think they are.

10    THE COURT:  A question I asked when you launched

11 into this agreement in its first pages, I asked you whether

12 this was characterized as a close shop, that may not be an

13 apt comparison, but in any event the question would be are

14 there any horses that do race at Charles Town Races whose

15 owners are not a member of the HBPA?

16    MR. HAMMER:  Not to our knowledge.  To our

17 knowledge every single person who races at the Charles Town

18 Races is a member of the HBPA.

19    THE COURT:  Your feeling would make it so?

20    MR. HAMMER:  Yes, sir.

21    THE COURT:  I see, okay.  So even those persons

22 who opt out as parties here today and who have other lawyers

23 who come in to have them opt out as parties are members of

24 your membership?

21

        MR. HAMMER:  Yes, they are and they will benefit
from the entry of a TRO which will force arbitration on
these very issues whether they wish to participate or not
directly.

        I can't present evidence today but there are
rumors that there are threats being directed against members
that they will lose all of their stalls if they participate
in this process and that is why some of the people have
bailed out of this hearing.  Now, I don't have witnesses to
testify to that today but that is our understanding coming
in this morning is why we are having people jumping out.

        THE COURT:  Thank you, Mr. Hammer.

        Mr. Peterson.

        MR. PETERSON:  I am deeply troubled by the fact
that Mr. Hammer has brought a complaint and request for
injunction on behalf of a bunch of horsemen and trainers he
has not even gotten permission to put on a pleading.  Your
Honor, I think that is borderline in violation of Rule 11 if
not a clear violation and I am deeply troubled by that.

        Secondly, there is a lot of horsemen here and
trainers that are here that I am sure would not agree with
that last statement Mr. Hammer made, they felt they're being
threatened or intimidated in order not to be part of this
lawsuit.  I take issue with that statement definitely.

22

1          Now, the basis of this from listening to what

2    Mr. Hammer just said is that this collective bargaining

3    agreement essentially with the Horsemen's Association which

4    does contain an arbitration clause.

5          Now, if this truly is a violation of this

6    agreement, I don't think he can resort to this Court for

7    injunctive remedy before even initiating arbitration on what

8    he feels is a violation of this agreement.  But aside from

9    that, even if you consider this to be something that --

10          THE COURT:  Wait, let me understand this then --

11    mr. Peterson, just because I ask questions, I don't mean to

12    cut you short on anything that you have to say to the

13    Court -- but are you saying that it is anyone's right to

14    invoke arbitration by simply asking for it and that would

15    stop the process and that would in effect give something

16    analogous to a TRO?

17          MR. PETERSON:  Well, I think the arbitrator would

18    have a decision to make whether there should be a TRO or any

19    kind of temporary relief and not a Court because there is an

20    arbitration clause in here the parties have agreed to.

21          THE COURT:  So in your view it would be within the

22    power of the HBPA to have simply said to the Charles Town

23    Races we wish to arbitrate this, we have this issue,

24    arbitrate it.

23

1          MR. PETERSON:  Absolutely.  These agreements were

2     put in place months and months ago, the new version of it,

3     some version of this.

4          THE COURT:  The new version, you are talking about

5     --

6          MR. PETERSON:  Exhibit 2.

7          THE COURT:  -- Exhibit 2, one page.

8          MR. PETERSON:  There is a second page to it.

9     It is essentially an application and agreement rolled into

10    one.  There are two pages.  He gave you the second page but

11    that is what we are talking about.  These terms have been in

12    place for months and months now and he shows up today only

13    because some of the horsemen have been told that some of

14    their stalls aren't going to be renewed and all of a sudden

15    it is an emergency and he is asking for a temporary

16    restraining order against the Track.

17         It is something that they could, if this was truly

18    a violation of this agreement, which it is not, but if it

19    were, they could have challenged this months ago and there

20    would have been no reason to come to Court and apply for a

21    drastic equitable remedy like a TRO.

22         So I am not sure other than for purposes of

23    harassment why they would have waited until the very day

24    that the people are supposed to vacate.  I mean, two weeks

24

1  ago they were given notice.  They were given two weeks to

2  get the horses out.  They show up on the last day and ask

3  for a TRO and ask for this Court to essentially get into the

4  business of the Charles Town Races and Slots to determine

5  even under this agreement they have brought discretion to

6  determine who stays in these stalls.

7        Your Honor, these stalls are free of charge to

8  these horsemen.  40 percent of the people who race at

9  Charles Town Races don't have stall agreements.  It is

10  absolutely not prejudicial whatsoever.  As a matter of fact,

11  I had them run -- and this is a preliminary figure -- but

12  yesterday the percentage of races won by people who don't

13  have stalls over there, we have 40 percent, 42 percent of

14  the starters don't have stall agreements, they are off

15  ground and they bring their horses in and they win 52

16  percent of the races.  It is absolutely not going to visit

17  irreparable harm on these folks to have their stall

18  agreements revoked.  One or more only two of them have all

19  their stalls revoked.

20        Now, this provision that he is relying on, this

21  paragraph 11 that talks about stalls, only says that the

22  Charles Town Races in paragraph 11B "shall not discriminate

23  in the allocation of stalls by reason of HBPA membership or

24  activity," and as came out in Mr. Hammer's proffer almost

25

1  all of it if not a hundred percent of the people who race

2  over there are members and people who will be put in these

3  stalls are members as well.  They are not discriminating

4  based on membership in the HBPA or their activity with the

5  HBPA.  There is no discrimination going on here.

6          The stall agreement is separate and it has always

7  been separate from this agreement.  There has been some

8  version of this agreement in place from the beginning and it

9  has never been negotiated by the HBPA what goes into this

10  agreement and never been challenged as part of the HBPA

11  agreement and it is completely separate.

12          It is a property owner's right to determine who

13  gets these free stalls.  I will tell you that it does have

14  a direct impact on the quality of the racing there.  It is

15  incumbent upon Charles Town Races and Slots to have the

16  highest quality horses on their property as they can in

17  order to get the highest quality horses in these races and

18  that has a direct effect on the amount of bets that are

19  placed and the amount of people who are interested in

20  putting money on the horses and the price of the purses and

21  all of that.  It directly benefits the HBPA because they get

22  a percentage of the takings that they have the highest

23  quality horses on the premises.

24          So my client is involved in a process where they

26

1   look at how many starts these horses have, they look at how

2   many placements the horses have, they don't want horses that

3   have a lot of starts but a lot of losses, so they go through

4   this analysis to determine in their discretion who gets

5   stalls and who doesn't.

6        There is an overflow of people who want stalls and

7   can't get them.  There is a number of folks that right now

8   would move into these 140 or more stalls that are going to

9   be vacated and vacant and they would like to have the

10  opportunity to get in there and won't if a TRO is issued in

11  this case.

12       THE COURT:  Mr. Peterson, again, I want to hear

13  everything but I have some questions as we run along here.

14       Mr. Hammer in his petition as I read it yesterday

15  seemed to indicate there was somehow a surplus of around

16  140 stalls that were, I guess, in his characterization not

17  even in use so that it was not important to the Track other

18  than as a vindictive thing to get these people out of the

19  Track.

20       MR. PETERSON:  Absolutely not.  The stalls almost

21  historically have almost a one hundred percent occupancy

22  rate.  The 140 that have been vacant have been vacant for a

23  short period of time while the Track is going through this

24  process of seeing who is going to vacate the premises and

27

1    when.

2            You have to understand that when you have a

3    vacancy, these horses need to be consolidated so that the

4    barns can be full and the trainers won't have to go to

5    separate and different places to attend to their horses,

6    so what they do is they look at the big picture, how many

7    stalls do we have vacant, how many are going to be vacant

8    and when after we don't renew some people's stall agreements

9    so they can look at this collectively and that is why there

10   are 140 vacancies.   They are going through the process right

11   now of trying to figure out how to consolidate things.

12           THE COURT:   So as you say everyone who has a horse

13   there is a member of the HBPA?

14           MR. PETERSON:   Right.

15           THE COURT:   So every stall is used by some member

16   of that organization?

17           MR. PETERSON:   Right.

18           THE COURT:   There are more applications for those

19   stalls than there are stalls that are available?

20           MR. PETERSON:   That is right.

21           THE COURT:   But that universe of stalls available

22   there are all free?

23           MR. PETERSON:   Right, they are all free.

24           THE COURT:   Every one is free?

1          MR. PETERSON:  The Track pays for the heat, the

2    light, the cleaning, the security, everything that goes with

3    these stalls, that is why this, I mean, there isn't a

4    collective bargaining, they don't have to interact with the

5    HBPA every time they want to make a decision.

6          THE COURT:  Have they always been in your

7    representation that allocation of stalls has always been

8    made by the Track?

9          MR. PETERSON:  That is correct.  There is a

10   committee at the Track that is made up of three or four

11   folks who make those decisions all because it has been that

12   way.

13         THE COURT:  The HBPA never itself has been in the

14   business of allocating stalls among members even though its

15   occupancy is entirely made up of its members?

16         MR. PETERSON:  No, it is in the discretion of the

17   Track to grant these licenses and it is not something that

18   is part of the collective bargaining process.

19         THE COURT:  You used licenses, licenses and stalls

20   are not the same thing, are they?

21         MR. PETERSON:  No, because this is a licensing

22   agreement essentially, I mean, these aren't --

23         THE COURT:  Having a stall is a type of licensing?

24         MR. PETERSON:  A license to be on the property and

29

1    in that space.

2            THE COURT:  How do people who don't have stalls

3    there but do race do they have licenses?

4            MR. PETERSON:  Okay, I see where you are going.

5    No, there is a difference between a racing license through

6    the State, and I am talking about more in terms of property

7    rights, a license like a hunting license to hunt on

8    property, this is a license to have a horse stabled at the

9    property.  That is a good point.  That is completely

10   separate.  This complaint indicates there is some sort of

11   due process that is at stake here, this has some effect on

12   their racing license.  These folks that don't have stall

13   agreements can come in and they can exercise their horses.

14   Their license to race horses at Charles Town Races is

15   completely separate and unaffected by whether they have a

16   stall on the property.  They are still allowed to bring

17   horses there as long as you comply with other rules of

18   racing.  They can bring the horses there to exercise them

19   before the race, you know, do whatever they want before the

20   race just like everybody else that ships their horses in.

21   This is not in anyway going to affect their license to race

22   at Charles Town Races.

23           THE COURT:  So there is some mechanism within

24   Charles Town Races management of Charles Town Races that

30

1    makes some sort of determination as to how these stalls are

2    allocated?

3          MR. PETERSON:  Yes, a business decision.

4          THE COURT:  Based upon winning, quality of horses,

5    things of that nature?

6          MR. PETERSON:  Right, exactly.  They take a

7    combination of objective and subjective factors, but mainly

8    they look first at the number of starts for each horse, and

9    that means the number of times they put them in a race, if

10    they have a horse not being put in any races, they don't

11    want it there.  If there is a horse that is being put in

12    races and consistently losing, that horse would go down on

13    the list for consideration.  They want owners and they want

14    trainers there who have winning horses.  They want winning

15    horses stabled there.

16          THE COURT:  Is the formula some sort of objective

17    formulation?

18          MR. PETERSON:  Yes, it is.  Like I said a

19    combination of objective, I mean, those are the first things

20    they look at.  They also look at other issues, if a trainer

21    is someone causing problems with other trainers, someone who

22    is abusing animals or not caring for their animals, not

23    showing up feeding their animals, things like that, those

24    are in there too.  Those are a little bit more subjective

31

1    than pure statistical, you know, are they getting enough

2    starts or not.

