# EXHIBIT 11A

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **CHARLES TOWN HORSEMAN'S** | : | |
| **BENEVOLENT AND PROTECTIVE** | : | |
| **ASSOCIATION, INC. and** | : | |
| **TINA MAWING,** | : | **NO. 55-196-Y-00015-12** |
| | : | |
| Claimants | : | |
| | : | |
| v. | : | |
| | : | |
| **PNGI CHARLES TOWN GAMING,** | : | |
| **LLC,** | : | |
| | : | |
| Respondent | | |

**CLAIMANT'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

This matter came on for arbitration on June 10, 2013 pursuant to the Rules of the

American Arbitration Association at the Holiday Inn in Martinsburg, West Virginia

before Arbitrators James T. Carney, Esq., William M. Wycoff, Esq., and Allan N. Karlin,

Esq.  The Claimants were represented by their legal counsel, David M. Hammer and

Harry P. Waddell. Claimant Mawing appeared in person and the claimant Charles Town

Horseman's Benevolent and Protective Association, Inc. [hereinafter "HBPA"] appeared

by its president, Raymond J. Funkhouser. The Respondent appeared by its legal counsel

Joseph E. Wolfson and Stacey A. Scrivani and by its corporate representative Erich

Zimny.  An audio recording of these proceeding was made and transcribed by Streski

Reporting & Video, Martinsburg, West Virginia.

All proposed findings submitted by the parties have been considered and

reviewed in relation to the adjudicatory record developed in this matter.  All proposed

conclusions of law and argument of Counsel have been considered and reviewed in

Page **1** of **85**

relation to the aforementioned record, proposed findings of fact as well as to applicable law.  To the extent that the proposed findings of fact, conclusions and argument advanced by the parties are in accordance with the findings, conclusions and legal analysis of the Panel and are supported by substantial evidence, they have been adopted in their entirety. To the extent that the proposed findings, conclusions and argument are inconsistent therewith, they have been rejected.  Certain proposed findings and conclusions have been omitted as not relevant or necessary to a proper decision.  To the extent that the testimony of the various witnesses is not in accord with the findings stated herein, it is not credited.

The Panel first considered the issue of whether the HBPA should be allowed to amend the pleadings to participate as a party in this arbitral proceeding as opposed to a nominal party as previously represented by counsel. After considering the arguments of counsel as contained in the official record of proceedings the Panel determined that the HBPA's motion to amend to participate as a party was denied without prejudice.  [125].[1]

The Panel next considered whether the Mawing's 42 USC § 1983 claim of retaliation arising under the First Amendment of the United States Constitution was properly before the Panel.  The Panel heard the arguments of counsel as contained in the official record of proceedings and, based upon the concession of counsel for the Respondent that the Claimant's 1st Amendment claim is properly plead the Claimant may proceed upon that claim.  [126].

The Panel then considered Mawing's motion to amend her pleadings to include specifically a cause of action arising under W. Va. Code § 61-5-27 in order to conform to the pleadings already made and the evidence presented.  The Panel heard the arguments

---

[1] All bracketed numbers are citations to the page number of the official transcript of the arbitral proceedings.

of counsel as contained in the official record of proceedings and deferred ruling upon this issue until the close of the Claimant's case.  [126].

## I.   PROPOSED FINDINGS OF FACT

**Tina Mawing**

WHEREUPON, the Claimant Tina Mawing, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

1.  Mawing is a horse trainer and registered nurse.  [40].  She works four days a week at the local hospital and has three days off per week.  [44]

2.  She has trained horses since 1984.  [40]

3.  Mawing is married to Anthony Mawing, a jockey.  [40].  When Mawing is working at the hospital Anthony Mawing assumes many of her duties related to her horse training business.  [44]

4.  Mawing moved to Charles Town in 2000 in order to settle in one location and be able to race horses year round.  [41]

5.  When Mawing first moved to Charles Town she received one stall from Charles Town Races & Slots [hereinafter "CTRS"].  [41]

6.  Over the ensuing years her business progressed and as she requested additional horse stalls from CTRS.  She was never denied stalls nor had her number of allocated stalls reduced until 2008.  [42]

7.  By letter dated 12/21/06 Mawing was allotted 7 stalls for 2007.  [C-39].  By letter dated 2/7/08 Mawing was allotted 9 stalls but was informed that CTRS was modifying the duration of the allotment to six months. [C-39].  By letter dated 4/25/08 Mawing's stall allotment was reduced from nine stalls to five stalls.  [C-39].  By letter dated

8/29/08 all of Mawing's stalls were taken away from her based upon, according to the letter, "a large demand for stalls" and that "based upon the Committee's review and in the exercise of its discretion, CTRS is unable to allocate any stalls to [Mawing] for the remainder of 2008." [C-29].

8. The number of horses Mawing trains at any one time fluctuates as horses get injured or are ready to race, but Mawing usually maintains a minimum of ten horses in training. [44 – 45]

9. Mawing is an elected member to the Board of the HBPA. She is currently serving her third consecutive three year term as Board member. [45]

10. Mawing has been a member of the HBPA since 2000. [45]. Al Britton, the General Manager of CTRS has known that Mawing was an HBPA Board member since February or March 2008 when he hosted a dinner at the CTRS Epic Buffet for HBPA Board members and Mawing sat next to Mr. Britton and conversed with him. [952 – 953]. Moreover, the HBPA is contractually obligated to annually provide to CTRS the name and address of every Board member of the HBPA. [C-1, ¶ 2, p. 4].

11. In 2007 the President of the HBPA, Randy Funkhouser had his occupational permit suspended by action of the Racing Stewards at CTRS. [48; Exhibit C-2, p. 1][2]

12. Mawing testified at a hearing before the West Virginia Racing Commission[3] held on October 15, 2007 [48; Exhibit C-2, p. 4]. She testified that, as a

---

[2] Pursuant to the Thoroughbred Racing Rules in effect from 2007 until July 10, 2011, there were three stewards: one selected by the Racing Commission, a second steward selected by PNGI, and those two stewards would then select the third steward. CSR § 178-1-10.1 [2007]. Up until 2011 two of the stewards were state employees and the third steward was paid by the race track. *See* Wehrman dep. p. 117. In 2011 all stewards became state employees.

consequence of her duties as a member of the Board of the HBPA, she gained personal knowledge of events leading up to Funkhouser's suspension and in her capacity as an HBPA Board member she communicated other HBPA members' concerns about the late entry of a horse into a race.  [48 – 49, 50 – 52; Exhibit C-2, p. 6, Findings of Fact, 8 – 10].

13.     CTRS is contractually obligated to make available to the Horsemen a minimum of 1,148 stalls free of charge at each race meeting. Equitable stall allocation is essential to the livelihood of Horsemen. [55; R-28 Agreement, p. 13, ¶ 11 A].  The obligation to provide stalls to horsemen is not unique to CTRS; it is an industry standard to provide stalls to horsemen.  [58]

14.     Stalls on-site are essential to the livelihood of Horsemen because if a trainer does not have stalls at CTRS then the trainer must pay for stalls at another location and also transport horses onto and off the grounds of CTRS.  [55 – 56].  It is disadvantageous to the training of horses to be kept off-site because it limits the amount of time available to train a horse.  [56 – 57].  It is disadvantageous to the trainer because the trainer is limited in the number of horses she can train in a day.  [57]. There are also inherent dangers to loading and unloading horses upon a trailer. [57].

15.     CTRS is contractually obligated not to discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or

---

[3] The Racing Commission has "full jurisdiction" and "plenary power and authority" over all horse racing meetings and all persons involved in the holding or conducting of a horse racing meeting. W. Va. Code § 19-23-6. Those powers include, *inter alia*, investigation and discipline, including fines and other sanctions such as suspension and revocation of a licensee's occupational license. The Racing Commission has the statutory authority to issue subpoenas and administer oaths. W. Va. Code § 19-23-6 (9) and (14). Any person adversely affected may demand a hearing of the Racing Commission.  Hearings are governed by W. Va. Code § 19-23-16 (c) [1975] and the Administrative Procedures Act.  The process was amended in 2011, however, those amendments are not relevant to the instant proceeding.

employees discriminating in the allocation of stalls. [56; R-28 <u>Agreement</u>, p. 13, ¶ 11 B].

16.    Stall allocation at CTRS and at other tracks is, by industry standard and corresponding longstanding practice at CTRS, is essentially the same:  a stall application is made by a trainer in which the trainer provides detailed information about each horse for which a stall is sought. The information includes the horses' names, sex, age, whether the horse is a maiden (*i.e.*, has not won a race) and the allowance price. [71 – 72]. This information is necessary so that the track can balance its need for horses with different characteristics to run races at varying distances and levels of competitiveness. There are races strictly for males, strictly for mares, and strictly for fillys [and there are more categories, too]. [59]. There are also different levels of competitiveness amongst horses such as lower level claims race horses, mid-tier allowance horses, versus much more competitive stakes race horses – such as horses that might run in the Kentucky Derby - the highest caliber of racing horse. [73 – 74]. The stall application is a snapshot in time:  the actual horses in the stalls allocated to a trainer will change as horses become injured and young horses begin training. [60 – 61]

17.    In any event, every race has to have enough entrants that meet the eligibility requirements to fill the racing cards every day of the racing year. [66]. [4] The track then compares the number of horse starts per stall (this annual productivity measure is typically in the range of six to eight starts per stall [64 - 65]) to ensure that an

---

[4] CTRS, in order to have video lottery terminals (commonly known as "slot machines") must conduct not less than 220 live racing days per year. W. Va. Code § 29-22A-3 (t). CTRS' demand for a variety of horses is constant and intensive:  Optimally, there are nine races a day each with ten horses per race [75] – *i.e.*, 90 different horses per day are needed. Thus, given this demand for horses, the minimum number of stalls to be made available free of charge by CTRS per year is 1,148.

applicant has quality horses and a balanced stable.  Lastly, tracks consider applicants on

criteria such as whether applicants keep their stalls clean and properly tend to the care of

the horses in their control.  [59].

18.     Mawing is familiar with these industry standards based upon her 30 years

of experience in the industry at different tracks as well as direct discussions with three

successive Racing Secretaries and Assistant Racing Secretaries at CTRS, including

Dickie Moore [62 - 63].

19.     "Winning percentage" of a horse is not a criterion for stall allocation.  The

criterion is called "percent of horses in the money" which means whether the horse

placed first, second, or third.  This again is a measure of the quality of a trainer's horses

in the stable.  [81 – 82]

20.     Mawing was allocated nine stalls by Dickie Moore on February 7, 2008

for the time period from March 1 through August 31.[84; C-39]

21.     Mawing's was notified of a reduction from nine to five stalls by hand

delivered letter dated April 25, 2008 signed by Dickie Moore.  [89; C-39].  The reason

for the reduction was alleged to be because Mawing had borrowed stalls from other

trainers.  [91]

22.     At the time, it was a common practice of trainers to borrow stalls from

each other so long as proper notification was provided to the racing office.  [91]. CTRS

did not have a rule at the time that required permission to be in writing.  [91].  Mawing

had notified the racing office that she was borrowing stalls and had permission from Mr.

Lamp to do so.  [90 – 91, 93].  When Mr. Lamp left CTRS Mawing apprised Dickie

Moore of the borrowed stalls too.  [94]

23.       After having the number of stalls assigned to her reduced to five, Mawing explained to Mr. Erich Zimny and Lamp's replacement, Randy Wehrman, that she had had permission to borrow stalls. [96 – 97]. They demanded that Mawing get the former racing secretary, Doug Lamp, to confirm his permission. [97]. When Mawing advised that Lamp was willing to corroborate his permission, Wehrman and Zimny refused to accept Lamp's corroboration on the basis that Lamp was alleged to be "disgruntled" and would say anything. [97]. Wehrman and Zimny thereafter refused to take Mawing's telephone calls. [97]

24.       Four days after being notified of her four stall reduction, on April 29, 2008 the HBPA board met. [106]. The minutes of that meeting show that Mawing and other board members, including alternate Skoobie Schneider, were present. [C-4]. Mawing expressed at the meeting her concern that her stall reduction was motivated by some factor other than the common practice of borrowing stalls. [109]. Mawing believed that she, along with the other trainers who testified at the Funkhouser Racing Commission hearing, was being targeted for retaliation. [111]. Mawing was of this state of mind because at the HBPA meeting Skoobie Schneider confirmed that he had told Mawing that supporters of Funkhouser were on a "hit list" and that losing four stalls was a "warning." [115; C-4[5] at p. 4].

25.       In June, 2008 Mawing arrived at her assigned shed row only to find a "huge" number of dead rats. She believed that CTRS had likely taken action to address the ongoing rodent problem. [127]. "Rodent and pest control and eradication" is expressly covered by the Agreement. [C-1 at p. 19, ¶ 19 A].

---

[5] Admitted as to Claimant's state of mind but not for the truth of the matter.

26.     Approximately a week later one of the higher quality allowance horses Mawing trained and which had been stabled at CTRS became seriously ill. [128]. All variety of testing was done to determine the reason for the horses illness but the horse did not improve. [129]. The horse was transported to an equine hospital and died about two days later on June 23, 2008 [129; 234].

27.     Even after the death of Mawing's horse she continued to observe dead rats in her shed row and one day, while sitting on a bale of straw in the shed row Mawing watched a rat staggering with its front end and back end dis-coordinated – a symptom of ataxia.[6] [129 – 130]. It occurred to Mawing that these were the same symptoms her now dead horse had exhibited and she speculated that perhaps, given the tremendous number of dead rats, a large dose of poison had been put in the shed row. [130].

28.     Mawing reported her concern about possible horse poisoning to racing steward Danny Wright. She told Wright about the inconclusive tests that had been run and the lack of evidence of any kind of disease process and asked Wright whether it was possible the horse had been a victim of rat poison. [130 – 131].

29.     In Mawing's presence Wright called track superintendent Bowlin. Wright told Mawing that Bowlin said there was no rat problem at Charles Town [131] and Wright told Mawing that there was no poison [132].

30.     Several days after that conversation Mawing learned that a companion goat of her dead horse was laying on its side and dying too. [133]. The goat had been healthy until that time. [133]. The goat had red foam coming from its mouth which Mawing, as a trained nurse, recognized as a symptom of poisoning called "flash

---

[6] Ataxia is a failure of muscular coordination; irregularity of muscular action. http://medical-dictionary.thefreedictionary.com/ataxia

pulmonary edema." [133].  Mawing was now suspicious that, because it is unusual for illnesses to cross species, it was not a disease process that had killed her horse and its companion goat, but rather the cause of death was poison. [134]

31.      Mawing inquired of her groomsman whether he had seen anyone putting down poison.  [137].  Up until this time Mawing had only known of poison being administered in pellet form in bait blocks or bait houses.  [137]. But based on a description of a man broadcasting poison in powder form, Mawing began searching for poison powder. [137 – 138].  Once she started searching she found a white to tan-colored powder in front of the dead horse's stall, in front of its feed box and underneath things in the stall such as under mats, and in the straw of the dead horse's stall from which the companion goat ate opportunistically [137 – 138, 142, 235; C-40 (a) through (f)].

