# EXHIBIT 11B

AMERICAN ARBITRATION ASSOCIATION

CHARLES TOWN HORSEMAN'S          :
BENEVOLENT AND PROTECTIVE         :
ASSOCIATION, INC. and            :
TINA MAWING,                      :   NO. 55-196-Y-00015-12
                                  :
          Claimants              :
                                  :
     v.                           :
                                  :
PNGI CHARLES TOWN GAMING,         :
LLC,                              :
                                  :
          Respondent             :

### CLAIMANT'S REPLY BRIEF

I. **Respondent's Recitation of Facts is Not True to the Record in Several Material Respects**

   A. **CTRS' Knowledge of Mawing's HBPA Activity with regard to the Racing Commission's Decision in the matter of Raymond Funkhouser**

Respondent asserts the following "facts" with regard to Mawing's testimony at

the Racing Commission's hearing upon the appeal of the suspension of Funkhouser's

occupational permit:

> [T]hree CTR employees occasionally attended parts of the hearing to listen to the proceeding as they have in other hearings involving other individuals when the Track was not a party. [citing to transcript pages 376:19 – 377:12; 950:10 – 951:18] However, none of the Track's employees were present during Ms. Mawing's testimony. [*Id.*] Further, none of the Track's employees involved in the allocation of stalls were even aware that Ms. Mawing testified on Mr. Funkhouser's behalf. [*Id.*]

> Respondent's brief, p. 5.

An examination of the record citations upon which the Respondent relies does not

support these assertions of fact and instead, reveals them to be quite deceptive. In the

Page 1 of 21

Respondent's first citation to transcript pages 376 – 377 Raymond Funkhouser identifies three members of the Respondent's executive team who were present during the hearing: Dickie Moore, Roger Ramey [VP of public affairs], and in-house legal counsel Phyllis LeTart.  Respondent's second citation to transcript pages 950:10 – 951:18 references the testimony of Dickie Moore in which he testified that he saw only one witness testify, he did not know whether Mawing testified, and he did not know for how long Ms. LeTart stayed at the hearing.

There is no testimony that CTRS employees "occasionally attended parts of the hearing;" no testimony about the supposed practice of CTRS employees to attend hearings to which CTRS is not a party; there is no testimony affirmatively stating that neither Mr. Ramey nor Ms. LeTart were present during Mawing's testimony; and no testimony that Al Britton who, as the general manager of CTRS was the ranking member of the Stall Allocation Committee, was not aware of Mawing's testimony.

Indeed, the Funkhouser hearing resulted in a written opinion that specifically identified Mawing and summarized her testimony.  [Exhibit C-2, p. 6, Findings of Fact, 8 – 10].  That opinion would necessarily have been conveyed to CTRS because a primary reason for the expedited Racing Commission hearing on October 15, 2007[1] was the upcoming Breeder's Classic, a series of large purse[2] horse races in which Funkhouser had entered four horses that were, as a result of the Racing Commission's decision, ultimately allowed to compete at CTRS on October 20, 2007: "The outcome of the hearing will

---

[1] Funkhouser was suspended indefinitely on October 2, 2007 by the racing stewards.  [C-2, p. 1]. Claimant's proposed FOF # 107 mistakenly identifies the date of the Funkhouser hearing as October 8, 2007.  That FOF should be corrected to reflect that the actual date of the hearing was on October 15, 2007.
[2] See e.g., Claimant's proposed FOF # 106 citing to one of the Breeder's Classic races that had a $500,000 purse.

determine whether Mr. Funkhouser will be permitted to race four of his horses in the

Breeder's Classic to be conducted on October 20, 2007. The outcome of the hearing will

also determine whether or not Mr. Funkhouser's ability to pursue his livelihood will be

indefinitely suspended." [C-2, p. 2]. Given the exigency of the upcoming Breeder's

Classic and the consequent need to know whether Funkhouser's horses could compete at

all, the fact that HBPA President Funkhouser's ability to engage in his occupation was in

jeopardy, the fact that CTRS's in-house legal counsel took the time to attend the

Funkhouser's hearing and the surrounding circumstances of John Finamore forswearing

any further cooperation with the HBPA as a consequence of the failed June 2007 table

games referendum,[3] and resulting extremely strained relationship of CTRS to the HBPA,

it is a fair inference from this evidence that CTRS by its legal counsel, and Al Britton and

John Finamore specifically, were well aware of the Funkhouser decision and Mawing's

role in that case.

