# EXHIBIT 14A

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CHARLES TOWN HORSEMAN'S | : | |
| BENEVOLENT AND PROTECTIVE | : | |
| ASSOCIATION, INC. and | : | |
| TINA MAWING, | : | NO. 55-196-Y-00015-12 |
| | : | |
| Claimants | : | |
| | : | |
| v. | : | |
| | : | |
| PNGI CHARLES TOWN GAMING, | : | |
| LLC, | : | |
| | : | |
| Respondent | | |

## RESPONDENT PNGI CHARLES TOWN GAMING, LLC'S
## POST-TRIAL BRIEF

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................1

II.  FACTUAL BACKGROUND..............................................................2

    A. The Parties and Their Relationship ...........................................2

    B. Ms. Mawing Testifies at the Forest Park Hearing.....................5

    C. Governor Joseph Manchin Mediates Contract Negotiations
       Between the Track and the HBPA ...........................................6

    D. The Track Did Not Allocate Ms. Mawing Any Free Stalls in June
       2008 ............................................................................................9

III. ANALYSIS........................................................................................11

    A. Ms. Mawing's Failed to Establish a Federal Due Process Claim ...........11

    B. Ms. Mawing's State Law Due Process Claim also Fails .........................25

    C. Ms. Mawing Failed to Present Evidence Sufficient to Establish a
       First Amendment Retaliation Claim.......................................25

    D. Ms. Mawing Failed to Prove that the Track Retaliated Against Her
       When She was Not Allocated Free Stalls.................................26

    E. Ms. Mawing's State Law Public Policy Retaliation Claim Also
       Fails as a Matter of Law .........................................................30

    F. Ms. Mawing Failed to Prove that CTRS Breached the HBPA
       Agreement ................................................................................32

IV.  CONCLUSION.................................................................................44

SL1 1247219v5 005982.00037

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970).................................................................13

*Alcena v. Raine,*
    692 F. Supp. 261 (S.D.N.Y. 1988) ............................................16, 17

*American Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999)...............................................................12, 16

*Andrews v. Federal Home Loan Bank,*
    998 F.2d 214 (4th Cir.1993) ...................................................17

*Bd. of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972)...............................................................13

*Blum v. Yaretsky,*
    457 U.S. 991 (1982)...........................................................*passim*

*Burton v. Wilmington Parking Auth.,*
    365 U.S. 715 (1961)...............................................................18

*Equity in Athletics, Inc. v. Department of Educ.,*
    639 F.3d 91 (4th Cir. 2011) ...................................................14

*Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.,*
    6 F.3d 211 (4th Cir. 1993) ...................................................*passim*

*Harless v. First Nat'l Bank in Fairmont,*
    246 S.E.2d 270 (W. Va. 1978)...............................................31

*Hefin v. Ky. State Racing Comm'n,*
    701 F.2d 599 (6th Cir. 1983) ...............................................22

*Hurley v. Allied Chem. Corp.,*
    262 S.E.2d 757 (W. Va. 1980)...............................................31

*Hutchison v. City of Huntington,*
    479 S.E. 2d 649 (W. Va. 1996)...............................................25

*Lamberos v. Laurel Racecourse, Inc.*,
    489 F. Supp. 1376 (D. Md. 1980) .......................................................................23

*Mahmoodian v United Hosp. Ctr. Inc.*,
    404 S.E.2d 750 (W. Va. 1991) ...........................................................................21

*Mentavlos v. Anderson*,
    249 F.3d 301 (4th Cir. 2001) ......................................................................12, 13

*Richardson v. Town of Eastover*,
    922 F.2d 1152 (4th Cir. 1991) ...........................................................................14

*Wittenberg v. Wells Fargo Bank, N.A.*,
    852 F.Supp.2d 731 (N.D. W. Va. 2012) ...........................................................32

*Lugar v. Edmondson Oil Co., Inc.*,
    457 U.S. 922 (1982) ...........................................................................................16

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ...........................................................................................16

*Roberts v. Louisiana Downs, Inc.*,
    742 F.2d 221 (5th Cir. 1984) .............................................................................22

**Statutes, Rules & Regulations**
42 U.S.C. § 1983 .........................................................................................*passim*

W. Va. Code § 19-23-6 ...............................................................................20

SL1 1247219v5 005982.00037

# I.    INTRODUCTION

Claimant Tina Mawing is a horse trainer who races the horses she trains at the racetrack owned by Respondent PNGI Charles Town, LLC, doing business as Charles Town Races and Slots, ("Respondent," "CTRS" or the "Track"). Ms. Mawing filed a lawsuit against the Track when she was not awarded the use of the Track's free horse stalls.[1]

Ms. Mawing claims that the Track deprived her of an established property interest without due process in violation of 42 U.S.C. § 1983 and the West Virginia Constitution when the Track did not award Ms. Mawing the use of its free horse stalls at the Track.  She also claims that CTRS improperly retaliated against her for claiming to the West Virginia Governor that the Track deployed pesticides around its barn area that Ms. Mawing contends poisoned her horse and goat.  She further claims that she suffered retaliation for testifying in a hearing before the state Racing Commission.  Finally, Ms. Mawing claims that CTRS discriminated against her because of her activities on behalf of the HBPA and because of her role as an HBPA board member, in breach of the agreement between the HBPA and the Track.

On June 10 – 12, 2013, the Panel held a trial on this matter.  Ms. Mawing has failed to prove any of her claims at trial.  First, Ms. Mawing failed to prove her

---

[1]      The Horsemen's Benevolent & Protective Association ("HBPA"), which represents horse trainers that race at the Track, joined with Ms. Mawing in bringing the lawsuit as a nominal party.  The HBPA no longer has claims in this dispute.

1

federal and state due process claims because she could not establish a legitimate claim of entitlement to the use, free of charge, of horse stalls owned by the Track. Ms. Mawing further failed to establish that CTRS acted under the color of state law when it made its stall allocation determination.  Likewise, Ms. Mawing's First Amendment claim fails because the Track is not a state actor.  Third, Ms. Mawing could not prove that the Track retaliated against her in violation of West Virginia Code § 61-5-27 because (i) her claims to the Governor do not satisfy the statutory definition for "official proceeding," and, (ii) there was no evidence that the stall allocation committee even knew of her testimony at the Racing Commission hearing.  Finally, Ms. Mawing was unable to prove that CTRS breached its agreement with the HBPA and failed to establish any damages resulting from this alleged breach.

For the reasons explained more fully herein, CTRS requests that the Panel reject Ms. Mawing's claims and find that CTRS is not liable.

## II.    FACTUAL BACKGROUND

### A.  The Parties and Their Relationship

CTRS operates a licensed racetrack located in Charles Town, West Virginia. [Ex. C-19, at ¶ 6; Ex. C-18, at ¶ 6].  Ms. Mawing is a licensed horse trainer who trains horses that she enters to race at various tracks, including CTRS's racetrack in Charles Town.  [Ex. C-19, at ¶ 1; Ex. C-18, at ¶ 1].  The HBPA is a non-profit

2

association made up of owners and trainers of thoroughbred horses that race at the Track. [Ex. C-18, at ¶ 2; Ex. C-18, at ¶ 2]. Ms. Mawing is a member of the HBPA and serves on the organization's board. [(Trial Transcript ("Trial Tr."), June 10, 2013 at 44:5 – 45:1; Ex. C-19, at ¶ 1; Ex. C-18, at ¶ 1].

CTRS and the HBPA are parties to an agreement dated December 21, 2004 (the "HBPA Agreement") which memorializes the parties' respective obligations to each other with regard to thoroughbred racing at the Track. [Ex. C-1]. The HBPA Agreement addresses issues such as the racing schedule, minimum prize monies (known as "purses"), and the racing facilities at the Track. [*Id.*, at ¶ 4]. The HBPA Agreement terminated when it was replaced by a new and different contract on February 20, 2009. [Ex. C-17; Deposition Transcript of Leonard Hale, Mar. 12, 2013 ("L. Hale Dep. Tr.) at 16:18 – 17:1].

