# EXHIBIT 14B

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CHARLES TOWN HORSEMAN'S | : | |
| BENEVOLENT AND PROTECTIVE | : | |
| ASSOCIATION, INC. and | : | |
| TINA MAWING, | : | NO. 55-196-Y-00015-12 |
| | : | |
| Claimants | : | |
| | : | |
| v. | : | |
| | : | |
| PNGI CHARLES TOWN GAMING, | : | |
| LLC, | : | |
| | : | |
| Respondent | | |

## RESPONDENT PNGI CHARLES TOWN GAMING, LLC'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

1.      The Claimant in this matter is Tina Mawing.  [Ex. C-19; Ex. C-18].

2.      The Respondent in this matter is PNGI Charles Town Gaming, LLC ("Respondent," "CTRS," or the "Track").  [Ex. C-19; Ex. C-18].

3.      CTRS is licensed by the State of West Virginia to operate a racetrack located in Charles Town, West Virginia.  [Ex. C-19, at ¶ 6; Ex. C-18, at ¶ 6].

4.      Ms. Mawing is licensed through the West Virginia Racing Commission to train horses for racing within the state of West Virginia.

5.      Ms. Mawing trains horses that race at various tracks, including CTRS's racetrack.  [Ex. C-19, at ¶ 1; Ex. C-18, at ¶ 1].

6.      The Horseman's Benevolent & Protective Association ("HBPA") is a non-profit association made up of owners and trainers of thoroughbred horses that race at the Track.  [Ex. C-18, at ¶ 2; Ex. C-18, at ¶ 2].

7.      The HBPA no longer has claims in this dispute.  [(Trial Transcript ("Trial Tr."), June 10, 2013 at 123:17 – 124:18].

8.      Ms. Mawing is a member of the HBPA and serves on the organization's board.  [Trial Tr., June 10, 2013 at 44:5 – 45:1; Ex. C-19, at ¶ 1; Ex. C-18, at ¶ 1].

9.      The Track and the HBPA are parties to an agreement dated December 21, 2004 (the "HBPA Agreement") which memorializes the parties' respective obligations with regard to thoroughbred racing at the Track.  [Ex. C-1].

10.      The Track owns approximately 1,350 horse stalls on the back side of its track.  [Trial Tr., June 11, 2013 at 500:5 – 501:2].

11.      The HBPA Agreement requires the Track to provide 1,148 free stalls to horsemen at the Track.  [Ex. C-1].

12.      The HBPA Agreement addresses general parameters for applying for and allocating those stalls.  [Ex. C-1, at ¶ 11, Trial Tr., June 11, 2013 at 502:22 – 503:3].

13.      The stall licenses have a six-month term and are not renewed automatically.  [Ex. C-39].

14.      A trainer must re-apply for a new license at the expiration of the previous term.  [Ex. C-39].

15.      According to the HBPA Agreement, "[t]he terms and conditions for all stall applications shall be determined by and set forth in an application by Charles Town Races."  [Ex. C-1, at ¶ 11(D)].

16.      The HBPA Agreement terminated when it was replaced by a new and different contract on February 20, 2009.  [Ex. C-17; Deposition Transcript of Leonard Hale, Mar. 12, 2013 ("L. Hale Dep. Tr.) at 16:18 – 17:1].

2

17.     For each allocation period, CTRS always receives more applications for stalls than it can accommodate at the Track.  [Trial Tr., June 11, 2013 at 446:1 – 9; Deposition Transcript of W. Randolf Wehrman, Apr. 6, 2010 ("R. Wehrman Dep. Tr.") at 98:9 – 5].

18.     The HBPA Agreement states that the Track will not "discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls."  [Ex. C-1, at¶ 11(B)].

19.     Outside of the prohibition of discrimination based upon HBPA membership, the HBPA Agreement gives CTRS absolute discretion in the allocation of its stalls.  [Ex. C-1, at¶ 11(B)].

20.     The Track currently allocates stalls to more than 100 different trainers.  [Trial Tr., June 11, 2013 at 515:16 – 516:6].

21.     Nearly thirty percent of the Track's stalls are allocated to trainers that serve on the HBPA board or trainers that train horses for owners who are on the HBPA board.  [Trial Tr., June 11, 2013 at 515:16 – 516:6].

22.     In October 2007, HBPA member Raymond Funkhouser's occupational permit was suspended by the West Virginia Racing Commission because of complaints he made about the allegedly improper entry of a certain

3

horse named "Forest Park" in a race at the Track. [Trial Tr., June 10, 2013 at 46:20 – 47:8].

