# EXHIBIT 14C

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CHARLES TOWN HORSEMAN'S | : | |
| BENEVOLENT AND PROTECTIVE | : | |
| ASSOCIATION, INC. and | : | |
| TINA MAWING, | : | NO. 55-196-Y-00015-12 |
| | : | |
| Claimants | : | |
| | : | |
| v. | : | |
| | : | |
| PNGI CHARLES TOWN GAMING, | : | |
| LLC, | : | |
| | : | |
| Respondent | | |

## RESPONDENT PNGI CHARLES TOWN GAMING, LLC'S
## RESPONSE TO CLAIMANT TINA MAWING'S
## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## I.    INTRODUCTION

Rather than provide succinct proposed findings of fact, Ms. Mawing submits a litany of incorrect statements plagued with improper legal argument and unsupportable conclusions of law.  Throughout her proposed findings of fact, Ms. Mawing attempts to sway the Panel by providing Ms. Mawing's own credibility determinations, many inaccurate statements, and blatantly ignoring key facts that defeat her claims.  Ms. Mawing then burdens the Panel with a rambling legal argument, which conflates her claims in an effort to obfuscate the glaring legal and factual deficiencies.

Ms. Mawing's legal argument fails to explain how Ms. Mawing established any individual claim during the arbitration hearing.  First, Ms. Mawing fails to establish that CTRS breached the HBPA Agreement by discriminating against her based upon her HBPA membership or activities on the organization's behalf.  Second, Ms. Mawing also fails to prove that she suffered discrimination under West Virginia state law.  In a failed attempt to bolster her deficient state law claims, Ms. Mawing relies upon legal analysis lifted from the employment context despite the fact that this dispute does not involve an employer/employee relationship.  Further, Ms. Mawing offers absolutely no facts or analysis to prove that CTRS is a state actor for the purposes of 42 U.S.C. § 1983.  Finally, Ms. Mawing fails to offer any cogent argument to support her bloated claims for

damages.  In sum, Ms. Mawing fails to provide the proper legal support and factual analysis to explain how she proved any of her claims during the arbitration hearing.

For the reasons explained more fully herein, as well as those explained in its Post-Trial Brief, CTRS requests that the Panel reject Ms. Mawing's claims and find that CTRS is not liable.

## II.    RESPONSE TO CLAIMANT'S PROPOSED FINDINGS OF FACT

**Tina Mawing**

1.    Agreed.

2.    Agreed.

3.    Agreed.  By way of further response, to the extent that Mr. Anthony Mawing trains horses, he does so in violation of West Virginia law because he does not have a state issued occupational permit to train horses.  [A. Mawing March 13, 2013 Dep. Tr. at 92:11 – 18].

4.    Agreed.

5.    Agreed.

6.    Agreed.  By way of further response, CTRS did not reduce Ms. Mawing's stall allocation until it learned of her violation of barn rules and defamatory statements to the Governor of West Virginia.  [Trial Tr., June 12, 2013 at 883:5 – 13].

2

7.      CTRS agrees that Ms. Mawing was allocated seven stalls for the 2007

stall allocation period.  CTRS further agrees that in 2008, it modified the length of

the stall allocation period for all trainers that raced at the Track.  [Ex. C-39].

CTRS also agrees that Ms. Mawing's stall allocation was reduced on April 25,

2008 because Ms. Mawing violated the Track's barn rules by placing horses in

stalls allocated to other trainers without permission.  CTRS specifically rejects that

"all of Mawing's stalls were taken away."  By way of further response, CTRS

determined not to allocate any of its free horse stalls to Ms. Mawing based upon

her failure to follow barn rules, her less than remarkable racing statistics, and her

baseless and slanderous allegation that the Track intentionally and deliberately

tried to injure animals on the property.  [Trial Tr., June 12, 2013 at 883:5 – 13].

8.      Rejected.  By way of further response, the best evidence of the

number of horses that Ms. Mawing trained is her training records, which were

never produced despite numerous requests from CTRS.

9.      Agreed.

10.     CTRS agrees only that Ms. Mawing has been a member of the HBPA

since 2000.  CTRS specifically rejects that Mr. Britton has known that

Ms. Mawing was an HBPA Board Member.  Mr. Britton testified that he did not

recall the dinner at the Epic Buffett nor does he recall whether Ms. Mawing

attended.  [Trial Tr., June 12, 2013 at 880:7 – 20].  CTRS further rejects that the

3

HBPA ever provided the name and address of each HBPA board member to CTRS and Ms. Mawing failed to offer any evidence of this ever occurring despite what the HBPA Agreement may require.

11.    Agreed.  By way of further response, the statements in the footnote 2 to Paragraph 11 are conclusions of law and should be disregarded.

12.    CTRS is unable to admit or deny the statements in Paragraph 12 concerning Ms. Mawing's alleged testimony at the hearing before the West Virginia Racing Commission on October 15, 2007 because Ms. Mawing has not provided any transcript of the hearing and because no CTRS employee was in attendance when Ms. Mawing allegedly testified.

13.    The statements in Paragraph 13 refer to a written document, which speaks for itself.  The Track rejects Ms. Mawing's characterizations.

14.    Rejected.  By way of further response, as many as 40% of horses that race at the Track are stalled at off-site locations.  [Trial Tr., June 11, 2013 at 519:4 – 20].

15.    The statements in Paragraph 15 refer to a written document, which speaks for itself.  The Track rejects Ms. Mawing's characterizations.

16.    CTRS rejects that Ms. Mawing can competently testify concerning CTRS's own internal procedures concerning stall allocations because Ms. Mawing has never been employed by CTRS.  Further, CTRS rejects that Ms. Mawing can

4

competently testify concerning "industry standards." Therefore, Ms. Mawing's characterizations in Paragraph 16 are rejected. By way of further response, despite Ms. Mawing's unsupported beliefs concerning "industry standards," there is no evidence that CTRS is required to follow any alleged "industry standard."

17.    CTRS rejects that Ms. Mawing can competently testify concerning CTRS's own internal procedures concerning stall allocations because Ms. Mawing has never been employed by CTRS. CTRS further rejects that Ms. Mawing can competently testify concerning "industry standards." Therefore, Ms. Mawing's characterizations in Paragraph 17 are rejected. By way of further response, despite Ms. Mawing's unsupported beliefs concerning "industry standards," there is no evidence that CTRS is required to follow any alleged "industry standard." CTRS further rejects Ms. Mawing's interpretations of W. Va. Code § 29-22A-3(t) in the footnote to Paragraph 17 as conclusions of law.

18.    CTRS rejects that Ms. Mawing can competently testify concerning "industry standards." Therefore, Ms. Mawing's characterizations in Paragraph 18 are rejected. By way of further response, despite Ms. Mawing's unsupported beliefs concerning "industry standards," there is no evidence that CTRS is required to follow any alleged "industry standard."

19.    CTRS rejects that Ms. Mawing can competently testify concerning CTRS's own internal procedures and standards because Ms. Mawing has never

5

been employed by CTRS.  To the contrary, Mr. Zimny, Mr. Britton, and

Mr. Moore, testified that the Track's stall allocation committee considered winning

percentages when it allocates stalls. [Trial Tr., June 11, 2013 at 553:10 – 21; June

12, 2013 at 797:10 – 798:11; 946:12 – 18].  Therefore, Ms. Mawing's

characterizations in Paragraph 19 are rejected.

20.     CTRS rejects that Mr. Moore allocated any stalls.  The stall allocation

committee allocates the Track's free stalls.

21.     CTRS admits that Ms. Mawing's stall allocation was reduced from

nine to five on April 25, 2008.  CTRS specially rejects Ms. Mawing's statement

that "[t]he reason for the reduction was alleged to be because Ms. Mawing had

borrowed stalls from other trainers." Ms. Mawing's stall allocation was reduced in

April 2008 because Ms. Mawing violated the Track's barn rules by keeping horses

in stalls allocated to other trainers.

22.     Rejected.  By way of further response, the Stall Application requires

all changes to stall allocations be made in writing and signed by both the trainer

and the Track. [Ex. C-39].  CTRS further rejects this statement because it

contradicts Paragraph 131 where Ms. Mawing claims that she received permission

from Mr. Elliott.

23.     Rejected.  By way of further response, the Stall Application requires

all changes to stall allocations be made in writing and signed by both the trainer

and the Track. [Ex. C-39]. CTRS further rejects this statement because it contradicts Paragraph 131 where Ms. Mawing claims that she received permission from Mr. Elliott.

24.     CTRS does not dispute that Ms. Mawing may have believed that she "was being targeted for retaliation." However, her belief is not supported by the evidence presented because other trainers also lost stalls because of the horses that were stalled in stalls allocated to other trainers and there is no evidence that those trainers testified at the Funkhouser racing commission hearing. [Trial Tr., June 11, 2013 at 452:20 – 453:2]. Notably, despite Ms. Mawing's belief and state of mind, she did not request that Mr. Schneider testify at the arbitration hearing or present evidence concerning the other trainers who lost stalls at that time. Further, at the time that she testified on Mr. Funkhouser's behalf, Ms. Mawing was allocated seven free stalls at the Track. [Ex. C-39, Trail Tr., June 10, 2013 at 81:19 – 22]. The Track then allocated stalls again in February 2008. [Ex. C-39, Trail Tr., June 10, 2013 at 82:15 – 83:21]. During this allocation, Ms. Mawing's allotment of stalls was increased to nine free stalls at the Track, two more than she had been allocated before her testimony at the Forest Park hearing. [*Id.*] Ms. Mawing's stall allocation was not reduced until April, 2008 when it was determined that she had improperly stalled her horses in stalls allocated to other trainers. [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21].

7

25.    Denied except that references to the HBPA Agreement refer to a written document, which speaks for itself.  The Track further rejects Ms. Mawing's characterizations of the HBPA Agreement.  By way of further response, the HBPA Agreement does not provide any specific direction concerning rodent and pest control and instead simply states that the Track and the HBPA "shall also use their best efforts to address and resolve in a timely and expeditious manner the following matter of mutual concern to the parties: A. Rodent and pest control eradication."  [Ex. C-1 at ¶ 19].