3         THE COURT:  Since the HBPA has this agreement with

4    the Track since it seems to be all encompassing for those

5    who would race there, has it ever been the practice of the

6    management of the races and the HBPA to agree upon a

7    mechanism for the stall allocation?

8         MR. PETERSON:  No, that has been left to the

9    discretion of the Charles Town Races and Slots to determine

10   that and they have always done it fairly and equitably as

11   required by agreement.  There is no constraint in this

12   agreement.  There is no side deals where they bargain over

13   how and what criteria are used.

14        THE COURT:  So this is a practice that has been

15   going on for years?

16        MR. PETERSON:  It is.

17        THE COURT:  That's your representation?

18        MR. PETERSON:  Yes, it is.

19        THE COURT:  And this agreement, this revocable

20   stall agreement, is this in one form or another has an

21   agreement like this existed for years?

22        MR. PETERSON:  It has always existed.  This is the

23   newest version of it but some version of that agreement has

24   always existed at Charles Town Races and Slots since the new

32

1    management has taken over.  When PNGI got involved they have

2    always had an agreement.  They were allowed to draft and

3    they were allowed to use with their horsemen because it is

4    their property and there is no constraint through this

5    collective bargaining agreement that they put any type of

6    language or criteria in it.  They have a business to run,

7    Your Honor.

8              THE COURT:  Mr. Peterson, one would at least

9    anticipate that if there is a competitive demand for stalls

10   than there is availability that all people would be seeking

11   those stalls as members of this organization that there

12   would be some sort of competition and perhaps friction among

13   members as to who gets the stalls and who doesn't so that

14   has never come into bargaining between --

15             MR. PETERSON:  In recent history we have had

16   individuals including Mr. Yetsook who filed suit over having

17   his number of stalls reduced.  I will say that when

18   Mr. Yetsook stood before this Court and Judge Steptoe,

19   Judge Steptoe told him that he couldn't do that, the Court

20   has no power over the case once the agreement expired.

21   Now, he was being thrown out early before the agreement

22   expired, but it was Judge Steptoe's representation and I

23   have not had time to get either the transcript or order, but

24   Judge Steptoe told Mr. Yetsook that once this license

33

1   expired, once this agreement expires, that there is nothing

2   I can do for you because that is within the discretion of

3   Charles Town Races and Slots.  There are several people, you

4   know, still that are involved in this case who are similarly

5   situated, Mawing and Yetsook, well, Mr. Yetsook just had his

6   stalls reduced, is my understanding, he still has stalls

7   there.

8          THE COURT:  Mr. Yetsook still has stalls there?

9          MR. PETERSON:  Right.  To answer your question

10   there is only until recent history never been controversy

11   over this agreement.  It has only been a couple of

12   individuals who have filed suit that have brought this to

13   the Court's attention or to the Track's attention.

14          THE COURT:  So your position is that a previous

15   ruling in this Court by Judge Steptoe was that once the

16   agreement -- the stall agreement is it an annual agreement?

17          MR. PETERSON:  No, I think it is a six month

18   agreement now.

19          THE COURT:  Once the agreement runs its course

20   that the Court has no power to determine whether or not the

21   Track will again extend stall rights to any particular

22   horsemen?

23          MR. PETERSON:  That is right.  The suit was

24   dismissed after -- they ended up working out an agreement

December 12, 2008 Jefferson County

34

1    where Mr. Yetsook could stay there through the end of the

2    agreement and once the agreement was done I think they

3    voluntarily dismissed the case based on that.

4              THE COURT:  Now, is Ms. Mawing at the end of her

5    agreement?

6              MR. PETERSON:  Yes, Ms. Mawing's agreement expired

7    in the end of August.

8              THE COURT:  So your argument would be by

9    Judge Steptoe's previous holding that the Court would have

10   no authority to --

11             MR. PETERSON:  Right, the Court has no authority

12   to get involved in that decision not to renew her.

13             MR. HAMMER:  Your Honor, Mr. Peterson is flatly

14   wrong on several issues.  The first issue he is flatly wrong

15   on is the idea this stall agreement hasn't been negotiated

16   in the past, indeed it has been negotiated.

17             THE COURT:  Well, I know it's tempting when I am

18   asking a lot of questions of Mr. Peterson to want to get up

19   and give answers too.  I will come back over to you.  If you

20   can keep a list of issues that you would like to address.

21   I don't want to be unfair and ask only one side questions,

22   it's just I ask questions as they pop into my mind, I just

23   have to take them when they pop up.

24             But, Mr. Hammer, since you did have the floor, one

35

1  question of you real quickly, the long list of clients that

2  you had listed in your initial has now been redrawn to

3  include fewer names, those persons whose individual names do

4  appear, are those your clients individually or basically is

5  your client here the HBPA?

6          MR. HAMMER:  And Ms. Mawing.

7          THE COURT:  She is your individual client who has

8  hired you directly?

9          MR. HAMMER:  Yeah.

10         THE COURT:  And the HBPA is also your client?

11         MR. HAMMER:  They have also hired me directly.

12         THE COURT:  Those clients here today?

13         MR. HAMMER:  Yes, and others that are members of

14 the HBPA like George Yetsook who is a member of the board.

15         THE COURT:  Members of the HBPA.

16         MR. HAMMER:  Mr. Yetsook is a member of the board

17 of directors of the HBPA.

18         THE COURT:  He is listed so we should consider him

19 in that capacity?

20         MR. HAMMER:  Both capacities individually and as a

21 member because as I alleged in the complaint he feels that

22 he was discriminated against.

23         (Cell phone rings.)

24         THE COURT:  I really thought we took care of

36

1    that.  I ask again did anybody want to search inside their

2    pockets right now once again.

3           We'll get back to you, Mr. Peterson, if you can

4    remember where you were since I have been peppering you with

5    questions as we have gone along.

6           MR. PETERSON:  Right.  Well, I ask you to turn to

7    page 14 of the agreement under the part about stalls and

8    paragraph D says, "The terms and conditions for all stall

9    applications," which is this agreement, it is a combination

10   application agreement for all stall applications, "shall be

11   determined by and set forth in an application by the Charles

12   Town Races."

13          So right there it says it shall be determined by

14   the Charles Town Races not it shall be determined by the

15   HBPA and the Charles Town Races it just says that it is to

16   be determined by them and has to be set forth in application

17   and it is so right there dispells any question as to whether

18   the HBPA has the right to collectively bargain over language

19   in this agreement.  It is right here in the collective

20   bargaining agreement.

21          Now, does the Track seek input from the HBPA?

22   They have a great relationship with the HBPA historically.

23   I don't understand why they wouldn't seek input, but that

24   doesn't mean they have the legal right to dictate what is in

37

1    this.    Charles Town Races and Slots owns the property.

2    They own the stalls.  They can determine under this

3    agreement who stays and who goes because as I said they are

4    the ones taking all the risks here.  They are the ones that

5    have the duty to put on the best horses that they can put on

6    and they want to do that.

7            Let me give you an example.  When a horse race has

8    a horse that is scratched for some reason and they have to

9    fill the race, they will often go to the barns there to find

10   a horse that can be put in that race, so it is incumbent

11   upon them to have the best quality horses there on-site

12   because that happens all the time.  It happens very

13   regularly that a horse gets scratched and they have to at

14   the last minute call upon another horse to fill in.  That is

15   another factor they consider when they're making the

16   determination of who stays and who doesn't.  If there is a

17   trainer that has a horse that they willingly put into races

18   on a moments notice, that is something that is sort of a

19   subjective criteria they use to say, hey, this person even

20   though they may not have as many starts or as many

21   placements as another, they'll keep that person on.

22           But, Your Honor, back to the irreparable harm.

23   That is key here.  In order to get a TRO they have to show

24   irreparable harm.  These folks have other places they can

38

1    put their horses.  They have been given plenty of notice.

2    If need be, they need a few more days, the Track would be

3    very willing without a TRO to allow them to find a place for

4    these horses.  A lot of these folks have access to barns

5    through the owners and they have access to barns through

6    other trainers and there are other barns that have rental

7    space available across the street from the Charles Town

8    Races.  There are other places for them to go.  The fact is

9    they don't pay anything to be there.  It is not irreparable

10   harm, Your Honor, to tell them, for the Track to tell them

11   to go when it makes very little difference statistically and

12   actually probably favors them to ship the horses

13   statistically over having a place that is purely just a

14   matter of convenience for them.  That is not grounds for a

15   TRO because it's inconvenient for them.  Irreparable harm,

16   it is not inconvenience, is what the standard is for the

17   issuance of a TRO.

18        THE COURT:  Another thing, every time I interrupt

19   either of you, I want to hear fully what you want to lay out

20   here today, I am not trying to truncate your presentation,

21   but one representation Mr. Hammer makes here today, and I

22   appreciate the fact that you have kept this on as you have

23   been answering my questions and informing me of some

24   technical things, I am just real not aware how these things

1    work, so I appreciate your answers, and also you have kept

2    it on a rather high plain legally, but just to descend to

3    maybe some more personal issues, Mr. Hammer says that you

4    are wishing to exclude Ms. Mawing in some vindictive manner

5    because she has given some testimony before the Racing

6    Commission or some other body with regard to some issue

7    existing between the parties.

8          MR. PETERSON:  Your Honor, Ms. Mawing was given a

9    license to be in those stalls after she testified in that

10   hearing.  That is absolutely false.  There have been stall

11   agreements entered into with her since she did that.  That

12   is not the reason that she was excluded.  My understanding

13   is that she had horses who were inferior to a lot of other

14   horses that are there and it was based on that objective

15   criteria is my understanding.

16         THE COURT:  Inferior --

17         MR. PETERSON:  I haven't had time to investigate

18   this.  I just got this yesterday.

19         THE COURT:  Inferior based on their earnings?

20         MR. PETERSON:  The number of starts and the number

21   of placements in that order of things, yeah.  But like I

22   said they have given her agreements since then.  They gave

23   her at least one stall agreement since she testified in that

24   hearing.  That is not a reason.

40

1    THE COURT:  As of today how many -- do all of her

2    stalls, all of her stalls expire today?

3        MR. PETERSON:  Yes, all of her -- they expired in

4    August but I think they gave her two weeks to vacate and

5    that comes out to today.

6        THE COURT:  I see, I see.  How many stalls did she

7    have?

8        MR. PETERSON:  Was it four, four or five.

9        THE COURT:  Is there a typical number of stalls

10    for an individual horsemen to have out there?

11        MR. PETERSON:  Some have a lot more than that.

12    Some have 10 or 20, right, I mean, as high as 40.  My client

13    tells me as high as 40.  A lot of folks have many more

14    horses than they have stall allocations as well.  I mean,

15    again, it is a horse by horse basis that they take things.

16        Again, we are talking about discrimination and

17    public policy, I mean, there is no tort claim I am aware of

18    that applies to a stall.  I mean, it is silly to consider

19    fair housing, I mean, the Fair Housing Act doesn't apply,

20    you know.  There is no right that these people have to

21    continue occupancy in these stalls.  There is no statute

22    that protects stall users from discrimination.  We are

23    talking about public policy.  That is just sort of a throw

24    in in this complaint.  There is no actual tort claim that

41

1    she could assert that I am aware of that she has a public

2    policy reason she can't be taken out of this stall.

3         THE COURT:  Okay, all right.  Well, you have been

4    answering my questions so I told you I didn't want to

5    truncate so if you have more you want to present if you can

6    recollect your thoughts.