32.      Mawing obtained a receipt from Ehrlich Exterminators that established that a poison called Rozol tracking powder had been spread on June 3, 2008 specifically in her barn, Barn 14.  [144; C-6].  The receipt shows that the concentration of the Rozol tracking powder was 0.20%.

33.      Upon learning that Rozol tracking powder poison had indeed been broadcast in Barn 14, Mawing returned to racing steward Wright and confronted him with evidence of poison that was contrary to what she had previously been told.  [147]. Mawing had also been informed by a veterinarian that two other goats had died and poison was suspected.  [229].  Wright said he would inquire further of Dickie Moore, but Wright did not further inform Mawing about the matter.  [147]

34.     Mawing repeatedly attempted to contact Moore by telephone but he did not return her calls. [147 – 148]. At a later point in time Mawing confronted Moore in a parking lot and explained to him that in her capacity as an HBPA Board member, her role as a barn captain[7] she was reporting a health and safety hazard to humans and animals caused by the Rozol poison. [148]. Mawing believed at the time of her parking lot discussion with Moore, based on follow-up research she had done at the hospital where she works, that Rozol in the powdered form was particularly unsafe for use around animals. [148, 150; C-27].

35.     The material data safety sheet[8] for Rozol Pellets [C-27] contains this prominent warning: "CAUTION: Keep away from humans, domestic animals and pets. Keep away from feed or foodstuffs. May be harmful or fatal if swallowed or absorbed through the skin because this material may reduce the clotting ability of blood and cause bleeding." Moreover, exhibit C-27 further states: "USE RESTRICTIONS: ….Do not place bait in areas where there is a possibility of contaminating food or surfaces that come in direct contact with food. Do not broadcast bait." Mawing noted that it was summertime and fans were blowing in front of every stall. [154]. It is a fair inference from this evidence that Rozol powder could have been blown about the stalls in Barn 14 and come in contact with people and animals present in the stalls and, from this knowledge, fair for Mawing to have been quite concerned and acting in good faith and

---

[7] Barn captains hold positions of responsibility and are selected by CTRS. Barn captains are responsible for, among other things, making sure that there are no health or safety issues in a captain's assigned barn. [149]
[8] It is noteworthy that C-27's explicit warnings regarding Rozol's use around domestic animals is in regard to the pellet form of Rozol at an active ingredient concentration of only 0.005%. The Rozol powder used in Barn 14 was at an active concentration of 0.20% - which is forty times more concentrated than the pellet form.

in accordance with her duties[9] as barn captain when she expressed her concerns about the presence of poison.

36.     Moore told Mawing he would look into the matter but he did not report back to her about the issue. [155].  Mawing, her husband, and her groomsman disposed of the dead rats, removed everything from the stalls and cleaned out the poison without any support or assistance from CTRS. [155]

37.     Moore's repeated failures to communicate with Mawing about rodent eradication, an express subject of the Agreement, is a breach of the contractual obligation of CTRS to negotiate all business within the scope of the Agreement and any matters reasonably related to the Agreement with the HBPA and its representatives : "Charles Town Races does agree that it shall negotiate with and conduct and all business which is the subject of this Agreement and any matters reasonably related to any provision of this Agreement with the duly elected officers of the HBPA or their duly designated representatives." [C-1, ¶ 2].

38.     Upon realizing that she was receiving no communication or support from CTRS and learning that Ehrlich Exterminators were again at the barn, on July 16, 2008 Mawing made an official complaint to the West Virginia Department of Agriculture to initiate an investigation to determine compliance with the West Virginia Pesticide Act [157 – 158; C-11].  Mawing assisted in providing a written statement dated August 19, 2008 from her groomsman to the Department of Agriculture.  [167].

---

[9] The Racing Commission has jurisdiction over trainers.  That jurisdiction includes all aspects of being a trainer including, subject to discipline by the Racing Commission,, the obligation of a trainer for the "care, health, condition and safety of horses in his or her charge."  CSR §178-1-31.1.4 [2007].

39.     Mawing applied for nine stalls for the period of September, 2008 through December, 2008. [98]. Mawing received an allocation of only five stalls. [100]. Then, Mawing was notified by letter dated August 29, 2008 that those five stalls, which had just been allocated to her, were being taken away from her entirely and that she was ordered to "vacate" all of her allocated stalls by September 12, 2008. [100 – 101; C-39]. Mawing was shocked by this order. [105]

40.     The order for Mawing to vacate all of her stalls was issued to her eleven days after Mawing had met with the Governor of West Virginia on August 18, 2008. [101, 158].

41.     Mawing, who was also on the HBPA's contract review committee that was then preparing to negotiate with CTRS regarding the <u>Agreement</u> that was soon to expire in December, was selected along with other HBPA Board members to travel to Charleston as a delegation to meet with the Governor. [158 – 159]. At the direction of CEM Martin (the HBPA's legal counsel at the time) Mawing was directed to bring photographs of the poison in her stalls and dead goat to the meeting with the Governor. [160]

42.     The meeting with the Governor lasted less than an hour. The Governor got directly to the point of the meeting: he wanted to see a new Agreement reached between the HBPA and CTRS and the passage of the vote to authorize table games as another form of permissible wagering at CTRS. [161]. In the latter half of the meeting the topic being discussed was a lack of dialogue between the HBPA and CTRS on issues of concern to the Horsemen. [161]. CEM. Martin prompted Mawing to relay her concerns about the spread of poison and the death of her horse and goat. [162].

Mawing expressed her concern that the issue of poison needed to be investigated to make sure it did not recur and stated that CTRS did not give her the courtesy of a return phone call and showed the Governor the photos that she had brought to the meeting. [162 - 163].

43.    Mawing did not tell the Governor that her horse had been deliberately poisoned and did not herself believe that the poisoning was deliberate. [164]. She did not say that her goat was deliberately poisoned as she does not believe the poisoning was deliberate. [164]

44.    Mawing does not know what a "trip wire" is and did not hear anyone during the meeting with the Governor reference a trip wire and did not herself make any comment about a trip wire.  She was present during the entire meeting.  [164 – 165]. Mawing has not heard any rumor around the track of a trip wire being at the track.  [165]

45.    Mawing received the order to vacate her assigned stalls despite never having violated any rule or regulation of racing and not having violated any published track rule.  [115 – 116].

46.    Pursuant to the Agreement, CTRS has the "right to discipline (including removal) Horsemen or their employees who fail to obey Charles Town Races' published rules and regulations."  [C-1 at p. 15, ¶ 12 B].  Respondent did not introduce any evidence of Mawing having violated a published rule or regulation.

47.    The quality of her horses had not changed and Mawing had exceeded the number of starts per stall required by CTRS.  [116]. CTRS refused to speak with her or provide any explanation for its act of depriving her of stalls that were contractually agreed upon to be essential to her livelihood.  [116; R-28 Agreement, p. 13, ¶ 11 A]

48.     Mawing had to immediately find stalls for the horses that had been stabled at CTRS.  She was able to find stalls but they were at four different locations. [118]

49.     The parties stipulated that Mawing continued to apply for stalls every six months thereafter and that she has not been allocated any stalls since being ordered to vacate all of her stalls by September 12, 2008.  [121].  CTRS's refusal to provide Mawing with stalls essential to her livelihood has forced Mawing to mitigate by renting stalls.  Stall rates on the open market vary from $250 to $300 per month [261, 263 – 264, 266 – 267, 288, 297] and sometimes she had to rent a block of stalls at a flat rate regardless of whether she needed each of the stalls in the block.  [262 – 263].  The total number of horses Mawing had in training from September 2008 when CTRS took all of her stalls from her until the arbitration hearing did not dip below nine horses.  [287].  The maximum number of horses she had at any one time in training was twelve.  [287].  If CTRS had not taken all of Mawing stalls she would not have had to incur vanning expense because she would have had nine stalls at CTRS and would, at most, have needed three additional stalls which could have been rented across the street from CTRS and walked over to the track.  [290].

50.     Mawing testified in detail about her damages based on the checks that she wrote for stall rents and vanning and she prepared a summary of her damages [234; R-34].  The expenses actually paid by Mawing are the most specific means of calculating the expense caused by the loss of stalls at CTRS.  [261].  Exhibit R-34 contains two entries totaling $300 payable to Jackie Erler.  Mawing testified that this amount should not be included in her damages.  [195].  Another entry for Taylor was struck by Mawing [R-34].  Mawing further testified that she is not seeking damages for horse owner

Wratchford's horses. [273]. Excluding amounts on Exhibit 34 below the two entries for "Mike Williams – Horse Trailer" on the last page, the total claimed is $161,221 ($145,286 stall rents and $15,935 vanning calculated from R-34).

51.     Mawing testified that using an average of $275 per month/stall for the period May through August, 2008 for four stalls is $4,400. Using nine stalls @275/stall/month for the period September, 2008 through June, 2013 totals $143,500 for a total stall rent of $147,950 through the date of the Arbitration hearing. [298 – 299; C-41]. If the vanning expense detailed in R-34 of $15,935 is added back in then the total expense damages under this method of calculation is $163,885 -- very nearly equivalent to the total of $161,221 on R-34 thus confirming Mawing's estimation of an average stall rent being $275 per month.

52.     Extending this calculation three months for nine stalls through the date of decision of September 31, 2013 would add an additional $7,425 in stall rent damages.

**John Finamore**

WHEREUPON, John Finamore, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

53.     John Finamore, Senior Vice President of Regional Operations for Penn National Gaming had oversight at PNGI's facility at Charles Town, West Virginia from November 2002 through October 2011. [Video Dep. p. 33]

54.     Al Britton, the General Manager of PNGI's facility at Charles Town, West Virginia reported to John Finamore. [Video Dep. p. 10]

55.     Mr. Finamore had the authority to hire or fire anyone working at the PNGI facility. [Video Dep. p. 35]

56.     Mr. Finamore was unable to state the reason Tina Mawing was not allocated stalls in 2008, 2009, 2010, 2011, 2012 or 2013.  [Video Dep. pp. 24-25, 28] [754]

57.     Mr. Finamore was unable during his video deposition to state who on the stall allocation committee would know why Tina Mawing received no stalls in 2008, 2009, 2010, 2011, 2012 or 2013. [Finamore Video Dep. pp. 25-28]

58.     Mr. Finamore consulted with in-house legal counsel at Charles Town Races and Slots during the 2008/2009 time frame [Video Dep. p. 38]  He received verbal reports periodically regarding the status of Ms. Mawing's litigation against PNGI Charles Town Gaming, LLC from General Manager Al Britton and legal in-house counsel. [Video Dep. pp. 42-43]

59.     Mr. Finamore was responsible for putting a more formal structure in place for the allocation of stalls using objective criteria including the trainers' quality of horses, trainer's maintenance of the stall and barn area, care of horses, and compliance with PNGI's racing rules handbook. [Video Dep. pp. 45-48]

60.     He never directed that the objective" criteria be put in writing at any point. [742] If the trainers follow the rules they are entitled to apply for stalls and obtain them. [707]

61.     The trainers should be entitled to rely upon the objective criteria established by PNGI for the allocation of stalls. [708]

62.     The trainers are provided with no right to challenge PNGI's allocation of stalls. [709]

63.     Penn National Gaming is the largest operator of thoroughbred racing, harness racing, dog tracks [642] and regional casinos in the country. [643]

64.     According to Mr. Finamore, the casino side of the business makes money while the racing side of the business is an economic loser. [651, 653-54]

65.     Overall, the Charles Town facility has been very profitable for Penn National. [656]

66.     Sixty percent of the money from the slots goes to the State of West Virginia. [658]

67.     The funds from the lottery in West Virginia, which includes all the racetrack revenue and lottery tickets, is the third largest source of revenue for the State. [659-60]

68.     By state law PNGI is required to have a contract in place with the HBPA or all gaming, the slot machines, table games, live poker and racing must all be turned off instantly. [664-666]

69.     Mr. Finamore approved the language in the contract with the HBPA acknowledging that effective stall utilization was important to Charles Town management and equitable allocation essential to the livelihood of the horsemen. [668]

70.     In June 2007 there had been a referendum to put table games at the Charles Town Casino that was defeated. [677]

71.     PNGI had approached the HBPA and requested that they support table games before the referendum. [678-79]

72.     Mr. Finamore believed it had a deal with the HBPA to support table games but the HBPA board voted to remain neutral. [679]

73.     Mr. Finamore's principal point of contact with the HBPA was Randy Funkhouser, the HPBA President. He felt that he had a handshake agreement with Mr. Funkhouser that the HBPA would support table games and that Mr. Funkhouser reneged on the agreement. [684-686] He felt personally betrayed by Randy Funkhouser. [712]

74.     The contract with the HBPA was set to expire December 31, 2008. [676]

75.     PNGI had entered negotiations with the HPBA on a new contract in 2008 with a goal of having the new contract in place before the old contract expired at the end of the year. [676-77]

76.     The two looming issues as Penn National began negotiations with the HBPA in 2008 were getting the contract in place by the end of the year and preparing for a second referendum on table games in 2009. [680-81]

77.     In 2008 the general relationship between Penn National Gaming and the HBPA was acrimonious. Penn National felt betrayed that the HBPA had not voted to support table games during the 2007 referendum. [680]

78.     Mr. Finamore sent a letter to Lenny Hale, the executive director of the HBPA dated April 25, 2008 in which he stated that PNGI would not meet with the HBPA to discuss anything until the HBPA pledged to support table games. [681-683; C-42]

79.     During the summer of 2008 the negotiations with the HBPA were not going well. Governor Manchin became involved. [689-90]

80.     Mr. Finamore understood the Governor's motivation to become

involved with the contract negotiations was the potential loss of one million dollars a day in lost taxes, payroll and benefits to the State if no contract with the HBPA was signed. [690]

81.     PNGI asked the Governor to mediate in order to reach an agreement with the HBPA. [691]

82.     On August 14, 2008, during a dinner with then Governor Manchin Mr. Finamore was informed that horsemen were coming to meet with the Governor on August 18, 2008 to discuss their perspective of the HBPA contract negotiations with PNGI. [Video Dep. p. 15] Mr. Finamore subsequently received a telephone call after August 18, 2008 from the Governor and his Chief of Staff Larry Puccio to update him on the meeting with the horsemen. [Video Dep. p. 16] [694]

83.     Mr. Finamore testified that during his telephone conversation with the Governor Ms. Mawing was referred to as a "crazy lady" by the Governor.  Mr. Finamore further testified that the Governor told him that Ms. Mawing accused PNGI of deliberately poisoning her goat and hanging a "trip wire" intended to slit the throat of her horse. [Video Dep. p. 17]

84.     Mr. Finamore stated that after his call with the Governor he called Al Britton to inquire why Ms. Mawing would allege that PNGI deliberately killed her pet goat and tried to kill or maim her horse. [Video Dep. p. 18] Mr. Finamore remembers saying to Mr. Britton: "I don't know when you're allocating stalls next, but you better put this into the mix when you look at Ms. Mawing's stall allocations".[10] [Video Dep. p. 19] [699]

---

[10] Finamore was not a member of the stall allocation committee in August, 2008.