Thus, Respondent's attempt to isolate the August 2008 decision to take away all

of the stalls previously allocated to Mawing and to deny her any future stall allocations

from that time until now from any of Mawing's HBPA activities is not credible. It is not

supported by the evidenced introduced at arbitration and the fair inferences that arise

therefrom and Respondent's assertion of "facts" in that regard is misleading.

### B. Mawing Did Not Tell Governor Manchin that CTRS "Deliberately" Used Improper Pest Control Poisons in the Barn Area which Caused the Death of Her Horse and Goat

A second example of Respondent's lack of fealty to the record of this Arbitration is

this claim regarding the HBPA's meeting with Governor Manchin: "During one such

meeting with HBPA members, Ms. Mawing claimed to Governor Manchin that CTRS

---

[3] *See* Claimant's proposed findings of fact ["FOF"], 70 – 79 and C-42.

deliberately used improper pest control poisons in the barn area, which caused the death

of her horse and goat. [Trial Tr., June 10, 2013 at 157:16 – 161:22]. Ms. Mawing further

alleged that the Track had installed wires in the barn area that were intended to injure or

kill Ms. Mawing's horses. [Trial Tr. June 11, 2013 at 595:2 – 13; June 12, 2013 at 696:9

– 697:6; 897:9 – 898:8]" Respondent's brief, p. 7.

Respondent's cite to Mawing's testimony at 157;16 – 161:22 as somehow supporting

a finding that Mawing claimed CTRS "deliberately" used improper pest control poisons

is particularly egregious. First, that supposed testimony is not within the page range cited

by Respondent. Second, what Mawing actually said was that she "had a strong belief that

poison had been spread in my barn that resulted in the death of my horse and my goat."

[162:12 – 15]. When asked directly whether she believed that the Track had <u>deliberately</u>

poisoned her horse her response was "absolutely not, I never believed that" [164:1 – 5]

and she did not believe her goat was deliberately poisoned either [164:6 – 9]. Mawing is

credible as to her never having held the belief that the poisoning was deliberate because

Dickie Moore confirmed that Mawing spoke to him about the poisonings and,

importantly, Mawing did not allege to Moore that the poisoning was deliberate. [936]

Moreover and as further confirmation that Mawing did not believe the poisoning was

deliberate and would not have made such a statement, Mawing's report about the

poisoning to the West Virginia Department of Agriculture did not allege that the

poisoning was deliberate.

Next, as to the claim that Mawing alleged that the Track had installed wires in the

barn area that were intended to injure or kill Mawing's horses, Respondent's citation to

Hale's testimony at page 595 is not supportive. Hale testified that "something" was said

at that meeting alleging that Penn National had strung either some sort of wire or rope across a barn.  Mr. Hale did not recall the details of what was said or, importantly, who had said it and he certainly did not testify that Mawing had made this statement.

Mr. Finamore's testimony on the wire issue at page 696 – 697 is not credible: Finamore claims that during a phone conference Governor Manchin told him of Mawing's claims but the Governor did not recall Mawing's name until Mr. Puccio reminded Gov. Manchin that it was Mawing who alleged that "some wire was hung negligently or deliberately to harm or injure her horses." [696:15 – 18] First, there is a vast gulf between the negligent hanging of a wire and the deliberate hanging of a wire so as to cause injury.  Second, Respondent, having never identified Finamore or Puccio in mandatory Initial Disclosures in federal court and only having identified these witnesses shortly before the Arbitration itself,[4] used this testimony as a predicate to allow Mr. Puccio to testify.   But Mr. Puccio contradicted Mr. Finamore as Mr. Puccio had no basis for a belief that Mawing had made any such statement. All that Mr. Puccio recalled was that Mawing was upset but did not recall hearing what Mawing said because he had to repeatedly go to the door of the meeting room in order to speak with other staff members about issues unrelated to the meeting with the HBPA.  [890]  By the end of the meeting, Puccio did not know Mawing's concerns  [891] and, therefore, could not have told