The Track owns approximately 1,350 horse stalls located on the back side of its racetrack. [Trial Tr., June 11, 2013 at 500:5 – 501:2]. While the HBPA Agreement requires the Track to provide only 1,148 free stalls at the Track, it actually makes almost all of its approximately 1,350 stalls available for free to HBPA members. The HBPA Agreement addresses general parameters for applying for and allocating those stalls. [Ex. C-1, at ¶ 11, Trial Tr., June 11, 2013 at 502:22 – 503:3]. The stall licenses have a six-month term and are not renewed automatically. [Ex. C-39]. Rather, a trainer must re-apply for a new license at the

3

expiration of the previous term.  [*Id.*]  The HBPA Agreement expressly states that CTRS will oversee an application process for free stalls using an application containing terms and conditions determined by CTRS.  [Ex. C-1, at ¶ 11(D)].  According to the HBPA Agreement, "[t]he terms and conditions for all stall applications shall be determined by and set forth in an application by Charles Town Races."  [*Id.*]  For each allocation period, the Track always receives more applications for stalls than it can accommodate.  [Trial Tr., June 11, 2013 at 446:1 – 9; Deposition Transcript of W. Randolf Wehrman, Apr. 6, 2010 ("R. Wehrman Dep. Tr.") at 98:9 – 5].

The Track agreed that it would not "discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls."  [*Id.* at ¶ 11(B)].  Outside of this sole limitation, however, the Track is given absolute discretion in the allocation of its stalls.  [*Id.* at ¶ 11; "Subject to this limitation, the allocation of stalls shall be in the discretion of Charles Town Races."  [*Id.* at ¶ 11(B)].

Currently, the Track's free stalls are allocated to more than one hundred different trainers.  [Trial Tr., June 11, 2013 at 515:16 – 516:6].  Nearly thirty percent of the Track's stalls are allocated to trainers that serve on the HBPA board or trainers that train horses for owners who are on the HBPA board.  [*Id.*]

4

## B. Ms. Mawing Testifies at the Forest Park Hearing

In October 2007, HBPA member Raymond Funkhouser's occupational permit was suspended by the West Virginia Racing Commission because of complaints he made about the allegedly improper entry of a certain horse named "Forest Park" in a race at the Track. [Trial Tr., June 10, 2013 at 46:20 – 47:8]. A hearing was held concerning Mr. Funkhouser's suspension, which would become known as the "Forest Park" hearing. [*Id.*; Trial Tr., June 11, 2013 at 374:24 – 375:13]. While Ms. Mawing did testify at the hearing on Mr. Funkhouser's behalf [Trial Tr., June 10, 2013 at 48:16 – 17; 49:16 – 18], CTRS was not involved in the suspension of Mr. Funkhouser's permit, nor was it involved in the subsequent hearing. [Trial Tr., June 12, 2013 at 701:13 – 702:1].

Because the allegations against Mr. Funkhouser involved particular horses that raced at the Track, three CTRS employees occasionally attended parts of the hearing to listen to the proceedings as they have in other hearings involving other individuals when the Track was not a party. [Trial Tr., June 11, 2013 at 376:19 – 377:12; Trial Tr. June 12, 2013 at 950:10 – 951:18]. However, none of the Track's employees were present during Ms. Mawing's testimony. [*Id.*] Further, none of the Track's employees involved in the allocation of stalls were even aware that Ms. Mawing testified on Mr. Funkhouser's behalf. [*Id.*]

5

### C.  Governor Joseph Manchin Mediates Contract Negotiations Between the Track and the HBPA

According to West Virginia law, an agreement must be in place between the Track and the unit the represents the horsemen, which in this case is the HBPA. [Trial Tr., June 12, 2013 at 664:7 – 16].  CTRS was concerned that if the current agreement lapsed, the HBPA would seek to use the absence of an agreement as a means to halt all gaming operations at the Track, including horse racing, table games, slot machines, and video simulcasting of racing.  [*Id.*; *Id.* at 664:17 – 665:21].  Hand in hand with the cessation of gaming operations, the flow of tax revenue to the state could also immediately stop.  [*Id.*]  According to CTRS's analysis, the cessation of gaming operations at the Track would cost the state of West Virginia approximately one million dollars per day.  [*Id.* at 690:2 – 17], in addition to jeopardizing the jobs of nearly 2,000 people now employed at CTRS's facility.  There is little question why CTRS's Senior Vice President of Regional Operations, John Finamore, referred to this scenario as "Armageddon."  [*Id.*]

In early 2008, as the term of the HBPA Agreement was drawing to a close, the parties began negotiating the terms for the next agreement.  [*Id.* at 680:2 – 681:4].  However, due to the parties' strained relationship resulting from a recently failed referendum concerning table games at the Track, negotiations had ceased. [*Id.* at 680:2 – 682:21].

6

Because of the extreme amount of money and jobs involved, then West Virginia Governor Joseph Manchin became interested in the negotiations between CTRS and the HBPA concerning the terms of the next agreement. [*Id.* at 382:1 – 18; 404:22 - 406:21; 589:17 – 591:14; June 12, 2013 at 689:22 – 691:16]. When Governor Manchin learned that negotiations between CTRS and the HBPA were not progressing, he stepped in to mediate the parties' disagreements so negotiations could move forward and a contract be consummated. [Trial Tr., June 11, 2013 at 382:1 – 18; 404:22 - 406:21; 589:17 – 591:14; June 12, 2013 at 689:22 – 691:16]. In his role as impartial mediator, Governor Manchin separately met with representatives from the HBPA and CTRS in order to try to bring the parties together on the terms of the next agreement. [*Id.* at 690:18 – 691:16].

During one such meeting with HBPA members, Ms. Mawing claimed to Governor Manchin that CTRS deliberately used improper pest control poisons in the barn area, which caused the death of her horse and goat. [Trial Tr., June 10, 2013 at 157:16 – 161:22]. Ms. Mawing further alleged that the Track had installed wires in the barn area that were intended to injure or kill Ms. Mawing's horses. [Trial Tr., June 11, 2013 at 595:2 – 13; June 12, 2013 at 696:9 – 697:6; 897:9 – 898:8]. When Governor Manchin heard these outlandish claims, he, along with his Chief of Staff, Larry Puccio, promptly telephoned CTRS's representative, Mr. Finamore, to get to the bottom of Ms. Mawing's allegations. [*Id.* at 694:5 –

7

696:21; 897:13 -898:16]. After this disturbing call from the Governor, Mr. Finamore contacted the Track's general manager, Albert Britton, to investigate if there was any way that Ms. Mawing's defamatory claims could possibly be true. [*Id.* at 697:7 – 698:1]. Mr. Finamore was understandably angry and frustrated to have received such an embarrassing call from the Governor concerning Ms. Mawing's defamatory allegations, especially in the midst of negotiations with the HBPA to avoid the potential "Armageddon" scenario. [*Id.*] Mr. Finamore advised Mr. Britton that, if Ms. Mawing's allegations turned out to be false, Mr. Britton should keep this incident in mind when Ms. Mawing's request for stalls was next reviewed. [*Id.* at 698:14 – 699:5]. Mr. Finamore testified that he believed that Ms. Mawing's slanderous allegations were harmful to the Track and was further worried about what other false claims Ms. Mawing may be making to other horsemen or others in the community. [*Id.* at 699:6 – 24].

Less than one month later, Governor Manchin followed up with Mr. Finamore to determine whether Ms. Mawing's alarming allegations were true. [*Id.* at 700:1 – 701:6]. Mr. Finamore informed the Governor that the allegations were completely baseless and untrue. [*Id.*] While Governor Manchin seemed dismayed that Ms. Mawing would make such distressing false claims, the Governor never instructed the Track to take any sort of action against Ms. Mawing. [*Id.*; *Id.* at 702:7 – 703:15; 899:8 – 14]. As Mr. Finamore explained, any instruction from the

8

Governor to take negative action against Ms. Mawing would have been counterproductive to the Governor's role as mediator between the parties in the very important and very contentious contract negotiations. [*Id.*] At no point during these conversations with the Governor concerning Ms. Mawing's inflammatory claims was Mr. Finamore aware of Ms. Mawing's status as an HBPA board member. [*Id.* at 705:3 – 17].