23.   Several days later, a hearing was held concerning Mr. Funkhouser's suspension, which would become known as the "Forest Park" hearing. [Trial Tr., June 10, 2013 at 46:20 – 47:8; Trial Tr., June 11, 2013 at 374:24 – 375:13].

24.   CTRS was not involved in the suspension of Mr. Funkhouser's permit, nor was it involved in the subsequent hearing. [Trial Tr., June 12, 2013 at 701:13 – 702:1].

25.   Ms. Mawing testified at the hearing on Mr. Funkhouser's behalf. [Trial Tr., June 10, 2013 at 48:16 – 17; 49:16 – 18].

26.   Three of the Track's employees observed parts of the hearing. [Trial Tr., June 11, 2013 at 376:19 – 377:12; Trial Tr. June 12, 2013 at 950:10 – 951:18].

27.   None of the Track's employees were present during Ms. Mawing's testimony. [Trial Tr., June 11, 2013 at 376:19 – 377:12; Trial Tr. June 12, 2013 at 950:10 – 951:18].

28.   None of the Track's employees involved in the allocation of stalls were even aware that Ms. Mawing testified on Mr. Funkhouser's behalf. [Trial Tr., June 11, 2013 at 376:19 – 377:12; Trial Tr. June 12, 2013 at 950:10 – 951:18].

29.     According to West Virginia law, an agreement must be in place between the Track and the unit the represents the horsemen, which in this case is the HBPA.  [Trial Tr., June 12, 2013 at 664:7 – 16].

30.     CTRS was concerned that if the current agreement lapsed, the HBPA would seek to use the absence of an agreement as a means to halt all gaming operations at the Track, including horse racing, table games, slot machines, and video simulcasting of racing.  [Trial Tr., June 12, 2013 at 664:7 – 665:21].

31.     If gaming operations ceased at the Track, all tax revenue that flows to the state of West Virginia from the gaming operations at the Track would also immediately stop.  [Trial Tr., June 12, 2013 at 664:7 – 665:21].

32.     The cessation of gaming operations at the Track would cost the state of West Virginia approximately one million dollars per day.  [Trial Tr., June 12, 2013 at 690:2 – 17].

33.     In early 2008, as the term of the HBPA Agreement was drawing to a close, the parties began negotiating the terms for the next agreement.  [Trial Tr., June 12, 2013 at 680:2 – 681:4].

34.     Due to the parties' strained relationship resulting from a recently failed referendum concerning table games at the Track, negotiations had ceased. [Trial Tr., June 12, 2013 at 680:2 – 682:21].

5

35.     Because of the extreme amount of money and jobs involved, then West Virginia Governor Joseph Manchin became interested in the negotiations between the Track and the HBPA concerning the terms of the next agreement. [Trial Tr., June 11, 2013 at 382:1 – 18; 404:22 - 406:21; 589:17 – 591:14; June 12, 2013 at 689:22 – 691:16].

36.     When Governor Manchin learned that negotiations between CTRS and the HBPA were not progressing, he stepped in to mediate the parties' disagreements so negotiations could move forward and a contract be consummated. [Trial Tr., June 11, 2013 at 382:1 – 18; 404:22 - 406:21; 589:17 – 591:14; June 12, 2013 at 689:22 – 691:16].

37.     In his role as impartial mediator, Governor Manchin separately met with representatives from the HBPA and CTRS in order to try to bring the parties together on the terms of the next agreement. [June 12, 2013 at 690:18 – 691:16].

38.     During one such meeting with HBPA members, Ms. Mawing claimed to Governor Manchin that the Track deliberately used improper pest control poisons in the barn area, which caused the death of her horse and goat. [Trial Tr., June 10, 2013 at 157:16 – 161:22].

39.     Ms. Mawing further alleged that the Track installed wires in the barn area that were intended to injure or kill Ms. Mawing's horses. [Trial Tr., June 11, 2013 at 595:2 – 13; June 12, 2013 at 696:9 – 697:6; 897:9 – 898:8].

6

40.     After Governor Manchin heard Ms. Mawing claims, he, along with his Chief of Staff, Larry Puccio, promptly telephoned Mr. Finamore to get to the bottom of Ms. Mawing's allegations.  [Trial Tr., June 12, 2013 at 694:5 – 696:21; 897:13 -898:16].

41.     After this call from the Governor, Mr. Finamore contacted the Track's general manager, Albert Britton, to investigate if there was any way that Ms. Mawing's claims could possibly be true.  [Trial Tr., June 12, 2013 at 697:7 – 698:1].