26.    CTRS specifically rejects Ms. Mawing's characterization of "higher quality" horses and no evidence of the quality of the horse was presented.  CTRS further rejects Ms. Mawing's statement concerning "[a]ll variety of testing" because no evidence of any testing was presented at the arbitration hearing.

27.    CTRS does not dispute Ms. Mawing's personal belief that the rat and horse exhibited similar symptoms but CTRS rejects the truth of this statement because Ms. Mawing failed to present any evidence to corroborate her personal opinion, including failing to provide any veterinary medical evidence or autopsy for the horse.

28.    CTRS is without knowledge or information concerning the truth of the statements in Paragraph 28.  Notably, Ms. Mawing did not call Mr. Wright as a witness at the arbitration hearing.

8

29.   CTRS is without knowledge or information concerning the truth of the statements in Paragraph 29.  Notably, Ms. Mawing did not call Mr. Wright or Mr. Bowlin as witnesses at the arbitration hearing.

30.   CTRS rejects that Ms. Mawing can competently testify concerning the health and medical symptoms of the goat because she is not a veterinarian nor has she has any training in veterinary medicine.  Notably, Ms. Mawing presented no medical evidence about the cause of death of her horse and goat.  Therefore, CTRS rejects the statements in Paragraph 30.

31.   CTRS lacks information or knowledge concerning conversations between Ms. Mawing and her groom.  CTRS further lacks information or knowledge concerning what Ms. Mawing claims to have known regarding the Track's past pest control procedures.  CTRS rejects Ms. Mawing's testimony concerning the Track's past pest control procedures because Ms. Mawing has never been employed by CTRS.  By way of further response, Ms. Mawing conceded that she never tested the food and feed she provided to her animals. [Trial Tr., June 10, 2013 at 233:8 -- 234:22].

32.   The receipt from Ehrlich Exterminators is a written document, which speaks for itself.  CTRS points out that the application of Rozol was not limited to Barn 14.  Further, Ms. Mawing did not submit any testimony concerning the significance of the 0.20% concentration of the Rozol tracking powder.

9

33.     CTRS rejects the statements in Paragraph 33 because the statements are inadmissible hearsay.  Ms. Mawing did not call the unnamed veterinarian nor did she submit an autopsy for the alleged other goats.  Further, Ms. Mawing did not call Mr. Wright to testify at the arbitration hearing.

34.     CTRS rejects that Ms. Mawing repeatedly attempted to contact Mr. Moore and that Mr. Moore failed to return Ms. Mawing's calls.  Rather, Ms. Mawing stopped Mr. Moore one evening as he was leaving the racing office and voiced her concerns.  [Trial Tr., June 12, 2013 at 935:3 – 936:6].  CTRS further rejects that Ms. Mawing confronted Mr. Moore "in her capacity as an HBPA Board member.  In reality, Ms. Mawing spoke to Mr. Moore concerning her own, individual concerns.  Further, CTRS rejects Ms. Mawing's statement concerning her "research" regarding Rozol because Ms. Mawing only researched information concerning Rozol in pellet form and not the powder form actually used.  [Trial Tr., June 10, 2013 at 230:14 – 231:23].

35.     The statements in Paragraph 35 attempt to characterize a written document, which speaks for itself.  CTRS specifically rejects Ms. Mawing's characterization.  CTRS further rejects Ms. Mawing's claim concerning the fans because no evidence was submitted to support this statement.  CTRS also rejects the statements in footnote 8 to Paragraph 35 because Ms. Mawing offered no independent testimony or evidence concerning any difference between Rozol in

10

pellet or powder form.  Ms. Mawing further failed to provide any independent

testimony or evidence to establish that any difference in concentration would result

in Rozol being more dangerous to large animals such as a horse or goat.  CTRS

also rejects the statements in footnote 9 to Paragraph 35 because the statements are

conclusions of law and should be disregarded.

36.     CTRS agrees that Mr. Moore told Ms. Mawing that he would look

into the pest control issue.  Mr. Moore testified that, after he was contacted by

Ms. Mawing, he contacted several members of the Track staff to inquire

concerning the pest control efforts.  [Trial Tr., June 12, 2013 at 937:2 – 13].  He

learned that pest control measures had been taking place in the barn areas during

the previous week.  [*Id.* at 937:15 – 24].  Mr. Moore also spoke to Dr. Starcher, the

state veterinarian, concerning the issue of Ms. Mawing's horse and goat.  [*Id.* at

939:3 – 11].  After his conversation with Dr. Starcher, Mr. Moore contacted

Ehrlich, the Track's long-standing pest control contractor, and confirmed that

poison had been placed.  [*Id.* at 941:2 – 7]  Mr. Moore instructed Ehrlich to halt all

pest control efforts until Mr. Moore heard back from Dr. Starcher.  [*Id.*].  Dr.

Starcher reported to Mr. Moore that he did not believe that the pest control poison

used by Erhlich was strong enough to kill Ms. Mawing's horse and goat.  [*Id.* at

943:1 – 7].  After the state veterinarian's opinion, Mr. Moore advised Erhlich to

resume pest control measures.  [*Id.* at 943:12 – 18].  Mr. Moore had no obligation

11

to report back to Ms. Mawing concerning the Track's pest control procedures. CTRS is without knowledge or information concerning the remaining statements in Paragraph 36.

37.     The statements in Paragraph 37 are conclusions of law and attempt to interpret the HBPA Agreement, which is a written document that speaks for itself. CTRS specifically rejects Ms. Mawing's characterization.  Further, the Panel rejected any claim based upon CTRS's alleged failure to negotiate solely with the HBPA.  [Trial Tr., June 10, 2013 at 123:17 – 124:18].

38.     While CTRS does not dispute that Ms. Mawing filed a complaint with the West Virginia Department of Agriculture, it is without information or knowledge concerning why Ms. Mawing contacted the agency.  By way of further response, the Department of Agriculture apparently found no merit to her claims because Ms. Mawing presented no evidence of any action taken by them, including responding to or her even informing CTRS about the existence of the complaint. [Trial Tr., June 10, 2013 at 234:19 – 235:7].

39.     Rejected.  By way of further response, based upon her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and slanderous allegation that the Track intentionally and deliberately tried to injure animals on the property, Ms. Mawing received no stalls for the September 2008 – December 2008 period.  [Trial Tr., June 12, 2013 at 883:5 – 13].

12

40.    Admitted that CTRS's decision to not allocate Ms. Mawing any free horse stalls occurred after CTRS learned of the defamatory and baseless statements Ms. Mawing made to West Virginia Governor Joseph Manchin.

41.    Agreed.  By way of further response, Ms. Mawing was not invited to discuss her personal loss.  [Trial Tr., June 10, 2013 at 157:19 – 158:10].

42.    CTRS is without knowledge or information concerning the statements in Paragraph 42 and Ms. Mawing failed to call any witnesses to corroborate her testimony.  Therefore, the statements in Paragraph are rejected.

43.    Rejected.  By way of further response, Mr. Finamore specifically testified that Governor Manchin claimed that Ms. Mawing stated at the meeting that CTRS had deliberately poisoned her horse and goat.  [Trial Tr., June 12, 2013 at 696:9 – 697:6]. Further, Mr. Puccio testified that Governor Manchin told Mr. Finamore that Ms. Mawing was claiming that the Track had purposely poisoned her horse and goat.  [*Id.* at 897:18 – 898:16].

44.    Rejected.  By way of further response, Mr. Hale, an employee of the HBPA at the time, testified that he recalled someone during the meeting with Governor Manchin claiming a wire or rope had been installed to injure horses in the barn area.  [Hale Dep. Tr., 44:2 – 21].

45.    Rejected.  By way of further response, the Stall Application provides written barn rules that Ms. Mawing violated when she placed horses in stalls allocated to other trainers without written permission.  [Ex. C-39].

46.    The statements in Paragraph 46 are conclusions of law and attempt to interpret the HBPA Agreement, which is a written document that speaks for itself. CTRS specifically rejects Ms. Mawing's characterization.  By way of further response, the Stall Application was admitted into evidence and expressly prohibits changing stall allocations without written consent.  [Ex. C-39].

47.    Rejected.  By way of further response, CTRS receives hundreds of stall applications and cannot speak with every trainer that is unhappy with the stall allocations.  [Trial Tr., June 11, 2013 at 446:1 – 9; Wehrman Dep. Tr. at 98:9 – 5]. The remaining statements in Paragraph 47 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.

48.    CTRS is without knowledge or information concerning which off-site stalls Ms. Mawing chose.  Further, CTRS is without knowledge or information concerning Ms. Mawing's criteria for selecting off-site stalls.  CTRS had no role in Ms. Mawing's business decision to rent stalls at four different locations.

49.    CTRS agrees only that Ms. Mawing continued to apply for stalls every six months and has not been allocated any stalls since being ordered to

14

vacate on September 12, 2008. CTRS specifically rejects the statement that the Track's free horse stalls are essential to any trainer's livelihood. [Trial Tr., June 11, 2013 at 519:4 - 20]. CTRS further rejects the statement that stall rent rates fluctuates "from $250 - $300 per month" because Ms. Mawing admitted that she paid as little as $220. [Trial Tr., June 10, 2013 at 265:8 – 14]. CTRS further rejects the statements that Ms. Mawing had no less than nine horses and no more than twelve in training because this testimony is inconsistent with the canceled checks provided by Ms. Mawing. [Ex. C-26]. CTRS further rejects the statement that Ms. Mawing "would have had nine stalls" at the Track because Ms. Mawing only had five stalls allocated to her when the Track denied her stall application in August 2008. [Ex. 39].

50.    CTRS rejects the statements in Paragraph 50 because Ms. Mawing testimony is inconsistent with the canceled checks she provided. By way of further response, Ms. Mawing's purported damages calculation is based on nothing more than speculation, guesswork, and conjecture. Ms. Mawing specifically conceded that her damages calculation is not 100% accurate. [*Id.* at 259:22 – 260:7]. Throughout her testimony, Ms. Mawing was never able to determine the exact amount of damages that she claims to have incurred as a result of being denied the use of the Track's free stalls. Her best effort was to produce copies of checks that she claims she wrote to various entities to pay for expenses such as stall rent

15

because she was unable to use the free stalls at the Track. [Ex. C-26]. However, Ms. Mawing herself could not testify with reasonable certainty that these checks accurately reflect the amount required to put her in a place equal to where she would have been had CTRS allocated her nine of its stalls.