7         MR. PETERSON:  Well, that goes to the element of

8    likelihood of success on the merits which I think is

9    something you have to sort of look at in issuing any kind of

10   injunctive relief.  Is this complaint likely to succeed on

11   the merits.  Again, if you don't have a cause of action that

12   protects a right to a stall, I mean, there is no human

13   rights allegation, they are not saying that, you know, they

14   are throwing them out because they are black or because they

15   are Hispanic or anything like that, there is no allegation

16   like that, it is purely I testified at some administrative

17   hearing, therefore, that act doesn't have any retaliation

18   provision in it I am aware of.  So, again, unless they come

19   here and show the Court they have some legal right under the

20   contract to stay there, and some right to renew, which they

21   don't, something under the HBPA agreement, you know, then

22   there is not a likelihood of success on the merits so that

23   element goes against them.

24        We have already talked about irreparable harm,

42

1    they can't show irreparable harm.  All they have to do is

2    move their horses to another barn.  This business about how

3    it's going to hurt the horses and they are not going to be

4    able to compete is bunk as I mentioned statistically.

5        The third element would be whether they have

6    adequate remedy at law and I think they clearly do.  I mean,

7    if they have to go and pay for a stall someplace else, you

8    know, that is an economic damage they could assert down the

9    road, you know, they can make a claim over that.  If for

10   some reason we did wrongfully evict them, they can get a

11   judgment against the Track for having to pay for the stall

12   someplace else, that is economic harm.

13       The balance of hardship is another element you are

14   supposed to look at and it would visit a great hardship on

15   my client to have their stall agreements tied up in court so

16   they can't make a decision to get the best horses in.

17   It is critical they be able to get the best horses in there

18   and get these stalls filled with quality horses.  They may

19   have a hardship they have to move the horses but these

20   horses like I said are moved all of the time.  These folks

21   can find other stall spaces.  They have plenty of stall

22   spaces out there outside of the racetrack for them to put

23   these horses in.  Again, the hardship is heavier on my

24   clients who are trying to run a business and having their

43

1    every decision reviewed in court.

2              So based on all of those I don't think they meet

3    any elements for issuance of a TRO.

4              THE COURT:  All right, thank you.

5              MR. PETERSON:  We ask it be denied.

6              THE COURT:  Thank you, Mr. Peterson.

7              Mr. Hammer, let's go back over to you, sir.

8              Mr. Hammer, I asked Mr. Peterson a bunch of

9    questions as he was going along, I asked a few of you too,

10   sort of got more on a roll, I guess, as Mr. Peterson was

11   going along, so if you remember those issues that you wanted

12   to address that I maybe asked Mr. Peterson and had not asked

13   you, if you would like to address them, go ahead.

14             MR. HAMMER:  First, let's begin with the concept

15   of the revocable stall license agreement not being

16   negotiated.  Mr. Watson is present in the courtroom this

17   morning and Mr. Watson himself negotiated the prior stall

18   agreement that was --

19             THE COURT:  Who is Mr. Watson?

20             MR. HAMMER:  Right back here.

21             THE COURT:  Let's see a hand, okay, all right.

22             MR. HAMMER:  I can tender his testimony if you

23   wish on this issue but he did negotiate on behalf of the

24   HBPA the prior stall agreement.

ecember 12, 2008  Jefferson County

44

1    THE COURT:  A former president of that

2    association?

3    MR. HAMMER:  Yes, Your Honor.

4    THE COURT:  All right.

5    MR. HAMMER:  So it is just flatly wrong to say

6    that this has not been the subject of negotiation in the

7    past.  Even if it hadn't been, the no waiver provision which

8    I pointed out to Your Honor in my opening statement, would

9    still allow the HBPA to bring this issue forward but it has

10   been negotiated and this particular contract that you have

11   marked as Exhibit 2 has not been negotiated.  They have

12   changed the terms of it from one year down to six months.

13   They have changed other terms within the body of it.

14   Most egregious of all they claim that it supersedes the

15   actual agreement between the HBPA and the Charles Town

16   Races.  That cannot be done.  You can't both recognize the

17   HBPA as an exclusive bargaining agent for its members and at

18   the same time turn around and impose unilaterally an

19   agreement that purports to supersede the contract so that

20   simply --

21   THE COURT:  So your representation was that in the

22   past that the HBPA had negotiated the wording of this

23   contract?

24   MR. HAMMER:  Various terms in this have been

45

1    negotiated in the past.  This is a new contract.

2            THE COURT:  But I take it that you don't argue

3    with the fact that Mr. Peterson makes that it has always

4    been the Racetrack itself which has allocated the stalls?

5            MR. HAMMER:  I do disagree and here is why, yes,

6    they make the decision as to equitable allocation of stalls

7    as required by the contract that is an overriding term

8    within the contract that allocation has to be equitable, we

9    are here today because stripping all the stalls away from

10   some of my clients and some of the stalls away from others

11   is not equitable and the issue of what is equitable or not

12   equitable is on its face a term of the main agreement and

13   subject to the arbitration clause of the agreement.

14           Mr. Peterson is right in the sense that the Court

15   shouldn't be interfering in the agreement in the decision

16   what is equitable or not, it is the arbitrators who shall by

17   agreement make that decision.  So the HBPA is here to say

18   you are not abiding by the agreement and we want a stay so

19   that we can invoke the arbitration provision of the

20   agreement.

21           Now, the idea we could get arbitrators appointed

22   and get an arbitration hearing conducted within the time

23   period between August 29th and when the notice was served on

24   these people to get out of their stalls and today is

December 12, 2008  Jefferson County

46

1   preposterous, it simply can't happen.

2          THE COURT:  But in listening to what you just said

3   is it the intention or desire of the HBPA to have an ongoing

4   arbitration to review all stall allocation decisions?

5          MR. HAMMER:  It is the intent of the HBPA to

6   negotiate within the contract to come up with agreeable

7   terms as to what is equitable in stall allocation because

8   the parties agree that the livelihood of the horsemen is at

9   stake by stall allocation.  You can't have it both ways.

10  Mr. Peterson has argued that he says it doesn't make a

11  difference, people do just fine outside, his own client

12  agreed it is essential to the livelihood to have these

13  stalls so he can't come back and say something contrary to

14  this agreement.

15         Now, Ms. Mawing is here and she can testify, I

16  will proffer her testimony if need be or put her on the

17  stand, she will testify about the harm that occurs in trying

18  to move horses that don't want to be moved, the risk of

19  injury to those horses, the need to anesthetize those horses

20  which means they are then not eligible to be in races.  She

21  has an upcoming stakes race this next Saturday so the idea

22  her horses aren't competitive and aren't quality horses is

23  absurd.  She is in.  She has made all of her appearances

24  required under the agreement.  She hasn't violated any

December 12, 2008  Jefferson County

47

1   term.  What she has done is she testified in the Funkhouser

2   matter and as a result had the number of stalls reduced from

3   11 down to five.  She has been quite vociferous as both an

4   individual member of the board and in raising concerns under

5   the West Virginia Pesticide Act about the improper

6   distribution of pesticides, which we cite in the complaint

7   at paragraph 48, which does evince public policy of West

8   Virginia and the result of that pesticide distribution was

9   to her knowledge and belief the death of one of her animals

10  and the death of a companion goat.  In retaliation for those

11  complaints for calling the West Virginia Department of

12  Agriculture onto the premises of the Racetrack they have

13  taken all of her stalls from her.

14          Now, Mr. Peterson says there is no basis then to

15  say, well, the Court can litigate that there is no public

16  policy, it is in the contract, if she is acting on behalf of

17  the HBPA or its members and she has racing concerns and she

18  feels she is discriminated against in stall allocation, then

19  in the contract on page 13 paragraph 11B they have already

20  agreed not to discriminate against her, that is a material

21  term of this contract that is subject to arbitration.

22  So this Court needs to stay taking away her stalls so that

23  she does have time to invoke arbitration and allow the

24  matter to be decided.

December 12, 2008  Jefferson County

48

1        THE COURT:  Well, Mr. Peterson asks the question

2    why have you not done that before rather than coming before

3    the Court for a TRO?

4        MR. HAMMER:  Why who has not?

5        THE COURT:  Asked for arbitration and simply

6    notified the Track you wish this to be the subject of

7    arbitration.

8        MR. HAMMER:  We will.  I have been retained in

9    this matter recently.  We will indeed ask for arbitration.

10   The more pressing matter right now is she is going to be

11   forced to leave her stalls and leave the free stalls that

12   she needs as a trainer to maintain her business.  Being a

13   trainer is a very competitive business and if you don't have

14   access to the free stalls that are there she is out of

15   business.

16        THE COURT:  But, Mr. Hammer, Mr. Peterson argued

17   that there is an over abundance of demand for these stalls

18   and that there are other horsemen who are members of the

19   HBPA who wish to have those very same stalls that are being

20   deprived of those stalls by, I guess, Ms. Mawing's presence

21   there.

22        MR. HAMMER:  He concedes there are 140 vacant

23   stalls at the present time, he acknowledged that some owners

24   have more than 40 stalls, that goes to the issue of

49

1    equitable allocation of the stalls which is a contractual

2    issue and subject to mandatory arbitration.  So we are

3    raising the issue and we are going to arbitrate that issue.

4         THE COURT:  Since you say that this revocable

5    stall licensing agreement has in the past been the object or

6    subject of negotiation between the HBPA and the Track, do

7    you have examples of earlier versions of it that specify

8    some sort of equitable mechanism different than what appears

9    in the document before us?

10        MR. HAMMER:  The mechanism is laid out on that

11   contract and the terms.  We are looking for the older one

12   now.  The terms of the older one are different.  In the past

13   this has been provided to the HBPA because there has not

14   been the issue of equitable allocation and the HBPA has not

15   invoked an arbitration right.  There is an issue of

16   equitable arbitration now so we are invoking the right.

17   Whether we did or didn't invoke it in the past is of no

18   import whatsoever because, quite frankly, there is a no

19   waiver provision that the Track agreed to in this contract

20   so the past practice of the parties whether they agreed to

21   another stall agreement or not is totally irrelevant.

22        THE COURT:  But you, Mr. Hammer, when you say that

23   this has always been the subject of negotiation before

24   between the language on page 14 that Mr. Peterson was

50

1    pointing out says that the terms and conditions for all

2    stall applications shall be determined by and set forth in

3    application by the Charles Town Races, in other words, it

4    seems to say in that language that the Racetrack itself is

5    able to set the terms of the negotiation of the revocable

6    stall licensing.

7            MR. HAMMER:  You read that sentence in isolation

8    from the stall section, the stall section says equitable

9    allocation is essential and that is a paragraph of that same

10   section, so the determination, yes, they can make the

11   determination, can they do so in a random manner, no.  Can

12   they do so in a manner that is discriminatory?  No, they

13   have to do it in a manner that is equitable.  The HBPA now

14   argues what they are doing is not equitable.  On its face

15   that is a mandatory subject of arbitration it says right

16   above it.

17           Now, all that Mr. Peterson has argued in denying

18   what we have said is that there is a dispute as to whether

19   or not the parties have complied with the terms of their

20   contract, collective bargaining agreement there is a

21   dispute, the purpose of today is not to get into all of the

22   facts of that dispute as the Court made clear, but there is

23   a dispute, a disagreement, and where that disagreement

24   existed under paragraph B of the top of page 13 it shall be

51

1    arbitrated no exception.  So the only choice this Court has

2    under the Federal Arbitration Act is to enforce the

3    validity of this agreement and to stay this matter and to

4    allow the parties to arbitrate.  That is all that this Court

5    has authority to do.  That is all that Judge Steptoe will

6    ultimately have authority to do because the federal law is

7    supreme on this issue.

8              Again, if you want to hear any facts

9    specifically Ms. Mawing is here and ready to testify if need

10   be about the damage and danger to horses.

11             THE COURT:  Well, I am somewhat reluctant to wade

12   into the facts knowing that Judge Steptoe will probably

13   revisit this issue and also against the backdrop of

14   apparently upon Mr. Peterson's representation that

15   Judge Steptoe has heard cases of this nature before and has

16   some sophistication in the area that I rather plainly lack.