85.     In addition to Al Britton, Mr. Finamore claimed that he spoke to Richard Moore[11] regarding the allegation of a wire place by the track to injure Ms. Mawing's horse. [720-21]

86.     Neither Mr. Britton nor Mr. Moore verified that Ms. Mawing had made any allegation concerning a wire. [721]. Mr. Finamore recalled no other instances of his intervening in stall allocation decisions once he was no longer on the stall allocation committee. [Video Dep. p. 56]

87.     Mr. Finamore acknowledged that PNG Charles Town Gaming, LLC's discretion to allocate stalls was limited by its contractual obligation not to discriminate in the allocation of stalls on the basis of HBPA membership or activity. [Video Dep. p. 63]

88.     Mr. Finamore was aware of no information suggesting that Ms. Mawing had violated any statute or rule governing thoroughbred horseracing in West Virginia at the time she was not allocated stalls in 2008. [Video Dep. p. 65]

89.     Mr. Finamore was not identified as an individual likely to have discoverable information in Defendants Rule 26(a) Initial Disclosures filed in the United States District Court for the Northern District of West Virginia. [728-29; Defendant's Rule 26(A) Initial Disclosures, ¶ 1, filed Nov. 18, 2009][12]

90.     Mr. Finamore talked to Mr. Britton once a week or every two weeks in 2008. [734]

---

[11] Moore disputed speaking to Finamore about this topic. *See infra.*
[12] The obligation to have identified Finamore and the subject matter of his testimony cannot reasonably be disputed. *See* FRCP, Rule 26(a)(1)(A)(i) ["...a party must...provide to the other parties...the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses...."]

91.     Mr. Finamore would have been aware of the Mawing lawsuit at the time it was filed. [735-736]

92.     In September or October 2008 he would have been aware that Tina Mawing filed a lawsuit against his company or subsidiary alleging discrimination in the allocation of stalls. [736]

93.     Mr. Finamore would have realized when the lawsuit was filed that Ms. Mawing was the same person previously referenced in his discussions with Britton. [736]

94.     Finamore would have realized that he had information germane to the issue of the allocation of Mawing's stalls. [737]

95.     Mr. Britton would also have known that Mr. Finamore had information relevant to the allocation of Ms. Mawing's stalls when he first became aware of the suit being filed. [737-738]

96.     Mr. Finamore never asked Mr. Britton whether he had spoken to Ms. Mawing to try and find out what she said happened. [742-743] He does not believe Mr. Britton ever spoke with Ms. Mawing. [743]

97.     Mr. Finamore does not know if Richard Moore ever talked to Ms. Mawing about the allegations. [745]

98.     He believes that Mr. Britton informed him that the track did not kill the goat on purpose and did not have a wire hanging in the barn area to harm the horse. [750]

99.     Mr. Finamore was not aware that Ms. Mawing had made complaints to track management regarding powdered pest poison being put in Barn 14 where her horses were stabled. [751-752]

100.     Mr. Finamore was not aware that one of Ms. Mawing's horses had in fact died. [752]

101.     Neither Mr. Britton nor other track management ever informed Mr. Finamore that Ms. Mawing had made complaints to track management about poison in her stalls. [752-753]

102.     In consideration of the totality of Finamore's testimony and the testimony of other CTRS managers, and given Mawing's repeated reports of her safety concern about poison to CTRS management and the racing stewards in various conversations that occurred before the HBPA's August 18, 2008 meeting with Governor Manchin, Finamore's allegation about Mawing's supposed statements about a trip wire to the Governor are not credible.  Surely Mawing would have spoken about a trip wire in the two months time between the death of her horse and goat and the HBPA's meeting with Governor Manchin.  Moreover, there is no credible evidence that Mawing ever claimed that the poisoning of her horse and goat was *deliberate*.  Indeed, if Finamore's testimony is to be believed, one would reasonably expect that he would have spoken to Mawing personally (or directed someone else to do so) in order to ascertain from Mawing what she had said to the Governor in her capacity as a member of the HBPA delegation sent to discuss contract negotiations and table games.  But neither Finamore nor any of the CTRS management team under Finamore's supervision made any inquiry of Mawing.  The absence of any attempt to inquire of Mawing as to what she had said during the meeting with the Governor tends to cast further doubt upon Finamore's explanation for the reason why he intervened in the stall allocation committee's consideration of Mawing's August, 2008 stall application and suggests that Finamore's

explanation is not the real reason for Mawing's loss of all stalls.  Likewise, given that

disclosure in federal court of Finamore's identity and the subject of his testimony was

mandated but no disclosure was made, it is a fair inference that Finamore's claim that

Mawing made reckless, defamatory allegations of an intentional attempt by PNGI to

maim or kill a horse by hanging a trip wire and by deliberate poisoning of animals,

which belatedly became the Respondent's central defense shortly before the scheduled

arbitration, was contrived.

**Raymond Funkhouser**

Whereupon, Raymond Funkhouser, after being first duly sworn, testified and the

Panel finds the following facts are supported by substantial evidence:

103.    Raymond Funkhouser is the current President of the Horseman's

Benevolent Protective Association (HBPA) and was also President from 2005 through

2007. [354 - 355]

104.    George Yetsook was Mr. Funkhouser's horse trainer during the time

period 2007 to 2009. [357]

105.    Rodent and pest control eradication was a subject of the Contract between

the HBPA and PNGI. [363]

106.    On or about October 2, 2007 Funkhouser's occupational permit was

suspended by the racing stewards at CTRS.  The charge against Mr. Funkhouser had the

effect of indefinitely suspending his livelihood to own and race horses, and prevented

him from racing four horses in the upcoming October 20, 2007 running of the West

Virginia Breeders Classics – the biggest race at CTRS with a $500,000 purse per race .

[374, 378; C-2, p. 2]

107.   On October 8, 2007 a hearing was held in Charles Town before a Racing Commission hearing officer in which Mr. Funkhouser challenged the suspension of his occupational license. [375; C-2]

108.   Members of the PNGI executive management team were present at the hearing including Richard ("Dickie") Moore, Roger Ramey (vice president of public relations) and in-house legal counsel Phyllis LeTart. [376 – 377; *see also* Moore's testimony at 934 – 935 confirming his presence and the presence of Ms. LeTart]

109.   Tina Mawing was subpoenaed by Mr. Funkhouser to testify on his behalf at the hearing. [377-78; C-2 ¶s 8 - 10].  Funkhouser had, in his capacity as HBPA president, approved Mawing's appearance and testimony.  [378].  The Racing Commission exonerated Funkhouser.  [378]

110.   John Finamore was angry at Funkhouser and the HBPA board for the 2007 public defeat of the table games referendum.  On April 25, 2008 Finamore directed his anger at the HPBA by, in responding to a request for a meeting from the HBPA, stating that he refused to "discuss anything" with the HPBA until it pledged its support of table games. [369 - 370; C- 42].  Finamore took this drastic step despite the HBPA having officially voted to remain neutral on the issue of table games.  [392].  Funkhouser had personally opposed the table games referendum.  [392]

111.   Finamore's refusal to discuss "anything" is a breach of the contractual obligation of CTRS to negotiate all business within the scope of the <u>Agreement</u> and any matters reasonably related to the <u>Agreement</u> with the HBPA and its representatives: "Charles Town Races does agree that it shall negotiate with and conduct and all business which is the subject of this Agreement and any matters reasonably related to any

provision of this Agreement with the duly elected officers of the HBPA or their duly designated representatives." [C-1, ¶ 2].

112.    CTRS management and the HBPA negotiating team, including Mawing as a part of the contract review team, met for contract negotiations on several occasions through the spring and summer of 2008. [379]

113.    Later in the summer of 2008 Mawing along with other four other members of the HBPA board, including the HBPA's executive director, Leonard Hale, were selected to serve on a delegation as the HBPA representatives to travel to Charleston, with the HBPA's legal counsel at the time, to meet with Governor Manchin on August 18, 2008. [380 -381]. Funkhouser identified each of the members of the delegation by name; two of the members are females. [380]

114.    In addition to the HBPA delegation, Governor Manchin and two of his aides, Larry Puccio and James Pitrolo, were present at the meeting. [381]. The Governor was concerned about the progress of contract negotiations between CTRS and the HBPA and the potential for the HBPA to use the renewed table games referendum as leverage in contract negotiations. [382] The Governor wanted to encourage the HBPA's support of the table games initiative and see if there was any means to ameliorate the contractual process. [382]

115.    The HBPA delegation discussed with Governor Manchin, in a round table format, contract related issues. Mawing expressed concerns about poison and rat control eradication. [383].   She was urged by the HBPA's legal counsel to share photographs with the Governor. [384; C-40]. Mawing explained that her horse and goat had died and said that we are trying to determine why they died. [385]. Mawing was also

concerned about the well-being of people in the barns. [385].   Mawing's demeanor in the meeting was business-like, reasonable, and rational.  [383 – 384].

116.     There was no discussion by Mawing during the meeting with the Governor of a wire or rope strung in the stable area.  Funkhouser denied that there was any discussion at all about a rope or wire during the meeting with the Governor. Funkhouser has not heard of such an allegation in his entire career at CTRS.  [386]

117.     CTRS is required to use 4% of all of the capital improvement funds it receives from West Virginia, which to date has been about $115 million in capital improvement funds, for barn or stable improvements.  [388; W.Va. Code §29-22A-10c (b)]

118.     In the context of stall allocations, Funkhouser's understanding of the language in the Agreement is that stall allocations are to be "equitable;" which he understands to mean based on the merits of the stall applicant so that allocations are fair and just. [408].With the principle of equity in mind, and so long as CTRS did not engage in contractually prohibited discrimination, CTRS could use its discretion in awarding stalls.  [403 – 404]

**Melvin Michael Elliott**

WHEREUPON, Melvin Michael Elliott, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

119.     Elliott has been employed at CTRS since 1997. [418]

120.     In August, 2008 Elliott was the backside administrator.  His job was to walk the barn area and make sure that horses were properly cared for and to check empty stalls so as to keep track of how long they were empty. [422]

121.    In addition to being the backside administrator, Elliott also served on the

stall allocation committee in August, 2008. [423]. The stall allocation committee met

twice per year in Al Britton's office. [445]

122.    A stall allocation meeting begins with a list of those trainers who already

have stalls and, if a trainer is requesting more stalls, there is an effort to accommodate

the trainer while recognizing that there are more stall requests than there are stalls.

[446].

123.    No member of the State Racing Commission has participated in a stall

allocation committee meeting or instructed the committee to provide stalls to a trainer or

take stalls away from a trainer  [449 – 450]

124.    In August, 2008 the stall allocation criteria included having seven starts

per stall but did not include win percentage.  Win percentage was something Erich

Zimny developed in December, 2009 – more than a year later.  [430 – 431]

125.    Elliott participated in the August, 2008 meeting of the stall allocation

committee.  However, he does not know why Mawing's stalls were taken away from her.

[426]

126.    The stall allocation committee did not vote on Mawing's application for

stalls.  [429] Indeed, the decision to take away all of Mawing's stalls was not made at

the stall allocation committee meeting.  [432 – 433].  There was no discussion of

Mawing's stall application at the stall allocation meeting.  [440, 441].  Elliott had no

idea why management would want to take away all of Mawing's stalls.  [438].  There

was no problem with Mawing's upkeep of her barn area.  [442].  There was no

allegation at the August stall meeting that Mawing had violated any track rule.  [443]

127.     After Mawing was informed by letter delivered by Elliott that she was having all of her stalls taken away and asked Elliott "why?" - Elliott did not follow-up with anyone to ask why Mawing's stalls were taken away. [442]

128.     In August, 2008 when Mawing had all of her stalls taken away from her there were about 140 vacant stalls. [438]

129.     At the time of the arbitration there were 30 empty stalls that had not been allocated and about 80 – 100 stalls empty that had been allocated to trainers. [420]

130.     Elliott was acting racing secretary after Doug Lamp left in November, 2007 and continued in that position until May, 2008. [419 – 420; 462]. Elliott did not know whether any of the duties of a racing secretary are regulated by state law.[13] [464]

131.     Elliott had given permission in November, 2007 to Mawing and another trainer named George Yetsook for Mawing to put two horses in Yetsook's stalls.  It was common practice for trainers to ask permission to put their horses in another trainer's stalls.  It was not a violation of any rule to ask permission. [456]

132.     There is no written rule that requires trainers to ask for permission before putting a horse in another trainer's stable.  Rather, it's a common understanding that permission should be sought from the racing secretary. [457]

133.     Although the April 25, 2008 letter to Mawing asserted that she did not have permission to occupy any other stalls at CTRS or to allow any other individual to use stalls allocated to her without the written permission of the racing secretary or assistant racing secretary, Elliott, who was the acting racing secretary at that time, was unaware of any such rule. [459; C-39]

---

[13] The Thoroughbred Racing rules [2007] clearly establish that the association's racing secretary (*i.e.*, CTRS's racing secretary) is an official of a race meeting whose eligibility is subject to the sole discretion of the Racing Commission and must be approved by the Commission. CSR § 178-1-9.1, 9.2, 9.3

**Erich Zimny**

WHEREUPON, Erich Zimny, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

134.    Mr. Zimny is the Vice President of Racing Operations for PNGI Charles Town Gaming, LLC [498]

135.    Mr. Zimny began working for PNGI in April of 2008 in the position of racing administrator. [498]

136.    Mr. Zimny has a bachelor of arts from Georgetown University in 1998 and a law degree and MBA from Rutgers in 2003 as well as master of science in race track management from the University of Arizona in 2007. [499]

137.    Mr. Zimny is a member of the stall allocation committee at PNGI. [500]

138.    Pursuant to the contract with the HBPA, the track is obligated to allocate 1,148 stalls to HPBA members. [502-503]

139.    The current State Racing Commission regulations enacted in July 2010 expressly address the racing secretary's responsibility for the allocation of stalls. [507-508]

140.    The role of the racing secretary in allocating stalls at PNGI has not changed since the enactment of the new regulations by the Racing Commission. [510]

141.    Mr. Zimny is generally aware of who sits on the HPBA board of directors. [513-514]

142.    The stall allocation meeting in August 2008 was Mr. Zimny's first meeting as a member of the committee. [521]

143.    Mr. Zimny has no recollection of Ms. Mawing's stall application being

discussed at the August 2008 meeting. [521]

144.     Mr. Zimny is aware that Ms. Mawing has applied for stalls since August of 2008 but cannot think of a time when her name was discussed at any of these meetings. [522]

145.     Trainers who do not have stalls are dealt with separately after the trainers with stalls have been discussed. [523]

146.     Generally when you are taken off the list of trainers who have stalls you are not going to be placed back on the list. [523-524]