---

[4] Britton had regular discussions with in-house counsel about Mawing's lawsuit and kept Finamore apprised of the litigation.  Claimant's proposed FOF #s 213 – 214.  Given that Mawing's supposed statements were the Respondent's main defense, it is beyond belief that Finamore and Puccio were not disclosed as mandated by the Federal Rules of Civil Procedure. On this basis alone the Panel could decide to discredit Finamore, Puccio, and Britton's testimony.

Governor Manchin that Mawing had made the statements Respondent now wishes to attribute to her. Thus, Finamore's account cannot be credited.[5]

With these purported "facts" the Respondent is contriving a non-discriminatory reason for its discriminatory and retaliatory act of taking all of Mawing's stalls away and thereafter never giving another one of her stall applications a moment's consideration. These purported "facts" are not supported by the record or any reasonable inference to be drawn from the record and should, therefore, be rejected as a pretext for unlawful discrimination and retaliation.

## II.  § 1983 Claims

### A.     Ms. Mawing Enjoyed a Property Interest in her Allocation of Stalls

A property interest for constitutional due process purposes is not limited to ownership of tangible property but includes those interests that "a person has already acquired in specific benefits." *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972).  In the present case, Ms. Mawing acquired a cognizable property interest in the stalls already allocated to her based upon (1) the Agreement between the CTRS and the HBPA requiring the allocation of stalls to the horsemen; (2) the provision in the Agreement prohibiting the CTRS from discriminating in the allocation of the stalls based on HBPA membership or activity; and, most importantly, the objective criteria promulgated by track management for use by the Stall Allocation Committee in considering the stall applications of horsemen who already

---

[5] Puccio himself was not a disinterested witness.  PNGI has paid Puccio $10,000/month with no hourly billing requirement for the last 3 ½ years since Puccio left the Governor's office.  This financial tie casts a pall on Puccio's testimony.  That pall is particularly heavy because, despite the years of litigation and the federal court requirement to disclose witnesses, Respondent did not disclose either Puccio or Finamore during federal court proceedings.  *See* Claimant's proposed FOF # 89.

possessed stalls. While an entitlement to stalls is required before a property interest is implicated, the entitlement need not be in writing or given explicitly. An entitlement may be implied from policies, practices, and understandings created by the Respondent and communicated to the horsemen. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The evidence presented at the Arbitration hearing demonstrates that Respondent created an objective set of criteria and a systematic process for evaluating the stall applications of the horsemen who already possessed stalls.

Respondent contends that Ms. Mawing could have no legitimate claim of entitlement to any allocation of stalls since its "Revocable Stall License Agreement" gives it unfettered discretion in the allocation of stalls. However, at the arbitration hearing Respondent's management team claimed the actual practice of the stall allocation committee was to review individual stall applications in alphabetical order employing a set of objective criteria applied in a systematic and uniform manner. If true, those horsemen who possessed stalls enjoyed more than a mere unilateral expectation in the continued use of their stalls. Rather, an understanding existed between the CTRS and the horsemen that if the horsemen satisfied the objective criteria established by the track they would continue to receive their allocation of stalls. The Supreme Court stated in *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971): Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood.... In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. The Agreement between the CTRS and the HBPA acknowledges that equitable allocation of the stalls is "essential to the livelihood of

Horsemen." At the very least, Ms. Mawing was entitled to notice and an opportunity to be heard before her stall application was completely denied.