### D. The Track Did Not Allocate Ms. Mawing Any Free Stalls in June 2008

The Track created a stall allocation committee to administer the task of allocating its limited supply of free stalls. The committee is made of six individuals who are employees of the Track. [Trial Tr., June 11, 2013 at 423:13 – 425:10; 505:12 – 507:6]. No one on the committee is a representative of the West Virginia Racing Commission. [*Id.* at 512:1 – 6]. Further, the decisions of the stall allocation committee are not directed by any employee of the state Racing Commission. [*Id.* at 512:7 – 10]. The Track always receives more requests for stalls than it can accommodate. [*Id.* at 446:1 – 9; R. Wehrman Dep. Tr. at 98:9 – 5]. Because the Track cannot provide free stalls to every applicant, the committee looks at a number of non-exhaustive factors that it considers in evaluating the applications. [Trial Tr., June 11, 2013 at 512:21 – 513:17]. These factors include, but are not limited to, objective statistics such as the number of starts per stall, winning percentage, and recent earnings. [*Id.*] The committee also looks to

9

subjective factors such as following the barn rules and keeping the trainer's area clean. [*Id.* at 513:11 – 17]. Whether a trainer is a member of the HBPA or serves on its board is not a factor in the stall allocation process. [*Id.* at 513:18 – 22].

For 2007, Ms. Mawing was allocated seven stalls pursuant to a Revocable Stall License Agreement dated December 21, 2006. [Ex. C-39, Trail Tr., June 10, 2013 at 81:19 – 22]. On February 7, 2008, the Track informed Ms. Mawing via letter that her allocation of free stalls would be increased to nine for the March 1, 2008 through August 31, 2008 period. [Ex. C-39, Trail Tr., June 10, 2013 at 82:15 – 83:21].

In November 2007, Ms. Mawing requested to borrow two stalls for a "weekend" from trainer George Yetsook, and received limited permission to use Mr. Yetsook's stalls for that weekend. [Trial Tr., June 11, 2013 at 450:14 – 451:17]. However, months later when Mr. Yetsook complained that Ms. Mawing was still in those two stalls, the Track conducted a check of all of its stalls in March 2008. [*Id.*] During this inventory, Ms. Mawing was discovered to be still using the stalls that she requested for a weekend the previous year. [*Id.*] She was also found to have horses in stalls allocated to two other trainers. [*Id.* at 452:14 - 19]. As a result of this violation of the Track's barn rules, Ms. Mawing's stall allocation was reduced by four stalls leaving her five stalls for the remainder of that allocation period. [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21]. Other

10

trainers including George Yetsook, Ronnie Wilt, and Richard Butts were also involved in this infraction and also lost stalls as a result. [Trial Tr., June 11, 2013 at 452:20 – 453:2].

After reviewing Ms. Mawing's stall application for the September 1, 2008 through December 31, 2008 term, the committee determined not to allocate Ms. Mawing any free stalls for that term. [Ex. C-39]. Ms. Mawing's reduction in stalls came as a direct result of her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and slanderous allegation that the Track intentionally and deliberately tried to injure animals on the property. [Trial Tr., June 12, 2013 at 883:5 – 13].

This denial of free stalls had no impact whatsoever on Ms. Mawing's occupational permit issued by the West Virginia Racing Commission and has not prevented Ms. Mawing from racing horses at the Track or any other track in West Virginia. [Ex. R-25]. Ms. Mawing, like many other trainers, now stables the horses she trains at an off-site location.

## III.   ANALYSIS

### A. Ms. Mawing's Failed to Establish a Federal Due Process Claim

Ms. Mawing contends that the Track violated her right to federal due process by failing to provide her with free horse stalls for the second half of 2008 through the present. According to Ms. Mawing, the allocation decision was an

11

unconstitutional denial of her property rights in violation of 42 U.S.C. § 1983.  Ms. Mawing further claims that Governor Manchin's role as mediator is sufficient to ascribe state action to the Track's stall allocation decision.  However, Ms. Mawing did not establish any of the required elements for a Section 1983 claim, and therefore this claim should be denied.

In relevant part, 42 U.S.C. § 1983 imposes civil liability on any person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001).  "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

Thus, to be successful on her Section 1983 claim, Ms. Mawing must establish: (1) that the Track's denial of Ms. Mawing's application for free horse stalls "deprived [her] of a right secured by the Constitution and laws of the United States;" **and** (2) that the Track deprived her of this alleged "constitutional right

12

"under color of [State] statute, ordinance, regulation, custom, or usage."
*Mentavlos*, 249 F.3d at 310. (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

    1.  *Ms. Mawing Does Not Have a Property Interest in the Allocation of Free Stalls from CTRS*

Ms. Mawing does not have a property interest in the Track's continued allocation of free stall space. It is well settled that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of **entitlement** to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (emphasis added).

Here, Ms. Mawing, like all other trainers, has no legitimate claim of entitlement to any allocation of free stall spaces at the Track's privately owned racetrack. There is no question that the stalls at issue belong to CTRS. [Trial Tr., June 11, 2013 at 500:5 – 21]. Moreover, the Revocable Stall License Agreement, by which each licensee is allocated free stalls, is revocable at the will of CTRS:

> It is understood and agreed that this is not a lease of any space, but is merely a **revocable license granted by CTRS only on the terms and conditions set forth**. CTRS reserves the unrestricted right to decline stall space, reduce the number of stalls allocated, revoke this licenses at all, for any reason or no reason, and to require any Applicant using stall space to vacate the stalls and move all horses, equipment and personnel off CTRS premises within fourteen (14) days after receiving written notice to vacate from CTRS. Such notice to vacate may

13

be given at any time during the term of the License and for any
reason or no reason **at the discretion of CTRS**.

[Ex. C-39 (emphasis added); *see also id.* ("The effective or authorized period from

the license granted by this Agreement is from January 1, 2008 to June 30, 2008

**unless terminated by CTRS prior thereto**." (emphasis added)].  Additionally, the

Revocable Stall License Agreement does not provide for a continuing license,

stating explicitly it "does not automatically renew."  [*Id.*]

A license, such as the Revocable Stall License at issue here, which may be

withdrawn at the discretion of the licensor, cannot be the source of a property

interest for constitutional due process purposes.  "Where a license or similar

benefit may be withdrawn at will, . . . the holder of the license or benefit has

property interest because he has no legitimate claim of entitlement to something

that can be withdrawn at the whim of the grantor." *Richardson v. Town of*

*Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991).  The Fourth Circuit further noted

"no property interest is implicated by the nonrenewal of a contract or license where

there is no entitlement to the renewal." *Id.*  Further, regardless of whether a

plaintiff may have a claim for breach of contract, she must establish the she has a

deprived of a constitutionally protected interest in order to establish a due process

violation. *See Equity in Athletics, Inc. v. Department of Educ.*, 639 F.3d 91, 109

(4th Cir. 2011) (holding that college athletes that participated in sports that were

eliminated by the college did not have a constitutionally protected interest in

14

intercollegiate athletic participation even though they may have a claim for breach of contract for the loss of scholarships).

Importantly, if Ms. Mawing is found to have a legitimate property interest in the use of the Track's free stalls, then all other trainers at the Track would also share the same right. Such a conclusion would mean that new trainers would never be awarded stalls at the Track and current trainers would have use of the Track's stalls in perpetuity. This conclusion exposes the absurdity of Ms. Mawing's claim.

Because Ms. Mawing was allocated stalls based on a revocable, at-will license without the right of renewal, Ms. Mawing did not have any property interest in the Track's allocation of free stalls and her Section 1983 claim fails.

### 2. *The Track Is Not a "State Actor"*

Ms. Mawing's lack of a property interest in the use of the Track's free stalls, standing alone, is fatal to her Section 1983 claim. Nevertheless, Ms. Mawing also failed to establish that the Track is a state actor to satisfy the second element of a federal due process claim. Ms. Mawing did not present any evidence to prove CTRS – a private company unaffiliated with the West Virginia government – acted under the color of state law when it made its decisions concerning the allocation of the Track's own horse stalls.