42.     Mr. Finamore advised Mr. Britton that, if Ms. Mawing's allegations turned out to be false, Mr. Britton should keep this incident in mind when Ms. Mawing's request for stalls was next reviewed.  [Trial Tr., June 12, 2013 at 698:14 – 699:5].

43.     Governor Manchin later followed up with Mr. Finamore to determine whether Ms. Mawing's alarming allegations were true.  [Trial Tr., June 12, 2013 at 700:1 – 701:6].

44.     Mr. Finamore informed the Governor that the allegations were completely baseless and untrue.  [Trial Tr., June 12, 2013 at 700:1 – 701:6].

45.     Governor Manchin never instructed CTRS to take any sort of action against Ms. Mawing.  [Trial Tr., June 12, 2013 at 700:1 – 701:6; 702:7 – 703:15; 899:8 – 14].

SL1 1249089v2 005982.00037

46.   Any instruction from the Governor to take negative action against Ms. Mawing would have been counterproductive to the Governor's role as mediator between the parties in the very important and very contentious contract negotiations. [Trial Tr., June 12, 2013 at 700:1 – 701:6; 702:7 – 703:15; 899:8 – 14].

47.   At no point during the conversations with the Governor concerning Ms. Mawing's claims was Mr. Finamore aware of Ms. Mawing's status as an HBPA board member. [Trial Tr., June 12, 2013 at 705:3 – 17].

48.   The Track created a stall allocation committee to administer the task of allocating its limited supply of free stalls.

49.   The committee is made of six individuals who are employees of CTRS. [Trial Tr., June 11, 2013 at 423:13 – 425:10; 505:12 – 507:6].

50.   No one on the committee is a representative of the West Virginia Racing Commission. [Trial Tr., June 11, 2013 at 512:1 – 6].

51.   The decisions of the stall allocation committee are not directed by any employee of the state Racing Commission. [Trial Tr., June 11, 2013 at 512:7 – 10].

52.   Because the Track cannot provide free stalls to every applicant, the committee looks at a number of non-exhaustive factors that it considers in evaluating the applications. [Trial Tr. June 11, 2013 at 512:21 – 513:17].

SL1 1249089v2 005982.00037

53.     These factors include, but are not limited to, objective statistics such as the number of starts per stall, winning percentage, and recent earnings. [Trial Tr., June 11, 2013 at 512:21 – 513:17].

54.     The committee also looks to subjective factors such as following the barn rules and keeping the trainer's area clean. [Trial Tr., June 11, 2013 at 513:11 – 17].

55.     Whether a trainer is a member of the HBPA or serves on its board is not a factor in the stall allocation process. [Trial Tr., June 11, 2013 at 513:18 – 22].

56.     For 2007, Ms. Mawing was allocated seven stalls pursuant to a Revocable Stall License Agreement dated December 21, 2006. [Ex. C-39, Trail Tr., June 10, 2013 at 81:19 – 22].

57.     On February 7, 2008, the Track informed Ms. Mawing via letter that her allocation of free stalls would be increased to nine for the March 1, 2008 through August 31, 2008 period. [Ex. C-39, Trail Tr., June 10, 2013 at 82:15 – 83:21].

58.     In November 2007, Ms. Mawing requested to borrow two stalls for a "weekend" from trainer George Yetsook. [Trial Tr., June 11, 2013 at 450:14 – 451:17].

SL1 1249089v2 005982.00037

59.   Ms. Mawing received limited permission to use Mr. Yetsook's stalls for that weekend.  [Trial Tr., June 11, 2013 at 450:14 – 451:17].

60.   Several months later, Mr. Yetsook complained that Ms. Mawing was still in those two stalls.  [Trial Tr., June 11, 2013 at 450:14 – 451:17].

61.   As a result of Mr. Yetsook's complaint, the Track conducted a check of all of its stalls in March 2008.  [Trial Tr., June 11, 2013 at 450:14 – 451:17].

62.   During this inventory, Ms. Mawing was discovered to be still using the stalls that she requested for a weekend the previous year.  [Trial Tr., June 11, 2013 at 450:14 – 451:17].

63.   She was also found to have horses in stalls allocated to two other trainers.  [Trial Tr., June 11, 2013 at 452:14 - 19].

64.   As a result of this violation of the Track's barn rules, Ms. Mawing's stall allocation was reduced by four stalls leaving her five stalls for the remainder of that allocation period.  [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21].