51.     CTRS rejects the statements in Paragraph 51 because Ms. Mawing's damages calculation is based on inconsistent information and is unreliable. Ms. Mawing failed to provide a consistent range of stall rent that she pa*Id*. [*Compare* Trial Tr., June 10, 2013 at 265:8 – 14 (admitting that she paid as little as $220 per month), *with Id.* at 295:4 – 7 (claiming she paid no less than $250 per month]. She further admitted that many of the barns would prorate the fees that they charged her during some months. [*Id.* at 259:22 – 260:15; 275:9 – 24]. CTRS further rejects the statements in Paragraph 51 because Ms. Mawing only had five stalls allocated to her when the Track denied her stall application in August 2008. [Ex. C-39, Trial Tr., June 10, 2013 at 88:2 – 21; 211:14 – 17].

52.     CTRS rejects the statements in Paragraph 52 because the calculation is based on the incorrect average of stall rent pa*Id*.

**John Finamore**

53.     Agreed.

54.     Agreed.

55.     Agreed.

16

56.     Agreed.  By way of further response, there is no dispute that Mr. Finamore was not a member of the Track's stall allocation committee at the time Ms. Mawing's stall allocation application was denied.

57.     Agreed.  By way of further response, because Mr. Finamore was not a member of the Track's stall allocation committee at the time Ms. Mawing's stall allocation application was denied, he would have no way of knowing the specific circumstances of each decision made by the committee.

58.     Agreed.

59.     Agreed.  By way of further response, Mr. Finamore did not testify that subjective factors are not also considered by the committee.

60.     CTRS specifically rejects the statement that any trainer is "entitled" to stalls.

61.     CTRS rejects the statements in Paragraph 61 because the statements are conclusions of law and should be disregarded.  CTRS further rejects the statements in Paragraph 61 because Ms. Mawing failed to provide any stated "objective criteria."  By way of further response, the Track's stall allocation looks at a number of non-exhaustive factors that it considers in evaluating the applications.  [Trial Tr., June 11, 2013 at 512:21 – 513:17].  These factors include, but are not limited to, objective statistics such as the number of starts per stall, winning percentage, and recent earnings.  [*Id.*]  The committee also looks to

17

subjective factors such as following the barn rules and keeping the trainer's area clean. [*Id.* at 513:11 – 17].

62.     Rejected.  By way of further response, the stalls belong to CTRS and the HBPA Agreement provides that the Track is the final decision maker concerning the allocation of its stalls.  [Trial Tr., June 11, 2013 at 500:5 – 21; Exs. C-1 & C-39].  Additionally, the HBPA voluntarily relinquished any right to challenge the Track's stall allocation decisions when the 2004 agreement between the Track and HBPA was signed and the prior agreement language affording the horsemen due process was removed.  [*Id.* at 399:24 – 400:18].

63.     Agreed.

64.     Agreed.

65.     Agreed.

66.     Agreed.

67.     Agreed.

68.     CTRS rejects the statements in Paragraph 68 because the statements are conclusions of law and should be disregarded.  By way of further response, Mr. Finamore was concerned that if the current agreement lapsed, the HBPA may argue that that the lack of an agreement between CTRS and the HBPA could affect gaming operations at the Track,  including horse racing, table games, slot

18

machines, and video simulcasting of racing. [Trial Tr., June 12, 2013 at 664:7 – 21].

    69.    Agreed.

    70.    Agreed.

    71.    Agreed.

    72.    Agreed.

    73.    Agreed.

    74.    Agreed.

    75.    Agreed.

    76.    Agreed.

    77.    Agreed.

    78.    The statements in Paragraph 78 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

    79.    Agreed.

    80.    CTRS only agrees that Mr. Finamore's personal perception was that Governor Manchin was concerned about the potential for lost revenue for the State of West Virginia.  [Trial Tr., June 12, 2013 at 689:22 – 691:16].

    81.    Agreed.

    82.    Rejected.  By way of further response, Governor Manchin did not attend the August 14, 2008 dinner. [Finamore Dep. Tr. at 13:21 – 20:2].  In reality,

19

Mr. Finamore testified that Governor Manchin's chief of staff attended the dinner.
[*Id.*].  CTRS further rejects that Governor Manchin contacted Mr. Finamore to
"update him on the meeting with the horsemen."  Governor Manchin contacted
Mr. Finamore to determine if Ms. Mawing's defamatory and baseless allegations
were true.  [Trial. Tr., June 12, 2013 at 694:5 – 696:21; 897:13 -898:16].

 83. Agreed.

 84. Agreed.

 85. Agreed.

 86. Rejected.  By way of further response, neither Mr. Britton nor
Mr. Moore spoke with Governor Manchin concerning Ms. Mawing's defamatory
allegations.  Further, Ms. Mawing did not testify that she complained to the Track
concerning the wire.  Additionally, the Track's primary concern was Governor
Manchin's perception that CTRS would deliberately attempt to injure animals on
the property.  [Trial Tr., June 12, 2013 at 697:7 – 698:1].  Because of the
Governor's role as impartial mediator, the Track had no reason to verify his
statements with Ms. Mawing.

 87. The statements in Paragraph 87 attempt to characterize a written
document, which speaks for itself.  CTRS rejects these characterizations.

 88. Rejected.  By way of further response, Mr. Finamore was not asked
about whether Ms. Mawing violated the Track's barn rules.

20

89.    The statements in Paragraph 89 are conclusions of law and are therefore, rejected.

90.    Rejected.  Mr. Finamore testified that there is no set meeting schedule but he typically speaks with the general managers once per week or once every two weeks.  [Trial Tr., June 12, 2013 at 734:14 – 22].

91.    Agreed.

92.    Agreed.

93.    Agreed.

94.    Rejected.  By way of further response, the statements in Paragraph 94 do not indicate when Mr. Finamore would have "realized" that he was aware of information relevant to this litigation.

95.    Agreed.

96.    Agreed.  By way of further response, the statements in Paragraph 96 are not relevant to PNGI's concerns related to the Governor's perception that Track would deliberately attempt to injury animals on the property.

97.    Agreed.

98.    Agreed.

99.    Agreed.

100.   Agreed.

101.   Agreed.

21

102.    The statements in Paragraph 102 are not factual statements from the record but rather legal argument.  Therefore, Paragraph 102 should not be considered as proposed findings of fact and should be disregarded.  By way of further response, the Panel should reject Ms. Mawing's determination concerning Mr. Finamore's testimony because such determinations are not factual findings rather legal conclusions.  Additionally, Ms. Mawing's claim that Mr. Finamore would personally speak to Ms. Mawing is simply ridiculous.  Mr. Finamore is an executive-level employee of the Track's parent company.  [Trial Tr., June 12, 2013 at 639:17 – 640:17].  He oversees nine properties and has no direct responsibilities at the Track.  [*Id.* at 705:3 – 17].  While her frustrations at the Track may have been Ms. Mawing's only priority, Mr. Finamore's concerns are more global in that his priorities are the overall performance of the nine properties he oversees.  In this vein, Mr. Finamore directed, Mr. Britton, the highest manager at the Track, to investigate whether Ms. Mawing's defamatory claims could possibly be true.  [*Id.* at 697:7 – 698:1].  Mr. Finamore's primary concern was the Governor's perception that the Track may be attempting to intentionally harm animals on the property. [*Id.* at 697:7 – 698:1].

**Raymond Funkhouser**

103.    Agreed.  By way of further response, Mr. Funkhouser lost his bid for re-election to Mr. Lowe in 2009.  [Trial Tr., June 11, 2013 at 336:10 – 15].

104.   CTRS admits only that Mr. Yetsook was one of Mr. Funkhouser's trainers from 2007 to 2009.

105.   Rejected.  By way of further response, the statements in Paragraph 105 attempt to character a written document, which speaks for itself.  By way of further response, the HBPA Agreement does not provide any specific direction concerning rodent and pest control and instead simply states that the Track and the HBPA "shall also use their best efforts to address and resolve in a timely and expeditious manner the following matter of mutual concern to the parties: A. Rodent and pest control eradication."  [Ex. C-1 at ¶ 19].

106.   Agreed.  By way of further response, the decisions of the West Virginia Racing Commission are completed independent of CTRS.

107.   Agreed.

108.   CTRS agrees only that three of its employees briefly attended the hearing.  By way of further response, none of the Track's employees were present during Ms. Mawing's testimony and no member of the stall allocation committee knew she had testified on Mr. Funkhouser's behalf prior to the decision not to allocate stalls.  [Trial Tr., June 11, 2013 at 376:19 – 377:12; Trial Tr., June 12, 2013 at 950:10 – 951:18].

109.   CTRS agrees that Ms. Mawing was subpoenaed by Mr. Funkhouser to testify on his behalf.  CTRS rejects the statement that Mr. Funkhouser was

23

"exonerated" because the opinion of the hearing officer is the best evidence of the hearing disposition.

110.   Rejected.  By way of further response, CTRS rejects the statement that Mr. Finamore "was angry at Funkhouser and the HBPA board" because Mr. Funkhouser cannot testify to Mr. Finamore's state of mind.  Mr. Finamore's own testimony where he stated that he was "disappointed" is the best evidence of his state of mind.  [Trial Tr., June 12, 2013 at 711:14 – 21].  CTRS further rejects the statement that Mr. Finamore "directed his anger at the HBPA" because the statement is not supported by the records.  CTRS further rejects Ms. Mawing's characterization of Exhibit C-42, which is a written document that speaks for itself.

111.   Rejected.  By way of further response, the statements in Paragraph 111 are not factual statements but rather legal conclusions.  Further, the statements in Paragraph 111 are not relevant to any of Ms. Mawing's claims in this litigation.  Additionally, Mr. Finamore's refusal to discuss cannot constitute a breach the HBPA Agreement because he is not a party to the agreement nor is he employed by a party to the agreement.  [Trial Tr., June 12, 2013 at 639:17 – 640:17].