17             MR. HAMMER:  I did want to address that because

18   the agreement that was at issue in the Yetsook case was a

19   different agreement, not this same stall license agreement,

20   so we'll be prepared for this and the argument that he is

21   going to wish to make will not be applicable to this same

22   stall agreement.  Again, I don't want to plunge into that

23   but I do want Your Honor to maintain the status quo long

24   enough that we can invoke the arbitration agreement which

52

1    the parties have agreed to and allow that process to take

2    place as 9 U.S.C. Section 2 requires.

3              THE COURT:  All right, thank you very much,

4    Mr. Hammer.

5              Mr. Peterson, going back over to you for a moment.

6    You began your remarks by saying that since arbitration is

7    available under the contract that the Plaintiff could simply

8    have sought arbitration instead of having the Court come in

9    and wade in and try to tinker with or fine-tune some aspect

10   of the agreement between these parties and to have the

11   arbitrator that is provided for under the contract do that.

12             Since Mr. Hammer in his remarks seems to want just

13   that, is that something that is agreeable to the Track?

14   I mean, Mr. Hammer is saying he has the right to it not that

15   it needs to be agreed.

16             MR. PETERSON:  I think the language is clear to

17   the extent this involves interpretation of this agreement

18   that has to be arbitrated because of the mandatory language

19   there shall.  My point is that these stall agreements aren't

20   part of this agreement and there is a requirement in here

21   that makes stalls available.  When he is talking about the

22   equitable distribution or equitable allocation of the

23   stalls, that doesn't say anywhere that this agreement has to

24   provide any certain right to maintain a stall, it is just

53

1    that stalls that are allocated have to be done so on an

2    equitable basis.

3         If they wanted to include language in here that

4    there has to be some sort of balancing of the equities

5    before you renew a license, it would have had to have been

6    stated in this agreement, I mean, but it is not in here.

7    The fact is that is not consistent with the clear language

8    of paragraph D that says the terms and conditions for all

9    stall applications shall be determined by Charles Town

10   Races.  That gives them sole discretion to determine what is

11   in this agreement.  If they wanted to put something in there

12   that you are entitled to due process or some other right or

13   balancing of the equities, or we have to show that it is

14   fair, you know, consistent with some requirement they have

15   that would have been in here but it is not in here,

16   therefore, they are not entitled to it.  This agreement is

17   separate from the HBPA agreement that is why we feel that

18   this agreement is not subject to arbitration.  We disagree

19   with that.  But I was saying to the extent that they are

20   claiming that the HBPA agreement is in dispute here then why

21   didn't they put us on notice months and months ago that they

22   disagreed with the language in here?

23        THE COURT:  How long?

24        MR. PETERSON:  This is not equitable for them to

December 12, 2008  Jefferson County

54

1    come here having delayed until the very last minute and then

2    ask for injunctive relief to challenge this agreement when

3    they could have done that months ago and not visited any

4    harm upon my client because this probably could have been

5    arbitrated and decided within a six month period since this

6    agreement has been in effect.

7         THE COURT:  How long has this particular form of

8    the agreement been in use?

9         MR. PETERSON:  January 1st of 2008 was the

10   beginning of these agreements.  I believe it was drafted

11   before then.  Do you know, Dicky?

12        THE COURT:  But the ones that had dates earlier so

13   this six month date so all of them now have six month dates?

14        MR. PETERSON:  They are all six month dates.

15        THE COURT:  Mr. Hammer represented that the

16   earlier ones had one year dates?

17        MR. PETERSON:  I believe that is true, correct.

18        THE COURT:  Was that under a different management?

19        MR. PETERSON:  No, it was under the same

20   management.  They revised the agreement, I mean, this is a

21   new agreement.

22        THE COURT:  How recently has it been revised?

23        MR. PETERSON:  I believe 2007.

24        THE COURT:  Is this the first six months set?

55

1          MR. DICKY:  Yes.

2          MR. HAMMER:  Yes, January 1st was the beginning of

3     the six month period.  If they had a problem with that six

4     months why didn't they challenge it back in January?  As a

5     matter of fact, these were set to expire in June and at the

6     end of June they extended them because they were like I said

7     they are trying to go through the process of determining,

8     you know, what are the best horses to get in the stalls and

9     they extended it through the end of August and then gave

10    notice at the end of August.

11         THE COURT:  Somehow is there a different process

12    in place right now who is determining who gets the stalls

13    than had previously been applied to these decisions?

14         MR. PETERSON:  Excuse me.

15         THE COURT:  Is the process now somehow different

16    in determining who gets the stalls than had been in the

17    past?

18         MR. PETERSON:  No, this is the same process that's

19    always been used.  The language in the agreement tightened

20    up for the Track's benefit to make it clear they have, I

21    mean, you know, paragraph 4 states, "It is understood and

22    agreed this is not a lease of any space but is merely a

23    revocable license granted by the CTRS only on the terms and

24    conditions set forth.  CTRS reserves the unrestrictive right

56

1    to decline stall space and reduce the number of stalls

2    allocated, revoke this license at will for any reason or no

3    reason."

4             THE COURT:  Mr. Hammer, is that the language?

5             MR. PETERSON:  All the folks signed this and none

6    of them objected to it as a contract of adhesion.

7             THE COURT:  Mr. Hammer, is the language startling

8    different than the language of the previous revocable stall

9    licensing agreements?

10            MR. HAMMER:  I don't know as to that particular

11   language, I don't have it in front of me, but the number of

12   starts has changed, Your Honor.  Most importantly here do

13   bear in mind that the contract does contemplate arbitration

14   of this because page 4 it says, "Charles Town Races does

15   agree that it shall negotiate with and conduct any business

16   which is the subject of this Agreement and any matters

17   reasonably related to any provision of this Agreement with

18   the duly elected officers of the HBPA or their duly

19   designated representatives."

20            So Mr. Peterson tells you that if they want to put

21   something in the contract they should have, the contract

22   already contemplates that matters reasonably related to this

23   contract are subject of arbitration, stalls are specifically

24   subject of this contract and equitable allocation is

1    specifically subject of this contract, so the issue of how

2    it is done which they have unilaterally changed the

3    purported claim that this stall license agreement supersedes

4    the contract is clearly improper and we want to arbitrate

5    those issues.  They can't argue against their own contract.

6    They agreed by this contract to be legally bound to do so

7    and instead they are acting unilaterally in the matter and

8    it deprives my clients of the livelihood that they

9    acknowledged in the agreement was essential to have those

10   free stalls and they agreed to the terms already.  So I

11   don't see how this Court has any choice but to grant this

12   stay and to allow arbitration to occur unless it's the

13   Court's decision to plunge into all of these issues which I

14   don't think that you can under the Supremacy Clause and

15   9 U.S.C. Section 2 but if that is the Court's intent

16   certainly we'll be back to do just that.

17            THE COURT:  Mr. Peterson.

18            MR. PETERSON:  They are forgetting when they're

19   saying that the equitable allocation of stalls entitled them

20   to challenge this agreement under HBPA agreement because it

21   is covered or reasonably related they're forgetting that

22   paragraph D of that section removes from consideration the

23   language that is contained in this agreement.  It is

24   expressly stated in here that they don't have any right to

58

1    determine the conditions under which these stalls are

2    allocated terms and conditions for stall applications are

3    set forth by Charles Town Races and Slots.  that there is no

4    implied coverage of this agreement in here because there is

5    an expressed provision stating that it won't be covered that

6    is given to my client as sole discretion.  There is nothing

7    in here that says they have the right to negotiate over

8    this.  So to the extent we are arguing here about whether

9    this is arbitrable, I don't feel that it is,  but that is

10   really not the point.  The point gets back to the factors

11   that you look at when you are issuing a temporary

12   restraining order, the likelihood of success on the merits,

13   irreparable harm which I think clearly has not been shown,

14   and the burden on my client versus the burden on his client

15   whoever they are, and when you look at those factors --

16   unclean hands that they have in coming in here at the very

17   last minute when they could have at the very latest weeks

18   ago come in and applied for this relief if not months ago,

19   if they're arguing over language in the agreement itself,

20   clearly it was in favor of my client not to have a

21   temporary restraining order entered until this thing gets

22   adjudicated either through arbitration or through the

23   courts.

24           MR. HAMMER:  You know, back to the arbitration

1    clause whether any party has complied with the terms or

2    conditions of this agreement is arbitrable itself so when he

3    says he doesn't think that this is the subject of the

4    arbitration agreement, the arbitration agreement at page 13

5    says that that very issue is properly arbitrable so whether

6    they have complied with the terms and conditions in doing

7    what they have done is the subject of arbitration.  Again,

8    this is all locked up by this contract.  There is no waiver

9    under this contract they agreed to that.  So whatever they

10   want to argue about the two weeks Ms. Mawing has had since

11   being told she will have no stalls left is simply not

12   applicable.  She is here, Mr. Yetsook is here, the HBPA is

13   here and they demand their right to arbitrate under the

14   agreement that the Racetrack entered into.  This Court has

15   no choice pursuant to the Federal Arbitration Act but to

16   enforce this agreement and send us to arbitration.

17          MR. PETERSON:  There is no requirement under the

18   Federal Arbitration Act that the Court enter a temporary

19   restraining order, none, that is completely within this

20   Court's discretion.  What I am saying is even if it is not

21   arbitrable, but even if it is, there is no ground under

22   state law to enter into a TRO and restrain my clients from

23   determining who can have these stalls in the interim.  That

24   is my point, Your Honor.

60

1          THE COURT:  All right, thank you very much.

2          I will take a recess.

3          (Brief recess.)

4          THE COURT:  It's always a pleasure to get a chance

5     to sit in any case that has two such outstanding lawyers as

6     we have experienced here this morning.  This high level of

7     lawyering is really a pleasure to watch and see lawyers who

8     are able to stand not only energetically and represent

9     clients the way that both of you have, but to answer the

10    Court's questions in a cogent and informative way because,

11    frankly, all of this is very new to me and I had only the

12    briefest of opportunity to go through the pleadings that

13    were laid before us yesterday so I needed to ask questions

14    of both sides.  I think that you have both ably answered the

15    questions that I have peppered both sides with all through

16    the morning.  So I want to tell you I do appreciate that.

17          In looking over not only the petition or the

18    complaint and the application for this TRO and the

19    supporting documentation, being the agreement between the

20    HBPA and the Racetrack and the revocable stall licensing

21    agreement, it appears to the Court that when you consider it

22    against the backdrop of the fact that all of the stalls are

23    held by members of the HBPA, that there are more members of

24    the HBPA who wish and need stalls than there are available,

61

1   and the fact that these are let under the terms of the

2   agreement by the Racetrack on terms that it sets, and the

3   fact that there are numerous issues that are perhaps grist

4   for the mill of an arbitrator, it appears to the Court that

5   the Plaintiff does not support a substantial likelihood of

6   success to the extent that the Court feels that it needs to

7   grant the TRO nor is there a case made we feel for

8   irreparable harm since this is a matter of transporting

9   horses, and if the arbitrator or this Court with Judge

10   Steptoe presiding on what may remain of this determines that

11   there has been some improper or impermissible or unlawful

12   basis for these determinations that are somehow actionable

13   that there are adequate remedies through financial damages,

14   therefore, I feel that the case for TRO is not strong enough

15   that the Court will not grant one today.

16       The matter can be and I take it will from

17   Mr. Hammer's remarks be subject to arbitration and Judge

18   Steptoe would have jurisdiction in this case beyond this

19   point.