147.     A trainer named Kevin Joy had lost all his stalls because he was not in fact the actual trainer of the horses who were being trained by someone else who was not allowed to race at Charles Town. Joy was definitely violating PNGI's racing rules. Nevertheless, he was allocated more stalls several years later. [524-525]

148.     Mr. Zimny is aware that the present litigation has been ongoing for five years. [525]

149.     Mr. Zimny is aware that Ms. Mawing has applied for stalls every six months. At every stall allocation meeting since she lost her stalls he has been aware that she has had an application pending. [525-526]

150.     Despite the committee's awareness of Ms. Mawing's repeated applications for stalls at every stall allocation meeting her name has never been mentioned at any meeting. [526]

151.     Mr. Zimny is acting as the corporate representative for PNGI. [531]

152.     The second amended complaint alleged that PNGI was motivated in whole or in part and discriminated against Mawing by reducing the number of stalls allocated

to HBPA board member Tina Mawing to zero in retaliation for plaintiff's repeatedly expressed concerns to track management, to the racing stewards and the Governor of West Virginia regarding the hazards and improper use around her barn area with powder rodent poison. [Exhibit 18]

153.    Mr. Zimny agrees that PNGI denied this allegation. [533]

154.    PNGI admitted the allegation that the defendant had approximately 140 empty stalls at the time the complaint was filed in September of 2008. [533-534]

155.    PNGI's Rule 26(a)(3) initial disclosure was made in federal court on November 18, 2009. [Exhibit 43] [535]

156.    PNGI's disclosure of individuals likely to have discoverable information about the issues in the case did not include Mr. Finamore. [535-536]

157.    Erich Zimny gave a declaration under oath on May 3, 2010 during the time Ms. Mawing's case was pending in federal court. [537-539]

158.    At paragraph 19 of his declaration Mr. Zimny averred that the stall allocation committee decided at the August 2008 meeting not to grant Ms. Mawing any stalls for the September 1 through December 31, 2008 term. [541]

159.    At paragraph 20 of his declaration Mr. Zimny averred that Ms. Mawing's racing statistics for the period January 1, 2008 through August 15, 2008, were as follows: Starts 61, wins 2, winning percentage 3.2 percent. He further averred that this was a very low winning percentage for trainers with stalls allocated to them on the grounds of CTRS. [541-542]

160.    When asked if he actually compiled the statistics used in his declaration after the lawsuit was filed, Mr. Zimny had a failure of recollection. [542]

161.     When asked if he was attempting to suggest to the federal court that Ms. Mawing received no allocation of stalls in August 2008 <u>because</u> of the statistics set forth in his declaration, Mr. Zimny had a failure of recollection as to how the declaration was compiled. [542-543]

162.     The August, 2008 stall allocation meeting was the first stall allocation committee meeting Mr. Zimny attended and it was the meeting in which Ms. Mawing lost all of her stalls [544]

163.     When asked to admit that he was not making and formulating any statistics at the August 2008 meeting Mr. Zimny had another failure of recollection. [544]

164.     When asked to admit that the first time he actually started producing charts with statistics and using them at a meeting was in December 2009 Mr. Zimny had a failure of recollection. [544]

165.     Mr. Zimny has no recollection of Ms. Mawing's name coming up at the August 2008 stall committee meeting. [545]

166.     Mr. Zimny has no recollection of anything that occurred at the August 2008 stall allocation committee meeting related to Ms. Mawing. [545]

167.     Mr. Zimny does not know why Ms. Mawing lost her stalls in August 2008. [551]

168.     Mr. Zimny does not know who would know why Ms. Mawing lost her stalls in August 2008. [552]

169.     Mr. Zimny cannot identify any trainer who lost all their stalls because of winning percentages. [554]

**George Yetsook**

Whereupon, with regard to the testimony of George Yetsook, in lieu of either party calling Mr. Yetsook as a witness, the parties stipulated that Yetsook would testify as follows if he was called as a witness (which appears in the official transcript beginning at page 466. The parties further stipulated that only the issue of whether Yetsook complained to anyone is controverted; the remainder of Yetsook's testimony is stipulated as true. [468]):

170.     Yetsook did not complain to anyone that Tina Mawing was using stalls allocated to Yetsook.

171.     Yetsook lost two stalls in April 2008 in connection with having horses in other trainers' stalls. This was the same audit in which Miss Mawing had stalls reduced.

172.     Yetsook took no legal action at that time to regain those stalls.

173.     Yetsook was allocated zero stalls in December 2009. Yetsook initiated arbitration to regain the five stalls he had in the allocation immediately preceding December – the December 2009 allocation.

174.     Yetsook was awarded five stalls through the end of 2011 in arbitration. Yetsook received five stalls in each allocation since then.

**Al Britton**

WHEREUPON, Al Britton, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

175.     Al Britton is the General Manager of the Hollywood Casino at Charles Town Races and has been General Manager of the facility since September of 2004. [762-763]

176.    He is in charge of all aspects of the facility including both gaming and racing. [765]

177.    The primary person he relies upon on the racing side is Dickie Moore, the general manager of racing. [767]

178.    According to Mr. Britton the stall allocation process involves the committee sitting down and going through a list of all the horsemen who have stalls and looking at their starts and win percentages and briefly discussing whether it is someone who keeps their shed row and stalls in good shape and has a good relationship with trainers in the barn.  Then, based on that criteria, a decision is made. [769-770]

179.    Before Mr. Zimny was hired the track did not have anyone with the skill set to put together some of the statistical information that the committee now reviews. The one thing that has remain consistent and is used as a guideline is seven starts per stall as a sort of gatekeeper for whether and how many stalls the committee is going to issue. [770]

180.    According to Mr. Britton his role on the stall allocation committee is just to ask some questions and kind of go with the recommendations of the group for the most part. [775-776]

181.    The racing secretary gets all the applications and the racing secretary brings the applications to the stall allocation committee meetings. [777]

182.    According to Mr. Britton, the stall allocation committee works virtually the same as it did since the beginning.  The only changes are in terms of the information that is considered. When it started, the committee primarily just looked at starts per stall and they now have additional information about winning percentages. [778]

183.     According to Mr. Britton, the stall committee goes through the list of current holders of stalls in alphabetical order individual by individual. [778-779, 781]

184.     According to Mr. Britton, usually a kind of combination of recommendations by the racing secretary, Mr. Elliot and Mr. Zimny arrives at the number of stalls to be allocated to each individual. [779-780]

185.     For people who are currently occupying stalls, their applications are considered in alphabetical order during the first part of the meeting. [783]

186.     With respect to individuals who do not currently occupy stalls, the committee does not go through each application and the racing secretary does not tell the committee who is applying who is not being considered. [785]

187.     Ms. Mawing's name has never come up for discussion by the stall allocation committee since the meeting when her stalls were not reissued to her. [785-786]

188.     Mr. Britton participated in the August 2008 stall allocation committee meeting. [789]

189.     According to Mr. Britton before the August 2008 stall allocation meeting either Mr. Moore or the track's in house counsel brought to his attention that there was an allegation by Ms. Mawing that the track was using the wrong rodent poison in the barn area. [790-791] His testimony in this regard conflicts with his deposition testimony that he did not become aware of her complaints regarding rat poison except as a result of Ms. Mawing's lawsuit. [818-821]

190.     Before the stall allocation meeting Mr. Finamore told Mr. Britton that Ms.

Mawing had claimed to the Governor that the track was stringing wires up in the barn area deliberately to harm horses. [794, 796]

191.   Mr. Britton claims that Ms. Mawing was discussed in the August 2008 stall allocation meeting because she was currently stabled in the barn area. Britton claims that the committee had a typical discussion of Ms. Mawing's starts per stall and winning percentage. [797]

192.   At that point Mr. Britton claims that he raised an issue regarding Ms. Mawing occupying stalls not allocated to her in April 2008 and asked whether there was anything outstanding or remarkable about her horses or any reason the committee should go out of its way to issue her stalls. He then claims based on the fact she did not follow the rules in April he said we issue her no stalls and no one disagreed. [797-798]

193.   Mr. Britton claims he told the stall allocation committee that Mawing should be issued no stalls and no one disagreed. [797-788]

194.   Mr. Britton claims that he told no one at the stall allocation committee meeting about the information he learned from Mr. Finamore about what Ms. Mawing allegedly told the Governor because he did not feel it was an appropriate forum. [798]

195.   All trainers are responsible for ensuring sanitary conditions in the barn area and are responsible for ensuring the health and safety of the horses. [809]

196.   In the spring of 2008, Mr. Britton was having very little contact with anyone at the HBPA about any matter because Mr. Finamore had stated that PNGI was not going to meet with the HBPA or discuss anything until the HBPA pledged its support for table games. [815]

197.    Mr. Britton acknowledges that there was a clamp down by Mr. Finamore on any discussions between the track and the HBPA. [815]

198.    Under the contract with the HBPA the track had an obligation to use its best efforts to address and resolve in a timely and expeditious manner the issue of rodent and pest control and eradication. [816]

199.    Mr. Britton never contacted or directed anyone to contact Ms. Mawing to tell her that the track had checked with the exterminating company and they did not believe the poison could harm a large animal. [823]

200.    Mr. Britton never picked up a phone or invited Ms. Mawing to come and tell her side of the story before the stall allocation meeting in August 2008. [829]

201.    Mr. Britton was copied on Mr. Finamore's 4/25/08 letter. [C-42]

202.    Ms. Mawing was penalized by the track by having four stalls taken away after the barn audit in April of 2008. [831-832]

203.    It was Dickie Moore's daughter who brought equine herpes into the barns and it was because of her that a barn check was necessary. [824]. Bio-security measures were put in place after this incident. [825 – 826]

204.    Before this barn check there was no published penalty for borrowing stalls. [826]

205.    According to Mr. Britton, she was penalized for the same conduct at the stall allocation committee meeting in August 2008. [832]

206.    Of all the trainers who lost stalls in April 2008 following the barn audit, none of them lost all their stalls in August 2008. Ms. Mawing was the only trainer to

lose all her stalls in August 2008 allegedly for having horses in other people's stalls in April of 2008. [832-833]

207.    According to Mr. Britton, the allegation of intentionally harming horses was "certainly rattling around" in his head when he told the stall allocation committee they should not allocate stalls to Ms. Mawing in August of 2008. [833]

208.    Mr. Britton did not recall Ms. Mawing's stall application being set aside with three other individuals who were horse abusers at the August 2008 stall committee meeting. [833-834]

209.    The information he received from Mr. Finamore was part of Mr. Britton's motivation to raise questions about issuing stalls to Ms. Mawing. [842-843]

210.    PNGI has an obligation to equitably and fairly allocate stalls to the horsemen. [847]

211.    PNGI never tells the horsemen the reason why they are allocated or not allocated stalls [847]

212.    Ms. Mawing was never given any reason why she was not allocated any stalls in August 2008. Mr. Britton did not give her a reason nor did he direct anyone else to give her a reason. [848]

213.    Mr. Britton kept Mr. Finamore apprised as to the status of Ms. Mawing's lawsuit against the track and had regular discussions with him. [850]

214.    Mr. Britton also had regular discussion with the track's in-house counsel Phyllis LeTart about the lawsuit. [850]

215.    Mr. Britton discussed Ms. Mawing's complaints about rat poison with Dickie Moore right after the complaints came to light. [852]

216.    His discussion with Dickie Moore concerned whether the poison was something that could be harmful to animals. [853]

217.    Charles Town Races management had an obligation to talk to Ms. Mawing regarding her concerns about rat poison in the barn area. [859-860]

218.    In 2007 there were a number of meetings between PNGI and the HBPA regarding whether or not the HBPA would support the referendum on table games. Mr. Britton was aware of the meetings and was involved in the discussions. [861]

219.    At that time there was a great deal of dissatisfaction toward Mr. Funkhouser because there was a feeling that he had reneged on promises made to support the referendum. [862]

220.    Mr. Britton was also aware that at the time there may have been some division within the HBPA. [862]

221.    Mr. Britton and Mr. Finamore had discussions about what could be done to convince the HBPA to support the table games referendum. [862]

222.    Mr. Britton claims he never tried to determine who was on the HBPA leadership team or which individuals supported or did not support the table games referendum. [863]

223.    Mr. Britton was aware that the Governor's meeting with the horsemen in August 2008 was for the purpose of mediating issues between PNGI and the HBPA. [876-877]

224.    Mr. Britton claims that if he had been asked in his deposition if he had learned anything about Ms. Mawing meeting with the Governor he would have told counsel about his phone call with Mr. Finamore. [868]

225.     However, referring to his deposition taken on April 23, 2010 at page 41, line 12, Mr. Britton was asked if he was aware that Ms. Mawing had met with the Governor and complained about the track's use of the pesticides in the barn area. His answer was "I recall hearing that. I don't know when or from whom." [869]  Britton's deposition claim of not remembering the conversation with Finamore was either lacking in candor at his deposition or his testimony at the arbitration was not truthful.

226.     In his deposition Mr. Britton also claimed that he could not recall whether he knew about Ms. Mawing's conversation with the Governor before the August 29, 2008 letter to her which notified her that she had not been allocated any stalls. [873] Again, Britton's credibility is in question as the significance of Finamore's conversation with Britton could not be understated; indeed, Britton was personally aware and kept apprised of the lawsuit over this issue that Mawing filed in September, 2008.

227.     Mr. Britton claims Mr. Finamore did not discuss the pesticide issue during his phone conversation with Britton about the Governor because Britton had already discussed the pesticide issue with Finamore. He then states he is speculating about the timing of his conversation with Mr. Finamore regarding the pesticide issue. [871]

228.     Mr. Britton is not aware of whether Ms. Mawing has ever applied for more stalls since the August 2008 stall allocation meeting because her name would not have come up at any later meetings because she did not have any active stalls. [874]

229.     If Mawing had not had all of her stalls taken away in August 2008 her name would have come up for allocation of stalls every six months thereafter. [874]

230.     Once Mawing's stalls were taken away she would not be considered for stalls unless the racing secretary and Mr. Zimny considered her a "priority". She has not been considered a priority to be issued stalls. [874-876]

231.     Mr. Britton never directed anybody to talk to Ms. Mawing about the wire allegation or if Mawing had ever made such an allegation. [878]

**Larry James Puccio**

Whereupon, Larry James Puccio, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

232.     Puccio is, among other things, a government relations specialist for several companies including PNGI and is also a consultant. [884 - 885]. For the past 3 ½ years and through to the present time, Puccio receives a $10,000 monthly "retainer" fee from PNGI. [901]. Puccio does not bill by the hour for work performed. [901]. The first time that Puccio had any contact with any legal representative of the Respondent about this case was five or six days before the first day of the Arbitration hearing. [903]

233.     Puccio served for five-and-a-half years, until December 31, 2009, as Governor Manchin's chief of staff. [885 - 887].