### B.     "State Action" is Implicated in the Stall Allocation Decisions

The United States Supreme Court has recognized a variety of fact specific situations in which the "under color of state law" or "state action" requirement is met with regard to nominally private actors such as the CTRS. For a nominally private individual's conduct to meet the state action requirement, there must be a sufficiently close connection between the state and the challenged conduct for the actor to be treated as an agent of the state, or the conduct to be attributed to the state. *Blum v. Yaretzky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982); *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). This factual determination must be made by "sifting facts and weighing circumstances case by case" to determine if there is a sufficient nexus between the state and the particular aspect of the private individual's conduct which is complained of. *Sims v. Jefferson Downs, Inc.,* 611 F.2d 609, 611 (5th Cir.1980), citing *Burton v. Wilmington Parking Authority,* 365 U.S. at 722, 81 S.Ct. at 860, 6 L.Ed.2d at 45. Thus, the inquiry in this case is whether the state regulation and control of horseracing under the specific facts presented is so intimately involved with the denial of stall space that state action is implicated.

It is undisputed that horseracing in West Virginia is the subject of extensive state regulation. Racetracks in the State are privately owned, but the racing itself and many aspects of track management, including stall allocation are governed by detailed regulations issued by the State Racing Commission. The Racing Commission maintains a continuous presence at each track through racing stewards, the officials who oversee the

administration and enforcement of Commission rules and policies. Stewards are an arm of the Racing Commission and are answerable directly to the Commission. Stewards may override the management of the track in matters pertaining to racing. The stewards have general supervision and authority over the association grounds during a meet. *Legislative Racing Rule Section 178-1-10.3*[6]  The Racing Rules also govern the registration of stable personnel with the association on whose racetrack the horses are stabled or racing. *Legislative Racing Rule Section 178-1-49.7.*

One of the racing officials provided for by Commission rule is designated the "racing secretary." The Racing Commission rules specify that the Racing Commission, in its sole discretion, may determine the eligibility of all racing officials, including the racing secretary, and, in its discretion, may approve or disapprove any official for an occupational permit. *Legislative Racing Rule Section 178-1-9.* State Racing Commission Rule 178- 1-11 provides in part: "The association's racing secretary or his or her assistant, shall discharge all the duties of his or her office, expressed or implied that are required by this rule, and he or she shall report to the stewards in writing all violations of this rule." No trainer is permitted to move any horse under his care from the grounds of the association without permission from the racing secretary or the stewards. *Legislative Racing Rule Section 178-1-54.12* In addition, a trainer may only rotate horses if approved by the racing secretary. *Legislative Racing Rule Section 178-1-39.3.*

At Charles Town Races, stalling decisions are purportedly made by the racing secretary pursuant to the terms of the Respondent's Revocable Stall License Agreement: "The agreement is not accepted and does not become final until signed by CTRS Racing

---

[6] Unless otherwise indicated, all citation to the Legislative Racing Rules is to the rules in effect in August 2008.

Secretary". The racing secretary also sits on the CTRS stall allocation committee which ostensibly makes the stall allocation decisions.  On July 10, 2011, a clarifying amendment to the West Virginia Racing Rules became effective which explicitly provides: "The racing secretary or his or her designee shall assign stall applicants such stabling as is deemed proper and maintain a record of arrivals and departures of all horses stabled on association grounds." *Legislative Racing Rule Section 178-1-9.3.*

In the process of "sifting facts and weighing circumstances" to determine if there is a sufficient nexus between the state and the challenged stalling decision to implicate state action, the Arbitration Panel should consider a Fifth Circuit Court of Appeals decision which is eerily on point with the present case. In *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (1984), the Fifth Circuit considered a factual pattern almost identical to that presented in this case.  Herbert Roberts was a trainer of thoroughbred racehorses by profession and regularly raced horses at Louisiana Downs Racetrack in Bossier Parish, Louisiana. Roberts had stalling privileges at the track, which meant that he was allotted some of the limited amount of stall space available on the grounds of the racetrack. *Roberts v. Louisiana Downs, Inc.,* 742 F.2d 221, 223 (5th Cir. 1984).