"The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth

15

Amendment: is the alleged infringement of federal rights 'fairly attributable to the state.'" *Rendell-Baker v. Kohn,* 457 U.S. 830, ----, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982), quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, ----, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) (holding that conduct which satisfies the "state action" requirement of the fourteenth amendment satisfies also the "under color of state law" requirement of § 1983), *see also Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 215 (4th Cir. 1993) (holding that the "under color" of law requirement of § 1983 is "equivalent to the 'state action' requirement under the Fourteenth Amendment"). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co.,* 526 U.S. at 50 (quoting *Blum,* 457 U.S. at 1002)). As a private, non-governmental entity, the Track's decisions concerning the allocation of free stalls can constitute state action only if its "conduct has sufficiently received the imprimatur of the State so as to make it 'state' action." *Haavistola,* 6 F.3d at 215 (quoting *Alcena v. Raine,* 692 F. Supp. 261, 266 (S.D.N.Y. 1988)).

State action may be found only if there is a sufficiently close nexus between the state and the conduct challenged so that a defendant is treated as a state actor and defendant's act is treated as that of the state. *See Lugar,* 457 U.S. at 938–939,

16

102 S.Ct. at 2754–55; *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786, 73 L.Ed.2d 534

(citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453,

42 L.Ed.2d 477 (1974)).  Accordingly, the party charged must be a state official, or

he must have acted together with or received significant aid from state officials, or

his conduct otherwise must be chargeable to the state.  *Lugar, supra,* 457 U.S. at

937, 102 S.Ct. at 2754.

In only certain situations may a private party be deemed a state actor.  *See*

*Andrews v. Fed. Home Loan Bank,* 998 F.2d 214 (4th Cir.1993).   The first

situation is where there is a "symbiotic relationship" between the private party and

the state.  *Haavistola,* 6 F.3d at 215.  A symbiotic relationship occurs when there

"is a sufficiently close nexus between the state and the challenged action of the

regulated entity such that those actions may be fairly treated as those of the state."

*Id.* (quoting *Alcena,* 692 F. Supp. at 267 (citing *Blum,* 457 U.S. at 1004–05, 102

S.Ct. at 2785–86)).

Ms. Mawing did not establish that the Track acted under color of state law

by means of a symbiotic relationship.  The Supreme Court has limited the

symbiotic relationship analysis as follows:

> We cautioned . . . that while "a multitude of relationships might
> appear to some to fall within the [Fourteenth] Amendment's
> embrace," differences in circumstances beget differences in
> law, limiting the actual holding to **lessees of public property**.

17

*Haavistola*, 6 F.3d at 215 (citing *Jackson*, 491 U.S. 358 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) (emphasis added).  Here, CTRS owns its own buildings, barns, and equipment.  (Trial Tr., June 11, 2013 at 500:5 – 501:2.)  Further, CTRS has not entered into any sort of leasing agreement with a local, state, or federal government entity that would provide a sufficiently close nexus between CTRS and West Virginia.  It is important to note that Ms. Mawing did not present any evidence to rebut this conclusion.  Accordingly, there is no "symbiotic relationship" between the Track and West Virginia that would permit the Track's allocation of its stalls to be considered state action.

The second circumstance in which a private party can be deemed a state actor is where there is extensive governmental regulation.  *Haavistola*, 6 F.3d at 215.  This circumstance also does not apply to the present matter.  "[A] state may be held responsible for private conduct only when it has exercised coercive power or has provided such significant encouragement that the action must be in law be deemed to be that of the state."  *Id.* (citing *Blum*, 457 U.S. at 1004-05).  Simply because an activity is regulated by the state is insufficient to satisfy this requirement.  *Id.*  The Supreme Court and others have held on numerous occasions that the regulatory scheme must directly impact the alleged constitutional violation for private action to be deemed conduct of the state.  *See, e.g., Blum*, 457 U.S. at

18

1005 (holding that actions by physicians and a nursing home, while part of a heavily regulated industry, were private party conduct); *Rendell-Baker*, 457 U.S. at 841 (holding that various regulations showed relatively little interest in a school's private personnel matters and the business decision to terminate teachers by a school did not become state action even though the schools were generally regulated by the state); *Haavistola*, 6 F.3d at 216 ("Without regulations addressing the qualifications for membership and the terms under which one serves as a member of a volunteer fire department, the State of Maryland cannot be said to exert the type of control over the Fire Company's personnel matters that gives rise to state action on the Fire Company's part in its dealings with its membership.").

Turning to the present matter, CTRS is a private, for-profit entity established to operate a racetrack and gaming activities that it owns. Despite that fact that it is licensed by the state of West Virginia to operate a racetrack, CTRS is not owned or operated by any governmental agency. The West Virginia legislature has made clear the distinction between the West Virginia Racing Commission and the Track by statute: "The Racing Commission shall not interfere in the internal business or internal affairs of any licensee." W. Va. Code § 19-23-6.

SL1 1247219v5 005982.00037

Moreover, the allocation of the free stalls at issue is a matter of a private agreement between CTRS and Ms. Mawing.[2] The West Virginia statutes and regulations governing horse racing unquestionably had no effect on the Revocable Stall License or the allocation of stalls in 2008. The Track's stall allocation committee is comprised solely of CTRS employees. [Trial Tr., June 11, 2013 at 423:13 – 425:10; 505:12 – 507:6]. Racing Stewards who represent the West Virginia Racing Commission at the Track do not participate in any allocation decisions. [*Id.* at 449:14 – 450:2; 515:1 – 10]. Further, Ms. Mawing offered no evidence to prove that West Virginia racing officials played any role in the Track's stall allocation decision.

It is also important to note the formerly confusing West Virginia regulatory structure that created a Racing Commission position known as the "Executive Secretary" of the Racing Commission, sometimes known as the "Racing Secretary." *See* W. Va. Code St. R. § 178-1-2.33 (2008) ("'Executive secretary' means the racing secretary of the Racing Commission."). This state employee worked only for the Racing Commission and is not to be confused with the Track's employee, also known as "Racing Secretary." As opposed to the state position, the Track's Racing Secretary is selected, hired, paid, evaluated, and terminated at the

---

[2]     As discussed *supra*, Ms. Mawing also holds a license from the West Virginia Racing Commission and is governed by the rules of racing. Any argument that the Track is a state actor either because it is licensed by the West Virginia Racing Commission to participate in horse racing or that the racing industry is highly regulated generally in West Virginia would necessarily mean that Ms. Mawing is also a state actor because she is also licensed to participate in horse racing and subject to the same heavy regulation.

20

sole discretion of CTRS. [Trial Tr., June 11, 2013 at 506:1 - 15]. The Racing Commission regulations were significantly revised in 2010 to create a regulatory structure more in line with the racing rules of other states. [Trial Tr., June 11, 2013 at 507:14 – 508:5]. Among these changes, the Executive Secretary of the Racing Commission title was eliminated. [*Id.* at 509:20 – 510:1; *see also* W. Va. Code St. R. § 178-1-2 (2011)]. To be certain, the Track's Racing Secretary is not, and has never been, a state employee. Moreover, the Track's Racing Secretary reports only to the Track and not to the state Racing Commission.

It is further important to note that the allocation of the Track's free stalls has nothing to do with the occupational permit the West Virginia Racing Commission issued to Ms. Mawing. Currently, Ms. Mawing continues to hold her occupational permit. Moreover, Ms. Mawing did not submit any evidence that shows that she has been precluded from racing horses at the Track. Thus, as a private entity, entering into private agreements with other private parties regarding the use of its privately-owned property, CTRS cannot be deemed to be a state actor. *See Mahmoodian v United Hosp. Ctr. Inc.*, 404 S.E.2d 750, 756 (W. Va. 1991) (private hospital's actions do not constitute state action and are not subject to scrutiny for compliance with procedural due process).