65.   Other trainers including Mr. Yetsook, Ronnie Wilt, and Richard Butts were also involved in this infraction and also lost stalls as a result.  [Trial Tr., June 11, 2013 at 452:20 – 453:2].

66.   After reviewing Ms. Mawing's stall application for the September 1, 2008 through December 31, 2008 term, the committee determined not to allocate Ms. Mawing any free stalls for that term.  [Ex. C-39].

10

67.     Ms. Mawing's reduction in stalls came as a direct result of her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and slanderous allegation that the Track intentionally and deliberately tried to injure animals on the property.  [Trial Tr., June 12, 2013 at 883:5 – 13].

68.     This denial of free stalls had no impact whatsoever on Ms. Mawing's occupational permit issued by the West Virginia Racing Commission.  [Ex. R-25].

69.     Ms. Mawing has not been prevented from racing horses at the Track or any other track in West Virginia.  [Ex. R-25].

70.     Ms. Mawing has continued to race horses at the Track.  [Ex. R-25].

## CONCLUSIONS OF LAW

1.     The Track allocates its stalls based on a revocable, at-will license without the right of renewal.

2.     Ms. Mawing does not have a legitimate claim of entitlement to the Track's horse stalls.

3.     Therefore, Ms. Mawing does not have a property interest in the use of the Track's free horse stalls.

4.     There is no symbiotic relationship between the Track and the state of West Virginia.

5.     There is no extensive government regulation of the Track's stall allocation decisions.

11

6.   The Track does not exercise powers that are traditionally the exclusive prerogative of the state with regard to stall allocations.

7.   Ms. Mawing failed to present sufficient evidence to prove an agreement or meeting of the minds between Governor Manchin and CTRS to engage in a conspiracy to deprive Ms. Mawing of a constitutional right.

8.   Therefore, the Track is not a state actor for the purposes of 42 U.S.C. § 1983.

9.   Because Ms. Mawing does not have a property interest in the use of the Track's free stalls, Ms. Mawing's federal due process claim is denied.

10.   Because the Track is not a state actor, Ms. Mawing's federal due process claim is denied.

11.   A private cause of action under the Due Process Clause embodied within Article 3, § 10 of the West Virginia Constitution is analyzed in the same manner as claims under 42 U.S.C. § 1983.

12.   As set forth above, Ms. Mawing failed to establish the elements required for a claim under 42 U.S.C. § 1983.

13.   Therefore, Ms. Mawing failed to establish the elements required for a West Virginia state law due process claim.

SL1 1249089v2 005982.00037

14.     Because Ms. Mawing does not have a property interest in the use of the Track's free stalls and because the Track is not a state actor, Ms. Mawing's West Virginia state law due process claim is denied.

15.     A claim for unlawful retaliation under the First Amendment is analyzed pursuant to 42 U.S.C. § 1983.

16.     A claim for unlawful retaliation under the First Amendment requires (1) that the conduct that led to the alleged retaliation was constitutionally protected; (2) she was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.

17.     As set forth above, the Track is not a state actor.

18.     Therefore, Ms. Mawing cannot establish a claim for unlawful retaliation under the First Amendment.

19.     Because the Track is not a state actor, Ms. Mawing's claim for unlawful retaliation under the First Amendment is denied.

20.     W.V. Code § 61-5-27(c)(3), states that "[i]t is unlawful for a person to cause injury or loss to person or property, or to threaten or attempt to do so, with the intent to . . . [r]etaliate against any other person for attending, testifying or participating in an official proceeding, or for the production of any record, document or other object produced by a person in an official proceeding."

13

21.     W.V. Code § 61-5-27(f) provides that a private civil action may be brought based upon a violation of § 61-5-27.

22.     W.V. Code § 61-5-27(a)(3) defines "official proceeding" as "a proceeding involving a legal process or other process of a tribunal of this state or of the United States."

23.     W. Va. Code § 61-5-27(a)(2) defines "legal process" as "an action, appeal, document instrument or other writing issued, filed or recorded to pursue a claim against person or property, exercise jurisdiction, enforce a judgment, fine a person, put a lien on property, authorize a search and seizure, arrest a person, incarcerate a person or direct a person to appear, perform or refrain from performing a specified act.  'Legal process' includes, but is not limited to, a complaint, decree, demand, indictment, injunction, judgment, lien, motion, notice, order, petition, pleading, sentence, subpoena, summons, warrant or writ."

24.     Ms. Mawing's mediation meeting with Governor Manchin does not meet the definition of "legal process" as set forth in W.V. Code § 61-5-27(a)(2).