112.   Agreed.

113.   Agreed.

114.   CTRS specifically rejects the statement that "[t]he Governor wanted to encourage the HBPA's support of the table games initiative and see if there was

24

any means to ameliorate the contract process" because the statement is
inadmissible hearsay.  CTRS does not dispute the remaining statements in
Paragraph 114.

   115.   CTRS specifically rejects the statement that "Mawing's demeanor in
the meeting was business-like, reasonable, and rational" because the statement is
inconsistent with the testimony of Mr. Hale and Mr. Puccio.  [Hale Dep. Tr., 42:17
– 24; Trial Tr., June 12, 2013 at 897:13 - 24].  None of the Track's employees were
at the meeting, thus CTRS is without knowledge about what happened at the
meeting beyond what Mr. Finamore was told by Governor Manchin about
Ms. Mawing's behavior and comments.

   116.   Rejected.  By way of further response, both Mr. Hale and Mr. Puccio
testified that the wire was discussed during the meeting with Governor Manchin.
[Hale Dep. Tr., 44:2 – 21; Trial Tr., June 12, 2013 at 890:3 – 11].

   117.   The statements in Paragraph 117 are conclusions of law and should be
disregarded.  By way of further response, CTRS does not "receive" capital
improvement funds from the State of West Virginia.  W. Va. Code § 29-22A-
10c(a) requires that 10% of a track's total gaming income be collected by the State
of West Virginia as a surcharge.  Pursuant to W. Va. Code § 29-22A-10c(b), 42%
of this surcharge is retained by the state in a separate Capital Reinvestment
Account for the Track.  The Track then receives one dollar from the Capital

25

Reinvestment Account for each dollar spent on capital improvements to its facility. *Id.* In the case of thoroughbred horse tracks, such as CTRS, four cents of every dollar recovered from the Capital Reinvestment Account must be spent on "capital improvements and upgrading to facilities used for the housing and care of horses, facilities located inside the perimeter of the racing surface, including the surface thereof, facilities used for housing persons responsible for the care of horses." *Id.* Further, these improvements must be approved by the HBPA. *Id.*

118.   The statements in Paragraph 118 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.

**Melvin Michael Elliott**

119.   Agreed.

120.   Agreed.  By way of further response, Mr. Elliott's role at the Track included other duties as well.  [Trial Tr., June 11, 2013 at 421:15 – 423:4].

121.   Agreed.  By way of further response, the August 2008 stall allocation meeting was the first meeting Mr. Elliott attended.  [Trial Tr., June 11, 2013 at 428:20 – 23].

122.   Rejected.  By way of further response, Mr. Elliott did not testify that the stall allocation committee makes "an effort" to accommodate trainers requesting additional stalls.  Rather, Mr. Elliott testified that "[i]f we can

accommodate them, we'll give them a couple more. . . ." [Trial Tr., June 11, 2013 at 446:14 – 20].

123.   Agreed.

124.   Rejected.  By way of further response, the Track's stall allocation criteria have always included subjective as well as objective factors.  [Trial Tr., June 11, 2013 at 512:21 – 513:17].

125.   Agreed.

126.   Rejected.  By way of further response, the stall allocation does not vote on any stall applications.  [Trial Tr., June 11, 2013 at 429:9 – 12; Wehrman Dep. Tr., at 79:11 - 17].  CTRS further rejects the statement that there was no discussion of Ms. Mawing's stall application at the stall allocation meeting.  To the contrary, Mr. Britton testified that Ms. Mawing's application was discussed because she had been allocated stalls during the previous allocation period.  [Trial Tr., June 12, 2013 at 797:6 – 798:11].  CTRS further rejects the statement that there was no allegation that Ms. Mawing had violated a track rule.  To the contrary, Ms. Mawing violated the Track's barn rules by placing her horses in stalls allocated to other trainers without the Track's written permission.  [*Id.*].  CTRS agrees to the remaining statements in Paragraph 126.

127.   Rejected.  By way of further response, CTRS specifically rejects that it had any obligation to provide a response to Ms. Mawing's inquiry.

27

128.   Rejected.  By way of further response, simply because a stall is "vacant" does not mean that the stall is not allocated to another trainer.  [Trial Tr., June 11, 2013 at 439:2 – 440:11].  Mr. Elliott could not testify to a number of stalls that were unallocated at the time that Ms. Mawing's stall application was denied.  [*Id.*]

129.   Agreed.  By way of further response, there are many reasons that the Track may keep unallocated stalls or for allocated stalls to remain empty.  [Trial Tr., June 11, 2013 at 439:2 – 440:11].

130.   Agreed.  By way of further response, the statements in footnote 13 to Paragraph 130 is rejected because the statements are conclusions of law and should be disregarded.

131.   CTRS specifically rejects the statement that Ms. Mawing received permission from Mr. Elliott because this statement contradicts Paragraphs 22 and 23 of Ms. Mawing's submission where she claims that she received permission from Mr. Lamp.  The permission granted to Ms. Mawing was only to use Mr. Yetsook's stalls for a weekend.  [Trial Tr., June 11, 2013 at 450:7 – 451:17].  CTRS agrees that it is not a violation of any rule for a trainer to request permission to put their horses in another trainer's stalls.  In fact, the Stall Application requires it.  [Ex. C-39].  In violation of the limited permission granted, Ms. Mawing's

28

horses remained in Mr. Yetsook's stalls for months and in other trainer's stalls without any permission at all.  [Trial Tr., June 11, 2013 at 452:14 - 19].

132.   Rejected.  By way of further response, the Stall Application requires all changes to stall allocations be made in writing and signed by both the trainer and the Track.  [Ex. C-39].

133.    The statements in Paragraph 133 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.  CTRS only agrees that Mr. Elliott testified that he was unaware of the rule requiring written permission to occupy other trainer's stalls.  Mr. Elliott went on to testify that he could not say for certain whether the rule existed but only that he was unaware of the rule.  [Trial Tr., June 11, 2013 at 459:11 – 460:10].  CTRS's stall application is clear that any requests for changes to the stall allocation must be made in writing and signed by the Track and the trainer making the request.  [Ex. C-39].

**Erich Zimny**

134.   Agreed.

135.   Agreed.

136.   Agreed.

137.   Agreed.

SL1 1254276v5 005982.00037

138.   The statements in Paragraph 138 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

139.   The statements in Paragraph 139 attempt to characterize the West Virginia Racing regulations, which speak for themselves.  CTRS rejects these characterizations.

140.   Agreed.

141.   Agreed.

142.   Agreed.

143.   Agreed.

144.   Agreed.  By way of further response, many other trainers' applications were not discussed at the stall allocation committee meetings.  [Trial Tr., June 11, 2013 at 522:22 – 523:15].

145.   Agreed.

146.   Rejected.  By way of further response, Mr. Zimny testified that, while it is difficult to regain stalls once the stall application is denied, there have been instances of trainers regaining stalls.  [Trial Tr., June 11, 2013 at 523:16 – 524:4].

147.   Agreed.

148.   CTRS admits that Mr. Zimny is currently aware that the present litigation has been ongoing for five years.

149.   Agreed.

30

150. Rejected. By way of further response, Mr. Zimny did not testify that the committee was aware of Ms. Mawing's repeated applications but rather testified that he was aware. [Trial Tr., June 11, 2013 at 526:4 – 13]. Further, Mr. Zimny testified that "[n]either [Ms. Mawing's name] nor probably 100 other trainers" were brought up at the stall allocation meetings. [*Id.* at 526:14 – 19].

151. Agreed.

152. The statements in Paragraph 152 attempt to characterize the pleadings in this matter, which speak for themselves. CTRS rejects these characterizations.

153. The statements in Paragraph 153 attempt to characterize the pleadings in this matter, which speak for themselves. CTRS rejects these characterizations.

154. The statements in Paragraph 154 attempt to characterize the pleadings in this matter, which speak for themselves. CTRS rejects these characterizations. By way of further response, simply because a stall is "vacant" does not mean that the stall is not allocated to another trainer. [Trial Tr., June 11, 2013 at 439:2 – 440:11].

155. Agreed.

156. The statements in Paragraph 156 attempt to characterize a written document, which speaks for itself. CTRS rejects these characterizations.

157. Agreed.

31

158.   The statements in Paragraph 158 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

159.   The statements in Paragraph 159 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

160.   Agreed.

161.   Rejected.  By way of further response, Mr. Zimny testified that the statements in the declaration were factual statements and that he did not believe that there was any suggestion concerning the reason Ms. Mawing's stall application was denied.  [Trial Tr., June 11, 2013 at 542:24 – 543:10].

162.   Agreed.

163.   Rejected.  By way of further response, when asked about the statistics formulated, Mr. Zimny testified that he didn't recall "if there was anything concrete produced for that meeting."  [Trial Tr., June 11, 2013 at 544:8 – 15].

164.   Rejected.  By way of further response, Mr. Zimny testified that he didn't recall when the statistics in their current form were first used but stated with certainty that starts per stall had been produced for the meetings.  [Trial Tr. 544:16 – 24].

165.   Agreed.

166.   Agreed.

167.   Agreed.

32

168.   Agreed.

169.   Agreed.

**George Yetsook**

170.   Agreed.

171.   Agreed.

172.   Agreed.

173.   Agreed.

174.   Agreed.

**Al Britton**

175.   Agreed.

176.   Agreed.

177.   Agreed.

178.   CTRS rejects that Ms. Mawing provides a complete list of information considered with regard to stall allocations. [Trial Tr., June 11, 2013 at 512:21 – 513:17].   CTRS does not dispute the remainder of Paragraph 178.

179.   Agreed.  By way of further response, Mr. Britton testified that the seven starts per stall is only a limited guideline in the stall allocation process. [Trial Tr., June 12, 2013 at 770:6 – 771:12].

180.   Agreed.

181.   Agreed.

33

182.   Agreed.  By way of further response, the Track's stall allocation committee now reviews many objective and subjective factors, including winning percentages.

183.   Agreed.

184.   Agreed.

185.   Agreed.

186.   Agreed.

187.   Agreed.

188.   Agreed.

189.   CTRS agrees that Mr. Britton was aware of Ms. Mawing's allegations concerning improper pest control in the barn area.  CTRS rejects the remaining statements in Paragraph 189.  By way of further response, Mr. Britton's deposition occurred nearly two years after the stall allocation meeting where Ms. Mawing's stall application was denied.  Further, Ms. Britton's testimony at the arbitration hearing is consistent with Mr. Moore's testimony that he contacted Mr. Britton concerning Ms. Mawing's allegations.  [Trial Tr., June 12, 2013 at 944:11 – 944:22].