20       I will note, Mr. Hammer, the objection that you

21   would make on behalf of the HBPA and, Mr. Peterson, I would

22   ask that you would write the order for today showing

23   Mr. Hammer's objection if you would, please, and we are in

24   recess.

62

1          (Whereupon, the proceedings concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                                    CERTIFICATE

2          I hereby certify that the transcript(s) in the above

3    case meet the requirements of the Code of the State of West

4    Virginia.  And all rules pertaining thereto as promulgated

5    by the Supreme Court of Appeals.

6

7

8                              *Marcia L. Chandler*

9                              Marcia L. Chandler, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 1

1  AMERICAN ARBITRATION ASSOCIATION
2
3  CHARLES TOWN HORSEMAN'S, :
   BENEVOLENT AND PROTECTIVE :
4  ASSOCIATION, INC., and   :
   TINA MAWING,        : NO. 55-196-Y-00015-12
5      Claimants  :
       v.      :
6  PNGI CHARLES TOWN GAMING, :
   LLC,        :
7      Respondent :
8
9
10      * * *
11     Deposition of Malcolm G. Barr
12     Wednesday, March 13, 2013
13      * * *
14  a witness herein, taken on behalf of the
15  respondent in the above-entitled cause of action
16  pursuant to notice and the Rules of the American
17  Arbitration Association by and before Tamela G.
18  Sheeler, RPR, CLR, Notary Public within and for
19  the State of West Virginia at the offices of
20  Streski Reporting & Video Service, 300 Foxcroft
21  Avenue, Suite 300, Martinsburg 25401, West
22  Virginia, commencing at 11:01 a.m.
23
24

Page 2

1  APPEARANCES:
2
3      On behalf of the Claimant:
4      DAVID M. HAMMER, Esquire
5  Hammer, Ferretti & Schiavoni, 408 West King
6  Street, Martinsburg, West Virginia 25401
7      Telephone: (304) 264-8505
8      Fax: (304) 264-8506
9      E-mail: dhammer@hfslawyers.com
10
11      On behalf of the Claimant:
12     HARRY P. WADDELL, Esquire
13  Waddell Law Offices, 300 West Martin Street,
14  Martinsburg, West Virginia 25401
15     Telephone: (304) 263-4988
16     Fax: (304) 262-2498
17     E-mail: hwad50@aol.com
18
19
20
21
22
23
24

Page 3

1  APPEARANCES (Cont.):
2
3      On behalf of the Respondent:
4      STACEY A. SCRIVANI, Esquire
5  Stevens & Lee, PC, 111 North Sixth Street,
6  Reading, Pennsylvania 19603
7      Telephone: (610) 478-2086
8      Fax: (610) 988-0812
9      E-mail: sasc@stevenslee.com
10
11
12
13  ALSO PRESENT:
14     Erich Zimny
15
16
17
18
19
20
21
22
23
24

Page 4

1      I N D E X
2  WITNESS                    PAGE
3  Malcolm G. Barr
4      Examination By Ms. Scrivani ........... 5
5      Examination By Mr. Hammer ............ 33
6      Examination By Ms. Scrivani .......... 42
7      Examination By Mr. Hammer ............ 45
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

```
 1            * * *
 2          MALCOLM G. BARR
 3  being first duly sworn, was examined and deposed
 4  as follows:
 5       E X A M I N A T I O N
 6  BY MS. SCRIVANI:
 7  Q.        Good morning, Mr. Barr.  We met off
 8  the record.  But for purposes of the record, my
 9  name is Stacy Scrivani and I'm an attorney with
10  the law firm of Stevens and Lee.  And in this
11  matter I represent PNGI Charles Town Races in an
12  arbitration that's been brought against it by
13  Tina Mawing.
14           You understand you're here today to
15  give a deposition in that matter?
16  A.        Yes.
17  Q.        Sir, have you ever given a deposition
18  before?
19  A.        Yes.
20  Q.        How many years ago?
21  A.        30-something.
22  Q.        What type of case was that, just
23  generally?
24  A.        It was -- it had to do something with
```

Page 6

```
 1  a town in Canada.
 2  Q.        Okay.
 3  A.        I was a reporter at the time and I
 4  didn't -- wasn't allow to say much.
 5  Q.        Okay.
 6           Sir, I'm going to give you a couple
 7  of instructions that will hopefully make the
 8  deposition move more smoothly.
 9           The first is that, as you can see, we
10  have a court reporter here who is taking down
11  what is being said.  So it's important that only
12  one of us speak at a time so she can accurately
13  record.  So I'm going to ask, I'm going to let
14  you know that I will make every effort to make
15  sure I do not start a new question until you
16  finished your answer, if you would please wait
17  for me to finish my question until you begin your
18  answer; is that fair?
19  A.        Sure.
20  Q.        Additionally, because this is being
21  recorded stenographically, you will need to give
22  audible responses.  A shake of the head, a nod of
23  the head, cannot be accurately recorded.  So I'd
24  ask that you please verbalize all of your
```

Page 7

```
 1  responses and use words as opposed to uh-huh or
 2  huh-uh.
 3  A.        I understand.
 4  Q.        Additionally, I'm going to do my best
 5  to try to ask questions that are as clear as
 6  possible, but I don't always succeed at that.  So
 7  if you do not understand me, please ask me to
 8  rephrase the question or let me know you don't
 9  understand.  If you answer my question, I'm going
10  to assume that you understood; is that fair?
11  A.        Yes.
12  Q.        Sir, I don't expect us to be here
13  very long today, but if at any time you would
14  like to take a break, please let me know.  I
15  would just ask that if I have a question pending
16  you answer that question and then we can take the
17  break.
18  A.        That's good.
19  Q.        Finally, you understand that you are
20  under oath today?
21  A.        Yes.
22  Q.        Are you suffering from any mental
23  conditions or physical conditions that prevent
24  you from testifying truthfully?
```

Page 8

```
 1  A.        No, ma'am.
 2  Q.        Are you taking any medication that
 3  would prevent you from testifying truthfully?
 4  A.        No.
 5  Q.        Sir, are you being represented here
 6  today by either Mr. Hammer or Mr. Waddell?
 7  A.        Nobody.
 8  Q.        Do you know why you are here today?
 9  A.        I know I'm here in the matter of the
10  Tina, or Anthony Mawing, or both.
11  Q.        Were you aware, prior to being
12  contacted by my office to come for this
13  deposition, that Miss Mawing had filed a lawsuit
14  against PNGI?
15  A.        Yes.
16  Q.        How were you aware of that?
17  A.        I was president of a horse racing
18  syndicate about four or five years ago.  And I
19  think it came up at a meeting of the Horseman's
20  Benevolent Association and later between she and
21  I when the question of stabling our horses off
22  track arose.
23  Q.        Okay.
24           Were you ever a member of the board
```

Page 9

1  of directors of the Horseman's Benevolent
2  Protective Association in Charles Town?
3  A.        Invited, but no.
4  Q.        So when you say it was a meeting, was
5  it a meeting of the general membership?
6  A.        Yes. And I don't even recall that it
7  was part of the agenda, it just came up, that's
8  when I first learned of it. But probably not as
9  part of the agenda of the meeting.
10 Q.        Then you said it came up again
11 privately between you when a question of stabling
12 arose. Can you tell me a little bit about that?
13 A.        Yes. I have had several trainers at
14 Charles Town, among other tracks. Tina Mawing
15 was the first one to call me and tell me that
16 they were stabling their horses off the track.
17 She stressed, I think, it's not too far and
18 convenient -- and it's convenient and we'll ship
19 the horses in for training.
20          And I said -- I think first words out
21 of my mouth, as I recall, had to do with, How
22 much extra will that be? And I think it was
23 about $15 a day.
24 Q.        Per horse?

Page 10

1  A.        Per horse, yeah. $15 or $20, I
2  forget.
3  Q.        Did you have a concern about that
4  additional $15 per day?
5  A.        Only that I had to sell it to my
6  partners. We had probably 15 or 20 investors at
7  the time. And I needed to know pretty
8  specifically then or -- I'm not answering
9  specifically now. To sell them on the idea that
10 Tina was a trainer for us. And that it would
11 cost extra money.
12 Q.        Okay.
13          I'm going to come back to that, I
14 want to sort of get a little historical
15 information first.
16 A.        Uh-huh.
17 Q.        Did you know that Miss Mawing had
18 identified you as a witness in this lawsuit?
19 A.        Not until I got a call before I went
20 on vacation two or three weeks ago from a
21 gentleman I recall as Nick.
22 Q.        Just for the record, that's Nick
23 Pennington and he works in my office.
24 A.        That's right, that's right.

Page 11

1  Q.        When you heard from Mr. Pennington
2  that we were trying to schedule your deposition,
3  did you then speak with Miss Mawing about why she
4  might have identified you as a witness?
5  A.        I called and asked her why at this
6  late date I was being called in. She said, I'm
7  sorry, I didn't realize you were on the list.
8  Q.        What else --
9  A.        I said, that's okay, don't worry
10 about it.
11 Q.        What else did you and she speak about
12 during that call?
13 A.        Pretty much about the case itself. I
14 asked her, is this still about the situation?
15 And I couldn't remember what it was specifically.
16 It was a few years ago. She said, Yes, it's
17 still dragging on.
18 Q.        Did she tell you anything about her
19 view of the case?
20 A.        Let me see. She -- she said it
21 was -- she said it was still about the, I think,
22 the off-track stabling of the horses.
23 And I said, Oh, that issue. Or some response
24 like that. And that I kind of rhetorically said,

Page 12

1  Oh, that's still going on, is it?
2          And she said yes. And she apologized
3  again for, as she put it, dragging me into it
4  since, I guess, so long had elapsed since I had
5  been involved.
6  Q.        Did she tell you what she expected
7  you to testify about?
8  A.        No.
9  Q.        Did she tell you what she had
10 communicated in the lawsuit would be your
11 testimony?
12 A.        Pardon?
13 Q.        Did she tell you what she had told
14 Penn National your testimony would be in this
15 case?
16 A.        No.
17 Q.        Did you have any other discussions
18 with Miss Mawing between the time Mr. Pennington
19 called you and today?
20 A.        No.
21 Q.        Did you have any discussions with
22 Anthony Mawing between the time Mr. Pennington
23 called you and today?
24 A.        Yes.