234.     Governor Manchin was generally interested in any contract that would mean jobs and tax dollars for West Virginia, including the HBPA contract. [888 – 889]. He would facilitate communications between parties so as to work toward a resolution of their differences. [889] The CTRS contract with the HBPA was "very important" to Governor Manchin because the State's share of the gaming revenue amounts to nearly 1/3 of the State's budget. [906]

235.     The HBPA and Mawing came to meet with the Governor in August, 2008.
[889 – 890]. Puccio did not recall the date of the meeting [908] and could not testify as
to who else from the Governor's staff was present at the meeting. [908].  Puccio could
not recall the identity of any of the individuals from the HBPA delegation who attended
the meeting other than Mawing and could not say how many people were in attendance
or the breakdown between men and women who were present. [908 - 909]. Puccio
could not remember if there was only one woman present or more than one woman.
[909]. Puccio does not recall seeing any photographs at the meeting. [910].  Puccio
does not have access to any notes of that meeting and any notes taken would have been
disposed of by the time of this arbitration hearing. [906 – 907]

236.     Puccio recalls that Mawing was upset but does not recall hearing what
Mawing said because he had to repeatedly go to the door of the meeting room in order to
speak with other staff members about issues unrelated to the meeting with the HBPA.
[890] By the end of the meeting, Pucchio did not know Mawing's concerns.  [891].

237.     Puccio testified on direct examination that at some later unidentified time
he heard Governor Manchin tell Finamore that Mawing had said that rat poison was
purposely placed to kill an animal[14] and than later said a goat and some form of wire
was put "in there" that could harm "their" horses.  [898]. Puccio does not recall
Governor Manchin calling Mawing "crazy." [912]. He remembers Governor Manchin
saying that Mawing was "extremely concerned" and recalls the Governor saying on
several occasions that animals were purposively poisoned and a wire hung purposely to
damage horses.  [912]

---

[14] Rat poison is, of course, intended to kill rodents.

238.     At a still later date in September, Puccio attended a meeting of Governor Manchin with Finamore. [898]. Governor Manchin brought up "concerns" and Finamore explained that he had checked into those concerns and assured the Governor "that that had not happened." [899]. Puccio did not explain what concerns were being discussed.

239.     Puccio testified that Governor Manchin did not instruct Finamore to take action against Mawing or mention Mawing's stall allocations to Finamore. [899]

**Richard Moore**

Whereupon, Richard "Dickie" Moore, after being first duly sworn, testified and the Panel finds the following facts are supported by substantial evidence:

240.     In August, 2008 Moore was the general manager of racing operations at CTRS. [918]. He was also at that time a member of the stall allocation committee. [918]. Moore has been at CTRS for forty-nine years. [946].

241.     Moore has known that Mawing is a member of the HBPA board since she was first elected to the Board. [948]

242.     The other members of the stall allocation committee were Al Britton, Erich Zimny, Randy Wehrman, Mike Elliot, and Jim Taylor (stall superintendent). [919]

243.     Wehrman was the racing secretary and typically ran the stall allocation committee meetings. [920].

244.     Moore signed a letter dated April 25, 2008 in which Mawing had her stall allocation reduced from nine stalls to five stalls. [923; C-39]. Moore felt that no

additional discipline or adverse action should have been taken against Mawing beyond the loss of four stalls. [946]

245.      In Moore's 49 years he is only aware of one other instance of a trainer having all of their stalls taken away for having horses in someone else's assigned stalls and that instance occurred in the 1980s. [946 – 947]. But even in that instance the trainer got his stalls back. [947]

246.      Moore was present at the August, 2008 stall allocation committee meeting. [925]. At that meeting stall applicants were triaged into three groups: those horsemen who were going to get stalls, those who were going to have the number of stalls allocated reduced, and those horsemen who were going to lose their stalls completely. [926]. There were 70 to 75 stall applicants considered at that meeting. [927]

247.      The normal stall allocation process was for Wehrman (the racing secretary) to bring to the meeting an alphabetical listing of trainers who actually have stalls allocated to them. [928]. The criteria applied for stall allocations in the normal course of business was the type of horse and the quality of the horse, the number of starts, whether the trainer properly cares for the horses, and the quality of the stall area. [945].

248.      In the August 2008 stall allocation meeting four trainers who already had stalls allocated were set aside from the full list. [928 - 929]. Mawing was one of those four trainers whose application was set aside. [929]. None of the stall allocation criteria normally considered in the ordinary course of business was discussed with regard to Mawing's stall application. [945]. Indeed, Moore was not aware of any criticism of Mawing. [945 – 946]. Other than Mawing was to lose all of her stalls, her stall

application was not discussed at all. [930]. The other three trainers who lost all of their stalls lost them for reasons such as violation of alcohol policy and no training activity at all. [931].

249.    There were no discussions at the August, 2008 stall allocation meeting of any problems with Mawing's starts per stall and Moore was not aware of any such problems in the first instance. [932]. There were no concerns discussed about the condition or quality of Mawing's horses. [932]. Moore testified that to his knowledge no problem with Mawing's win percentage or how many horses she had "in the money." [932]. Likewise, there was no allegation of animal abuse or failure to maintain barn area properly. [933]. Nor was there any allegation that Mawing had violated any rule of racing. [933].

250.    CTRS does not have any appeal mechanism for trainers to challenge their stall allocations and Moore did not tell Mawing why she had lost all of her stalls. [934].

251.    Moore recalled Mawing's complaint that someone had poisoned her horse and goat and Moore told her he would look into the matter. [935 – 936]. Mawing did not allege that the poisoning was deliberate. [936]

252.    Mawing did not make any allegation whatsoever to Moore about any wire being strung in a shed row. [936]. Moore did not conduct any investigation regarding such a thing. [936 – 937]

253.    Moore telephoned the track superintendent, Doug Bowling, about Mawing's poison concern and he confirmed only that he had heard about it but had not done anything about it. [937]. Next, Moore telephoned the track maintenance supervisor, Rodney Walker, and he had heard of the poisoning and confirmed that

poison had been placed in the stalls. [937]. Walker told Moore that the rodenticide was in boxes. [942]. Moore saw poison boxes himself but did not see powdered poison in Barn 14 or any other barn. [942]

254.     The following day Moore received a telephone call from head racing steward Wright who recommend that Moore look into the issue and speak with the state veterinarian, which Moore did. [938 – 939]

255.     The state veterinarian confirmed that poison had been placed and that he had received a call from someone about a sick horse and a sick goat. [939].

256.     Ordinarily when Ehrlich Pest Control placed poison it was in a black box that was placed along the shed or close to the tack rooms. [940]. Moore had never known Ehrlich to broadcast powder. [940]. Moore was not aware that poison in powdered form had been spread in Mawing's barn. [940]

257.     Moore authorized an Ehrlich representative to continue the use of rodenticide in a box. [943]

258.     Moore is positive that no one, including Finamore, told him that Mawing had raised concerns with Governor Manchin about poison or made any allegation about a wire. [943 – 944]

259.     Moore went to Al Britton and told him about Mawing's complaint about rat poison. [944]. Moore did not say to Britton that Mawing had said the poisoning was deliberate. [944 – 945]. Moore also did not speak to Britton of any trip wire or wire in the barn being hung to kill Mawing's horse because no one had made such an allegation at that time. [945]

**James Taylor**

The deposition testimony of James Taylor taken on April 5, 2010 was submitted into evidence and the Panel finds the following facts are supported by substantial evidence:

260.    Mr. Taylor has worked at the track since 1985. [dep. 6]

261.    At the time of his deposition Mr. Taylor was employed at CTRS as a stall superintendent. [dep. 7]

262.    Mr. Taylor is a member of the stall allocation committee and has been a member since the committee began, but he had no involvement in any decisions regarding stall allocations to Mawing. [dep. 8 - 9]

263.    The members of the stall allocation committee do not vote on stall allocations. The stall allocation committee members have no say as to the allocation of stalls. [dep. 12, 25]

264.    All of the stall allocation decisions "come out of the office." [dep. 17, 19 - 20]

265.    It is common practice for trainers to lend stalls to other trainers. Permission to borrow stalls should be obtained from the racing secretary, but sometimes trainers do not ask permission. [dep. 22 – 23]

266.    Mr. Taylor knew that all of Mawing's stalls were taken from her but, despite being on the stall allocation committee; he does not know why that happened or who made that decision. [dep. 23 – 24]

267.    If a trainer does not have stalls at CTRS then the trainer must ship the horses. That is why it is important to have stalls – to avoid all the shipping of horses. [dep. 28]

**William Randolph Wehrman**

The deposition testimony[15] of William Randolph Wehrman taken on April 6, 2010 was submitted into evidence and the Panel finds the following facts are supported by substantial evidence:

268.     Randy Wehrman was employed by CTRS as the racing secretary beginning on April 28, 2008.  [dep. 9 – 10]

269.     Doug Lamp had been the racing secretary up until November, 2007.  {dep. 10]

270.     Wehrman was supervised by Erich Zimny.  Zimny reports to Richard Moore and Al Britton.  [dep. 19].

271.     Each racing official has to be approved by the West Virginia Racing Commission and licensed.  [dep. 24 – 25]

272.     In addition to other duties, Wehrman also has supervisory responsibility over the entire barn area.  [dep. 26]

273.     In the barn area if there is any condition that would pose a risk to human and animal safety than Wehrman would be aware of it and obliged to report it.  [dep. 28]

274.     Richard Moore is ultimately responsible for the barn area.  [dep. 28].  Moore is the one who knows everything.  [dep. 30]

275.     Wehrman has encouraged Mawing to enter a stakes race in Kentucky because she had nice horses every year.  [dep. 34]

276.     Wehrman is of the opinion that Mawing is a professional person.  [dep. 35]

277.     The HBPA is the exclusive bargaining agent and contractual representative of the horsemen.  [dep. 43; C-1, ¶ 2]

---

[15] R-32.

278.     In 2008 CTRS had somewhere between 1200 and 1300 stalls. [dep. 46 – 47]

279.     In the August to September, 2008 time period 50 to 100 stalls were unoccupied. Sometimes there might be two stalls in one barn or five or six stalls unoccupied in another barn. [dep. 48]

280.     The horse population fluctuates as horses get sick, get hurt, or someone leaves the track. Room can be made for someone. Typically, in everyone's allotment they will have one or two empty stalls at various times for various reasons. [dep. 49]

281.     In 2008 and 2009 if a trainer needed five stalls they could be accommodated. [dep. 50 – 51]

282.     Wehrman did not have input as to whether a trainer should be allotted stalls. [dep. 51]

283.     The activity of loading a horse on a trailer, storing it on a trailer, and unloading it from a trailer presents a problem for some horses and not for other horses. Sometimes the horses react poorly to vanning and injure themselves. [dep. 53 – 54]

284.     Wehrman is not aware of Mawing having ever violated any statute or rule governing thoroughbred horseracing in West Virginia. [dep. 58]

285.     The racing stewards are strictly responsible to the Racing Commission for the conduct of all race meetings and every detail directly or indirectly pertaining to the racing law and the rules of the West Virginia Racing Commission. [dep. 59 – 60]

286.     In 2008 the stall allocation process began with a competed stall application. Information about each horse had to be included in the stall application and the application must be signed. [65 – 67]

287.     No specific stall allocation guidelines were provided to the trainers.  [dep. 67 – 68]

288.     Wehrman administered stall applications in his official capacity as the racing secretary.  [69 – 70]

289.     At the stall allocation meetings, which are done in Britton's office, the applications are divided into two sections.  One section contains an expandable, alphabetized file on each trainer who is on CTRS grounds.  The second section is for new applicants for stalls.  [dep. 70 – 71]

290.     In 2008 Britton, Moore, Zimny, Taylor, Elliot and Wehrman were on the stall allocation committee. [dep. 71]

291.     The stall allocation committee meets shortly after the expiration of the deadline for submitting stall applications.  [dep. 74]

292.     Erich Zimny provided the number of starts per stall. [dep. 75].  Wehrman would provide information about the quality of the horses starts meaning the type of horse and class level, and in the race order of finish.  Other factors include how often the horse was taken off-track and teamwork ethics, how often a trainer scratches horses from races, and how well the trainer takes care of the horses.  [dep. 78]

293.     Although the entire stall allocation committee is present at stall allocation meetings, Wehrman does not know who decides how many stalls a trainer is allocated. [dep. 79 – 80].  The number of stalls to be allocated to each trainer in 2008 and 2008 was dictated by Britton or Moore.  [dep. 80 – 81].  The allocation was not done by vote of the stall allocation committee.  [dep. 81]

294.     If a trainer was to lose all of her stalls, that decision was made outside of the stall allocation committee meeting.  [dep. 82]

295.     Wehrman does not recall participating in a meeting to discuss removing all of Mawing's stalls.  [dep. 82].  He does not recall Mawing's application even being discussed at a stall allocation committee meeting.  [dep. 84 – 85]

296.     Wehrman does not know who decided how many stalls to allocate to an applicant.  [dep. 87]

297.     Wehrman does not know why CTRS claimed that it was unable to allocate any stalls to Mawing for the remainder of 2008.  [dep. 89]

298.     Wehrman made no effort to ascertain why Mawing lost all of her stalls. Zimny just gave Wehrman a letter for Mawing without explanation.  [dep. 93]

299.     As of the time of his 2010 deposition, no one at CTRS had explained to Wehrman why Mawing's stalls were taken away.  [dep. 95]

300.     Wehrman has seen Mawing's stall applications each time they were due and does not know what action was taken on her requests, however, he knows that she was not given any stalls but he does not know why.  [dep. 95 – 96].  There was no discussion about her applications for stalls at subsequent stall allocation meetings.  [dep. 98]

301.     A few trainers have allocations of close to 50 stalls.  [dep. 98]

302.     In 2008 and 2009 Mawing's horses were not inferior to other trainers' horses; and in 2010 her horses were probably as good as or better than other trainers' horses.  [dep. 99]

303.     Wehrman can recall only four trainers at CTRS other than Mawing who lost all of their stalls and each of those four mistreated their animals.  [dep. 99 – 100]

304.     When a trainer seeks permission to borrow stalls, Wehrman will determinate if the reason is legitimate and if so, he will recommend to his superiors that permission be given.  If his superiors grant permission, Wehrman will telephone the trainer and  verbally communicate the permission. [dep. 103 – 104]

305.     Wehrman is not aware of any process by which a trainer can appeal a stall allocation decision.  [dep. 113].  There are no stall allocation committee notes or records kept other than the number of stalls assigned and the stall allocation letters themselves.  [dep. 120]

306.     In the winter of 2009/2010 Skoobie Schneider neglected his horses with regard to feed and stall maintenance.  [dep. 114].  The first action that Wehrman recommended was to get feed and straw for the benefit of the horses.  But following this incident Wehrman is unaware of any recommendation being made to take stalls away from Schneider.  [dep. 115]

307.     The West Virginia Racing Commission maintains a continuous presence at CTRS who oversee administration and enforcement of the Commission's rules and policies.[16]  [dep. 117]

308.     Britton did not discuss with Wehrman any of the concerns with poison that Mawing raised with the Governor of West Virginia and does not know whether Britton spoke to anyone else about Mawing's concerns.  [dep. 131]

**Leonard Hale**

---

[16] *See* Rule 8.3 of the Thoroughbred Racing rules [2007]: "The jurisdiction of the Racing Commission over matters related to subjects covered by law or the rules of the Racing Commission is continuous throughout the year."