In August 1980, Roberts and a number of other individuals became disturbed that the management of Louisiana Downs allowed horses to race using a particular type of shoe. Roberts was one of a group of owners and trainers who later signed a petition requesting an investigation of this practice. In March 1981, Roberts was notified that the track was denying him stalling and racing privileges for the coming season. Roberts' racing privileges were later restored, but he lost his stalling privileges. Roberts contacted the Louisiana Racing Commission concerning this matter, but was informed that the

Commission did not review denials of stall space, as opposed to denials of racing privileges. *Id.*

Roberts then brought an action for damages and injunctive relief against the racetrack under 42 U.S.C. § 1983, alleging that the track's action was in response to his signing the petition, and violated his right of free speech secured by the first and fourteenth amendments. In August 1983, the district court granted summary judgment for the racetrack on the ground that the "state action" required by § 1983 was not present. *Id.*

As in West Virginia, horseracing in Louisiana is the subject of extensive state regulation. Racetracks in the state are privately owned, but the racing itself and many aspects of track management are governed by detailed regulations issued by the Louisiana State Racing Commission. The Racing Commission maintains a continuous presence at each track through racing stewards, the officials who oversee the administration and enforcement of commission rules and policies. Stewards are paid by the management of each track, but they are an arm of the racing commission and are answerable directly to the commission. Stewards may override the management of the track in matters pertaining to racing. *Id.* at 224.

As in West Virginia, a number of other racing officials are also provided for by state statute or by Commission rule, including a "racing secretary." One of the duties the racing secretary is specifically directed to perform by the rules of racing is "assigning stall applicants such stabling as he may deem proper after consultation with the stewards ..." Louisiana State Racing Commission, Rules of Racing 11–6:6(6.2)(D). *Id.* at 225.

At Louisiana Downs, stalling decisions were in practice made by a "stalling committee" composed of the racing secretary, the chief of security, and three other

individuals. No means of appeal from decisions regarding stall space were provided by statute or Racing Commission regulation. *Id.* Again the actual practice was almost identical to that at CTRS.

As in the present case, Louisiana Downs argued that its decisions regarding stalls were decisions made by the private management of Louisiana Downs, a private corporation, and had nothing to do with the state. The Fifth Circuit acknowledged that the fact that a private actor is in a heavily regulated industry, such as horseracing, does not of itself suffice to make its actions under color of state law. *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 351, 95 S.Ct. at 453. The Court further acknowledged that the receipt of substantial revenues by the state from the operation of the horseracing industry does not suffice to create a symbiotic relationship of the sort which makes a private individual's conduct under color of state law. *Fulton v. Hecht,* 545 F.2d 540, 543 (5th Cir.1977). *Id.* Nevertheless, the Fifth Circuit found that Louisiana Downs had failed to adequately address the peculiar circumstances of the case, in particular the participation of the racing secretary in the stalling decision. The Court found that the racing secretary for the purpose of the challenged stalling decision had the characteristics of a state official. *Id.* at 225-26.

As in the present case, Louisiana Downs argued that the racing secretary was a private employee, answerable only to track management, and that allocation of stalls was part of its proprietary rights, having no connection to the state. Citing the facts that the secretary is selected by the track (although subject to the approval of the Racing Commission) and paid by the track, Louisiana Downs contended that it would "beg reality" to call the secretary a state official.

The Court acknowledged that in performing some of his job functions, the racing secretary no doubt functioned as a private employee. However, in the narrow context of the case, the Court found the racing secretary's function was so bound about and permeated by the regulatory authority of the state as to raise a serious question whether his actions should be attributed to the state. *Id.* at 227

The Court found the fact that the racing secretary was selected and paid by the track was not determinative of his status. *Id.* at 227-28. The Court noted that two of the racing stewards at each track were chosen by the track's management, and all were paid by the track but this did not alter their status as state officials. The Court noted that the racing secretary was assigned specific administrative duties by state regulation including the allocation of stall space. *Id.* at 227.