The third exception to the rule that private parties are not subject to constitutional scrutiny is when "'the private entity exercised powers that are

21

traditionally the exclusive prerogative of the state.'" *Haavistola*, 6 F.3d at 215

(quoting *Blum*, 457 U.S. at 1004-05). The Supreme Court emphasizes that actions

by a private entity do not become those of the state simply because the private

entity performs a function that serves the public. *Rendell-Baker*, 457 U.S. at 842.

Furthermore, a "State's mere acquiescence in a private action [does not] convert[]

that action into that of the State." *Flagg Bros.*, 436 U.S. at 164-65. In the matter

at hand, the allocation of the Track's free stalls is a matter of private contract and

not a power that traditionally belongs to the state of West Virginia.

Importantly, courts that have considered the issue of whether a private

racing company's allocation of its stalls constitutes state action have rejected

liability under Section 1983.[3] In *Hefin v. Ky. State Racing Comm'n*, 701 F.2d 599

(6th Cir. 1983), the U.S. Court of Appeals for the Sixth Circuit noted that

pervasive state regulation did not transform Churchill Downs' actions into state

action: "[Plaintiffs'] complaint is directed solely to alleged unfairness in the

allocation of the limited number of stalls which are available for rent. This matter

is within the discretion of this private corporation." *Id.* at 600. Likewise, the

United States District Court for the District of Maryland found that because the

---

[3]       Based upon a regulatory structure vastly different than West Virginia's, the Fifth Circuit Court of Appeals
found that a track's stall allocation decisions were state action. *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th
Cir. 1984). Important to the court in *Roberts* was that Louisiana racing rules specifically required the track's racing
secretary to confer with the *Louisiana racing commission's* racing stewards when making stall allocation decisions.
*Id.* at 228. The West Virginia regulations do not have any such requirement and, as disused above, the West
Virginia racing stewards are not involved in any stall allocations at the Track. [Trial Tr., June 11, 2013 at 449:14 –
450:2; 515:1 – 10]

racetracks were privately owned, and because the state Racing Commission was not involved in the stall allocation process, the allocation decision could not be considered state action. *Lamberos v. Laurel Racecourse, Inc.*, 489 F. Supp. 1376, 1382-86 (D. Md. 1980).

Just as the courts found in *Hefin* and *Lamberos*, the Panel should also find the decision of CTRS, a private, for-profit limited liability company, not to allocate stall space to Ms. Mawing did not constitute state action. Therefore, Ms. Mawing's Section 1983 claim fails as a matter of law.

### 3. *Governor Manchin Did Not Conspire with CTRS to Deprive Ms. Mawing of a Constitutional Right*

In a last ditch effort to prop up her deficient claims, Ms. Mawing asserts that Governor Manchin's role as independent mediator somehow transforms the Track into an arm of the state. Ms. Mawing did not establish this claim because she failed to produce any evidence to prove that Governor Manchin conspired with CTRS to deprive Ms. Mawing of any constitutional right.

A private party involved in a conspiracy with a state actor can be liable under § 1983. *Hessami v. Corp. of Ranson*, 170 F. Supp. 2d 626, 634 (N.D. W.Va. 2001). However, to establish such a claim, Ms. Mawing must present evidence to prove an agreement or meeting of the minds between the state actor and the private actor to engage in a conspiracy to deprive her of a constitutional right. *Id.* Conclusory allegations or claims of joint action or a conspiracy do not demonstrate

23

that the defendants acted under color of state law. *Id.* at 635. Rather, there must

be evidence of a concerted effort between the state actor and the private individual.

*Id.* Specifically, to establish liability through conspiracy, Ms. Mawing must

demonstrate that: (1) Governor Manchin and the Track reached an understanding

to deprive the Ms. Mawing of her constitutional rights, and (2) the Track was a

willful participant in joint activity with the Governor or his agents. *Id.* at 634

(citing *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

Ms. Mawing offered no evidence to prove any conspiracy between Governor

Manchin and the Track. In fact, the undisputed testimony of Governor Manchin's

former chief of staff explains that the Governor's role was "to try to get both

parties to come together and work out their differences." [Trial Tr., June 12, 2013

at 888:8: - 19]. Further, both Mr. Puccio and Mr. Finamore testified that Governor

Manchin never instructed or advised the Track to take any sort of action against

Ms. Mawing. [*Id.* at 702:7 – 703:15; 899:8 – 14]. As Mr. Finamore explained,

such action from Governor Manchin would be counterproductive to his role in

mediating an agreement to avoid the one million dollar per day loss of tax revenue

that could result from a gaming shutdown at the Track. [*Id.*]

Without evidence to prove that Governor Manchin and the Track agreed to

deprive Ms. Mawing of a constitutional right, her claim fails and should be denied.

24

## B. Ms. Mawing's State Law Due Process Claim also Fails

Ms. Mawing also claims that the Track's failure to allocate her free stalls violated the West Virginia Constitution's Due Process clause. For the same reasons that Ms. Mawing's Section 1983 claim fails, her state law claims also fail under West Virginia law. *See Hutchison v. City of Huntington*, 479 S.E. 2d 649, 660 (W. Va. 1996) (holding that the private cause of action under the Due Process Clause embodied within Article 3, § 10 of the West Virginia Constitution is analyzed in the same manner as claims under 42 U.S.C. § 1983). The West Virginia Supreme Court of Appeals applies the same definition of "property interest" and "color of state law" as the federal courts. *See id.* at 661 – 62. As discussed *supra*, because the Track did not deprive Ms. Mawing of anything in which she has a property interest and did not do so under "color of state law," her West Virginia Constitutional claim fails.

## C. Ms. Mawing Failed to Present Evidence Sufficient to Establish a First Amendment Retaliation Claim

Ms. Mawing vaguely claims that CTRS retaliated against her based on the exercise of her rights under the First Amendment when she made baseless and inflammatory allegations to Governor Manchin. Ms. Mawing's purported First Amendment retaliation claim fails as a matter of law because, as discussed above, the Track is not a "state actor." To establish a First Amendment claim for unlawful retaliation under 42 U.S.C. § 1983, Ms. Mawing must show (1) that the

25

conduct that led to the alleged retaliation was constitutionally protected; (2) she was subjected to adverse actions by a **state actor**; and (3) the protected activity was a substantial motivating factor in the **state actor's** decision to take the adverse action. *See Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). As discussed more fully above, Ms. Mawing failed to present any evidence that would prove CTRS – a private company unaffiliated with the West Virginia government – acted under the color of state law when it made its decisions concerning the allocation of the Track's own horse stalls.

Because, as demonstrated above, CTRS is not a state actor, Ms. Mawing's purported claim for First Amendment retaliation, as well as her other constitutional claims, fail as a matter of law.

### D.  Ms. Mawing Failed to Prove that the Track Retaliated Against Her When She was Not Allocated Free Stalls

On the eve of trial, Ms. Mawing added an additional claim of criminal retaliation under W.V. Code § 61-5-27. Ms. Mawing failed to prove the required elements to sustain this claim. According to W.V. Code § 61-5-27(c)(3), "[i]t is unlawful for a person to cause injury or loss to person or property, or to threaten or attempt to do so, with the intent to . . . [r]etaliate against any other person for attending, testifying or participating in an official proceeding, or for the production of any record, document or other object produced by a person in an official

26

proceeding." Subsection (f) further provides that a private civil action may be brought based upon a violation of § 61-5-27.

Ms. Mawing claims that CTRS retaliated against her because of her complaints to Governor Manchin and because she testified on behalf of Mr. Funkhouser at the Forest Park hearing. Both of these claims fail and should be denied. First, § 61-5-27(a)(3) unambiguously defines "official proceeding" as "a proceeding involving a legal process or other process of a tribunal of this state or of the United States." "Legal process" is exhaustively defined as follows:

> [A]n action, appeal, document instrument or other writing issued, filed or recorded to pursue a claim against person or property, exercise jurisdiction, enforce a judgment, fine a person, put a lien on property, authorize a search and seizure, arrest a person, incarcerate a person or direct a person to appear, perform or refrain from performing a specified act. "Legal process" includes, but is not limited to, a complaint, decree, demand, indictment, injunction, judgment, lien, motion, notice, order, petition, pleading, sentence, subpoena, summons, warrant or writ.