25.     Therefore, Ms. Mawing's mediation meeting with Governor Manchin does not meet the definition of "official proceeding" as set forth in W.V. Code § 61-5-27(a)(3).

26.     No one on the Track's the stall allocation committee was aware of Ms. Mawing's testimony during the Forest Park hearing.

14

27.     Ms. Mawing's testimony at the Forest Park hearing was not a factor in the Track's stall allocation decision.

28.     Therefore, Ms. Mawing failed to establish that she suffered retaliation based on her testimony at the Forest Park hearing.

29.     Because Ms. Mawing failed to establish that mediation meeting with Governor Manchin was an "official proceeding," Ms. Mawing's claim under W.V. Code § 61-5-27 is denied.

30.     Because Ms. Mawing failed to establish that she suffered retaliation based upon her testimony at the Forest Park hearing, Ms. Mawing's claim under W.V. Code § 61-5-27 is denied.

31.     The West Virginia state law public policy tort extends only to employment disputes.

32.     Because there is no employment relationship between the Track and Ms. Mawing, Ms. Mawing's West Virginia state law public policy tort claim is denied.

33.     The elements of a breach of contract claim in West Virginia are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach.

34.     The HBPA Agreement is a valid agreement between the parties.

15

35.     The HBPA Agreement provides that the Track will not discriminate in the allocation of stalls by reason of HBPA membership or activity or condone its representatives or employees discriminating in the allocation of stalls.

36.     Outside of this sole limitation, the HBPA Agreement gives the Track absolute discretion in the allocation of its stalls.

37.     The Track did not allocate stalls to Ms. Mawing because of her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and inflammatory allegations to the Governor that the Track intentionally and deliberately tried to injure animals on the property.

38.     The Track's allocation decision was not based on Ms. Mawing's membership in the HBPA, role as board member, or activities on behalf of the HBPA.

39.     As set forth above, no one on the Track's stall allocation committee was aware of Ms. Mawing's testimony during the Forest Park hearing.

40.     As set forth above, Ms. Mawing's testimony at the Forest Park hearing was not a factor in the Track's stall allocation decision.

41.     Therefore, the Track did not discriminate against Ms. Mawing based upon HBPA membership or activity.

42.     Therefore, the Track did not fail to comply with a term in the HBPA Agreement.

16

43.     Ms. Mawing must prove breach of contract damages to a reasonable certainty.

44.     Breach of contract damages cannot be proved by mere speculation or conjecture.

45.     Ms. Mawing's testimony concerning the average amount of stall rent that she paid was inconsistent.

46.     Therefore, Ms. Mawing's testimony concerning the average amount of stall rent she paid is rejected.

47.     Ms. Mawing's calculation of the average amount of stall rent she paid is inaccurate.

48.     Therefore, Ms. Mawing' calculation of the average amount of stall rent she paid is rejected.

49.     Ms. Mawing's testimony that she did not charge her clients for stall rent was contradicted by the testimony of Anthony Mawing, Malcolm Barr, and documents provided by David Wratchford.

50.     Therefore, Ms. Mawing's testimony that she did not charge her clients for stall rent is not credible.

51.     Therefore, Ms. Mawing's testimony that she did not charge her clients for stall rent is rejected.

52.     Ms. Mawing charged some of her clients for stall rent.

17

53.   Ms. Mawing failed to present evidence to establish that the amounts she spent for vanning horses was attributable to not having the use of CTRS's stalls at the Track.

54.   Ms. Mawing failed to establish that the checks she wrote to Rhonda Plymale were specifically attributable to not having the use of free stalls at the Track.

55.   Therefore, Ms. Mawing failed to present evidence that proved her claimed damages with reasonable certainty.

56.   Because Ms. Mawing failed to establish that the Track failed to comply with a term in the HBPA Agreement, Ms. Mawing's claim for breach of contract is denied.

57.   Because Ms. Mawing failed to establish her claimed damages with reasonable certainty, Ms. Mawing's claim for breach of contract is denied.

18

STEVENS & LEE

Dated: July 31, 2013

By: /s/ Stacey A. Scrivani
   Joseph Wolfson
   Attorney I.D. No. PA 44431
   Stacey A. Scrivani
   Attorney I.D. No. WV 11593
   Attorney I.D. No. PA 84275
   111 North Sixth St.
   P.O. Box 679
   Reading, Pennsylvania 19603
   (610) 478-2000
   jwo@stevenslee.com
   sasc@stevenslee.com

   Counsel for Respondent