190.   Agreed.

191.   Agreed.

192.   Agreed.

34

193.   Agreed.

194.   Agreed.

195.   Agreed.

196.   Rejected.  By way of further response, Mr. Britton testified that Mr. Finamore's direction was only one reason that discussions between the Track and the HBPA were limited.  Mr. Britton further testified that there were rarely discussions between the Track and the HBPA even before the table game issue. [Trial Tr., June 12, 2013 at 814:24 – 815:15]

197.   Agreed.  By way of further response, Mr. Britton testified that Mr. Finamore's direction was only one reason that discussions between the Track and the HBPA were limited.  Mr. Britton further testified that there were rarely discussions between the Track and the HBPA even before the table game issue. [Trial Tr., June 12, 2013 at 814:24 – 815:15]

198.   The statements in Paragraph 198 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.  According to the HBPA Agreement, the Track **and the HBPA** "shall also use their best efforts to address and resolve in a timely and expeditious manner the following matter of mutual concern to the parties: A. Rodent and pest control eradication." [Ex. C-1 at ¶ 19].

35

199.   Agreed.  By way of further response, Mr. Britton was not obligated to contact Ms. Mawing regarding the Track's conversation with the exterminator.

200.   Agreed.  By way of further response, Mr. Britton was not obligated to contact Ms. Mawing to hear "her side of the story" prior to the August 2008 stall allocation meeting.  Additionally, the Track's primary concern was Governor Manchin's perception that CTRS would deliberately attempt to injure animals on the property.  [Trial Tr., June 12, 2013 at 697:7 – 698:1].  Because of the Governor's role as impartial mediator, the Track had no reason to verify his statements with Ms. Mawing.

201.   The statements in Paragraph 201 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.

202.   Rejected.  By way of further response, Ms. Mawing was not "penalized" after the barn audit in April 2008.  Rather, Ms. Mawing, along with other trainers, violated the Track's barn rules.  As a result of this violation, Ms. Mawing's and the other trainers' stall allocations were reduced.

203.   Agreed.

204.   Rejected.  By way of further response, the Stall Application requires all changes to stall allocations be made in writing and signed by both the trainer and the Track.  [Ex. C-39].

36

205.   Rejected.  By way of further response, Ms. Mawing was not "penalized."  Rather, Ms. Mawing's stall allocation was reduced because of her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and slanderous allegation that the Track intentionally and deliberately tried to injure animals on the property.  [Trial Tr., June 12, 2013 at 883:5 – 13].

206.   Rejected.  By way of further response, Mr. Britton did not testify that Ms. Mawing was the only trainer that lost stalls in April 2008 as a result of the barn audit that went on to lose additional stalls in August 2008.  Rather, Mr. Britton testified that he is not aware of other trainers.  [Trial Tr., June 12, 2013 at 832:17 – 23].  Further, Mr. Britton specifically testified that placing horses in other trainer's stalls was only one factor considered when Ms. Mawing's stall application was denied.  [*Id.* at 832:24 – 833:4].  Mr. Britton testified that Ms. Mawing stall application was denied because of her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and slanderous allegation that the Track intentionally and deliberately tried to injure animals on the property.  [Trial Tr., June 12, 2013 at 883:5 – 13].

207.   Agreed.

208.   Agreed.

209.   Agreed.

37

210.    The statements in Paragraph 210 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.  By way of further response, the HBPA Agreement states that "the allocation of stalls shall be in the discretion of Charles Town Races."  [Ex. C-1, at ¶ 11(B)].

211.    Agreed.

212.    Agreed.  By way of further response, no trainer received any reason or explanation when their stall allocation was reduced or denied.  [Trail Tr., June 12, 2013 at 849:17 – 850:1].

213.    Agreed.

214.    Agreed.

215.    Agreed.

216.    Agreed.

217.    Rejected.  By way of further response, Ms. Mawing did not establish that CTRS any duty or obligation to speak with Ms. Mawing concerning rodent control in the barn areas.

218.    Agreed.

219.    Agreed.

220.    Agreed.

221.    Agreed.

38

222.   Agreed.

223.   Agreed.

224.   Agreed.

225.   The statements in Paragraph 225 are legal conclusions and conclusions concerning Ms. Mawing's opinion of witness credibility, which is a matter for the Panel to decide. Therefore, these statements should be disregarded. By way of further response, Mr. Britton's deposition occurred nearly two years after the stall allocation meeting where Ms. Mawing's stall application was denied. Further, Mr. Britton testified that the focus of his conversation with Mr. Finamore was Ms. Mawing's allegation to Governor Manchin that the Track had deliberately installed wires to injure horses. [Trial Tr., June 12, 2013 at 794:7 – 22]. Mr. Britton testified that at the arbitration hearing that he did not recall Mr. Finamore providing any further information concerning Ms. Mawing during the call. [*Id.*].

226.   The statements in Paragraph 226 are legal conclusions and conclusions concerning Ms. Mawing's opinion of witness credibility, which is a matter for the Panel to decide. Therefore, these statements should be disregarded. By way of further response, Mr. Britton's deposition occurred nearly two years after the stall allocation meeting where Ms. Mawing's stall application was denied. Further, as Mr. Britton pointed out at the arbitration hearing, he testified at his deposition that he was aware of the meeting with Governor Manchin prior to stall

39

allocation meeting.  [Trial Tr., June 12, 2013 at 872:22 – 874:3; Britton Dep. Tr. at 41:12 – 18].

227.    The statements in Paragraph 227 are legal conclusions and conclusions concerning Ms. Mawing's opinion of witness credibility, which is a matter for the Panel to decide.  Therefore, these statements should be disregarded. By way of further response, Mr. Britton's deposition occurred nearly two years after the stall allocation meeting where Ms. Mawing's stall application was denied. Mr. Britton testified that he was speculating that he would have already discussed the pest control issues because he and Mr. Finamore discussed issues at the Track on a semi-regular basis.  [Trial Tr., June 12, 2013 at 734:14 – 22; 871:7 - 22].

228.    Agreed.

229.    Agreed.  By way of further response, simply because Ms. Mawing's stall application would have been discussed at future stall allocation committee meetings; it does not follow that she would have been awarded stalls.

230.    Agreed.

231.    Agreed.  By way of further response, Mr. Britton had no obligation to make such a direction.

**Larry James Puccio**

232.    Agreed.

233.    Agreed.

40

234.   Agreed.

235.   Agreed.

236.   Agreed.

237.   Agreed.

238.   Agreed.

239.   Agreed.

**Richard Moore**

240.   Agreed.

241.   Agreed.

242.   Agreed.

243.   Agreed.

244.   CTRS rejects the statement that Mr. Moore "felt that no additional discipline or adverse action should have been taken against Mawing beyond the loss of four stalls." Mr. Moore testified that no additional action should have been taken against Ms. Mawing solely in relation to her violation of the barn rules by placing her horses in stalls allocated to other trainers. [Trial Tr., June 12, 2013 at 946:12 – 15]. CTRS does not dispute the remaining statements in Paragraph 244.

245.   Agreed.

246.   CTRS rejects the statement that "[t]here were 70 to 75 stall applicants considered at that meeting." Mr. Moore testified that he did not recall how many

41

applications were considered.  [Trial Tr., June 12, 2013 at 927:2 – 5].  CTRS

agrees that Mr. Moore testified that the stall applications were divided into three

groups but no other member of the stall allocation committee had this recollection.

247.   Agreed.

248.   Rejected.  By way of further response, Mr. Moore is the only member

of the stall allocation committee that recalls these events.

249.   Agreed.

250.   Agreed.  By way of further response, the HBPA Agreement at issue

here does not include an appeal process.  [Ex. C-1].  A prior version of the

agreement contained due process rights that the HBPA relinquished when it agreed

to the HBPA Agreement at issue here.  [Trial Tr., June 11, 2013 at 399:24 –

400:18].

251.   Agreed.  By way of further response, the statements in Paragraph 251

relate only to the discussion between Ms. Mawing and Mr. Moore.

252.   Agreed.  By way of further response, the statements in Paragraph 252

relate only to the discussion between Ms. Mawing and Mr. Moore.

253.   Agreed.

254.   Agreed.

255.   Agreed.

256.   Agreed.

42

257.   Agreed.  By way of further response, Mr. Moore testified that he authorized an Ehrlich representative to continue the use of rodenticide after Mr. Moore confirmed with the state veterinarian that the pesticide was not strong enough to kill a horse or goat.  [Trial Tr., June 12, 2013 at 943:1 – 20].

258.   Agreed.

259.   Agreed.

**James Taylor**

260.   Agreed.  By way of further response, Mr. Taylor is currently eighty years old and was fifty-two when he joined CTRS.

261.   Agreed.

262.   Rejected.  By way of further response, Mr. Taylor testified that he rarely attended the stall allocation meetings.  [Taylor Dep. Tr. at 8:12 – 20]. Mr. Taylor estimated that he only attended three stall allocation meetings during his time as an employee at the Track.  [*Id.* at 9:5 – 7].

263.   CTRS agrees only that the members of the stall allocation committee do not vote on stall allocations.  CTRS rejects the statement that "stall allocation committee members have no say as to the allocation of stalls" because this statement is not in the record.

264.   Rejected.  By way of further response, Mr. Taylor testified that he rarely attended the stall allocation meetings; therefore, he is unable to accurately

43

testify concerning the decisions made by the committee concerning allocations determinations.

265.   Rejected.  By way of further response, the Stall Application requires all changes to stall allocations be made in writing and signed by both the trainer and the Track.  [Ex. C-39].

266.   Agreed.  By way of further response, Mr. Taylor testified that he rarely attended the stall allocation meetings; therefore, he is unable to accurately testify concerning the decisions made by the committee concerning allocations determinations.

267.   CTRS agrees that Mr. Taylor testified that horses must be trailered to the Track if the trainer does not have stalls at the Track.  Mr. Taylor further testified that trailering horses does not cause any increased risk.  [Taylor Dep. Tr. at 27:17 – 28:1].