Page 13

1 Q.        How many times have you spoken to
2 Anthony Mawing?
3 A.        I spoke to Anthony when I first got
4 Pennington's call.
5 Q.        Why did you --
6 A.        Well, I called him to find out what
7 it was all about.
8 Q.        Did you --
9 A.        And he told me.  Sorry.
10 Q.       I'm sorry.
11          What did Mr. Mawing tell you?
12 A.        Because it was a cell phone call and
13 I think he was at the track, he told me very
14 little that was intelligible, we kept breaking
15 up.  And I said, I know you're working, Anthony.
16 I'll talk to Tina at some point.Then.
17          The second time I talked to him was
18 just this morning when I called from
19 the -- called him offhanded, there was nothing
20 better to do from the car.  Today we didn't talk
21 about anything to do with this, we just exchanged
22 pleasantries, I guess.  And I asked him if he knew
23 his way here and if he didn't I would -- he told
24 me he was coming this morning.  And I asked him

Page 14

1 if he knew his way here, if he didn't, I could
2 tell him.
3 Q.        But you didn't talk about your
4 testimony or the lawsuit?
5 A.        Nope.
6 Q.        Okay.
7          Have you ever at any time had a
8 discussion with Mr. Hammer?
9 A.        No, ma'am.
10 Q.       How about Mr. Waddell?
11 A.        Neither one.
12 Q.       Anybody from either of their law
13 offices?
14 A.        I don't -- I don't think so.
15 Q.       Okay.
16          Sir, when did you first become
17 involved in horse racing?
18 A.        1989.
19 Q.       What was that involvement?
20 A.        That was the formation of the
21 Hampshire Racing Partnerships, it was an L.L.C.,
22 International Press Club in Washington, DC.  That
23 was a formation meeting of the L.L.C. and the
24 initial perspective partners.  My partner then

Page 15

1 was William Joyce, who then was the justice
2 department attorney to become an immigration
3 judge.  And now he is in private immigration
4 practice in Boston.
5 Q.        So initially the partnership
6 consisted of you and Mr. Joyce?
7 A.        Right.
8 Q.        What was the purpose of the
9 partnership?
10 A.        To bring people together to, and sell
11 partnership shares in thoroughbred horses.
12 Q.       All thoroughbred horses?
13 A.        Yes.
14 Q.       Was this a breeding operation or
15 simply an ownership operation?
16 A.        This was a -- began as an ownership
17 of horses that were racing, actively racing.
18 Initially in 1996 we incorporated and became the
19 Hampshire Alliance, Inc. registered in Delaware.
20 At which point we bred, we began breeding from
21 two mares who we had racing and ended up being
22 retired.
23 Q.       From 1989 to 1996, did you have any
24 horses in -- is it fair for me to call this a

Page 16

1 syndicate?
2 A.        Yes.
3 Q.        Did you have any horses in the
4 syndicate that raced at Charles Town?
5 A.        Probably -- yes.  Yes.
6 Q.        How many horses were owned by the
7 syndicate in that same period '89 to '96?
8 A.        Off and on we would have gone
9 through -- this is a very rough estimate, 40 to
10 60 claiming horses.
11 Q.       What other tracks in addition to
12 Charles Town did those horses that were owned
13 between '89 and '96 race at?
14 A.        They were all raced specifically at
15 Laurel and Pimlico.  The number of times we raced
16 at Charles Town at that period would have been
17 probably less than five percent of our races.
18 Q.       Were they always transported in for
19 those races, as opposed to being stalled locally?
20 A.        Yes.
21 Q.       In 1996 when you -- is it fair to say
22 that you added breeding to the ownership?
23 A.        Yes.
24 Q.       Okay.

Page 17

1      **Did you continue to own approximately**
2  **40 to 60 horses after 1996?**
3  A.      Let me explain the 40 to 60.
4  **Q.      Sure.**
5  A.      These came in in groups of one --
6  well, not a group of one.  But they came in as
7  single horses.  They were claimed from the track
8  for certain of, a number of partnerships, which
9  usually were considered of ten owners.  And each
10  partnership would be for a period of, last for a
11  period of two years.  And we would probably run
12  four or five claiming horses depending on the
13  success or lack of it through the partnership,
14  individual partnerships.
15          At that time we were running probably
16  an average of two of the ten person partnerships.
17  **Q.      When you say at that time, you're**
18  **talking about 1996?**
19  A.      Up to that time, yes.  It was one and
20  two partnerships.  And later we developed into,
21  up to five and six partnerships.
22          Pretty well always with 10 and not
23  more than 14 investors.
24  **Q.      The partnerships all had different**

Page 18

1  names?
2  A.      Yes.
3  **Q.      But they had Hampshire in them**
4  **somehow?**
5  A.      Yeah, mostly, sometimes we'd name
6  them after -- yes, it would be the Hampshire
7  Saratoga, for example, the Hampshire Saratoga
8  Partnership, the Hampshire Laurel Partnership, et
9  cetera.  Those were inside the umbrella, the
10  L.L.C. umbrella and later the corporate umbrella.
11  **Q.      Did there come a time when the**
12  **corporation had partnerships that were racing on**
13  **more of a full-time basis at Charles Town?**
14  A.      Yeah, the time came in the early
15  2000s.  Let me see, I retired from the federal
16  government in 1996 and we moved to Front Royal
17  and my wife retired in 19 -- in 2002.  And due
18  to the proximity of the Charles Town Racetrack,
19  we hired our first full-time trainer there in,
20  sometime after 2002.
21  **Q.      Who was that?**
22  A.      That was a lady whose name escapes me
23  that we only had her very briefly.  She claimed a
24  horse for us, the horse broke down, we didn't

Page 19

1  have any more to do with her.  I can't remember
2  her name.
3          The first major trainer we had was
4  Jeff Runco.
5  **Q.      Do you recall about what year, what**
6  **year or years you had him?**
7  A.      Yeah, Runco would have come in around
8  2004 or '05, probably 2004.
9  **Q.      How long did he -- let me back up.**
10  **In what name, what named partnership**
11  **was running horses at Charles Town?**
12  A.      We ran under, in the program we ran
13  under Hampshire Racing Partnerships still.
14  **Q.      Okay.**
15          **How long did Mr. Runco act as trainer**
16  **for the Hampshire Racing Partnerships?**
17  A.      I think about two years.
18  **Q.      Why did he cease being the trainer?**
19  A.      In a nutshell I fired him.
20  **Q.      Why?**
21  A.      He wasn't -- he is one of the top
22  trainers in Charles Town but he wasn't
23  claiming -- his success of claiming for us wasn't
24  like we expected.

Page 20

1  **Q.      So was that in '06 or '07 when he**
2  **ceased being a trainer for the Hampshire Racing**
3  **Partnerships?**
4  A.      I can't be precise.  That's around
5  about it.
6  **Q.      Was another trainer then hired?**
7  A.      Yes.  We went on to -- oh, dear.
8  Cuttino, C U T T I N O.  First name escapes me at
9  the moment.  Although we had him for a couple of
10  years until he left the area unexpectedly.
11  **Q.      How many horses was Mr. Runco**
12  **training?**
13  A.      He had one or two, depending on
14  claims.
15  **Q.      Then in '06 or '07 you hired Mr., is**
16  **it --**
17  A.      It's Cuttino, you pronounced it.  I
18  think that's the correct spelling.
19  **Q.      Hired him in '06 or '07.**
20  A.      Yeah.
21  **Q.      And had him until '08, '09?**
22  A.      Yeah, again roughly.
23  **Q.      How many horses did he train**
24  **approximately?**

Page 21

1   A.        Over the period he probably had seven
2   or eight.
3   Q.        He ceased being the trainer because
4   he left the area unexpectedly?
5   A.        Right.
6   Q.        Who was the next trainer?
7   A.        Around this time we started -- no, we
8   didn't start, we continued a breeding program in
9   West Virginia and bought -- also, we bought two
10  year olds in training from Randy Funkhouser. And
11  we used his trainer, George Yetsook for probably
12  18 months. This was taking us down to 2009,
13  2010?
14  Q.        Let me go back a minute.
15            When Mr. Runco was your trainer, were
16  the one to two horses that he was training
17  stalled at Charles Town or off the property?
18  A.        They were training out of stables at
19  the track.
20            I had one, I had horses on his farm,
21  young ones, or maybe a young one.
22  Q.        So the horses that were racing were at
23  the track and then there was a horse on the farm?
24  A.        When I say two, I mean two at one

Page 22

1   time. He probably had six or eight horses over
2   the period. But they would come and go and
3   change horses in the claiming business. We're
4   still in the claiming business.
5   Q.        I understand.
6            Mr. Cuttino, the horses that he
7   trained over time.
8   A.        Yeah.
9   Q.        Were they on the track or somewhere
10  else?
11  A.        They were on the track.
12  Q.        Okay.
13            How about the horses that Mr. Yetsook
14  was training?
15  A.        They were on the track -- some of
16  them were on the track for a while. And then
17  Randy Funkhouser moved them into private barns.
18  And I don't remember what arrangement we came to
19  at that point. There was some increase in cost,
20  but I don't -- I don't remember the details. We
21  weren't with him too long after that.
22  Q.        Was it because the horses were moved
23  off the track that you stopped using Mr. Yetsook?
24  A.        No, it was a dispute with Funkhouser

Page 23

1   and Yetsook.
2   Q.        Over what?
3   A.        Over the length of time that Yetsook
4   was taking to get our young horses then prepared
5   to race.
6   Q.        Now, was there any overlap between
7   any of these trainers?
8   A.        Well -- yeah, we had a principal
9   trainer who was with us all of this time in
10  Laurel. His name was Dale Capuano. He was our
11  trainer from the get go of all horses until we
12  began moving them to Charles Town. Well,
13  claiming from Charles Town.
14  Q.        As between Mr. Runco, Mr. -- let me
15  get this right, Cuttino and Mr. Yetsook, was
16  there ever an overlap between those through?
17  A.        No. The overlap was with Capuano all
18  the time.
19  Q.        After Mr. Yetsook, who did you hire
20  to train horses at Charles Town?
21  A.        After Yetsook we got Tina Mawing.
22  Q.        How did you come to hire Ms. Mawing?
23  A.        Reputation, actually.
24  Q.        What about her reputation?

Page 24

1   A.        She had a good reputation for
2   bringing along young horses.
3   Q.        Generally on the track or was there
4   somebody specifically that had told you about
5   that?
6   A.        It was -- yeah, it was track. I knew
7   a lot of people around the track, trainers, and a
8   lot of horsemen. And her name came up. And I
9   went to visit with her and liked her attitude.
10  And that -- it was my judgment call. And I put
11  it to the owners of the day. And they generally
12  agreed with what we were doing. And they agreed
13  in this case, to, for me to hire Tina Mawing.
14  Q.        Do you recall a date when that,
15  around a year when that happened?
16  A.        I'm trying to -- it was after
17  Cuttino, I've got all of this in written -- we've
18  got five years of Hampshire records. But it
19  would be around 2009. I think we had her
20  for -- until the end the partnerships which was
21  terminated in December 2010, the end
22  of -- December 31st.
23  Q.        How many owners did you have in the
24  partnerships about the time you hired Ms. Mawing

Page 25

1  A.        Probably 20.
2  Q.        I'm going to show you a document that
3  I hope will help you on the dates.
4  A.        Okay.
5  Q.        I'm showing you what's been marked
6  previously as Exhibit R-25 which I will represent
7  to you is a printout of Ms. Mawing's training
8  record.
9          It starts in the back, it's oldest to
10  newest, on January 1st, 2007 and goes through
11  February 27th of 2013.
12          I believe if you look in the 2008
13  period you may find some Hampshire Racing.
14  A.        What page is it?
15  Q.        Let me find one here. I'm going in
16  the wrong direction.
17  A.        We've got records of every race we
18  had, but I didn't bring it with me.
19          Here we are Page 4. Makinusfamous
20  was one. It's on Page 4.
21  Q.        I'm sorry, my mistake, I don't think
22  I see in Hampshire Racings in 2008, so I think
23  your recollection of 2009 is correct.
24  A.        Well, this is -- okay. Yeah, this

Page 26

1  was in '10. This is 2010.
2  Q.        On Page 5 I see, six down from the
3  top, a July 2009.
4  A.        That's the same horse as on the
5  previous page, one of them anyway.
6  Q.        Yeah. What I'm trying to establish
7  is the first time Ms. Mawing raced a horse on
8  behalf of Hampshire Way. And it looks like that
9  might be it, July of 2009?
10  A.        How does this go?
11  Q.        It goes from oldest to newest.
12  A.        It's backwards.
13  Q.        Yeah, it's backwards.
14  A.        West Hampshire Way, that makes sense,
15  because that was a homebred, she was young. And
16  we were looking for a hands on trainer who
17  understood and frankly formed a relationship with
18  these young horses.
19  Q.        How --
20  A.        That would be about it.
21  Q.        How long before one of your, the
22  Hampshire horses, actually ran under Ms. Mawing
23  did she have them in training?
24  A.        I haven't the foggiest idea. What

Page 27

1  weeks or -- I mean, weeks? Several weeks.
2  Q.        Okay.
3          When you hired Ms. Mawing, did she
4  have any stalls at the track?
5  A.        No. At least I don't think so. We
6  were told that we would be obliged to have them
7  kept off track. And I put the proposal to the
8  partners. And they kind of said, okay.
9  Q.        Did you have any reservations or
10  concerns about the fact that Miss Mawing was not
11  going to stall them at the track?
12  A.        I had reservations about the extra
13  charge that she would -- told us she would have
14  to make to cover the cost of the privately owned
15  stalls and the vanning of the horses to the
16  track, which was about, I guess, about three
17  miles, three or four times a week.
18          Those concerns I took to the partners
19  because they were financial and impacted them.
20  And recommended that we go ahead and try it.
21          I think I said there may be
22  advantages to having them off the track since
23  they, most of those that we knew were upcoming
24  were young horses.