The deposition testimony of Leonard Hale taken on March 12, 2013 was submitted into evidence and the Panel finds the following facts are supported by substantial evidence:

309.     Hale was the HBPA's executive director from October 1, 2007 until he resigned in August, 2011.  [dep. 12, 15]

310.     While Hale was the executive director of the HBPA the WV Racing Commission was not involved in stall allocations.  [dep. 18 – 19]

311.     Hale remembers that there was an allegation that Butts had gone to the racing secretary and received permission to loan stalls to Mawing but that there was no written confirmation.  [dep. 23]

312.     It is not uncommon at racetracks for trainers to loan stalls.  [dep. 24]

313.     Hale guesses that perhaps six to ten people had stalls taken away for loaning/borrowing stalls.  [dep. 26]

314.     Hale remembers that before the HBPA's April 29, 2008 meeting Schneider was "gleefully" telling others that Mawing was going to lose her stalls.  [dep. 29]

315.     The minutes of the April 29, 2008 board meeting of the HBPA accurately depict the discussion at that meeting.  [dep. 28; R-29]

316.     Hale discussed Finamore's refusal to meet in any regard about the horsemen at the HBPA's April 29, 2008 meeting.  [dep. 30]

317.     Richard "Dickie" Moore's letter of May 2, 2008 cites to a need for "required written consent" to occupy stalls other than those assigned to a particular

trainer. [R-30]. However, there is no evidence in the record of this arbitration of any published rule requiring written consent.

318.    R-30 was copied to the HBPA board, including Mawing. [dep. 32]

319.    Hale agrees with Moore's comment in his May 2, 2008 letter that bio-security diligence benefits the track and the horsemen because it was Dickie Moore's daughter who had brought an infected horse onto CTRS grounds and the barn check was done to "weed out" that problem. [dep. 34]

320.    Mawing raised concerns about possible rat poisoning in the barns when showed Hale pictures of a dead horse and a dead goat and said it was from the rat poison that was put in the barns. [dep. 36]

321.    Mawing asked Hale about the procedure for poisoning rats at other racetracks. Hale explained that normally barns are vacated before rat poison is applied. [dep. 38]

322.    Hale was present when a delegation from the HBPA met with Governor Manchin in Charleston on August 18, 2008. [dep. 39]

323.    The purpose of the meeting was to discuss HBPA contract negotiations with CTRS and upcoming table games legislation. [41]. Hale was present for the entire meeting. [dep. 43]

324.    There was no agenda *per se* for the meeting. [dep. 41]. Toward the end of the meeting Mawing showed the Governor and his staff photographs of the dead horse and goat. [dep. 42]

325.    Hale does not recall how this issue arose and did not recall Mawing's exact words. [dep. 42]

326.     Hale thinks the Governor had questions about the confirmed cause of
death but did not recall what Mawing provided anything to the Governor on that issue.
[dep. 43]

327.     Hale did not recall Mawing making any other comments about PNGI
during the meeting.  [dep. 43].  He did not recall any comments by Mawing or anyone
else about conditions in the barn other than about rat poisoning.

328.     Hale did recall "something" being said during the meeting about a wire in
a barn or a rope across a barn but did not recall who had made such a comment.  [dep.
44]

329.     Hale knows that PNGI became aware of the HBPA's meeting with the
Governor before August 29, 2008 when Mawing lost all of her stalls because Al Britton
commented to Hale about pictures being shown to the Governor. [dep. 47 – 48].
Nothing else was discussed about the HBPA's meeting. [dep. 49]

330.     Britton commented specifically about Mawing showing pictures to the
Governor but Britton did not express any opinion about how he felt about Mawing
having made that comment.  [dep. 49]

331.     Per R-31, other trainers who were not at the meeting with Governor
Manchin had the number of stalls assigned to them at the August, 2008 stall allocation
meeting reduced [not eliminated entirely] and no explanation was provided.  [dep. 53 –
54]

332.     Horsemen who race at CTRS are not obligated to join the HBPA.  [dep.
57].  But all of the trainers who lost stalls and to whom Hale was referring in R-31 were
members of the HBPA.  [dep. 57].  The August, 2008 stall allocation meeting was the

next regular stall allocation meeting after Finamore refused to "discuss anything" with the HPBA until it pledged its support of table games. [C- 42].

333.    Mawing ran plenty of horses and ran well. [dep. 61]. Hale believes that Mawing lost all of her stalls because of HBPA activity. [dep. 59 – 61]

**Malcolm G. Barr**

The deposition testimony of Malcolm G. Barr [R-71] taken on March 13, 2013 was submitted into evidence and the Panel finds the following facts are supported by substantial evidence:

334.    Barr was the president of a horse racing syndicate called Hampshire Racing Partnerships, LLC. [dep. 8, 14]

335.    In 2006 Barr made a complaint to CTRS management about track conditions having caused the breakdown of two of his horses. [dep. 35, 43]. After he made his complaint, the racing secretary, without explanation other than that he had been told to do so, refused to accept Barr's entries for horse races. [dep. 35]

336.    Barr then had Funkhouser's trainer, George Yetsook, entry Barr's horses in races using Yetsook's name and legally race them. [dep. 36]

337.    Barr met with Finamore and Finamore commented that Barr was making a poor choice of a trainer by using Funkhouser's trainer. [dep. 39]. Because it was well-known around the track that Funkhouser and management were "butting heads", Barr had a sense of what Finamore want him to do. [dep. 39]

338.    In 2009 Barr hired Mawing to train horses for his syndicate because Mawing had a good reputation as a trainer of young horses. [dep. 23 – 24]

339.     Mawing telephoned Barr and told him that she would be stabling horses off of the track and that there would be a charge of maybe $15 / day. [dep. 9]

340.     Barr did not know why Mawing did not know why Mawing lost her stalls at CTRS. [dep. 28]

341.     In December 2010 the decision was made to terminate Hampshire Racing Partnerships. [dep. 31]. Once the partnership ended there was no need for Mawing's services. [dep. 32 – 33]

## II. **LEGAL ARGUMENT**

### A. CTRS Discriminated in the Allocation of Stalls to Mawing by Reason of HBPA Membership or Activity

The Agreement prohibits CTRS from discriminating in the allocation of stalls by reason of HBPA membership or activity. Moreover, CTRS shall not condone its representatives or employees discriminating in the allocation of stalls. [C-1, ¶ 11 B]. Mawing contends, and her contentions are supported by substantial evidence, that CTRS discriminated against her in the allocation of stalls in the following regards that are discussed below in chronological order:

1. The HBPA Board's Neutrality Vote on Table Games and Mawing's Testimony Before the Racing Commission

There is substantial evidence that Mr. Finamore and CTRS were very angry and upset that the president of the HBPA, Raymond Funkhouser, and the HBPA board, of which Mawing is a member, voted to remain neutral on the issue of the HBPA's support of the table games referendum and subsequently the voters of Jefferson County voted to reject table games. Mr. Britton confirmed that the table games issue was of importance to PNGI because it meant "millions and millions of dollars." [863] *See also* C-41, Mr.

Finamore's 4/25/08 letter in which he details the millions he estimates the HBPA lost

[statutorily, the HBPA's share is a tiny portion of what PNGI receives].

Sufficient evidence was introduced that the racing stewards, one of whom was a

paid employee of CTRS, suspended Funkhouser's occupational permit shortly before the

Breeder's Classic, which suspension he challenged. The Racing Commission conducted

an evidentiary hearing at which CTRS's legal representative and management were so

interested that even though CTRS was not itself a party, they attended the Funkhouser

hearing. Had Funkhouser's occupational permit suspension been upheld he would have

been out of the racing business. Mawing, was authorized by the HBPA to testify at that

hearing and her testimony related to her duties as an HBPA board member. Mawing's

testimony was a part of the basis for the Racing Commission's decision to overturn the

Funkhouser suspension and Mawing is specifically identified in that decision. [C-2, p. 6,

¶s 8 – 10].

Although Respondent argues that Mawing's February 7, 2008 allocation of stalls

[C-39] actually increased from seven to nine stalls which was after the Funkhouser

decision and that Mawing's stalls were reduced in April 2008 after a barn audit in which

Mawing was cited for having horses in the stalls assigned to other trainers, there is

sufficient evidence for this Panel to disbelieve the explanation of CTRS because, while

the granting of two additional stalls is a factor to consider, it is not dispositive of CTRS's

intent to discriminate against Mawing. Instead, it seems plain that CTRS and in

particular, Mr. Finamore, were opportunistic in their efforts to harm Mawing.

First, it was not the stall allocation committee, *per se*, that was angry with

Mawing and the rest of the HBPA Board; it was PNGI and specifically, Mr. Finamore

who were furious.  Mr. Finamore's 4/25/08 letter was, of course, intentionally copied to Mr. Moore and the message was quite clear – no discussions about **anything**.  It was not until Mr. Finamore decided to use his corporate heft and make his substantial view point known that overt retaliation opportunistically commenced against Mawing.

Second, there was no published rule that required written permission of the racing secretary in order for trainers to share stalls.  Under the Agreement, CTRS had the right to discipline or remove horsemen but only where there was a failure to "obey Charles Town Races' published rules and regulations."  [C-1, ¶ 12 B].  Mr. Britton agreed that there was no published penalty for borrowing stalls.  Thus, even if the Panel believed that Mawing did not seek permission from the racing secretary before borrowing stalls, the question must be asked: Why would CTRS punish Mawing in the absence of any failure by her to abide by published rules and regulations?  That CTRS chose to discipline Mawing under circumstances that cannot give rise to discipline under the Agreement is compelling evidence that CTRS was motivated by an impermissible factor.

Third, CTRS's animus against Mawing is evident from its refusal to confirm with the former racing secretary, Doug Lamp, that Mawing and Yetsook had in fact obtained his permission to share stalls.  Mr. Finamore's letter of April 25, 2008 in which he stated that there would be no cooperation on anything until the HBPA supported table games is consistent with CTRS choice to ignore Mawing's assertion that she had permission to occupy other trainers' stalls.  Thus, while Dickie Moore may have been legitimately motivated to conduct a barn audit (it was, after all, his daughter who had caused the bio-security issue by bringing a horse with equine herpes onto the grounds without having an in-slip as conceded by Mr. Britton), when Mawing disputed the appropriateness of

discipline because she had permission, CTRS refused to confirm that she was telling the truth. CTRS, by refusing to confirm that Mawing and Yetsook had permission, was condoning its representative and employees in discriminating against Mawing in the allocation of stalls. Moreover, by turning a deaf ear to the issue of Mawing's permission to share stalls, CTRS was violating the contractual requirement of equitable allocation of stalls which it knew to be essential to horsemen's livelihoods. [C-1, ¶ 11 A].

Fourth, the evidence is disputed as to whether Yetsook ever complained about Mawing improperly occupying his stalls. Yetsook states that he did not complain. This testimony is credible because Yetsook confirmed that he lost two stalls for allowing Mawing to occupy his stalls. It makes no sense at all for Yetsook to have been punished because he complained that Mawing was occupying his assigned stalls without permission. It is more likely that Yetsook did not complain and that he and Mawing were singled-out for punishment despite permission as both of them were members of the HBPA board that did not affirmatively support table games and with which Mr. Finamore was so angry, and both of them testified for Funkhouser before the Racing Commission.

Fifth, there is evidence that Skoobie Schneider knew in advance that Mawing was going to have her stalls taken away and that it was being done as a warning. For example, Leonard Hale remembered that Mr. Schneider was "gleefully" telling others before the HBPA meeting that Mawing was going to lose her stalls. Virtually simultaneously, Mr. Finamore wrote his letter pledging no cooperation on anything and copied Mawing along with the rest of the HBPA board.

From the foregoing the Panel could rightly conclude that Mawing was discriminated against in the allocation of four of her stalls because of her HBPA membership or activity.

## 2.  Mawing's Rat Poison Concerns

The Agreement contemplates that the parties will use "their best efforts to address and resolve in a timely and expeditious manner matters of mutual concern to the parties: A. Rodent and pest control and eradication." [C-1, ¶19]. Mawing, in addition to having the duties of a barn captain, had statutory responsibilities as a trainer for the health and well-being of her horses.

It is beyond dispute that Mawing acted in good faith in reporting her concerns about the possible powdered Rozol poisoning of her animals to track management, the racing stewards and the West Virginia Department of Agriculture when she filed a written complaint that initiated an investigation.  It is also undisputed that no one from CTRS provided assistance, information, or feedback to her about her complaints.  Indeed, Mr. Britton admitted that despite knowing about her concerns about poison, the loss of her valuable property (a horse) he did not get back in touch with Mawing and he did not direct anyone else to respond to her concerns.  Within the context of a contractual obligation to cooperate on issues of mutual concerns such as rodent control/eradication, the failure the confer with Mawing is explained in light of the animus CTRS felt against her and the rest of the HBPA.  That animus is succinctly evidenced by Mr. Finamore's unilateral decision, stated in his letter of April 25, 2008 to refuse cooperation on any issue.  This was a willful violation of the plain violation of the Agreement and that animus is a rosetta stone to understanding CTRS's actions and attitude toward Mawing.

In stark contrast to Mr. Finamore's unbridled animus, had CTRS only cooperated with the HBPA about broadcasting the much more highly concentrated powdered form of Rozol inside the stalls, instead of the less concentrated bait boxes containing pellets, the safety of humans and animals could have been properly addressed.

Instead, CTRS continued its course of discrimination against Mawing when, in August 2008, Mawing applied for a stall allocation. Mr. Britton's testimony on the issue of when he learned about Mawing's rat poison concerns is contradictory. At the arbitration he testified that he knew of her complaints before the August 2008 stall allocation meeting and that he had discussed Mawing's concerns with Mr. Finamore before Mawing and the rest of the HBPA delegation met with Governor Manchin on August 19, 2008. [871]. If this is true, it supports Mawing's assertion that her complaints were a motivating factor in the decision not to award her any stalls. In his 2010 deposition, Britton denied having knowledge of her rat poison concerns until she filed suit in September 2008. But Britton's deposition testimony is entirely contradicted by Mr. Moore who testified that he went to Mr. Britton and reported Mawing's complaint about rat poison. [944]. There is no evidence from any of the other attendees at the August 2008 stall allocation committee meeting that Mawing's stall allocation request was discussed. Every attendee except Mr. Britton testified either that there was no discussion about Mawing's application or that they did not recall any discussion. Mr. Britton did not even give Mawing an explanation for this singular and unique denial of that which is contractually acknowledged to be essential to a horseman's livelihood – an equitable allocation of stalls.

The timing of the denial of all stalls coming so soon after Mawing's good faith reports is substantial evidence that her complaints were but one more motivating reason for CTRS's denial of stall application in August 2008 and ever afterwards.