The Court also found a critical point was that the racing secretary was by statute, and by Racing Commission regulation, under the supervision of the stewards. Complaints concerning racing officials were to be made directly to the racing stewards, not to track management. In the view of the Fifth Circuit, this scheme necessarily entailed that, contrary to Louisiana Downs' assertions, the racing secretary was answerable to the stewards—state officials—and that his actions in areas in which the state's interest is evidenced by specific assignment of duties may be considered to be pursuant to authority emanating from them. Essential to this is the fact of the stewards' intimate and continuous involvement in the actual day to day management of racing-related activities at the track. *Id.* at 228.

In conclusion, the Fifth Circuit found something more was present than simply extensive regulation of an industry, or passive approval by a state regulatory entity of a

decision by a regulated business. On the contrary, an official in a position created by statute was required to perform a duty in a specific area. The duty was performed under the supervision of state officials who were continuously on the situs of the regulated business, and had the power to override decisions of the management of the regulated business. Under such circumstances, the Court found that the stalling decision may be considered to bear the imprimatur of the state. *Id.*

There is no principled distinction between the facts presented to the Fifth Circuit in *Roberts* and the facts presented in Mawing's case. In both cases, the racing secretary was selected and paid by the track and could be considered a private employee for many of his functions. However, in both cases the racing secretary was assigned specific administrative duties by state regulation including the allocation of stall space. In both cases the racing secretary was by statute, and by Racing Commission regulation, under the supervision of the stewards. Complaints concerning racing officials in both cases were to be made directly to the racing stewards, not to track management. In conclusion, in this case just as in *Roberts*, an official, the racing secretary, holding a position created by statute is required to perform a duty, stall allocation. This duty is performed under the supervision of state officials, the stewards, who are continuously on the situs of the regulated business, and have the power to override decisions of the management of the regulated business. Under these circumstances, the decision not to allocate stalls to Ms. Mawing in 2008 and to ignore her stall applications every six months thereafter implicates state action and can be challenged as retaliatory under the 1st Amendment and a violation of due process under the 14th Amendment.

### III. <u>Mawing Has Legitimate State Law Public Policy Claims and Claims Pursuant to W. Va. Code §61-5-27 and § 55-7-9</u>

Respondent argues that Claimant cannot have state law public policy claims because, according to Respondent, such *Harless* claims are only recognized where there is an employee/employer relationship and Mawing was not an employee of CTRS and, therefore, can have no claim.[7] This syllogism ignores the nature and purpose of a *Harless* claim.

In every employment relationship there is fundamentally a contract: work is performed in exchange for compensation. Whether the employment contract is for a fixed period of time or terminable at-will is irrelevant to the *Harless* analysis. The purpose of *Harless* is to protect such contracts from termination for reasons that contravene some substantial public principle.

There is a contract in this case too. Not unlike an employment contract which, from the employee's perspective, is entered into in order to earn a living, the <u>Agreement</u> at issue here acknowledges that an equitable allocation of stalls is essential to the livelihood of Horsemen. Claimant contends that CTRS breached its obligation to make an equitable allocation of stalls in retaliation against her for reasons that violated the substantial public policy of West Virginia including:

1) Testifying in a West Virginia Racing Commission hearing <u>In the Matter of Raymond J. Funkhouser, DOB, 3/1//1951, Occupational Permit Holder 34168;</u>

2) Reporting to the Racing Stewards the hazardous and improper use around her barn area of powdered rodent poison; and,

---

[7] Respondent relies on *Hurley v. Allied Chem. Corp.*, 262 S.E.2d 757 (W. Va. 1980) however, that case did not involve an existing employment relationship; the plaintiff was an applicant for employment but was held to be within the class of persons a statute was intended to protect.

3) Filing a complaint with the West Virginia Department of Agriculture pursuant to the West Virginia Pesticide Control Act of 1990, W. Va. Code § 19-16A-1, *et seq.*

Plaintiff discerns no reason not to apply *Harless* under the facts presented in this case.  In both this case and in traditional *Harless* cases the issue is whether the more economically powerful party to the contract should be able to cause a loss of livelihood to the weaker party for reasons that violate the substantial public policy of West Virginia.