W. Va. Code § 61-5-27(a)(2). There can be no question that the meeting with Governor Manchin fails to meet the standard for "legal process." Governor Manchin served only as a neutral mediator between two private parties in the midst of negotiations involving a private agreement. [Trail Tr., June 12, 2013 at 887:24 – 888:19]. As Mr. Puccio testified, Governor Manchin's only interest in the parties and their agreement was the revenue and jobs it meant for the state. [*Id.* at 888:20 – 889:2]. Ms. Mawing did not produce any evidence to establish that the meeting

27

with Governor Manchin was anything more than an informal mediation designed to bring the parties together during their contentious negotiations. If fact, Ms. Mawing testified that she was only invited to attend the meeting by representatives of the HBPA and not by the Governor or anyone from his office. [Trial Tr., June 10, 2013 at 157:19 – 24]. Because the meeting with the Governor fails to meet the statutory definition of "official proceeding," Ms. Mawing's claim for criminal retaliation with regard to the claims she made to Governor Manchin fails as matter of law.

Ms. Mawing's criminal retaliation claim also fails with regard to her testimony at the Forest Park hearing. The undisputed testimony proves that none of the Track's employees on the stall allocation committee was aware of her testimony during the hearing. [Trial Tr., June 11, 2013 at 454:18 – 22; 522:6 – 10; Trial Tr., June 12, 2013 at 702:2 – 6; 789:22 – 790:5; 801:20 – 802:11; 950:10 – 951:18.] Neither Ms. Mawing nor Mr. Funkhouser testified that they witnessed any CTRS representatives present during Ms. Mawing's testimony. Further, Ms. Mawing failed to establish that any of the Track's employees responsible for stall allocations were even aware that Ms. Mawing testified at the hearing. [Trial Tr., June 11, 2013 at 454:18 – 22; 522:6 – 10; Trial Tr., June 12, 2013 at 702:2 – 6; 789:22 – 790:5; 801:20 – 802:11; 950:10 – 951:18]. Moreover, the Track's witnesses that took part in Ms. Mawing's stall allocation each testified that Ms.

28

Mawing's testimony at the Forest Park hearing did not play any role in the committee's allocation decision. [*Id.*] Ms. Mawing offered absolutely no evidence to explain how the Track retaliated against her based upon testimony that the Track's employees never knew occurred.

Further, the timeline of Ms. Mawing's stall allocations belies her contention that she suffered retaliation because of her testimony in support of Mr. Funkhouser. The Forest Park hearing occurred in October 2007. [Trial Tr., June 10, 2013 at 46:20 – 47:10; Trial Tr., June 11, 2013 at 374:18 – 375:9]. At the time that she testified, Ms. Mawing was allocated seven free stalls at the Track. [Ex. C-39, Trail Tr., June 10, 2013 at 81:19 – 22]. The Track then allocated stalls again in February 2008. [Ex. C-39, Trail Tr., June 10, 2013 at 82:15 – 83:21]. During this allocation, Ms. Mawing's allotment of stalls was increased to nine free stalls at the Track, two more than she had been allocated <u>before</u> her testimony at the Forest Park hearing. [*Id.*] Ms. Mawing's stall allocation was not reduced until April, 2008 when it was determined that she had improperly stalled her horses in stalls allocated to other trainers. [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21]. Ms. Mawing lost one stall for each horse that had placed in another trainer's stalls, for a total of four. [*Id.*] Further, Ms. Mawing was not the only trainer that lost stalls as a result of this infraction of the Track's barn rules. [Trial Tr., June 11, 2013 at 452:14 – 453:2]. At the next stall allocation meeting in August 2008, Ms. Mawing

29

was not awarded any stalls. [Ex. C-39]. As Mr. Britton testified, Ms. Mawing's

stall allocation was ultimately reduced to zero at the next allocation meeting –

nearly one year after her testimony at the Forest Park hearing – because of her less

than remarkable racing performance, pervious barn rule infractions, and her

baseless and inflammatory statements that she made to Governor Manchin. [Trial

Tr., June 12, 2013 at 883:5 – 13].

Ms. Mawing cannot establish that the meeting with Governor Manchin

meets the definition of "official proceeding" as defined by W.V. Code § 61-5-

27(a). Further, Ms. Mawing offered no testimony or proof that the Track's

employees responsible for the allocation of stalls retaliated against her based on

her testimony at the Forest Park hearing. In fact, the undisputed testimony is that

none of the Track's employees were even aware that Ms. Mawing testified at all.

Because Ms. Mawing failed to prove the requisite elements of criminal retaliation,

her claim for criminal retaliation should be denied.

### E.  Ms. Mawing's State Law Public Policy Retaliation Claim Also Fails as a Matter of Law

CTRS believes that Ms. Mawing's abandoned her public policy retaliation

claim by pursuing a claim for criminal retaliation under W.V. Code § 61-5-27.

Nevertheless, even if Ms. Mawing still plans to assert a public policy retaliation

claim, such a claim fails as a matter of a law. The public policy tort, as pleaded by

Ms. Mawing, extends only to employment disputes, not the allocation of a private

30

company's horse stalls, which is governed by private contract. Therefore, this claim also fails as a matter of law and should be dismissed.

The West Virginia Supreme Court of Appeals created the public policy tort as an exception to the general rule of at-will employment. *Harless v. First Nat'l Bank in Fairmont*, 246 S.E.2d 270, 271 (W. Va. 1978) ("The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public principle, then the employer may be liable to the employee for damages associated with the discharge."). The public policy tort cause of action **does not** apply in the absence of an employment relationship. *See Hurley v. Allied Chem. Corp.*, 262 S.E.2d 757, 759 (W. Va. 1980) ("An essential ingredient for the cause of action is an existing employment relationship between the parties. In the present case, [plaintiff] did not occupy any employment status with [defendant] and, therefore, *Harless* is not applicable.").

Here, it is undisputed that Ms. Mawing was not an employee of CTRS. Further, CTRS is not aware of any law in West Virginia (or beyond) recognizing a tort cause of action for retaliatory failure to provide an allocation of free horse stalls. Therefore, because West Virginia does not recognize this cause of action, Ms. Mawing's claim for public policy retaliation fails as a matter of law.

31

### F.  Ms. Mawing Failed to Prove that CTRS Breached the HBPA Agreement

Ms. Mawing failed to prove the required elements of her claim for breach of contract.  Ms. Mawing claims that CTRS breached the HBPA Agreement by discriminating against her in the allocation of free stalls based upon her HBPA activities and role as a board member.  At trial, Ms. Mawing did not establish a breach of the HBPA Agreement.  Further, Ms. Mawing failed to establish her claim for damages with reasonable certainty.

In West Virginia, the elements of breach of contract are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach.  *Wittenberg v. Wells Fargo Bank, N.A.*, 852 F.Supp.2d 731, 749 (N.D. W. Va. 2012).  Based upon this standard, Ms. Mawing's claim for breach of contract fails and should be denied.

#### 1.  *Ms. Mawing Failed to Prove That the Track Discriminated Against Her Because of Her HBPA Activities*

With regard to the allocation of the Track's stalls, the HBPA Agreement provides:

> Charles Town Races shall not discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls.  Subject to this limitation, the allocation of stalls shall be in the discretion of Charles Town Races.

[Ex. C-1, at ¶ 11].  According to the unambiguous language of this provision, absent discrimination based upon "HBPA membership or activity," the allocation

32

of its stalls lies solely with the Track. In order to establish her breach of contract claim, Ms. Mawing must prove that the only reason she lost stalls was her HBPA membership or her activities on behalf of the HBPA.

In reality, Ms. Mawing's HBPA membership and her activities on behalf of the organization had nothing to do with her reduction in stalls. The undisputed testimony is that the Track's stall allocation committee based its decision not to allocate stalls to Ms. Mawing on her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and inflammatory allegations to the Governor that the Track intentionally and deliberately tried to injure animals on the property. [Trial Tr., June 12, 2013 at 883:5 – 13].