**William Randolph Wehrman**

268.   Agreed.

269.   Agreed.

270.   Agreed.

271.   Agreed.  By way of further response. Mr. Wehrman testified that racing officials must be licensed by the State of West Virginia.  [Wehrman Dep. Tr. at 25:2 – 4].

44

272.   Agreed.

273.   Agreed.

274.   CTRS agrees that Mr. Moore is ultimately responsible for the barn areas at the Track.  CTRS is unable to agree that Mr. Moore knows "everything."

275.   Agreed.  By way of further response, Mr. Wehrman testified that he was in Kentucky when he encouraged Ms. Mawing to enter the race, thus this occurred prior to when he began working for CTRS in 2008.  [Wehrman Dep. Tr., 34:2 – 15].  Therefore, Mr. Wehrman's statement is not relevant to the quality of horses Ms. Mawing was training at the time her stall application was denied.

276.   CTRS agrees that Mr. Wehrman's opinion is that Ms. Mawing is a professional person.

277.   The statements in Paragraph 277 attempt to characterize and interpret a written document, which speaks for itself.  CTRS rejects these characterizations and interpretations.

278.   Agreed.

279.   Agreed.  By way of further response, simply because a stall is "vacant" does not mean that the stall is not allocated to another trainer.  [Trial Tr., June 11, 2013 at 439:2 – 440:11].

280.   Agreed.

45

281.   Rejected.  By way of further response, Mr. Wehrman testified that, if a determination was made in 2008 to allocate a trainer five stalls, the trainer could be accommodated but the stalls would be inconveniently spread out across several barns.  [Wehrman Dep. Tr. at 50:12 – 51:1].

282.   Rejected.  By way of further response, Mr. Wehrman is member of the Track's stall allocation committee.   The testimony cited by Ms. Mawing refers to a hypothetical posed where a new trainer arrives at the Track and is inadmissible as fact.  [Wehrman Dep. Tr. at 50:12 – 51:6].

283.   Rejected.  By way of further response, Mr. Wehrman testified that it is a "generalization" that trailering a horse poses an additional risk.  [Wehrman Dep. Tr. at 53:18 – 54:4].  He also testified that many horses like being trailered.  [*Id.* at 54:5 – 8].

284.   Agreed.

285.   CTRS rejects the statements in Paragraph 285 because the statements are conclusions of law.

286.   Agreed.

287.   Rejected.  By way of further response, the Stall Application requires all changes to stall allocations be made in writing and signed by both the trainer and the Track.  [Ex. C-39].

46

288.   Agreed.  By way of further response, Mr. Wehrman was an employee of CTRS and administered stall applications as part of his duties as an employee.

289.   Agreed.

290.   Agreed.

291.   Agreed.

292.   Agreed.

293.   Agreed.

294.   Rejected.  By way of further response, Mr. Wehrman testified that he did not recall whether trainers that lost all of their stalls were discussed at the committee meetings.  [Wehrman Dep. Tr. at 82:13 – 16].

295.   Agreed.

296.   Agreed.

297.   Agreed.

298.   Agreed.

299.   Agreed.

300.   Agreed.

301.   Agreed.

302.   Agreed.

303.   Agreed.

47

304.   CTRS agrees only that the statements in Paragraph 304 describe Mr. Wehrman's policy for granting trainers permission to use stalls that are not part of the trainer's stall allocation.  CTRS specifically rejects the statements' relevance to the present matter because Mr. Wehrman was not involved in Ms. Mawing's use of stalls allocated to other trainers.

305.   Agreed.

306.   Agreed.

307.   CTRS agrees only that the West Virginia Racing Commission maintains a presence at the Track.  The remaining statements in Paragraph 307 are conclusions of law and should be disregarded.

308.   Agreed.

**Leonard Hale**

309.   Agreed.

310.   Agreed.

311.   CTRS agrees that Mr. Hale testified concerning an allegation that Mr. Butts received permission to lend the stalls.

312.   CTRS rejects the statements in Paragraph 312 because they concern other racetracks and, therefore, are not relevant to the present matter.

313.   Agreed.

48

314.   Rejected.  By way of further response, Mr. Hale testified that Mr. Schneider was a liar and that Mr. Hale did not pay any attention to Mr. Schneider's claim that Ms. Mawing was going to lose stalls.  [Hale Dep. Tr. at 29:3 – 30:3].

315.   The statements in Paragraph 315 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

316.   Agreed.

317.   The statements in Paragraph 317 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.  By way of further response, the Stall Application requires all changes to stall allocations be made in writing and signed by both the trainer and the Track.  [Ex. C-39].

318.   The statements in Paragraph 318 attempt to characterize a written document, which speaks for itself.  CTRS rejects these characterizations.

319.   Agreed.

320.   CTRS agrees that Ms. Mawing claimed that the pest control led to the death of her horse and goat.  Mr. Hale testified that he never saw any proof that the animals died as a result of the rat poison.  [Hale Dep. Tr. at 37:10 – 38:1].

321.   CTRS rejects that Mr. Hale can competently testify concerning the Track's procedures for pest control because he has never been employed by CTRS. By way of further response, despite Ms. Hale's unsupported beliefs concerning

49

procedures at other racetracks, there is no evidence that CTRS follows or is required to follow any such procedure. Further, Mr. Hale specifically admitted that he saw no medical reports to substantiate Ms. Mawing's claims that her horse and goat died as a result of rat poison. [Hale Dep. Tr., 38:16 – 23].

    322.   Agreed.

    323.   Agreed.

    324.   Agreed.

    325.   Agreed.

    326.   Agreed.

    327.   Agreed.

    328.   Agreed.

    329.   Agreed.

    330.   Agreed.

    331.   Agreed.

    332.   Agreed.

    333.   Agreed. By way of further response, Mr. Hale testified that he did not have any facts or evidence identifying the reason Ms. Mawing's stall application was denied. [Hale Dep. Tr. at 59:5 – 11].

**Malcolm G. Barr**

    334.   Agreed.

50

335.   Rejected.  By way of further response, Mr. Barr's racing entries are not relevant to the current dispute.

336.   Agreed.

337.   Rejected.  By way of further response, Mr. Barr's relationship with Mr. Yetsook is not relevant to the current dispute.

338.   Agreed.

339.   Agreed.

340.   Agreed.

341.   Agreed.  By way of further response, Mr. Finamore never advised, suggested, or requested that Mr. Barr discontinue working with Ms. Mawing. [Barr Dep. Tr., at 45:1 – 4].

SL1 1254276v5 005982.00037

## III.  ARGUMENT

### A.  CTRS Did Not Discriminate Against Ms. Mawing Based Upon Her HBPA Membership Or Activity

Ms. Mawing claims that CTRS breached the HBPA Agreement by discriminating against her in the allocation of the Track's free horse stalls because of Ms. Mawing's membership in the HBPA and her activities on its behalf. Ms. Mawing is incorrect.  In reality, the Track's stall allocation committee based its decision not to allocate stalls to Ms. Mawing on her failure to follow barn rules, her less than remarkable racing statistics, and her baseless and inflammatory allegations to the Governor that the Track intentionally and deliberately tried to injure animals on the property.  [Trial Tr., June 12, 2013 at 883:5 – 13].

1.  *Ms. Mawing Violated the Track's Barn Rules by Placing Horses in Stalls Allocated to Other Trainers Without Written Permission*

Ms. Mawing incorrectly claims that the Track retaliated against her because of the HBPA's neutrality on the table games issue and because of Ms. Mawing's testimony in support of Mr. Funkhouser.  To support this claim, Ms. Mawing strings together a laundry list of incorrect facts and unsupportable conclusions. Nevertheless, Ms. Mawing cannot escape the truth that she and other trainers lost stalls because they violated the Track's barn rules by placing horses in stalls allocated to other trainers without the Track's written permission.

Ms. Mawing is incorrect that there were no published rules that require written permission in order for trainers to share stalls.  The Track's stall

52

application makes clear that trainers are required to keep their horses in their own stalls. [C-39]. The application further explains that any changes to the stall allocation must be in writing and signed by both the Track and the trainer. [*Id.*] Ms. Mawing simply ignored the terms of the stall application that she signed each time she applied for stalls when she improperly placed horses in stalls allocated to other trainers without permission. Now again, she ignores the terms of the stall application and claims that there were no published rules concerning trainers sharing stalls.

Further, Ms. Mawing cannot explain how she was singled out for retaliation when other trainers also lost stalls as a result of this violation. There is no dispute that other trainers including George Yetsook, Ronnie Wilt, and Richard Butts were also involved in this infraction and also lost stalls as a result. [Trial Tr., June 11, 2013 at 452:20 – 453:2]. Ms. Mawing claims that both she and Mr. Yetsook suffered retaliation because they both served on the HBPA board and both testified on behalf of Mr. Funkhouser. However, Ms. Mawing ignores the fact that Mr. Wilt and Mr. Butts, who were not on the HBPA board and did not testify on behalf of Mr. Funkhouser, also lost stalls for violating the barn rules. Ms. Mawing does not offer any explanation in her scenario for why these other trainers also lost stalls because there is only one inescapable conclusion: Ms. Mawing, Mr. Yetsook, Mr. Butts, and Mr. Wilt all lost stalls because they violated the barn rules by

53

placing horses in stalls allocated to other trainers without the Track's written permission.

Ms. Mawing also claims that "there is evidence that Skoobie Schneider knew in advance that Mawing was going to have her stalls taken away and that it was being done as a warning." Ms. Mawing's statement is completely false. First, Mr. Schneider did not testify at the arbitration hearing nor was there any transcript of his testimony provided as evidence. The only reference in the record to anything said by Mr. Schneider appears in the transcript of Mr. Hale's deposition where Mr. Hale discusses statements made by Mr. Schneider. [Hale Dep. Tr., 29:3 – 12]. Therefore, these statements by Mr. Schneider are inadmissible hearsay and cannot be considered for the truth of the matter asserted. Moreover, Mr. Hale specifically testified that Mr. Schneider was likely lying and that Mr. Hale didn't "pay any attention" to his statements. [*Id.* at 29:22 – 30:3]. Ms. Mawing ignores both the Rules of Evidence and Mr. Hale's statement that Mr. Schneider was likely lying and attempts to pass Mr. Schneider's statements off as evidence to support her deficient claims.