Page 28

1  Q.        What are some of those advantages?
2  A.        For the youngsters one of them would
3  be the relative quiet, away from the humdrum of
4  the track. We always recognize that if we moved
5  them anywhere else it would be at the track, so
6  this wasn't to be a -- we never really thought of
7  it to be a long-term thing.
8          MR. HAMMER: I'm sorry, what
9  did you say?
10          THE WITNESS: Never thought
11  it was a forever thing.
12  BY MS. SCRIVANI:
13  Q.        What was a forever thing?
14  A.        We didn't think of having horses
15  consistently in stalls away from the track
16  forever.
17          I think frankly we thought there
18  would be a move on her part back to the track. I
19  didn't know much then about the -- about why she
20  left. I don't even know now, I don't think,
21  firsthand, why she was, why she lost her stalls.
22  Q.        You never talked to her about that?
23  A.        Not really. It wasn't -- know her
24  that well. We didn't -- it didn't really matter

Page 29

1  to us at the moment.
2  Q.    Was Makin --
3  A.    Makinusfamous.
4  Q.    Makinusfamous and West Hampshire Way
5  the only two horses that Ms. Mawing has trained
6  for Hampshire?
7  A.    No. But I can't remember the others
8  offhand without looking at the list here.
9      Makinusfamous was the claimer, West
10  Hampshire Way was a, either a two or three year
11  old homebred. It was these homebreds that we
12  felt was an initial advantage to having them away
13  for their first few months, at least.
14  Q.    Can you look at the list and see if
15  you see any others?
16  A.    Yeah, I just saw some.
17  Q.    Those are the only two I'm seeing.
18  A.    Maybe. She had one later that
19  we -- actually retired there, she was injured.
20  That was neither one of those. I'm trying to
21  think of the retiree.
22      To save a lot of time, you'll get
23  the -- I'm having one of my senior moments. The
24  horse we had with her was, we felt, one of our

Page 30

1  better horses. And toward the end of the
2  partnerships in 2010 we were looking for a farm
3  to take this horse for retraining into something
4  else, dressage or even as a hunter. And we left
5  her with Tina and Anthony. And I think they've
6  used her since as a, as a jog, just a jogging
7  horse who moved around wherever she is.
8      I can't remember the name of it. I
9  can't find it here. I can't remember. I cannot
10  remember the name of that horse.
11  Q.    Were there any others besides
12  Makinusfamous -- I can't remember what I just
13  looked at.
14  A.    West Hampshire Way.
15  Q.    West Hampshire Way and the horse who
16  retired whose name you can't recall that Miss
17  Mawing trained?
18  A.    No, I don't think so. Relatively
19  speaking we weren't with her very long. As I
20  said, it was towards the end of the partnership.
21  The horse she kept could have been West Hampshire
22  Way. It was a homebred. I didn't think so.
23  Q.    Now, you testified previously that
24  the partnerships ended at the end of December

Page 31

1  2010. What was the purpose of ending the
2  partnerships?
3  A.    The corporation ended in December
4  31st, 2010. It was just a decision to close out
5  the business. I was getting into my mid to upper
6  70s. My wife who was the treasurer similarly was
7  aging. And we decided in the ultimate to go out
8  on the top with our 130th winner. And we did.
9  Q.    Who was that, the 130th winner?
10  A.    I don't know, I can't remember.
11  Q.    All right. If I look at Miss
12  Mawing's chart there, if you turn to Page 3 of
13  10.
14  A.    Uh-huh.
15  Q.    The last race I see for a Hampshire
16  Racing Partnership horse is on May 30th, 2010,
17  which is towards the end of the page,
18  Makinusfamous.
19  A.    Yeah.
20  Q.    I don't see another Hampshire Race in
21  2010, but if I'm mistaken, please let me know.
22  A.    Without my own records, I don't know.
23  Q.    Okay. Did you ever --
24  A.    Wait a minute, here is -- well,

Page 32

1  that's Makinusfamous. This goes the opposite
2  way, doesn't it?
3  Q.    It goes the opposite way, right.
4  A.    Okay.
5  Q.    So the last race that Miss Mawing had
6  in 2010 was on December 22nd, 2010, kind of in
7  the middle of the page, with the horse that she
8  owned. So that's where 2010 ends, do you see
9  that? The dates are on this side.
10  A.    What are we looking for here?
11  Q.    Between May 30th, 2010 when
12  Makinusfamous ran and the end of 2010 --
13  A.    Here, it ran twice.
14  Q.    do you see any Hampshire Racing
15  races?
16  A.    No. Let me just go through the
17  horses. No.
18  Q.    No you don't see any?
19  A.    No.
20  Q.    Did you ever have any trainers at
21  Charles Town after Miss Mawing?
22  A.    No.
23  Q.    Was the reason that Miss Mawing
24  ceased being a trainer for Hampshire Racing

Page 33

1  Partnerships was because the partnership ended?
2  A.      Yes.
3  Q.      Was the decision to cease using Miss
4  Mawing as a trainer, did it ever have anything to
5  do with whether or not she had stalls at the
6  track?
7  A.      No.
8          MS. SCRIVANI:   I have
9  nothing further, thank you.
10         * * *
11         E X A M I N A T I O N
12  BY MR. HAMMER:
13  Q.      Mr. Barr, I want to kind of go back
14  in time a little bit.  Just a little bit more
15  background information from you.
16  You're retired from the federal government?
17  A.      Yes.
18  Q.      What agency were you employed by?
19  A.      The last agency was Commerce, I was
20  Justice, and Labor, and then the US Senate before
21  that.
22  Q.      How many years did you serve with the
23  US Government?
24  A.      25.

Page 34

1  Q.      25 years.
2          You're currently how old?
3  A.      80.
4  Q.      80.
5          I want to talk a little bit about
6  conversations that you had with management
7  regarding your selection of trainers.
8          Do you recall ever having a
9  discussion with anyone from the Charles Town
10  Races management about who you were to select a
11  a trainer?
12  A.      Yes.
13  Q.      What do you recall?
14  A.      I had a disagreement with management
15  over a letter I had written to the head of PNGI
16  about safety, concerning safety, or unsafe
17  conditions of the track.  I'm trying to remember
18  when that was, probably around 2006.  Anyway,
19  it's in the chapter of the book I wrote about my
20  experiences in horse racing.
21          It was a -- there was a conversation
22  about my association with Yetsook, George
23  Yetsook, the trainer.  That's -- I'm trying to
24  remember now.  That had something to do with

Page 35

1  Yetsook's association with Randy Funkhouser who
2  was, I think, possibly then was head of the
3  Horseman's Association.  But I can't really be
4  any more specific.
5          However, during this period track
6  management, because of my complaint on the
7  conditions of the track and the fact that I had
8  my first, experienced my first breakdown there
9  and then a second one a couple of months later,
10  that resulted in the racing secretary, on the
11  instructions of I don't know who, declined to
12  take my entries.
13  Q.      Do you recall the name of the racing
14  secretary?
15  A.      I would if you -- somebody reminded
16  me. I don't -- Randy somebody.
17  Q.      Randy Wehrman?
18  A.      That's right.
19  Q.      Okay.
20  A.      I didn't get any explanations from
21  Randy except that he had been told not to accept
22  my -- my entries.
23         * * *
24          (Brief break)

Page 36

1          * * *
2          THE WITNESS:  Oh, Yetsook was
3  under some sort of court order, is my
4  recollection.  And he kept horses for me under
5  the protection of that order and was able to
6  race, legally race them.  I guess you would call
7  it hiding behind George Yetsook at the time,
8  since I -- and I accepted that because, you know,
9  you can't do much with the partnership if you
10  can't race the horses.
11          My alternative was to send them all
12  back to Capuano and Laurel.  But when we found
13  that we -- at least when Yetsook and his boss,
14  Randy Funkhouser, I think they had to go to court
15  for this, or something happened.  And anyway, I
16  was allowed to race a couple of horses, I had
17  gone with Yetsook at the time.
18          And he kind of got me over the hill
19  until we could get this ban lifted, which
20  I -- which they ultimately did lift for me, about
21  10, 15 days later.
22  BY MR. HAMMER:
23  Q.      Did management express any concern to
24  you about your selection of Yetsook as someone

Page 37

1 through whom you could race your horses?
2 A.      Yeah. I think the vice president for
3 racing at that time suggested that he wasn't the
4 best choice for me.
5 Q.      Do you remember the vice president's
6 name?
7 A.      Again, I would if you...
8 Q.      Dickie Moore?
9 A.      No, no, his --
10 Q.      Al Britton?
11 A.      No, his forerunner.
12 Q.      John Finamore?
13 A.      Yes. And John and I had several
14 talks. And ultimately I think we had a meeting
15 of the minds and came to an understanding that I
16 wasn't deliberately trouble making, but I
17 think -- in fact, I know his problem was, and
18 Dickie Moore's problem was that I had written a
19 letter straight up to the president in
20 Harrisonburg instead of going through channels.
21 Q.      So I'm not sure why is it that they
22 refused to accept your entries.
23 A.      I don't know except secondhand. We
24 discovered at one point that they -- an entry was

Page 38

1 turned down at the racing secretary's office. I
2 tried to find out but...
3 Q.      Did Mr. Wehrman tell you why he had
4 been told not to accept your entries?
5 A.      No.
6 Q.      How long a time was it that your
7 organization could not race in Charles Town?
8 A.      It was probably a matter of -- well,
9 the contretemps was extended over a period of
10 about a month. And there were meetings between
11 me and Dickie Moore, and Finamore on two or three
12 different occasions. But meanwhile, I assumed
13 they knew that we found a way to at least race
14 the horses a couple of times while all of this
15 was going on under whatever court order that
16 Yetsook and -- and his --
17 Q.      Funkhouser?
18 A.      Yeah. Funkhouser had accomplished.
19 Q.      Was it after you informed track
20 management that you were racing your horses
21 through Yetsook that Mr. Finamore made a comment
22 to you about being more careful about who you
23 chose to train your horses?
24          MS. SCRIVANI:    Objection.