3.   Delegation to the Governor

It is undisputed that Mawing was a member of an HBPA delegation selected to meet with then Governor Manchin to discuss contract negotiations with PNGI Charles Town Gaming Limited Liability Company [d/b/a CTRS] regarding a renewed Agreement and also a push to put another table games referendum before the public.  The Agreement is of fundamental concern to the Horsemen because, as acknowledged by the parties to the Agreement, their livelihoods depend upon the equitable allocation of stalls.  Thus, it is beyond dispute that Mawing's participation in the meeting with Governor Manchin was quintessentially HBPA activity.

There is no evidence that during all of Mawing's efforts occurring before the meeting with the Governor to report her concerns for the well-being of her horses and other animals and people in Barn 14 she ever claimed that the rat poisoning of her animals was deliberate.  For example, her signed complaint that she filed with the West Virginia Department of Agriculture to initiate an investigation does not allege a deliberate poisoning. Likewise, there is no evidence that she ever claimed to anyone an issue with a wire or rope being strung across her stalls to maim her horses when surely, such an outrageous act would have been reported to at least the racing stewards and discussed widely at the track and at an HBPA meeting.  Mr. Moore was quite clear that no such report of deliberate poisoning or a strung wire was made to him when Mawing met with Moore to discuss the issue of rat poison.

If Mr. Finamore's recounting of what the Governor said to him about a claim of deliberate poisoning or a wire and Mr. Finamore's promise to the Governor to investigate the allegations were true, one would expect that Mr. Finamore would have followed through and initiated an investigation of such serious allegations. But there is no evidence of an investigation. To the contrary Mr. Moore – the general manager of Racing, who presumably would have been an important witness to the investigation[17] if not the investigator himself, testified that he was quite positive that no one spoke to him about Mawing's conversation with Governor Manchin or made any mention of a wire being strung. [943 – 944]. Nor did anyone question Ms. Mawing herself about her alleged statements to ascertain such basic information essential to beginning an investigation such as when the wire was hung, who saw it, to whom did she report it, what became of the wire, etc.

Instead, despite years of litigation and depositions, including mandatory disclosures in federal court, no disclosure was made by the Respondent of Mr. Finamore's supposed conversations with Governor Manchin until shortly before the arbitration hearing itself.  There were only four witnesses to Mawing's discussion with the Governor during the delegation's meeting who testified:  Mawing – who flatly denied alleging a deliberate poisoning to the Governor and who knew nothing about a wire; Randy Funkhouser – who did not recall Mawing making any such statements; Leonard Hale – who did not recall Mawing or anyone else making comments about conditions in the barn other than about the rat poisoning, but thought that maybe something was said about a wire in a barn or a rope across a barn but did not recall who made such a comment; and, Mr. Puccio – who, while continuing to be the beneficiary of a $10,000 per

---

[17] Recall that Mawing reported her concerns to Mr. Moore about the rat poison.

month PNGI retainer for the last three and one-half years following his service as Governor Manchin's chief of staff, testified that he did not know what Mawing's concerns were by the end of the HBPA delegation's meeting with the Governor, but claimed to have later heard Governor Manchin tell Mr. Finamore that Mawing had made comments about deliberate poisoning and about a wire. This was not credible testimony because Mr. Puccio admitted that by the end of the delegation meeting he did not know what Mawing's concerns were; obviously, if her concerns had been the deliberate poisoning of her horse and an intentional effort to maim a horse by stringing a wire surely Mr. Puccio would have known of those two enormously significant concerns - criminal acts - by the end of the meeting. Instead, when the Governor during a telephone conference with Mr. Finamore on some later date did not remember which of the two women from the meeting about whom he was speaking, Mr. Puccio provided Mawing's name to the Governor. [897 – 898]. Mr. Puccio, who had no documents to support his recollection and had poor recall about the meeting and its attendees generally, offered no explanation as to why he later offered Mawing's name to the Governor when he did not know what she had said during the meeting. In other words, Puccio offered up Mawing's name to Governor Manchin without any factual basis for doing so.[18]

Given the state of this evidence coupled with the non-disclosure by Respondent when obligated to disclose by the federal rules, the Claimant respectfully submits that Respondent's contentions about Mawing's comments to the Governor are not supported by substantial evidence; the conduct and statements of Mawing and other witnesses in the

---

[18] Finamore obviously heard the Governor struggling for a name. But despite being on notice of the Governor's uncertainty, he chose not to speak with Mawing, the other woman present at the meeting, or any of the HBPA delegation to ascertain what actually was discussed. This is further evidence of opportunistic retaliation discussed *infra*.

weeks after the death of her horse and before the meeting with the Governor when one

would have expected Mawing or someone else to raise such issues, during the meeting

with the Governor, or after the meeting with the Governor when one would have

expected that the promised investigation would have been conducted do not support

Respondent's claim.

      What is beyond dispute is that Mr. Finamore admits interjecting himself into the

stall allocation process and telling Mr. Britton to put his concerns about Mawing's

meeting with the Governor "into the mix" in deciding whether she should be allocated

any stalls at all. It is no stretch at all to see that when the senior vice-president of CTRS's

parent corporation, PNGI, chooses to inject himself into the stall allocation process to

speak against the application of a trainer who was on the HBPA's Board when the Board

voted contrary to Mr. Finamore's wishes on a matter involving millions of dollars to

PNGI, who testified in support of the HBPA's president with whom Mr. Finamore was

known to be very angry, which trainer was reporting a rat poison problem and who had

filed a complaint with the WV Dept. of Agriculture, who was a part of the pending

contract review team and who had embarrassed CTRS by reporting to the Governor the

lack of cooperation of CTRS (such cooperation having been forbidden by Mr. Finamore

in writing) in such basic, fundamental matters of mutual concern to the parties as rodent

control/eradication, that Mrs. Mawing was not going to be awarded any stalls by Mr.

Britton in August of 2008 or at any time thereafter.

**B.  CTRS Retaliated Against the Claimant in Violation of West Virginia Law**

CTRS should have been aware that any attempt to interfere with the process of obtaining truthful testimony, by either intimidating a potential witness/employee prior to his or her testimony or retaliating against such witnesses/employee thereafter, violates the clear and substantial public policy of West Virginia. *See e.g., Kanagy v. Fiesta Salons, Inc.*, 208 W. Va. 526, 531 (W. Va. 2000) (retaliation for providing truthful information to an investigator is protected activity); *see also Page v. Columbia Natural Resources, Inc.*, 198 W. Va. 378, 480 S.E.2d 817 (1996) (public policy prohibited discharge of an employee when such employee had given or might be called to give truthful testimony in a legal action).

The Claimant's burden is to establish that CTRS's denial of stalls was motivated by an unlawful factor contravening substantial public policy. *Page v. Columbia Natural Resources*, 198 W. Va. 378, 390 (W. Va. 1996) ("[W]e hold that once the plaintiff in an action for wrongful discharge based upon the contravention of a substantial public policy has established the existence of such policy and established by a preponderance of the evidence that an employment discharge was motivated by an unlawful factor contravening that policy, liability will then be imposed on a defendant unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.")

Claimant alleges that Respondent retaliated against her for 1) testifying in a West Virginia Racing Commission hearing In the Matter of Raymond J. Funkhouser, DOB, 3/1//1951, Occupational Permit Holder 34168; 2) reporting to the Racing Stewards the hazardous and improper use around her barn area of powdered rodent poison; and, 3)

filing a complaint with the West Virginia Department of Agriculture pursuant to the West Virginia Pesticide Control Act of 1990, W. Va. Code § 19-16A-1, *et seq.*

As to testifying before the Racing Commission in the <u>Funkhouser</u> matter, there should be no dispute that the Racing Commission is a tribunal and thus her testimony was in an "official proceeding" as contemplated by W. Va. Code § 61-5-27(a) (3) [defining an "official proceeding"]. Likewise, Mawing contends that the retaliation she suffered detailed *supra*, is a violation of W. Va. Code § 61-5-27(c)(3) (prohibiting causing injury or loss to a person with the intent to retaliate for attending, testifying or participating in an official proceeding)

The Claimant also contends that CTRS retaliated against her for making reports to, *inter alia*, a racing steward, about rodent poison in the barn area. Mawing had statutory obligations for the well-being and health of the horses in the stables and stable areas of the racing association. Those responsibilities include:

- Maintaining sanitary condition at all times. §178-1-31.1.2
- The proper identity, custody, care, health, condition and safety of horses in his or her charge. §178-1-31.1.4.

Because of these obligations, Claimant contends that she made a report to the Racing Stewards, the West Virginia officials having broad authority and responsibility on racing association grounds for every racing law and rule of the Racing Commission.[19] A report to Racing Stewards initiates the Racing Commission's jurisdiction and is the first step in the "legal process" as defined by W. Va. Code § 61-5-27(a)(2) [defining "Legal Process"] that leads to an official proceeding of the Racing Commission. The Claimant

---

[19] "The stewards are strictly responsible to the Racing Commission for the conduct of all meetings in every detail, directly or indirectly, pertaining to the racing law and rules of the Racing Commission." § 178-1-10.2 [2007] and § 178-1-8.3.a. [2011].

contends that her participation in the official proceeding was a motivating cause of the Respondent's retaliation against her and consequent damages. Thus, this claim too fits squarely within the protection contemplated by W. Va. Code § 61-5-27.

The West Virginia Pesticide Control Act, W. Va. Code § 19-16A-1 *et seq.*, [1990] has as its statutory purpose the regulation and control of pesticides so as to prevent, among other things, the injury to animals either by direct poisoning or gradual accumulation. *Id.* at § 19-16A-2. In this case, a loose powdered form of rozol™ called Rozol Tracking Powder was liberally distributed in barn area 14 containing stables and horses for which the Claimant was responsible on, at least, June 3, 2008. Rozol is known to be hazardous to humans and animals. As a consequence of the Claimant's concerns regarding the improper use of Rozol Tracking Powder she made a report to the W. Va. Dept. of Agriculture and an investigation by the Department of Agriculture was undertaken, including the gathering of witness statements.

There can be no question that the Pesticide Control Act evinces the substantial public policy of West Virginia. *See* 19-16A-2 (discussing the risks of injury to man, animals, and the environment posed by the improper use or application of pesticides). It is settled law in West Virginia that statutes are a source of public policy. *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W. Va. 371, 377 (W. Va. 1992) ("To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."); *Kanagy v. Fiesta Salons, Inc.*, 208 W. Va. 526 (W. Va. 2000) (West Virginia Code of State Regulations § 3-5-3 clearly provides a substantial public policy sufficient to support a claim for wrongful discharge where an

employee is discharged in retaliation for providing truthful information, in compliance with the requirements of the regulation, to an investigator for the West Virginia Board of Barbers and Cosmetologists).

The West Virginia Commissioner of Agriculture has enforcement responsibilities for the Act, including investigation of complaints by entering upon the property [W. Va. Code § 19-16A-25(a)], issuance of subpoenas [W. Va. Code § 19-16A-24], and the authority to impose civil penalties pursuant to W. Va. Code § 19-16A-22(b), among other actions. Indeed, any person aggrieved by the action of the Commissioner may seek judicial review pursuant to W. Va. Code § 19-16A-20. Thus, it cannot reasonably be disputed that the WV DOA conducts "official proceedings" as that term is defined by W. Va. Code § 61-5-27(a)(3) and Claimant initiated "legal process" as defined by W. Va. Code § 61-5-27(a)(2). The Claimant contends that her action in initiating a complaint with the WV DOA and the consequent exercise of the WV DOA's authority was a motivating cause of the Respondent's retaliation against her and consequent damages. Thus, this claim too fits squarely within the protection contemplated by W. Va. Code § 61-5-27.

The filing of a report or the failure to file a report pursuant to the <u>West Virginia Pesticide Control Act</u> does not preclude a person from bringing a civil action for damages. W. Va. Code § 19-16A-19(b). While the Act itself does not describe the civil remedies available to a person injured by the improper application of pesticides, the general authority conferred by W. Va. Code § 55-7-9 authorizes her to bring a civil action for her injuries caused by a violation of the Act.

Moreover, West Virginia's case law is quite clear that where the statutory remedy is not exclusive and the available administrative remedy is inadequate, a private right of action for tort remedies is available.  The following quoted passage is instructive:

> In *Wiggins,* we rejected the theory relied upon by the trial court here, and concluded for a number of reasons that the administrative remedy was not exclusive. In Syllabus Point 2 of *Wiggins,* we held: "Where the available administrative remedy is inadequate, this Court recognizes an exception to the general rule that where a new right is created by statute, the remedy can be only that which the statute prescribes." *See also Price v. Boone County Ambulance Auth.,* __ W. Va. __, 337 S.E.2d 913 (1985).
>
> We found in *Wiggins* that the remedies available in federal and state administrative proceedings were not adequate to protect the substantial public policy interests embodied in our Mine Safety Act. We noted that damages recoverable in a tort action are broader than those available administratively and also observed that the primary purpose of the administrative remedy was different than the interests protected in a retaliatory discharge action. Both these considerations are reflected in the language of Syllabus Points 3 and 4 of *Wiggins:*
>
>> "3. The common law wrongful discharge action recognized in *Harless v. First Nat'l Bank in Fairmont,* 162 W. Va. 116, 246 S.E.2d 270 (1978) follows the applicable rules relating to tort damages, and permits a claim for damages caused by the intentional infliction of severe emotional distress, or, in the appropriate case, for the assessment of punitive damages.
>>
>> "4. The primary purpose of the penalties imposed under the antidiscrimination provisions of the mine safety acts is to ensure the reporting of safety violations, rather than vindication of private interests, and victims of discrimination must look to the courts to receive full compensation for the violation of their legal rights."
>
> In *Wiggins,* we also relied in part on "the silence of the [federal and State] statutes themselves on the exclusivity issue, and the fact that these safety statutes are to be construed liberally in favor of their intended beneficiaries, *State ex rel. Perry v. Miller,* __ W. Va. __, 300 S.E.2d 622 (1983)." __ W. Va. at __, 357 S.E.2d at 748.

*Collins v. Elkay Mining Co.,* 179 W. Va. 549, 551 (W. Va. 1988).

Mawing contends that the retaliation directed at her is evident from the ongoing denial of any stalls whatsoever from August 2008 to the present time.  First, Mr. Britton attempted to conceal his true reason for denying any stalls to Mawing as being merely additional punishment for having horses in other stalls back in April.  As discussed supra, such punishment in the first instance was a violation of the Agreement.  Second, even though (or perhaps because) Mr. Britton has ongoing reporting obligations about this case to PNGI, Mr. Britton claimed that he knew nothing of the fact that she has without fail applied for stalls every six months.  Mr. Britton made this claim despite his commanding position on the stall allocation committee.  Claimant respectfully states that Mr. Britton is not credible and his claimed lack of knowledge is intended to obfuscate CTRS's retaliatory intent.