The Respondent did not address Claimant's good faith reporting of the hazardous and improper use of poison to the Racing Stewards or her having filed a complaint with the West Virginia Department of Agriculture so Claimant refers the Panel to the legal analysis in her opening brief at  pp. 67 – 73.  Plaintiff contends that both grounds are within the scope of protection afforded by W. Va. Code § 61-5-27 and W. Va. Code § 55-7-9 as well as being against the substantial public policy of West Virginia.

The Respondent apparently does not dispute that Claimant has a private right of action pursuant to W. Va. Code § 61-5-27 (f) and does not address the general right to bring an action for damages for violation of a statute pursuant to W. Va. Code § 55-7-9 ("Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages.").  Instead, Respondent makes two arguments:  1) the HBPA meeting with Gov. Manchin was not an official proceeding [which Claimant never argued]; and, 2) according to Respondent the stall allocation committee was not aware of Mawing's testimony (but in making this argument the Respondent utterly ignores the written decision of the Racing Commission, the presence of legal counsel at the Racing

Commission hearing, and the fair inference that in-house legal counsel and the most senior executive at Charles Town and member of the Stall Allocation Committee, Al Britton, would have communicated about a variety of topics [*see e.g.,* FOF 214]. *See* Claimant's discussion addressing Respondent's purported "facts," *supra* ). Claimant has thoroughly addressed this second argument and, therefore, refers to her arguments already made without repeating them again here.

### IV. Mawing has Proven Breach of Contract

Respondent makes the fantastical claim that "[t]he undisputed testimony is that the Track's stall allocation committee based its decision not to allocate stalls to Ms. Mawing on her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and inflammatory allegations to the Governor that the Track intentionally and deliberately tried to injure animals on the property." Respondent's brief, p. 33. *See also id.* at p. 11 ["After reviewing Ms. Mawing's stall application for the September 1, 2008 through December 31, 2008 term, *the committee determined* not to allocate Ms. Mawing any free stalls for that term." Respondent makes these assertions despite knowing that only its General Manager, Al Britton, claimed to have discussed Mawing's stall allocation in August 2008: none of the other five members of the Stall Allocation Committee shared Mr. Britton's "recollection." *See* testimony of Mike Elliott summarized at Claimant's proposed finding of fact ["FOF"] #126 [Mawing not discussed]; Erich Zimny at proposed FOF 143 [no recollection of August 2008 stall allocation committee meeting], FOF #s 160 – 168 [failure of recollection about when and by whom statistics were purportedly calculated and no knowledge as to why Mawing lost her stalls]; Richard Moore at FOF # 248 [other than the fact that Mawing was to lose all

of her stalls, none of the criteria ordinarily considered in the ordinary course of business were discussed with regard to Mawing's application]; James Taylor FOF # 266; Randy Wehrman FOF # 295.  Thus, Respondent's counsel's claim of what is "undisputed" is not reasonable as it is not supported by the evidence or any reasonable inference from the evidence.

Respondent does not address Mawing's rat poison concerns briefed by Claimant at Claimant's brief, pp. 62 – 64.

## V.   Mawing has Proven by a Preponderance of the Evidence that She was Damaged and has Proven to a Reasonable Certainty the Amount of her Damages.

Respondent has conflated Mawing's burden to prove that she was damaged by a preponderance of evidence with the reasonable degree of certainty necessary to recover specific amounts of damage.  "In this jurisdiction the burden of proving damages by a preponderance of the evidence rests upon the claimant[.]" *Taylor v. Elkins Home Show, Inc.*, 558 S.E.2d 611, 618 (W. Va. 2001) (internal citation omitted).

Recoverable damages are those "as may fairly and reasonably be considered as arising naturally – that is, according to the usual course of things – from the breach of the contract itself, or such as may reasonably be supposed to have been in the contemplation of the both parties at the time they made the contract, as the probable result of its breach." *Kentucky Fried Chicken v. Sellaro*, 158 W. Va. 708, 716 (W. Va. 1975) [citations omitted].  Like any other business, Respondent must be liable for the foreseeable results of its acts or omissions.  *Art's Flower Shop v. Chesapeake & Potomac Tel. Co.*, 186 W. Va. 613, 619 (W. Va. 1991).