The mere fact that Ms. Mawing attended the meeting with Governor Manchin in her capacity as an HBPA board member did not give her blanket immunity to say whatever she wanted about the Track under the guise of "HBPA Activity." While CTRS does not dispute that initially Ms. Mawing was part of a group of HBPA members and staff that met with Governor Manchin to address the HBPA's concerns during the contract negotiations, Ms. Mawing interrupted the meeting that was intended to address general horsemen concerns by interjecting her own individual and false claims that the Track deliberately caused the death of her goat and intended to decapitate her horse. [Trial Tr., June 11, 2013, at 591:19 -- 593:2]. When Ms. Mawing made these slanderous claims, she abandoned the

33

interests of the HBPA in order to pursue her own agenda of defaming the Track. If an individual board member's defamatory claims are found to be HBPA activity, then there is simply no limit on conduct or speech that is protected by the HBPA Agreement. Such an outrageous outcome was not the intention of the parties during the formation of the HBPA Agreement.

Further establishing that the Track does not discriminate against HBPA board members, more than one quarter of the Track's stalls are allocated to HBPA board members or trainers that train horses owned by HBPA board members. The Track currently allocates stalls to more than one hundred different trainers. [Trial Tr., June 11, 2013 at 515:16 – 516:6]. The Track estimates that nearly thirty percent of its stalls are allocated to trainers, who just like Ms. Mawing, serve on the board of the HBPA or trainers that train horses for owners who serve on the HBPA board. [*Id.*] Ms. Mawing fails to reconcile her claim that she was discriminated against based on her HBPA membership and board activities with the fact that the Track allocates more than a quarter of its stalls to her fellow HBPA board members.

Ms. Mawing simply cannot point to any evidence to prove her claim that she was discriminated against because of her membership in the HBPA or her activities on its behalf.

34

2. *Ms. Mawing Failed to Establish Damages Resulting from CTRS's Alleged Breach of the HBPA Agreement*

Even if Ms. Mawing proved that CTRS breached the HBPA Agreement (which she did not), Ms. Mawing's breach of contract claim still fails because she did not establish her alleged damages with reasonable certainty. It is axiomatic that damages from breach of contract may only place the plaintiff in the position she would have been in had the contract been performed. *Ohio Valley Builders' Supply Co. v. Wetzel Const. Co.*, 151 S.E. 1 (W. Va. 1929). However, a plaintiff is **not** to be "put in a better position by a recovery of damages for the breach of a contract than she would have been in if there had been performance." *Id.* In West Virginia, "the burden of proving damages by a preponderance of the evidence rests upon the claimant." *Sammons Bros. Const. Co. v. Elk Creek Coal Co.*, 65 S.E.2d 94, 105 (W. Va. 1951).

It is well settled that breach of contract damages cannot be proved by "mere speculation or conjecture." *Taylor v. Elkins Home Show, Inc.*, 558 S.E.2d 611, 619 (W. Va. 2001), *see also Spencer v. Steinbrecher*, 164 S.E.2d 710, 715 (W. Va. 1968) ("The general rule with regard to proof of damages is that such proof cannot be sustained by mere speculation or conjecture."). Rather, "[c]ompensatory damages recoverable by an injured party incurred through the breach of a contractual obligation must be proved with reasonable certainty." *Id.* (quoting *Kentucky Fried Chicken of Morgantown v. Sellaro*, 214 S.E.2d 823, 828 (1975);

35

*see also Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co. of W. Va., Inc.*, 413 S.E.2d 670, 676 (W. Va. 1991) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). Simply because the alleged damages are difficult to prove does relieve a plaintiff of her burden to establish damages with reasonable certainty. *Sammons Bros. Const. Co.*, 65 S.E.2d at 105.

The Supreme Court of Appeals' decision in *Taylor* is instructive. In *Taylor*, purchasers of a mobile home sued the seller for the alleged breach of a warranty contract based upon defects in the foundation of the home. *Taylor*, 558 S.E.2d at 614. During the trial, the plaintiff's presented a contractor's estimate of $29,907 for the cost required to completely replace the foundation wall. *Id.* After the trial, the jury found that the defendants breached the warranty agreement and awarded the plaintiffs $4,000 in replacement damages for the foundation wall. *Id.* Following the verdict, the Defendant moved for reconsideration of its motion for judgment as a matter of law, which was granted. *Id.* Plaintiffs appealed this ruling. *Id.* The Supreme Court of Appeals affirmed the circuit court's decision and found the plaintiffs failed to establish damages with reasonable certainty. *Id.* at 619. According to the court, plaintiffs failed to establish that the foundation wall needed to be completely replaced to put it in the condition it should have been if properly constructed. *Id.* Because the possibility remained that the wall could

36

have been repaired at a lesser cost, "any amount of damages based on the cost of complete replacement of the perimeter block wall is mere speculation and fails under our rule which requires proof of damages with reasonable certainty." *Id.*

Here, Ms. Mawing's purported damages calculation is based on nothing more than speculation, guesswork, and conjecture. Ms. Mawing unequivocally testified that she believes that she should have been allocated nine of the Track's free stalls even though she had only five stalls at the time her allocation was reduced to zero. [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21; 211:14 – 17]. Arbitrator Karlin succinctly questioned Ms. Mawing concerning actual measure of damages in this case: "So the question is, what is the charge -- what is the charge per month for those nine horses?" [*Id.* at 287:16 – 22]. Despite bringing this litigation more than four years ago, Ms. Mawing was unable to answer the Arbitrator's simple question or provide evidence to support her damages claim.

Ms. Mawing conceded that her damages calculation is not 100% accurate. [*Id.* at 259:22 – 260:7]. Throughout her testimony, Ms. Mawing was never able to determine the exact amount of damages that she claims to have incurred as a result of being denied the use of the Track's free stalls. Her best effort was to produce copies of checks that she claims she wrote to various entities to pay for expenses such as stall rent because she was unable to use the free stalls at the Track. [Ex. C-26]. However, Ms. Mawing herself could not testify with reasonable certainty that

37

these checks accurately reflect the amount required to put her in a place equal to where she would have been had CTRS allocated her nine of its stalls.

Ms. Mawing could not even provide a consistent range of stall rent that she paid. [*Compare id.* at 265:8 – 14 (admitting that she paid as little as $220 per month), *with id.* at 295:4 -- 7 (claiming she paid no less than $250 per month]. She further admitted that many of the barns would prorate the fees that they charged her during some months. [*Id.* at 259:22 – 260:15; 275:9 – 24]. Ms. Mawing, just as the plaintiffs in *Taylor*, attempts to hold CTRS liable for an inflated amount of damages without first proving that her claimed amount is the reasonably certain amount needed to put her in the same position should would have been had she been allocated nine of the Track's stalls.

Ms. Mawing did not offer one single receipt, invoice, lease, contract, or agreement from the off-site barns that specified how much she paid in stall rent. Further, no witness independently testified how much any barn charged for stall rent. Ms. Mawing was not able to explain even how many horses she stalled at any particular off-site barn. Instead, she spewed speculative, unsubstantiated numbers and asks the Panel to award her damages based up "the average" stall rent that she claims to have paid. This damages calculation does not pass muster. First, Ms. Mawing could have maintained and produced proper records to allow her to show how many stalls she rented at any given barn, which horses were kept in the stalls,

38

the cost she paid for each stall, and produced receipts or agreements from the barn specifying the amount she was charged. Ms. Mawing filed this lawsuit almost immediately after her stall allocation was reduced in 2008. Nothing prevented her from complying with her obligation to maintain records in order to present evidence at trial. Shockingly, Ms. Mawing even testified that she had documents that would show the number of horses she was training at any given time. [*Id.* at 258:7: - 22]. Ms. Mawing was capable of calculating, with reasonable certainty, how much she allegedly paid to replace the nine stalls she believes she should have been allocated at the Track. Rather, Ms. Mawing chose to submit incomprehensible and inconclusive evidence of amounts she paid for unknown expenses and requests that the Panel divine her alleged damages. This method of damages calculation fails under West Virginia law.