Because Ms. Mawing failed to prove that she suffered discrimination because of the HBPA's neutrality on the table games issue and because of her testimony in support of Mr. Funkhouser, Ms. Mawing's retaliation claims and breach of contract claims should be rejected.

54

2.  *Ms. Mawing Did Not Prove that She Suffered Retaliation Based Upon Her Concerns About Rat Poison*

Ms. Mawing failed to prove that she suffered any retaliation based upon her concerns related to the pest control measures employed in the Track's barn areas. Ms. Mawing attempts to somehow claim that she suffered retaliation because she reported the Track's pest control methods to CTRS management, the Racing Stewards, and the West Virginia Department of Agriculture. Ms. Mawing is incorrect. First, Ms. Mawing offers no evidence to prove that any CTRS employee was aware that she complained to the Department of Agriculture. Ms. Mawing fails to explain how the Track could have discriminated against her based on actions that no one at CTRS even knew occurred. Further, Ms. Mawing offered no evidence that that the Racing Stewards took any action toward CTRS. According to Mr. Moore, Mr. Wright simply passed on Ms. Mawing's concerns regarding the Track's pest control procedures. [Trial Tr., June 12, 2013 at 938:1 – 19]. There is no evidence that the Racing Stewards investigated Ms. Mawing's claims or further inquired with the Track concerning the pest control procedures. Ms. Mawing fails to explain why the Track would retaliate against her based on her complaints to the Racing Stewards when there was no negative action taken against the Track.

Ms. Mawing further claims that no one from CTRS contacted her concerning her complaints about the rat poison. In reality, CTRS did not have an obligation to contact Ms. Mawing concerning its own investigation into her claims.

55

This is reinforced by the fact that the Track's investigation provided no evidence that the pest control measures led to the death of Ms. Mawing's horse and goat. [Trial Tr., June 12, 2013 at 937:2 – 943:18]. Indeed, Ms. Mawing failed to prove that the animals died as a result of the rat poison and there is no evidence that any other animal died during the pest control measures. [Trial Tr., June 11, 2013 at 227:18 – 228:9]. Because CTRS found no evidence that the pest control methods were harmful, it considered the matter resolved and closed.

Ms. Mawing further complains that Mr. Britton "did not even give Mawing an explanation" for the denial of her stall application. Again, Ms. Mawing fails to recognize that the Track is not obligated to provide any explanation with regard to stall allocation decisions. The Track's stall application makes clear that "CTRS reserves the unrestricted right to decline stall space . . . for any reason or no reason." [Ex. C-39]. Further, no other trainer is entitled to an explanation when his or her stall allocation is reduced. [Trail Tr., June 12, 2013 at 849:17 – 850:1]. In essence, Ms. Mawing seeks special treatment that is separate than the treatment of the hundreds of other trainers that race at the Track.

Because Ms. Mawing failed to prove that the Track discriminated against her based upon her rat poison concerns, her claims should be rejected.

3.  *Ms. Mawing Did Not Prove that CTRS Discriminated Against Her Based on Her Meeting with Governor Manchin*

Ms. Mawing claims that she suffered discrimination as a result of being a part of a meeting between HBPA members and Governor Manchin concerning the new agreement between the HBPA and the Track.  According to Ms. Mawing, the meeting with Governor Manchin was HBPA activity and, therefore, protected under the HBPA agreement.  Ms. Mawing attempts to stretch the protections of the HBPA agreement well beyond all logical bounds.  While the meeting with Governor Manchin may have originally began as HBPA activity, Ms. Mawing abandoned the HBPA's concerns and advanced her own agenda when she falsely and maliciously claimed that the Track deliberately poisoned her animals as well as deliberately installed wires so that Ms. Mawing's horses would be injured.  Despite Ms. Mawing's claims that she never made such statements, Mr. Puccio, Mr. Finamore, and even Mr. Hale all testified that the wire issue was discussed during the meeting with Governor Manchin.  [Hale Dep. Tr., 44:2 – 21; Trial Tr., June 12, 2013 at 696:9 – 697:6; 890:3 – 11].

Ms. Mawing's focus on her own agenda is unquestionable because such baseless and defamatory allegations were actually counterproductive to the HBPA's goal of securing an agreement with the Track.  Further, Mr. Hale testified that Mr. Mawing's comments were not "an intentional part of the meeting" with Governor Manchin.  [Hale Dep. Tr., 41:19 – 45:5].  Such inflammatory claims to

57

the Governor of West Virginia would no doubt complicate the already contentious negotiations between the Track and the HBPA.  Indeed, after hearing Ms. Mawing's baseless claims, Governor Manchin immediately telephoned Mr. Finamore to find out if such outlandish claims could possibly be true, thus creating further disagreements between the Track and the HBPA.  [Trial Tr., June 12, 2013 at 694:5 – 696:21; 897:13 -898:16].  At the Governor's request, Mr. Finamore contacted Mr. Britton to investigate whether Ms. Mawing's ridiculous claims could possibly be true.  [*Id.* at 697:7 – 698:1].  As Mr. Finamore testified, he is no longer responsible for the day-to-day operations at the Track, therefore, Mr. Britton was the best person to charge with the investigation.  [*Id.* at 698:14 – 669:5].  Based on Ms. Mawing's defamatory claims to the highest elected official in the State of West Virginia, Mr. Finamore suggested to Mr. Britton, if the allegations turned out to be false, Mr. Britton should consider such during the next stall allocation meeting.  [*Id.*].

As an HBPA board member, Ms. Mawing was certainly aware of the importance of the meeting with Governor Manchin but she chose to usurp the HBPA's opportunity and advanced her own, individual agenda.  When Ms. Mawing defamed the Track, she abandoned the concerns of the HBPA.  Thus, her defamatory conduct is not protected under the HBPA Agreement.

58

Because Ms. Mawing's defamatory statements were not HBPA activity, her claims that she suffered retaliation because she met with Governor Manchin should be rejected.

### B.  Ms. Mawing Failed To Prove Retaliation Under Any West Virginia State Law

#### 1.  *The Public Policy Tort Cause of Action Does Not Apply in the Absence of an Employment Relationship*

Ms. Mawing relentlessly tries to pursue a West Virginia public policy tort claim in defiance of insurmountable authority that the cause of action only applies in the employment context. *See Hurley v. Allied Chem. Corp.*, 262 S.E.2d 757, 759 (W. Va. 1980) ("An essential ingredient for the cause of action is an existing employment relationship between the parties.  In the present case, [plaintiff] did not occupy any employment status with [defendant] and, therefore, *Harless* is not applicable.").  Ms. Mawing fails to recognize the deficiency of her claim despite citing no less than ten cases that solely concern disputes arising out of the employment context.  In fact, every single case cited by Ms. Mawing to support her public policy tort claim arises from the employment context.  Because it is undisputed that Ms. Mawing was never employed by CTRS, none of the cases are applicable to the current dispute.  Further, because Ms. Mawing was never a CTRS employee, her public policy tort cause of action fails as matter of law.

59

2. *The Employment Caselaw and Analysis Offered by Ms. Mawing is not Applicable to this Dispute.*

Ms. Mawing desperately tries to shoehorn her deficient claims into an analysis concerning wrongful discharge of an employee. As discussed above, Ms. Mawing has never been an employee of CTRS, therefore, this analysis is not applicable to the current dispute. As Ms. Mawing admits that her analysis is based on "the employment context." Based on this analysis, Ms. Mawing attempts to perform legal gymnastics to shift the burden of proof to the Track to establish that did not discriminate against Ms. Mawing. To be certain, the burden of proof for each of her claims rests with Ms. Mawing. Further, even if CTRS was required to articulate a credible, non-retaliatory basis for its actions, Ms. Mawing's baseless and defamatory statements to Governor Manchin easily meet this burden.

3. *Ms. Mawing Failed to Prove that She Suffered Criminal Retaliation*

Ms. Mawing claims that she suffered retaliation for reporting the Track's pest control measures to the Racing Stewards and for filing a complaint with the West Virginia Department of Agriculture. Both of these claims fail because Ms. Mawing failed to establish that any member of the stall allocation committee was aware that she complained to the Department of Agriculture. Further, Ms. Mawing offered no evidence to prove that the decision to deny her stalls was in any way related to her discussion with Mr. Wright.

60

Regardless of whether Ms. Mawing's complaints to either the Racing Stewards or the Department of Agriculture satisfy the definition of "official proceeding" in W. Va. Code 61-5-27(a)(3), Ms. Mawing offered no testimony that any of the Track's employees was aware that she initiated the Department of Agriculture complaint.  Further, Ms. Mawing offered no evidence that the Racing Stewards took any negative action toward the Track based on Ms. Mawing's complaints.  While CTRS employees may have been aware that Ms. Mawing had complained to the Track and to Governor Manchin concerning the pest control measures, Ms. Mawing did not establish that her complaints to the Racing Stewards and the Department of Agriculture were a factor in the Track's stall allocation decision.  Ms. Mawing presented no evidence that shows that either the Racing Stewards or the Department of Agriculture initiated any sort of investigation into Ms. Mawing's complaints.  While Ms. Mawing repeatedly points out that the Track did not contact her after she complained about the pest control measures, she fails to admit that the Racing Stewards and the Department of Agriculture followed the same practice.

Ms. Mawing offered no testimony or evidence at the arbitration hearing to prove that her complaints to the Racing Stewards or the Department of Agriculture played any role in her stall allocation decision.  Ms. Mawing failed to prove that any CTRS employee was even aware that she had contracted the Department of

61

Agriculture. Ms. Mawing offers no explanation as to how she could suffer

discrimination based upon actions that no one on the stall allocation committee

even knew occurred. Without this crucial element, Ms. Mawing failed to prove

that the Track retaliated against her in violation of W. Va. Code 61-5-27.

### C. Ms. Mawing Failed To Prove That CTRS Violated Her Rights Under the First And Fourteenth Amendments

    1. *Ms. Mawing Does Not Have a Property Interest in the Use of the Track's Free Stalls*

Ms. Mawing claims, without any legal support, that she has a property

interest in the use of the Track's stalls free of charge. This is simply not accurate.