Page 39

1          You can answer.
2 BY MR. HAMMER:
3 Q.      You can go ahead and answer.
4 A.      I don't recall.
5 Q.      Okay.
6          As accurately as you can recall, can
7 you tell us what Mr. Finamore's comment was to
8 you?
9 A.      Yes, it was something to do with
10 making a poor choice of trainer. And I -- I made
11 an assumption from that.
12 Q.      Did he explain to you why he thought
13 Mr. Yetsook was a poor choice?
14 A.      No. He left me to make my own
15 assumption, which I did.
16 Q.      In the context of the conversation,
17 what did you take his statement to mean?
18 A.      I took it to mean that, that
19 management and Funkhouser were butting heads, not
20 only as -- well, were butting heads. I think
21 that was well, well known around the track. I
22 certainly knew, because I was dealing with
23 Funkhouser in the purchase of horses, but... And
24 there were conversations. But it's -- it's kind

Page 40

1 of hearsay.
2 Q.      Did you make any changes in
3 management direction of Hampshire Racing as a
4 result of your conversation with Finamore?
5 A.      No. We were able to continue for the
6 time of the fire that I ignited by writing the
7 letter and the settlement of that which was
8 ultimately on good terms. And to the extent that
9 Dickie Moore bought my wife and I dinner in the
10 clubhouse after my final conversation with John
11 Finamore who said he would make sure everything
12 was taken care of.
13 Q.      With regard to your specific safety
14 concerns about the track at Charles Town, what
15 were they?
16 A.      They were concerns during the,
17 particularly during the times of wet tracks,
18 sloppy tracks, over the footing of the horses.
19 There was a period then that my recollection was
20 more than ten horses had gone down in a 48, 72
21 hour period. And that came after my personal
22 accident when I lost a horse in May, this would
23 be closer to the end of the year. And
24 that -- then I lost, the only horse I ever owned,

Page 41

1  I lost also toward the end of that year.  She
2  broke down in the backside.
3       Generally, I felt that a bad job had
4  been done on the -- when they rebuilt and
5  resurfaced the track.
6       I think there was a time when I had
7  offered or was involved in getting the track
8  superintendent from Laurel to come and see if he
9  couldn't help.  I'm not sure whether I mentioned
10 that to Finamore, I could have.  I know that it
11 was talked about.
12       Ultimately I think the track decided,
13 there was some negotiation with the
14 superintendent at Laurel that I was aware of.
15 But it came to nothing.
16 **Q.      Just out of my only personal**
17 **curiosity, what is the title of your book?**
18 A.      It's 1,000 to 1.  And it had a
19 subtitle.  How to race horses on a shoestring, I
20 think, and win.  And it's published by
21 AuthorHouse.  I was going to bring the book with
22 me, but I only have one copy left.
23 **Q.      Who is the publisher?  I'm sorry.**
24 A.      AuthorHouse.

Page 42

1  **Q.      Is it still in print?**
2  A.      It is still in print and I still get
3  royalties.  And I'm going to update it one of
4  these day.  It was up to the 15th year of the
5  partnerships.
6       And there is a chapter that has, did
7  describe some of what we've just been discussing,
8  perhaps more accurately, or succinctly.
9            MR. HAMMER:  Thank you,
10 that's all the questions I have for you.
11           MS. SCRIVANI:  I do have a
12 little follow up, I'm sorry.
13           THE WITNESS:  That's okay.
14           * * *
15        E X A M I N A T I O N
16 BY MS. SCRIVANI:
17 **Q.      Sir, talking about your concerns**
18 **about the conditions of the track in a letter you**
19 **said you wrote up to Penn National in**
20 **Pennsylvania, was that letter addressed to Peter**
21 **Carlino?**
22 A.      Yes.
23 **Q.      You said that that was in 2006?**
24 A.      To the best of my recollection.  It's

Page 43

1  in the book.
2  **Q.      Well, I want to test your memory on**
3  **that just a little bit, because you did then make**
4  **reference that you had two horses in the year,**
5  **you said in that year.  Was that the year that**
6  **you wrote that letter that you had two horses**
7  **break down?**
8  A.      I wrote after -- probably.
9  **Q.      Can you recall if it was May of 2006**
10 **and then the end of 2006 when you had those break**
11 **downs?**
12 A.      May, I'm pretty sure, was when the
13 one broke down.  And it would have been October,
14 November, I think, when I lost my own, that was
15 my own horse.
16 **Q.      Was that in 2006 to the best of your**
17 **recollection?**
18 A.      Yeah.
19 **Q.      Okay.**
20       **Sir, the reason I'm asking this is**
21 **because Mr. Wehrman was not employed by Charles**
22 **Town in 2006.  He did not come to Charles Town**
23 **until after 2008.**
24 A.      Well, then it was a different race.

Page 44

1        Did I say -- I said Randy, didn't I?
2  **Q.      Yes.**
3  A.      Is his last name Wehrman?
4  **Q.      Wehrman.**
5            MR. HAMMER:  You did.  But he
6  had two employments at Charles Town.
7  BY MS. SCRIVANI:
8  **Q.      His last one ended in 1999 and then**
9  **he did not come back to Charles Town until the**
10 **spring of 2008.**
11 A.      The -- I wasn't sure on that name in
12 the first place.  I know there was a secretary
13 named Randy.  If the dates don't jibe, it
14 wasn't -- because Wehrman doesn't ring a bell.
15 But anyway, the fact of the matter was, I was
16 instructed by the racing secretary's office that
17 they were not allowed to take Hampshire Racing
18 Partnership entries for a short period of time,
19 whenever that was.  And if it wasn't Randy
20 Wehrman, whoever the racing secretary was of the
21 day would be it.
22 **Q.      Was there ever any overlap in**
23 **training time between Mr. Yetsook and Ms. Mawing**
24 A.      No.

Page 45

1  Q.      So when Mr. Finamore made a comment
2  about your choice in trainers, did you ever
3  understand him to be speaking about Miss Mawing?
4  A.      No, it was to do with Yetsook.
5           MS. SCRIVANI:   I have
6  nothing further, thank you.
7           MR. HAMMER:   One last
8  question.
9               * * *
10         E X A M I N A T I O N
11  BY MR. HAMMER:
12  Q.      Does the name Doug Lamp ring a bell
13  to you?
14  A.      It does, but that wasn't it.
15  Q.      That wasn't the person?
16  A.      No.
17           MR. HAMMER:   That's all the
18  questions I have.
19       You have the right to read and sign
20  your deposition transcript, you can correct or
21  make any changes to the transcript you need to
22  make.  You can choose to exercise that right or
23  you can choose to waive that right.  The choice
24  is entirely yours.  You need to let the court

Page 46

1  reporter know what you want to do.
2           THE WITNESS:   Yeah.  I'd like
3  to see it.
4       You want corrections noted in pencil?
5           MR. HAMMER:   You will get an
6  errata sheet.  It has a line number and what your
7  correction is.
8           THE WITNESS:   That doesn't
9  stop me from going back and refreshing my memory
10  from the big box of five years of, the last five
11  years of Hampshire and my book of recorded races,
12  600 and something races.  So you'll understand
13  that these things get kind of jumbled.
14           MS. SCRIVANI:   I understand
15  that.  And it's entirely up to you if you do
16  that.  I will --
17           THE WITNESS:   It would
18  probably be helpful to you, I think.
19           MS. SCRIVANI:   -- give you
20  a heads up that, you know, when we get an errata
21  sheet back, if it has changes to your testimony,
22  we will likely call you back to talk about them.
23           THE WITNESS:   Okay.
24               * * *

Page 47

1           (Whereupon, this deposition
2  was concluded at 12:04 p.m.)
3               * * *
4           (Whereupon, signature was not
5  waived by the witness.)
6               * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 48

1  THE STATE OF    :
2  WEST VIRGINIA   :
3                  : SS: C E R T I F I C A T E
   COUNTY OF OHIO  :
4
      I, TAMELA G. SHEELER, Registered
5  Professional Reporter, do hereby certify that the
   testimony given by the within-named witness,
6  MALCOLM G. BARR, was by me reduced to stenotype
   in the presence of the witness; afterwards
7  reduced to Computer Aided Transcription under my
   direction and control; and that the foregoing is
8  a true and correct transcription of the testimony
   given by said witness.
9
10     I do further certify that this testimony was
   taken at the time and place in the foregoing
11  caption specified, and was completed without
   adjournment.
12
13     I do further certify that I am not a
   relative, counsel or attorney of either party, or
14  otherwise interested in the event of this action.
15
      IN WITNESS THEREOF, I have hereunto set my
16  hand in Wheeling, West Virginia, on the 22nd day
   of March, 2013.
17
18
19
20
21       _____
         TAMELA G. SHEELER
         Registered Professional Reporter
22
23
24

Page 49

1
  THE STATE OF    :
2  WEST VIRGINIA  :
              : SS: C E R T I F I C A T E
3  COUNTY OF OHIO :
4
5          I, TAMELA G. SHEELER, Notary Public
   within and for the State of West Virginia, duly
6  commissioned and qualified, do hereby certify
   that the within-named witness MALCOLM G. BARR,
7  was by me duly sworn to testify to the truth, the
   whole truth and nothing but the truth in the
8  cause aforesaid.
9
10
           I do further certify that I am not a
11 relative, counsel or attorney of either party, or
   otherwise interested in the event of this action.
12
13
14         IN WITNESS THEREOF, I have hereunto set
   my hand and affixed my seal of office at
15 Wheeling, West Virginia, on the 22nd day of
   March, 2013.
16
17
18
19         _____
           TAMELA G. SHEELER, Notary
20         Public within and for the State
           of West Virginia
21
22
   My Commission expires:
23 November 4, 2021
24

**Subject:** FW: Mawing v. PNGI // AAA No: 55−196−Y−00015−12

**From:** Pennington, Nicholas (NHP@stevenslee.com)

**To:** SASC@stevenslee.com;

**Cc:** staceyscrivani@yahoo.com;

**Date:** Tuesday, June 11, 2013 4:35 PM

**From:** David Hammer [mailto:DHammer@hfslawyers.com]
**Sent:** Monday, April 29, 2013 1:17 PM
**To:** Scrivani, Stacey A.; hwad50@aol.com
**Cc:** Wolfson, Joseph; Pennington, Nicholas; Christina Bernhard; Hwad50
**Subject:** RE: Mawing v. PNGI // AAA No: 55-196-Y-00015-12

Stacey,

Client and her husband spent the weekend going through old files, storage, and whatever else they could search looking for invoices. They have all of the 2012 and 2013 invoices and a few strays from years earlier. Once an invoice was paid and the payment matched the invoice they did not routinely save invoices.

I have also queried Ms. Mawing regarding the computer used to generate the older invoices. They do not have the computer and Ms. Mawing believes they have been through at least several computers over the years. They also do not have any back-ups of the old computer systems.

I understand that the invoices will be delivered to me tomorrow. We will pdf them and depending on the time of day, either email them to you tomorrow or Wednesday morning.

With regard to resuming Randy Werhman's deposition I am awaiting dates from you. I don't think the deposition will take very long and I anticipate doing it by telephone. Please provide me with several alternate dates when you are available.

EXHIBIT
R-72
DW 6/12/13

Thank you,


David Hammer


> **From:** Scrivani, Stacey A. [mailto:SASC@stevenslee.com]
> **Sent:** Monday, April 29, 2013 8:36 AM
> **To:** David Hammer; hwad50@aol.com
> **Cc:** Wolfson, Joseph; Pennington, Nicholas
> **Subject:** RE: Mawing v. PNGI // AAA No: 55-196-Y-00015-12



> David,
>
> I'm following up on the below.  If you are not able to give me a date by which these will be produced this
> week, we will have no choice but to go back to the panel to compel a production deadline.
>
> Stacey
>
>
> **Stacey A. Scrivani | Stevens & Lee, P.C.**
> 111 North Sixth Street | P.O. Box 679 | Reading, PA 19603
> Phone: (610) 478-2086 | Internal: ext 655 | Fax: (610) 988-0812 | E-mail: sasc@stevenslee.com



> **From:** David Hammer [mailto:DHammer@hfslawyers.com]
> **Sent:** Wednesday, April 24, 2013 10:39 AM
> **To:** Scrivani, Stacey A.; hwad50@aol.com
> **Cc:** Wolfson, Joseph; Pennington, Nicholas
> **Subject:** RE: Mawing v. PNGI // AAA No: 55-196-Y-00015-12



> Not yet as she's assessing what will have to be searched.
>
>
> David Hammer