That Mawing has been discriminated and retaliated against is apparent by comparing CTRS's  treatment of her to the only other instance of a trainer losing all of his stalls for having horses in another trainer's assigned stalls.  Dickie Moore, who has 49 years experience at the track, testified about the only other such instance which occurred in the 1980s (which is before PNGI owned Charles Town Races) and even in that instance the trainer got his stalls back.  Yet Mrs. Mawing is now entering her fifth year without an equitable allocation of stalls - which is contractually acknowledged by CTRS to be essential to her livelihood.

**B.  Respondent Failed to Rebut Claimant's Retaliation Claims**

1.  The Panel May Infer a Retaliatory Motive

It is generally acknowledged in the employment context that an inference of dissembling may arise where the employer has given shifting, contradictory, implausible,

uninformed, or factually baseless justifications for its actions. (See, e.g., *Tinker v. Sears, Roebuck & Co.* 127 F.3d 519, 523 (6th Cir. 1997); *Testerman v. EDS Technical Products Corp.* 98 F.3d 297, 303 (7th Cir. 1996); *Bechtel Construction Co. v. Secretary of Labor* 50 F.3d 926, 935 (11th Cir. 1995); *EEOC v. Sears Roebuck Co.* 243 F.3d 846, 853(4th Cir. 2001) ("[A] fact finder could infer from the late appearance of [the employer''s] current justification that it is a post-hoc rationale, not a legitimate explanation for [its] decision not to hire [the employee]."); *Tyler v. Re-Max Mountain States, Inc.* 232 F.3d 808, 813(10th Cir. 2000) ("We are disquieted...by an employer who 'fully' articulates its reasons for the first time months after the decision was made."); *Dominguez-Cruze v. Suttle Caribe, Inc.* 202 F.3d 424, 432(1st Cir. 2000)("[W]hen a company, at different times, gives different and arguably inconsistent explanations [regarding its reasons for termination an employee], a jury may infer that the articulated reasons are pretextual."); *Raytheon v. Hughes Missile Systems, Inc.* 362 F.3d 564, 569(9th Cir. 2004) ("Raytheon's first mention of its purported 'unwritten policy' of uniformly refusing to re-hire individuals previously fired for misconduct occurred after EEOC conciliation efforts had terminated, and Hernandez had brought this action against the company. From the fact that Raytheon has provided conflicting explanations of its conduct, a jury could reasonably conclude that its most recent explanation was pretextual.").

    2.  <u>Respondent Failed to Articulate a Credible Non-Retaliatory Basis for Its Actions</u>

None of Respondent's witnesses articulated a credible non-retaliatory reason why Mawing's stalls were taken away. Either at the arbitration hearing or in depositions that have been admitted as evidence in this matter, each member of the CTRS stall allocation

committee was asked to state the reason why all of Ms. Mawing's stalls were taken away in August 2008.  In addition, John Finamore, PNGI's Senior Vice President of Regional Operations was asked the same question. One would have thought the answer to this question could have been answered easily if Respondent possessed a legitimate non-retaliatory response. Instead, no witness could answer this question with the exception of the CTRS general manager Al Britton. Unfortunately, Mr. Britton's testimony on this point is directly contradicted by the testimony of several other members of the stall allocation committee.

John Finamore revealed his newly disclosed telephone conversation with the Governor and his subsequent conversation with Al Britton regarding putting this information "in the mix" when allocating stalls to Ms. Mawing. However, he was unable to state the reason Ms. Mawing lost her stalls.

Mike Elliott, who was a member of the stall allocation committee and participated in the August 2008 meeting, also was unable to state why Ms. Mawing's stalls were taken away. According to Mr. Elliot the decision was not made at the stall allocation committee meeting.  He remembered no discussion of Mawing's stall application at the meeting.  In addition, he had no idea why management would want to take away Mawing's stalls. According to Elliott there was no problem with Mawing's upkeep of her barn area and no allegation that she had violated any track rule.

Erich Zimny, the Vice President of Racing Operations for PNGI Charles Town Gaming, LLC, was a member of the stall allocation committee and attended the August 2008 meeting.  Mr. Zimny simply contended that he had no recollection whatsoever of what occurred at the meeting. This is consistent with his complete failure of recollection

regarding when he actually compiled the statistics placed in his declaration used to support Respondent's motion for summary and his complete lack of memory how the misleading declaration was prepared. Despite his undergraduate degree from Georgetown University and his law degree and MBA from Rutgers, he seemed to suffer from a severe memory deficit. Needless to say, he could not state the reason Ms. Mawing lost all her stalls in 2008.

Richard "Dickie" Moore was the general manager of racing operations at CTRS. He was a member of the stall allocation committee and he attended the August 2008 meeting.  According to Mr. Moore, the application of Ms. Mawing was set aside with those of three other trainers. None of the stall allocation criteria normally considered in the ordinary course of business was discussed with regard to Mawing's application. Other than the fact Ms. Mawing was to lose all of her stalls, her stall application was not discussed.  The other three trainers who lost all of their stalls lost them for reasons such as violation of the alcohol policy or the failure to train any horses at all. Mr. Moore was not aware of any problems with Mawing's starts per stall, the quality of her horses, her win percentage or how many horses she had "in the money". He also stated there were no allegations that she abused animals, failed to maintain her barn area properly or had violated any rule of racing. He could give no reason why she lost her stalls.

James Taylor was employed as a stall superintendant and was a member of the stall allocation committee in August 2008. He did not know why all of Mawing's stalls were taken away or who made the decision to do so.

Randy Wehrman was employed by CTRS as the racing secretary in April 28, 2008 and was a member of the stall allocation committee in August 2008. Mr. Wehrman

Page 76 of 85

administered the stall applications in his official capacity as the racing secretary.
According to Mr. Wehrman, although the entire stall allocation committee is present at
stall allocation meetings, the number of stalls to be allocated to each trainer in 2008 was
dictated either by Britton or Moore.  In addition, the decision to take all a trainer's stalls
was made outside of the stall allocation committee meeting. He had no recollection of
participating in a meeting to discuss removing all of Ms. Mawing's stalls. He had no
recollection of Mawing's application even being discussed at a stall allocation committee
meeting.  He had no idea why Ms. Mawing's stalls were taken away in August 2008.  He
had seen Ms. Mawing's stall applications each time they were submitted after August
2008 and knew that she did not receive any stalls but did not know why. In 2008 and
2009, Ms. Mawing's horses were not inferior to the other trainers' horses; in 2010 her
horses were probably as good or better than the other trainers' horses. Mr. Wehrman
could recall only four trainers who lost all their stalls other than Ms. Mawing and in each
instance those four trainers mistreated their animals. Mr. Wehrman was not aware of Ms.
Mawing having ever violated any statute or rule governing thoroughbred horseracing in
West Virginia.

        In contrast to the testimony of the other five members of the stall allocation
committee, Al Britton had a very different recollection of the events occurring at the
August 2008 stall allocation committee meeting.  According to Mr. Britton, the stall
allocation process involves the committee sitting down and going through a list of all the
horsemen who have stalls and looking at their starts and win percentages and briefly
discussing whether it is someone who keeps their shed row and stalls in good shape and

has a good relationship with trainers in the barn.  Based on that criteria, a decision is made by the committee regarding stall allocation.

Mr. Britton stated that his roll is just to ask some questions and kind of go with the recommendations of the group for the most part. According to Mr. Britton, usually a combination of recommendations by the racing secretary, Mr. Elliot and Mr. Zimny arrives at the number of stalls to be allocated to each individual.

Britton claims that the committee had a typical discussion of Ms. Mawing's starts per stall and winning percentage. At that point Britton claims that he raised an issue regarding Ms. Mawing occupying stalls not allocated to her in April 2008 and asked whether there was anything outstanding or remarkable about her horses or any reason the committee should go out of its way to issue her stalls.  He then claims based on the fact she did not follow the rules in April he said we issue her no stalls and no one disagreed.

Mr. Britton's testimony is internally inconsistent.  If he is to be believed he did not simply ask questions and follow the recommendation of the committee.  He asserted his authority as the general manager to announce that Ms. Mawing would be issued no stalls, and, hearing no dissent, that is what happened.

More significantly, Mr. Britton's version of what occurred is directly contradicted by the other members of the stall allocation committee. Both Mr. Elliot and Mr. Wehrman testified that any decisions to remove all stalls from a trainer are not made at stall allocation committee meetings and that no such discussion or decision was made at the August 2008 stall committee meeting with regard to Ms. Mawing.  Neither Mr. Elliot nor Mr. Wehrman knew of any reason why Ms. Mawing should have lost all her stalls. In addition, Mr. Moore testified that Ms. Mawing's application was separated from

consideration at the beginning of the meeting and that no discussion occurred with regard to her application or whether she met any of the objective criteria purportedly used by the track to allocate stalls. Mr. Moore also knew of no reason why Ms. Mawing should have lost all her stalls.  In August 2008 she had no problems with her starts per stall, the condition or quality of her horses, her winning percentage or horses "in the money" and there were no complaints regarding her abuse of animals or failure to maintain the barn area properly. Nor were there any allegations that she had violated any rule of racing.

Where Respondent has offered only shifting, contradictory, implausible, uninformed, or factually baseless justifications for removing all Ms. Mawing's stalls, the Panel may infer a retaliatory motive for its actions.

## C. Respondent Violated Mawing's Rights Under the 1st and 14th Amendment

### 1. Mawing Enjoyed a Property Interest in the Stalls Taken by the CTRS

While the Fourteenth Amendment protects against deprivations of property without due process, it does not itself create a property interest. The nature and extent of a property interest is determined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A property interest is not limited to ownership of tangible property but includes those interests that "a person has already acquired in specific benefits." *Id.* at 576, 92 S.Ct. at 2708.

While such an entitlement is required before a property interest is implicated, the entitlement need not be given explicitly. An entitlement to a license renewal may be implied, for instance, from policies, practices, and understandings, if state law or other sources support a finding of such an entitlement. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The Agreement between the CTRS and the HBPA provided that Respondent could not discriminate in the allocation of stalls by reason of HBPA membership or activity. In addition, Respondent's management employees testified that as a matter of practice and procedure its stall allocation committee utilized specific objective criteria in making stall allocation decisions. Due process under these circumstances should protect Ms. Mawing from Respondent's arbitrary or capricious conduct in removing all her stalls if state action is present.

2. Respondent Violated Mawing's 1st Amendment Rights

Claimant has amply set forth the factual basis supporting her claims of retaliation for testifying on behalf of HBPA President Raymond Funkhouser and making complaints regarding the improper use of rat poison to track management, the racing stewards, state agricultural authorities and the Governor of West Virginia. These facts also support Claimant's claim that Respondent retaliated against her for the exercise of her First Amendment right to free speech and the right to petition for redress of grievances if state action was involved in the decision to take her stalls.

The weight of all the credible evidence in this case establishes that Ms. Mawing made a reasonable, good faith complaint concerning the misuse of rat poison in her barn area which she believed may have lead to the death of her goat and her horse. Neither the local track management nor the racing stewards have ever corroborated any allegation that she deliberately accused the track of poisoning her animals or ever mentioned any complaint about a wire or rope. That being so, one is left with the inescapable conclusion that Finamore has distorted what the Governor told him or, in the alternative, that the Governor conspired with Finamore to support the track's action against Ms. Mawing.

While Claimant believes it more likely that Finamore has distorted the Governor's comments, should the Panel find otherwise the requisite state action would support Claimant's Due Process and First Amendment claims.

### III.   DAMAGES

Ms. Mawing seeks all relief to which this Panel determines she is entitled including, but not limited to, equitable relief consisting of nine stalls, clustered in one barn so far as possible, equitable consideration of her future stall applications applying the same standards to her as are applied to every other trainer in good stead, and an order to cease and desist from all acts of discrimination or retaliation.

Ms. Mawing seeks special damages, beyond incidental annoyance and inconvenience, in the amount of $161,221 ($145,286 stall rents and $15,935 vanning as calculated from R-34). While Respondent has been critical of Mawing for her difficulty in calculating her damages precisely, there is no requirement in West Virginia law that special damages be calculated exactly. *See Sun Sand Co. v. County Court,* 96 W. Va. 213, 218 (1924) (Holding in a trespass/damage to property case that exact measurement of damages is never required. The amount reasonably necessary to put the property in substantially as good condition as it was immediately before the injuries occurred is the true amount of damages which should be assessed). Ms. Mawing, who has been forced to mitigate by renting private stalls, at varying prices and under varying terms (sometimes one at time; sometimes being obliged to rent stalls in blocks) has established her special damages by substantial evidence. That the amount of special damages to which she testified as summarized in R-34 is reasonable is confirmed by the cross-check performed

in Exhibit C-41.  In addition, Ms. Mawing requests that she be awarded stall rents at $275 per month for nine stalls from the date of the hearing until such time as CTRS restores her to nine stalls.

Ms. Mawing seeks general compensatory damages for more than five years of suffering inflicted by CTRS as a result of its retaliatory conduct.  In addition, Ms. Mawing requests punitive damages, within a multiple allowed by the Constitution, in order to punish CTRS and in order to deter CTRS from engaging in the type of conduct evidenced here, and also as additional compensation for Ms. Mawing.  *See Garnes v. Fleming Landfill*, 186 W. Va. 656, 668 (1991) setting forth the factors to be considered:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater.

> (2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

> (3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

> (4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

> (5) The financial position of the defendant is relevant.

By operation of law Ms. Mawing requests statutory interest upon her special damages from April 2008, the date her cause of action accrued, to the date of verdict. *See Rodriguez v. Consolidation Coal Co.*, 206 W. Va. 317, 330 (W. Va. 1999) (prejudgment interest is calculated from the date the cause of action accrued). In addition, she requests interest on the entire judgment from the date of entry until it is satisfied in full.

Lastly, Claimants seek an award of attorney's fees and costs in an amount to be determined after petition and response following the decision in this case. The authority for this request is based not only on the fee shifting statutes at issue [W. Va. Code § 61-5-27(f) and the fee shifting provisions of 42 U.S.C. § 1983] but also upon the common-law of West Virginia which allows a plaintiff her reasonable fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *See* Syllabus Point 3, *Sally-Mike Properties v. Yokum*, 179 W. Va. 48, 49, 365 S.E.2d 246, 247 (1986) ("There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as "costs," without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons.") The evidence of bad faith, vexatious, and oppressive conduct in this case is overwhelming and cries out for an award of reasonable attorney's fees and costs.

Dated this the 31st day of July, 2013.

PLAINTIFF
**By Counsel**

___/s/ David M. Hammer_
David M. Hammer
408 West King Street
Martinsburg, WV 25401

Page **83** of **85**

304-264-8505
304-264-8506 (fax)
WV Bar No. 5047
*Counsel for the Plaintiff*

 /s/Harry P. Waddell  
Harry P. Waddell
300 West Martin Street
Martinsburg, WV 25401
304-263-4988
304-262-2498 (fax)
WV Bar No. 3883
*Counsel for the Plaintiff*