With these principles in mind and as the fact finder, the Panel may consider what damages would naturally flow from a breach of the <u>Agreement</u> and what was in the contemplation of the parties when they agreed that the Respondent would not itself discriminate or condone its employees discriminating in the allocation of free stalls on the basis of HBPA membership or activity. The <u>Agreement</u> itself is the best evidence of what the parties contemplated. The <u>Agreement</u> itself acknowledges that equitable allocation of stalls is essential to the livelihood of Horsemen. [R-28 <u>Agreement</u>, p. 13, ¶ 11 A] Clearly, the bargained for benefit of a minimum of 1,148 stall free of charge itself evidences an acknowledgement by the parties to the <u>Agreement</u> that absent *free* stalls, trainers would have to pay for stalls. Moreover, discrimination on the basis of HBPA membership or activity is contractually forbidden and repugnant to the <u>Agreement</u>. Thus, that damages arising from the wrongful deprivation of stalls by virtue of discrimination was within the contemplation of the parties to the <u>Agreement</u>. Such damages, therefore, naturally flow from the breach of the <u>Agreement</u> and, as testified to by Mawing, involve her mitigating efforts to obtain stalls in a limited market that at times required renting stalls in blocks as opposed to individually and where stall rents varied and fluctuated with demand and based upon distance from the track. It is perfectly reasonable to expect that when horses are stabled at a distance from the track those horses will have to be trailered to the track for training and for races. Thus, trailering damages also flow naturally from the breach of the <u>Agreement</u>.

It is evident from the Respondent's argument that Respondent apparently seeks to hold Mawing to a perfect certainty standard ["Mrs. Mawing conceded that her damages calculation is not 100% accurate. Throughout her testimony, Mrs. Mawing was never

able to determine the exact amount of damages that she claims to have incurred as a result of being denied the use of the Track's free stalls." [Respondent's post-trial brief, p.37] One hundred percent or perfect certainty is not, however, required. The question for the fact finder is whether Mawing has proved the quantum of her damages to a reasonable certainty, as opposed to mere speculation or conjecture.

The parties stipulated that Mawing continued to apply for stalls every six months to the present time and that she has not been allocated any stalls. Assuming each such denial of stalls to have been the result of discrimination or its *sequelae*, pursuant to the express terms of the Agreement it is reasonably certain that Mawing's livelihood has been damaged by, *inter alia*, the need to rent stalls and provide transportation for horses.

Mawing testified at length about stall rents actually paid and trailering expense incurred and offered two methods of calculating such damages: actual expenses as substantiated by cancelled checks and calculated expenses using an average stall rent figure as a cross-check upon her actual damages. These calculations were quite close and thus confirm that Mawing has established the quantum of her damages to a reasonable certainty.

Finally, Mawing does not seek from the Panel expenses that were reimbursed to her and was clear about that in her testimony. *See e.g.,* p. 195 (where Mawing disavows seeking a recovery for $300 payable to Jackie Erler).

## VI.   CONCLUSION

Tina Mawing respectfully asks that judgment be entered in her favor and that she be awarded all damages sounding in contract and tort, including attorney's fees and costs, to which this Panel determines she is entitled.

Dated this the 30th day of August, 2013.

                                        PLAINTIFF
                                        **By Counsel**


                                            __/s/ David M. Hammer_
                                        David M. Hammer
                                        408 West King Street
                                        Martinsburg, WV 25401
                                        304-264-8505
                                        304-264-8506 (fax)
                                        WV Bar No. 5047
                                        *Counsel for the Plaintiff*

                                            _/s/Harry P. Waddell__
                                        Harry P. Waddell
                                        300 West Martin Street
                                        Martinsburg, WV 25401
                                        304-263-4988
                                        304-262-2498 (fax)
                                        WV Bar No. 3883
                                        *Counsel for the Plaintiff*