Second, Ms. Mawing's damages are based upon her theory that the Panel should award her damages based upon the "average" amount she paid for off-site stalls. [Trial Tr., June 10, 2013 at 210: 11- 213:7]. Ms. Mawing admitted that she hasn't calculated the average amount she paid per stall. [*Id.* at 213:10 – 17]. This improper damages method does not accurately reflect what Ms. Mawing actually paid and fails the reasonable certainty standard. Averaging amounts paid for stall rent fails because Ms. Mawing was unable to testify how many horses she had at each barn and the amount she actually paid for the rent. Ms. Mawing initially

testified that she paid anywhere as little as $220 per month to rent stalls. [*Id.* at 265:8 – 14]. She later increased that amount to claim that the minimum she paid was $250. [*Id.* at 287:16 – 22]. Despite the fact that Ms. Mawing testified that she had documents (which were never produced) that would enable her calculate which horses were being stalled at any point in time, she rather chose to rely on her speculation that she paid an "average" of $275 per month in stall rent. [*Id.* at 258:7: - 22]. This method ignores that scenario where Ms. Mawing had several horses at lesser expensive barn and only one at more expensive barn, the "average" would create a windfall for Ms. Mawing and compensate her beyond what she actually spent on stall rent. Again, Ms. Mawing throws out random amounts paid for various services and then pulls numbers out of thin air. This calculation method does not establish her damages with reasonable certainty and should be rejected.

Further, Ms. Mawing's testimony that she did not charge her clients for stall rent is not credible. According to Ms. Mawing, she did not pass the stall rent fees on to her clients. [*Id.* at 279:8 – 14]. However, Anthony Mawing, Ms. Mawing's husband, specifically admitted that some clients do indeed pay stall rent. [Trial Tr., June 11, 2013 at 562:2 – 8; 562:18 – 563:12; 563:22 – 564:1; & 564:10 – 18]. Ms. Mawing and her husband both testified that Mr. Mawing was primarily responsible for accounting and booking keeping in their horse training business.

40

[Trial Tr., June 10, 2013 at 239:12 – 16; June 11, 2013 at 566:20 – 567:6]. Despite Ms. Mawing's claims to the contrary, Mr. Mawing specifically testified during his deposition that several of Ms. Mawing's clients were indeed charged for stall rent. [Trial Tr., June 11, 2013 at 562:2 – 8; 562:18 – 563:12; 563:22 – 564:1; & 564:10 – 18]. Further, one of Ms. Mawing's clients, Malcolm Barr, testified that Ms. Mawing charged him between $15 - $20 per day for stall rent. [*Id.* at 574:24: - 576:1; 579:4 – 20]. Additionally, invoices produced by David Wratchford - not Ms. Mawing - indisputably show that Ms. Mawing charged Mr. Wratchford between $250 and $275 per horse per month for stall rent. [Ex. R-35; Ex. R-36].

Based upon the testimony of Mr. Mawing, Mr. Barr, and the documents provided by Mr. Wratchford, Ms. Mawing's claim that she did not charge her clients for stall rent is simply unbelievable. Ms. Mawing's only evidence to refute Mr. Wratchford's documents, Mr. Barr's testimony, and her own husband's testimony is Ms. Mawing's own self-serving testimony. There can be no question that Ms. Mawing charged several of her clients for stall rent. This amount was not taken into account in Ms. Mawing's damages calculation and is further evidence that Ms. Mawing's damages calculation is inflated, inaccurate, and fails the West Virginia standard for reasonable certainty. *See Taylor*, 558 S.E.2d at 619, *Spencer*, 164 S.E.2d 710 at 715, *Kentucky Fried Chicken of Morgantown*, 214 S.E.2d at 828, *Art's Flower Shop, Inc.*, 413 S.E.2d at 676.

41

Ms. Mawing further failed to establish her other claims for damages with reasonable certainty. Ms. Mawing claims that she is also entitled to the amounts she paid for transporting horses to and from the Track. [Trail Tr., June 10, 2013 at 201:1 - 12]. She also claims that she is entitled to other costs such as a driver for her groom. [*Id.* at 192:4 - 13]. Both of these alleged claims for damages also fail. First, Ms. Mawing failed to establish the alleged transportation costs she incurred with reasonable certainty. As discussed above, Ms. Mawing claims that she should have been allocated nine free stalls at the Track. [*Id.* at 211:14 – 17]. However, Ms. Mawing admitted that it would be "nearly impossible" to calculate the percentage of van charges that are attributable only to loss of the nine stalls. [*Id.* at 287:23 – 288:10]. Ms. Mawing went on to concede that her calculation for vanning costs includes costs for vanning horses that she would have incurred regardless of whether Ms. Mawing had the use of the Track's stalls. [*Id.* at 288:11 – 23]. Ms. Mawing's only justification for this inaccurate and inflated calculation is that it would be too difficult to calculate which horses were vanned and which were not. [*Id.*] Apparently, Ms. Mawing believes that, rather than her engaging in allegedly difficult damages calculation, CTRS should be required to pay for all of

42

her vanning expenses since 2008.[4]  This inaccurate and baseless damages calculation fails under West Virginia law regardless of whether or not an accurate calculation would be difficult to complete.  *See Sammons Bros. Const. Co.*, 65 S.E.2d at 105 (holding that difficulty in calculating damages does not relieve a plaintiff of her burden to present a reasonably certain damages calculation).

Ms. Mawing also seeks damages based upon checks paid to Rhonda Plymale for transporting Ms. Mawing's grooms, who chose not to have drivers' licenses. [Trial Tr., June 10, 2013 at 192:7 – 193:10].  Regardless of the fact that Ms. Mawing fails to explain why the Track should be punished because Ms. Mawing chose to hire employees that did not care to drive, Ms. Mawing further failed to establish that the amounts she paid Ms. Plymale were actually for transporting Ms. Mawing's employees.  Ms. Mawing testified that many of the checks written to Ms. Plymale included other tasks such as laundry and feeding horses.  [*Id.* at 243:3 – 244:16].  Feeding and laundry are charges that Ms. Mawing would have incurred regardless of whether she would have been allocated stalls at the Track.  Again, Ms. Mawing failed to present evidence to prove her inflated claim for damages with any reasonable certainty.

---

[4]        Mr. Mawing even testified the he did not do anything to ensure that all of the checks submitted for vanning costs were only related to hauling horses back and forth from the Track.  [Trial Tr., June 11, 2013 at 572:22 – 573:4].  Mr. Mawing went on to testify that it is possible that checks submitted as damages in this litigation could include checks written to haul horses to race at other tracks.  [*Id.*]  Ms. Mawing's inaccurate damages calculation fails under West Virginia law.  *See Taylor*, 558 S.E.2d at 619.

SL1 1247219v5 005982.00037

Ms. Mawing failed to prove her alleged damages with any reasonable certainty. Despite having documents in her possession that would allow her to calculate exactly how much she was charged per horse by the various barns, Ms. Mawing chose rather to simply guess how much she was charged by looking at the checks wrote during the relevant time period. Such a baseless and speculative damages calculation fails to meet the well-settled reasonable certainty standard in West Virginia.

Because Ms. Mawing failed to establish her damages with reasonable certainty, her breach of contract claim must be rejected.

## IV.    CONCLUSION

For all the foregoing reasons, CTRS requests that the Panel enter a finding of no liability against CTRS based upon Ms. Mawing's failure to prove her claims at the arbitration hearing.

STEVENS & LEE

Dated: July 31, 2013                    By: /s/ Stacey A. Scrivani
                                              Joseph Wolfson
                                              Attorney I.D. No. PA 44431
                                              Stacey A. Scrivani
                                              Attorney I.D. No. WV 11593
                                              Attorney I.D. No. PA 84275
                                              111 North Sixth St.
                                              P.O. Box 679
                                              Reading, Pennsylvania 19603
                                              (610) 478-2000
                                              jwo@stevenslee.com
                                              sasc@stevenslee.com