There can be no dispute that the stalls belong to CTRS. [Trial Tr., June 11, 2013 at

500:5 – 21]. Further, the Revocable Stall License Agreement makes clear that

such use of the Track's stalls is revocable at the will of CTRS. [Ex. C-39]. It is

well-settled in the Fourth Circuit that "no property interest is implicated by the

nonrenewal of a contract or license where there is no entitlement to the renewal."

*Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991). Because

Ms. Mawing's use of the Track's stalls was simply not renewed, her claim that she

had a property interest in the use of the Track's stalls fails as matter of law.

Ms. Mawing offers no legal analysis to refute this conclusion but rather

relies on the inaccurate statement that the stall allocation committee relied upon

"specific objective criteria in making stall allocation decisions." Ms. Mawing's

62

statement ignores the testimony that the stall allocation committee reviews both

objective and subjective factors when making allocation determinations. [Trial Tr.,

June 11, 2013 at 512:21 – 513:17]. Regardless of the criteria examined by the

committee, Ms. Mawing fails to explain how she has a claim to the perpetual use

of the Track's stalls, regardless of her conduct or defamatory statements.

Because Ms. Mawing was allocated stalls based on a revocable, at-will

license without the right of renewal, Ms. Mawing did not have any property

interest in the Track's allocation of free stalls and her First and Fourteenth

Amendment claims fail as a matter of law

### 2. *Ms. Mawing Failed to Prove that CTRS is a "State Actor"*

Ms. Mawing completely failed to establish that CTRS is a state actor for the

purposes of 42 U.S.C. § 1983. There is no dispute that a finding of "state action"

is essential to either claim under the First or Fourteenth Amendments. *Rendell-

Baker v. Kohn*, 457 U.S. 830, ----, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982),

quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, ----, 102 S.Ct. 2744,

2754, 73 L.Ed.2d 482 (1982) (holding that conduct which satisfies the "state

action" requirement of the fourteenth amendment satisfies also the "under color of

state law" requirement of § 1983); *see also Anderson v. Davila*, 125 F.3d 148, 161

(3d Cir. 1997) (requiring state action to establish a First Amendment claim).

Ms. Mawing failed to present any evidence to prove that CTRS – a private, for-

63

profit company unaffiliated with the West Virginia government – acted under the color of state law when it made its decisions concerning the allocation of the Track's own horse stalls.  Further, Ms. Mawing failed to produce any evidence to prove that Governor Manchin conspired with CTRS to deprive Ms. Mawing of any constitutional right.

Because Ms. Mawing failed to prove that CTRS is a state actor, her claims under the First and Fourteenth Amendments fail as a matter of law.[1]

### D.  Ms. Mawing Failed To Establish That She Is Entitled To Damages

1.  *Ms. Mawing Failed to Prove Her Claimed Damages with Reasonable Certainty*

As CTRS explained in its Post-Trial Brief, Ms. Mawing did not establish her alleged damages with reasonable certainty.  There can be no reasonable dispute that West Virginia law requires a plaintiff to establish her damages with reasonable certainty.  *Taylor v. Elkins Home Show, Inc.*, 558 S.E.2d 611, 619 (W. Va. 2001).  Ms. Mawing attempts to escape her burden of establishing her alleged damages by relying on a nearly 100 year old case from the West Virginia Supreme Court of Appeals.  Regardless, the case cited by Ms. Mawing still requires that damages must be proven with a reasonable certainty.  *See Sun Sand Co. v. County Court of*

---

[1]    Ms. Mawing's Post-Trial Brief does not address her claims for denial of due process under the West Virginia State Constitution, therefore, CTRS assumes that Ms. Mawing has abandoned this claim.  Regardless, for the same reasons that Ms. Mawing's First and Fourteenth Amendment claims fail, any due process claim under the West Virginia Constitution claim would also fail.  *See Hutchison v. City of Huntington*, 479 S.E. 2d 649, 660 (W. Va. 1996) (holding that the private cause of action under the Due Process Clause embodied within Article 3, § 10 of the West Virginia Constitution is analyzed in the same manner as claims under 42 U.S.C. § 1983).

SL1 1254276v5 005982.00037

*Fayette County*, 122 S.E. 536 (W. Va. 1924) (holding that reasonable certainty for computation of damages is required).  Ms. Mawing did not offer one single receipt, invoice, lease, contract, or agreement from the off-site barns that specified how much she paid in stall rent.  Further, no witness independently testified how much any barn charged for stall rent.  Ms. Mawing was not able to explain even how many horses she stalled at any particular off-site barn.  Instead, she spewed speculative, unsubstantiated numbers and asks the Panel to award her damages based upon "the average" stall rent that she claims to have pa*I*d.  This method of damages calculation fails under West Virginia law.

## 2.   *Punitive Damages are not Appropriate*

Punitive damages against CTRS are not appropriate because Ms. Mawing has not established that CTRS engaged in gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others.  In order to provide a basis for punitive damages, the requesting party must show that the defending party not only committed a wrongful act, but that that wrongful act was committed with malice, thus constituting a willful, wanton, reckless or malicious act.  *Concerned Loved Ones and Lot Owners Ass'n of Beverly Hills Memorial Gardens v. Pence*, 383 S.E.2d 831, 838 (W.Va. 1989).  As discussed in the Track's Post-Trial Brief and above,

65

Ms. Mawing has failed to prove that CTRS committed any wrongful act.

Additionally, Ms. Mawing has failed to prove that CTRS acted with malice.

Ms. Mawing completely ignores her burden of establishing that the Track's

conduct warrants punitive damages. In West Virginia, the party seeking punitive

damages has the burden of proving that such damages are appropriate. *Camden-*

*Clark Memorial Hosp. Ass'n v. St. Paul Fire and Marine Ins. Co.*, 682 S.E.2d 566

(W. Va. 2009). Ms. Mawing does not even attempt to explain how any of the

Track's conduct constituted a willful, wanton, reckless or malicious act. Rather,

Ms. Mawing simply pastes the list of factors courts must use in fashioning a

punitive damages award without first providing any shred of analysis concerning

whether punitive damages are appropriate.

Ms. Mawing further ignores the well-established West Virginia rule that

punitive damages are not available in a claim for breach of contract. *See Berry v.*

*Nationwide Mut. Fire Ins. Co.*, 381 S.E.2d 367 (W. Va. 1988); *Hayseeds, Inc. v.*

*State Farm Fire & Cas.*, 352 S.E.2d 73, 80 (W. Va. 1980); *Warden v. Bank of*

*Mingo*, 341 S.E.2d 679, 684 (W. Va. 1985); *Horn v. Bowen*, 67 S.E.2d 737, 739

(W. Va. 1951) ("They [damages] cannot be punitive in action on contracts").

While Ms. Mawing does not explain exactly which claim entitles her to punitive

damages, West Virginia law unquestionably holds that she cannot be awarded

66

punitive damages simply based on finding that the Track breached the HBPA Agreement.

First, Ms. Mawing did not prove that CTRS committed any wrongful act. Additionally, Ms. Mawing has failed to prove that CTRS acted with malice. Because Ms. Mawing failed to prove the essential elements, the Panel should reject her request of punitive damages.

### E. Ms. Mawing Should Not Be Awarded Attorneys' Fees

Ms. Mawing should not be awarded attorneys' fees because she has not prevailed on any of her claims authorizing such an award. As cases cited by Ms. Mawing make clear, the general rule in West Virginia is that "each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." *Sally-Mike Properties v. Yokum*, 365 S.E.2d 246, 248 (W. Va. 1986). This rule, known as the American rule, "promotes equal access to the courts for the resolution of *bona fide* disputes." *Id.* at 250. West Virginia recognizes only a very limited exception to the American rule. *Id.* A court may "award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Id.* In contrast to Ms. Mawing's claims, in West Virginia, the exception to the American rule only applies for conduct that occurred <u>during the pendency of an</u>

67

action. *Horkulic v. Galloway*, 665 S.E.2d 284, 298 (W. Va. 2008). Indeed, the sole case cited by Ms. Mawing concerns conduct that occurred throughout the course of the litigation rather than the underlying conduct that gave rise to the litigation. *Id.* Ms. Mawing offers no evidence that CTRS acted in bad faith, vexatiously, wantonly or for oppressive reasons at any time during the pendency of this action as is required to sustain a claim for attorneys fess in West Virginia. *Id.* While Ms. Mawing claims that the Track's conduct requires an award of attorneys' fees, she offers no legal support or analysis to support her claim that the Panel should deviate from the well-settled American rule. *See Kalany v. Campbell*, 640 S.E.2d 113, 121 n. 5 (W. Va. 2006) (holding that a party must establish that a fee-shifting exception applies to the cause of action to remove it from the realm of the "American rule," which requires individual responsibility for costs and fees).

Further, Ms. Mawing failed to submit any evidence to establish the amount of attorneys' fees she claims to have incurred. Ms. Mawing had the burden of establishing the amount of attorneys' fees she claims she should be awarded. *Moats v. City Hospital, Inc.*, Civ. No. 3:06-cv-120, 2007 WL 2220282, at *4 (N.D. W. Va. Aug. 2, 2007). Ms. Mawing offered no evidence concerning attorneys' fees and the record in this matter is now closed.

Because Ms. Mawing failed to establish that she is entitled to attorneys' fees, the Panel should reject Ms. Mawing's request for such an award.

68

## IV.   CONCLUSION

For all the foregoing reasons, and those discussed in its Post-Trial Brief, CTRS requests that the Panel enter a finding of no liability against CTRS based upon Ms. Mawing's failure to prove her claims at the arbitration hearing.

STEVENS & LEE

Dated: August 30, 2013

By:  */s/ Stacey A. Scrivani*
   Joseph Wolfson
   Attorney I.D. No. PA 44431
   Stacey A. Scrivani
   Attorney I.D. No. WV 11593
   Attorney I.D. No. PA 84275
   111 North Sixth St.
   P.O. Box 679
   Reading, Pennsylvania 19603
   (610) 478-2000
   jwo@stevenslee.com
   sasc@stevenslee.com

Counsel for Respondent

69